INTERROGATORY NO. 26.

For each of the mills at issue, describe in detail all plant costs and expenses, including, but not limited to, operating costs, rental expenses, labor costs, fuel costs, and repair costs, for each month between June 1991 and July 2000.

ANSWER:

Pursuant to RCFC 33(d), Precision Pine states that information responsive to this interrogatory is contained in 10 numbered boxes labeled "Financial Records," which are currently available for review and will be produced at the former corporate headquarters of Precision Pine in Heber, AZ at a mutually agreeable time.

INTERROGATORY NO. 27.

For each product for which Precision Pine seeks the recovery of lost profits (i.e., "lost market opportunity" damages), identify the price at which Precision Pine contends that it could have sold the product in each month between August 1993 and December 1998.

ANSWER:

Precision Pine has already produced the actual lumber price invoices from the suspension period to the government. Additional lumber price invoices from 6/95 to 8/23/95 and from 1/97 to 12/98 are currently available for review and will be produced at a mutually agreed upon time at the Washington, D.C. offices of Saltman & Stevens. Earlier lumber price invoices are currently available for review and will be produced at the former corporate headquarters of Precision Pine in Heber, AZ at a mutually agreeable time.

**INTERROGATORY NO. 28.**

Describe in detail the methodology used and any sources of information or market data used, relied upon or consulted in determining the prices provided in your response to interrogatory no. 27.

**ANSWER:**

Precision Pine used the actual market price that it received for each of the lumber products it would have produced during each quarter of the suspension. The price was determined by using the average actual sales price of each product for each quarter of the suspension. The invoices containing the actual sales prices used have been produced to the government in the supporting documents binder volume II to Precision Pine's February 26, 2003 damage calculations.

**INTERROGATORY NO. 29.**

Describe in detail all sales of timber, roundwood or other material harvested pursuant to each of the contracts at issue (i.e., sales where the timber, roundwood or other material was not material sold was harvested, the date of the sale, the identity of the purchaser, the type of material sold (e.g., roundwood), the volume of material sold, the price of the sale, and the amount of any costs incurred by Precision Pine in connection with the sale (e.g., logging costs or transportation costs).

**ANSWER:**

Pursuant to RCFC 33(d), Precision Pine states that information responsive to this interrogatory is contained in its timber sale contract files, which are currently available for review and will be produced at a mutually agreed upon time at the Washington, D.C. offices of Saltman & Stevens.

**INTERROGATORY NO. 30.**

Describe in detail all sales of by-products (i.e., chips, grindings, shavings, or bark) by Precision Pine between August 1993 and December 1998, including, but not limited to, the date of the sale, the identity of the purchaser, the type of material sold, the volume of material sold, the price of the sale, the mill from which the product sold was produced, and the amount of any costs incurred by Precision Pine in connection with the sale (e.g., transportation costs).

**ANSWER:**

Objection. Upon review of the materials related to the numerous sales of by-products by Precision Pine between August 1993 and December 1998, it became clear that the sought after information is both overly broad and unduly burdensome. Without waiving these objections, Precision Pine states that information responsive to this interrogatory for the period of the suspension with respect to chips, shavings and bark has already been produced to defendant in the damages binder volume II at III(a)1-29, III(c)1-30, III(d)1-22, respectively.

Pursuant to RCFC 33(d), Precision Pine states that information with respect to the sales of by-products is currently available for review and will be produced at a mutually agreed upon

time at the Washington, D.C. offices of Saltman & Stevens.

Pursuant to RCFC 33(d), Precision Pine further states that information responsive to this interrogatory is contained in 10 numbered boxes labeled "Financial Records," which are currently available for review and will be produced at the former corporate headquarters of Precision Pine in Heber, AZ at a mutually agreeable time. Additionally, invoices for sales of by-products from the requested time period are currently available for review and will be produced at the former corporate headquarters of Precision Pine in Heber, AZ at a mutually agreeable time.

**INTERROGATORY NO. 31.**

Describe in detail each and every action taken by Precision Pine in order to mitigate the damages allegedly caused by the suspension of the contracts at issue.

**ANSWER:**

Precision Pine mitigated its damages throughout the suspension by consolidating its operations when ever possible, laying-off employees and reducing officers' salaries. In this regard, see the response to interrogatory no. 36 below. Additionally, Precision Pine sought out and pursued all leads for obtaining raw material that it could profitably process including: cutting Precision Pine's own fee timber (much earlier than it wanted to do so), assessing Arizona State timber sale offerings, contacting Indian tribes, including the Fort Apache Indian Tribe, Zuni Tribe and Hualapai Tribe, about the availability of timber from tribal lands, and contacting all area private landholders that Precision Pine believed might have private timber/logs for sale.

Because the Forest Service, which is by far the largest single landowner, and source of timber in north-central Arizona, was enjoined from offering sawtimber, timber was both exceedingly scarce and competition for the limited remaining quantities was quite high. Precision Pine also sought to mitigate its damages by repeatedly pleading with the Forest Service to release suspended timber as soon as possible and/or to offer additional timber for sale. The Forest Service, despite repeatedly stating that the suspension would be lifted shortly (thereby hampering Precision Pine's ability to accurately forecast its future operations), did neither.

**INTERROGATORY NO. 32.**

Describe in detail all efforts by Precision Pine to obtain additional timber for its sawmills between August 24, 1995 and April 15, 1997, including but not limited to the identity of any persons involved on behalf of Precision Pine, the identity of the companies or individuals contacted by Precision Pine, the identity of any contracts, agreements or other arrangements that resulted from Precision Pine's efforts, and the volume of additional timber procured by Precision Pine's efforts.

**ANSWER:**

See answer to interrogatory no. 31. Lorin Porter and Lewis Tenney were primarily involved in directing Precision Pine's efforts to secure timber. Pursuant to RCFC 33(d), Precision Pine states that the sources and amounts of timber obtained by Precision Pine can be determined by reviewing Precision Pine's Timber Sale Status Reports 1995 – 1997 as well as actual mill production records during the period of the suspension. These records are currently available for review and will be produced at a mutually agreeable time at the Washington, D.C.

offices of Saltman & Stevens. Additionally, responsive material is located in the 10 boxes labeled "Timber Sale Contracts" which are currently available for review and will be produced at the former corporate headquarters of Precision Pine in Heber, AZ at a mutually agreeable time.

**INTERROGATORY NO. 33.**

With respect to each of the contracts at issue, identify each person who was involved on behalf of Precision Pine in determining the price to be bid, approving the price bid, or otherwise securing the contracts at issue.

**ANSWER:**

President Lorin Porter and Vice-President Lewis Tenney decided bid strategy together. Both Mr. Porter and Mr. Tenney attended most sales bid openings and auctions and conferred on bid strategy. If one or the other of them was unable to attend an auction, the absent party was generally kept apprised of the progress of bidding by phone.

**INTERROGATORY NO. 34.**

With respect to each of the contracts at issue, explain in detail why did Precision Pine did not harvest timber that it anticipated harvesting during the suspension at issue (see, e.g., the "harvest dates" in page C-0064 to -0066 of Precision Pine's February 26, 2003 damages calculations), after suspension of the contract was lifted.

**ANSWER:**

Objection. As defendant should know, the premise of the interrogatory is incorrect. Precision Pine did ultimately harvest some, albeit not all, of the timber that was suspended beginning in August of 1995. Moreover, information regarding post-suspension harvesting is already available to the Forest Service in its TSSAs for each of the sales.

Without waiving these objections Precision Pine states further that it was prevented from harvesting much of the timber that it would have harvested during the suspension period after the effects of the suspension were removed, for several reasons beyond its control: First, shortly after the suspension that is the subject of this suit, a number of Precision Pine's sales were suspended again due to yet another injunction against the Forest Service. This injunction lasted from May, 1997 to December 15, 1997. These enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce the most profitable range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this suspension of the Forest Service resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997.

Shortly after the 1997 suspension was lifted, in February, 1998, Stone Container Corporation announced that it would meet its need for pulpwood fiber from recycled materials and was therefore eliminating its need for pulpwood from outside vendors. Overnight, this

rendered Precision Pine's multi-product contracts (i.e., those sales containing pulpwood) significantly less valuable. Indeed, the very premise behind the Forest Service's offering of sales containing pulpwood, as it did almost exclusively by the mid-1990's, was that the Stone facility would be available as an outlet for this material, for which no one in the Region except Stone had a significant use. Precision Pine sought any number of compromises with the Forest Service to make these sales operable, including leaving the pulpwood standing, cutting and stacking the pulpwood for use by firewood collectors, and reducing the stumpage rate on the sales to reflect the dramatically changed market conditions. The Forest Service refused all of these options, offered none of its own, and instead began offering multi-product sales with the pulpwood component priced at $.73/CCF, thereby virtually ensuring that the work could not get done.

Moreover, the lumber market for most of the products manufactured by Precision Pine declined dramatically in early and mid-1997, and remained relatively flat (and well below their levels during the suspensions) through 1998. In essence, the Forest Service's breach of contract in 1995 and 1996 cost Precision Pine two peak harvest seasons, and forced Precision Pine into a situation where many of the sales (and all of its larger diameter timber sales) were again suspended during the 1997 peak harvest season, and by 1998, Precision Pine had been forced into a dramatically different economic situation than had prevailed at the time it bid on and was awarded the contracts at issue, especially with respect to the multi-product sales. Few, if any, companies could withstand such massive and seriatim blows to planned raw material supply. Nevertheless, and despite all of these impediments, none of which were of its own making, Precision Pine continued to struggle to try to complete and, in fact did complete, some of the sales that had been improperly suspended by the Forest Service in 1995.

**INTERROGATORY NO. 35.**

With respect to Precision Pine's February 26, 2003 damages calculations, specify the amount of damages attributable to each contract that was found to have been breached in the Court's July 30, 2001 opinion.

**ANSWER:**

Objection. All of the lost market opportunity costs and virtually of the miscellaneous items of damage have been computed on a contract basis. Defendant can add these items of damage together as readily as can Precision Pine.

Without waiving this objection, attached hereto as Exhibit 2 are updated calculations demonstrating the per sale cost at each mill and company-wide of unabsorbed expenses incurred by Precision Pine as a direct result of the Forest Service's suspension.

**INTERROGATORY NO. 36.**

For each subcategory in the damages summary section of Precision Pine's February 26, 2003 damages calculations, *see* pages C-0001 and C-0002, specify each contract found to have been breached in the Court's July 30, 2001 opinion that Precision Pine contends resulted in such damages, and with respect to each contract, explain in detail how the alleged breach caused the damages sought.

**ANSWER:**

The Miscellaneous Items and Lost Opportunity Costs are already broken down by contract. With respect to these items of damage, the suspension and resulting breach of contract deprived Precision Pine of the ability to make the profit it had anticipated because the suspension precluded Precision Pine from harvesting the timber on the sale.

Moreover, with respect to the Sawmill and Corporate expenses, Precision Pine states that:

Item VI(a): Sawmill Expenses (Eager)

Breached sales which resulted in such damages in whole or in part are:

Hay

Kettle

Manaco

O.D. Ridge

The suspension of these four sales resulted in far less timber than expected being processed through the Eager mill (i.e., being manufactured into rough cut lumber) during the period August 24, 1995 through April 15, 1997 and less rough cut lumber was, therefore, run through the company's planer at Winslow. In fact, the suspension resulted a reduced level of production and ultimately lead to Precision Pine's shutting down the Eager mill in effort to mitigate its damages from December 1, 1995 to February 17, 1997. The reduced level of operations and shut down also resulted in the substantial underutilization of several pieces of equipment at the mill. During the shutdown most of Precision Pine's employees at Eager were laid off. However, three key employees, whose skills would have been difficult to replace were

kept on at their then current rates of pay even though at the time they were performing menial jobs and Precision Pine incurred the additional cost of retaining these employees. As a result of the suspension and resulting shut down, Precision Pine was also forced to hire Manuel Nava as a security officer to occasionally check the property while no one was there.

Needless to say, reduced level of operations followed by the lengthy shutdown significantly increased Precision Pine's per unit cost for the lumber that it was able to produce from August 24, 1995 through April 15, 1997 to a level well above the unit cost that was anticipated. This was due to several factors including Precision Pine's inability to spread certain fixed costs of operations over the much larger volume that it intended to produce during the period, inefficiencies created by not having enough timber to keep the production line moving at its normal pace when the mill was operating and costs relating to shutting down and restarting the mill.

The reduced level of operations and shut down also resulted in the substantial underutilization of several pieces of equipment at the mill.

Item VI(b): Sawmill Expenses (Heber)

Breached sales which resulted in such damages in whole or in part:

Brookbank

Jersey Horse

Salt

The suspension of these four sales result in far less timber than expected being processed through the Heber mill (i.e., being manufactured into rough cut lumber) during the period August 24, 1995 through April 15, 1997 and less rough cut lumber was therefore run through the company's planer at Winslow. In fact, it resulted in a reduced level of production and ultimately lead to Precision Pine's shutting down of the Heber mill for the last half of September 1995, the month of October 1995, most of the month of November 1995 and from June 14, 1996 to April 15, 1997 at which time it was decided not to re-start the mill. During the latter shutdown most of Precision Pine's employees at Heber were laid off. However, seven key employees, whose skills would have been difficult to replace were kept on at their then current rates of pay even though at the time they were performing menial jobs. As a result, Precision Pine incurred the additional cost of retaining these employees.

Needless to say, reduced level of operations followed by the shutdown significantly increased Precision Pine's per unit cost for the lumber that it was able to produce from August 24, 1995 through April 15, 1997 to a level well above the unit cost that was anticipated. This was due to several factors including inability to spread certain fixed costs of operations over the much larger volume that it intended to produce during the period, inefficiencies created by not having enough timber to keep the production line moving at its normal pace when the mill was operating and costs relating to shutting down and restarting the mill.

The reduced level of operations and shut down also resulted in the substantial underutilization of several pieces of equipment at the mill and the trucks and trailers of our log hauling subcontractor Transporting Renewable Resources Inc. (TRRI).

Item VI(c): Sawmill Expenses (Winslow)

Breached sales which resulted in such damages in whole or in part:

Monument

Mud

Saginaw Kennedy

U Bar

The suspension of these four sales resulted in far less timber than expected being processed through the Winslow mill (i.e., being manufactured into rough cut lumber) during the period August 24, 1995 through April 15, 1997. In fact, it resulted in a reduced level of production and ultimately lead to Precision Pine's shutting down of the Winslow sawmill from March 12, 1996 to April 15, 1996, for the first week of July 1996, all of March and the first week of April 1997. Due to the reduced level of production at Winslow, a number of Precision Pine's employees at Winslow were laid off. However, one key employee, Brad Henrie, whose skills would have been difficult to replace was kept on at his then current rates of pay even though at the time he was performing a menial job. As a result, Precision Pine incurred the additional cost of retaining him.

The reduced volume of timber that was available to run through the mill significantly increased Precision Pine's per unit cost for the lumber that it was able to produce above that anticipated. This was do to several factors including the need to spread certain fixed costs of operations over a much smaller volume and inefficiencies created not having enough timber to

keep the production line moving at its normal pace.

Winslow Planer Expenses:

Breached sales which resulted in such damages in whole or in part:

Hay

Kettle

Manaco

O.D. Ridge

Brookbank

Jersey Horse

Salt

Monument

Mud

Saginaw Kennedy

U Bar

Historically, a substantial percentage of the rough sawn lumber that was produced at Precision Pine's three sawmills was transported to and further processed at the company's planer in Winslow. As a result of the above referenced reduced level of operations and shut downs which the Forest Service's suspension caused, the volume of rough sawn lumber produced during the period August 24, 1995 through April 15, 1997 was substantially reduced. Correspondingly, the volume of rough sawn lumber that was processed through the Winslow planer was substantially reduced as well.

The reduced volume of rough sawn lumber that was available to run through the planer significantly increased Precision Pine's per unit planing cost for the finished lumber that it was able to produce above that anticipated. This was due to several factors including the need to spread certain fixed costs of operations over a much smaller volume and inefficiencies created by not having enough rough sawn lumber to keep the production line moving at its normal pace.

Item VI(d): Sawmill Expenses (Pellet Mill)

Breached sales which resulted in such damages in whole or in part:

Hay

Kettle

Manaco

O.D. Ridge

Brookbank

Jersey Horse

Salt

Monument

Mud

Saginaw Kennedy

U Bar

The pellet mill used shavings from the Winslow planer. As noted above, as a result of suspension of the above referenced timber sale contracts, less rough cut lumber was run through the planer and less shavings were produced, thereby impacting the production of pellets. The

reduced volume of shavings that was available to run through the mill while it was operating significantly increased Precision Pine's per unit cost for the lumber that it was able to produce above that anticipated. This was due to several factors, including but not limited to the need to spread certain fixed costs of operations over a much smaller volume, and inefficiencies created by not having enough timber to keep the production line moving at its normal pace.

Item VII: Company-wide

Breached sales which resulted in such damages in whole or in part:

Hay

Kettle

Manaco

O.D. Ridge

Brookbank

Jersey Horse

Salt

Monument

Mud

Saginaw Kennedy

U Bar

The suspension of these sales result in far less timber than expected being processed through all of the company's mills (i.e., being manufactured into rough cut lumber) during the period August 24, 1995 through April 15, 1997 and less rough cut lumber was therefore run

through the company's planer also located at Winslow. It also resulted in lower pellet production at the Heber pellet mill. Because of the slowdown at the company's mills, a number of corporate employees were laid off. However, several key corporate employees, whose skills would have been difficult to replace were kept on at his then current rates of pay even though at the time he was performing a menial job. As a result, Precision Pine incurred the additional cost of retaining them.

The reduced volume of timber that was available to run through the mills and the planer forced Precision Pine to spread certain costs of corporate operations, including costs at the company-wide sales office located in Winslow over a much smaller volume than anticipated resulting in substantially higher corporate overhead per unit of production costs than would have been the case had there been no suspension.

The suspension, and the substantial damages that were a direct result of it, necessitated Precision Pine's engaging experienced and specialized counsel to prepare Precision Pine's claims with the substantial assistance of a number of Precision Pine's employees, and after the unjustified denial of the claims by the government, to prosecute the claims before the Court of Federal Claims.

The combination of the additional expenses that Precision Pine incurred as a result of the suspension and the loss of profits that it was denied also precluded Precision Pine from paying down outstanding loans that it had; a fact which resulted in unanticipated interest payments until those loans count be reduced as planned.

**INTERROGATORY NO. 37.**

With respect to each year of each contract listed on page C-0041 of Precision Pine's February 26, 2003 damages calculations, identify each breach of contract that Precision Pine contends resulted in the damages sought, and for each alleged breach, explain in detail how the breach caused the damages.

**ANSWER:**

Each sale obtained by Precision Pine was typically intended to be hauled to, and milled at, the most proximate of Precision Pine's three sawmills. However, as set forth in the response to interrogatory no. 36, the Forest Service's breach of Precision Pine's contracts lead to the closure of Precision Pine's mills at various times. Although Precision Pine did its best to harvest timber and haul it to the mill it was originally intended to supply, sometimes, due to the ongoing closure of a mill caused by the Forest Service's breach of contract, this was not possible. The additional expenses Precision Pine incurred for "increased haul cost" as direct result of the Forest Service's suspension of Precision Pine contracts are set forth on page C-0041.

Similarly, Precision Pine did its best to have the sales logged by its subcontractors at the price originally agreed to for logging prior to the suspension; sometimes, however, this was not possible and sometimes the logging subcontractor demanded an increase in the logging price. These modest $10/MBF increases on two sales, which were the direct result of not being able to harvest the timber as originally anticipated due to the Forest Service's breach of contract, are also set forth on page C-0041.

**INTERROGATORY NO. 38.**

With respect to Precision Pine's February 26, 2003 damages calculations, explain in detail how Precision Pine has determined the volume of chips, grindings, shavings and bark that it anticipated producing at each of the mills at issue.

**ANSWER:**

Objection. The information used in answering this question has been provided to defendant and is contained in the February 26, 2003 Damages Calculations Binder and Volume I of the Supporting Documents Binder and, therefore, the interrogatory is unduly burdensome. These calculations are self explanatory, as is the source of the information.

Without waiving this objection, Precision Pine states that in determining the volume of chips, grindings[3] and bark (each of which is a by-product of the sawmilling process, as opposed to shavings, which are produced at the planer mill) that it anticipated producing at the three mills at issue, Precision Pine calculated the total volume of lumber in MBF produced at each sawmill during two representative months shortly before the suspension. Next, Precision Pine determined the actual volume of chips produced during same two representative months shortly before the suspension from actual invoices of deliveries of Precision Pine chips to Stone Forest Products Corporation. Precision Pine then divided the tons of chips produced by the total MBF of lumber produced to determine a ratio of tons of chips produced per MBF of lumber produced. The ratio for chips was 1.41 tons/MBF. Based on the experience of the President of Precision Pine, Lorin Porter, it was determined that half again as much bark would have been produced per

[3]The column headed "shavings" on page C-0043 should properly have read "grindings."

MBF and that half again as much grindings as bark would have been produced. This resulted in .7 tons of bark and .35 tons of grindings per MBF being used to determine the appropriate ratio for the production of these by-products. Finally, these factors were multiplied by the anticipated volume of timber to be put through each mill, on a quarterly basis, to determine the anticipated volume of by-products, in tons, per quarter, for each timber sale.

To determine the shavings volume, Precision Pine calculated the total shavings volume produced at the Winslow planer from the Winslow shavings ledger produced in the Supporting Damages Binder at pages III(d)1-22. Precision Pine then calculated the total volume of green lumber (minus timbers, which are not planed) produced by the three mills during the period of the suspension. Then, Precision Pine divided the shavings production by the total lumber planed at the planer mill to obtain a ratio of tons of shaving produced per MBF of lumber. This factor was then multiplied by the anticipated volumes of lumber that would have been produced from each sale during the suspension by quarter to get the anticipated volume of shavings.

**INTERROGATORY NO. 39.**

With respect to Precision Pine's February 26, 2003 damages calculations, describe in detail how Precision Pine determined and justifies the sale price used for its sale of by-products (i.e., chips, shavings, grindings, and bark).

**ANSWER:**

Chip prices were determined from the actual price paid by Stone Forest Products for the relevant period. Supporting invoices are provided at Tab III(a)-1 of the Supporting Documents Binder Volume I.

Grindings prices were based on the conservative estimate of Precision Pine's President, Lorin Porter, of actual prices paid for grindings during the relevant time period.

Bark prices were determined from the actual prices during the suspension as shown in Precision Pine's bark sale ledger which was previously produced to the government at Tab III(c)1-30 of the Supporting Documents Binder Volume I. (Prices were converted from yards to tons based on 413 lbs/yd.).

Shavings prices were determined from the actual prices during the suspension as shown in Precision Pine's shavings sale ledger which was previously produced to the government in at Tab III(d)1-22 of the Supporting Documents Binder Volume I.

**INTERROGATORY NO. 40.**

With respect to Precision Pine's February 26, 2003 damages calculations, state all facts justifying the use of an "overrun factor" in the amount of 125% in connection with Precision Pine's lost profits claims.

**ANSWER:**

The overrun factor is a conservative estimate based on historical experience at each of the mills of Precision Pine's President, Lorin Porter. That this factor is both sound and, if anything, probably low, is also borne out by the Forest Service's use of overrun factors greater than 125% for Ponderosa Pine when calculating minimum bid values on its timber sale appraisals, including such appraisals for all of the timber sales at issue in this case.

**INTERROGATORY NO. 41.**

With respect to Precision Pine's February 26, 2003 damages calculations, state all facts on which Precision Pine bases its assertion about the products it would have been able to produce from the timber it anticipated harvesting on the contracts at issue.

**ANSWER:**

The products that Precision Pine anticipated producing during the suspension are based on those products that Precision Pine produced historically and those products, as reflected in the invoices which were produced to defendant on February 26, 2003, in the Volume II of the backup binder that Precision Pine actually produced during the suspension.

**INTERROGATORY NO. 42.**

Describe in detail the corporate relationship, if any, between Precision Pine and (i) Precision Forest Management, Inc., (ii) Transporting Renewable Resources, Inc., (iii) Tri Star Logging, Inc., and (iv) any other company in which Precision Pine had an ownership interest between June 1991 and July 2000, including, but not limited to, whether the respective

corporations were a wholly or partially owned subsidiary of Precision Pine, had any common officers or directors with Precision Pine, or shared any employees with Precision Pine.

**ANSWER:**

Objection. The relationship between these entities is described in the financial statements previously provided to defendant and therefore asking Precision Pine to restate this information is unduly burdensome. Without waiving this objection, Precision Pine states that:

Precision Pine & Timber, Inc. ("PPTI") was the parent corporation and was originally owned 50% each by Lorin Porter as the President, and Lewis Tenney as the Vice-President.

Transporting Renewable Resources Inc. ("TRRI") is a separately incorporated subsidiary of PPTI having the same owners as PPTI. Lewis Tenney was originally the President, and Lorin Porter the Vice-President of TRRI.

Precision Forest Management, Inc. ("PFMI") was separately incorporated but 100% owned by PPTI. Lewis Tenney was originally the President, and Lorin Porter the Vice-President of PFMI. PFMI ceased active operations in May of 1995.

Precision Lumber and Hardware, Inc. ("PLHI") was separately incorporated but 100% owned by PPTI. Lewis Tenney was originally the President, and Lorin Porter the Vice-President of PLHI.

Building Materials Wholesale, Inc. ("BMWI") was established in FY 1997 as a partnership between Mr. Tenney and Mr. Porter to consolidate and increase the purchases made by the four hardware stores of PLHI. PPTI had no ownership interest in BMWI.

The non-PPTI companies did not share employees with PPTI.

As of March 31, 2000, Mr. Porter and Mr. Tenney divided ownership of the companies as follows:

PPTI – Lorin Porter 100% owner.

TTRI – Lewis Tenney 100% owner.

PLHI – Lewis Tenney 100% owner. (Except the Heber Hardware Store which remained with PPTI).

**INTERROGATORY NO. 43.**

Describe in detail each "related party transaction" shown on or listed in Precision Pine's annual financial statements between the fiscal year ending March 31, 1992 and the fiscal year ending March 31, 2000.

**ANSWER:**

The "related party transactions" for each year involved essentially the same types of transactions (which are described below), however, the monetary amounts of the transfers differed from year to year:

PLHI – both purchased lumber products from PPTI and sold some limited amount of hardware items to PPTI. The amounts of these transactions are set forth in the financial statements.

PPFI – prior to its discontinuing business in May of 1995, PPFI sold logging services to PPTI.

TRRI – sold trucking services to PPTI.

BMW – beginning in FY 1997, BMW bought supplies on behalf of all of the PLHI hardware stores.

**INTERROGATORY NO. 44.**

With respect to damages calculations produced by Precision Pine on February 26, 2003, describe in detail the basis for its claim for "out of pocket costs to financial institutions, including stockholder loans."

**ANSWER:**

As a result of the Forest Service's breach, Precision Pine incurred damages in the form of interest on loans that it could not pay down. As detailed on page C-0148 of the damages calculations binder produced by Precision Pine on February 26, 2003, these loans were made both with financial institutions and with stockholders of the company. What Precision Pine seeks is not interest on damages incurred but rather interest as an element of damage that would

not have been incurred but for the Forest Service's breach. These costs are shown in Precision Pine's external financial reports, which have already been produced to defendant.

**INTERROGATORY NO. 45.**

For each component of damages sought in the calculation binder produced in informal discovery, describe in detail all evidence that Precision Pine intends to use to support such damages including, but not limited to, the identity of each person that will testify and all documents upon which Precision Pine intends to rely.

**ANSWER:**

Precision Pine has made no final decision at this time as to witness, exhibits or the evidence to be used at trial; however, with respect to witnesses, it would be logical to assume that those potential witnesses identified in the response to Interrogatory Nos. 1 and 2 may be called to testify with respect to those areas about which they have knowledge. Similarly, with respect to documents, those materials already produced to the government, including the materials produced in support of the damage calculations are likely sources of trial exhibits as are those material that Precision Pine currently has available for inspection at the law offices of Saltman & Stevens in Washington, D.C.