**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Chief Judge Damich) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SANCTIONS AND CROSS-MOTION FOR FEES AND EXPENSES PURSUANT TO RCFC 37(a)(4)(B)**

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140
(202) 775-8217 – facsimile

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
David J. Craig
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Washington, D.C. 20006
(202) 452-2140
(202) 775-8217 – facsimile

Dated: September 16, 2003

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ..... iii

Introduction ..... 1

Response to Defendant's "Background" Statements ..... 3

Argument ..... 4

I. Precision Pine Has Not Violated The Court's July 15, 2003 Order ..... 4

A. Precision Pine's Objections Are Proper ..... 8

1. Precision Pine's Objections That Certain Interrogatories Are Overly Board And Unduly Burdensome Were Proper But, In Any Event, Were Voluntarily Withdrawn Before The Instant Motion Was Filed ..... 8

2. Precision Pine's Objections To Interrogatory Nos. 10, 11 And 34 Are Appropriate ..... 9

B. Precision Pine Properly Invoked RCFC 33(d) In Responding To Certain Of Defendant's Interrogatories ..... 11

1. RCFC 33(d) Is Specifically Designed To Be Used As It Has Been In This Case ..... 11

II. Precision Pine Has Facilitated And Expedited Review and Copying of Documents And Has Not Impeded The Government's Efforts ..... 21

A. Early Service of Precision Pine's Discovery Responses And The Document Production In D.C. ..... 22

B. The Document Production At The Former Corporate Headquarters Of Precision Pine In Rural Heber, Arizona ..... 25

III. Precision Pine's Interrogatory Responses Are Responsive And Complete ..... 30

1. Precision Pine's Response To Interrogatory No. 27 Is Responsive ..... 31

2. Precision Pine's Answer To Interrogatory No. 9 Is Proper ..... 33

3. Precision Pine's Answer To Interrogatory No. 12 Is Responsive .............35

4. Precision Pine's Answer To Interrogatory No. 22 Is Complete ................35

5. Precision Pine's Answer To Interrogatory No. 34 Is Complete ................36

6-8. Precision Pine's Responses To Interrogatory Nos. 35, 36, And 37 Are Proper ..........................................................................................37

9. Precision Pine's Answers To Interrogatory No. 41 Is Complete...............38

Conclusion ..........................................................................................................................39

# TABLE OF AUTHORITIES

**CASES** **PAGE**

Govas v. Chalmers,
965 F.2d 298 (1992)....20

Hasbro, Inc. v. Serafino,
168 F.R.D. 99 (D. Mass. 1996)....6

In re: Tutu Wells Contamination Litg.,
168 F.R.D. 46 (D.V.I. 1995)....20

Oleson v. Kmart Corp.,
175 F.R.D. 650 (D. Kan. 1997)....20

Petroleum Ins. Agency, Inc. v. Hartford Accident and Indemnity Co.,
111 F.R.D. 318 (D. Mass.1984)....12, 20

Ross v. Citifinancial, Inc.,
203 F.R.D. 239 (S.D. Miss. 2001)....5

Shuffle Master, Inc. v. Progressive Games, Inc.,
170 F.R.D. 166 (D. Nev. 1996)....6

United States Securities and Exchange Commission v. Elfindepan, S.A.,
206 F.R.D. 574 (M.D. N.C. 2002)....12, 23

**STATUTES AND REGULATIONS**

Rules of the Court of Federal Claims
33(c)....20
33(d).... *passim*
37....1, 30
37(a)....5
37(a)(2)....1
37(a)(2)(B)....5, 36
37(a)(4)(B)....2, 39
37(d)....5

**MISCELLANEOUS**

Advisory Committee Note to the 1980 Amendment to the FRCP 33(c)
(now FRCP 33(d))..........................................................................................................13

**Introduction**

Defendant's improperly styled "Motion for Discovery Sanctions"[1] is a thinly-veiled attempt to expand the discovery schedule crafted by the Court now that some substantial deadlines loom. Indeed, defendant tipped its hand in this regard when, the day after receiving Precision Pine's discovery responses and before it had even reviewed a single document, it faxed a letter complaining about, among other things, the production of documents. See Ex. C to Defendant's Motion.[2] As is demonstrated below, defendant's attempts to manufacture discovery "problems" is as transparent as it is baseless.

More disturbing, however, is that defendant misstates basic facts of record regarding this Court's rulings and the events that have transpired during the damages discovery to date.[3] Unfortunately, setting straight these factual inaccuracies requires a fairly detailed examination of the events as they transpired. It is important, however, in light of the serious nature of defendant's motion for the Court to understand the exhaustive efforts that Precision Pine has

[1]Though styled a motion for sanctions, as detailed below, defendant's motion is properly a motion to compel coupled with a motion to greatly extend the date by which defendant must submit its expert report.

[2]This letter, which provides a laundry-list of claimed problems with Precision Pine's discovery responses, but only two such examples of specific problems, does not comply with RCFC 37 requiring that a party confer and try to resolve discovery disputes.

[3]Perhaps this is the reason that defendant has failed to provide the required certification that it "has in good faith conferred or attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action." RCFC 37(a)(2).

made, and continues to make, cooperatively and in good faith, to comply with its discovery obligations.[4]

At bottom, defendant has been on notice of the details of Precision Pine's damage claims since January of 2002, and in possession of much of the relevant documentary support for those claims, since at least February 26, 2003, when Precision Pine served defendant with its revised damage calculations.[5] However, rather than seeking information related to the damages that Precision Pine is actually seeking to recover in this case, defendant chose to serve exceedingly broad, overlapping and ill-defined interrogatories and requests for the production of documents, many of which seek information about Precision Pine's entire operations, including those on unrelated contracts over nearly a ten year period.[6] Notably, despite this exceedingly broad discovery request, defendant does not complain that Precision Pine has not provided it with access to any and all documents that it wanted, or that Precision Pine has provided anything but responsive documents in response to its requests. Although defendant may be free to use the

---

[4]Such being the case, and pursuant to RCFC 37(a)(4)(B), Precision Pine requests that the Court award it its reasonable expenses, including attorney's fees, in defending against this baseless motion.

[5]As the Court will recall from the status conference held on May 20, 2003, Precision Pine first provided detailed damage to defendant in February 2002, and on August 24, 2002, during the informal discovery process, counsel for Precision Pine, met for an entire day with counsel for defendant and a Forest Service accountant, answered exhaustive questions regarding each component of its damage claim and offered to provide additional information. No further requests were forthcoming until June 20, 2003 when defendant served its massive formal discovery requests.

[6]This Court ruled that the Forest Service breached 12 of Precision Pine's timber sale contracts due to a suspension the agency imposed on August 25, 1995 and lifted on December 4, 1996. Instead of focusing on these contracts and this time period, defendant generally sought information for all timber sale contracts held by Precision Pine from 1991 to 2000. See, e.g., Interrogatories Nos. 6-9, 15-27. Moreover, defendant's definitions of "documents" are so broad as to have encompassed virtually every piece of paper in Precision Pine's files.

shotgun approach in discovery that it did, defendant should not now be heard to complain that it has been provided with all that it requested in conformity with the rules of this Court.[7]

**Response to Defendant's "Background" Statements**

In its background statements, defendant incorrectly claims that the Court "declined to accept Mr. Goeken's proposal" of allowing the defendant to travel to Heber to look at Precision Pine's business records. This is an apparent attempt to create a ruling, that the Court never made, that Precision Pine was somehow forbidden from using the option provided by RCFC 33(d). Although Mr. Goeken did offer to allow the defendant to come and look at Precision Pine's documents, see Transcript at 11-12 attached hereto as Ex. 1, this was not, however, an invocation of RCFC 33(d). Instead, Mr. Goeken simply offered a means by which the extensive discovery in this case might be completed. At no point during the telephonic status conference of July 15, 2003 did the Court prohibit Precision Pine from using the option of producing business records where appropriate in response to an interrogatory. See Transcript at 1-18 attached hereto as Ex. 1. Indeed, RCFC 33(d) does not require prior court approval before it is invoked and certainly does not require approval from the interrogating party to be invoked. As discussed below, Precision Pine has properly followed the requirements of RCFC 33(d).

[7]Defendant has served 48 interrogatories, 27 requests for the production of documents and 10 requests for admissions on Precision Pine. Defendant raises no issues with respect to any of Precision Pine's responses to defendant's Requests for Admissions, Production of Documents or approximately half of Precision Pine's responses to interrogatories, but raises issues with respect to the adequacy of several other of Precision Pine's responses to interrogatories.

**Argument**

**I. Precision Pine Has Not Violated The Court's July 15, 2003 Order.**

At pages 3-7 of its Motion, defendant argues that Precision Pine has violated this Court's Order of July 15, 2003. This is incorrect. The Court's Order addressed both Precision Pine's Motion for a Protective Order and Defendant's so-called Motion To Compel. In its Motion for a Protective Order, Precision Pine sought to be relieved, in whole or in part, from answering defendant's discovery requests. Defendant simply cross-moved to have Precision Pine respond to them on or before July 21, 2003. Precision Pine was ordered to respond to defendant's discovery requests by August 28, 2003.[8] (It is not disputed by defendant that, in conformity with the Court's Order, Precision Pine hand-served its discovery responses on defendant three days in advance of this deadline. Defendant does not claim, nor could it, that Precision Pine had failed to provide a response to any of the interrogatories.)

Because Precision Pine had not yet provided any response to defendant's discovery requests, this Court's Order of July 15, 2003 granted Precision Pine's motion in part and granted defendant's motion seeking to have Precision Pine respond to its discovery. The Order did not,

[8]On June 20, 2003, Precision Pine served discovery requests on defendant and, as the parties had previously stipulated, sought a response within 45 days. As the Court is aware, it was initially defendant's position that Precision Pine was required to respond to its voluminous discovery requests within 30 days, while defendant was permitted to take up to 45 days to respond to plaintiff's interrogatories, in conformity with the parties stipulation. Indeed, defendant persisted in this view, seeking to compel discovery responses by July 21, 2003. At the July 15, 2003 status conference this Court quickly disabused defendant of any illusion that it could attempt to compel responses from Precision Pine in less than the 45 days to which it had previously stipulated. At the July 15, 2003 telephonic status conference, defendant, to its credit, finally withdrew its claim in this regard, claiming that it had been the result of counsel's inattention to detail. See Ex. 1 at 5. In this respect, and contrary to defendant's assertions in its Motion, the Court denied defendant's motion to compel a response in less than the 45 days allotted.

and could not have, ordered Precision Pine to cure any deficient response. While it is apparent that defendant has now brought claims that Precision Pine's responses are inadequate (claims which Precision Pine strongly disputes), clearly none of these specific issues were, or could have been before the Court on July 15, 2003. Thus, even assuming that Precision Pine's responses are inadequate (which they are not), as alleged by defendant in its present Motion, this Court has not previously passed on any of the issues raised by defendant. Accordingly, by definition, no order of this Court has been violated by Precision Pine.

Moreover, although the defendant stylizes the instant motion as one for sanctions for a failure to comply with a court order, as demonstrated above, the Court had not previously ruled on the specific issues defendant now raises with respect to Precision Pine's discovery responses. Such being the case, the instant motion takes issue with the adequacy of some of Precision Pine's answers to defendant's interrogatories, a motion which appropriately falls under RCFC 37(a) "Motion for Order Compelling Disclosure or Discovery." One of the requirements for a motion under RCFC 37(a) is that the moving party must "include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action." RCFC 37(a)(2)(B).[9] Courts have taken this certification requirement very seriously. See, e.g., Ross v. Citifinancial, Inc., 203 F.R.D. 239, 240 (S.D. Miss. 2001) (motion to compel denied where movant did not

[9] RCFC 37(d), which addresses, among other things, a failure by a party to serve answers or objections to interrogatories, includes an almost identical provision requiring the moving party to certify in good faith that it has conferred with the opposing party in an attempt to obtain the requested answers. Although the defendant's motion would not fall under RCFC 37(d) because Precision Pine has timely served answers to defendant's interrogatories, this repeated requirement for such a certification in the rules illustrates the importance of such a certification.

submit certification); Hasbro, Inc. v. Serafino, 168 F.R.D. 99, 101-102 (D. Mass. 1996) (court denied motion to compel, noting lack of certification was particularly problematic where non-moving party was not even aware that an impasse had been reached in the discussions between the parties).

Even when a certification is included with a motion, it is not just a formality, but it must allege facts demonstrating a good faith conferment or attempt to confer. See Shuffle Master, Inc. v. Progressive Games, Inc., 170 F.R.D. 166, 173 (D. Nev. 1996) (motion to compel discovery responses denied despite certification, where counsel merely sent a series of faxes and placed one phone call to opposing counsel, but no meaningful discussions were held).

The defendant has not included such a certification with its motion, and could not have, because it has not attempted to confer in good faith with Precision Pine in order to resolve its complaints with Precision Pine's responses. Defendant's effort to "confer" with Precision Pine regarding Precision Pine's responses is embodied in David Harrington's letter to Richard Goeken dated August 26, 2003. In this letter, Mr. Harrington essentially demanded, under threat of a motion for sanctions,[10] that Precision Pine rectify four issues that the defendant identified. See Defendant's Motion Ex. C. This letter makes no mention of a willingness to discuss these issues. Nevertheless, Precision Pine mooted defendant's first complaint with respect to certain objections by voluntarily withdrawing them.

[10]Defendant threatened to file this motion within two days of the letter, i.e., even before any document production had begun.

Defendant left little room for cooperation with its second and third complaints identified in the August 26, 2003 letter and, more importantly, made no real effort to confer in an effort to resolve these issues. With respect to defendant's third complaint, Mr. Harrington's letter vaguely alleges that 17 interrogatory answers are incomplete or non-responsive. (Defendant only raises nine such allegedly incomplete or non-responsive interrogatories in its Motion). Moreover, the letter does not provide any actual basis for these complaints, except for the most general of assertions with regard to Interrogatory Nos. 12 and 27, thus leaving Precision Pine with little idea as to the specific deficiencies defendant claimed existed and unable to provide the information the defendant sought. The only time in which the defendant provided a detailed explanation of why it alleges certain interrogatories are incomplete or non-responsive is in its current motion.

More troubling is defendant's complaint that Precision Pine's use of RCFC 33(d) was improper. This "issue" was raised one day after defendant received Precision Pine's responses and <u>before a single document had been produced</u> to defendant in response to an interrogatory. This complaint lays bare defendant's plan to resist the use of Rule 33(d) without to regard to whether the rule has been properly invoked and fails to meet defendant's duty to confer in good faith to resolve discovery disputes. For these reasons, defendant's motion should be denied in its entirety.

**A. Precision Pine's Objections Are Proper.**

1. Precision Pine's Objections That Certain Interrogatories Are Overly Broad And Unduly Burdensome Were Proper But, In Any Event, Were Voluntarily Withdrawn Before The Instant Motion Was Filed.

In drafting responses to defendant's interrogatories the extraordinarily burdensome nature of responding was brought home to Precision Pine in ways that were not immediately apparent to Precision Pine in its initial reading of them. This Court's July 15, 2003 ruling specifically permitted Precision Pine raise such objections. See Ex. 1 hereto at 15. Nevertheless, and despite the considerable burden imposed on it, Precision Pine went on to respond fully to each of the interrogatories to which it raised such an objection.

More importantly, because Precision Pine had gone on to answer each of the interrogatories fully in spite of the extraordinary burden that this placed upon it, in the spirit of compromise and in an attempt to avoid just the sort of protracted "non-dispute," that defendant appears determined to pursue, Precision Pine voluntarily withdrew all of its objections based on undue burden and undue breadth more than a week before the instant motion was filed. See Letter dated September 3, 2003 from Richard W. Goeken to David A. Harrington, attached hereto as Ex. 2. Indeed, in a footnote defendant concedes that these objections have, in fact, been withdrawn. See Defendant's Motion at 6 n.1.[11] This is precisely the result defendant claimed to be seeking in its letter of September 26, 2003. See Ex. C to Defendant's Motion. In

[11]In its footnote, defendant complains that Precision Pine "fails to identify which objections it is withdrawing"(Motion at 6 n.1), yet defendant identified each of those interrogatories which it believe improperly raise the objection, i.e., 6-11, 14-24, 26-27, 29, 35-37, 42. Motion at 4. It is clear that defendant understood which objections were voluntarily withdrawn well before it filed its Motion.

withdrawing its objections, Precision Pine has mooted defendant's purported complaints in this regard with respect to interrogatories 6-11, 14-24, 26-27, 29, 35-37 and 42 which constitutes the lion's share of the Motion. See Defendant's Motion at 4. Allegedly unhappy even when getting what it asked for, defendant nevertheless seeks to manufacture a dispute where none exists in an apparent bid to shirk its own impeding obligations to comply with the Court's discovery schedule.

2. Precision Pine's Objections To Interrogatory Nos. 10, 11 And 34 Are Appropriate.

Defendant admits that none of the objections raised by Precision Pine in response to interrogatories 10, 11 and 34 had been raised in Precision Pine's Motion for a Protective Order (Motion at 7) and, therefore, none could have been specifically ruled on by the Court in its Order of July 15, 2003. Rather, in attempting to respond to each of these interrogatories Precision Pine encountered for the first time specific difficulties, which it identified in response to these three interrogatories, an option that this Court specifically ruled remained available to Precision Pine during the July 15, 2003 status conference. Ex. 1 hereto at 15. For example, in its responses to Interrogatories 10 and 11, Precision Pine identified specific, legitimate difficulties it had in understanding what information defendant was seeking. Defendant's Ex. B at 14-16.[12] Precision

[12] The meaning of Interrogatories 10 and 11 are particularly difficult to follow in that each appears to use the terms "plans" and "schedules" interchangeably despite the fact that each term has a defined meaning in Forest Service timber sale contracts. Both interrogatories also assume the existence of certain changes which neither identifies. Still more perplexing is defendant's request in both Interrogatories 10 and 11 for information regarding "the contracts at issue as set forth in response to interrogatory no. 9." The instructions to defendant's interrogatories define the term "contracts at issue" as those contracts at issue in this case; however, Interrogatory Nos. 10 and 11 refers back to Interrogatory No. 9, which itself refers back to Interrogatory No. 6 which seeks information about every contract ever held by Precision Pine from June 24, 1991

Pine simply sought a clarification from defendant, something which has not been forthcoming. Id. These were the only two interrogatories to which Precision Pine responded in this manner. Moreover, Precision Pine, further responded that it stood ready to try to respond when defendant clarified these two interrogatories. Id. Precision Pine remains ready to do so today.

Even more bizarre is defendant's "complaint" with Precision Pine's objection to Interrogatory No. 34. In answering this interrogatory, Precision Pine discovered that the factual premise of the question, i.e., that Precision Pine did not harvest any of the contracts after the suspension was lifted is incorrect and Precision Pine so advised defendant, even though defendant should already have known this from information readily available to it. Defendant does not dispute that the factual premise of its interrogatory is incorrect in this regard. Moreover, despite the objectionable nature of the interrogatory, Precision Pine went on to provide a comprehensive two-page narrative response explaining those issues which prevented the completion of some of the contracts at issue in this case. Again, defendant can be seen to be trying to manufacture controversy where none exists.

---

and August 1, 2000. All of these inconsistencies, which were not immediately apparent to Precision Pine, render these interrogatories unanswerable without clarification.

### B. Precision Pine Properly Invoked RCFC 33(d) In Responding To Certain Of Defendant's Interrogatories.

1. RCFC 33(d) Is Specifically Designed To Be Used As It Has Been In This Case.

Notably absent from defendant's discussion of the option of producing business records in response to interrogatories pursuant to Rule 33(d) is any mention of the language of the Rule itself, which provides that:

**(d) Option to Produce Business Records.**

> Where the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served or from an examination, audit or inspection of such business records, including a compilation abstract or summary thereof, and the burden of deriving or ascertaining the answer is substantially the same for the party being served, it is a sufficient answer to such an interrogatory to specify the records from which the answer may derived or ascertained and to afford the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries. A specification shall be shall be in sufficient detail to permit the interrogating party to locate and to identify, <u>as readily as can the party being served the records from which the answer may be ascertained</u>.

<u>See</u> RCFC 33(d) (emphasis supplied). The Advisory Committee Note explaining the operation of the then new provision states:

> The subdivision gives the party an option to make the records available and places the burden of research of [sic] the party who seeks the information. This provision, without undermining the liberal scope of discovery, places the burden of discovery upon its potential benefitee. . . .

<u>See</u> Advisory Committee Note to the 1970 Amendment (internal quotations and citations omitted).

Despite defendant's unsupported assertion to the contrary, nothing in the rule or the cases interpreting the rule indicate that its use is "carefully circumscribed." Rather, where, as here, the circumstances of the rule apply, a party has the right to invoke it. See Petroleum Ins. Agency, Inc. v. Hartford Accident and Indemnity Co., 111 F.R.D 318, 320 (D. Mass. 1984) ("[P]laintiffs want this discovery but do not want to expend the effort and expense in procuring it. *But the stated purpose of the Rule is to require the party seeking discovery to expend the effort and expense to procure it.* What plaintiffs are saying is that they do not like the Rule; however, like it or not, it was enacted and the Court is duty bound to follow it." (emphasis in the original)), accord United States Securities and Exchange Commission v. Elfindepan, S.A., 206 F.R.D. 574, 576 (M.D. N.C. 2002) (party opposing use of Rule 33(d) must make a *prima facie* showing that the use of Rule 33(d) is somehow inadequate).

Not surprisingly, with respect to defendant's broad requests for other information it apparently wants for its case, often for the broad time period of June 24, 1991 to August 1, 2000, virtually all such business records were located in boxes stored at Precision Pine's former corporate headquarters. The outside of each of these boxes had been labeled by Precision Pine personnel as to some, but not all, of their contents. Moreover, these personnel had not compiled an index of the boxes or the materials contained within the boxes. Additionally, no one at Precision Pine was specifically familiar with the actual contents of these boxes, nor were the boxes, some of which had been in storage for a decade or more, organized in any fashion whatsoever. Such being the case, as provided for under RCFC 33(d), Precision Pine would have been within its rights, without more, to simply have provided defendant with access to these

materials as the burden of actually ascertaining what was in each box was equal to both Precision Pine and defendant.[13]

Despite this fact, and in an effort to go the extra mile in meeting defendant's discovery requests, two lawyers for Precision Pine traveled to Heber, AZ where both spent seven days/ten hours per day reviewing the content of the boxes in storage and segregating responsive from non-responsive material. These lawyers segregated 30 boxes of materials which contained those items most directly responsive to defendant's interrogatories as follows:

10 - Boxes of Financial Records;
7 - Boxes of Logging and Hauling Records;
11 - Boxes of Timber Sale Contracts and related documents; and
2 - Boxes of Timber Sale Statements of Account [14]

The Financial Records were organized in individual file folders by month and year, the Logging and Hauling records were organized by the entity performing the work, the documents in the timber sale contract files were grouped by contract, and the TSSAs were also arranged by contract. Accordingly, pursuant to RCFC 33(d), Precision Pine specifically referred to the appropriate subgroups of these 30 boxes when responding to the interrogatories. The organization within these boxes should have allowed defendant to readily identify the materials it

---

[13]In this regard, the Advisory Committee Note to the 1980 Amendment to FRCP 33(c), (now FRCP 33 (d)) states, "A party who is permitted by the terms of this subdivision to offer records for inspection in lieu of answering an interrogatory should offer them in the same direct and economical manner available to the party."

[14]Timber Sale Statements of Account ('TSSAs") are computer printouts produced by the Forest Service which show, among other things, harvest activity on timber sale contracts by species and size of timber. Though defendant should have already had copies of these materials, Precision Pine produced them as much of the information defendant sought regarding the timing of actual operations is ascertainable from the TSSA.

sought to review and copy. In this regard, defendant completed its review of the materials at Heber in three days. Moreover, defendant, in fact, copied 11 of the 30 boxes in their entirety. In light of the foregoing, it is clear that Precision Pine did not "dump" a mass of undifferentiated documents on defendant but rather specified the location of and those categories of records from which the answer to an interrogatory could be derived or ascertained.

Moreover, counsel for Precision Pine, though it need not have done so, also created a 13-page list of 147 additional boxes containing nominally responsive material also located in storage. The list is attached as Ex. 1 to Ex. B of Defendant's Motion.[15] This list included the actual designation on the outside of the box, plus additional relevant information about the contents of each box that had been deemed noteworthy. The list was produced to defendant along with the discovery responses on August 25, 2003, three days before they were due, so that defendant might understand generally what materials were available in storage and make plans with respect to those materials it sought to review.

All of these efforts, including Precision Pine's intent to produce the 30 boxes of responsive materials containing information also relevant to the interrogatories, as well as the additional boxes of responsive material also responsive to the production requested, were explained in several telephone calls to counsel for defendant as the efforts were being undertaken. These points were reiterated in the Introduction to Precision Pine's Response to the Interrogatories. See Defendant's Motion Ex. B at 1-2. Moreover, it is undisputed that the

[15] As noted above, many of defendant's interrogatories sought information over nearly a decade. This requirement, coupled with defendant's exceedingly broad definition of document rendered these documents nominally responsive for purposes of the document production.

government actually reviewed all of the boxes in storage at the former corporate headquarters of Precision Pine in three days and designated any and all materials that it wanted to have copied and has, in fact, already received copies of the approximately 20,000 documents which it desires for its case.

Indeed, for all of its rhetoric, defendant only provides the Court with a few "examples" of interrogatory responses which it claims were improper under RCFC 33(d). However, a review of these examples demonstrates that they do not support defendant's claims.[16] First, with respect to Precision Pine's response to Interrogatory No. 18, Precision Pine has specifically directed defendant to those documents which contain the answers. Interrogatory No. 18 states: "For each of the mills at issue state the total volume of timber or other material from each source that was processed by the facility during each month between June 1991 and July 2000." See Defendant's Motion Ex. B at 21. Because Precision Pine does not compile the information in the form requested by the defendant, it could not provide a single document which contained the information. Therefore, Precision Pine, quite properly, directed defendant to those responsive materials from which the sought-after information could be "derived or ascertained" pursuant RCFC 33(d). That is, the defendant was directed to the lumber production records by mill which show logs input into the mill and lumber produced by month. All such records have been produced to and copied by defendant. Additionally, Precision Pine pointed to its contract files from which it can be ascertained how much timber was removed from each sale, when harvest occurred, and to what mill the timber was hauled and manufactured into lumber. Additionally,

[16]Presumably, these examples represent the most "egregious" examples defendant could find.

Precision Pine directed defendant to the Timber Sale Statements of Account ("TSSAs") which show the volume of timber removed from Forest Service sales by month. Again, all of the responsive contract records and TSSAs have been produced to defendant.

With respect to Interrogatory No. 9, defendant does not complain about the quality of the narrative answer provided, but rather asserts that Precision Pine's identification of TSSAs as containing relevant information was improper because the TSSA provide "no information on plans for scheduling." Defendant's Motion at 9. However, defendant overlooks that fact that the interrogatory also requests information regarding the volume and species of timber on the sales and that such information is "ascertainable or derivable" from the TSSAs. Precision Pine's identification of the TSSAs in conjunction with its detailed narrative response is appropriate under Rule 33(d).

Defendant's "complaint" with regard to Precision Pine's response to Interrogatory No. 25 wherein defendant seeks detailed information about the value of all of the equipment at three mills as of the purchase date of each piece of equipment and as of August 24, 1995 (Defendant's Motion Ex. B at 27) is utter nonsense. First, contrary to defendant's assertion, Precision Pine did not direct defendant to 18 boxes of material. Rather, Precision Pine informed defendant to review the depreciation schedules that were contained within the 10 boxes of financial records. As noted above, these records are organized by month and year and were copied in their entirety by defendant. Accordingly, defendant should not have encountered any difficulty in ascertaining or deriving the information it sought from these records.

Precision Pine further directed defendant to certain mill purchase documents which also contain information responsive to the interrogatory. These documents, which were maintained in an individually labeled file folder, have been produced to and copied by defendant in the D.C. document production. Notably, defendant has not claimed that the documents specifically identified in response to this interrogatory do not contain the sought-after information.

Defendant's suggestion that plaintiff should have queried Precision Pine employees about Interrogatory No. 25 (Defendant's Motion at 9) is absurd. Two of the mills are no longer functioning and much of the equipment has been removed, while the third mill has had some alterations since August 24, 1995. There was no reason to have Precision Pine employees engage in a test of memory regarding, among other things, the original purchase and depreciated value of each piece of equipment at these mills from eight or more years ago. This is especially true where, as here, the documents specifically identified contain information from which the information can be ascertained or derived.[17] In this regard, defendant again has not claimed that it has been unable to derive or ascertain the information in those records.

Defendant's claims with regard to alleged problems with Precision Pine's response to Interrogatory No. 20 are similarly misplaced. Contrary to defendant's contention that it was required to review "eight boxes of material;" the mill purchase records, as well, as mill production records identified in response to this interrogatory (see Defendant's Motion at 23)

[17]Of course, defendant is free to ask Precision Pine employees what they recall about the value of the mill equipment during depositions which the parties have agreed will commence in Heber, AZ on October 8, 2003.

were specifically and clearly labeled as such in individual file folders and produced to and selected for copying by defendant during the Washington D.C. document production during the week of August 25.[18] Again, defendant does not claim that it has been unable to ascertain or derive the sought-after information from the documents provided.

Defendant further asserts that Precision Pine's answer to Interrogatory Nos. 8 and 30 fail to identify the specific documents from which an answer can be derived. However, it should be borne in mind that Interrogatory No. 8 seeks the actual harvest for every contract Precision Pine had between June 24, 1991 to August 21, 2000 by month, by species, by volume, by size class of timber and the mill where the timber was harvested. At bottom, this interrogatory seeks to know in detail about the harvest operations for virtually every contract that Precision Pine ever had by month over a ten-year period for purposes known only to defendant. Precision Pine did not, however, track this information in the form sought by defendant. However, it can be ascertained or derived from the records identified. Unfortunately, given the considerable breadth of the interrogatory, there are of necessity many documents which contain the sought-after information, which Precision Pine properly identified. Once again, defendant does not contend that it has been unable to locate the sought-after information in the records identified.

Similarly, Interrogatory No. 30 seeks information regarding the sales of four different by-products over a six-year period. In this regard, Precision Pine has already produced considerable supporting information in the damage binder backup with respect to by-products. Additionally,

---

[18]Moreover, in response to Interrogatory No. 36, Precision Pine provided defendant with a comprehensive narrative response regarding impacts to the mills, including mill shutdowns resulting from the suspension. See Defendant's Motion Ex. B at 37-44.

Precision Pine also produced an entire transfer box of by-product invoices and related data from the time period requested. Moreover, as indicated in the response to the interrogatory, information regarding by-products is also summarized in the financial records by month and year. Thus, far from telling defendant to go search "in nearly 200 boxes of documents" Precision Pine has provided specifically denominated information where the requested answers may derived or ascertained. Indeed, defendant does not claim that it has been unable to derive or ascertain the answers it seeks from the documents specified by Precision Pine.[19] In light of the foregoing, it is clear that even those few specific examples that defendant identifies do not support is claim that Precision Pine's response under Rule 33(d) are improper and defendant's motion with respect to those interrogatories should be denied.

Moreover, general claims such as that made by defendant that "every invocation of RCFC 33(d) in Precision Pine's answers suffers from one or more of the three problems"[20] have been rejected by the Courts:

> Once the defendants exercised the Rule 33[d] option, plaintiffs had the burden to show that the burden of deriving or ascertaining the answers is not substantially the same for both parties. See 4A *Moore's Federal Practice*, ¶ 33.25[5], p. 33-142 (2 ed., 1983 rev) stating the holding of Daiflon, Inc. v. Allied Chemical Corp., 534 F.2d 221, 227 (10 Cir., 1976), *cert. den.*, 429 U.S. 886, 97 S.Ct. 239, 50 L.Ed. 168 (1976). Plaintiff's expressions of general discontent with having to obtain discovery pursuant to the provisions of Rule 33 [d], F.R.Civ.P., however severe the discontent may be, is not a sufficient *showing* under the law for the Court to deny the defendant's the option the rule provides. While it is true that the defendants are more familiar with their records, there has been no showing

[19]It is a testament to the broad nature of defendant's discovery requests that, of the "nearly 200 boxes" of documents produced to defendant, defendant has not identified a single page which is not responsive to its requests.

[20]It is not clear exactly what defendant believes the "three problems" are. See Defendant's Motion at 9, n.4.

> that the answers of the defendants delineating the records in which answers can be found and how the records are kept are wanting or that the plaintiffs have had difficulty in dealing with defendants' records as they have been identified and described.

Petroleum Ins. Agency, Inc., 111 F.R.D at 320-321 (emphasis in original). Similarly here, because defendant has not, and cannot, make any showing that the burden on it of deriving the information it seeks is any greater than it would have been on Precision Pine, nor has it made the requisite showing that it has been unable to locate the information it seeks from the information provided, defendant's general complaints about Precision Pine's compliance with Rule 33(d) are groundless and should be denied.

The cases primarily relied upon by defendant address circumstances significantly removed from the instant case. See, e.g., In re: Tutu Wells Contamination Litg., 168 F.R.D. 46, 68 (D.V.I. 1995) (responding party deliberately concealed specifically requested information among several volumes of raw data); Govas v. Chalmers, 965 F.2d 298, 302 (1992) (Party that knows or has exclusive access to an interrogatory answer may not use Rule 33(c) to avoid furnishing a responsive answer where the answer cannot be ascertained from the documents); Oleson v. Kmart Corp., 175 F.R.D. 650, 654 (D. Kan. 1997) (In response to former employee's discovery requests seeking very specific information about employee's employment history in a workers compensation case, employer dumped voluminous records and failed to produce other responsive information). These cases are clearly distinguishable from the instant situation where Precision Pine has worked in good faith to specify the records from which answers may be derived, defendant has failed to claim that it cannot derive the answers from the documents

specified and defendant's true complaint is that in response to broad data requests seeking information relevant to its case, defendant got a large amount of data.

## II. Precision Pine Has Facilitated And Expedited Review And Copying Of Documents And Has Not Impeded The Government's Efforts.

Defendant asserts that Precision Pine "has thrown up road block after road block" to its efforts to have an efficient review of documents (Defendant's Motion at 11); however, the record of accomplishment in the production and copying of all of the voluminous records sought by the government belies this contention. As set forth in greater detail below, Precision Pine served its discovery responses on August 25, i.e., three days before it was required to do so, produced documents at the law offices of Saltman & Stevens that same week, i.e., less than a day and a half after being advised by defendant that it wanted to review the documents, and provided copies of all of the documents marked by defendants for copying in the D.C. production (which totaled in excess of 7,000 pages) within four business days, despite the intervening Labor Day weekend.

The following week, at a time and place agreed to by defendant, Precision Pine produced the massive amount of records defendant requested for production at Precision Pine's former headquarters in Heber, AZ – some 175 boxes of material in all. Precision Pine devoted two employees to overseeing the review and copying process in Arizona and, as a result, defendant was able to complete its review in three days and received all of the copies it requested within two business days thereafter. In short, in a little over two week's time defendant was been

permitted to review all of the records of Precision Pine that it sought, and has obtained tens of thousands of pages of copies that it desires for its case.

Despite getting all it asked for on an expedited basis, defendant still raises several complaints with the production and discovery process. Again, all of these complaints are readily rebutted and appear to be nothing more than attempt to foist on to Precision Pine defendant's own inability to process all that which it has asked for.

### A. Early Service of Precision Pine's Discovery Responses And The Document Production In D.C.

First, defendant complains that it only received Precision Pine's discovery responses on Monday, August 25, 2003, rather than on Friday, August 22, 2003. See Defendant's Motion at 11 and n.5. Defendant's argument omits several salient facts in this regard: first pursuant to this Court's discovery schedule, Precision Pine's responses were not even due until Thursday, August 28. Had Precision Pine been interested in "throwing up road blocks" and making defendant's review difficult, it could have waited until the last possible moment and served its responses by mail, it did not do so, but rather hand-delivered the responses to defendant on August 25, three days before it was required to do so. Second, counsel for Precision Pine called counsel for defendant on the afternoon of Friday, August 22 and advised that an equipment malfunction prevented completion of the interrogatories before DOJ closed on Friday, but that a copy of the interrogatories would be hand-delivered to defendant first thing on Monday morning, which they were. Understandably, defendant did not complain about getting the discovery response three days earlier at that time.

Additionally, during the Friday, August 22 telephone call, counsel for Precision Pine, Richard Goeken, advised counsel for defendant that he would in and out of the office the following week and that in his absence, defendant should contact David Craig, another attorney for Precision Pine, about reviewing documents.[21] Counsel for defendant responded that he needed to review the responses before deciding when he would start the document review.

On the afternoon of Tuesday August 26, without contacting either Mr. Goeken or Mr. Craig, counsel for defendant faxed a letter addressed only to Mr. Goeken, who was out of the office, stating for the first time that defendant wanted to start document review at 9 a.m. the next morning.[22] By the time the faxed document was routed to Mr. Craig, to whom it was not addressed, it was late in the afternoon. Additionally, Saltman & Stevens subleases shared office space to another government contracts litigation firm that has, understandably, requested advance notice when DOJ and/or other government attorneys are going to be in the office. Both principles of the subtenant firm were not in the office on the afternoon August 26, 2003.

Upon speaking with the subtenants on Wednesday August 27, counsel for Precision Pine confirmed with counsel for defendant that the document review could proceed starting first thing in the morning of Thursday, August 28. Defendant came to the offices of Saltman & Stevens on

---

[21]Counsel for defendant had been aware for weeks that Precision Pine intended to produce those materials most directly related to its damages claims in Washington D.C., and the voluminous materials sought for production by the defendant would be made available at the former corporate headquarters of Precision Pine in AZ.

[22]Defendant's claim that the "confirming" letter was routine (Defendant's Motion at 12) is disingenuous at best. It is not possible to "confirm" a date and time that had not been previously discussed. Moreover, counsel for defendant did not contact the individual he had been advised to contact about the document review.

the morning of Thursday, August 28, i.e., less then 13 business hours after defendant first faxed its letter regarding it desire to review the documents in D.C. Moreover, defendant completed its review of documents that same day, but was unable to advise Precision Pine to begin copying until checking with his reviewer. It was not until Friday, August 29, 2003 that defendant authorized the copying to commence.

Moreover, during the course of its review, and despite its contention that the copying job was "relatively modest" (Defendant's Motion at 12), defendant actually marked in excess of seven thousand pages for copying. As defendant also knows, but fails to mention, much of this copying was of oversized and irregularly shaped documents, as well as of documents that required considerable unstapling and restapling. Despite these obstacles, counsel for Precision Pine devoted two employees, including paying some overtime, to copying the materials using two copiers (this was accomplished by Saltman & Stevens personnel borrowing the copier of the subtenant). Due to these extraordinary efforts, Precision Pine was able to complete the copying in less than four business days, despite the intervening Labor Day Holiday weekend.

On the afternoon of Thursday, September 4, counsel for Precision Pine attempted to contact counsel for defendant by phone and e-mail to advise him that copies would be ready that day and to arrange for defendant to pick them up. See e-mail message from Richard Goeken to David Harrington attached hereto as Ex. 3.[23] Counsel for defendant did not contact counsel for

[23]Because the four boxes of documents requested for copying by the government were not going to be ready until the late afternoon, and due to counsel's experience with the difficulties of making deliveries to DOJ toward the end of the day, Precision Pine had wanted to arrange for a DOJ courier to pick-up the documents to expedite the process.

Precision Pine on Thursday or even first thing on Friday morning, at which point counsel for Precision Pine located a courier with a car and the delivery of the four boxes was made to counsel for defendant. Thus, in all Precision Pine completed the copying of documents marked by defendant in D.C. quite expeditiously and was prepared to produce the documents to defendant on the afternoon of Thursday, September 4 as promised, i.e., less than four business days after having been authorized by defendant to start the copying. Only defendant's failure to contact counsel for Precision Pine on Thursday delayed the delivery of documents until Friday.[24]

### B. **The Document Production At The Former Corporate Headquarters Of Precision Pine In Rural Heber, Arizona.**

In light of the Monday, September 1, Labor Day holiday and pursuant to the agreement of the parties, the document review at the former corporate headquarters of Precision Pine began

[24] In a footnote, defendant suggests that counsel for Precision Pine "withheld" certain documents from the August 28, 2003 document review. However, as defendant has been advised, due to a miscommunication between Mr. Craig (who handled the D.C. document production) and Mr. Goeken (who had organized the materials for production but who was out of the office during the production) one box of material was inadvertently not produced. This fact was not discovered until both Mr. Craig (who also handled the document production in Heber, AZ during the entire week of September 1) and Mr. Goeken were both in the office together on September 8 and able to discuss fully what had transpired at the productions. As soon as the oversight was discovered, Mr. Goeken left messages for counsel in Washington, D.C. and with agency counsel in Albuquerque, N.M. regarding this issue. Counsel for Precision Pine explained how the oversight had occurred, described the documents contained in the one box and offered to produce the documents to the government for review or simply to copy the documents (at Precision Pine's expense) and make those copies available to the government. Counsel for defendant eventually advised Precision Pine on the afternoon of September 9 that it wanted a copy of all of the documents. Precision Pine immediately copied all of the materials (which again included many oversized and irregular documents as well us much stapling and unstapling) and has produced all of these copies to defendant.

on Wednesday, September 3.[25] Defendant first complains that documents were being provided in two rooms. Defendant's Motion at 13. Defendant fails to mention that not all of the boxes could have been fit into the reviewing room at once. It had been Precision Pine's intent to provide defendant with immediate access to the 30 boxes of clearly responsive material and then, rather than moving all 147 boxes of nominally responsive material, to have Mr. Craig retrieve those boxes that the defendant sought to review from among the 147 additional boxes of documents. In this regard, the list of the boxes had been produced to defendant as a means by which defendant might identify those boxes which it wished to review. However, when it became clear to Precision Pine that defendant intended to review the contents of all of the 147 boxes, Precision Pine agreed to permit defendant direct access to the 147 boxes of documents in the storage room, while allowing the review of the 30 boxes to continue in the reviewing room. Counsel for Precision Pine also assisted in the numbering of the boxes to correspond to the list in order to facilitate defendant's direct review in the storage room.[26] Most importantly, however, defendant does not dispute that it was, in fact, given direct access to all of the materials it sought to review in Arizona, and that it was able to complete its review of all of these materials in three

[25]DOJ counsel for defendant, David Harrington, did not attend the document production in Arizona. This necessitated communications back and forth between agency counsel on the ground in Arizona and Mr. Harrington, who remained in D.C., before any change in action could take place. Similarly, the attorney who attended the production on behalf of Precision Pine was David Craig, who has been with the firm less then a year and understandably sought to confer with senior counsel before changing the pre-arranged plan for production and copying of the client's documents. The three-hour difference in time between D.C. and Arizona added to the logistical challenges.

[26]Defendant designated none of the 147 boxes for copying in its entirety and simply selected certain documents for copying from only 36 of these 147 boxes, i.e., less than 25%.

days. In short, the Arizona document production was an unqualified success, especially in light of the sheer volume of materials produced at a remote, rural location.

Defendant also seeks to manufacture a dispute about the manner in which copying was conducted in Arizona. However, once again defendant's claims are groundless. Prior to the start of document review in Arizona, counsel for Precision Pine sent an e-mail to counsel for defendant advising him of the manner in which Precision Pine intended to make copies in Arizona:

> Our two requirements are that (1) we be able to maintain control over the copying; and (2) for every copy the government makes we will make an additional copy for ourselves. Mike Jones from our office will arrive in Heber on Thursday morning to oversee the copying.

See the e-mail from David Craig to David Harrington dated August 29, 2003 attached hereto as Ex. 4.[27] Counsel for Precision Pine confirmed this plan in a telephone call with counsel for defendant on the Tuesday before the review began. Defendant voiced no objection to this plan, which clearly envisioned that copying would commence on Thursday. Understandably, it had been Precision Pine's goal to retain control over its documents and make a record of materials that were copied. Despite these clear requirements, defendant inconsistently argues in its motion that "The United States anticipated a rolling process where copies of documents were made [at the Forest Service's Offices in Heber] while the review of other documents continued." Defendant's Motion at 13. Regardless of what defendant may have envisioned, it had not

---

[27]As counsel for defendant has been advised, Mr. Jones, is a paralegal for Saltman & Stevens who is also a graduate student. Mr. Jones was required to attend class on Wednesday, September 3, but took a flight to Phoenix that night and drove the 2½ hours to Heber the next morning so that he could commence copying at 9:00 a.m. on Thursday as promised.

apprised Precision Pine of these views. Moreover, as a practical matter, there is no way for Mr. Craig to have both overseen the document review at the former headquarters of Precision Pine while Forest Service personnel simultaneously made copies at their offices in a another location.[28]

Upon Mr. Jones' arrival in Heber on Thursday at 9:00 a.m., he commenced copying at the Forest Service's offices provided for in Mr. Craig's e-mail of August 29, 2003, set forth above. Upon conferring with Mr. Craig and Mr. Jones on the afternoon of September 4, 2003, senior counsel for Precision Pine concurred in their assessment that copying in this manner would take a long time as would simply using the copiers available at the Forest Services offices as proposed by the defendant. In an effort to improve the situation and complete the document production, Precision Pine proposed the following compromise: those boxes of the 30 boxes to

[28]The defendant mischaracterizes the situation with the copying in Heber in several respects. The reviewers sent by the defendant made numerous unreasonable demands immediately upon arrival at the review site, in contravention to the original, agreed-upon plan to proceed. When Mr. Craig informed the reviewers that Precision Pine intended to adhere to the copying procedure that the parties had agreed to, a Forest Service employee appeared several hours later at the review site with a copier without any prior notice to Precision Pine, and in total disregard of agreed-upon plan. This copier did remain unused on the first day of the review, in part because Mr. Craig, the sole representative of Precision Pine, assisted in identifying and numbering the listed boxes in storage, and would have had a difficult time actively overseeing the copying. When this particular copier was put into service the following day, it became readily apparent that it was unreliable and unacceptably slow, and any progress made in the use of this copier would have been minimal.

Moreover, each copier at the Forest Service's offices was in a different room which would have made oversight and control of copying process by Precision Pine virtually impossible. Finally, originally unbeknownst to the defendant, not one of the copiers at the Forest Service's offices was in fact "high speed," leading to the compromise of outsourcing of the largest, most difficult portion of the copying.

be copied in their entirety would be sent off-site to an independent, third-party copy service.[29] For those boxes of the 30 in which less than all of the materials would be copied, copying would take place in the presence of and under the supervision of Saltman & Stevens' personnel. Finally, copies from the 147 boxes could be made by the Forest Service itself, once Precision Pine had made a list of the materials from these boxes that defendant intended to copy.[30]

Even once this compromise was proposed on Thursday afternoon, it was not immediately implemented, as DOJ counsel could not be reached to agree to the plan. Moreover, on Friday morning, agency counsel decided that she needed to obtain a waiver from the Government Printing Office so that copying could be performed on behalf of the government by a third-party. Thus, it was solely these delays by the government, and not any actions on the part of Precision Pine, that delayed the implementation of the compromise until the afternoon of Friday, September 5. However, once agreed to, the compromise was implemented forthwith. In this regard, both Mr. Craig and Mr. Jones remained in Heber and spent the weekend copying documents at the Forest Service and transporting boxes to the third-party copy service in Payson, AZ. It is Precision Pine's understanding that the copying of all of the documents desired by the Forest Service was completed, both at the Forest Service and by the third-party copy service, no later than Tuesday, September 9.

[29]The nearest such third-party copier with the capacity to perform the work is in Payson AZ, more than 50 miles from Heber, AZ.

[30]This compromise remains less than ideal to Precision Pine, as relinquishing original documents into the unsupervised custody of a litigation adversary is never desirable. Nevertheless, when it became clear just how many documents defendant wanted to copy from among the 147 boxes (that Precision Pine's damages claims do not directly depend upon), Precision Pine proposed the compromise in order that discovery in this case might remain on schedule.

In light of the foregoing, defendant can once again be seen trying to manufacture disputes for this Court where none exist. That is, it is undisputed the government was given direct access to all of the boxes of material it sought to review at Precision Pine's former corporate headquarters. Moreover, defendant does not dispute that it completed the review and marking for copying all of these materials in three days. Additionally, copying of these materials began in the manner and at the time the parties had initially agreed. During that first day of copying, it became apparent that the sheer volume of documents sought by the government was not going to permit copying to proceed as planned, if the discovery schedule were going to be adhered to. The next day, Precision Pine proposed a compromise, which was far from optimal from its perspective, but which has resulted in all of the copying being completed. Again, defendant has nothing to complain about and its Motion on this point should be denied.

### III. Precision Pine's Interrogatory Responses Are Responsive And Complete.

In its Motion, defendant identified nine interrogatories, the responses to which it claims are either incomplete or non-responsive.[31] As demonstrated below, the responses are both complete and responsive.

---

[31] As noted above, counsel for defendant has not certified that it attempted to confer with Precision Pine about any of these issues as required by RCFC 37. Moreover, defendant's letter of August 26, 2003 did not raise any specific problems with respect to any interrogatories except 9 and 12, complaints about which have been expanded in the Motion. Because defendant did not confer with Precision Pine about the specific problems it now raises in its Motion, and has not certified that it did so, both of which are required under RCFC 37, defendant's motion should be denied.

**1. Precision Pine's Response To Interrogatory No. 27 Is Responsive.**

In support of its contentions about lost lumber profits in this case as a result of the suspension, in its damage binder produced to the government on February 26, 2003 Precision Pine specified the lumber products it would have made from the timber on each sale. Additionally, Precision Pine produced several charts which show, for each lumber product, its selling value, based on actual Precision Pine lumber sales invoices during the suspension. The date and number of each lumber invoice utilized in computing the price of each product has been provided to the government. Moreover, Precision Pine has produced a binder which contains in chronological order all of the actual lumber sales invoices which support these actual prices. Accordingly, the government already has the information in its possession regarding Precision Pine's "contentions" about the prices at which it could have sold its lumber products during the suspension. This point was further made to the government in response to Interrogatory No. 28.

Because Precision Pine makes no "contention" about the prices at which it could have sold lumber products at any time other than during the suspension, it has properly invoked RCFC 33(d) with respect to invoices from other time periods. Although the government apparently feels strongly that this information is relevant to its defense in this case, that does not make it a "contention" that Precision Pine intends to use in its case-in-chief, nor does it make it Precision Pine's burden to compile the information for the government to use in its case. That is, Precision Pine does not track the information in the form demanded by the government. (This is clear from the fact that Precision Pine itself had to actually calculate this lumber price information by product during the period of the suspension from lumber invoices in the damage binders.) As Rule 33(d) makes clear, its use is appropriate here, because the burden on the government is

clearly no greater than it would be on Precision Pine to compile and calculate the information the government seeks from the documents identified and produced. Accordingly, Precision Pine has directed the government to those documents, i.e., the lumber invoices from which it too could determine this information for the time periods in which it claims to be interested.

As even the case relied upon by the government states, a party opposing the use of Rule 33(d) "must make a *prima facie* showing that that use of Rule 33(d) is somehow inadequate to the task of answering the discovery, whether because the information is not fully contained in the documents, it is too difficult to extract, or other such reasons." United States Securities and Exchange Commission v. Elfindepan, S.A., 206 F.R.D. 574, 576 (M.D. N.C. 2002).[32] Plainly the information defendant seeks is contained in the actual lumber sales invoices, is not difficult to extract, nor has defendant suggested otherwise.

With respect to defendant's hyperbolic claims that Precision Pine is deliberately withholding lumber price information it has already compiled for its own use (Defendant's Motion at 15) or that Precision Pine has acted in bad faith to frustrate the United States' efforts to obtain such information (Defendant's Motion at 16), defendant is as wrong as it rhetoric is offensive. As stated above, lumber price information for periods other than that during the

---

[32]The case further notes that:

> Rule 33(d) was intended to be used in the situation where an interrogatory makes broad inquiries numerous documents must be consulted to ascertain facts such as identities, quantities, data, action tests, results, etc.

Id. at 577. Under this ruling, the use of Rule 33(d) in response to Interrogatory No. 27, which seeks pricing for all of the products produced by Precision Pine, by month, over a six-year period is certainly appropriate.

period of the suspension does not play a role in Precision Pine's contentions in this case, and Precision Pine, pursuant to Rule 33(d), has properly specified those records from which defendant may "ascertain or derive" the information it seeks. In light of the foregoing, the response to Interrogatory No. 27 is proper and no further response, let alone a sanction against Precision Pine, is warranted.[33]

**2. <u>Precision Pine's Answer To Interrogatory No. 9 Is Proper</u>.**

Precision Pine properly answered Interrogatory No. 9 by stating that "[t]here is no 'operating plan' for the mills, *per se*," because Precision Pine does not, as a matter of practice, establish a plan of operations for each mill. Rather, each mill operates based on the timber that is available to be put through the mill. The fact that Precision Pine merely indicated that the type of information sought after by the defendant does not exist in the form that defendant seems to believe it does is not a game of semantics, as the defendant alleges. Where the mills at issue operate based on the amount of timber harvested, Precision Pine properly answered Interrogatory No. 9 by stating that the information sought could be found within the individual contract files for each contract, which were grouped together in boxes labeled as contract boxes, and made available to the defendant in Heber and Washington, D.C. This answer is proper under RCFC 33. Recognizing that Interrogatory No. 9 focused on timber available at the time of suspension, Precision Pine supplemented its proper use of RCFC 33 by clearly stating what volume of non-

[33]Defendant's continued attempts to bootstrap its claims for sanctions with the Court's discovery order is improper. It is undisputed that, in compliance with the Court's Order, Precision Pine has provided responses to each of defendant's discovery responses. Although, defendant is unhappy with some of those responses and now seeks to contest them, clearly the propriety of the specific responses themselves has not been and could not have been the subject of any prior court order.

Forest Service timber it had available as of August 24, 1995, and at what mills this timber would be processed.

The defendant does not allege that it could not find the answer to this interrogatory within the specified documents, nor does it appear that defendant has even attempted to try to find the answer. Moreover, the defendant cites a single monthly "goal report" that describes Precision Pine's goals for operating its mills, stating that this report demonstrates the existence of a detailed plan of operation. This goal report is not an operating plan for the mills in the sense that the defendant's interrogatory uses the term, and therefore is not responsive to Interrogatory No. 9. This report bears no direct relation to the timber that was to be harvested from a particular contract, the mill that such timber would be taken to, and the amount of timber that would be processed at the mill, which is the information sought by Interrogatory No. 9. The report cited by defendant relates to post-production results at each mill, stating the "goal" or desired production result, as well as the actual production in rough green lumber. This report also states sales goals and actual production from each mill, which also are not the information sought after by Interrogatory No. 9.

The defendant also seems to imply that Precision Pine somehow has tried to prevent the defendant from seeing these goal reports, stating that Precision Pine provided a single such report, "perhaps inadvertently." The defendant seems to have forgotten that in the material provided on February 26, 2003 Precision Pine provided goal reports covering a starting period a year and a half before the suspension, through March 31, 1997. Such a voluntarily revelation of these goal reports by Precision Pine clearly belies any attempt to hide them as defendant alleges.

**3. <u>Precision Pine's Answer To Interrogatory No. 12 Is Responsive</u>.**

Precision Pine properly answered Interrogatory No. 12, which asks about the changes in Precision Pine's harvesting plans caused by the suspensions, by stating that Precision Pine was unable to harvest the suspended timber and harvested what timber it had available. The defendant's complaint about this response again assumes that Precision Pine had some form of detailed operations plan that it formulated and put into action when its chief source of timber was improperly suspended away. Precision Pine harvested whatever it could in order to keep its mills running. The timber it had available at the time of the suspension is clearly indicated in Precision Pine's response to Interrogatory No. 9.

**4. <u>Precision Pine's Answer To Interrogatory No. 22 Is Complete</u>.**

Precision Pine properly answered Interrogatory No. 22, which asks for the reasoning behind mill openings and closings by stating that Precision Pine opened or closed each mill to improve its profitability. This was the answer provided by both Precision Pine's President and Vice President, Lorin Porter and Lewis Tenney, respectively.

Precision Pine did not understand Interrogatory No. 22 to address temporary mill shutdowns caused by the suspensions. The natural reading of a mill <u>closure</u>, as used in the context of the series of Interrogatory Nos. 20-22, is a permanent closure rather than a temporary shutdown. Where a temporary shutdown was caused by the suspensions at issue, the reasoning for such a shutdown was discussed in detail in Precision Pine's answer to Interrogatory No. 36. Precision Pine reasonably assumed that this was the proper place to provide the reasoning for each temporary shutdown caused by the suspensions, and that the defendant was not actually

asking for the same exact information in two places. Assuming Interrogatory No. 22 can be read to include temporary shutdowns (which seems unlikely given Interrogatory No. 36), by not conferring with Precision Pine in order to clarify the meaning of Interrogatory No. 22, the defendant has not followed the requirements of RCFC 37(a)(2)(B). If followed, defendant would have been advised that the answer that it sought was contained in Precision Pine's response to Interrogatory No. 36.

### 5. <u>Precision Pine's Answer To Interrogatory No. 34 Is Complete</u>.

Precision Pine has provided a complete answer to Interrogatory No. 34, which asks for an explanation as to why Precision Pine did not harvest the contracts at issue after the suspension of each contract was lifted. As clearly stated in its answer, Precision Pine did ultimately harvest timber from some of the contracts at issue, a fact already known to the Forest Service. As far as timber that was not harvested, Precision Pine's answer discusses at length the combination of factors that prevented Precision Pine from harvesting timber from the contracts at issue through 1998. These combined factors affected all of the contracts.[34] With respect to timber harvesting after 1998, as the defendant is aware, the Department of the Treasury decertified Precision Pine's bonding company in June, 1999. Precision Pine was unable to obtain substitute bonding, and the Forest Service considered Precision Pine in breach of the U-Bar, Monument, O.D. Ridge, Brookbank, Jersey Horse, Hutch Boondock, Brann, Saginaw Kennedy, and Manaco contracts

[34]The defendant asks Precision Pine to account for the period between December 1996 and May 1997. As the defendant is aware, this period is generally outside the normal operating season for the contracts at issue.

and subsequently put Precision Pine into default (improperly) which prevented harvesting of those contracts.[35] All of these facts are known to the Forest Service.

**6-8. Precision Pine's Responses To Interrogatory Nos. 35, 36, and 37 Are Proper.**

Defendant argues that Precision Pine's answers to Interrogatory Nos. 35, 36, and 37 are incomplete because Precision Pine has not identified the breach of contracts that resulted in the damages claimed for its claim for increased logging and hauling costs. Again, the government is mistaken.[36]

First, with respect to the increased costs of logging, such costs are only claimed for two sales that this Court found had been breached by the government, namely the Hay and O.D. Ridge sales. As explained in the narrative response to Interrogatory No. 37, "these increased costs were the direct result of not being able to harvest the timber as originally anticipated due to the Forest Service's breach of contract." Defendant cannot have any legitimate question as to the contracts at issue for this item of damage.

Secondly, with respect to increased costs of hauling, Precision Pine provided a narrative response explaining that, due to the mill closures caused by the suspension of the contracts this Court found to have been breached, Precision Pine had to haul timber to a mill located further

---

[35] Precision Pine was also defaulted, improperly, on the Salt contract in 1998 for other reasons which prevented harvest of that contract.

[36] Precision Pine's calculation of its claim for increased logging and hauling damages is attached hereto as Ex. 5.

away than the mill it had anticipated using. See Defendant's Motion Ex. B at 45. Precision Pine has specifically identified the anticipated mill to which the timber from each of the five contracts on Ex. 5 was initially to have gone but was unable to do so due to a mill closure caused by the suspension.

As set forth in the narrative response to Interrogatory No. 36, the closure of those mills was attributable to the suspensions of those specifically identified breached sales that would have kept those mills operating, i.e., the Hay, Kettle, Manaco, and O.D. Ridge were to have gone to the Eagar Mill (see Defendant's Motion Ex. B at 37); whereas the Brookbank, Jersey Horse and Salt timber sales were designated to go to the Heber sawmill (see Defendant's Motion Ex. B at 38). The percentage that each sale made up of the timber at the mill made up by each breached sale during the suspension is set forth Ex. 2 to Precision Pine's discovery responses. See Defendant's Motion Ex. B, Exhibit 2, pp. 2-4. The amount attributable to each of the specific breached sales is determined by applying these percentages from the suspended sales to the increased hauling costs claimed.[37]

## 9. Precision Pine's Answer To Interrogatory No. 41 Is Complete.

Interrogatory No. 41 seeks information regarding the products Precision Pine would have made from the timber on the suspended sales. In its damages binder previously provided to the defendant, Precision Pine has identified the volume of 13 different lumber products by sale that it anticipated producing from each of the breached timber sale contracts. That Precision Pine had

[37] Again, defendant never raised any of the specific issues for which it now seeks to compel a response from Precision Pine. Had defendant simply requested further clarification of this issue, Precision Pine would have provided it.

the capability to manufacture and sell such products is demonstrated by the invoices that have been produced to defendant which show actual lumber products produced by Precision Pine during the suspension. By identifying information which demonstrates both what products Precision Pine anticipated producing from each sale and that it had the ability to produce those products, Precision Pine has fully responded to the interrogatory.[38]

Defendant's assertion "upon information and belief" that Precision Pine has not disclosed all information "it intends to introduce into evidence" on this point. However, Precision Pine has not made any final decision as to what information it will introduce into evidence on this point but that it will, in conformity with this Court's pretrial order and its duty, provide defendant with all such information to which it is entitled.

**Conclusion**

In light of the foregoing, Precision Pine respectfully request that defendant's "Motion for Discovery Sanctions" be denied, and that Precision Pine be awarded all of its reasonable costs and expenses, including attorneys fees, incurred in defending against this motion pursuant to RCFC 37(a)(4)(B).

---

[38]In this regard, in response to Interrogatory No. 2, Precision Pine identified its President, Lorin Porter, as someone who could be called at trial to testify about mill operations, product sales and certain items of damage. The deposition of Mr. Porter is scheduled to commence in Heber, AZ on or after October 8, 2003 and it would be reasonable for defendant to seek information from Mr. Porter on this point.

Respectfully submitted,

s/ Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140
(202) 775-8217 – facsimile

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
David J. Craig
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Washington, D.C. 20006
(202) 452-2140
(202) 775-8217 – facsimile

Dated: September 16, 2003