**INTERROGATORY NO. 28**

Describe in detail the methodology used and any sources of information or market data used, relied upon or consulted in determining the prices provided in your response to Interrogatory No. 27.

**SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 28**

**Lumber Products – Ponderosa Pine**

Precision Pine used two methods for determining the prices at which it could have sold lumber products made from ponderosa pine, between August 1993 and December 1998. For the months during the suspension of the contracts at issue, from August 1995 through December 1996, Precision Pine used the actual sales invoices and averaged the actual price for each product for each month. This is the most accurate method of ascertaining the price for products during the suspension, because the suspensions caused a shortage in quality timber, and Precision Pine therefore was forced to process some low quality timber that it otherwise would not have had to use, but for the suspension. The invoice prices for the sub-par products produced from this low quality timber were excluded from these averages. In this regard, for the following high-end products, no invoice prices were available, therefore Random Lengths pricing was used:

Moulding and Better – August, September, October and December, 1996

#1 Shop – August and October, 1996

Any blanks in the chart were caused by a lack of information for the particular month and product necessary to determine an accurate price.

For the months specified in this interrogatory that lie outside the months of the suspensions of the contracts at issue, i.e., August 1993 – July 1995, and January 1997 – December 1998, the listed monthly price for each lumber product is the average sale price for that product in that month, as listed on the "Winslow Sales Record," which lists product volumes and prices as sold from the Winslow planer. Any blanks in the chart were caused by a lack of information for the particular month and product necessary to determine an accurate price.

**Lumber Products – Douglas-fir**

A few of the sales at issue contained small volumes of Douglas-fir timber. Because there were not a sufficient number of invoices to determine pricing for Douglas-fir lumber products on a quarterly or monthly basis, Precision Pine's President determined the price at which it could have sold Douglas-fir lumber products by using the Random Lengths listed monthly price as follows:

Three products would have been made from the Douglas-fir timber in the volumes and sold at the prices below:

1. #2 & Better – The price used was equal to the Random Lengths Price for Douglas-fir (Portland Rate) #2 and Better, 2x6 Random plus $60 freight. (This product would have accounted for 85% of the Douglas-fir lumber produced.)

2. #3 & Better – The Price used was equal to the Random Lengths Price for Douglas-fir (Portland Rate) #3, 2x6 Random (Portland Rate) plus $60 freight. (This product would have accounted for 10% of the Douglas-fir lumber produced.)

3. #4 – The price used was equal to the Random Lengths Price for Douglas-fir (Portland Rate) #3, 2x6 Random (Portland Rate) minus $70. (This product would have accounted for 5% of the Douglas-fir lumber produced.)

**Lumber Products – Spruce**

One of the sales at issue contained a small volume of Spruce timber. Because there were not a sufficient number of invoices to determine pricing for Spruce products on a monthly or quarterly basis, Precision Pine's president determined the price at which it could have sold spruce lumber products by using the Random Lengths listed monthly price as follows:

Six products would have been made from the Engelmann-Spruce timber in the volumes and sold at the prices below:

1x4 Spruce Lumber – 30% of the total spruce lumber produced

1. #2 & Better – The price used was equal to the Random Lengths price for Englemann-Spruce Lodgepole Pine, Kiln Dried 1x4, #2&Btr, Random plus $50. (This product would have accounted for 10% of the 1x4 Englemann-Spruce lumber produced.)

2. #3 – The price used was equal to Random Lengths Price for Englemann-Spruce Lodgepole Pine #3, 1x4 Random plus $50. (This product would have accounted for 65% of the 1x4 Englemann-Spruce lumber produced.)

3. #4 – The price used was equal to Random Lengths Price for Englemann-Spruce Lodgepole Pine #4, 1x4 Random plus $50. (This product would have accounted for 25% of the 1x4 Englemann-Spruce lumber produced.)

1x6 Spruce Lumber – 70% of the total spruce lumber produced

1. #2 & Better – The price used was equal to the Random Lengths price for Englemann-Spruce Lodgepole Pine, Kiln Dried 1x6, #2&Btr, Random plus $50. (This product would have accounted for 10% of the 1x6 Englemann-Spruce lumber produced.)

2. #3 – The price used was equal to Random Lengths Price for Englemann-Spruce Lodgepole Pine #3, 1x6 Random plus $50. (This product would have accounted for 65% of the 1x6 Englemann-Spruce lumber produced.)

3. #4 – The price used was equal to Random Lengths Price for Englemann-Spruce Lodgepole Pine #4, 1x6 Random plus $50. (This product would have accounted for 25% of the 1x6 Englemann Spruce lumber produced.)

Random Lengths did not publish such listings prior to January, 1995, therefore, Precision Pine has not listed the price at which it could have sold spruce lumber products before January, 1995.

**Chips**

In determining the prices at which Precision Pine could have sold and/or did sell chips, Precision Pine relied on the contracts and correspondence with, and settlement statements from, Stone Container Corporation. These contracts and correspondence show the contract prices at which Stone Container had contracted to buy chips during the specified period. The available settlement statements show that Stone Container actually paid these prices. While it was still in operation and accepting chips, Stone Container purchased virtually all of the chips that Precision Pine produced. After Stone Container Corporation permanently stopped purchasing chips from Precision Pine in February 1998, Precision Pine has had virtually no market for chips.

**Shavings**

Precision Pine relied on the fact that, as set forth in the ledger on shavings sales, Precision Pine actually sold shavings at $9.50 per ton for every month that it sold shavings between August 1993 and September 1997, the last month listed in the ledger. April, 1997 is the only month during this period in which sales are not recorded in this ledger.

**Bark**

Precision Pine relied on the fact that, as set forth in the ledger on bark sales, Precision Pine actually sold bark at $4.25 per yard (a unit of measure used for bark) for every month in which it sold bark, from August 1993 to September 1997, the last month listed in the ledger. March 1997 is the only month during this period in which no sales are recorded in this ledger. This dollar per yard figure can be converted into dollars per ton by multiplying by 2000, i.e., the

number of pounds in a ton, and then dividing by 413, the conversion factor that one divides the weight to bark in pounds by to get weight in yards.

**Grindings**

Precision Pine determined the sale price for grinding based on Lorin Porter's belief that this price accurately reflects the average price at which Precision Pine historically sold grindings.

**INTERROGATORY NO. 34**

With respect to each of the contracts at issue, explain in detail why did Precision Pine did not harvest timber that it anticipated harvesting during the suspension at issue (see, e.g., the "harvest dates" in page C-0064 to -0066 of Precision Pine's February 26, 2003 damages calculations), after suspension of the contract was lifted.

**SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 34**

With respect to each of the contracts at issue, explain in detail why did (sic) Precision Pine did not harvest timber that it anticipated harvesting during the suspension at issue (see, e.g., the "harvest dates" in page C-0064 to -0066 of Precision Pine's February 26, 2003 damages calculations), after suspension of the contract was lifted.

**Brann** – The normal operating season for this sale was April 15 to December 31. Restrictions on harvesting in portions of Payment Unit 1 began on February 1 and ran through August 30.

This sale was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995 and which was not lifted with respect to this sale until October 20, 1995. At about the same time the suspensions of Hutch-Boondock and St. Joe were also lifted. On October 23, 1995 Precision Pine advised the Forest Service that it intended to begin operations on Hutch-Boondock (the operating season for which ended on November 30) and then come back to Brann.

On January 26, 1996, Precision Pine participated in a pre-work meeting with the Forest Service which approved Precision Pine's plan to begin harvest on Payment Unit 2 of the Brann sale on January 29, 1996. Precision Pine continued operations on payment unit 2 of Brann and removed some 500 MBF of timber in the 1st quarter of 1996. On February 12, 1996, Precision Pine advised the Forest Service that it had purchased the C-12 sale on the Hualapai reservation and would be operating there through June at which time Precision Pine intended to return to Brann and harvest Payment Unit 3 in July and Payment Unit 1 in October. As of February 15, 1996 Precision Pine had also completed all of the specified roads.

From May 3, 1996 to July 9, 1996 operations were precluded due to a fire closure. Thereafter, Precision Pine removed both pulpwood and sawlogs from Brann in the 3rd and 4th quarters of 1996.

In January 1997, Precision Pine advised the Forest Service that it intended to continue harvesting the Brann sale during the normal operating season in 1997. However, effective June 2, 1997, the Brann sale and several other of Precision Pine's sales were again the subject of an injunction against the Forest Service. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service

resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of this third normal operating season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

Shortly after the 1997 suspension was lifted, in January 1998, Precision Pine made plans to harvest pulpwood on the Brann sale beginning in April. These plans were later moved up to February 27, 1998. However, on February 12, 1998, Stone Container announced that thereafter it would be meeting its need for pulpwood and chip fiber primarily from recycled materials and would no longer be purchasing pulpwood and chips from outside vendors. Overnight, this rendered Precision Pine's contracts, and especially its multi-product contracts like Brann (i.e., those contracts containing pulpwood), significantly less profitable. Indeed, the very premise behind the Forest Service's offering of sales containing pulpwood, as it did almost exclusively by the mid-1990's, was that the Stone facility would be available as an outlet for this material, material for which no one in Arizona except Stone had a significant use. Precision Pine sought any number of compromises with the Forest Service to make multi-product sales like Brann operable, including being allowed to leave the pulpwood standing, cutting and stacking the pulpwood for use by firewood collectors, and reducing the stumpage rate on the sales to reflect the dramatically changed market conditions. The Forest Service instead began offering new multi-product sales for bid with the pulpwood component priced at \$.73/CCF, thereby virtually ensuring that harvesting on existing multi-products contracts could not be performed except at huge losses. Indeed, had Precision Pine harvested this sale to completion without an outlet for pulpwood and chips, it would have added significantly to (rather than mitigated) the damages sought in the instant action.

In addition to the adverse impacts to Precision Pine's ability to operate the Brann sale caused by severe disruptions to the pulpwood market, the lumber market began to decline dramatically in mid-1997, and remained relatively flat through 1998 and into the first half of 1999 before nose-diving in the year 2000. For example, the annual average lumber price index published by Western Wood Products Association for Rocky Mountain Ponderosa Pine, which is the relevant index (adjusted to a 1997-1998 basis), was as follows: 1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83; 1999 – $374.35; 2000 – $333.67. In recognition of the decline in the market the Forest Service granted Precision Pine Market Related Contract Term Addition for 1998.

Also, in the fall of 1998, the Winslow sawmill to which the Brann sale was to have been hauled and processed, burned down forcing Precision Pine to consolidate its operations at its Heber sawmill. Attempts to harvest Brann after the fire at Winslow would have required considerable additional hauling costs in an already bad market for lumber and in a virtually non-existent market for pulpwood and chips.

In light of all of the foregoing, no plans were made to harvest the Brann sale in 1999 because, as Precision Pine informed the Forest Service on February 24, 1999, (1) the Winslow mill had burned down, (2) the market for softwood lumber was down, (3) Stone Container no longer needed pulpwood and chips and (4) the Forest Service had dropped the price for pulpwood to $0.73/ccf while Precision Pine was required to pay $9.40/ccf for wood it could not mill or sell.

No specific plans were made to harvest because the poor market conditions persisted in the year 2000 as did Stone Container's continuing refusal to buy pulpwood and chips. Nevertheless, during the summer of 2000, Precision Pine sought to harvest some timber from this sale for its Heber mill, however, the sale area was under fire restrictions for almost the entire summer, including a complete shutdown from June 2 to June 30, 2000.

Finally, on or about June 9, 2000, the Forest Service notified Precision Pine that its surety, Frontier Insurance Company, had been removed from the U.S. Department of the Treasury's list of approved sureties. This prompted the Forest Service to demand that Precision Pine find a new surety or provide bonding in some way, which Precision Pine was unable to do because all of the cash it had available to pay for bonding had already been paid in advance to Frontier Insurance. The Forest Service would not permit operations on the sale (or other Forest Service sales) while this problem continued leaving Precision Pine with very limited access to timber. Thereafter, the Forest Service terminated the Brann contract on December 4, 2000.

**Brookbank** – The normal operating season for this sale was April 15 to November 15 and harvesting was only permitted on dry or frozen ground unless this restriction was waived in writing by the Forest Service. In September of 1997, the Forest Service further restricted operations in Payment Units 2 and 3 by prohibiting operations from February 1, until September 30.

This sale, on which Precision Pine was operating at the time, was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas on August 24, 1995. The suspension was not lifted with respect to this sale until December 4, 1996.

On January 22, 1997, Precision Pine informed the Forest Service that it was planning to harvest the sale in 1997. However, effective June 2, 1997, several of Precision Pine's sales were again the subject of a preliminary injunction against the Forest Service. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of a third normal operation season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

In an effort to restart its operations after the September 30 harvest restrictions on the Brookbank were over, Precision Pine reopened its Heber mill (which had been closed since June 19, 1996) on October 20, 1997. After seeking and receiving Forest Service approval for operations outside of the normal operating season, Precision Pine began harvest of the

Brookbank sale in November and December of 1997. Precision Pine continued operations on the Brookbank sale into 2nd quarter of 1998.

However, on February 12, 1998 Stone Container announced that thereafter it would meet its need for pulpwood and chip fiber primarily from recycled materials and would no longer be buying pulpwood and chips from outside vendors. Overnight, this rendered all of Precision Pine's contracts, especially including its multi-product contracts like Brookbank (i.e., those contracts containing pulpwood), significantly less profitable. Indeed, the very premise behind the Forest Service's offering of sales containing pulpwood, as it did almost exclusively by the mid-1990's, was that the Stone facility would be available as an outlet for this material, material for which no one in Arizona except Stone had a significant use. Precision Pine sought any number of compromises with the Forest Service to make multi-product sales like Brookbank operable, including being allowed to leave the pulpwood standing, cutting and stacking the pulpwood for use by firewood collectors, and reducing the stumpage rate on the sales to reflect the dramatically changed market conditions. The Forest Service instead began offering new multi-product sales for bid with the pulpwood component priced at $.73/CCF, thereby virtually ensuring that harvesting on existing multi-product contracts could not be performed except at huge losses. Indeed, had Precision Pine harvested this sale to completion without an outlet for pulpwood and chips, it would have added significantly to (rather than mitigated) the damages sought in the instant action.

In addition to the adverse impacts to Precision Pine's ability to operate the Brookbank sale caused by severe disruptions to the pulpwood market, the lumber market began to decline dramatically in mid-1997, and remained relatively flat through 1998 and into the first half of 1999 before nose-diving in the year 2000. For example, the annual average lumber price index published by Western Wood Products Association for Rocky Mountain Ponderosa Pine, which is the relevant index (adjusted to a 1997-1998 basis), was as follows: 1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83; 1999 – $374.35; 2000 – $333.67. In recognition of the decline in the market the Forest Service granted Precision Pine Market Related Contract Term Addition for 1998.

Despite all of the foregoing, limited harvesting did take place on Brookbank in the 4th quarter of 1998 (after the harvest restriction was over on September 30) and into the first and second quarters of 1999. No specific plans were made to harvest because very poor market conditions persisted in the year 2000 and so did Stone Container's refusal to take pulpwood. Moreover, from May 27, to June 28, 2000 the sale area was closed due to fire conditions.

Finally, in June 2000, the Forest Service notified Precision Pine that its surety, Frontier Insurance Company, had been removed from the U.S. Department of Treasury's list of approved sureties. This prompted the Forest Service to demand that Precision Pine find a new surety or provide bonding in some way, which Precision Pine was unable to do because all of the cash it had available to pay for bonding had already paid in advance to Frontier Insurance. The Forest Service would not permitted operations on the sale (or other Forest Service sales) while this

problem continued leaving Precision Pine with very limited access to timber. Thereafter, the Forest Service purportedly terminated the Brookbank contract on December 4, 2000.

**Hay** – The normal operating season on this contract was April 15 to November 30. Additionally, logging was only permitted on the following units at the time indicated unless the Forest Service agreed otherwise in writing:

Cutting Unit 7: June 30 to April 1; Cutting Units 1, 2, 3, 4, 5, 6, 9, 10, 11, 12, 13, 14, 15, 19, 20, 21, 23, 24, 25, 33, 36, 41: September 1 to January 31.

This sale was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995 and which was not lifted with respect to this sale until December 4, 1996. Almost immediately Precision Pine sought to recommence it operations on this sale even though it would have to haul logs to its Winslow mill due to the ongoing closure of the Eagar mill. Precision Pine harvested on the sale from December 1996 to February 1997 at which time contract restrictions prevented further harvest.

Effective June 2, 1997, the Hay sale and several other of Precision Pine's sales were again suspended by the Forest Service due to the issuance of yet another injunction against the Forest Service. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full

range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of a third normal operating season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

In January 1998, Precision Pine advised the Forest Service of its intention to harvest the sale once harvest restrictions were over, i.e. in September and October of 1998. In accordance with this plan the Hay sale was logged to completion in the 3rd and 4th Quarters of 1998 and the contract was closed.

**Hutch-Boondock** – The normal operating season for this sale was to April 15 to November 30.

This sale was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995 and which was not lifted with respect to this sale until October 20, 1995. Precision Pine presented a plan on October 31, 1995 to harvest sawlogs from the sale outside the Normal Operating Season. Permission was granted by the Forest Service in December 1995 and Precision Pine harvested sawlogs from the sale during the 4th Quarter of 1995 and the 1st Quarter of 1996 and 3rd Quarter of 1996 and harvested pulpwood from the sale in 2nd and 3rd Quarters of 1996 at which point only 23 CCF of sawlogs and 905 CCF of roundwood remained.

The injunction of the remaining sales was lifted on December 4, 1996. However, effective June 2, 1997, several of Precision Pine's sales were again the subject of an injunction against the Forest Service. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of a third normal operating season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

Shortly after the 1997 suspension was lifted, on February 12, 1998 Stone Container announced that thereafter it would be meeting its need for pulpwood and chip fiber primarily from recycled materials and would no longer be purchasing pulpwood and chips from outside vendors. Overnight, this rendered all of Precision Pine's contracts, especially including its multi-product contracts like Hutch-Boondock (i.e., those contracts containing pulpwood), significantly less profitable. Indeed, the very premise behind the Forest Service's offering of sales containing pulpwood, as it did almost exclusively by the mid-1990's, was that the Stone facility would be available as an outlet for this material, material for which no one in Arizona except Stone had a significant use. Precision Pine sought any number of compromises with the Forest Service to make multi-product sales like Hutch-Boondock operable, including being allowed to leave the

pulpwood standing, cutting and stacking the pulpwood for use by firewood collectors, and reducing the stumpage rate on the sales to reflect the dramatically changed market conditions. The Forest Service instead began offering new multi-product sales for bid with the pulpwood component priced at $.73/CCF, thereby virtually ensuring that harvesting on existing multi-products contracts could not be performed except at huge losses. Indeed, had Precision Pine harvested this sale to completion without an outlet for pulpwood and chips, it would have added significantly to (rather than mitigated) the damages sought in the instant action.

In addition to the adverse impacts to Precision Pine's ability to operate the Hutch-Boondock sale caused by severe disruptions to the pulpwood market, the lumber market began to decline dramatically in mid-1997, and remained relatively flat through 1998 and into the first half of 1999. For example, the annual average lumber price index published by Western Wood Products Association for Rocky Mountain Ponderosa Pine, which is the relevant index (adjusted to a 1997-1998 basis), was as follows: 1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83; 1999 – $374.35; 2000 – $333.67. In recognition of the decline in the market the Forest Service granted Precision Pine Market Related Contract Term Addition for 1998.

Also, in the fall of 1998, the Winslow sawmill to which the Hutch-Boondock sale was to have been hauled and processed, burned down forcing Precision Pine to consolidate its operations at its Heber sawmill. Attempts to harvest Hutch-Boondock after the fire at Winslow would have required considerable additional hauling costs in an already bad market for lumber and in a virtually non-existent market for pulpwood.

In light of all of the foregoing, no plans were made to harvest the sale in 1999 or 2000 because (1) the Winslow mill had burned down, (2) the market for softwood lumber was down, (3) Stone Container no longer needed pulpwood and (4) the Forest Service had dropped the price for pulpwood to $0.73/ccf while Precision Pine was required to pay $9.40/ccf for wood it could not mill or sell.

No specific plans were made to harvest because the poor market conditions persisted in the year 2000 as did Stone Container's continuing refusal to buy pulpwood. Nevertheless, during the summer of 2000, Precision Pine sought to harvest some timber from this sale for its Heber mill, however, the sale area was under fire restrictions for almost the entire summer, including a complete shutdown from June 2 to July 10, 2000.

Finally, on June 12, 2000 the Forest Service notified Precision Pine that its surety, Frontier Insurance Company, had been removed from the U.S. Department of the Treasury's list of approved sureties. This prompted the Forest Service to demand that Precision Pine find a new surety or provide bonding in some way, which Precision Pine was unable to do because all of the cash it had available to pay for bonding had already been paid in advance to Frontier Insurance. The Forest Service would not permit operations on the sale (or other Forest Service sales) while this problem continued leaving Precision Pine with very limited access to timber. Thereafter, the Forest Service terminated the Hutch-Boondock contract on December 4, 2000 with only an estimated volume of 23 CCF of sawlogs and 905 CCF of roundwood remained.