**Jersey Horse** – The normal operating season for this sale was April 15 to November 15. Restrictions on harvesting included:

Payment Units 2, 3, 4, 5, 6, 7: Logging, hauling and road construction were prohibited from February 1 until August 30.

Harvest Unit 14: logging was prohibited from February 1 to September 30.

Logging on all cutting units was permitted on dry or frozen ground unless the restriction was waived in writing by the Forest Service.

Cutting Units 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24: Logging activities were prohibited from February 1 to August 31.

Additionally, all logging activities were prohibited on weekends and holidays unless the restriction was waived by the Forest Service in writing.

Moreover, on September 15, 1997, the Forest Service added still more restrictions to cutting units 2, 3, and 22.

Accordingly, operations during the Normal Operating Season on the Jersey Horse sale were essentially limited to dry or frozen periods on weekdays (that were not holidays) between September 1 and November 15.

This sale was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995 and which was not lifted with respect to this sale until December 4, 1996.

In the spring of 1997, Precision Pine advised the Forest Service that it intended to resume harvesting the Jersey Horse sale beginning once the harvest restrictions were over in September 1997. However, effective June 2, 1997, the sale and several other of Precision Pine's sales were again the subject of a preliminary injunction against the Forest Service. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of a third normal operation season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

Despite these difficulties, Precision Pine commenced operations on the Jersey Horse sale and harvested timber during the 4th Quarter of 1997 and the 1st Quarter of 1998. Precision Pine also submitted a plan in which it indicated that it would resume harvest of Jersey Horse in September of 1998.

However, on February 12, 1998, Stone Container announced that thereafter it would be meeting its need for pulpwood and chip fiber primarily from recycled materials and would no longer be purchasing pulpwood from outside vendors. Overnight, this rendered all of Precision

Pine's contracts, especially its multi-product contracts (i.e., those contracts containing pulpwood), significantly less profitable. Indeed, had Precision Pine harvested the Jersey Horse sale to completion without an outlet for chips, it likely would have added to (rather than mitigated) the damages sought in the instant action.

Additionally, the lumber market began to decline dramatically in mid-1997, and remained relatively flat through 1998 and into 1999. For example, the annual average lumber price index published by Western Wood Products Association for Rocky Mountain Ponderosa Pine, which is the relevant index (adjusted to a 1997-1998 basis), was as follows: 1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83; 1999 – $374.35; 2000 – $333.67. In recognition of the decline in the market the Precision Pine sought a Market Related Contract Term Addition for 1998.

In 1999 and 2000 the ongoing combination of low lumber prices, the lack of a market for chips and the extremely limited operating period prevented Precision Pine from resuming harvesting operations on the sale.

Finally, on or about June 9, 2000, the Forest Service notified Precision Pine that its surety, Frontier Insurance Company, had been removed from the U.S. Department of the Treasury's list of approved sureties. This prompted the Forest Service to demand that Precision Pine find a new surety or provide bonding in some way, which Precision Pine was unable to do because all of the cash it had available to pay for bonding had already been paid in advance to Frontier Insurance. The Forest Service would not permit operations on the sale (or other Forest

Service sales) while this problem continued leaving Precision Pine with very limited access to timber. Thereafter, the Forest Service terminated the Jersey Horse contract on December 4, 2000.

**Kettle** – The normal operating season for this sale was May 15 to November 15. Restrictions on harvesting included that logging would only be permitted on dry or frozen ground unless the restriction were waived by the Forest Service in writing.

The Kettle timber sale contract was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995 and which was not lifted with respect to this sale until December 4, 1996.

In April 1997, Precision Pine advised the Forest Service that it intended to resume harvesting the Kettle timber sale during the 2nd Quarter of 1997 and Precision Pine did, in fact, commence harvesting on the sale.

By letter dated August 21, 1997, Precision Pine advised the Forest Service of its intent to transfer the Kettle sale to Stone Container via a third-party agreement. The third-party agreement transferring the contract to Stone Container was formalized and approved by the Forest Service on November 3, 1997.

**Manaco** – The normal operating season for this sale was May 1 to July 15 and August 15 to November 30 for Payment Units 2-10, and the day after Labor Day to the November 30 and

May 1 to the weekend before Memorial Day for Payment Unit 1. Other restrictions on harvesting included:

Cutting Units 9, 10, 11, 17, 17A, 20 and 37: hauling prohibited from March 1 to September 30.

Cutting Units 7, 12, 13, 14, 15, 16, 19, 30, 31A, 32, 33, 36, 38, and 39: all harvest activities prohibited from March 1 to September 30.

Cutting Units: 6, 21, 22, 40 and 41: all harvest activities prohibited from March 1 to August 31.

Road construction was also prohibited on much of the sale from March 1 to September 30.

Additional restrictions were imposed on harvesting and road use in a modification dated August 31, 1999.

This sale was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995 and which was not lifted with respect to this sale until December 4, 1996. Moreover, Precision Pine was advised that the discovery of a Mexican Spotted Owl adjacent to the Manaco sale area would require consultation with the U.S. Fish and Wildlife Service ("FWS") and that operations could not resume until the expedited consultation was completed for the sale in whole or in part. Despite the ongoing suspension, on January 22, 1997, Precision Pine presented its plan to harvest the Manaco sale in October 1997.

However, as of March 16, 1997, the FWS had only released 34% of the sale area for harvest. Moreover, effective June 2, 1997, part of the Manaco sale and several other of Precision Pine's sales were again the subject of an injunction against the Forest Service. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of a third normal operating season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

Shortly after the 1997 suspension was lifted, Precision Pine made plans to harvest the Manaco sale and did in fact harvest the sale in the 2nd quarter of 1998 before the harvest restrictions precluded operations.

However, on February 12, 1998 Stone Container announced that thereafter it would be meeting its need for pulpwood and chip fiber primarily from recycled materials and would no longer be purchasing pulpwood and chips from outside vendors. Overnight, this rendered all of Precision Pine's contracts, especially its multi-product contracts like Manaco (i.e., those contracts containing pulpwood), significantly less profitable. Indeed, the very premise behind

the Forest Service's offering of sales containing pulpwood, as it did almost exclusively by the mid-1990's, was that the Stone facility would be available as an outlet for this material, material for which no one in Arizona except Stone had a significant use. Precision Pine sought any number of compromises with the Forest Service to make multi-product sales like Manaco operable, including being allowed to leave the pulpwood standing, cutting and stacking the pulpwood for use by firewood collectors, and reducing the stumpage rate on the sales to reflect the dramatically changed market conditions. The Forest Service instead began offering new multi-product sales for bid with the pulpwood component priced at $.73/CCF, thereby virtually ensuring that harvesting on existing multi-products contracts could not be performed except at huge losses. Indeed, had Precision Pine harvested this sale to completion without an outlet for pulpwood and chips, it would have added significantly to (rather than mitigated) the damages sought in the instant action.

In addition to the adverse impacts to Precision Pine's ability to operate the Manaco sale caused by severe disruptions to the pulpwood market, the lumber market began to decline dramatically in mid-1997, and remained relatively flat through 1998 and into the first half of 1999. For example, the annual average lumber price index published by Western Wood Products Association for Rocky Mountain Ponderosa Pine, which is the relevant index (adjusted to a 1997-1998 basis), was as follows: 1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83; 1999 – $374.35; 2000 – $333.67. In recognition of the decline in the market the Forest Service granted Precision Pine Market Related Contract Term Addition in 1998 and 1999.

In light of all of the foregoing, no specific plans were made to harvest the Manaco sale in 1999 because, as Precision Pine informed the Forest Service on February 24, 1999, the market for softwood lumber was down, Stone Container no longer needed pulpwood and the Forest Service had dropped the price for pulpwood to $0.73/ccf while Precision Pine was required to pay $9.40/ccf for wood it could not mill or sell. No specific plans were made to harvest because the poor market conditions persisted in the year 2000 as did Stone Container's continuing refusal to buy pulpwood.

Finally, on or about June 14, 2000, the Forest Service notified Precision Pine that its surety, Frontier Insurance Company, had been removed from the U.S. Department of the Treasury's list of approved sureties. This prompted the Forest Service to demand that Precision Pine find a new surety or provide bonding in some way, which Precision Pine was unable to do because all of the cash it had available to pay for bonding had already been paid in advance to Frontier Insurance. The Forest Service would not permit operations on the sale (or other Forest Service sales) while this problem continued leaving Precision Pine with very limited access to timber. Thereafter, the Forest Service terminated the Manaco contract on December 4, 2000.

**Monument** – The normal operating season for this sale was April 15 to November 30. This sale was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995 and which was not lifted with respect to this sale until December 4, 1996.

In January 1997, Precision Pine advised the Forest Service that it intended to continue harvesting the Monument sale beginning in July, 1997. However, effective June 2, 1997, the several of Precision Pine's sales were again the subject of an injunction against the Forest Service. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of a third normal operating season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

On January 21, 1998, Precision Pine presented its plan to the Forest Service to harvest the Monument sale in June and July of 1998. However, on February 12, 1998, Stone Container announced that thereafter that it would be meeting its need for pulpwood and chip fiber primarily from recycled materials and would no longer be purchasing pulpwood and chips from outside vendors. Overnight, this rendered all of Precision Pine's contracts, especially including its multi-product contracts like Monument (i.e., those contracts containing pulpwood), significantly less profitable. Indeed, the very premise behind the Forest Service's offering of sales containing pulpwood, as it did almost exclusively by the mid-1990's, was that the Stone facility would be available as an outlet for this material, material for which no one in Arizona except Stone had a

significant use. Precision Pine sought any number of compromises with the Forest Service to make multi-product sales like Monument operable, including being allowed to leave the pulpwood standing, cutting and stacking the pulpwood for use by firewood collectors, and reducing the stumpage rate on the sales to reflect the dramatically changed market conditions. The Forest Service instead began offering new multi-product sales for bid with the pulpwood component priced at $.73/CCF, thereby virtually ensuring that harvesting on existing multi-products contracts could not be performed except at huge losses. Indeed, had Precision Pine harvested this sale to completion without an outlet for pulpwood and chips, it would have added significantly to (rather than mitigated) the damages sought in the instant action.

In addition to the adverse impacts to Precision Pine's ability to operate the Monument sale caused by severe disruptions to the pulpwood market, the lumber market began to decline dramatically in mid-1997, and remained relatively flat through 1998 and into 1999. For example, the annual average lumber price index published by Western Wood Products Association for Rocky Mountain Ponderosa Pine, which is the relevant index (adjusted to a 1997-1998 basis), was as follows: 1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83; 1999 – $374.35; 2000 – $333.67. In recognition of the decline in the market the Forest Service granted Precision Pine Market Related Contract Term Addition in 1998 and 1999.

Also, in the fall of 1998, the Winslow sawmill to which the Monument sale was to have been hauled and processed, burned down forcing Precision Pine to consolidate its operations at its Heber sawmill. Attempts to harvest Monument after the fire at Winslow would have required

considerable additional hauling costs in an already bad market for lumber and in a virtually non-existent market for pulpwood.

In light of all of the foregoing, no specific plans were made to harvest the Monument sale in 1999 because, as Precision Pine informed the Forest Service on February 24, 1999, (1) the Winslow mill had burned down, (2) the market for softwood lumber was down, (3) Stone Container no longer needed pulpwood and (4) the Forest Service had dropped the price for pulpwood to $0.73/ccf while Precision Pine was required to pay $9.40/ccf for wood it could not mill or sell.

No specific plans were made to harvest because the poor market conditions persisted in the year 2000 as did Stone Container's continuing refusal to buy pulpwood. Nevertheless, Precision Pine sough permission to enter the sale area in June, 2000 but was denied access due to a fire closure that lasted until July 10, 2000.

Finally, on or about June 12, 2000, the Forest Service notified Precision Pine that its surety, Frontier Insurance Company, had been removed from the U.S. Department of the Treasury's list of approved sureties. This prompted the Forest Service to demand that Precision Pine find a new surety or provide bonding in some way, which Precision Pine was unable to do because all of the cash it had available to pay for bonding had already been paid in advance to Frontier Insurance. The Forest Service would not permit operations on the sale (or other Forest Service sales) while this problem continued leaving Precision Pine with very limited access to timber. Thereafter, the Forest Service terminated the Monument contract on December 4, 2000.

**Mud** – The normal operating season for this sale was June 1 to December 31.

This sale was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995. Pursuant to the October 20, 1995 Stipulation filed in that case, the Mud sale was to be released once the Forest Service had modified the Mud contact to delete trees greater than 12" dbh in cutting units 1, 4, and 16. The Forest Service eventually accomplished this in March 1996 although it remains unclear when the suspension of Mud was lifted. However, regardless of the date that the Forest Service formally lifted its suspension, Precision Pine would not have been able to begin harvest in March of 1996, absent Forest Service's approval, due to a restriction in the contract only allowing logging between June 1 and December 31 each year because of past bark beetle activity. By letter dated March 25, 1995, Precision Pine requested that the Forest Service grant a waiver to allow harvest to begin immediately on payment units 1, 2 and 3. The Forest Service denied Precision Pine's request to waive the time restriction in a letter dated April 12, 1996, although the Forest Service stated that roadwork could begin before June 1. Subsequent fire precautions also delayed the start of operations on the sale. Roadwork was scheduled to begin July 17. Timber falling seems to have begun on or about August 1. Thus, the Forest Service's improper suspension of Mud in August of 1995, regardless of whether or not the Forest Service formally lifted the suspension on March, 1996, effectively precluded the start of timber harvest until August of 1996. Precision Pine performed harvesting operations in August and September, October 1996.

In January 1997, Precision Pine advised the Forest Service that it intended to continue harvesting the Mud in April, 1997. However, effective June 2, 1997, several of Precision Pine's sales were again the subject of an injunction against the Forest Service. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of a third normal operation season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

After the 1997 suspension was lifted, Precision Pine resumed operations on the Mud sale in June of 1998 and continued harvesting on the sale to completion in September of 1998. The contract was subsequently closed on January 15, 1999.

**O.D. Ridge** – The normal operating season for this sale was between May 15 and October 15.

This sale was suspended because of the U.S. District Court injunction in Silver v. Thomas, which was not lifted until December 4, 1996. Thereafter, Precision Pine indicated its

intent to log the sale to completion in 1997. In furtherance of this plan Precision Pine sought and obtained permission to begin work on the O.D. Ridge sale outside of the normal operation season. Just as harvesting was beginning in earnest, operations were suspended again by the Forest Service in the wake of the Forest Guardians injunction which prohibited operations from June 2, 1997 to December 17, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of a third normal operating season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

On January 21, 1998, Precision Pine presented its plan to the Forest Service to harvest the sale in August/September 1998. However, on February 12, 1998, Stone Container announced that thereafter it would be meeting its need for pulpwood and chip fiber primarily from recycled materials and would no longer be purchasing pulpwood from outside vendors. Overnight, this rendered all of Precision Pine's contracts, especially its multi-product contracts (i.e., those contracts containing pulpwood), significantly less profitable. Indeed, had Precision Pine harvested the O.D. Ridge sale to completion without an outlet for chips, it likely would have added to (rather than mitigated) the damages sought in the instant action.

Moreover, the lumber market began to decline dramatically in mid-1997, and remained relatively flat through 1998 and into the first half of 1999. For example, the annual average lumber price index published by Western Wood Products Association for Rocky Mountain Ponderosa Pine, which is the relevant index (adjusted to a 1997-1998 basis), was as follows: 1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83; 1999 – $374.35; 2000 – $333.67. In recognition of the decline in the market the Forest Service granted Precision Pine Market Related Contract Term Addition in 1998 and 1999.

Despite the foregoing difficulties, Precision Pine did harvest the sale beginning in the third quarter of 1999 and continued harvesting the sale into the second quarter of 2000 when fire restrictions precluded operations. Then, on or about June 12, 2000, the Forest Service notified Precision Pine that its surety, Frontier Insurance Company, had been removed from the U.S. Department of the Treasury's list of approved sureties. This prompted the Forest Service to demand that Precision Pine find a new surety or provide bonding in some way, which Precision Pine was unable to do because all of the cash it had available to pay for bonding had already been paid in advance to Frontier Insurance. The Forest Service would not permit operations on the sale (or other Forest Service sales) while this problem continued leaving Precision Pine with very limited access to timber. Thereafter, the Forest Service terminated the O.D. Ridge contract on December 4, 2000.

**U-Bar** – The normal operating season for this sale was April 15 to November 30.

The U-Bar sale was suspended because of the U.S. District Court injunction in Silver v. Thomas which was not lifted until December 4, 1996. On January 22, 1997, Precision Pine presented a plan to operate in April 1997. Just as harvesting was beginning in earnest, the U-Bar sale and several other of Precision Pine's sales were again the subject of a preliminary injunction against the Forest Service, effective June 2, 1997. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of a third normal operating season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

Shortly after the 1997 suspension was lifted, in January, 1998, Precision Pine again made plans to harvest the sale beginning in June/July of 1998. However, on February 12, 1998, Stone Container announced that thereafter it would be meeting its need for pulpwood and chip fiber primarily from recycled materials and would no longer be purchasing pulpwood and chips from outside vendors. Overnight, this rendered all of Precision Pine's contracts, especially including its multi-product contracts like U-Bar (i.e., those contracts containing pulpwood), significantly less profitable. Indeed, the very premise behind the Forest Service's offering of sales containing pulpwood, as it did almost exclusively by the mid-1990's, was that the Stone facility would be

available as an outlet for this material, material for which no one in Arizona except Stone had a significant use. Precision Pine sought any number of compromises with the Forest Service to make multi-product sales like U-Bar operable, including being allowed to leave the pulpwood standing, cutting and stacking the pulpwood for use by firewood collectors, and reducing the stumpage rate on the sales to reflect the dramatically changed market conditions. The Forest Service instead began offering new multi-product sales for bid with the pulpwood component priced at $.73/CCF, thereby virtually ensuring that the harvesting on existing multi-products contracts could not be performed except at huge losses. Indeed, had Precision Pine harvested this sale to completion without an outlet for pulpwood and chips, it would have added significantly to (rather than mitigated) the damages sought in the instant action.

In addition to the adverse impacts to Precision Pine's ability to operate the U-Bar sale caused by severe disruptions to the pulpwood market, the lumber market began to decline dramatically in mid-1997, and remained relatively flat through 1998 and into the first half of 1999. For example, the annual average lumber price index published by Western Wood Products Association for Rocky Mountain Ponderosa Pine, which is the relevant index (adjusted to a 1997-1998 basis), was as follows: 1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83; 1999 – $374.35; 2000 – $333.67. In recognition of the decline in the market the Forest Service granted Precision Pine Market Related Contract Term Addition in 1998 and 1999.

Also, in the fall of 1998, the Winslow sawmill to which the U-Bar sale was to have been hauled and processed, burned down forcing Precision Pine to consolidate its operations at its Heber sawmill. Attempts to harvest U-Bar after the fire at Winslow would have required

considerable additional hauling costs in an already bad market for lumber and in a virtually non-existent market for pulpwood.

In light of all of the foregoing, no plans were made to harvest the U-Bar sale in 1999 unless the lumber market dramatically improved. Again, no specific plans were made to harvest the U-Bar sale because the poor market conditions persisted at the beginning of the year 2000 as did Stone Container's continuing refusal to buy pulpwood. Nevertheless, during the summer of 2000, Precision Pine sought to harvest some timber from U-Bar for its Heber mill, however, the sale area was under fire restrictions for almost the entire summer, including a complete shutdown from June 2 to June 30, 2000.

Finally, on or about June 12, 2000, the Forest Service notified Precision Pine that its surety, Frontier Insurance Company, had been removed from the U.S. Department of the Treasury's list of approved sureties. This prompted the Forest Service to demand that Precision Pine find a new surety or provide bonding in some way, which Precision Pine was unable to do because all of the cash it had available to pay for bonding had already been paid in advance to Frontier Insurance. The Forest Service would not permit operations on the sale (or other Forest Service sales) while this problem continued leaving Precision Pine with very limited access to timber. Thereafter, the Forest Service terminated the U-Bar contract on December 4, 2000.

**Salt** – The normal operating season for this sale was May 1 to July 15 and August 15 to November 30.

This sale was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995 and which was not lifted with respect to this sale until December 4, 1996. In January 1997, Precision Pine advised the Forest Service that it intended to resume harvesting in May 1997. However, effective June 2, 1997, cutting units 1, 8-10, 12 or 14-15 on the Salt sale and several other of Precision Pine's sales were again the subject of a preliminary injunction against the Forest Service. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of a third normal operating season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

Shortly after the 1997 suspension was lifted, in January 1998, Precision Pine made plans to harvest the Salt sale beginning in the late fall of 1998 or the early spring 1999. However, on February 12, 1998 Stone Container announced that thereafter it would be meeting its need for pulpwood and chip fiber primarily from recycled materials and would no longer be purchasing pulpwood and chips from outside vendors. Overnight, this rendered all of Precision Pine's contracts, especially including its multi-product contracts like Salt (i.e., those contracts

containing pulpwood), significantly less profitable. Indeed, the very premise behind the Forest Service's offering of sales containing pulpwood, as it did almost exclusively by the mid-1990's, was that the Stone facility would be available as an outlet for this material, material for which no one in Arizona except Stone had a significant use. Precision Pine sought any number of compromises with the Forest Service to make multi-product sales like Salt operable, including being allowed to leave the pulpwood standing, cutting and stacking the pulpwood for use by firewood collectors, and reducing the stumpage rate on the sales to reflect the dramatically changed market conditions. The Forest Service instead began offering new multi-product sales for bid with the pulpwood component priced at $.73/CCF, thereby virtually ensuring that harvesting on existing multi-products contracts could not be performed except at huge losses. Indeed, had Precision Pine harvested this sale to completion without an outlet for pulpwood and chips, it would have added significantly to (rather than mitigated) the damages sought in the instant action.

In addition to the adverse impacts to Precision Pine's ability to operate the Salt sale caused by severe disruptions to the pulpwood market, the lumber market began to decline dramatically in mid-1997, and remained relatively flat through 1998. For example, the annual average lumber price index published by Western Wood Products Association for Rocky Mountain Ponderosa Pine, which is the relevant index (adjusted to a 1997-1998 basis), was as follows: 1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83.

In an April 16, 1998 letter to Steve Gunzel, the Acting Contracting Officer for this sale, responding to a Forest Service request that the deposit for the sale be restored, Precision Pine's

President, Lorin Porter, explained the difficult situation into which Precision Pine had been thrust by the Forest Service:

> The Forest Service's suspension of this sale during all or part of three consecutive harvest seasons, combined with the virtual closure of the National Forests in Arizona and New Mexico during the same period, has lead to substantial economic hardship throughout the forest products industry in Region 3, the repercussions of which continue to be felt. Indeed, during this time Precision Pine went from operation of three mills to limited operation of one mill. These suspensions were in no way caused by us and we took significant steps to free our sales from the suspensions which occurred during relatively good timber markets. . . .
>
> This already bleak situation was recently made significantly worse when Stone Container Corporation announced the closure of its Kraft pulping system in Snowflake. With this closure, the last regional outlet for pulpwood from sales such as Salt is gone, and our ability to dispose of chips from all of our sales has been drastically diminished . . . . Moreover, this closure raises larger issues with regard to the removal of pulpwood on current sales throughout the region as well as how the Forest Service will manage the ever increasing fuel loads on the forest in the future. Indeed, we are at a point where performance of these sales has reached the point of virtual impossibility.

On May 8, 1998, Mr. Gunzel responded to that letter with empathy ("We are cognizant of your difficulties due to the lack of a pulpwood market and the financial hardship the previous injunction has caused"), but Precision Pine's pleas were unavailing.

Precision Pine's later request to mutually cancel the contract was denied on August 13, 1998. On August 14, 1998, the Vice President of Precision Pine, Lewis Tenney, Jr. reiterated the reasons why harvesting Salt was impossible in a letter to Mr. Gunzel, and declared that Precision Pine "consider[ed] the Salt contract to be at an end." This fact notwithstanding, the Forest Service later found Precision Pine to be in default on the contract for refusing to restore the deposit on the sale and terminated the sale.

**St. Joe** – This sale was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995 and which was lifted with respect to this sale on October 20, 1995. Precision Pine began work on this sale in the fourth quarter of 1995 and logged the sale to completion in by the end of the second quarter of 1996.

**Saginaw-Kennedy** – The normal operating season on this contract was May 1 to November 30. Additional restrictions included no activity in cutting in units 12, 13, and 14 between March 1 and June 30.

This sale was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995 and which was not lifted with respect to this sale until December 4, 1996. On January 22, 1997, Precision Pine informed the Forest Service that it intended to harvest the sale in August, 1997. However, effective June 2, 1997, several of Precision Pine's sales, including the Saginaw-Kennedy sale were again the subject of a preliminary injunction against the Forest Service. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service resulted in all of Precision Pine's mills eventually being shut-

down in the fall of 1997. Needless to say, the loss of a third normal operating season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

Shortly after the 1997 suspension was lifted, on January 21, 1998, Precision Pine provided the Forest Service with its plan to harvest the Saginaw-Kennedy sale in July/August of 1998. However, on February 12, 1998 Stone Container announced that thereafter it would be meeting its need for pulpwood and chip fiber primarily from recycled materials and would no longer be purchasing pulpwood and chips from outside vendors. Overnight, this rendered all of Precision Pine's contracts, especially including its multi-product contracts like Saginaw-Kennedy (i.e., those contracts containing pulpwood), significantly less profitable. Indeed, the very premise behind the Forest Service's offering of sales containing pulpwood, as it did almost exclusively by the mid-1990's, was that the Stone facility would be available as an outlet for this material, material for which no one in Arizona except Stone had a significant use. Precision Pine sought any number of compromises with the Forest Service to make multi-product sales like Saginaw-Kennedy operable, including being allowed to leave the pulpwood standing, cutting and stacking the pulpwood for use by firewood collectors, and reducing the stumpage rate on the sales to reflect the dramatically changed market conditions. The Forest Service instead began offering new multi-product sales for bid with the pulpwood component priced at $.73/CCF, thereby virtually ensuring that harvesting on existing multi-products contracts could not be performed except at huge losses. Indeed, had Precision Pine harvested this sale to completion without an outlet for pulpwood and chips, it would have added significantly to (rather than mitigated) the damages sought in the instant action.

In addition to the adverse impacts to Precision Pine's ability to operate the Saginaw-Kennedy sale caused by severe disruptions to the pulpwood market, the lumber market began to decline dramatically in mid-1997; and remained relatively flat through 1998 and into the first half of 1999. For example, the annual average lumber price index published by Western Wood Products Association for Rocky Mountain Ponderosa Pine, which is the relevant index (adjusted to a 1997-1998 basis), was as follows: 1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83; 1999 – $374.35; 2000 – $333.67. In recognition of the decline in the market the Forest Service granted Precision Pine Market Related Contract Term Addition in 1998.

Also, in the fall of 1998, the Winslow sawmill to which the Saginaw-Kennedy sale was to have been hauled and processed, burned down forcing Precision Pine to consolidate its operations at its Heber sawmill. Attempts to harvest Saginaw-Kennedy after the fire at Winslow would have required considerable additional hauling costs in an already bad market for lumber and in a virtually non-existent market for pulpwood.

In light of all of the foregoing, no specific plans were made to harvest the Saginaw-Kennedy sale in 1999 because, as Precision Pine informed the Forest Service on February 24, 1999, (1) the Winslow mill had burned down, (2) the market for softwood lumber was down, (3) Stone Container no longer needed pulpwood and (4) the Forest Service had dropped the price for pulpwood to $0.73/ccf while Precision Pine was required to pay $9.40/ccf for wood it could not mill or sell.

No specific plans were made to harvest because the poor market conditions persisted in the year 2000 as did Stone Container's continuing refusal to buy pulpwood. Nevertheless, during the summer of 2000, Precision Pine sought to harvest some timber from this sale for its Heber mill, however, the sale area was under fire restrictions for almost the entire summer, including a complete shutdown from June 2 to June 30, 2000.

Finally, in June 2000, the Forest Service advised Precision Pine that Precision Pine's surety, Frontier Insurance Company, was removed from the U.S. Department of the Treasury's list of approved sureties. This prompted the Forest Service to demand that Precision Pine find a new surety or provide bonding in some way, which Precision Pine was unable to do because all of the cash it had available to pay for bonding had already been paid in advance to Frontier Insurance. The Forest Service would not permit operations on the sale (or other Forest Service sales) while this problem continued leaving Precision Pine with very limited access to timber. Thereafter, the Forest Service terminated the Saginaw-Kennedy contract on December 4, 2000.