**INTERROGATORY NO. 37**

With respect to each year of each contract listed on page C-0041 of Precision Pine's February 26, 2003 damages calculations, identify each breach of contract that Precision Pine contends resulted in the damages sought, and for each alleged breach, explain in detail how the breach caused the damages.

**SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 37**

The chart at page C-0041 of the damage binder is made up of two components: (a) increased logging costs and (b) increased hauling costs. These costs are discussed in turn below and include a breakdown of damages incurred with respect to each contract by year.

a. Increased Logging Costs.

Increased costs of logging are claimed for two contracts that were breached by the Forest Service, namely Hay and O.D. Ridge. Due to the suspension, these sales could not be harvested by Precision Pine during the time periods anticipated. When the suspension was lifted on or about December 4, 1996, i.e., some 16 months after it had begun and harvesting operations resumed, Precision Pine was charged an additional $10/MBF by its logging contractor to harvest these sales. This logging price increase resulted in total additional logging costs of $9,983.20 (plus overhead and profit) on the Hay sale in 1998, $4,570.00 (plus overhead and profit) on the O.D. Ridge contract in 1997, and $8,001.00 (plus overhead and profit) on the O.D. Ridge contract in 1998. The increased logging costs on these two contracts were the direct result of not being able to harvest the timber as originally anticipated during the suspension due to the Forest Service's breach of these contracts.

b. Increased Hauling Costs.

1. Hay and O.D. Ridge timber sales:

But for the Forest Service's suspension and breach of the Hay and O.D. Ridge timber sale contracts, these sales would have been harvested to completion and the timber delivered to Precision Pine's Eagar mill before December 4, 1996, the date that the injunction was lifted. Eagar is the most proximate mill to both of these sales. However, after the suspension was lifted, the Eagar mill was not immediately available to process timber and, thereafter, due to the ongoing effects of another suspension, on or about August 1, 1997, the Eagar sawmill was permanently closed. Because the Forest Service's breach prevented Precision Pine from harvesting and processing these sales as anticipated, when harvesting was possible on the sales, Precision Pine was required to haul timber from these sales to either Precision Pine's Heber or Winslow sawmills for processing. Both of these mills are further from the sales than Eagar and Precision Pine thus incurred increased hauling costs in doing so. This additional hauling cost, which would not have been incurred had there been no breach, is based on the roundtrip cost of hauling (e.g., fuel, driver pay, wear and tear on the trucks) which Precision Pine's President conservatively set at $1.10/mile multiplied by the number of additional miles hauled, i.e., 272 additional miles roundtrip to the Winslow sawmill instead of the Eagar sawmill, 190 miles roundtrip to the Heber sawmill instead of Eagar sawmill and 166 miles roundtrip to the Winslow sawmill instead of the Heber sawmill. In order to arrive at a cost per MBF, the total increased haul cost was divided by four to account for the fact that, according to Precision Pine's President, an average truck load consists of 4 MBF of timber.

Specifically, in December of 1996, Precision Pine hauled 54.28 MBF of timber from the Hay sale to Precision Pine's sawmill at Winslow (rather than Eagar) at an additional cost of $29,260.26 plus overhead and profit, and in the first quarter of 1997 Precision Pine hauled 1765.56 MBF of timber from the Hay sale to Precision Pine's sawmill at Winslow (rather than Eagar) at an additional cost of $132,063.89 plus overhead and profit. Thereafter, in 1998, after the permanent closure of the Eagar sawmill, Precision Pine hauled another 998.32 of timber from the Hay sale to its mill in Heber at an additional cost of $52,162.22 plus overhead and profit.

Similarly, with respect to the O.D. Ridge sale (which should have been processed at the Eagar sawmill), in 1996 Precision Pine hauled timber from the sale to its mill in Winslow at an additional cost of $4,060.14 plus overhead and profit, in 1997 Precision Pine hauled timber from this sale to its mill at Heber at total cost of $23,878.25, and in 1998 Precision Pine hauled timber from this sale to its mill at Heber at total cost of $41,805.23 plus overhead and profit.

2. <u>Brewer, Delgado and Highway Salvage timber sales</u>.

Although these sales were not the subject of the Forest Service's suspension, they were nevertheless impacted by the Forest Service's breaches, <u>i.e.</u>, the breach necessitated the shut down of the mills to which the timber these sales were to have been delivered for processing and resulted in Precision Pine having to incur greater cost to haul the timber from these sales to more distant sawmill facilities as discussed below:

**Brewer and Delgado sales** – Due to the ongoing impacts of the Forest Service's breach, the Heber sawmill remained closed from June 16, 1996 to October 20, 1997. Accordingly, in

both 1996 and 1997, Precision Pine was forced to haul timber removed from the Brewer and Delgado sales, which otherwise would have gone to the Heber sawmill, to the Winslow sawmill. In 1996 these additional costs for the Brewer sale totaled $1,753.87 (plus overhead and profit). In 1997 these additional costs for the Brewer sale totaled $1,734.70 (plus overhead and profit) and for the Delgado sale totaled $520.41 (plus overhead and profit). This item of damage was allocated to the breached sales that would have gone to the Heber mill had there been no suspension in the proportion that that the volume of those sales bears to the total suspended volume as follows: Brookbank 21.7% = $1,052.64, Jersey Horse 21.5% = $1042.94, Manaco 30.1% = $1,460.11, Salt 26.8% = $1,295.18.

**Highway Salvage sale** – Although the chart in the calculations binder at page C-0041 states that the sale would have gone to Heber, the sale in fact would have gone to Eagar in 1998. However, at the time of harvest the Eagar mill had been permanently closed due to the ongoing repercussions of the Forest Service's breach and suspension of the sales that would have gone to the Eager mill. Accordingly, Precision Pine was required to haul the timber from this sale to its Winslow sawmill at an additional cost of $2,873.75 plus overhead and profit. This item of damage has been allocated to the breached sales that would have gone to the Eagar sawmill had there been no suspension, in the proportion the volume of those sales bears to the total suspended volume at the Eagar mill as follows: Hay 42.2% = $1,212.72, Kettle 22.3% = $640.85, O.D. Ridge 35.3% = $1,014.43.

**INTERROGATORY NO. 41**

With respect to Precision Pine's February 26, 2003 damages calculations, state all facts on which Precision Pine bases its assertion about the products it would have been able to produce from the timber it anticipated harvesting on the contracts at issue.

**SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 41**

With respect to lumber products, Precision Pine's President reviewed the quality and kind of timber on each of the sales and determined that Precision Pine would have manufactured the lumber products for which it has claimed damages from each of the contracts at issue. Additional support for the fact that such lumber products would have been produced is found in the Winslow Sales Record and the lumber price invoices which were produced to defendant as part of the Washington, DC document production. These documents demonstrate that Precision Pine did in fact manufacture and sell the lumber products for which it seeks damages before, during and after the period of the suspension.

With respect to by-products, as the name suggests, these products were produced as a natural consequence of processing the timber into lumber and, according to Precision Pine's President, each of these by-products was consistently produced at Precision Pine's mills before, during and after the suspension.

As permitted by the Court's order of October 2, 2003, Precision Pine specifies the following locations in the damages binder where facts related to the products that would have been produced from the timber harvested may be located:

Chips: Calculation Binder – pages C0043-C0047;

Grindings: Calculation Binder – pages C0043, C0048-C0051;

Bark: Calculation Binder – pages C0043, C0052-C0052;

Shavings: Calculation Binder – pages C0043, C0056-C0060;

Lumber: Calculation Binder – pages C0072 – C0089.

Additional factual information as to how calculations were performed for each of these products is found in the narrative response to Interrogatory No. 36.

Respectfully submitted,

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140
(202) 775-8217 - facsimile

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
David J. Craig
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140
(202) 775-8217 – facsimile

Date: October 13, 2003

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14h day of October 2003, I caused to be served via hand delivery a copy of the foregoing PLAINTIFF'S SUPPLEMENTAL ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES on David A. Harrington, Esq., counsel for defendant The United States, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Attn: Classification Unit, 8th Floor, 1100 L Street, N.W., Washington, D.C. 20530.

David J. Craig