**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Chief Judge Damich) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S STATUS REPORT**

Pursuant to the Court's October 20, 2003 order, defendant, the United States, submits this report providing additional detail regarding its objections to the supplemental answer of plaintiff, Precision Pine & Timber, Inc. ("Precision Pine"), to interrogatory 34.

**DISCUSSION**

Interrogatory 34 reads as follows:

> With respect to each of the contracts at issue, explain in detail why Precision Pine did not harvest timber that it anticipated harvesting during the suspension at issue . . . after suspension of the contract was lifted.

See App. 35 (emphasis added).[1] Addressing the United States' motion for sanctions, on October 2, 2003, the Court ordered Precision Pine to fully answer interrogatory 34. Order of Chief Judge Damich at 3 (Oct. 2, 2003).

Precision Pine served a supplemental answer to interrogatory 34 on October 14, 2003. However, as explained below, Precision Pine's supplemental answer – while long and referring to

---

[1] Citations to "App. __" are to the appendix to the United States' October 16, 2003 status report.

many facts – does not explain why Precision Pine decided not to harvest timber after the Forest Service lifted the suspension of the contracts at issue.

**1. Brann**

October 23, 1995 to January 26, 1996 – Precision Pine states that it advised the Forest Service that it would harvest timber on the Hutch-Boondock and St. Joe contracts "and then come back to Brann." App. 35. This does not explain why the Brann contract was not harvested. Perhaps Precision Pine's logging subcontractor lacked the capacity to harvest all three contracts (Hutch-Boondock, St. Joe and Brann) at the same time. Perhaps Precision Pine was speculating that prices would rise and it would earn more by waiting to harvest the Brann contract. Perhaps Precision Pine had ample timber for the sawmill to which timber from the Brann sale was to be shipped. The United States should not have to guess why Precision Pine chose not to harvest the Brann contract during this period. Because Precision Pine does not supply an explanation, its supplemental answer is incomplete.

February 12, 1996 – May 3, 1996 – Precision Pine states that it informed the Forest Service on February 12, 1996 that it had purchased a timber sale "on the Hualapai [Indian] reservation and would be operating there through June at which time Precision Pine intended to return to Brann." App. 36. This does not explain why Precision Pine chose not to harvest timber from the Brann sale. Once again, there are many possible reasons: Precision Pine's logging subcontractor could have lacked the capacity to harvest both contracts; Precision Pine could have concluded that harvesting the Brann contract was unprofitable; Precision Pine could have had ample timber supplies for its mills. Regardless, Precision Pine's supplemental answer fails to supply the reason and is therefore incomplete.

April 15, 1997 to June 2, 1997 – Precision Pine provides no explanation for its decision not to harvest the Brann timber sale from April 15, 1997 (the beginning of the normal operating season) to June 2, 1997 (the date that operations upon the Brann contract was enjoined in the Forest Guardians litigation).

December 15, 1997 to December 31, 1997 – Precision Pine provides no explanation for its decision not to harvest the Brann timber sale from December 15, 1997 (the date that the Forest Guardians suspension was lifted) and December 31, 1997 (the end of the normal operating season).

February 27, 1998 to June 30, 2000 – Precision Pine states that on February 12, 1998, Stone Container Corporation ceased buying pulpwood and chips from outside vendors such as Precision Pine, App. 37, that the lumber market "declined in mid 1997, and remained relatively flat through 1998 and into the first half of 1999 before nose-diving in the year 2000," App. 38, and that its Winslow sawmill burned down in the fall of 1998, App. 38.

These things each had a potential effect upon the profitability of the Brann contract. Indeed, it could be inferred that Precision Pine did not operate the Brann contract during this period because the contract was not profitable. However, Precision Pine might have elected not to operate the Brann contract for other reasons. The United States should not have to guess why Precision Pine did not operate the contract. If the reason was that the Brann contract was not profitable during some or all of this period, Precision Pine should say so. In any event, because Precision Pine does not explain why it did not harvest timber during this period, its supplemental answer is incomplete.

**2. Brookbank**

April 15, 1997 to November 15, 1997 – Precision Pine notes that an injunction was entered in the Forest Guardians litigation on June 2, 1997. App. 40. The injunction affected harvesting of "the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts." Id. However, it did not enjoin harvesting upon the Brookbank contract. Consequently, the Forest Guardians injunction does not explain why Precision Pine did not harvest the Brookbank contract.

Precision Pine also notes that on September 15, 1997, the Forest Service restricted the operation of payment units 2 and 3 through September 30.[2] However, this only explains why there were no operations on two payment units for a period of 15 days, i.e., between September 15, 1997 and September 30, 1997. Precision Pine does not address why it did not harvest payment units 2 and 3 before September 15, 1997 or after September 30, 1997. Furthermore, the Brookbank sale contained six payment units. There was no restriction on harvesting most of the contract (i.e., on 4 of 6 payment units). Precision Pine does not explain why harvesting did not proceed on the payment units that were subject not to harvesting restrictions. Consequently, its answer is incomplete.

May 9, 1998 to June 30, 2000 – Precision Pine states that it commenced harvesting timber upon the Brookbank contract in the second quarter of 1998. App. 41. However, according to Forest Service records, Precision Pine stopped harvesting upon the Brookbank contract on or about May 9, 1998. Precision Pine provides no explanation for its decision not to

---

[2] The area to be logged on a given contract is divided into "payment units." Payment units are further subdivided into "cutting units." Restrictions on harvesting one payment (or cutting unit) does not affect the right to harvest a contract's other payment units.

harvest the Brookbank timber sale contract for the remainder of the 1998 operating season or during the 1999 operating season.

Precision Pine does assert that on February 12, 1998, Stone Container Corporation ceased buying pulpwood and chips from outside vendors such as Precision Pine, App. 41, that the lumber market "declined in mid 1997, and remained relatively flat through 1998 and into the first half of 1999 before nose-diving in the year 2000," App. 42, and that its Heber sawmill was closed, App. 40-41.

Precision Pine is pointing to things that had a potential effect upon the Brookbank contract's profitability. However, none of these things – not the decision by Stone Container to stop buying roundwood, not changes in the market price for lumber, and not the fact that the Heber mill was closed – prevented harvesting upon the Brookbank contract. For instance, Precision Pine could have transported timber from the Brookbank sale to a different sawmill.

If Precision Pine contends that these events made harvesting the Brookbank contract during some, or all, of this period unprofitable, it should say so in its answer. In any event, because Precision Pine has not explained why it did not harvest timber from the Brookbank contract between July 1, 1998 and June 30, 2000, its supplemental answer is incomplete.

**3. Hay**

No objections.

**4. Hutch-Boondock**

April 15, 1997 to November 30, 1997 – With respect to the 1997 normal operating season, Precision Pine states only that an injunction was entered in the Forest Guardians litigation on June 2, 1997. See App. 45. The injunction affected harvesting upon "the

Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts." Id. It did not enjoin harvesting upon the Hutch-Boondock contract. Consequently, the Forest Guardians injunction does not explain why Precision Pine did not harvest the Hutch-Boondock contract during the contract's normal operating season in 1997.

June 1, 1998 to June 30, 2000 – Precision Pine states that on February 12, 1998, Stone Container Corporation ceased buying pulpwood and chips from outside vendors such as Precision Pine, App. 45, states that the lumber market "declined in mid 1997, and remained relatively flat through 1998 and into the first half of 1999," App. 46, and states that its Winslow sawmill burned down in the fall of 1998, App. 46.

Precision Pine is pointing to things that had a potential effect upon the Hutch-Boondock contract's profitability. However, none of these occurrences prevented harvesting of the Hutch-Boondock contract during the normal operating season in 1998, 1999 or 2000. If Precision Pine contends that these events made harvesting the Hutch-Boondock contract unprofitable during some, or all, of this period, it should say so in its answer. In any event, because Precision Pine has not explained why it did not harvest timber from the Hutch-Boondock contract between June 1, 1998 and June 30, 2000, its supplemental answer is incomplete.

**5. Jersey Horse**

September 1, 1997 to November 15, 1997 – With respect to this period, Precision Pine states only that an injunction was entered in the Forest Guardians litigation on June 2, 1997. See App. 49. The injunction affected harvesting upon "the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts." Id. It did not enjoin harvesting upon the Jersey Horse contract. Consequently, the Forest Guardians injunction does not explain why Precision

Pine did not harvest the Jersey Horse contract between September 1, 1997 (when various contractual restrictions ended), and November 15, 1997 (the end of the normal operating season).[3]

September 1, 1998 to November 15, 1999 – Precision Pine states that on February 12, 1998, Stone Container Corporation ceased buying pulpwood and chips from outside vendors such as Precision Pine, App. 49-50, and that the lumber market "declined in mid 1997, and remained relatively flat through 1998 and into the first half of 1999," App. 50.

Precision Pine is pointing to things that had a potential effect upon the Jersey Horse contract's profitability. However, none of these occurrences prevented harvesting of the Jersey Horse contract during the normal operating season in 1998 or 1999. If Precision Pine contends that these events made harvesting the Jersey Horse contract unprofitable during some, or all, of this period, it should say so in its answer. In any event, Precision Pine has not explained why it did not harvest timber from the Jersey Horse contract between September 1, 1998 and November 15, 1998, and between September 1, 1999 and November 15, 1999. Its supplemental answer is, therefore, incomplete.

**6. Kettle**

June 17, 1997 to August 31, 1997 – Precision Pine states that it "commenced" harvesting upon the Kettle contract in the second quarter of 1997. App. 51. However, according to Forest Service records, no timber was harvested upon the contract from mid-June 1997 to the end of August 1997. Precision Pine does not explain why no harvesting took place during this period.

---

[3] Precision Pine states that it began harvesting timber at some point "during the 4th Quarter of 1997." App. 49. However, Precision Pine does not state when its harvesting operations began.

**7. Manaco**

May 1, 1997 to June 2, 1997 – Precision Pine does not explain why no harvesting upon the Manaco contract occurred between May 1, 1997 (the beginning of the contract's normal operating season) and June 2, 1997 (the date of the Forest Guardians injunction).[4] Precision Pine notes that it was advised of the discovery of a Mexican Spotted Owl adjacent to the Manaco sale in December 1996 or January 1997. App. 52. However, this issue was resolved prior to the beginning of the contract's normal operating season, i.e., prior to May 1, 1997.

June 1, 1998 to November 30, 1999 – With respect to the 1998 and 1999 normal operating seasons, Precision Pine states that on February 12, 1998, Stone Container Corporation ceased buying pulpwood and chips from outside vendors such as Precision Pine, App. 53-54, and that the lumber market "declined in mid 1997, and remained relatively flat through 1998 and into the first half of 1999," App. 54.[5]

Precision Pine is pointing to things that had a potential effect upon the Manaco contract's profitability. However, none of these occurrences prevented harvesting upon the Manaco contract during the normal operating season in 1998 or 1999. If Precision Pine contends that these events made harvesting the Manaco contract unprofitable during some, or all, of this

---

[4] Precision Pine also notes that restrictions existed on certain cutting units during this period. App. 52. If Precision Pine contends that, as a result of these restrictions, the harvesting of those cutting units that were not restricted was unfeasible, it should say so in its answer. Compare App. 48 (stating with respect to the Jersey Horse contract that contract restrictions "essentially limited" harvesting to the period between September 1 and November 15), with App. 52 (simply listing, without explanation, contractual restrictions with respect to some cutting units on the Manaco contract).

[5] Precision Pine states that it harvested timber during an unspecified part of the second quarter of 1998. See App. 53. According to Forest Service records, this harvesting began in April and ended in May 1998.

period, it should say so in its answer. In any event, Precision Pine has not explained why it did not harvest timber from the Manaco contract during the 1998 and 1999 operating seasons, i.e., between June 1, 1998 and July 15, 1998, August 15, 1998 and November 15, 1998, May 1, 1999 and July 15, 1999, and August 15, 1999 and November 15, 1999. Its supplemental answer is, therefore, incomplete.

**8. Monument**

April 15, 1997 to November 30, 1997 – With respect to this period, Precision Pine states only that an injunction was entered in the Forest Guardians litigation on June 2, 1997. See App. 56. The injunction affected harvesting upon "the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts." Id. It did not enjoin harvesting upon the Monument contract. Consequently, the Forest Guardians injunction does not explain why Precision Pine did not harvest the Monument contract during the 1997 normal operating season, i.e., between April 15, 1997 and November 30, 1997.

April 15, 1998 to November 30, 1999 – With respect to the 1998 and 1999 normal operating seasons, Precision Pine states that on February 12, 1998, Stone Container Corporation ceased buying pulpwood and chips from outside vendors such as Precision Pine, App. 56-57, that the lumber market "declined in mid 1997, and remained relatively flat through 1998 and into the first half of 1999," App. 57, and that its Winslow sawmill burned down in the fall of 1998, App. 57.

Precision Pine is pointing to things that had a potential effect upon the Monument contract's profitability. However, none of these occurrences prevented harvesting upon the Monument contract during the normal operating season in 1998 or 1999. For instance, Precision

Pine concedes that it could simply have transported timber from the Monument sale to a different sawmill, albeit at an increased cost. See App. 57.

If Precision Pine contends that these events made harvesting the Manaco contract unprofitable during some, or all, of this period, it should say so in its answer. In any event, Precision Pine has not explained why it did not harvest timber from the Manaco contract during the 1998 and 1999 operating seasons, i.e., between April 15, 1998 and November 30, 1998, and between April 15, 1999 and November 30, 1999. Its supplemental answer is, therefore, incomplete.

**9. Mud**

June 24, 1996 to August 1, 1996 – The suspension of the Mud timber sale was lifted on March 11, 1996, see Letter from Ken Broyles to Lorin Porter (Mar. 11, 1996) (attached as Exhibit A), and the Forest Service informed Precision Pine that it could begin road work prior to the contract's normal operating season, see App. 59. Precision Pine states that fire restrictions prevented harvesting from commencing at the beginning of the normal operating season on June 1, 1996. App. 59. However, Precision Pine does not explain why it did not begin harvesting timber when the fire restrictions were lifted on or about June 24, 1996. See App. 59 (stating that "timber falling seems to have begun on or about August 1").

November 1, 1996 to December 31, 1996 – Precision Pine states that it harvested timber on the Mud contract in August, September and October 1996. App. 59. However, Precision Pine does not explain why it did not harvest through the end of the normal operating season, i.e., through December 31, 1996.

June 1, 1997 to December 31, 1997 – Precision Pine notes that an injunction was entered in the Forest Guardians litigation on June 2, 1997. See App. 60. The injunction affected harvesting upon "the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts." Id. It did not enjoin harvesting upon the Mud contract. Consequently, the Forest Guardians injunction does not explain why Precision Pine did not harvest the Mud contract during the contract's normal operating season in 1997.

**10. O.D. Ridge**

May 15, 1998 to August 17, 1999 – With respect to this period, Precision Pine asserts only that on February 12, 1998, Stone Container Corporation ceased buying pulpwood and chips from outside vendors such as Precision Pine, App. 61, and that the lumber market "declined in mid 1997, and remained relatively flat through 1998 and into the first half of 1999," App. 62. These occurrences had a potential effect upon the O.D. Ridge contract's profitability. However, none prevented harvesting upon the O.D. Ridge contract. Indeed, Precision Pine did operate the O.D. Ridge sale during the third quarter of 1999 and the second quarter of 2000. App. 62.

Thus, Precision Pine has not explained why it did not harvest timber upon the O.D. Ridge contract during the 1998 operating season or the first part of the 1999 operating season, i.e., between May 15, 1998 and October 15, 1998, and between May 15, 1999 and August 17, 1999.[6] Its supplemental answer is, therefore, incomplete.

---

[6] Precision Pine states that it "commenced harvesting" upon the O.D. Ridge contract during "the third quarter of 1999." App. 62. According to Forest Service records, Precision Pine's timber harvesting operations began on or about August 17, 1999.

**11. U-Bar**

April 15, 1998 to November 30, 1999 – With respect to the 1998 and 1999 operating seasons, Precision Pine asserts only that on February 12, 1998, Stone Container Corporation ceased buying pulpwood and chips from outside vendors such as Precision Pine, App. 63-64, that the lumber market "declined in mid 1997, and remained relatively flat through 1998 and into the first half of 1999," App. 64, and that its Winslow sawmill burned down in the fall of 1998, App. 64. These occurrences had a potential effect upon the U-Bar contract's profitability. However, none prevented harvesting upon the U-Bar contract. For instance, Precision Pine concedes that it could simply have transported timber from the U-Bar sale to a different sawmill, albeit at an increased cost. See App. 65.

If Precision Pine contends that these events made harvesting the U-Bar contract unprofitable during some, or all, of this period, it should say so in its answer. In any event, Precision Pine has not explained why it did not harvest timber from the U-Bar contract during the 1998 and 1999 operating seasons, i.e., between April 15, 1998 and November 30, 1998, and between April 15, 1999 and November 30, 1999. Its supplemental answer is, therefore, incomplete.

**12. Salt**

May 1, 1997 to June 2, 1997 – Precision Pine provides no explanation for its decision not to harvest the Salt timber sale from May 1, 1997 (the beginning of the 1997 operating season) and June 2, 1997 (the date of the Forest Guardians injunction).

June 2, 1997 to November 15, 1997 – Precision Pine notes that an injunction was entered in the Forest Guardians litigation on June 2, 1997. App. 66. However, the injunction in Forest

Guardians applied to only part of the Salt timber sale. App. 66. Precision Pine does not explain why it chose not to harvest timber on those cutting units unaffected by the Forest Guardians injunction.

May 1, 1998 to November 15, 1999 – With respect to the 1998 and 1999 operating seasons, Precision Pine asserts that on February 12, 1998, Stone Container Corporation ceased buying pulpwood and chips from outside vendors such as Precision Pine, App. 66-67, and that the lumber market "declined in mid 1997, and remained relatively flat through 1998," App. 67.[7] These occurrences had a potential effect upon the Salt contract's profitability. However, none prevented harvesting upon the Salt contract. Consequently, simply citing these events does not explain why no harvesting upon the Salt contract occurred.

If Precision Pine contends that these events made harvesting the Salt contract unprofitable during some, or all, of this period, it should say so in its answer. In any event, Precision Pine has not explained why it chose not to harvest timber from the Salt contract during the 1998 and 1999 operating seasons, i.e., between May 1, 1998 and July 15, 1998, August 15, 1998 and November 15, 1998, May 1, 1999 and July 15, 1999, and August 15, 1999 and November 30,1999. Its supplemental answer is, therefore, incomplete.

**13. St. Joe**

No objections.

[7] Precision Pine also states that it requested cancellation of the Salt contract in 1998. App. 68. Its request was denied by the Forest Service. App. 68.

**14. Saginaw-Kennedy**

April 1, 1997 to June 2, 1997 – Precision Pine provides no explanation for its decision not to harvest the Saginaw-Kennedy timber sale from April 1, 1997 (the beginning of the 1997 operating season) and June 2, 1997 (the date of the Forest Guardians injunction).

April 1, 1998 to December 1, 1999 – With respect to the 1998 and 1999 operating seasons, Precision Pine asserts that on February 12, 1998, Stone Container Corporation ceased buying pulpwood and chips from outside vendors such as Precision Pine, App. 70, and that the lumber market "declined in mid 1997, and remained relatively flat through 1998 and into the first half of 1999," App. 71. These occurrences had a potential effect upon the Saginaw-Kennedy contract's profitability. However, none prevented harvesting upon the Saginaw-Kennedy contract. Consequently, simply citing these events does not explain why no harvesting upon the Saginaw-Kennedy contract occurred.

If Precision Pine contends that these events made harvesting the Saginaw-Kennedy contract unprofitable during some, or all, of this period, it should say so in its answer. In any event, Precision Pine has not explained why it chose not to harvest timber from the Saginaw-Kennedy contract during the 1998 and 1999 operating seasons, i.e., between April 1, 1998 and December 1, 1998, and between April 1, 1999 and December 1, 1999. Its supplemental answer is, therefore, incomplete.

## CONCLUSION

For these reasons, Precision Pine's answer to interrogatory 34 is incomplete and does not comply with the Court's October 2, 2003 and October 8, 2003 orders.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

s/ David A. Harrington

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Attorneys for Defendant

OF COUNSEL:

Patricia Disert
Lori Polin Jones
Office of the General Counsel
U.S. Department of Agriculture

October 22, 2003