No. 98-720C
(Judge George W. Miller)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PRECISION PINE & TIMBER, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING DAMAGES

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277

Attorneys for Defendant

OF COUNSEL:

Lori Polin Jones
Patricia L. Disert
Office of General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

Dated: April 16, 2004

# TABLE OF CONTENTS


STATEMENT OF THE ISSUES . . . . . 1

STATEMENT OF THE CASE . . . . . 2

I. Nature Of The Case . . . . . 2

II. Statement Of Facts . . . . . 3

SUMMARY OF ARGUMENT . . . . . 9

ARGUMENT . . . . . 11

I. Standard Of Review . . . . . 11

II. Precision Pine Cannot Make The Requisite Showing To Recover Lost Profits . . . . . 12

A. Precision Pine Cannot Establish That Lost Profits Were Proximately Caused By The MSO Suspension . . . . . 14

1. Precision Pine Cannot Show What Contracts Would Have Been Harvested Had The MSO Suspension Not Occurred . . . . . 14

2. Any Lost Profits Suffered By Precision Pine Were Caused By Its Own Business Decisions – Not The Suspension Of Contracts . . . . . 16

B. The Loss Of Profits Resulting From A Suspension Was Not Contemplated By The Parties At The Time Of Contracting . . . . . 18

C. Precision Pine Can Establish No Lost Profits With Reasonable Certainty . . . . . 21

1. Precision Pine Cannot Demonstrate With Reasonable Certainty The Types And Amount Of Lumber Products That Would Have Been Produced From The Suspended Timber Sale Contracts . . . . . 22

2. Precision Pine's Claim Ignores The Actual Harvesting That Occurred After The Suspension Was Lifted And, Thus, Fails To Demonstrate Lost Profits With Reasonable Certainty . . . . . 25

III. Precision Pine Seeks Unrecoverable Consequential Damages . . . . . 27

A. Precision Pine's Claims For Increased Logging And Hauling Costs Should Be Denied As A Matter Of Law . . . . . 28

1. Increased Hauling Costs . . . . . 29

2. Increased Logging Costs . . . . . 30

B. Precision Pine's Claims For Increased Sawmill Costs Are Precluded By Federal Circuit Precedent And Should Be Denied As A Matter Of Law . . . . . 32

C. Precision Pine's Claim For "Unanticipated Interest Expenses" Should Be Denied As A Matter Of Law . . . . . 34

IV. Precision Pine Cannot Recover Damages Upon Behalf Of Its Subcontractors . . . . . 37

A. TRRI's Idle Equipment Costs Are Not Recoverable . . . . . 37

B. Tri-Star's Alleged Profits For Roundwood Are Not Recoverable . . . . . 39

V. The Contract Does Not Provide For The Payment Of Attorney's Fees . . . . . 40

A. The Doctrine Of Sovereign Immunity Precludes Precision Pine From Recovering Attorney's Fees From The Government . . . . . 41

B. The Attorney's Fees Sought By Precision Pine Are Remote And Consequential Damages And Cannot Be Recovered . . . . . 42

C. A Plain Reading Of CT6.01 Demonstrates That Attorney's Fees Are Not Recoverable . . . . . 44

D. Precision Pine Has Produced No Receipts Or Other Documentation Establishing That It Has Paid The Attorney's Fees For Which It Seeks Compensation . . . . . 46

CONCLUSION . . . . . 46

# TABLE OF AUTHORITIES

## Cases

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) . . . . . . . . . . 13

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 11

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 11-12, 28

Assurance Co. v. United States,
813 F.2d 1202 (Fed. Cir. 1987) . . . . . . . . . . 44

Barmag Barmer Maschinenfabrik AG v. Murata Machine Ltd.,
731 F.2d 831 (Fed. Cir. 1984) . . . . . . . . . . 12

Bausch & Lomb, Inc. v. United States,
148 F.3d 1363 (Fed. Cir. 1998) . . . . . . . . . . 45

Bluebonnet Savings Bank, FSB v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . 13, 18, 27, 41

C.B.C. Enterprises, Inc. v. United States,
24 Cl. Ct. 1 (1991) . . . . . . . . . . 44

California Federal Bank, FSB v. United States,
245 F.3d 1342 (Fed. Cir.2001) . . . . . . . . . . 36

Castle v. United States,
48 Fed. Cl. 187 (2000), aff'd in part, rev'd in part on other grounds,
301 F.3d 1328 (2002), cert. denied, 123 S. Ct. 2572 (2003) . . . . . . . . . . 19

Chain Belt Co. v. United States,
115 F. Supp. 701, 127 Ct. Cl. 38 (1953) . . . . . . . . . . 15, 19, 21

Christianson v. Colt Industrial Operating Corp.,
486 U.S. 800 (1988) . . . . . . . . . . 43

Columbia First Bank, FSB v. United States,
___ Fed. Cl. ___, 2004 WL 503718 (Mar. 15, 2004) . . . . . . . . . . 13

Cosmic Construction Co. v. United States,
697 F.2d 1389 (Fed. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

Department of the Army v. Blue Fox, Inc.,
119 S. Ct. 687 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Embrey v. United States,
17 Cl. Ct. 617 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Energy Capital Co. v. United States,
302 F.3d 1314 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14, 27

Energy Capital Corp. v. United States,
47 Fed. Cl. 382 (2000), aff'd in part, rev'd in part on other grounds,
302 F.3d 1314 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18-19

Everett Plywood Corp. v. United States,
206 Ct. Cl. 244, 512 F.2d 1082 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Federal Land Bank of St. Paul v. Bismark Lumber Co.,
314 U.S. 95 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Glendale Federal Bank, FSB v. United States,
239 F.3d 1374, 1380 (Fed. Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 27

Globe Savings Bank, FSB v. United States,
59 Fed. Cl. 86 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Henry J. Crowley & Co. v. United States,
143 Ct. Cl. 812, 166 F. Supp. 750 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 36

IBM v. United States,
201 F.3d 1367 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Imperial Tobacco Limited v. Phillip Morris, Inc.,
899 F.2d 1575 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Johns-Manville Corp. v. United States,
893 F.2d 324 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Kania v. United States,
227 Ct. Cl. 458 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Kumho Tire Co., Ltd. v. Carmichael,
526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24-25

Landmark Land Co. v. FDIC,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Lucas v. United States,
25 Cl. Ct. 298 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

M Corp. v. United States,
15 Cl. Ct. 670 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

M.A. Mortenson v. United States,
40 Fed. Cl. 389 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

MVM Inc. v. United States,
47 Fed. Cl. 361 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Martin Lane Company v. United States,
432 F.2d 1013 (Ct. Cl. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Mason v. United States,
615 F.2d 1341 (Ct. Cl. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Micro Chemical, Inc. v. Lextron, Inc.,
317 F.3d 1387 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Miller v. Robertson,
266 U.S. 243 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 27

Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Norfolk Dredging Co. v. United States,
58 Fed. Cl. 741 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-17

Northern Helex Co. v. United States,
207 Ct. Cl. 862, 524 F.2d 707, 713, 720 (1975),
cert. denied, 429 U.S. 866 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 34

Olin Jones Sand Co. v. United States,
225 Ct. Cl. 741 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37-38

Owen Equipment & Erection Co. v. Kroger,
437 U.S. 365 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Perry-MeCall Construction, Inc. v. United States,
46 Fed. Cl. 664 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Public Citizen, Inc. v. Lew,
127 F. Supp. 2d 1 (D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (1951),
cert. denied, 343 U.S. 977 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Rocky Mountain Construction Co. v. United States,
218 Ct. Cl. 665 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Rumsfeld v. Freedom NY, Inc.,
329 F.3d 1320 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Scott Timber, Inc. v. United States,
333 F.3d 1358 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 28, 33-34

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Seaboard Lumber Co. v. United States,
48 Fed. Cl. 814 (2001),
aff'd, 308 F.3d 1283 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Shelleman v. United States,
9 Cl. Ct. 452, 455 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Singer Co. v. United States,
568 F.2d 695 (Ct. Cl. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Smokey Bear, Inc. v. United States,
31 Fed. Cl. 805 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

South Corporation v. United States,
690 F.2d 1368 (Fed. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Sweats Fashions, Inc. v. Pannill Knitting Company, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

UNR Industrial, Inc. v. United States,
962 F.2d 1013 (Fed. Cir. 1992),
aff'd sub nom. Keene Corp. v. United States,
508 U.S. 200 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

United States Department of Energy v. Ohio,
503 U.S. 607 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

United States v. Nordic Village, Inc.,
503 U.S. 30 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

United States v. Sherwood,
312 U.S. 584 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

W.G. Yates & Sons Construction Co. v. Caldera,
192 F.3d 987 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 33-34, 37-38

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040, 1043 (Fed. Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18, 27

William Green Constr. Co. v. United States,
201 Ct. Cl. 616 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Wilner v. United States,
23 Cl. Ct. 241 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## Statutes

16 U.S.C. § 472a(a) . . . . . . . . . . 3-4

16 U.S.C. § 620a . . . . . . . . . . 29

Ariz. Stat. § 12-548 . . . . . . . . . . 40-41

Fed. R. Evid. 407 . . . . . . . . . . 47

Fed. R. Evid. 701 . . . . . . . . . . 24

Fed. R. Evid. 702 . . . . . . . . . . 25

## Other Authority

24 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts
§ 64:1 at 5 (4th ed.2002) . . . . . . . . . . 13

In re Reidhead Bros. Lumber Mill,
00-2 B.C.A. ¶31,144, AGBCA No. 2000-126-1 (Oct. 4, 2000), aff'd,
36 Fed. Appx. 426 (Fed. Cir. 2002) . . . . . . . . . . 34

Coastal Dry Dock & Repair Corp.,
ASBCA No. 36754, 9101 BCA ¶ 23,324 . . . . . . . . . . 45

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**REGARDING DAMAGES**

Pursuant to Rule 56(b) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court grant this motion for partial summary judgment because there are no genuine issues of material fact and defendant is entitled to judgment as a matter of law. In support of this motion, the United States relies upon the amended complaint (" Am. Compl."), the proposed findings of uncontroverted fact accompanying this motion ("PFUF"), the following brief, and the separately filed appendix.

**STATEMENT OF THE ISSUES**

1. Whether the lost profits claim asserted by Precision Pine & Timber, Inc. ("Precision Pine") fails as a matter of law because:

(a) Precision Pine cannot establish which timber sales would have been operated had no suspension occurred; and

(b) the alleged loss of profits was the immediate and proximate result of Precision Pine's business decision not to harvest the contracts to completion once the suspension was lifted.

2. Whether Precision Pine's lost profits claim is insufficient as a matter of law because lost profits is not the natural and inevitable result of a delay in harvesting timber and the Forest Service was apprised of no special circumstances at the time of contracting.

3. Whether Precision Pine can establish alleged lost profits with reasonable certainty where:

(a) it cannot establish the mix of lumber products that would have been produced from the respective contracts; and

(b) it cannot account for revenues earned by partially harvesting the respective contracts after the suspension was lifted.

4. Whether Precision Pine's claims for increased logging and hauling costs with respect to the Hay and O.D. Ridge contracts, increased sawmill costs, and interest payments upon its corporate loans constitute unrecoverable "remote and consequential damages."

5. Whether Precision Pine can recover alleged costs and lost profits upon behalf of putative subcontractors where it has no contractual liability to the subcontractors.

6. Whether attorney fees incurred in connection with this action are recoverable pursuant to contract clause CT 6.01.

## STATEMENT OF THE CASE

### I. Nature Of The Case

This action concerns 14 contracts for the sale of timber and roundwood that were awarded or transferred to Precision Pine prior to August 1995. On August 25, 1995, the Forest Service suspended these contracts in order to comply with an injunction issued by a Federal district court. The Forest Service lifted the suspension of Precision Pine's contracts on or before December 4, 1996.

In a decision dated July 31, 2001, this Court concluded that 12 of the 14 contracts at issue had been breached because the length of the suspension of these contracts was unreasonable. See Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35 (2001).[1] Precision Pine seeks to recover alleged lost profits and other indirect damages that purportedly result from the breach of these contracts. Precision Pine also seeks to recover alleged "out of pocket" costs pursuant to contract clause CT 6.01.

## II. Statement Of Facts [2]

The United States Forest Service manages approximately 191 million acres of Federal lands in National Forests throughout the United States for multiple purposes. As part of its management of these lands, the Forest Service plans and conducts timber and multi-product sales. 16 U.S.C. § 472a(a).

From the standpoint of potential bidders, a timber sale commences when the Forest Service issues an advertisement and prospectus describing the timber to be harvested, the estimated volume of timber and (for multi-product sales) roundwood being sold,[3] and the dates bids must be submitted. Included in the advertisement is a minimum bid price. A prospectus and sample contract are made available to interested bidders. The prospectus identifies the

---

[1] The United States accepts for purposes of this motion the Court's liability decision. In so doing, the United States does not waive and expressly reserves the right to appeal, or contest in any other appropriate manner, the Court's July 31, 2001 decision.

[2] Pursuant to RCFC 56.1(h)(1), the United States is filing with this motion proposed findings of uncontroverted fact. This section provides a summary of the facts relevant to this motion.

[3] Timber generally is defined as trees larger than 9 inches in diameter at breast height ("dbh"). PFUF ¶ 22. Such trees are commonly referred to as "saw timber." "Roundwood" refers to smaller trees that are between 5.0 and 8.9 inches dbh. PFUF ¶ 23. Roundwood is sometimes referred to as pulpwood.

length of time the contractor will be allowed to perform the contract, establishes the contract's operating season, specifies the timing of contractor payments for the timber, and, for multi-product sales, states the price for the sale's roundwood component.[4] Interested parties are invited to examine the site and available timber prior to bidding. Contracts are awarded to the high bidder. See generally Seaboard Lumber Co. v. United States, 48 Fed. Cl. 814, 816 (2001), aff'd, 308 F.3d 1283 (Fed. Cir. 2002).

This action concerns 14 Forest Service contracts: (1) the O.D. Ridge timber sale; (2) the Kettle multi-product sale; (3) the Hay timber sale; (4) the Brookbank multi-product sale; (5) the Jersey Horse timber sale; (6) the Salt multi-product sale; (7) the Manaco multi-product sale; (8) the St. Joe timber sale; (9) the Hutch-Boondock multi-product sale; (10) the Mud multi-product sale; (11) the Saginaw-Kennedy multi-product sale; (12) the Brann multi-product sale; (13) the U-Bar timber sale; and (14) the Monument multi-product sale. Precision Pine, 50 Fed. Cl. at 38. Precision Pine bid upon and was awarded the O.D. Ridge, Kettle, Brookbank, Jersey Horse, Salt, Manaco, Hutch-Boondock, Mud, Saginaw-Kennedy Brann, U-Bar, and Monument contracts on various dates between August 14, 1992 and July 20, 1995. App.4; 50 Fed. Cl. at 38 n.1. Precision Pine did not inform the Forest Service of any special circumstances relating to these contracts at or before their award. PFUF ¶¶ 4-19; App. 1-6. The Hay and St. Joe contracts were originally awarded to other purchasers and who subsequently assigned the contracts to Precision Pine. App. 4; 50 Fed. Cl. at 38 n.1. Precision Pine did not inform the Forest Service of

[4] The price of roundwood for multi-product sales is an administratively-established, fixed price set by the Forest Service. PFUF ¶ 24. The contract's bid price affects only the stumpage price paid for timber harvested from the sale. Id.

any special circumstances relating to these two contracts at or before their award. PFUF ¶¶ 4-19; App. 1-6.

Each of the contracts at issue contain similar terms. For example, the contracts each establish an operating season, require the purchaser to submit an annual operating schedule, and prescribe harvesting methods to be employed. PFUF ¶ 20. The contracts also require the purchaser to meet with the Forest Service prior to commencing harvesting operations to finalize an operating plan. Id.. The purchaser is required to harvest all sawtimber and roundwood by the contract's termination date. PFUF ¶ 21. In certain circumstances, such as, for instance, a suspension of the contract, the purchaser may be entitled to request an extension of the contract's termination date. PFUF ¶ 25; App. 257, 346.

On August 25, 1995, as a result of an injunction entered by a Federal district court in litigation brought by an environmental group concerning the Mexican Spotted Owl, the Forest Service suspended the 14 contracts at issue in this action (the "MSO suspension"). PFUF ¶ 26. Less than eight weeks later, on October 18, 1995, the Forest Service lifted the suspension upon the St. Joe, Hutch-Boondock and Brann contracts. PFUF ¶ 27; 50 Fed. Cl. at 47 & n.18. One of the released sales, the St. Joe timber sale, contained the largest trees of any of Precision Pine's Forest Service contracts.[5] Shortly thereafter, Precision Pine began harvesting timber from the three released sales. PFUF ¶28. On March 11, 1996, the suspension of the Mud multi-product sale was lifted. Precision Pine did not begin harvesting the Mud sale until July 1996. PFUF ¶ 29. The suspension of the remaining contracts ended on December 4, 1996. PFUF ¶ 31.

---

[5] Precision Pine also purchased timber from the State of Arizona, various Indian tribes and private landowners. The United States does not know if the timber upon the St. Joe contract was also larger than that available from Precision Pine's state, Indian and private timber sale contracts.

Precision Pine requested and was granted permission by the Forest Service to operate the Hay timber sale outside of the contract's normal operating season. PFUF ¶ 32; App. 421-23. Timber harvesting upon the Hay sale began later in December 1996. Id. Precision Pine did not seek to operate any of its other contracts at this time. PFUF ¶ 33.

After the suspensions were lifted, Precision Pine requested and was granted contract term adjustments. PFUF ¶ 34. The contract term adjustments provided additional time to harvest commensurate with the time lost as a result the MSO suspension. Id.. Precision Pine also submitted claims to Forest Service contracting officers requesting monetary compensation for the MSO suspension. Precision Pine, 50 Fed. Cl. at 51. Those claims were granted in part and denied in part. Id.

On September 11, 1998, Precision Pine filed this action. On July 31, 2001, this Court ruled that the Forest Service had breached 12 of the 14 contracts at issue. Id. at 73-74. In so doing, the Court concluded that the length of the MSO suspension was unreasonable. Id. at 70-71 ("the suspension should have not lasted much more than 135 days").[6] The Court found no breach of the St. Joe and Hutch-Boondock contracts – contracts where the suspension had ended after only eight weeks. Id. at 71.

While finding that the Forest Service had breached 12 of Precision Pine's contracts, Judge Damich made clear that he was not convinced that Precision Pine had actually been harmed by the delay:

> [Various] considerations lead the Court to question whether the Forest Service's failure to timely consult with the FWS was a "felix

---

[6] The Court also concluded that the MSO suspension breached a warranty in contract clause CT 6.25 with respect to seven of the contracts. Id. at 73 (terming the breach of warranty a breach of the "implied duty to cooperate").

> culpa" for the Plaintiff, who up until the suspensions were imposed may have, knowingly or not, benefitted . . . .
>
> This question, however, is not now before the Court, nor need it be answered to enter judgment as to liability. However, consideration of this issue may well be desirable when it comes time for the Court to determine an appropriate measure of damages in this case.

50 Fed. Cl. at 73. Indeed, the price for wood products hit bottom during the MSO suspension. Prices were better both before the suspension in 1993 and 1994 and after the suspension in 1997. PFUF ¶¶ 37-38.[7]

On February 26, 2003, Precision Pine submitted a "calculation binder," and three binders of supporting documents, containing damages claims based upon the Court's July 31, 2001 decision. In its calculation binder, Precision Pine asserted total damages in the amount of $10,580,287.82. App. 98. Precision Pine contended that all of the documents needed to support its claimed damages were contained in these binders. See App. 196-99 (offering to go to trial using this evidence and without further discovery from Government).

On November 18, 2003, Precision Pine served an expert report by Mr. Robert A. Ness (the "Ness Report"). App. 99. In his report, Mr. Ness "recommended" that Precision Pine substantially revise its claims by dropping some claims, revising other damages claims upward, and altering key factual assertions upon which Precision Pine's February 26, 2003 claim was based. App. 103-16. Precision Pine has adopted all of the recommendations in the Ness Report. App. 100.

---

[7] According to Precision Pine, "the annual average lumber price index published by the Western Wood Products Association Rocky Mountain Ponderosa Pine, which is the relevant index . . . was as follows: 1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83; 1999 – $374.35." App. 39.

In accordance with Mr. Ness's report, Precision Pine now alleges the following damages in this action:

- Miscellaneous Items: $19,954.53
- Increased Logging and Hauling Costs: $176,162.32
- Lost Profits (Lumber, Roundwood and By-Products): $6,865,541.21
- Increased Manufacturing Costs: $380,711.20
- Idle Equipment Costs for TRRI: $75,352.31
- Unanticipated Interest Costs on Notes: $577,425.76
- Attorney's Fees Pursuant to CT 6.01: $1,298,830.21

Precision Pine thus seeks total damages in the amount of $9,328,180.88. App. 118.

Precision Pine's damages allegations, as amended, are confused in that they are not based upon any single theory of recovery. As a result, Precision Pine is seeking to recover the same alleged damages two or more times. For instance, Precision Pine's lost profits claim seeks both profits and overhead. App. 102 (seeking lost "gross profit"). At the same time, Precision Pine seeks to tack on overhead and profits to its various consequential damages claims (e.g., increased logging and hauling costs, increased mill costs, unanticipated interest expenses, and miscellaneous items). App. 104, 113. Precision Pine plainly is not entitled to recover overhead and profits more than once (if at all). Similarly, Precision Pine seeks lost profits for timber that it actually harvested, processed and sold after the MSO suspension had was lifted. At a minimum, Precision Pine must deduct revenues that it actually earned from harvesting the once-suspended sales from its claim for "lost" profits. Lastly, Precision Pine seeks to recover for breach of its contracts at the same time that it seeks payment pursuant to its contracts. While Precision Pine

may be entitled to assert such inconsistent theories as alternative bases for recovery, RCFC 8(e)(2), it cannot properly recover pursuant to both.

**SUMMARY OF ARGUMENT**

Precision Pine's claims in this action adhere to no single theory of damages. Precision Pine seeks lost profits and consequential damages pursuant to the common law, expenses and profits upon behalf of putative subcontractors pursuant to the Severin doctrine, and overhead, profit and attorney's fees pursuant to contract clause CT 6.01.

The respective contracts define the extent of the relationship between the parties and provide the only remedy for Precision Pine. Precision Pine's contracts merely provide Precision Pine the opportunity to profit from the harvest of timber; they provide no guarantee that Precision Pine would realize a profit. While the parties contemplated that there was the possibility that the harvest would be delayed or cancelled, Precision Pine agreed to limit the liability of the United States to out-of-pocket expenses resulting directly from any delay. App. 283-84, 376-77 (contract clause CT 6.01). However, notwithstanding the limitation upon liability in the respective contracts, Precision Pine's various damages claims fail on their merits.

To recover lost profits, Precision Pine must prove causation, establish foreseeability, and provide a reasonably certain estimate of damages. Precision Pine can satisfy none of these requirements. As an initial matter, Precision Pine is without evidence to show that it would have actually operated particular timber sale contracts had the MSO suspension not occurred. Moreover, it was Precision Pine's admitted "business decision" not to harvest its contracts to completion after the suspension was lifted (during a good lumber market in 1997) that caused any subsequent loss of profits. Second, Precision Pine's alleged loss was not foreseeable at the

time of contracting because a suspension does not naturally and inevitably result in a loss of profits, and because Precision Pine apprised the Forest Service of no "special circumstances" in connection with its contracts. Third, no reasonable estimate of Precision Pine's alleged damages has been proffered. Precision Pine not only relies upon an inadmissible expert opinion from its company President as the basis for its claimed lost profits, it fails to account for revenues earned from the actual harvesting of the contracts at issue that occurred after the suspension was lifted.

Precision Pine's requests for various categories of consequential damages also are legally insufficient. None of the consequential damages sought – increased logging costs, increased hauling costs, interest payments upon corporate debt – naturally flow from the suspension of a timber sale contract. As a result, because Precision Pine informed the Forest Service of no special circumstances at the time of contracting, the damages sought are legally "remote" and, therefore, unrecoverable.

Precision Pine's novel attempt to recover upon behalf of putative subcontractors pursuant to the Severin doctrine is equally unavailing. First, Precision Pine has produced no contracts establishing that it owes any sums to its supposed subcontractors. Second, even if contracts had once existed, Precision Pine would have no present liability by virtue of the applicable statute of limitations. Simply put, the basic elements required to invoke the Severin doctrine are missing.

Lastly, Precision Pine seeks the recovery of attorney's fees pursuant to contract clause CT 6.01. The plain language of clause CT 6.01 – a liability limiting provision – does not authorize the recovery of attorney's fees. In addition, Precision Pine has produced no documents demonstrating that it has actually paid any of the attorney's fees for which it seeks compensation.

**ARGUMENT**

**I. Standard of Review**

Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(b); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). It is "a salutary method of disposition 'designed to secure the just, speedy and inexpensive determination of every action.'" Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

Facts are material only if they "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. Substantive law provides the basis to identify the material facts. Embrey v. United States, 17 Cl. Ct. 617 (1989). A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Celotex obliges the non-moving party to "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof ... at trial." Id. at 322. A failure of proof concerning an essential element of the non-moving party's case entitles the moving party to a legal judgment. Id. at 323.

As the United States Court of Appeals for the Federal Circuit emphasized in Sweats Fashions: "the burden is not on the movant to produce evidence showing the absence of a

genuine issue of material fact." 833 F.2d at 1563 (emphasis in original). Rather, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the [Court of Federal Claims] – that there is an absence of evidence to support the non-moving party's case." Id. (emphasis in original) (quoting Celotex, 477 U.S. at 325). The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the non-moving party's case. Celotex, 477 U.S. at 331.

"The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant." Barmag Barmer Maschinenfabrik AG v. Murata Mach. Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984). It is well settled that self-serving conclusory statements as to the ultimate issue asserted by a party's witnesses cannot raise a genuine issue of material fact. Imperial Tobacco Limited v. Phillip Morris, Inc., 899 F.2d 1575, 1581 (Fed. Cir. 1990) (citing Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1564 (Fed. Cir. 1987)); RCFC 56.

In this case, the relevant facts are either not in dispute or, given the evidence presented in the appendix to this motion, not subject to a genuine dispute. Summary judgment in favor of the Government is therefore appropriate. Celotex, 477 U.S. at 325.

## II. Precision Pine Cannot Make The Requisite Showing To Recover Lost Profits

"Compensation through damages is the basic means of redressing a breach of contract." Globe Savings Bank, FSB v. United States, 59 Fed. Cl. 86, 91 (2003) (citing 24 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 64:1 at 5 (4th ed.2002)). "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." Energy Capital Co. v. United States, 302 F.3d 1314, 1326

(Fed. Cir. 2002) (quoting Glendale Federal Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001)). However, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Bluebonnet Savings Bank, FSB v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003) (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir.2002)); Miller v. Robertson, 266 U.S. 243, 257 (1924).

"The benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits." Id; accord Glendale Federal, 239 F.3d at 1380 (citing Restatement (Second) of Contracts § 347). To recover lost profits, or indeed any damages, it is insufficient for the plaintiff simply to establish a contractual breach. See Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400 (2004) (awarding no damages upon plaintiff's $8.7 billion claim notwithstanding the Government's breach of a 50-year timber sale contract); Columbia First Bank, FSB v. United States, ___ Fed. Cl. ___, 2004 WL 503718 (Mar. 15, 2004) (rejecting plaintiff's damages claims, including a claim for lost profits, where a breach had previously been established). A plaintiff seeking lost profits must also establish, by a preponderance of the evidence, that: (1) the loss of profits was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty. Energy Capital, 302 F.3d at 1326 (citing Chain Belt Co. v. United States, 115 F. Supp. 701, 714, 127 Ct. Cl. 38, 58 (1953)).

The starting point for the analysis of Precision Pine's lost profits claim is the nature of the breach asserted. Precision Pine objects that its contracts were suspended. Yet, the suspension did not prevent Precision Pine from harvesting the timber that it purchased; at most, it delayed

the harvesting of timber.[8] Moreover, this Court found, not that a suspension of Precision Pine's contracts was unauthorized, but that the length of the suspensions constituted a breach.[9] See Precision Pine, 50 Fed. Cl. at 70-71 ("the suspension should have not lasted much more than 135 days").

As explained below, Precision Pine cannot establish that its timber harvesting on any given contract was improperly delayed by the Forest Service, much less that a delay proximately resulted in lost profits. Furthermore, Precision Pine cannot demonstrate that at the time of contracting a loss of profits was the natural and inevitable result of delayed harvesting and cannot provide a reasonably certain estimate of the amount of any lost profits. For each of these reasons, summary judgment with respect to Precision Pine's lost profits claims is warranted.

### A. Precision Pine Cannot Establish That Lost Profits Were Proximately Caused By The MSO Suspension

#### 1. Precision Pine Cannot Show What Contracts Would Have Been Harvested Had The MSO Suspension Not Occurred

In order to recover lost profits, Precision Pine must first establish that lost profits were "the immediate and proximate result" of the Forest Service's breach of its timber sale contracts. Chain Belt Co. v. United States, 115 F. Supp. 701, 714, 127 Ct. Cl. 38, 58 (1953); Energy

[8] Precision Pine in fact harvested timber and/or roundwood from the O.D. Ridge, Kettle, Hay, Brookbank, Jersey Horse, Manaco, St. Joe, Hutch-Boondock, Mud, Brann and U-Bar sales after the suspension of the respective contracts was lifted. App. 439-49.

[9] In its July 31, 2001 decision, the Court held that the suspension of Precision Pine's contracts was not a breach per se. Precision Pine, 50 Fed. Cl. at 70-72. Rather, the suspension was a breach only insofar as it exceeded 135 days. Id. Because the first 135 days of the suspension were not a breach of Precision Pine's contracts, Precision Pine would have to show, for instance, that the lost profits sought are the natural and inevitable result not merely of a suspension – but of a suspension in excess of 135 days. This distinction does not appear to affect significantly the analysis in this brief. Nevertheless, the discussion of "the suspension" of Precision Pine's contracts should be understood to refer only to that part of the suspension that constitutes a breach, i.e., that is in excess of 135 days.

Capital Corp. v. United States, 47 Fed. Cl. 382, 393 (2000), aff'd in part, rev'd in part on other grounds, 302 F.3d 1314 (2002); see also Henry J. Crowley & Co. v. United States, 143 Ct. Cl. 812, 166 F. Supp. 750 (1958) ("[R]ecovery of lost profits as damages for breach of contract depends upon the initial showing that such loss is the immediate and proximate result of the breach. This is basic.").[10] Consequently, as a threshold matter, Precision Pine must show that it would have harvested each of the contracts for which it now seeks lost profits (O.D. Ridge, Kettle, Hay, Brookbank, Jersey Horse, Salt, Manaco, Mud, Saginaw-Kennedy, U-Bar and Monument) had it not been for the MSO suspension.

Precision Pine cannot show which timber sales, if any, would have been operated in 1995 and 1996 had the MSO suspension not occurred. Precision Pine prepared no business plan, scheduling plan, operating plan, or other document describing anticipated timber harvesting.[11] App. 137, 157, 178. As a result, Precision Pine possesses no documents that discuss the company's plans for harvesting and processing timber in 1995 and 1996.

Moreover, Precision Pine's potential trial witnesses are unable to provide this information. App. 161A, 171. At Precision Pine, decisions concerning the harvesting of timber were made by company President Lorin Porter. App. 134, 156, 171. Mr. Porter did not include other company officials or employees in the decision making process. App. 156, 171,-72, 174

---

[10] Decisions of the United States Court of Claims – the predecessor to the Federal Circuit Court of Appeals – are binding upon this Court. See, e.g., South Corporation v. United States, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (en banc); Norfolk Dredging Co. v. United States, 58 Fed. Cl. 741, 749 (2003) ("the Court of Federal Claims . . . is bound by the precedent of the United States Court of Claims and the Court of Appeals for the Federal Circuit").

[11] Precision Pine's purchaser representative, John Smith, did present to the Forest Service in early 1995 an annual operating schedule as required by Precision Pine's timber sale contracts. Precision Pine does not rely upon Mr. Smith's annual operating schedule, which conflicts with the *post hoc* schedule developed by Precision Pine's attorneys for this litigation. See supra note 13.

("Lon [Porter] had total control of that"). Rather, he personally decided on an ad hoc basis what timber on what contracts would be cut. App. 156-57. Precision Pine's President cannot say, however, which contracts would have been harvested in 1995 and 1996 if the MSO suspension had not occurred. Indeed, upon being specifically asked at his deposition, Mr. Porter responded: "What we would have cut had the suspension not been there, that's a mystery. I mean I don't know." App. 161A.[12]

Because Precision Pine cannot demonstrate what timber sale contracts it would have operated had the MSO suspension not occurred, it cannot establish that the suspension was the immediate and proximate cause of its alleged loss of profits. This is fatal to Precision Pine's lost profits claim.[13]

**2. Any Lost Profits Suffered By Precision Pine Were Caused By Its Own Business Decisions – Not The Suspension Of Contracts**

Precision Pine concedes that market prices for lumber were particularly low during the MSO suspension. See, e.g., App. 39. However, prices were markedly higher in 1997. Id. Consequently, when the MSO suspension ended on December 4, 1996, subject to the terms and conditions of the respective contracts, Precision Pine was free to harvest timber and take advantage of the improved marketplace. The fact that Precision Pine did not do so cannot be attributed to the MSO suspension – but to Precision Pine's own business decisions.

---

[12] In addition, Mr. Porter was unable to identify any documents that might shed light upon this "mystery." Id.

[13] In response to defendant's interrogatories, Precision Pine proffered a schedule that purports to describe harvesting plans as of August 25, 1995, i.e., the date of the suspension. See App.15. The schedule was prepared by counsel, is unsupported by contemporaneous records, and has not been verified as required by RCFC 33(b). App. 14-15, 74-75; see also RCFC 33(b) (requiring that interrogatory answers be provided "under oath"). As a result, it does not raise a genuine issue of material fact.

Precision Pine offers no cogent explanation for the slow start of its operations in early 1997.[14] And while four contracts for which Precision Pine seeks lost profits were again suspended for much of the latter half of 1997,[15] Precision Pine explains simply that it was a "business decision" not to harvest its other contracts to completion. See App. 36-73, 209-16. Precision Pine's business decision to forego profitably harvesting the Brookbank, Kettle, Jersey Horse, Mud, Saginaw-Kennedy and Monument contracts to completion in 1997 was not caused by the MSO suspension or the Forest Service. See Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (2002). Accordingly, any loss of profits was not directly and proximately caused by the Forest Service's breach. See, e.g., Energy Capital, 47 Fed. Cl. at 393; Henry J. Crowley & Co., 166 F. Supp. at 755, 757 n.2.

Moreover, Precision Pine concedes that it also had the opportunity to harvest in 1998 and 1999.[16] According to Precision Pine's own numbers, the lumber market was better in 1999 than

---

[14] The Hay contract is a notable exception. The Forest Service permitted Precision Pine to operate this contract outside the normal operating season. See App. 421-23. Precision Pine began harvesting operations upon this contract in December 1996 and operations continued through February 1997. See App. 421-23, 446. Precision Pine did not seek Forest Service approval to operate any other contracts during the winter of 1996-97.

[15] The O.D. Ridge, Hay, Saginaw-Kennedy, and U-Bar contracts were suspended as a result of the Forest Guardians litigation. Operations upon certain parts of two other contracts – Salt and Manaco – were also barred. The Forest Guardians suspension lasted from June 2 to December 15, 1997. Precision Pine has not questioned the propriety of the Forest Guardians suspension in this action.

[16] By 1998, Precision Pine had sold the Kettle contract. Additionally, in 1997, Precision Pine completed harvesting on the Hay and Mud contracts. Accordingly, the United States' argument is limited to the other contracts for which Precision Pine seeks lost profits. Of course, as explained below, Precision Pine must deduct the profits made from selling and/or harvesting these contracts from its lost profits claim. See Bluebonnet Savings Bank, 339 F.3d at 1345 ("the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach"); White, 285 F.3d at 1043 (same).

during the MSO suspension in 1995 and 1996. E.g., App. 39 (citing the Western Wood Products Association's Rocky Mountain Ponderosa Pine index)). Precision Pine avers that it did not harvest in 1999 because harvesting would nevertheless have been unprofitable. See App. 36-73, 209-16. Precision Pine attributes this unprofitability to the fact that its Winslow sawmill was destroyed by fire in the Fall of 1998 and that its purchaser of "chips" (a by-product produced by sawmills) began taking only recycled material in February 1998. App. 38-39, 209; see also App. 40-73. These events are clearly unrelated to the MSO suspension.

While Precision Pine was free to play the market when the MSO suspension ended, the Forest Service did not become a guarantor of Precision Pine's profits. The fact that Precision Pine made poor business decisions and suffered the consequences when unforeseen events occurred years later is not the fault of the Forest Service. See Seaboard, 308 F.3d at 1294 ("At most, the government's acts indirectly made performance of the . . . contract unprofitable. . . . Seaboard simply made a business decision not to harvest. Timber prices fell and Seaboard must bear this market risk"). Put differently, Precision Pine's loss of profits were immediately and proximately caused by post-suspension events including its own business decision not to harvest; they were not caused by the MSO suspension. See, e.g., Energy Capital, 47 Fed. Cl. at 393.

**B. The Loss Of Profits Resulting From A Suspension Was Not Contemplated By The Parties At The Time Of Contracting**

Chain Belt Co. v. United States provides the standard for the foreseeability of lost profits in this Court:

> It must . . . be established that loss of profits in the event of breach was within the contemplation of the contracting parties either (1) because the loss was natural and inevitable upon the breach so that the defaulting party may be presumed to have foreseen it; or (2) if the breach resulted in lost profits because of some special

> circumstances, those circumstances must have been known to the defaulting party at the time the contract was entered into.

Chain Belt, 127 Ct. Cl. at 58, 115 F. Supp. at 714; accord Energy Capital, 47 Fed. Cl. at 396; Castle v. United States, 48 Fed. Cl. 187, 200 (2000), aff'd in part, rev'd in part on other grounds, 301 F.3d 1328 (2002), cert. denied, 123 S. Ct. 2572 (2003). Thus, pursuant to Chain Belt, Precision Pine must show that the loss of profits is the "natural and inevitable" result of the suspension of its contracts, or that the Forest Service had been apprised at the time of contracting of any "special circumstance" that resulted in the loss of profits. Id. Precision Pine cannot meet this burden.

A loss of profits is not the natural result of the suspension of Precision Pine's timber sale contracts. At most, the suspension delayed the timber harvest. Once the suspension was lifted, the very same trees upon the very same contracts were available to Precision Pine.[17] Furthermore, the term of the contracts were extended, in accordance with contract clause BT 8.21, to provide Precision Pine additional time to conduct timber harvesting.[18] See App. 243, 257. Because there was no change in the timber being harvested and no change in the time available to harvest, no loss of profits would be reasonably anticipated. Given that Precision Pine did not apprise the Forest Service of any "special circumstances" at the time of contracting, App. 1-6, the undisputed facts establish that no loss of profits was within the contemplation of the contracting parties.

---

[17] Having had an additional year to grow, the trees would yield a slightly larger volume of timber after the suspension. Except for the Hay timber sale, Precision Pine's payment for harvested timber was based upon the Forest Service's pre-sale volume estimates. Consequently, any additional growth would inure to Precision Pine's benefit.

[18] The length of the contract term enlargement pursuant to BT 8.21 is the same as the time lost as a result of the contract suspension. App. 243, 257.

Precision Pine may argue that the profitability of its contracts could be affected by a downturn in the lumber market and that a loss of profits is therefore foreseeable.[19] Market fluctuations in the price of commodities such as lumber occur constantly. However, as Precision Pine has admitted, future market prices are inherently unforeseeable. App. 464-65 (stating, in a letter to the Forest Service, that the market downturn in the mid-1990s was "entirely unforeseeable").[20] Because increases in market price are at least as likely as decreases, the "natural" result of a delay is not the loss of profits. Furthermore, the terms of Precision Pine's contracts minimize downside market risk by giving purchasers a lengthy period to harvest and the ability to extend the contract term in the event of poor market conditions.[21] See App. 218, 306, 317, 408. In any event, it is not enough for Precision Pine to show that a loss of profits might conceivably result from a suspension. Precision Pine must establish that lost profits naturally and inevitably result. Chain Belt, 127 Ct. Cl. at 58, 115 F. Supp. at 714. Because Precision Pine cannot make this showing, and because Precision Pine communicated no "special circumstances" at the time of contracting, Precision Pine cannot satisfy the well-established test for foreseeability in Chain Belt. Accordingly, Precision Pine cannot recover lost profits.

---

[19] If the possibility of lower market prices were in and of itself sufficient to establish foreseeability, the foreseeability prong of the standard for the recovery of lost profits would be all but eliminated.

[20] In fact, the market price for lumber products during the MSO suspension in 1995 and 1996 was particularly poor. Prices were better both before the suspension (in 1993 and 1994) and after the suspension was lifted (in 1997). This appears to be one of the "considerations" that prompted Judge Damich to suggest that Precision Pine may well have benefitted from "the Forest Service's failure to timely consult with the FWS." 50 Fed. Cl. at 73 (opining the suspension may have been a "felix culpa").

[21] Most of Precision Pine's contracts also provide for a lower stumpage price when the price of lumber declines. App. 183-84.

### C. Precision Pine Can Establish No Lost Profits With Reasonable Certainty

According to Precision Pine's claim, it would have harvested all of the suspended contracts to completion during the MSO suspension. The harvested logs would have been taken to Precision Pine's sawmills for processing. The resulting rough green lumber would then have been shipped to Precision Pine's planer mill, where it would have been planed, graded, dried and ultimately sold.[22] Precision Pine's request for lost profits with respect to processed lumber products in connection with these timber cutting contracts necessarily seeks remote and consequential damages. See, e.g., Scott Timber, Inc. v. United States, 333 F.3d 1358, 1371-72 (Fed. Cir. 2003).

Although we do not concede that Precision Pine could be entitled to lost profits for processed lumber products under the contracts at issue, as we demonstrate, Precision Pine cannot meet the necessary elements of recovery even under its own theory of damages. See Everett Plywood Corp. v. United States, 206 Ct. Cl. 244, 512 F.2d 1082, 1091 (1975). In addition to the legal problems with Precision Pine's lost profits claim, there are numerous glaring uncertainties in Precision Pine's claim for lost lumber profits such as: (i) the volume of timber that actually would have been harvested; (ii) the appropriate "overrun factor" for converting unprocessed log volumes into rough green lumber volumes; (iii) the types and amounts of lumber products that would have been produced from the timber harvested ("product mix") and (iv) the sale prices that actually would have been obtained for Precision Pine's lumber products. While many of

---

[22] Precision Pine also contends that it would have sold certain by-products (bark, chips, grindings and shavings) generated by its sawmills and planer, as well as "roundwood" harvested from the multi-product sales. Precision Pine's claim addresses profits from lumber, roundwood and by-products separately. This section addresses only Precision Pine's lost profits claim with respect to lumber and by-products.

these uncertainties involve disputed issues of fact and are inappropriate for summary disposition, Precision Pine's allegations regarding product mix rely solely upon an expert analysis that, as explained below, is inadmissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993), and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999). Because the inadmissible product mix analysis is an essential step in Precision Pine's calculation of its alleged lost profits, summary judgment is appropriate. In addition, Precision Pine's indisputable failure to take into account post-suspension harvesting upon the contracts at issue prevents Precision Pine from establishing its putative lost profits with reasonable accuracy. For this additional reason, the Court should grant summary judgment with respect to Precision Pine's lost profits claim.

### 1. Precision Pine Cannot Demonstrate With Reasonable Certainty The Types And Amount Of Lumber Products That Would Have Been Produced From The Suspended Timber Sale Contracts

Precision Pine contends that but for the MSO suspension it would have harvested timber, would have processed the resulting logs in its sawmills and then in its planer mill to produce various lumber products,[23] and would have sold these lumber products at a handsome profit. Consequently, to calculate lost profits for a particular timber sale contract,[24] Precision Pine must

---

[23] In its claim, Precision Pine asserts that it would have produced 11 kinds of finished lumber products from the sales at issue: (1) Moulding & Better; (2) 5/4" #1 Shop; (3) 5/4" #2 Shop; (4) 5/4" #3 Shop; (5) Paragraph 99 Redress; (6) 5/4" x RWL Radius Edge; (7) #2, #3, #4 & Better; (8) #3 Common Utility; (9) #4 Common Economy; (10) #5 Common; and (11) Miscellaneous Shop Outs. App. 85-87. In addition, for each timber sale, Precision Pine identifies the percentage of each of these lumber products that it purportedly would have manufactured. Id.

[24] As noted above, we do not concede that Precision Pine can recover lost profits for processed lumber products pursuant to timber cutting contracts. Such damages are remote

(continued...)

establish the volume of each type of lumber product (i.e., the "product mix") that would have been produced from timber from the contract.[25]

Precision Pine did not track the timber from its respective timber sale contracts through the manufacturing process. App. 16-29. As a result, Precision Pine has no reports or other contemporaneous documents showing what products were derived from any of the contracts at issue. Lacking direct evidence of product mix, Precision Pine proffers product mix estimates developed by company President Lorin Porter in the course of this litigation. App. 76-87.

Although Precision Pine has neither identified Mr. Porter as an expert, nor provided a report, workpapers or other backup documentation supporting the estimates, Mr. Porter's estimates of product mix plainly constitute expert testimony. See Fed. R. Evid. 701 (limiting non-expert testimony to "opinions or inferences" that are "rationally based upon the perception of the witness" and "not based on scientific, technical or other specialized knowledge"). As such, "the landmark case of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), provides the analytical framework for determining admissibility." Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1391 (Fed. Cir. 2003).

In Daubert, the Supreme Court held that a trial judge must act as a "gatekeeper" under Federal Rule of Evidence 702 to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597; see also Kumho Tire,

---

[24](...continued)
consequential losses are unrecoverable at common law. See Scott Timber, 333 F.3d at 1271-72.

[25] Numerous factors affect the mix of lumber products derived from the harvest of a timber sale. These factors include, but are not limited to, the species of trees harvested, tree size (usually expressed as the average diameter at breast height ("dbh")), and tree quality (often expressed in terms of "percent grade").

526 U.S. at 147 (extending this gatekeeping requirement to all expert testimony). The gatekeeping requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152. Consequently, in determining the admissibility of nonscientific expert testimony, the Court considers: (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or technique enjoys a general acceptance within the scientific community. Kumho Tire 526 U.S. at 149-50 (citing Daubert, 509 U.S. at 592- 94); see also Fed. R. Evid. 702.

Mr. Porter consulted no textbooks, treatises or studies in developing his methodology and product mix estimates. App. 166. Mr. Porter's methodology is untested, has not been subjected to peer review, and has never been published. Id. And Mr. Porter could not say whether his technique enjoys a general acceptance because he does "not know what is recognized by the industry." Id. Mr. Porter could not even describe key aspects of how he arrived at the estimated product mix. App. 166-68 (testifying that he could not recall, and knew of no way to ascertain, what "lag time" between the harvesting of timber and the sale of lumber was used in preparing the estimate product mix).

Moreover, Mr. Porter's methodology cannot reasonably be expected to accurately predict the actual product mix that would be generated if each contract were completely harvested. Mr. Porter used Precision Pine's record of lumber sales as the starting point for his estimates. App. 76-77. Mr. Porter then simply assumed that the volume of each lumber product (and therefore the overall mix of lumber products) that was sold by Precision Pine in a given month

was identical to the volume of each lumber product (and therefore the overall mix of lumber products) that had been produced from one of the timber sales at issue in an unspecified prior month. See App. 76-87, 166-68.

Mr. Porter's method is valid only if, after correctly accounting for the lag time between timber harvest and lumber sale, the volumes and mix of products sold during the month considered are in fact identical to the volumes and mix manufactured from timber harvested in the earlier month. Yet, Mr. Porter does not know (and cannot determine) what lag time he used to prepare his estimates. App. 166-68. Moreover, the lumber products sold during any given month are a function of the needs of the customers. Customer needs cannot be expected to precisely match products derived from timber harvested from a specific sale in terms of both quantity and product mix.

In addition, the lumber available for sale in a given month would exactly reflect the timber derived from a specific sale only if (1) Precision Pine carried no inventory of lumber from month to month, and (2) the lumber produced came exclusively from a single timber sale. It is undisputed that Precision Pine carried lumber inventories from month to month. App. 451-54. Additionally, not knowing what lag time was used, it is impossible to assess whether timber was also being harvested from other sales or sources.

Mr. Porter's analysis of product mix is facially unsound and plainly inadmissible under the Daubert factors. This Court should exercise its gatekeeping function to ensure that expert testimony rests on a reliable foundation by excluding Mr. Porter's product mix estimates. In addition, because Mr. Porter's product mix estimates are essential to Precision Pine's lost profits calculations, the Court should enter summary judgment with respect to the Precision Pine's lost profits claim.

### 2. Precision Pine's Claim Ignores The Actual Harvesting That Occurred After The Suspension Was Lifted And, Thus, Fails To Demonstrate Lost Profits With Reasonable Certainty

Precision Pine cannot demonstrate lost profits with reasonable certainty for an additional reason: it has failed to account for profits that it derived from harvesting the very same timber for which it seeks "lost" profits.

The MSO suspension arguably delayed Precision Pine's harvesting of timber. After the MSO suspension was lifted, Precision Pine harvested some or all of the timber upon the O.D. Ridge, Kettle, Hay, Brookbank, Jersey Horse, Manaco, St. Joe, Hutch-Boondock, Mud, Brann and U-Bar sales. See App. 439-50. Consequently, in order to estimate profits lost as a result of the MSO suspension, Precision Pine must deduct the revenues that it subsequently derived by harvesting these sales. See Bluebonnet Savings Bank, 339 F.3d at 1345; Miller, 266 U.S. at 257.

Precision Pine has indicated that it will argue that post-suspension revenues earned by harvesting the once-suspended contracts may be ignored in calculating lost profits. Joint Status Report (filed Jan. 5, 2004). However, expectancy damages are only intended to give the non-breaching party "the benefits he expected to receive had the breach not occurred." Energy Capital, 302 F.3d at 1326; Glendale Federal, 239 F.3d at 1380. Precision Pine seeks to recover profits once in litigation, and then once again by harvesting the contracts. Precision Pine's position that it is entitled to profit twice from the same contract is legally unsupportable. Bluebonnet Savings Bank, 339 F.3d at 1345 ("the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach"); White, 285 F.3d at 1043 (same). Moreover, as a result of its conscious failure to develop an estimate of

revenues earned from post-suspension harvesting,[26] Precision Pine cannot meet its burden of establishing lost profits with reasonable certainty.

Because post-suspension revenues earned by Precision Pine from harvesting timber upon the contracts at issue must be considered in calculating alleged lost profits, because Precision Pine has failed to develop and produce any estimate of post-suspension revenues, and because Precision Pine bears the burden of proving its lost profits claim with reasonable certainty, summary judgment is appropriate. See Celotex, 477 U.S. at 322 (to avoid summary judgment a plaintiff must "make a showing sufficient to establish the existence of [every] element essential to that [its] case, and on which [it] will bear the burden of proof . . . at trial.").

## III. Precision Pine Seeks Unrecoverable Consequential Damages

In common law breach of contract actions, absent proof of "special circumstances" communicated at the time of contracting, only actual damages that are the natural and probable consequence of the asserted breach are recoverable. E.g., Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed. Cir. 2001); Landmark Land Co. v. FDIC, 256 F.3d 1365, 1378 (Fed. Cir. 2001); Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996) (quoting Locke v. United States, 151 Ct. Cl. 262, 283 F.2d 521, 526 (1960)); Lucas v. United States, 25 Cl. Ct. 298, 310 (1992) ("The only damages that are recoverable for breach of contract are those that are foreseeable at the time of the making of the contract."). In other words, "remote and consequential damages are not recoverable in a common law suit for breach

[26] Precision Pine was specifically apprised of this deficiency in its lost profits calculations more than 6 months ago. App. 201-03. Precision Pine elected not to address post-suspension revenues in three subsequently-served expert reports. It is far too late in the day for Precision Pine to now begin developing an expert analysis of post-suspension activities.

of contract." Wells Fargo Bank, 88 F.3d at 1021 (quoting Northern Helex Co. v. United States, 207 Ct. Cl. 862, 524 F.2d 707, 713, 720 (1975), cert. denied, 429 U.S. 866 (1976)); accord Scott Timber, 333 F.3d at 1372.

Precision Pine alleges various damages that do not result in the ordinary course from the suspension of a timber sale contract. Moreover, at the times of contracting, Precision Pine failed to inform the Forest Service of any "special circumstances" indicating that a suspension would result in such damages. Consequently, the claimed consequential damages are not recoverable in this action. The Court should therefore grant summary judgment in favor of the United States.

### A. Precision Pine's Claims For Increased Logging And Hauling Costs Should Be Denied As A Matter Of Law

A purchaser of timber from the Forest Service is obligated to cut the timber and remove it from Forest Service lands by the contract's termination date. App. 218, 317 **[other pages?]**. The harvested logs can then be used in virtually any manner that the purchaser sees fit.[27]

In conducting its operations, Precision Pine retained a subcontractor, usually Tri-Star Logging, to harvest timber and haul the cut logs to one of Precision Pine's three sawmills for initial processing. App. 190, 192. The resulting "rough green lumber" was then trucked to Precision Pine's planer mill in Winslow, Arizona, where the it was planed, graded, dried and sold. See, e.g., App. 172..[28]

---

[27] The use of logs from Forest Service lands is subject to limited statutory constrains not at issue in this action. For example, the initial processing of logs from Federal lands in the western United States must be performed domestically. See 16 U.S.C. § 620a.

[28] The process described is based upon the deposition testimony of Precision Pine's President, Lorin Porter, its Vice President, Lewis Tenney, and other key employees, regarding Precision Pine's processing of larger logs in 1995-98. Smaller logs were, if possible, sold to Stone Container Corporation for use as pulpwood in the manufacturing of paper products. More (continued...)

Precision Pine seeks as consequential damages in this action alleged post-suspension increases in logging costs and hauling costs. Precision Pine's claim for the recovery of these costs is without merit.

### 1. Increased Hauling Costs

An increase in hauling costs does not occur as the natural consequence of the suspension of a timber sale contract. Indeed, Precision Pine only alleges that it paid increased hauling costs in connection with one of the fourteen contracts at issue.[29] See App. 104, 118A. Precision Pine nevertheless contends that it can recover increased hauling costs purportedly incurred in connection with the Hay timber sale in 1996, 1997 and 1998. App. 118A.

According to Precision Pine, it intended to haul logs harvested from the Hay timber sale to its sawmill in Eagar, Arizona. See, e.g., App. 104, 118A. "However, after the suspension was lifted, the Eagar mill was not immediately available to process timber and, thereafter, due to the ongoing effects of another suspension, on or about August 1, 1997 the Eagar sawmill was permanently closed." App. 457. As a result, Precision Pine contends that logs from the Hay sale were hauled to its sawmill in Winslow, Arizona, which is farther than the Eagar mill, and that it therefore incurred increased costs. App. 104, 118A, 457.

Precision Pine's increased hauling cost claim is premised upon the fact that timber from the Hay sale was to be hauled to its Eagar mill. Precision Pine did not apprise the Forest Service of this fact or any other "special circumstances" at the time of contracting. App. 1-6. This is

---

[28](...continued)
frequently, such logs were sold as firewood, stacked in the forest, hauled to and stacked at one of Precision Pine's mills, or simply left uncut. App. 466-69

[29] Precision Pine has withdrawn its claim with respect to increased hauling costs for the O.D. Ridge sale. App. 104.

hardly surprising. Precision Pine was not awarded the Hay sale. App. 4, 419-20. Moreover, the Hay contract was awarded in 1989 – more than four years before Precision Pine had built its mill in Eagar. App. 35.[30] Put simply, at the time of contracting, Precision Pine itself did not anticipate hauling timber from the Hay sale to its Eagar mill because (i) it was not awarded the contract and (ii) the Eagar mill did not exist.

Precision Pine's alleged increased hauling costs, which resulted from the closure of Precision Pine's Eagar mill in 1997, were not foreseeable at the time of contracting. Consequently, they are not as a matter of law recoverable as consequential damages.

### 2. <u>Increased Logging Costs</u>

Precision Pine also seeks to recover a supposed increase in logging costs. App. 118A. Specifically, Precision Pine alleges that its logging subcontractor – Tri-Star Logging – charged an additional $10/mbf to log the O.D. Ridge timber sale in 1997 and the Hay timber sale in 1998. App. 118A. However, Precision Pine cannot establish that it actually paid Tri-Star a higher price for logging the Hay and O.D. Ridge sales, much less that the purported increase was caused by the MSO suspension and was foreseeable at the time of contracting.[31]

Precision Pine did not execute written contracts with Tri-Star concerning timber logging or hauling. App. 162, 175-77, 187-89, 191. Rather, for each timber sale where Tri-Star was asked to perform work, Precision Pine's President, Lorin Porter, and Tri-Star's President, Steven

---

[30] Nor can Precision Pine establish that the unavailability of Eagar mill was caused by the suspension of the Hay contract in 1995 and 1996. To the contrary, Precision Pine avers that the Eagar mill was unavailable as a result of "the ongoing effects of another suspension." App. 457. For this additional reason, Precision Pine's increased hauling costs claim is without merit.

[31] The Hay timber sale was assigned to Precision Pine on January 17, 1990. App. 4. The O.D. Ridge timber sale was awarded on August 14, 1992. App. 4.

Reidhead, would discuss and agree upon a price before operations commenced. Id. Precision Pine did not memorialize the result of discussions with Tri-Star. Id. When memories about the agreed price differed, Mr. Porter and Mr. Reidhead simply worked out the price after logging had been completed. App. 187.

As a result of its informal business practice, Precision Pine has no contracts, correspondence or other contemporaneous documents establishing that Tri-Star increased the price for logging the O.D. Ridge sale in 1997 and the Hay sale in 1998. Moreover, neither Mr. Porter nor Mr. Reidhead recall any increase in price charged by Tri-Star for logging these contracts. App. 162, 191. Thus, Precision Pine cannot establish that it incurred increased logging costs for the O.D. Ridge and Hay timber sales as a result of the MSO suspension.

Furthermore, increased logging costs are not the natural consequence of the suspension of a timber sale contract. Precision Pine seeks increased logging costs for only two of the fourteen suspended timber sales notwithstanding the fact that other sales were also harvested by Tri-Star in 1997 and 1998. App. 118A. Nor did Precision Pine apprise the Forest Service of any special circumstances regarding the cost of logging the Hay or O.D. Ridge sales at the time of contracting, i.e., in January 1990 and August 1992.

Because the purported increases in logging costs were not foreseeable at the time of contracting in 1990 and 1992, Precision Pine's alleged increased logging costs are not recoverable consequential damages

**B. Precision Pine's Claims For Increased Sawmill Costs Are Precluded By Federal Circuit Precedent And Should Be Denied As A Matter Of Law**

Precision Pine seeks $380,711.20 in "increased manufacturing costs" that allegedly arose as a consequence of the suspension of its timber sale contracts. See App. 112-13, 118. Specifically, Precision Pine contends that its sawmill costs (per mbf) were higher during the suspension because its "sawmills and planer were not as efficient as they would have been with a steady supply of logs."[32] Ness Report at 12. Such purported indirect effects of the suspension – even assuming they could be traced to the breach of one of Precision Pine's contracts – are not recoverable. See Scott Timber, 333 F.3d at 1372.

The United States Court of Appeals for Federal Circuit has frequently ruled that "remote and consequential damages" are not available in an action for common law breach against the Government. E.g., Wells Fargo Bank,, 88 F.3d at 1021. Moreover, in Scott Timber v. United States, the Federal Circuit specifically held as a matter of law that "sawmill costs" resulting from the suspension of a timber sale contract constitute "remote and consequential damages" and, therefore, are not recoverable. Scott Timber, 333 F.3d at 1372

The dispute in Scott Timber, as in this action, involved the Forest Service's suspension of a purchaser's timber sale contracts as a result of litigation filed by an environmental group. See id. at 1360-61. The plaintiff in Scott Timber sought the recovery of various "costs related to sawmill operations" that purportedly resulted from the suspension of its contracts. Id. at 1372.

---

[32] Precision Pine's sawmill costs claim contains numerous analytical problems. For instance, during much of the 1995-96 suspension, Precision Pine maintained significant log inventories at its sawmills. Thus, a steady supply of logs was in fact available for milling operations. Furthermore, Precision Pine simply assumes that changes in the efficiency of its mills can be attributed to the MSO suspension. Such issues will be addressed, if necessary, at trial.

The Court of Federal Claims concluded that sawmill costs are "remote and speculative damages and [therefore] not recoverable." Id. In affirming this decision, the Federal Circuit stated:

> This court agrees with the conclusion of the Court of Federal Claims. Scott's sawmill expenses are not directly related to the timber sale contracts. Any sawmill costs were not a direct result of the suspensions in this case. "[R]emote and consequential damages are not recoverable in a common-law suit for breach of contract . . . especially . . . in suits against the United States for the recovery of common law damages."

Scott Timber, 333 F.3d at 1372 (quoting Wells Fargo Bank, 88 F.3d at 1021, and Northern Helex Co. v. United States, 207 Ct. Cl. 862, 524 F.2d 707, 720 (1975)). Thus, the Federal Circuit established that sawmill costs purportedly arising from the suspension of a timber sale contract constitute "remote and consequential damages" that "are not recoverable in a common suit for breach." Id; see also In re Reidhead Bros. Lumber Mill, 00-2 BCA ¶ 31,144, AGBCA No. 2000-126-1 (Oct. 4, 2000) (rejecting plaintiff's claim for the recovery of increased sawmill costs resulting from a suspension of timber sale contracts), aff'd, 36 Fed. Appx. 426 (Fed. Cir. 2002). Precision Pine's sawmill inefficiency claim is, therefore, barred by binding Federal Circuit precedent.[33]

Precision Pine may seek to distinguish Scott Timber upon the ground that the Court was addressing a claim for damages pursuant to contract clause C6.01. However, in rejecting Scott Timber's claim, the Federal Circuit specifically held that "sawmill costs" resulting from a suspension are "remote and consequential." Scott Timber, 333 F.3d at 1372. In addition, the court noted and relied upon precedent establishing that "remote and consequential" damages are not recoverable "in suits against the United States for the recovery of common law damages." Id.

---

[33] For the same reason, Precision Pine's claim for lost profits on the finished products processed at its mills and planer are remote and consequential damages that are not recoverable. Scott Timber, 333 F.3d at 1372.

(quoting Wells Fargo Bank, 88 F.3d at 1021, and Northern Helex, 524 F.2d at 720) (emphasis added). Consequently, regardless of whether the asserted theory of recovery is clause C6.01 or common law breach, sawmill costs remain "remote," "consequential" and "unavailable."[34]

Furthermore, Precision Pine had no long-term plan for operating its sawmills. App. 74. According to Precision Pine, it determined the level at which its sawmills would be operated 30 days in advance. App. 74 (stating that the company's "goal" reports merely "forecast" the level of production at its mills for the next month). Consequently, even if sawmill costs could potentially be recovered, Precision Pine has no baseline against which to measure alleged "lost efficiency." Put differently, having no planned volume of production at its sawmills, Precision Pine cannot show that operations were affected by any changes in the supply of logs resulting from the MSO suspension.

**C. Precision Pine's Claim For "Unanticipated Interest Expenses" Should Be Denied As A Matter Of Law**

Precision Pine seeks $577,425.76 that it characterizes as "unanticipated interest payments."[35] App. 114, 118. This interest allegedly was paid pursuant to outstanding business loans that Precision Pine obtained before the MSO suspension in August 1995. Id. The loans are

---

[34] The Federal Circuit is clearly correct that a claimed increase in sawmill costs is consequential and remote. Precision Pine, for instance, asserts that its operations were less efficient because its mills were deprived of "a steady supply of logs." This in turn depends upon myriad factors many of which cannot possibly be known at the time of contracting. Such factors include: the other timber contracts being processed at the sawmill; the rate at which logs are being used at the sawmill; the log inventory maintained at the sawmill; the availability of timber from the purchaser's other contracts; and the availability of timber from state lands, Indian lands and private lands.

[35] The United States is immune from paying interest absent an express waiver of sovereign immunity by Congress. IBM v. United States, 201 F.3d 1367, 1369 (Fed. Cir. 2000) (citing Library of Congress v. Shaw, 478 U.S. 310, 314 (1986)). Precision Pine's attempt to finesse this limitation should be rejected.

completely unrelated to the suspension, except insofar as Precision Pine now contends that they would have been "paid down" with anticipated profits from the suspended sales. See App. 463.

Essentially, Precision Pine asserts that it planned to invest any profits derived from the suspended sales in paying down its own business debt.[36] However, Precision Pine's putative business plan was never passed along to the Forest Service. App. 1-6. As the Forest Service had no reason to know of Precision Pine's plan absent some specific notice, the consequential damages sought by Precision Pine are unavailable. Hughes Communications, 271 F.3d at 1066 ("the damages must have been foreseeable at the time the parties entered the contract").

Additionally, Precision Pine's attempt to recover profits that supposedly would have been earned by investing anticipated profits is barred by controlling law. As explained by the Federal Circuit:

> If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement . . . . But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

California Fed. Bank, FSB v. United States, 245 F.3d 1342, 1349 (Fed. Cir.2001) (quoting Wells Fargo, 88 F.3d at 1022-23) (emphasis added).

The Federal Circuit and its predecessor court, the Court of Claims, have uniformly refused to award damages for independent and collateral undertakings as too remote and

[36] Precision Pine has produced no contemporaneous documents reflecting a business plan to "pay down" outstanding loans – much less with revenues from the sale of lumber derived from one of the breached timber sale contracts.

speculative to be recoverable. See, e.g., Wells Fargo, 88 F.3d at 1022; Rumsfeld v. Freedom NY, Inc, 329 F.3d 1320, 1333 (Fed. Cir. 2003) (profits on future contracts which plaintiff alleged it would have been awarded absent the Government's breach were too remote and uncertain); Olin Jones Sand Co. v. United States, 225 Ct. Cl. 741 (1980) (denying a contractor claim that the Government's failure to make timely payments under the contract prevented it from obtaining bonding that would have resulted in other profitable contracts); Rocky Mountain Construction Co. v. United States, 218 Ct. Cl. 665 (1978) (rejecting claim for lost profits on contracts that plaintiff would have bid on had the contract at issue not been delayed by the Government); Ramsey v. United States, 121 Ct. Cl. 426, 101 F. Supp. 353 (1951) (holding that "plaintiffs could not recover an amount in addition to that provided by the contract by designating their claim as one for damages, consisting of interest on amounts paid out by plaintiffs' corporation to third persons"), cert. denied, 343 U.S. 977 (1952); see also Smokey Bear, Inc. v. United States, 31 Fed. Cl. 805, 808 (1994) ("Damages for the loss of future profits and lost profitable business opportunities arising from potential contracts with others are per se unrecoverable."). In Wells Fargo, for instance, the Federal Circuit considered and rejected plaintiff's claim that it would have earned interest on loans that it would have made but for the Government's breach: "Wells Fargo's loss of interest on additional loans it allegedly could have made had there been no breach is too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit." Wells Fargo, 88 F.3d at 1023.

Precision Pine's claim that it would have invested profits from its timber sale contracts in "paying down" its own debt constitutes "a collateral undertaking" that is as a matter of law "too remote and indirect to be recoverable." E.g., Olin Jones Sand Co., 225 Ct. Cl. at 743. For this

reason, the Court should grant the United States' motion for summary judgment with respect to Precision Pine's "unanticipated interest" claim.

## IV. Precision Pine Cannot Recover Damages Upon Behalf Of Its Subcontractors

Precision Pine asserts claims for damages for idle equipment costs of Transporting Renewable Resources, Inc. ("TRRI") and roundwood profits that allegedly would have been earned by Tri-Star Logging. App. 118. Precision Pine itself has incurred no expense and therefore suffered no loss as a result of TRRI's allegedly idle equipment. Similarly, Precision Pine anticipated no profits from harvesting roundwood and, therefore, suffered no damages as a result of any delay in harvesting roundwood. Consequently, Precision Pine has no basis for common law breach of contract damages.[37]

Apparently recognizing this fact, Precision Pine seeks to assert a so-called "pass through" claim pursuant to the Severin doctrine upon behalf of TRRI and Tri-Star. This kind of claim is unique to Government construction contracting. It has no applicability – and indeed has never been applied – in an action for common law breach of a timber sale contract. Moreover, as explained below, Precision Pine cannot meet well-established requirements for asserting a pass-through claim.

### A. TRRI's Idle Equipment Costs Are Not Recoverable

TRRI is a separately incorporated affiliate of Precision Pine. See App. 171, 173. Precision Pine has at times used TRRI to haul rough green lumber from its sawmills to its

[37] Such damages, even if they had in fact been sustained by Precision Pine, would also constitute unrecoverable consequential damages because (i) they do not flow naturally from the alleged contractual breach, and (ii) because Precision Pine informed the Forest Service of no special circumstances at the time of contracting. E.g., Wells Fargo, 88 F.3d at 1021.

planing facility in Winslow.[38] Id. However, Precision Pine had no written contract requiring the use of TRRI with respect to the hauling of timber or rough green lumber. Id. Precision Pine instead used TRRI for hauling on an as-needed basis. Id.

In this action, Precision Pine asserts a claim for idle equipment costs upon TRRI's behalf. App. 118. "As a general rule, subcontractors under government contracts do not have standing to sue the government." W.G. Yates & Sons Constr. Co. v. Caldera, 192 F.3d 987 (Fed. Cir. 1999) (citing Severin v. United States, 99 Ct. Cl. 435, 442 (1943)). "This is because such subcontractors lack privity with the government, and the government has not consented to be sued by those with whom it is not in privity." Id. "However, if the prime contractor is liable to the subcontractor for damages sustained by the subcontractor, that prime contractor can bring an action against the government for the subcontractor's damages." Id. In such circumstances, it is "the prime contractor [that] is injured by the acts of the government and, therefore, [the prime contractor] has standing to sue the government in a pass-through suit on behalf of its subcontractor." W.G. Yates & Sons, 192 F.3d at 991 (citing E.R. Mitchell Const. Co. v. Danzig, 175 F.3d 1369, 1370 (Fed. Cir.1999)).

"The Severin doctrine precludes a prime contractor from bringing a pass-through suit for a subcontractor where the prime contractor is not liable to the subcontractor." Perry-MeCall Constr., Inc. v. United States, 46 Fed. Cl. 664, 671 (2000) (citing W.G. Yates & Sons, 193 F.3d at 991). No contract between Precision Pine and TRRI required Precision Pine to use TRRI for hauling work. See App. 171, 173. As a result, the requisite prime contractor-subcontractor

[38] In early 1995, Precision Pine reached an agreement with Tri-Star pursuant to which Tri-Star would harvest all of Precision Pine's sales. As a result, before the MSO suspension, Tri-Star began hauling the logs from Precision Pine's timber sales to Precision Pine's sawmills. This resulted in a substantial reduction in Precision Pine's need for TRRI's services.

relationship for a pass-through claim is missing.[39] Put differently, in the absence of a contract, Precision Pine is not liable to TRRI for idle equipment. Moreover, even if a written contract had existed, any right to damages that TRRI might at one time have possessed would no longer be enforceable. See Ariz. Stat. § 12-548 (six years). Precision Pine cannot therefore maintain a pass-through claim upon behalf of TRRI for alleged idle equipment costs.

**B. Tri-Star's Alleged Profits For Roundwood Are Not Recoverable**

Pursuant to the Severin doctrine, Precision Pine also seeks to assert a pass-through claim with respect to alleged roundwood profits upon behalf of Tri-Star Logging:

> Precision Pine's goal with respect to bidding on contracts with a pulpwood component was essentially just to cover its contract costs on pulpwood and allow its logging and hauling subcontractor Tri-Star Logging to retain what, if any money from the sale of pulpwood removed was covered. . . . Accordingly, the claim for lost [profits] with respect to roundwood is a "pass through" claim made by Precision Pine upon behalf of the logging subcontrator, Tri Star . . . .

App. 461.

Tri-Star is an independent company that is not affiliated with Precision Pine. App. 188. Precision Pine used Tri-Star as its principal logger upon the contracts at issue beginning in early 1995. App. 190, 192. However, Precision Pine and Tri-Star had no contractual arrangement by which Tri-Star was entitled to cut, sell and retain the profits for roundwood upon Precision Pine's multi-product sale contracts. Id. In the absence of a valid contract, Precision Pine simply is not liable to Tri-Star. Additionally, even if a contract had existed, by virtue of the applicable statute of limitations, any right to damages that Tri-Star might at one time have possessed would no

---

[39] In addition, at the time of the MSO suspension, Precision Pine used TRRI only to haul rough green timber between its own mills. App. 190, 192. Thus, the work performed by TRRI (on an as needed basis) was not even work that had to be performed pursuant to the Forest Service timber sale contracts.

longer be enforceable. See Ariz. Stat. § 12-548. Precision Pine is not liable to Tri-Star and cannot, therefore, maintain a pass-through claim upon TriStar's behalf.

## V. The Contract Does Not Provide For The Payment Of Attorney's Fees

Clause CT6.01 reimburses purchasers for out-of-pocket expenses only.[40] App. 283-84, 376-77. Thus, in order to receive compensation under CT6.01, a liability limiting clause, a purchaser must fulfill all three of following requirements: first, the purchaser must have actually incurred an out-of-pocket expense; second the expense must have been incurred as a "direct result" of an interruption or delay; and third, the expense must be incurred pursuant to interruption or delay of operations. App. 283-84, 376-77. The purchaser must show proof of these expenses with "receipts or other documentation" that "clearly identify and verify actual expenditures." App. 283-84, 376-77.[41]

Attorney's fees are not recoverable under the terms of the contracts for three reasons. First, the doctrine of sovereign immunity precludes the Government from being held liable for costs without its consent. Second, contract provision CT6.01 provides that Precision Pine is

---

[40] Damages for breach of contract and payment pursuant to contract clause CT 6.01 are alternative remedies. Accordingly, if Precision Pine elects breach of contract damages, no payment pursuant clause CT 6.01 is owed. E.g., Bluebonnet Savings Bank, 339 F.3d at 1345 ("the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach"). In this action, Precision Pine seeks breach damages with respect to the O.D. Ridge, Kettle, Hay, Brookbank, Jersey Horse, Salt, Manaco, Mud, Saginaw-Kennedy, U-Bar and Monument contracts.

[41] Presumably pursuant to CT 6.01, Precision Pine seeks tack on the payment of overhead and profits as part of each "miscellaneous items" claim. Plainly, overhead and profits are not "out-of-pocket" expenses. Indeed, lost profits are not even an expense. Additionally, general overhead expenses and lost profits are not the"direct" result of a suspension. Lastly neither overhead nor profits can be identified and verified by "actual receipts." Therefore, overhead and profits are not recoverable pursuant to clause CT 6.01 and the Court should enter summary judgment in favor of the United States with respect to this component of Precision Pine's miscellaneous costs claims.

entitled to "out of pocket expenses incurred as a direct result of interruption or delay of operations," and that such out-of-pocket expenses "do not include lost profits, replacement cost of timber or any other anticipatory losses suffered by Purchaser." App. 284, 377. The attorney's fees Precision Pine incurred by pursing its claims against the Government are costs that did not result directly from the suspension. Third, a plain reading of the contracts' terms does not support Precision Pine's claims for attorney's fees.

Furthermore, even assuming for the sake of argument attorney's fees could be recovered pursuant to clause CT 6.01, Precision Pine has produced no receipts or other documents demonstrating that it has actually paid any attorney's fees.[42]

### A. The Doctrine Of Sovereign Immunity Precludes Precision Pine From Recovering Attorney's Fees From The Government

"[U]nder the doctrine of sovereign immunity, the United States cannot be held liable for costs without its consent." Johns-Manville Corp. v. United States, 893 F.2d 324, 326 (Fed. Cir. 1989). Where the United States has given its consent, the terms of its consent define the court's jurisdiction to entertain the suit. United States v. Sherwood, 312 U.S. 584, 586 (1941). Waiver of sovereign immunity, and hence consent to be sued, must be expressed unequivocally – it cannot be implied. Department of the Army v. Blue Fox, Inc., 119 S. Ct. 687, 688 (1999); United States v. Nordic Village, Inc., 503 U.S. 30, 33-34 (1992). Moreover, a waiver of the Government's sovereign immunity must be strictly construed in favor of the Government. United States Dep't of Energy v. Ohio, 503 U.S. 607, 615, 619-20 (1992); Cosmic Constr. Co. v. United

[42] Clause CT 6.01 provides, in pertinent part: "Purchaser agrees that in the event of interruption or delay . . . its sole exclusive remedy shall be . . . [a] Contract Term Adjustment pursuant to BT 8.21, plus out-of-pocket expenses incurred as a direct result of interruption of delay of operation under this provision. Out-of-pocket expenses do not include lost profits, replacement cost of timber, or any other anticipatory losses suffered by Purchaser." App. 283-84, 376-77.

States, 697 F.2d 1389, 1390 (Fed. Cir. 1982). "[A] court may not in any case, even in the interest of justice, extend its jurisdiction where none exists . . . ." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 818 (1988); accord UNR Indus., Inc. v. United States, 962 F.2d 1013, 1022-23, 1025 (Fed. Cir. 1992) (en banc), aff'd sub nom. Keene Corp. v. United States, 508 U.S. 200 (1993). "It is a fundamental precept that federal courts are courts of limited jurisdiction." Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374 (1978). More particularly, "the [Court of Federal Claims] is a court of exceedingly limited statutory jurisdiction." Shelleman v. United States, 9 Cl. Ct. 452, 455 (1986).

Precision Pine cannot overcome the general proposition that the United States has not waived sovereign immunity with regard to attorney's fees. Clause CT 6.01 does not specifically allow such expenses and, therefore, Precision Pine has failed to show the "specific authorization" for such fees to be recoverable. See C.B.C. Enterps., Inc. v. United States, 24 Cl. Ct. 1, 5 (1991).

**B. The Attorney's Fees Sought By Precision Pine Are Remote And Consequential Damages And Cannot Be Recovered**

Attorney's fees and other litigation expenses are not recoverable as breach of contract damages absent a specific authorization. Attorney’s fees are the kind of consequential damages not normally awarded in contract breach cases. See William Green Constr. Co. v. United States, 201 Ct. Cl. 616 (1973). Merely characterizing attorney's fees as contract damages does not overcome the Court's general denial of such claims. See Kania v. United States, 227 Ct. Cl. 458, 467 (1981).

Similarly, damages must be the direct result of the breach. See Myerle v. United States, 33 Ct. Cl. 1, 27 (1897) ("There must not be two steps between cause and damage."). Therefore,

consequential damages may not be awarded. See Assurance Co. v. United States, 813 F.2d 1202, 1205 (Fed. Cir. 1987). In CCM Corp. v. United States, the Court held:

> It is well established . . . that damages may only be recovered against the United States if they arise from the natural and probable consequences of a contract breach. . . . Remote or consequential damages are not recoverable. . . . Additionally, damages resulting from a contract breach must be contemplated by the parties when entering into the contract.

CCM Corp. v. United States, 15 Cl. Ct. 670, 671 (1988).

The contract in this case provides only for reimbursement of out-of-pocket expenses that are the direct result of the delay. App. 283-84, 376-77. The contract contemplated the sale and removal of timber only and consequential damages of any delay are limited to expenses related to the tree harvest. Precision Pine only incurred the claimed fees because of its independent decision to use an attorney to prepare and prosecute its claim against the Government. This voluntary decision is several steps beyond the scope of CT 6.01 and, therefore, constitutes unrecoverable expenses. See, e.g., Wilner v. United States, 23 Cl. Ct. 241 (1991) (stating BCAs regularly and properly conclude costs incurred pursuant to claim preparation are unallowable) (citing Coastal Dry Dock & Repair Corp., ASBCA No. 36754, 9101 BCA ¶ 23,324 (costs incurred pursuant to claim preparation unallowable)).

Attorney's fees should not be reimbursable because they fall outside the terms of the contract. The contract defines the extent of the relationship between the parties and provides the only basis for Precision Pine's damages. The contract merely provides Precision Pine the opportunity to profit from the harvest of timber, not guarantee that the harvest would actually occur or that Precision Pine would realize a profit. The parties contemplated that there was the possibility that the harvest would be delayed or cancelled, and the contract specifically provides

that the United States would only be liable for certain articulated damages as a result of delay. App. 283-84, 376-77. The claimed attorney's fees are not contemplated under the contract.

### C. A Plain Reading Of CT6.01 Demonstrates That Attorney's Fee's Are Not Recoverable

The universe of what does not constitute out-of-pocket expenses is limitless, and the specific list of areas not considered out-of-pocket in CT 6.01 does not constitute the total enumeration of all non-reimbursable costs. See Federal Land Bank of St. Paul v. Bismark Lumber Co., 314 U.S. 95, 99-100 (1941); see Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1367 (Fed. Cir. 1998); Public Citizen, Inc. v. Lew, 127 F. Supp.2d 1, 23 (D.C. 2000) (stating "the word 'includes' normally does not introduce an exhaustive list but merely sets out some examples of some 'general principle'" (citations omitted)). The contract further provides for the expenses incurred as the direct result of delay. App. 283-84, 376-77.

The voluntary hiring of an attorney to file a claim against the Government is not an out-of-pocket expense incurred as a direct result of a suspension or delay.[43] In this contract, an attorney was not required to perform the contract, nor was an attorney necessary to perform any activity relating to the suspension of the contract.

Precision Pine's legal fees are attributable to the preparation and prosecution of this action, rather than the performance of the contract work. Such expenditures incurred years after the suspension constitute "remote indirect consequences" relating to litigation against the Government, rather then contractual performance. See MVM Inc. v. United States, 47 Fed. Cl.

---

[43]Even if claim preparation costs were reimbursable, the court in Singer Co.. v. United States, 568 F.2d 695 (Ct. Cl. 1977), disallowed legal expenses as a direct expense as a part of an equitable adjustment under a contract on the basis that entitlement was not clear.

361, 365 (2000) (attorney's fees are "remote indirect consequences of a breach of contract, and were not directly contemplated by the partes when they formed the contract").

The plain meaning of CT6.01, as well as the contract as a whole, demonstrates that attorney's fees are not recoverable under this provision. Thus, it follows that attorney's fees incurred after the presentation of its claim to the contracting officer, do not qualify as out-of-pocket expenses, under CT6.01.

Precision Pine may argue that the United States could have listed attorney's fees as non-reimbursable costs. However, the fact that attorney’s fees, and myriad other potential consequential damages, were not expressly listed in the contracts does not change the contractual requirement that the reimbursable costs must flow directly from the delay.

Precision Pine may also note that the Forest Service has subsequently determined to list attorney's fees as another example of non-reimbursable costs under CT6.01. This fact, however, demonstrates nothing about the clause at issue in this case. "Subsequent revision or clarification of contract language which has given rise to disagreement is only wise, and does not constitute an admission." Mason v. United States, 615 F.2d 1341, 1349 (Ct. Cl. 1980); see also Martin Lane Company v. United States, 432 F.2d 1013, 1021 (Ct. Cl. 1970).

In M.A. Mortenson v. United States, 40 Fed. Cl. 389, 421 (1998), the court recognized:

> evidence of measures taken after an event are of limited use and are insufficient to demonstrate liability. See Fed. R. Evid. 407 advisory committee notes ("the rule rejects the notion that 'because the world gets wiser as it gets older, therefore it was foolish before.'" . . . [citation omitted]).

Accordingly, while attorney's fees are specifically excluded under a newer version of CT6.01, this clarification does not change the meaning of out-of-pocket expenses in the contract at issue

in this case. Out-of-pocket expenses, as defined by the scope of the contract, are limited to those incurred as a direct result of delay. Merely adding new examples of what is not a direct result does not demonstrate that the attorney's fees allegedly incurred in this case are recoverable.

### D. Precision Pine Has Produced No Receipts Or Other Documentation Establishing That It Has Paid The Attorney's Fees For Which It Seeks Compensation

Precision Pine cannot demonstrate that it actually has paid the attorney's fees for which it seeks compensation pursuant to CT 6.01.[44] At her February 6, 2004 deposition, Saltman & Steven's office manager, Rhonda Ryan, testified that, although she was responsible for ensuring that bills sent out by the firm were paid, she did not know if Precision Pine had in fact paid its bill. App. 180-81. In addition, Precision Pine has failed to produce any receipts or invoices verifying it has paid any attorney's fees.[45] Consequently, even if attorney's fees were recoverable pursuant to CT 6.01, Precision Pine would not be entitled to recovery in this action.

## CONCLUSION

For these reasons, the United States respectfully requests that the Court grant this motion and enter summary judgment upon behalf of the United States with respect to Precision Pine's claims for (1) lost profits, (2) increased logging and hauling costs, (3) increased sawmill costs,

---

[44] Likewise, Precision Pine's fees claim relates to "claim preparation costs" by Precision Pine employees are not recoverable pursuant to CT 6.01. Precision Pine has produced no documents responsive to the United States' requests for production of documents supporting these alleged damages. Accordingly, Precision Pine cannot present proof that clearly identifies and verifies any expenses incurred. Summary judgment with respect to this component of Precision Pine's damages claim is therefore merited.

[45] Precision Pine has produced billing statements from Saltman & Stevens. However, as Ms Ryan's testimony makes clear, the fact that a bill has been prepared is not evidence that it has in fact been paid.

(4) company-wide interest expenses, and (5) expenses and attorney's fees pursuant to contract clause CT 6.01, and overhead and profit pursuant to contract clause CT 6.01.[46]

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

s/ David A. Harrington

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
(202) 307-0277
(202) 307-0972 (fax)

Attorneys for Defendant

April 16, 2004

[46] The United States seeks summary judgment with respect to all of Precision Pine's claims other than certain "miscellaneous items" claims. See App. 104, 118.