No. 98-720C
(Judge George W. Miller)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PRECISION PINE & TIMBER, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277

Attorneys for Defendant

OF COUNSEL:

Lori Polin Jones
Patricia L. Disert
Office of General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

Dated: April 16, 2004

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-131C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(d)(1) of the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits the following proposed findings of uncontroverted fact in support of its motion for summary judgment.

**Background**

1. The United States Forest Service manages approximately 191 million acres of Federal lands in National Forests throughout the United States for multiple purposes. As part of its management of these lands, the Forest Service plans and conducts timber sales. 16 U.S.C. § 472a(a).

2. This action concerns 14 Forest Service contracts: (1) the O.D. Ridge timber sale; (2) the Kettle multi-product sale; (3) the Hay timber sale; (4) the Brookbank multi-product sale; (5) the Jersey Horse timber sale; (6) the Salt multi-product sale; (7) the Manaco multi-product sale; (8) the St. Joe timber sale; (9) the Hutch-Boondock multi-product sale; (10) the Mud multi-product sale; (11) the Saginaw-Kennedy multi-product sale; (12) the Brann multi-product sale; (13) the U-Bar timber sale; and (14) the Monument multi-product sale (collectively, the "contracts at issue"). Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 38 (2001).

3. Precision Pine bid upon and was awarded the O.D. Ridge timber sale on August 14, 1992, the Kettle multi-product sale on July 20, 1995, the Brookbank multi-product sale on April 13, 1995, the Jersey Horse timber sale on December 13, 1993, the Salt multi-product sale on February 28, 1994, the Manaco multi-product sale on January 17, 1995, the Hutch-Boondock multi-product sale on June 29, 1994, the Mud multi-product sale on September 14, 1994, the Saginaw-Kennedy multi-product sale on August 29, 1994, the Brann multi-product sale on September 29, 1994, the U-Bar timber sale on October 5, 1992, and the Monument multi-product sale on September 28, 1994. Precision Pine, 50 Fed. Cl. at 38 n.1.

4. At the time of contracting, Precision Pine did not and had not informed the Forest Service of any special circumstances relating to the O.D. Ridge contract. App. 3-6 (Harris Decl. ¶¶ 10-16).

5. At the time of contracting, Precision Pine did not and had not informed the Forest Service of any special circumstances relating to the Kettle contract. App. 3-6 (Harris Decl. ¶¶ 10-16).

6. At the time of contracting, Precision Pine did not and had not informed the Forest Service of any special circumstances relating to the Brookbank contract. App. 3-6 (Harris Decl. ¶¶ 10-16).

7. At the time of contracting, Precision Pine did not and had not informed the Forest Service of any special circumstances relating to the Jersey Horse contract. App. 3-6 (Harris Decl. ¶¶ 10-16).

8. At the time of contracting, Precision Pine did not and had not informed the Forest Service of any special circumstances relating to the Salt contract. App. 3-6 (Harris Decl. ¶¶ 10-16).

9. At the time of contracting, Precision Pine did not and had not informed the Forest Service of any special circumstances relating to the Manaco contract. App. 3-6 (Harris Decl. ¶¶ 10-16).

10. At the time of contracting, Precision Pine did not and had not informed the Forest Service of any special circumstances relating to the Hutch-Boondock contract. App. 3-6 (Harris Decl. ¶¶ 10-16).

11. At the time of contracting, Precision Pine did not and had not informed the Forest Service of any special circumstances relating to the Mud contract. App. 3-6 (Harris Decl. ¶¶ 10-16).

12. At the time of contracting, Precision Pine did not and had not informed the Forest Service of any special circumstances relating to the Saginaw-Kennedy contract. App. 2-3 (Harris Decl. ¶¶ 4-9).

13. At the time of contracting, Precision Pine did not and had not informed the Forest Service of any special circumstances relating to the Brann contract. App. 2-3 (Harris Decl. ¶¶ 4-9).

14. At the time of contracting, Precision Pine did not and had not informed the Forest Service of any special circumstances relating to the U-Bar contract. App. 3-6 (Harris Decl. ¶¶ 10-16).

15. At the time of contracting, Precision Pine did not and had not informed the Forest Service of any special circumstances relating to the Monument contract. App. 3-6 (Harris Decl. ¶¶ 10-16).

16. The Hay timber sale was originally awarded to another purchasers and was assigned to Precision Pine on January 17, 1990. App. 4; Precision Pine, 50 Fed. Cl. at 38 n.1.

17. Precision Pine did not inform the Forest Service of any special circumstances relating to the Hay contract at or before its award, or at the time of its assignment. App. 3-6 (Harris Decl. ¶¶ 10-17).

18. The St. Joe timber sale was originally awarded to another purchasers and was assigned to Precision Pine on April 14, 1992. App. 4; Precision Pine, 50 Fed. Cl. at 38 n.1.

19. Precision Pine did not inform the Forest Service of any special circumstances relating to the St. Joe contract at or before its award, or at the time of assignment. App. 3-6 (Harris Decl. ¶¶ 10-16).

**General Contractual Provision**

20. Each of the contracts at issue establishes an operating season, requires the purchaser to submit an annual operating schedule, requires the purchaser to meet with the Forest Service prior to commencing harvesting operations to finalize an operating plan, and prescribes harvesting methods to be employed. See generally App. 217-418.

21. The purchaser is required to complete of all harvesting timber and roundwood by the contract's termination date. Id.

22. Timber is defined by contract as trees larger than 9.0 inches in diameter at breast height ("dbh"). App. 223, 319.

23. "Roundwood" refers to smaller trees that are between 5.0 and 8.9 inches dbh. App. 319.

24. The price paid for roundwood harvested pursuant to multi-product sale contracts is established administratively by the Forest Service. App. 321-23; see generally App. 217-418.

25. In certain circumstances, where the contract is interrupted or delayed by Government action, the purchaser is entitled to an extension of the contract's termination date. App. 257, 346.

**The MSO Suspension And Concurrent Harvesting On Forest Service Contracts**

26. On August 25, 1995, as a result of an injunction entered by a Federal district court in litigation brought by an environmental group concerning the Mexican Spotted Owl, the Forest Service suspended the contracts at issue (the "MSO suspension"). Precision Pine, 50 Fed. Cl. at 38-39.

27. On October 18, 1995, the Forest Service lifted the suspension upon the St. Joe, Hutch-Boondock and Brann contracts. App. 424-33; Precision Pine, 50 Fed. Cl. at 47 & n.18.

28. Precision Pine began harvesting the St. Joe, Hutch-Boondock and Brann in late 1995 or early 1996. App. 439, 444.

29. On March 11, 1996, the suspension of the Mud multi-product sale was lifted. App. 437.

30. Precision Pine began harvesting the Mud contract in late July 1996. App. 440.

31. The suspension of the remaining contracts ended on December 4, 1996. Precision Pine, 50 Fed. Cl. at 39, 70.

**Post-Suspension Harvesting Actions**

32. Precision Pine requested and was granted permission by the Forest Service to operate the Hay timber sale outside of the contract's normal operating season. App. 42-23, 446. Timber harvesting upon the Hay sale began later in December 1996 and continued through February 1997. Id.

33. Precision Pine did not request to operate any other contracts during the winter of 1996-97.

34. Precision Pine requested and was granted contract term adjustments pursuant to contract clause BT 8.21 upon all of the contracts at issue as a result of the MSO suspension. The contract term adjustments provided additional time to harvest commensurate with the time that Precision Pine had lost as a result the MSO suspension. App. 148, 158, 218, 243, 257, 306, 317, 408.

35. Precision Pine submitted contract claims to Forest Service contracting officers requesting monetary compensation for the MSO suspension. The claims were granted in part and denied in part. Precision Pine, 50 Fed. Cl. at 51.

**Other Facts Related To Precision Pine's Damages Claims**

36. Before, during and after the MSO suspension, Precision Pine purchased timber from the United States Forest Service, the State of Arizona, various Indian tribes and private landowners. App. 136, 153.

37. The price for wood products was lower during the MSO suspension than it had been in 1993 and 1994 and than it was in 1997. App. 43.

38. The annual average lumber price index published by the Western Wood Products Association for Rocky Mountain Ponderosa Pine, which is the relevant index, was as follows:

1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83; 1999 – $374.35. E.g., App. 43.

39. Decisions concerning Precision Pine's harvesting of timber were made by company President Lorin Porter. App. 134-35, 151-52, 156, 171. Mr. Porter did not involve other company officials or employees in the decision making process. App. 156, 171-74 ("Lon [Porter] had total control of that").

40. Precision Pine prepared no business plan, scheduling plan, operating plan, or other document describing or addressing anticipated timber harvesting under its contracts in 1995 and 1996. App. 137, 157, 178.

41. Precision Pine prepared no plan or other document describing or addressing the anticipated operation of its sawmills in 1995 and 1996. App. 14-15, 74-75.

42. Mr. Porter cannot identify which contracts would have been harvested in 1995 and 1996 had the MSO suspension not occurred. App. 161A ("What we would have cut had the suspension not been there, that's a mystery. I mean I don't know.").

43. The O.D. Ridge, Hay, Saginaw-Kennedy, and U-Bar contracts were again suspended as a result of the Forest Guardians litigation. Timber harvesting upon certain parts of the Salt and Manaco was suspended as a result of the Forest Guardians litigation. These suspension lasted from June 2, 1997 to December 15, 1997. App. 36-73.

44. The Kettle, Brookbank, Jersey Horse, St. Joe, Hutch-Boondock, Mud, and Monument contracts were not suspended and were unaffected by the Forest Guardians litigation. App. 36-73, 205-16.

45. Precision Pine had the opportunity to operate the Kettle, Brookbank, Jersey Horse, St. Joe, Hutch-Boondock, Mud, and Monument contracts in 1997. Precision Pine chose not to harvest these contracts to completion in 1997. App. 205-16. Precision Pine has described this as a "business decision." Id.

46. Precision Pine had the opportunity to operate the contracts at issue in 1998 and 1999. App 36-73, 205-16.

47. The lumber market was better in 1999 than during the MSO suspension in 1995 and 1996. App. 43.

48. Precision Pine did not harvest the Brookbank, Jersey Horse, Salt, Manaco, Saginaw-Kennedy, O.D. Ridge, U-Bar and Monument contracts to completion in 1999 because harvesting would have been unprofitable. App. 36-73, 205-16.

49. Precision Pine attributes the unprofitability of its contracts in 1999 to the fact that its Winslow sawmill was destroyed by fire in the Fall of 1998 and the decision of the purchaser of Precision Pine's "chips" (a by-product produced by sawmills) to began taking only recycled material in February 1998. App. 36-73.

50. Precision Pine's contracts minimize downside market risk by giving purchasers a lengthy period to harvest and the ability to extend the contract term in the event of poor market conditions. App. 218, 306, 316, 408. Most of Precision Pine's contracts also provide for the payment of lower stumpage prices when the price of lumber declines. App. 183-84.

51. Precision Pine asserts that it would have produced 11 kinds of finished (i.e., planed) lumber products from the sales at issue: (1) Moulding & Better; (2) 5/4" #1 Shop; (3) 5/4" #2 Shop; (4) 5/4" #3 Shop; (5) Paragraph 99 Redress; (6) 5/4" x RWL Radius Edge;

(7) #2, #3, #4 & Better; (8) #3 Common Utility; (9) #4 Common Economy; (10) #5 Common; and (11) Miscellaneous Shop Outs. App. 85-87, 119-32. Precision Pine also asserts that it would have produced and sold two unfinished products: (1) Rough; and (2) Timbers. App. 85-87, 119-32.

52. Precision Pine estimates a percentage of each of these lumber products that would allegedly have been manufactured from each of the contracts at issue. See, e.g., App. 85-87, 119-32.

53. Precision Pine relies upon after-the-fact estimates prepared by its President, Lorin Porter as the basis for the alleged product mix. App. 165-66, 194

54. Precision Pine has not identified Mr. Porter as an expert and has produced no report, workpapers or other backup documentation supporting his estimates. App. 7-12, 88-92

55. Mr. Porter consulted no textbooks, treatises or studies in developing his estimates. App. 166.

56. Mr. Porter does not know whether the methodology he used to generate the estimated product mix is accepted in the industry. App. 166 see also 167-68.

57. Mr. Porter does not know what "lag time" was used in generating the estimated product mix. Mr. Porter knows of no documents from which the "lag time" used in generating the estimated product mix can be derived. App. 166-68.

58. Mr. Porter's methodology is untested, has not been subjected to peer review, and has not been published. App. 165-68.

59. In preparing the product mix estimates, Mr. Porter assumed that the volume of each lumber product (and therefore the overall mix of lumber products) that was sold by

Precision Pine in a given month was identical to the volume of each lumber product (and therefore the overall mix of lumber products) produced from one of the timber sales at issue in some prior month. App. 76-87..

60. Precision Pine's sales records do not identify the timber sale contract from which lumber products originated. App. 16-29, 32-33.

61. Precision Pine maintains no record of the volume of each lumber product that is produced by its sawmills or its planer mill on a monthly basis. App. 16-29.

62. The lumber products sold by Precision Pine during any given month are based upon of the needs of its customers.

63. Precision Pine carried an inventory of lumber products for sale in 1994, 1995, 1996 and 1997. App. 451-54. The level of the lumber product inventories varied from month to month. App. 451-54.

64. After the MSO suspension was lifted, Precision Pine harvested some or all of the timber upon the O.D. Ridge, Kettle, Hay, Brookbank, Jersey Horse, Manaco, St. Joe, Hutch-Boondock, Mud, Brann and U-Bar contracts. App. 439-50.

65. Precision Pine harvested no timber upon the Salt, Saginaw-Kennedy or Monument contracts before or after the MSO suspension. App. 92-95.

66. In conducting operations during 1995, 1996 and 1997, Precision Pine retained a subcontractor, usually Tri-Star Logging, to harvest timber and haul the cut logs to one of Precision Pine's three sawmills for initial processing. App. 159, 190. The resulting "rough green lumber" was then trucked to Precision Pine's planer mill in Winslow, Arizona where the it was planed, graded, dried and sold. App. 170.

67. The Hay sale was originally awarded in 1989. App. 419.

68. Precision Pine's sawmill in Eagar, Arizona was built and began operating in October 1993. App. 35.

69. Precision Pine did not execute written contracts with Tri-Star concerning timber logging or hauling. App. 162, 175-77, 187-89, 191.

70. For each timber sale where Tri-Star was asked to perform work, Precision Pine's President, Lorin Porter, and Tri-Star's President, Steven Reidhead, would discuss and agree upon a price before operations commenced. App. 162, 175-77, 187-89, 191.

71. Precision Pine did not memorialize the result of its negotiations with Tri-Star. App.162, 175-77, 187-89, 191.

72. Precision Pine has produced no contracts, correspondence or other contemporaneous documents showing that Tri-Star increased the price for logging the O.D. Ridge sale in 1997 and the Hay sale in 1998.

73. Neither Mr. Porter nor Mr. Reidhead recall any increase in price charged by Tri-Star for logging the Hay contract. App. 162, 191.

74. Precision Pine seeks "unanticipated interest payments" that allegedly were paid pursuant to outstanding business loans that Precision Pine obtained before the MSO suspension in August 1995. See App. 462-63. The loans are unrelated to the MSO suspension. Id.

75. Precision Pine has incurred no expense as a result of TRRI's allegedly idle equipment. App. 172.

76. Precision Pine anticipated no profits from harvesting roundwood and, therefore, suffered no damages as a result of any delay in harvesting roundwood. App. 461.

77. TRRI is a separately incorporated affiliate of Precision Pine. App. 171, 173

78. Tri-Star is an independent company that is not affiliated with Precision Pine. App. 187-88.

79. Beginning in early 1995, Precision Pine reached an agreement with Tri-Star pursuant to which Precision Pine would use Tri-Star to log all of the contracts at issue. As part of its logging, Tri-Star hauled cut timber to Precision Pine's sawmills. App. 190, 192.

80. Precision Pine had no contract requiring it to use TRRI for the hauling of any timber or rough green lumber in 1995 or 1996. App. 172-73.

81. Precision Pine and Tri-Star had no contractual arrangement by which Tri-Star was entitled to cut, sell and retain profits for roundwood upon Precision Pine's multi-product sale contracts in 1995 or 1996. App.190, 192.

82. Saltman & Steven's office manager, Rhonda Ryan, testified that, although she was responsible for ensuring that bills sent out by the firm were paid, she did not know if Precision Pine had in fact paid its bills for legal services. App. 180-81.

83. Precision Pine has produced no receipts or invoices verifying it has paid any attorney fees.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

s/ David A. Harrington

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
(202) 307-0277
(202) 307-0972 (fax)

Attorneys for Defendant

April 16, 2004