**INTERROGATORY NO. 20**

For each sawmill that Precision Pine bought, sold, opened or closed between June 1991 and July 2000, identify that date on which the mill was bought, sold, opened or closed.

**SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 20**

**Winslow Sawmill**

The Winslow Sawmill was purchased on or about December 23, 1991 and was destroyed by a fire on or about September 16, 1998, and remained closed thereafter.

The following are periods of time when this mill was not operating for at least several days. This list includes any such period of time that Lorin Porter recollects or that was indicated from a review of mill production records. This list does not include holidays, maintenance, single day log shortages, or stoppages dues to equipment breakdowns of very limited duration. Any major, temporary shut down caused by Forest Service suspensions is included in this list:

April 11 – April 15, 1994
July 2 – July 8, 1994
March 11 – April 14, 1995
July 20 – 27, 1995
Dec. 4 – Dec.8, 1995
March 12, 1996 – April 15, 1996
June 28 – July 5, 1996
Dec. 10 – Dec. 16, 1996
Feb. 21, – April 1, 1997
Oct. 1997 – Down for two weeks to a month, exact dates unknown.

**Winslow Planer**

The Winslow Planer was purchased on or about December 23, 1991. According to the best recollection of Lorin Porter, it was closed permanently around the fall of 1999. Mr. Porter

**Eagar Sawmill**

To the best recollection of Lorin Porter, the Eager Sawmill was opened in October 1993 and closed permanently on or about August 1, 1997.

The following are periods of time when this mill was not operating for at least several days. This list includes any such period of time that Lorin Porter recollects or that was indicated from a review of mill production records. This list does not include holidays, maintenance, single day log shortages, or stoppages due to equipment breakdowns of very limited duration. Any major, temporary shut down caused by Forest Service suspensions is included in this list:

December 1, 1995 – February 17, 1997
March 28 – all but 2 days of April 1997

**Heber Sawmill**

The Heber Sawmill was purchased prior to the period specified in the interrogatory.

The following are periods of time when this mill was not operating for at least several days. This list includes any such period of time that Lorin Porter recollects or that was indicated from a review of mill production records. This list does not include holidays, maintenance, single day log shortages, or stoppages due to equipment breakdowns of very limited duration. Any major, temporary shut down caused by Forest Service suspensions is included in this list:

Feb 4 – Feb. 11, 1994
Unknown date in March or early April 1995 – April 11, 1995
Sept. 19, 1995 – Nov. 26, 1995
June 19, 1996 – Oct. 20, 1997
Feb. 19, 1998 – April 24, 1998
June 24, 1998 – Sept 21, 1998

**INTERROGATORY NO. 34**

With respect to each of the contracts at issue, explain in detail why did Precision Pine did not harvest timber that it anticipated harvesting during the suspension at issue (see, e.g., the "harvest dates" in page C-0064 to -0066 of Precision Pine's February 26, 2003 damages calculations), after suspension of the contract was lifted.

**SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 34**

With respect to each of the contracts at issue, explain in detail why did (sic) Precision Pine did not harvest timber that it anticipated harvesting during the suspension at issue (see, e.g., the "harvest dates" in page C-0064 to -0066 of Precision Pine's February 26, 2003 damages calculations), after suspension of the contract was lifted.

**Brann** – The normal operating season for this sale was April 15 to December 31. Restrictions on harvesting in portions of Payment Unit 1 began on February 1 and ran through August 30.

This sale was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995 and which was not lifted with respect to this sale until October 20, 1995. At about the same time the suspensions of Hutch-Boondock and St. Joe were also lifted. On October 23, 1995 Precision Pine advised the Forest Service that it intended to begin operations on Hutch-Boondock (the operating season for which ended on November 30) and then come back to Brann.

On January 26, 1996, Precision Pine participated in a pre-work meeting with the Forest Service which approved Precision Pine's plan to begin harvest on Payment Unit 2 of the Brann sale on January 29, 1996. Precision Pine continued operations on payment unit 2 of Brann and removed some 500 MBF of timber in the 1st quarter of 1996. On February 12, 1996, Precision Pine advised the Forest Service that it had purchased the C-12 sale on the Hualapai reservation and would be operating there through June at which time Precision Pine intended to return to Brann and harvest Payment Unit 3 in July and Payment Unit 1 in October. As of February 15, 1996 Precision Pine had also completed all of the specified roads.

From May 3, 1996 to July 9, 1996 operations were precluded due to a fire closure. Thereafter, Precision Pine removed both pulpwood and sawlogs from Brann in the 3rd and 4th quarters of 1996.

In January 1997, Precision Pine advised the Forest Service that it intended to continue harvesting the Brann sale during the normal operating season in 1997. However, effective June 2, 1997, the Brann sale and several other of Precision Pine's sales were again the subject of an injunction against the Forest Service. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service

resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of this third normal operating season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

Shortly after the 1997 suspension was lifted, in January 1998, Precision Pine made plans to harvest pulpwood on the Brann sale beginning in April. These plans were later moved up to February 27, 1998. However, on February 12, 1998, Stone Container announced that thereafter it would be meeting its need for pulpwood and chip fiber primarily from recycled materials and would no longer be purchasing pulpwood and chips from outside vendors. Overnight, this rendered Precision Pine's contracts, and especially its multi-product contracts like Brann (i.e., those contracts containing pulpwood), significantly less profitable. Indeed, the very premise behind the Forest Service's offering of sales containing pulpwood, as it did almost exclusively by the mid-1990's, was that the Stone facility would be available as an outlet for this material, material for which no one in Arizona except Stone had a significant use. Precision Pine sought any number of compromises with the Forest Service to make multi-product sales like Brann operable, including being allowed to leave the pulpwood standing, cutting and stacking the pulpwood for use by firewood collectors, and reducing the stumpage rate on the sales to reflect the dramatically changed market conditions. The Forest Service instead began offering new multi-product sales for bid with the pulpwood component priced at $.73/CCF, thereby virtually ensuring that harvesting on existing multi-products contracts could not be performed except at huge losses. Indeed, had Precision Pine harvested this sale to completion without an outlet for pulpwood and chips, it would have added significantly to (rather than mitigated) the damages sought in the instant action.

In addition to the adverse impacts to Precision Pine's ability to operate the Brann sale caused by severe disruptions to the pulpwood market, the lumber market began to decline dramatically in mid-1997, and remained relatively flat through 1998 and into the first half of 1999 before nose-diving in the year 2000. For example, the annual average lumber price index published by Western Wood Products Association for Rocky Mountain Ponderosa Pine, which is the relevant index (adjusted to a 1997-1998 basis), was as follows: 1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83; 1999 – $374.35; 2000 – $333.67. In recognition of the decline in the market the Forest Service granted Precision Pine Market Related Contract Term Addition for 1998.

Also, in the fall of 1998, the Winslow sawmill to which the Brann sale was to have been hauled and processed, burned down forcing Precision Pine to consolidate its operations at its Heber sawmill. Attempts to harvest Brann after the fire at Winslow would have required considerable additional hauling costs in an already bad market for lumber and in a virtually non-existent market for pulpwood and chips.

In light of all of the foregoing, no plans were made to harvest the Brann sale in 1999 because, as Precision Pine informed the Forest Service on February 24, 1999, (1) the Winslow mill had burned down, (2) the market for softwood lumber was down, (3) Stone Container no longer needed pulpwood and chips and (4) the Forest Service had dropped the price for pulpwood to $0.73/ccf while Precision Pine was required to pay $9.40/ccf for wood it could not mill or sell.

No specific plans were made to harvest because the poor market conditions persisted in the year 2000 as did Stone Container's continuing refusal to buy pulpwood and chips. Nevertheless, during the summer of 2000, Precision Pine sought to harvest some timber from this sale for its Heber mill, however, the sale area was under fire restrictions for almost the entire summer, including a complete shutdown from June 2 to June 30, 2000.

Finally, on or about June 9, 2000, the Forest Service notified Precision Pine that its surety, Frontier Insurance Company, had been removed from the U.S. Department of the Treasury's list of approved sureties. This prompted the Forest Service to demand that Precision Pine find a new surety or provide bonding in some way, which Precision Pine was unable to do because all of the cash it had available to pay for bonding had already been paid in advance to Frontier Insurance. The Forest Service would not permit operations on the sale (or other Forest Service sales) while this problem continued leaving Precision Pine with very limited access to timber. Thereafter, the Forest Service terminated the Brann contract on December 4, 2000.

**Brookbank** – The normal operating season for this sale was April 15 to November 15 and harvesting was only permitted on dry or frozen ground unless this restriction was waived in writing by the Forest Service. In September of 1997, the Forest Service further restricted operations in Payment Units 2 and 3 by prohibiting operations from February 1, until September 30.

This sale, on which Precision Pine was operating at the time, was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas on August 24, 1995. The suspension was not lifted with respect to this sale until December 4, 1996.

On January 22, 1997, Precision Pine informed the Forest Service that it was planning to harvest the sale in 1997. However, effective June 2, 1997, several of Precision Pine's sales were again the subject of a preliminary injunction against the Forest Service. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of a third normal operation season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

In an effort to restart its operations after the September 30 harvest restrictions on the Brookbank were over, Precision Pine reopened its Heber mill (which had been closed since June 19, 1996) on October 20, 1997. After seeking and receiving Forest Service approval for operations outside of the normal operating season, Precision Pine began harvest of the

Brookbank sale in November and December of 1997. Precision Pine continued operations on the Brookbank sale into 2nd quarter of 1998.

However, on February 12, 1998 Stone Container announced that thereafter it would meet its need for pulpwood and chip fiber primarily from recycled materials and would no longer be buying pulpwood and chips from outside vendors. Overnight, this rendered all of Precision Pine's contracts, especially including its multi-product contracts like Brookbank (i.e., those contracts containing pulpwood), significantly less profitable. Indeed, the very premise behind the Forest Service's offering of sales containing pulpwood, as it did almost exclusively by the mid-1990's, was that the Stone facility would be available as an outlet for this material, material for which no one in Arizona except Stone had a significant use. Precision Pine sought any number of compromises with the Forest Service to make multi-product sales like Brookbank operable, including being allowed to leave the pulpwood standing, cutting and stacking the pulpwood for use by firewood collectors, and reducing the stumpage rate on the sales to reflect the dramatically changed market conditions. The Forest Service instead began offering new multi-product sales for bid with the pulpwood component priced at $.73/CCF, thereby virtually ensuring that harvesting on existing multi-product contracts could not be performed except at huge losses. Indeed, had Precision Pine harvested this sale to completion without an outlet for pulpwood and chips, it would have added significantly to (rather than mitigated) the damages sought in the instant action.

In addition to the adverse impacts to Precision Pine's ability to operate the Brookbank sale caused by severe disruptions to the pulpwood market, the lumber market began to decline dramatically in mid-1997, and remained relatively flat through 1998 and into the first half of 1999 before nose-diving in the year 2000. For example, the annual average lumber price index published by Western Wood Products Association for Rocky Mountain Ponderosa Pine, which is the relevant index (adjusted to a 1997-1998 basis), was as follows: 1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83; 1999 – $374.35; 2000 – $333.67. In recognition of the decline in the market the Forest Service granted Precision Pine Market Related Contract Term Addition for 1998.

Despite all of the foregoing, limited harvesting did take place on Brookbank in the 4th quarter of 1998 (after the harvest restriction was over on September 30) and into the first and second quarters of 1999. No specific plans were made to harvest because very poor market conditions persisted in the year 2000 and so did Stone Container's refusal to take pulpwood. Moreover, from May 27, to June 28, 2000 the sale area was closed due to fire conditions.

Finally, in June 2000, the Forest Service notified Precision Pine that its surety, Frontier Insurance Company, had been removed from the U.S. Department of Treasury's list of approved sureties. This prompted the Forest Service to demand that Precision Pine find a new surety or provide bonding in some way, which Precision Pine was unable to do because all of the cash it had available to pay for bonding had already paid in advance to Frontier Insurance. The Forest Service would not permitted operations on the sale (or other Forest Service sales) while this

problem continued leaving Precision Pine with very limited access to timber. Thereafter, the Forest Service purportedly terminated the Brookbank contract on December 4, 2000.

**<u>Hay</u>** – The normal operating season on this contract was April 15 to November 30. Additionally, logging was only permitted on the following units at the time indicated unless the Forest Service agreed otherwise in writing:

Cutting Unit 7: June 30 to April 1; Cutting Units 1, 2, 3, 4, 5, 6, 9, 10, 11, 12, 13, 14, 15, 19, 20, 21, 23, 24, 25, 33, 36, 41: September 1 to January 31.

This sale was suspended by the Forest Service in the wake of the U.S. District Court injunction in <u>Silver v. Thomas</u> which was issued on August 24, 1995 and which was not lifted with respect to this sale until December 4, 1996. Almost immediately Precision Pine sought to recommence it operations on this sale even though it would have to haul logs to its Winslow mill due to the ongoing closure of the Eagar mill. Precision Pine harvested on the sale from December 1996 to February 1997 at which time contract restrictions prevented further harvest.

Effective June 2, 1997, the Hay sale and several other of Precision Pine's sales were again suspended by the Forest Service due to the issuance of yet another injunction against the Forest Service. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full

range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of a third normal operating season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

In January 1998, Precision Pine advised the Forest Service of its intention to harvest the sale once harvest restrictions were over, i.e. in September and October of 1998. In accordance with this plan the Hay sale was logged to completion in the 3rd and 4th Quarters of 1998 and the contract was closed.

**Hutch-Boondock** – The normal operating season for this sale was to April 15 to November 30.

This sale was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995 and which was not lifted with respect to this sale until October 20, 1995. Precision Pine presented a plan on October 31, 1995 to harvest sawlogs from the sale outside the Normal Operating Season. Permission was granted by the Forest Service in December 1995 and Precision Pine harvested sawlogs from the sale during the 4th Quarter of 1995 and the 1st Quarter of 1996 and 3rd Quarter of 1996 and harvested pulpwood from the sale in 2nd and 3rd Quarters of 1996 at which point only 23 CCF of sawlogs and 905 CCF of roundwood remained.

The injunction of the remaining sales was lifted on December 4, 1996. However, effective June 2, 1997, several of Precision Pine's sales were again the subject of an injunction against the Forest Service. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of a third normal operating season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

Shortly after the 1997 suspension was lifted, on February 12, 1998 Stone Container announced that thereafter it would be meeting its need for pulpwood and chip fiber primarily from recycled materials and would no longer be purchasing pulpwood and chips from outside vendors. Overnight, this rendered all of Precision Pine's contracts, especially including its multi-product contracts like Hutch-Boondock (i.e., those contracts containing pulpwood), significantly less profitable. Indeed, the very premise behind the Forest Service's offering of sales containing pulpwood, as it did almost exclusively by the mid-1990's, was that the Stone facility would be available as an outlet for this material, material for which no one in Arizona except Stone had a significant use. Precision Pine sought any number of compromises with the Forest Service to make multi-product sales like Hutch-Boondock operable, including being allowed to leave the

pulpwood standing, cutting and stacking the pulpwood for use by firewood collectors, and reducing the stumpage rate on the sales to reflect the dramatically changed market conditions. The Forest Service instead began offering new multi-product sales for bid with the pulpwood component priced at $.73/CCF, thereby virtually ensuring that harvesting on existing multi-products contracts could not be performed except at huge losses. Indeed, had Precision Pine harvested this sale to completion without an outlet for pulpwood and chips, it would have added significantly to (rather than mitigated) the damages sought in the instant action.

In addition to the adverse impacts to Precision Pine's ability to operate the Hutch-Boondock sale caused by severe disruptions to the pulpwood market, the lumber market began to decline dramatically in mid-1997, and remained relatively flat through 1998 and into the first half of 1999. For example, the annual average lumber price index published by Western Wood Products Association for Rocky Mountain Ponderosa Pine, which is the relevant index (adjusted to a 1997-1998 basis), was as follows: 1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83; 1999 – $374.35; 2000 – $333.67. In recognition of the decline in the market the Forest Service granted Precision Pine Market Related Contract Term Addition for 1998.

Also, in the fall of 1998, the Winslow sawmill to which the Hutch-Boondock sale was to have been hauled and processed, burned down forcing Precision Pine to consolidate its operations at its Heber sawmill. Attempts to harvest Hutch-Boondock after the fire at Winslow would have required considerable additional hauling costs in an already bad market for lumber and in a virtually non-existent market for pulpwood.

In light of all of the foregoing, no plans were made to harvest the sale in 1999 or 2000 because (1) the Winslow mill had burned down, (2) the market for softwood lumber was down, (3) Stone Container no longer needed pulpwood and (4) the Forest Service had-dropped the price for pulpwood to $0.73/ccf while Precision Pine was required to pay $9.40/ccf for wood it could not mill or sell.

No specific plans were made to harvest because the poor market conditions persisted in the year 2000 as did Stone Container's continuing refusal to buy pulpwood. Nevertheless, during the summer of 2000, Precision Pine sought to harvest some timber from this sale for its Heber mill, however, the sale area was under fire restrictions for almost the entire summer, including a complete shutdown from June 2 to July 10, 2000.

Finally, on June 12, 2000 the Forest Service notified Precision Pine that its surety, Frontier Insurance Company, had been removed from the U.S. Department of the Treasury's list of approved sureties. This prompted the Forest Service to demand that Precision Pine find a new surety or provide bonding in some way, which Precision Pine was unable to do because all of the cash it had available to pay for bonding had already been paid in advance to Frontier Insurance. The Forest Service would not permit operations on the sale (or other Forest Service sales) while this problem continued leaving Precision Pine with very limited access to timber. Thereafter, the Forest Service terminated the Hutch-Boondock contract on December 4, 2000 with only an estimated volume of 23 CCF of sawlogs and 905 CCF of roundwood remained.

**Jersey Horse** – The normal operating season for this sale was April 15 to November 15. Restrictions on harvesting included:

Payment Units 2, 3, 4, 5, 6, 7: Logging, hauling and road construction were prohibited from February 1 until August 30.

Harvest Unit 14: logging was prohibited from February 1 to September 30.

Logging on all cutting units was permitted on dry or frozen ground unless the restriction was waived in writing by the Forest Service.

Cutting Units 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24: Logging activities were prohibited from February 1 to August 31.

Additionally, all logging activities were prohibited on weekends and holidays unless the restriction was waived by the Forest Service in writing.

Moreover, on September 15, 1997, the Forest Service added still more restrictions to cutting units 2, 3, and 22.

Accordingly, operations during the Normal Operating Season on the Jersey Horse sale were essentially limited to dry or frozen periods on weekdays (that were not holidays) between September 1 and November 15.

This sale was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995 and which was not lifted with respect to this sale until December 4, 1996.

In the spring of 1997, Precision Pine advised the Forest Service that it intended to resume harvesting the Jersey Horse sale beginning once the harvest restrictions were over in September 1997. However, effective June 2, 1997, the sale and several other of Precision Pine's sales were again the subject of a preliminary injunction against the Forest Service. This injunction lasted until December 15, 1997. The enjoined sales included all or the most valuable portions of the Hay, O.D. Ridge, Brann, Saginaw-Kennedy, Salt, Manaco and U-Bar contracts. These sales (especially Hay, U-Bar, and O.D. Ridge) contained the largest diameter and most valuable timber that Precision Pine had under contract at the time. Accordingly, these sales were vital to Precision Pine's ability to produce a profitable and full range of products in conjunction with the other sales in its portfolio. The loss of a third consecutive peak operating season due to this injunction of the Forest Service resulted in all of Precision Pine's mills eventually being shut-down in the fall of 1997. Needless to say, the loss of a third normal operation season only exacerbated the serious impacts that the Forest Service's breaches in 1995 and 1996 had had on Precision Pine's operations.

Despite these difficulties, Precision Pine commenced operations on the Jersey Horse sale and harvested timber during the 4th Quarter of 1997 and the 1st Quarter of 1998. Precision Pine also submitted a plan in which it indicated that it would resume harvest of Jersey Horse in September of 1998.

However, on February 12, 1998, Stone Container announced that thereafter it would be meeting its need for pulpwood and chip fiber primarily from recycled materials and would no longer be purchasing pulpwood from outside vendors. Overnight, this rendered all of Precision

Pine's contracts, especially its multi-product contracts (i.e., those contracts containing pulpwood), significantly less profitable. Indeed, had Precision Pine harvested the Jersey Horse sale to completion without an outlet for chips, it likely would have added to (rather than mitigated) the damages sought in the instant action.

Additionally, the lumber market began to decline dramatically in mid-1997, and remained relatively flat through 1998 and into 1999. For example, the annual average lumber price index published by Western Wood Products Association for Rocky Mountain Ponderosa Pine, which is the relevant index (adjusted to a 1997-1998 basis), was as follows: 1995 – $367.39; 1996 – $370.45; 1997 – $415.17; 1998 – $348.83; 1999 – $374.35; 2000 – $333.67. In recognition of the decline in the market the Precision Pine sought a Market Related Contract Term Addition for 1998.

In 1999 and 2000 the ongoing combination of low lumber prices, the lack of a market for chips and the extremely limited operating period prevented Precision Pine from resuming harvesting operations on the sale.

Finally, on or about June 9, 2000, the Forest Service notified Precision Pine that its surety, Frontier Insurance Company, had been removed from the U.S. Department of the Treasury's list of approved sureties. This prompted the Forest Service to demand that Precision Pine find a new surety or provide bonding in some way, which Precision Pine was unable to do because all of the cash it had available to pay for bonding had already been paid in advance to Frontier Insurance. The Forest Service would not permit operations on the sale (or other Forest

Service sales) while this problem continued leaving Precision Pine with very limited access to timber. Thereafter, the Forest Service terminated the Jersey Horse contract on December 4, 2000.

**Kettle** – The normal operating season for this sale was May 15 to November 15. Restrictions on harvesting included that logging would only be permitted on dry or frozen ground unless the restriction were waived by the Forest Service in writing.

The Kettle timber sale contract was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995 and which was not lifted with respect to this sale until December 4, 1996.

In April 1997, Precision Pine advised the Forest Service that it intended to resume harvesting the Kettle timber sale during the 2nd Quarter of 1997 and Precision Pine did, in fact, commence harvesting on the sale.

By letter dated August 21, 1997, Precision Pine advised the Forest Service of its intent to transfer the Kettle sale to Stone Container via a third-party agreement. The third-party agreement transferring the contract to Stone Container was formalized and approved by the Forest Service on November 3, 1997.

**Manaco** – The normal operating season for this sale was May 1 to July 15 and August 15 to November 30 for Payment Units 2-10, and the day after Labor Day to the November 30 and

May 1 to the weekend before Memorial Day for Payment Unit 1. Other restrictions on harvesting included:

Cutting Units 9, 10, 11, 17, 17A, 20 and 37: hauling prohibited from March 1 to September 30.

Cutting Units 7, 12, 13, 14, 15, 16, 19, 30, 31A, 32, 33, 36, 38, and 39: all harvest activities prohibited from March 1 to September 30.

Cutting Units: 6, 21, 22, 40 and 41: all harvest activities prohibited from March 1 to August 31.

Road construction was also prohibited on much of the sale from March 1 to September 30.

Additional restrictions were imposed on harvesting and road use in a modification dated August 31, 1999.

This sale was suspended by the Forest Service in the wake of the U.S. District Court injunction in Silver v. Thomas which was issued on August 24, 1995 and which was not lifted with respect to this sale until December 4, 1996. Moreover, Precision Pine was advised that the discovery of a Mexican Spotted Owl adjacent to the Manaco sale area would require consultation with the U.S. Fish and Wildlife Service ("FWS") and that operations could not resume until the expedited consultation was completed for the sale in whole or in part. Despite the ongoing suspension, on January 22, 1997, Precision Pine presented its plan to harvest the Manaco sale in October 1997.