## Plaintiff's Supplemental Answer to Interrogatory No. 9

Precision Pine supplements it previous answer to Interrogatory No. 9 with the attached chart which identifies for each source of timber responsive to Interrogatory No. 6, irrespective of whether any timber remained to be harvested on 8/24/95, a description of Precision Pine's "plan," as of 8/24/95, for harvesting the remaining timber and other material. As indicated at previous status conferences and in the attached chart, where a sale had been fully harvested prior to 8/24/95, by definition, Precision Pine had no plan to harvest any more timber on the sale. (The same is, of course, true of contracts that as of 8/24/95 had yet to be entered into by Precision Pine.) As also indicated in the attached charts with the exception of a small, albeit not specifically quantifiable, volume of timber from sales harvested prior to 8/24/95, Precision Pine had no plans to use any of the previously harvested timber to operate any of its mills after 8/24/95. Lastly, the chart shows in detail when the timber and other material on the uncompleted sales would have been harvested during the period encompassed by the suspension and, to the extent possible, how that timber would have been used to operate Precision Pine's mills.

---

Also attached are all goal reports that through due diligence Plaintiff has been able to locate. All of these goal reports have been previously produced to the government for inspection and copying.[1]

[1] As previously indicated, these monthly goal reports do not constitute or indicate the existence of any broad, formal plan for the production of a specified volume of lumber during a given time period at any of Precision Pine's mills except to the extent that they forecast the level of production anticipated at Precision Pine's mills in the next month.

Exercising that same due diligence, Plaintiff has not located any other information requested by Defendant. With this response, Plaintiff has fully and completely responded to the deficiencies that Defendant asserted in its motion of September 29, 2003 with regard to Plaintiff's response to Interrogatory No. 9.

**Plaintiff's Additional Information Regarding Interrogatory No. 41**

As Precision Pine agreed to do during the October 20, 2003 telephonic Status Conference, set forth below is the methodology it used to determine the volume of each specific lumber product that it would have produced from the timber on the sales at issue in this case that would have been harvested during the suspension:

**Volume of Ponderosa Pine Lumber Products:**

During the claim preparation process, the President of Precision Pine, Lorin Porter, reviewed TSSAs, timber sale status reports, and the Winslow Sales Record[1] in order to identify months when the sale of lumber products actually made from timber harvested on contracts at issue in this case occurred. (In doing so, Mr. Porter took into account lag time from timber harvest to lumber sale.) The Sales Record lists sales in board feet for specific lumber products as well as total sales for all lumber products in board feet by month. By taking the total board footage for each lumber product actually sold during a given time period in which he concluded that lumber from a sale at issue was being sold, and dividing that figure by the total board footage of all lumber products sold in that period, Mr. Porter determined the percentage of the total lumber production that each product represented for that period. Multiplying the percentage for each product by the total mbf of lumber that would have been produced from a sale in a given

[1]Precision Pine's damage claim with respect to lumber is based on the opportunity Precision Pine lost to make lumber sales during the suspension. Accordingly, the products shown on the Sales Record were used because some of the rough green lumber coming from a sawmill is graded differently (with the exception of rough and timbers) than it is graded after the lumber has planed and dried. Defendant has been provided with a copy of the Sales Record.

quarter,[2] Mr. Porter calculated lumber production for each specific lumber product by sale and by quarter. Repeating the process on other contracts, he calculated the total volume of each lumber product that would have been produced during the relevant quarters of the suspension.

At the time that Mr. Porter made these calculations, he was able to use TSSAs, timber sales status reports, and the Sales Record to determine the percentage of each lumber product produced from timber from the following sales: St. Joe, Brookbank, Hutch-Boondock, Mud, U-Bar, and Brann. The total lumber produced and the percentage of this total that each lumber product represents for these six sales is set out in the attached charts. By utilizing his experience in the production of the various Ponderosa Pine lumber products that Precision Pine makes and by comparing the average dbh and percentage of clear faces contained in the Forest Service's appraisal for each sale, Mr. Porter applied the percentage of products that were produced from these six sales (with the adjustments indicated below) to the other sales at issue which either had not been cut, had not been cut in sufficient quantity to obtain a reliable percentage of products produced, or had not been separately processed at the planer, and obtained the following results:

---

**U-Bar** - The percentage of each lumber product produced is based on lumber determined to have been produced and sold from the timber on the sale and is set forth on the attached charts.

**Jersey Horse, Hay** - Based on the similarities between the timber on the U-Bar, Jersey Horse and Hay sales, Mr. Porter used the same percentages of lumber products to be produced

[2]I.e., sawlog volume harvested multiplied by 1.25.

from total lumber with respect to U-Bar for the Jersey Horse and Hay timber sale contracts. This and the resulting percentage for each lumber product that should have been produced from the timber on these sales during the suspension is set forth on the attached charts.

**St. Joe** - The percentage of each lumber product produced is based on lumber determined to have been produced and sold from the timber on the sale and is set forth on the attached charts.

**O.D. Ridge** - Based on the similarities between the sales, Mr. Porter used the same percentages of lumber products to be produced from total lumber with regard to St. Joe for the O.D. Ridge timber sale contract. This percentage for each lumber product is set forth in the attached charts. Mr. Porter's determination was based on his years of experience with the production of these lumber products by Precision Pine as well as his review of the timber on the sales, including, as noted above, the average dbh and percentage of clear faces as set forth in the Forest Service's appraisal for each sale.

---

**Mud** - The percentage of each lumber product produced is based on lumber sales determined to have been produced from the timber on this sale and is set forth on the attached charts.

**Brann** - The percentage of each lumber product produced is based on lumber sales determined to have been produced from the timber on this sale and is set forth on the attached charts.

**Hutch-Boondock** - The percentage of each lumber product produced is based on lumber sales determined to have been produced from the timber on this sale and is set forth on the attached charts.

**Brookbank** - The percentage of each lumber product produced is based on lumber sales determined to have been produced from the timber on this sale and is set forth on the attached charts.

**Saginaw-Kennedy** - Mr. Porter determined the percentage of each lumber product to be produced from the timber on this sale based on the percentages of lumber products that were produced from the timber on the Brookbank sale with adjustments made for differences in the timber between the sales. This and the resulting volume of each lumber product is set forth on the attached charts. No set formula was used for this adjustment; rather, Mr. Porter's adjustment was based on his years of experience with the production of these lumber products by Precision Pine as well as on his review of the timber on the sales, including, as noted above, the average dbh and percentage of clear faces as set forth in the Forest Service's appraisal for each sale.

**Manaco, Salt and Kettle** - The percentages from the Saginaw-Kennedy sale were in turn used on the Manaco, Salt, and Kettle sales based on Mr. Porter's determination that these sales contained timber of similar quality and characteristics and would have produced specific lumber products in the same proportions as did the timber from Saginaw-Kennedy. This and the resulting volume of each lumber product is set forth on the attached chart for Saginaw-Kennedy. Mr. Porter's determination was based on his years of experience with the production of these

lumber products by Precision Pine as well as on his review of the timber on the sales, including, as noted above, the average dbh and percentage of clear faces as set forth in the Forest Service's appraisal for each sale.

**Monument** - Mr. Porter determined the specific lumber product percentages on the Monument timber sale based on the percentages used on the Saginaw-Kennedy sale with adjustments made for differences in timber between the sales. This and the resulting percentage of each lumber product that would have been produced is set forth on the attached charts. No set formula was used for this adjustment; rather, Mr. Porter's determination was based on his years of experience with the production of these lumber products by Precision Pine as well as on his review of the timber on the sales, including, as noted above, the average dbh and percentage of clear faces as set forth in the Forest Service's appraisal for each sale

**Volume of Douglas-fir Lumber Products:**

Three sales (Hay, O.D. Ridge and U-Bar) contained relatively small amounts of Douglas-fir timber. Based on Mr. Porter's years of experience with the production of Douglas-fir lumber products by Precision Pine, he determined that three Douglas-fir lumber products would have been produced from the Douglas-fir timber on the sales in the following percentages:

| Lumber Product | Percent of Anticipated Production |
|---|---|
| #2 & Better | 85% of the Douglas-fir lumber produced |
| #3 & Better | 10% of the Douglas-fir lumber produced |
| #4 | 5% of the Douglas-fir lumber produced |

The volume of each Douglas-fir lumber product that would have been produced in a given quarter was determined by multiplying the total volume of Douglas-fir lumber that would have been produced from timber harvested on a sale in a given quarter (i.e., the volume of Douglas-fir harvested x 1.25) by the percentage for each specific product set forth above.

**Volume of Englemann Spruce Lumber Products:**

The O.D. Ridge sale had a relatively small volume of Englemann Spruce timber to be harvested. Based on Mr. Porter's years of experience with the production of Spruce lumber products by Precision Pine, he determined that six Spruce lumber products would have been produced from the volume of Spruce timber on the sale in the following percentages:

| **Lumber Product** | **Percent of Anticipated Production** |
|---|---|
| 1x4 Spruce Lumber = | 30% of the Spruce lumber produced, divided among the following three lumber products: |
| #2 & Better | 10% of the 1x4 Spruce lumber produced |
| #3 | 65% of 1x4 the Spruce lumber produced |
| #4 | 25% of 1x4 the Spruce lumber produced |

---

| **Lumber Product** | **Percent of Anticipated Production** |
|---|---|
| 1x6 Spruce Lumber = | 70% of the Spruce lumber produced, divided among the following three lumber products: |
| #2 & Better | 10% of the 1x6 Spruce lumber produced |
| #3 | 65% of the 1x6 Spruce lumber produced |
| #4 | 25% of the 1x6 Spruce lumber produced |

The volume of each Spruce lumber product that would have been produced was determined by multiplying the total volume of Spruce lumber that would have been produced in a given quarter (i.e., volume of Englemann Spruce harvested x 1.25) by the percentages set forth above.

The above referenced percentages for Ponderosa Pine, Douglas-fir and Spruce lumber products were applied to the anticipated quarterly production of lumber set out on pages C-0072 – C-0089 of the February 26, 2003 damage binder from each sale with the minor adjustments as described below:

Timbers and #5 Common were not produced from the Ponderosa Pine timber on every sale and were generally only produced if there was a good market for them or if a customer ordered them. Indeed, during the suspension, these two products were not produced/sold during the following quarters:

| **Quarter During The Suspension** | **Product Not Produced** |
|---|---|
| 3rd Q '95 | #5 Common |
| 4th Q '95 | Timbers |
| 1st Q '96 | #5 Common<br>Timbers |
| 2nd Q '96 | Timbers |
| 3rd Q '96 | #5 Common |
| 4th Q '96 | #5 Common |

Such being the case, Lorin Porter determined that even if there had been no suspension, Precision Pine likely would not have produced those products from any of the sales at issue during those quarters. Therefore, for those sales that Mr. Porter had originally estimated would have produced some amount of Timbers or #5 Common during a quarter when in fact no production/sales of these products occurred, Mr. Porter reallocated the volume for these products to another product that would have been produced from the same timber as follows:

| Sale | Quarter | Volume of Total Quarterly Lumber Production Re-allocated |
|---|---|---|
| **Monument** | 4th Q '96 | .37% from Timbers to #3 Common |
| **Mud** | 4th Q '95 | 11.90% from Timbers to #3 Common |
| **Saginaw-Kennedy** | 3rd Q '96 | 3.54% from Timbers to #3 Common<br>.5% from #5 Common to #4 Common |
| **Brookbank** | 3rd Q '95 | .7% from #5 Common to #4 Common |
| **Jersey Horse** | 1st Q of '96 | 1.0% from Timbers to #5 Common |
| **Manaco** | 3rd Q of '95<br>3rd Q of '96 | .5% from #5 Common to Rough[3]<br>.5% from #5 Common to #4 Common |
| **Salt** | 3rd Q of '95<br>3rd Q of '96 | .5% from #5 Common to #4 Common<br>.5% from #5 Common to #4 Common |
| **St. Joe** | 4th Q 96 | 6.32% Timbers to #3 Common |
| **Hay** | 1st Q '96<br>2nd Q '96 | 1.0% Timbers to #3 Common<br>1.0% Timbers to #3 Common |
| **Kettle** | 1st Q '96 | 3.54% from Timbers to #3 Common<br>.5% from #5 Common to #4 Common |

[3]This percentage should have been re-allocated to #4 Common. Because the price for #4 Common is more than the price for rough during this period, the mistake is to the benefit of the government.

| | | |
|---|---|---|
| | 2nd Q '96 | 3.54% from Timbers to #3 Common |
| | 3rd Q '96 | .5% from #5 Common to #4 Common |
| **O.D. Ridge** | 2nd Q '96 | 1.0% Timbers to #3 Common |

Percentage of each lumber product that would have been produced from each sale.

St. Joe (also used for O.D. Ridge)

| Products Produced | May 1995 (BF) | June 1995 (BF) | May and June Totals | % of Totals |
|---|---|---|---|---|
| Moulding & Better | 142,690 | 133,976 | 276,666 | 6.97% |
| 5/4 #1 Shop | 19,366 | 19,177 | 38,543 | 0.97% |
| 5/4 #2 Shop | 227,797 | 242,587 | 470,384 | 11.86% |
| 5/4 #3 Shop | 544,714 | 593,948 | 1,138,662 | 28.70% |
| Paragraph 99 Redress | 323,979 | 321,346 | 645,325 | 16.26% |
| 5/4 x RWL Radius Edge | 52,132 | 114,220 | 166,352 | 4.19% |
| #2, #3 , #4 & Better | 127,969 | 85,563 | 213,532 | 5.38% |
| #3 Common Utility | 27,996 | 159,472 | 187,468 | 4.72% |
| #4 Common Economy | 29,846 | 220,156 | 250,002 | 6.30% |
| #5 Common | 0 | 0 | 0 | 0.00% |
| Rough | 49,625 | 83,934 | 133,559 | 3.37% |
| Timbers | 28,224 | 222,470 | 250,694 | 6.32% |
| Misc. Shop Outs | 105,004 | 91,538 | 196,542 | 4.95% |
| TOTALS | 1,679,342 | 2,288,387 | 3,967,729 | |

U-Bar (also used for Hay and Jersey Horse)

| Products Produced | January 1994 (BF) | February 1995 (BF) | Feb & Jan Totals | % of Totals |
|---|---|---|---|---|
| Moulding & Better | 80,567 | 81,196 | 161,763 | 6.5% |
| 5/4 #1 Shop | 64,480 | 11,460 | 75,940 | 3.1% |
| 5/4 #2 Shop | 143,356 | 127,101 | 270,457 | 10.9% |
| 5/4 #3 Shop | 413,616 | 294,590 | 708,206 | 28.5% |
| Paragraph 99 Redress | 213,199 | 215,545 | 428,744 | 17.3% |
| 5/4 x RWL Radius Edge | 83,033 | 195,674 | 278,707 | 11.2% |
| #2, #3 , #4 & Better | 81,071 | 72,183 | 153,254 | 6.2% |
| #3 Common Utility | 7,948 | 19,272 | 27,220 | 1.1% |
| #4 Common Economy | 43,259 | 0 | 43,259 | 1.7% |
| #5 Common | 0 | 0 | 0 | 0.0% |
| Rough | 33,672 | 13,449 | 47,121 | 1.9% |
| Timbers | 0 | 25,035 | 25,035 | 1.0% |
| Misc. Shop Outs | 112,008 | 150,995 | 263,003 | 10.6% |
| TOTALS | 1,276,209 | 1,206,500 | 2,482,709 | |

Hutch-Boondock

| Products Produced | December 1995 (BF) | January 1996 (BF) | Dec. & Jan. Totals | % of Totals |
|---|---|---|---|---|
| Moulding & Better | 59606 | 72830 | 132,436 | 4.4% |
| 5/4 #1 Shop | 7949 | 8102 | 16,051 | 0.5% |
| 5/4 #2 Shop | 78582 | 98004 | 176,586 | 5.8% |
| 5/4 #3 Shop | 254539 | 287377 | 541,916 | 17.9% |
| Paragraph 99 Redress | 290618 | 322097 | 612,715 | 20.2% |
| 5/4 x RWL Radius Edge | 290841 | 42923 | 333,764 | 11.0% |
| #2, #3 , #4 & Better | 109151 | 280243 | 389,394 | 12.8% |
| #3 Common Utility | 72493 | 105579 | 178,072 | 5.9% |
| #4 Common Economy | 135692 | 181539 | 317,231 | 10.5% |
| #5 Common | 0 | 0 | 0 | 0.0% |
| Rough | 68398 | 44041 | 112,439 | 3.7% |
| Timbers | | | 0 | 0.0% |
| Misc. Shop Outs | | | 222,333 | 7.3% |
| TOTALS | 1438480 | 1594457 | 3032937 | |

**Brann**

| Products Produced | February 1996 (BF) | Feb % | March 1996 (BF) | Mar. % | Ave of Feb & Mar % | As Rounded by Client to nearest .05% |
|---|---|---|---|---|---|---|
| Moulding & Better | 68830 | 4.22% | 63248 | 4.17% | 4.19% | 4.20% |
| 5/4 #1 Shop | 23498 | 1.44% | 11755 | 0.78% | 1.11% | 1.10% |
| 5/4 #2 Shop | 118413 | 7.25% | 114828 | 7.58% | 7.42% | 7.45% |
| 5/4 #3 Shop | 382186 | 23.41% | 328071 | 21.65% | 22.53% | 22.50% |
| Paragraph 99 Redress | 254431 | 15.59% | 186333 | 12.29% | 13.94% | 13.95% |
| 5/4 x RWL Radius Edge | 87683 | 5.37% | 0 | 0.00% | 2.69% | 19.60% |
| #2, #3 , #4 & Better | 415792 | 25.47% | 449297 | 29.64% | 27.56% | 10.65% |
| #3 Common Utility | 31552 | 1.93% | 45284 | 2.99% | 2.46% | 2.45% |
| #4 Common Economy | 80297 | 4.92% | 210172 | 13.87% | 9.39% | 9.40% |
| #5 Common | 0 | 0.00% | 0 | 0.00% | 0.00% | 0.00% |
| Rough | 60300 | 3.69% | 0 | 0.00% | 1.85% | 1.85% |
| Timbers | 0 | 0.00% | 0 | 0.00% | 0.00% | 0.00% |
| Misc. Shop Outs | 109324 | 6.70% | 106669 | 7.04% | 6.87% | 6.85% |
| | | | | | | |
| **TOTALS** | 1632306 | | 1515657 | | | |

**Mud**

| Products Produced | September 1996 (BF) | October 1996 (BF) | Sept. & Oct. Totals | % of Totals |
|---|---|---|---|---|
| Moulding & Better | 4,570 | 2,590 | 7,160 | 0.4% |
| 5/4 #1 Shop | 4,485 | 6,488 | 10,973 | 0.6% |
| 5/4 #2 Shop | 9,956 | 16,663 | 26,619 | 1.5% |
| 5/4 #3 Shop | 55,065 | 67,221 | 122,286 | 6.9% |
| Paragraph 99 Redress | 96,761 | 161,359 | 258,120 | 14.6% |
| 5/4 x RWL Radius Edge | 259,312 | 125,411 | 384,723 | 21.7% |
| #2, #3 , #4 & Better | 47,423 | 0 | 47,423 | 2.7% |
| #3 Common Utility | 0 | 64,965 | 64,965 | 3.7% |
| #4 Common Economy | 147,389 | 116,584 | 263,973 | 14.9% |
| #5 Common | 0 | 0 | 0 | 0.0% |
| Rough | 24,948 | 31,845 | 56,793 | 3.2% |
| Timbers | 85,155 | 124,875 | 210,030 | 11.9% |
| Misc. Shop Outs | 133,769 | 184,587 | 318,356 | 18.0% |
| | | | | |
| **TOTALS** | 868,833 | 902,588 | 1,771,421 | |

**Brookbank**

| Products Produced | July 95 (BF) | August 1996 (BF) | July & Aug. Totals | % of Totals |
|---|---|---|---|---|
| Moulding & Better | 89,042 | 96,399 | 185,441 | 3.7% |
| 5/4 #1 Shop | 11,289 | 10,882 | 22,171 | 0.4% |
| 5/4 #2 Shop | 117,949 | 185,393 | 303,342 | 6.1% |
| 5/4 #3 Shop | 438,852 | 537,261 | 976,113 | 19.6% |
| Paragraph 99 Redress | 199,837 | 283,901 | 483,738 | 9.7% |
| 5/4 x RWL Radius Edge | 354,073 | 682,094 | 1,036,167 | 20.8% |
| #2, #3 , #4 & Better | 274022 | 149,951 | 423,973 | 8.5% |
| #3 Common Utility | 300737 | 105,725 | 406,462 | 8.2% |
| #4 Common Economy | 486293 | 163,013 | 649,306 | 13.0% |
| #5 Common | 34,449 | 0 | 34,449 | 0.7% |
| Rough | 34,[illegible] | [illegible] | [illegible],038 | 2.8% |
| Timbers | 186,[illegible] | [illegible] | [illegible],354 | 4.9% |
| Misc. Shop Outs | 61,[illegible] | [illegible] | [illegible],790 | 1.6% |
| | | | | |
| **TOTALS** | 2589013 | 2397331 | 4986344 | |

| | | | | | |
|---|---|---|---|---|---|
| Saginaw-Kennedy Based on Brookbank (used for Manaco, Salt & Kettle) | | | | | |
| | | | | | |
| Products to be Produced | | | | | |
| | | | | | |
| Moulding & Better | 3.72% | | | | |
| 5/4 #1 Shop | 0.95% | | | | |
| 5/4 #2 Shop | 5.96% | | | | |
| 5/4 #3 Shop | 18.14% | | | | |
| Paragraph 99 Redress | 9.84% | | | | |
| 5/4 x RWL Radius Edge | 21.02% | | | | |
| #2, #3 , #4 & Better | 13.45% | | | | |
| #3 Common Utility | 12.14% | | | | |
| #4 Common Economy | 9.48% | | | | |
| #5 Common | 0.00% | | | | |
| Rough | 3.34% | | | | |
| Timbers | 0.00% | | | | |
| Misc. Shop Outs | 1.98% | | | | |
| | | | | | |
| | | | | | |
| Monument Based on Saginaw-Kennedy | | | | | |
| | | | | | |
| Products to be Produced | | | | | |
| | | | | | |
| Moulding & Better | 2.88% | | | | |
| 5/4 #1 Shop | 0.74% | | | | |
| 5/4 #2 Shop | 4.66% | | | | |
| 5/4 #3 Shop | 16.27% | | | | |
| Paragraph 99 Redress | 16.01% | | | | |
| 5/4 x RWL Radius Edge | 26.70% | | | | |
| #2, #3 , #4 & Better | 6.20% | | | | |
| #3 Common Utility | 6.46% | | | | |
| #4 Common Economy | 10.50% | | | | |
| #5 Common | 0.00% | | | | |
| Rough | 2.87% | | | | |
| Timbers | 0.37% | | | | |
| Misc. Shop Outs | 6.34% | | | | |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PRECISION PINE & TIMBER, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 98-720C (Chief Judge Damich) |

**PLAINTIFF'S SUPPLEMENTAL RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

Pursuant to Rule of the Court of Federal Claims 26(e), Precision Pine supplements its interrogatory responses as follows:

**INTERROGATORY NO. 1.**

Identify all witnesses, including experts, that Precision Pine anticipates will offer testimony at trial in this matter.

**ANSWER:**

Robert A. Ness
Present Address: 1809 Balboa Street, Eugene, OR 97408
Home Phone: (541) 684-5915

Current Employer: Sundance Lumber
Address: 1001 N. 35 Street Springfield, OR 97478
Phone: (541) 746-2563
Job Title: Comptroller

Employer at time of event: Mobius, Inc.

James L. Matson
Present Address: 135 West Kanab Creek Dr.
Home Phone: (435) 644-8841

Current Employer: Vermillion Services
Address: 135 West Kanab Creek Dr.
Phone: (435) 644-8841
Job Title: Owner and Manager

Employer at time of event: Kaibab Industries

Martin L. Devere

Present Address: P.O. Box 457
Home Phone: (520) 457-3557

Current Employer: Self-employed
Address: P.O. Box 457
Phone: (520) 457-3557
Job Title: Independent Consulting Forester

Employer at time of event: Self-employed consulting forester

Ron Lewis
Present Address: 1418 N. Concord Road, Concord, MI
Home Phone: (517) 524-6089

Current Employer: Retired
Address: NA
Phone: NA
Job Title: NA

Employer at time of event: USDA Forest Service

**INTERROGATORY NO. 2.**

With respect to each witness identified in response to Interrogatory No. 1, describe in detail his or her proposed testimony.

ANSWER:

If called, Messrs. Ness, Matson and Devere will testify in an expert capacity as to their opinions as set forth in their reports that were provided to the government on November 18, 2003. As these reports contain the most detailed description of each expert's testimony, Precision Pine refers defendant to the reports for the potential testimony of these witnesses.

If called, Mr. Lewis will testify to the custom and practice of the USDA Forest Service, particularly with respect to timber management, timber sale contract preparation and administration.

Precision Pine also anticipates that these witnesses may be called to analyze and offer rebuttal testimony to evidence offered by the government, the exact nature and scope of this rebuttal testimony is not presently known.

**INTERROGATORY NO. 4.**

Identify each person with knowledge or information about, or that Precision Pine consulted in preparing its answers to, these discovery requests or defendant's first set of requests for admission on damages.

ANSWER:

None of the witnesses identified in the above amendment to Interrogatory No. 1 were consulted with respect to any discovery responses provided by Precision Pine prior to the preparation of this amended response. Lorin Porter, President of Precision Pine (who has been

expertise. Similarly, with respect to documents, those materials already produced to the government, including the materials and calculations produced in support of damages are likely sources of trial exhibits.

Respectfully submitted:

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: December 18, 2003