IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Chief Judge Damich) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSION ON DAMAGES**

Pursuant to Rule 36 of the Rules of the United States Court of Federal Claims, Precision Pine & Timber, Inc., responds to defendant's first set of requests for admission as set forth below.

**REQUEST FOR ADMISSION NO. 1:**

Admit that the suspension of the Brann contact as a result of the *Silver v. Thomas* litigation began on August 25, 1995 and ended on October 18, 1995.

**RESPONSE:**

The injunction against the Forest Service was entered on August 24, 1995 and Precision Pine admits that the Forest Service suspended its operations shortly thereafter. With regard to the end of the suspension of the Brann contract, Precision Pine received a letter dated November 1, 1995 stating that, as of October 20, 1995, the Brann timber sale was released from the



154-98-720

Precision Pine further states that, regardless of the date that the Forest Service formally lifted its suspension, Precision Pine would not have been able to begin harvest in March of 1996, absent Forest Service's approval, due to a restriction in the contract only allowing logging between June 1 and Dec. 31 each year because of past bark beetle activity. Id. at 645. By letter dated March 25, 1995, Precision Pine requested that the Forest Service grant a waiver to allow harvest to begin immediately on payment units 1, 2 and 3. Id. at 655, see also 657, 659. The Forest Service denied Precision Pine's request to waive the time restriction in a letter dated April 12, 1996, although the Forest Service stated that roadwork could begin before June 1. Id. at 661. Subsequent fire precautions also delayed the start of operations on the sale. See id. at 663, 691, 692, 210. Roadwork was scheduled to begin July 17. Id. at 667. Timber falling seems to have begun on or about August 1. Id. at 212. Thus, the Forest Service's improper suspension of Mud in August of 1995, regardless of whether or not the Forest Service formally lifted the suspension on March 11, 1996, effectively precluded the start of timber harvest until August of 1996.

**REQUEST FOR ADMISSION NO. 3:**

Admit that Precision Pine harvested no timber pursuant to the Salt contract before, during, or after the suspension resulting from the *Silver v. Thomas* litigation.

**RESPONSE:**

Plaintiff admits.

**REQUEST FOR ADMISSION NO. 4:**

Admit that Precision Pine harvested no timber pursuant to the Saginaw-Kennedy contract before, during, or after the suspension resulting from the *Silver v. Thomas* litigation.

**RESPONSE:**

Plaintiff admits.

**REQUEST FOR ADMISSION NO. 5:**

Admit that Precision Pine harvested no timber pursuant to the Monument contract before, during, or after the suspension resulting from the *Silver v. Thomas* litigation.

**RESPONSE:**

Plaintiff admits.

**REQUEST FOR ADMISSION NO. 6:**

Admit that the annual capacity of Precision Pine's sawmill in Winslow, Arizona was approximately 12-14 MMBF in 1995, 1996 and 1997.

**RESPONSE:**

Plaintiff admits with qualifications. Plaintiff admits that the annual lumber production capacity for one shift at its Winslow, Arizona sawmill was approximately 14 MMBF for 1995-1997.

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
David J. Craig
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Date: August 25, 2003

**PRECISION PINE & TIMBER, INC.**
**V.**
**UNITED STATES**

**U.S. COURT OF FEDERAL CLAIMS**
**CASE NO. 98-720 C**

# Calculations Binder

**February 26, 2003**

| DAMAGES SUMMARY | | | |
|---|---|---|---|
| | | | |
| I. Misc. Items | | | |
| (a) Unpaid Bond Costs | | | $16,686.79 |
| (b) Unpaid Move-in/Move-out Costs | | | $1,093.20 |
| (c) Interest On Cash Balances | | | $319.45 |
| (d) Interest On Down Payment | | | $2,763.04 |
| (e) Interest On Unused Effective Purchaser Credit | | | $4,208.63 |
| (f) Snow Removal | | | $1,577.53 |
| (g) Log Transfer (Due to Closure of Eager) | | | $2,126.58 |
| | | | |
| II. Increased Logging & Hauling Costs | | | $378,326.98 |
| | | | |
| III. Lost Market Opportunity: By-products | | | |
| (a) Chips | | $733,955.53 | |
| (b) Grindings | | $109,683.20 | |
| (c) Bark | | $225,829.81 | |
| (d) Shavings | | $80,418.36 | |
| | | Total | $1,149,886.90 |
| | | | |
| IV. Lost Market Opportunity: Roundwood | | | $503,992.12 |
| | | | |
| V. Lost Market Opportunity: Lumber | | | |
| (a) Delivered Log Costs | | | |
| (b) Manufacturing Costs | | | |
| (c) Lost Market Opportunity | | | |
| (d) Credit for 3 Sales Released Early | | | |
| (e) Lumber Product Prices Based on Invoices | | | |
| | | | |
| | | Total | $4,464,485.42 |
| | | | |
| (DAMAGES SUMMARY CONTINUED ON PAGE 2) | | | |



C-0001

| DAMAGES SUMMARY -- PAGE 2 | | | |
|---|---|---|---|
| | | | |
| VI. Sawmill Expenses: | | | |
| (a) Eagar Sawmill | | | |
| | key employees | $48,806.06 | |
| | security | $2,706.55 | |
| | idle equipment cost | $33,455.62 | |
| increased | cost of performance | $383,846.88 | |
| | | Total | $468,815.11 |
| | | | |
| (b) Heber Sawmill | | | |
| | key employees | $50,989.86 | |
| | idle equipment cost | $74,880.83 | |
| increased | cost of performance | $163,508.79 | |
| | TTRI | $178,119.59 | |
| | | Total | $467,499.06 |
| | | | |
| (c) Winslow Sawmill | | | |
| | key employees | $3,511.94 | |
| increased | cost of performance | $1,626,248 | |
| | | Total | $1,629,760.22 |
| | | | |
| (d) Pellet Mill | | | |
| increased | cost of performance | | $206,771.76 |
| | | | |
| VII. Company-wide Expenses: | | | |
| | key employees | $32,975.06 | |
| increased | cost of unemp. ins. | $147,356.95 | |
| Interest | costs thru 12/31/02 | $542,260.13 | |
| unamort. deprec. - sales office | | $8,962.54 | |
| claim preparation costs (client) | | $36,009.49 | |
| claim preparation costs (Atty.) | | $114,508.09 | |
| C6.01 Attys fees/exp. to 1/31/03 | | $606,674.55 | |
| | | Total | $1,488,746.81 |
| | | | |
| | | GRAND TOTAL | $10,580,287.82 |

SALTMAN & STEVENS, P.C.

1801 K Street, N.W., Washington, D.C. 20006

(202) 452-2140
Fax: (202) 775-8217
Email: rgoeken@saltmanandstevens.com

November 18, 2003

**VIA HAND DELIVERY**

David A. Harrington, Esq.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C 20530

Re: Precision Pine & Timber, Inc. v. United States,
No. 98-720C (Chief Judge Damich)

Dear David:

Pursuant to the Court's order of November 4, 2003 enclosed are the following:

1. Expert Report of Robert Ness.

2. Binder of workpapers supporting Mr. Ness's report.

3. Mr. Ness's Curriculum Vitae.

4. Copies of documents obtained and reviewed by Mr. Ness from Frontier State Bank.

5. Copies of attorney's fees and expenses record for the period August 1, 2003 to October 31, 2003 referred to in Mr. Ness's report.[1]

6. Expert Report of James Matson.

7. Mr. Matson's Curriculum Vitae.

8. Expert Report of Martin Devere.

---

[1] To the extent that these records reflect attorney-client and/or attorney-work product privileged information, Precision Pine waives the privileges to the most limited extent possible and this waiver does not extend to any other document or communication concerning the same subject matter.

9. Mr. Devere's Curriculum Vitae.

Please be advised that Precision Pine adopts the changes to its damage calculations as recommended by Mr. Ness.

Very truly yours,

SALTMAN & STEVENS, P.C.

Richard W. Goeken

RWG/ecf
Enclosures

# Robert A. Ness

1809 Balboa Street
Eugene, Oregon 97408
Ph: (541) 746-2563
Fax: (541) 746-1162


November 14, 2003

Alan I. Saltman, Esq.
Saltman & Stevens, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006

Dear Mr. Saltman:

I have reviewed the calculation of damages in the case of Precision Pine & Timber, Inc. v. United States, CoFC No. 98-720C. I agreed to conduct this review, prepare this report and testify to its contents at the rate of $90.00 per hour plus expenses. The damage calculations presented to me show a grand total of $10,580,287.82. In the process of my review, I examined:

- Precision Pine's Calculations Binder dated February 26, 2003 consisting of pages C-001 through C-0151.
- Precision Pine's Supporting Documents Binder Volume I dated February 26, 2003 consisting of Pages I.(a)-1 through VIII-13.
- Precision Pine's Supporting Calculations Binder Vol. II dated February 23, 2003 containing copies of Precision Pine's invoices to customers during the suspension period.

I also examined Precision Pine's financial records including:

- Reviewed financial statements prepared by Baldwin, Jones & Co., CPAs for the FYE 3/31/91 through the FYE 3/31/98.
- CPA workpaper packages supporting the reviewed financial statements for FYE 3/31/93 through the FYE 3/31/98.

- Documents from Frontier State Bank showing the payment history on loans to Precision Pine.

I also examined Precision Pine's Sales Journal for the period August 1995 – December 1996.

I did not review any of the source journals (i.e., cash receipts journals, cash disbursements journals, purchases journals or payroll journals) or the general ledger. I also did not generally review source documents such as timecards or vendor invoices, etc. I did not deem a review of these materials to be necessary because the financial records had already been reviewed by Baldwin, Jones & Co., CPAs as part of their preparation of reviewed financial statements.

The general approach taken by Precision Pine in its February 26, 2003 calculation binder was to assign its damages to the following categories:

1. The gross profit that Precision Pine would have earned if these timber contracts had not been suspended by the Forest Service.

2. The cost of manufacturing inefficiencies incurred by Precision Pine due to the disruptions in its supply of logs caused by the Forest Service's suspension.

3. Extra costs that Precision Pine incurred as a result of the Forest Service's suspension.

Precision Pine did not attempt to calculate the less tangible damages that resulted from the significant disruption of its business caused by the Forest Service's suspension such as the long-term effects on their relationships with vendors, customers and banks, all of which have been significant. In addition, the effect of the suspension on Precision Pine's operations adversely impacted employee morale, including Precision Pine's ability to retain and attract quality employees, which would also have had a long-term effect on their ability to achieve maximum profitability.

The approach used by Precision Pine assumes that operating the sales as anticipated would have generated sufficient revenue to have absorbed all overhead. Other approaches could have been

used that would have calculated profit after manufacturing overhead, or profit before income taxes plus the additional damage of unabsorbed overhead, however, because of the severe disruption of Precision Pine's business, it would have been difficult to analyze all of the effects on overhead costs. Similarly, although I suspect that Precision Pine would have attained additional reductions in direct manufacturing costs through manufacturing efficiencies had the suspension not occurred and the anticipated flow of timber through the mills been realized, calculating these would have been extremely difficult and Precision Pine chose not to do so. Such being the case, the general approach taken by Precision Pine in determining damages is both reasonable and conservative.

Although I agree with the general approach to damages taken by Precision Pine, I do recommend that certain changes be made to enhance their accuracy. As explained in greater detail below and in the calculations set forth in the attached Exhibits, these changes consist of correcting mathematical errors in Precision Pine's February 26, 2003 damage calculations, insuring that amounts Precision Pine calculated are consistently transferred from one worksheet to the next, and making greater use of the actual cost and revenue relationships of Precision Pine's historic financial results. These changes would result in total damages being due Precision Pine in the amount of $9,328,180.88, see Exhibit 1; it is my opinion, based on reasonable degree of accounting certainty, that this is the amount of Precision Pine's damages to October 31, 2003.

The final two Exhibits of this Report are summary reconciliation Exhibits which are useful in understanding the changes I have recommended to Precision Pine's February 26, 2003 damage calculations. Exhibit 21 reconciles in summary form the differences between the damage calculations set out in the Calculation Binder of February 26, 2003 and the amounts I have calculated for each item of damage. Exhibit 22, in turn, shows the actual calculations for each change that I recommend with references to the page numbers where the original calculation is presented in the February 26, 2003 calculation binder. The narrative below discusses these changes with respect to each category of damage.[1]

[1]The category of damage and paragraph numbers in the narrative corresponds to the category of damage and numbers on Exhibits 21 and 22.

**Miscellaneous Items**

1. I recommend reducing the overhead (i.e., General and Administrative) rate to 7.6%. See Exhibit 19 for calculation of the General & Administrative Overhead rate. This rate would apply to the Unpaid Bond Costs, Move Out Costs, Cost of Removing Snow to Access Timber and Cost of Transferring Logs Due to Closure of Eagar. The total effect of this change would reduce damages by $8,820.68.

See Exhibit 2 for a summary of the revised Miscellaneous Items based on my recommended changes.

**Increased Logging and Hauling Costs**

1. I recommend removing the amounts claimed for Brewer, Delgado and Highway Salvage timber sales, because the relationship of these costs to the breached sales is not clear. The total effect of this change would reduce damages by $8,328.11.

2. I recommend that increased logging and hauling costs on O.D. Ridge be revised. There should not have been any increased hauling costs associated with the O.D. Ridge timber sale in 1996 or 1997. Additionally, the volume of timber logged at an increased rate in 1997 should be reduced to 150 MBF and removed entirely in 1998. The total effect of these changes would reduce damages by $97,785.70.

3. In some instances when the logs were hauled further to get to a different sawmill at additional cost, the resulting green lumber produced would not have been hauled as far as anticipated to get to the Winslow planer. I, therefore, recommend that a deduction be made for the reduced green lumber haul. The total effect of this change would reduce damages by $90,111.66.

4. I recommend reducing the overhead rate to 7.6%. See Exhibit 19 for calculation of the General & Administrative Overhead rate. The total effect of this change would reduce damages by $5,939.19.

See Exhibit 3 for a revised summary of Increased Logging and Hauling Costs.

**Lost Market Opportunity**

See Exhibits 4 through 7 for a complete recalculation of the Lost Market Opportunity. The damages data used in making these calculations is contained in Appendix A to this report. The changes that I recommended are detailed below:

1. I recommend removing the Brann,[2] Hutch-Boondock and St. Joe timber sales from these calculations because these contracts were determined not to have been breached. Correspondingly, I also recommend removing the credits for early release on these contracts. The total effect of this change would reduce damages by $640,015.44.

2. On the Manaco timber sale, the amount on C-0071 does not match the amount calculated on C-0081 for Anticipated Market Opportunity. After raising this issue with Precision Pine, I have determined that the amount calculated on C-0081 is correct. The effect of this change would increase damages by $9,059.30.

3. The sum of Total Revenue on the Manaco timber sale (C-0081) is not totaled correctly. I recommend that this arithmetical error be corrected. The effect of this change would reduce damages by $6,917.40.

4. The fields for calculating Total Revenue (Volume x Unit Selling Price) on the Salt timber sale (C-0082) do not arrive at the correct result. I recommend that this arithmetical error be corrected. The total effect of this change would increase damages by $29,031.17.

5. A sales price for Timbers was not calculated for several of the calendar quarters during the suspension because Precision Pine did not have any invoices for this product during the quarter. Such being the case, on several timber sales, a volume of Timbers is shown as having been produced, but since the sales price is shown as $0.00, there are no sales dollars generated for this volume. In similar situations where no Timbers sales figures were available for a given quarter on other timber sales, the Timbers volume has been grouped with #3 Common Utility. This appears to be a reasonable approach as Timbers could readily be sawn into #3 Common Utility with unit selling prices tending to be some what less than Timbers. I recommend that adjustments be made to the U-Bar, Jersey Horse, Hay and O.D. Ridge sales to

---

[2] I have treated Brann in the same manner as the St. Joe and Hutch-Boondock sales which were not breached because the suspensions on all of these sales were of the same, relatively short duration.

reclassify the Timbers footage as #3 Common Utility in those calendar quarters with no sales price calculated for timbers as follows:

- U-Bar – 1st Quarter 1996 (C-0077)
- Jersey Horse – 4th Quarter 1995 (C-0079)
- Hay – 4th Quarter 1995 (C-0084)
- O.D. Ridge – 4th Quarter 1995 (C-0087)

The total effect of this change would increase damages by $41,923.89.

6. Similarly, for the Salt timber sale, a volume of #5 Common lumber is shown as having been produced, but since the sales price is shown as $0.00, there are no sales dollars generated for this production. In similar situations where no sales figures for #5 Common lumbers were available for a given quarter on other timber sales, the #5 Common lumber volume has been grouped with #4 Common Economy lumber. This appears to be a reasonable approach as the small volume of #5 Common lumber could have been sold at about the same prices as #4 Common Economy lumber. Additionally, for the Brookbank and Manaco timber sales, a volume of #5 Common from the 3rd Quarter of 1995 was mistakenly transferred to Rough lumber, rather than #4 Common Economy. I recommend that adjustments be made to the Salt, Brookbank and Manaco timber sales to reclassify the #5 Common lumber volume as #4 Common Economy lumber in those calendar quarters with no sales prices for #5 Common lumber as follows:

- Salt – 3rd Quarter 1995 (C-0082)
- Brookbank – 3rd Quarter 1995 (C-0078)
- Manaco – 3rd Quarter 1995 (C-0081)

The total effect of these changes would increase damages by $1,051.70.

7. The initial grade breakdown on the Saginaw-Kennedy timber sale (C-0076) should be the same as the Manaco, Kettle and Salt timber sales, however, it was slightly different for Moulding & Better (adding to a total of 100.02%). I thus recommend reducing the grade breakdown for Moulding and Better on Monaco by .02%, <u>i.e.</u>, from 3.72% to 3.70%. The total effect of this change would reduce damages by $421.68.

8. The volume of Timbers for the Saginaw-Kennedy timber sale (C-0076) have been grouped with #3 Common Utility even though there is a sales price for Timbers in the 3rd Quarter

1996. I recommend reclassifying 3.54% of the total footage from #3 Common Utility to Timbers. The total effect of this change would increase damages by $6,140.53.

9. The sales prices for Douglas Fir do not match the prices used in the calculations for the O.D. Ridge timber sale (C-0087 – C-0089). I have confirmed the proper sales prices and recommend the recalculation of the Douglas Fir prices for the O.D. Ridge sale. See Exhibit 22. The total effect of this change would reduce damages by $17,302.07.

10. The sales prices for Spruce do not match the prices used in the calculations for the O.D. Ridge timber sale for 4th Quarter 1995 and 2nd Quarter 1996 (C-0087 and C-0088). I have confirmed the proper sales prices and recommend the recalculation of the Spruce prices for the O.D. Ridge sale in these quarters. See Exhibit 22. The total effect of this change would reduce damages by $3,880.58.

11. The grade distribution for Ponderosa Pine used on the O.D. Ridge timber sale for the 2nd and 3rd Quarters 1996 does not match the grade distribution used for the 4th Quarter 1995. I have confirmed that the correct grade distribution is the one used for the 4th Quarter 1995 and I recommend using this distribution for the 2nd and 3rd Quarters of 1996 (C-0088 – C-0089). The total effect of this change would reduce damages by $30,081.71.

12. The volume of lumber sales for Douglas Fir from the O.D. Ridge sales for the 3rd Quarter 1996 shown on C-0089 was not calculated using the correct overrun factor. I have recalculated the total sales revenue using the correct overrun factor of 125% which results in the production of 117.50 MBF of lumber. The total effect of this change would reduce damages by $30,094.69.

13. The delivered log cost on the Lost Market Opportunity: Lumber chart does not match the detailed calculations of the delivered log cost for the following sales:

- Manaco – 3rd Quarter 1995 (C-0081 vs. C-0065)
- Manaco – 3rd Quarter 1996 (C-0081 vs. C-0065)
- O.D. Ridge – Spruce - 3rd Quarter 1996 (C-0089 vs. C-0066)

I have determined that the more detailed calculations of the delivered log costs on C-0065 and C-0066 are correct and recommend that they be used. The total effect of this change would reduce damages by $3,908.24.

14. The manufacturing cost on the Lost Market Opportunity: Lumber chart does not match the detailed calculations of the Anticipated Manufacturing Cost chart for the following sales:

- U-Bar – Pine - 1st Quarter 1996 (C-0077 vs. C-0068)
- O.D. Ridge – Douglas Fir - 2nd Quarter 1996 (C-0088 vs. C-0070)

I have determined that the more detailed calculation of Anticipated Manufacturing Costs on C-0068 and C-0070 is correct and recommend that it be used. The total effect of this change would increase damages by $1,475.02.

15. The lumber footage for Spruce used in calculating Anticipated Manufacturing Costs for the O.D. Ridge sale in 4th Quarter of 1995 (C-0070) does not correspond to the lumber footage for Spruce shown on the Lost Market Opportunity Cost: Lumber chart for the O.D. Ridge sale during the same Quarter (C-0087). I have confirmed that the correct lumber footage for Spruce in the 4th Quarter of 1995 is contained on C-0087 and recommend using that Spruce lumber footage in calculating Anticipated Manufacturing Costs. The total effect of this change would increase damages by $4,176.00

16. Upon review of the volume of remaining sawlogs and roundwood on the timber contracts at the date of suspension, it was determined that some of the remaining volumes used to calculate the Lost Market Opportunity both for sawlogs and roundwood were not correct. I recommend the use of corrected volumes based on the Forest Service's Timber Sale Statements of Account ("TSSA") as of the date of the suspension. See Exhibit 9 for corrections of volume for both sawlogs and roundwood. These changes have been incorporated into all parts of the Lost Market Opportunity calculations, i.e., Sales, Delivered Log Costs, Manufacturing Costs, Roundwood Revenue and By-Product Revenue. The total effect of these changes increase damages by $194,814.23.

17. Precision Pine sells lumber in the following three ways:

- "FOB Mill," i.e., the customer arranges and pays for its own trucking of the lumber;
- "FOB Mill plus freight," i.e., the cost of freight is charged to the customer as a separate line item on the lumber sales invoice; or

- "Delivered," i.e., the cost of freight is included in the sales price on the lumber sales invoice.

Some of the invoices used to calculate the sale prices of individual lumber products include the cost of delivered freight. I recommend that this freight charge be removed from the sales revenue. To do so, in Exhibit 8, I have calculated the amount of delivered freight during the suspension period per MBF by using the Winslow Sales Journal as follows: First, I totaled the freight charges shown on the Sales Journal. From that total, I deducted that portion of the freight charges that are shown to be FOB Mill, i.e., freight charged to the customer separately from the price charged for lumber. In this way, I was able to derive that portion of the freight costs that were for Delivered Freight, i.e., charged to the customer as part of the lumber sales price. Since these freight rates are calculated using all lumber sales, they have been applied to all lumber sales. This will approximate the result if Delivered Freight had been eliminated from each invoice in the calculation of sales prices in C-0093 through C-0116. The total effect of this change would reduce damages by $256,351.13.

18. The calculation of the Lost Market Opportunity does not include any deduction from sales revenue for prompt payment discounts taken. Almost all of Precision Pine's customers take advantage of the 1% 10 day prompt payment discount offered by Precision Pine. I thus recommend that it be taken into account and have included this prompt payment discount for all lumber sales. The total effect of this change would reduce damages by $151,431.31.

19. Precision Pine's income statements show that Arizona State severance tax is charged on logs when they are harvested. This tax was not accounted for in Precision Pine's damage calculations. The tax is $2.13 per MBF for pine logs and $1.51 per MBF for other species. I have included the cost of the severance tax in my calculations. The total effect of this change would reduce damages by $51,689.69.

20. The manufacturing costs used in Precision Pine's February 26, 2003 damage calculations are based on goal numbers that had been projected by Precision Pine. A much better approach would be to use the actual manufacturing costs incurred at each facility immediately prior to the suspension period, since it is reasonable to expect that similar (or perhaps even lower) costs would have been incurred during the suspension period if there had been an adequate supply of logs. Exhibit 10 calculates Precision Pine's actual direct manufacturing costs

for each facility for the 17 months immediately prior to the suspension. During the suspension, it appears that most of Precision Pine's costs were fairly level or even decreasing compared to the 17-month period immediately preceding the suspension. Two items that show a significant decrease during this time are Workers' Compensation Insurance and Employee Group Insurance. Such decreases would tend to offset any increases that might have occurred in other direct expenses during the suspension. As it is difficult to project the net effect of increases and decreases in various costs during the suspension period, I recommend using the amounts calculated on Exhibit 10 as Precision Pine's anticipated manufacturing costs at each facility during the suspension period. The total effect of this change would increase damages by $891,165.91.

21. Green lumber produced at the Eagar and Heber sawmills is trucked to Winslow for drying and planing. However, Precision Pine's February 26, 2003 damage calculations do not include this trucking cost. The trucking cost from Eagar to Winslow is $25 per MBF and the cost from Heber to Winslow is $18 per MBF. I recommend that this cost be included in the calculation of damages. The total effect of this change would reduce damages by $458,260.92.

22. The sales price for roundwood used in Precision Pine's February 26, 2003 damage calculations binder is not the actual price paid for roundwood by Stone Forest Products. A review of prices paid immediately prior to the suspension supports a sales price of approximately $70 per cord. The total effect of this change would increase damages by $58,959.31.

23. The calculation of profit from roundwood does not include the contract costs for the roundwood, i.e., the $49.17 cost figure used in the calculations binder is simply the cost of logging and hauling the roundwood, but does not include the actual amounts paid to the Forest Service under the contracts. I thus recommend adding an additional line to the model for this cost. See Exhibit 11. The total effect of this change would reduce damages by $198,332.21.

24. The chip sales invoices from Stone Forest Products show that sometimes small deductions were made by Stone from the gross sales price. See Supporting Documents Binder, Vol. I at III.(a)-2 – III.(a)-29. Exhibit 12 calculates the average of such deductions from these invoices. This average deduction should be used to calculate net prices for each quarter. The total effect of this change would reduce damages by $17,740.99.

25. Precision Pine's bark production journals for the Winslow Sawmill are reproduced in the Supporting Documents Binder, Vol. I at III.(c)-1 – III.(c)-30. Since the journals contain a 17-month sample for bark production and figures for lumber production by month also exists for the same period, I was able to calculate a bark production rate. See Exhibit 13. I recommend the use of this 17-month sample to more accurately reflect actual bark production than the 6-month sample set out at C-0043. The total effect of this change would increase damages by $32,084.01.

26. Page C-0056 of Precision Pine's damage calculation binder shows a calculation of the shavings production rate, however, a review of the Supporting Documents Binder Vol. I at III.(d)-12 – III.(d)-14 shows that the total shavings production for Feb. – Apr. 1996 is not reflected on C-0056. Also, actual sawmill production shows that C-0056 is not accurate. Furthermore, the calculation on page C-0056 assumes that sawmill production at Precision Pine's three mill sites is equivalent to planer production for the same months, and therefore, does not reflect the time between the production of green lumber at the sawmills and the date on which finished lumber products are produced at the planer. Because both the Winslow planer production and shavings production records exist for August 1995 through March 1996, I have used that time period to calculate a shavings production rate which I recommend be used. See Exhibit 14. The total effect of this change would increase damages by $8,886.21.

27. Precision Pine's February 26, 2003 damage calculations assume that logs are harvested, sawn, planed and sold in the same time period. This assumption does not reflect the reality of converting timber to finished lumber products. I do not agree with this assumption as it not only ignores the time required to move timber to the mill and then lumber through the entire manufacturing process, but fails to consider the capacities of the various mills. In addition, this assumption does not account for the need to deck logs during certain times of year in order to have a continuous supply of timber at the mill during anticipated times of limited or no logging (i.e., over the winter). Based on the above, I recommend that the approach set forth on Exhibit 7 be used. Exhibit 7 reflects a time adjustment for processing logs but does not change the schedule with regard to when the sales would have been harvested. Additionally, Exhibit 7 reflects the fact that processing would be deferred as mill capacities are reached on the assumption that it is generally more desirable to delay processing than to work overtime or add

additional shifts. Moreover, Exhibit 7 indicates that Douglas Fir and Spruce logs would have been accumulated to be processed at a time when there was sufficient volume of those species to justify switching from processing Ponderosa Pine at a sawmill. Overall, there would have been sufficient total capacity at the sawmills to process all of the logs from the breached sales during the period of August 24, 1995 to April 15, 1997 in addition to the logs that were actually run through the mills during the suspension. For the period after December 31, 1996, I have used the costs and lumber sales prices for the 4th quarter of 1996. I believe this approach to be accurate as costs should have remained relatively flat, while Ponderosa Pine product prices were also relatively flat during this time period. The total effect of this change would increase damages by $1,334,675.31.

**Increased Manufacturing Cost During the Suspension Period**

1. Consistent with Precision Pine's gross profit approach, I recommend the deletion of all items of Precision Pine's overhead that are shown as direct damages. This includes the cost of retaining key employees, security costs and the idle equipment costs for Precision Pine's equipment. The total effect of these changes would reduce damages by $214,350.86.

2. During the suspension period, the sawmills and planer were not as efficient as they would have been with a steady supply of logs from the suspended sales. As noted above, I have calculated the actual direct manufacturing cost per MBF during the 17-month period before the suspension. Using the same methodology, I calculated the manufacturing cost per MBF that Precision Pine experienced during the suspension. See Exhibits 10 and 16. The difference between these two rates represents the inefficiency that Precision Pine experienced during the suspension period to which I applied the actual volume of lumber production during the suspension period. See Exhibit 15. This calculation replaces the calculations made at C-0121, C-0128 and C-0136. The effect of this change would reduce damages by $1,792,892.75.

3. Transporting Renewable Resources, Inc. (TRRI) had idle equipment at Heber as a result of the reduced production and the shut-downs due to inadequate log supply. The calculations on C-0133 are based on monthly ownership costs as published by The Associated General Contractors of America, 1966 Ed. These monthly costs are, however, based on the equipment being used less than 12 months per year, while TRRI's equipment would normally be