# Precision Pine & Timber, Inc.
# Lost Market Opportunity - Anticipated Lumber Sales

**Exhibit 6**

| | Grade Breakdown | Footage (MBF) | Amount Per M | Total Amount |
|---|---|---|---|---|
| **Kettle Timber Sale** | | | | |
| **1st Quarter 1996** | | | | |
| **Anticipated Sales Breakdown - Pine** | | | | |
| Moulding & Better | 3.70% | 11.56 | $ 1,166.25 | $ 13,481.85 |
| 5/4 # 1 Shop | 0.95% | 2.97 | 893.18 | 2,652.74 |
| 5/4 # 2 Shop | 5.96% | 18.63 | 789.57 | 14,709.69 |
| 5/4 # 3 Shop | 18.14% | 56.69 | 579.90 | 32,874.53 |
| Paragraph 99 Redress | 9.84% | 30.75 | 419.90 | 12,911.93 |
| 5/4 x RWL Radius Edge | 21.02% | 65.69 | 402.50 | 26,440.23 |
| # 2, # 3, # 4 & Better | 13.45% | 42.03 | 507.02 | 21,310.05 |
| # 3 Common Utility | 12.14% | 37.94 | 383.93 | 14,566.30 |
| # 4 Common Economy | 9.48% | 29.63 | 243.71 | 7,221.13 |
| # 5 Common | | 0.00 | N/A | 0.00 |
| Rough | 3.34% | 10.44 | 187.50 | 1,957.50 |
| Timbers | | 0.00 | N/A | 0.00 |
| Misc Shop Outs | 1.98% | 6.17 | 263.32 | 1,624.68 |
| | 100.00% | 312.50 | $ 479.20 | $ 149,750.63 |
| **2nd Quarter 1996** | | | | |
| **Anticipated Sales Breakdown - Pine** | | | | |
| Moulding & Better | 3.70% | 27.75 | $ 1,336.54 | $ 37,088.99 |
| 5/4 # 1 Shop | 0.95% | 7.13 | 931.67 | 6,642.81 |
| 5/4 # 2 Shop | 5.96% | 44.70 | 831.84 | 37,183.25 |
| 5/4 # 3 Shop | 18.14% | 136.05 | 644.88 | 87,735.92 |
| Paragraph 99 Redress | 9.84% | 73.80 | 440.17 | 32,484.55 |
| 5/4 x RWL Radius Edge | 21.02% | 157.65 | 426.14 | 67,180.97 |
| # 2, # 3, # 4 & Better | 13.45% | 100.88 | 466.94 | 47,104.91 |
| # 3 Common Utility | 12.14% | 91.05 | 266.56 | 24,270.29 |
| # 4 Common Economy | 8.98% | 67.35 | 214.37 | 14,437.82 |
| # 5 Common | 0.50% | 3.75 | 172.50 | 646.88 |
| Rough | 3.34% | 25.05 | 187.08 | 4,686.35 |
| Timbers | | 0.00 | N/A | 0.00 |
| Misc Shop Outs | 1.98% | 14.84 | 270.33 | 4,011.70 |
| | 100.00% | 750.00 | $ 484.63 | $ 363,474.44 |
| **3rd Quarter 1996** | | | | |
| **Anticipated Sales Breakdown - Pine** | | | | |
| Moulding & Better | 3.70% | 27.75 | $ 1,506.00 | $ 41,791.50 |
| 5/4 # 1 Shop | 0.95% | 7.13 | 1,027.00 | 7,322.51 |
| 5/4 # 2 Shop | 5.96% | 44.70 | 907.50 | 40,565.25 |
| 5/4 # 3 Shop | 18.14% | 136.05 | 733.57 | 99,802.20 |
| Paragraph 99 Redress | 9.84% | 73.80 | 497.33 | 36,702.95 |
| 5/4 x RWL Radius Edge | 21.02% | 157.65 | 492.61 | 77,659.97 |
| # 2, # 3, # 4 & Better | 13.45% | 100.88 | 404.95 | 40,851.36 |
| # 3 Common Utility | 8.60% | 64.50 | 248.46 | 16,025.67 |
| # 4 Common Economy | 9.48% | 71.10 | 193.41 | 13,751.45 |
| # 5 Common | | 0.00 | N/A | 0.00 |
| Rough | 3.34% | 25.05 | 214.91 | 5,383.50 |
| Timbers | 3.54% | 26.55 | 370.83 | 9,845.54 |
| Misc Shop Outs | 1.98% | 14.84 | 320.83 | 4,761.12 |
| | 100.00% | 750.00 | $ 525.95 | $ 394,463.02 |

## Precision Pine & Timber, Inc.

**Exhibit 6**

## Lost Market Opportunity - Anticipated Lumber Sales

| | Grade Breakdown | Footage (MBF) | Amount Per M | Total Amount |
|---|---|---|---|---|
| **Kettle Timber Sale** | | | | |
| **4th Quarter 1996** | | | | |
| **Anticipated Sales Breakdown - Pine** | | | | |
| Moulding & Better | 3.70% | 59.75 | $ 1,626.00 | $ 97,153.50 |
| 5/4 # 1 Shop | 0.95% | 15.34 | 1,129.89 | 17,332.51 |
| 5/4 # 2 Shop | 5.96% | 96.25 | 1,015.00 | 97,693.75 |
| 5/4 # 3 Shop | 18.14% | 292.95 | 832.50 | 243,880.88 |
| Paragraph 99 Redress | 9.84% | 158.91 | 539.35 | 85,708.11 |
| 5/4 x RWL Radius Edge | 21.02% | 339.46 | 500.36 | 169,852.21 |
| # 2, # 3, # 4 & Better | 13.45% | 217.21 | 404.89 | 87,946.16 |
| # 3 Common Utility | 8.60% | 138.89 | 280.00 | 38,889.20 |
| # 4 Common Economy | 9.48% | 153.10 | 179.90 | 27,542.69 |
| # 5 Common | | 0.00 | N/A | 0.00 |
| Rough | 3.34% | 53.94 | 243.33 | 13,125.22 |
| Timbers | 3.54% | 57.17 | 335.00 | 19,151.95 |
| Misc Shop Outs | 1.98% | 31.99 | 332.11 | 10,624.20 |
| | 100.00% | 1,614.96 | $ 562.80 | $ 908,900.38 |
| **O.D. Ridge Timber Sale** | | | | |
| **1st Quarter 1996** | | | | |
| **Anticipated Sales Breakdown - Pine** | | | | |
| Moulding & Better | 6.97% | 74.06 | $ 1,166.25 | $ 86,372.48 |
| 5/4 # 1 Shop | 0.98% | 10.41 | 893.18 | 9,298.00 |
| 5/4 # 2 Shop | 11.86% | 126.01 | 789.57 | 99,493.72 |
| 5/4 # 3 Shop | 28.70% | 304.94 | 579.90 | 176,834.71 |
| Paragraph 99 Redress | 16.26% | 172.76 | 419.90 | 72,541.92 |
| 5/4 x RWL Radius Edge | 4.19% | 44.52 | 402.50 | 17,919.30 |
| # 2, # 3, # 4 & Better | 5.38% | 57.16 | 507.02 | 28,981.26 |
| # 3 Common Utility | 11.04% | 117.30 | 383.93 | 45,034.99 |
| # 4 Common Economy | 6.30% | 66.94 | 243.71 | 16,313.95 |
| # 5 Common | 0.00% | 0.00 | N/A | 0.00 |
| Rough | 3.37% | 35.81 | 187.50 | 6,714.38 |
| Timbers | | 0.00 | N/A | 0.00 |
| Misc Shop Outs | 4.95% | 52.59 | 263.32 | 13,848.00 |
| | 100.00% | 1,062.50 | $ 539.63 | $ 573,352.71 |
| **2nd Quarter 1996** | | | | |
| **Anticipated Sales Breakdown - Pine** | | | | |
| Moulding & Better | 6.97% | 52.28 | $ 1,336.54 | $ 69,874.31 |
| 5/4 # 1 Shop | 0.98% | 7.35 | 931.67 | 6,847.77 |
| 5/4 # 2 Shop | 11.86% | 88.95 | 831.84 | 73,992.17 |
| 5/4 # 3 Shop | 28.70% | 215.25 | 644.88 | 138,810.42 |
| Paragraph 99 Redress | 16.26% | 121.95 | 440.17 | 53,678.73 |
| 5/4 x RWL Radius Edge | 4.19% | 31.43 | 426.14 | 13,393.58 |
| # 2, # 3, # 4 & Better | 5.38% | 40.35 | 466.94 | 18,841.03 |
| # 3 Common Utility | 11.04% | 82.80 | 266.56 | 22,071.17 |
| # 4 Common Economy | 6.30% | 47.25 | 214.37 | 10,128.98 |
| # 5 Common | 0.00% | 0.00 | 172.50 | 0.00 |
| Rough | 3.37% | 25.28 | 187.08 | 4,729.38 |
| Timbers | | 0.00 | N/A | 0.00 |
| Misc Shop Outs | 4.95% | 37.11 | 270.33 | 10,031.95 |
| | 100.00% | 750.00 | $ 563.20 | $ 422,399.49 |

**Exhibit 6**

## Precision Pine & Timber, Inc.
## Lost Market Opportunity - Anticipated Lumber Sales

| | Grade Breakdown | Footage (MBF) | Amount Per M | Total Amount |
|---|---|---|---|---|
| **O.D. Ridge Timber Sale** | | | | |
| **3rd Quarter 1996** | | | | |
| **Anticipated Sales Breakdown - Pine** | | | | |
| Moulding & Better | 6.97% | 41.04 | $ 1,506.00 | $ 61,806.24 |
| 5/4 # 1 Shop | 0.98% | 5.77 | 1,027.00 | 5,925.79 |
| 5/4 # 2 Shop | 11.86% | 69.83 | 907.50 | 63,370.73 |
| 5/4 # 3 Shop | 28.70% | 168.97 | 733.57 | 123,951.32 |
| Paragraph 99 Redress | 16.26% | 95.73 | 497.33 | 47,609.40 |
| 5/4 x RWL Radius Edge | 4.19% | 24.67 | 492.61 | 12,152.69 |
| # 2, # 3, # 4 & Better | 5.38% | 31.67 | 404.95 | 12,824.77 |
| # 3 Common Utility | 4.72% | 27.79 | 248.46 | 6,904.70 |
| # 4 Common Economy | 6.30% | 37.09 | 193.41 | 7,173.58 |
| # 5 Common | 0.00% | 0.00 | N/A | 0.00 |
| Rough | 3.37% | 19.84 | 214.91 | 4,263.81 |
| Timbers | 6.32% | 37.21 | 370.83 | 13,798.58 |
| Misc Shop Outs | 4.95% | 29.14 | 320.83 | 9,348.99 |
| | 100.00% | 588.75 | $ 626.97 | $ 369,130.60 |
| | | | | |
| **Anticipated Sales Breakdown - Douglas Fir** | | | | |
| # 2 & Btr | 85.00% | 468.56 | $ 546.00 | $ 255,833.76 |
| # 3 | 10.00% | 55.13 | 344.33 | 18,982.91 |
| # 4 | 5.00% | 27.56 | 274.33 | 7,560.53 |
| | 100.00% | 551.25 | $ 512.25 | $ 282,377.20 |
| | | | | |
| **Anticipated Sales Breakdown - Spruce** | | | | |
| 1 x 4 | | | | |
| # 2 & Btr | 3.00% | 9.90 | $ 614.33 | $ 6,081.87 |
| # 3 | 19.50% | 64.35 | 354.33 | 22,801.14 |
| # 4 | 7.50% | 24.75 | 285.00 | 7,053.75 |
| 1 x 6 | | | | |
| # 2 & Btr | 10.50% | 34.65 | 636.00 | 22,037.40 |
| # 3 | 42.00% | 138.60 | 397.67 | 55,117.06 |
| # 4 | 17.50% | 57.75 | 280.33 | 16,189.06 |
| | 100.00% | 330.00 | $ 391.76 | $ 129,280.28 |

# Precision Pine & Timber, Inc.
# Lost Market Opportunity - Anticipated Lumber Sales

**Exhibit 6**

| | Grade Breakdown | Footage (MBF) | Amount Per M | Total Amount |
|---|---|---|---|---|
| **Eagar Sawmill Totals** | | | | |
| **Sales - Pine** | | | | |
| 3rd Quarter 1995 | | 350.00 | $ 565.79 | $ 198,026.31 |
| 4th Quarter 1995 | | 1,412.50 | 554.77 | 783,618.05 |
| 1st Quarter 1996 | | 2,700.00 | 536.58 | 1,448,775.46 |
| 2nd Quarter 1996 | | 2,700.00 | 550.84 | 1,487,270.51 |
| 3rd Quarter 1996 | | 1,503.34 | 579.30 | 870,880.40 |
| 4th Quarter 1996 | | 1,614.96 | 562.80 | 908,900.38 |
| **Subtotal - Pine** | | 10,280.80 | $ 554.19 | $ 5,697,471.11 |
| | | | | |
| **Sales - Douglas Fir** | | | | |
| 3rd Quarter 1996 | | 873.19 | $ 512.25 | $ 447,290.79 |
| **Subtotal - Douglas Fir** | | 873.19 | $ 512.25 | $ 447,290.79 |
| | | | | |
| **Sales - Spruce** | | | | |
| 3rd Quarter 1996 | | 330.00 | $ 391.76 | $ 129,280.28 |
| **Subtotal - Douglas Fir** | | 330.00 | $ 391.76 | $ 129,280.28 |
| | | | | |
| **Total** | | 11,483.99 | | $ 6,274,042.18 |
| | | | | |
| **Total Precision Pine & Timber, Inc.** | | | | |
| | | | | |
| **Sales - Pine** | | | | |
| 3rd Quarter 1995 | | 755.00 | $ 505.59 | $ 381,717.68 |
| 4th Quarter 1995 | | 4,060.00 | 476.28 | 1,933,678.62 |
| 1st Quarter 1996 | | 3,725.00 | 491.73 | 1,831,698.99 |
| 2nd Quarter 1996 | | 3,775.00 | 508.26 | 1,918,690.57 |
| 3rd Quarter 1996 | | 4,717.72 | 525.10 | 2,477,284.09 |
| 4th Quarter 1996 | | 5,041.84 | 596.68 | 3,008,369.64 |
| Jan-Apr 1997 | | 6,200.75 | 621.76 | 3,855,388.85 |
| **Subtotal - Pine** | | 28,275.31 | $ 544.89 | $15,406,828.44 |
| | | | | |
| **Sales - Douglas Fir** | | | | |
| 2nd Quarter 1996 | | 750.00 | $ 420.97 | $ 315,727.51 |
| 3rd Quarter 1996 | | 1,548.19 | 512.25 | 793,059.21 |
| 4th Quarter 1996 | | 276.25 | 461.90 | 127,599.64 |
| **Subtotal - Douglas Fir** | | 2,574.44 | $ 480.25 | $ 1,236,386.36 |
| | | | | |
| **Sales - Spruce** | | | | |
| 3rd Quarter 1996 | | 330.00 | $ 391.76 | $ 129,280.28 |
| **Subtotal - Douglas Fir** | | 330.00 | $ 391.76 | $ 129,280.28 |
| | | | | |
| **Total** | | 31,179.75 | | $16,772,495.08 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 98-720 C

(Filed January 30, 2004)

- - - - - - - - - - - - - - - - -x

PRECISION PINE & TIMBER, INC., :

Plaintiff, :

v. :

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - -x

Washington, D.C.

Monday, February 2, 2004

Deposition of JOHN B. SMITH, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Saltman & Stevens, P.C., 1801 K Street, N.W., Washington, D.C. 20006, at 9:05 a.m., Monday, February 2, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

A. I did deck inventories, plus trying to work with a number of truckloads.
Q. What do you mean when you say trying to work with a number of truckloads?
A. You kind of break things down into the point that for a day, to run a mill, you need five truckloads, you need eight truckloads, and you maybe try to haul in that respect.
Q. How did you determine which contracts would be harvested to get the volume you needed?
A. Well, that was one -- one of the first things you looked at was your expiration dates, and of course you wanted to get the volume off the timber sale before the end of your expiration date.
MR. SALTMAN: I'm also going to raise an objection I don't think there's been any foundation that he made the determination of when or which sales would be harvested.
BY MR. HARRINGTON:
Q. Were you involved in determining which sales would be harvested?
A. In the final analysis, no.
Q. Do you, did you make an initial determination of which sales would be harvested?



A. It was more of a, a operating plan or an operating schedule to satisfy a forest department, Forest Service requirement the first of the year, and I would do that on my own using some of these various things.
Q. Well, who would make the final determination of which sales would be harvested?
A. Well, Mr. Porter.
Q. And did you discuss with Mr. Porter what you were telling the Forest Service was going to be done?
A. When, when I worked up that letter and presented it to them in the spring, as part of the contract requirement, I would send him a copy.
MR. SALTMAN: What do you mean by them?
THE WITNESS: Oh, I'm sorry -- Forest Service.
BY MR. HARRINGTON:
Q. When you sent Mr. Porter a copy of the letter, if he disagreed with what you were telling the Forest Service, did he let you know?
A. Not necessarily, no.
Q. When would he let you know that he



didn't agree with your plan?
MR. SALTMAN: Objection. I think the terminology was an operating schedule.
BY MR. HARRINGTON:
Q. When would he let you know that he disagreed with your operating schedule?
A. When either he or the logger called me and said we need to get a pre-work going on XYZ timber sale.
Q. Let me take a step back because I'm not sure I understand.
How was it that Precision Pine as a company determined which sales it was going to harvest?
A. I don't know. You would have to ask Mr. Porter that.
Q. Well, let me ask you this. Once you sent your plan to the Forest Service or when you sent your plan to the Forest Service, did you believe that the plan was accurate?
MR. SALTMAN: Objection. If you're referring to the annual operating schedule, I wish you would indicate that.
A plan is something different.
BY MR. HARRINGTON:



Q. Mr. Smith, maybe you can tell me what you understand to be the difference that Mr. Saltman is referring to between a plan and an operating schedule.
A. Okay. The plan was a requirement by the Forest Service shortly after the purchase of the sale indicating how you planned to operate on the sale.
Q. Did the plan have anything in it about scheduling?
A. The ones that I prepared and turned in, no.
Q. And what would an operating schedule be?
A. That was a little bit more detailed, and it was for a approximate logging season period of time.
Q. And when you say a logging season, what would a logging season be?
A. Basically in our country, we shoot for some time in April, and then depending on the weather, it could extend into late December or even into January.
That's a variable.
MR. SALTMAN: What does our country

Page 34

mean? I mean --
THE WITNESS: Oh, I'm sorry. The Southwest Arizona, New Mexico, that's a typical time period.
BY MR. HARRINGTON:
Q. You said at the beginning of each year roughly, you would send an operating schedule to the Forest Service, is that correct?
A. Yes.
Q. When you sent the Forest Service this operating schedule, did you believe it to be accurate?
A. At the point in time I made it up, yes. That was my best estimate of what we would be able to do during that season.
Q. And when the time came to begin operations on one of the sales identified in your operating schedule, what did you do?
A. Okay. When we got ready to start on the sale, we would have, any sale, we would have what's called a pre-work conference.
Q. And what would that involve?
A. That would involve meeting with the Forest Service timber sale administrator at least, sometimes the district. Just depends on

Page 35

the district.
District ranger perhaps, Forest Service representatives, the logger, his woods boss, and myself, and perhaps Lewis or Lonnie if they were inclined to come to the pre-work.
Q. And what would happen after the pre-work?
A. After the pre-work, the logger would go to work and start harvesting the timber.
Q. And so would you follow the operating schedule that you provided to the Forest Service unless you heard from Mr. Porter that he didn't want you to follow it?
A. Unless Mr. Porter had let me know he wanted to start or go to a different sale than what I had there, yes, we would have followed the schedule.
Q. Was it a common occurrence for Mr. Porter to ask you to change what was put in the operating schedule?
A. Yes.
Q. How frequent?
A. Very often.
Q. Did it happen every year?
A. Yes.

Page 36

Q. Would it happen more than once a year?
A. Yes.
Q. And how did he let you know he wanted to change what was in the operating schedule that you had put together?
A. He might call me, or our logger might get ahold of me and tell me.
Q. How would the logger find out?
A. He would have a -- well, I don't know. There's various ways he could have found out.
Q. What would some of those ways be?
A. Telephone conversation, chance meeting on the street, chance meeting at church, just, you know, any variety of communication methods.
Q. So sometimes Mr. Porter would contact a logger directly?
A. Yes.
Q. When the operating schedule was changed this way, did you do anything to let the Forest Service know?
A. For the most part, it was verbal.
Q. And when you say it was verbal, what do you mean?
You contacted the Forest Service?
A. The relating of the information that

Page 37

we're going to start on Y timber sale rather than X was for all practical purposes verbal.
Q. Do you know why the changes in the operating schedule would typically be made?
A. No, I do not.
Q. Were you involved in the decisions to change the operating schedule that you put into the Forest Service?
A. No.
Q. When Precision Pine began harvesting work on a contract, did it generally harvest that contract through to completion?
A. No.
Q. How did Precision Pine determine when it would stop work on a contract where harvesting had begun?
A. Weather could have been one thing. Other than that, there again, word would have come from Lonnie -- Mr. Porter.
I'm sorry.
Q. Were there any other reasons that Precision Pine would stop working on a contract where harvesting operations had begun?
A. Oh, there would be a multitude of reasons.

Page 258

A. That's what it appears to be.
Q. Going over to the second page, does that read at the top "Hutch really helped"?
A. Yes, it does.
Q. What is that talking about?
A. This is, would have been talking to the fact that on the Hutch-Boondock timber sale, we paid for 2,809 CCF, and which was an estimated 1405 thousand board feet, and that the scaled hauled volume was 2,250, I mean 2,250 thousand board feet, 2250.
Q. Okay. And then it says overcut down below that.
What's an overcut?
A. Okay. Our haul volume was more than what we paid for.
Q. And is that why it says up at the top Hutch really helped?
A. Yes.
Q. And do you have similar calculations down below for other contracts?
A. Yes.
Q. Okay. There are some initials it appears, the date March 12, 1996 and March 13, 1996 under them?

Page 259

A. Yes.
Q. Whose initials are those?
A. Those are mine.
Q. You said that this was an overcut on the second page that you were talking about.
Is an overcut different than an overrun?
A. By terminology, yes, it is.
Q. So when you're talking overcut and you're talking overrun, you're not talking about the same thing?
A. No.
(Smith Exhibit No. 58 was marked for identification.)
BY MR. HARRINGTON:
Q. I have marked Exhibit 58, which has a note to Mel from J on the first page, and an agreement to modify contract for the Brann contract on the second page.
Is this your handwriting on the first page, Mr. Smith?
A. Yes, it is.
Q. Is this what we discussed earlier that you were going to request contract term

Page 260

adjustments for the different contracts that were suspended?
A. No. I believe that this relates back to -- I don't remember the exact terminology, but the lack of market verbiage that was mentioned earlier this morning.
I don't remember the, but so --
Q. So this is a different reason you're requesting the contract term adjustment, is that what you're saying?
A. Yes. A-huh.
Q. Okay. Are you familiar with a gentleman named Marty Moore?
A. Not that I'm aware of.
Q. Haven't run across him in your work for Precision Pine?
A. No.
(Smith Exhibit No. 59 was marked for identification.)
BY MR. HARRINGTON:
Q. I'm marking as Exhibit 59 an October 17th, 1996 note from John B. Smith to Keith with a copy of a check, and attached to it is an earlier letter and an earlier note from -- well,

Page 261

some additional correspondence.
It's a four-page document in its entirety.
Looking at the first page of this, Mr. Smith --
A. Just a moment, please.
Q. Sure.
(The witness reviewed the document.)
THE WITNESS: Okay. Start again. I may have to look again.
BY MR. HARRINGTON:
Q. Actually let's go ahead and go to the fourth page of it.
A. Oh.
Q. Is this a letter from you to Keith P-a-j-k-o-s?
A. Yes, it is.
Q. And does this concern the Park multiproduct sale?
A. Yes, it does.
Q. What was the Park multiproduct sale?
A. It was a timber sale that the State of Arizona put out for bid that we bought.
Q. Did Precision Pine default on that sale?

A. No.
Q. Did you have anything at Precision Pine that showed this sort of information or that from which you could derive this sort of information at the time of the injunction back in 1995?
A. I'm sorry. I need you to repeat the question.
MR. HARRINGTON: Could you read the question back?
THE REPORTER: Question: "Did you have anything at Precision Pine that showed this sort of information or that from which you could derive this sort of information at the time of the injunction back in 1995?"
THE WITNESS: Yes.
BY MR. HARRINGTON:
Q. And what material did you have from back in 1995 that you could use to get this information?
A. Timber sale contracts, timber sale statements of account would have been the two basic areas.
Q. So those documents you just mentioned would have had the volumes that are used on this



document, is that correct?
A. Yes. They would have had volumes that may have been appropriate to put into this document, yes.
Q. Did you have anything regarding the timing of harvesting that would show this sort of a schedule for harvesting the contracts?
A. Not that I was aware of, but I don't remember every document, either.
Q. Okay. Going back to August of 1995, let's talk about, we can start talking about the Manaco contract.
A. Okay.
Q. Had you at that time been in contact with TriStar or any other timber harvester about harvesting the Manaco contract in the fall of 1995?
A. Oh, I don't remember. It's too far back. I don't remember whether I had or not.
Q. Would the same -- would you remember on any of the contracts that you had been in touch with anybody back in August of 1995 about starting up harvesting?
A. No. Any of that information, I would have to go back to the records to see if there



was anything written down.
Q. If you had had those conversations, would you have written something down about it?
A. Not necessarily.
Q. What would, what was your usual practice when you were getting in touch say with Stephen Reidhead to set up harvesting on a contract?
MR. SALTMAN: I think many, many hours ago you asked him and he answered that, but if he recalls, he can answer it again.
THE WITNESS: Would you repeat the question again, please?
BY MR. HARRINGTON:
Q. What did you do when you were, what did you do to get Stephen Reidhead on board when you were setting up harvesting of the contract assuming you were using TriStar?
A. Lonnie would call me and say let's get Steve working on a contract, or perhaps Steve would contact me and say Lonnie wants us to start on this contract, get a pre-work set up.
Q. How far in advance did you usually get a pre-work set up if you wanted to harvest a particular month?



Let's say you wanted to harvest in July.
When would you want to have your pre-work conference set up?
A. Just as soon as possible after the decision was made to, that we want to harvest, just as soon as possible.
Q. How long did it usually take for you once you got that decision made to set up the pre-work conference?
A. In some cases, next day. In some cases, couple days away; maybe over a weekend; timing varied.
Q. How far in advance did you usually get a call from Mr. Porter when he wanted to set up a contract for harvesting?
Did he usually call you and say I want the harvesting starting next week, or did he usually give you more advanced notice than that?
A. You'll need to rephrase the question, please.
Q. You said that Mr. Porter would contact you when he wanted harvesting to start on a contract.
MR. SALTMAN: Or he would talk to Mr.

Page 274

what did that involve?
A. Some of all -- the harvesting, some of the pricing and what not, but not to a major extent.
Q. What sort of pricing did you work out with him?
A. I don't remember off the top of my head.
Q. Do you know if it covered Precision Pine's cost to the Forest Service?
A. I don't remember. We would have to go back and look.
Q. When you were figuring what part of a sale to cut to harvest, what units to open, what did you consider in making that decision?
MR. SALTMAN: I think earlier he testified that he wasn't the one who made that decision.
MR. HARRINGTON: I think he testified as to figuring out which sales to go to, and now I'm asking within the sale, were you --
BY MR. HARRINGTON.
Q. Let me take a step back and ask a more general question.
Were you involved in determining what

Page 275

payment units or cutting units on a sale to operate?
A. Yes.
Q. And what did you look at to determine what payment unit or cutting units you were going to operate on a given sale?
A. Well, you have to look at what you're anticipating the weather is going to be, the availability of the roads.
Those were things that I would look at.
Q. Did the quality of the timber, sawtimber or the amount of roundwood that you had to cut affect your decision as to where to go on a sale?
A. Not in terms of my independent decision, no.
Things like that, I would have worked with Mr. Porter on.
Q. And so to the extent that that sort of thing affected where you were going to cut on a sale, that decision would have been made by Mr. Porter?
A. Yes.
Q. Did those sorts of things sometimes

Page 276

affect what units you were going to cut on a sale?
A. I don't know that for a fact, no.
Q. Does that mean that you were simply told which units to cut and not why you were going to cut them?
A. Yes.
Q. Were you ever told why you were going to cut particular units?
A. No.
Q. Did TriStar and Stephen Reidhead work exclusively with Precision Pine, or did TriStar have other business that they, businesses they worked with as well?
A. At different times, they worked with different businesses.
Q. When was that that they were working with companies other than Precision Pine?
A. We would have to check the records. I don't remember.
Q. Do you remember if they were working with other companies say in 1994 or 1995?
A. No, I don't remember.
Q. Do you remember after that if they were working with other companies to harvest

Page 277

timber?
A. No. We would have to just check the records on what they were doing.
Q. Was TriStar paid by the volume of timber and roundwood that they cut and hauled off the sale?
Is that how you determined what they were paid? Let me rephrase the question.
A. Okay.
Q. How did you determine how much TriStar was going to be paid for their work?
A. Okay. The contract price, Mr. Porter did.
Q. Okay.
A. Okay. In terms of an amount owed for a given time period, we weighed the trucks and came up with weight of the product and converted to tons, and we paid on a per ton basis.
Q. Okay. Going back to the summer of 1995, do you remember what contracts Precision Pine was planning to harvest later in the year if there had been no suspension?
A. No, I don't.
Q. Would you have written that down anywhere or informed the Forest -- would you

Page 278

have written that down?
A. There may have been something in place, but I don't remember.
Q. Would you have informed the Forest Service what the harvesting schedule was?
A. If we had had anything in place and thoughts of what we were going to be doing at that period of time, yes, there would be paperwork some place that I had notified them of what our plan, you know, what our schedule was.
(There was a pause in the proceedings.)
BY MR. HARRINGTON:
Q. In the 1995, 1996, 1997 period, was Precision Pine having difficulty getting enough timber to operate its mills?
A. During that time period, I don't, I don't remember whether we were or not.
There again, I would have to defer to Mr. Porter.
Q. Were you involved in the mill operations for Precision Pine at all?
A. No, I was not.
(There was a pause in the

Page 279

proceedings.)
BY MR. HARRINGTON:
Q. To close out a Forest Service contract, did Precision Pine have to complete all of its cutting on all of the payment units?
Is that how it worked?
A. To close the contract, yes, all the work had to be done.
Q. And that would include both roundwood and sawtimber?
A. Sawtimber, yes.
Q. And the other contractual requirements for --
A. Yes.
Q. Slash and what not?
A. Yes.
(The transcript continues on the following page.)

Page 280

MR. HARRINGTON: On that, that sounds like a good place to quit, go ahead and wrap it up for the day.
MR. SALTMAN: Let's go off the record for a second.
(Whereupon, at 5:25 p.m., the taking of the instant deposition ceased.)

---------------------------
JOHN B. SMITH

SUBSCRIBED AND SWORN to before me this---------

day of-----------------------------, 20------.

---------------------------
NOTARY PUBLIC

My commission expires:

Page 281

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages 1 through 281, do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to the proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The District of Columbia

My commission expires:
September 14, 2007

John Jiles

**PRECISION PINE & TIMBER, INC.**

P.O. BOX 70
HEBER, ARIZONA 85928
(602) 535-9112 • FAX (602) 535-9196

P.O. DRAWER W WINSLOW, AZ 86047

EXHIBIT
Smith No 4
Jeh 2/2/04

John Holmes, F.S.R.
Kaibab N.F.

RE: Brann T.S.
26 Jan. 1996

John,

I Will be the Purchaser Representative for this Sale. Loren Porter Will be my Alternate.

Tri Star Co. Will be the Logging Contractor with Steve Reidhead as Contractors Representative; Dean Reidhead Will be his Alternate.

We plan to begin Cutting in CU of PU 2 on 29 Jan. Skidding Will begin on 1 feb 96, With load and haul Commencing Week of 5th. We anticipate hauling 10-15 loads per day.

Road Construction for this Unit is Complete; for the Sale in general we do still have Some road work to accomplish - PU 1 and Some borrow in PU 3. At this Time it is Uncertain as to When we [illegible] ite that Work.

**PRECISION PINE & TIMBER, INC.**
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 535-9112 • FAX (602) 535-9196

P2

Road Maintanence will be as needed or required by Contract.

Brush disposal requirements will be kept as Current as possible for the Weather Conditions at the time.

Erosion Control and Seeding will be kept Current.

~~Truck Safety Signs will be placed~~ as indicated on haul route Map. Other locations for Safety Signs will be as Needed, or directed by T.S.A.

A Fire Plan for the Kaibab N.F. is in place.

A Haul Route Map is attached.

Also; Will you please grant P.P.&T. permission to operate outside the Normal Operating Season?

Sincerely,

John B. Smith
Purchaser Represe

**PRECISION PINE & TIMBER, INC.**
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 536-2181

Brann T.S.

P.S. for Prework Letter:

I will plan to sign for and receive Log Removal Ticket Books for Brann.

Dean Reidhead is authorized if Necessary.

Thank You,

John B. Smith
Pur. Rep.

PRECISION PINE & TIMBER, INC.
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 536-2181

P.O. DRAWER W WINSLOW, AZ 86047

EXHIBIT
Smith No 29
[illegible]

31 Oct 95

Al Schirman, TSA
Long Valley RD
Coconino N.F.

RE: Hutch BD

Al,

As we discussed at the Hutch BD Pre Work yesterday - PP&T does not have an outlet for pulpwood at this time. Jerry Zellner at Camp Verde has indicated that he would take the wood in the spring.

In terms of Hutch BD we plan to harvest Sawlogs only at this time concentrating on the Hutch side.

We anticipate entering the Hutch side, and the Boondock Side next Spring to harvest the pulpwood and Misc Sawlogs that will develope.

Thank You for your understanding on this Matter.

Sincerely,

R. B. Smith, Pur. Rep.

MUD 117 /18

PRECISION PINE & TIMBER, INC.
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 535-9112 • FAX (602) 535-9198

P.O. DRAWER W WINSLOW, AZ 86047

Richard Stevens, FSR.
Mormon Lake R.D.

12 July 96

RE: Mud M.P.

Dick,

After meeting with everyone today I can finally put together some semblance of an Operating Plan. As we discussed Warren Smith Contracting will start the P.C. work on Wednesday the 17th starting on Pl and working through 2, 3 and 4 if you can get 4 squared away for us. We had started logging on the State (Clark T.S.) and had to move to the Saddle Sale (11) today.



EXHIBIT
Smith no 46
Ant 2/17/04

MUD 668

Once TriStar has their feet on the ground on Saddle I will request permission and plan a Prework for Whd. I understand that we can work P.U. 1 without concern over the two small pieces of PC road which won't be used for PU1 anyway. Hopefully the road work will progress as planed so that we can proceed behind it with logging. We will plan to harvest Sawlogs 9"+ at this time.

Lewis and Lonnie have been in

MUD 669

contact with Stone. Stone has indicated that they will probably take our pulpwood sometime this fall. We would plan to begin the pulpwood harvest once that outlet is available. At this time I don't know if we would go tree length direct or bolts thru the reload in Flag.

At any rate it appears that we will have a) the logical outlet for our pulpwood.

I will prepare more detail on other items for the Logging Prework.

Sincerely,

Smith, Pur. Rep.

(Capitaken)