**PRECISION PINE & TIMBER, INC.**
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 535-9112 • FAX (602) 535-9196

P.O. DRAWER W WINSLOW, AZ 86047

21 Mar 96

Bob Leaverton, F.S.O.
Apache-Sitgreaves N.F.

Bob,

This is the time of year when I formulate my road construction and Logging Plans for the various Sales.

This year is easy:

St. Joe – plan to resume sometime within the first 2 weeks of April.

I will put together plans for the other Sales when "the" injunction is lifted.

Sincerely

John B. Smith
Pur Rep.

Copy to: Pa

EXHIBIT
Smith No 50
2/2/04

26 Sept 97

Lmnico

| | DBH | % clear faces | MBF vol. |
|---|---|---|---|
| Brann — | 12.2 | 9 | ~~588~~ 393 |
| Hatch Block — | 12.5 | .8 | ~~.073~~ 070 |
| Monument — | 11.5 | ~~0~~ | ~~731~~ 731 |
| Mud — | 11.6 | ~~0~~ | ~~0~~ ~~0~~ |
| Saginaw Kenn — | 11.6 | .6 | ~~1134~~ 1016 |
| vi-Bar — | 15.2 | 39.9 | 2.535 |
| Brookbank — | 12.6 | 22.9 | 1,~~356~~ 1288 |
| Jersey House — | 17.9 | 37.9 | ~~1559~~ 1596 |
| Manaco — | 12.9 | .7 | ENS. 1189 ~~1251~~ / NON ~~1251~~ 1189 |
| Salt — | 11.9 | 1.8 | 1000 ~~1070~~ / 1118 ~~1160~~ |
| Hay — | 17.1 | 20.6 | 3066 |
| JD — | 16.6 | 54.3 | 2475 |

John



mur 2056
rba 12/01

Lonnie — 25 Sept 97

Brookbank — Av DBH — 12.6"
Bid Price — $45.00/ccf
Bid Index — $229.00 WWPA-B

Jersey Horse — Av DBH — 17.9"
Bid Price — $184.90/ccf
Bid Index — $234.27 WWPA-C

Hay T.S. — * Av DBH — 17.2 | 17.6
Bid Price — PP $90.60/m | DF $36.09/m
Bid Index —
original $306.05 | $226.86
Modification $283.13 | $225.53

90 T.S. — Av DBH — 16.6" all species
Bid Price — PP $223.77/m | DF $40.45.03/m | $53.33
Bid Index — $328.44 | $252.70 | $252.75

* Joel Q is to call with the DBH on Hay.
J.

John

Mel,

I will be requesting various Contract Term Adjustments for Most of the Sales as time goes on.

J

I'll send you the info as I get them.

EXHIBIT

Smith no 58
12/17/04

United States Department of Agriculture
Forest Service

FS-2400-9 (3/69)

Contract No.
02-006577

Brann

# AGREEMENT TO MODIFY CONTRACT

(Timber Sale) (FSM 2430)

1. It is mutually agreed that the above designated timber sale contract, signed by Lorin D. Porter, President, Precision Pine & Timber, Inc., of Heber, AZ, herinafter called the purchaser and by David P. Harris (Name), Contracting Officer (Title) for the United States of America, as of the 29th day of September 1994 6/ as heretofore modified, be modified as follows:

1. Revise the termination date in AT16 to SEPTEMBER 22, 1999. (CTA per BT8.21- Stone's refusal to acccept pulp.)

2. Replace clause CT4.264# with revised version of same clause. Revised date for "Additional" periodic payment is now **JANUARY 10, 1999.**

Draw a diagonal line with pen and ink in unused portion of form.

2. Pursuant to this mutual agreement, the purchaser hereby agrees to cut and remove timber in strict accordance with all and singular the terms and provisions of the aforesaid contract as herein modified.

IN WITNESS WHEREOF, the parties hereto have executed this modification of contract as of the 1/ 30th day of September, 1998

UNITED STATES OF AMERICA

BY David P. Harris (Signature of approving officer) Contracting Officer (Title)

Two Witnesses: 2/

(Name of Witness)

(Address)

(Name of witness)

(Address)

Precision Pine & Timber, Inc. (Purchaser) 3/

BY [signature] (Purchaser)

P.O. Box 70 (Business Address)

Heber, AZ 85928 (Business Address)

I, 4/ Tonita Porter, certify that I am the Secretary of the corporation named as Purchaser herein; that Lorin D. Porter who signed this contract on behalf of Purchaser, was then President of said corporation; that said contract was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

Tonita Porter

CORPORATE SEAL 5/

1/ The date approving Forest officer signs this form.
2/ The signatures and address of two witnesses are required if sale is to other than a corporation.
3/ If contracting party is a co-partnership, the signatures should be: XYZ Company, by John Doe, a member of the firm. If contracting party is a corporation, form of signature should be: XYZ Company, by John Doe, President (or other officer or agent) and the seal of the corporation must be impressed or indicated.
4/ The certificate must be completed if the purchaser is a corporation.
5/ If the corporation has no corporate seal that fact shall be stated, in which case a scroll or adhesive seal shall follow the corporate name.
6/ Delete "as heretofore modified" if not applicable.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 98-720 C

(Filed January 30, 2004)

- - - - - - - - - - - - - - - - -x

PRECISION PINE & TIMBER, INC., :

Plaintiff, :

v. :

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - -x

Washington, D.C.

Tuesday, February 3, 2004

Deposition of LORIN D. PORTER, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Saltman & Stevens, P.C., 1801 K Street, N.W., Washington, D.C. 20006, at 9:05 a.m., Tuesday, February 3, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 22

look at the timber, my partner and I.

We became partners, 50 percent owners in the company, and we would generally look at the timber together, evaluate the timber, and make some decisions about what we felt like we could bid, and go from there.

Q. So would you go out to the sale and cruise the sale yourself to determine what you would do?

A. Every time.

Q. When did you stop doing the cruising yourself?

A. I never have.

Q. You still go out to the sales before you bid them?

A. I do absolutely. Absolutely.

Q. When you do that, what do you do?

A. You mean as far as cruising?

Q. Um-hm.

A. Try to see as much of the timber as you can. You try to check to -- you know, you're looking at several things.

You're looking not only at grade, you're looking at terrain.

You're looking at logging costs.

Page 23

You're trying to evaluate as much as you can about the value of the timber and the cost to get it to your mill and what it would cost to produce it.

You just -- and so you're trying to look at every bit of it that you can, you know.

We would walk sometimes. Sometimes I would run. Sometimes I'd ride a four-wheeler. Sometimes I'd ride a horse, you know, so just depending on the terrain and the timber, the terrain of the country and where the timber laid.

Q. And would you typically do the bidding on a sale if it was an auction sort of sale?

A. Pretty much; we would have the, either myself or my partner, and generally speaking, I would think that I was the one that actually did the bidding, and it wasn't just me. It was we were together on the thing.

Q. When did you start acquiring timber sales from the Forest Service?

A. You know, there's not many other places to get timber in Arizona.

There's like very, very little, comparatively speaking anyway, private property.

Page 24

I think in Arizona, it's something like 80, 83 percent of the land in Arizona is owned by the federal government or the state government or Indian tribes or something, so there's just not a whole lot of private land in there.

Q. So were most of the sales you were bidding on then Forest Service sales?

A. Yes, they were.

Q. Okay. Did you also become involved in the planning of the harvesting of the sales?

A. Oh, yeah.

Q. When did you start doing that?

A. From the very beginning, you know, knew what I needed to run through my mill, and I had a hands-on approach with it.

Q. How many employees did you start out with back in the, you know, early, mid or late '80s?

A. I think it was me and two other Navajos.

I don't know. We only had, when we first started, really it was myself and one or two other guys in the construction.

It was just my Dad, who basically

Page 25

worked for nothing, you know, and two other guys is basically what we used, and then as we got a little closer, we added three or four more people of expertise, and that helped us out a bunch.

Q. The mill that you were talking about that you built in Heber, is that the mill that you operated on through the '90s during the time of the suspension?

A. Yes, it is.

Q: How would you go about, how would you go about planning the harvesting of your sales?

A. Oh, you try to consider all the aspects and decide what's best, and at the same time, you're trying to make sure you fulfill your obligations to the Forest Service and get all their work done, so it's just a process.

I don't know there's any specific thing I could tell you. It's just a process that you go through and determine what's best.

Q. And during this time, were you also overseeing the mill operations at Precision Pine?

A. Yes. Yeah. It only --

MR. SALTMAN: Could I ask you to

Page 30

BY MR. HARRINGTON:
Q. What responsibilities did you personally have on the Forest Service contracts, timber sale contracts that you obtained?
A. Well, I signed the contracts, and so it was my responsibility to make sure the contracts were fulfilled, so that's, whatever that included is where I was.
Q. Did you start by doing all the communicating with the Forest Service and other responsibilities under the contracts yourself?
A. Pretty much, yes. Again, I had a partner in there, and he shared with me the responsibilities, especially in, in the actual -- oh, I don't know what you would call it -- the public relations with the Forest Service and that kind of thing. He was involved with a lot of that.
Q. What were Mr. Tenney's responsibilities as opposed to your own responsibilities?
MR. SALTMAN: As of what time might be useful.
BY MR. HARRINGTON:
Q. Well, let's start out at the

Page 31

beginning, and maybe you can tell me after that how they changed, if they changed?
A. From the very beginning, well, in the very beginning, Mr. Tenney not only had invested money and was part of our business as a, as a part owner, as a partner, but he also had his own business that had been an ongoing business, and so he was involved in both of those, but I can't -- but we were together in the business of Precision Pine & Timber.
As far as responsibilities, I had, I pretty much had the expertise in the sawmill and the logging and lumber end of it, and Lewis had had and has had experience in the transportation and that part of it, and so that's kind of how we split it up, and he also had experience in the by-products end of it.
Q. You said he had his own business. What business is that you're referring to?
A. L.N. Tenney, Junior & Company, and other businesses, and I'm not, I wasn't involved in his affairs. I don't know for sure.
I mean I know he was in the transportation business, and I'm not sure what other businesses.

Page 32

I know he had been in the hardware business and that kind of thing.
Q. Would that be transporting lumber or timber, or more generally?
A. Yeah, it was more generally I think. It wasn't isolated to just one thing.
Q. You said earlier you knew from experience what would come out of a tree.
What experience is that you're referring to, and how did you get this sort of knowledge?
A. Experience is my time in Chama, New Mexico, and my time managing the mills in Heber, and Snowflake was my father's company, and the time I spent with Evergreen, and also in my youth, that's, you know, that's where I worked.
That was my summer jobs and that was my, my father's life, and I spent a lot of time with him and learned from his experience, and so all those things, just being there, and I spent time in the woods with my Dad.
I'd seen the trees. I knew where they came from. I heard him talk of it. I'd seen them cut in mills, and so yeah, it was just a lifetime of experience.

Page 33

Q. So it was from your experience as opposed to some formal education that you had?
A. Yeah, in relation to -- I'm not sure there is formal education, the sum of that, you know.
Q. Changing the subject a little bit, can you tell me what you did to prepare for your deposition here today?
A. Well, we looked, just looked over some things, kind of refreshed, trying to refresh our memories on the history of what's happened.
A limit of water's gone under the bridge, you know, so yeah, just mainly trying to review and go over some things that brought back some of our memories, you know.
Q. What sort of things did you go over?
MR. SALTMAN: I'm going to object to the extent that your answer relates to discussions that you had with counsel.
Those are attorney-client privileged, and I would direct you not to answer, but with regard to anything else that was responsive to Mr. Harrington's question, you're free to answer.
THE WITNESS: I'll need you to repeat

Page 50

Q. You said that the Forest Service was the main source of timber for Precision Pine, is that right?
A. Yes. Yes. Absolutely.
Q. In 1990, about what portion of Precision Pine's timber was from Forest Service sales?
A. In 1990?
Q. (Indicated "yes.")
A. Oh, I -- that would be a guess. You know, that would be just -- I can't tell you.
Q. Would it have been more than half?
A. I'm sure it would have been more than half.
Q. Would it have been more than three quarters?
A. I'm sure it'd be more than three quarters, but you know, it's going to be up there.
I don't know, I don't know what from there, but it's going up there.
Q. Something over three quarters then?
A. Oh, yeah.
Q. In 1994 and 1995, was it a similar percentage to what it had been in 1990?

Page 51

A. I think so.
Q. You said earlier that you also would get timber from the state or from tribal lands and to a limited extent, from private lands.
Was there any difference in the quality depending on the source where you were getting it?
A. I can't remember if I said that or not.
I said that there was, there was -- much of Arizona was, was, was federal lands, and the rest of it was either state or Indian lands, and that kind of thing, but I don't remember saying whether we bought any there or not.
Q. Well, let me ask that then. Did you buy from the state or from Indian tribes?
A. In what period of time?
Q. In the 1990s, first half of the 1990s.
A. First half of the 1990s, I'm sure we probably did.
Q. Was there any difference in the quality of the timber that you got from the state as opposed to the Forest Service?
A. You know, if you had, if you, it seems to me if you had state land and forest land that

Page 52

were right close together, there'd be very little difference in the kind of timber you would get from one or the other, and I don't remember there being a significant difference in the timber as long as you're talking about the same basic area that timber came from, you know.
There were lot of different areas that timber could come from I think from the state or from the, from the government as far as terrain and that type of thing.
Q. Did you notice any difference between state lands generally and Forest Service lands generally?
A. I didn't, not me.
Q. How about Forest Service lands and tribal lands?
A. You know, it didn't seem to me to be a lot of difference.
I mean you're talking about a place where Ponderosa Pine would grow, and then you have the different locations there, and so it just depended.
Q. When did Precision Pine get its second and then its -- get its second mill?
A. Man, I have a hard time remembering.

Page 53

There was a, there was a very small operator right close to Heber that offered to sell us his mill, and I would have to go back to the documents to know the time.
It was late, seemed like it was late in the '80s to me.
Q. When you got that mill, did you operate that mill?
A. Yes, we did. Yes, we did. We operated it for a substantial length of time, yes, a couple of years, two or three years.
Q. That wouldn't have been one of the mills that was operating at the time of the Mexican Owl suspension, though, is that right?
A. Oh, I can't remember. Again, I don't know what the owl was, when -- the suspension, you're talking about actual suspension in '95?
Q. The actual suspension in '95.
A. I don't think that mill was operating in '95.
We had combined that I think with our Heber operations at that time.
Q. When did -- is it correct that the mills that you had in operation at the time that the Forest Service contracts were suspended as a

Page 78

A. Ask that again. Is there any reason to think this is something that I did not prepare?
Q. That's correct.
A. I'll just tell you, it's hard to tell. I may have, but I don't have any recollection.
I don't have any recollection of this letter.
Q. Do you have any recollection of what this letter discusses?
A. Let me take a minute and read it over entirely.
(The witness reviewed the document.)
MR. SALTMAN: I think that is excluding the handwriting of Mr. Harrington.
THE WITNESS: Yes.
BY MR. HARRINGTON:
Q. Yes. For purposes of all of the questions, please disregard that.
(The witness reviewed the document.)
THE WITNESS: You know, just the -- there's some things that are odd about this letter.
For example, there is, in the second paragraph, there's a portion of it that is

Page 79

capital letters.
You know, it seems weird that you'd have capital letters right in the middle of a paragraph there, and it doesn't seem like it has anything to do with emphasis or --
BY MR. HARRINGTON:
Q. What are you referring to?
A. It looks like to me right where it says we did not have an outlet, as we did not have an outlet for, and then it looks like to me it goes back to the smaller letters, but maybe I'm seeing that wrong.
Maybe the spaces are different, or I don't know if that's just a computer thing, or -- but it just looks a little different to me.
Q. May I see your copy of the exhibit?
A. Sure.
Q. I don't see it on mine.
A. It seems like it's spaced out. Doesn't it look funny?
It does to me. It looks like that's almost like it's highlighted or out, exaggerated there somehow, but anyway.
MR. HARRINGTON: This document was

Page 80

produced from Precision Pine's files, and I believe Mr. Saltman will stipulate to that.
Is that --
MR. SALTMAN: I don't know. I have no reason to doubt your word, though.
MR. HARRINGTON: I will represent that it was.
THE WITNESS: Okay.
BY MR. HARRINGTON:
Q. If this was in Precision Pine's piles, files --
MR. SALTMAN: Or piles!
MR. HARRINGTON: I will try again.
THE WITNESS: You got that right!
BY MR. HARRINGTON:
Q. If this were in Precision Pine's files, would you have any reason to believe that it was not something that had been drafted by Precision Pine?
A. If it was in Precision Pine's files, more than likely, someone in our organization drafted this letter.
Q. Can you think of anyone other than you who would have drafted this letter?
A. Yeah.

Page 81

MR. SALTMAN: I think that's been asked and answered, but answer it again.
THE WITNESS: Yeah, I can think of others that might have drafted it.
Lewis Tenney would be one. Could have been my wife I guess.
I don't know. She sometimes does some letters for me.
Q. Looking at the language of the letter, it says in the second paragraph, well, perhaps you could read into the record the second paragraph of the letter?
A. We began harvesting, harvesting this sale in January -- I'm sorry. We began harvest of this sale.
I'm sorry. I get accused of that when I read that I slur my words together.
We began harvest of this sale in January of 1996. We harvested the sawlog component only -- see, that's, it just looks like all this is in capital letters. It's just odd.
I don't see any -- we harvested the sawlog component only, comma, as we did not have an outlet for the 5 inch to 8.9 inch DBH

Page 82

pulpwood component, period.
Q. Do you know if that was accurate?
A. There were times on this sale and others that we may not have had an outlet for the 5 inch, 8.9 DBH pulpwood on a, on a component of the timber sale.
I do not know if it's accurate that the sawlog component that we went in was only, was only sawlogs.
It sounds very unlikely to me that it would have been a unit that was only sawlogs.
Generally speaking, if it was a, a multiproduct sale, there were multiproducts on all the units.
Q. Would it be possible that you only harvested the sawlogs on a unit and did not harvest the pulpwood part of that unit?
A. I suppose it's possible that we would do that.
Generally speaking, you don't do that. Your sawyers are already in there, and so you might as well cut the trees and take care of the of the 5 to 8.9 inch component at the same time.
Q. Isn't this what, isn't that what the second sentence says, that you harvested the

Page 83

sawlog component only and did not harvest the pulpwood component of the sale?
A. That's what it says. That's what it says.
That's why I can't imagine this letter being, being anything that was worth anything to anybody because it's not, doesn't act like it's very accurate to me.
Q. If you had written this letter, would you have tried to make it accurate as you were writing it?
A. I would think so.
Q. So you wouldn't deliberately writing a letter like this with false information in it?
A. Oh, no. I mean, you know, in a draft of a letter, regardless of who put it together, you know, I don't how many times I go back and change letters.
There's times you go back and say hey, I didn't really mean to say that, I meant to say something different, you know, and that so you add something or you delete something from the letter as long as it's a draft.
You know, you're trying to get the thing refined before you, before you mail the

Page 84

final copy.
Q. But even in putting together a draft, you'd try to make the draft accurate, wouldn't you?
A. Oh, yeah, as accurate as possible. You may have, you know, left something out or added something you didn't intend to, or it was inaccurate.
You know, you may go back and look and say that's not really right.
Q. Do you know if this letter was sent to Milo Larson of the Forest Service?
MR. SALTMAN: It was asked and answered, but feel free to answer.
THE WITNESS: This letter right here would not have been mailed to Milo Larson. I'm just almost sure of that.
Just the way it's written, and there's no signature on it, it would not have been, no.
BY MR. HARRINGTON:
Q. Is it possible that a letter -- withdraw that.
Looking further down in this letter, it describes an incident.
Do you remember this incident? I'm

Page 85

looking at the third, fourth, fifth and sixth paragraphs of the letter.
A. Interesting, that third paragraph almost contradicts the second paragraph.
If there had been no harvesting of the pulpwood in that component, then why would we have had a company interested in harvesting the pulpwood?
That's why I say this letter just does not make any sense to me.
"Two days into the haul the pulpwood operation was forced to cease because Stone Container did not want the wood."
Q. Do you have any recollection of what is described in the third, fourth, fifth and sixth paragraphs occurring?
A. Let me go through those again.
(The witness reviewed the document.)
THE WITNESS: "We assumed that someone at Stone realized that wood was from a Precision Pine & Timber, Inc. sale, Brann, and that they would not accept..." -- see, it's just not put together like a letter, and I guess the question is do I, do I remember something like this?
BY MR. HARRINGTON:

relation to this, and that would not have been uncommon for John to write a letter, you know, to get an indication of from the Forest Service about how they felt about a certain thing or to get some information, which that's what it looks like to me.

John was trying to get some information about what it would cost for surface, surface replacement requirements.

And then he's got four. I don't know what that means at the end of that.

There's no signature and no anything on this letter.

Whether this was actually sent, I don't know.

(Porter Exhibit No. 11 was marked for identification.)

BY MR. HARRINGTON:

Q. I have marked as Porter Exhibit 11 a January 22, 1997 letter from John B. Smith to various interested parties.

If you would look on the second page of this exhibit, Mr. Porter, it has a logging schedule for 1997.



The full title is estimated logging schedule for 1997.

(The witness reviewed the document.)

BY MR. HARRINGTON:

Q. Would you have discussed this schedule with Mr. Smith before he sent a letter like this out?

A. Probably not.

Q. Would you have received a copy of this letter?

A. I doubt it. I don't know. It was a standard practice at the beginning of the year for us to, in fact I think it's a contract requirement for us to put out some kind of a schedule that tells the Forest Service our, our approximate intentions and kind of the direction we would like to move -- not necessarily like to, but what we might move, the way we might go with this timber, and Mr. Smith was pretty much independent on this. He would just do that.

I didn't have to worry about it. He would not contact me about what, what he put in these things. I wouldn't even have any idea.

Q. Who made the decision about when Precision Pine would harvest a particular



contract?

A. That was pretty much my decision. I would discuss it with my partner a lot of times, and sometimes I wouldn't, because he was busy with other things on his agenda, but the responsibility for that pretty much fell on me at all times.

Q. What basis did Mr. Smith have for telling the Forest Service that this was the estimated logging schedule in 1997?

MR. SALTMAN: Objection. I think that calls for speculation.

To the extent you know, go ahead and answer it.

THE WITNESS: I was going to say the same thing.

I would be speculating as to what John was thinking here.

You know, he had copies of the contracts and knew he had to have this requirement to them, and he put it together as he, as he saw fit without my input.

BY MR. HARRINGTON:

Q. How did you go about deciding which contracts would be harvested at which times?



A. It was a process, you know, of just all kinds of things relative to the needs of the mill, the conditions of the woods, the weather, the time of year.

All kinds of things came into play when you were deciding when to harvest a timber sale contract, and of course you would try to do it to maximize the benefit to your company.

Q. When would you make the decision about what contracts to harvest in the course of the cutting season?

A. When? Let's see. If I understand what you're saying, you're asking me when I decided to go on which timber sale?

Q. Yes.

A. It was generally something that, that I decided spontaneously.

It would be something that after looking at the information and also seeing where we were on a particular sale, what closing point, I may talk to the logger and say how close are you to finishing your unit on such and such sale, and could you move, could you move over to this other sale and bring that to us? We need to get some volume off of that.

THE WITNESS: Long-term plans, the contracts are, many of them were different contracts.
You know, they had three-year contracts.
There were some very small sales that may have a one-year contract or termination date.
Some of them were five, eight, and so sure, you had long-term plans, you know, that nothing, nothing specific, nothing you knew that you were absolutely going to do except you did know that you had to try and plan that thing to get it completed in the time that of the contract, and to maximize the benefit to your company.
BY MR. HARRINGTON:
Q. Were the long-term plans as you described them ever put down in writing?
A. Not to my knowledge, other than, you know, when you made your original plan with the Forest Service in order to, to qualify for the award -- you were already awarded it, but to comply with the contract, that operating plan that they asked for, sure, we put that down



every time, you know, just a basic idea of, you know, we would finish the sale before it terminated.
Q. And that plan as you described it earlier, is that what you were, when you described that earlier, is that what you were talking about when you said we're just going to finish the sale up?
A. Yeah. Basically, it's the idea that we're going to get this done, we will operate within the bounds of your contract and get it done.
Q. In your view, you didn't need to provide any additional information to the Forest Service?
A. No. No. We were never required to, requested to, that I'm aware of it anyway.
Q. We talked about the logging schedule for 1997 that Mr. Smith had put together.
A. This is Exhibit 11 again?
Q. That's right.
A. Okay.
Q. Was the same process used in other years, say in 1994 and 1995, 1996?
A. As far as Mr. Smith? You know, if you



notice on here, I don't think Mr. Smith is listing any of the sales that we would consider to be on the Eagar side.
I don't see Hay or the O.D. or those kind of sales on the Eagar side that are included in this plan, so this would be a partial plan.
To be honest with you, I don't know that there was ever a plan submitted.
I shouldn't say ever -- if there was a plan submitted in the years you're talking about here on that Eagar side, and I don't know that the Forest Service ever wrote us a letter requesting that, or excuse me -- asking us for that plan.
I don't know.
Q. On the Heber and Winslow side of things, was this the process that was used in other years?
Mr. Smith would send a letter in?
A. I would sure believe so.
Q. And was it the same in other years that he did not consult with you before sending this letter in?
A. That's true.



Q. So the same process was used at least as to the Heber and Winslow site?
A. The ones that John felt responsibility for, yes.
Q. Were you aware before the injunction and suspension occurred on August 25th, 1995, that the sales were likely to be suspended?
A. Absolutely not. Absolutely not. I did not have any idea.
Q. Do you know if, if anyone else at Precision Pine knew that a suspension of sales was likely going to occur?
A. You know, I can't answer that. I don't know what they, what they knew.
Q. Do you know if the company took any steps before the suspension in the expectation that its contracts were going to be suspended?
A. I don't remember any particular steps that we would have taken.
I don't know what you refer to there.
Q. Did you, did you change your harvesting practices at all in the summer of 1995 as a result of the likely suspension?
MR. SALTMAN: Objection. He has already testified he didn't know suspension was

adjustments?
A. It's something I could have been, not specifically as far as the dates on this.
It could have been something that Mr. Smith decided to do on his own as well, and I might mention that simply because you request something doesn't mean that's what happened.
It doesn't mean that even these dates and days are correct as far as the -- some of that could have been just partial closures or something.
I don't know. There's a lot different fire schedules.
Q. Do you know if Precision Pine requested a contract term adjustment as a result of the Mexican Spotted Owl suspension?
A. If it requested a contract term adjustment because of the suspension?
Q. Yes.
A. I believe we did. I would just have to say we probably did, yes.
Q. Do you believe you did on all of the contracts that were suspended?
A. I would have to look at all of them, but I mean it just stands to reason that yeah,



we would have.
Q. Do you have any recollection as to whether or not a contract term adjustment was granted based on the suspension?
A. Without looking at them individually, I don't know, but you know, it makes sense that they would as well, but --
Q. Do you believe that it probably was, but you would like to look at the record?
Is that what you're saying?
A. Yes, that's right.
Q. Okay.
(Porter Exhibit No. 16 was marked for identification.)
BY MR. HARRINGTON:
Q. Let's go ahead and look over this document that I have marked as Exhibit 16.
It's a letter from Billy R. Caskey, forester, to Mr. Walter Thole at the Eagar ranger district.
MR. SALTMAN: Let the record reflect it is an undated document.
(The witness reviewed the document.)
BY MR. HARRINGTON:



Q. Have you had a chance to take a look at the document?
A. Well, you know, just, you know, reading through it.
MR. SALTMAN: Have you read through it completely?
THE WITNESS: No, I haven't. I don't know if you want me to read every word.
It will take me a little while.
BY MR. HARRINGTON:
Q. You can feel free to read as much as you want.
I'm going to be asking mainly about some passages on the second page.
A. All right. I'm going to read the second page in context.
MR. SALTMAN: I would ask you to read the whole document and put it in context.
(The witness reviewed the document.)
THE WITNESS: You should have given it to me to take to lunch and read it while I was there!
(The witness reviewed the document.)
BY MR. HARRINGTON:
Q. Mr. Porter, the letter on the third



page is signed by Billy R. Caskey?
A. Yes.
Q. Was he working as a forester for Precision Pine?
MR. SALTMAN: When?
MR. HARRINGTON: In writing this letter.
THE WITNESS: You know, it's on our letterhead. It's on Precision Pine's letterhead.
That's the only indication that I would have that he was working for us.
I don't know a date.
BY MR. HARRINGTON:
Q. You testified earlier that he was a Precision Pine employee, is that correct?
A. Yes.
Q. And so based on the fact that he was a Precision Pine employee, and this letter is on Precision Pine letterhead, do you believe he was writing this on behalf of Precision Pine?
A. Without having a date on this thing, I mean this could have been written after his employment and after he stopped.
I don't know. I just don't know when

Page 250

here, it would be material from a pile that had run through a screen, some sizing screen, something like that.
Q. Who is Western Organics?
A. Western Organics is a company that specializes in by-products.
Actually it's not just by-products. They specialize in, as far as I know, soil amendments, fertilizers, you know, decorative bark, colored chips.
I mean, I don't know what all they do. I think they have colored rock, and I mean I don't know for sure, but it's just a, it's a bunch of stuff that deals with landscaping and organics.
Q. And you were selling some land to them along with the by-product that was there with the land?
A. At least that's what was proposed by this letter; I don't remember whether we actually sold them land or not over there.
Q. Did you work with TriStar Logging as your timber harvesting contractor?
A. They were one of the harvesting contractors, yes.

Page 251

Q. In the 1993, '94 and '95, '96 timeframe, were they your principal harvesting contractor?
A. Define principal, please. You mean over 50 percent, or almost all, or what do you mean by that?
Q. Were they doing more than 50 percent of your harvesting work?
A. I would think they were doing more than 50 percent.
Q. About how much of your harvesting work would you say they were doing during that time?
A. I would say two thirds to three quarters, something like that, and on the, what we call the Winslow/Heber side, they were doing most of it or just about all of it.
On the Eagar side, not much.
Q. Who was doing most of the harvesting on the Eagar side?
A. In that timeframe, somewhere around the '93, '94, '95 area, it was, I believe it was called Timber Industries, Dan Ramsey? Dan? I can't remember the first name.
It was Ramsey.
Q. And that contractor was doing most of

Page 252

your harvesting on the contracts that went to the Eagar Mill then?
At that time, yes.
Q. Did that change after the '93, '94, '95 time period?
A. It seems after the suspension, I don't remember the exact details, but the way I remember it, Ramsey decided to do something else.
I don't remember if he sold his equipment or if he just decided to go to work somewhere else or what happened, but it seemed to me like there was a change after that, after the suspensions.
Q. When you say the suspensions, are you talking about more than just the 1995, '96 Mexican Spotted Owl suspension?
A. I'm talking about, yeah, from whenever it was in August of '95 clear through when we could log again after the Forest Guardians suspension because we didn't, we virtually couldn't do much logging during that whole time.
Q. Did you have any agreement with Mr. Reidhead regarding what you would contract with him to do?

Page 253

A. Of course, we had agreements.
Q. Was it on a contract-by-contract basis, or was it on a different basis?
A. When you say contract-by-contract, are you talking about a contract with TriStar?
Are you talking about a contract with the Forest Service?
Q. Was it on a timber-sale-contract-by-timber-sale-contract basis?
A. Generally speaking, generally speaking, we worked by timber sale in our agreements.
Q. Who decided who was going to be the harvester on a given timber sale contract?
A. Mainly me. Lewis and I would consult over that, but I would have the final decision.
Q. How did you decide who you were going to hire for any given contract sale?
MR. SALTMAN: For a given timber sale you mean?
MR. HARRINGTON: For any given timber sale.
THE WITNESS: How would we decide? Many times we would ask, you know, ask to get,