IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 98-720 C

(Filed January 30, 2004)

\- - - - - - - - - - - - - - - - -x

PRECISION PINE & TIMBER, INC., :

Plaintiff, :

v. :

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - - -x

Washington, D.C.

Wednesday, February 4, 2004

Continued deposition of LORIN D. PORTER, a witness herein, recalled for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness having been duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Saltman & Stevens, P.C., 1801 K Street, N.W., Washington, D.C. 20006, at 9:07 a.m., Wednesday, February 4, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 308

A. You know, again, I would have to look at some information to know where we were there and what we were planning on doing, and again, that would, just, I just know that it would have depended on, on the circumstances, on what was going on at the time.
Q. What information would you look at to figure that out?
MR. SALTMAN: Objection -- asked and answered, but you're free to answer.
THE WITNESS: You know, weather conditions, the proximity of the timber to the mill, the market conditions, the mix of timber -- you know, those, the same kinds of things is what I would have been considering at that time as I would have at any other time in the contracts.
BY MR. HARRINGTON:
Q. You said you would look at documents to figure out what you were anticipating harvesting in September 1995?
MR. SALTMAN: Objection. I don't think that's what he testified to.
BY MR. HARRINGTON:
Q. Okay. What contracts did you

Page 309

anticipate harvesting in September 1995?
MR. SALTMAN: Objection -- asked and answered.
You're free to answer.
THE WITNESS: I would have to go back and see what we were operating on.
What we were operating on in August was evidently something we decided, and we could have had plans in place to harvest, you know, we could moved the next week or whatever on to something else.
We may have been in the process of moving them.
I mean I can't remember that part of it.
Q. Do you know if you were in the process of moving?
A. I can't remember; just too far away.
Q. Are there any documents you could look at to determine if you were planning to move from contract to contract at that time?
A. Not that I'm aware of. It would have been something we would have done pretty much verbally.
Q. Did you have any long-term plans in

Page 310

place as of the time of the suspension about what kind of harvesting you were going to be doing?
A. Plans? I believe those decisions were being made, in fact I know those decisions were being made as, as a needed basis.
You know, as we examined the situations and the various contracts, we would say we feel like we need to move here, we feel like we need to move here, and at the same time, trying to fulfill the obligations that we had with, with the contract.
Q. So as time moved forward, you would have then been making decisions about changes in the harvesting that you wanted to make?
A. As a general statement, that's the way it worked.
As time moved forward, that's what you did, as long as everything was available to you, you know.
Of course, with the suspension, you're just, all of a sudden, you don't have a choice.
Q. Can you tell me what harvesting you would have done on the contracts if there had been no suspension?

Page 311

A. I can tell you this. I had sawmills that had a certain capacity that I had to bring that amount of logs into that mill to keep it running plus what I had to bring in for building log decks and preparing for the future at that mill, keeping it running, and that's what we would have done.
To know exactly which sale, it would had to been done on a, you know, as time went by and you saw what was actually happening at that time, you would have made a decision.
Q. But I'm asking what you can tell me here today.
What can you tell me here today about what contracts would have been harvested if there had been no suspension?
MR. SALTMAN: Do you have a document to refresh his recollection?
THE WITNESS: Which contracts would we have harvested -- I can, all I can tell you about that is we would have harvested what contracts needed to be harvested under the circumstances and the decisions that we made on an ongoing basis.
It's very difficult to take a period

Page 436

Q. Do you know if any increase in prices was caused by the suspension?
A. Absolutely. Absolutely. As far as our costs, absolutely; our costs increased during that period of the suspension, and --
Q. I'm thinking what -- was the price that TriStar charged you affected by the suspension for logging operations?
A. Without looking at the numbers, I can't honestly answer that.
Q. You just know that there was an increase in price after the suspension?
A. Right. And I just know that, and I'm not sure why, but there was a definite increase in costs.
Maybe it was so many people that felt like they were out of the business in the logging.
I'm not sure what it was, but --
Q. Did you negotiate prices for harvesting on the contract-by-contract basis?
A. Again --
MR. SALTMAN: Objection -- asked and answered.
THE WITNESS: Generally speaking, yes.

Page 437

BY MR. HARRINGTON:
Q. Did you negotiate those prices with TriStar if TriStar was your logger?
A. Um-hm.
MR. SALTMAN: Objection -- asked and answered.
You can answer. Let me get my objection in before you answer.
BY MR. HARRINGTON:
Q. What things were considered in setting the price that you were willing to pay TriStar for its harvesting operations?
A. Boy, a myriad of things -- you know, the distance, the type of timber, the quality of the roads, the, you know -- there were just a lot of things considered in determining the price.
And even Mr. Reidhead had his ideas, and I had my ideas, and we both would bring those out and would come to an agreement.
Q. So it was a back and forth between the two of you?
A. It was a back and forth thing.
Q. Did you have any contracts in place at the time of the suspension where he subsequently

Page 438

asked you to raise the price on the contract after the suspension?
A. I believe so, yes.
Q. Do you know what contracts those were?
A. I don't.
Q. Do you know if you agreed to raise the price?
A. I'm sure there was some, some, you know, we worked back and forth there, yes.
I'm sure I raised the price of some of them.
Q. Is one aspect of the damages you're asking for lost profits on the suspended contracts?
MR. SALTMAN: We'll stipulate he is asking for lost profits on the suspended contracts.
BY MR. HARRINGTON:
Q. If the price of, the sale price for your lumber products had gone up substantially after the suspension, would you have lost profits then?
A. Absolutely. Absolutely. You never get back the time that you lost.
There is no way that you're ever going

Page 439

to recover that amount of time that you were, you were withheld from.
Q. Was the volume of timber put up for sale by the Forest Service after the suspension as high as it had been before the suspension?
A. I can't remember exact numbers. In relation to what their, you know, what their program was after and what their program was before, it seemed like to me that it had been declining, but I can't remember from one, one point to the other.
Q. You had talked about price increases by Mr. Reidhead after the suspension.
Do you know what the basis for his request to change the contract price would have been?
A. Without going, you know -- I mean it's hard for me to remember that far back and those conversations.
I do not, I do not remember specific, his specific reasons.
(There was a pause in the proceedings.)
BY MR. HARRINGTON:
Q. Did you make an attempt to obtain

PRECISION PINE & TIMBER, INC., )
)
Plaintiff, )
)
v. )
)
THE UNITED STATES, )
)
Defendant. )
)

DEPOSITION OF LORIN PORTER

Overgaard, Arizona
February 11, 2004
2:30 p.m.

Prepared for: The Court (Original)

Prepared by: Bonnie Ponce, Certified Court Reporter No. 50669

Page 18

whatever timber we had available, we were aware of it.
Q. Given that you only had a little bit more than a year of timber available, was Precision Pine planning to take any action with respect to its operations?
A. We were being told by the Forest Service that they were offering timber and that it would be continued to be offered, and we were receiving one-year tentative and six-month firm projections that looked like we had the opportunity to buy timber all the way into the future.
Q. What volume of timber was the Forest Service planning to put up for sale in 1996?
A. Without looking at some documents, I couldn't tell you. But I know I wasn't worried about it at that point as far as keeping our mills running.
Q. So you had no plans to close any of your mills at that time?
A. No.
Q. And you weren't considering doing so?
A. No.
Q. Did you have any plan to cut back on your harvesting operations so the timber would last you

Page 19

longer?
A. No.
Q. At your deposition last week we looked at an exhibit that was numbered Porter Exhibit 52. I'm handing you a copy of that exhibit.
A. Uh-huh.
Q. Do you know who was involved in preparing this document?
MR. SALTMAN: Objection. I believe that was asked and answered.
THE WITNESS: Initially I was involved, along with my counsel here.
Q. BY MR. HARRINGTON: When you say "initially," what --
A. This particular document or when we put the claim together?
Q. This particular document.
A. This particular document, I was involved in it, as well as the counsel here. They sent to me information. I sent them information back, and we came up with this. And I believe there -- it was just mainly involved with them and me.
Q. When was it that you worked on putting this document together?
A. This particular document -- specific date

Page 20

I can't tell you, but I can tell you it was months ago. I don't remember.
Q. Was it within the last year?
A. I believe so, yes.
Q. Aside from counsel, did anyone assist in the preparation of this document?
MR. SALTMAN: Objection. I believe that was asked and answered at the first deposition.
THE WITNESS: I can't remember if it was asked or answered, but I can tell you that I believe there was an expert involved with counsel on that, and I spoke with him with the counsel.
Q. BY MR. HARRINGTON: What was said to the expert?
A. What was said to him?
Q. Yes.
A. We talked about the document and how it was prepared, and I don't remember any specifics. I just remember generalities.
Q. What do you remember the expert asking you?
A. I don't remember any specific questions. I just remember we talked about the documents and tried to determine whether they were feasible, factual, something that was correct, and I was going

Page 21

over it, and had gone over it prior, so I don't remember specific questions that he asked.
Q. Do you remember generally what was discussed?
A. Just what I told you.
Q. Did you consult any documents in preparing this?
MR. SALTMAN: You mean Exhibit 52?
MR. HARRINGTON: Exhibit 52.
THE WITNESS: I considered the original documents that we submitted.
Q. BY MR. HARRINGTON: What original documents are you referring to?
A. The original claim documents.
Q. The original claims that you submitted to the Forest Service contracting officers?
A. Uh-huh, I believe so.
Q. Did you make any changes to any schedules that you had submitted to the contracting officers?
A. Yes, we did.
Q. What were those changes?
A. The changes that are indicated on this form.
Q. When you --
A. We had taken a fairly simplistic approach

Page 22

in the beginning of this thing, and after reviewing it and going over it, I felt like this was probably more like it ought to be.
Q. Who proposed making the changes?
MR. SALTMAN: Objection to the extent that it came from counsel, I would ask you not to answer, but...
MR. HARRINGTON: To the extent that the expert was involved in the discussions, however, they would not be privileged.
THE WITNESS: The only time I talked to the expert was when counsel was on the line with us.
Q. BY MR. HARRINGTON: You can tell me about conversations with the expert. I think Mr. Saltman will agree with that.
A. The expert asked me about, "You submitted this originally," and we just talked about the way I remember it, the generalities of the way it went and how it would flow.
I think his idea was more from what we had produced during this period of time, and originally when I set it up, it was straight out as if we had not had anything.
MR. SALTMAN: Are you thinking about the right document?

Page 23

THE WITNESS: I think so.
MR. SALTMAN: Take a look at this document.
MR. HARRINGTON: Please let Mr. Porter go ahead and answer the question.
THE WITNESS: I think that's what happened here, the way I remember it. This document is a schedule of the wood that had been cut had there been no injunction.
Q. BY MR. HARRINGTON: What was the suggestion to changes to your original schedule that was made?
A. Just to make it more accurate.
Q. And how was it proposed that you make it more accurate?
A. We talked about a lot of things, production, capacities, you know, just those kinds of things, things that would deal with this type of document, and, you know...
Q. Who raised the issue of production capacities; was it you or the expert?
A. I don't remember.
Q. Was it counsel?
A. I don't remember that either.
Q. Was it your idea to make changes to the

Page 24

schedule that you had presented to the Forest Service?
A. Yeah, it was.
Q. So did you contact -- did you initiate these changes?
A. I didn't initiate them. It was with this expert, and counsel was on the phone when we were there, but I reviewed it, and I believe it was more accurate.
Q. Had you proposed making any changes to the schedule before the expert you are referring to became involved?
MR. SALTMAN: What schedule are you referring to?
MR. HARRINGTON: The harvest schedule.
THE WITNESS: I don't know that I can answer in relation to my counsel. I can just tell you I had talked to them about thinking there needed to be some different --
MR. SALTMAN: I caution you, any discussions that are just between you and counsel are privileged, and you don't have to answer them.
THE WITNESS: That was my doing, not theirs.
Q. BY MR. HARRINGTON: Is the expert you are

Page 25

referring to Mr. Ness?
A. I believe so, yes.
Q. Did you come up with the mix of products that are used in Precision Pine's lost profit claim?
MR. SALTMAN: Objection; asked and answered.
You are free to answer that, if you understand the question.
THE WITNESS: The original claims?
Q. BY MR. HARRINGTON: In the claim as it now stands.
A. In the claim as it now stands. And your question is was I involved?
Q. Yes. In developing the mix of products that Precision Pine alleges it would have made from the various timber sale contracts.
A. Oh, yeah.
Q. Did you come up with the mix that is currently used in Precision Pine's claim?
MR. SALTMAN: Objection; asked and answered.
THE WITNESS: Did I come up with the actual mix of products that were going to be produced?
Q. BY MR. HARRINGTON: Yes.

Page 26

A. I believe so, yes.
Q. How did you derive the mix of products that Precision Pine claims it would have produced from the suspended contracts?
MR. SALTMAN: Objection; asked and answered.
THE WITNESS: How did I come up with the list of products? I think I explained that in Washington, D.C., and that is the same thing we used.
Q. BY MR. HARRINGTON: Is the methodology that you used to come up with the mix of products a methodology that is recognized by the industry?
A. I don't know what is recognized by the industry in that regard. I can tell you that I believe I knew what we were cutting and making from the types of logs we had under contract.
Q. Did you consult any textbooks or studies in coming up with the methodology you used?
A. Just the studies we made ourselves. But as far as textbooks, I don't know if there are any textbooks that can tell you what you're going to get from a specific sale and log and area.
Q. Did you talk to anyone else in coming up with the mix of products that Precision Pine claims

Page 27

it would have derived from the timber sales?
A. Not that I'm aware of, other than reviewing it with counsel.
(Deposition Exhibit Number 54 was marked for identification.)
Q. BY MR. HARRINGTON: Marked as Porter Exhibit 54, a series of Precision Pine & Timber profit projections dated July 17th, 1995 --
MR. SALTMAN: For the record, they're not labeled as profit projections. They may be. I don't know. I don't know how many pages we have. I'd like to count them and put that on the record, though.
MR. HARRINGTON: That will be marked and included with the record, but feel free.
MR. SALTMAN: These are 25 unnumbered pages. All appear to be dated on July 17, 1995, and I believe that there is one for -- well, looks like for most of the sales there are only one and -- most, but not all of them, are Forest Service sales.
Q. BY MR. HARRINGTON: Mr. Porter, are each of these sheets in the format of the profit projection that we discussed earlier?
A. Yes, they are. I think they're labeled a little differently, but I think they would have --

Page 28

I'm almost sure they came from my computer.
Q. Would you have developed these profit projections?
A. Yes.
Q. And is it accurate to refer to these as profit projections?
A. I think so.
Q. Do any of these profit projections have an entry on them projecting profits for roundwood or pulpwood?
A. I doubt it. I didn't look on each one of them. I didn't ever have that on my form. I'm sure these are the ones I prepared for Mr. Tenney.
(Deposition Exhibit Number 55 was marked for identification.)
Q. BY MR. HARRINGTON: I've marked as Plaintiff's Exhibit 55 Plaintiff's Additional Information Regarding Interrogatory 41, which was Plaintiff's Second Supplemental Answer to United States 41st Interrogatory.
MR. SALTMAN: It is nine pages, undated, and there is a chart of two pages -- three pages attached thereto.
Q. BY MR. HARRINGTON: Mr. Porter, did you assist in the preparation of the answer to this

Page 29

interrogatory?
A. Yes.
Q. Does this interrogatory describe the process you used in deriving the mix of products that Precision Pine claims it would have produced on the suspended timber sale contracts?
A. I think as well as you can explain it on paper and get the explanation. It's difficult to explain everything in written form.
Q. That's why I want to talk to you a little about it now.
There on the first page it makes reference to a lag time.
MR. SALTMAN: Where on the first page are you referring?
MR. HARRINGTON: It's not on the first page. Hold on.
It's about four lines down in the answer in parentheses, and it says, "In doing so, Mr. Porter took into account lag time from timber harvest to lumber sale."
Q. BY MR. HARRINGTON: What was the lag time you used in your methodology?
A. It --
MR. SALTMAN: I'm going to object. He

Page 30

has testified extensively about the process he used, and I think in the course of that answer he has provided an answer.
With that, you are free to answer the question.
THE WITNESS: The lag time is -- there is a period of time, you bring logs in and cut them at the mill and you -- depending on which mill it was at. If you are in Winslow, you are right there.
If you are at Heber or Eagar, you had to transport the material, so there was a lag time that had to be considered to try to calculate what the percentages were, and so I used the best of my knowledge and ability in watching the lumber go through as a lag time.
Q. BY MR. HARRINGTON: What was the period of time used as a lag time?
A. It varied from mill to mill.
Q. So you didn't use the same lag time on each of the contracts that you were analyzing?
A. I tried to be as accurate as I possibly could in putting this together, and that's all I tried to do.
Q. Did you use the same lag time on each of the contracts that you were analyzing?

Page 31

A. Probably not. I can't remember specifically, but I probably did not use the exact same lag time.
Q. Do you know what lag time you used in analyzing the St. Joe contract?
A. I would have considered -- when the St. Joe was harvested at the mill, I would have watched that lumber from the time it was harvested at the mill and it was transported to Winslow, and I would have taken whatever that period of time as I watched that -- could have been two, three weeks. Whatever I felt was accurate is what I used.
MR. SALTMAN: I'm going to renew my objection, because he testified, as I recall, for a good half hour or more as to the process he used, and I believe he answered the questions regarding things like lag time.
You are free to continue your questioning.
MR. HARRINGTON: I am interested in the specific lag time that was used in analyzing each of these contracts, and I can assure you that we did not get, last week or today, any information on specific lag times that were used, and that's what I'm asking Mr. --

Page 32

MR. SALTMAN: You can ask away, and I'm going to object away.
MR. HARRINGTON: That's fine.
Q. BY MR. HARRINGTON: Do you know what lag time was used in performing your analysis of the St. Joe contract?
MR. SALTMAN: Objection; asked and answered.
You are free to answer.
THE WITNESS: The question is on each specific --
Q. BY MR. HARRINGTON: Specifically on the St. Joe contract.
A. I don't remember the specific time in relation to that. I just know when I did it, I felt it was as accurate as I could get it.
Q. Do you know how you would figure out what lag time was used for the St. Joe contract?
A. Simply by watching it go through the mill and transported and actually produced at the other mill.
Q. Let me phrase the question differently.
When you did this analysis, can you now go back to anything to figure out what lag time you used in analyzing the St. Joe contract?

Page 33

A. Can I now go back to anything? I doubt there's anything that is specifically written down that says it was three weeks or two weeks or four weeks.
I don't think there's anything like that that I jogged down in my memory. I just went through it piece by piece and said it was in my best estimate, and in watching it go through, this is the best estimate I could make.
Q. Do you know what lag time was used in your analysis of the U-bar contract?
MR. SALTMAN: Objection; asked and answered.
THE WITNESS: Same scenario.
Q. BY MR. HARRINGTON: And you mean right now you do not know what specific lag time --
A. Similar as St. Joe, watching it, seeing the lumber at the different mills.
Q. I'm not asking how you did it. I simply want to know what specific lag time was, in fact, used.
A. Then I can't tell you.
Q. Is there anything you could look at so that you could determine what lag time you used in your analysis on the U-bar contract?

Page 34

A. Not that I'm aware of.
Q. Can you tell me what lag time you used in your analysis of the Hutch-Boondock contract?
MR. SALTMAN: Objection; asked and answered.
THE WITNESS: Same answer. I can't tell you the specific lag time I used. I just know it was done most accurately I could do it.
Q. BY MR. HARRINGTON: Do you have anything that you could refer back to with respect to the Hutch-Boondock contract to figure out what lag time you used in the analysis of that contract?
A. Probably not.
Q. You say, "Probably not." Is there something you might be able to refer to?
A. No. I think that it would be with -- all the time that's gone by, I don't think there's a way in the world you could look for it.
Q. Do you know what specific lag time you used in your analysis of the Brann contract?
MR. SALTMAN: Objection; asked and answered.
THE WITNESS: Same answer.
Q. BY MR. HARRINGTON: No, you don't know what specific time was used?

Page 35

A. The same answer I had in reference to the others. No, I don't know specifically. I just know that I knew at the time specifically what I was using.
Q. How about the Mud contract; do you know what lag time you used to analyze the Mud contract?
MR. SALTMAN: Objection; asked and answered.
THE WITNESS: Same answer there, that there is nothing specific that I know that is recorded other than what I used.
Q. BY MR. HARRINGTON: And here today you don't know what that specific period of time was?
A. No, I don't.
Q. And how about the Brookbank contract; do you know what lag time you used in analyzing the Brookbank contract?
MR. SALTMAN: Objection; asked and answered.
THE WITNESS: I don't know specifically.
Q. BY MR. HARRINGTON: And do you know of anything you could refer to to figure out the answer with respect to the Brookbank contract?
A. I don't know specifically at this time.
Q. Is there anything you might be able to

Page 36

refer to?
A. Nothing that I'm aware of, other than my experience.
Q. Looking at the second to last page of this exhibit --
MR. SALTMAN: Are you talking about the charts or the text?
MR. HARRINGTON: The charts.
MR. SALTMAN: Okay.
Q. BY MR. HARRINGTON: Under the Brookbank contract, it has a list of products produced.
A. Yes.
Q. What is Paragraph 99 redress?
A. A specific grade of lumber.
Q. What is that sort of grade?
A. Paragraph 99 is a grade that we would sell to an industrial manufacturer to rerip the lumber. It has specific rules. If you want me to go over those, I can probably tell you what they are.
I think it was 50 percent, nine inches long, two and a half inches wide.
Q. How about five-quarter RWL radius edge; what does that mean?
A. Five quarter random width and length

Page 37

radius edge.
Q. What kind of product is that?
A. A decking product that we sold to the treating companies. They treated it and sold it for decking. I guess that's what they did with it. We sold it to them.
Q. What are miscellaneous shop-outs?
A. That would be a grade of lumber that did not make your shop grades, your one, two, three shop grades or Paragraph 99, or go into some of these other areas would be a shop-out, they call it.
Q. Across the top of the table for Brookbank it refers to July 1995 and August 1996.
A. Uh-huh.
Q. I believe the Brookbank contract was actually suspended in August 1996.
Is that column an error, and is it supposed to refer to August 1995?
A. You know, I can't remember where that exactly came from, but we may have had some logs on the deck, and it was going through actually -- was it suspended in '95?
Q. No, in '96.
A. In '96. There could have been sufficient log decks at the time to run that much volume and

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 98-720 C

(Filed January 30, 2004)

- - - - - - - - - - - - - - - -x
PRECISION PINE & TIMBER, INC., :
Plaintiff, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - -x

Washington, D.C.
Thursday, February 5, 2004

Deposition of LEWIS N. TENNEY, JR., a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Saltman & Stevens, P.C., 1801 K Street, N.W., Washington, D.C. 20006, at 9:07 a.m., Thursday, February 5, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 46

A. Not that I know, not that I know of. I don't know whether Lonnie tracked it at the mill or not, but I don't know of any.
Q. You said that bark went to Western Organics.
Did you have any other purchasers of bark?
A. Yes. Western Organics was a soil, they manufactured soil conditioners, also decorative bark.
There was a company down around Maricopa, Arizona, and I don't remember their name, but I remember hauling bark into their site.
We hauled some for them that they used as, I assume they used as a soil conditioner.
Q. Do you know when that would have been?
A. No. That's long ago, you know, somewhere between the '80s and the end of the century.
I just remember going in there.
Q. Do you know if it was before the suspension in this case?
A. I don't know.
Q. All right. Would Precision Pine have

Page 47

records of these sales of bark to this company you're referring to?
A. I don't know if they would have or not.
You know, certainly there was a paper trail somewhere, an invoice, something, but you know, where that would be, I have no idea because I don't know, I don't remember when it was and how long we've held on to that stuff.
I just don't remember.
Q. We talked a bit about sawdust. Is that the same thing that is sometimes referred to as grindings?
A. Yeah. That was a market thing. If you tell somebody they'd bed their horse in sawdust, they didn't want it.
If you told them it was grindings, they would take it.
Q. The sales of the sawdust for horse bedding, was that the same purchasers down in the Scottsdale area of Phoenix?
A. Yeah, pretty much. You know, there was some years when, you know, a horse breeder would be there, and the next, he may not be, but you know, there were numerous customers at that

Page 48

time that was using the product.
Q. And when you say at that time, at what time period were you selling these as horse bedding, the sawdust and the shavings?
A. Shavings -- I don't know. Off and on, all during, you know, during that.
I think Lonnie is still selling sawdust for horse bedding.
Q. Did the demand for the products go up and down?
A. It's been pretty -- you know, it depends on what product.
Q. Okay.
A. But it's been pretty consistent in the horse bedding anyway, because the supply has been limited.
There's not sawdust and shavings everywhere, and so it's been pretty consistent.
Q. You also said that one of the principal areas that you were involved with was transportation.
Would that be through your role with TRRI?
A. Yes.
Q. Did Precision Pine itself have any, do

Page 49

any transportation of products?
A. No.
Q. So then all the transportation work that you would have done would have been coordinating with TRRI?
A. Yes.
Q. Could you tell me a little bit about what it was that you did in that capacity?
A. Well, we've talked about the by-product, and then we had a green lumber haul that, that I, that TRRI would haul to whatever planer facility it was going to.
We hauled the chips to Southwest, to Stone, wherever they were going. Hauled the shavings. We have talked about that.
For a period of time until we arranged with TriStar, we did, we did logging, and we hauled the logs in from the, from the forest, from the timber sale into the mill, and you know, every other thing in between.
If Lonnie bought a piece of equipment in Portland, Oregon, I would go up and get it, you know, things hike that.
Q. So you would do some specialized hauls just on an as-needed basis?

Yes.
Q. Did you decide what was going to be bid on at a timber sale?
A. No.
Q. Did you leave that to Mr. Porter?
A. Yep. Yes, I did.
Q. Did Mr. Smith attend the timber sales with you all?
A. I don't know that I ever remember him attending a timber sale with us.
Q. Would it have been unusual then if he did?
A. Yeah.
(Tenney Exhibit No. 15 was marked for identification.)
BY MR. HARRINGTON:
Q. I've marked as Tenney Exhibit 15 a document to interested individuals regarding harvest schedule for 1995 season.
MR. SALTMAN: We will stipulate that this was drafted by John B. Smith, and that a copy is indicated as having been sent to L and L, which represents Lon, Lonnie Porter and Lewis Tenney.



BY MR. HARRINGTON:
Q. Mr. Tenney, would you have received this harvest schedule from Mr. Smith?
A. I don't believe so. I don't remember the document.
I'm not sure I'd be as kind to you as Mister, Alan has because John didn't sign it, but it looks to me like -- you know, I haven't seen, I haven't seen it.
I don't see a date. I see a date at the top that's written in.
It talks and refers to through December.
I don't know who the interested individuals are.
I didn't, I don't know that I ever saw this.
I don't remember it.
Q. Did you ever consult with Mr. Smith about harvest schedules for Precision Pine's timber sale contracts?
A. A harvest schedule or a, a projection or plan, I don't, you know.
Q. A planned harvest schedule?
A. When Lonnie made the decision to go on



what sale he wanted to go on, I would talk with John about his transportation needs, Steve, you know, when that product was going to be there and so forth.
That's really the only conversation I had with John.
Q. Would it be correct that he would not have gotten the information needed to put this sort of a memo together from you?
A. No, he wouldn't have gotten this from me.
Q. Do you know where he would have gotten this information?
A. I don't know that this information would have been anywhere but in his head, you know.
I know of no document that Precision would have, that would have made him believe we were going to, this or that or that Lonnie was going to do this or that, so I don't know.
Q. To get information on the planned harvesting schedule, would he have needed to go to Mr. Porter?
A. Yes, but can I qualify that a little bit? Lots of times --



Q. Sure.
A. John I feel was confined to a requirement in the contract.
Lonnie had the flexibility to go anywhere he wanted, to do what he wanted depending on whatever issue it was that was driving him, and he had the total control of that, and John knew at any time he sent out a projection that it was basically a projection.
(There was a pause in the proceedings.)
BY MR. HARRINGTON:
Q. Do you know if Precision Pine actually followed this schedule?
A. No. I've never seen this schedule. I wouldn't have had input into it.
It was not my responsibility to decide where they went.
I don't know.
Q. If Mr. Porter had not told Mr. Smith this schedule -- let me retract that.
(Tenney Exhibit No. 16 was marked for identification.)
BY MR. HARRINGTON:

Page 166

Q. Did you have that understanding of plan of operation and schedule before sitting through the depositions this week?
A. Yeah. Yeah, pretty much.
Q. Did anything you heard during the depositions change your view of what that would be?
A. No.
Q. Do you know if plans of operation were in fact submitted by Precision Pine to the Forest Service?
A. Yeah. If they weren't, we were, we would have been notified I believe, and John would have complied to that, or Lonnie, somebody would have complied to say you know, we will comply to the stipulations in the contract, so forth.
Q. Who would have been responsible for seeing that the plans of operation were submitted to the Forest Service?
A. I don't know that there was any, ever anyone that was really put on that responsibility to do that, whether Lonnie did it.
He was the one that would have

Page 167

received the contract and signed it on behalf of the company.
Whether he asked John to do it or somebody to do it, I don't know.
Q. You also refer to scheduling plans I believe?
MR. SALTMAN: Objection. I think he said something about operating schedule.
I don't think he called it a scheduling plan.
BY MR. HARRINGTON:
Q. Operating schedules; who at Precision Pine would be responsible for submitting operating schedules to the Forest Service?
A. When you had a pre-work meeting and you were going on to a sale, you would have to submit a schedule of when you're going to take that timber out and your haul route, things like that.
Ordinarily, John, working with the logger, would do that, and that was done at the pre-work or shortly thereafter, to inform the Forest Service where the timber was coming from.
Q. Now is that an operating schedule or a plan of operation that you're describing?

Page 168

A. Oh, I'm, I'm not sure technically what I'm describing.
I'm just saying that I know that when you were going to remove logs from the sale, you had to give them when you were going to do it, and that was done at the pre-work.
As I remember it, the operating plan was flexible, and the Forest Service didn't hold us to it.
Lonnie had the ability to go into anything he wanted to at any time, and we, and we all knew this, and so we left that decision to him.
Q. Did you have any requirement to notify the Forest Service before going into a contract?
A. Yes.
Q. Did you have an obligation at the beginning of the year to provide an operating schedule for the year?
A. I don't know. I don't know.
Q. Would it be fair to say that it wouldn't have been your responsibility to, at the company to submit such an operating schedule if it needed to be submitted?
A. I was doing whatever I was asked to

Page 169

do, but I don't remember doing those.
(There was a pause in the proceedings.)
BY MR. HARRINGTON:
Q. Were you involved in making decisions about where timber should be hauled, that is, the mill to which timber should be hauled?
A. No. That decision was made by Lon. He would tell me where he wanted it hauled, and we would get that information out to, to John and to Steve, and they basically worked on that.
I worked more from the mills out.
Q. And when you say the mills out, what do you mean the mills out?
A. Well, the distribution of the by-products out of the mill and the lumber, green lumber hauls, that type of thing.
Q. And was seeing that the green lumber hauls were done, was that something that TRRI did for Precision Pine?
A. Yes.
Q. How was TRRI paid for doing the hauling that it did for Precision Pine?
A. Lonnie and I would discuss the rates and arrive at a decision, and that's what was

Page 170

paid.
Q. What were the rates based on? Were they based on distance or were they based on how -- did you calculate the amount that would be due?
A. Miles, and the equipment being used; whether there's a live floor trailer or whether there's a float.
There are several things that go into considering what you're going to do for a haul, and we would arrive at a decision once we, we thought it was fair for the company, and then that's what we would use in our, in our books, procedures.
Q. What sort of factors did you consider in setting that price?
MR. SALTMAN: Objection. I think he just answered the question.
THE WITNESS: Want me to answer it?
MR. SALTMAN: You can answer it again.
THE WITNESS: It's mileage and equipment used.
BY MR. HARRINGTON:
Q. When you say equipment used, do you mean the particular kind of equipment that was

Page 171

being used?
A. Yes. Yes.
Q. Were there any written contracts between Precision Pine and TRRI concerning the hauling work that was done?
A. Not that I remember. There may have been, but not that I can remember.
Q. How was it recorded, the prices that you and Mr. Porter came up with for the hauling work?
A. We would arrive at a price. We would tell our secretaries that was the price, and whoever was computing that then stuck with that price until we told them something different.
Q. Who would you pass that information along to?
A. Oh, I don't know -- one of the girls in the office, someone at the mill that was weighing in and out.
You know, it would have been different employees at different times.
Q. Where did that get recorded in Precision Pine's records?
A. I don't know, unless it would be on some of the, you know, records kept by the

Page 172

controllers.
Q. When you say the controllers, would that be Nancy Kehret or Mel Bowers?
A. It could have been. Could have been others.
Q. Who else might have it been?
A. Lori Soubie, Jack Porter, any other people that we had working for us; you know, Lonnie was in charge of the office and that staff, and he pretty well controlled that.
Q. What did Mr. Bowers do for Precision Pine?
A. I don't know all that Lonnie had him do, but he's a bookkeeper. I considered him a bookkeeper.
Q. And what sort of things did he do as a bookkeeper?
A. Just whatever a bookkeeper would do; you know, his, his assignments were made by Lon, and he did whatever Lon asked him to do, and so you know, specifically I don't, I wouldn't know how to answer; just the normal duties of a bookkeeper.
Q. How about Ms. Kehret? What sort of things did she do for Precision Pine?

Page 173

A. She did more of the returns. She, she's a CPA, and she works with other CPAs that do our, that were doing our documents for the tax returns and so forth.
Q. So was her work mostly tax related?
A. During what time period?
Q. During the time period she was working for Precision Pine.
A. Okay. I wouldn't say strictly for tax paying, no.
She was, she was doing other things, but she had that responsibility.
Q. Did her responsibilities change over time?
A. Ultimately they did because she works for me now, and she no longer works for Precision Pine, but during those years, Lonnie assigned her and directed her to do the work that she did.
Q. Do you know what she did besides tax, besides tax work?
A. I don't. I don't. I don't recall. I just -- I don't remember all her duties.
Q. We talked about one particular logging plan for 1995 in one of our earlier exhibits.

Page 174

You said that you were not involved in coming up with that plan that was provided to the Forest Service?
MR. SALTMAN: If I recall correctly, it was an operating schedule.
MR. HARRINGTON: You're correct. It was an operating schedule.
MR. SALTMAN: Okay. I want to make sure we're straight.
What exhibit are you referring to and --
MR. HARRINGTON: My question -- well, it's Exhibit 15.
MR. SALTMAN: All right. Thank you.
BY MR. HARRINGTON:
Q. My question isn't so much about Exhibit 15 as it is was your role with respect to other operating schedules the same as it was with respect to the 1995 operating schedule?
MR. SALTMAN: Objection. I believe it's been asked and answered, but you're free to answer the question.
Do you have Exhibit 15 in front of you?
THE WITNESS: I think I remember it,

Page 175

but I, you know, I just wasn't involved with that.
That had to do with logs and the scheduling of logs.
Lon had totally control of that, so I, you know, sometimes at some point, Lon may have said write a schedule or somebody, you know, but that was really out of my --
BY MR. HARRINGTON:
Q. Did you find out that the sales were likely to be enjoined before you actually got word that the sales were suspended in August 1995?
A. I don't remember. Did we?
MR. SALTMAN: I don't know if we did or not.
THE WITNESS: Would likely be enjoined, I don't remember.
I don't remember.
BY MR. HARRINGTON:
Q. Would it be correct then that you also wouldn't remember if Precision Pine took any steps in August 1995 expecting their contracts to be suspended?
MR. SALTMAN: I'm going to object

Page 176

because there's no foundation because he testified he didn't know that he heard in advance if the sales were going to be suspended, so --
BY MR. HARRINGTON:
Q. Do you know if Precision Pine took any actions before the suspension in the expectation that its contracts would be suspended?
A. I don't know, and I don't, I don't remember anything.
I just don't know. We felt like -- you know, I was busy in the day-to-day operation.
I felt like that our contracts were sound.
I had assumed that the government had done what it would take to for us to be able to harvest them, and I wasn't unduly concerned about it.
I was just trying to do the things from day to day.
Had we ever been told that, or notified of that, I don't remember that if it happened.
If there is, if there's a document

Page 177

that it did or the Forest Service got something, I don't know.
(Tenney Exhibit No. 20 was marked for identification.)
BY MR. HARRINGTON:
Q. Mr. Tenney, this is a memo from John to Mel.
MR. SALTMAN: We will stipulate that the John here is John Smith, and with the exception of all these stickers down at the bottom, which are an increasingly large number, that this was authored by John Smith.
BY MR. HARRINGTON:
Q. Up at the top, it says pulpwood to Heber Mill.
Were you aware that you were delivering pulpwood to the Heber Mill at various times?
A. When you say you --
Q. Well --
A. The areas that I had responsibility for in my transportation, I wasn't hauling this.
TriStar, I recall the time when TriStar had been asked by Lonnie to move some

Page 214

Q. You're not aware of any such agreement?

MR. SALTMAN: Objection. He just said he didn't know.

THE WITNESS: I'm not aware of it other than what was written in the other, in the other -- in Exhibit 27.

MR. SALTMAN: I will note for the record that Exhibit 28 is -- scratch that.

(There was a pause in the proceedings.)

BY MR. HARRINGTON:

Q. Mr. Tenney, were you involved in negotiations with Reidhead, Steve Reidhead or TriStar regarding the harvesting of Precision Pine's timber sales?

A. Yes.

Q. What role did you play in negotiations between TriStar and Precision Pine regarding harvesting?

A. Usually this is the way it went. Lonnie would decide what sale he wanted to go on, and he would say would you talk to Steve and see what his haul costs would be on a particular sale?

Page 215

So then I would go and start negotiations with TriStar. They would give me a price.

I would go back to Lonnie. Lonnie said it's too much, you know, or I'll accept it, and that would take place until we agreed on a price.

Q. So you would be involved in the back and forth with TriStar about what price they would be doing the harvesting?

A. Um-hm. At times, Lonnie went directly to TriStar.

Sometimes John played that part, went between Steve and Lonnie, but Lonnie always made that decision.

Q. Did you negotiate prices with TriStar on a contract-by-contract basis?

A. Yes.

Q. So when you negotiated a price with TriStar, was that for completing harvesting on whatever contract it was you were talking about?

A. Yes.

Q. Did you enter into written agreements with TriStar concerning its harvesting and the prices that were being charged?

Page 216

A. An actual written contract, I never remember one.

Q. So it was all discussions back and forth?

A. Discussions, and then agreement and a handshake.

Q. Did you ever put down in writing or maybe I should say -- well, did you put down in writing the price that you had agreed to?

A. Never in a document; what I would do or what would happen is it would go to Mel Bowers or whoever was handling the, the account at the time, and say here's what we've, TriStar and Precision has agreed upon, and here is what we want you to pay, and, and then that would be noted somewhere to where they would keep track of that, and that remained the price unless Steve came back and said I want to renegotiate or this has happened or that has happened.

That's the way it handled, and the accountant just took care of that number.

Steve knew we would pay that price, and we knew he would do it for that price whenever we shook hands on it.

Q. You mentioned that sometimes Steve

Page 217

would come back and renegotiate.

Under what circumstances would he do that?

A. Maybe if he had to go a different haul route off a sale; you know, I don't remember it happening very often, but usually when we set a price, it stayed there, but I'm sure from time to time there was a change if it was something that impacted him, it was different than what we agreed upon on the performance.

Q. Did you ever not agree to renegotiate a, renegotiate a price with TriStar?

A. No, not that I remember. We're men that have a lot of respect for each other, and we know, he knew that we would do what we said, and we could always count on him.

Q. Were you obligated to renegotiate the price with him?

A. No.

Q. But you had such a relationship with him that if he came to you, you knew there was a reason for it?

A. We would, we would listen, but as I said, I don't remember many times that took place.