company.
Do you know what that says?
A. That's Apache County. That's what I would think it says.
Q. And the first line on the second page, I can't really make it out, but maybe you have a better idea.
Do you know what that says?
A. At the top?
Q. Title?
A. No.
Q. Maybe information something, but --
A. I can't remember. You know, I can't read it.
MR. SALTMAN: I'd like the record to reflect that this is information set forth here, it appears to be with regard to the Eagar Mill.
(There was a pause in the proceedings.)
MR. HARRINGTON: Certainly some of the information is in any event.
MR. SALTMAN: Well, I was referring to line 2 on the first page of the questionnaire.
MR. HARRINGTON: I see that.
BY MR. HARRINGTON:



Q. Mr. Tenney, were the St. Joe, Brann, and Hutch-Boondock sales going to the mill in Eagar?
A. No. And that's what perplexed me, you know, about the document.
Those sales were not going to Eagar, as I remember.
Q. Were the, were the Hay and O.D. Ridge sales going to Eagar?
A. No. As I remember, they weren't.
Q. How about the Kettle timber sale? Was that going to the Eagar Mill?
MR. SALTMAN: I think your question is as of the date?
BY MR. HARRINGTON:
Q. As of the date, as of, you know, would it have been in December 1995?
A. No. We had already sold I believe the Kettle to Stone at that time.
One of the things I would like to note on this document is there is, there's a note 7.
BY MR. HARRINGTON:
Q. Mr. Tenney --
A. I'm sorry.
MR. SALTMAN: Let him complete his



answer.
MR. HARRINGTON: I don't believe that was an answer to a question.
THE WITNESS: Okay.
MR. SALTMAN: Oh, I thought he was.
BY MR. HARRINGTON:
Q. Correct me if I'm wrong, Mr. Tenney. I didn't want to cut you off if you were answering the question.
A. I just had a comment on the document, and that's fine.
(There was a pause in the proceedings.)
BY MR. HARRINGTON:
Q. Mr. Porter -- Mr. Tenney -- it's getting late in the day for me, too.
MR. GOEKEN: You almost made it!
THE WITNESS: I've called worse.
MR. SALTMAN: Hey, you?
THE WITNESS: That's a compliment to me.
BY MR. HARRINGTON:
Q. On two of, I believe it's two of the timber sales, at least a couple of the timber sales, Precision Pine is seeking to recover



increased logging costs.
And could you tell me if the increased logging costs that Precision Pine is seeking to recover are the result of TriStar, Mr. Reidhead, seeking an adjustment to the contract price for timber harvesting?
A. I don't know the answer to that.
(There was a pause in the proceedings.)
BY MR. HARRINGTON:
Q. In its claim, the sales at issue I believe are the Hay and O.D. Ridge timber sales.
A. Okay.
Q. Do you know if Mr. Reidhead harvested those sales?
A. I don't recall exactly who harvested them because of the timetable.
It would have been, you know, after the injunction, everything just went to pot.
And I know -- well, I don't know, but I believe both of those sales, if not one of them, were harvested and hauled to Heber because the Eagar Mill was closed, and that indeed incurred additional cost to do that.
Q. As far as those haul costs go, were

those costs that were paid by Precision Pine to TRRI, or would it have been to some other entity?
A. No. TRRI did not haul the logs. That was TriStar.
Q. So the, the hauling costs to go the increased distance would have been paid to TriStar?
A. Absolutely.
Q. And the costs that you're seeking to recover are for the increased distance of the haul?
A. I don't know if that's all, but certainly that's part of it, yes.
Q. Do you have an understanding of anything else that would have resulted from the suspension, increased hauling costs, that is?
A. I don't -- no.
MR. SALTMAN: What was your answer, no, or I don't know?
THE WITNESS: I don't know if there are any others.
BY MR. HARRINGTON:
Q. Do you know what the, what caused the increase in logging costs as opposed to an



increase in hauling costs?
A. I don't know. Could have been fuel, cost of fuel versus one time to another.
I don't know. I don't, I didn't put that together, and so I'm not privy to that.
I just haven't.
Q. Would it have been a renegotiation of the contract that Precision Pine had?
A. Well, definitely if we changed locations, or were forced to, I would assume that Lon would have made a, a arrangement with Steve to, to increase the price to him.
He couldn't haul it to Heber for what he had agreed to haul it to Eagar.
Q. Would that have affected the price charged for the logging as opposed to the hauling?
A. It could, depending on the timetable, cost of fuel, time of year that we asked him to do it, winter logging outside the -- I don't know. I don't know what was actually figured in.
I'm just saying there could be other issues, but I don't know what they were.
Q. Okay.



MR. SALTMAN: Off the record for a second.
(A discussion was held off the record.)
BY MR. HARRINGTON:
Q. Mr. Tenney, were you involved in Precision Pine's preparation of the claim that they presented as a result of the Mexican Spotted Owl suspension?
A. No, I wasn't.
Q. Did you provide any information to Mr. Porter or to anyone who was preparing the claim?
A. I may have had. I don't remember it. He had access to I would assume all the records that he needed to do that, and I wasn't involved in it.
(There was a pause in the proceedings.)
BY MR. HARRINGTON:
Q. I think we may have addressed this, but I'm not a hundred percent sure at this time of the day, so during the 1990s, did Precision Pine acquire most of its timber from the Forest Service?
A. Yes.



Q. Do you know how Precision Pine determined the total volume of timber it wanted to harvest in a given year?
A. No. There again, that would have been Lonnie's decision, and I left those matters up to him.
It would depend on what he needed for his mills.
Q. Did you leave essentially all of the decisions about how to harvest, what contracts to harvest, when to harvest, to Mr. Porter?
A. Basically; sometimes I would have input into it.
Q. Were there any exceptions that sort of stand out in your mind?
A. Not that I remember, simply because he had, he had to have that ability to be flexible, and I didn't want to stand in his way.
That was his area of responsibility, and so I let him do it.
He would listen to me if I talked to him, but I don't ever remember a time when that we had contention over it or big difference of opinion.
(Tenney Exhibit No. 45

was marked for
identification.)
BY MR. HARRINGTON:
Q. Mr. Tenney, have you seen this chart before?
A. Yes, I have.
Q. I have marked as Tenney Exhibit 45 a chart entitled anticipated quantity of wood per contract MBF log scale, roundwood in cords.
And I'll state for the record that this was provided in response to United States Interrogatory No. 9.
A. Okay.
Q. Were you involved in preparing this table, Mr. Tenney?
A. No.
Q. Do you know when this table was prepared?
A. No, I don't.
Q. Did you ever see this table or a table like this in your work at, while you were working at Precision Pine?
A. No. The first time I saw it was several days ago.
Q. Have you seen, did you see while you



were at Precision Pine any table or any document providing a schedule for harvesting timber contracts over a period of a year as this one does?
A. No, not that I recall.
Q. Were you aware of any long-term plans for the harvesting of timber while you were at Precision Pine?
A. A written-out plan, certainly there was a plan to harvest those timbers we had under contract.
I don't recall a long-term plan, but we didn't need it.
We knew what our sales were. Lonnie knew what those sales were, and he could move around as he needed, and so we were interested in buying timber and putting it through our mills.
Q. Did you have any written plan for that sort of thing?
A. Not that I recall, other than what we have looked at in these documents today.
Q. When you're talking about these documents today, are you referring to the harvesting schedules prepared by Mr. Smith?



A. Yes.
Q. Did you at the time the suspension began in 1995 have any understanding about what contracts Precision Pine was planning to harvest at that time?
A. No. I don't recall.
Q. Do you recall if it was Precision Pine's general practice to harvest a given contract to start to finish without, without breaking?
A. We had done that.
Q. Was that the usual way you harvested your contracts?
A. I don't know if you can say usual. We allowed Lonnie the flexibility to do what he wanted to do, and what determined his decisions all the time, I don't know.
I have total faith in him. We would respond as he asked us to.
(There was a pause in the proceedings.)
BY MR. HARRINGTON:
Q. Do you know how long it generally took Precision Pine to harvest a contract from start to finish?



A. It varied from every contract depending on the weather, depending on the size of the contract, how many loads of material you had off of it, so you couldn't look at a contract and say that will take us a week and we'll be off of it or that will take us six months or you know, they varied. All of them varied.
Q. Was there any rule of thumb you could use to figure how long it would take to harvest a given contract?
A. I don't know. I don't know of one, because of all the varied issues that you're dealing with from time to time as we have discussed through the day.
Q. So would it be difficult to tell in advance how long it would take to harvest a contract?
A. If it's the only logs you have, it may not be.
I don't know. You know, it depends. I think, well --
Q. The table that we've got marked as Exhibit 45 to your deposition shows harvesting of roundwood in September 1995.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 98-720 C

(Filed January 30, 2004)

\- - - - - - - - - - - - - - - - -x

PRECISION PINE & TIMBER, INC., :

Plaintiff, :

v. :

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - - -x

Washington, D.C.

Friday, February 6, 2004

Deposition of RONDA M. RYAN, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Saltman & Stevens, P.C., 1801 K Street, N.W., Washington, D.C. 20006, at 10:18 a.m., Friday, February 6, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Q. Getting the amounts paid on the bills for the firm.
A. Yes.
Q. And it's in that connection that you have been identified as a witness here?
A. Yes.
Q. Could you describe for me your job here at Saltman & Stevens?
A. I'm the office administrator, actually, many hats, as well as the accounting functions, doing bills and office supplies, that kind of budget.
I also do the computer maintenance and support, and human resources.
Q. Are you responsible for the attorneys' billing on the computerized system that you have?
A. Yes.
Q. What exactly are your responsibilities in connection with billing?
A. I put together, I create the bills every month.
Q. You send them out?
A. Yes.
Q. When payments are paid on the bills,



are they sent to you?
A. Yes.
Q. Are there any other responsibilities that you have, or maybe you could describe a little bit the other responsibilities that you have?
A. Other responsibilities?
Q. At Saltman & Stevens.
A. I think I covered it.
Q. Okay. You don't have anything to add to what you said?
A. I don't think so, not unless you want me to get, get into detail about job description, no. No.
Q. Are you responsible for inputting the hours that the attorneys worked on matters?
A. No.
Q. Have you ever testified before in a case?
A. No. Yes. I'm sorry. In a case, it was a child custody case.
Yes. Sorry.
Q. But it didn't have anything to do with your work at Saltman & Stevens?
A. No.



(Ryan Exhibit No. 1 was marked for identification.)
BY MR. HARRINGTON:
Q. I have marked as Ryan Exhibit 1 a document titled Saltman & Stevens, P.C. with the address of the firm, and that appears to be billing for professional services to Precision Pine & Timber.
Ms. Ryan, do you recognize this document?
A. Yes.
Q. What is this document?
A. This is a history bill for the court.
Q. History bill for the court, what do you mean for the court?
A. In terms of my system creates this report. It's not an actual invoice.
It's a history bill for the court. It's all-inclusive of everything that was done time-wise and expense-wise during this time period.
Q. And what is this time period that you're referring to?
A. The period stated on the document; it



says August 1st, 01 through July 31st, 03.
Q. I believe that it says in reference to, and has a number, and then the name Muecke.
Do you know what that refers to?
A. That's our system. We put in client matter numbers. That's how we refer to the client matters.
Q. And so the number 90096-00005 is a client matter number?
A. Yes.
Q. What client matter is that?
A. Precision Pine - Muecke.
Q. Is that the case that's filed in the Court of Federal Claims as case zero -- excuse me -- as case 98-720?
MR. STEVENS: I think your question presumes that it refers to a specific case, and I don't know that's --
BY MR. HARRINGTON:
Q. Does it refer to a specific case?
A. This number?
Q. Yes.
A. Yes.
Q. What case does it refer to?
A. Precision - Muecke; that's as much as

Q. I notice the last several pages of this document starting on page 80 have additional charges.
What additional charges does Saltman & Stevens include with its bills?
MR. STEVENS: You're referring to the term additional charges on this bill?
MR. HARRINGTON: That's right.
MR. STEVENS: That's what you mean, okay.
THE WITNESS: These are expenses.
BY MR. HARRINGTON:
Q. What sorts of expenses are added to client bills?
A. Photocopying costs, long distance, facsimile, maybe courier, overnight mail, legal research; that's not all of them, but that's to list a few.
Q. Can you think of any others?
A. No.
Q. At what rate does Saltman & Stevens charge for photocopying?
A. I believe it's 20 cents a copy. We actually have a form. It's in the system. A secretary works it up, so I don't actually know



exact.
Q. How does the, looking at the column that's entitled, "Qty/Price," what does that stand for?
A. That's the item number and the price of the expense, so under we'll say photocopying, say there is 662 copies at 20 cents per copy.
Q. Two lines down from that, there's a .04 as the quantity for long-distance phone.
Do you know what that means?
A. It's time entered, how much -- may have been four minutes that was charged for long-distance.
It was put in as an exact amount. If the time was four minutes, it was entered in four minutes, and that was 0.4, right?
You said .04.
Q. 0.4, yes. See, there is also a charge for facsimile?
A. Yes.
Q. It shows a quantity of, if you look at the bottom of page 81, for example, there are two different facsimile charges, each showing a quantity of one with a different price.
Do you know why that would be?



A. No, not without looking at the actual entry.
Q. How is it that charges are made for facsimiles?
A. Some are long-distance. Some are local.
Q. Are there charges for local facsimiles?
A. I would say yes.
Q. How do the charges for local and long-distance facsimiles differ?
A. I don't know.
Q. You say the attorneys prepare records of what they have done with their time for entry into your system, is that correct?
A. Yes.
Q. How often are those time sheets prepared?
A. Daily.
Q. Are they, are they actually always prepared on a daily basis, or do you know?
A. I would not know.
Q. Do you have any role yourself in reviewing the billing itself for accuracy?
A. Just to make sure that everything is



included, that I put the right dates, time period.
Q. So you don't look to see if a reasonable amount of time was spent on a particular task?
A. No, I do not.
Q. Or if the work performed by the attorney was needed?
A. No, I do not.
Q. Do you check the descriptions that are provided by the attorneys?
A. No.
Q. Do you know if Precision Pine & Timber has paid Saltman & Stevens the amounts shown as billed on Ryan Exhibit 1?
A. No, I don't know.
Q. Do you know if they have paid Saltman & Stevens any of the amounts shown on Exhibit 1?
A. No.
MR. HARRINGTON: Let's just go ahead and mark this.
(Ryan Exhibits Nos. 2-4 were marked for identification.)
MR. STEVENS: The one dated July 19th

PRECISION PINE & TIMBER, INC.)
)
Plaintiff, )
)
vs. )
)
THE UNITED STATES, )
)
Defendant. )
)

DEPOSITION OF MEL BOWERS

Overgaard, Arizona
February 10, 2004

Q. Did Precision Pine track the information that you were getting from the mill managers in any other way?
A. Not that I am aware of. Not that I can recall.
(Deposition exhibit 19 was marked for identification.)
Q. BY MR. HARRINGTON: Have you ever seen this report before, Mr. Bowers?
A. Yes. This is the report that I referred to before as the Timber Sales Status Report.
Q. Did you prepare this report?
A. I did.
Q. What was the purpose of this report?
A. The purpose of this report was to help Mr. Porter see where we were on the different timber sales that we had open. This includes the volume cut, the volume remaining, costs.
Q. Do you know where you got the numbers for this report?
A. Most of it came off of the T.S.S.A., the Forest Service T.S.S.A..
Q. Do you know what Mr. Porter used this for?
A. All I can do is assume. I don't know. I assume that he used it in planning to help him



determine what to cut.
Q. Looking at the second page of this report, what does that provide?
A. The cost because some were using CCFs and on other MBFs. This was an attempt to bring the two together.
Q. Because of some cuts they were using?
A. Into MBFs.
Q. So these are conversion factors that you used to --
A. Yes.
Q. Were these conversion factors used on generating the front page of this report?
A. Let's see if we did a total. Yes, because I show everything in MBFs on the front page, and in order to show those, the Forest Service used CCFs on, I had to convert, which this was my attempt to convert it as accurately as possible.
Q. Did you consistently use the same conversion factors in these reports?
A. That was the hardest thing that I had to do was get a conversion factor. Some of the sales I was able to find a conversion factor listed in the contract. Some of them I could not find it. Some of them I would ask what sale is this similar to, and I



would use that ratio.
Q. Did you consult with other folks at Precision Pine in coming up with --
A. When I could catch them, I would ask John Smith or Bill Casky if they could help me. I didn't always have them available. I did the best that I could. I can tell you that it is not accurate 100 percent.
Q. When you say it is not accurate 100 percent, do you know which sales you were unable to speak to Mr. Smith or Mr. Casky about?
A. No.
Q. Do you know which numbers you were unable to get a number from the contract?
A. I would have to go back and re-trace my steps step by step. Just by looking at this, I don't know.
Q. Would it be those sales where you would be unable to consult with Mr. Casky or Mr. Smith that you would be concerned about?
A. Yes.
Q. These were the numbers that were used for the reports that you generated for Mr. Porter?
A. Yes.
Q. Let's see. You mentioned that you were



responsible for submitting reports to the W.W.P.A.?
A. Yes.
Q. Did you have other interactions with the W.W.P.A.?
A. Only that I paid the bill. That is the only other interaction.
Q. What bill was this that was paid?
A. As a member of the W.W.P.A., we pay dues, grading dues we call it.
Q. What were the dues for?
A. I think, for the privilege of using their stamp on the lumber as being W.W.P.A. approved or something.
Q. So that had to do with grading the lumber as it came out of the mill?
A. Yes.
(Deposition exhibit 20 was marked for identification.)
Q. BY MR. HARRINGTON: Marked as Bowers' exhibit 20 is a document, a letter dated October 20, 1999 from Mel Bowers to Jim Mathews.
Is this what you were referring to when you were talking about the grading stamps? Is that what this letter is talking about?
A. Yes.

PRECISION PINE & TIMBER, INC.
Timber Sale Status Report
As of August 31, 1995

Current Index PP: 435.01
DF: 326.06

| Name Of Sale | Award Date | MBF Volume | Bid Price | Bid Index | Adjusted Bid | Total $ | Term Date | Vol To Date | Cur % Done | Vol Remain | Remain Total $ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Barber | 9-93 | 3775 | 612.67 | 446.44 | 601.24 | 2,312,829.25 | 12-96 | 1500 | 40% | 2275 | 1,367,821.00 |
| Brann | 9-94 | 914 | 140.60 | Flat | 140.60 | 128,508.40 | 12-96 | 0 | 0% | 914 | 128,508.40 |
| Brookbank | 4-95 | 2062 | 95.85 | 480.72 | 50.14 | 197,642.70 | 12-97 | 790 | 38% | 1272 | 63,801.38 |
| Campbell | 7-94 | 2280 | 525.25 | 467.36 | 492.90 | 1,197,570.00 | 12-96 | 0 | 0% | 2280 | 1,123,812.00 |
| Hay | 1-90 | 12000 | 90.60 | 285.13 | 165.54 | 1,087,200.00 | 12-95 | 5366 | 45% | 6634 | 1,098,192.36 |
| DF&O | 1-90 | 1000 | 36.09 | 226.86 | 66.18 | 36,090.00 | 12-95 | 901 | 90% | 99 | 6,551.82 |
| Hualapai | 5-94 | 3003 | 300.00 | Flat | 232.98 | 900,900.00 | | 2329 | 78% | 674 | 157,005.22 |
| Hutch-Boon | 7-94 | 2236 | 204.54 | 525.85 | 159.12 | 457,351.44 | 12-97 | 0 | 0% | 2236 | 355,792.32 |
| Kettle | 7-95 | 2851 | 313.12 | Flat | 313.12 | 892,705.12 | 12-99 | 0 | 0% | 2851 | 892,705.12 |
| Jers Hors | 12-93 | 1701 | 352.23 | 446.28 | 340.96 | 599,076.00 | 12-96 | 65 | 4% | 1636 | 557,958.22 |
| Manaco | 1-95 | 2688 | 165.81 | 436.41 | 165.11 | 445,697.28 | 12-95 | 310 | 12% | 2378 | 392,631.58 |
| Monument | 9-94 | 731 | 124.00 | Flat | 124.00 | 90,582.00 | 12-96 | 0 | 0% | 731 | 90,582.00 |
| Mud | 9-94 | 2945 | 109.88 | 476.28 | 89.25 | 323,599.55 | 12-98 | 0 | 0% | 2945 | 262,829.47 |
| O.D.Ridge | 8-92 | 3650 | 223.77 | 328.44 | 277.06 | 816,760.50 | 12-96 | 1730 | 47% | 1920 | 531,945.60 |
| DF&O | 8-92 | 1510 | 48.35 | 252.70 | 66.17 | 73,008.50 | 12-96 | 805 | 53% | 705 | 46,649.85 |
| Park | 10-93 | 1306 | 340.00 | Flat | 340.00 | 444,040.00 | 10-95 | 364 | 28% | 942 | 320,167.12 |
| Ramah | 1-95 | 857 | 260.06 | 443 | 256.20 | 222,871.42 | 12-95 | 0 | 0% | 857 | 219,559.12 |
| Saginaw | 9-94 | 1016 | 125.00 | Flat | 125.00 | 127,008.00 | 12-96 | 0 | 0% | 1016 | 127,008.00 |
| Salt | 1-94 | 2119 | 281.38 | 513.68 | 202.71 | 596,168.20 | 12-96 | 0 | 0% | 2119 | 429,542.49 |
| St Joe | 4-92 | 8310 | 251.66 | 328.44 | 304.95 | 2,091,294.60 | 12-96 | 4839 | 58% | 3471 | 1,058,464.10 |
| U Bar | 10-92 | 6887 | 397.00 | 400.08 | 414.47 | 2,734,139.00 | 12-96 | 5054 | 73% | 1833 | 759,900.85 |
| DF&O | 10-92 | 1361 | 122.84 | 310.49 | 130.63 | 167,185.24 | 12-96 | 0 | 0% | 1361 | 177,780.63 |
| TOTALS Pine: | | 61331 | | | | 15,665,943.46 | | 22346 | 36% | 38984 | 9,938,226.35 |
| TOTALS DF&O: | | 3871 | | | | 276,283.74 | | 1706 | 44% | 2165 | 230,982.30 |

Weighted Average $ per MBF Pine: $254.93
Weighted Average $ per MBF DF&O: $106.69

Bowers EXHIBIT 19
DATE 2-10-2004
Sheryl Barker, Court Reporter



Porter

PRECISION PINE & TIMBER, INC.
Timber Sale Status Report
As of August 31, 1995

Current Index PP: 435.01
DF: 326.06

| Name Of Sale | Award Date | MBF Volume | Bid Price | Bid Index | Adjusted Bid | Total $ | Term Date | Vol To Date | Cur % Done | Vol Remain | Remain Total $ |
|---|---|---|---|---|---|---|---|---|---|---|---|

Several sales were bid out and awarded on the basis of hundred cubic feet (CCF).
For comparison, volume and bid price have been converted to thousand board feet (MBF).
The sales so bid and the bid amounts are:

| Sale Name | $\CCF | Ratio | $/MBF |
|---|---|---|---|
| Brann | 70.30 | 2.000 | 140.60 |
| Brookbank | 45.00 | 2.130 | 95.85 |
| Dog | 89.88 | 2.000 | 179.76 |
| Hutch-Boondock | 96.94 | 2.105 | 204.06 |
| Jersey Horse | 184.90 | 1.905 | 352.23 |
| Kettle | 156.56 | 2.000 | 313.12 |
| Manaco | 78.77 | 2.105 | 165.81 |
| Monument | 62.00 | 2.000 | 124.00 |
| Mud | 52.20 | 2.105 | 109.88 |
| Park | 143.70 | 2.366 | 340.00 |
| Saginaw-Kennedy | 56.00 | 2.232 | 125.00 |
| Salt | 133.67 | 2.105 | 281.38 |

PRECISION PINE & TIMBER, INC., )
)
Plaintiff, )
)
v. )
)
THE UNITED STATES, )
)
Defendant. )
)

DEPOSITION OF STEPHEN REIDHEAD

Overgaard, Arizona
February 11, 2004
9:00 a.m.

Prepared for:

The Court
(Original)

Prepared by:
Bonnie Ponce
Certified Court Reporter
No. 50669

Page 10

Q. And was that the work that was done by Precision Forest Management that you are talking about?
A. Uh-huh. Yes, sir.
MR. GOEKEN: You are trainable.
Q. BY MR. HARRINGTON: What sort of arrangement did you work out with Precision Pine in this buyout that you were talking about?
A. I just bought their equipment for so much money, and they told me that I could do their logging. That was the reason I bought it, because I already had enough equipment.
Q. So you were more interested in doing their logging at that point?
A. Control of the market.
Q. Were you doing all of Precision Pine's logging at that point?
A. When they sold it to me, I was.
Q. From that point forward?
A. Yes.
Q. Was there a written agreement that you would do all of their logging?
A. No. I just think we talked about it. That's the way we did everything.
Q. Most of your agreements with Precision

Page 11

Pine you just spoke with someone at Precision Pine about?
A. Yes, sir.
Q. Who was your contact at Precision Pine that you would make these arrangements with?
A. Mostly Lonnie Porter.
Q. And can you tell me, in as much detail as you can, about the arrangement you made when you bought the equipment of Precision Forest Management?
A. Well, we just met. We agreed on a price. And then I financed that, and they told me that we would take care of their logging.
Seemed like there was some -- I don't remember if there was a stipulation in that, and as long as -- we bought the equipment, financed it, and then just started logging. We were logging already, but we just increased logging.
Q. That was sometime in the early '90s?
A. Uh-huh. Yes, sir.
Q. Was it before the suspension occurred in 1995, 1996?
A. Yes, sir.
Q. Aside from logging Precision Pine sales, was there any other work you did for Precision Pine?
A. Yes. We supplied pulpwood to Stone.

Page 12

Actually, some logs too. Stone Forest Industry.
Q. And was there anything besides that that you did?
A. No.
Q. And when we talk about logging, is that simply cutting the trees down, or was there more involved in the logging process that Tri Star did for Precision Pine?
A. Yes. We went and cut the logs down, skidded them to a landing. We limbed them, bucked them up, loaded them, and hauled them to their mill.
Q. And what were you paid for the logging work that you did for Precision Pine?
A. You are paid so much per thousand.
Q. So it would be payment for volume of the timber that you cut and hauled?
A. That we hauled in, right.
Q. How was that rate per MBF determined?
A. Most of the time it was just -- I'd look at the sale. Lonnie would look at it. Or we would get together and talk about it. Or we had times where I jumped on the sale because he was needing to move quickly, and we would agree afterwards.
Q. So there wasn't a written agreement about that either?

Page 13

A. No.
Q. Did you record somewhere what it was you were going to be paid on the sales?
A. We usually would write it down on a piece of paper. Mostly that's what we did.
Q. And would you take a copy and Mr. Porter take a copy?
A. No. Actually, we did have a time or two where we remembered differently. And once you got paid once, you knew. And I'd usually write mine down and have to call Lonnie and say, "This isn't what we agreed."
And if I won out, okay. And if he won out -- if his memory was better than mine, that's just the way it was.
Q. During the 1993-1997 time period, could you describe the employees you had and the equipment you had at that time?
A. We had six timber jack skidders -- that's log skidders -- three Prentice log loaders, two sheers, the feller bunchers. One was a bell. One was a hydroaccess geared for real high production in smaller timbers. The bell was larger timber. And we had a crawler we did brush with. And then we had trucks.

Page 42

Q. Whose handwriting is this?
A. Karen's.
Q. Who is Karen?
A. My secretary.
Q. Is this something she would have put together then and forwarded to Precision Pine?
A. I would have generated that information to her, and she would have written this down.
Q. And this has to do with snow removal work that you did on the U-bar contract?
A. Road maintenance type things.
Q. When you say "road maintenance type things," what do you mean?
A. Just using a motor grader and opening the snow, getting the snow off the road so you can get to the U-bar.
Q. Was this something that was -- was this something you did when snow would otherwise have prevented you from operating a timber sale contract?
A. Yes.
Q. Did you have an understanding with Precision Pine that snow removal work was going to be billed separately from the other work you did?
A. Correct.
Q. How was the rate set for that?

Page 43

A. We just agreed on a rate. I just called and told them I would do it for $60, and he felt like that was okay. I guess that's the way we set it up. That's what I remember.
Q. And was this something that from time to time you had to do if you want to operate --
A. Right.
Q. -- during the cold seasons of the year?
A. Once in a while we would do that, whenever they asked us to.
Q. Sometime you would get a specific request to clear some snow?
A. Uh-huh. Yes.
Q. Do you remember under what circumstances that would occur?
A. If you had deep snow and they needed a log.
Q. So they would ask you to clear the snow and go ahead and go on to the contract and do some harvesting?
A. Correct.
MR. SALTMAN: Could we take a break?
MR. HARRINGTON: We can take it now.
(Recess taken.)
MR. HARRINGTON: Back on the record.

Page 44

(Deposition Exhibit Number 5 was marked for identification.)
Q. BY MR. HARRINGTON: Marked as Reidhead Exhibit 5, a December 2, 1998, memo from John to Mel concerning the Hay sale.
Was $137.50 per MBF the agreed rate for the Hay sale?
A. Correct.
Q. Did you increase this rate over time?
A. I don't remember.
Q. Do you know if you charged more in 1998 than you had in previous years?
A. Possibility.
Q. Is that something that sometimes happened with your work for Precision Pine?
A. Yeah, sometimes, if your sale was over a long protracted period of time.
Q. How would you renegotiate the rate on a sale such as this?
A. I'd just call up Lonnie and say, "We need another $5," or whatever, or 10.
And he would say, "No. I can do two and a half," and the haggling, and that is the way we would do it.
Q. Why would you ask for an increase in the

Page 45

rate per sale?
A. Sometimes fuel -- I don't know if this was the period of time, but fuel became a real issue. I think it was around that time fuel just went astronomically high.
And we went back to almost every company. We went back and tried to renegotiate, and they would pay us a stipend, whatever you call it, an increase of pay to help with the fuel and those kinds of costs.
Q. Would there be any other reasons that you would ask for a higher rate on the timber sale contract?
A. The length of time of the contract, you know, you increase your employees' pay. Sometimes that would become a factor if it went four or five years instead of in the first or second year.
Q. Did it ever happen that the harvesting work was more difficult than you anticipated and you would want an increase for that reason?
A. There probably was a time. I couldn't tell you that it turned out to be rougher than we thought or the Forest Service demanded more than we thought was in the contract and we would renegotiate something like that.

Page 46

Q. Is there any way to tell at this point why you would have renegotiated a price on a given contract?
A. Why I would --
Q. Let me rephrase the question.
Is there any way to go back now and figure out what would have caused a particular price increase?
A. I don't know how you would have done that that many years ago, how I could remember why did we come up with another 2 or $5. I would not know.
Q. And there wouldn't be anything written at the time, would there?
A. That's been a long time. I'm sure there's not. I wouldn't think so.
Q. I'm just basing that on -- given that most of your communications with Mr. Porter were oral communications.
A. Yeah. Yes.
Are you typing in the yeahs too?
MR. GOEKEN: We're catching them, though.
Q. BY MR. HARRINGTON: Do you know if you renegotiated the timber harvesting price on any other of the other contracts that are at issue in this suit?

Page 47

A. I don't know. It seemed like when we took the Hay sale, we had to run -- had to haul it to Winslow. I don't know if you would call that a renegotiation. It was a longer haul and all that. I'm not sure if you would call that a renegotiation, but that would be increased cost, for sure.
Q. So there would have been increases on some sales if you had to change where you were hauling the timber to?
A. Yes, sir.
Q. You mentioned the Hay sale in particular. Why did you have to change where you were hauling the Hay sale?
A. I don't remember. I don't remember the particulars why they wanted to go to Winslow, but they did. They just told us that's where we need to take it, but I don't remember why.
Q. Do you know if that resulted from Precision Pine closing its mill in Eagar?
A. I think so.
Q. Is that possibly a reason that you changed where you were hauling the Hay sale?
A. Correct.
Q. Do you know why Precision Pine closed its mill in Eagar?

Page 48

A. I don't.
Q. Do you know why Precision Pine opened or closed its mills at any of the times that you were working for Precision Pine?
A. I don't.
(Deposition Exhibit Number 6 was marked for identification.)
Q. BY MR. HARRINGTON: I've marked as Reidhead Exhibit 6 a February 2, 1999, memo from John to Mel.
Mr. Reidhead, it mentions -- at the top it says, "Pulpwood to Heber Mill."
A. Correct.
Q. Would you have been hauling pulp mill to the Heber Mill at about this time?
A. Pulpwood?
Q. Yes.
A. Yes.
Q. Do you know why it was being hauled to the Heber Mill?
A. I'm not sure on that one. I don't know. I was looking at the poundage there.
Q. Is this just something that Precision Pine would have told you to do and you would have gone ahead and complied with their wishes?

Page 49

A. Correct.
(Deposition Exhibit Number 7 was marked for identification.)
Q. BY MR. HARRINGTON: Marked as Reidhead Exhibit 7, December 15, 1997, invoice from Tri Star Logging.
Mr. Reidhead, is that your signature down at the bottom?
A. Yes.
Q. What is the document that I just handed to you?
A. It's a billing from us from Tri Star Logging to Precision Pine.
Q. This invoice refers to a letter to Sean Leary at Stone Container giving him the okay to pay Tri Star directly.
Do you remember that arrangement?
A. Vaguely.
Q. Do you know why that arrangement was made?
A. I don't remember right now.
Q. For pulpwood from the Jersey Horse contract that was subject to the arrangement, did you have to pay anything to Precision Pine after you were paid by Stone?

Page 54

A. I do.
Q. Were these profit and loss statements for Tri Star Company?
A. Correct.
Q. Did you generate a profit and loss statement each month?
A. Mostly.
Q. Who was responsible for putting together this sort of a profit and loss statement?
A. My office manager and help from our accountant occasionally.
Q. It has a line under "Income," called "Precision."
A. Correct.
Q. What does that line reflect?
A. What did that mean?
Q. Yes.
A. That was the revenue received from Precision, I assume.
Q. And do you know if during the time of these profit and loss statements you were doing any other work for any other entities? I point you particularly to the July 1995 page where there are some other entries under income.
A. The U.S. Treasury, must have been some

Page 55

kind of oil return or money return or something, I would assume. Silver Creek Little Theater, I have no idea where that came from. Man, that is interesting.
Zellner's Firewood is a place we would haul some firewood to -- some of the top wood to.
Q. You said that you would sometimes haul and sell pulpwood to Stone; is that right?
A. Correct.
Q. If you had sold pulpwood to Stone, would that have shown up as income on one of these statements?
A. It wouldn't have shown up from Stone unless Stone paid us directly. If they didn't pay us directly, then it would come through Precision.
Q. During the time of the suspension, from August 1995 through December 1996, did you do any work for Precision Pine?
A. I don't recall.
Q. Were there any contracts or sales that were not suspended during that time, if you recall?
A. I don't remember.
Q. Were you able to look for work from other companies during that time period?
A. In Arizona there weren't any companies

Page 56

working. There was one in New Mexico. We worked there a little bit. A disaster, but we worked there.
Q. Who was the company you worked for in New Mexico?
A. Used to be -- I don't know if it was Duke City then or -- no, Duke City sold out. I don't remember the company that took their place. It's up in Espanola. I know where it's at but don't remember the company.
Q. Were you doing harvesting work for them?
A. Yes, trying.
Q. Did Tri Star have any relationship to Reidhead Lumber Company?
A. Only as a cousin.
Q. Reidhead Lumber Company was operated by one of your cousins?
A. Yeah. I don't know how far away. My dad knew him. I didn't know him very well.
Q. So there was no formal relationship between the companies?
A. We never, ever worked for them.
Q. Are there any other companies that you remember working for during the time period when Precision Pine contracts were suspended?

Page 57

A. I don't think so.
(Deposition Exhibit Number 10 was marked for identification.)
Q. BY MR. HARRINGTON: I've marked as Reidhead Exhibit 10, April 18, 1995, letter from Lewis N. Tenney to Steve Reidhead.
Have you seen this letter before, Mr. Reidhead?
A. Yeah. I think this is when I bought the equipment, I think, or he finally sent me a letter or something. I can't remember for sure, but I think that's what that deal was.
Q. So this was the time period when you were purchasing the Precision Forest Management equipment?
A. I may have purchased it before then, but he may have just sent it to me.
Q. And the agreement on future logging, is that what you have already discussed?
A. Uh-huh. Correct.
Q. So from this time -- from roughly this time on you were going to be doing all of Precision Pine's logging work?
A. Correct.
Q. It refers to, "If we were required to

Page 66

MR. SALTMAN: You ask too many questions.
Q. BY MR. HARRINGTON: It was going to Winslow Mill.
A. That was probably on the Coconino somewhere, I'd assume.
Q. It was -- I'll tell you also, the Mud sale was one that was released earlier than some of the other sales. Cutting began on that in 1996.
A. I assume we did it then. I just don't remember much about it. I just don't.
Q. When you say you "assume we did it," that you assume that you cut the sawtimber and left the roundwood?
A. We cut the timber off there.
Q. And you left the pulpwood on the sale when you were cutting the sawtimber?
A. I don't remember.
Q. When Tri Star harvested roundwood on Precision Pine's timber sales, was there always a purchaser lined up at the time?
A. No.
Q. Do you remember any occasions when -- by reference to any particular sales, any occasions when there was no purchaser that had been lined up for roundwood?

Page 67

A. I don't remember that.
Q. You just remember it happened?
A. We did the pulpwood. I don't know -- I don't think anybody purchased pulpwood but Stone, did they? I don't remember that.
Q. Who would negotiate the sale of pulpwood with Stone? Would that be Precision Pine or Tri Star?
A. Precision Pine did most of it, unless they couldn't, and it seemed like a sale or two that I was able to do because of my relationship with Stone, but most of the time it was Precision.
Q. Would you say there were occasions when they were unable to negotiate the sale and they asked you to help with that?
A. Negotiations might be the wrong word. They couldn't sell the pulpwood to them. Because of my relationship to them, I could sell a sale to them.
Q. So how did it work on those occasions?
A. It worked pretty good. I mean, it was okay.
Q. What was the mechanism you used to do that?
A. Sorry. I missed that.

Page 68

Q. That's okay.
A. I would contact Stone, and then if they would take the pulpwood from me, I would contact Precision and say, "Hey, they'll take the pulpwood from me." That wasn't very often.
Q. Did Stone know the pulpwood was coming from the Precision Pine contract?
A. Most of the time.
Q. Not all the time?
A. I don't know. They knew who I was logging for. It wasn't like it was a real hard decision.
Sometimes they needed the pulpwood. It's like I told you, it would be getting down, and they didn't like Precision very well, because they competed all the time, but...
Q. Is that sometimes why they would take it when you offered it to them but not when Precision Pine offered it to them?
A. Probably. I assume. I don't know.
Q. Do you remember what the sales were where you went to Stone to see if you could get them to take the pulpwood?
A. I don't recall that at all.
Q. Do you remember what time frame it was

Page 69

when this happened?
A. I don't know that either. We just varied over the years. We just -- you know, one here and one there.
Q. Do you remember when the first time that you went to Stone on behalf of Precision Pine to try to sell the roundwood would have been?
A. The first time?
Q. Yes.
A. I don't remember that. I don't.
Q. Would it have been in the 1995, 1996 time frame?
MR. GOEKEN: I'm going to object at this point. He's answered the question three times.
If you have any better recollection on this question, you can go ahead and answer it.
THE WITNESS: I just don't remember what sale we started. We just used to do that.
Q. BY MR. HARRINGTON: We talked a little bit about the Hay sale and increasing your price.
Do you know if you increased your price on the O.D. Ridge sale?
A. I don't remember.
Q. Do you know any way that we could find out now if you did, in fact, raise your price on the