PRECISION PINE & TIMBER, INC.
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 536-2181

April 18,1995

Steve Reidhead
HC 63 Box 8206
Snowflake, AZ 85937

Dear Steve:

This is to confirm our agreement with you on future logging.

If we are required to shut down another sawmill, we will contract with you to do the logging on the remaining two.

This agreement will expire July 15th 1999.

Sincerely,

Lewis N. Tenney, Jr.
Vice President Resource



Porter Ex. 43

Tenney Ex. 40

EXHIBIT NO. 10
REIDHEAD
2/11/04

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 98-720 C

(Filed January 30, 2004)

- - - - - - - - - - - - - - - - -x

PRECISION PINE & TIMBER, INC., :

Plaintiff, :

v. :

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - -x

Washington, D.C.

Tuesday, February 17, 2004

Deposition of ROBERT A. NESS, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of the United States Department of Justice, 1100 L Street, N.W., Washington, D.C. 20539, at 9:15 a.m., Tuesday, February 17, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 182

MR. GOEKEN: Objection -- lack of foundation.
You can answer.
THE WITNESS: I don't really know. I have nothing, no knowledge except general knowledge of log scaling, and so how you would convert CCF to MBF, I'm sure there's a lot of [illegible] involved, but from my discussions with Lon, it sounds like two was a reasonable number to use consistently, produced a good average.
BY MR. HARRINGTON:
Q. So you accepted what counsel did as far as picking those conversions in coming up with Exhibit 9?
A. Oh, actually I accepted what Lon had represented to me.
Q. Was Mr. Porter involved in putting together Exhibit 9?
A. No, but he was involved in explaining to me the conversion factor, so from there, I [illegible] mathematically used it.
Q. So you relied on what Mr. Porter told [illegible] accepting a conversion factor across the

MR. GOEKEN: Objection -- asked and

Page 183

[illegible]
You can answer.
THE WITNESS: That's correct.
[illegible] a pause in the proceedings.)
BY MR. HARRINGTON:
Q. We touched on lumber sales prices

Is it correct that you relied on the lumber sale prices contained in Precision Pine's calculations, supporting documents binder in analyzing the price that lumber could be sold for during the suspension?
A. For Ponderosa Pine.
Q. What did you rely on for Douglas Fir pricing?
A. Douglas Fir pricing was prepared by [illegible] and I received a schedule of that.
I don't believe that schedule was in the supporting documents for February.
I understand that that has been, been presented at some time during the discovery [illegible] remember, it was based on some [illegible] with some adjustments for being [illegible] Arizona as opposed to being located

Page 184

in Portland, Oregon.
Q. Did you do anything to verify the Douglas Fir sorts of prices?
A. I did not. They looked reasonable based on my knowledge of the market, and although I don't specifically remember 1995, they didn't seem to be out of line.
Q. Do you know how the product mix for Douglas Fir was arrived at?
A. That information came from Lon.
Q. Did you strictly rely on what he gave you for the product mix information for Douglas Fir?
A. Yes, I did.
Q. How about for Englemann Spruce? How was the pricing information arrived at for the Englemann Spruce?
A. I believe Englemann Spruce, there was some random lengths information that Lon then used to make some adjustments to, so I believe I had both random lengths reports and Lon's calculations, and grade breakdown again was provided by, by Lon as well as the breakdown between one by four and one by one and one by six.

Page 185

Q. Did you do anything on the spruce to verify the prices that you were provided by Mr. Porter?
A. Same thing I did on Douglas Fir; I looked at the document, and I did some recalculations to make sure that the numbers were right, and you can see that I did change the numbers from what the February calculations are, if there were some inaccuracies in the transcription at that point.
Q. How about the product mix that came from the Englemann Spruce?
A. No.
Q. You just simply relied on what Mr. Porter provided you on that?
A. Yes, I did. It's fairly insignificant.
Q. In considering the costs -- start over.
In considering the sale prices that Precision Pine was able to obtain for its products, did you look at Precision Pine's Winslow sales record?
A. For Ponderosa Pine?
Q. (Indicated "yes.")

Page 270

Do you know if any of the notes were entered into for any particular purposes?
A. The only documentation I saw was for working capital.
Q. So it was just general working capital as far as you know?
A. Yes.
Q. Looking at Exhibit 18, can you explain briefly what Exhibit 18 shows?
A. Exhibit 18 is, is prepared from the fiscal year March 31st, 1995 financial statement, and basically groups all overhead types of expenses into two different pools.
One would be, or I'm sorry -- not just overhead expenses, all expenses into two different pools.
One would be your logging manufacturing costs, and the other major pool would be your general and administrative costs, to develop a percentage overhead for general and administrative expenses.
Q. And so this is the sheet that shows how you developed the 7.6 percent overhead rate?
A. That's correct.
Q. Okay. I think that's all I've got.

Page 271

It was three questions.
MR. GOEKEN: Very good. We'll reserve signature.
(Whereupon, at 4:25 p.m., the taking of the instant deposition ceased.)

---------------------------
ROBERT A. NESS

SUBSCRIBED AND SWORN to before me this----------

day of-----------------------------, 20------.

---------------------------
NOTARY PUBLIC

My commission expires:

Page 272

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages 1 through 271, do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to the proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The District of Columbia

My commission expires:
September 14, 2007

**PRECISION PINE AND TIMBER v. U.S No.: 98-720C May 20, 2003**

**Heritage Reporting Corporation**

**Page 1 to Page 56**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
PRECISION PINE AND TIMBER, )
INC., )
Plaintiff, )
v. ) Docket No.: 98-720C
UNITED STATES, )
Defendant. )
Courtroom 5, Room 505
National Courts Building
717 Madison Place, N.W.
Washington, D.C.
Tuesday,
May 20, 2003
The parties met, pursuant to notice of the
Court, at 10:13 a.m.
BEFORE: HONORABLE EDWARD J. DAMICH
Chief Judge
APPEARANCES:
For the Plaintiff:
ALAN I. SALTMAN, Esquire
RICHARD GOEKEN, Esquire
DAVID J. CRAIG, Esquire
Saltman & Stevens, P.C.
1801 K Street, N.W., Suite M-110
Washington, D.C. 20006
(202) 452-2140

Page 2

APPEARANCES: (cont'd.)
For the Defendant:
MONICA J. PALKO, Esquire
DAVID HERRINGTON, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W., 10th Floor
Washington, D.C. 20530
(202) 307-6288
Also for the Defendant:
LORI POLIN JONES, Esquire
U.S. Department of Agriculture
1400 Independence Avenue, S.W.
South Building Room 2015
Washington, D.C. 20250
(202) 690-0167

Page 3

P R O C E E D I N G S
(10:13 a.m.)
THE CLERK: All rise. The Court of Federal
Claims is now in session, the Honorable Edward J.
Damich presiding. God save the United States and this
Honorable Court. Please be seated.
THE COURT: This is case of Precision Pine
and Timber, Incorporated v. The United States, Docket
No. 98-720C. Representing the Plaintiff is Mr. Alan
I. Saltman. Hi, Mr. Saltman.
MR. SALTMAN: How are you, Your Honor?
THE COURT: And I see with you is Mr.
Richard W. Goeken?
MR. SALTMAN: Yes. And also with us at
counsel table is our associate, Mr. David Craig.
MR. CRAIG: Good morning, Your Honor.
THE COURT: Mr. Craig, good to meet you.
Let me see, and formally representing the United
States is Ms. Monica J. Palko. Welcome, Ms. Palko.
MS. PALKO: Thank you, Your Honor.
THE COURT: And I guess representing the
U.S. is Mr. David Herrington.
MR. HERRINGTON: Good morning, Your Honor.
THE COURT: Welcome, Mr. Herrington. And
with you is?

Page 4

MS. JONES: Lori Jones with the USDA LGC.
THE COURT: Okay, Ms. Jones. Welcome.
MS. JONES: Thank you.
THE COURT: In addition to Jamison Weinbaum,
my law clerk, also attending, this is apparently a
very interesting case, is my other law clerk, Mr. John
Buckley, who is sitting in the back and our intern for
the summer, Ms. Ann Salovier, who is a student at
George Washington Law School. Okay. The purpose of
this status conference, at least for me, is to see
what has been done and where we go from here. The
parties have agreed to a formal discovery schedule
which was submitted to the Court.
But before we go into that, I would like to
find out from Ms. Palko why seemingly, very little has
been done on the 150 pages of charts and tables,
51,500 pages of supporting documentation that the
Plaintiff has submitted to the government? Ms. Palko?
MS. PALKO: I'm not sure I understand when
you say not much has been done. But if you mean why
we couldn't maybe knock out some of those issues, is
that what you're getting at?
THE COURT: That's a better question.
MS. PALKO: Okay. We certainly have done
our best with it. It is about 1,500 pages. I believe

Page 21

responses and the meeting, I can just say that in that 11 month period, nearly eight months of it was in their hands to get their documentation together. Now, I am grateful that they did that but, just to be very clear on since I've been on the case, I believe we have been very cognizant of moving it on. And frankly, when we talked about it and I spoke with Rick, I don't believe they felt pressured into this. What I said is, hey let's look at this. Look at how long it took you to get this together. Are we realistically, when it took you let's say six to seven and one-half months, we can go back and forth on to which inquiry they were specifically responding on February 26. Do you really think we're going to be responding to each other in 30 days time? Let's at least give each other 45 days to respond. And I don't think I had to twist anybody's arm for that. I think people are acknowledging this as a 14 contract case with at least six plots per contract. Each plot is treated differently. Then they have three sawmills that are involved, overhead claims. It's a big, hefty, complex claim I think, on both sides. So that's all. Just to acknowledge that at least recently we certainly have been moving it along on our end.

Page 22

MR. SALTMAN: We don't see any need for discovery, really. I mean I think the questions, we'd anticipate receiving them from the government, not us propounding them. So, if she wanted to give us 45 days to respond, fine.

THE COURT: What you're saying is that you don't have any further requests of the government at this time.

MR. SALTMAN: No. No.

THE COURT: So it's entirely the government's discovery request.

MR. SALTMAN: I mean, aside from the fact that we'd like to know eventually who they're going to have as witnesses, we really don't have any other questions.

THE COURT: Okay. Can you enlighten us, the Court, Ms. Palko, as to what additional information that you need?

MS. PALKO: Well, I will refer to David Herrington ultimately, of course, but you do raise an interesting issue. If they say they're done, can we get that through a formal discovery request. They cite the Bates number they've already provided us and they say, we're done. But I do believe we need to formalize the process pursuant to Court rules so that

Page 23

we have something we can show the Court in Court and say, this is their response. But if they're willing to go on what they have, then I still think it makes sense to have a consultant look at it, talk about where the holes are or where the reasonable areas are. I can tell you what I would be asking for based on conversations that we've had and a couple of meetings with the consultants albeit they weren't on the payroll yet so they couldn't start work, I can tell you what we believe we need. For example, they say historical data. We say, wait a minute, you say missed out on this profit. We need an opportunity to determine whether you've ever made such a profit. Well you have our tax returns, you don't need anything else.

MR. SALTMAN: You know, there is some case law that says you don't have to –

THE COURT: Mr. Saltman, hold on please. Yes, Ms. Palko.

MS. PALKO: We have our tax returns, you don't need anything else. Well our consultants say there are a lot of ways to find this information and this is what we'd like to be asking them for. They have a sawmill that burned down that was unattended. We have some questions about that. They say that

Page 24

ordinarily they put X NBF through this sawmill and because they couldn't proceed with these contracts, it went out of business. We'd like historical data on the NBF that goes through that sawmill. We don't have it. Now, if they want to proceed without it, then we can perhaps ask our consultants to go ahead, based on the data they have, we get one set of discovery out and they say hey, you've got everything you need, it's Bates-stamped X, Y, Z, that's all we're using. And, I defer to Mr. Herrington, but if that's how they want to proceed, maybe we can. And maybe that's the way to go with this. That's a possibility.

THE COURT: So the argument would be, since the burden is on the Plaintiff to prove that there were damages, you think there is insufficient evidence currently to do that. You're trying to flush it out so you understand more, but what you're saying is, if you want to go on what you have, okay, because you feel confident that they will not be able to prove their damages with what they have. Is that the right answer?

MS. PALKO: That sums it up, Your Honor.

THE COURT: Okay. Let me get Mr. Saltman's view on that.

Page 25

MR. SALTMAN: We think we can prove our damages. We think we've got a lot of documentation here to do it. I don't see why we can't proceed.
THE COURT: So, in other words, you would at this point now change your agreement to further discovery and say no further discovery –
MR. SALTMAN: The discovery was I agreed to the government's discovery, essentially. If they don't need discovery because the Plaintiff doesn't need discovery.
MS. PALKO: Your Honor, may I confer just very briefly with Mr. Herrington?
THE COURT: Yes, if you please.
MR. SALTMAN: I think we go to a pretrial.
MS. PALKO: Your Honor, this may be a manageable solution but, if perhaps we could have even a week to just get back in touch with the Court. We don't have the consultant on board. It should be imminent. I got an e-mail yesterday saying, we think we can sign this up today or tomorrow. We would like to ask that person, okay, if you don't get anymore discovery on this case, can you give a proper opinion on it. And I believe the answer is, I can give an opinion on whatever evidence is there. But we would like an opportunity to do that

Page 26

and perhaps it's enough that they're on the record today saying, this is the sum total of their evidence. We, of course, don't want to show up in Court and have additional documents emerge, additional testimony. It still makes sense –
THE COURT: I can assure, neither does the Court want that to happen.
MS. PALKO: And we do believe it will still possibly make sense to take deposition because I believe the president of their company would likely be the one to testify as to the damages. So it might still make sense to take some depositions so we understand where they're coming from, so it's not the first time you've asked the president, what did you mean by this number, when you're in Court. So, some depositions still might make sense. But, if they say they have no further documents, they don't care to provide any further, I think it's something we can look into as to whether we proceed.
THE COURT: Before you do that, let me just throw this out as an alternative. And if there's an agreement between the parties right at this moment, then we'll just go with this. What it basically is is I would agree then to some formal discovery, but not to the length of time that the government has asked

Page 27

for. And if Mr. Saltman would prefer instead not to do this at all and to instead rest his case on the evidence that he has submitted, then we can talk about a weeks' delay and you can discuss that with your expert and, of course, obviously you can discuss it with your experts as well. And this is my schedule. The commencement of formal discovery would begin, not surprisingly, May 20. The close of written discovery, except for expert reports, would be July 21. The issuance of any expert reports would be August 22. The completion of all depositions and the close of all formal discovery would be September 19. And then the deadline for any memorandum by either party indicating a notice of intent to file a dispositive motion would be October 3. And if Mr. Saltman agrees to that, then we'll just do that, otherwise, we will consider just doing it on the evidence that you have without further discovery and –
MR. SALTMAN: I wasn't exactly suggesting that we submit a motion for summary judgment on this but that seems fine, Your Honor. I would go further though is, let's schedule the pretrial and set a trial date.
THE COURT: I, in fact, don't have much of a

Page 28

problem with that except for the fact that I have an extremely extensive pretrial order that requires a lot of effort and what I can do is send it out to you now, as soon as Court adjourns for the day, so that you know what you're in for. And you can begin to work on it so that we can compress. It actually takes, I believe, almost three months, believe it or not, to do. But what we can do is try to compress that since you have the pretrial order now, if you begin working on it since it seems as if settlement is not a possibility that when October 3 comes around, we can compress considerably the time for pretrial. But the pretrial period, you see, is primarily for me because of the fact that I'd like to have everything as clear as possible and everything out on the table for trial so that we don't have problems that arise during trial. Because I can tell you right now that I hate those things. I hate surprises unless, of course, we're talking about, you know, cross-examination. I hate surprises and the one thing I really detest is when a legal issue arises that could have been identified earlier and that could have shortened the number of witnesses and the amount of evidence at trial. So what the pretrial order is calculated to

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PRECISION PINE AND TIMBER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No.: 98-720C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Pages: 1 through 224

Place: Washington, D.C

Date: October 1, 2003

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

154-98-720
(14)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PRECISION PINE AND TIMBER, )
Plaintiff, )
v. ) Docket No.: 98-720C
UNITED STATES, )
Defendant. )

Courtroom 4, Room 501
National Courts Building
717 Madison Street, N.W.
Washington, D.C. 20005

Wednesday
October 1, 2003

The parties met, pursuant to notice of the Court, at 3:05 p.m.

BEFORE: HONORABLE EDWARD J. DAMICH
Chief Judge

APPEARANCES:

<u>For the Plaintiff</u>:

ALAN I. SALTMAN, Esquire
RICHARD W. GOEKEN, Esquire
DAVID J. CRAIG, Esquire
Saltman & Stevens, P.C.
1801 K Street, N.W., Suite M-110
Washington, D.C. 20006
(202) 452-2140

<u>For the Defendant</u>:

DAVID ALLEN HARRINGTON, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277

MR. GOEKEN: Okay.

THE COURT: My view is, and that, indeed, is my ruling, that you have not answered responsively to Interrogatory 27, and I would ask you to please do so.

MR. GOEKEN: There were some assumptions made there that I can flesh out.

THE COURT: Okay. Please do that.

MR. HARRINGTON: Your Honor?

THE COURT: Yes, Mr. Harrington.

MR. HARRINGTON: Ms. Jones is going to need to leave at this point, and I just wanted to let you know that she is going to be stepping out.

THE COURT: Oh. Do you want to recess until another time, or do you want to continue, Mr. Harrington?

MR. HARRINGTON: I think we can continue, Your Honor.

THE COURT: Okay. All right. Thanks very much, Ms. Jones.

MS. JONES: Thank you, Your Honor.

THE COURT: Okay. Twenty-nine.

MR. HARRINGTON: Your Honor?

THE COURT: Yes, Mr. Harrington.

MR. HARRINGTON: Just touching on Interrogatory No. 27, this is central to the lost-

profits claim. I would note that in their brief in response to our motion, they say they have no contention during periods outside of the suspension. And I would like to suggest that, first of all, if that is, in fact, the case, their lost-profits claim necessarily fails because in order to maintain their lost-profits claim, they do not merely need to show what they could have sold the lumber for during the period of the suspension, but they need to show that that number is higher than what they could have sold it for after the suspension or before the suspension because if that's not the case, then they haven't been harmed by the suspension because they were allowed to harvest this timber after the suspension. And if they would have made more money after the suspension by selling this lumber, there are no damages, there are no lost profits because they were better off.

THE COURT: You can make that argument at trial. All that the interrogatory says is the price that they could have sold.

MR. HARRINGTON: My point is simply that we anticipated receiving a full answer for the full period of time --

THE COURT: That's what it says.

MR. HARRINGTON: -- that we're asking for in

**PRECISION PINE v. U.S. 98-720C NOVEMBER 4, 2003**

**Heritage Reporting Corporation**

**Page 1 to Page 67**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
PRECISION PINE & TIMBER, INC.,)
Plaintiff, )
v. ) Docket No. 98-720C
UNITED STATES, )
Defendant. )
Courtroom 6
National Courts Building
717 Madison Place, N.W.
Washington, D.C.
Tuesday,
November 4, 2003
The parties met, pursuant to notice of the Court, at 10:05 a.m.
BEFORE: HONORABLE EDWARD J. DAMICH
APPEARANCES:
For the Plaintiff:
ALAN I. SALTMAN, Esquire
DAVID J. CRAIG, Esquire
RICHARD W. GOEKEN, Esquire
Saltman & Stevens, P.C.
1801 K Street, N.W., Suite M-110
Washington, D.C. 20006
(202) 452-2140

Page 2

APPEARANCES: (Cont'd.)
For the Defendant:
DAVID ALLEN HARRINGTON, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277
LORI POLIN JONES, Esquire
U.S. Department of Agriculture
Office of General Counsel
South Building, Room 3551
1400 Independence Avenue, S.W.
Washington, D.C. 20250
(202) 690-0167

Page 3

P R O C E E D I N G S
(10:05 a.m.)
THE CLERK: All rise.
THE COURT: Please be seated. This is the case of Precision Pine & Timber, Inc. v. United States, Docket No. 98-720C. Representing the Plaintiff is Mr. Alan I. Saltman. Mr. Saltman, good morning.
MR. SALTMAN: Good morning, Your Honor.
THE COURT: With you I see is Mr. Goeken.
MR. GOEKEN: Good morning, Your Honor.
THE COURT: How are you?
MR. CRAIG: And Mr. David Craig.
THE COURT: Mr. Craig, welcome. Representing the Defendant, the United States, is Mr. David Allen Harrington. Hi, Mr. Harrington.
MR. HARRINGTON: Good morning, Your Honor.
THE COURT: How are you? And with you is?
MR. HARRINGTON: This is Ms. Lori Polin Jones of the co-op (phonetic) party.
THE COURT: Okay. Ms. Polin Jones, welcome.
MS. JONES: Good morning.
THE COURT: The purpose of the status conference is to continue to see if there are any problems with regard to discovery, in particular with regard to interrogatory no. 34. I guess the ball is in your court, Mr. Harrington, to

Page 4

tell the Court whether you believe so far the answers are satisfactory.
MR. HARRINGTON: Well Your Honor, as you know I put in a status report regarding the first supplemental interrogatories, we got on 9, 27, 28 and 41. As for interrogatory 34, I got the second supplemental answer on that yesterday. I've reviewed it and regrettably I do have some problems with the answer that we've gotten.
THE COURT: Okay. What are those?
MR. HARRINGTON: The Court's order specifically said to, said it in bold I believe, to explain in detail why Precision Pine didn't harvest its timber and it provided a very detailed list of items that was supposed to be provided in doing that.
What we've gotten once again in various places are certain facts asserted, but no explanation as to why, leaving us once again having to infer the "why" part of this. I would like to talk about a couple of specific examples –
THE COURT: Sure.
MR. HARRINGTON: – that I think may be illustrative.
THE COURT: Excuse me a minute. I'll close the door. This is, by the way, John Byrd, who is an intern in my chambers. We don't have a budget to correct those

Page 5

things. Thank you. Mr. Harrington?
MR. HARRINGTON: The first contract in the first period on that contract is talked about specifically –
THE COURT: All right. I actually lost the train of thought. Which contract are you talking about?
MR. HARRINGTON: It's the Brann contract.
THE COURT: Okay.
MR. HARRINGTON: I'm looking at the Court's October 23 order and it talks about the period from October 23 to December 31, '95, and it states, "The Plaintiff shall explain why part of the contract was not harvested during this time including but not limited to explaining why Precision Pine decided to begin operations on Hutch Boondock and then come back to Brann". Now, that language begin operations on Hutch Boondock and then come back to Brann is what Precision Pine has stated in its first supplemental answer. That's what they had told us. In this supplemental answer, they don't have any reference to their assertions of the Forest Service that they were going to begin operations on Hutch Boondock and then come back to Brann. They don't provide any explanation for why that is what they said in their answer, why that was what they said to the Forest Service and that is something that was supposed to be specifically answered in the supplemental interrogatories.

Page 6

THE COURT: Okay. Let me ask Mr. Saltman or Mr. Goeken, who's on now?
MR. GOEKEN: Mr. Goeken is up.
THE COURT: Mr. Goeken, is that true?
MR. GOEKEN: Well, the first paragraph or the opening period of time talked about in Brann we say expressly that the roadwork wasn't completed and couldn't be completed until the fall and that's what the records provided by the Forest Service show.
It doesn't say that therefore they went on to the Hutch Boondock sale, but it's quite clear that because they couldn't get on to this one, which we stated here, we can't get on to the sale because you don't have roads into the sale area, that's why they went on to the other, Hutch Boondock contract, where the roads were in and they commenced working there and as soon as they could, they got back out on this sale.
THE COURT: Okay. Is that sufficient for you, Mr. Harrington?
(Away from microphone.)
MR. HARRINGTON: Your Honor, the problem is it's not the answer we're looking for in this answer.
THE COURT: Regardless of that and they even agree with you, but Mr. Goeken has now clarified. Is that sufficient for you?

Page 7

MR. HARRINGTON: If the reason they didn't do it was that they were unable to do that in during this period, October 23 to December 31, that would be a sufficient answer, if they were unable to do that for some reason. That's not what the answer says that we've gotten at this point however.
MR. GOEKEN: Your Honor –
THE COURT: Go ahead, Mr. Goeken.
MR. GOEKEN: – if I might, this is quoting from my answer, we say, "As noted by the Forest Service's contracting officer in a letter dated February 7, Precision Pine was however", this is the contracting officer, "'unable to complete the road construction reconstruction due to the court ordered injunction last fall'".
THE COURT: So basically what you're saying is yes to Mr. Harrington's question?
MR. GOEKEN: Yes. I mean it's in there already.
MR. HARRINGTON: Your Honor, if I may?
THE COURT: Yes, Mr. Harrington.
MR. HARRINGTON: The problem with this language is that the reason that this injunction was – was what we're asking about is the injunction was lifted on October 23, 1995. The injunction didn't prevent them from doing anything after that and that's why we're just interested in this period. Referencing the injunction at all is –

Page 8

injunction preventing them from doing roadwork up until October 23. But that's before this period. The injunction was lifted on October 23 and perhaps the injunction is the reason that they couldn't do the work after it was lifted.
(Multiple voices.)
THE COURT: So what you want to know is why they couldn't do roadwork?
MR. HARRINGTON: After the injunction was lifted, yes.
THE COURT: All right. Mr. Goeken, why is that the case? Why couldn't you do the roadwork after the injunction was lifted?
MR. SALTMAN: Well Your Honor, if I might, the –
THE COURT: Yes, Mr. Saltman.
MR. SALTMAN: When a road construction crew is stopped for a period of two months, they don't just sit around there and be instantly available to get reassembled and come back on the job, and I think that's what happened and that's what the government's contracting officer recognized. They gave us a full year saying that the roads couldn't be completed during the fall. They recognized that the crews can't instantly be reassembled and you pick up immediately after a two-month suspension. That's what happened here.
THE COURT: Mr. Harrington, does that satisfy you?

Page 9

MR. HARRINGTON: I think we need a supplementation to the answer anyway, Your Honor, but if what they want to say is that they were unable to get road crews going during the two plus months that the sale was open and want to say that that's why they were unable to do that, you know if that's what their answer is, that's what their answer is. But for right now we don't have any explanation as to why and let me take a step back. We're asking that – but putting the roads in, cutting the trees, thinning the trees, all this was part of the harvesting process. If what they're going to say is they were unable to get crews in during this period of time to do this work, I guess that's their answer. It is a little incongruous with their previous answer that they decided to do Hutch Boondock and then come back to Brann. They didn't say there were any problems doing the Brann contract. They said they decided to do the Hutch Boondock. That's what they originally answered.

THE COURT: Let me do this: Mr. Saltman, I can either let what you just said on the record stand as your answer here to Brann or if you would prefer to write something out to answer in more detail after thinking about it, that's okay with me, too.

MR. SALTMAN: Can I defer on that, Your Honor and give us a date by which to add further, if we so choose?

Page 10

THE COURT: I don't know. Defer making a decision until I give you a date?

MR. SALTMAN: If we don't supplement this say by Thursday, that my answer on the record will stand.

THE COURT: Okay. So you're pretty sure that you're answer is correct, but you would like to verify?

MR. SALTMAN: I would like to verify it with the client.

THE COURT: Okay. Today is what, Tuesday?

MR. SALTMAN: Yes.

THE COURT: All right. Let's do that. Next problem, Mr. Harrington?

MR. HARRINGTON: The next problem, Your Honor, I think is in the next section. The answer to the contract on Brann. It says what the Court's order said was that the Plaintiff shall explain why the Brann contract was not harvested during this time, that being April 15 to May, 1996, including but not limited to explaining why Precision Pine chose not to harvest the Brann contract, when it bought the Cepaw sale on the Hualapai reservation. Well what I've gotten in the answer here is that, these are in the last sentence of the first paragraph, the answer was that there was 320 MBF of sawtimber available for harvest during this period of time. They also state that they decided to move on to

Page 11

the Hualapai C12 sale, which contained 1,632 MBF. But that is simply a recitation of the same facts that they had given us before. That they had chosen to move on to this other sale. Now they simply told us what the sawtimber is. If there was some reason that they were unable to harvest both at the same time, perhaps moving on to the other sale would provide an explanation as to why they didn't harvest Brann, but unless there is some reason that they were not able to harvest both contracts at the same time and this, Your Honor, is significant, because this is during 1996. This is during the cessation of the other contracts and during the period of time when Precision Pine is claiming they were starved for timber. That their mills were running out of timber. That they were going to become idle, but for some reason they weren't able to harvest both of these at the same time or so the answer seems to imply. But if that's what it is, then we should know that they simply didn't have the capability to harvest these both at the same time. But if that's not the case, then the fact that they also had the Hualapai reservation sale held doesn't have anything to do with harvesting the Brann contract.

THE COURT: Mr. Goeken, I guess?

MR. GOEKEN: Sure.

THE COURT: Can you clarify or answer the

Page 12

concerns?

MR. GOEKEN: Again, I think the answer is just a willful attempt not to connect any dots on the part of the government, Your Honor. If I can just go through the answer, as we explained, Precision Pine got onto the Brann sale and took the majority of the saw logs off the sale. Mr. Harrington's correct that Precision Pine was in need of sawtimber at that point. One of the other units on the sale had a harvest restriction on it. So to stay on the sale at that point would have not been the best way to get a large amount of sawtimber most efficiently and quickly. The Hualapai sale had more than three times the amount of sawtimber on it. It had only sawtimber on it. It didn't have any of the other smaller diameter logs on it that Precision Pine couldn't use. So it made economic sense to move onto that sale. That's exactly what the answer says. It also says that Precision Pine told the Forest Service that they intended to go back to Brann, when the harvest restrictions were lifted on the one unit, which they in fact did. I think all the pertinent information is there.

THE COURT: Okay. Mr. Harrington, does that help?

MR. HARRINGTON: Your Honor, I mean I understand that Precision Pine wanted to harvest this other sale, but