Page 13

what I don't understand is why that had any effect on whether or not it harvested the Brann sale. When I said that they had 320 MBF sawtimber standing as of this period, that's what they state in their answer and that was available for harvest, putting aside any harvesting that had already been done, putting aside any restrictions on one of the other – units they had the 320 MBF sawtimber that was available during this period of time that we're talking about. For some reason they didn't harvest it. They say that the other sale was presumably more profitable. Maybe that's so, but it doesn't really explain why they didn't harvest the Brann sale.

MR. GOEKEN: If I might, Your Honor. It's a confluence of events, all of which are in here. Another significant point that I didn't mention the first time, which is in here, is the Hualapai had a termination date of September of 1996, i.e. just a few months later. If Precision Pine were to harvest the 1,600 MBF, which is not an insubstantial amount of timber, it had to get out there and get working on it. Again, just drawing the reasonable inferences, it's not difficult at all to understand why, from a business standpoint, Precision Pine chose to go to the Hualapai sale and then come back to Brann.

MR. HARRINGTON: Your Honor, if I may?

Page 14

THE COURT: Yes, go ahead, Mr. Harrington.

(Away from microphone.)

MR. HARRINGTON: Mr. Goeken's argument there has some merit and that's because they couldn't work on both sales at the same time. That they needed to go over to the Hualapai sale and get that done, because it had a short time period of September. The only reason they would have to go over and get that done and stop working the Brann sale is that they couldn't cut both at the same time. Now what they did in response to other interrogatories is a list of timber subcontractors, folks that were supposedly available to cut, to harvest the timber on these contracts during the relevant time periods. The list that they provided, and the volumes that they provided in connection with those folks, suggest that they were perfectly capable of harvesting both of these at the same time. Not only that, the supposed plan for harvesting the other contracts, if you look at the volumes of what they claimed they had been harvesting at this period of time, they could have easily harvested both of these contracts. So what was going on with the Hualapai sale has nothing to do with whether or not they could cut on the Brann contract, unless the capacity of their harvesting subcontractors was not such that they could do both at the same time. If they

Page 15

couldn't do both at the same time, they should be telling us that and not just implying it in the answer.

THE COURT: I think what's happening here is if we could try to step back from the whole discovery dispute, et cetera, is that I can see that you would prefer that the Plaintiff would make certain statements that you would find extremely useful in your argument at trial with regard to damages. The impression that I get in going through these interrogatories is that you are making that particular argument. On the other hand, of course you are entitled to have your interrogatories answered with due diligence. But I don't know if the standard is that unless you get precisely what you want, therefore the answer is not satisfactory. I think we have to sort of find a middle road here. If there is an answer that has been made and it is relevant, even if it's not as detailed as you would like it, it seems to me as if I have to say that it was answered satisfactorily. Because in a sense, I think if you look at this particular slice of the case I can see why you would be frustrated and what you particularly want at this time. But remember it's the Plaintiff's burden to prove damages. Insofar as you do not have information and you can say it was because it was not forthcoming from the

Page 16

Plaintiff, first of all if there is information that does come forth after discovery, then that of course is a serious problem. And secondly, if no information is provided, it seems to me that it actually doesn't benefit you, but you're on the winning side of that argument because of the fact that you can simply say that this was unaccounted for in the interrogatories. I think we have to sort of, as I say, try to find a middle ground here in not getting precisely what you want on the one hand and on the other hand again if the Plaintiff has given an answer, even if it's not precisely what you wanted, but is more or less in the ballpark, it seems to me as if that I at this point should allow it. Otherwise, this process will become endless.

MR. HARRINGTON: I agree, Your Honor. My concern with respect to this part is that they do reference the Hualapai sale and that the reference to the Hualapai sale is really not relevant to cutting on the Brann contract, unless there was some reason that they couldn't cut both contracts at the same time.

THE COURT: Let me just ask that question then. Could you cut both contracts at the same time? Mr. Goeken?

MR. GOEKEN: I believe there was sufficient logging subcontracting capacity out there to handle it. Who was available precisely at that point for the two-week

Page 17

period we're talking about here, I mean it's April 15 to May 3, I can't say for sure that there was somebody that could have stepped in exactly at that point to do it.

THE COURT: Mr. Saltman?

MR. SALTMAN: Your Honor, if I can add. There probably was enough logging capacity, if one pulled it from everywhere, to log every sale in our portfolio in the two-week period. That's just not reality. Timber sale companies are in business for the long haul, not for two-week periods. So why didn't we harvest a given sale in any two-week period? Timber companies are moving between sales constantly, as the Forest Service well knows and I think that Mr. Goeken's point about the government not being willing to connect the dots is absolutely correct here. This sort of thing happens every week where you just don't go out there and say I'm going to harvest every sale in my portfolio today. It is physically possible perhaps to do that. It is not realistic to do that.

THE COURT: I think that the government is entitled not to have to connect dots in an answer. It seems to me the answer should be clear. On the other hand, what I think we can accomplish here is if in fact the answer is not clear, but you believe that it is there by implication, then the question is to make precise, pull out that implication

Page 18

by your statements now so that the government can have a clearer picture, although not exactly perhaps what it wants.

MR. SALTMAN: Your Honor, also I think what we –

THE COURT: Mr. Saltman?

MR. SALTMAN: We lose sight of one thing. Is that there still are scheduled depositions of relevant officials from our company. If there are nuances that cannot or are very difficult to put down in paper as to the thought processes of the people who were involved, that to me is better suited for a deposition than to try to articulate it in seriatim rounds of probing somebody's mind as to what happened ten years ago.

THE COURT: That's a good point. Mr. Goeken, let's go back now to the question about the not harvesting both at the same time, because even I'm not clear what the answer was to that one.

MR. GOEKEN: I will just restate. My understanding is that there is sufficient subcontracting logging capacity out there to have handled this sale and a number of other sales simultaneously. Precision Pine made a business decision to go from the Brann to the Hualapai, taking into account all of the reasons I've put into this interrogatory response. Does that help?

THE COURT: I think so. Mr. Harrington, what's your next problem?

Page 19

MR. HARRINGTON: I think generally, Your Honor, there is a stock answer that has been provided with respect to the 1998 and 1999 harvesting seasons, not just on the Brann contract. I'm looking at the Brann contract, but it's also there with respect to a number of the other contracts. It is essentially the same stock answer that was provided in the initial answers. Precision Pine cites several specific factual occurrences: that Stone Container stopped using chips; that there were poor lumber markets; that Winslow Sawmill was down. They would have had to have processed the timber at a different mill. All these things leave the implication that during the 1998 and 1999 harvesting seasons, the contracts would have been unprofitable. I think Precision Pine sort of dances around that issue in their answer. They say, for instance, with respect to the Stone Container cessation of taking chips that it made the contract significantly less profitable. They say with respect to the Winslow Sawmill that the contract had become commercially impracticable. If the contract was in fact profitable, there would have been a reason to harvest presumably, and if it was not, there would have been no reason to harvest. And I just want to be clear that that's really what they're saying here, because they don't actually ever come out and say that

Page 20

and that's what the Court asked them to do in its order. The Court directed Precision Pine to "explain the connection between events mentioned in its supplemental answer to interrogatory no. 34 and its decision not to harvest with respect to these timeframes".

THE COURT: Okay. Mr. Goeken?

MR. GOEKEN: Frankly, Your Honor, I thought we had all answered this the first time and we've been even more express in the supplemental answers. As he conceded, if you have the answers in front of you to the Brann sale on page 5, we've highlighted those sections and we said the first time that it was significantly less profitable after Stone closed. Then if you skip down to the next paragraph we said harvesting couldn't go on for, on the sales, except at huge losses. I don't think it takes much of a leap to understand what that means.

THE COURT: So you can actually agree with Mr. Harrington then and say, the reason why you recited all these factual occurrences is that you thought it would portray, to a person who read this, that the reason for not doing the harvesting is because the contracts were unprofitable, is that correct, Mr. Goeken?

MR. GOEKEN: That's correct, Your Honor.

THE COURT: Okay. Mr. Harrington.

(Away from microphone.)

MR. HARRINGTON: With that clarification, I have no problem with the answer, Your Honor. I just wanted to be clear that that's what the answer referred to, that statement.

THE COURT: Okay. Just a minute, please.

MR. GOEKEN: Okay.

THE COURT: We need you to speak more clearly into the microphones to –

MR. GOEKEN: Okay. I'm sorry.

THE COURT: – pick up your words. You have to share a mike there. Maybe you should give one to Mr. Saltman and then –

MR. GOEKEN: I'm looking this way, which is a little awkward. We tried to bring this point across again in our supplement by saying the sales were a commercially impracticable performance.

THE COURT: Okay.

MR. GOEKEN: We have tried in good faith to comply with the Court's orders. I just want to bring that point home.

THE COURT: Mr. Harrington?

MR. HARRINGTON: As I say, Your Honor, with respect to the clarification, what I consider the clarification where they say the contracts were unprofitable



during these periods and that's why they weren't harvested, that is the answer I have no problem with the answer now it has been clarified.

THE COURT: Okay. Next?

MR. HARRINGTON: Your Honor, if I could, just to be certain, we're talking specifically about the Brann sale. They provide the same answer with respect to many of the contracts. I want to be certain that it's the same with respect to all these contracts, where they provided that sort of answer.

THE COURT: Is that correct, Mr. Goeken?

MR. GOEKEN: Yes.

THE COURT: Okay. Mr. Harrington? Does anyone feel that it's hot in here? It's even hotter with this robe.

MR. SALTMAN: It's 80 degrees outside. I don't think that was to be anticipated.

THE COURT: That's true. I suppose the system can't cope with the changes.

MR. HARRINGTON: You don't expect 80 degrees in November.

THE COURT: This is a good thing about being a Judge. My wish is anticipated by Mr. Byrd leaving immediately I guess to see if something can be done.

MR. SALTMAN: I mean you're not going to offend me



if you want to take your robe off.

THE COURT: I may if you knew what I was wearing underneath.

(Laughter.)

MR. SALTMAN: I don't want to go there. I don't want to have to imply anything.

THE COURT: I'm sorry. Mr. Harrington?

MR. HARRINGTON: Your Honor, turn to the Brubank contract and there's a discussion about the April 15, 1997 to November 15, 1997, period. There are a number of factors that are discussed and it comes to a conclusion sort of sentence that says, "Because the Beaverville, where it intended to process the timber from Brubank, was closed and Precision Pine feared that the increased costs of hauling timber to Winslow could result in an unprofitable operation of the sale, Precision Pine did not harvest payment units 1, 4, 5, and 6, during the period of September 15 to September 30, 1997."

The only problem is that conclusion only deals with a tiny fraction of the period, which was April 15, 1997 to November 14, 1997, that includes only, talks about 15 days during that period. If that's the reason that the contract was not harvested during the entire period, that is fine, but it seems to be limited to a 15-day period, during what is actually a question of six or eight months.



THE COURT: Okay. Mr. Goeken, can you clarify that?

MR. GOEKEN: The Court's order directed us to specifically respond with respect to those units in that time period. So I did.

THE COURT: It does say that explaining why Precision Pine did not harvest payment units 1, 4, 5 and 6 during the period of September 15 through the 30th. Mr. Harrington?

MR. HARRINGTON: Your Honor, it states including –

THE COURT: Including, but not limited to, exactly.

MR. HARRINGTON: It refers to the entire April 15, 1997 to November 15, 1997 time period.

THE COURT: Yes, it does. Mr. Goeken?

MR. GOEKEN: I believe the same reasons would apply to the entire time period, but I just wanted to comply with the Court's order directly.

THE COURT: It says, "Plaintiff shall explain why the Brubank contract was not harvested during this time, including but not limited to". What is the answer with regard to the other dates? Do you want to supplement that by Thursday?

MR. GOEKEN: I think the answer again is still in

there. It's just the mill was closed until the 20th and given the limited operating season on this sale –

MR. HARRINGTON: Your Honor, if I may?

THE COURT: Yes, Mr. Harrington.

MR. HARRINGTON: This whole period was during the normal operating season of this contract and they referred to certain facts in the answer, which they tied together and give an answer to as to the 15-day period. Those facts may well have been the operation of the sale is unprofitable during the remainder of that period, but if that's in fact the case, that's what we would like to confirm.

THE COURT: Okay. Mr. Goeken, can you confirm that? I think what Mr. Harrington is saying is that the facts that you list in the answer, tying them together, the impression is that those are the reasons that made the contract unprofitable, which is why the timber was not harvested. You seem to make that statement more clearly or clearly with regard to September 15 through the 30th, but not with regard to the other period of time.

If I understand Mr. Harrington correctly, all you have to say is yes, those facts also made it unprofitable for the other period of time or if you don't want to do that, then you can supplement by Thursday.

MR. GOEKEN: Can we take the same approach that we took to the previous interrogatory?



THE COURT: Yes, as long as you at least give me an answer now.

MR. GOEKEN: All right. We will.

THE COURT: Qualified as it may be.

MR. GOEKEN: Yes, all right. With that qualification, we'll say that the same reasons that are set forth in the answer carry through the entire time period.

THE COURT: Okay. All right. Mr. Harrington, next? Mr. Byrd, did you check about the temperature?

THE CLERK: We've checked about the A/C controls.

THE COURT: I usually find them to be decorative.

(Laughter.)

MR. SALTMAN: If it's any consolation, Your Honor, in our office they are decorative as well.

THE COURT: I think the only thing we can do is I guess if you call Mr. Nolan, the chief deputy clerk for administration and ask him if he can do something? Thanks.

MR. SALTMAN: I think you're required to send it by electronic means.

THE COURT: Mr. Harrington?

MR. HARRINGTON: Your Honor, the next period is for the period Hutch Boondock contract and it's talking about the April 15, 1997, through November 30, 1997, period. If I recall correctly on the Hutch Boondock contract, I'll go ahead and pull the original answer, but our recollection



is that Precision Pine harvested the vast majority of the Hutch Boondock contract and then stopped. This was after the suspension of the Hutch Boondock was lifted. Let me be clear on that before we go one.

THE COURT: Okay.

MR. GOEKEN: That is probably true, Your Honor, because we admit that it was only eleven MBF remaining on the sale, which is probably two or three trees.

MR. HARRINGTON: That is correct, Your Honor, that they did harvest most of the Hutch Boondock contract and then stopped before harvesting the completion. And my concern with the answer is they are saying that during the April 15-November 30 period it didn't make sense to go back, but that doesn't really respond to why they didn't just harvest on through.

THE COURT: Mr. Goeken, can you point to an answer to that question?

MR. GOEKEN: My assumption is that the 11 MBF was some place not easily accessible. It didn't make sense to try and go in there. The effort expended to get those last two remaining trees was not worth it so they moved on to another sale. You have to remember, this is in the period where operations are starting up again and Precision Pine was in need of sawtimber. So they were trying to get the sales of significant amounts of the larger diameter trees on



them.

THE COURT: Okay. I want to hold you to your statement that that is the reason, unless you tell the Defendant and Court otherwise by Thursday.

MR. GOEKEN: That's fine, Your Honor.

THE COURT: Okay. Mr. Harrington? Mr. Byrd gives me the thumbs-up. Does that mean you talked to Mr. Nolan?

THE CLERK: To Mr. Nolan.

THE COURT: I've heard that before.

MR. HARRINGTON: Your Honor –

THE COURT: Okay. Thank you.

MR. HARRINGTON: I'm sorry, Your Honor.

THE COURT: Go ahead, Mr. Harrington.

MR. HARRINGTON: I guess my next question is referring to the Kennel contract and Precision Pine on that one states that it didn't harvest, because it was strongly considering closing its Eagan Mill. Frankly Your Honor, I don't understand the answer, because Eagan Mill was operating during this time period. I don't understand how saying that they were considering closing the mill would have affected the harvests' sale, when the mill was still operating.

THE COURT: Okay. Mr. Goeken?

MR. GOEKEN: As you can see from the answer, the mill was in fact closed only a few weeks later. It just

Page 29

didn't make sense to pile up logs at a mill that you may be closing, so they did not proceed to do that.
THE COURT: Okay. Mr. Harrington?
MR. HARRINGTON: I guess that answers the question I had, Your Honor.
THE COURT: Okay.
MR. HARRINGTON: Let me see.
THE COURT: Again, let me just point out for the record that when you say, I guess, I still take it as your answer subject to supplementation.
MR. GOEKEN: Thank you, Your Honor.
THE COURT: Okay. Your verbal here means to me that you reserve the right to correct it by Thursday.
MR. GOEKEN: Thank you.
THE COURT: But still it's a statement of fact.
MR. GOEKEN: We will withdraw the qualification.
THE COURT: Okay.
MR. HARRINGTON: Your Honor, I guess my next question is on the Manaco sale, May 1 to June 2, 1997, time period. Precision Pine uses this phrase in a couple of cases and they refer to certain restrictions on harvesting, particular cutting that's on the contract, restrictions that didn't apply to cutting units on the contract. They were directed to provide an answer as to those other cutting units.

Page 30

They do provide an answer and the answer they state is that it made more economic sense waiting until later in the year. I'm not sure I understand what the greatest economic sense means, if it's something other than it would have been unprofitable to harvest those cutting units at this particular time.
THE COURT: Mr. Goeken, can you clarify?
MR. GOEKEN: I don't think you can necessarily draw that conclusion. It just meant that there were places where they could more economically harvest than on this sale at that time.
Given that there were harvest restrictions on here, you'd have to build roads to get to units. It could've been very difficult to, exactly to move in, move off the sale, hop onto it for a while and move back out. Even though they might have been able to harvest part of the units profitably, they would have had to move back out because of the harvest restrictions elsewhere on the sale. I don't think it's fair to say that they weren't unprofitable. It was just better places for them to commit their resources at that time.
THE COURT: The issue I guess is that I think Mr. Harrington is correct in the sense that the sentence and let me just quote the sentence for the record so I can be sure we're all talking about the same one. "Such being the

Page 31

case, it simply made much more economic sense to wait until later in the year, when these restrictions did not affect large portions of the sale." Is that correct Mr. Harrington, that sentence?
MR. HARRINGTON: That is correct, Your Honor.
THE COURT: Okay. There is an ambiguity in simply made much more economic sense as is proved by the fact that we have an interpretation from Mr. Harrington and an interpretation from Mr. Goeken. I guess what Mr. Goeken is saying is that he did not mean, since I presume he was the author, or at least the Plaintiff collectively is the author, he did not mean that it was unprofitable, but meant that it was less profitable, is that correct?
MR. GOEKEN: Right, Your Honor. And if I might, the problem with this is you could do a massive matrix on every timeframe for every contract to try and figure out all of the confluence of events that affected a particular decision.
For example, this is the period right after the two-year suspension had essentially had been lifted and harvesting is ramping back up. We're talking about a one-month period in which at least, given all of these cutting units that had restrictions on them, a vast majority of the sale wasn't available. Why didn't the company that had been hammered financially for two years decide to go on

Page 32

half of a sale, when all of it's other sales or most of it's other sales at least during this time period were available? Does that mean it was unprofitable? I don't think you can necessarily draw that conclusion.
They had other places to go to try and resuscitate their mills, all of which had been shut down at one point, due to the suspension.
THE COURT: But why would you go to other places? Implicitly it seems to me you would have to say that it made more economic sense means that more money could be made by the –
MR. GOEKEN: I think that's what it means.
THE COURT: – the course chosen, as opposed to continuing on with the old course.
MR. GOEKEN: That's correct.
THE COURT: Of course the other implication then is that the old course was less profitable, if not unprofitable.
MR. GOEKEN: I'm not sure I know what you mean by the old course.
THE COURT: You mentioned that there was a change. Let's go back to the question. Plaintiff shall explain why the Manaco, how do you pronounce that? Manaco?
MR. GOEKEN: Manaco.
THE COURT: Manaco. Manaco contract was not

Page 33

harvested during this time.
MR. GOEKEN: Right.
THE COURT: Which means of course that you moved to doing other things.
MR. GOEKEN: No. It wasn't available for harvest prior to that time. I mean we're just talking about the normal operating season for this sale.
THE COURT: During May 1, 1997, to June 2, 1997?
MR. GOEKEN: Correct.
THE COURT: Presumably the Manaco contract could have been harvested at this time, but was not, is that correct?
MR. GOEKEN: Correct.
THE COURT: The question is: Why was it not harvested during this time?
MR. GOEKEN: Yes, because of the harvest restrictions that were on half the sale and like I said, Precision Pine was attempting to revive its operations. There may not have been any plan to move onto this sale in that time period. I'm just saying as of May 1, given the harvest restrictions and the financial situation of the company, they had other places to go and did go to other places. It made more economic sense to start elsewhere than on this sale.
THE COURT: Okay. In other words, more money

Page 34

could be made by going elsewhere, than by continuing on with this sale?
MR. GOEKEN: I don't know if that's true. It's just a matter of where they wanted to restart operations. They had to make decisions to try and revive a company that had been decimated. To say that they couldn't have made money here or that a different plan might have worked or might not have worked, I don't know. They made certain decisions to go forward in their best business judgment to try and revive their operations.
MR. SALTMAN: Your Honor, may I interject on this?
THE COURT: Yes, go ahead, Mr. Saltman.
MR. SALTMAN: As a general rule, purchasers try not to have multiple entries into a timber sale. That is, if it has five units, they don't go and harvest one unit and then pull off and the second unit, because there's a lot of move in, move out costs. With half the sale here being precluded, I could imagine that the company would decide to go to other sales, where they could log the entire sale, then move back to this sale, when the restriction was lifted and make one entry and log the entire sale. They would drop their fixed costs of operation and hence, if you will, it would be more profitable at that point.
THE COURT: Okay.

Page 35

MR. HARRINGTON: Your Honor?
THE COURT: Mr. Harrington, sure.
MR. HARRINGTON: I guess just as an initial matter, Mr. Saltman, is saying that ordinarily you go in and harvest contracts – something else, but as we've seen and as we started out talking about, the Brann sale, that's not what Precision Pine frequently did.
THE COURT: But Mr. Saltman said ordinarily. I think that ordinarily probably means that what he said was true, even if you can point to an instance when it did not happen.
MR. HARRINGTON: Yes, I agree and there are many instances. But putting that aside, I think that there's something that maybe needs to be spoken about implicitly that is significant and that's that where Precision Pine is talking about something making more economic sense, something along those lines, what they're saying is they were making a business decision not to harvest. Not that the timber was unavailable, but that they were electing not to harvest during that period of time. I just want to be clear that when they're talking about something not making economic sense, they had the opportunity to harvest it during that time and chose, for whatever business reasons, not to.
THE COURT: That's the interpretation I would –

Page 36

MR. SALTMAN: But I come back –
THE COURT: – place on what you said.
MR. SALTMAN: But I come back to the government –
THE COURT: Mr. Saltman?
MR. SALTMAN: – implied belief that Precision Pine should have gone in the moment that these restrictions were lifted and harvested every stick of wood on every sale. That doesn't make sense. That's not the real world.
THE COURT: Mr. Saltman, I don't want to get into an argument about –
MR. SALTMAN: I think that –
THE COURT: – implied results –
MR. SALTMAN: You don't have to agree with me or not.
THE COURT: I know but it doesn't advance the ball at this particular hearing to start talking about the larger picture. If you look at the words here, my interpretation certainly would be that when you say it simply made more economic sense was that there was a business decision to do something other than continue to harvest the Manaco contract.
MR. SALTMAN: That is absolutely correct.
THE COURT: Okay. Thanks. Mr. Harrington?
MR. HARRINGTON: With that being said, Your Honor, I don't think that I have any more to say on the Manaco

Page 37

contract.

THE COURT: Okay.

MR. HARRINGTON: I'll move on to the next. Your Honor, I wanted to look at the period in 1997 on the Monument contracts.

THE COURT: Okay. Monument contract.

MR. SALTMAN: Do you have a page number there, David?

MR. HARRINGTON: It's page 17.

MR. SALTMAN: Thanks.

THE COURT: What was the period again, Mr. Harrington?

MR. HARRINGTON: April 15, 1997 to November 30, 1997.

THE COURT: Okay. Thank you.

MR. HARRINGTON: Essentially it's the 1997 cutting season. Again here Precision Pine talks about the sale being "of marginal profitability" and that it did not make economic sense for Precision Pine to start its operations on this sale. This is a little bit different than the reference to making economic sense, in respect to the last answer, because they talk about profitability specifically. I think it appears that they're saying the sale would be unprofitable, but again, I may have a different interpretation from across the room. I would like to know

Page 38

if that is in fact what they're talking about here.

THE COURT: Where is the language that you're talking about?

MR. HARRINGTON: In the first paragraph on page 17, Your Honor. It says, "As such, standing alone on the sale of marginal profitability, and therefore it did not make economic sense for Precision Pine to try to restart its operations following two years of suspensions, by immediately harvesting Monument".

THE COURT: Okay. I think the way I would understand this then is it being a canon of construction that we should be consistent and I would say that this means that there was a business decision. When the Plaintiff says it did not make economic sense means that it made a business decision not to restart operations following two years, et cetera, et cetera. I guess what you want to do is clarify that a little more and say: Was the business decision based on the fact that it was unprofitable, is that correct?

MR. HARRINGTON: That is correct and in this answer they phrase it a little bit differently, because they specifically state that the sale was of marginal profitability, which is something that we didn't have in the last answer.

THE COURT: Okay. It says, "The sale was of

Page 39

marginal profitability and therefore it did not make economic sense". It seems to me that the business decision was made because it was of marginal profitability. What more do you want, Mr. Harrington?

MR. HARRINGTON: Again and maybe can do this slowly, because they talked about making economic sense in respect to a number of interrogatory answers and I think Your Honor does get into it, but I just want to be clear that what they're saying is that the contract was available for harvest and they elected, because it was of marginal profitability, as a business decision, not to harvest it.

THE COURT: You have to be careful, because I think you're correct in saying globally when the phrase it did not make economic sense is concerned that that means there was a business decision. It was a business decision. But, if it is linked to marginal profitability, then I think it's appropriate to say a business decision was based on marginal profitability. But if the phrase "marginal profitability" is not in there, then it would be putting words in the Plaintiff's mouth to say the business decision was based on marginal profitability.

MR. HARRINGTON: Yes, Your Honor.

THE COURT: If that's all right, then what I'll just sort of summarize what I mean is: I would take every time the phrase occurred, "it did not make economic sense,"

Page 40

as meaning it was a business decision period. Then if that noneconomic sense is linked to marginal profitability, I think I and the an ordinary and reasonable person would say that was the basis for the business decision. Is that okay with you, Mr. Goeken?

MR. GOEKEN: All right. As long as marginal profitability doesn't mean unprofitable. I'm just saying –

THE COURT: No, it doesn't.

MR. GOEKEN: I'm saying –

THE COURT: I think in English marginal profitability does not mean unprofitable.

MR. GOEKEN: I think the language is fine the way it is.

THE COURT: Okay. Go ahead.

MR. HARRINGTON: I don't want to beat a dead horse, Your Honor. I think we've clarified this.

THE COURT: Is that one of the contracts, the dead horse contract?

MR. SALTMAN: No, it's the Jersey horse. I think it points to the dead horse one.

MR. HARRINGTON: I just wanted to be clear that the use of economic sentences is consistent throughout.

THE COURT: Okay.

MR. HARRINGTON: Your Honor, moving on to the Mud contract, particularly in to this period of June 1, 1997 to

Page 41

December 31, 1997. The answer refers to the Forest Guardian's injunction, but the Mud contract –

THE COURT: Do you have a page on that?

MR. HARRINGTON: Yes, page 21, Your Honor. At the bottom of the page. The answer refers to the Forest Guardian's injunction, but the Mud contract was not one of the contracts that was enjoined by the Forest Guardian's injunction. It also goes on to say, harvest of this timber was not economic. This is a little bit of a different phraseology than what we've talked about before, but I think it's referring to essentially the same thing.

THE COURT: Let me ask the first question: If Forest Guardian's injunction did not apply to this contract, why is it relevant even to mention it in this answer, Mr. Goeken?

MR. GOEKEN: As a set out in the answer, Precision Pine had removed much of the larger sawtimber from this sale. The remaining sawtimber was of smaller diameter and by virtue of the fact that the sale was not suspended means by implication that it was of extremely small diameter timber because the focus of the Forest Guardian's injunction was larger diameter. The effect of the Forest Guardian's injunction was to suspend larger diameter timber.

THE COURT: But it didn't apply at all to the Mud contract?

Page 42

MR. GOEKEN: It does not, Your Honor, but as the answer goes on to state, the best use of the remaining timber on the Mud sale was to mix it with larger diameter timber so that you could produce the widest range of products. I mean we say this any number of times in the answers and because the larger diameter timber on Precision Pine's other contracts was suspended, the remaining timber on Mud could not have been economically harvested.

THE COURT: Okay. Does that help you, Mr. Harrington?

MR. HARRINGTON: I'm not sure I understand the answer that we just got, Your Honor. The timber on the Mud contract is the timber on the Mud contract and it's going to be harvested. So it costs the same to harvest the tree, whether or not they're also harvesting some other sale at the same time. I'm not sure what the availability of trees on other sales has to do with the harvesting of the Mud contract. I'm still kind of at a loss for why there is some connection between the two.

THE COURT: Yes, I'm not clear on that either, Mr. Goeken. Mr. Saltman?

MR. SALTMAN: The actual cost of cutting down the tree is the same. I agree with that. The cost of running that through the mill, the per unit cost changes marketability. If you run only small logs through, as

Page 43

opposed to running simultaneously large logs and small logs, your per unit cost of manufacturing drop significantly.

THE COURT: You have large and small logs on the Mud?

MR. SALTMAN: No.

THE COURT: In this contract?

MR. SALTMAN: At this time, we only had small logs on the Mud and the larger logs that should have gone with it at the same time to make this thing economic, were suspended by Forest Guardian.

THE COURT: But Forest Guardian didn't apply to the Mud contract?

MR. SALTMAN: No, it didn't.

MR. GOEKEN: That's how you would know there was only small logs left.

THE COURT: I'm sorry. Go ahead. Okay. There are only small logs left in the Mud contract?

MR. SALTMAN: That's my understanding, yes. If you take the small logs off the Mud sale and run it through the mill, your per unit cost of manufacturing is going to be high, because you don't have larger logs to go through the mill simultaneously. Those were the ones enjoined by the Forest Guardians.

THE COURT: Okay. Mr. Harrington?

MR. HARRINGTON: I'm still a little bit confused,

Page 44

Your Honor. I understand what Mr. Saltman is saying about their mill costs, but if they were putting all the large logs in their mill, the efficiency of the mill would be that much greater. I think Mr. Saltman is right that the small logs are inherently less efficient costs. You get less money out of them per log, but you mix going through the mill. That will average different contracts together and your average cost will be different, but the cost of processing timber from the sale is going to be the same timber regardless of when you process it.

THE COURT: But you have to be careful. I think we're sliding again into an argument.

MR. HARRINGTON: Yes, you're right.

THE COURT: It really should be at the trial, because you may contest the credibility of their answer. The question is: Is the answer sufficient for the question? It seems to me as if it is.

MR. HARRINGTON: Your Honor, honestly I still don't really understand the relevance to the Forest Guardian's injunction, but putting that aside –

THE COURT: Let me try to get this clear then. What I thought that was said was that because Forest Guardian's injunction applied to other contracts and other stands of timber, which would have had the large-diameter