**INTERROGATORY NO. 36**

For each subcategory in the damages summary section of Precision Pine's February 26, 2003 damages calculations, *see* pages C-0001 and C-0002, specify each contract found to have been breached in the Court's July 30, 2001 opinion that Precision Pine contends resulted in such damages, and with respect to each contract, explain in detail how the alleged breach caused the damages sought.

**SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 36**

Please note that the following narrative is in response to the Court's Order of October 2, 2003 requiring Precision Pine to respond to interrogatory 36 "without referring to other documents." The narrative response below is intended to show how the calculations were performed for each subcategory of damage by contract. This narrative is not intended to replace, amend or update the damage calculation binder and supporting documents which currently remain the best place to determine how Precision Pine actually calculated its damages.

**Damage Item I(a): Unpaid Bond Costs:**

**Brookbank** – The Forest Service's breach of this contract resulted in Precision Pine incurring bonding costs in the amount of $565.89 plus overhead and profit for the period during which it could not have gone forward with harvesting. This is an item of suspension damages which the Forest Service has always paid. Although the Forest Service did pay a portion of the amount claimed in Precision Pine's claim letter for such bonding costs, it refused to pay Precision Pine's claim for overhead and profit on this item of damage. Accordingly, Precision

closed, there remained four and one-half loads of logs that had not been processed. Rather than pay overtime to continue to run the mill that day or have the mill employees return to process the few remaining logs the next day, Precision Pine, in an effort to mitigate its damages, transferred the few remaining logs from Eagar to its still-operating Winslow sawmill. The cost of this transfer, $2,126.58, has been allocated as damages to each of the three breached sales that were to have gone to the Eagar mill according to the percentage that the volume of timber suspended on each sale bears to the total volume of timber suspended on all three of the breached sales that were to have gone to the Eagar mill, i.e., Hay 42.4%, Kettle 22.3%, O.D. Ridge 35%.

**II. Increased Logging and Hauling Costs.**

a. Increased Logging Costs.

Increased costs of logging are claimed for two contracts that were breached by the Forest Service, namely Hay and O.D. Ridge. Due to the suspension, these sales could not be harvested by Precision Pine during the time periods anticipated. When the suspension was lifted on or about December 4, 1996, i.e., some 16 months after it had begun and harvesting operations resumed, Precision Pine was charged an additional $10/MBF by its logging contractor to harvest these sales. This logging price increase resulted in total additional logging costs of $9,983.20 (plus overhead and profit) on the Hay sale and $12,571.00 (plus overhead and profit) on the O.D. Ridge contract. The increased logging costs on these two contracts were the direct result of not being able to harvest the timber as originally anticipated due to the Forest Service's breach of these contracts.

b. Increased Hauling Costs.

1. <u>Hay and O.D. Ridge timber sales</u>:

But for the Forest Service's suspension and breach of the Hay and O.D. Ridge timber sale contracts, these sales would have been harvested to completion and the timber therefrom delivered to Precision Pine's Eagar mill before December 4, 1996, the date that the injunction was lifted. Eagar is the most proximate mill to both of these sales. However, after the suspension was lifted, the Eagar mill was not immediately available to process timber and, thereafter, due to the ongoing effects of another suspension, on or about August 1, 1997 the Eagar sawmill was permanently closed. Because the Forest Service's breach prevented Precisio[n] Pine from harvesting and processing these sales as anticipated, when harvesting was possible on the sales Precision Pine was required to haul timber from these sales to either Precision Pine's Heber or Winslow sawmills for processing. Both of these mills are further from the sales than Eagar and Precision Pine thus incurred increases hauling costs in doing so. This additional hauling cost, which would not have been incurred had there been no breach, is based on the roundtrip cost of hauling, (<u>e.g.</u>, fuel, driver pay, wear and tear on the trucks) which Precision Pine's President conservatively set at $1.10/mile multiplied by the number of additional miles hauled, <u>i.e.</u>, 272 additional miles roundtrip to the Winslow sawmill instead of the Eagar sawmi[ll] 190 miles roundtrip to the Heber sawmill instead of Eagar sawmill and 166 miles roundtrip to Winslow sawmill instead of the Heber sawmill. In order to arrive at a cost per MBF, the total increased haul cost was divided by four due to the fact that an average truck load of logs cons[ists] of 4 MBF of timber.

Specifically, in December of 1996 and early 1997 Precision Pine hauled timber 2,156.74 MBF from the Hay sale to Precision Pine's sawmill at Winslow (rather than Eagar) at an additional cost of $161,324.15 plus overhead and profit. Thereafter in 1998, after the permanent closure of the Eagar sawmill, Precision Pine hauled another 998.32 of timber from the Hay sale to its mill in Heber at an additional cost of $52,162.22 plus overhead and profit.

Similarly, with respect to the O.D. Ridge sale which should have been processed at the Eagar sawmill, in 1996 Precision Pine hauled timber from the sale to its mill in Winslow and in 1997 and 1998 Precision Pine hauled timber from this sale to its mill at Heber sawmill at total cost of $37,236.23 (plus overhead and profit).

2. Brewer, Delgado and Highway Salvage timber sales.

Although these sales were not the subject of the Forest Service's suspension, they were nevertheless impacted by the Forest Service's breaches, i.e., the breach necessitated the shut down of the mills to which the timber these sales were to have been delivered for processing and resulted in Precision Pine having to incur greater cost to haul the timber from these sales to more distant sawmill facilities as discussed below:

**Brewer and Delgado sales** – Due to the ongoing impacts of the Forest Service's suspension, the Heber sawmill remained closed from June 16, 1996 to October 20, 1997. Accordingly, in both of those years Precision Pine was forced to haul timber removed from the Brewer and Delgado sales, which otherwise would have gone to the Heber sawmill, to the Winslow sawmill at a combined additional cost of $4,008.98 (plus overhead and profit). This

item of damage has been allocated to the breached sales that should have gone to the Heber sawmill had their been no suspension in the proportion that that the volume of those sales bears to the total suspended volume as follows: Brookbank 21.7%, Jersey Horse 21.5%, Manaco 30.1%, Salt 26.8%.

**Highway Salvage sale** – Although the chart in the calculations binder at page C-0041 states that the sale would originally have gone to Heber, the sale in fact would have gone to Eagar in 1998. (The correct haul distance was used.) However, at the time of harvest the Eagar mill had been permanently closed due to the ongoing repercussions of the Forest Service's breach and suspension. Accordingly, Precision Pine was required to haul the timber from this sale to its Winslow sawmill at an additional cost of $2,873.75 plus overhead and profit. This item of damage has been allocated to the breached sales that would have gone to the Eagar sawmill had their been no suspension, in the proportion the volume of those sales bears to the total suspended volume at the Eagar mill as follows: Hay 42.2%, Kettle 22.3%, O.D. Ridge 35.3%.

**III. Lost Market Opportunity – By-Products: (a) Chips.**

In processing timber into lumber several by-products are produced, one of which is wood chips ("chips"). These chips have value and can be used, among other things, in the paper making process. However, due to the suspension and breach of Brookbank, Jersey Horse, Manaco, Salt, Hay, Kettle, O.D. Ridge, Monument, Mud, Saginaw-Kennedy, and U-Bar contracts, Precision Pine did not produce the volume of chips nor did it make the sales and earn

Note: Lost market opportunity costs for shavings in the amount of $1,788.94 were incurred on the non-breached/nominally breached contracts (i.e., St. Joe, Hutch-Boondock and Brann) as a result of the breach of the foregoing 11 contracts. As set forth in the chart below, this cost has been attributed to each of the 11 breached contracts based on the volume of timber that each breached contract contains as a percentage of the total volume of breached timber on all 11 breached contracts:

| | | Brookbank | Jersey Horse | Manaco | Salt | Hay | Kettle | O.D. Ridge | Monument | Mud | Saginaw | U-Bar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1714 | 1701 | 2378 | 2119 | 3155 | 1658 | 2625 | 730.5 | 3099.5 | 1134 | 3195 |
| | | 7.29% | 7.24% | 10.12% | 9.01% | 13.42% | 7.05% | 11.17% | 3.11% | 13.18% | 4.82% | 13.59% |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | Total of 3 non-breached contracts | | | | | | | | | | | |
| Shavings | $1,788.84 | $130.42 | $129.43 | $180.95 | $161.24 | $240.07 | $126.16 | $199.74 | $55.58 | $235.85 | $86.29 | $243.11 |

## IV. Lost Market Opportunity: Roundwood.

In Region 3 of the Forest Service, roundwood, also known as pulpwood, consists of trees less than 9 inches in diameter at breast height. As the name suggests, pulpwood is most typically used in the manufacture of pulp as part of the paper making process. From the early to the mid-1990's Region 3 increasingly offered timber sales which, in addition to containing the saw timber that Precision Pine needed for its operations, also contained a mandatory requirement for the removal of a significant volume of pulpwood to be paid for at non-negotiable prices established by the Forest Service. Precision Pine itself has never had a use for pulpwood in its operations. The facility closest to Precision Pine's operations which had far and away the greatest capacity and need for pulpwood at the time the contracts at issue were offered and

awarded was the pulp mill at Snowflake, Arizona owned by Stone Container, formerly known as Southwest Forest Industries ("Stone").

Precision Pine's goal with respect to bidding on contracts with a pulpwood component was essentially just to cover its contract costs on pulpwood and allow its logging and hauling subcontractor Tri-Star Logging to retain what, if any, money from the sale of pulpwood remained after Precision Pine's stumpage payment to the Forest Service for the pulpwood removed was covered. (In exchange for this, Precision Pine received a lower logging and hauling rate than would otherwise have been the case.) Accordingly, the claim for lost market opportunity with respect to roundwood is a "pass through" claim made by Precision Pine on behalf of the logging sub-contractor, Tri-Star, that was to cut and remove the pulpwood. Had the Forest Service not breached the contracts at issue containing pulpwood, Tri-Star would have been able to harvest the pulpwood and made a profit during the period of the suspension. However, the Forest Service's breach prevented Tri-Star from realizing this profit.

The contracts at issue in the instant matter that were breached by the Forest Service which contain a pulpwood component are: Kettle, Brookbank, Manaco, Salt, Monument, Saginaw-Kennedy, U-Bar, and Mud. Precision Pine's pulpwood claim, presented on behalf of its logging and hauling subcontractor, Tri-Star, with respect to each of these contracts is set forth below:

**Kettle** – At the time of the suspension there remained 3,958 Hundred Cubic Feet ("CCF") of pulpwood on the sale. Because Tri-Star calculated its costs and gross revenues

**U-Bar** – 13.59% of the increased cost of producing pellets due to the breach, which is $28,101.30 of the damages at the Pellet Mill.

**Item VII: Company-wide Expenses**:

Breached sales which resulted in company-wide damages are: Hay, Kettle, Manaco, O.D. Ridge, Brookbank, Jersey Horse, Salt, Monument, Mud, Saginaw Kennedy, and U-Bar. As discussed above, the Forest Service's suspension and breach of these sales resulted in far less timber than expected being processed through all of the company's mills (i.e., being manufactured into rough cut lumber) during the period August 24, 1995 through April 15, 1997 and less rough cut lumber was therefore run through the company's planer also located at Winslow. It also resulted in lower pellet production at the Heber pellet mill. Because of the slowdown at the company's mills, a number of corporate employees were laid off. However, several key corporate employees, whose skills would have been difficult to replace were kept on at their then current rates of pay even though at the time each was performing a menial job. As a result, Precision Pine incurred the additional cost of retaining these key corporate employees in the total amount of $32,975.06.

The reduced volume of timber that was available to run through the mills and the planer due to the breaches also forced Precision Pine to spread certain costs of corporate operations, including costs at the company-wide sales office located in Winslow over a much smaller volume than anticipated, resulting in substantially higher corporate overhead per unit of production costs than would have been the case had there been no suspension. The total cost of this unamortized depreciation was $8,962.54.

The suspension, and the substantial damages that were a direct result of it, necessitated Precision Pine's engaging experienced and specialized counsel to prepare Precision Pine's claims at a cost of $114,508.00 for work through October 30, 1997. Of course, Precision Pine employees provided substantial assistance in the claim preparations at a total cost of $36,009.49. Moreover, after the unjustified denial of the claims by the government, specialized assistance of counsel was again required to prosecute the claims before the Court of Federal Claims an amount of $606,674.55 through January 31, 2003. (The amount of legal fees incurred has, of course, continued to increase thereafter.)

The combination of the additional expenses that Precision Pine incurred as a result of the suspension and the loss of profits that it was denied also precluded Precision Pine from paying down outstanding loans that it had; a fact which resulted in unanticipated interest payments through December 31, 2002 in the total amount of $542,260.13.

Moreover, due to the Forest Service's breaches of these contracts and the lay-offs they caused, Precision Pine was required to incur substantially increased costs of unemployment insurance. The total amount of this item of damage was $147,356.95.

The amount of each of the foregoing company-wide expenses attributable to each the breached contracts is set forth in the chart below.

Ron
This was
sent

August 14, 1998

VIA FACSIMILE AND REGULAR MAIL

Stephen L. Gunzel
Contracting Officer
United States Forest Service
Tonto National Forest
2324 E. McDowell Road
Phoenix, AZ 85006

Dear Mr. Gunzel:

We are in receipt of your letter of August 12, 1998, concerning Precision Pine's purported default under the Salt Timber Sale contract. As you know, a long series of events in Region 3 has resulted in the complete destruction of the most fundamental assumptions underlying the formation of this contract. These events, which were in no way caused by and which were entirely unforeseeable to Precision Pine when it entered into the Salt contract, include the total or partial suspension of the sale on three occasions, including during each of the three previous harvest seasons, the unavailability of Stone Container's pulping system which was the sole commercial outlet for the roundwood in the Region, and a severe downturn in the market for wood products. As you know, the lumber market has been so severely depressed that it has triggered Market Related Contract Term Adjustment in Region 3. Unfortunately, the protective policy behind MRCTA cannot be achieved by additional time alone against the backdrop of the seriatim suspensions and mill closures suffered by Precision Pine.

Since the loss of the Stone pulping system as the outlet for the roundwood from our sales, Precision Pine has worked diligently with the Forest Service to arrive at a solution both to the current situation regarding Salt and within Region 3 as a whole. However, your letter of August 12, 1998 indicates that arriving at some accommodation with Precision Pine on the Salt sale would not "be of advantage to the Government". Surely avoiding the loss of Precision Pine as a contracting partner in Region 3 is of advantage to the United States. unfortunately, the Tonto National Forest's short sighted refusal to recommend mutual cancellation or other resolution to the Regional Forester is yet another step in the inexorable destruction of Precision Pine conducted during the past few years. Clearly, the Forest Service has abdicated its obligation of good faith and fair dealing which is an implied and integral part of all of its contracts.



EXHIBIT
Tommy No 30
[illegible] 2/5/04

In light of all of these events, please be advised that we consider the Salt contract to be at an end.

Sincerely,

Lewis N. Tenney, Jr.
Vice President

Date

~~MARCH~~ 22, 1996

MILO LARSON, TIMBER STAFF
USFS - SOUTHWESTERN REGION
517 GOLD AVE, S.W.
ALBUQUERQUE, NEW MEXICO 87102

MILO,

PRECISION PINE & TIMBER, INC. IS THE HOLDER OF TIMBER SALE CONTRACT - 02-006577, OTHERWISE KNOWN AS BRANN ON THE CHALENDER DISTRICT OF THE KAIBAB NATIONAL FOREST.

WE BEGAN HARVEST OF THIS SALE IN JANUARY OF 1996. WE HARVESTED THE SAWLOG COMPONENT ONLY, AS WE DID NOT HAVE AN OUTLET FOR THE 5" TO 8.9" DBH PULPWOOD COMPONENT.

DURING THE SAWLOG HARVEST WE WERE APPROACHED BY A COMPANY INTERESTED IN HARVESTING THE PULPWOOD FOR DELIVERY TO STONE CONTAINER IN FLAGSTAFF. WE CONTRACTED WITH THIS COMPANY AND THE PULPWOOD OPERATION WAS STARTED.

TWO DAYS INTO THE HAUL THE PULPWOOD OPERATION WAS FORCED TO CEASE BECAUSE STONE CONTAINER DID NOT WANT THE WOOD.

WE ASSUMED THAT "SOMEONE" AT STONE REALIZED THAT THE WOOD WAS FROM A PRECISION PINE & TIMBER INC. SALE, BRANN, AND THAT THEY WOULD NOT ACCEPT THE WOOD. WE WERE TOLD LATER THAT A COMMENT WAS MADE BY A STONE EMPLOYEE - (SOMETHING TO THE EFFECT THAT...) - YOU DID NOT TELL ME THAT THIS WOOD WAS FROM A PRECISION SALE.

A LATER INCIDENT INVOLVES A STONE EMPLOYEE RELATING THAT STONE WOULD NOT PURCHASE PULPWOOD FROM PRECISION PINE AND TIMBER OR DUKE CITY LUMBER COMPANY.

THESE INCIDENTS FURTHER SUPPORTS OUR POSITION THAT MULTI-PRODUCT SALES NEED TO BE DISCONTINUED. THE SAWLOG AND PULPWOOD COMPONENTS NEED TO BE SOLD SEPARATELY OR THE PULPWOOD BE LISTED

WE AS A COMPANY CANNOT SURVIVE LONG WHEN WE HAVE NO OUTLET FOR A PRODUCT-(PULPWOOD)THAT WE ARE FORCED TO PURCHASE ALONG WITH SAW-LOGS WHICH WE DO REQUIRE.

WILL YOU PLEASE,ONCE AGAIN,CONSIDER SEPARATING THE SAWLOG - PULPWOOD COMPONENT FROM FUTURE TIMBER SALE PLANNING AND LAYOUT.

SINCERELY,

LORIN D. PORTER
PRESIDENT

PRECISION PINE & TIMBER, INC.
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 536-2181

P.O. DRAWER W WINSLOW, AZ 86047

25 May 95

Patty Bennett, TSA,
Heber Ranger District

Patty, Please find attached a site, map and haul route(s) that we may use for the Brookbank T.S.

The larger material will go to the Heber Mill. Smaller sawlogs will come to Winslow.

Small pulpwood and topwood will go to either Stone at the papermill or to Zellner firewood @ Camp Verde.

In the event that Stone or Zellners does not work the PW/TW may go [illegible]

PRECISION PINE & TIMBER, INC.
P.O. BOX 70
HEBER, ARIZONA 85928
(602) 535-9112 • FAX (602) 535-9196
P.O. DRAWER W WINSLOW, AZ 86047

22 Jan 97

To: Various Interested Parties
From: John B. Smith, Purchaser Rep
RE: Logging Plans for Various Sales

Please find attached an estimated logging Schedule/plan for our Sales for 1997.

These are estimated start dates and are subject to change depending upon which Mill or Mills we have open and the availability of a Market for our pulpwood.

Sincerely
John B. Smith
John B Smith

# Precision Pine & Timber, Inc.
## Increased Logging and Hauling Costs

**Exhibit 3**

| | MBF | Anticipated Milling Site | Actual Milling Site | Increased Haul Cost | Increased Logging Costs | Total |
|---|---|---|---|---|---|---|
| Hay | | | | | | |
| 1996 | 391.18 | Eagar | Winslow | $ 74.80 | | $ 29,260.26 |
| 1997 | 1,765.56 | Eagar | Winslow | 74.80 | | 132,063.89 |
| 1998 | 998.32 | Eagar | Heber | 52.25 | 10.00 | 62,145.42 |
| O.D. Ridge | | | | | | |
| 1997 | 150.00 | | | | 10.00 | 1,500.00 |
| Subtotal | | | | | | $ 224,969.57 |
| **Reduction in Hauling Cost for Green Lumber** | | | | **Reduced** | | |
| | **MBF** | | | **Haul** | | |
| | **Lumber** | | | **Cost** | | |
| Hay | | | | | | |
| 1996 | 488.98 | | | 25.00 | | $ 12,224.50 |
| 1997 | 2,206.95 | | | 25.00 | | 55,173.75 |
| 1998 | 1,247.90 | | | 7.00 | | 8,735.30 |
| Subtotal | | | | | | $ 76,133.55 |
| Net Increase in Logging & Hauling Cost | | | | | | 148,836.02 |
| General & Administrative Overhead | | | | | 7.6% | 11,311.54 |
| | | | | | | 160,147.56 |
| Profit | | | | | 10.0% | 16,014.76 |
| | | | | | | $ 176,162.32 |

C:\Documents and Settings\Alan\Local Settings\Temporar
Exhibit 3

of time and have it basically disappear from your decision-making process, and then say what would you have done?

We did what we felt like we had to do at the time because there was, these timber sales we could not get to.

We, that became I mean very clear all of sudden on one day, and so you couldn't get to those contracts, so we had to make decisions on what we cut during that time.

What we would have cut had the suspension not been there, that's a mystery. I mean I don't know.

BY MR. HARRINGTON:

Q. Are there any documents that you could refer to to figure that out?

A. You mean in our files, or some place that we could keep them?

Q. Anywhere, yeah.

A. Not that I'm, not that I'm aware of.

Q. Do you recall what was happening with timber prices from say 1993 through 1998?

A. No.

Q. Excuse me. I meant to ask you about lumber sale prices.



A. You know, I would have to see a chart or look at the indexes or something to give me an idea of what that, what that was.

I mean I have a vague recollection of how the market moved up and down, but I can't remember that far back.

Q. What is your general recollection of what was happening with the market?

A. The way I remember it, and you're talking about which period of time now, '93 to --

Q. Through '98.

A. It seems to me that the market at times was, was very high, and at times, fallen fairly low.

It seems like to me that there was a movement in the, in the market during that period of time, and as long as I have been in the lumber business, the market moves up and down, up and down, and sometimes you go real high, and other times, it goes down and you're wondering what in the world, so I mean I don't know.

Q. Is it fair to say you can't tell in advance what the market is going to do?



A. It's fair to say that you can't tell in the, in the long term what the market is going to do.

You can generally feel, if you have had some experience and been in the business for a while, you can, you can sense when the market has bottomed.

You can generally sense when the market has topped, and then you can make decisions relating to that, and you know, that's, that's an educated, that's an educated guess, but with experience, you can, you can generally see what's going on.

And it may not be true, you know, long term. Long term, you know, the market's going to go up and it's going to go down, but in the short term, you have some traditionally low numbers that you look at and some traditionally high numbers, and you kind of go well, you know, and you make some, you make some judgments.

Q. What are those things that you look at to determine the market in the short term?

A. How, how long the, how long the market has been moving down or how long the market has moving up, and, and has it kind of, you know,



kind of leveled off, you know, in the last few weeks.

And your sales people are talking to people out there on the buying end, and they're listening to what, what they're hearing from their customers, and so there is -- it's, it's difficult to do that.

Q. When you say short term, what do you mean by short term?

Are you talking weeks? Months? Years?

A. Usually talking about months, just a few months, you know, six months or so.

You get an idea, and it's hard to, it's hard to judge those kinds of things one way or the other.

Q. So does that mean you don't always get it right when you're figuring out what's going to happen six months off?

A. You know what? If I had a crystal ball, if we all had a crystal ball, we'd just be all wealthy, wouldn't we? You know, but it does help to have some experience and expertise in a certain area to make those kind of judgments.

Q. You said there are things that track