Only the Westlaw citation is currently available.

United States Court of Federal Claims.

AMERICAN SAVINGS BANK, F.A., et al.,
Plaintiffs,
v.
THE UNITED STATES, Defendant.

**No. 92-872C.**

Aug. 31, 2004.

William F. Ryan, with whom were David M. Cohen, Director, Stuart E. Schiffer, Deputy Assistant Attorney General, and Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice. Marc S. Sacks, Trial Attorney, Commercial Litigation Branch, of counsel.

Melvin C. Garbow, Arnold & Porter, Washington, D.C. Howard N. Cayne, Edward H. Sisson, Kwame A. Clement, and Todd A. Wynkoop, Arnold & Porter, of counsel.

OPINION

SMITH, Senior J.

***1** This case arises out of the *Winstar* line of cases, the background of which is well described in *Winstar Corp. v. United States,* 518 U.S. 839 (1996), and the cases leading to it. In a previous opinion, this Court found the Government liable for breach of contract as a result of the passage of the Financial Institution Reform, Recovery and Enforcement Act of 1989 (hereinafter "FIRREA"), Pub.L. No. 101-73, 103 Stat. 183, and its implementing regulations. *Am. Savings Bank v. United States,* 52 Fed. Cl. 509 (2002) ("*American Savings I* "). This Court noted that the Plaintiffs had presented "one of the strongest *prima facie* demonstrations of the existence of a *Winstar*-type contract." *Id.* at 510 (citing *Am. Savings Bank v. United States,* 50 Fed. Cl. 586 (2001)). The present case is now before the Court on cross-motions for summary judgment on damages. The Plaintiffs have presented their motion for summary judgment as four distinct motions, each based on different aspects of the transaction and different theories of recovery. [FN1] This opinion will therefore follow that same structure, and as Plaintiff's arguments are addressed the relevant arguments included in the Defendant's Motion for Summary Judgment will be addressed at that time. For the reasons stated herein, Plaintiff's Motions for Summary Judgment are GRANTED, IN PART, and DENIED, IN PART, and Defendant's Motion for Summary Judgment is likewise GRANTED, IN PART, and DENIED, IN PART.

FN1. Plaintiffs filed a fifth Motion for Summary Judgment on February 20, 2004, on an issue which it claimed was newly raised by the Government's briefing. As is described in further detail in Section VI of this opinion, the outcome of this motion is wholly subsumed by the discussion of the second Motion for Summary Judgment (regarding the breach of the "Warrant Forbearance"), and thus the fifth Motion for Summary Judgment is DENIED AS MOOT.

BACKGROUND

In 1988, American Savings and Loan Association of Stockton, California ("Old American"), was the largest failed thrift in the United States. It owed more than $30 billion to its depositors and other lenders and creditors, and its market value was several billion dollars below that of its liabilities. The Federal Savings and Loan Insurance Corporation ("FSLIC") assumed responsibility for the bank's liabilities, and estimated that the liquidation of Old American would cost the FSLIC more than $3 billion.

Earlier, in the mid-1980s, investor Robert Bass and his associates ("the Bass Investors") perceived that turmoil in the savings and loan industry had created attractive opportunities for outside investors. The Bass Investors initially took an interest in a subsidiary of Old American, the American Real Estate Group. In the process of these negotiations, the Bass Investors began to take an interest in acquiring the entire thrift, and entered into serious acquisition negotiations in early 1988. [FN2] By this time, Old American was insolvent, so the Bass Group negotiated directly with Old American's federal

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

regulator, the Federal Home Loan Bank Board ("FHLBB"), and FSLIC, Old American's deposit insurer. The Bass Investors proposed a plan to FHLBB and FSLIC whereby Old American would be divided into two new thrifts, one of which would be operational and one of which would be liquidated. The FSLIC and FHLBB accepted the Bass Investors' proposal and chartered the two new thrifts. The operating thrift was known as American Savings Bank, F.A. ("New American," the "good bank") and the liquidating thrift was called New West Federal Savings and Loan Association ("New West," the "bad bank").

FN2. The parties dispute whether additional investors, including a subsidiary of Ford Motor Company, had also presented viable offers for Old American at or around this time. While there is evidence that some negotiations occurred, it is disputed whether any other investors were prepared to make an offer to acquire the failed thrift. Nevertheless, the Bass Investors *did* make an offer, which was accepted. Thus this dispute is not material to the Court's decision, and does not affect the decision on summary judgment.

***2** The Bass Investors formed Keystone Partners, L.P. (the "Partnership"), Keystone Holdings, Inc. ("Keystone"), New American Capital, Inc. ("NA Capital") and other subordinate holding companies, all ultimately wholly owned by the Partnership for the purpose of acquiring the assets and liabilities of Old American. These holding companies are all plaintiffs in this action. Through NA Capital, the Plaintiffs raised $400 million in cash to fund the new enterprise: $30 million from common stock investors, $80 million from preferred stock investors, $40 million from subordinated debt lenders, and $250 million from senior debt lenders. NA Capital then downstreamed $350 million of that cash into New American.

The Acquisition Agreement described how New American would acquire and value certain assets and liabilities that Plaintiffs would select from Old American. Old American held approximately $22 billion in assets, from which The Bass Investors, in agreement with the Government, selected for New American approximately $7 billion. $15 billion in assets (primarily mortgages) remained on the books of New West, the liquidating thrift. New West also retained $7 billion in liabilities. New American assumed nearly $15 billion in existing FSLIC-insured liabilities owed to depositors from Old American. The result was that New West had a surplus of assets over liabilities of approximately $8 billion and New American was left with an $8 billion surplus of liabilities over assets. To balance the books of the two banks, New West issued an $8 billion dollar note to New American (the "FSLIC Note"), which was guaranteed by FSLIC. The FSLIC Note was then recorded as an asset on the books of New American and as a liability on the books of New West. The Note had a ten-year term, with interest payments made regularly by the FSLIC to New American. Had the Note not balanced the books of both banks, New American would have begun with an $8 billion deficit, making the transaction unworkable.

As part of the transaction, the FSLIC received warrants for the potential purchase of stock in American Saving's holding company. The final agreement effectively gave FSLIC a thirty percent ownership interest in American Savings, which FSLIC found attractive as it might potentially enable FSLIC to recoup the assistance that it was giving to American Savings. In April 1988, when the FHLBB first entered into an exclusive negotiating agreement with the Bass Investors, the FSLIC valued the warrant aspect of the deal at $543 million.

In 1988, thrifts were generally required to maintain regulatory capital in an amount at least equal to 3 percent of their liabilities. FSLIC provided Plaintiffs with a "Note Forbearance" which was written down as capital in an amount equal to the amount of regulatory capital required as a result of having the $8 billion Note recorded as an asset. It was also agreed that the value of the warrants issued to FSLIC would be included as regulatory capital, pursuant to which FSLIC issued a "Warrant Forbearance" for the first ten years after the Transaction (which was the expected term of the FSLIC Note). This forbearance was similar to arrangements made with acquirers of other thrifts. (Bass Group List of Pending Issues, dated July 26, 1988, submitted as part of the negotiations with FSLIC, Def.'s App. to Mot. for Summ. J. at 238.) The final agreement permitted American Savings to count the "fair value" of the warrants as regulatory capital for "certain limited purposes," and granted FSLIC a $214 million "second preference" upon the sale of the bank. This gave FSLIC priority in the distribution of the proceeds of any sale of New American. While the Bass Investors would still receive 100 percent of the proceeds from a sale up to the amount of cash that

they contributed, FSLIC was given a preference distribution of 100 percent of the next $214 million of sales proceeds. Only after these preferential distributions would the remainder be distributed proportional to the ownership interests that the parties held in the bank (30% for FSLIC and 70% for the Plaintiffs).

***3** Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), Pub.L. No. 101-73, 103 Stat. 183, on August 9, 1989. As discussed in *American Savings I,* the result of this legislation in part was that American Savings could no longer rely on the Note Forbearance and the Warrant Forbearance when calculating the required amount of regulatory capital, and thus had to increase its regulatory capital from other sources. One response was to "reverse" its push-down accounting for the warrants. The warrants provided FSLIC with an ownership interest in American Savings' holding company, rather than a direct interest in American Savings. Prior to FIRREA, the holding company had to "push down" the value of the warrants to American Savings in order for the warrants to have been recorded as regulatory capital. As long as the Warrant entry remained on the books of American Savings, the bank had to maintain $167 million of balancing assets on the books. These assets would depreciate and amortize over time, which would reduce capital. To avoid these expenses on the remaining capital, American Savings received approval from the newly-created Office of Thrift Supervision ("OTS") to reverse this push-down accounting.

Even in the face of a California economy that was experiencing deep recession, American Savings became profitable, recording net income of $247.6 million in 1990, and describing itself in 1991 as "one of the most profitable depository institutions in the nation." (Private Placement Memorandum, dated October 1991, Def.'s App. to Mot. for Summ. J. at 294.) Despite this, Plaintiffs claim that they were damaged as a result of the Government's breach of contract, and bring four distinct claims for compensation. The Court will address each of these in turn.

Summary Judgment Standard

Rule 56(c) of the Rules of the Court of Federal Claims states that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment may not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). *See also* *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed.Cir.2001); *Gen. Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir.1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986); *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir1998).

II. Plaintiff's Motion for Damages as a Result of the Government's Breach of the Note Forbearance.

***4** New American Capital raised the following amounts of capital by issuing coupons for interest or dividends: 1) $250 million in senior debt, 2) $40 million in subordinated debt, 3) $80 million in preferred stock, and 4) $30 million in common stock. Each of these sources of capital produced different costs to New American Capital, as the rates at which interest and dividends were paid varied. For purposes of this motion, the plaintiffs have agreed to simplify matters by assuming that there was no cost associated with the maintenance of common stock. The Government does not dispute this estimation (which serves to reduce the Plaintiff's potential damage award). In addition to this capital raised by the Plaintiffs, New American assumed responsibility for $8 billion of Old American's liabilities balanced on the asset side of the ledger by the "FSLIC Note."

The interest rate to be paid on the FSLIC Note was negotiated and set by the parties prior to the issuance of the Note Forbearance. The plaintiffs argue that the interest rate needed to be set high enough to generate sufficient income to cover three types of potential costs associated with the excess liabilities assumed from Old American. The first of these was the interest that New American would have to pay on the $8 billion of Old American's FSLIC-insured liabilities to depositors, which New American had assumed. The second category of costs was the actual general and administrative operating costs of New American, which would be considerable given the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

size of excess liabilities the bank had assumed from Old American. Finally, plaintiffs argue that they were required by the FSLIC regulations at the time to maintain three percent of total liabilities as regulatory capital. Three percent of eight billion amounted to $240 million in capital, and this in turn would generate interest and dividends that would have to be paid to lenders who provided that capital. FSLIC agreed to a Note Forbearance, waiving the requirement that New American maintain this amount of capital against their $8 billion in assumed liabilities, thereby reducing the bank's expenses.

After the passage of FIRREA, the regulatory forbearance was voided and Plaintiffs were required to substitute real capital for the forbearance in order to support the billions of dollars in excess liabilities. The Note was repaid periodically by FSLIC (and then the FDIC, after the passage of FIRREA eliminated the FSLIC and the FHLBB), which reduced the amount of capital necessary to support it. At the same time, OTS periodically raised the regulatory capital percentage, which of course raised the amount of capital required to support the Note. The balance between the two changed, causing the amount required of New American to increase or decrease depending on the term in question. For instance, in the fourth quarter of 1990, the balance of the Note had been reduced to $7.42 billion as a result of principal payments made by the FSLIC. However, the regulatory capital requirement was raised from 3% to 4% of the total outstanding liabilities, requiring New American to maintain an even greater amount of capital ($297 million, an increase of $57 million) to support the smaller balance of outstanding liabilities.

***5** Capital is critical to operating a thrift. Under the federal deposit insurance regulations in place at the time of the Transaction, Plaintiffs were authorized to hold up to $100 of deposits for every $3 of capital the thrift possessed, but they could not fall below this ratio without losing the backing of FSLIC and the ability to attract deposits. $167 million in capital would have allowed New American to obtain upwards of $5 billion in deposits to use for growth and buying assets that would generate income for interest payments to depositors. Naturally, this growth potential made New American more attractive to investors than a similarly-sized bank without that kind of leverage.

The parties do not dispute that New American was able to comply with the regulatory capital requirements. The primary conflict between the parties on this issue stems from the Plaintiffs' description of having "posted" a certain amount of capital in order to replace the FSLIC's Note Forbearance. Plaintiffs repeat this terminology throughout their briefs on this motion, but it is not clear precisely what they mean by this. The capital in question had already been raised by the Plaintiffs prior to the breach of the Note Forbearance; Plaintiffs do not request the cost of "replacement capital." The question for the Court here is whether this pre-existing capital somehow lost value as a result of the breach. Plaintiffs claim that this is exactly what happened, as the capital which had previously been available for investment had to be "sterilized" and "rendered ... useless" in order to meet the regulatory capital requirements. *See, e.g.,* Pls.' Mot. For Summ. J. I, at 14-15.

Capital held by a bank must be leveraged to create investments which generate income for capital growth and dividends for investors and interest for depositors. This can only be done with capital that is unencumbered, and Plaintiffs' argument is that the $350 million that they had to earmark for "regulatory capital" could not therefore be leveraged anymore. While this argument is simple enough, neither the briefing nor the oral argument sufficiently explained the details of what *did* happen to this capital in this case. Despite Plaintiff's description of the $350 million in capital as "useless," they admit that it was "invested in short-term instruments" in March of 1989, approximately three months after the acquisition. (Private Placement Memorandum, dated March 20, 1989, Def.'s App. to Mot. for Summ. J. at 77.) Plaintiffs' own expert, when asked "How does one allocate capital?" responded "Well, I'm not suggesting they put it in a particular box labeled capital. Money is fungible." (Dep. Of Nevins D. Baxter, dated February 23, 2000, Def.'s App. to Mot. for Summ. J. at 579) (punctuation added for clarity). The Court acknowledges that these short-term investments may not have been nearly as profitable as other uses which might have been envisioned by the Plaintiffs prior to the breach. However, they may have been profitable in at least some amount, and the Court is not in a position on summary judgment to make a factual finding as to what the capital earned while it was serving as regulatory capital.

***6** As a legal matter, Plaintiffs have put forth a sound argument for damages in this motion. A plaintiff who has been injured by a breach of contract may request damages if it can show that: "(1) its losses were reasonably foreseeable at the time of the contract; (2) the breach was a substantial factor in causing its losses; and (3) it has proven its losses with

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

reasonable certainty." *Westfed Holdings v. United States,* 55 Fed. Cl. 544, 549 (2003) (citations omitted). The loss of regulatory capital sustained by New American when the Note Forbearance was reneged on by the Government was perfectly foreseeable. The Note Forbearance provided New American with the accounting equivalent of $240 million in capital, or three percent of the value of the FSLIC Note, and this capital was taken away from the bank upon the passage of FIRREA. The parties do not seriously dispute that the Note and its accompanying Forbearance were negotiated for and were an essential part of the contract, of which both sides were aware. Similarly, the losses caused by Plaintiffs were a direct result of the Forbearance being eliminated, and therefore were not only a "substantial factor" in causing Plaintiff's injury but such losses would not have occurred "but for" the Government's breach. *Cf. California Federal Bank v. United States,* 54 Fed.Cl. 704, 713 (2002) (applying the "but for" test to determine the measure of lost profits damages in a *Winstar* suit). The Court's difficulty comes on the third prong of the test, which requires the Plaintiffs to prove their losses with "reasonable certainty."

The claim of the Plaintiffs includes a claim for the dividend and interest payments made to the capital providers. In order to recover these costs, the Plaintiffs must first prove that these are not costs that they would have incurred in the absence of the breach. The obligations to pay dividends and interest payments to their capital providers predated the breach of the Note Forbearance. Mr. Barnum, who was Chief Financial Officer and then Chief Operating Officer of New American, admitted in his deposition that these payments would certainly have gone on regardless of the breach of the Note Forbearance, because that is the cost of raising capital. Nevertheless, Plaintiffs argue these payments are a viable way to measure the continuing "cost" of maintaining capital for purposes of damages recovery.

As a matter of law, this motion comes down to two competing theories of how the Plaintiffs intend to recover damages. The Government perceives this motion as one for "replacement capital." They understand the Plaintiffs to either be requesting 1) the cost of raising an additional $240 million to meet the new regulatory capital obligation that arose post-breach, or 2) the costs Plaintiffs *would* have incurred replacing the lost forbearance capital with real capital. (Def.'s Opp. to Pls.' Mot. for Summ. J. I at 4.) The first request must of course be denied because the Plaintiffs did not actually raise new capital to meet their new regulatory capital obligation. The Government therefore focuses on the second possibility, that of prospective replacement capital costs, and points the Court to cases that state that Plaintiffs may only recover the transaction costs involved. *See, e.g., Cal. Fed. Bank v. United States,* 245 F.3d 1342, 1350 (Fed.Cir.2001) (affirming trial court's award of transaction costs alone as the cost of replacement capital when supervisory goodwill agreement was breached).

***7** Plaintiff's argument in this case, however, differs from that presented by the plaintiffs in cases such as *Cal. Fed.* The Plaintiffs in this case attempt to step out of the *Winstar* context and analogize their loss to more general government contracts cases, describing their argument as follows:

> Whenever the government has induced a contractor to accept a lower contract price by promising that the government will provide at no cost to the contractor something the contractor needs to perform the contract (*e.g.,* equipment), and the government then fails to provide the promised item, requiring instead that the contractor use his own property to perform the contract, the government must pay the contractor's rental costs.

(Pls.' Reply to Def.'s Opp. to Mot. for Summ. J. I, at 2.) The premise of Plaintiffs' argument, that the Government induced them to accept a lower price, is based on Plaintiffs' assertion that the interest rate paid on the FSLIC Note was set lower than it otherwise would have been had there been no Note Forbearance included in the deal. The Government responds by claiming that this wasn't a consideration, but the only evidence they put forth for this explanation is the fact that the interest rate was pegged to a specific cost index. [FN3] This is nonresponsive to Plaintiff's allegations as to *why* the particular rate was chosen--the parties could just as well have agreed on a set rate that was 350 basis points above the index, or only 50 points above the index. Certainly there was some reason why this particular rate was chosen, and Defendant offers no explanation that counters Plaintiff's characterization of the negotiations. The Note Forbearance reduced the costs for Plaintiffs, and the Government correspondingly reduced the amount they paid to Plaintiffs in interest payments on the Note itself. This case is unlike the cases cited by Defendant in which *Winstar* Plaintiffs have asked for compensation for the cost of replacing capital. The Court accepts Plaintiff's methodology for determining the cost of capital maintenance in this particular situation.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

FN3. The base rate for the Note was set at 225 basis points above the 11 District Cost of Funds Index ("COFI") for the first 18 months of the Note's term, then 200 basis points above COFI for the second 18 months, and thereafter 175 basis points above COFI. The 11th District COFI was a weighted average of the cost of funds of all of the thrifts within California, Nevada, and Arizona.

Nevertheless, the Court finds that a material dispute of fact remains as to the amount by which the value of the capital in question was diminished. While the Court understands that the $240 million used to meet regulatory capital requirements was greatly restricted as a result, and could not be leveraged as Plaintiffs would have liked, the Court is not convinced that its value was reduced to zero. Therefore, the Plaintiff's damages should still be offset by the amount of value, however small, Plaintiffs were able to benefit from the capital while it was considered "regulatory." The Court does not know with "reasonable certainty" by what amount Plaintiff's requested damages should be offset and cannot award damages on summary judgment without additional factual inquiry. Should Plaintiffs be able to provide this proof at trial, Plaintiffs are legally entitled to the relief they request here. Plaintiff's Motion for Summary Judgment I, with respect to the FSLIC Note, is therefore GRANTED, IN PART, and DENIED, IN PART.

III. Plaintiffs' Claim for Damages as a Result of the Government's Breach of the Warrant Forbearance

***8** At the time that New American received the Note for $8 billion from New West, this would have balanced the bank's assets and liabilities, and would have made the bank regulatorily solvent, but for the Government's requirements that banks maintain a certain amount of regulatory capital. As part of the transaction, the Plaintiffs and the FSLIC both agreed to provide regulatory capital to New American. Both received a proportionate ownership interest in the new venture. The Plaintiffs contributed $350 million in cash in exchange for common stock in New American. The FSLIC, rather than contributing cash, authorized New American to credit its regulatory capital account with $167 million. This was considered to be the amount of the "deposit premium" on the Old American deposits which had been assumed by New American. [FN4] For purposes of the cross-motions for summary judgment, the parties do not dispute that this value properly represents the value of the Old American deposit base. (Pls.' Mot. for Summ. J. II at 7.) Plaintiffs also issued warrants to the FSLIC for the purchase of thirty percent of the common stock in the new bank (referred to collectively as "the Warrant"). The Warrant was convertible into 3,000 Class B common shares of New American Capital Holdings, the parent of American Savings Bank. The Warrant represented a 30 percent ownership interest in New American Capital Holdings based on total number of shares outstanding. This arrangement gave Plaintiffs ownership of seventy percent of the bank and the Defendant ownership of the other thirty percent.

FN4. The deposit premium reflects the value of a depositor base to a bank. Even though deposits are a liability, not an asset, they have value to a bank because they represent a relatively inexpensive source of cash that may then be invested by a bank. A typical transaction reflecting this deposit premium would be as follows. Bank One sells its deposits to Bank Two. Unlike the more common sale transaction where the buyer pays the seller, here the seller provides assets to the buyer to back up the deposit liability. However, to the extent that a deposit base is valuable to the buyer, the seller delivers less assets than the face amount of the deposit liability. This difference is the deposit premium which the buyer is willing to "pay" because of the economic value of having these depositors in its bank. For example, suppose that Bank One sells Bank Two $1 billion in deposits. Bank One delivers $900 million in assets so that Bank Two can support the liability represented by those deposits. The deposit premium is the $100 million difference.

This transaction was concluded in 1988, following the enactment of the Competitive Equality Banking Act of 1987 ("CEBA"), Pub.L. No. 100-86, sec. 405, 12 U.S.C. § 1729(f)(6)(C), 101 Stat. 552, 613 (1987). CEBA required that if FSLIC contributed capital to a thrift, they must obtain a warrant in exchange. The statute read in part: "In the case of an insured institution with capital stock, the Corporation [FSLIC] shall require such institution to negotiate with the Corporation warrants for the purchase of stock as a condition for the purchase of capital

instruments by the Corporation, on such terms and conditions as the Corporation may prescribe." 12 U.S.C. § 1729(f)(6)(A) (1987).

Generally Accepted Accounting Principles ("GAAP") at the time of the transaction related to the issuance of equity instruments would have prevented the transaction from working the way that parties intended, because only instruments issued for cash or readily marketable securities could create additional tangible capital that could be recognized as equity in the financial statements. Emerging Issues Task Force, Issue No. 88-19 (Financial Accounting Stds Bd.1988). Accordingly, the Government granted the Plaintiffs an accounting forbearance, similar to that granted for purposes of the FSLIC Note discussed in Section II, which allowed the Warrants to be included in capital, notwithstanding the offset required by GAAP. Thus New American recorded $167 million in regulatory capital as part of the transaction in which FSLIC received the Warrant.

***9** This forbearance of the regulatory capital requirement in relation to the Warrant was nullified by Office of Thrift Supervision Regulatory directives (Thrift Bulletins 38-2 and 38-2A) issued after FIRREA was enacted in August 1989. *Am. Savings I,* 52 Fed. Cl. at 510. These bulletins advised the Plaintiffs that FIRREA made the Government's performance on the Warrant Forbearance impossible, stating that "[t]he Office of Thrift Supervision is applying the new capital standards to all savings associations, including those associations that have been operating under previously granted capital and accounting forbearances. [FIRREA] eliminates those forbearances." (Thrift Bulletin 38-2, dated January 9, 1990, P.App. to Mot. for Summ. J. on Liability at Tab Z.) This breached the contract between Plaintiffs and Defendant.

In 1996, Washington Mutual, an unaffiliated banking entity ("Acquiring Bank"), acquired New American. As a result of the merger, the Government received 14 million shares of the Acquiring Bank's stock. The Government then sold the Acquiring Bank's shares for $651.7 million in cash, net of sales costs. The Plaintiffs move for the return of this money on a "partial restitution" theory.

The Government challenges this motion on three grounds. First, the Government asserts the Plaintiffs may not, after a breach, continue to receive benefits under a contract and then subsequently seek restitution. Second, the Government asserts the Plaintiffs may not obtain partial restitution, and may not seek solely to unwind the warrant aspect of the transaction. And third, the Government asserts the Plaintiffs may not obtain restitution if they have received more benefits from a contract than the breaching party.

Restitution, of course, is one of the principal remedial doctrines in contract law, along with expectancy damages and reliance costs. "An injured party usually seeks, through protection of either his expectation or his reliance interest, to enforce the other party's broken promise ... However, he may, as an alternative, seek through protection of his restitution interest, to prevent the unjust enrichment of the other party." Restatement (Second) of Contracts § 373 cmt. a (1981). When proof of expectancy damages fails because they are speculative or indeterminate due to the complexities of the transaction, "the law provides a fall-back position for the injured party--he can sue for restitution." *Glendale Fed. Bank v. United States,* 239 F.3d 1374, 1380 (Fed.Cir.2001). The same fall-back position may be taken when reliance damages are indeterminate, because expectation damages without lost profits are reliance damages. Parties in that situation may also sue for restitution. *See* Restatement (Second) of Contracts § 344 cmt. a (1981).

The objective of restitution "is to return the parties, as nearly as is practicable, to the situation in which they found themselves before they made the contract." *Glendale,* 239 F.3d at 1380. This approach seeks to remedy unjust enrichment of either party to a contract and requires that the entirety of the context surrounding the contractual agreement be taken into account, especially when both parties perform at least partially before and after the breach of contract. "Restitution is sometimes described in terms of taking from the breaching party any benefits he received from the contract and returning them to the non-breaching party ... [T]hat requires determining what benefit from the contract the breaching party has received, and restoring that to the non-breaching party." *Id.* at 1380-1381.

***10** Typically, Plaintiffs waive their right to restitution when they continue to accept performance under a once-repudiated contract. *Mobil Oil Exploration and Producing Southeast, Inc. v. United States,* 530 U.S. 604, 621- 622 (2000). The Government argues that Plaintiffs continued to receive partial performance under the contract knowing the warrant accounting forbearance was no longer available for computing regulatory capital.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

The Government argues that Plaintiffs continued to benefit from billions of dollars in assistance after the breach, and that this acceptance waived their right to restitution by affirming the contract. However, any benefits Plaintiffs continued to receive under the contract were derived from the Plaintiffs' attempts to preserve their remaining investment. "[O]rdinarily, if a person continues to perform a contract after knowing facts which make it voidable, it would be inferred that he affirms the contract and hence he would not be entitled subsequently to avoid it and to obtain restitution. This, however, is not true where he continues to perform *only for the purpose of preserving what he has already invested in the performance.*" Restatement (First) of Restitution § 68 cmt. b (1937) (emphasis added). While Plaintiffs continued to operate the bank, they did not do so with the benefit of the Warrant Forbearance, the specific benefit relevant to the divisible contract in question. Furthermore, the Plaintiffs did make a concerted effort to unwind the contract and recover the Warrants by purchasing them back from the FDIC, but to no avail. The Government chose instead to keep the benefits it had received under the contract, in the form of the Warrant. (Pls.' Mot. for Summ. J. II at 25.) Under these narrow circumstances, the Plaintiffs may, after the Government's breach, continue to receive benefits under the Agreement and seek restitution for the breach. Plaintiffs are not legally barred from seeking restitution damages as a result of their continued performance.

Restitution is generally awarded with respect to the contract as a whole. However, in the present case, Plaintiffs seek only partial restitution to recover damages because of the difficulty inherent in determining expectation and reliance damages within a complex bank holding company structure and transaction scheme as is present in this case. "There is very little law in this circuit on whether restitution can also be employed to return only some part of the [benefit] received." *First Nationwide Bank v. United States,* 51 Fed. Cl. 762, 766 (2002). There is a considerable dearth of law on this matter in other Circuits as well. Nevertheless, this Court has in at least one instance previously awarded partial restitution in the *Winstar* context. *See* *id.* at 769. In order to grant restitution for some part of the contract, that aspect of the contract for which restitution is requested must be sufficiently distinct from the rest of the contract as to make the value of that aspect clear. It is often said that the contract must be found "meaningfully divisible." *Id.* The Government asserts that restitution is not available to the Plaintiffs because the warrant transaction cannot be unwound from the Agreement. The Court disagrees.

***11** Both Plaintiffs and the Government rely on *Stone Forest Industries. v. United States,* 973 F.2d 1548 (Fed.Cir.1992) to support their assertions. In *Stone Forest* the issue was whether the Government's refusal to allow access to four of fourteen timber tracts negated the contractor's obligation to proceed with the rest of the contract. The court held that it did, because the contract was not divisible, and ordered the return of the contractor's advance deposits. *Id.* at 1553.

*Stone Forest* is distinguishable from the present case. The court in *Stone Forest* was primarily concerned that severing the contract would "favor the breaching party." *Id.* In the present case, it is the non-breaching party that demands restitution from the breaching party, not the breaching party seeking a claim for non-performance or repudiation of a contract as was the issue presented in *Stone Forest.* Here the Court is not asked to sever the contract to favor the breaching party. Rather, the refusal of this Court to sever the contract would unjustly enrich the breaching party.

> [T]here are situations in which a fair solution requires partial rescission or equivalent relief, and a failure to recognize this can result in manifest injustice ... Rescission of an entire contract is a process of reopening the whole transaction; there are times when this is not a sensible thing to do, because more limited form of relief can be formulated to fit the needs of the case at hand. Courts have not hesitated to give such relief even though it amounts to partial rescission.

George E. Palmer, The Law of Restitution § 12.6(D) (1978).

For the Court to find the contract meaningfully divisible, the Plaintiffs must overcome the "presumption that when parties enter into a contract, each and every term and condition is in consideration of all the others, unless otherwise stated." *Stone Forest,* 973 F.2d at 1552. The parties characterize the transaction quite differently. Plaintiffs argue that the Warrant was given to FSLIC in exchange for two aspects of the transaction: the receipt of the value of Old American's deposit base, and the agreement from FSLIC and FHLBB that the value could be treated as regulatory capital. Defendant argues that there was no *quid pro quo* exchange of the Warrant Forbearance for the Warrants, and thus the contract is indivisible. Defendant argues that the "warrants were an integral part of the plaintiffs' proposed acquisition of American Savings from the beginning." (Def. Opp.

to Pls.' Mot. for Summ. J. II at 33.) The Warrant Forbearance, however, was negotiated several months later. The initial structure of the proposed deal was laid out in a March 1988 Term Sheet submitted by the Plaintiffs, and which specified the warrants to be given to the FSLIC. (App. to Def.'s Mot. for Summ. J. at 57.) The Term Sheet also specifies that "the amount of warrants is tied to American's retail deposit base." This Term Sheet does not mention the possibility of a Warrant Forbearance. The regulators initially rejected the proposed forbearance, noting among other things that "[t]his was not specified in the March 28, 1988 Term Sheet which describes the deal." (Memorandum from Darrel Cochow to Chairman Wall, App. to Def .'s Mot. for Summ. J. at 223.)

***12** Plaintiffs explain, however, that this Term Sheet was merely an initial summary of the transaction, and did not include the details of the regulatory treatment of any capital. This term sheet was submitted on March 28, 1988, approximately nine months before the close of the deal, and the parties had at that point not yet negotiated the value to assign to the franchise (and thus to the Warrant, the corresponding capital entry for the acquired asset). While the Government is correct that *at that stage* the parties had not yet arranged an exchange for the Warrant Forbearance, that is not the appropriate place for the Court to focus its attention. Parties to a complex contract like the one at issue in this case will commonly go through several rounds of negotiations, proposals and counter-proposals, before coming to a final agreement. It is that final agreement, the final contract, that the Court must focus upon. Thus, the Government's objections on the grounds of divisibility are somewhat off the mark. While it is certainly true that the Warrant and the Warrant Forbearance were given as part of the larger contract, that does not necessarily mean that those aspects of the agreement cannot be severed from the remaining elements. The Court must look to the facts of the transaction to determine mutual intent with respect to those promises.

The Government's Opposition brief explains at length that the purpose of the warrants was to "defray the enormous assistance that FSLIC would be paying in connection with plaintiffs' acquisition." (Def. Opp. to Pls.' Mot. for Summ. J. II at 2; *see also id.* at 3, 16-18). This may well be so, but it is not necessarily determinative of whether the Warrant was given in consideration of some other aspect of the overall transaction. The Plaintiffs must establish a *quid pro quo* exchange of the Warrant for the $167 million in regulatory capital as well as the value of the deposit base.

It is clear that the value of the Warrant was intended by the parties to be counted as regulatory capital. FSLIC Executive Director Stuart Root was advised by James Meyer, the Assistant Director of FSLIC's Financial Assistance Division (who was himself actively engaged in negotiations with the Bass investors), that the value of the Warrant was to count as regulatory capital. "[T]he term 'capital instrument' under this section of CEBA means any instrument created by the FSLIC that counts as capital for the insured institution pursuant to applicable capital requirements." (App. to Pls.' Mot. for Summ. J. II at 20.) FSLIC Executive Director Root advised FHLBB Chairman Wall that "the issue of critical importance" was the extent to which the new bank could count as regulatory capital the "bargained for" amount "deemed to be contributed by FSLIC." (Root Memorandum, dated July 18, 1988, App. to Pls.' Mot. for Summ. J. on Liability at Tab Q.) Chairman Wall testified to Congress that under the terms of the Agreement, New American could include the "fair value" of the Warrant issued to FSLIC in its regulatory capital. (Wall-Gonzalez Letter, App. to Pls.' Mot. for Summ. J. on Liability at Tab R.) The parties did some negotiating over the actual value of the deposit base, and thus of the Warrant, but there was never any serious dispute over the ability to record that value as regulatory capital.

***13** Critical to the divisibility of this aspect of the contract is the repeated statement made by Plaintiffs during the negotiation of the contract that the Warrant would be revocable should FSLIC be "unable to perform its assistance obligations." (1988 Term Sheet, App. to Pls.' Mot. for Summ. J. II at Tab 1, p. 8.) "Assistance obligations" included forbearances to provide assistance in the form of regulatory capital. For example FSLIC reported to Congress that a "Forbearance" was one of the "Types of FSLIC Assistance" provided to thrifts. (Second Annual Report of the Fed. Savings and Loan Ins. Corp. Industry Advisory Comm. to the Comm. on Banking, Finance and Urban Affairs of the United States House of Representatives and the United States Senate, dated Jan. 10, 1989, App. to Pls.' Mot. for Summ. J. II at Tab 15, p. 203.) FSLIC was fully aware of this connection between the Forbearance and the Warrant. An internal memorandum from the FHLBB general counsel to the Board warned that "In the unlikely event FSLIC (or its successor in interest) was unable or unwilling to perform its assistance obligations to New American or New West, New

American would have a right to ... cancel FSLIC's warrant." (Memorandum from Office of General Counsel, dated Dec. 27, 1988, App. to Pls.' Mot. for Summ. J. II at Tab 16, p. 234.) The acquisition transaction was approved on the next day.

The Court finds that the Warrant and the Warrant Forbearance were linked as a part of this transaction, and can be unwound from the acquisition transaction as a whole as a matter of law. The Plaintiffs are legally entitled to pursue a claim for partial restitution on the grounds stated in their motion, assuming that they are able to prove the necessary factual predicate.

When a contract is breached, restitution requires the parties to return the benefit each received from the other during performance of the contract to prevent an unjust enrichment to one of the parties. Accordingly, restitution may be had to the extent that the Plaintiffs' claim for restitution does not include the benefit resulting from the warrant forbearance they received from the Government. The Government opposes Plaintiffs' motion on the grounds that Plaintiffs have received more benefits from the contract than the breaching party. This argument assumes the benefit of billions of dollars in assistance from the FSLIC Note and other aspects of the transaction unrelated to the Warrant and Warrant Forbearance. In other words, the Government would have the Court offset an award of partial restitution by an amount that considers the contract as a whole. The requirement of an offer to return is not so strict; it "has been relaxed in view of the merger of law and equity and modern procedural reforms." Restatement (Second) Contracts § 384, Reporters' Notes. The general principle that a party seeking restitution must return the benefits he has received does not apply when "the contract apportions the price if that part of the price is not included in the claim for restitution." Restatement (Second) of Contracts § 384(2)( c) (1981). "[I]f the contract apportions the price among various pieces of property, restitution of the price as to part of the property may be had on a return of only that part if the price as to the unreturned property is not included in the claim for restitution." *Id.* at § 384 cmt. c. *See also* 5 Corbin, Contracts § § 1114, 1116 (1964 & Supp.1980); 12 Williston, Contracts § 1460A (3d ed.1970); Dobbs, Remedies § 4.8 (1973); 1 Palmer, Law of Restitution § § 3.11, 3.12 (1978). In the uncommon circumstance of a motion for partial restitution, the benefits and injuries to both sides that the Court must consider in making the parties whole involve only those that were part of the divisible, unwound aspects of the overall contract.

***14** Of course, the Court must still determine the value of the benefit received by Plaintiffs within the confines of the divisible aspect of the contract. In the present case, the Plaintiffs benefitted by the $167 million deposit premium which supported the regulatory capital they received from the Government in the form of the Warrant Forbearance. This is the asset that FIRREA disallowed which caused the regulatory capital to become useless. This capital would have created additional opportunities for the Plaintiffs to grow the bank using its deposit base to fund loans, purchase additional financial assets, or borrow funds. This value should be used to offset "the value of the benefits received by the defendant due to the plaintiff's performance." *Landmark Land Co. v. FDIC,* 256 F.3d 1365, 1372 (Fed.Cir.2001). The "traditional measure of restitution" is the "benefit conferred on the breaching party or by the market value of the goods or services rendered" *LaSalle Talman Bank v. United States,* 45 Fed. Cl. 64, 116 (1999). The benefit of the Warrants conferred to the Government was the $651.7 million received (net of sales costs) when it converted the Warrants and subsequently sold the stock for cash. Thus, the benefit to the Plaintiffs must offset the benefit to the Government, with the difference to be awarded to the Plaintiff.

However, the exact amount of damages remains a factual dispute to be resolved. Plaintiffs have proposed to simply offset the value of the common stock in Washington Mutual, the Acquiring Bank, sold by the FSLIC in 1996 by subtracting the value of the original warrants as represented by the $167 million in regulatory capital placed on the books of American Savings in 1988. This does not account for the change in value of those monies over time, and so the parties must provide the Court with some mechanism for valuing the $167 million in 1996 dollars to account for the eight-year gap between the Plaintiffs' benefit and the Defendant's benefit from the contract. Without further fact-finding, the Court cannot award a specific dollar amount, and therefore the Plaintiffs' Motion for Summary Judgment II, with respect to the Warrant Forbearance, is GRANTED in part, and DENIED in part.

IV. Plaintiff's Motion for Damages from the Sale of "Junk Bonds"

As discussed above, the breach of both the Note Forbearance and the Warrant Forbearance imposed an increased obligation on American Savings to maintain capital. The Plaintiffs argue that in order to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

meet this obligation, they were required to sell off a portfolio of highly volatile high-yield bonds (or "junk bonds") at a loss of approximately $111 million. Plaintiffs seek reliance damages in this sum as compensation for this loss.

New American began operations with approximately $380 million in excess of the required amount of regulatory capital, giving New American a regulatory capital base of 8.25%. (App. to Pls.' Mot. for Summ. J. at Tab 20, pp. 393-94.) *See also* Private Placement Memorandum for New American Capital, Inc., dated Mar. 20, 1989, *Id* . at Tab 21, p. 496. As part of the overall transaction, the Bass Investors had submitted for FHLBB approval a Proposed Business Plan that described a projected portfolio "comprised primarily of corporate debt instruments which are unrated or rated at less than investment grade." (Proposed Business Plan, dated Dec. 20, 1988, App. to Pls. Mot. for Summ. J. at Tab 20, pp. 400-01.) This portfolio was projected to have a principal amount of $1.5 billion, "or slightly less than 10% of American's assets." *Id.* The Proposed Business Plan outlined two forecast "cases" covering the first three years of New American's operations. Case One projected monthly investments of $75M in bonds that would provide a return of 13 1/2 % net of management fees, up to a total investment of 5% of total assets. Case Two envisioned the same type of investment, only with a cap of $1.5 billion rather than a percentage-based cap.

***15** This Proposed Business Plan, as part of the larger Holding Company Application submitted by the Bass Investors, had to be approved by the FHLBB and FSLIC before the acquisition of New American could be completed. After considerable review, the Proposed Business Plan was approved. The internal memoranda evaluating the Proposed Business Plan and given to the FHLBB negotiators indicate that the approval was made with full awareness of New American's plan to invest up to $1.5 billion in high-yield, volatile bonds. (Memorandum from Caton to Brewer, *et al.,* dated Dec. 22, 1988, App. to Pls. Mot. for Summ. J. at Tab 28; Memorandum from Wright to Smuzynski, dated Dec. 23, 1988, *Id.* at Tab 27, pp. 755-56.)

In order to effect its purchase of junk bonds, American Savings entered into an Advisory Agreement with Rosecliff, Inc., an investment advisor that also served as an advisor to Acadia Partners, L.P. (App. to Pls. Mot. for Summ. J. at Tab 29, pp. 767-78, Tab 16 at 237-39.) Acadia Partners was an affiliate of American Savings, creating a potential conflict. To resolve this, the Advisory Agreement required both Acadia and American Savings to direct to Rosecliff all potential junk bond investments, which would then allocate the opportunities between the two in proportion to the amount of funds committed by each. (*Id.* at 769, 774-74.)

American Savings began to purchase volatile high-yield bonds in May 1989, when they made an investment of $77 million. They increased their holdings through the end of June to a total portfolio of $164 million. Some of these were sold in July 1989, and others were purchased; the total portfolio balance at the end of July was $254 million. During the same week that the House Conference Report on FIRREA was published, which clearly stated that after the law's enactment thrifts could no longer purchase junk bonds, American Savings purchased an additional $239 million of these bonds.

The market in which American Savings purchased these bonds was not a buyers' market. Indeed, a subsequent report to American Savings's board of directors described it as a "a seller's market in which dealers could quote high prices, particularly for the better quality high-yield securities." (App. to Def.'s Mot. for Summ. J. at 24.) As soon as Congress passed FIRREA, thus preventing the purchase of such securities by thrifts, the bond prices went down and by the end of 1989 American Savings had suffered a loss on their junk bond portfolio of $59 million. Of course, one expects volatile investments to behave in a volatile manner. Plaintiffs argue that they simply intended to ride out the downturn until they could later sell these bonds at a profit.

"The purpose of reliance damages is to compensate the plaintiff 'for loss caused by reliance on the contract." ' *Westfed,* 55 Fed. Cl. at 549 (quoting *Castle v. United States,* 301 F.3d 1328, 1341 (Fed.Cir.2002)). "Because reliance damages (like lost profits) are contract damages, to recover a plaintiff must also show that: (1) its losses were reasonably foreseeable at the time of the contract; (2) the breach was a substantial factor in causing its losses; and (3) it has proven its losses with reasonable certainty." *Id.* Plaintiffs attempt to characterize their purchase of the junk bonds as one of classic reliance. For instance, in their brief they state that "the government understood that New American would invest in high-yield bonds *in reliance* on the government's promises of surplus regulatory capital." (Pl.'s Mot. for Summ. J. III at 12 (emphasis in original).) Yet this is a mischaracterization of the contract at issue. While it

is clear that Plaintiffs certainly "relied" on the presence of regulatory capital created by the Note and Warrant Forbearance when they made their decisions to invest in junk bonds, the actual decision to invest was not a bargained-for part of the contract. Its performance does not therefore necessarily earn Plaintiffs the right to reliance damages as they are traditionally understood.

***16** Reliance damages are awarded for the cost of performance on a required part of a contract. To say that the Plaintiffs bought the high-yield bonds "in reliance on the capital" is not to say that they bought the bonds in order to receive the capital promised by the contract. Rather, it is simply that they contracted for an arrangement which they anticipated would give them money, and then they spent that money. Consequential damages, not reliance damages, would seem the appropriate remedial theory if a remedy is required.

The Plaintiffs themselves point to "alternative strategies" that were available to them for investing their capital. For instance, they might have used this capital (including the surplus regulatory capital resulting from the Note and Warrant Forbearances) to purchase adjustable-rate mortgages, a much less volatile investment than the junk bonds which they chose to purchase.

FIRREA required thrifts to dispose of their junk bond portfolios "as quickly as can be prudently done, and in any event not later than July 1, 1994." 12 U.S.C. § 1831e(d)(3)(A) (2003). After its passage, the Plaintiffs began to do just this. In its required filing explaining its compliance with FIRREA, American Savings acknowledged its plan to comply by tracking this language: "This strategy is to divest its portfolio as quickly as prudently possible and in no event later than July 1, 1994." (App. to Def.'s Mot. for Summ. J. at 590.) Defendant's position is that this divestment was legally required, and thus cannot be the subject of a suit for damages. Defendant argues that if the Plaintiffs had held on to these securities, they would necessarily have been in violation of the law. Defendant is correct in stating the principle that a request for damages may not be premised on the assumption that the Plaintiffs would have been permitted to violate the law. However, it is not the case that Plaintiffs' only alternative to selling the junk bonds when they did would have been to break the law.

Plaintiffs sold these bonds in 1990, leaving them nearly four years to sell within the time allotted by FIRREA. This is less time than Plaintiffs may have liked, but they have already conceded that this requirement of FIRREA, while an unwelcome change, was not a breach of any contract that the Government had with the Plaintiffs. Plaintiffs claimed at oral argument that they intended to hold the bonds until maturity, and that being "required" to sell them at any point before that caused them damage. This may well be true economically, but this does not make those damages legally recoverable contract damages. Also, factually inconsistent with Plaintiffs' claims is the fact that on February 2, 1989, American Savings provided potential investors with"Investment Policies and Procedures" for the management of its junk bond portfolio. The policies were introduced with the statement that "In general, High Yield Securities will be held for variable anticipated investment horizons." (App. to Pls.' Mot. for Summ. J. at Tab 34, p. 895.)

***17** American Savings started liquidating its junk bond portfolio as early as September 1989, and notified the Office of Thrift Supervision on May 1, 1990, that it planned to completely divest its junk bond portfolio by the end of June, 1990. This was in keeping with the general practices of the thrift industry at the time. Acadia, American Saving's affiliate, reported that the industry as a whole had sold seventy percent of its junk bond portfolio by the end of June, 1990.

Plaintiffs argue that despite the four years provided by the OTS regulations for the selling of their high-yield bonds, they were forced by regulators to sell more quickly than they would have liked and thus sold out at much lower prices than they had intended when they were purchased (in other words, these sales were prior to the "variable anticipated investment horizons"). Indeed, in granting American Savings' application to divest its junk bond portfolio, the FDIC conditioned its approval on a complete divestiture "no later than June 30, 1990"--only 30 days after issuance of its edict. (Stone Memorandum, dated May 1, 1990, App. to. Def.'s Mot. for Summ. J. at 595.) Certainly it appears that regulators required American Savings to sell its junk bonds in a shorter time-frame than FIRREA would have allowed. Yet this still does not constitute a contractual breach on behalf of the Government.

Quite simply, Plaitiffs did not contract with the Defendant for the purchase of these bonds. Plaintiffs have put forth evidence demonstrating that the FSLIC was aware that these bonds were going to be purchased, but that, in and of itself, does not make

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the purchases "bargained for." In order for the Court to award consequential damages to the Plaintiffs for the losses suffered from the sale of these bonds, the Plaintiffs would have to prove that such losses were a foreseeable consequence of the breach of contract by the Defendant. Such proof is a factual matter that may not be resolved on summary judgment, and there is nothing the Court has seen supporting the likelihood of such proof. A further bar to the Plaintiffs' being able to prove causation on this matter is the discretion which FIRREA granted to the FDIC for setting conditions and timetables for the divestitures of these "junk bond" portfolios. 12 C.F.R. § 303.13(e) (1990) ("the FDIC may impose such conditions and requirements as it deems appropriate in its *sole discretion* with regard to the divestiture of the debt securities, including requiring completion of divestiture in advance of July 1, 1994.") (emphasis added). *Cf. San Carlos Irrigation & Drainage Dist. V. United States,* 111 F3d. 1557, 1563 (Fed.Cir.1997) ("Too many contingencies--including, most importantly, the discretion of the agency [to command plaintiffs] exist in the causal chain from the government's breach to the asserted [harm to plaintiffs].").

Plaintiffs are not entitled to reliance damages on the theory presented, and therefore Plaintiff's Motion for Summary Judgment III, requesting reliance damages for the sales of their junk bond portfolio, is DENIED. Defendant's Motion for Summary Judgment as to Damages and Restitution, to the extent that it addresses the specific claim for reliance damages stemming from the sale of the "junk bond" portfolio, is GRANTED, IN PART.

V. Plaintiff's Motion for Damages Resulting from the Sale of Mortgage Loans

***18** As discussed above, New American began operation with a surplus of capital above that required by regulatory capital requirements, owing largely to the forbearances granted with respect to the amount of the FSLIC Note and the Warrant. This surplus was approximately $383 million, which at a 3% leverage ratio meant that New American could call on FSLIC to insure an additional $12.8 billion in deposits which could then be invested. The Proposed Business Plan submitted by the Bass Investors for FHLBB approval described how New American intended to emphasize adjustable-rate mortgage lending. New American expected to acquire from Old American approximately $7.7 billion in sound assets, which included $3.4 billion in performing fixed-rate mortgage loans and $2.8 billion in performing adjustable-rate mortgages. (Proposed Business Plan, Plaintiff's Damages Appendix Tab 20 at 393.) The appeal of adjustable-rate mortgages was that changes in interest expense to the bank on the bank's borrowing would generally correspond to changes in interest income to the bank on the bank's lending. The investors proposed that this would reduce interest-rate risk to the bank. However, the bank intended to retain most of the $3.4 billion in fixed-rate mortgages that it acquired from Old American as well. *Id.* at 339-91; 399. The bank's growth would come primarily from originating adjustable-rate mortgages tied to the 11th District Monthly Cost of Funds Index.

Plaintiffs argue that New American would only have sold adjustable-rate mortgages if they put the bank in excess of limits imposed by regulatory capital requirements. This situation would have been unlikely to occur shortly after the acquisition because of the $12 billion in allowable growth based on the bank's capital ratios. Although Plaintiffs expected that 40% of the loans that it would originate would be fixed-rate mortgages, due to customer preference for such loans, they argue that they intended to sell all such loans into the secondary market. In the Plaintiffs' Proposed Business Plan submitted to the FHLBB, they provided two alternative forecasts, or "cases," describing how they expected the bank to perform. Case One projected that their single-family fixed-rate mortgage portfolio would decline by some 38% in the first three years, while single-family adjustable-rate mortgages were expected to increase by $4 billion over the same period, an increase of 315%. *Id.* at 419-20. Forecast Case Two also emphasized adjustable-rate mortgage lending, although it did not include similar forecasted growth figures as were present in Case One.

The Proposed Business Plan was considered and discussed by the regulators upon submission of the plan. FHLBB regulators indicated in an internal memorandum sent while the Board was considering the Proposed Business Plan that the plan "projects some fairly large volumes of origination" and questioning whether the bank would be capable of producing such volumes. (Caton Memo, dated Dec. 22, 1988, App. to Pls.' Mot. for Summ. J. at Tab 26, p. 752.) The following day, however, the Supervisory Agent presented many of the same regulators with a report approving the plan and calling the proposed rate of loan origination growth "reasonable." (Wright Memo, dated 12/23/88, App. to Pls.' Mot. for Summ. J. at Tab 27, p. 755-56.) Within a week, the Proposed Business Plan was approved by FSLIC Executive

Director Stuart Root and then the FHLBB.

***19** During 1989, Plaintiffs proceeded as they had forecast, increasing New American's adjustable-rate mortgage portfolio to $4.3 billion. On August 9, 1989, Congress enacted FIRREA, and by the year's end Plaintiffs had been notified that the Government would no longer honor the Note and Warrant Forbearances. This greatly reduced New American's capital to the point where they were in danger of falling below the regulatory capital requirements. Regulators indicated to the bank that they were considering lowering the bank's rating because of its lack of capital. Plaintiffs responded by shrinking the bank's holding. They sold the bank's portfolio of high-yield bonds, as discussed above in Section IV. They also sold most of the fixed-rate mortgages that had been acquired from Old American. Plaintiffs made five sales of mortgages over the first six months of 1990, totaling $299.6 million in principal amount.

Despite this shrinkage of the bank's holdings, the OTS indicated on September 1, 1990, that they had increased the regulatory capital requirements for New American from three to four percent because it had a CAMEL rating greater than "1." [FN5] (1991 Business Plan, dated Jan. 31, 1991, App. to Pls.' Mot. for Summ. J. at Tab 61, p. 1754.) In order to achieve the necessary core capital ratio, New American deviated from its proposed business plan (which had forecast originating more adjustable-rate mortgages) and began to sell even more. In the fourth quarter of 1990, New American sold off $1.4 billion in assets, primarily consisting of adjustable-rate mortgage loans. (1991 Rating Agency Private Placement Memorandum, P. Damages App. to Pls.' Mot. for Summ. J. at Tab 59, p. 1525.)

FN5. CAMEL stands for Capital, Asset quality, Management, Earnings, and Liquidity. This was a system developed by United States banking regulators to evaluate the financial and managerial soundness of U.S. commercial lending institutions. A Camel rating of "1" indicated a bank in excellent condition, while a "5" indicated a bank in the worst condition. In 1997, the ratings became CAMELS with the addition of a market Sensitivity rating.

For purposes of the current motion, Plaintiffs have identified $1 .2 billion of these mortgages sold in the final quarter of 1990 as loans which were sold as a direct result of the need for increased regulatory capital caused by the breach of contract by the Government. They have then attempted to identify the profits lost as a result of the sale. This was done by reviewing the 1989 Business Plan, the 1990 Business Plan, and the 1990 Operating Review (reflecting what actually occurred during the year 1990), to determine what loans the bank would have sold if it had not been subject to the breach. Plaintiffs sold the loans by pooling a group of adjustable-rate mortgages, creating a security backed by each pool of mortgages, and then selling the security. The performance of these loans could then be traced by following the unique Cusip number assigned to each security. [FN6] The accuracy of this methodology as a means of determining the future value of the loans that were sold is not disputed. Consulting the publicly-available reports of interest paid on each security, identified by cusip number, provides the rate of interest on the outstanding principal amounts of the sold loans that the borrowers of the pooled mortgage loans actually paid to each security's purchasers. Plaintiffs argue that this amount represents lost interest income that would have been paid to New American instead, had the loans been retained by the bank. Additionally, there were various guarantee or certification fees associated with the sale of securities which New American had to pay. These two costs are summed by the Plaintiffs to determine their lost profits from the loan sales, and total $353.6 million as of June 30, 1999.

FN6. "Cusip" is actually an acronym for the Committee on Uniform Securities Identification Procedures, which in 1968 began issuing unique nine-digit numbers to publicly-traded securities. These numbers are permanently assigned to each issue and are generally printed on the face of the security if they are issued in physical form. The Cusip numbers (and their associated securities) may be tracked through the use of various databases.

***20** The sale of these loans also decreased the bank's overhead and operations costs, as well as reducing its costs for FDIC insurance. Plaintiffs propose that by multiplying the avoided costs per dollar of liabilities paid down by the total outstanding balance of mortgages sold, per month, they can determine the amount of New American's "avoided costs." This amount is then used to offset the gross lost profits,

and the Plaintiffs arrive at a final amount of $78.7 million which they request in damages as lost profits.

Plaintiffs present a simpler and much less speculative argument than many Plaintiffs in *Winstar* cases who request damages for lost profits, because they do not request compensation for investments they *might* have made but for the contractual breach. Rather, they simply request reimbursement for losses that they can clearly demonstrate that they *did* suffer, and thereby avoid numerous material factual disputes that might derail a motion for summary judgment on damages. Plaintiffs make much of this, referring several times to the potential for considerably larger damages if given the opportunity to present factual evidence at trial, but claiming a willingness to accept a lesser amount should a trial be avoided. While the Court is aware that a trial is a lengthy and often expensive process, the Court must nevertheless be bound by the standards applicable to a motion for summary judgment and cannot award damages simply on the theory that it is simpler to do so than to identify and resolve material disputes.

A. The Legal Standard for Recovering Lost Profits

Awarding lost profit damages is an appropriate remedy in breach of contract cases. "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *California Fed. Bank v. United States,* 245 F.3d 1342, 1349 (Fed.Cir.2001) (citing Restatement (Second) of Contracts § 344(a) (1981)); *see also Commercial Fed. Bank v. United States,* 59 Fed.Cl. 338, 344 (2004). "The benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well." *Cal. Fed.,* 245 F.3d at 1349 (citing Restatement (Second) of Contracts § 347); *see also Long Island Savings Bank v. United States,* 60 Fed.Cl. 80, 89 (2004); Williston § 64:2 at 30 (stating that expectancy damages include lost profits and other consequential harm caused by the breach).

The Federal Circuit has summarized the legal standard governing the recovery of lost profits in *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1324-25 (Fed.Cir.2002):

> To recover lost profits for a breach of contract, the plaintiff must establish ... that: (1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty.

***21** In addition to these familiar requirements, plaintiffs must also take reasonable steps to mitigate their loss upon a breach of contract. *LaSalle Talman,* 317 F.3d at 1366; *Long Island Savings Bank,* 60 Fed.Cl. at 89; *Commercial Fed. Bank,* 59 Fed.Cl. at 355. The Federal Circuit has emphasized that "the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute." *Cal. Fed.,* 245 F.3d at 1350. Plaintiffs must thus establish causation, foreseeability, certainty, and mitigation of their lost profits in order to succeed on their motion for summary judgment. In the instant case, because the Court finds genuine disputes of material facts with respect to causation, the Court DENIES Plaintiffs' Motion for Summary Judgment on that ground (and does not find the need to address the other elements).

B. Causation

Defendant argues that, in order to be recoverable, the alleged damages must be direct and immediate results of the contract breach and cannot be "remote or consequential." *Wells Fargo Bank v. United States,* 88 F.3d 1012, 1021 (Fed.Cir.1996) (quoting *Northern Helex Co. v. United States,* 524 F.2d 707, 720 (Ct.Cl.1975)). Previous *Winstar*-related decisions already have established that lost profits, foregone as a result of the loss of regulatory capital, may be sufficiently related to the breaching provisions of FIRREA to be recoverable. *See Cal Fed,* 245 F.3d at 1349 (holding that lost profits on the use of supervisory goodwill as regulatory capital are recoverable as damages.); *Commercial Fed .,* 59 Fed.Cl. at 350 (awarding plaintiffs $5,602,000 in lost profits resulting from the government's breach caused by the passage of FIRREA). Therefore, as a threshold matter, Plaintiffs are not precluded from establishing that their lost profits were the proximate result of Defendant's breach.

The term "proximate result," as used by this Court, refers to causation in fact, and not to legal judgments about the appropriate limits on liability. *See Columbia First,* 60 Fed. Cl. at 102; 3 Dan B. Dobbs, Dobbs Law of Remedies § 12.4(2), at 66 (2d ed.1993). The causation-in-fact requirement demands that the damages claimed must in fact result from the breach; it "prevents the plaintiff's recovery for any losses not proven to have occurred at all, for losses

which in fact occurred but as a result of factors wholly other than the defendant's breach, and for losses which in fact occurred but which would have resulted even if the defendant had not breached." Dobbs Law of Remedies § 12.4(2), at 66. In other words, the issue facing the Court is whether the breach factually led to Plaintiffs' loan sales, and whether existence of multiple causes for the loan sales would preclude summary judgment in Plaintiffs' favor.

Defendant claims that Plaintiffs "must prove causation not only in the 'but for' sense, but they also must show that the breach was a substantial factor causing American Savings to sell the loans." Defendant's Brief at 4. Defendant is essentially asking the Court to apply two different legal standards. In previous *Winstar*-related cases, the Government has relied on *Myerle v. United States,* 33 Ct.Cl. 1 (1897), for the proposition that a "butfor" analysis of the causal link is the appropriate standard of review for lost profits damages. *See Columbia First Bank,* 60 Fed.Cl. at 103 (discussing and rejecting Government's proposed "but for" test in favor of the "substantial factor" test); *Citizens Federal Bank v. United States,* 59 Fed.Cl. 507, 514 (2003) (describing history of "substantial factor" test as used in *Winstar* context by this Court). In *Myerle,* the court held that plaintiff must prove that defendant's breach caused it to lose profits, "inevitably and naturally, not possibly nor even probably." 33 Ct. Cl. at 27. Thus, the Government's position has historically been that plaintiffs must prove that, but for the breach, plaintiffs would not have suffered lost profits. On the other hand, plaintiffs have generally argued for the adoption of the "substantial factor" test, which states that, when multiple causes combine to produce the injury complained of, plaintiff has to demonstrate that defendant's breach was a substantial factor in causing the injury. *See e.g., Citizens Federal Bank,* 59 Fed.Cl. at 514. Recent decisions by the Federal Circuit and this Court strongly support the application of the "substantial factor" analysis of causation for lost profits damages. *See Bluebonnet Savings Bank v. United States,* 266 F.3d 1348, 1356 (Fed.Cir.2001) (holding the Court of Federal Claims properly determined that the breach was a substantial factor in Bluebonnet's increased financing costs); *Columbia First Bank,* 60 Fed.Cl. 103-05; *Citizens Federal Bank,* 59 Fed.Cl. 515; *See also Energy Capital Corp.,* 302 F.3d at 1328-29 (affirming the application of the substantial factor test in determining causation). For this reason, the Court concludes that the appropriate standard for analysis of cause in fact is the "substantial factor" test. *Bluebonnet Savings Bank v. United States,* 266 F.3d 1348, 1355 (Fed.Cir.2001) (choice of standard by which to evaluate causation is a question of law, not fact). Existence of multiple causes for the loan sales, in itself, would not necessarily preclude Plaintiffs from proving causation.

***22** A breach is a "substantial factor" causing the lost profits if it directly and primarily caused the injuries. *Columbia First Bank,* 60 Fed.Cl. at 105; Dobbs Law of Remedies § 12.4(2), at 68. Applying this definition to the instant case, the Court finds that Defendant has demonstrated adequately that there are genuine disputes of material facts with respect to the causation element. For example, relying on the testimony from head executives of New American, Plaintiffs claim that Defendant's breach forced New American to sell five pools of "seasoned" fixed-rate mortgage loans in the first three quarters of 1990, which it had acquired from Old American and would have held to maturity but for the breach. Defendant alleges that these sales would have occurred despite the breach. To support its argument, Defendant points out that Plaintiffs' business plans for 1989 and 1990 projected sales of a significant amount of the fixed-rate mortgage loan portfolio, even without the reduction in regulatory capital caused by the passage of FIRREA. In fact, Plaintiff's 1990 business plan had projected sales of $572 million of the acquired fixed-rate loans in the absence of Defendant's breach of the forbearance, exceeding the $400 million fixed-rated loans that Plaintiffs actually sold in 1990. Plaintiffs' contemporaneous business documents do not distinguish "seasoned" and "unseasoned" fixed-rate loans and do not support Plaintiffs' position that the business plans referred to sales of unseasoned fixed-rate loans only. Plaintiffs provide a reasonable explanation for the sale of these loans but the allegation that they were sold as a direct result of the breach of contract by the Government is not supported by the evidence presented. Given the evidence presented, the Court cannot determine whether or not Defendant's breach was a "substantial factor" leading to Plaintiff's lost profits. Thus, this issue is not amenable to summary judgment as there is a dispute of material fact.

Despite this conclusion, however, many of the Defendant's other defenses may be rejected as a matter of law, and will be mentioned briefly here so as to narrow the focus of the parties during any future arguments. The Government alleges that Plaintiffs overstate their injury because they have omitted the savings they enjoyed from not paying taxes on the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

profits they would have earned but for the breach. This claim is unsupportable in light of the fact that, pursuant to the Acquisition Agreement, Plaintiffs enjoyed protection from tax payments as a result of assuming the tax losses of Old American. Furthermore, Section 9 of the Assistance Agreement requires Plaintiffs to pay 75% of their tax benefits to FSLIC, and so 75% of the taxes saved on any future lost profits awards that Plaintiffs may receive from this litigation will be paid to the FDIC. These payments would have been made earlier to the FSLIC during the ordinary course of business, but for the breach. The Government's argument that the Court should initially offset any lost profits award by the tax obligation on the amount of the award would amount to rewarding the Government twice.

***23** Additionally, the Government argues that the Plaintiffs' claim for lost profits should be denied because they received "market price" for the loans. This is essentially the argument that since the Plaintiffs received a fair price for the loans, they didn't suffer a loss because they then had the money from the loan sales to use as they would. This argument neglects the broader context of Plaintiff's claim, one in which the proceeds from the loan sales were used to reduce liabilities of the bank and to increase its capital ratio as a result of the loss of regulatory capital stemming from the Government's breach of contract. The fact that Plaintiffs were not in a position to reinvest those proceeds in a more profitable manner is the basis for their lost profits claim.

The Court finds that Defendant has produced sufficient evidence to raise a dispute of material fact, and Plaintiff's Motion for Summary Judgment IV with respect to its loan sales is DENIED.

VI. Plaintiff's Motion for Summary Judgment with respect to the "second preference" given to FSLIC.

Plaintiffs filed a fifth motion for summary judgment requesting partial restitutionary damages in the amount of approximately $280 million, which they allege is the value attributable to the "second preference" that the FDIC received upon sale of American Savings to Washington Mutual in 1996. As part of the negotiations leading to the acquisition of Old American, the Plaintiffs agreed to grant the FSLIC a distribution preference in the event of any sale of American Savings; this preference was to be second only to Plaintiffs' own recovery of their initial cash investment in the bank. This preference was exercised when Washington Mutual purchased American Savings for 40 million shares of Washington Mutual Stock, and the FDIC (the FSLIC's successor agency) received 7,254,237 of those shares that it acknowledged were compensation for the distribution preference.

Plaintiffs rely exclusively on a statement made by the Government in its Motion for Summary Judgment on Damages:

> Ultimately, the sides reached a compromise, under which American Savings would receive a forbearance (the "Warrant Accounting Forbearance"), allowing it to count the "fair value" of the warrants as regulatory capital for "certain limited purposes," and FSLIC would receive a $200 million "second preference" upon sale of the bank.

(Def.'s Mot. for. Summ. J. at 13.) Plaintiffs characterize this as an admission by the Government that there was a *quid pro quo* exchange of the Warrant Forbearance for the "second preference." Plaintiffs argue that this "renders immaterial the principal factual dispute the [G]overnment attempted to raise in opposition to Plaintiffs' Damages Motion II." (Pls.' Mot.. for Summ. J. V at 2 (emphasis in original omitted).)

However, even if that were the case, this argument is not sufficiently distinct from that made in Plaintiffs' second motion for summary judgment (requesting restitution from breach of the Warrant Forbearance). Plaintiffs concede that this is a "lesser included" request within the scope of their request for partial restitution for the value of the Warrant Forbearance, requested in Plaintiff's Motion for Summary Judgment II. *Id.*

***24** The Court has already determined that the Plaintiffs are entitled to partial restitution on Motion for Summary Judgment II, as described in Section III of this opinion. The amount of damages that may be awarded on that theory are a matter of factual dispute, but there is no outcome of Motion V which could result in an increased damages award to the Plaintiffs. The "second preference" given to FSLIC described the way in which proceeds from the sale of American Savings would be distributed, but the only reason the FSLIC was entitled to *any* proceeds from the sale was due to the Warrant. The Court has already determined that the proceeds from the sale of the Warrant must be returned to the Plaintiffs as partial restitution (minus, of course, any benefits received by the Plaintiffs as part of the exchange). This amount will necessarily include the amount of

compensation that FSLIC received as the result of their "second preference." Indeed, Plaintiffs have previously acknowledged that they raised this argument "[a]s a contingency, in the event the Court does not grant plaintiffs a recovery based upon the first admission." (Pls.' Reply to Def.'s Opp. to Mot. for Summ. J. II at 6.) Therefore, as Plaintiffs cannot recover any additional damages even were they to be successful on this motion, the Court hereby DENIES Plaintiff's Motion for Summary Judgment V as MOOT.

## CONCLUSION

To the extent that the Court has recognized material disputes between the parties in the opinion above, Plaintiffs' Motions for Summary Judgment are DENIED. However, with respect to those aspects of Plaintiffs' arguments which the Court has found to be a legally valid basis for damages recovery, Plaintiffs' Motions for Summary Judgment are GRANTED. The Government's Motion for Summary Judgment is DENIED, IN PART, with the single exception of the issue of reliance damages for the sale of the Plaintiffs' "junk bond" portfolio, on which point Defendant's Motion is GRANTED.

The Court hereby SCHEDULES a status conference sixty days from the date of this opinion, so that the parties can propose to the Court a plan for future proceedings in this litigation.

2004 WL 1941210 (Fed.Cl.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.