# In the United States Court of Federal Claims

No. 98-720 C
Filed November 23, 2004
TO BE PUBLISHED

| | |
|---|---|
| PRECISION PINE & TIMBER, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Lost profits, substantial factor, causation, foreseeability, reasonable certainty, offset, consequential damages, *Severin* doctrine, summary judgment |

Alan I. Saltman, Saltman & Stevens, P.C., Washington, D.C., for plaintiff. Richard W. Goeken and David J. Craig, Saltman & Stevens, P.C., Washington, D.C., of counsel.

David A. Harrington, Trial Attorney, Kathryn A. Bleecker, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. Lori Polin Jones and Patricia L. Disert, U.S. Department of Agriculture, Washington, D.C., of counsel.

**OPINION AND ORDER**

GEORGE W. MILLER, Judge.

This matter is before the Court on Defendant's Motion for Partial Summary Judgment Regarding Damages ("Def. Mot."), filed April 16, 2004. Plaintiff filed a Response to Defendant's Motion for Partial Summary Judgment Regarding Damages ("Pl. Opp.") on June 9, 2004. On July 27, 2004, defendant filed a Reply in Support of its Motion for Partial Summary Judgment Regarding Damages ("Def. Reply"). Oral argument was held on August 10, 2004. For the reasons discussed below, defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.

## *FACTS*

### I. Background

The following facts are undisputed by the parties, unless otherwise noted. This action concerns 14 contracts[1] for the sale of sawlogs and roundwood[2] that were awarded or transferred to Precision Pine & Timber, Inc. ("Precision Pine") prior to August 1995: (1) O.D. Ridge timber sale; (2) Kettle multi-product sale; (3) Hay timber sale; (4) Brookbank multi-product sale; (5) Jersey Horse timber sale; (6) Salt multi-product sale; (7) Manaco multi-product sale; (8) St. Joe timber sale; (9) Hutch-Boondock multi-product sale; (10) Mud multi-product sale; (11) Saginaw-Kennedy multi-product sale; (12) Brann multi-product sale; (13) U-Bar timber sale; and (14) Monument multi-product sale.[3] *Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35, 38 & n.1 (2001). The Hay and St. Joe contracts were originally awarded to other purchasers that subsequently assigned the contracts to Precision Pine. *Id.* at 38 n.1.

On August 24, 1995, the United States District Court for the District of Arizona entered an order enjoining all timber harvesting on Forest Service timber sales in Region 3 (Arizona and New Mexico), until the Forest Service complied with its obligations under the Endangered Species Act, 15 U.S.C. § 1531 *et. seq.*, to consult with the United States Fish and Wildlife Service ("FWS") regarding the impacts of Forest Service's Land and Resource Management Plans on the Mexican Spotted Owl ("MSO"). *Silver v. Babbitt*, 924 F. Supp. 976, 989 (D. Ariz. 1995). Less than eight weeks later, on October 18, 1995, the suspensions on the St. Joe, Hutch-Boondock, and Brann contracts were lifted. *Precision Pine*, 50 Fed. Cl. at 47 & n.18. Shortly thereafter, Precision Pine began harvesting timber from the three released sales. On March 11, 1996, the suspension of the Mud sale was lifted and Precision Pine harvested the Mud sale between August and October 1996. The suspensions of the remaining contracts were lifted in December 1996. Precision Pine requested and was granted permission by the Forest Service to

---

[1] The contracts at issue contain similar terms. For example, the contracts establish an operating season, require the purchaser to submit an annual operating schedule, require the purchaser to meet with the Forest Service prior to commencing harvesting operations to finalize an operating plan, and prescribe harvesting methods to be employed. The purchaser is required to harvest all sawtimber and roundwood by the contract's termination date. In certain circumstances, such as a suspension of the contract, the purchaser may request an extension of the contract's termination date.

[2] "Sawlogs" are trees larger than 9.0 inches in diameter at breast height ("dbh"). "Roundwood" refers to smaller trees that are between 5.0 and 8.9 inches dbh.

[3] Contracts where only sawlogs are required to be harvested are designated "timber sale" contracts. Contracts where both sawlogs and roundwood are required to be harvested are designated "multi-product sale" contracts. For ease of reference, however, the two contract types will sometimes be referred to collectively as "timber sale" contracts.

operate the Hay timber sale outside of the contract's normal operating season. Timber harvesting on the Hay sale began later in December 1996. Precision Pine was unable to operate any of its other contracts at the time the suspensions were lifted.

After the suspensions were lifted, Precision Pine requested and was granted term adjustments, which provided additional time within which Precision Pine was permitted to harvest the sales. Precision Pine submitted contract claims to the cognizant Forest Service contracting officers requesting monetary compensation for the MSO suspensions. The Forest Service determined that Precision Pine was entitled to $18,242.78 in compensation for its damages resulting from the suspensions of the 14 contracts. *Precision Pine*, 50 Fed. Cl. at 51-52.

On September 11, 1998, Precision Pine filed this action. On July 30, 2001, Chief Judge Damich[4] held that the Forest Service had breached 12 of the 14 contracts at issue. *See Precision Pine*, 50 Fed. Cl. at 73-74. The Forest Service breached its duty to cooperate with respect to the following contracts: Mud, Monument, Saginaw-Kennedy, Brann, Manaco, Brookbank, and Kettle. *Id.* Additionally, the Forest Service breached its duty not to hinder with respect to the following contracts: Hay, O.D. Ridge, U-Bar, Jersey Horse, Salt, Mud, Monument, Saginaw-Kennedy, Manaco, Brookbank, and Kettle. *Id.* at 74. The court found no breach of the St. Joe and Hutch-Boondock contracts – contracts where the suspensions ended after only eight weeks. *Id.* at 71. While finding that the Forest Service had breached 12 of Precision Pine's contracts, the court made clear that the July 2001 decision pertained to liability only and did not address the issue of damages. *Id.* at 73.

## II. Damages Sought by Plaintiffs

Plaintiff alleges several categories of damages: miscellaneous items, $19,954.53; increased logging and hauling costs, $176,162.32; lost profits (lumber, roundwood, and by-products), $6,865,541.21; increased manufacturing costs, $380,711.20; unanticipated interest costs on notes, $577,425.76; and attorneys' fees pursuant to CT 6.01, $1,298,830.21. Precision Pine also seeks damages on behalf of two of its subcontractors: idle equipment costs for Transporting Renewable Resources, Inc. ("TRRI") totaling $75,352.31 and lost profits allegedly sustained by Tri-Star Logging ("Tri-Star"). Precision Pine thus seeks total damages in the amount of $9,328,180.88. Pl. App. 659, Porter Decl. ¶ 62. Defendant's Motion for Partial Summary Judgment related to lost profits, increased logging, hauling, and sawmill costs, unanticipated interest costs, the subcontractor pass-through claims, and attorneys' fees.

---

[4] This case was reassigned to the undersigned on January 30, 2004.

## *DISCUSSION*

## I. Standard of Review for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. United States Court of Federal Claims Rule ("RCFC") 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A material fact is one that might affect the outcome of the litigation. *Anderson*, 477 U.S. at 248. A dispute over a material fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Id.*

In considering a motion for summary judgment, the court does not "weigh" each side's evidence. *Process Control Techs. v. United States*, 53 Fed. Cl. 71, 76 (2002) (citing *Contessa Food Prods., Inc. v. Conagra, Inc.* 282 F.3d 1370, 1376 (Fed. Cir. 2002)). Rather, "the court views the evidence and any disputed factual issues in the light most favorable to the party opposing the motion." *Id.* (citing *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 285 F.3d 1013, 1017 (Fed. Cir. 2002)). The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if that party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.*, 109 F.3d 739, 741 (Fed. Cir. 1997). The non-moving party then has the burden of producing sufficient evidence to demonstrate that there is a genuine issue of material fact that would allow a reasonable finder of fact to rule in its favor. *Process Control*, 53 Fed. Cl. at 76 (citing *Anderson*, 477 U.S. at 256). Unsupported assertions or conclusory allegations are insufficient to withstand summary judgment. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985).

## II. Defendant is Not Entitled to Summary Judgment Regarding Plaintiff's Claim for Lost Profits

### A. <u>Elements of Lost Profits</u>

In this Circuit, a plaintiff is entitled to damages for a breach of contract including lost profits upon its demonstration, by a preponderance of the evidence, of: (1) causation, (2) foreseeability, and (3) reasonable certainty as to amount. *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1325 (Fed. Cir. 2002). "Both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute." *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1350 (Fed. Cir. 2001). In *California Federal*, the Federal Circuit reversed the granting of the Government's motion for summary judgment on the issue of lost profits because:

> Cal Fed submitted considerable evidence, including documents and expert testimony, that more than sufficed to create a genuine issue of material fact as to the existence and quantum of lost profits. The Court of Federal Claims erred by not permitting Cal Fed to present its evidence at a trial based on its legal conclusion that the proof would be too speculative. We therefore vacate the summary judgment on lost profits and remand for trial on the issue.

*Id.* Indeed, the Government's burden to prevail on the issue of lost profits at summary judgment is high. As this court noted in the context of the *Winstar*-related litigation:

> In short, there is no *Winstar*-related case law supporting the Government's contention that this court should rule for defendant as a matter of law on the Franklin Plaintiffs' lost profits claim. The crux of the Federal Circuit's rulings in *Cal Fed* and *Glendale*, and this court's rulings in *Glendale*, *Bank United*, *Suess*, *Citizens*, and *Columbia*, is that the plaintiffs were entitled to their day in court, regardless of their prospects for success and the difficult standard of proof, as long as they offered enough evidence to raise a genuine issue of material fact.

*Franklin Federal Savings Bank v. United States*, 55 Fed. Cl. 108, 134 (2003).[5] The Court finds that Precision Pine has "submitted considerable evidence, including documents and expert testimony, that more than suffice to create a genuine issue of material fact as to the existence and quantum of lost profits." *Cal. Fed.*, 245 F.3d at 1350. The Court will next address each of the three elements that must be established in order to recover lost profits.

B. Causation

1. The Legal Standard For Causation is The "Substantial Factor" Test

As a threshold matter, the Court must determine the proper legal standard for causation. Plaintiff argues that the Court must decide whether the timber sale contract suspensions were a "substantial factor" in causing Precision Pine's damages. *See Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1356 (Fed. Cir. 2001) ("The Court of Federal Claims properly determined that the breach of the forebearances was a substantial factor in Bluebonnet's increased financing costs"); *Columbia First Bank, FSB v. United States*, 60 Fed. Cl. 97, 103 (2004) ("the weight of authority supports the appropriateness of the use of the substantial factor analysis of causation for lost profits damages in this court"). A breach is a "substantial factor" causing the lost profits if it directly and primarily caused the injuries. *American Savings Bank, F.A. v. United States*, 62 Fed. Cl. 6, 26 (2004) (citing *Columbia First Bank*, 60 Fed. Cl. at 105).

---

[5] The Court of Federal Claims so held even though it recognized that no *Winstar*-plaintiff had yet succeeded in prevailing on its lost profits claim at trial. *Id.*

"Plaintiffs must first show that defendant's breach produced damage 'inevitably and naturally, not possibly or probably.'" *Franconia Associates v. United States*, 61 Fed. Cl. 718, 747 (2004) (quoting *Ramsey v. United States*, 121 Ct. Cl. 426, 101 F. Supp. 353, 357 (1951)). The Federal Circuit held that "'if the profits are such as would have accrued and grown out of the contract itself, as a direct and immediate result of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement.'" *Energy Capital*, 302 F.3d at 1328 (quoting *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996)). In order to establish that losses were "proximately caused" by defendant's breach, plaintiff need not show that defendant's conduct was the "sole" cause of its damages. *Franconia,* 61 Fed. Cl. at 750 (citing *Long Island Sav. Bank, FSB v. United States*, 60 Fed. Cl. 80, 90 (2004); *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 553 (2003)). Under this standard, plaintiff "need not show that each dollar claimed was entirely unaffected by outside events." *Id.* (citing *Citizens Federal Bank, FSB v. United States*, 59 Fed. Cl. 507, 514-15 (2003)).

The Government proposes a more stringent "but for" standard, relying in part on *Myerle v. United States*, 33 Ct. Cl. 1, 27 (1897), and its progeny. In *Myerle*, the Court of Claims held:

> The plaintiff can only recover those items of damages which are the proximate result of the acts of the Government. What those items are is somewhat difficult to determine. For a damage to be direct there must appear no intervening incident (not caused by the defaulting party) to complicate or confuse the certainty of the result between the cause and the damage; the cause must produce the effect inevitably and naturally, not possibly or even probably. The damage must be such as was to have been foreseen by the parties, who are assumed to have considered the situation, the contract, and the usual course of events . . . . There must not be two steps between the cause and the damages.

*Id.* The Government further cites *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997), for the proposition that "a plaintiff must show that but for the breach, the damages alleged would not have been suffered."

While the issue of causation is a question of fact, the correct standard under which to evaluate it is a question of law. *Bluebonnet*, 266 F.3d at 1355-56. In *Citizens Federal*, Chief Judge Damich thoroughly analyzed the evolution of the "substantial factor" test in this Circuit. 59 Fed. Cl. at 514-16. That decision discussed the origin of the "substantial factor" test in the Court of Federal Claims and its treatment on appeal by the Court of Appeals for the Federal Circuit. *See id.* In concluding its analysis of this issue in *Citizens Federal*, the court stated:

> The "substantial factor" standard has been reviewed with approval by the Federal Circuit in both *Bluebonnet* and *Energy Capital* even though *Myerle* has not been explicitly overruled. Because the Federal Circuit

> has accepted this standard, it is consistent with this Court's analysis in *Energy Capital*, and because the standard has been adopted in numerous *Winstar*-related cases before other judges on the Court, this Court concludes that it is the appropriate standard to be applied in the present case.

59 Fed. Cl. at 515.

The Court of Federal Claims has expanded the "substantial factor" test beyond the context of the *Winstar*-related cases. In *Alaska Pulp Corp. v. United States*, 59 Fed. Cl. 400 (2004), Judge Baskir applied the "substantial factor" test in a case that involved the Forest Service's adjudicated breach of its timber contract with plaintiff. The court set forth the framework for analyzing causation:

> Where, as in this case, independent factors combine to harm the Plaintiff, the causation requirement is satisfied only if Plaintiff proves the breach was a "substantial factor" in causing the damages. *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 160 (2002) (question of whether the breach was a "substantial factor" in causing damages was an issue of material fact precluding summary judgment). As applied in the immediate case, damages are not appropriate if [Alaska Pulp's] harm is "more probably than not caused by factors general to the economy, not the defendant's breach." *LaSalle Talman Bank, FSB v. United States*, 45 Fed. Cl. 64, 98 (1999), *aff'd in part, vacated in part and remanded*, 317 F.3d 1363 (Fed. Cir. 2003).

*Id.* at 414.[6]

More recently, this court applied the "substantial factor" test in a breach of contract case involving the Department of Agriculture's Farmer's Home Administration ("FmHA"). *Franconia Associates*, 61 Fed. Cl. at 718. The plaintiffs in that case were various property owners that entered into mortgage contracts with the FmHA in exchange for providing low- and moderate-income rural housing. *Id.* at 721. While the loan contracts allowed for prepayment, without restriction, Congress, concerned with the loss of rural housing due to such prepayments, subsequently enacted laws that significantly restricted the exercise of that right. *Id.* Plaintiffs claimed that the legislation constituted a breach of their mortgage contracts and sought damages. *Id.* Among plaintiffs' damages claims was a claim for expectancy damages or lost profits. The court recited the three elements that plaintiffs had to establish in order to recover lost profits, *see supra* at 4, and then turned to the issue of causation, where the court applied the "substantial

---

[6] The court ultimately determined that Alaska Pulp was not entitled to damages, but did so only after a trial on damages.

factor" test. *Id.* at 746, 750.

Based on the case law of this circuit, the appropriate standard for determining causation is the "substantial factor" test.

2. There are Genuine Issues of Material Fact Regarding Causation

The Court of Federal Claims has recently held that "because causation is a question of fact that ordinarily should be determined at trial, the government's contentions regarding causation do not provide grounds for entry of partial summary judgment in its favor on expectancy damages." *Long Island Savings Bank,* 60 Fed. Cl. at 91 (citations omitted). Precision Pine has raised genuine issues of material fact as to whether the Forest Service's suspension of the contracts at issue was a "substantial factor" in causing the lost profits that plaintiff is seeking. Accordingly, the Government is not entitled to "judgment as a matter of law," and summary judgment would be improper. *See Anderson*, 477 U.S. at 247.

C. Foreseeability

1. The Legal Standard for Foreseeability

Lost profits are legally foreseeable only if, at the time the contract was entered into: (1) the loss was natural and inevitable upon the breach so that the defaulting party may be presumed from all the circumstances to have foreseen it; or (2) if the breach resulted in lost profits because of some special circumstances, those circumstances must have been known to the defaulting party at the time the contract was entered into. *Chain Belt Co. v. United States*, 127 Ct. Cl. 38, 58, 115 F. Supp. 701, 714 (1953); RESTATEMENT (SECOND) OF CONTRACTS § 351(2). There may be, however, valid reason to assess foreseeability at the time of the breach rather than at the time of the agreement, for it is at the time of the breach that the consequences of the wrongdoing are more apparent and assessable, and the deterrent accordingly greater. *Gardner Displays Co. v. United States*, 171 Ct. Cl. 497, 505, 346 F.2d 585, 589 (1965)).

A plaintiff's recovery is not contingent on defendant's having actually foreseen the injury that occurred. Rather,

> The existing rule requires only reason to foresee, *not actual foresight*. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefor in case of breach. It is erroneous, therefore, to refuse damages for an injury merely because its possibility was not in fact in contemplation of the parties at the time they made the contract. 11 CORBIN ON CONTRACTS § 1009 at 66 (Interim ed.) (emphasis added); *see also Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) ("expectation damages are recoverable

> provided they are actually or reasonably foreseeable . . . .") (citing RESTATEMENT (SECOND) OF CONTRACTS §§ 347, 351, 352 (1981)) (emphasis added).

*Anchor Sav. Bank, FSB v. United States*, 59 Fed. Cl. 126, 146 (2003). In that regard, Precision Pine need not show that a particular type of breach was foreseeable, but must prove that both the general magnitude and type of damages were foreseeable. *Franconia*, 61 Fed. Cl at 751 (citing *Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1378 (Fed. Cir. 2001)).

2. There are Genuine Issues of Material Fact Regarding Foreseeability

In this Circuit, "foreseeability is a question of fact." *Landmark*, 256 F.3d at 1379. Defendant cites no basis or authority for its contention that the Court can, nevertheless, decide the issue of foreseeability as a matter of law. Indeed, none of the three cases that defendant cites held that lost profits were not foreseeable as a matter of law. *See Energy Capital*, 302 F.3d at 1334 (affirming trial court's award of lost profits to plaintiff following trial); *Chain Belt*, 127 Ct. Cl. 38, 115 F. Supp. 701 (based upon the record developed in the Trial Division, the Court of Claims awarded lost profits to plaintiff); *Castle v. United States*, 48 Fed. Cl. 187, 191 (2000), *aff'd in part, rev'd in part on other grounds*, 301 F.3d 1328 (Fed. Cir. 2002), *cert. denied*, 539 U.S. 925 (2003) (deciding the issue of lost profits only after a "lengthy trial"). "Whether or not lost profits was within the contemplation of the parties at the time the contract was made depends on the facts of each case." *Chain Belt*, 127 Ct. Cl. at 59, 115 F. Supp. at 715.

Defendant contends that summary judgment is proper because "Precision Pine does not dispute that it did not inform the Forest Service of any special circumstances at the time of contracting." Def. Reply at 11 (citing Pl. Opp. at 43-44). Plaintiff asserts that "the fact that the forest products industry used Forest Service timber sale contracts to supply raw material to its sawmills for the production of salable wood products was a long-standing *goal* of the Forest Service's commercial timber sales program and was in no way a 'special circumstance' about which the Forest Service may credibly claim ignorance." Pl. Opp. at 44. In fact, defendant concedes that "in its bid for each of the timber sale contracts at issue, Precision Pine indicated that it was a 'manufacturer.' . . . The Forest Service was aware of this fact . . . as well as the fact that manufacturers used timber to produce wood products including lumber." Def.'s Resp. to Pl.'s Add. Proposed Findings of Uncontroverted Fact at ¶ 58. Thus, plaintiff argues, the lost profits were foreseeable because they followed from the breach in the ordinary course of events. RESTATEMENT (SECOND) OF CONTRACTS § 351(2)(a).

Plaintiff relies upon, *inter alia*, a document entitled, "Summary Effects of Mexican Spotted Owl Injunction," dated September 14, 1995, in which the Forest Service outlined the effect of the suspension on "Commercial Sawtimber and Pulpwood Harvest:"

> The effect on the timber industry is very serious. Most timber projects have been delayed and/or modified as consultation on each project took

> place. Sawlog inventories in most mills is very low. The logging season is restricted in most places to the fall months due to protective requirements for the owl and goshawks. Thus we expect to lose the 1995 year of production which will put several mills out of business permanently. . . . We expect about three sawmills to go out of business permanently if the injunction lasts through this logging season.

Pl. App. at 255. Though that document was not drafted at the time of contract formation, much of the information included in the statement reflects facts likely long known to the Forest Service, *i.e.*, the logging season is restricted and a suspension can cause a contractor to lose an entire year of production and such a loss can result in lost profits and several sawmills going out of business permanently. Additionally, to the extent that foreseeability can be measured from the time of breach, *see Gardner Display Co.*, 171 Ct. Cl. at 505, 346 F.2d at 589, the September 14, 1995 summary demonstrates that the Forest Service may have actually foreseen the types of lost profits sustained by Precision Pine as a result of the suspensions.

Plaintiff has submitted ample evidence sufficient to raise a genuine issue of material fact regarding what damages the Forest Service, at the time of contracting, could have reasonably foreseen would flow inevitably or in the ordinary course of business from the suspensions.

D. Reasonable Certainty

1. The Legal Standard for Reasonable Certainty

The Federal Circuit has held that certainty of damages is sufficient "if the evidence adduced enables the court to make a fair and reasonable approximation of the damages. In assessing damages, the court may act upon probable and inferential as well as direct and positive proof." *Energy Capital*, 302 F.3d at 1329 (citing *Locke v. United States*, 151 Ct. Cl. 262, 267-68, 283 F.2d 521, 524 (1960)); *Bluebonnet*, 266 F.3d at 1355. Absolute certainty is not required because "the risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages." *Energy Capital*, 302 F.3d at 1327. "'Fixing lost profits damages with reasonable certainty requires careful examination of the nature and reliability of the statistical proof.'" *Franconia*, 61 Fed. Cl. at 753 (quoting *Travellers Intern., A.G. v. Trans World Airlines*, 41 F.3d 1570, 1579 (2d Cir. 1994)).

2. There are Genuine Issues of Material Fact Regarding the Reasonable Certainty of Precision Pine's Damages Calculation

Precision Pine has submitted expert reports, as well as testimony from company president Lorin Porter to support its damages calculations. The Government attacks Mr. Porter's testimony as constituting an improper expert opinion. Defendant alleges that "[a]lthough Precision Pine has neither identified Mr. Porter as an expert, nor provided a report, workpapers or other backup documentation supporting the estimates, Mr. Porter's estimates of product mix [relied on by

plaintiff to calculate lost profits] plainly constitute expert testimony." Def. Mot. at 23 (citing Fed. R. Evid. 701 (limiting non-expert testimony to "opinions or inferences" that are "rationally based upon the perception of the witness" and "not based on scientific, technical or other specialized knowledge")). In essence, the Government challenges the *admissibility* of Precision Pine's proffered evidence.

Defendant misconstrues the standard under which the Court evaluates plaintiff's evidence at this stage of the proceedings. *See supra* at 4. RCFC 56 provides that "the [non-moving] party may not rest upon the mere allegations or denial of the [non-moving] party's pleading, but the [non-moving] party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." RCFC 56(e). However, this "do[es] not mean that the non-moving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex*, 477 U.S. at 324 (citing F.R.C.P. 56(e)). Furthermore, in considering a motion for summary judgment, the court does not "weigh" each side's evidence. *Process Control*, 53 Fed. Cl. at 76.

Defendant will have ample opportunity via motions in *limine* or later, at trial, to challenge the sufficiency of Precision Pine's evidence. Defendant may even be correct that ultimately plaintiff will be unable to adequately support is claim for damages with reasonable certainty. Precision Pine, however, has provided the court with ample evidence to raise a genuine issue of material fact regarding the certainty of its damages calculation. Accordingly, summary judgment in favor of the Government would be premature.

3. <u>The "Offset" Issue</u>

Beyond the general attacks on Precision Pine's evidence, the Government specifically contends that Precision Pine cannot prove its damages with reasonable certainty because of "Precision Pine's indisputable failure to take into account post-suspension harvesting upon the contracts at issue." Def. Mot. at 22. Defendant argues that because the contracts were suspended and not terminated, Precision Pine eventually harvested the timber and made a profit. According to the Government, Precision Pine's failure to subtract that profit from its claimed damages will result in a windfall to plaintiff.

Expectancy damages are intended to give the non-breaching party "the benefits he expected to receive had the breach not occurred." *Energy Capital*, 302 F.3d at 1324; *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001). Additionally, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." *Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341, 1345 (Fed. Cir. 2003). These statements of law are undisputed by the parties. What is disputed is whether allowing plaintiff to recover lost profits without offsetting the revenues that it subsequently derived by harvesting the sales would put Precision Pine "in a better position through the award of damages than if there had been no breach." *Id.*

In support of its position, plaintiff relies on "the lost volume seller" concept. Pl. Opp. at 53-63. The Government contends that the "lost volume seller" theory is inapposite because Precision Pine is the buyer in its timber sale contracts with the Government. The Government's argument is incorrect and misses the point. It is not necessary that Precision Pine be the seller vis-à-vis the Government. Precision Pine is a seller of lumber products in the marketplace. As such, it is entitled to rely on the "lost volume seller" theory. *See* RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. f, illust.16 (1981).

Lost volume damages are premised on the notion that had the supplier fully performed, plaintiff would have had the benefit of the original sale, and as a trader of the particular good, the profits from the subsequent sale as well. Here, Precision Pine argues that "but for the breach, [it] would have manufactured the sawlogs from the breached contracts into lumber products in 1995, 1996, and early 1997, sold those products *and* would still have entered into subsequent lumber sales in 1997 and 1998 using other sawlogs to manufacture that lumber." Pl. Opp. at 55 (citing Porter Decl.). Precision Pine claims that it would have earned profits on both sets of transactions absent the breach, and therefore, it should not have to offset the profits it earned from post-suspension harvesting against the lost profits it is claiming in this action. Precision Pine contends that if the Court were to impose such an offset, Precision Pine would not be able to recover "the benefits [it] expected to receive had the breach not occurred." *Energy Capital*, 302 F.3d at 1326.

The Restatement (Second) of Contracts § 347, illustration sixteen, is instructive in understanding the concept of lost volume damages:

> A contracts to pave B's parking lot for $10,000. B repudiates the contract and A subsequently makes a contract to pave a similar parking lot for $10,000. A's business could have been expanded to do both jobs. Unless it is proved that he would not have undertaken both, A's damages are based on the net profit he would have made on the contract with B, without regard to the subsequent transaction.

RESTATEMENT (SECOND) OF CONTRACTS § 347, illus. 16 (1981); *Anchor Savings Bank*, 59 Fed. Cl. at 155.

The Restatement (Second) of Contracts further provides that the issue of lost volume is a question of fact to be resolved at trial:

> Whether a subsequent transaction is a substitute for the broken contract sometimes raises difficult questions of fact. If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have "lost volume" and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then

> based on the net profit that he has lost as a result of the broken contract. Since entrepreneurs try to operate at optimum capacity, however, it is possible that an additional transaction would not have been profitable and that the injured party would not have chosen to expand his business by undertaking it had there been no breach. It is sometimes assumed that he would have done so, but the question is one of fact to be resolved according to the circumstances of each case.

RESTATEMENT (SECOND) OF CONTRACTS § 347, cmt. f. Relying on this language from the Restatement, in *Anchor Savings Bank*, the court similarly concluded that:

> [T]he issue of whether Anchor is a "lost volume seller" is a question of fact. Were it otherwise, this court would be faced with the impermissible duty of making findings as to whether Anchor could and would have held both branches it sold, and bought Lincoln. Rule 56 does not permit this court to do so on summary judgment.

59 Fed. Cl. at 156. Likewise, here, the Government urges the Court to find as a matter of law that Precision Pine is not a "lost volume seller." The Government has not met its burden under RCFC 56 of showing that it is entitled to judgment on that issue as a matter of law. *See Anderson*, 477 U.S. at 247. There are genuine issues of material fact as to whether Precision Pine would have manufactured the sawlogs from the breached contracts into lumber products in 1995, 1996, and early 1997, sold those products, *and* would still have entered into subsequent lumber sales in 1997 and 1998 using other sawlogs to manufacture that lumber.

In the event that Precision Pine is a "lost volume seller," it would not be required to offset the profits from its post-suspension harvesting. Accordingly, Precision Pine will have calculated its damages with reasonable certainty. If Precision Pine is found not to be a "lost volume seller," it will have to account for the profits from its post-suspension harvesting. Plaintiff has represented to the Court that "such a calculation [can] be made based on the information that has already been turned over to the government in discovery. (Although fairly mechanical, such a calculation would, however, be time consuming)." Pl. Opp. at 52 n.41. If such a deduction is required, the burden is on plaintiff to establish the quantum of damages. *See Citizens Federal*, 59 Fed. Cl. at 526 ("the burden is on [plaintiff] to consider the beneficial effects of mitigation in its damages calculation"). Such a calculation, however, would need to be only reasonably certain and not absolutely certain. *See Energy Capital*, 302 F.3d at 1327.

Because there are genuine issues of material fact as to whether an offset is appropriate and plaintiff has otherwise submitted sufficient evidence regarding its damages to survive summary judgment, *see supra* at 11, the Government's motion for summary judgment based on Precision Pine's alleged failure to calculate lost profits with reasonable certainty is denied.

### III. Consequential Damages

The Government also moved for summary judgment on Precision Pine's so-called consequential damages. This category of damages is comprised of four separate claims: increased hauling costs, increased logging costs, increased sawmill costs, and unanticipated interest expenses. Because the Government's arguments on each of these claims are distinct, the Court will address each claim separately.

As a general matter, in common law breach of contract actions, absent proof of "special circumstances" communicated at the time of contracting, only actual damages that are the natural and probable consequence of the asserted breach are recoverable. *E.g.*, *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2001); *Landmark*, 256 F.3d at 1378; *Wells Fargo*, 88 F.3d at 1021. In other words, "remote and consequential damages are not recoverable in a common law suit for breach of contract." *Wells Fargo*, 88 F.3d at 1021. Of course, merely labeling damages "consequential" does not render them unrecoverable *per se*: "defendant's characterization of the lost profits as 'consequential' is not dispositive. The issue is whether the damages are the 'natural and probable consequences of the breach' or whether they are too remote and speculative to be recoverable." *Marathon Oil Co. v. United States*, 16 Cl. Ct. 332, 336-37 (1989).

A. <u>The Government is Not Entitled to Summary Judgment on Plaintiff's Claim for Increased Hauling Costs</u>

Precision Pine allegedly incurred additional hauling costs in connection with the Hay sale. After the suspension was lifted in December 1996, Precision Pine was forced to haul timber to the Winslow mill rather than the Eagar mill because the Eagar mill had been and remained shut down in 1996 and early 1997, allegedly due to the suspension. The Government challenges the hauling cost claim primarily on the ground that such increased costs were not foreseeable. Def. Mot. at 29-30; Def. Reply at 27-28. The Government asserts that the increase in hauling costs did not occur as the natural consequence of the suspension and that Precision Pine never informed the Forest Service of any special circumstances at the time of contracting. *Id.* As factual support for its motion, defendant asserts that any damages caused as a result of the unavailability of the Eagar mill were not foreseeable because at the time of contracting (1) Precision Pine was not the contractor, and (2) the Eagar mill did not exist. *Id.*

As discussed *supra* at 9, foreseeability is a question of fact, not generally amenable to resolution on summary judgment. Precision Pine has provided evidence sufficient to raise genuine issues of material fact regarding whether the increased hauling costs were foreseeable. The parties agree that the "Forest Service knew that Precision Pine had sawmills at Eagar." Def.'s Resp. to Pl.'s Additional Proposed Findings of Uncontroverted Fact ¶ 68. Precision Pine contends that it informed the Forest Service to which sawmill it planned to haul the timber from the sale for processing, and was under a contractual obligation to inform the Forest Service of any changes in that regard. The Government disputes that Precision Pine was under a contractual

obligation to inform the Forest Service of any change of sawmills. While interpretation of a government contract is a question of law, *La Van v. United States*, 382 F.3d 1340, 1345 (Fed. Cir. 2004), *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996), whether or not Precision Pine actually informed the Forest Service of its intent to use the Eagar mill, and when Precision Pine made such a disclosure are questions of fact.

The record is unclear as to whether and when Precision Pine informed the Forest Service that it would be hauling sawlogs from the Hay timber sale to the Eagar mill. The record is also unclear as to what if any adjustments were made to the appraisal for the Hay sale in response to Precision Pine's intent to haul to the Eagar Mill. Additionally, to the extent that the Government asserts that it is entitled to judgment as a matter of law, the parties have not sufficiently briefed the question whether a contract modification allowing Precision Pine to haul to Eagar would "restart the clock" on foreseeability such that the Court would measure foreseeability from the time of contract modification and not the time of original contract formation. The *Gardner Display* case, discussed *supra* at 8, indicates that foreseeability may be determined from the time of the breach, at which point, the Eagar mill existed. The record indicates that prior to the breach, the Forest Service likely knew that Precision Pine had intended to use the Eagar mill in connection with the Hay sale. The Government has failed to show that there are no genuine issues of material fact, or that it is entitled to judgment as a matter of law regarding Precision Pine's claim for increased hauling costs.

B. Defendant is Entitled to Summary Judgment Regarding Plaintiff's Claim for Increased Logging Costs

Precision Pine alleges that its logging subcontractor, Tri-Star Logging, charged an additional $10/mbf to log the O.D. Ridge timber sale in 1997 and the Hay timber sale in 1998. Def. App. at 118A. The Government moved for summary judgment on the grounds that Precision Pine cannot establish either that (1) it actually paid Tri-Star a higher price for logging the Hay and O.D. Ridge sales, or (2) the purported increase was caused by the MSO suspension and was foreseeable at the time of contracting. As the Court has stated previously in this opinion, causation and foreseeability are issues of fact and are generally not amenable to summary disposition. The Court will address, however, the Government's contention that Precision Pine cannot prove that it actually sustained damages relating to increased logging costs.

Precision Pine did not execute written contracts with Tri-Star concerning timber logging or hauling. Def. App. 162 (Porter Deposition), 175-77 (Tenny Deposition), 187-89, 191 (Reidhead Deposition). Rather, for each timber sale where Tri-Star was asked to perform work, Precision Pine's president, Lorin Porter, and Tri-Star's president, Stephen Reidhead, would discuss and agree upon a price before operations commenced. *Id.* Precision Pine did not memorialize the result of discussions with Tri-Star. *Id.* When memories about the agreed price differed, Messrs. Porter and Reidhead simply worked out the price after the logging had been completed. Def. App. 187.

As a result of its informal business practice, Precision Pine has no written contracts, correspondence or other contemporaneous documents establishing that Tri-Star increased the price for logging the O.D. Ridge sale in 1997 and the Hay sale in 1998. Nor has plaintiff provided any receipts evidencing an increase in logging costs. Neither Mr. Porter nor Mr. Reidhead recalled a price increase for logging the O.D. Ridge or Hay contracts specifically. Furthermore, none of the proffered witnesses recalled the amount of any alleged price increase. Def. App. 162 (Porter Deposition), 175-77 (Tenny Deposition), 187-89, 191 (Reidhead Deposition).

The $10/mbf figure appears only in plaintiff's response to defendant's interrogatories and the declaration of Lorin Porter submitted by plaintiff in opposition to defendant's motion. Mr. Porter's declaration does not explain what he relied upon in determining the $10/mbf number, nor does it explain why he now remembers the exact amount of the increase.[7] As the Federal Circuit explained in *Sinskey v. Pharamacia Opthalmics, Inc.*:

> A party cannot create an issue of fact by supplying an affidavit contradicting his prior deposition, without explaining the contradiction or attempting to resolve the disparity . . . . Where, as here, a party has been examined extensively at deposition and then seeks to create an issue of fact through a later, inconsistent declaration, he has the duty to provide a satisfactory explanation for the discrepancy at the time the declaration is filed. To allow him to preclude summary judgment simply by contradicting his own prior statements would seriously impair the utility of Federal Rule of Civil Procedure 56.

982 F.2d 494, 498 (Fed. Cir. 1992) (holding that "[t]he trial court properly disregarded the declaration in assessing the existence of a genuine issue of material fact"). The record establishes that Precision Pine cannot show that it incurred damages relating to increased logging costs, and to the extent that such damages may have been incurred, Precision Pine cannot establish the quantum with reasonable certainty. The Government's motion for summary judgment regarding increased logging costs is therefore granted.

C. <u>The Government is Not Entitled to Summary Judgment on Precision Pine's Claim for Sawmill Costs</u>

Precision Pine has claimed the increased unit cost of manufacturing that it incurred at its sawmills due to the significantly reduced volume of sawlogs it had available allegedly because of the Forest Service's suspension of Precision Pine's contracts. The Government, relying on *Scott*

---

[7] Mr. Porter mentioned at his deposition that he needed to "look at the numbers" in order to determine the amount of the increase. Def. App. at 162. But according to his own deposition testimony, as well as that of Mr. Reidhead, there were no documented numbers for Mr. Porter to consult. *Id.* at 162,187-89.

*Timber*, 333 F.3d 1358, 1371-72 (Fed. Cir. 2003), argues that as a matter of law, sawmill costs resulting from the suspension of a timber sale contract constitute "remote and consequential damages" and therefore, are not recoverable. The Government overstates the precedential value of the *Scott Timber* decision on this issue for the case at bar. In *Scott Timber*, the court analyzed plaintiff's claim for sawmill costs under contract clause C 6.01[8], relating to "out of pocket expenses." *Id.* The Federal Circuit affirmed the Judge Margolis's determination that:

> *Scott's* sawmill expenses are not directly related to the timber sales contracts. Any sawmill costs were not a direct result of the suspension *in this case*.

*Id.* (emphasis added). The Federal Circuit then recited the general principle that "remote and consequential damages are not recoverable in a common-law suit for breach of contract . . . ." *Id.* The Federal Circuit, however, did not hold that sawmill costs are *per se* unrecoverable in a common-law suit for breach of contract. The Federal Circuit's holding addressed only Scott Timber's claimed sawmill expenses, and did not attempt to create a global rule applicable to all sawmill expenses in all cases. The case law cited by the Government does not mandate a finding that the Government is entitled to judgment on this issue "as a matter of law." *See Anderson*, 477 U.S. at 247. The Government has failed to demonstrate the absence of genuine issues of material fact regarding causation, foreseeability, or reasonably certainty of the damages calculation relating to Precision Pine's claim for increased sawmill costs. Accordingly, defendant's motion for summary judgment regarding plaintiff's claim for increased sawmill costs is denied.

D. Defendant is Entitled to Summary Judgment With Respect to Precision Pine's Claim To Recover Unanticipated Interest Costs

Precision Pine seeks damages for increased interest payments on outstanding loans. Plaintiff contends that it would have used the profits from the timber sales to pay down those debts. When the sales were suspended, Precision Pine was unable to realize profits during that time period, and accordingly, was unable to pay down the outstanding debts. As a result, Precision Pine allegedly incurred interest payments totaling $577,425.76 that it would not have incurred had the Forest Service not suspended the contracts. Plaintiff asserts its claim for "unanticipated interest costs" under both the common law and clause CT 6.01 of the contracts.

The Government moved for summary judgment on the ground that the outstanding loans were "independent and collateral undertakings" and the increased interest payments are "too remote and speculative to be recoverable" under the common law. Def. Mot. at 35-36 (citing, *inter alia*, *Wells Fargo*, 88 F.3d at 1022; *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1333 (Fed. Cir. 2003)). Additionally, because the language of CT 6.01 requires that the "out-of-pocket

---

[8] The clause in the Scott Timber contract was C 6.01. The relevant language was identical to the language in CT 6.01 of Precision Pine's contracts.

expenses" being sought be incurred as a "direct result" of the delay, a finding that the interest costs are "too remote and speculative" would preclude recovery under the contracts. *See Scott Timber*, No. 94-784C, slip op. at 9 (Fed. Cl. July 11, 2001) (holding that interest expenses were "too remote and speculative to be recoverable" under the out-of-pocket expenses clause of the contract).

In opposition, Precision Pine argues that unanticipated interest expenses are recoverable under the holdings in certain *Winstar*-related cases. *See, e.g.*, *Bluebonnet*, 266 F.3d at 1355; *Bank United of Texas FSB v. United States*, 50 Fed. Cl. 645 (2001) *affirmed in part, reversed in part*, 80 Fed. Appx. 663 (2003). The *Winstar* cases cited by plaintiff are distinguishable. In *Bluebonnet*, the increased financing costs resulted directly from the breach caused by the passage of FIRREA. 266 F.3d at 1355 ("The government is not persuasive when it asserts that it was unforeseeable at the time of contract execution that the breach of the forebearances would lead to increased financing costs for [plaintiffs]"). In *Bank United*, the interest costs at issue were incurred in an effort to mitigate the breach. 50 Fed. Cl. at 665. Conversely, the interest payments incurred by Precision Pine were on outstanding debt, which was not incurred as a result of, or in connection with, the MSO suspension. *See* Def.'s Opp. at 79.

The law of this circuit is clear that lost profits from a collateral undertaking are not recoverable:

> If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. These are part and parcel of the contract itself, and must have been in the contemplation of the parties when the agreement was entered into. But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

*Myerle*, 33 Ct. Cl. at 26. For the same reason, damages resulting from increased interest payments on collateral undertakings, *i.e.*, outstanding debt, are likewise unrecoverable. *See Scott Timber*, slip op. at 9.

The outstanding loans constitute independent and collateral undertakings and the increased interest payments are too remote and speculative to be recoverable. *See generally Wells Fargo*, 88 F.3d at 1022; *Olin Jones Sand Co.*, 225 Ct. Cl. 741, 742-43 (1980). The Court also holds that Precision Pine cannot recover these damages under clause CT 6.01 of the contracts. The increased interest payments on the outstanding debt are not "a direct result of . . . [the] delay," within the meaning of CT 6.01. *Scott Timber*, slip op. at 9. Accordingly, the Government's motion for summary judgment regarding Precision Pine's claim for "unanticipated

interest expenses" is granted.

## IV. The Government is Entitled to Summary Judgment With Respect to Precision Pine's Claims on Behalf of its Subcontractors, TRRI and Tri-Star

Precision Pine asserts claims on behalf of two purported subcontractors: damages for idle equipment costs of TRRI and roundwood profits that allegedly would have been earned by Tri-Star. Def. App. at 118. Because Precision Pine cannot prove that it is liable to either TRRI or Tri-Star Logging for any damages those entities may have incurred as a result of the MSO suspension, summary judgment in favor of the Government is appropriate with respect to these claims.

"As a general rule, subcontractors under government contracts do not have standing to sue the government." *W.G. Yates & Sons Constr. Co. v. Caldera*, 192 F.3d 987, 990-91 (Fed. Cir. 1999) (citing *Severin v. United States*, 99 Ct. Cl. 435, 442 (1943)). "This is because such subcontractors lack privity with the government, and the government has not consented to be sued by those with whom it is not in privity." *Id.* "However, if the prime contractor is liable to the subcontractor for damages sustained by the subcontractor, the prime contractor can bring an action against the government for the subcontractor's damages." *Id.* In such circumstance, it is "the prime contractor [that] is injured by the acts of the government and, therefore, [the prime contractor] has standing to sue the government in a pass-through suit on behalf of its subcontractor." *W.G. Yates & Sons*, 192 F.3d at 991 (citing *E.R. Mitchell Const. Co. v. Danzig*, 175 F.3d 1369, 1370 (Fed. Cir. 1999)). "The *Severin* doctrine precludes a prime contractor from bringing a pass-through suit for a subcontractor where the prime contractor is not liable to the subcontractor." *Perry-McCall Const., Inc. v. United States*, 46 Fed. Cl. 664, 671 (2000) (citing *W.G. Yates & Sons*, 192 F.3d at 991). If the Government seeks dismissal of the prime contractor's pass-through claims, the Government bears the burden of proof, and must show that the prime contractor is not responsible for the costs incurred by the subcontractor. *W. G. Yates*, 192 F.3d at 991.

### A. <u>TRRI's Claim for Idle Equipment Costs</u>

Precision Pine's purported subcontractor, TRRI, contends that as a result of the MSO suspensions, it incurred \$75,352.31[9] in idle equipment costs.[10] Def. App. at 118.

---

[9] The record does not reveal the nature of the specific costs that comprise the \$75,352.31.

[10] There are costs associated with maintaining equipment, regardless of whether or not the equipment is being used. When the equipment is being used on a contract, the payments from that contract absorb, at least to some degree, the cost of maintaining the equipment. When the equipment is not being used on a contract, either because there is no contract that requires it or because a contract has been suspended, the contractor must pay the maintenance costs with no offsetting income. The loss associated with the maintenance of equipment that is not being used

Precision Pine has failed to establish liability to TRRI based on its alleged contract with the subcontractor. Precision Pine concedes that it has not produced a written agreement with TRRI. Pl. Opp. at 85 n.76. In fact, Precision Pine's witnesses acknowledge that the agreements between Precision Pine and TRRI were oral. *See, e.g.*, Pl. App. 173, Tenney Depo. at 171. The absence of a written subcontract is not fatal to Precision Pine's claim on behalf of TRRI. *See Kentucky Bridge & Dam, Inc. v. United States*, 42 Fed. Cl. 501 (1998). Regardless of whether the subcontract is oral or written, however, Precision Pine must be able to show that it is liable to TRRI under the terms of the contract. The record is devoid of such information. In his declaration, Lorin Porter stated,

> Precision Pine did have an agreement with [TRRI] pursuant to which TTRI [sic] hauled all green lumber produced at our sawmills to our planer at Winslow . . . . That is, at all times relevant to the sales here in issue, TRRI had the exclusive contractual responsibility to haul all of the green lumber produced at our Eagar and Heber sawmills to our planer at Winslow. The fact that at some point in 1995 we reached an agreement with Tri-Star Logging for it to become our primary logger, had absolutely no affect [sic] on our arrangement with TRRI to haul our green lumber to our planer.

Pl. App. 657, Porter Decl. ¶ 59. Mr. Porter further asserted that: "As a result of the August 1995-December 1996 suspensions, Precision Pine produced far less green lumber than our agreement with TRRI anticipated." Pl. App. 658, Porter Decl. ¶ 61. There is also testimony on the record as to how Precision Pine and TRRI would establish the rate or price at which hauling would occur. Pl. App. 173, Tenney Depo. at 169-172.

There is no evidence in the record that Precision Pine was required by the contract to provide any minimum amount of green lumber for TRRI to haul. There is no testimony regarding any liability of Precision Pine to TRRI in the event that there was less green lumber than the parties anticipated. Furthermore, plaintiff has provided no contemporaneous documents evidencing any liability of Precision Pine. Accordingly, the Government has met its burden, under the *Severin* doctrine, of showing that Precision Pine is not liable to TRRI for any idle equipment costs that the subcontractor may have incurred as a result of the MSO suspension. It follows that Precision Pine is precluded from bringing a claim for idle equipment costs on behalf of TRRI, *see Severin*, 99 Ct. Cl. at 442, and the Government is entitled to summary judgment with respect to this claim.

---

is characterized as "idle equipment costs."

B. Tri-Star's Lost Profits Claim

Precision Pine's claim on behalf of Tri-Star likewise fails because defendant has established that plaintiff is not liable to Tri-Star for roundwood profits that Tri-Star would have allegedly earned by selling the roundwood on the open market. Precision Pine's contract with Tri-Star was an oral agreement. Stephen Reidhead, President of Tri-Star, described the contract as follows:

> Tri-Star would harvest the roundwood on Precision Pine's timber sales, haul it to Stone Container Corp.'s ("Stone") pulp mill in Snowflake, Arizona and receive whatever Stone paid for it less the price of the stumpage, i.e., the price that Precision Pine had to pay to the Forest Service for the roundwood. . . . The stumpage price would either be retained by Precision Pine (and the balance of the Stone payment turned over to Tri-Star) or, if we received the payment from Stone, we would retain all of it except for the amount that Precision Pine had to pay the Forest Service for the pulpwood.

Pl. App. 663-64, Reidhead Decl. Even assuming that Precision Pine had a valid subcontract with Tri-Star, the pass-through claim still fails because there is nothing in the record that supports Precision Pine's assertion that it is liable to Tri-Star for Tri-Star's alleged lost profits. During oral argument, the Court explicitly asked plaintiff:

> Is there a declaration or a deposition in the record wherein somebody from Precision Pine says, my understanding of the contract was that we were absolutely bound to provide trees to Tri-Star, and if we couldn't do that for whatever reason, it was our problem and we were obliged to compensate them?

Transcript of Proceedings, Precision Pine & Timber, Inc. v. United States, 98-720C at 195-96 (Fed. Cl. Aug. 10, 2004) ("Tr."). Counsel for plaintiff candidly answered, "I think if I answered that in the affirmative, I would be misleading the Court." *Id.* at 196. The record in this case simply does not support the conclusion that Precision Pine was liable to Tri-Star in the event that it could not provide roundwood to its subcontractor. "The *Severin* doctrine precludes a prime contractor from bringing a pass-through suit for a subcontractor where the prime contractor is not liable to the subcontractor." *Perry-McCall Const.*, 46 Fed. Cl. at 671 (citing *W.G. Yates & Sons*, 192 F.3d at 991).

The Government has met its burden of demonstrating that there is no genuine issue of material fact with respect to the claim asserted by Precision Pine on behalf of Tri-Star and the Government is entitled to judgment as a matter of law with respect to Tri-Star's pass-through claim.

## V. Attorneys' Fees are Not Recoverable Under the Contracts

Precision Pine is seeking to recover attorneys' fees incurred in connection with claim preparation and litigation in this court. Plaintiff asserts that such fees are recoverable under clause CT 6.01 of the contracts:

> Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be . . . (2) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to BT8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, replacement cost of timber, or any other anticipatory losses suffered by Purchaser. Purchaser agrees to provide receipts or other documentation to the Contracting Officer which clearly identify and verify actual expenditures.

P. App. 23. The Government contends that attorneys' fees are not recoverable under CT 6.01 because the United States has not waived sovereign immunity with respect to claims for such fees, and they are not contemplated by the plain language of the clause.

"[U]nder the doctrine of sovereign immunity, the United States cannot be held liable for costs without its consent." *Johns-Manville Corp. v. United States*, 893 F.2d 324, 326 (Fed. Cir. 1989). Where the United States has given its consent, the terms of its consent define the court's jurisdiction to entertain the suit. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Waiver of sovereign immunity, and hence consent to be sued, must be expressed unequivocally – it cannot be implied. *Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999); *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-34 (1992); *Ledford v. United States*, 297 F.3d 1378, 1381 (Fed. Cir. 2002). Moreover, a waiver of the Government's sovereign immunity must be strictly construed in favor of the Government. *United States Dep't of Energy v. Ohio*, 503 U.S. 607, 615, 619-20 (1992); *Cosmic Constr. Co. v. United States*, 697 F.2d 1389, 1390 (Fed. Cir. 1982).

Pursuant to the "American Rule," attorneys' fees are not recoverable in the absence of an express statutory or contractual provision. *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975); *see also Rolm & Haas Co. v. Crystal Chemical Co.*, 736 F.2d 688 (Fed. Cir. 1984). This general principle that litigation costs, including attorneys' fees, are not recoverable without specific authorization is applicable whether plaintiff's attorneys' fees were characterized as litigation costs or contract damages. *Bighorn Lumber Co. v. United States*, 49 Fed. Cl. 768, 776 (2001) (citing *Kania v. United States*, 227 Ct. Cl. 458, 467, 650 F.2d 264, 269 (1981)).

The interpretation of a government contract is a question of law. *See supra* at 15. In resolving disputes involving contract interpretation, the starting point is "the plain language of the contract." *M.A. Mortenson Co. v. Brownlee*, 363 F.3d 1203, 1206 (Fed. Cir. 2004); *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). "Where, as here, the provisions of the [contract] are phrased in clear and unambiguous language, they must be given their plain and ordinary meaning, and [a court] may not resort to extrinsic evidence to interpret them." *Coast Federal Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003). The fact that the parties differ in their respective interpretations of a contract term is insufficient to show an ambiguity. *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999).

The plain language of CT 6.01 provides for recovery of out-of-pocket expenses only if they are incurred as a direct result of the delay. The clause does not define the term "out-of-pocket expenses." The contracts do, however, specifically provide that "out-of-pocket expenses do not include lost profits, replacement cost of timber, or any other anticipatory losses suffered by Purchaser." The Court construes "out-of-pocket expenses" to be "things of the same general kind of class as those specifically mentioned, *i.e.*, losses due to plaintiff's inability to harvest timber under the contract." *Bighorn Lumber*, 49 Fed. Cl. at 771. Attorneys' fees are simply not within that "general kind of class." The plain meaning of CT 6.01 does not permit plaintiff to recover attorneys' fees incurred in connection with claim preparation or litigation in this court.

The contract clause is silent on the issue of attorneys' fees.[11] Precision Pine argues that the fact that attorneys' fees were not specifically excluded from out-of-pocket expenses, means that those costs are included and recoverable under the contract. Precision Pine is incorrect. The universe of what does not constitute out-of-pocket expenses is limitless, and the specific list of costs not considered out-of-pocket in CT 6.01 does not constitute the total enumeration of all non-reimbursable costs. *See Federal Land Bank of St. Paul v. Bismark Lumber Co.*, 314 U.S. 95, 99-100 (1941) ("the term 'including' is not one of all embracing definition, but connotes simply and illustrative application of the general principle"); *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1367 (Fed. Cir. 1998).

The absence of any mention of attorneys' fees, in the context of the "American Rule" and the requirement that "waivers of sovereign immunity cannot be implied but must be unequivocally expressed," *Ledford*, 297 F.3d at 1381, is fatal to Precision Pine's claim for attorneys' fees. Defendant's motion for summary judgment regarding plaintiff's claim for attorneys' fees pursuant to CT 6.01 is granted.

---

[11] Later versions of this clause expressly provide that attorneys' fees are not recoverable as out-of-pocket expenses. The clarification in the newer iterations does not, however, alter the Court's interpretation of the clause at issue in this case. *Mason v. United States*, 222 Ct. Cl. 436, 615 F.2d 1343 (1980) (holding that "subsequent revision or clarification of contract language which has given rise to a disagreement is only wise, and does not constitute an admission").

## *CONCLUSION*

For the reasons set forth above, the Government's Motion for Partial Summary Judgment is GRANTED in part, and DENIED in part. Defendant's Motion is GRANTED with respect to plaintiff's claims for increased logging costs, unanticipated interest costs, the pass-through claims asserted on behalf of TRRI and Tri-Star, and attorneys' fees. Defendant's Motion is DENIED with respect to plaintiff's claims for lost profits, increased hauling costs, and increased sawmill costs.

IT IS SO ORDERED.

s/ George W. Miller

GEORGE W. MILLER
Judge