**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-720C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF FACTS AND LAW**

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Washington, D.C. 20006
(202) 452-2140

Dated: March 7, 2005

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES .......... iv

I. CONTENTIONS OF FACT .......... 1

A. For Years Prior to the Breach, Precision Pine Had Been Consistently Profitable By Purchasing Forest Service Timber Sales as Raw Material for Its Lumber Mills .......... 1

B. But For the Breach, Precision Pine Would Have Harvested the Timber on the Breached Sales During the Ensuing 16-Month Suspension and Sold the Resulting Wood Products at a Profit .......... 5

C. It Was Foreseeable to the Forest Service that Precision Pine Would Suffer Lost Profits as a Result of a Protracted Suspension .......... 10

D. No "Offset" of Post-Suspension Profits from the Breached Sales Is Required, Because Precision Pine Was a Lost Volume Seller .......... 15

E. To the Extent that an Offset of Post-Suspension Profits Is Required, Precision Pine's Expert, Mr. Ness, Has Correctly Quantified the Post-Suspension Profits .......... 17

F. As a Result of the Breach, Precision Pine Suffered Other Damages, Including Increased Timber Hauling Costs, Increased Manufacturing Costs and Employee Claim Preparation Costs .......... 21

1. Precision Pine's Increased Hauling Costs on the Hay Sale are Recoverable .......... 21

a. But for the Suspension, Precision Pine Would Not Have Incurred Increased Timber Hauling Costs on the Hay Sale .......... 21

b. That the Protracted Suspension Would Increase Precision Pine's Hauling Costs Was Foreseeable to the Forest Service .......... 23

c. The Amount of Precision Pine's Increased Timber Hauling Costs Has Been Calculated with Reasonable Certainty .......... 25

2. As a Result of the Breach, Precision Pine Suffered Increased Manufacturing Costs ....................26

a. But for the Suspension, Precision Pine Would Not Have Incurred Increased Manufacturing Costs....................26

b. It Was Foreseeable to the Forest Service That a Prolonged Suspension Would Have Increased the Cost of Precision Pine's Manufacturing Operations ....................28

c. The Amount of Precision Pine's Increased Manufacturing Costs Has Been Calculated with Reasonable Certainty....................30

3. As a Result of the Breach, Precision Pine Incurred the Cost of Preparing and Submitting Its CDA Claim Letters ....................30

a. But for the Suspension, Precision Pine Would Not Have Incurred the Cost of Preparing Its CDA Claim Letters....................30

b. That the Forest Service's Protracted Suspension Would Cause Precision Pine to Incur Costs in Preparing CDA Claim Letters Was Foreseeable to the Forest Service ....................31

c. The Amount of Precision Pine's Cost in Preparing Its CDA Claim Letters Has Been Calculated with Reasonable Certainty....................31

II. CONTENTIONS OF LAW ....................31

A. Precision Pine is Entitled To Recover Its Lost Profits....................32

1. But for the Suspension, Precision Pine Would Have Earned the Profits Claimed ....................32

2. Precision Pine's Lost Profits were Foreseeable by the Forest Service ......33

a. Precision Pine's Lost Profits were Objectively Foreseeable .........33

b. Lost Profits are Presumed to Occur in the Circumstances Here Present....................36

c. The Forest Service was Fully Aware of the Circumstances Surrounding Precision Pine's Use of Forest Timber ....................39

d. No Special Circumstances Exist that the Forest Service Was Not Aware of ....40

e. The Test for Foreseeability of "Special Circumstances" Is Whether the Government was Aware of Them ....41

3. Precision Pine Will Demonstrate the Amount of Its Lost Profits with Reasonable Certainty ....42

B. Precision Pine Is Entitled to Recover Its Damages for Its Increased Hauling Costs on the Hay Contract, Increased Manufacturing Costs and Costs It Incurred in Claim Preparation....47

1. Precision Pine Is Entitled to Recover Its Increased Hauling Costs ....49

a. But for the Suspension, Precision Pine Would Not Have Incurred Increased Hauling Costs on the Hay Sale ....49

b. The Increased Hauling Costs were Foreseeable to the Forest Service....50

c. Precision Pine Will Prove Its Increased Hauling Costs with Reasonable Certainty ....52

C. Precision Pine is Entitled to Recover Its Increased Manufacturing Costs....52

D. Precision Pine is Entitled to Recover Its Costs Incurred in Preparing Its CDA Claim Letters....54

III. ISSUES TO BE RESOLVED....57

# TABLE OF AUTHORITIES

**CASES** **PAGE**

Anchor Sav. Bank FSB v. United States,
59 Fed. Cl. 126 (2003) ........................................................................................34

Bluebonnet Sav. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003)..........................................................................46

California Federal Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005)..........................................................................32

Ellerman Lines, Ltd. v. The President Harding,
187 F. Supp. 948 (S.D.N.Y. 1960).....................................................................46

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002)................................................................... *passim*

Everett Plywood Corp. v. United States,
512 F.2d 1082 (Ct. Cl. 1975) ...................................................................... *passim*

Everett Plywood Corp. v. United States,
651 F.2d 723 (Ct. Cl. 1981) ...............................................................................38

Forest Guardians v. Thomas, 967 F. Supp. 1536, *aff'd sub nom.*,
Forest Guardians v. Dombeck, 131 F.3d 1309 (9th Cir. 1997) ...................................19, 45

Fortis Corporate Insurance, S.A. v. M/V Cielo Del Canada,
320 F. Supp.2d 95 (S.D.N.Y. 2004)...................................................................46

Gardner Displays Co. v. United States,
346 F.2d 585 (Ct. Cl. 1965) ...............................................................................33

Glenn Distributors Corp. V. Carlisle Plastics, Inc.,
297 F.3d 294 (3rd Cir. 2002) ..............................................................................46

Greater Gila Biodiversity Project v. USFS,
Civ. 95-0242-PCT-PGR......................................................................................14

Hawthorne Indus., Inc. v. Balfour Maclaine Int'l, Ltd.,
676 F.2d 1385 (11th Cir. 1982) ............................................................................53

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001)......................................................................21, 38

In re Kellet Aircraft Corp.,
186 F.2d 197 (3rd Cir. 1950) ....................................................................................46

J.D. Hedin Construction Company v. United States,
347 F.2d 235 (Ct. Cl. 1965) ....................................................................................45

Landmark Land Co., Inc. v. FDIC,
256 F.3d 1365 (Fed. Cir. 2001)....................................................................................21

Madigan v. Hobin Lumber Co.,
986 F.2d 1401 (Fed. Cir. 1993)....................................................................................47

Marathon Oil Co. v. United States,
16 Cl. Ct. 332 (1989) ....................................................................................48

Mass. Bay Transp. Auth. v. United States,
129 F.3d 1226 (Fed. Cir. 1997)....................................................................................48, 53

Matt Allen Logging,
AGBCA No. 2002-124-1, 04-1 BCA ¶ 32,596 (April 8, 2004) ......................................57

Neely v. United States,
167 Ct. Cl. 407 (1964) ....................................................................................37

Peck Iron & Metal Co., Inc. v. United States,
603 F.2d 171 (Ct. Cl. 1979) ....................................................................................37

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) .................................................................................... *passim*

Precision Pine & Timber, Inc. v. United States,
62 Fed. Cl. 635 (2004) ....................................................................................18

Precision Pine & Timber, Inc. v. United States,
63 Fed. Cl. 122 (2004) .................................................................................... *passim*

Precision Pine & Timber, Inc. v. United States,
___ Fed. Cl. ___, 2005 WL 352547 (Fed. Cl. Feb. 14, 2005) ..........................................32

Precision Pine & Timber, Inc. v. United States,
No. 01-131C....................................................................................45

Precision Pine & Timber, Inc. v. United States,
No. 01-201C....................................................................................18

Reidhead Bros. Lumber Co.,
AGBCA No. 2000-126-1, 01-2 BCA ¶ 31,486, *aff'd*, Reidhead Bros. Lumber Mill v. Veneman, 36 Fed. Appx. 426 (Fed. Cir. 2002), *reh'g denied* (Sept. 10, 2002) .....50, 55

Reliance Enterprises,
ASBCA No. 27638, 85-2 BCA ¶ 18,045 (1985) .....46

Robert L. Rich d/b/a Unitranco,
DOTBCA 1026, 82-2 BCA ¶ 15,900(1982) .....46

Scott Timber, Co. v. United States,
333 F.3d 1358 (Fed. Cir. 2003).....52, 53, 56

Scott Timber Co. v. United States,
COFC No. 94-784C .....56

Stoner-Caroga Corp. v. United States,
3 Cl. Ct. 92 (1983) .....37, 41, 42

Weaver-Bailey Contractors, Inc. v. United States,
19 Cl. Ct. 474 (1990) .....45

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997).....21, 37, 48

**STATUTES AND REGULATIONS**

Organic Act of 1897,
16 U.S.C. §§ 473-482, 551 *et seq.* .....10
16 U.S.C. § 475.....10

36 C.F.R. § 223.52.....13
36 C.F.R. § 223.160(f) (1989-90).....11
36 C.F.R. § 223.186 (2000) .....10
36 C.F.R. § 223.187(a).....11

55 Fed. Reg. 50643 (Dec. 7, 1990).....13

**MISCELLANEOUS**

5 CORBIN ON CONTRACTS § 1011 (1964).....38, 48

11 SAMUEL WILLISTON & WALTER H.E. JAEGER, A TREATISE ON THE LAW OF CONTRACTS § 1344 (3d ed. 1968 & Supp. 2001) ........................................................48

Robert L. Dunn, *Recovery of Damages for Lost Profits* (5th ed. 1998)
§ 2.4........................................................................................................................38
§ 118........................................................................................................................38

RESTATEMENT (SECOND) OF CONTRACTS
§ 347........................................................................................................................15
§ 351 (1981)............................................................................................................48
§ 351, cmt. a (1981) ..................................................................................34, 48, 53
§ 351, cmt. b............................................................................................................40
§ 351(1) (1981) .......................................................................................................33

U.C.C. § 2-715, Official Comment 6.......................................................................38

The contentions of fact and law as well as any supporting exhibits identified below are not intended to be exhaustive or final and are subject to revision based on, among other things, the evidence adduced at trial. Moreover, although Appendix A, ¶ 14(a)(3) contemplates that a party make objections to witnesses and exhibits in, or concurrently with the filing of, the Memorandum of Fact and Law, at this time, plaintiff has not been provided with defendant's final exhibit list or its final witness list as is contemplated by Appendix A. Therefore, at this time plaintiff has not identified its objections to defendant's witnesses or exhibits, however, in accordance with this Court's pre-trial order of January 4, 2005, plaintiff reserves the right to file motions *in limine* as to defendant's witnesses and objections as to defendant's exhibits on April 18, 2005.

## I. CONTENTIONS OF FACT

### A. For Years Prior to the Breach, Precision Pine Had Been Consistently Profitable By Purchasing Forest Service Timber Sales as Raw Material for Its Lumber Mills.

Mr. Lorin Porter, President of Precision Pine & Timber Co., Inc. ("Precision Pine"), will testify at trial that Precision Pine was founded in 1984 in Heber, Arizona and that he has more than 29 years of employment experience in lumber manufacturing, including approximately 20 years of experience in the procurement of timber. Moreover, Mr. Porter's father was the owner/operator of a sawmill and was engaged in obtaining timber for the production and sale of lumber products in Northern Arizona and New Mexico. Accordingly, from a very young age, Mr. Porter participated in the family business of assessing and acquiring standing timber, all facets of sawmill operations as well as the production and sale of lumber products.

Heber is located in a rural area of northeastern Arizona, in the heart of a swath of virtually unbroken Ponderosa Pine forest that extends in an arc from Flagstaff (located in north-central Arizona) to Springerville, Arizona (located on the border of Arizona and New Mexico). Plaintiff's Exhibit ("PX") 104. However, approximately 42.1% of the State of Arizona is owned by the federal government and that percentage of ownership is even higher in northeastern Arizona.[1] Precision Pine will present testimony indicating that it was at all times relevant to this case substantially dependant upon the Forest Service's commercial timber sale program for its supply of raw material. See also PX 272. Indeed, Precision Pine estimates that historically more than 75% of its supply of raw material was obtained from the Forest Service's timber sale program.

In each and every year from its inception to 1995, Precision Pine bid on and was awarded contracts by the Forest Service for the harvesting of timber, harvested timber pursuant to those contracts, paid the Forest Service for the timber removed, manufactured that timber into lumber and by-products and sold the lumber and by-products at a profit. Indeed, prior to the suspension, Precision Pine was consistently profitable.

As the Court is well aware, on August 25, 1995, the Forest Service suspended performance on all of the Forest Service contracts that had been awarded to Precision Pine. See Precision Pine & Timber, Inc. v. United States, 63 Fed. Cl. 122, 126 (2004). This suspension

---

[1]The State of Arizona owns an additional approximately 12.8% of the land base in Arizona. PX 270.

resulted in Precision Pine's filing claims for the breach of 14 contracts and the Court's finding that the Forest Service had, in fact, breached 12 of those contracts. Id.

At the time of the suspension in 1995, Precision Pine was operating three sawmills strategically located in Heber, Eagar and Winslow, Arizona. The Heber sawmill, constructed in 1984, drew its timber supply primarily from the Tonto and the western-portion of the Apache-Sitgreaves National Forests. The Heber sawmill had the capacity to produce approximately 10 million board feet[2] of lumber per year when operating one eight-hour shift per day. PX 271.

The Winslow facility had been obtained from Duke City Lumber Company in 1991. The Winslow sawmill drew its timber supply primarily from the Coconino and Kaibab National Forests and had the capacity to produce approximately 14 million board feet of lumber per year on a one shift basis. PX 271. The Winslow facility also housed a planer mill and kilns, where rough green lumber products from all of Precision Pine's sawmills were surfaced and dried. The Winslow planer and kilns had an annual capacity well in excess of the combined annual output of Precision Pine's sawmills.

Finally, the Eagar sawmill drew on the supply of timber sold by the Forest Service on the eastern-portion of the Apache-Sitgreaves National Forest. During the period of the suspension, the Eagar sawmill had the capacity to produce approximately 11 million board feet of lumber per year on a one shift basis. PX 271.

[2]A board foot is a board measuring 1 foot long by 1 foot wide by 1 inch thick. The volume of Forest Service timber sales are often calculated in "thousand board feet," which is abbreviated as "MBF." "MMBF" denotes one million board feet.

As noted, in 1997, Precision Pine submitted claims under the Contract Disputes Act ("CDA") for breach of contract with respect to 14 of its Forest Service timber sale contracts that had been suspended beginning on August 25, 1995 and seeking, among other things, lost profits. See Precision Pine, 63 Fed. Cl. at 126. The suspension of 10 of those contracts lasted for some 16 months, i.e., until December 1996. Id. The remaining volume of sawlogs on the 14 suspended sales regarding which Precision Pine submitted claims was 31.5 million board feet and represented an approximately 13.5-month supply of sawlogs for the company's sawmills. In the final decisions on Precision Pine's claims, the government disclaimed liability for the breach of contract as well as for Precision Pine's lost profit claim and paid Precision Pine a total of $18,242.78 in out-of-pocket expenses for the protracted suspension of the contracts pursuant to contract clause CT6.01. Id.[3]

At summary judgment in this matter, 12 of the 14 timber sale contracts were held to have been breached by Forest Service. See Precision Pine, 63 Fed. Cl. at 126. One of the breached contracts, the Brann multi-product timber sale, was only suspended for a period of approximately

---

[3]The Forest Service, however, failed on some contracts to compensate Precision Pine for certain small suspension expenses items that are regularly compensated by it, i.e., total costs (including markup) of maintaining performance bonds during the suspension, the total cost (including markup) of having to move off the Brookbank contract on which it was operating at the time of the suspension, and interest on cash deposits, effective purchaser road credits and downpayments held by the Forest Service during the suspension. See PX 131 at ex.2. The Forest Service also failed to compensate Precision Pine for several other small items, i.e., the necessary cost to remove snow in the winter of 1996 in order to access badly needed timber and the cost in October 1996 of transferring logs from a mill forced to close by the suspension to an operating mill.

At trial, Precision Pine will demonstrate that each of these costs were incurred and that they are of the type normally compensated by the Forest Service in the circumstances here present.

eight weeks before being released. Id. Although the Brann contract was breached, Precision Pine has not sought lost profits with respect to the breach of that contract. At the time of the suspension, the 11 breached contracts for which lost profit damages are sought had sawlog volumes in the following amounts:

| Sale Name | Volume In CCF | Volume In MBF |
|---|---|---|
| Monument: Ponderosa Pine | 1,461 CCF | 730.50 MBF |
| Mud: Ponderosa Pine | 6,199 CCF | 3,099.5 MBF |
| Saginaw-Kennedy: Ponderosa Pine | 2,268 CCF | 1,134 MBF |
| U-Bar: Ponderosa Pine | Sold in MBF | 1,824.45 MBF |
| U-Bar: Douglas Fir | Sold in MBF | 1,361 MBF |
| Brookbank: Ponderosa Pine | 2,711.3 CCF | 1,355.65 MBF |
| Jersey Horse: Ponderosa Pine | 3,040 CCF | 1,520 MBF |
| Manaco: Ponderosa Pine | 5,002 CCF | 2,501 MBF |
| Salt: Ponderosa Pine | 4,460 CCF | 2,230 MBF |
| Hay: Ponderosa Pine | Sold in MBF | 3,561.67 MBF |
| Hay: Douglas Fir | Sold in MBF | 257.55 MBF |
| Kettle: Ponderosa Pine | Sold in MBF | 2,741.97 MBF |
| O.D. Ridge: Ponderosa Pine | Sold in MBF | 1,921 MBF |
| O.D. Ridge: Douglas Fir | Sold in MBF | 441 MBF |
| O.D. Ridge: Englemann Spruce | Sold in MBF | 264 MBF |

PX 131 at Ex. 9, p. 1 and PX 290.

B. But For the Breach, Precision Pine Would Have Harvested the Timber on the Breached Sales During the Ensuing 16-Month Suspension and Sold the Resulting Wood Products at a Profit.

As noted in the above chart, the remaining total of sawlogs on the 11 breached sales regarding which Precision Pine suffered lost profits was 24,943 MBF (LS)[4] (i.e., 24.9 million board feet) or approximately an 11-month supply of sawlogs for Precision Pine's mills. PX 158. But for the suspensions, Precision Pine would have harvested this 11-month supply (24.9 million

[4]"LS" refers to "log scale" or the volume of board feet contained in a log. By contrast, "LT" refers to "lumber tally" or the board feet of lumber that can be produced from a log. The two are not identical, and board feet produced at sawmill in lumber tally typically exceeds (and in Precision Pine's operations did exceed) board feet in log scale.

feet) during the 16-month period from August 25, 1995 to December 1996. See PX 102. Indeed, this volume was a critical portion of its raw material supply. Moreover, by the end of April 1997, Precision Pine would have manufactured all of those sawlogs into lumber and by-products of the type it normally produced, sold those products to its usual customers and made a profit in doing so. PX 131. These lost profit damages have been quantified in the Expert Report of Robert Ness as $6,865,541. PX 131 at exs. 1, 4-7.

Defendant may attempt to argue that the calculation of Precision Pine's lost profits is not reasonably certain and that, had there been no suspension, Precision Pine would not necessarily have harvested any of the timber on the breached contracts during the period August 1995 through December 1996 because on the eve of the suspension, Precision Pine did not have a written plan demonstrating in detail precisely when each of the breached contracts was to be harvested and the resulting sawtimber to be run through Precision Pine's sawmilling operations. Defendant's argument, however, ignores that the breached contracts contained a very substantial portion of the timber that Precision Pine had available at the time of the suspension, that the breached sales plus the other timber that Precision Pine was able to obtain and operate on during the suspension would have brought its operations to near capacity, PX 131, as well as the testimony of Precision Pine's President that he would have operated the breached sales plus the other timber available to him during the period of the suspension. See PX 102.

Defendant will likely also attempt to argue that aspects of Precision Pine's lost profits calculation are flawed and/or might have been calculated another way. However, once the evidence is presented and all testimony adduced, it will become clear that Precision Pine's

approach to quantifying the magnitude of the considerable damage imposed on it by defendant's breaches of contract is sound and, if anything, is quite conservative.

More specifically, defendant will probably contend that Precision Pine could not have harvested the sawlogs on the contracts in issue between August 1995 and December 1996 as it alleges because seven of the eleven breached sales were "multi-product sales" which contained both sawlogs and pulpwood. See PX 102. The basis for defendant's position is that at various times during that period, Stone Container Corporation ("Stone"), Precision Pine's primary buyer of pulpwood, would not accept pulpwood and/or would not accept pulpwood from Precision Pine. Defendant's argument, of course, has no application to the four sales (Hay, Jersey Horse, U-bar, and O.D. Ridge) which, as of the date of the suspension, contained 45% (11,150 mbf (LS) of the 24,900 mbf (LS)) of sawlogs remaining on the breached contracts but no pulpwood. See PX 102. Moreover, the evidence and testimony at trial will show that: (1) the situation that existed intermittently between Stone and Precision Pine between August 1995 and December 1996 *vis-à-vis* pulpwood was nothing new, but this fact notwithstanding, Precision Pine had always been able to harvest both the sawlogs and pulpwood on its Forest Service multi-product sales in full conformity with its obligations under those contracts and to dispose of virtually of all that pulpwood to Stone (It was able to dispose of this pulpwood both by waiting to harvest or remove pulpwood until Stone's needs increased, as is permitted by the terms of each of Precision Pine's timber sale contracts, and by selling the pulpwood to its loggers who in turn sold it to Stone); (2) Precision Pine intended to dispose of pulpwood on the seven subject contracts to Stone by selling the pulpwood to its primary logger, Tri-Star Logging, who had an excellent long-term relationship with Stone, and, who, in turn would continue to sell it to Stone; and (3) in

fact, during and after the suspension, Precision Pine was able to dispose of pulpwood to Stone both through direct sales and by selling the timber to its loggers who in turn sold it to Stone. See PX 114, 117, 223.

It appears that the government will also attack Precision Pine's calculation of the profits it would have made with respect to the eleven breached sales during the period August 1995 through April 1997 if there had been no suspension with various challenges to those calculations, e.g., Precision Pine's projection of the total volume of lumber that it would have produced, the quantities of particular lumber products that it would produced, and the prices at which it would have sold those products. The government will also likely challenge more generally the profitability of the sales. The evidence and testimony that will be adduced at trial will, however, demonstrate that Precision Pine's approach to damages is fully supported consistent with the evidence and considerably more accurate than the approaches taken by the government.

Indeed, in contrast to the government's assertions, Precision Pine will demonstrate that its calculation of the total volume of lumber that it would have produced from the 24,900 mbf (LS) of sawlogs remaining to be harvested on the eleven breached contracts as of August 25, 1995 was not only reasonable but conservative. See PX 51. Precision Pine will demonstrate that the factors it applied to calculate the total volume of lumber that it would have produced from the sawlogs on these breached contracts (most notably by using an overrun/lumber recovery factor of 1.25) was a good deal more conservative than that set forth by the Forest Service itself in the pre-bid documents for each of the contracts in issue (see PX 1-27) and that the substantially

lower overrun/lumber recovery factor for which the government has advocated is simply incorrect.

While the government will attempt to introduce reports from its so-called experts, and will likely try to produce hours of testimony critical of the manner in which Precision Pine calculated the quantities of particular lumber products that it would have produced from these contracts from August 1995 through April 1997 had there been no suspension (i.e., Precision Pine's lumber product mix for this hypothetical production), at the end of the day the testimony and evidence adduced at trial will demonstrate that Precision Pine's projected product mix is quite accurate. E.g., PX 288.

The government's will in all likelihood also try to attack the accuracy of prices at which Precision Pine has indicated that it would have sold the various lumber products that it would have produced from these sales from August 1995 through April 1997 had there been no suspension. However, Precision Pine will demonstrate that these prices are consistent with the prices at which these products were, in fact, sold during the period of the suspension and that by contrast the pricing methodology utilized by the government is inaccurate. PX 287.

Finally, the government's probable general criticism of the size of the profit that Precision Pine would have made had it been permitted to harvest and process the sawlogs on the eleven breached sales without interference will also be shown to be unfounded. That is, the testimony and exhibits that Precision Pine will present will show that the lumber production rate that, but for the suspension, Precision Pine would have been achieved from August 1995 through

April 1997, i.e., 35,000 mbf (LT) (35 million board feet of lumber) per year, and that the lumber market was such that throughout the suspension profits would have been achieved. E.g., PX 131, 168.

C. It Was Foreseeable to the Forest Service that Precision Pine Would Suffer Lost Profits as a Result of a Protracted Suspension.

The National Forests were established under authority of the Organic Act of 1897, 16 U.S.C. §§ 473-482, 551 *et seq.*, which provides that "[n]o national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States[.]" 16 U.S.C. § 475 (emphasis added). This is also one of the fundamental premises for the existence of the Forest Service's commercial timber sale program. Indeed, the Forest Service Manual currently states (and at the time of contracting stated) that:

> [S]pecific objectives for commercial timber sales are . . . [t]o provide a continuous flow of raw material to local forest industries.

PX 132-134. From its inception and at all times relevant to this case, the Forest Service, through its commercial timber sale program, has knowingly engaged in providing raw material to industry for the manufacture of wood products. Everett Plywood Corp. v. United States, 512 F.2d 1082, 1091 (Ct. Cl. 1975).

As one would expect, the timber sale contracts awarded to Precision Pine reflected this knowledge in many ways. That is, not only was the primary item being sold pursuant to the subject contracts "sawlogs" (see PX 169-179) but each of the Forest Service's commercial

timber sale contracts actually contained provisions that required Precision Pine to process the timber it harvested under the contract in a domestic sawmill,[5] to notify the Forest Service of the sawmill where the specific timber was to be processed and of any changes in this regard, to certify where processing had occurred, and warned that the failure to process the timber at a domestic sawmill would constitute a breach of contract.[6] Id. Moreover, each of the bid forms for the contracts here in issue required that the bidder indicate whether or not it was a manufacturer, i.e., an entity that processed timber into wood products such as lumber or plywood, e.g., PX 135-136. Accordingly, in its bid for each of the timber sale contracts in issue, Precision Pine indicated that it was a "manufacturer." Indeed, the Forest Service was aware that Precision Pine was a manufacturer (PX 272, 275) as well as the fact that manufacturers used timber to produce wood products including lumber (PX 273, 274, 275, 276). See also 36 C.F.R. § 223.160(f) (1989-90), 36 C.F.R. § 223.187(a).

In this regard, as the Court found in its ruling denying the government's motion for summary judgment:

> In fact defendant concedes that 'in its bid for each of the timber sale contracts at issue, Precision Pine indicated that it was a 'manufacturer.' . . . The Forest Service was aware

[5]In the forest products industry and to the Forest Service, "processing" and "manufacturing" mean the same thing. See 36 C.F.R. § 223.186 (2000) ("Manufacturing facility means a permanently located processing plant used to convert unprocessed timber into products"). As discussed below, Precision Pine regularly certified to the Forest Service both before and after contracting that it was processing the timber from its Forest Service timber sale contracts at its sawmills. PX 21-27.

[6]Moreover, contract clause CT8.641 required that the contractor ensure that the timber is domestically processed, i.e., prior to delivering the timber to another party, Precision Pine was required to execute an agreement acceptable to the Forest Service with that party which shall "specify domestic processing for the timber. . . ." PX 169-179.

> of this fact . . . as well as the fact that manufacturers used timber to produce wood products including lumber."

Precision Pine, 63 Fed. Cl. at 130. Indeed, the Forest Service knew that Precision Pine had sawmills at Eagar (PX 272, 273, 275) and Heber (PX 272, 273, 274, 275) and a sawmill and planer at its Winslow facility. (PX 272, 275, 276). The Forest Service knew that Precision Pine produced lumber at its sawmills. PX 272, 273, 274, 275. Moreover, at the time of award, the Forest Service anticipated that sawlogs from Precision Pine's contracts would be sent to sawmills for processing. PX 274, 275, 276. The Forest Service also knew that Precision Pine was substantially dependant on the Forest Service commercial timber sale program as its source of sawlogs to supply its mills. PX 272.

The contracts themselves also reflect the Forest Service's understanding that Forest Service timber was being purchased to be manufactured into lumber. That is, clause B(T)8.21 of each of Precision Pine's timber sale contracts also required the Forest Service to grant additional time within which the contractor could harvest the timber on the sale if the contractor's "primary timber processing facilities," i.e., the sawmill where it intended to process the timber, were destroyed or damaged by fire, flood, or similar cause. See PX 169-179. If the ability to successfully perform sawmill operations and produce lumber were not integral to the performance of the timber sale contract, there would have been no reason for Forest Service to have included such a clause in the contracts.

Additionally, since 1990, each Forest Service commercial timber sale contract, including those here in issue, has contained clause C(T)8.212 providing for the addition of time to the term

of the contract when the Chief of the Forest Service determines that adverse market conditions have resulted in a drastic reduction of wood product prices for two or more consecutive quarters.[7] See PX 169-178; 36 C.F.R. § 223.52. The stated purpose for the inclusion of such a contract provision was the Forest Service's recognition of the need to avoid purchaser defaults in periods of severe economic downturn, because:

> Such economic distress broadly affects community stability and the ability of industry to supply construction lumber and other products for public use and threatens the maintenance of plant capacity necessary to meet future needs of the Nation for wood products from domestic sources. Accordingly, in order to insure the retention of a viable established industry capable of supplying the wood fiber needs of the public for housing and other products, the Chief of the Forest Service has determined that if there is a drastic reduction in wood product prices . . . it would be in the substantial overriding public interest to extend the contract term (36 C.F.R. 223.115(b)).

55 Fed. Reg. 50643 (Dec. 7, 1990) (emphasis added), PX 222.

Furthermore, in Certifications of Timber Domestically Processed submitted to the Forest Service annually, both before and after all of the sales in issue were awarded, Precision Pine certified that all sawtimber it removed from Forest Service sales was processed at its sawmills. PX 272, 273, 274. See also PX 144-146, 275, 276.

Given the above, it was objectively foreseeable to the Forest Service that the probable result of a protracted suspension of 12 of Precision Pine's sales was reduced sawmill operations and lost profits on the lumber that Precision Pine intended to produce. This fact is supported by

---

[7] To determine if a drastic reduction in wood product prices had occurred, the Forest Service elected to track wood product prices (i.e., lumber prices, not prices bid for standing timber) as determined by the Bureau of Labor in its producer price indices. Id.

sworn statements of other Forest Service officials in Region 3 where all of the breached contracts were located. For example, in a declaration made to the United States Court of Appeals for the Ninth Circuit, Milo Larson, the then Director of Forestry and Forest Health for Region 3, stated that:

> When many timber sale contracts in a large geographic area are affected for a long period of time, there is the potential to destroy businesses that cannot operate any of their contracts and consequently their manufacturing plants. Because the individual contract delay provisions were not envisioned to be applied to more than one contract at a time, the government could face potentially broad damages for businesses being unable to operate enough of their contracts to avoid loss[es] from mill closings and other losses outside an individual contract. This could result in millions of dollars in damages being paid by the government.

PX 49 (¶ 6) (emphasis added). Similarly, Alan Lucas, the then Timber Sale Preparation and Sale Administration Forester for Region 3, submitted an affidavit on behalf of the government to the United States District Court for the District of Arizona in Greater Gila Biodiversity Project v. USFS, Civ. 95-0242-PCT-PGR (a case that involved a request for an injunction pending the Forest Service's compliance with NEPA), which stated that if the injunction were issued necessitating the Forest Service to suspend operations on timber sale contracts "[e]xpenses associated with the interruption or shutdown and Start-up of [a] Purchaser's sawmill . . ." were costs for which the Forest Service could expect claims. PX 50.

Perhaps most importantly, this Court has already found in denying defendant's motion for summary judgment that evidence presented by Precision Pine:

> Reflects facts likely long known to the Forest Service, i.e., the logging season is restricted and a suspension can cause a contractor to lose an entire year of production and such a loss can result in lost profits and several sawmills going out of business permanently.

Precision Pine, 63 Fed. Cl. at 131. Based on the above, there is more than sufficient factual evidence to establish that the Forest Service actually foresaw or could have foreseen that the probable result of its protracted suspensions and breach of Precision Pine's contracts would be lost profits.

D. No "Offset" of Post-Suspension Profits from the Breached Sales Is Required, Because Precision Pine Was a Lost Volume Seller.

The government may argue that a deduction for profits made in post-suspension harvesting of some of the timber on the contracts at issue should be made. However, as this Court has already determined: "In the event that Precision Pine is a 'lost volume seller,' it would not be required to offset the profits from its post-suspension harvesting." Precision Pine, 63 Fed. Cl. at 133. Here, the facts demonstrate that Precision Pine was a lost volume seller and, therefore, no offset is required.

At all times relevant, Precision Pine was a regular volume dealer in sawlogs, and processor of those sawlogs into lumber. That is, consistent with the tests laid out in § 347 of the Restatement, Precision Pine regularly dealt with significant quantities of sawlogs, i.e., in the years preceding the breach, it annually purchased millions of feet of sawlogs and used that substantial volume of sawlogs to manufacture lumber products at its sawmills. PX 246. Indeed, at the time of the breach, on average, each of these sawmills had the capacity to produce approximately one million board feet of lumber per month on a one shift basis, i.e., a total of 35-36 million feet of lumber annually. PX 271.

In fact, had there been no suspension, in the 16 months between the time that the government breached the contracts in August 1995 and December 1996, Precision Pine would have harvested the 11-month supply of sawlogs (24,900 MBF) on the breached sales and by the end of April 1997 would have manufactured all of it into lumber. PX 130, 131. Moreover, once the injunction was dissolved in December of 1996, the Forest Service did start selling timber again. PX 156-157. From this other timber put out for bid, including the 80,000 MBF offered by the Forest Service between December 1, 1996 and December 31, 1998 by the four national forests on which Precision Pine operated, id., Precision Pine would have purchased a similar volume, i.e., enough sawlogs to keep its mills in operation for a comparable period throughout 1997 into 1998. Such being the case, but for the breach, Precision Pine would have had the opportunity to make a profit on lumber sales both during the period of the suspension in 1995-96 and in the ensuing years of 1997-98.

Put slightly differently, because Precision Pine would have made the lumber sales that it did after April 1997 whether or not the Forest Service had breached the contracts in issue, offsetting a portion of any post-suspension profits against profits that were lost on timber that could not be harvested from August 1995 to December 1996 as a result of the suspension, will leave Precision Pine in a considerably worse position than it would have been in had there been no breach. This is due to the fact that, absent the breach, Precision Pine would have earned both the profits on the timber from the 11 breached sales that would have been harvested during August 1995-December 1996 and the profits that it would have earned on an equal volume of timber harvested from other sales in 1997-98. In short, absent the breach, after August 25, 1995 Precision Pine would have made $X in profits on the sale of lumber made from sawlogs

harvested on the 11 sales at issue **and** would have made $Y in profits on the sale of lumber made from an equal volume of other sawlogs which it would have processed thereafter, i.e., Precision Pine's total profit would thus have been $X+$Y. However, by offsetting any actual post-suspension profits that Precision Pine would have earned in any event ($Y) against the profits that Precision Pine lost due to the suspension, Precision Pine would obtain only $X-$Y in profit, a far lesser sum. Thus, the government's proposed offset would put Precision Pine in a worse position than it would have been in had there been no breach.

E. To the Extent that an Offset of Post-Suspension Profits Is Required, Precision Pine's Expert, Mr. Ness, Has Correctly Quantified the Post-Suspension Profits.

At summary judgment, this Court determined that if Precision Pine is found not to be a lost volume seller it will have to account for the profits from post-suspension harvesting. Precision Pine, 63 Fed. Cl. at 133. In a report dated February 7, 2005, plaintiff's accounting expert Mr. Robert Ness calculated the post-suspension profits, if any, that Precision Pine made on the sale of lumber and by-products from the breached contracts in the post-suspension period. See Post–Suspension Report of Robert A. Ness ("Ness Post-Susp. Report"), PX 182. Mr. Ness employed the same basic methodology that had been used in calculating Precision Pine's damages during the suspension period. That is, during the post-suspension period Precision Pine conducted at least some harvesting on eight of the 11 breached sales. (PX 182 at ex. 4, p.3).[8] In all, some 11,092 MBF (LS) of sawlogs were removed by Precision Pine from the breached sales

[8]No post-suspension harvesting was conducted on the Saginaw-Kennedy, Salt or Monument contracts (PX 182 at ex. 4, p. 3) while the Hay and Mud contracts where harvested to completion and the Kettle sale, after some harvesting by Precision Pine in 1997 (id. at ex. 4, p. 3), was transferred to another purchaser. Id. at ex. 1, p. 1.

between the time that the suspension was lifted until the 2nd Quarter of 2000. Id. at ex. 4, p. 3.[9] Mr. Ness calculated the profit that was made on the sale of lumber, pulpwood and by-products from the breached sales during this period and from that profit Mr. Ness deducted the costs associated with manufacturing the lumber from those sales, including the contract costs (stumpage, road maintenance deposits, etc.) (id. at ex. 6), logging and hauling costs (id. at ex. 4, p. 4), manufacturing costs (id. at ex. 7), unabsorbed manufacturing overhead costs (id. at ex. 9), as well as unabsorbed General & Administrative Costs. Id. at ex. 12. On an "income before tax basis," Precision Pine lost money on the lumber produced from the breached sales (and, indeed, for the first time as a company) in each of its fiscal years ending 1998, 1999, and 2000. Id. at ex. 14A-C. This was due in large part to the considerable inefficiencies that Precision Pine experienced in the post-suspension period. Even on a slightly modified gross profit basis (i.e., reflecting the amount of unabsorbed manufacturing overhead and G&A experienced by the company in the post-suspension period (id. at exs. 9 and 12) and the default damages assessed with respect to the contracts but not reflecting that portion of the company's manufacturing overhead and G&A that would have been incurred in the normal course of operations (see id. at ex. 1), the total profit attributable to the breached contracts was only $803,353.12. Id. at ex. 1.

[9] In the summer of 2000, the remaining eight breached contracts were put into default by the government because Precision Pine was unable to replace its surety for the contracts after the government removed the surety from its approved list. The resolution of the government's breach claim is pending in Precision Pine & Timber, Inc. v. United States, No. 01-201C, currently pending before this Court. As found by this Court in its order of October 29, 2004 the government had calculated its damages incorrectly and is now in the process of recalculating them, a task it is to complete no later than six months after the entry of that order. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 656 (2004). It is Precision Pine's contention that the Forest Service's claim for default damages on the breached contracts represents a loss that Precision Pine sustained on the timber remaining on the breached contracts.

The government may assert that among the reasons that these contracts generated no or limited profits in the post-suspension period were events that its breach did not cause and for which it is not responsible, e.g., the suspension of seven of these contracts in whole or part from May 30 to December 15, 1997 in order to comply with an injunction wrongfully issued in Forest Guardians v. Thomas, 967 F. Supp. 1536, 1544, *aff'd sub nom.*, Forest Guardians v. Dombeck, 131 F.3d 1309 (9th Cir. 1997), the permanent closure of Stone, Precision Pine's primary buyer of chips and pulpwood, in early 1998, and the fire later that same year which destroyed Precision Pine's Winslow sawmill. Thus, the government may try to argue that the post-suspension profits that Precision Pine could have earned on these sales in a perfect world is considerably higher. However, $803,352 is what Precision Pine actually earned on the breached sales in the post-suspension period and, while perhaps more could have been earned had circumstances in the post-suspension period been other than they were, as the case law discussed in the Contentions of Law, infra, makes clear, where a government suspension forces a contractor into a period where the contractor's operations are hampered or prevented by events not caused by the government directly, the government nonetheless remains responsible for the full amount of damages resulting from its suspension.

The government may also argue that any lost profits that Precision Pine suffered were caused by its decision to forego profits and not harvest the sales in **1997** and thereafter, i.e., after the suspensions were lifted. The government made such an assertion in its motion for summary judgment based on the premise that lumber product prices "were markedly higher in 1997"[10] and

[10] This statement is not totally accurate. See Ex. 3 of the report of one of defendant's putative experts. Defendant's Preliminary Ex. 776.

that, despite this good market, Precision Pine simply decided (for no apparent reason) not to harvest these sales and make a profit on them. In making this argument, defendant asks this Court to believe that the owners of Precision Pine were either blithering idiots or masochists. Not surprisingly, for a company that was consistently profitable before the Forest Service's breach of its contracts, neither is the case.

Although not relevant for purposes of determining Precision Pine's entitlement to profits lost as a result of the Forest Service's suspensions of harvesting operations in 1995 and 1996, subsequent to the lifting of the suspensions in December 1996 Precision Pine did attempt to dig out from the devastation that the August 1995-December 1996 suspensions caused the company and to get back to some semblance of normal operations. However, as it attempted to do so, it was hit seriatim with a number of obstacles beyond its control. First, the suspensions were lifted in December, when, as the Forest Service itself recognizes, through April, it is usually too wet and not cold enough in Arizona to provide good winter logging conditions. Subsequently, after logging conditions had improved, the Forest Service again suspended operations on a number of the company's most critical sales, and shortly after those suspensions were lifted in December 1997, Stone, Precision Pine's customer for chips and roundwood, stopped buying anything other than recycled paper for its operations. PX 125, 126. To make matters even worse, thereafter, in September of 1998, Precision Pine suffered a major fire at its sawmill in Winslow. PX 128, 129.

These events alone belie the picture that defendant attempts to paint (no matter how irrelevant) of a company that simply decided to forgo profitable operations after the suspensions, which are at the center of this case, were lifted in December 1996.

F. As a Result of the Breach, Precision Pine Suffered Other Damages, Including Increased Timber Hauling Costs, Increased Manufacturing Costs and Employee Claim Preparation Costs.

As this Court determined at summary judgment, "actual damages that are the natural and probable consequence of the asserted breach are recoverable." Precision Pine, 63 Fed. Cl. at 134, citing Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed. Cir. 2001); Landmark Land Co., Inc. v. FDIC, 256 F.3d 1365, 1378 (Fed. Cir. 2001); Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1989). As demonstrated below, the facts here amply demonstrate that Precision Pine's claimed increased timber hauling costs, increased manufacturing costs, and its employee claim preparation costs were caused by the suspension, were foreseeable and have been calculated with reasonable certainty.

1. Precision Pine's Increased Hauling Costs on the Hay Sale are Recoverable.

a. But for the Suspension, Precision Pine Would Not Have Incurred Increased Timber Hauling Costs on the Hay Sale.

Precision Pine has claimed the additional costs it paid to haul timber harvested on the Hay sale to another of its sawmills after the suspension of the Hay sale was lifted in December of 1996 because its Eagar sawmill was not operating. PX 163. This claim is premised on the fact that, but for the suspension, Precision Pine would have hauled the logs from the Hay sale to its Eagar mill which was proximate to the sale. Indeed, Precision Pine had built the Eagar mill in large measure to handle the timber from the Hay sale rather than incurring the costs to haul the timber from the Hay sale a greater distance to another of Precision Pine's sawmills. PX 259. Prior to the suspension, Precision Pine had hauled timber from the Hay sale to its Eagar mill. PX 260-261. However, due to the suspension and the resulting shortage of sawlogs, the Eagar

sawmill was shut down on or about December 1, 1995 and remained closed throughout the suspension (PX 163), and as a result Precision Pine consolidated its manufacturing operation at the Winslow facility during the suspension. Immediately after the suspensions were lifted, Precision Pine was allowed to and began harvesting on the Hay timber sale, which unlike most sales, was at an elevation at which extended winter logging was possible outside of the Normal Operating Season. PX 257, 258, 262. However, until it could reassemble a crew and reopen the Eagar mill in 1997, Precision Pine had to haul the sawlogs removed from the Hay sale to its Winslow sawmill which, due to the suspension, was also in need of logs at the time.

The nexus between the suspensions that resulted in sawmill closings and concomitant additional costs to haul sawlogs from the timber sale site to a mill that remains in operation can be seen in the fact that the Forest Service takes the cost of hauling sawlogs to a sawmill into account in establishing the minimum acceptable bid price for the sawlogs on any given timber sale. PX 1-17. In fact, the contracting officers for the subject sales confirmed at deposition that the Forest Service appraisals take into account the estimated cost that a contractor would incur to haul sawlogs from a timber sale to the nearest sawmill (PX 273, 275, 276), and that if the nearest sawmill did not have a planer facility to finish the resulting lumber, the Forest Service would make a further adjustment in the appraisal to recognize the additional cost of hauling green lumber to the planer. (PX 273, 276, 277). In fact, the Forest Service's appraisal of the Hay sale included a cost component for hauling the timber to a mill in Eagar. PX 1.[11] Thus, at the time of contracting the Forest Service knew that there were costs associated with hauling timber from a

[11] The appraisal was prepared based on a haul to Stone's sawmill in Eagar. Id.

sale to even the nearest mill and that, if additional hauling were required beyond the distance to that mill, the purchaser would incur additional costs.

b. That the Protracted Suspension Would Increase Precision Pine's Hauling Costs Was Foreseeable to the Forest Service.

It was entirely foreseeable to the Forest Service that the prolonged suspension of the contracts at issue would result in sawmill shutdowns such as the one that occurred at Eagar. As this Court found in denying the government's motion for summary judgment on this issue, "The parties agree that the 'Forest Service knew that Precision Pine had sawmills at Eagar.'" Precision Pine, 63 Fed. Cl. at 134, citing Def.'s Resp. to Pl.'s Additional Proposed Findings of Uncontroverted Fact ¶ 68. The appraisal prepared by the Forest Service for the Hay sale anticipated that the sale would be hauled to a sawmill in Eager. PX 1. Additionally, as noted above, the nexus between the suspensions that resulted in sawmill closings and the resulting additional costs to haul sawlogs from the timber sale site to a mill that remains in operation can be seen in the fact that the Forest Service takes the cost of hauling sawlogs to a sawmill into account in establishing the minimum acceptable bid price for the sawlogs on any given timber sale (PX 1-17) that the contracting officers for the subject sales confirmed at deposition that the Forest Service appraisals take into account the estimated cost that a contractor would incur to haul sawlogs from a timber sale to the nearest sawmill (PX 273, 275, 276), and that if the nearest sawmill did not have a planer facility to finish the resulting lumber, the Forest Service would make a further adjustment in the appraisal to recognize the additional cost of hauling green lumber to the planer. (PX 273, 276, 277).

Furthermore, in documents cited by Chief Judge Damich in his decision on liability, the Forest Service recognized just after the injunction was issued that if the injunction (and resulting suspension of ongoing sales and proposed sales in Region 3) continued for just two to three months, "that many mills will have to shut down for extended periods" and that "due to low availability of logs to process, this injunction could cause mills to close permanently." Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 47 (2001). This is entirely consistent with the statement in Mr. Lewis' declaration, which he will iterate at trial, that he and his colleagues in the Forest Service were aware that a prolonged suspension of harvesting Forest Service timber sales could likely cause purchasers to take steps to minimize their losses such as shutting down sawmills (or even closing them permanently), consolidating manufacturing operations at a single facility, and that doing so would result in purchasers incurring, among other things, additional hauling costs in the process. Thus, the Forest Service knew that there were costs associated with hauling timber from a sale to even the nearest mill, that the suspension was causing mills to shut down and, if additional hauling were required beyond the distance to the nearest mill, the purchaser would incur additional costs.

During harvesting of the Hay sale in the period prior to the suspension, Precision Pine had informed the Forest Service that timber was going from that sale to its Eagar mill. (Letter dated November 23, 1994 from Lewis Tenney to Charles Denton stating "We plan to haul all timber from the Hay sale to our Eagar, Arizona plant," PX 260). Moreover, as soon as the suspension was lifted in December of 1996, Precision Pine sought Forest Service approval to haul timber from the Hay sale to its Winslow mill, instead of to the shutdown mill at Eagar as Precision Pine had originally informed the Forest Service that it would do. PX 257. The Forest

Service approved the requested new haul route of timber from the Hay sale to the Winslow mill and logs from the Hay sale were delivered to the Winslow mill in December of 1996 and into 1997. PX 263. Similarly, in 1998, the Forest Service approved Precision Pine's request that scaling (i.e., measuring the volume) of logs from the Hay sale be performed by Forest Service scalers at Precision Pine's Heber mill (PX 266) and the logs were, in fact, hauled to the Heber mill. PX 268.[12]

Since it was clear to the Forest Service that a suspension of even a few months would result in the closure of sawmills, with this knowledge came the certain realization that timber that was to have gone to a mill that was now closed would, in all likelihood, have to be hauled greater distances to a mill that remained open. Moreover, the Forest Service was actually advised by Precision Pine that the timber for the Hay sale which was to have been hauled to the Eagar mill was instead being hauled to the Winslow mill in 1997 and to the Heber mill in 1998.

c. The Amount of Precision Pine's Increased Timber Hauling Costs Has Been Calculated with Reasonable Certainty.

Mr. Porter calculated the increased hauling cost on the Hay sale by applying a conservative estimate of the cost per mile to haul timber from the Hay sale and applying this cost to the MBF of logs that were hauled from the Hay sale to Winslow in 1996 and 1997 and to Eager in 1998. PX 180. To date, defendant has not disputed the soundness of this approach.

[12]Hay was the only sale at issue that was scaled.

2. As a Result of the Breach, Precision Pine Suffered Increased Manufacturing Costs.

a. But for the Suspension, Precision Pine Would Not Have Incurred Increased Manufacturing Costs.

The issue of how the suspension caused the increased manufacturing costs incurred by Precision Pine was described by Mr. Ness as follows:

> During the suspension period, the sawmills and planer were not as efficient as they would have been with a steady supply of logs from the suspended sales. As noted above, I have calculated the actual direct manufacturing cost per MBF during the 17-month period before the suspension. Using the same methodology, I calculated the manufacturing cost per MBF that Precision Pine experienced during the suspension. See Exhibits 10 and 16. The difference between these two rates represents the inefficiency that Precision Pine experienced during the suspension period to which I applied the actual volume of lumber production during the suspension period. See Exhibit 15.

PX 131 at ex.12, ¶ 2.[13] In short, Precision Pine had the capacity at its mills to process all of the sawlogs that it actually did during the suspension plus all of the sawlogs from the breached sales and would have done so but for the suspension. See id. at ex. 7. However, the significantly reduced volume of logs available at Precision Pine's mills caused by the Forest Service's breach drove up Precision Pine's per unit manufacturing costs. Indeed, this Court in several earlier opinions in this matter, left little doubt about the fact that the protracted suspension and breach of Precision Pine's contracts, in fact, caused the increased costs at Precision Pine's mills. That is,

[13] It always has been and it remains Precision Pine's contention that it would have harvested all of the breached timber sales during the period of the suspension and used the sawlogs as a source of raw material to produce lumber products at its sawmills. Moreover, as set forth above, Mr. Ness's report has described the methodology, identified the documents and provided the calculations used to quantify the increased unit cost that Precision Pine incurred. See PX 131 at ex.12. The fact remains that Precision Pine had operated profitably for many years simply by securing a volume of sawlogs sufficient to supply its sawmills and then harvesting those sawlogs in a manner so as to actually keep its mills supplied. Not surprisingly, on the eve of the suspension, Precision Pine's plan remained to have sufficient sawlogs under contract to supply its three sawmills. In fact, at that time it had slightly more than a year's supply of sawlogs under contract.

as this Court noted in its decision on liability, in a document dated September 14, 1995, the Forest Service recognized full well the impact that a suspension of even a few months would have on sawmill operations. Precision Pine, 50 Fed. Cl. at 47, see also PX 103. This unsurprising recognition was noted again in the Court's order of November 20, 2001. Indeed, this Court quoted directly from the September 14, 1995 document in denying the government's motion for summary judgment:

> Plaintiff relies upon, *inter alia,* a document entitled, "Summary Effects of Mexican Spotted Owl Injunction," dated September 14, 1995, in which the Forest Service outlined the effect of the suspension on "Commercial Sawtimber and Pulpwood Harvest:"
>
>> The effect on the timber industry is very serious. Most timber projects have been delayed and/or modified as consultation on each project took place. Sawlog inventories in most mills is very low. The logging season is restricted in most places to the fall months due to protective requirements for the owl and goshawks. Thus, we expect to lose the 1995 year of production which will put several mills out of business permanently. . . . We expect about three sawmills to go out of business permanently if the injunction lasts through this logging season.
>
> Though that document was not drafted at the time of contract formation, much of the information included in the statement reflects facts likely long known to the Forest Service, *i.e.*, the logging season is restricted and a suspension can cause a contractor to lose an entire year of production and such a loss can result in lost profits and several sawmills going out of business permanently.

Precision Pine, 63 Fed. Cl. at 131 (emphasis supplied). In this same regard, during the summary judgment proceedings, long-time Forest Service employee, Mr. Ronald Lewis submitted a declaration stating that:

> [M]y colleagues and I in the Forest Service were at all times aware that unexpected delays in harvesting could have a substantially negative effect on the profitability of a timber sale and could increase the purchaser's per mbf sawmill costs. That is, it was understood that an ordered suspension or other sudden interruption of harvesting operations on one or more sales could very well necessitate a purchaser's reducing or halting sawmill activity, either of which

> would result in lost profits and increased costs to the purchaser. We were also very much aware of the fact that such negative impacts to a purchaser would be exacerbated if the suspension were a prolonged one, all sales it had under contract were suspended, and/or at the same time the Forest Service timber sale program in the area were halted for any length of time.

Mr. Lewis will so testify at trial. See also PX 49 (¶ 6). Indeed, all of the facts set forth above showing that the Forest Service foresaw lost profits on lumber sales also indicates that the Forest Service foresaw the manufacturing of timber into lumber at Precision Pine's mills. As such, it was certainly foreseeable that a protracted suspension of a large volume of Precision Pine's timber would result in increased unit costs at the mills. Thus, the direct casual relationship between the protracted suspension of Precision Pine's source of raw material on the breached timber contracts and the increased costs of manufacturing at Precision Pine's sawmills is clearly established.

b. It Was Foreseeable to the Forest Service That a Prolonged Suspension Would Have Increased the Cost of Precision Pine's Manufacturing Operations.

As discussed in great detail, supra, regarding foreseeability of lost profits, Precision Pine's sawmill operations were directly contemplated by the parties because they were entirely consistent with the stated objectives of the Forest Service's commercial timber sale program (PX 132-134) and were the subject of contract obligations both by Precision Pine (e.g., the contractual requirement to domestically process the timber) and the Forest Service (e.g., the obligation to adjust the term of the contract if Precision Pine's mill was shut down due to causes beyond its control). See PX 169-179. As Chief Judge Damich found, just three days into the suspension, the Forest Service recognized the direct relationship between the suspension and sawmill operations by stating that if the suspension lasted only two to three months that "many

mills will have to shut down for extended periods" and that by mid-September 1995 the Forest Service stated that "[w]e expect to lose the 1995 year of production which will put several sawmills out of business permanently." Precision Pine, 50 Fed. Cl. at 47, 71-72. This is only consistent with Mr. Lewis' testimony that both he and his colleagues in the Forest Service "were at all times aware that unexpected delays in harvesting could have a substantially negative effect on the profitability of a timber sale and could increase the purchaser's per mbf sawmill costs," and "that such negative impacts to a purchaser would be exacerbated if the suspension were a prolonged one, all sales it had under contract were suspended, and/or at the same time, the Forest Service timber sale program in the area were halted for any length of time."[14]

Furthermore, as of the time that the breached sales were awarded, Precision Pine was a regular purchaser of (indeed, substantially dependant on) Forest Service timber to supply its mills. PX 272. Moreover, Precision Pine had for years advised the Forest Service that it processed the timber from Forest Service sales at its mills. See, e.g., PX 144-147. Given the above, the Forest Service knew or should have known that Precision Pine was relying on the sawlogs from the contracts to supply its mills and that any significant suspension of timber harvesting operations which reduced or eliminated the availability of sawlogs, would also in all probability result in reduced sawmill operations and increased costs to Precision Pine. In these circumstances, it was plainly and objectively foreseeable that Precision Pine's sawmills would, to the extent they could operate at all, operate at higher unit costs.

---

[14]In the instant case, the suspension was a prolonged one and at the same time the Forest Service's commercial timber sale program in Region 3 came to a virtual halt. PX 156.

c. The Amount of Precision Pine's Increased Manufacturing Costs Has Been Calculated with Reasonable Certainty.

Mr. Ness has provided detailed calculations and supporting data reasonably quantifying the increased costs sustained at Precision Pine's sawmills to have been $380,711.20. See PX 131 at ex. 10, 14 and 15. That is, Mr. Ness calculated a baseline of Precision Pine's per unit costs at each of its sawmills and planer in the 16 months immediately preceding the suspension. See PX 131 at ex. 10. He then calculated the actual per unit manufacturing costs incurred by Precision Pine during the suspension period. Id. at ex. 16. Then, taking the difference between the baseline costs and the actual increased costs during the suspension and multiplying that difference by the actual production during the suspension, Mr. Ness quantified the amount of increased costs sustained by Precision Pine. Id. at ex. 15.

3. As a Result of the Breach, Precision Pine Incurred the Cost of Preparing and Submitting Its CDA Claim Letters.

a. But for the Suspension, Precision Pine Would Not Have Incurred the Cost of Preparing Its CDA Claim Letters.

Shortly after the suspension, Precision Pine requested that the Forest Service compensate it for the damages that it had incurred as a result of the Forest Service's prolonged suspension and breach of its contracts. See, e.g., PX 152. In response to those requests, the Forest Service directed Precision Pine to submit claims under the CDA and the formal procedures contained in the contracts. See, e.g., PX 153-155. Accordingly, during 1997, Precision Pine prepared and submitted its CDA claim letters to Forest Service. PX 194-221. Of course, but for the suspension and the Forest Service's request that Precision Pine seek compensation through the

formal procedures of the CDA, Precision Pine would not have incurred the cost of preparing its claim letters.

b. That the Forest Service's Protracted Suspension Would Cause Precision Pine to Incur Costs in Preparing CDA Claim Letters Was Foreseeable to the Forest Service.

By telling Precision Pine that it would only consider claims that were submitted through the formal CDA procedures, it was certainly foreseeable to the Forest Service that Precision Pine would incur costs in preparing and submitting its claims on the timber sale contracts.

c. The Amount of Precision Pine's Cost in Preparing Its CDA Claim Letters Has Been Calculated with Reasonable Certainty.

At page C-0149 of PX 180, Mr. Porter calculated the value of employee time spent in preparing the original CDA claim letters in this case. This was based on his supervision of the claim preparation process and the rate of pay for himself and each of his employees. Mr. Porter calculated the amount of time spent by employees of Precision Pine in claim preparation to be $17,910.00, plus appropriate markups.

## II. CONTENTIONS OF LAW

In this Circuit, a plaintiff is entitled to damages for a breach of contract, including lost profits, upon its demonstration of the following elements by a simple preponderance of the evidence: (1) causation, (2) foreseeability, and (3) reasonable certainty as to amount. Energy Capital Corp. v. United States, 302 F.3d 1314, 1325 (Fed. Cir. 2002). In deciding the government's motion for summary judgment, this Court has already ruled that Precision Pine has

raised a genuine issue of material fact allowing it to go to trial on its remaining damage claims, including its claims for lost profits on lumber and by-products, increased hauling costs on the Hay sale, increased manufacturing costs, and the costs incurred by Precision Pine in preparing its claim letters. In so ruling, the Court also set forth much of the law applicable to each element. Because the issues remaining before the Court are predominantly issues of fact which have been addressed in Part I of this memorandum above, the following contentions of law are relatively brief.

### A. Precision Pine is Entitled To Recover Its Lost Profits.

#### 1. But for the Suspension, Precision Pine Would Have Earned the Profits Claimed.

In California Federal Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005), the Federal Circuit made clear that the standard for demonstrating entitlement to lost profits is "but for" causation and that this standard does not require

> that the breach must be the sole factor or sole cause in the loss of profits. The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach.

Id. at 1268 (citation omitted). The Court has recognized the applicability of this ruling here. Precision Pine & Timber, Inc. v. United States, __ Fed. Cl. __, 2005 WL 352547 (Fed. Cl. Feb. 14, 2005).

As demonstrated in the Contentions of Fact above, had the Forest Service not breached its contracts with Precision Pine, Precision Pine would have harvested the timber from the breached sales profitably during the period of the suspension.

2. Precision Pine's Lost Profits were Foreseeable by the Forest Service.

In order to recover lost profits for breach of contract, the plaintiff must establish that

> the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable **or** because the defaulting party had knowledge of special circumstances at the time of contracting.

Energy Capital, 302 F.3d at 1325 (emphasis added). As the Federal Circuit further explained, where there are no special circumstances, the test is an objective one and lost profits are recoverable when the breaching party had reason to foresee that lost profits were a probable result of the breach at the time of contracting. Id., citing RESTATEMENT (SECOND) OF CONTRACTS § 351(1) (1981). Additionally, as this Court found at summary judgment, there may be valid reasons to assess foreseeability at the time of breach rather than at the time of the contracting. Precision Pine, 63 Fed. Cl. at 130, citing Gardner Displays Co. v. United States, 346 F.2d 585, 589 (Ct. Cl. 1965) (Foreseeability at the time of breach may be relevant because the government can better assess its potential liability and the impacts of its breach on the contractor).

a. Precision Pine's Lost Profits were Objectively Foreseeable.

As this Court also found at summary judgment:

> A plaintiff's recovery is not contingent on a defendant's having actually foreseen the injury which occurred. Rather:
>
> > The existing rule requires only reason to foresee, *not actual foresight*. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefor in case of breach. It is erroneous, therefore, to refuse damages for an injury merely because its possibility was not in fact in the contemplation of the parties at the time they made the contract. 11 CORBIN ON CONTRACTS § 1009 at 66 (Interim ed.) (emphasis added); *see also*

> Bluebonnet Sav. Bank, FSB v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) ("expectation damages are recoverable provided they are actually *or reasonably* foreseeable . . . .") (citing RESTATEMENT (SECOND) OF CONTRACTS §§ 347, 351, 352 (1981)) (emphasis added).

Precision Pine, 63 Fed. Cl. at 130, citing Anchor Sav. Bank FSB v. United States, 59 Fed. Cl. 126, 146 (2003).[15] From this, the Court concluded that "Precision Pine need not show that a particular type of breach was foreseeable, but must prove that both the general magnitude and type of damages were foreseeable." Id. Thus, Precision Pine's specific lost profits need not have been within the actual "contemplation" of the Forest Service at the time of contracting, rather, the Forest Service need only have been able to objectively anticipate lost profits as the natural result of its suspension either at the time of contracting or at the time of breach. At trial, Precision Pine will proffer evidence showing that the Forest Service had reason to foresee lost profits in the event of a breach such as occurred here because, at the time of contracting and at the time of breach, the Forest Service was aware that a prolonged suspension of a large number of timber sale contracts would likely result in lost profits to the holder of those contracts.

Indeed, it has already been determined in this case "that the Defendant was aware that the Plaintiff's operations would be significantly hindered by the delay," Precision Pine, 50 Fed. Cl. at 71, and that, "[t]he Forest Service was [also] aware of the effects of the suspension of the timber sales contracts on the timber industry as a whole within Region 3." Id. Indeed, in a

---

[15]On the issue of the foreseeability of damages, the Restatement further provides that:

> The party in breach need not have made a "tacit agreement" to be liable for the loss. Nor must he have had the loss in mind when making the contract, for the test is an objective one based on what he had reason to foresee.

RESTATEMENT (SECOND) OF CONTRACTS § 351, cmt. a (1981).

document dated September 14, 1995, the Forest Service assessed the impact of the suspension on the timber industry in Region 3:

> The effect on the timber industry is very serious. . . . The logging season is restricted in most places to fall months due to protective requirements for the owl and goshawks. Thus we expect to lose the 1995 year of production which will put several mills out of business permanently. . . . The [sic] represents about 1300 job [sic] or families that will lose some or all of their annual income with another 700 secondary jobs affected. Twelve communities in Arizona and 28 in New Mexico will feel the effects. We expect about three sawmills to go out of business permanently if the injunction lasts through this logging season.

This document alone, relied upon by this Court in its decision on liability (see Precision Pine, 50 Fed. Cl. at 47), indicates that the Forest Service was aware of the impact of the suspensions on the profitability of the timber companies to which it sold timber.

Moreover, in denying the government's motion to "clarify" the decision on liability, this Court reiterated the fact that Precision Pine had notified the Forest Service shortly after the suspensions were imposed, that it was suffering economic harm and had to shut down its mills as a result of the suspensions, and then stated that:

> It is simply not credible that the Forest Service would somehow be unaware that the Plaintiff's performance of the contract[s] would be significantly hindered in the face of a 2-year suspension.

Order of November 20, 2001 (emphasis added). Given the consistent nature of the relationship between the Forest Service and Precision Pine over many years, such impacts from contract suspensions in the number and scope imposed by the Forest Service here were no less foreseeable at the time of contracting. Indeed, as this Court found in denying the government's motion for summary judgment, these facts were likely long known to the Forest Service. Precision Pine, 63 Fed. Cl. at 131.

The government's knowledge that Precision Pine, like other members of the timber industry, would suffer lost profits as the result of a suspension is further belied by standard contract clause C(T)6.01 issued in 1990, which states in pertinent part that, in the event of a suspension under the clause, a purchaser is entitled to certain relief, i.e.:

> Contract Term Adjustment pursuant to B8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations. . . . Out-of-pocket expenses do not include **lost profits**, . . .

PX 168-179 (emphasis added). Needless to say, unless the Forest Service actually foresaw the possibility of lost profits occurring as a result of a suspension, it would have been neither possible nor necessary for it to draft and include a clause at the time of contracting that attempted to preclude their recovery.

b. Lost Profits are Presumed to Occur in the Circumstances Here Present.

Where the government is supplying raw material, such as timber, to one in the business of manufacturing and reselling the resulting wood products, the objective foreseeability of lost profits from a breach of contract is so obvious as to be essentially presumed by the law. In Everett Plywood Corp. v. United States, 512 F.2d 1082 (Ct. Cl. 1975), the Court of Claims recognized that foreseeable damages for breach of a Forest Service timber sale contract would include profits lost because the purchaser was being precluded from manufacturing the timber in the course of its normal operations. Id. at 1091. Although the court refused to award Everett the lost profits that it claimed it would have made by reselling the timber in the log export market because it had not demonstrated that the government knew or should have known that the

company intended to export the logs, the court did find that the government foresaw or should have foreseen the timber contractor's use of the logs in its normal manufacturing operations:

> Plaintiff is a manufacturer of plywood, not an exporter of logs. Its timber purchases are for the purpose of supplying its plywood operations and it was for that purpose it entered the present contract.

Id. (emphasis added), and the court concluded that:

> As stated previously plaintiff is a plywood manufacturer. There has been no showing that defendant had any reason to know that any substantial amount of the timber would have been used for any purpose **other than in plaintiff's operations**.

Id. (emphasis added). As common sense would dictate, the court recognized that where the Forest Service sells timber to a commercial contractor that uses the timber as raw material in its ongoing manufacturing operations, the government has reason to foresee the use of that timber to produce and sell lumber and by-products in plaintiff's normal operations and that its breach of the timber sale agreement will result in lost profits on sales of those products. Accord Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1023 (Fed. Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997) (lost profits recoverable where the breach precluded use of the subject of the contract itself); Neely v. United States, 167 Ct. Cl. 407 (1964) (Bureau of Land Management's breached a lease by virtue of its refusal to allow plaintiff to strip mine coal on the leased property, and the court awarded plaintiff the estimated profits it would have made on its sales of the coal); Peck Iron & Metal Co., Inc. v. United States, 603 F.2d 171 (Ct. Cl. 1979) (Due to the government's wrongful cancellation of a contract to deliver a surplus aircraft carrier, the Court of Claims awarded plaintiff its lost profit on ten types of metal that the plaintiff would have salvaged from the aircraft carrier and resold. Id. at 175); Stoner-Caroga Corp. v. United States, 3 Cl. Ct. 92, 96 (1983) (plaintiff, who was in the business of buying, repairing and reselling mobile

homes, contracted to purchase two surplus mobile homes from the government for $456 and was found entitled to its lost resale profits (which plaintiff alleged were $10,800)). In sum, these cases demonstrate that a basic presumption of foreseeability regarding lost profits exists with respect to contracts entered into by the government to provide manufacturers with raw material.

The law of this Circuit is consistent with the views of legal commentators who have recognized that the foreseeability of lost profits may be presumed from the very fact that a contract was part of a commercial transaction. See Robert L. Dunn, *Recovery of Damages for Lost Profits* § 118 (5th ed. 1998). This principle applies with particular force where, as here, the seller is supplying raw materials to an established manufacturer for processing and resale:

> One who has contracted to supply a factory with machinery necessary to run it, or with special materials necessary to the product of the factory and not obtainable elsewhere, is likely to have reason to foresee that his failure to supply as agreed will cause the factory to cease production and to prevent the making of profits from the operation of the factory and the sale of its product. . . . There are cases holding that for breach of the supplier of necessary materials the manufacturer can recover damages for his loss of operating profits.

5 CORBIN ON CONTRACTS § 1011 (1964). See also Dunn, *Recovery of Damages for Lost Profits* § 2.4 (Collecting and discussing pre-U.C.C. cases allowing recovery of lost profits by one in the business of reselling).[16]

---

[16]This view is also found in Official Comment 6 to U.C.C. § 2-715: "In the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know . . . ." The U.C.C. has been applied as an aid in interpreting Forest Service timber sale contracts, e.g., Everett Plywood Corp. v. United States, 651 F.2d 723, 729, 733 (Ct. Cl. 1981), and has deemed to be a "useful guidance" in applying general contract principles. Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed. Cir. 2001).

c. The Forest Service was Fully Aware of the Circumstances Surrounding Precision Pine's Use of Forest Timber.

Even apart from the fact that Precision Pine's lost profits resulting from the protracted suspension of 11 of its timber sales contract were objectively foreseeable to the Forest Service, the facts set forth above amply demonstrate that the Forest Service was actually aware (both at the time of contracting and at the time of breach) of the use to which Precision Pine was putting the timber removed from its Forest Service timber sales contracts. That is, even if the Court were to require Precision Pine to demonstrate foreseeability under the second prong of the disjunctive test set forth in Energy Capital, 302 F.3d at 1325 (i.e., foreseeability exists "because the defaulting party had knowledge of special circumstances at the time of contracting"), here, the Forest Service was, in fact, fully aware that Precision Pine used Forest Service timber to supply its mills.

Despite the fact that the Forest Service's commercial timber sale program was specifically authorized and designed to provide raw material to industry for the domestic manufacture of wood products (PX 132-134), that Precision Pine's timber sale contracts themselves recognized these facts and required processing of the sawlogs on the sale in a domestic sawmill, and that the Forest Service knew that Precision Pine was, in fact, using all of the sawlogs from its Forest Service timber sales to supply its mills (PX 21-26), defendant may yet assert, as it did at summary judgment, that Precision Pine cannot recover the profits lost on foregone lumber and by-product production and sales because it did not "apprise" the Forest Service of any "special circumstances" that resulted in the loss of those profits. However, as noted above, where, as here, lost profits on the use of the subject of the contract arise naturally as

a result of the breach, there is no need to resort to the alternative legal test for determining whether or not lost profits are recoverable, i.e., whether the breaching party was aware of "special circumstances." Energy Capital, 302 F.3d at 1325.

d. No Special Circumstances Exist that the Forest Service Was Not Aware of.

Moreover, in boldly contending that "special circumstances" exist in this case, the government does not explain what "special circumstances" it believes existed about which the Forest Service was unaware. As demonstrated above, the fact that the forest products industry used Forest Service timber sale contracts to supply raw material to its sawmills for the production of salable wood products was a long-standing goal of the Forest Service's commercial timber sales program and was in no way a "special circumstance" about which the Forest Service may credibly claim ignorance. See, e.g., Everett, 512 F.2d at 1091. In this regard, the Restatement provides examples of what constitutes "special circumstances" such as an extraordinary profit, unusual resale terms, or an intended use of a commodity in an abnormal way. See RESTATEMENT (SECOND) OF CONTRACTS § 351, cmt. b. Here, Precision Pine's lost profits claims are based on its inability, due to the Forest Service's suspensions, to simply produce wood products in the ordinary course of its business from Forest Service sawlogs and to sell those products to its usual customers at going market rates as it has always done. In short, there were no "special circumstances" about which the Forest Service could have been or needed to be alerted, or about which the Forest Service was not already well aware.[17]

[17] If, as in Everett, the plaintiff were attempting to claim lost profits for use of the timber out of the norm, i.e., other than to make lumber and the resulting by-products in its usual

e. The Test for Foreseeability of "Special Circumstances" Is Whether the Government was Aware of Them.

Even assuming that Precision Pine's use of the timber to produce lumber at its sawmills were a "special circumstance," the test is not whether the contractor "apprised" the government of the special circumstances, as defendant argued at summary judgment, but whether "the defaulting party had knowledge of special circumstances." See Energy Capital, 302 F.3d at 1325. That the Forest Service had specific knowledge of all relevant circumstances related to Precision Pine's intended use of the sawlogs here in issue is clear. Precision Pine will demonstrate at trial that the Forest Service, at all relevant times, knew that Precision Pine was using its Forest Service timber sales as a source of raw material to supply its mills for the production of lumber and the resulting by-products and intended to do the same thing with the timber from the subject sales. Moreover, there is an absence of any facts from defendant with respect to what, if anything, the Forest Service was unaware of at the time of contracting on the breached sales that would have any bearing on the inapplicability of lost profits.

The situation here is, in fact, little different from that in Everett, supra, and Stoner-Caroga, supra, in that (a) the government's contractual role was that of a seller and (b) based on its past experience with the buyer-plaintiff, the government knew or should have known that plaintiff was in the business of reworking and/or reselling the corpus of the contract. As the court stated in Stoner-Caroga:

> . . . plaintiff can recover its lost profits upon a resale by showing that the defendant knew, or should have known, that plaintiff intended to resell the mobile homes. In his affidavit, plaintiff's president states that the corporation had

---

operations, that might constitute a special circumstance regarding which specific notice might be appropriate.

> entered into 20 contracts with the government for the sale of surplus property, including one where the government has agreed to store the property until plaintiff resells the goods to a third party. Due to this prior and continuing course of dealing between the parties, the government reasonably should have known that Stoner-Caroga intended to resell the mobile homes to a third party. Hence, plaintiff is entitled to recover the lost profits it would have received had the government provided the mobile homes.

Stoner-Caroga, 3 Ct. Cl. at 96 (emphasis added). Here, the course of dealings between the parties demonstrates that the foreseeability of lost profits is even stronger than in Stoner-Caroga given the consistency of Precision Pine's known use of Forest Service sawlogs coupled with the long-standing purpose of the Forest Service's commercial timber sale program to supply raw material to industry.

3. Precision Pine Will Demonstrate the Amount of Its Lost Profits with Reasonable Certainty.

As this Court held at summary judgment:

> The Federal Circuit has determined that certainty of damages is sufficient
>
> > if the evidence adduced enables the court to make a fair and reasonable approximation of the damages. In assessing damages, the court may act upon probable and inferential as well as direct and positive proof. Energy Capital, 302 F.3d at 1329 (citing Locke v. United States, 151 Ct. Cl. 262, 267-68, 283 F.2d 521, 524 (Ct. Cl. 1960)); Bluebonnet, 266 F.3d at 1355.

Precision Pine, 63 Fed. Cl. at 131. This Court further observed that "absolute certainty is not required because the risk of uncertainty must fall on the defendant whose conduct caused the damages." Id., quoting Energy Capital, 302 F.3d at 1327. Precision Pine will demonstrate at trial that its claimed lost profits have been calculated with reasonable certainty and that the approach taken by Precision Pine is conservative.

At summary judgment, the government argued that Precision Pine had not calculated its lost profit damages with reasonable certainty because it had not "offset" the profits (if any) that it may have made on lumber sales from the timber harvested on the breached contracts after the suspension was lifted. Precision Pine countered this point with evidence that it was a "lost volume seller," i.e., that, but for the suspension, it would have made the profits claimed on the breached contracts during the suspension and would also have had the opportunity to make profits in the post-suspension period on other timber sales that it would have purchased. As the Court correctly summarized the situation at summary judgment:

> Lost volume damages are premised on the notion that had the supplier fully performed, plaintiff would have had the benefit of the original sale, and as a trader of the particular good, the profits from the subsequent sale as well.

Precision Pine, 63 Fed. Cl. at 132, and

> In the event that Precision is a "lost volume seller," it would not be required to offset the profits from its post-suspension harvesting.

Id. at 133.

As the Court also determined at summary judgment, the government had not demonstrated that Precision Pine was not a lost volume seller:

> There are genuine issues of material fact as to whether Precision Pine would have manufactured the sawlogs from the breached contracts into lumber products in 1995, 1996, and early 1997, sold those products, and would still have entered into subsequent lumber sales in 1997 and 1998 using other sawlogs to manufacture that lumber.

Precision Pine, 63 Fed. Cl. at 133.

As set forth in its Contentions of Fact, supra, Precision Pine will submit evidence at trial demonstrating that for many years prior to the suspension it purchased substantial quantities of Ponderosa Pine timber and processed it into lumber, that it had the capacity to process the sawtimber on the breached sales in the 20 months from August 1995 through April 1997, it had the capacity to process an additional equal volume sawtimber in 1997 and 1998 , that it would have desired to do so, that there were sufficient timber sale offerings in the post-suspension period such that had there been no suspension Precision Pine would have had the opportunity to acquire a volume of timber from them equal to that on the breached sales and make profitable lumber sales from it in 1997 and 1998. PX 157.[18] On this basis, Precision Pine qualifies as a lost volume seller and any post-suspension profits made on the breached contracts are irrelevant to the damages Precision Pine sustained during the suspension.

Were the Court to determine that Precision Pine was not a lost volume seller (which it was), Precision Pine's expert, Robert A. Ness, has calculated the profits made by Precision Pine on the breached sales in the post-suspension period with reasonable certainty. PX 182. In making this calculation, Mr. Ness did not assume any profit on that part of the sales that Precision Pine did not harvest. Id.

Defendant may argue that it is entitled to some form of a "credit" for additional profits that in theory might have been made on this timber in the post-suspension period on the basis

[18]Once the suspension was lifted in December of 1996, Precision Pine still retained the considerable timber volume on the breached sales, and therefore, did not enter into as many of the post-suspension timber sale offerings as it would have had there been no suspension and the sales at issue had been harvested as anticipated in 1995-6.

that the government did not directly cause some of the factors which adversely affected Precision Pine's operations in the post-suspension period, e.g., the injunction in Forest Guardians v. Thomas, 967 F. Supp. 1536, 1544, *aff'd sub nom.*, Forest Guardians v. Dombeck, 131 F.3d 1309 (9th Cir.1997) which caused seven of the breached contracts to be suspended in whole or in part from May 30, 1997 to December 15, 1997; the closure of Stone's facilities for utilizing chips and pulpwood in March of 1998, and the fire at Precision Pine's Winslow mill in September of 1998.[19] Such a contention would, however, be contrary to case law which indicates that when a government delay pushes a contractor's performance into a later period when performance is hindered for reasons not directly caused by the government, e.g., adverse weather conditions, the government is not entitled to a credit for those factors that it did not cause, but rather is fully financially responsible for all aspects of the belated performance. See, e.g., J.D. Hedin Construction Company v. United States, 347 F.2d 235, 240, 254-55 (Ct. Cl. 1965) (government's suspension due to faulty specifications led to delays due to bad weather when the contractor resumed performance. Because the contractor's "work would have been completed prior to the bad weather . . . had there not been delays in the foundations and sewers," the government was liable for "62 days in delays" and incurred costs for temporary heating and snow removal. Id. at 254-55); Weaver-Bailey Contractors, Inc. v. United States, 19 Cl. Ct. 474 (1990) (government liable for problems with performance during winter months after suspension); Reliance Enterprises, ASBCA No. 27638, 85-2 BCA ¶ 18,045 (1985) (government liable for problems

[19] The putative damages owed to the government due to Precision Pine's inability to complete some of the sales at issue in this case in the post-suspension period are at issue in Precision Pine & Timber, Inc. v. United States, No 01-131C. Of course, any offset of theoretical "profits" that might have been earned on this timber in the instant case would be completely at odds with the damages sought by the government in No. 01-131C. By order of this Court the government is currently attempting to properly calculate its damages, if any, on these sales.

with erosion and clearing weed growth arising during post-suspension performance); Robert L. Rich d/b/a Unitranco, DOTBCA 1026, 82-2 BCA ¶ 15,900 (1982) (government liable for problems with performance in wet winter months after suspension).

Moreover, to the extent that the government tries to argue that Precision Pine's inability to cut all of the timber on the breached contracts resulted in some sort of a failure to mitigate damages, this argument is an affirmative defense that must have been raised by the breaching party and, once properly raised, the breaching party "has the burden of showing the losses could have been avoided through the reasonable efforts of the damaged party." Glenn Distributors Corp. v. Carlisle Plastics, Inc., 297 F.3d 294, 302 (3rd Cir. 2002). However, when assessing whether the non-breaching party acted reasonably in mitigating damages, "the situation must be viewed without the benefit of hindsight" (Ellerman Lines, Ltd. v. The President Harding, 187 F. Supp. 948, 952 (S.D.N.Y. 1960)) and courts should not engage in a "hypercritical examination of the conduct of the injured party" in determining whether mitigation was reasonable. Fortis Corporate Insurance, S.A. v. M/V Cielo Del Canada, 320 F. Supp.2d 95, 106 (S.D.N.Y. 2004), citing In re Kellett Aircraft Corp., 186 F.2d 197, 198-99 (3rd Cir. 1950).

At bottom, defendant's argument that it is entitled to an offset runs afoul of the basic principle that damages for breach of contract shall place the wronged party in as good a position as it would have been in had the breaching party fully performed its obligation, Bluebonnet Sav. Bank, 339 F.3d 1341, 1345 (Fed. Cir. 2003).[20] As demonstrated above and in the Contentions of

[20]When the shoe is on the other foot and it is the Forest Service that is seeking damages for the breach of a timber sale contract by a purchaser, the Federal Circuit has held that the

Fact, because Precision Pine would have made the lumber sales that it did after April 1997 whether or not the Forest Service had breached the contracts in issue, offsetting a portion of any post-suspension profits against profits that were lost on timber that could not be harvested from August 1995 to December 1996 as a result of the suspension, will leave Precision Pine in a considerably worse position than it would have been in had there been no breach. This is due to the fact that, absent the breach, Precision Pine would have earned both the profits on the timber from the 11 breached sales that would have been harvested during August 1995-December 1996 and the profits that it would have earned on timber harvested from other sales in 1997.

B. Precision Pine Is Entitled to Recover Its Damages for Its Increased Hauling Costs on the Hay Contract, Increased Manufacturing Costs and Costs It Incurred in Claim Preparation.

In addition to its lost profits claim, Precision Pine seeks the recovery of other items of damages caused by the breach; namely, its increased costs of hauling timber on the Hay contract, increased manufacturing costs, and costs incurred by Precision Pine's employees in preparing and submitting its claim letters. Such damages are often denominated "consequential damages," however, as this Court ruled at summary judgment:

> [C]haracterization of [damages] as "consequential" is not dispositive. The issue is whether the damages are the "natural and probable consequences of the breach" or whether they are too remote and speculative to be recoverable.

---

Forest Service is entitled to the difference between the contract price and value of the timber at the time of default irrespective of any future benefit which the government may derive from the unharvested timber, i.e., "[a]ny subsequent decision made by the government as to what to do with the timber land cannot negate the fact that [the purchaser's] breach deprived the government of the benefit of its bargain." Madigan v. Hobin Lumber Co., 986 F.2d 1401, 1406 n.4 (Fed. Cir. 1993). This fact notwithstanding, here the government seeks to reduce the damages due Precision Pine by every bit of benefit that the company may have derived subsequent to the government's material breach.

Precision Pine, 63 Fed. Cl. at 134, citing Marathon Oil Co. v. United States, 16 Cl. Ct. 332, 336-37 (1989) (emphasis added).[21] The Federal Circuit has determined that damages which result from the government's breach of a contract and that "are not 'too remote, speculative or consequential'" are recoverable. Mass. Bay Transp. Auth., 129 F.3d 1226, 1232 (Fed. Cir. 1997) (emphasis added), citing Wells Fargo Bank, N.A., supra); see also Everett, 512 F.2d at 1091 (consequential damages about which the government knew or should have known are recoverable); 11 SAMUEL WILLISTON & WALTER H.E. JAEGER, A TREATISE ON THE LAW OF CONTRACTS § 1344 (3d ed. 1968 & Supp. 2001); RESTATEMENT (SECOND) OF CONTRACTS § 351 (1981); see also RESTATEMENT (SECOND) OF CONTRACTS § 351, cmt. a ("It is enough . . . that the loss was foreseeable as a probable, as distinguished from a necessary, result of his breach").

At summary judgment, the Court determined that the government was not entitled to judgment as a matter of law and that Precision Pine had presented sufficient factual evidence to go to trial on each of these three items of damage. Accordingly, the resolution of each of these damages comes down to the facts as set forth above and as will be presented at trial. However, Precision Pine will discuss the few outstanding legal issues of which it is presently aware with respect to each of these items of damage.

---

[21] Indeed, such a label is more of a hindrance than a help:

> The term "consequential damages" has often been used with respect to harm suffered as a "consequence" of the breach of duty, but not as a direct and immediate and foreseeable consequence. The use of this expression should be abandoned. It may be that "consequential damages" is a term that is used loosely as a synonym of "special" as opposed to general damages. If such damages are not recoverable, it is for reasons stated herein in discussing foreseeability and remoteness.

5 CORBIN ON CONTRACTS § 1011 (1964).

1. Precision Pine Is Entitled to Recover Its Increased Hauling Costs.

a. But for the Suspension, Precision Pine Would Not Have Incurred Increased Hauling Costs on the Hay Sale.

But for the suspension, Precision Pine would have harvested the Hay sale to completion during the period of the suspension and hauled the logs to its mill in Eagar, Arizona, which was near to the Hay sale. PX 260, 261. In fact, Precision Pine had built the Eager mill because of the Forest Service sales it had in the area, especially including the Hay Sale. PX 259. However, due to the suspension and the resulting shortage of logs to operate its mills, Precision Pine was forced to consolidate its operations at its Winslow mill where its planer facility was also located. PX 163.

When the suspension was lifted in December 1996, Precision Pine moved on to the Hay sale which, due to its elevation, allowed for a high probability of extended winter logging outside of the Normal Operating Season. PX 257, 262. However, many of the logs removed from the Hay sale during the winter of 1996-1997 were hauled a greater distance to the Winslow facility rather than to the Eagar mill, which remained closed due to the suspension. PX 263. It is this increased cost of hauling that Precision Pine seeks to recover. Additionally, in 1998, Precision Pine hauled logs from the Hay sale to its Heber sawmill because the Eagar sawmill was closed. PX 266-268. Again, but for the suspension, the Hay sale would have been competed during the suspension period and hauled to Precision Pine's mill in Eager and, therefore, the Forest Service is liable for these increased costs.

The issue of the recoverability of increased logging and hauling costs resulting from a suspension was addressed in Reidhead Bros. Lumber Co., AGBCA No. 2000-126-1, 01-2 BCA ¶ 31,486, *aff'd*, Reidhead Bros. Lumber Mill v. Veneman, 36 Fed. Appx. 426 (Fed. Cir. 2002), *reh'g denied* (Sept. 10, 2002). There, the purchaser asserted that after the suspension was lifted, its logging subcontractor sought and was given an increase in the price of that work. Id. at 155,441. The AGBCA concluded that this increased cost was incurred as "a direct result of the suspension," and, thus, that it was compensable. Id. Similarly here, because of the suspension, Precision Pine could not harvest the Hay sale to completion during the suspension period and haul the resulting logs to its Eagar mill as it had planned, but rather hauled logs from the Hay sale a greater distance to the Winslow mill in 1996 and 1997 and to the Heber mill in 1998. In other words, but for the suspension, Precision Pine would not have incurred increased hauling costs on the Hay sale.

b. The Increased Hauling Costs were Foreseeable to the Forest Service.

Defendant argued at summary judgment (and may contend at trial) that Precision Pine's increased hauling costs on the Hay sale were not foreseeable to the Forest Service at the time of contracting because Precision Pine had not yet opened its Eagar mill. However, as this Court found at summary judgment, "Precision Pine need not show that a particular type of breach was foreseeable, but must prove that the general magnitude and type of damages were foreseeable." Precision Pine, 63 Fed. Cl. at 130. Indeed, in documents quoted by the Court in the liability decision in this case, the Forest Service recognized just after the suspension at issue in this case was imposed that if the injunction (and resulting suspension of ongoing sales and proposed sales

in Region 3) continued for just two to three months, "that many mills will have to shut down for extended periods" and that "due to low availability of logs to process, this injunction could cause mills to close permanently." Precision Pine, 50 Fed. Cl. at 47. In the same regard, this Court at summary judgment on damages also ruled that the Forest Service likely long knew that "the logging season is restricted and a suspension can cause a contractor to lose an entire year of production and such a loss can result in lost profits and several sawmills going out of business permanently." Precision Pine, 63 Fed. Cl. at 131. Certainly, because it was foreseeable to the Forest Service both at the time of contracting and the time of breach that a protracted suspension would result in sawmill closures, it was also quite foreseeable that timber from a sale proximate to a closed mill would have to be hauled greater distances to another mill at increased cost to timber sale contractors.

Moreover, as this Court also ruled at summary judgment, under the law of this Circuit, the relevant time for assessing foreseeability may include the time of breach. Id. at 130 and 131. As shown in the Contentions of Fact, supra, Precision Pine informed the Forest Service that the log shortage caused by the suspension was causing it to close its mills, including Eagar, and that Precision Pine was going to hold the government responsible for the costs it incurred as a result. PX 257. Thereafter, Precision Pine sought Forest Service approval to haul logs from the Hay sale to the Winslow mill beginning in December 1996 (PX 257-258) and in 1998 again sought and obtained Forest Service approval for the logs from Hay to be scaled at Precision Pine's Heber mill. PX 266. Thus, that the suspension was causing Precision Pine's mills to close and that Precision Pine was hauling logs from the Hay sale a greater distance than it would have but for the breach was not only foreseeable, it was actually known to the Forest Service.

c. Precision Pine Will Prove Its Increased Hauling Costs with Reasonable Certainty.

The appropriate standard of proof of damages is reasonable (not absolute) certainty and the risk of any uncertainty must fall on the defendant whose conduct caused the damages. Precision Pine, 63 Fed. Cl. at 131. Precision Pine has set forth its methodology for calculating its increased hauling damages with reasonable certainty at PX 180.[22] Defendant has not previously raised any issue with respect to Precision Pine's calculation methodology or the amount of its increased hauling costs, therefore, Precision Pine is not currently aware of any disagreement that defendant may have with respect to the method of calculation of Precision Pine's increased hauling costs.

C. Precision Pine is Entitled to Recover Its Increased Manufacturing Costs.

How the suspension caused the increased manufacturing costs incurred by Precision Pine was described by Mr. Ness as follows:

> During the suspension period, the sawmills and planer were not as efficient as they would have been with a steady supply of logs from the suspended sales. As noted above, I have calculated the actual direct manufacturing cost per MBF during the 17-month period before the suspension. Using the same methodology, I calculated the manufacturing cost per MBF that Precision Pine experienced during the suspension. See Exhibits 10 and 16. The difference between these two rates represents the inefficiency that Precision Pine experienced during the suspension period to which I applied the actual volume of lumber production during the suspension period. See Exhibit 15.

PX 182 at ex. 12, ¶ 2. At summary judgment, the government attempted to preclude Precision Pine's claim for those costs by seeking to extend the ruling in Scott Timber, Co. v. United States, 333 F.3d 1358 (Fed. Cir. 2003) (a case which had been decided under clause C6.01) to this

[22]Note: Precision Pine has revised its total volume hauled to Winslow sawmill in 1997 from 1765.56 MBF to 1102.6 MBF. PX 263.

breach of contract case. This Court correctly rejected the government's attempt and found Scott Timber to be inapposite to this case for breach of contract damages. Precision Pine, 63 Fed. Cl at 136. Indeed, contrary to defendant's position, it is established that "[i]ncreased production costs are unquestionably proper items of recovery as consequential damages when properly attributed to a breach." Hawthorne Indus., Inc. v. Balfour Maclaine Int'l, Ltd., 676 F.2d 1385, 1387 (11th Cir. 1982) (case remanded for determination of carpet manufacturer's damages for lost efficiencies at its carpet mill that arose from the seller's failure to deliver conforming raw material).

This Court also ruled at summary judgment that the government had failed to demonstrate the absence of genuine issues of material fact regarding causation, foreseeability and reasonable certainty of the damages calculation relating to Precision Pine's claim for increased manufacturing costs. Precision Pine, 63 Fed. Cl. at 136. The facts related to each of these elements of Precision Pine's claim for these costs are set forth above in Precision Pine's Contentions of Fact and will also be demonstrated at trial. As such, the issue of the recovery of Precision Pine's increased manufacturing costs to be resolved at trial is whether the claimed damages "are not 'too remote, speculative or consequential'" to be recoverable. Mass. Bay Transp. Auth., 129 F.3d at 1232 (emphasis added); see also RESTATEMENT (SECOND) OF CONTRACTS § 351, cmt. a.

Precision Pine is not aware of any other purely legal arguments that defendant may make with respect to Precision Pine's increased manufacturing costs.

D. Precision Pine is Entitled to Recover Its Costs Incurred in Preparing Its CDA Claim Letters.

On December 30, 2004, Precision Pine filed a motion which sought clarification of the Court's November 24, 2004 decision on summary judgment because that decision had not specifically addressed Precision Pine's claim for the costs it had incurred in having its employees participate in the preparation of its CDA claim letters. By Order dated January 6, 2005, the Court ruled that:

> The Court's [November 24, 2004] Opinion addressed attorney's fees only, and did not specifically consider the costs incurred by Precision Pine due to participation by its employees in pre-litigation claim preparation. That issue, while discussed briefly by the parties, has not been argued to the satisfaction of the Court. Without prejudice to any argument on the merits as to the propriety of Precision Pine's being able to recover such damages, plaintiff will be permitted to present evidence at trial regarding internal costs it incurred in pre-litigation claim preparation. Further legal arguments regarding recovery of pre-litigation claim preparation costs shall be set forth in the parties' pre-and post-trial contentions of law.

Order dated January 6, 2005 at 1. As demonstrated below, pursuant to contract clause CT6.01, Precision Pine is entitled to recover the costs it incurred in having its employees prepare the claim letters in this matter.

In contract clause CT6.01 (6/90), the government has agreed to pay a timber contractor's "out-of-pocket expenses" incurred as a "direct result" of an interruption or delay of operations when the interruption lasts for more than 30 days during the Normal Operating Season. See, e.g., PX 170-179. Of course, had there been no suspension, Precision Pine would have had no reason to have its employees participate in the preparation of the claim letters. Thus, it cannot be seriously contested that these costs were not incurred by Precision Pine as a direct result of the suspension. Moreover, Precision Pine actually paid its employees their usual wages during the

time they were engaged in preparing the claim letters. Thus, these costs are out-of-pocket expenses actually incurred and paid as a direct result of the suspension.

Additionally, the Forest Service directed Precision Pine to submit CDA claim letters and, therefore, it knew that Precision Pine would incur costs in preparing and submitting its claims. That is, shortly after the suspensions were lifted, Precision Pine contacted the Forest Service seeking compensation for the damages it had incurred as a result of the suspension, e.g., PX 152. In responding to Precision Pine's inquiry, the Forest Service instructed Precision Pine to review clause CT6.01 and file formal claims under the CDA for its damages. PX 152-154. Therefore, because the Forest Service required Precision Pine to submit formal CDA claims even to recover out-of-pocket expenses under clause CT6.01, the Forest Service was certainly aware that Precision Pine would incur costs in doing so. Indeed, the Forest Service drafted contracts that are expressly subject to the procedures of the CDA. See PX 169-179. These procedures, of course, include the requirement that a contractor submit a claim letter. Thus, at the time of contracting, it was known to the Forest Service that a dispute arising under clause CT6.01 would result in the preparation and submission of a formal claim letter.

The case law on this issue further demonstrates that such costs are recoverable under contract clause C(T)6.01. See Reidhead Bros. Lumber Co., AGBCA No. 2000-126-1, 01-2 BCA ¶ 31,486, *aff'd* Reidhead Bros. Lumber Mill v. Veneman, 36 Fed. Appx. 426 (Fed. Cir. 2002), *reh'g denied* (Sept. 10, 2002) (Awarding attorneys fee's incurred in preparing claim letters prior

to litigation).[23] Additionally, costs incurred when a timber contractor's staff prepared CDA claims were actually paid by the government under clause C6.01 in Scott Timber. PX 151 (July 8, 2002 Judgment in Scott Timber Co. v. United States, COFC No. 94-784C).[24] Thus, contractor costs incurred in preparing its pre-litigation claims are recoverable and, in fact, have been paid by the government under clause C(T)6.01.

The total costs incurred by Precision Pine in preparing its claim letters are set forth in PX 180. Precision Pine's president prepared the exhibit based on the tasks that he performed and that he assigned to various of his employees to perform in preparing the claim letters on company time. That is, due to the suspension and the Forest Service's requirement that Precision Pine submit formal CDA claim letters in order to be compensated under CT6.01, Precision Pine's employees were taken away from their normal duties and were paid by Precision Pine for performing tasks related to preparation of the claim letters. Accordingly, these out-of-pocket expenses were incurred as a direct result of the suspension and are reimbursable under contract clause CT6.01.[25]

---

[23]Although at summary judgment this Court rejected Precision Pine's claim for attorneys fees under clause C(T)6.01 (and, implicitly, the award of such fees by the AGBCA in Reidhead), it did so premised on sovereign immunity and the "American Rule" in favor of both sides paying their own attorneys' fees. Precision Pine, 63 Fed. Cl. at 140. Although Precision Pine respectfully disagrees with this ruling, no such considerations preclude the award of Precision Pine's costs incurred in having its own employees participate in preparing its claim letters.

[24]At summary judgment, defendant asserted that counsel for Precision Pine had violated the terms of a stipulation by citing to this Judgment. The stipulation that defendant cites, by its own terms, prohibits the citation of the stipulation and not any related Judgments issued by the court. Precision Pine did not cite the stipulation and, therefore, did not violate its terms.

[25]In addition to the above, as noted in Plaintiff's Contentions of Fact, the Forest Service failed on some contracts to compensate Precision Pine for certain small items of suspension expenses that are regularly compensated by it. These items include total costs (including

## III. ISSUES TO BE RESOLVED

Precision Pine is yet to be provided with final witness and exhibit lists from defendant, and also lacks the identity and report of defendant's rebuttal expert, if any, with respect to post-suspension harvesting; therefore, Precision Pine may not be currently aware of all potential issues to be resolved at trial, however, such issues as are known at this time are:

1. Whether Precision Pine has proven by a preponderance of the evidence that its claimed lost profits on lumber and by-product sales were caused by the breach, were foreseeable and are reasonably certain in amount?

2. Whether Precision Pine is a lost volume seller?

3. If Precision Pine is not a lost volume seller, whether it must deduct post suspension profits (if any) from it lost profits claim and if so, how much?

---

markup) of maintaining performance bonds during the suspension (found compensable in Matt Allen Logging, AGBCA No. 2002-124-1, 04-1 BCA ¶ 32,596 (April 8, 2004); the total cost (including markup) of having to move off a timber sale area on which the contractor was operating at the time of the suspension also found compensable in Matt Allen Logging, 04-1 BCA ¶ 32,596; and interest on cash deposits, effective purchaser road credits and downpayments held by the Forest Service during the suspension found compensable by the contracting officers for the Jersey Horse (see PX 203), O.D. Ridge (see PX 209), and Mud (see PX 219) sales in this matter. The Forest Service also failed to compensate Precision Pine for several other small items, i.e., the necessary cost to remove snow in the winter of 1996 in order to access badly needed timber and the cost in October 1996 of transferring logs from a mill forced to close by the suspension to an operating mill. Each of these items is compensable under CT6.01 as an expense incurred as a direct result of the suspension.

4. If Precision Pine is not a lost volume seller, whether the government has demonstrated that Precision Pine failed to mitigate its lost profit damages?

5. Whether Precision Pine has proven by a preponderance of the evidence that its claimed increased hauling costs on the Hay contract were caused by the breach, were foreseeable and are reasonably certain in amount?

6. Whether Precision Pine has proven by a preponderance of the evidence that its claimed increased manufacturing costs were caused by the breach, were foreseeable and are reasonably certain in amount?

7. Whether Precision Pine has demonstrated that the costs it incurred in preparing its claim letters were an "out-of-pocket expense" "incurred as a direct result" of the suspension under contract clause CT6.01?

Respectfully submitted,

s/Alan I. Saltman

SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: March 7, 2005