No. 98-720C
(Judge George W. Miller)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PRECISION PINE & TIMBER, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S PRETRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277

Attorneys for Defendant

OF COUNSEL:

LORI POLIN JONES
PATRICIA L. DISERT
Office of General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

Dated: April 4, 2005

# TABLE OF CONTENTS


QUESTIONS PRESENTED . . . . . 1

STATEMENT OF FACTS DEFENDANT EXPECTS TO PROVE AT TRIAL . . . . . 3

I. Arizona Timber And Lumber – An Industry In Decline . . . . . 3

II. Precision Pine's Strategy Of Aggressive Growth . . . . . 4

III. Precision Pine's Operations And Business Practices . . . . . 6

IV. The Contracts . . . . . 7

A. The Award Of Timber And Multi-Product Sale Contracts . . . . . 7

B. The Contracts At Issue . . . . . 8

V. The Mexican Spotted Owl ("MSO") Suspensions . . . . . 12

A. The Length Of The Suspensions . . . . . 12

B. Low Lumber Prices During The MSO Suspensions . . . . . 12

C. No Outlet For Roundwood During The MSO Suspensions . . . . . 13

D. Profitability Of The Contracts During The MSO Suspensions . . . . . 14

VI. The Post-Suspension Period . . . . . 15

A. Post-Suspension Contract Term Adjustments . . . . . 15

B. Precision Pine's Post-Suspension Harvesting . . . . . 15

C. Post-Suspension Releases Of Liability . . . . . 17

VII. Precision Pine's Claims Regarding The MSO Suspension . . . . . 18

VIII. Claims Currently Pending In This Lawsuit . . . . . 19

DEFENDANT'S CONTENTIONS OF LAW . . . . . 19

I. Precision Pine Is Entitled Only To Damages For "Partial Breach" . . . . . 21

II. Precision Pine Has Released The Government "From Any And All Liability Arising From The Suspension" Of The Brann, Hutch-Boondock, Monument, Mud and Saginaw-Kennedy Contracts . . . . . . . . 23

III. Precision Pine's Claimed Common Law Breach Of Contract Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

A. Precision Pine Is Not Entitled To Recover Lost Lumber Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1. Lost Profits For The Sale Of Lumber Are Not Recoverable For Breach Of A Timber Cutting Contract Because The Production And Sale Of Lumber Products Constitute A Collateral Undertaking . . . . . . . . . . . . . . 24

2. Precision Pine Misuses The "Lost Volume Seller" Concept, Which Is Inapplicable Here Because The United States Does Not Seek To Offset Profits From "Substitute Transactions" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

3. Even If Lumber Profits Were Potentially Recoverable, Precision Pine Cannot Make The Requisite Showing . . . . . . . . . 30

a. Precision Pine's Brookbank, Jersey Horse, Kettle, Manaco, Monument, Mud, Saginaw-Kennedy, Salt and U-Bar Contracts Would Not Have Been Profitable During The MSO Suspensions . . . . . . . . . . . . 33

b. Precision Pine Cannot Establish That Its Alleged Lost Profits Were Directly And Primarily Caused By The MSO Suspensions . . . . . . . . . . . . . . . . . . . . . . . . 34

c. The Loss Of Profits Resulting From A Suspension Was Not Contemplated By The Parties At The Time Of Contracting . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

d. Precision Pine Cannot Establish Lost Profits With Reasonable Certainty . . . . . . . . . . . . . . . . . . . . . . . 39

e. The MSO Suspensions Did Not Cause Precision Pine To Suffer A Loss Of Profits . . . . . . . . . . . . . . . . . . . 45

B. Precision Pine Is Not Entitle To Recover Alleged Sawmill Inefficiency Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

1. Precision Pine Cannot Establish What Increased Sawmill Costs Were Directly and Primarily Caused By A Breach Of Contract . . . . . 47

2. Sawmill Inefficiency Costs Were Not Legally Foreseeable . . . . . 48

3. Precision Pine's Damages Calculations Are Flawed . . . . . 50

C. Precision Pine's Claim For Increased Log Hauling Costs Should Be Denied . . . . . 52

1. The Court Lacks Jurisdiction To Entertain Precision Pine's Increased Hauling Costs Claim . . . . . 52

2. Precision Pine's Increased Log Hauling Costs Claim Is Without Merit . . . . . 54

IV. Precision Pine's Claims For Compensation Pursuant To CT 6.01 . . . . . 56

A. Precision Pine's Claims For The Cost It Allegedly Incurred In Preparing Claim Letters Should Be Denied . . . . . 57

1. The Court Lacks Jurisdiction To Entertain Precision Pine's Claim Preparation Costs Claim . . . . . 58

2. Precision Pine's Claim For Employee Claim Preparation Costs Is Not Recoverable Under CT 6.01 . . . . . 59

B. Precision Pine's Claims For "Miscellaneous Costs" Pursuant To CT 6.01 Should Be Denied . . . . . 60

1. Overhead And Profits Are Not Recoverable Under CT 6.01 . . . . . 60

2. Interest Is Not Payable Under CT 6.01 . . . . . 60

3. Precision Pine Is Not Entitled To Recover Other Costs Sought Pursuant To CT 6.01 . . . . . 62

4. Precision Pine Cannot Invoke CT 6.01 To Obtain Reimbursement Of Expenses In Connection With The Hay Contract . . . . . 63

## TABLE OF AUTHORITIES

**Cases:**

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) . . . . . 30, 56

Bighorn Lumber Co. v. United States,
49 Fed. Cl. 768 (2001) . . . . . 54

Bluebonnet Savings Bank, FSB v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . 29

Bohac v. Department of Agriculture,
239 F.3d 1334 (Fed. Cir. 2001) . . . . . 37, 54

California Federal Bank v. United States,
395 F.2d 1263 (Fed. Cir. 2005) . . . . . 34-35, 40, 47, 54

Cavalier Clothes, Inc. v. United States,
51 Fed. Cl. 399 (2001) . . . . . 47

Chain Belt Co. v. United States,
127 Ct. Ct. 38, 115 F. Supp. 701 (1953) . . . . . 31, 37-38, 54

Cities Service Helex, Inc. v. United States,
211 Ct. Cl. 222, 543 F.2d 1306 (1976) . . . . . 19, 21-22, 27, 46

Clary v. United States,
333 F.3d 1345 (Fed. Cir. 2003) . . . . . 61

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004) . . . . . 31

Contract Cleaning Maintenance, Inc. v. United States,
811 F.2d 586 (Fed. Cir. 1987) . . . . . 52-53, 58

Croman Corp. v. United States,
44 Fed. Cl. 796 (1999) . . . . . 52-53, 58

Dairyland Power Co-op. v. United States,
16 F.3d 1197 (Fed. Cir.1994) . . . . . 23

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Energy Capital Corp. v. United States,
47 Fed. Cl. 382 (2000),
aff'd in part, rev'd in part, 302 F.3d 1314 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . 38

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Everett Plywood Corp. v. United States,
512 F.2d 1082 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Gulf Contracting, Inc. v. United States,
23 Cl. Ct. 525, 532 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Hadley v. Baxendale,
9 Ex. 341, 156 Eng. Rep. 145 (1854) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Hansen Bancorp, Inc. v. United States,
376 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Hi-Shear Tech. Corp. v. United States,
356 F.2d 1372 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31, 34, 44

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 35-37, 45, 47, 54, 56

International Air Response v. United States,
324 F.3d 1376 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Kumho Tire Co., Ltd. v. Carmichael,
526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Landmark Land Co. v. FDIC,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 31, 37-39, 48, 54-55

M.A. Mortenson Co. v. Brownlee,
363 F.3d 1203 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Marathon Oil Co. v. United States,
374 F.3d 1123 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Micro Chemical, Inc. v. Lextron, Inc.,
317 F.3d 1387 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 35-36, 47, 56

In re Nangle,
274 F.3d 481 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Nicon, Inc. v. United States,
331 F.3d 878 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Olin Jones Sand Co. v. United States,
225 Ct. Cl. 741 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Petrofky v. United States,
203 Ct. Cl. 347, 488 F.2d 1394 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Pinewood Realty Limited Partnership v. United States,
223 Ct. Cl. 98, 617 F.2d 211 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 32, 45, 47

Precision Pine & Timber, Inc. v. United States,
62 Fed. Cl. 635 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17, 21, 45

Precision Pine & Timber, Inc. v. United States,
63 Fed. Cl. 122 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30, 44, 54, 58

Precision Pine & Timber, Inc. v. United States,
___ Fed. Cl. ___, 2005 WL 352547 (Feb. 14, 2005) . . . . . . . . . . . . . 31, 35-36, 47, 54

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (1951),
cert. denied, 343 U.S. 977 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-27

Reynolds v. Commissioner,
296 F.3d 607 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Rocky Mountain Constr. Co. v. United States,
218 Ct. Cl. 665 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Rumsfeld v. Freedom, N.Y.,
329 F.3d 1320 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

SAI Industrial Corp. v. United States,
63 Fed. Cl. 1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

San Carlos Irrigation & Drainage District v. United States,
877 F.2d 957 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Santa Fe Engineers, Inc. v. United States,
818 F.2d 856 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Scott Timber Co. v. United States,
333 F.3d 1358 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 27, 32, 48-49

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 45

Seaboard Lumber Co. v. United States,
48 Fed. Cl. 814 (2001),
aff'd, 308 F.3d 1283 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Singer Co. v. United States,
215 Ct. C 568 F.2d 695 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Smokey Bear, Inc. v. United States,
31 Fed. Cl. 805 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Thompson v. Cherokee Nation,
334 F.3d 1075 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-27, 48

White v. United States,
187 Ct. C 410 F.2d 773 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Wilner v. United States,
23 Cl. Ct. 241 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

**<u>Docketed Cases</u>:**


<u>Precision Pine & Timber, Inc. v. United States,</u>
No. 02-131 (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43-44

<u>Precision Pine & Timber v. United States,</u>
No. 01-415C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63


**<u>Statutes, Regulations And Other Authority</u>:**


41 U.S.C. § 605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 58

41 U.S.C. § 609 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 58

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Restatement (Second) of Contracts § 347 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

Restatement (Second) of Contracts § 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 49

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PRETRIAL MEMORANDUM**
**<u>OF CONTENTIONS OF FACT AND LAW</u>**

Pursuant to the Court's January 4, 2005 order, and ¶ 14(b) of Appendix A of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits the following memorandum of contentions of fact and law regarding the claims of plaintiff, Precision Pine & Timber, Inc. ("Precision Pine").

**<u>QUESTIONS PRESENTED</u>**

1. Whether Precision Pine, by electing to continue – not cancel – the contracts at issue following the Mexican Spotted Owl suspensions ("MSO suspensions"), is limited to the recovery of damages for partial breach.

2. Whether Precision Pine released the United States from liability for the claims asserted upon the Brann, Hutch-Boondock, Monument, Mud, and Saginaw-Kennedy contracts.

3. Whether the claims for gross profits from the sale of lumber products asserted by Precision Pine should be denied because:

   (a) the manufacture and sale of lumber products is a collateral undertaking that is not recoverable for breach of a timber cutting contract;

   (b) Precision Pine is not a lost volume seller;

(c) Precision Pine's contracts would not have been profitable during the MSO suspensions;

(d) Precision Pine cannot establish which timber sales would have been operated had no suspensions occurred;

(e) Precision Pine's business decision not to harvest the contracts to completion after the MSO suspensions were lifted was the direct and primary cause of any loss of profits;

(f) lost lumber profits do not result in the ordinary course from a delay in timber harvesting and, at the time of contracting, the Forest Service had been apprised of no special circumstances relating to the contracts at issue;

(g) lost profits have been not established with reasonable certainty; or

(h) Precision Pine could have earned greater profits by fully harvesting the contracts during the post-suspension period.

4. Whether claims for increased sawmill costs are recoverable as damages for breach of a timber cutting contract.

5. Whether Precision Pine's claim for increased log hauling costs with respect to the Hay contract should be denied because:

(a) Precision Pine submitted no claim for increased log hauling costs to the contracting officer;

(b) the alleged increase in log hauling costs resulted from Precision Pine's business decisions; and

(c) the alleged increase in log hauling costs was not foreseeable at the time of contracting.

6. Whether Precision Pine is entitled to reimbursement pursuant to CT 6.01 for time allegedly spent by employees preparing Precision Pine's claim letters where:

(a) Precision Pine submitted no claim for employee claim preparation costs to the respective contracting officers; and

(b) Precision Pine has produced no receipts or other documents verifying out-of-pocket costs resulting from the preparation of claim letters by its employees.

7. Whether Precision Pine is entitled to recover "overhead and profits," "interest" and other miscellaneous costs pursuant to contract clause CT 6.01.

## STATEMENT OF FACTS DEFENDANT EXPECTS TO PROVE AT TRIAL

## I. Arizona Timber And Lumber – An Industry In Decline

1. In terms of volume and value, Arizona is a relatively small producer of timber and lumber. As of 1992, the total timberland in Arizona was approximately 4 million acres. More than two-thirds of that area was designated as national forest. In terms of volume of available sawtimber, the percentage of public ownership is even higher. DX776.

2. While the timber and timberland in Arizona are predominately public owned, timber production in the state has largely been from private sources. For instance, less than 30 percent of the timber processed by Arizona sawmills in 1996 came from public lands. DX776.

3. Production of lumber from Arizona sawmills fell in every year from 1988 to 1996, from 447 million board feet in 1998 to 105 million board feet in 1996. This decline in production continued after 1996. In fact, by 1998, lumber production in Arizona had fallen to 78 million board feet. DX776.

4. Logging restrictions on national forest land have been largely responsible for the downward trends in Arizona production volumes. While Federal timber sales in Arizona have been limited since the late 1980s, these limitations have become increasingly restrictive over time. As a result, the amount of timber on national forest land offered for sale declined significantly during the late 1980s and throughout the 1990s. DX776.

5. Offers of timber on Federal lands in Arizona were approximately 250 million board feet in 1988, down from more than 300 million board feet in 1984 and 1985. By 1995, the amount of timber offered for sale had fallen below 70 million board feet. Since 1997, Forest Service timber offers have averaged approximately 60 million board feet per year. In terms of the volume of timber cut, amounts have fallen from approximately 280 million board feet in 1988, to approximately 40 million in 1995. Annual harvests have averaged about 30 million board feet per year since 1997. DX776.

## II. Precision Pine's Strategy Of Aggressive Growth

6. While Arizona timber and lumber markets were largely on the decline throughout the early and mid-1990s, Precision Pine chose to embark on a rapid expansions of its operations. DX776; DX761 (interrog. no. 20 & 21). As part of this strategy, Precision Pine purchased a number of sawmills from other companies. Id.

7. As of 1990, Precision Pine operated a single sawmill in Heber, Arizona. See DX761. This was Precision Pine's original mill and it was first opened in 1984. Joint Stip. ¶ 2. Precision Pine also owned and operated a planer in Snowflake, Arizona. DX781.

8. In December 1991, Precision Pine purchased a sawmill and planer in Winslow, Arizona, from Duke City Lumber Company. Precision Pine operated the Winslow sawmill until September 1998. Joint Stip. ¶¶ 3-4; DX781.

9. In October 1992, Precision Pine purchased a sawmill in Williams, Arizona, from Grand Canyon Forest Industries. Precision Pine operated the Williams sawmill until October 1994. The equipment from the Williams sawmill was sold at auction shortly thereafter. DX781.

10. In June 1993, Precision Pine purchased a sawmill in Payson, Arizona, from Kaibab Forest Products Company. Precision Pine never operated the Payson sawmill. The Payson sawmill's equipment was sold at auction in or about August 1993. DX781.

11. Prior to June 1991, Precision Pine had purchased a sawmill in Show Low, Arizona. Precision Pine never operated the Show Low sawmill. DX781.

12. Prior to June 1991, Precision Pine had purchased a sawmill in Clay Springs, Arizona. Precision Pine operated the Clay Springs sawmill for only a short period and closed the sawmill in the early 1990s. DX781.

13. In 1993, Precision Pine assembled a sawmill in Eagar, Arizona using equipment from the Show Low and Clay Springs sawmills. Precision Pine opened the Eagar sawmill in or about October 1993. DX781.

14. Precision Pine closed its planer in Snowflake, Arizona in March 1995. DX781.

15. Precision Pine closed the Eagar sawmill in August 1997. DX781.

16. In order to secure raw material for its sawmills from increasingly restricted sources of supply, Precision Pine bid on timber and multi-product sale contracts offered by the Forest Service in the early and mid-1990s. Precision Pine also bid upon timber sale contracts offered by the State of Arizona, Indian tribes and private landowners. DX776.

17. Precision Pine paid a broad range of prices for the timber acquired under its contracts. DX776. Precision Pine's bidding strategy was aggressive as evidenced by the bid premiums the company paid over and above minimum bid prices. DX776; see also DX554.

18. While Precision Pine's aggressive bidding practices enabled the company to win many contracts upon which it bid and secure timber for its expanded mill operations, it also meant that the company had to pay high prices for timber that might never be economical. DX776.

19. This exposed the company to considerable market risk. This market risk was especially acute during periods in which lumber prices were depressed because the lower the market prices for lumber products, the greater the number of Precision Pine's contracts that would be rendered unprofitable. DX776.

**III. <u>Precision Pine's Operations And Business Practices</u>**

20. Precision Pine harvested no more that 25.4 mmbf of timber in a single year. DX559. The volume of timber Precision Pine had under contract was declining during the 1990s. DX559.

21. Precision Pine had log inventories at its sawmills and lumber inventories at its planing facilities that varied from month to month. DX478-500.

22. The lumber prices used in Precision Pine's gross profit calculations are inconsistent with Precision Pine's Winslow Sales Record and, as a result, overstate gross profits by approximately $650,000. DX776.

23. For a variety of reasons, including the skill of the sawyer, the efficiency of sawmill equipment, the size and quality of logs being milled, and the types of lumber products being produced, the volume of lumber in mbf (known as "lumber tally") produced by a given sawmill commonly exceeds the volume of logs in mbf (known as "log scale") used by the sawmill. The ratio of the volume of lumber (in mbf (l.t.)) to the volume of logs used to produce that lumber (in mbf (l.s.)) is commonly referred as the "overrun factor."

24. According to a contemporaneous analysis conducted by Precision Pine, the overrun factor achieved at the Winslow sawmill in 1995 and 1996 was 1.08. DX547.

25. The overrun factor that Precision Pine used for its own profit projections in July 1995 was 1.10. DX521-27; DX530-39.

26. In accordance with the terms of its contracts, in early 1995 Precision Pine submitted to the Forest Service an annual operating schedule. The 1995 annual operating schedule describes harvesting plans for 1995. DX294.

27. Other than its 1995 annual operating schedule, Precision Pine developed no business plan, scheduling plan, operating plan or other plan that described planned timber harvesting in 1995 and 1996.

28. Precision Pine had no plan for the production of a specified volume of lumber at any of its mills. DX784.

29. Precision Pine has no documents or other data that shows what mix of lumber products was produced from logs from a particular timber sale. DX784.

## IV. The Contracts

### A. The Award Of Timber And Multi-Product Sale Contracts

30. Forest Service timber sale contracts and multi-product sale contracts are generally competitively bid and awarded to the highest bidder. Joint Stip. ¶ 10.

31. From the standpoint of potential bidders, a timber sale commences when the Forest Service issues an advertisement and prospectus that describe the timber to be harvested, the estimated volume of sawtimber and (for multi-product sales) roundwood being sold, and the dates bids must be submitted. Included in the advertisement is a minimum bid price. See

generally Seaboard Lumber Co. v. United States, 48 Fed. Cl. 814, 816 (2001), aff'd, 308 F.3d 1283 (Fed. Cir. 2002).

32. A prospectus and sample contract are made available to interested bidders. The prospectus identifies the length of time the contractor will be allowed to perform the contract, establishes the contract's operating season, specifies the timing of contractor payments for the sawtimber, and, for multi-product sales, states the fixed price for the sale's roundwood component. Interested parties are invited to examine the site and available timber prior to bidding. Id.

33. In Forest Service contracts, "sawtimber" generally is defined as trees larger than 9 inches in diameter at breast height ("dbh"). See, e.g., DX1, DX26. "Roundwood" refers to smaller trees that are between 5.0 and 8.9 inches dbh. Id.

34. The price of roundwood for multi-product sales is an administratively-established, fixed price set by the Forest Service. As a result, the contract's bid price affects only the stumpage price paid for sawtimber harvested from the sale. See, e.g., DX1, DX26.

35. Bidders on Forest Service timber and multi-product sale contracts need not own or have access to a sawmill, a planer, kilns or other facilities for processing logs harvested from the sale.

**B. The Contracts At Issue**

36. This action concerns 14 contracts: (1) the O.D. Ridge timber sale; (2) the Kettle multi-product sale; (3) the Hay timber sale; (4) the Brookbank multi-product sale; (5) the Jersey Horse timber sale; (6) the Salt multi-product sale; (7) the Manaco multi-product sale; (8) the St. Joe timber sale; (9) the Hutch-Boondock multi-product sale; (10) the Mud multi-

product sale; (11) the Saginaw-Kennedy multi-product sale; (12) the Brann multi-product sale; (13) the U-Bar timber sale; and (14) the Monument multi-product sale. Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 38 (2001); see also DX1; DX26; DX54; DX105; DX125; DX149; DX176; DX211; DX238; DX284; DX318; DX342; DX395; DX435.

37. The contracts are spread across four National Forests: (1) the Apache-Sitgreaves National Forest; (2) the Coconino National Forest; (3) the Kaibab National Forest; and (4) the Tonto National Forest. See DX1; DX26; DX54; DX105; DX125; DX149; DX176; DX211; DX238; DX284; DX318; DX342; DX395; DX435.

38. Precision Pine bid upon and was awarded the O.D. Ridge, Kettle, Brookbank, Jersey Horse, Salt, Manaco, Hutch-Boondock, Mud, Saginaw-Kennedy Brann, U-Bar, and Monument contracts on various dates between August 14, 1992 and July 20, 1995. Joint Stip. ¶¶ 11-23. Precision Pine did not inform the Forest Service of any special circumstances relating to these contracts at or before their award.

39. The Hay contract originally was awarded to Reidhead Lumber Company, Inc., on January 17, 1990. Joint Stip. ¶ 24. The Hay contract was transferred to Precision Pine by contract modification on June 24, 1991. Id. ¶25. Precision Pine did not inform the Forest Service of any special circumstances relating to the Hay contract at or before its award. Precision Pine first notified the Forest Service that it intended to haul timber from the Hay sale to a sawmill in Eagar, Arizona in April 1994. DX76.

40. The St. Joe contract originally was awarded to Grand Canyon Forest Industries ("GCFI") on April 14, 1992. Joint Stip. ¶ 26. The St. Joe contract was assigned to Precision

Pine by GCFI on October 16, 1992. Id. ¶ 27. Precision Pine did not inform the Forest Service of any special circumstances relating to the St. Joe contract at or before its award.

41. Each of Precision Pine's Forest Service contracts contain similar terms. See DX1; DX26; DX54; DX105; DX125; DX149; DX176; DX211; DX238; DX284; DX318; DX342; DX395; DX435. However, the Hay contract, unlike the other contracts, is a scaled timber sale. DX54. The Hay contract does not contain contract clause CT 6.01. DX54.

42. The contracts each establish a normal operating season in which harvesting operations are to be performed. The contracts require the purchaser to submit to the Forest Service an annual operating schedule. The contracts also require the purchaser to meet with the Forest Service prior to commencing or restarting harvesting operations to discuss their operating plan, as well as issues unique to the sale and sale area. See DX1; DX26; DX54; DX105; DX125; DX149; DX176; DX211; DX238; DX284; DX318; DX342; DX395; DX435.

43. Each contract requires the purchaser to harvest cut and remove all sawtimber and (for multi-product sales) roundwood by the contract's termination date. Each contract prescribes the manner of conducting logging and hauling operations, as well as land restoration work. Each contract establishes a pricing mechanism for sawtimber and a fixed price for roundwood. The price for sawtimber is frequently based upon the Inland Rocky Mountain Ponderosa Pine index published by the Western Wood Products Association. Generally, payment for timber and roundwood occurs when the logs are cut and removed from the sale area. However, each Forest Service contract contains a midpoint payment date that requires an initial payment even if no work on the contract has occurred. The contracts require the purchaser to make a down payment and to maintain payment and performance bonds. See DX1; DX26; DX54; DX105; DX125;

DX149; DX176; DX211; DX238; DX284; DX318; DX342; DX395; DX435; Joint Stip. ¶ 32.

44. The sale area for each contract is divided into payment units. Payment units are further subdivided into cutting units. At any given time, operations are allowed to occur only upon a set number of payment units. Only when all work on a payment unit (i.e., all cutting and hauling of timber and roundwood, and all land restoration work) is completed may the next payment unit be opened and work commence. See DX1; DX26; DX54; DX105; DX125; DX149; DX176; DX211; DX238; DX284; DX318; DX342; DX395; DX435.

45. Forest Service contracts do not require the purchaser to process logs from the sale at its sawmill or at any sawmill whatsoever. Once the purchaser has cut, removed and paid for the logs, subject only to statutory and regulatory constrains such as the statutory prohibition on exporting unprocessed logs from Federal lands, the purchaser is free to put harvested logs to any use it chooses. See DX1; DX26; DX54; DX105; DX125; DX149; DX176; DX211; DX238; DX284; DX318; DX342; DX395; DX435.

46. Precision Pine took advantage of this flexibility. At times, Precision Pine milled logs and planed and sold the resulting lumber. At other times, logs were (1) milled and sold as rough cut (unplaned) lumber products, (2) sold to third parties for use in their own milling or manufacturing operations, (3) sold for use as pulpwood, (4) sold as firewood, (5) sold for resale as vigas or firewood, and (6) stacked and left unused. E.g., DX468-71; DX553; DX795.

## V. The Mexican Spotted Owl ("MSO") Suspensions

### A. The Length Of The Suspensions

47. On August 25, 1995, in order to comply with an injunction entered by a Federal district court in litigation brought by an environmental group concerning the Mexican Spotted Owl, the Forest Service suspended the Brann, Brookbank, Hay, Hutch-Boondock, Jersey Horse, Kettle, Manaco, Monument, Mud, O.D. Ridge, Saginaw-Kennedy, Salt, St. Joe and U-Bar contracts. Joint Stip. ¶ 29.

48. On October 18, 1995, the Forest Service lifted the suspension of the Brann, Hutch-Boondock and St. Joe contracts. See Joint Stip. ¶ 30; DX236; DX281; DX393.

49. On March 11, 1996, the Forest Service lifted the suspension of the Mud contract. DX300; DX316.

50. On December 4, 1996, the Forest Service lifted the suspension of the Brookbank, Jersey Horse, Kettle, Manaco, Monument, Mud, O.D. Ridge, Salt, Saginaw-Kennedy, and U-Bar contracts. DX23; DX52; DX101; DX123; DX144; DX173; DX207; DX340; DX432; DX452.

51. Precision Pine was free, subject to the terms and conditions of its contracts, to harvest timber and roundwood once the MSO suspensions were lifted.

### B. Low Lumber Prices During The MSO Suspensions

52. The price for wood products hit bottom during the MSO suspensions. Prices were better both before the suspension in 1993 and 1994 and after the suspension in 1997. DX776; see also DX781 (interrog. no. 34) (stating that the relevant "annual average lumber price index

published by the Western Wood Products Association Rocky Mountain Ponderosa Pine" was: $367.39 in 1995; $370.45 in 1996; $415.17 in 1997; $348.83 in 1998; and $374.35 in 1999).

53. Due to this major downturn in lumber prices in 1995 and 1996, the Forest Service offered Precision Pine contract term adjustments on several contracts in March 1996. DX271-72. Precision Pine accepted market-related term adjustments on the Hutch-Boondock, O.D. Ridge and Monument contracts. DX2; DX239; DX436.

**C. No Outlet For Roundwood During The MSO Suspension**

54. The only substantial purchaser of the roundwood component of Precision Pine's multi-product sale contracts was Stone Container Corporation, a/k/a Stone Forest Industries ("Stone"). See, e.g., DX566; DX570.

55. Precision Pine and Stone never had an arrangement that obligated Stone to purchase all roundwood from all of Precision Pine's multi-product sale contracts. Rather, from time to time, Precision Pine and Stone would execute contracts providing that Stone would buy a fixed quantity of roundwood harvested from a particular multi-product sale contract. See DX468-71.

56. In early 1995, Stone agreed to purchase 20 loads of roundwood from the Manaco multi-product sale contract. DX469. At about the same time, Stone agreed to purchase 500 cords of roundwood from the Brookbank contracts. DX472. By the end of August 1995, Precision Pine had delivered most or all of this roundwood to Stone. See DX109; DX186; DX588-92.

57. In September 1995, shortly after the MSO suspensions had begun, Lewis Tenney sent a letter to Stone stating that he had recently heard that Stone was interested in purchasing roundwood. DX474. Mr. Tenney expressed "surprise" that no one at Stone had contacted

Precision Pine. Id. He offered to sell Stone 1000 cords of roundwood from the Park timber sale – a multi-product sale that had been awarded to Precision Pine by the State of Arizona. Id.

58. On October 3, 1995, Stone turned down Mr. Tenney's offer of roundwood from Precision Pine and explained that Stone was "not looking to make any new commitments" for roundwood during the 1995-96 season. DX475.

59. During the remainder of the MSO suspensions, Stone continued to refuse to purchase roundwood from Precision Pine. See DX21; DX41; DX47; DX242-43; DX263; DX279-80; DX306; DX309; DX313; DX339; DX348-49; DX374-75; DX392; DX403; DX454-55; DX461; DX553; DX555. In fact, in early 1996, Stone refused to take roundwood from a third-party upon learning that the roundwood had come from one of Precision Pine's multi-product sales. DX454. As a result, Precision Pine repeatedly informed the Forest Service that it had no outlet for roundwood. E.g., DX263; DX454; DX555.

60. Stone continued to decline to purchase roundwood from Precision Pine until September 1997 when it began accepting deliveries as part of its purchase of the Kettle contract from Precision Pine. See DX553 (accepting roundwood that had been taken from the Kettle contract and decked (i.e., stacked) at the Eagar mill).

**D. Profitability Of The Contracts During The MSO Suspensions**

61. The Brookbank, Jersey Horse, Kettle, Manaco, Monument, Mud, Saginaw-Kennedy, Salt and U-Bar contracts were unprofitable during the period of the MSO suspensions because of depressed lumber prices and the unavailability of an outlet for the roundwood component of multi-product sales. DX521-27; DX530-39; DX777; DX792.

62. Precision Pine voluntarily defaulted upon the Park timber sale – a multi-product sale awarded to Precision Pine by the State of Arizona – in October 1996. DX699; DX705.

## VI. The Post-Suspension Period

63. When the MSO suspensions were lifted, Precision Pine elected to continue – not cancel – its contracts. E.g., Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 651 (2004); Joint Stip. ¶ 34; DX276. Thus, Precision Pine chose to reaffirm its contractual obligations, including the obligation to harvest all sawtimber and roundwood. Id.

### A. Post-Suspension Contract Term Adjustments

64. After the suspensions were lifted, Precision Pine requested contract term adjustment for each contract affected by the MSO suspensions. Joint Stip. ¶ 34. The Forest Service granted each of these requests for contract term adjustments. Id. Accordingly, Precision Pine was provided term adjustments equivalent to the number of days lost during the contract's normal operating season as a result of the MSO suspensions. Id.

### B. Precision Pine's Post-Suspension Harvesting

65. The Forest Service lifted the suspension and, subject to the terms and conditions of the contracts, made the Brann, Hutch-Boondock and St. Joe contracts available for harvesting by Precision Pine on October 18, 1995. See Joint Stip. ¶ 30; DX236; DX281; DX393. Precision Pine did not complete harvesting the Hutch-Boondock and Brann contracts by December 4, 1996. DX251; DX361.

66. The Forest Service lifted the suspension and, subject to the terms and conditions of the contract, made the Mud contract available for harvesting by Precision Pine on March 11, 1996. DX300; DX316. Precision Pine did not complete harvesting the Mud contract by December 4, 1996. DX291.

67. The Forest Service lifted the suspensions and, subject to the terms and conditions of the contracts, made the Brookbank, Hay, Jersey Horse, Kettle, O.D. Ridge, Manaco,

Monument, Saginaw-Kennedy, Salt and U-Bar contracts available for harvesting by Precision Pine on December 4, 1996. DX23; DX52; DX101; DX123; DX144; DX173; DX207; DX340; DX432; DX452.

68. In December 1996, Precision Pine requested and was granted permission by the Forest Service to operate the Hay timber sale outside of the contract's normal operating season. See DX54; DX91. Timber harvesting upon the Hay sale began later in December 1996. DX68. Precision Pine did not seek to operate any of the other contracts at issue in late 1996 or early 1997.

69. Precision Pine kept key employees at its Eagar sawmill on salary during the MSO suspensions. DX788. Precision Pine decided not to reopen the Eagar sawmill until January 1997. DX96-97. Precision Pine elected to haul timber from the Hay sale to the Winslow sawmill after the Eagar mill was reopened. DX97.

70. During the post-suspension period (i.e., between December 4, 1996 and July 31, 2000), Precision Pine completed harvesting upon the Hay and Mud contracts. DX68; DX291.

71. During the post-suspension period, Precision Pine partially harvested the Kettle multi-product sale contract and, in August 1997, sold the remaining sawtimber and roundwood in unopened payment units to Stone. DX31; DX477.

72. During the post-suspension period, Precision Pine partially harvested the Brookbank, Jersey Horse, Manaco, O.D. Ridge and U-Bar contracts. DX3; DX109; DX128; DX186; DX407.

73. During the post-suspension period, Precision Pine conducted no harvesting upon the Monument, Saginaw-Kennedy, and Salt multi-product sale contracts. DX780.

74. During the post-suspension period, Precision Pine cut and removed approximately 45 percent of the sawtimber available from the Brookbank, Hay, Jersey Horse, Kettle, Manaco, Monument, Mud, O.D. Ridge, Saginaw-Kennedy, Salt and U-Bar contracts. DX795; DX797. Precision Pine did not cut the remainder for "business reasons." DX781; DX784-85; DX791.

75. Precision Pine could have earned more by fully harvesting the contracts during the post-suspension period than it claims it would have earned during the period of the MSO suspensions. DX797.

76. Precision Pine failed to comply with contractual obligations upon the Brann, Brookbank, Hutch-Boondock, Jersey Horse, Manaco, Monument, O.D. Ridge, Saginaw-Kennedy, Salt and U-Bar contracts. As a result, these contracts were terminated for default by the Forest Service. <u>See</u> <u>Precision Pine</u>, 62 Fed. Cl. at 636; DX570.

77. Precision Pine did not forego bidding on Government timber sale contracts or forego any other opportunities to acquire additional timber for its mills as a result of the MSO suspensions. DX780 (request no. 10).

**C. <u>Post-Suspension Releases Of Liability</u>**

78. In 1997, the Forest Service offered timber purchasers contract term adjustments for certain contracts awarded before January 1, 1995. The adjustments offered by the Forest Service deferred the periodic payment date by one year and extended the contract completion date by one year. In order to receive such an adjustment, the timber purchaser was required to execute a release of liability.

79. Precision Pine was offered such contract term adjustments upon the Brann, Hay, Hutch-Boondock, O.D. Ridge, Monument, Mud and U-Bar contracts. <u>See</u> DX386. Precision Pine requested and received the offered contract term adjustments upon the Brann, Hutch-

Boondock, Monument, Mud and U-Bar contracts. DX343 (Brann); DX239 (Hutch-Boondock); DX436 (Monument); DX285 (Mud); DX319 (Saginaw-Kennedy). Each release was executed by the Forest Service contracting officer and Precision Pine's president, Lorin Porter. Id.

80. The release executed by Precision Pine in order to receive the requested term adjustments upon these contracts reads in pertinent part:

> Purchaser, Precision Pine & Timber, hereby releases the Government from any and all liability arising from the suspension, modification, or cancellation (in whole or in part) of contract no. [applicable contract number] in order to protect sensitive, threatened, or endangered species, or for any other environmental reasons.

DX239; DX285; DX319; DX343; DX436.

**VII. Precision Pine's Claims Regarding The MSO Suspensions**

81. Between August 15, 1997, and November 17, 1997, Precision Pine sent to the Forest Service claims letters seeking compensation as a result of the MSO suspensions. DX23; DX52; DX101; DX123; DX144; DX173; DX207; DX236; DX281; DX316; DX340; DX393; DX432; DX452. The claim letters were submitted pursuant to the Contract Disputes Act ("CDA") and were certified by Precision Pine's president, Lorin Porter. Id.

82. Precision Pine's claim letters did not include claims for compensation for time spent by company employees preparing the claim letters. See DX23; DX52; DX101; DX123; DX144; DX173; DX207; DX236; DX281; DX316; DX340; DX393; DX432; DX452.

83. Precision Pine's claim letter with respect to the Hay contract did not include a claim for compensation for increased log hauling costs. DX101.

84. Between November 28, 1997, and March 16, 1998, Precision Pine received final decisions from Forest Service contracting officers that granted in part, and denied in part, the

claims that had been submitted. DX25; DX53; DX104; DX124; DX148; DX175; DX210; DX237; DX283; DX317; DX341; DX394; DX434; DX453. Precision Pine was awarded, and the Forest Service paid, total compensation in the amount of $16,278.85 in connection with the claims. DX25; DX53; DX104; DX124; DX148; DX175; DX210; DX237; DX283; DX317; DX341; DX394; DX434; DX453; see also DX792 (exhibit 2).

## VIII. Claims Currently Pending In This Lawsuit

85. In this action, Precision Pine currently seeks the following damages:

- Gross Profits from the Sale of Lumber and By-Products: $6,865,541.21
- Increased Lumber Manufacturing Costs: $380,711.20
- Increased Log Hauling Costs on the Hay Contract: $176,162.32
- Claim Preparation Costs by Precision Pine Employees: $17,910.00
- Miscellaneous Items: $19,954.53

Thus, Precision Pine seeks damages in the total amount of: $7,460,279.26

See DX792 (exhibit 1); Pl.'s Pretrial Br. at 31 (citing PX180).

## DEFENDANT'S CONTENTIONS OF LAW

Precision Pine has failed to assert claims for the proper measure of damages in this action. Precision Pine elected to continue the contracts at issue after the MSO suspensions were lifted. As a result, Precision Pine has retained only claims for "damages for partial breach." Cities Service Helex, Inc. v. United States, 211 Ct. Cl. 222, 543 F.2d 1306, 1313 (1976). Precision Pine fails to acknowledge this fundamental limitation upon its claims and, consequently, asserts no claims seeking compensation for a partial breach. As a result, Precision Pine fails to meet its burden of proof in this action.

Furthermore, Precision Pine has executed releases that relieve the Government of liability with respect to the suspension of five of the contracts at issue – the Brann, Hutch-Boondock, Monument, Mud and Saginaw-Kennedy contracts. DX239; DX285; DX319; DX343; DX436. Precision Pine is therefore entitled to no compensation for the suspension of the Brann, Hutch-Boondock, Monument, Mud and Saginaw-Kennedy contracts.

Precision Pine's damages claims would be properly rejected even if its theories of liability were viable. This action concerns suspensions of 14 different timber and multi-product sale contracts that resulted from the listing of the Mexican Spotted Owl as an endangered species. The contracts were awarded on different dates, concern operations on different national forests, involve different volumes and different qualities of timber, and frequently (though not always) require the removal of substantial quantities of roundwood. The contracts were suspended for different periods ranging from 8 weeks to 16 months. Twelve of the contracts were found to have been breached and Precision Pine asserts a claim for lost profits with respect to 11 of these contracts. After the MSO suspensions were lifted, Precision Pine completely harvested some contracts, chose to partially harvest other contracts, and elected to perform no harvesting on still other contracts. Simply put, Precision Pine's claims are highly fact-dependent and cannot be feasibly addressed in the aggregate, but rather, must be assessed on a contract-by-contract basis.

Precision Pine's damages claims fall into two broad categories: (1) damages for common law breach of contract; and (2) claims for reimbursement pursuant to contract clause CT 6.01. With respect to a given contract, these are alternative measures of relief. For example, with respect to the O.D. Ridge contract, Precision Pine may seek compensation pursuant to either the common law or contract clause CT 6.01 – but not both. The United States discusses specific

shortcomings with Precision Pine's claims in these two general categories below. See section III, infra (common law claims); section IV, infra (CT 6.01 claims).

## I. Precision Pine Is Entitled Only To Damages For "Partial Breach"

In this action, the Court concluded that the duration of the MSO suspensions resulted in a breach of Precision Pine's timber and multi-product sale contracts.[1] Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 70-71 (2001). Upon breach, the injured party can choose between canceling the contract or continuing it. Cities Service Helex, Inc. v. United States, 211 Ct. Cl. 222, 543 F.2d 1306, 1313 (1976). It has already been established that, here, Precision Pine chose to continue the contracts affected by the MSO suspension. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. at 651 ("Precision waived its right to cancel the contracts . . . through its continued manifestation of an understanding that the contracts remained in effect.");[2] see also Joint Stip. of Facts ¶ 34 (stipulating that Precision Pine sought and received contract term adjustments upon each of its contracts after the MSO suspension was lifted).

---

[1] The Court also concluded that the Forest Service breached a warranty in clause CT 6.25 in seven of the contracts. See Precision Pine & Timber, 50 Fed. Cl. at 70, 73. We respectfully maintain that the Court erred in finding clause CT 6.25 contains an express warranty. Furthermore, the Court's ruling that reliance upon a warranty is not required is directly contrary to the Federal Circuit's subsequent decision in Scott Timber Co. v. United States, 333 F.3d 1358 (Fed. Cir. 2003). Because Scott Timber is controlling precedent, this aspect of the liability decision is no longer viable.

[2] The doctrine of collateral estoppel bars Precision Pine from re-litigating this issue, which has already once been litigated and decided. E.g., International Air Response v. United States, 324 F.3d 1376, 1378 (Fed. Cir. 2004) ("Under the doctrine of collateral estoppel, . . . the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.") (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n. 5 (1979)); In re Nangle, 274 F.3d 481, 485 (8th Cir. 2001).

The implications of Precision Pine's decision to continue performance are significant – particularly with respect to the assessment of damages. As the Court of Claims explained in Cities Service Helex:

> If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

543 F.2d at 1313 (citing cases) (emphasis added); see also Pinewood Realty Limited Partnership v. United States, 223 Ct. Cl. 98, 617 F.2d 211, 214 (1980) (if a contract is breached but "the injured party ignores the breach, and continues to perform, it has waived its right to terminate the contract, and has only retained its claim for damages for partial breach"). A party that elects to continue contract performance receives the benefit of the bargain through the contract itself – not through the recovery of expectancy damages. See Cities Service Helex, 543 F.2d at 1313.

The "normal measure" of damages for a "partial breach" due to delayed performance is the difference in value between what was conveyed and what was supposed to have been conveyed. White v. United States, 187 Ct. Cl. 564, 410 F.2d 773, 779 (1969). Thus, in the case of the suspension of a timber sale contract for an unreasonable duration, damages for partial breach are measured as the difference between the contract price/market value differential for timber at the time of breach (i.e., on the date when the suspension became unreasonable) and the contract price/market value differential when the suspension was lifted. See Everett Plywood Corp. v. United States, 512 F.2d 1082 (1975) ("The usual measure of damages for the failure to deliver goods is the difference between the contract price the buyer was to pay and the fair market value of those goods."). For instance, if the purchaser had a contract price for timber

$15.00/mbf less than market value at the time of breach, but had a contract price of only $10.00/mbf less than market value when the suspension was lifted, the purchaser's damages for partial breach would be $5.00/mbf.

Precision Pine has made no attempt to quantify damages for partial breach. As a result, Precision Pine cannot satisfy its burden of proof in this action.

## II. Precision Pine Has Released The Government "From Any And All Liability Arising From The Suspension" Of The Brann, Hutch-Boondock, Monument, Mud and Saginaw-Kennedy Contracts

In 1997, Precision Pine executed a series of releases of liability in order to obtain additional contract term adjustments. See DX239 (Hutch-Boondock); DX285 (Mud); DX319 (Saginaw-Kennedy); DX343 (Brann); DX436 (Monument). Each release was signed by the Forest Service contracting officer and Precision Pine's president, Lorin Porter. The operative language of the releases reads:

> Purchaser, Precision Pine & Timber, hereby releases the Government from any and all liability arising from the suspension, modification, or cancellation (in whole or in part) of contract no. 006577 in order to protect sensitive, threatened, or endangered species, or for any other environmental reasons.

DX343 (Brann); accord DX239 (Hutch-Boondock); DX285 (Mud); DX319 (Saginaw-Kennedy); DX436 (Monument). The plain language of the releases relieves the Government from "any and all liability arising from the suspension" in this action. Accordingly, Precision Pine is entitled to no recovery upon claims asserted with respect to the Brann, Hutch-Boondock, Monument, Mud and Saginaw-Kennedy contracts. E.g., Dairyland Power Co-op. v. United States, 16 F.3d 1197, 1203 (Fed. Cir.1994) ("the execution of an unrestricted release, pursuant to a government contract, bars the later assertion of claims against the government with respect to that contract").

## III. Precision Pine's Claimed Common Law Breach of Contract Damages

In its pretrial brief, Precision Pine subdivides its common law breach claims into three separate categories: gross profits from the sale of lumber products; sawmill inefficiency costs; and increased log hauling costs. See Pl.'s Pretrial Br. at 31-53. Precision Pine embeds within its gross profits calculations alleged increases in sawmill costs and log hauling costs. See DX792; DX796. By asserting increased sawmill and log hauling costs in its gross profits claims and as independent claims, Precision Pine seeks a double recovery. Furthermore, as we explain below, each of Precision Pine's common law claims suffers from fatal flaws that preclude Precision Pine's recovery in this action.

### A. Precision Pine Is Not Entitled To Recover Lost Lumber Profits

#### 1. Lost Profits For The Sale Of Lumber Are Not Recoverable For Breach Of A Timber Cutting Contract Because The Production And Sale Of Lumber Products Constitute A Collateral Undertaking

The contracts at issue are timber cutting contracts. Each contract requires the purchaser to cut and remove from the sale's units fixed quantities of timber and roundwood. The contracts prescribe the manner in which logging and hauling (and subsequent land restoration work) is to be performed. The contracts establish a pricing mechanism for the timber and roundwood that are to be cut and removed. And the contracts each establish a fixed time during which all contract work is to be completed. See generally DX1.

On the other hand, the contracts do not require that any timber or roundwood be processed at the purchaser's sawmill or, for that matter, at any sawmill whatsoever. Precision Pine was free to – and did – put logs from its contracts to varied uses. Some logs from Precision Pine's Forest Service contracts were milled and planed, and the resulting lumber sold. Other logs were not processed by Precision Pine at all, but instead were (i) sold to third parties for use in

their own mills, (ii) sold to third parties for use as pulpwood, (iii) sold to third parties to use as firewood, or (iv) stacked and left unused. See, e.g., DX477; DX553. Simply put, milling and planing were collateral to – not a part of – Precision Pine's contractual obligations.

Profits upon "independent and collateral undertakings" are not recoverable under the common law. E.g., Rumsfeld v. Freedom, N.Y., 329 F.3d 1320, 1333 (Fed. Cir. 2003); Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996); see also Olin Jones Sand Co. v. United States, 225 Ct. Cl. 741, 743-44 (1980) (damages based on future contracts "too remote and speculative to be recoverable" when Government wrongdoing caused contractor to lose bonding capacity and thus be unable to obtain contracts); Rocky Mountain Constr. Co. v. United States, 218 Ct. Cl. 665, 666 (1978) (damages based on future contracts are "too remote, indirect and speculative to permit recovery" when, absent Government delay, contractor would have been able to bid on other contracts); Smokey Bear, Inc. v. United States, 31 Fed. Cl. 805, 808 (1994) ("Damages for the loss of future profits and lost profitable business opportunities arising from potential contracts with other are per se unrecoverable."). In Wells Fargo, for instance, the Federal Circuit considered whether a bank could recover profits on loans it would allegedly have made but for the unavailability of capital occasioned by the defendant's breach. 88 F.3d at 1022-23. Using capital to make loans was a part of the bank's regular business operations and the bank asserted that it anticipated profits upon the loans it was unable to make. Id. at 1023. The Federal Circuit nevertheless held that such loans constituted a collateral undertaking upon which profits were unrecoverable as a matter of law. Quoting Ramsey v. United States, 121 Ct. Cl. 426, 101 F. Supp. 353, 357-58 (1951), cert. denied, 343 U.S. 977 (1952), the Federal Circuit first explained:

> The profits lost from the corporation's over-all business activities . . . may not be recovered . . . . The lost profits of these collateral undertakings, which the corporation was unable to carry out, are too remote to be classified as a natural result of the Government's delay . . . . "[T]here is a distinction by which all question[s] of this sort can be easily tested. If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. . . . But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit."

Wells Fargo, 88 F.3d at 1022-23 (quoting Ramsey, 101 F. Supp. at 357-58 (quoting Myerle v. United States, 33 Ct. Cl. 1, 26 (1897))) (emphasis added). The Federal Circuit then held that the reasoning in Ramsey was "equally applicable to the present case." Id. at 1023.

> Here the Court of Federal Claims awarded damages for the profits Wells Fargo allegedly would have made on the additional loans it could have made if the guarantee had been issued. Like the lost profits in Ramsey, Wells Fargo's loss of interest on additional loans it allegedly could have made had there been no breach is "too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit."

88 F.3d at 1023.

Like the plaintiffs in Wells Fargo and Ramsey, Precision Pine seeks profits upon its "over-all business activities," namely, profits from the sale of lumber products manufactured by the company's milling and planing operations – operations that were, in turn, supplied logs from Forest Service (and other) timber sales.[3] Precision Pine's Forest Service contracts required only the cutting and removal of trees from Forest Service lands – not the milling, planing, drying or

[3] Precision Pine obtained timber from the State of Arizona, Indian tribes, private parties, and its own lands, as well as from the Forest Service.

sale of lumber products. As a result, like the additional loans in Wells Fargo, Precision Pine's manufacture of lumber products constitute "an independent and collateral undertaking . . . entered into in consequence and on the faith of the principal contract." 88 F.2d at 1022; see also Ramsey, 101 F. Supp. at 358 (lost profits must be "part and parcel of the contract itself"). The recovery of alleged lost profits from lumber manufacturing operations is, therefore, "too uncertain and remote to be taken into account" for breach of a timber cutting contract. Id. at 1023; see also Scott Timber, Inc. v. United States, 333 F.3d at 1372 (holding that increased sawmill manufacturing costs "are not directly related" to the suspension of a timber sale contract).

**2. Precision Pine Misuses The "Lost Volume Seller" Concept, Which Is Inapplicable Here Because The United States Does Not Seek To Offset Profits From "Substitute Transactions"**

Precision Pine's attempt to invoke the lost volume seller concept in this action is misplaced. While the MSO suspension may have delayed the harvesting of timber, it did not prevent Precision Pine from harvesting timber on the contracts at issue. To the contrary, by electing to continue the contracts, Precision Pine reaffirmed its contractual obligations, including the obligation to fully harvest all timber upon the contracts. See Cities Service Helex, 543 F.2d at 1313. Because Precision Pine was entitled (and indeed obligated) to harvest all timber on the contracts after the suspensions were lifted, it received the timber for which it had bargained.[4] Precision Pine's claim for lost profits must be reduced, at a minimum, by revenues that were

[4] As we explain above, Precision Pine retained a claim only for "partial breach."

actually earned by harvesting timber in the post-suspension period.[5] Failing to take into account post-suspension harvesting would place Precision Pine in a better position through litigation than through full performance of its contracts, because Precision Pine would obtain profits once by performing the contracts and a second time through this lawsuit. See generally DX796.

An analysis of the illustration quoted by the Court in its summary judgment decision clarifies the basic fallacy of Precision Pine's putative lost volume seller claim.

> A contracts to pave B's parking lot for $10,000. B repudiates the contract and A subsequently makes a contract to pave a similar parking lot for $10,000. A's business could have been expanded to do both jobs. Unless it is proved that he would not have undertaken both, A's damages are based on the net profit he would have made on the contract with B, without regard to the subsequent transaction.

Precision Pine & Timber, Inc. v. United States, 63 Fed. Cl. 122, 133 (2004) (quoting Restatement (Second) of Contracts § 347 illus. 16 ("Restatement § __")). If A is a lost volume seller, it could have performed both contracts, and the subsequent contract should have no effect upon damages claimed against B. A's damages are, therefore, net profits upon the contract with B. This action is not analogous to the example in illustration 16 because there is no subsequent contract. The United States has not argued that profits upon other timber sale contracts should offset damages in the post-suspension period. Other timber sale contracts would be analogous to the subsequent paving contract entered into by A. Rather, the United States argues that post-suspension profits earned upon the once-suspended contracts must be offset. These contracts are analogous to the

---

[5] As explained in greater detail below, Precision Pine should also be precluded from seeking damages based upon volumes that were not harvested. Precision Pine had a contractual obligation to harvest all timber under contract. Precision Pine should not be permitted to use its failure to harvest – in breach of its contractual duties – to increase its damages claims. Indeed, if Precision Pine had fully harvested the contracts, it would have earned more revenue from post-suspension operations than its claimed revenue during the MSO suspension. DX797.

original contract between A and B. Since Precision Pine actually earned profits upon these contracts after the suspension, it must, at a minimum, reduce its claimed damages by the amount of the post-suspension profits.[6] See, e.g., Hi-Shear Tech. Corp. v. United States, 356 F.2d 1372, 1382 (Fed. Cir. 2004) ("[T]he recovery of damages must not serve as a windfall to the non-breaching party.").

In addition, Precision Pine cannot establish as a factual matter that it is a lost volume seller. Precision Pine's lost volume seller claim is predicated upon the factual allegation that, but for the MSO suspension, Precision Pine would have harvested and processed all timber upon the suspended contracts during 1995 and 1996, and that it would have purchased, harvested, and processed a similar volume of Forest Service timber in 1997 and 1998. See Pl.'s Pretrial Br. at 16-17. However, in response to a July 2003 request for admission, Precision Pine admitted that it "did not forego bidding on Government timber sale contracts or forego any other opportunities to acquire additional timber for its mills as a result of the suspension of the contracts at issue." DX780 (request no. 10). Put simply, Precision Pine's admission that it did not forgo any opportunity to purchase additional timber as a result of the MSO suspensions is directly contrary

---

[6] To make the illustration analogous to this action, assume that after A contracts with a third party to pave its parking lot, B changes its mind and reinstates the contract with A. A as a volume seller can perform both contracts. In this situation, A's profits earned on the eventual performance of the contract with B must offset any claim for damages against B. Otherwise, A would get paid twice for its contract with B – once from the eventual performance, and once again when it sued. See DX796. Likewise, here, if Precision Pine's claimed damages are not reduced by post-suspension profits, Precision Pine would be paid twice – once when it earns profits by harvesting and processing the contracted-for timber, and once again through this action. Id. Neither the common law nor the lost volume seller concept authorizes such a double recovery. Bluebonnet Savings Bank, FSB v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003) ("the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach"); Hansen Bancorp, Inc. v. United States, 376 F.3d 1297, 1315 (Fed. Cir. 2004) ("Courts should avoid bestowing an 'unfair windfall' on the plaintiff by compensating him or her above and beyond the losses suffered under the breached agreement.").

to the predicate for its lost volume claim, i.e., that it would in fact have purchased additional quantities of timber in 1997 and 1998 had the MSO suspension not occurred.

Answers to requests for admission are binding judicial admissions. RCFC 36 ("Any matter admitted under this rule is conclusively established."); see also Reynolds v. Commissioner, 296 F.3d 607, 612 (7th Cir. 2002) ("When a party in a lawsuit makes an admission . . . in its answer to a request for admissions, it makes a judicial admission."). "It is well-settled that judicial admissions provide proof possessing the highest possible probative value, rendering the facts therein indisputable." SAI Indus. Corp. v. United States, 63 Fed. Cl. 1, 4 n.8 (2004) (citing E.C. McAfee A/C Bristol Metal Industries of Canada v. United States, 832 F.2d 152, 154 (Fed. Cir.1987)); see also Reynolds, 296 F.3d at 612 ("Judicial admissions . . . may not be controverted at trial or on appeal"). Because Precision Pine's admission is "indisputable," Precision Pine cannot establish that it would have purchased additional timber but for the MSO suspensions. As a result, Precision Pine cannot establish the factual predicate for its "lost volume seller" claim.[7]

**3. Even If Lumber Profits Were Potentially Recoverable, Precision Pine Cannot Make The Requisite Showing**

To recover lost profits, or indeed any damages, it is insufficient for the plaintiff simply to establish a contractual breach. See Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400 (2004) (awarding no damages upon plaintiff's $8.7 billion claim notwithstanding the Government's

---

[7] In ruling upon the United States' motion for summary judgment, the Court held that the question of whether subsequent transactions are substitutes for the breached contracts can present difficult factual issues. Precision Pine, 63 Fed. Cl. at 133 (quoting Restatement § 347 cmt. f). Precision Pine has identified no "subsequent transaction" that could potentially be a substitute for Precision Pine's timber sale contracts. See id. at 133. For this additional reason, Precision Pine cannot prevail upon its lost volume seller claim.

breach of a 50-year timber sale contract); Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97 (2004) (rejecting plaintiff's damages claims, including a claim for lost profits, where a breach had previously been established). Where a plaintiff seeks alleged lost profits, "it [first] must be 'definitely established' that without the government's breach there would have been a profit." Hi-Shear, 356 F.3d at 1379 (quoting California Fed. Bank v. United States, 245 F.3d 1342, 1349 (Fed. Cir. 2001)). In addition, the plaintiff must establish, by a preponderance of the evidence, that (1) the breach caused the lost of profits "'directly and primarily,' and 'inevitably and naturally, not possibly or probably;'" (2) the loss of profits was foreseeable as a probable result of the breach because it follows from the breach in the ordinary course of events, or as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know, and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty. Precision Pine & Timber, Inc. v. United States, ___ Fed. Cl. ___, 2005 WL 352547, at *2 (Feb. 14, 2005) (citing California Fed. Bank v. United States, 395 F.3d 1263, 1278-79 (Fed. Cir. 2005)); Energy Capital Corp. v. United States, 302 F.3d 1314, 1326 (Fed. Cir. 2002) (citing Chain Belt Co. v. United States, 127 Ct. Cl. 38, 58, 115 F. Supp. 701, 714 (1953)); Landmark Land Co. v. FDIC, 256 F.3d 1365, 1378 (Fed. Cir. 2001).

The starting point for the Court's analysis of Precision Pine's claims for lost profits is the nature of the breach in this action. Although Precision Pine's contracts were suspended for varying periods of time, the MSO suspensions did not prevent Precision Pine from harvesting the timber that it purchased. To the contrary, after the suspensions were lifted, Precision Pine elected to continue performance of the contracts and, accordingly, was able (and obligated) to harvest timber upon the once-suspended contracts. Thus, at most, the MSO suspensions delayed

the harvesting of timber.[8] Furthermore, this Court did not rule that the suspensions of Precision Pine's contracts were unauthorized; rather, the Court found that the length of the suspensions (as to 11 of the 14 contracts) was unreasonable and, thus, constituted a breach.[9] See Precision Pine, 50 Fed. Cl. at 70-71 ("the suspension should have not lasted much more than 135 days").

Precision Pine's 11 lost profits claims are deficient for numerous reasons. First, due to depressed prices for lumber products and Precision Pine's lack of an outlet for roundwood during the period of the MSO suspensions, many of Precision Pine's timber sale and multi-product contracts would not have been profitable to operate. Second, Precision Pine cannot establish that planned harvesting on any given contract was prevented by the MSO suspensions. Third, at the time of contracting, lost lumber profits were not foreseeable as the probable result of a contract's suspension. Fourth, Precision Pine's damage estimates are so badly flawed that they fail to provide reasonably certain estimates of lost profits. Fifth, if Precision Pine had fully harvested the contracts after the MSO suspensions were lifted (as it was contractually obligated to do), it would have earned more than the claimed lost revenues during period of the MSO suspensions.

---

[8] Precision Pine in fact harvested timber and/or roundwood from the O.D. Ridge, Kettle, Hay, Brookbank, Jersey Horse, Manaco, St. Joe, Hutch-Boondock, Mud, Brann and U-Bar sales after the suspension of the respective contracts was lifted. See, e.g., DX781; DX785-86; DX791; DX795.

[9] In its July 31, 2001 decision, the Court held that the suspension of Precision Pine's contracts was not a breach per se. Precision Pine, 50 Fed. Cl. at 70-72; accord Scott Timber, 333 F.3d 1358. Rather, the suspension was a breach only insofar as it lasted "much more than 135 days." Id. The discussion of "the suspension" of Precision Pine's contracts should be understood to refer only to that part of the suspension that constitutes a breach, i.e., that is in excess of 135 days. Accordingly, because the first 135 days of the suspension were not a breach of Precision Pine's contracts, Precision Pine must show that lost profits are the natural and inevitable result not merely of a suspension – but of a suspension in excess of 135 days.

DX797. Accordingly, for each of these reasons, the 11 claims for lost lumber profits asserted by Precision Pine in this action are properly rejected.

**a. Precision Pine's Brookbank, Jersey Horse, Kettle, Manaco, Monument, Mud, Saginaw-Kennedy, Salt and U-Bar Contracts Would Not Have Been Profitable During The MSO Suspensions**

Precision Pine would have been unable to earn a profit upon most of its timber and multi-product sale contracts during the MSO suspensions. During the period of the suspensions, market prices for lumber products were particularly low. DX776; see also DX271; DX570. Indeed, prices were markedly higher both before the suspensions in 1993 and 1994, and after the suspensions in 1997. DX776. Furthermore, during the MSO suspensions, Precision Pine had no outlet for roundwood. E.g., DX263; DX306; DX309; DX313; DX454; DX474-75; DX555. The unavailability of an outlet for roundwood during the suspensions adversely affected the profitability of Precision Pine's multi-product sale contracts because, in order to harvest sawtimber for its mills, Precision Pine was obligated to cut and remove the roundwood component at the same time. See, e.g., DX145; DX228; DX280; DX375. With no outlet for roundwood, Precision Pine would have incurred stumpage, harvesting and hauling costs, but would have earned no offsetting revenues from roundwood sales. Thus, during the MSO suspensions, the roundwood component of Precision Pine's multi-product sale contracts was a dead loss, not the break-even proposition Precision Pine had been hoping to achieve. This caused many of Precision Pine's contracts to be unprofitable during the suspensions.

According to analyses that Precision Pine itself conducted just over a month before the MSO suspensions, the Jersey Horse, Salt and U-Bar contracts were not profitable. DX523 (Jersey Horse) (as of July 17, 1995); DX526 (Salt) (as of July 17, 1995); DX535 (U-Bar) (as of July 17, 1995). Additionally, an analysis of Precision Pine's claims by former DCAA auditor,

Wayne G. Moosman, confirms that the Brookbank, Kettle and Saginaw-Kennedy multi-product sale contracts also were not profitable during the MSO suspensions. DX777 at 15 (showing negative contribution margins for the Brookbank, Jersey Horse, Kettle, Saginaw-Kennedy, Salt and U-Bar contracts). Moreover, Precision Pine's contemporaneous analyses and Mr. Moosman's analysis make no deductions for corporate overhead (i.e., they reflect gross profit or contribution margin figures – not net profit), and assume that the roundwood component of multi-product sales has neither a positive nor negative effect upon profitability. See DX521-527; DX530-539. When losses due to the unavailability of an outlet for Precision Pine's roundwood are taken into account, the Manaco, Monument and Mud contracts are likewise unprofitable. See DX521-527; DX530-539; DX777; DX792.

In sum, as a result of depressed lumber prices and Precision Pine's lack of a practical outlet for roundwood, the Brookbank, Jersey Horse, Kettle, Manaco, Monument, Mud, Saginaw-Kennedy, Salt and U-Bar timber and multi-product sale contracts were not profitable during the MSO suspensions. Consequently, Precision Pine's lost profits claims with respect to these contracts are not viable. See Hi-Shear, 356 F.3d at 1379 (the contract's profitability in the absence of the breach must be "definitely established" by the plaintiff); California Federal Bank v. United States, 395 F.3d 1263, 1368 (Fed. Cir. 2005) ("The inability to prove by a preponderance of the evidence that profits would have been made but for the breach will . . . preclude recovery on a lost profits theory.").

**b. Precision Pine Cannot Establish That Its Alleged Lost Profits Were Directly And Primarily Caused By The MSO Suspensions**

The Federal Circuit recently reaffirmed that the "but for" standard of causation applies in a breach of contract action. California Federal, 395 F.3d at 1368. Consequently, as this Court

explained, a breach must cause the alleged injury "directly and primarily." Precision Pine, 2005 WL 352547, at *2; see also Myerle, 33 Ct. Cl. at 27 ("There must not be two steps between cause and damage."). Further, the plaintiff must show that alleged lost profits resulted "inevitably and naturally, not possibly nor even probably" from the breach. California Federal, 395 F.3d at 1267 (quoting Myerle, 33 Ct. Cl. at 27); Precision Pine, 2005 WL 352547, at *2. And while the existence of "other factors operating in confluence with the breach" do "not necessarily preclude recovery," see California Federal, 395 F.2d at 1268, damages are unrecoverable if they are due to an intervening cause, see Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1071 (Fed. Cir. 2001) (holding that the plaintiff's "independent business decision" constituted an intervening cause that precluded damages); Myerle, 33 Ct. Cl. at 27 ("there must appear no intervening incident . . . to complicate or confuse the certainty of the result between the cause and the damage").

Here, as a threshold matter, Precision Pine must show that it would have harvested each of the contracts for which it seeks lost profits (i.e., the Brookbank, Hay, Jersey Horse, Kettle, Manaco, Monument, Mud, O.D. Ridge, Salt, Saginaw-Kennedy and U-Bar contracts) "but for" the MSO suspensions. California Federal, 395 F.3d at 1268; Precision Pine, 2005 WL 352547 at *2. Further, for each of these contracts, Precision Pine must establish that the loss of profits resulted "directly and primarily" from the unreasonable duration of the suspension. Precision Pine cannot meet this burden.

#### (1) Precision Pine Cannot Show What Contracts Would Have Been Harvested Had The MSO Suspensions Not Occurred

Precision Pine cannot show which timber sales, if any, would have been operated in 1995 and 1996 had the MSO suspensions not occurred. Precision Pine prepared no business plan,

scheduling plan, operating plan, or other document describing anticipated timber harvesting.[10] As a result, Precision Pine possesses no contemporaneous documents that describe company harvesting plans in 1995 and 1996. Moreover, Precision Pine's witnesses are unable to provide this information. Most notably, Precision Pine's president, who was solely responsible for selecting contracts to harvest, testified at his deposition that he could not identify what contracts Precision Pine would have harvested but for the MSO suspensions. Because Precision Pine cannot establish what timber sales would have been cut had the MSO suspensions not occurred, it cannot establish that the MSO suspensions were a "but for" cause of its alleged lost profits.

**(2) Any Lost Profits Suffered By Precision Pine Were Caused By Its Own Business Decisions – Not The Suspension Of Contracts**

Lost profits must result directly and primarily from the breach. Precision Pine, 2005 WL 352547, at *2. Losses due to intervening causes are unrecoverable. Hughes Communications, 271 F.3d at 1071; Myerle, 33 Ct. Cl. at 27 ("there must appear no intervening incident . . . to complicate or confuse the certainty of the result between the cause and the damage").

It is not disputed that market prices for lumber products were particularly low during the MSO suspensions in 1995 and 1996, and were markedly higher in 1997. As a result, when the MSO suspensions ended on December 4, 1996, Precision Pine was free to harvest timber and take advantage of the improved marketplace. Precision Pine did not do so. Indeed, Precision Pine harvested only 45 percent of the timber available under the contracts at issue during the post-suspension period (i.e., between December 1996 and July 2000). DX795; DX797.

---

[10] Precision Pine's purchaser representative, John Smith, provided the Forest Service an annual operating schedule in early 1995 as required by Precision Pine's timber sale contracts. However, Precision Pine does not rely upon its annual operating schedule, which conflicts with the *post hoc* schedule developed for this litigation.

Precision Pine attributes its failure to harvest after the MSO suspensions were lifted to its own "business decisions," as well as to the Forest Guardians suspension in June 1997, the closure of Stone Container Corporation's pulpmill in February 1998, and a fire at the Winslow mill in September 1998. See DX781; DX785-86; DX791. In sum, Precision Pine's failure to harvest its contracts to completion was the direct result of its business decisions and subsequent unforeseen events – not the MSO suspensions or the Forest Service. See Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002).

While Precision Pine was free to play the market once the MSO suspensions ended, the Forest Service did not become a guarantor of Precision Pine's profits. The fact that Precision Pine made poor decisions and suffered the consequences is not the fault of the Forest Service. See Seaboard, 308 F.3d at 1294 ("At most, the government's acts indirectly made performance of the . . . contract unprofitable. . . . Seaboard simply made a business decision not to harvest. Timber prices fell and Seaboard must bear this market risk"). Because Precision Pine's alleged loss of profits were directly and primarily caused by post-suspension events, including its own business decision not to harvest in a favorable market in 1997 – not by the MSO suspensions – its claims for lost profits should be rejected. Hughes Communications, 271 F.3d at 1071; Seaboard, 308 F.3d at 1294.

**c. The Loss Of Profits Resulting From A Suspension Was Not Contemplated By The Parties At The Time Of Contracting**

With respect to each contract, Precision Pine must establish that the loss of profits was legally foreseeable at the time of contracting. Landmark, 256 F.3d at 1378; see also Bohac v. Dept. of Agriculture, 239 F.3d 1334, 1340 (Fed. Cir. 2001); San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 960 (Fed. Cir. 1989); Chain Belt, 115 F. Supp. at 714. In

Chain Belt, the Court of Claims discussed the standard for legal foreseeability of lost profits as follows:

> It must . . . be established that loss of profits in the event of breach was within the contemplation of the contracting parties either (1) because the loss was natural and inevitable upon the breach so that the defaulting party may be presumed to have foreseen it; or (2) if the breach resulted in lost profits because of some special circumstances, those circumstances must have been known to the defaulting party at the time the contract was entered into.

127 Ct. Cl. at 58, 115 F. Supp. at 714 (emphasis added); accord Energy Capital Corp. v. United States, 47 Fed. Cl. 382, 396 (2000), aff'd in part, rev'd in part, 302 F.3d 1314 (Fed. Cir. 2002). More recently, the Federal Circuit explained that a loss is "foreseeable as a probable result of breach [if] it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." Landmark, 256 F.3d at 1378 (quoting Restatement § 351(2)). "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Id. (quoting Restatement § 351, cmt. a). Furthermore, where "several circumstances have contributed to a loss, the party in breach is not liable for it unless he had reason to foresee all of them." Restatement § 351 cmt. d.

With respect to legal foreseeability, the nature of the alleged breach is significant. As explained above, at most, Precision Pine timber sale contracts were delayed by the MSO suspensions. Once the suspension was lifted, the very same trees upon the very same contracts were available to Precision Pine. The time for performance was likewise unaffected because, in accordance with contract clause BT 8.21, contract terms were adjusted to give Precision Pine

additional time.[11] See Joint Stip. of Facts ¶ 34. Because there was no change in the timber being harvested and no change in the time available to harvest, no loss of profits would be expected as the probable result of delayed harvesting "in the ordinary course of events." Landmark, 256 F.3d at 1378. Furthermore, the Forest Service was aware of no "special circumstances" at the time of contracting. Consequently, lost profits were not within the contemplation of the contracting parties as the probable result of a suspension at the time of contracting. Precision Pine cannot, therefore, recover lost profits.

In its pretrial brief, Precision Pine seeks to muddy the waters. Precision Pine asserts that the Forest Service was aware that Precision Pine has sawmills, that Precision Pine informed the Forest Service that it was a "manufacturer," and that Precision Pine certified that it used Forest Service timber in its sawmills. Pl.'s Pretrial Br. at 10-13. Precision Pine misses the point. Performance of the timber sale contracts was merely delayed. As a result, after the suspension, Precision Pine had the opportunity to cut and remove the timber, produce lumber using its sawmills and planer, and sell the resulting lumber products. Precision Pine offers no reason why it was foreseeable (at the time of contracting) that the delay caused by a suspension would resulted in a loss of profits, as opposed to the mere deferral of profits. See id. Consequently, Precision Pine's lost profit claims should be rejected.

**d. Precision Pine Cannot Establish Lost Profits With Reasonable Certainty**

Precision Pine contends that but for the MSO suspensions it would have harvested timber, would have processed the resulting logs in its sawmills and then in its planer mill to produce various lumber products, and would have sold these lumber products at a handsome

[11] The length of the contract term enlargement granted pursuant to BT 8.21 is the same as the time lost as a result of the contract suspension. Joint Stip. ¶ 34.

profit.[12] Precision Pine's expert, Robert Ness, developed a "model" upon which Precision Pine bases its calculation of alleged lost gross profits. See DX792. Mr. Ness has testified that his model describes what Precision Pine could have done during the MSO suspensions – not what it actually would have done "but for" the suspensions. Indeed, according to Mr. Ness, Precision Pine probably would not have followed the harvesting and manufacturing schedules that he used as the underpinnings of his model. Furthermore, as explained below, Mr. Ness's model uses inaccurate and unverified data, employs faulty assumptions, seeks damages that have already been rejected by Court rulings, and is based upon invalid methodologies. As a result, Mr. Ness has not provided a valid "but for" damages model for use in this action. See California Federal, 395 F.3d at 1268 (affirming the "but for" requirement for causation).

First, the volume of logs that Mr. Ness assumes that Precision Pine would have harvested during and after the MSO suspension is unrealistic. Mr. Ness assumes a volume substantially higher than Precision Pine had harvested and processed in previous years. See DX792. Furthermore, Mr. Ness disregards the industry's continuing decline in Southwest, the effect of continuing reductions in the volume of timber being offered for sale during the 1990's, and Precision Pine's admission that it did not forego any opportunity to purchase timber due to the MSO suspension.

---

[12] In its claim, Precision Pine asserts that it would have produced 11 kinds of finished lumber products from the sales at issue: (1) Moulding & Better; (2) 5/4" #1 Shop; (3) 5/4" #2 Shop; (4) 5/4" #3 Shop; (5) Paragraph 99 Redress; (6) 5/4" x RWL Radius Edge; (7) #2, #3, #4 & Better; (8) #3 Common Utility; (9) #4 Common Economy; (10) #5 Common; and (11) Miscellaneous Shop Outs. App. 85-87. In addition, for each timber sale, Precision Pine identifies the percentage of each of these lumber products that it purportedly would have manufactured. Id.

Second, the harvesting and processing schedules that Mr. Ness uses are unsupported and unrealistic. Mr. Ness adopts a harvesting schedule that was supplied by counsel and that he never independently verified. See DX792. The schedule is unrealistic on its face. For instance, among other things, Mr. Ness's schedule projects operations outside the normal operating season, contains harvesting during periods of fire closure, and is significantly different from the annual operating schedule that Precision Pine supplied to the Forest Service for 1995. See, e.g., DX118; DX224; DX294; DX792. In addition, Mr. Ness's schedule would result in a dramatic increase in log inventories. DX792. Not only does this increase in inventories run contrary to Precision Pine's historical practices, it would be unfeasible due to the strain upon company cash flows that would result. See DX777; DX778.

Third, Mr. Ness uses an inflated "overrun factor" in his damages calculations.[13] The effect of the inflated overrun factor is to increase the total volume of lumber products that Precision Pine would supposedly have produced from Forest Service timber, which, in turn, increases gross profits supposedly lost as a result of the suspensions. Mr. Ness performed no independent analysis to determine an appropriate overrun factor to use for Precision Pine's sawmills. Instead, Mr. Ness adopted the 1.25 overrun factor provided by plaintiff's counsel in this action. An overrun factor of 1.25 is unsupported. The overrun factor that Precision Pine used for its own profit projections in July 1995 was substantially lower. See, e.g., DX521-27 (July 17, 1995) (using a 1.10 overrun factor). Moreover, according to Precision Pine's own

[13] For a variety of reasons, including the skill of the sawyer, the efficiency of sawmill equipment, the size and quality of logs being milled, and the types of lumber products being produced, the volume of lumber in mbf (known as "lumber tally") produced by a given sawmill commonly exceeds the volume of logs in mbf (known as "log scale") used by the sawmill. The ratio of the volume of lumber (in mbf (l.t.)) to the volume of logs used to produce that lumber (in mbf (l.s.)) is commonly referred as the "overrun factor."

contemporaneous analysis, the actual overrun factor achieved at the Winslow sawmill during 1995 and 1996 was 1.08. DX547. While Precision Pine has retained an expert to attempt to justify a higher overrun factor, Precision Pine's expert bases his conclusions upon a single page extracted from a large private mill study. See DX793. The extracted page provides no details about the mills studied and, thus, it cannot be determined if any of the studied mills are comparable to Precision Pine's mills. See id. Moreover, because Precision Pine has refused to produce a complete copy of the mill study relied upon by its expert, the conclusions of Precision Pine's expert should be held inadmissible. See RCFC 26(a)(2).[14]

Fourth, the lumber prices used in Mr. Ness's report to generate projected gross profits are unsupported and overstated. Mr. Ness did not independently analyze Precision Pine's sales records and invoices to generate lumber price estimates during the MSO suspensions. Rather, he adopts lumber sale prices supplied by counsel. Mr. Ness acknowledges that a weighted average of invoice prices should have been – but was not – used to determine lumber sale prices. Additionally, Mr. Ness acknowledges that invoices concerning certain categories of lumber products were simply dropped from the pricing analysis. The overall effect of the plaintiff's faulty analysis of sales invoices is to (1) overstate lumber prices, and (2) to inflate the gross profits claimed as damages by nearly $650,000. DX776.

Fifth, the "product mix" used by Mr. Ness is unsupported and skewed toward high-value products. In calculating gross profits for each timber sale contract, Mr. Ness must first establish the volume of each type of lumber product (i.e., the “product mix”) that would have been derived

[14] In the alternative, if this evidence is admitted by the Court, it should be accorded no weight.

from timber from the contract.[15] In arriving at a product mix, Mr. Ness does no independent analysis. Rather, once again, he adopts figures supplied by counsel. The product mix used by Mr. Ness, when compared against industry data, is biased toward high value lumber products. DX775; DX778. This bias has the effect of inflating Precision Pine's alleged gross profits. Moreover, the methodology used in arriving at product mix estimates is unsound.[16] DX775.

Deficiencies with Mr. Ness's calculation of an offset for post-suspension profits are similarly pervasive. See DX795. While Mr. Ness did develop his own lumber price estimates for the post-suspension period, he accepted without analysis alleged increases in logging and hauling costs, an alleged overrun factor, and the alleged product mixes. Further, Mr. Ness attempts to increase Precision Pine's damages by reducing post-suspension profits in various illegitimate ways. For instance, Mr. Ness deducts default damages that he expects to be assessed by this Court in Precision Pine & Timber, Inc. v. United States, No. 02-131 (Fed. Cl.). DX795. Mr. Ness provides no explanation for this deduction of nearly $1 million from Precision Pine's total post-suspension profits. And Precision Pine has no good faith basis for a belated and

---

[15] Numerous factors affect the mix of lumber products derived from the harvest of a timber sale. These factors include, but are not limited to, the species of trees harvested, tree size (usually expressed as the average dbh), tree quality (often expressed in terms of "percent grade"), and the skill of the sawyer.

[16] According to Precision Pine, the product mix used by Mr. Ness was generated by company president Lorin Porter. DX784 (interrog. no. 41). Although Mr. Porter's product mix estimates plainly constitute expert testimony, Precision Pine has neither identified Mr. Porter as an expert, nor provided a report, workpapers and other backup documentation supporting his estimates. See Fed. R. Evid. 701. Furthermore, Mr. Porter has been unable to describe and support the methodology used to derive his product mix estimates. Therefore, Precision Pine's product mix estimates should be held inadmissible or, in the alternative, accorded no weight and not relied upon. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993), Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1391 (Fed. Cir. 2003).

surreptitious attempt to recoup in this action default damages awarded pursuant to this Court's summary judgment ruling in Case No. 02-131. See Precision Pine, 62 Fed. Cl at 656 (granting the United States' motion for summary judgment). Similarly, Mr. Ness seeks to use supposed increases in logging and hauling costs in the post-suspension period to reduce post-suspension profits. DX795. The Court has granted summary judgment in favor of the United States upon Precision Pine's claims for increased logging costs upon the O.D. Ridge and Hay sales. Precision Pine, 63 Fed. Cl. at 135-36 (rejecting Precision Pine's claims for increased logging costs). And with the exception of a pending claim for hauling costs upon the Hay contract, see section III.C., infra, Precision Pine has asserted no other increased logging or hauling cost claims in this action. See Pl.'s Pretrial Br. at 47-52; DX792. Mr. Ness's attempt to interject such claims into the case at this late date is improper.[17] Mr. Ness also reduces post-suspension profits by supposed increases in manufacturing costs, while at the same time asserting a stand-alone claim for increased manufacturing costs. DX792; DX795. Mr. Ness is seeking to recover the same alleged costs twice. See id. This is improper. E.g., Hi-Shear, 356 F.2d at 1382 ("[T]he recovery of damages must not serve as a windfall to the non-breaching party."). Lastly, Mr. Ness bases Precision Pine's lost profits claims upon "gross profits" – as opposed to net profits – from the sale of lumber products. This is not the correct measure of damages. DX776; see also Precision Pine, 63 Fed. Cl. at 133 (if Precision Pine prevails upon its lost volume seller claim it is entitled to "net profits").

---

[17] Additional claims for increased logging and hauling costs were not included in Precision Pine's claim letters. See DX23; DX52; DX123; DX144; DX173; DX207; DX236; DX281; DX316; DX340; DX393; DX432; DX452. As a result, the Court lacks jurisdiction to entertain such claims. See section III.C.1., infra.

These, among other deficiencies in Precision Pine's lost profits calculations, are so serious and all-encompassing that Precision Pine has failed to provide a fair or reasonable estimate of damages.

**e. The MSO Suspensions Did Not Cause Precision Pine To Suffer A Loss Of Profits**

Precision Pine's own damages calculations confirm that the company did not suffer a loss of profits as a result of the MSO suspensions. Precision Pine cut approximately 45 percent of the timber available pursuant to its Forest Service contracts in the post-suspension period. See DX795; DX797. Using the calculations of Precision Pine's own expert, the net revenue earned from Precision Pine's actual post-suspension harvesting exceeds the net revenue claimed for harvesting the same timber during the period of the MSO suspensions. DX797. Moreover, if Mr. Ness's post-suspension harvesting credit is applied in order to give full credit for harvested and unharvested Ponderosa Pine volumes on the timber sales at issue, the net revenue during the post-suspension period exceeds the net revenue Precision Pine claims it would have achieved during the MSO suspensions. Id. Thus, Precision Pine was better off as a result of the MSO suspensions. See Precision Pine, 50 Fed. Cl. at 73 (suggesting that the MSO suspensions may have been "a felix culpa" as the breach may actually have benefitted Precision Pine).

This approach to analyzing damages is well-justified. Precision Pine's failure to fully harvest the contracts in 1997 and thereafter was a business decision. This business decision is an intervening cause that bars Precision Pine's lost profits claim. See Hughes Communications, 271 F.3d at 1071; Seaboard, 308 F.3d at 1294. Moreover, Precision Pine elected to continue the contracts after the MSO suspensions were lifted. Precision Pine, 62 Fed. Cl. at 656. As a result, Precision Pine reaffirmed its contractual obligations, including the obligation to fully harvest all

timber upon the contracts. See Cities Service Helex, 543 F.2d at 1313. Ultimately, Precision Pine defaulted upon the Brann, Brookbank, Hutch-Boondock, Jersey Horse, Manaco, Monument, O.D. Ridge, Saginaw-Kennedy, Salt and U-Bar contracts without harvesting all timber and roundwood as required by the contracts. See Precision Pine, 62 Fed. Cl. at 648; DX570. Precision Pine should not be allowed to benefit by its own default. Precision Pine should be barred from claiming increased damages based upon the breach of its contractual obligation to complete the harvesting of timber and roundwood. Put differently, because Precision Pine was obligated to fully harvest the contracts, and because Precision Pine could have earned more that its claimed damages by fulfilling this obligation during the post-suspension period, Precision Pine's lost profits claim should be rejected.

**B. Precision Pine Is Not Entitled To Recover Alleged Sawmill Inefficiency Costs**

Precision Pine asserts a common law breach claim for sawmill inefficiency costs.[18] Pl.'s Pretrial Br. at 26-30, 52-53. According to Precision Pine, it incurred such costs because its mills were less efficient during the MSO suspensions than they would have been with a steady supply of logs. Id. at 52; DX792 at 12.

Precision Pine's sawmill inefficiency costs are calculated by Mr. Ness. See DX792. In calculating these costs, Mr. Ness first purports to calculate baseline sawmill costs on a per mbf basis during a 17-month period prior to the MSO suspensions. Id. (exhibit 10). Mr. Ness next purports to calculate actual per mbf sawmill costs during the period of the suspensions. Id. (exhibit 15). Mr. Ness makes no attempt to attribute inefficiency costs to individual contracts or

[18] As explained above, Mr. Ness also incorporates increased sawmill costs into his calculation of post-suspension profits. In so doing, Mr. Ness seeks a double recovery of alleged sawmill costs – once as a part of plaintiff's lost profits claims, and a second time in plaintiff's stand-alone sawmill inefficiency claim. This is inappropriate.

to the part of the MSO suspensions that the Court found to constitute a breach (i.e., the part exceeding 135 days) . Nor does Mr. Ness take into account inventories that provided Precision Pine a "steady supply" of logs during much of the period of the suspensions. Instead, Mr. Ness simply assumes the entire difference in costs is properly attributable to the MSO suspensions. In this way, Mr. Ness's calculations resemble the disfavored "total cost" approach in the construction context. See, e.g., Cavalier Clothes, Inc. v. United States, 51 Fed. Cl. 399, 417 (2001) (the total cost method is "highly disfavored" and should be used only as "a theory of last resort").

### 1. Precision Pine Cannot Establish What Increased Sawmill Costs Were Directly and Primarily Caused By A Breach Of Contract

In an action for breach of contract, the plaintiff must establish that damages resulted from the contract's breach "'directly and primarily,' and 'inevitably and naturally, not possibly or probably.'" Precision Pine, 2005 WL 352547, at *2 (citing California Federal, 395 F.3d 1263); see also Hughes Communications, 271 F.3d at 1071; Myerle, 33 Ct. Cl. at 27. In Precision Pine's "increased manufacturing costs" claim, Mr. Ness allocates alleged inefficiency costs to Precision Pine's milling and planing facilities as follows: (1) Eagar sawmill: $107,047.47; (2) Heber sawmill: $17,931.93; (3) Winslow sawmill: $56,131.40; and (4) Winslow planer: $199,600.31. DX792 (exhibit 1). Mr. Ness fails to attribute these inefficiency costs to specific contracts. Not only were two of the suspended contracts not breached by the Forest Service, Precision Pine released its claims on five contracts. Precision Pine, 50 Fed. Cl. at 70-71; DX239; DX285; DX319; DX343; DX436. Additionally, Mr. Ness fails to allocate inefficiency costs between the first 135 days of the MSO suspensions (which were not a breach) and the remainder of the suspensions (which the Court concluded were a breach). As a result,

Precision Pine cannot establish that alleged increases in sawmill costs was caused "directly and primarily" by breaches of the timber and multi-product sale contracts at issue.[19]

In addition, Precision Pine had no long-term plan for operating its sawmills. DX781; DX784 (interrog. no. 9). According to Precision Pine, it determined the level at which its sawmills would be operated 30 days in advance. Id. (stating that the company's "goal" reports merely "forecast" the level of production at its mills for the next month). Consequently, even if sawmill costs could potentially be recovered, Precision Pine has no valid baseline against which to measure alleged “lost efficiency.” Put differently, having no planned volume of production at its sawmills, Precision Pine cannot show that operations were affected by any changes in the supply of logs that resulted from the MSO suspensions.

**2. Sawmill Inefficiency Costs Were Not Legally Foreseeable**

In common law breach of contract actions, absent knowledge of "special circumstances" communicated at the time of contracting, only losses that result from the breach in the ordinary course of events are recoverable. E.g., Landmark, 256 F.3d at 1378. In other words, "remote and consequential damages are not recoverable in a common law suit for breach of contract." Wells Fargo, 88 F.3d at 1021 (quoting Northern Helex Co. v. United States, 207 Ct. Cl. 862, 524 F.2d 707, 713, 720 (1975), cert. denied, 429 U.S. 866 (1976)); accord Scott Timber, 333 F.3d at 1372.

Sawmill inefficiency costs do not result "in the ordinary course" from a suspension (even a lengthy suspension) of a timber sale contract. This is because timber is a largely fungible

[19] Moreover, even if such indirect effects could be traced back to a breach of one or more of Precision Pine's contracts, they would not be recoverable under the common law. See Scott Timber, 333 F.3d at 1372 (holding that increases in sawmill costs are not the direct result of the suspension of a timber cutting contract).

commodity, and mill operators such as Precision Pine ordinarily obtain timber from many different sources through many different contracts. Only in "special circumstances" where it is known at the time of contracting that a particular contract will be essential to the operation of a particular mill at a particular time would mill inefficiency costs be potentially foreseeable as the result of a suspension. And even in such an unusual situation, no effect upon mill operations would be foreseeable unless there was no other timber available as a substitute, i.e., it was not possible to "cover." See Restatement § 351 cmt. d (explaining that the inability to obtain cover must itself be foreseeable at the time of contracting). Here, at the various times of contracting, Precision Pine informed the Forest Service of no such special circumstances concerning the contracts at issue. As a result, the claimed sawmill inefficiency costs are not legally foreseeable.

This conclusion is confirmed by Scott Timber. In Scott Timber, the Federal Circuit found that a claimed increase in sawmill costs due to the inability to perform a timber cutting contract is consequential and remote. Scott Timber, 333 F.3d at 1372 (holding, in addressing a claim for reimbursement under CT 6.01, that increased sawmill costs allegedly due to the suspension of timber sale contracts are "remote and speculative . . . and therefore not recoverable").[20] Precision Pine's claim that its sawmill and planing operations were less efficient because its mills were deprived of "a steady supply of logs" by the MSO suspensions falls squarely into this category. Indeed, Precision Pine's claim for increased mill costs depends upon myriad factors many of which could not possibly be known (and certainly were not communicated to the Forest Service) at the time of contracting. Such factors include: the availability of timber from other timber

[20] Damages that are "remote" for purposes of CT 6.01 are likewise "remote" under the common law. See Scott Timber, 333 F.3d at 1372 (citing common law damages cases as support for its conclusion).

contracts to be processed at the sawmill; the rate at which logs are being used at the sawmill; the log inventory maintained at the sawmill; and the availability of replacement timber from state lands, Indian lands and private lands. Accordingly, Precision Pine's mill cost claims are legally remote and unrecoverable under the common law.

### 3. Precision Pine's Damages Calculations Are Flawed

Timber and sawmill operations in the southwestern United States are cyclical. Sawmill operations are typically slower during the winter and early spring. Indeed, Precision Pine frequently closed sawmills during this period due to a lack of logs or for scheduled mill maintenance. See DX781 (interrog. no. 22). Operations then generally pick up during the summer and into the fall. Mr. Ness used a 17-month baseline (April 1994 – August 1995) that covered much of two operating seasons. He compared that baseline to a 19-month period (September 1995 – March 1997) that included two winters. Thus, it is hardly surprising that this skewed analysis showed some increase in costs.

Furthermore, as noted above, Mr. Ness's calculations failed to attribute sawmill inefficiencies to the breach of specific contracts by the Forest Service. Two contracts were suspended by the Forest Service, but were not breached. Additionally, Precision Pine executed releases of "any and all liability" resulting from suspension of the Brann, Hutch-Boondock, Monument, Mud and Saginaw-Kennedy contracts. See section II, supra. Plainly, Precision Pine cannot recover any sawmill inefficiencies caused by the suspension of these contracts. However, due to the total cost methodology used by Mr. Ness to calculate sawmill inefficiency damages, it is impossible to distinguish among inefficiencies caused by (i) the suspension of contracts that

were not breached, (ii) contracts where releases were executed, and (iii) other contracts suspended by the Forest Service.[21]

Similarly, Precision Pine's efficiency during the MSO suspension was affected by its decision to default upon the Park timber sale. DX699. Precision Pine was awarded the Park timber sale by the State of Arizona. In October 1996, Precision Pine chose to default upon the Park sale, which affected the supply of timber available to mills during the period of the MSO suspension. See DX699; DX705. Mr. Ness does not acknowledge this default, or make any effort to account for the effect of Precision Pine's default upon the Park sale upon sawmill efficiencies.

Finally, Mr. Ness fails to offset inefficiency costs with efficiency benefits that Precision Pine obtained as a result of the suspensions. It is established that Precision Pine did not forego any opportunities to obtain timber for its sawmills as a result of the MSO suspensions. DX780 (request no. 10). Consequently, the MSO suspensions did not effect the sum total of timber that Precision Pine had available for its sawmills. Precision Pine argues that its mills were less efficient because they processed a smaller volume of timber during the MSO suspension. However, the converse should be equally true. Because Precision Pine processed less timber during the MSO suspension, it had more timber available in the post-suspension period and its sawmills should have experienced efficiency gains from the "steady supply" of timber available during this period. Mr. Ness's total cost claim fails to quantify or credit any post-suspension gains in sawmill efficiency.

---

[21] Likewise, Mr. Ness's methodology makes it impossible to distinguish between inefficiencies resulting from the first 135 days of a suspension, which was not a breach, and inefficiencies resulting from the remainder of the suspension. See DX792.

Mr. Ness has failed to provide a fair or reasonable estimate of any sawmill inefficiency damages and Precision Pine's claim for such damages should, therefore, be denied.

### C. Precision Pine's Claim For Increased Log Hauling Costs Should Be Denied

Precision Pine seeks increased log hauling costs in connection with the Hay contract under the common law. Pl.'s Pretrial Br. at 47-52. This claim should be dismissed for lack of jurisdiction or, in the alternative, rejected on the merits.

#### 1. The Court Lacks Jurisdiction To Entertain Precision Pine's Increased Log Hauling Cost Claim

The Court does not possess jurisdiction to entertain Precision Pine's claim for increased hauling costs upon the Hay contract.

In order to maintain an action pursuant to the CDA, a plaintiff must first certify and submit its claims to a contracting officer for a final decision. See 41 U.S.C. § 605(a). Upon obtaining the contracting officer's final decision, see 41 U.S.C. §§ 605, 609(a)(1), an action challenging the decision may be filed in this Court. See 41 U.S.C. § 609(a)(3). Such an action, however, "may not raise any new claims not presented and certified to the contracting officer." Croman Corp. v. United States, 44 Fed. Cl. 796, 800 (1999) (quoting Sante Fe Engineers, Inc. v. United States, 818 F.2d 856, 858 (Fed. Cir. 1987)); see also Contract Cleaning Maintenance, Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987) (it is a jurisdictional requirement that the contractor "submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim."). Indeed, "[i]t would subvert the statutory purpose of requiring contractors first to submit their claims to the contracting officer if plaintiffs were allowed first to submit a claim based on an unexamined

factual premise and then permitted later to . . . set forth an altered factual basis for a claim before this court." Croman, 44 Fed. Cl. at 802.

On November 10, 1997, Precision Pine submitted a claim concerning the Forest Service's suspension of the Hay contract from August 25, 1995 to December 4, 1996.[22] DX101. Precision Pine asserted claims for various alleged damages. DX101 (page HAY1190) (asserting claims for, among other things, lost market opportunity, interest on deposits, and idle equipment costs). However, Precision Pine's claim letter does not mention, much less seek compensation for, an increase in log hauling costs. To the contrary, in its summary of claims for the Hay contract, Precision Pine expressly disclaims any claim for increased delivered log costs – a category that would include any claim for increased log hauling expenses. Id. (stating that "increased DLC" are "n/a").

Precision Pine has failed to submit "a clear and unequivocal statement that put the contracting officer on sufficient notice of the basis [of the increased log hauling cost] claim currently before the court." Croman, 44 Fed. Cl. at 801 (citing Contract Cleaning, 811 F.2d at 592). The Court is, therefore, without jurisdiction to entertain the increased log hauling cost claim in this action.

---

[22] Precision Pine did not assert claims for increased hauling costs in connection with any of the other suspended contracts. See DX23; DX52; DX123; DX144; DX173; DX207; DX236; DX281; DX316; DX340; DX393; DX432; DX452. However, Precision Pine's expert, Robert Ness, includes increased logging and hauling costs in his supplemental expert report on post-suspension harvesting. At his deposition, Mr. Ness stated that the alleged increase in logging and hauling costs in his supplemental report were not based upon his own analysis, but rather, were supplied by counsel for Precision Pine. The United States will address this issue during the course of trial.

### 2. Precision Pine's Increased Log Hauling Costs Claim Is Without Merit

Precision Pine's consequential damages claim for increased log hauling costs also fails on the merits. First, increased log hauling costs were not foreseeable at the time of contracting as the probable result of the contract's suspension. See Landmark, 256 F.3d at 1378. Second, the Hay contract's suspension did not cause an increase in log hauling "'directly and primarily,' and 'inevitable and naturally.'" See Precision Pine, 2005 WL 352547, at *2 (quoting California Federal, 395 F.2d 1263).

Consequential damages are recoverable only if they were legally foreseeable at the time of contracting.[23] Bighorn Lumber Co. v. United States, 49 Fed. Cl. 768, 773 (2001) (citing Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145 (1854)). Damages are legally foreseeable only if they "follow from breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." E.g., Landmark, 256 F.3d at 1378. An increase in log hauling costs does not follow from the suspension of a timber contract in the ordinary course of events. Indeed, Precision Pine claims increased hauling costs in connection with only one of the 14 contracts at issue.[24] See DX792 (exhibit 3). Consequently, Precision Pine's log hauling costs claim is legally foreseeable

[23] In its decision, the Court suggested that "[t]here may be . . . valid reason to assess foreseeability at the time of the breach rather than at the time of the agreement." Precision Pine, 63 Fed. Cl. at 130 (citing Gardner Displays Co. v. United States, 171 Ct. Cl. 497, 505, 346 F.2d 585, 589 (1965)). The law in this circuit is both settled and clear: the foreseeability of alleged consequential damages is assessed "at the time of contracting." Bohac, 239 F.3d at 1340 ("The concept of 'consequential damages' in contract law relates to the concept of foreseeability at the time the contract is executed, not, as the petitioner would have it, foreseeability at the time of the breach"); see also California Federal, 395 F.3d at 1267; Hughes Communications, 271 F.3d at 1066; Chain Belt, 127 Ct. Cl. at 59, 115 F. Supp. at 714.

[24] While Precision Pine also asserted a claim for increased hauling costs in connection with the O.D. Ridge sale, that claim was withdrawn in November 2003. See DX792 (exhibit 3).

only if, at the time of contracting, the Forest Service was aware of "special circumstances." Landmark, 256 F.3d at 1378.

Precision Pine's increased log hauling cost claim is premised upon the fact that timber from the Hay sale was to be hauled to Precision Pine's sawmill in Eagar, Arizona. However, Precision Pine did not apprise the Forest Service of this fact or any other "special circumstances" at the time of contracting. This is hardly surprising. The Hay sale was awarded in January 1990 to Reidhead Lumber Company – not Precision Pine.[25] Joint Stip. ¶ 24. This was more than three years before Precision Pine opened a sawmill in Eagar. See Joint Stip. ¶ 6. Indeed, it was not until April 1994, over four years after the contract award, that Precision Pine first informed the Forest Service that it intended to haul timber from the Hay sale to Eagar. DX76. Put simply, at the time of contracting, Precision Pine itself did not anticipate hauling timber from the Hay sale to its Eagar mill because (i) it was not awarded the contract and (ii) the Eagar mill did not exist. Thus, Precision Pine's increased hauling costs, which allegedly resulted from the closure of Precision Pine's Eagar mill, were not foreseeable at the time of contracting.

Additionally, Precision Pine kept key employees from the Eagar sawmill on salary during the suspension. See DX788. As a result, it was capable of promptly reopening the mill. Precision Pine elected to wait until January 1997 to reopen its mill in Eagar. E.g., DX96-97 (requesting that the Forest Service provide scaling for logs from the Hay sale in Eagar). Additionally, Precision Pine elected to haul some logs from the Hay sale to Winslow even after the Eagar mill reopened. See DX96. As a result, the cost of hauling logs from the Hay sale to

[25] On June 24, 1991, the Hay sale was transferred to Precision Pine. Joint Stip. ¶ 25.

Winslow (and later to Heber) was the direct result of Precision Pine's business decisions – not the MSO suspension. See Hughes Communications, 271 F.3d at 1071; Myerle, 33 Ct. Cl. at 27.

## IV. Precision Pine's Claims For Compensation Pursuant To CT 6.01

In addition to its common law damages claims, Precision Pine seeks recovery pursuant to contract clause CT 6.01. See Pl.'s Pretrial Br. at 54 & 56 n.25. As explained above, clause CT 6.01 is an alternative avenue of recovery. Consequently, with respect to each contract, Precision Pine must elect to recover either pursuant to the contract or for breach of the contract. It cannot do both. E.g., Petrofky v. United States, 203 Ct. Cl. 347, 488 F.2d 1394, 1404 (1973) ("it is generally the rule that restitution and a suit for damages are alternative remedies"); Alaska Pulp Corp., 59 Fed. Cl. at 402 (explaining that damages based upon "theories of expectancy, . . . reliance, and restitution" are "alternative measures").

The starting point for the analysis of Precision Pine's CT 6.01 claims is the provision's "plain language." E.g., M.A. Mortenson Co. v. Brownlee, 363 F.3d 1203, 1206 (Fed. Cir. 2004) ("we begin by examining the plain language of the contract"). CT 6.01 provides, in pertinent part:

> Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer. . . .
>
> Purchaser agrees that in the event of interruption or delay of operations [exceeding 30 days during the Normal Operating Season], that its sole and exclusive remedy shall be: . . . Contract Term Adjustment pursuant to BT8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, replacement cost of timber, or any other anticipatory losses suffered by Purchaser. Purchaser agrees to provide receipts or other documentation to the Contracting Officer which clearly identify and verify actual expenditures.

E.g., DX1 (emphasis added). Put simply, only "out-of-pocket expenses" that result directly from an interruption or delay of timber harvesting operations are recoverable. Id. In addition, out-of-pocket expenses must be shown by receipts or other documents that clearly verify "actual expenditures." Id.

In its pretrial brief, pursuant to CT 6.01, Precision Pine seeks payment for time allegedly spent by its employees preparing claim letters, as well as for snow removal costs, log transfer costs, interest, and "overhead and profit." Pl.'s Pretrial Mem. at 54 & 56 n.25; see also DX792. None of these costs result directly from an interruption of timber harvesting operations. Consequently, reimbursement pursuant to CT 6.01 is unavailable.[26]

### A. Precision Pine's Claims For The Costs It Allegedly Incurred In Preparing Claim Letters Should Be Denied

Precision Pine's claim for claim preparation costs pursuant to CT 6.01 should be denied because the Court is without jurisdiction to entertain this claim, and because Precision Pine cannot meet the substantive and evidentiary requirements of CT 6.01.

[26] Precision Pine also asserts claims for bonding costs and "move out" costs. Pl.'s Pretrial Br. at 56 n.25; DX792 (exhibit 2). The United States does not contest Precision Pine's claims for reimbursement of bond costs actually incurred upon the Brookbank, Jersey Horse, Kettle, Manaco, O.D. Ridge, Salt, and U-Bar contracts. Nor does the United States contest Precision Pine's claim for reimbursement for move out costs upon the Brookbank contract. In the aggregate, costs totaling $14,952.45 are reimbursable pursuant to CT 6.01. See id. The Forest Service previously paid Precision Pine $16,278.85. Id. Thus, Precision Pine has been overpaid by $1,326.40.

### 1. The Court Lacks Jurisdiction To Entertain Precision Pine's Claim Preparation Costs Claim

As explained above, in order to maintain an action pursuant to the CDA, a plaintiff must certify and submit its claims to a contracting officer for a final decision. See 41 U.S.C. § 605(a). Upon obtaining the contracting officer's final decision, an action challenging the decision may be filed in this Court. See 41 U.S.C. § 609(a)(3). Only claims that were previously certified to the contracting officer may be raised. Croman, 44 Fed. Cl. at 800 (an action "may not raise any new claims not presented and certified to the contracting officer"); Santa Fe Engineers, Inc. v. United States, 818 F.2d 856, 858 (Fed. Cir. 1987); Contract Cleaning Maintenance, 811 F.2d at 592.

Each of Precision Pine's claim letters contains a claim for "attorney fees," which is contained in a standard section that reads in pertinent part:

> As a result of the suspension, we were also forced to incur substantial legal expenses in part because when we inquired of the Forest Service how the Forest Service was going to "pay us for the cost we incurred" as a result of the delay (as the Acting Chief said would happen) we were simply advised to submit claims. Given the extent, length and implications of the suspensions to the operations of our company, preparing any such claims mandated that we hire specialized counsel. . . . For this reason, we have included and are entitled to the attorney's fees that we have incurred as a result of the suspension.

E.g., DX23 (page ODR457) (emphasis added).[27] Precision Pine does not assert that company employees were involved in claim preparation, much less certify a claim for reimbursement of any time that its employees expended. Id. Consequently, Precision Pine failed to submit "a clear and unequivocal statement that put the contracting officer on sufficient notice of the basis for the claim currently before the court." Croman, 44 Fed. Cl. at 801 (citing Contract Cleaning, 811

[27] The Court ruled upon and rejected Precision Pine's claims for attorney fees. Precision Pine, 63 Fed. Cl. 122, 139-41 (2004).

F.2d at 592). As a result, the Court is without jurisdiction to entertain Precision Pine's claim for compensation for time its employees allegedly spent assisting with the preparation of claim letters.

**2. Precision Pine's Claim For Employee Claim Preparation Costs Is Not Recoverable Under CT 6.01**

Claim preparation costs – like attorney fees – are not ordinarily recoverable by a plaintiff. E.g., Singer Co. v. United States, 215 Ct. Cl. 281, 568 F.2d 695, 721 (1977); Wilner v. United States, 23 Cl. Ct. 241, 261 (1991); Gulf Contracting, Inc. v. United States, 23 Cl. Ct. 525, 532 (1991). In Singer, the Court of Claims held that, unless claim preparation costs are shown to be beneficial to contract performance, such costs are not allowable. 568 F.2d at 721. Here, as in Singer, Precision Pine's claims concerned only the recovery of damages. See id. Such claim preparation costs are, therefore, unrecoverable as a matter of law.

The language of CT 6.01 warrants the same result. CT 6.01 provides for reimbursement of expenses that result directly from an interruption or delay of timber harvesting operations. See DX1. Precision Pine does not contend that it incurred an out-of-pocket expense because its workers put in overtime to prepare the claim letters. Nor has Precision Pine produced any documents that verify reimbursable out-of-pocket expenditures. The claim letters themselves state that they were prepared by "specialized counsel" – not Precision Pine employees – and the only document cited in Precision Pine's pretrial brief is an inadmissible summary generated solely for purposes of this litigation. See Pl.'s Pretrial Br. at 56 (citing PX180). Having failed to produce any documentation showing that company employees performed work upon the claim letters or that Precision Pine incurred some out-of-pocket expense, even if the Court possessed

jurisdiction, no reimbursement for alleged claim preparation costs would be available under the terms of CT 6.01.

### B. Precision Pine's Claims For "Miscellaneous Costs" Pursuant To CT 6.01 Should Be Denied

#### 1. Overhead And Profits Are Not Recoverable Under CT 6.01

Precision Pine contends that it is entitled to add overhead and profit as a "markup" to various out-of-pocket expenses for which compensation is sought under CT 6.01. See Pl.'s Pretrial Br. at 56 n.25; DX792. CT 6.01 expressly denies reimbursement for lost profits and anticipatory losses. Therefore, "profits" are not recoverable directly or as a "markup" to other costs. Likewise, "overhead" is unrecoverable under CT 6.01. Overhead is by definition an indirect expense. E.g., Nicon, Inc. v. United States, 331 F.3d 878, 882 (Fed. Cir. 2003) ("Indirect costs include such things as . . . overhead."); Thompson v. Cherokee Nation, 334 F.3d 1075, 1081-82 (Fed. Cir. 2003) ("administrative or other expenses related to the overhead incurred by [a] contractor" are "[i]ndirect costs"). Furthermore, overhead is incurred without regard to whether a timber sale is being operated. Consequently, overhead is not incurred as the result, much less the "direct result," of an interruption or delay of harvesting operations. Precision Pine's claims for profit and overhead pursuant to CT 6.01 should, therefore, be denied.

#### 2. Interest Is Not Payable Under CT 6.01

Interest is not payable under CT 6.01. Under the "no interest rule," an express and unambiguous waiver of sovereign immunity is necessary to permit an award of interest against the United States.

> As sovereign, the United States, in the absence of consent, is immune from suit. . . . A waiver of sovereign immunity must be unequivocally expressed, or a court must infer that Congress did not intend to create a waiver.

* * *

> With respect to waiver of sovereign immunity for interest . . . "[t]he no interest rule provides an added gloss of strictness upon these usual rules. . . . "[T]here can be no consent by implication or use of ambiguous language. Nor can an intent on the part of the framers of a . . . contract to permit the recovery of interest suffice where the intent is not translated into affirmative . . . contractual terms. The consent necessary to waive the traditional immunity must be express, and it must be strictly construed."

Marathon Oil Co. v. United States, 374 F.3d 1123, 1127 (Fed. Cir. 2004) (quoting Library of Congress v. Shaw, 478 U.S. 310, 318 (1986)) (internal cites omitted); see also Clary v. United States, 333 F.3d 1345, 1351-52 (Fed. Cir. 2003) ("absent a waiver of sovereign immunity, no interest may be paid").

CT 6.01 merely provides for reimbursement of certain "out-of-pocket" expenses if documentation verifying the "actual expense" is produced. Id. It does not expressly authorize the payment of interest. See DX1. Further, interest is not an out-of-pocket expense. Accordingly, neither the language of CT 6.01, nor the law, supports Precision Pine's argument that interest is payable under CT 6.01.

Precision Pine's claims are further undermined by contractual provisions that – instead of authorizing interest – permit the Forest Service to refund deposited funds. For instance, CT 4.222 allows the Forest Service to refund 95 percent of the contractually-required down payment during a suspension that lasts more than 60 days. See, e.g., DX105 (clause CT 4.222). Indeed, Precision Pine knew about and took advantage of this provision. See, e.g., DX116 (requesting a down payment reduction pursuant to CT 4.222).

Because CT 6.01 does not expressly authorize the payment of interest, and because Precision Pine identifies no receipts or other documents meeting the requirements of CT 6.01, Precision Pine's claims for interest should be rejected.

**3. Precision Pine Has Failed To Demonstrate An Entitlement To Other Costs Sought Pursuant To CT 6.01**

Precision Pine's claim for reimbursement of snow removal costs under CT 6.01 is meritless. Precision Pine apparently incurred snow removal costs in January 1996 to harvest the Hutch-Boondock, St. Joe and South Black Aspen contracts. DX788; see also DX792. Not only were these contracts not breached by the Forest Service, the South Black Aspen sale was never affected by the MSO suspensions. Further, Precision Pine was able to harvest in January 1996 only because the Forest Service consented to operations outside the normal operating season. See DX211; DX238. Simply put, Precision Pine paid for snow removal because it was allowed to continue operations after the normal operating season ended – not because harvesting operations were interrupted or delayed. Reimbursement under CT 6.01 is, therefore, not authorized.

Likewise, the "cost of transferring logs (due to the closure of Eagar)," see DX792, is not payable under CT 6.01. According to Precision Pine, such costs were incurred when it decided to close the Eagar mill in August 1997 – nearly a year after the MSO suspensions had been lifted. DX788; see also DX792. Even then, hauling costs were incurred only because Precision Pine decided to haul remaining logs from the Eagar mill yard to its Winslow sawmill, rather than operate the Eagar mill for an additional half day. DX781. Reimbursement under CT 6.01 is unavailable because the alleged hauling costs were not the direct result of the MSO suspensions.

Furthermore, Precision Pine asserts that it closed the Eagar mill not because of the MSO suspensions, but because of the unavailability of timber in 1997 due to the Forest Guardians suspension and Precision Pine's sale of the Kettle contract. See DX477; DX781. Precision Pine has filed an independent action asserting separate claims with respect to the Forest Guardians suspension. See Precision Pine & Timber v. United States, No. 01-415C (Fed. Cl.) (filed July 17, 2001). Consequently, any claim for reimbursement in connection with the closing of the Eagar mill is properly asserted in that action – not here.

**4. Precision Pine Cannot Invoke CT 6.01 To Obtain Reimbursement Of Expenses In Connection With The Hay Contract**

The Hay contract does not include clause CT 6.01. DX54. Therefore, CT 6.01 is not available as a basis for reimbursement of bond costs, claim preparation costs, interest costs or other costs allegedly incurred in connection with the suspension of the Hay contract.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

s/ David A. Harrington

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
(202) 307-0277
(202) 307-0972 (fax)

April 4, 2005

Attorneys for Defendant