# Robert A. Ness

35670 Myrtlewood Lane
Pleasant Hill, OR 97455
Ph: (541) 746-2563
Fax: (541) 746-1162

February 26, 2005

Alan I. Saltman, Esq.
Saltman & Stevens, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006

Re: Rebuttal of Certain of Mr. Moosman's Conclusions

Dear Mr. Saltman:

After attending the deposition of Mr. Wayne Moosman, the government's accounting expert, I raised several issues regarding Mr. Moosman's use of the Precision Pine Sales Journals. At your request, I have completed my own analysis of the Precision Pine Sales Journals from August 24, 1995 through December 31, 1996. In preparing this analysis, I reviewed Mr. Moosman's report, the attached exhibits, my report dated November 14, 2003 and Precision Pine's sales journals.

Mr. Moosman in Appendix 2 of his report asserts that Precision Pine "has overstated its delayed market opportunities by calculating a **simple** average on the product invoice prices … as opposed to calculating a **weighted** average based on invoice sales volumes". While I agree that using a weighted average is a preferable method, I do not agree that using a simple average necessarily will overstate sales, and I see nothing in Mr. Moosman's report that proves this assertion.

Mr. Moosman also asserts that removal of "several invoices" from those used to calculate the sales averages may have impacted "the overall weighted average prices". He

contends that using the "Winslow Sales Record" which is a monthly summary of the customer invoices (I will refer to both the summary and the monthly detailed listing of each invoice as the Winslow Sales Journal) would be a better means to project Precision Pine's "delayed market opportunities" because "this document appears to be the most encompassing of PP&T's actual prices realized during these years". His calculation of the sales averages is shown in Attachment 9 of his report.

It does not appear that Mr. Moosman did sufficient checking to determine if each column in this sales journal was a reflection of products with enough similarity to allow an appropriate average to be computed. Also, he did not check to see if the accumulation of the data was accurate, i.e. Were product types consistently placed in the same column? My review shows that both of these issues caused significant distortions in the sales averages as calculated by Mr. Moosman.

For example, I found lumber products summarized in the same column of the sales journal, for the same quarter, where one lumber product sold for $1,340.00 per MBF and the other lumber product sold for $570.00 per MBF. Clearly, these are not similar products that can be averaged together. This is just one example – Many more could be cited. I also noticed invoices for the same lumber product were recorded in different columns at different times. For example, 5/4 x 6 # 3 Common was found in two different columns (column 7 for 5/4 RWL and column 9 for # 3 Common Utility). This was true of many other product types. In total, I found over 200 invoices out of about 1200 invoices that were either classified with dissimilar products or were not consistently classified.

In addition, over 500,000 BF of Douglas Fir, Hem Fir and White Fir are included in sales journal columns 8, 9 and 10. Mr. Moosman's calculations treated them as if they were Ponderosa Pine products. The sales prices for lumber products made from these other species can be significantly different than lumber products of the same dimensions and grades made from Ponderosa Pine.

In the exhibits attached, I calculate the weighted average sales price for each of the thirteen lumber product categories used by Precision Pine in its damage calculations. Each invoice was reviewed to determine which lumber product category was appropriate. Lumber products that did not precisely fit into one of the thirteen categories (e.g. 4/4 RW Shop)

required judgment calls in order to determine the appropriate classification. These were discussed with Mr. Lon Porter, President of Precision Pine, to determine the most appropriate classification. All invoices (approximately 1200) were used and the sales dollars for each invoice is net of any delivered freight. Note that the previous sales averages used in the Precision Pine damage calculations were before freight and an average freight was deducted for all sales. The invoices for other species were grouped into their own category which is labeled as Product Code 20 -- Other Species. Seven invoices (Inv # 1034, 1230, 1255, 1508, 1536, 1560, and 1623) either did not have enough information to properly classify them or were invoices for services, not for lumber sales. These invoices are included in Product Code 15 -- Misc.

During this review, I also noticed that 8/4 lumber products (e.g. products sold as 2 x 4, 2 x 6, etc.) and 5/4 lumber products were included in the same lumber product classifications. This does not accurately reflect the correct ratio of the volume of the log actually used to produce 5/4 lumber products vs. 8/4 lumber products. Specifically, producing a 5/4 lumber product uses about 88-90% of the wood volume required to produce an 8/4 lumber product. Yet, the board footage calculation used for invoicing the 5/4 lumber products reflects a volume of wood that is 62½% of the 8/4 lumber products. Therefore, using a weighted average that simply combines 5/4 and 8/4 lumber products, as Mr. Moosman has done, produces an inaccurately low result.

To put 5/4 and 8/4 lumber products on a more equal basis, I have converted all 8/4 lumber products to 6/4 lumber products in determining the average sales price. This conversion makes the difference between the board footage calculation for a 5/4 lumber product equal to 83 1/3% of the board footage calculation for the resulting 6/4 lumber product, which is much closer to the volume of wood ratio noted above. As other factors (e.g. the number of resaw cuts, the sizes that are cut by the edger, etc.) also affect the volume of lumber recovered, the comparison is within the range of reasonableness and is more accurate than the approach used by Mr. Moosman.

The result of my calculations using the approach detailed above is summarized in Exhibits 1 – 5 attached. In Exhibit 4, the column labeled "Prod Code" corresponds to my classification of products as summarized for each quarter under the "Summary by Product

Type". The column labeled "SJ Col" corresponds to the column used in the sales journal and is summarized for each quarter under the "Summary by Sales Journal".

By making all of the adjustments discussed above, I calculate that Precision Pine's damages are understated by approximately $388,000. I do not suggest that Precision Pine necessarily increase its request for damages in this case to reflect this amount (although from an accounting standpoint it would certainly be entitled to do so), rather I offer these calculations as a rebuttal to the calculations performed by Mr. Moosman and as further evidence of the conservative approach used by Precision Pine in calculating its damages.

This analysis addresses only the sales averages that Mr. Moosman calculated to use in his report. It does not address how he used these sales averages or any other issues regarding his report.

Very truly yours,

s/Robert A. Ness

Robert A. Ness

# Precision Pine & Timber, Inc.
## Analysis of Winslow Sales Journal
## List of Exhibits

| | | |
|---|---|---|
| Exhibit 1 | 1 Page | Summary of Differences between Original Calculations and Revised Sales Prices |
| Exhibit 2 | 17 Pages | Anticipated Lumber Sales - Revised Sales Prices |
| Exhibit 3 | 17 Pages | Anticipated Lumber Sales - Original Calculations |
| Exhibit 4 | 39 Pages | Lumber Sales Invoices - Suspension Period |
| Exhibit 5 | 34 Pages | Ponderosa Pine Lumber Sales Invoices - Suspension Period Sorted by Product Type |