**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY FROM MARTIN DEVERE REGARDING THE APPROPRIATENESS OF A 1.25 OVERRUN FACTOR**

Pursuant to Rules 26(a) and 37(c) of the Rules of the United States Court of Federal Claims ("RCFC"), and Rule 702 of the Federal Rules of Evidence, defendant, the United States, moves to exclude plaintiff's exhibit 51 ("PX51") and all testimony from the exhibit's author regarding the appropriateness of a 1.25 "overrun factor."

PX51 is an expert report prepared by Martin Devere, whom the plaintiff, Precision Pine & Timber, Inc. ("Precision Pine"), intends to offer as an expert witness in this action. See Pl.'s Final Witness List (filed Mar. 7, 2005) (docket no. 291). The conclusion in Mr. Devere's report regarding the appropriate overrun factor is based strictly upon data from a large, proprietary mill study. Mr. Devere attached to his report a single page extracted from this voluminous study. When the United States asked for a complete copy of the mill study, Precision Pine declined to comply with its request. Because Precision Pine's failure to provide this information is contrary to RCFC 26(a), because it severely impairs the ability of the United States to cross-examine Mr. Devere, and because the information is necessary for the Court to perform the gatekeeping

function required by Rule 702, the Court should exclude PX51 and preclude Mr. Devere from testifying about the appropriateness of a 1.25 overrun factor.

## BACKGROUND

Precision Pine has identified Martin Devere as an expert witness in this action. On November 18, 2003, Precision Pine produced a two-page report by Mr. Devere opining that "the 1.25 overrun factor being asserted by Precision Pine" in this action is appropriate.[1] PX51 (attached as Exhibit A). "Overrun" is the ratio of the volume of lumber produced by a sawmill (in mbf (l.t.)) to the volume of logs (in mbf (l.s.)) used to make the lumber.[2] Mr. Devere does not base his conclusion about the appropriate overrun factor upon his own study of Precision Pine's sawmills or upon contemporaneous records maintained by Precision Pine. See Devere Dep. at 63 (attached as Exhibit B). Rather, the basis for Mr. Devere's conclusion is a proprietary study of sawmills performed in 1999 by the Beck Group.[3] PX51; see also Devere Dep. at 103 (stating that the Beck Group study is the only document relied upon in reaching his conclusion).

Mr. Devere attached to his report a single page extracted from the Beck Group's study. See PX51 at 3. This page contains a table with ten columns. Each column presumably concerns

---

[1] Mr. Devere's report discusses only Precision Pine's sawmill in Heber, Arizona. PX51. Mr. Devere acknowledged that he was not familiar with Precision Pine's other mills and simply assumed that the same overrun factor should apply. See Devere Dep. at 53-54.

[2] The volume of timber and lumber are commonly measured in "mbf" – shorthand for thousand board feet. The unit for timber is mbf (log scale); the unit for lumber products is mbf (lumber tally). Thus, a mill that produced 110 mbf (l.t.) of lumber from 100 mbf (l.s.) of logs would have an overrun factor of 1.10. As explained below, a sawmill's overrun is affected by numerous factors.

[3] None of Precision Pine's sawmills was a participant in this study. PX51; Devere Dep. at 63.

one of the sawmills participating in the study. However, the names of participating sawmills are redacted. In addition, the extracted page contains no information about the Beck Group's methodology and provides no information about (1) mill location, (2) the age and type of equipment in use at the mill, (3) the skill of the mill's sawyer and other personnel, (4) the quality of logs being processed at the mill, or (5) the mix of lumber products being produced by the mill.[4] Id.

The Beck Group study is not publicly available. Devere Dep at 16-17. As a result, the United States requested on multiple occasions that Precision Pine provide a complete copy of the study. See, e.g., Devere Dep. at 25; Letter from David A. Harrington to Alan I. Saltman, at 1-2 (Feb. 11, 2005) (requesting that the full mill study be produced immediately) (attached as Exhibit C). Precision Pine has not complied with these requests. See Letter from Richard W. Goeken to David A. Harrington, at 2 (Feb. 14, 2005) (stating that "Mr. Devere has been unable to secure the release of any other portions of the Beck Report" and that it will not, therefore, be provided) (attached as Exhibit D).

## ARGUMENT

Precision Pine's expert, Martin Devere, bases his conclusions upon one out-of-context page from a large mill study that was conducted years after the MSO suspensions and that involves none of Precision Pine's mills. The United States has requested that the complete study be made available. Precision Pine has declined to provide a complete copy citing the study's confidential, proprietary nature. As a result, the United States did not have the study during

---

[4] Mr. Devere acknowledges that each of these factors can have a significant effect on a mill's overrun factor. See Devere Dep. at 45-46, 55-56, 59, 72, 84-85.

Mr. Devere's deposition and will not have the study for cross-examination at trial. Precision Pine's attempt to use one page of this study as a sword in the hand of its expert, and the proprietary nature of the study as a shield to prevent scrutiny by the defendant, should not be permitted.

## I. Testimony Based Upon The Beck Group Study Should Be Excluded In Accordance With RCFC 26(a) And 37(c)

Precision Pine's selective disclosure of data underlying Mr. Devere's report is contrary to the "detailed and complete" disclosure required by RCRC 26(a)(2), and would impede the United States' cross-examination of Mr. Devere. Accordingly, testimony from Mr. Devere regarding an appropriate overrun factor should be excluded pursuant to RCFC 37(c)(1).

"A party that without substantial justification fails to disclose information required by RCFC 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial . . . information not so disclosed" RCFC 37(c)(1). "The sanction of exclusion under rule 37 is automatic and mandatory unless the sanctioned party can show that its violation of rule 26 was either justified or harmless."[5] Tritek Technologies, Inc. v. United States, 63 Fed. Cl. 740, 750 (2005) (citing Finley v. Marathon Oil Co., 75 F.3d 1225, 1230 (7th Cir.1996), and Klonoski v. Mahlab, 156 F.3d 255, 269 (1st Cir.1998)) (brackets omitted). The burden rests with the party facing sanctions to prove that its violation of rule 26 was justified or harmless. Id. (citing Wilson

---

[5] "The advisory committee thought that the evidence preclusion sanction of Rule 37(c)(1) would be 'self-executing' and 'automatic' in its application to failure to make the disclosures Rule 26(a) requires. As a practical matter, however, the court [does] not know that evidence a party offers should have been, but was not, disclosed unless the opponent brings the matter to the court's attention. The opponent can do so through a motion *in limine* prior to trial." 6 Moore's Federal Practice § 26.27[2][a] (3d ed. 2004) (citing Fed. R. Civ. P. 37(c)(1), advisory committee note (1993)).

v. Bradlees of New England, 250 F.3d 10, 21 (1st Cir. 2001), and Yeti by Molly Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1107 (9th Cir. 2001)). In addition to the automatic exclusion of undisclosed evidence, the Court may in its discretion award reasonable expenses, including attorney's fees, caused by the failure to disclose, and may impose any other sanctions authorized by RCFC 37(c)(2). RCFC 37(c)(1); see also RCFC 37(c)(2) (authorizing the Court to order facts be taken as established, to strike the non-disclosing party's pleadings, or to dismiss the action or part of the action).

Rule 26(a)(2) requires the production of a "detailed and complete" expert report. RCFC 26(a)(2); Fed. R. Civ. P. 26(a)(2) advisory committee's note (1993); 6 Moore's Federal Practice § 26.23[2][b][ii] (3d ed. 2004). This requires, in part, that the "data or other information that forms the basis of the expert's opinion" be made available. RCFC 26(a)(2); Haworth, Inc. v. Herman Miller, Inc., 162 F.R.D. 289, 294-95 (W.D. Mich. 1995) (an expert must disclose all factual information considered, including factual information that was considered but not relied on); Builders Association of Greater Chicago v. City of Chicago, No. 96-C-1122, 2002 WL 31027957, at *1 (N.D. Ill. Sept. 10, 2002) (requiring defendant to produce restricted-access census data used in defendant's expert report "before those results can be admitted") (attached as Exhibit E). "This sort of disclosure is consonant with the federal courts' desire to make trial less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent." Thibeault v. Square D Co., 960 F.2d 239, 244 (1st Cir. 1992); see also Ortiz-Lopez v. Sociedad Espanola De Auxilio Mutuo Y Beneficiencia De Puerto Rico, 248 F.3d 29, 35 (1st Cir. 2001) (The purpose of a 'detailed and complete' expert report as contemplated by Rule 26(a) . . . is, in part, to . . . prevent ambush at trial."); Salgado v. General Motors Corp., 150

F.3d 735, 742 n.6 (7th Cir. 1998) ("The 'incentive for total disclosure' is the threat that expert testimony not disclosed in accordance with the rule can be excluded.").

Mr. Devere relied upon the Beck Mill study as the basis for his conclusion regarding an appropriate overrun factor. PX51; Devere Dep. at 103. However, only one page of the study was included with his report. Even when the United States made repeated requests for a complete copy of the mill study, it was not provided.

Having produced an expert report premised upon data from the Beck Group study, the underlying data must either be produced or testimony based upon the data excluded. RCFC 26(a)(2); RCFC 37(c)(1); see also Builders Association, 2002 WL 31027957 at *1 (requiring the production of restricted-access census data used in defendant's expert report "before those results can be admitted"). Because Precision Pine has proved unwilling or unable to provide a complete copy of the Beck Group study, the Court should exclude testimony from Mr. Devere based upon the undisclosed study, including testimony about "the appropriateness of the 1.25 overrun factor."[6]

[6] In its February 14, 2005 letter, Precision Pine appears to suggest that Mr. Devere can testify about an appropriate overrun factor even if testimony based upon the Beck Group study is excluded. See Ex. D at 2. If so, Precision Pine is mistaken. "Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." Salgado, 150 F.3d at 742 n.6. The only basis for a 1.25 overrun factor provided in Mr. Devere's report is the Beck Group study. PX51. Mr. Devere's "expertise," divorced from the explanation given in his report, does not provide an alternate ground for testimony. See Zenith Electronic Corp. v. WH-TV Broadcasting Corp., 395 F.3d 416, 419-20 (7th Cir. 2005) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

## II. Without The Complete Mill Study, Precision Pine Cannot Establish That Testimony From Mr. Devere Regarding The Appropriateness Of A 1.25 Overrun Factor Is Admissible Under Rule 702

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. This rule was significantly modified in 2000 to expressly incorporate the "gatekeeping function" established by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). Fed. R. Evid. 702 advisory committee notes (2000).

Under Daubert and Kuhmo Tire, the trial judge acts as a gatekeeper to ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152; accord Daubert, 509 U.S. at 597. Accordingly, under Rule 702, expert testimony is admissible only after the trial court has verified that: (1) "the [expert's] testimony is based upon sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

Without the complete Beck Group study, Precision Pine cannot satisfy these requirements and Mr. Devere's testimony should be excluded. First, without the entire Beck Group study, Mr. Devere's testimony is not based upon sufficient facts. According to Mr. Devere, a sawmill's "overrun factor" is affected by many different factors. Among the factors affecting a sawmill's overrun are: (1) the skill of the mill's sawyer; (2) the type and quality of equipment installed at the mill; (3) the size of the logs being processed by the mill; (4) the quality of the logs being processed by the mill; (5) the species of the logs being processed by the mill; (6) the taper of the

logs being processed by the mill; and (7) the mix of lumber products being produced by the mill. Devere Dep. at 45-46, 55-56, 59, 72, 84-85. The page attached to Mr. Devere's report lacks information about most of these factors, including, perhaps most significantly, information about the equipment in use at the sawmills being studied.

Without solid information about the mills studied by Beck Group, which would be provided by the full report, Mr. Devere's conclusions are not based upon "sufficient facts or data."[7] Fed. R. Evid. 702. The cited page from the Beck Group study contains no information about mill equipment, log quality, log taper, employee skill or lumber product mix – five of the seven factors identified by Mr. Devere as having a significant bearing on overrun. Determining which, if any, of the mills studied by the Beck Group are comparable to Precision Pine's mills is the essential first step in Mr. Devere's analysis. Because the single page extracted from the Beck Group study does not contain most of the information needed to make this determination, Mr. Devere's conclusion about an appropriate overrun factor is not based upon sufficient data.[8]

Second, without the full Beck Group study, it is not possible to assess whether the study was conducted in accordance with "reliable principles and methods." See Fed. R. Evid. 702.

---

[7] Mr. Devere apparently does not himself know what equipment was at the sawmills studied. At his deposition, Mr. Devere testified that, about 5 years before he complied his report, he had access to the study prepared for Fort Apache Lumber. See Devere Dep. at 12, 15-16. Fort Apache Lumber is an Indian-owned and operated sawmill in Arizona. Id. at 13. At that time, Mr. Devere was on the Fort Apache board of directors. Id. at 12. However, Fort Apache was given a redacted version of the Beck Mill study that deleted detailed information about the competing mills that were studied. Id. at 15-16.

[8] The Beck Group study was conducted several years after MSO suspensions. Mills likely made equipment upgrades and improved the recovery from their operations during this interval. Lacking information about the equipment used as of the Beck Group study, it simply is not possible to determine if the studied mills were comparable to Precision Pine's operations in 1995 and 1996.

The one page attached to Mr. Devere's report provides no information about the "principles and methods" employed by the Beck Group.[9] See PX51 at 3. Consequently, Precision Pine cannot establish that the study's methodology is reliable and generally accepted. See Daubert, 509 U.S. at 593-94 (indicating that trial courts should consider, among other things, (1) whether the methodology has been or can be tested, (2) whether the methodology has been subject to peer review and publication, and (3) whether the methodology has achieved "general acceptance").

Third, Precision Pine cannot demonstrate that Mr. Devere has applied the principles and methods reliably to the facts of the case. As an initial matter, as explained above, the principles and methods used in the Beck Group study are unknown. It is not possible for the Court to assess the application of unknown methodologies. Moreover, even if one were to focus on the limited information on the page of the Beck Group study that was produced, the study has not been applied reliably to the facts of this case.

In his report, Mr. Devere asserts that there exists a negative correlation between average log size and overrun factor.[10] See PX51; Devere Dep. at 84-85 (indicating that a high average log size is indicative of a low overrun factor). Mr. Devere cites no authority for this proposition and performs no statistical analysis to confirm the existence or strength of the supposed correlation. See DX51. Nevertheless, relying upon the supposed correlation, Mr. Devere claims

---

[9] Mr. Devere assisted with the compilation of data from one of ten participating mills. He had no other role in the analysis performed by the Beck Group. Devere Dep. at 104.

[10] Mr. Devere clarified in his deposition that he looked at the "long log" size in the Beck study and that the "bucked log" size has no relationship to overrun factor. Devere Dep. at 92. Additionally, Mr. Devere stated that he did no independent analysis, but was informed that Precision Pine's average log size in 1995 and 1996 was around 100 mbf/log. See DX51; Devere Dep. at 45, 92.

that "those [mills] with a log size similar to Precision Pine" had an overrun factor between 1.29 and 1.35.[11] PX51. The Beck Group data does not support this claim. Indeed, two mills with an average log size substantially less than Precision Pine had overrun factors lower than 1.25 – when according to Mr. Devere's correlation their overrun should exceed 1.35. See PX51 at 3 (columns 2 and 4). Moreover, two of the three study participants that Mr. Devere cites as "similar" to Precision Pine provided no data on average log size. Id. (columns 6 and 7). Thus, even the limited data currently available from the Beck Group study does not support Mr. Devere's conclusion.[12] Put differently, Mr. Devere has not applied principles and methods reliably to the facts of the case and, accordingly, his testimony about an appropriate overrun factor should be excluded.

**CONCLUSION**

For these reasons, the United States respectfully requests that the Court grant this motion *in limine*, exclude PX51 from evidence, and preclude any testimony from plaintiff's expert, Martin Devere, regarding the appropriateness of a 1.25 overrun factor.

---

[11] Virtually nothing is known about the three mills in the Beck Group study that Mr. Devere characterizes as comparable to Precision Pine mills. Indeed, Mr. Devere only knows the identity of one mill that participated in the Beck Group study. It is unclear if that mill is one of the mills Mr. Devere characterized as comparable to Precision Pine's mills because he was unwilling to divulge even that limited information as a result of confidentiality constraints. Devere Dep. at 15, 85.

[12] Devere did not visit Precision Pine's Eagar or Winslow mills and obtained no information about those mills in his conversation with Mr. Porter. Devere Dep. at 53-54, 68. Therefore, Mr. Devere has no basis upon which to offer an opinion about the appropriate overrun factor for the Eagar and Winslow mills.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

s/ David A. Harrington

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Attorneys for Defendant

OF COUNSEL:

Patricia Disert
Lori Polin Jones
Office of the General Counsel
U.S. Department of Agriculture

April 18, 2005