IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 98-720 C

(Filed January 30, 2004)

- - - - - - - - - - - - - - - - -x

PRECISION PINE & TIMBER, INC., :

Plaintiff, :

v. :

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - -x

Washington, D.C.

Friday, February 6, 2004

Deposition of RONALD D. LEWIS, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Saltman & Stevens, P.C., 1801 K Street, N.W., Washington, D.C. 20006, at 9:07 a.m., Friday, February 6, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 10

Forest Service in Oregon on Rogue River National Forest as a junior forester is what they called them then.
Q. When was that?
A. That was in summer 1962.
Q. And how long were you there as a junior forester?
A. I worked six months and was drafted, went into the Army for two years.
Q. What did you do as a junior forester?
A. It was more or less of a training position.
You jumped around. I worked in timber management, preparation of timber sales, reforestation, recreation, wilderness management, trail building, fire fighting, of course.
It was a training position, so you got a shot at all of the different things going on in the Forest Service.
Q. How long were you in each of those different areas that you were talking about?
Did you rotate through them during your six months?
A. Oh, a month to six weeks in each

Page 11

probably.
Q. You said you went into the Army after that?
A. Yes.
Q. How long were you in the Army?
A. Two years; I was in Army Corps of Engineers, taught cadasteral surveying. It's land surveying. It's just land surveying, and while I went to school at Fort Belvoir, and then they kept me on as an instructor for nine months, and then I was shipped to Korea for thirteen months.
Then my time was up, and I came home.
Q. What did you do when you came home?
A. I went back to work for the Forest Service down the Rogue River National Forest at the Butte Falls Ranger District in Butte Falls, Oregon.
Q. In Oregon you say?
A. Um-hm.
Q. What was your position then?
A. I started out there as a, as a small sales forester they called me.
I prepared small timber sales and administered them after they were sold.

Page 12

Q. And when was this you rejoined the Forest Service?
A. It was in January of 1965.
Q. Was there anything else you did at that time for the Forest Service?
A. Other than timber sales, no. As soon as I got, rejoined the Forest Service there, we had this, it was called a December flood or whatever it was.
It was the December Christmas flood of 1964, which -- and storm which blew down a ton of trees.
The first three or four months after I got back from the Army, I worked at salvage sales salvaging the downed timber from the storm.
Q. How long were you a small sales forester out in Oregon?
A. About a year at Butte Falls, and then I transferred to their Prospect Ranger District in the same forest, Rogue River National Forest, and became the large sale forester finding and preparing timber sales.
Q. What did you do in planning and preparing the timber sales?

Page 13

A. Supervised the preparation crew that went out and laid out timber sale areas, and wrote the proposed plan, how much timber volume would be in the sale.
We would cruise the timber and determine volume, and then appraise it, advertise it for sale.
Q. Was there anything else you did as a large scale forester?
A. Yeah. I also supervised the log scaling crew and the timber sale administrators, people who administered the contracts.
Q. Was there anything else that you did while you were there as a large scale forester?
A. Served as acting ranger occasionally when the ranger was gone, that kind of thing.
Q. How long were you at was it the Prospect Ranger Station?
A. Yes.
Q. How long were you there as the large scale forester?
A. About two years.
Q. So you left there in at what time?
A. Nineteen sixty-eight I think it was.
Q. And what did you do then?

Page 14

A. I transferred to the Blue River Ranger station at Wilamette National Forest, W-i-l-a-m-e-t-t-e, Blue River Ranger Station District.
Q. What was your position there?
A. I was the reforestation forester and civil culturalist.
Q. What is a civil culturist?
A. He manages the, it's called the young stand tending basically.
We thinned, made thinning, government contracts for thinning, and the reforestation was planting, planned thinning of anything from commercial pole-size timber to real small trees, Christmas trees, that kind of thing, and wrote Environmental Impact Statements for all timber sales.
Q. Was there anything else that you did while you were at the Blue Ridge Ranger Station?
A. Yeah. I was there about five years, and later on, I became the timber management assistant it was called where I supervised all preparation, administration and scaling of timber.
Q. When did you get that position?

Page 15

A. It would have been about 1970.
Q. Could you describe a little bit further your responsibilities as the timber management assistant?
A. Well, planned, prepared, appraised timber sales, and supervised the, the contract administrators and the, that administered the timber sale contracts, conducted auctions and log scaling, and log scaling supervisor.
We had several log scalers that measured the logs as they came out of the woods.
Q. Were you supervising people doing these tasks, or were you actually doing them yourself?
A. No. I was supervising.
Q. How many people were you supervising?
A. Counting everybody, it would have been about 25. That's summer help and all that.
Q. What did you do next after you left the Blue Ridge Ranger Station?
A. I transferred over to the east side of the mountains to Bend, Oregon, and the Deschutes National Forest, D-e-s-c-h-u-t-e-s, National Forest on the, on the Fort Rock Ranger District.
Again, I was a timber management

Page 16

assistant on the Fort Rock Ranger District, and the Fort Rock was the largest district under the Deschutes Forest. That was about 800,000 acres or something of that size.
Q. What did you do as the timber management assistant on the Deschutes National Forest?
A. Basically the same thing I was doing on the Wilamette National Forest -- supervising timber sale layout crews, preparation, administration, appraisals, auctions, and then log scaling.
Q. Were there any differences between what you had been doing at the Blue Ridge Ranger Station and what you did after you transferred?
A. Not really; we were just dealing with different species of trees.
Over there, it was more Ponderosa Pine on that side of the mountain.
On the west side, it was more Douglas Fir and Hemlock.
Q. How long were you there at Fort Rock as the timber management assistant?
A. Let's see. No. I left there in '79.
Q. In 1979, where did you -- what was

Page 17

your next job?
A. I took a long-term detail to the office, USDA Office of Inspector General for three years, out of their San Francisco regional office.
Q. What did you do in the Office of Inspector General?
A. I was called an auditor specialist, and we traveled as an audit team or inspector, inspection team that went around to the various national forests in the nation doing program audits, whistle-blower-type audits, investigations, a few other special-type audits, and we drafted, we reviewed their programs and what they were doing, and, and I specialized primarily in timber sale areas because that was my area of expertise on the team.
Make sure they were obeying the laws and spending their money the way it was supposed to be spent.
Q. Where was it that you did the audits? Was it nationwide?
A. Yes, pretty much. The regional office in San Francisco primarily concentrated on the West Coast -- California, Oregon, Washington,

Page 18

Alaska, Arizona, New Mexico, Montana, Idaho.
Occasionally we would travel back east to the southeastern forest in Georgia and Alabama.
Let's see. Where else did I go -- Wisconsin, Minnesota occasionally, but most of our auditing, our special work, was in the West.
Q. What sorts of things were you auditing?
A. Contract administration, timber sale contract administration, timber sale administrators to make sure that they were administering the contracts the way the contract was written, they weren't playing favors with, you know, interested people, that kind of thing, that the timber that they had designated to be harvested was what was being harvested, they weren't getting any extra timber or they weren't leaving timber unharvested that was planned to be harvested, that kind of stuff.
Otherwise just making sure they were living up to the terms of, the Forest Service was living up to the terms of the contract, and that the Forest Service was requiring the timber purchasers to live up to the terms of the

Page 19

contracts, road building requirements, fleet management, whether they were using Forest Service fleet efficiently and properly, and what else?
Recreation a little, ski resort permits, special use permits, grazing and that kind of thing; we looked into a general overall program review of things.
Q. Was there anything else that you were doing while you were the auditor specialist in San Francisco?
A. Writing a lot of reports; we were drafting -- well, usually we would be out traveling for two weeks, home for a week drafting the report, out again for two weeks.
Involved a tremendous amount of traveling.
Q. Did you do audits in Arizona while you were there?
A. Yes, a couple of them, um-hm.
Q. Let's see. When did you leave your position in San Francisco?
A. In 1981, I went back to -- my year, three years was up, and I went back to the Forest Service on the Gifford-Pinchot National

Page 20

Forest in Vancouver, Washington.
Q. What was your position now when you went back to the Forest Service?
A. I worked in the forest supervisor's office as the contracting officer for timber sales.
Q. Did you say you went back to this position in 1981?
A. Yes. It was right after Mount St. Helen's had erupted, and it was really a new position they created to help oversee the salvaging of timber from the, that the volcano destroyed.
Q. What did you do in that position?
A. Supervised the preparation of the larger sales, the ones that came in under the forest supervisor's authority, which would have been over a million board foot of timber in each sale all the way up to 20 million or so size.
I supervised the log export control provisions because Vancouver is on a port, and quite a bit of Gifford-Pinchot National Forest is near the Pacific Coast.
There were several ports that we had to inspect and keep an eye on to make sure there

Page 21

was no national forest logs being exported.
Q. Why did you have to make sure of that?
A. Because there's a law against exporting national forest logs without primary processing in the United States.
Q. What is primary processing?
A. It has to be sawed into not necessarily boards, but into thick timbers, and then they could be exported and finished processing overseas, but they had to be primarily processed in the United States.
Q. What else did you do as the contracting officer on the Gifford-Pinchot National Forest?
A. Headed up the timber sale administration, training of the administrators on the districts, and there was five ranger districts, so we conducted training operations on the districts, visited all the districts, and went out and looked at their timber sale programs in the field, the logging operations going on.
Q. And how were, how long were you there as the contracting officer?
A. About two and a half years, three



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 22

years I guess, three years.
Q. So you left in 1984?
A. It must have been '85.
Q. What was, what was your next position that you took?
A. I took a similar position in the regional, in the Forest Service regional office at Portland, and then I was, assist the staff for timber sales in Portland, Oregon, in the Pacific Northwest Regional Office.
Q. When you say it was a similar position, how was it similar to the work you did as contracting officer?
A. Well, instead of supervising five ranger districts, then we had thirteen national forests we were overseeing in their preparation of timber sales, administration of timber sales, log measurements, log export, but I was primarily the timber sale, administering the sales after they were sold at that point in the regional office.
I didn't have responsibility for overseeing the preparation of the sales, just administration of the contracts.
Q. Had you been overseeing the

Page 23

preparation of the sales when you were in the supervisor's office back in Washington?
A. Yes. In Washington?
Q. Yes.
A. No.
Q. When had you been supervising the preparation of the sales?
A. When I was under Gifford-Pinchot National Forest; in other words, they would, the ranger district would prepare the sale.
They would send the packet into our office, and we would review it for accuracy as far as the appraisals, the plans, the Impact Statements.
Q. And what was your position again when you were in the Gifford-Pinchot National Forest?
A. Contracting officer for timber sales, so they would send the packet into us.
We would approve it for advertising after review.
Q. And then, well, when you went to the regional office in Portland, how did you, did your responsibilities differ?
A. I wasn't involved with overseeing the preparation anymore.

Page 24

It was just strictly contract administration.
Q. And what responsibilities did you have with respect to contract administration in the regional office in Portland?
A. Overseeing thirteen national forests and their programs, again, training for contracting officers and timber sale administrators, setting up training programs, going out and conducting training and reviews and regional reviews of the forests to see if they're meeting the standards.
Q. What would you have been doing in order to, in order to supervise the various national forests at that time?
A. Constant communication with them -- telephone, Internet, and visit, visiting the forests.
Q. What period of time were you in the regional office at Portland?
A. Let's see. From '86 or '87; I came into the national office in '89, so I was only there about two years in the regional office.
Q. So you left the regional office in 1989?

Page 25

A. Yes.
Q. And what did you do then?
A. I transferred to the Washington office here in the National Headquarters in Washington, D.C.
Q. What was your position when you made that transfer?
A. I was a staff specialist for timber sale contracting.
Q. What did you do as the staff specialist for timber sale contracting?
A. Advised, whenever forests would call in or regional office would call for advice and information, and I would advise them on timber sale contracts, draft proposed contract provisions, new provisions or clauses, whatever they needed for a particular situation on a sale or something changed and had to be added to the national program.
Q. What do you mean? What was the last thing you were saying? Changed?
A. Yeah. Something they wanted to implement nationally in all regions on all sales, and I would draft the provisions to do that.

Q. And you're talking standard provisions in timber sale contracts then?
A. No -- the special provisions in timber sale contracts.
Standard provisions were the, you know, the boiler plate stuff was pretty much standard provisions, and then we would tweak those where we needed to on what we called C provisions, which were special provisions drafted to either do away with the standard boiler plate or add to it.
Q. And some of the C provisions were used nationwide?
A. Oh, yes. Yeah. They didn't have to be -- they could be specific to a region, or they could apply nationwide.
Q. And how long were you doing this work?
A. Until I retired in 1994. In '89, and retired in '94.
Q. Did you do anything else while you were in the Washington office?
A. I drafted federal regulations for the Log Export Control Act.
What else was it? Some small business provisions or whenever Congress, you know,



passed a new law involving Forest Service timber sale activities, then we would draft a regulation to implement it, and I was involved in drafting regulations.
Q. Did you do anything else while you were in the Washington office between 1989 and the time you retired?
A. You travel out to the regions in various national forests doing program reviews, timber sale program reviews.
Q. What, what does that mean that you did program reviews at regional offices?
A. Similar to what I was doing with the OGC; we would go out and review the operations of a region or a particular forest to see that they were, you know, working to the standards and according to the laws and regulations as far as their preparation of sales, administration of contracts, using the contracts properly, interpretation of contracts.
Q. How often would you do that sort of work?
A. Two or three times a year, we would go out for maybe a month, two weeks sometimes.
Q. You say we. Who would be we?



A. Oh, we usually had a team. There would be myself as a contracting officer.
Another specialist would be sale preparation.
You know, maybe a wildlife biologist would go with us, and they would look over the contract to see if, different things we were working on to make sure they were living up to the Environmental Protection standard provisions of the contracts.
Q. When you were doing these reviews, what role did you have specifically?
A. Well, sometimes I would be the team leader.
Sometimes someone else would be, but it would be the scheduling with the forests and the regions and having then go on a show-me trip.
Basically they'd take us out and show us what they were doing and why, and then we would examine the files and the documentation of the contracts and that kind of thing; just standard stuff, you know.
Q. Do you remember if you did any of these reviews in Region 3 in 1992, 1993, 1994?



A. Yes. We were in Albuquerque in, gosh, I don't remember the exact year, but a couple of times.
We valued a few of the forests, the Kaibab National Forest out of Flagstaff once or twice, the Prescott National Forest in Williams? Is that right? My memory -- it's been a while.
Was out at Tonto National Forest, a couple in New Mexico.
Hm, I don't remember all -- Carson National Forest in New Mexico.
I forget where all we were, but we were, I was around several of the forests down there.
Q. When you were doing these reviews in Albuquerque, do you remember about what year it was that you did these reviews?
A. From '91 to '94; I don't remember the exact year, no.
Q. Did you go out to Region 3 every year?
A. No.
Q. How was it selected where you would go in a given year?
A. Sometimes the regional forester would request a review, and so we would go to it, or

Page 30

the chief salvager would just decide it was time to go review something.
If they were having problems technically with anything that was, that was affecting the sales or the, or the chief's office would be getting complaints from timber purchasers or whatever, that somebody was doing something that they didn't think was right, why sometimes we'd go out and look into things like that.
Q. When you were doing your reviews in Region 3, the one or two reviews you mentioned, what -- how many times did you go to Region 3 I guess I should ask you first, to do these sorts of program reviews?
A. I don't recall exactly. It was two or three different times.
Q. And this would be two or three different times between 1989 when you got to the Washington office and 1994?
A. Right.
Q. When in 1994 did you retire, do you remember?
A. September, September 30th.
Q. Is there anything that stands out in

Page 31

your mind about your reviews in Region 3 in Albuquerque?
MR. STEVENS: Can you be a little more specific?
You want the weather? Time of day? What he had for dinner, that kind of thing?
MR. HARRINGTON: Having to do with the programs that the Forest Service was running out of Region 3.
MR. STEVENS: Do you mean specific activities he was involved in?
It's just a very broad question. That's all.
MR. HARRINGTON: I understand, and I'm interested to hear anything that he has a specific recollection of, and obviously I'll narrow things down somewhat if he has specific recollections based on what he did.
BY MR. HARRINGTON:
Q. So do you know?
MR. STEVENS: Go ahead.
THE WITNESS: Well, Region 3 out of Albuquerque, out of Santa Fe, they had a special agreement with -- I forget the exact term it's called -- the agreement with a couple of timber

Page 32

companies that worked -- actually it was an Indian tribe that had some timber companies, and there was a guaranteed amount of volume that they would receive every year throughout the national forests, and they were having problems meeting that guarantee, and shoot! I forgot the name of the agreement.
Do you remember that, Alan?
MR. STEVENS: Let's just stick with what you can recall.
If you can't remember, that's understandable.
MR. SALTMAN: Actually I don't know what the hell you're talking about!
THE WITNESS: Anyway, there was a special use-type agreement that they had with the Indian tribes to have so many timber sales a year and keep their people employed, keep the mills running.
BY MR. HARRINGTON:
Q. Okay.
A. That was in New Mexico.
Q. Was there anything else that you remember coming up in your reviews in Region 3?
A. No. That's the one, that I remember

Page 33

spending a lot of time on that one.
Q. Was there anything in particular that you were focused on when you were doing the reviews in Region 3?
A. Timber sale contract administration.
Q. Do you remember reviewing any contracts held by Precision Pine & Timber?
A. No. I knew of them, but I don't remember any specific contracts.
Q. When you say you knew of them, what did you know of them?
A. That they were a timber purchaser in Region 3, primarily Arizona.
Q. Did you know anything else about them?
A. Not really.
Q. Is there anything else that you remember about the reviews that you did out in Region 3 while you were in the Washington office?
A. No.
MR. STEVENS: And you're asking just if something very specific pops into his mind?
MR. HARRINGTON: (Indicated "yes.")
MR. STEVENS: That's your intent?
BY MR. HARRINGTON:

Q. Did you have any involvement in awarding any of the contracts at issue in this case to Precision Pine?
A. No. We didn't award contracts out of the Washington office.
Q. Did you have any involvement in managing the contracts at issue in this case?
A. No.
Q. Do you remember reviewing any of the contracts in this case while you were in the Washington office?
A. No.
Q. Do you remember having any involvement with any of the work that Precision Pine was doing while you were with the Forest Service?
MR. STEVENS: Would you repeat that question?
THE REPORTER: Question: "Do you remember having any involvement with any of the work that Precision Pine was doing while you were with the Forest Service?"
MR. HARRINGTON: Let me try that question again. I think I may have phrased it inelegantly.
BY MR. HARRINGTON:



Q. Do you know if you had any involvement of any sort with the contracts awarded to Precision Pine that are at issue in this action?
A. No, I had no involvement. I don't even know what contracts we're talking about.
Q. Did you have any involvement concerning changes that the Forest Service made after the Mexican Spotted Owl was listed as an endangered species?
MR. STEVENS: Changes?
MR. HARRINGTON: In his programs.
THE WITNESS: Changes to contracts?
MR. STEVENS: Could you just restate the question?
MR. HARRINGTON: Sure.
BY MR. HARRINGTON:
Q. Did you have any involvement in any changes to the Forest Service timber sale program that were made after the Mexican Spotted Owl was listed as an endangered species?
MR. STEVENS: That you can recall.
THE WITNESS: I don't recall any specifics of the Mexican Spotted Owl.
BY MR. HARRINGTON:
Q. Did you have any role in administering



any contracts between the Forest Service and Precision Pine?
A. No.
(Government counsel conferred.)
BY MR. HARRINGTON:
Q. Did you respond to any questions out of the regional office that had been asked about administration of Precision Pine's contracts?
A. When I was in the regional office?
Q. When you were in Washington.
A. Oh.
Q. Did you respond to any questions from the regional office, Region 3, about Precision Pine's contracts?
A. I don't recall any, no.
MR. HARRINGTON: Precision -- well, why don't we go ahead, and we'll mark one?
(Lewis Exhibit No. 1 was marked for identification.)
BY MR. HARRINGTON:
Q. Have you read the second paragraph in this e-mail, Mr. Lewis?
MR. STEVENS: Why don't you?
BY MR. HARRINGTON:



Q. Please read the whole thing. Have you read the second paragraph?
A. Yeah. Um-hm.
Q. As you'll see, it says that you were anticipated to offer testimony on the mechanics, objectives, and implications of the Forest Service timber sale program, including a number of different areas?
A. Um-hm. Yes.
Q. Do you have specialized knowledge about the mechanics, objectives, and implications of the Forest Service timber sale program?
MR. STEVENS: I'm going to object because I think this actually has been asked and answered.
You have gone through great detail through his background, and I think that he's spoken to you about and answered your questions in great detail about all the various mechanics, objectives and implications that he has been available.
If you want to ask it again, that's fine, but I want the record to be clear he has already responded to that question.

Page 38

MR. HARRINGTON: Okay. Could you go ahead and read the question back?
THE REPORTER: Question: "Do you have specialized knowledge about the mechanics, objectives, and implications of the Forest Service timber sale program?"
THE WITNESS: I guess I would have to answer yes based on my experience.
BY MR. HARRINGTON:
Q. And I guess you're saying that you gained that specialized knowledge during your employment with the Forest Service?
A. Yes.
Q. Were you involved in any way with the Forest Service's small business program while you were with the, worked with the Forest Service?
A. To some extent; not a great deal. We have another staff specialist that helps us that works with the Small Business Administration people more than I did, but I was involved occasionally.
Q. What did you do on the small business program?
A. We had an overall agreement with the

Page 39

Small Business Administration, and we would have to review and meet with them occasionally to set up timber sales that would meet the requirements for small business.
Q. In your time in the Washington office, did you have any responsibilities with respect to the small business program?
A. Just advisory role.
Q. And when you say an advisory role, what do you mean by that?
A. I was familiar with regulations, and when regions or forests could call it and say what does this mean, I would try to interpret it for them.
Q. So you sometimes responded to questions concerning the small business program?
A. Yes.
Q. Did you have specialized knowledge about the effect of contract suspensions?
A. Yes.
Q. Would you have any specialized knowledge about the effect of contract suspensions on Precision Pine & Timber?
MR. STEVENS: Now are you asking him if he, if he does have that knowledge?

Page 40

MR. HARRINGTON: Yes.
MR. STEVENS: If he has it now about Precision Pine & Timber?
BY MR. HARRINGTON:
Q. Did you have it while you were with the Forest Service, any knowledge about the effect of contract suspensions on Precision Pine & Timber?
A. Not Precision Pine specifically, no.
Q. Do you have any knowledge now about the effect of contract suspensions on Precision Pine & Timber?
A. No.
Q. Do you have knowledge about Forest Service cruises?
A. Yes.
Q. What is a cruise?
A. It's a measurement of, of the volume of timber in a particular timber sale, measure the trees in ground and measure tree heights, diameters and heights, and come up with a gross volume estimate, and then in that volume estimate, you deduct defects you see and so on.
Q. So you have experience and knowledge about Forest Service cruises generally?

Page 41

A. Yes.
Q. Do you have any knowledge about the cruises that were done on the Precision Pine contracts at issue in this case?
A. No.
Q. Do you know how they were performed?
A. No.
Q. Have you spoken to anyone who performed the cruises on Precision Pine's contract?
A. No.
Q. Do you have knowledge about Forest Service appraisals of contracts?
A. Yes.
Q. How did you gain that knowledge?
A. From my work experience.
Q. Has the way the Forest Service has done appraisals differed over time, to your knowledge?
A. Well, there are several different ways to do appraisals, but basically, not much I could say.
Q. Did you have any involvement in the appraisals done for the contract at issue in this case?

Page 42

A. No.
Q. Do you know anything about how the appraisals on the contracts at issue in this case were done?
A. No, not without speculating.
Q. Have you spoken to anyone at the Forest Service or otherwise who was involved in the appraisals on the contracts in this case?
A. No.
Q. You mentioned, we talked just a little bit about domestic processing requirements.
You said there was a statute concerning domestic processing requirements?
A. Yes.
Q. Do you know anything about how the domestic processing requirements were implemented in the case of Precision Pine's contracts?
A. I know how they were supposed to be. I don't know how they were.
Q. What did you do to prepare for your deposition here today?
A. Absolutely nothing.
Q. You didn't review any documents?
A. No.

Page 43

MR. HARRINGTON: Why don't we take just a short break?
I think I'm probably done, but let me run through my notes and make sure.
MR. STEVENS: Sure.
(A recess was taken.)
BY MR. HARRINGTON:
Q. Mr. Lewis, you testified that you know about the effect of suspensions generally.
Do you have any knowledge about the effect of the 1995, '96 suspension on Precision Pine & Timber?
A. Not specifically, no. I knew it happened. I read about it, but --
Q. Where did you read about it?
A. Forest Service newsletters.
Q. What have you done since you left the Forest Service?
A. Well, I moved up to Michigan, and I substitute teach at the high school around there.
Q. Have you done any other work?
A. Occasional forestry consulting, but not, not too much.
Q. What have you been doing as forestry

Page 44

consulting work?
A. Mainly off the Internet, drafting responses to Forest Service proposals at one time, and working with local farmers, advise them on forest issues, some of their wood lots, that kind of thing.
Q. Who have you done consulting work for other than the local farmer you just mentioned?
A. Mr. Saltman -- or no. Excuse me. It was not -- the local -- it's about two, three years ago.
The forest industry group here in D.C., they have an office here. It was concerning a proposed federal regulation.
Q. Have you worked with Mr. Saltman or the Saltman & Stephens firm before?
A. No, not directly.
Q. How about indirectly?
A. Through the American, the American Wood Products Association -- is that what it's called? Something like that, but I worked with them, not directly for --
Q. Have you testified in any cases since you retired from the Forest Service?
A. No.

Page 45

Q. If you'll look at Exhibit 1, the first sentence refers to the mechanics, objectives, and implications of the Forest Service timber sale program.
Do you know anything that that refers to other than the things that are specifically listed afterwards?
MR. STEVENS: I'm going to object to the question because of its breadth, and you have just pointed to a specific sentence and with a few qualifying phrases afterwards and asked this witness if he remembered anything or is aware of anything other than that.
And I caution that this is just so broad that he very well might not recall some specific or some point that may be important later on.
You can ask the question if you want. I'm just making the point that the question is extremely broad.
MR. HARRINGTON: Actually it may be better to ask it of you or Mr. Saltman.
Is there any area that you anticipate Mr. Lewis testifying in other than those that are enumerated? Because as you point out, the



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005