IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 98-720 C

(Filed January 30, 2004)

\- - - - - - - - - - - - - - - - -x

PRECISION PINE & TIMBER, INC., :

Plaintiff, :

v. :

THE UNITED STATES, :

Defendant. :

ORIGINAL

\- - - - - - - - - - - - - - - - -x

Washington, D.C.

Wednesday, February 4, 2004

Continued deposition of LORIN D. PORTER, a witness herein, recalled for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness having been duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Saltman & Stevens, P.C., 1801 K Street, N.W., Washington, D.C. 20006, at 9:07 a.m., Wednesday, February 4, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

shutting any sawmills down prior to the, prior to the suspension.

I don't have any idea.

BY MR. HARRINGTON:

Q. I'm asking if you know if it was something that was being considered.

A. I don't. I don't know. That does not make a lot of sense to me, so I don't know.

That's the first time that I remember seeing the letter.

Q. Okay.

A. I wonder about the date.

(There was a pause in the proceedings.)

BY MR. HARRINGTON:

Q. We have spoken a little bit about the Winslow sales record?

A. Um-hm.

Q. Could you describe for me exactly what that record is, what it consisted of?

A. Not exactly. I could probably generally tell you what --

Q. Could you tell me generally?

A. Yes. It was a record that tracked our sales.

We had a secretary in the office that had worked for Duke City Lumber company that had maintained a sales record for them, and she basically took that, took that thing over and just did the same thing for Precision Pine.

You know, she was the one that decided what went where generally speaking, and I didn't pay any attention to that.

But I, you know, I did look at the record, and then see what it was.

It was generally something that we tried to see what our average sales utilization was, not by product, but by, by, by overall, you know, just get an idea of where we were, at least in my mind.

Q. So was this something that you used to track the sales that Precision Pine was making?

A. At times, yes. And when you say sales, you're talking about lumber sales? Yeah. Yeah.

Q. Did it include rough cut sales?

A. It may have included some rough cut stuff that was sold from -- actually I can't remember whether those were included from the Heber and Eagar Mills, or if they had a separate

PRECISION PINE & TIMBER, INC., )
)
Plaintiff, )
)
v. )
)
THE UNITED STATES, )
)
Defendant. )
)

DEPOSITION OF LORIN PORTER

Overgaard, Arizona
February 11, 2004
2:30 p.m.

Prepared for:
The Court
(Original)

Prepared by:
Bonnie Ponce
Certified Court Reporter
No. 50669

Certified Copy

A. I believe so, yes.

Q. How did you derive the mix of products that Precision Pine claims it would have produced from the suspended contracts?

MR. SALTMAN: Objection; asked and answered.

THE WITNESS: How did I come up with the list of products? I think I explained that in Washington, D.C., and that is the same thing we used.

Q. BY MR. HARRINGTON: Is the methodology that you used to come up with the mix of products a methodology that is recognized by the industry?

A. I don't know what is recognized by the industry in that regard. I can tell you that I believe I knew what we were cutting and making from the types of logs we had under contract.

Q. Did you consult any textbooks or studies in coming up with the methodology you used?

A. Just the studies we made ourselves. But as far as textbooks, I don't know if there are any textbooks that can tell you what you're going to get from a specific sale and log and area.

Q. Did you talk to anyone else in coming up with the mix of products that Precision Pine claims

interrogatory?

A. Yes.

Q. Does this interrogatory describe the process you used in deriving the mix of products that Precision Pine claims it would have produced on the suspended timber sale contracts?

A. I think as well as you can explain it on paper and get the explanation. It's difficult to explain everything in written form.

Q. That's why I want to talk to you a little about it now.

There on the first page it makes reference to a lag time.

MR. SALTMAN: Where on the first page are you referring?

MR. HARRINGTON: It's not on the first page. Hold on.

It's about four lines down in the answer in parentheses, and it says, "In doing so, Mr. Porter took into account lag time from timber harvest to lumber sale."

Q. BY MR. HARRINGTON: What was the lag time you used in your methodology?

A. It --

MR. SALTMAN: I'm going to object. He

has testified extensively about the process he used, and I think in the course of that answer he has provided an answer.

With that, you are free to answer the question.

THE WITNESS: The lag time is -- there is a period of time, you bring logs in and cut them at the mill and you -- depending on which mill it was at. If you are in Winslow, you are right there.

If you are at Heber or Eagar, you had to transport the material, so there was a lag time that had to be considered to try to calculate what the percentages were, and so I used the best of my knowledge and ability in watching the lumber go through as a lag time.

Q. BY MR. HARRINGTON: What was the period of time used as a lag time?
A. It varied from mill to mill.
Q. So you didn't use the same lag time on each of the contracts that you were analyzing?
A. I tried to be as accurate as I possibly could in putting this together, and that's all I tried to do.
Q. Did you use the same lag time on each of the contracts that you were analyzing?

A. Probably not. I can't remember specifically, but I probably did not use the exact same lag time.

Q. Do you know what lag time you used in analyzing the St. Joe contract?

A. I would have considered -- when the St. Joe was harvested at the mill, I would have watched that lumber from the time it was harvested at the mill and it was transported to Winslow, and I would have taken whatever that period of time as I watched that -- could have been two, three weeks. Whatever I felt was accurate is what I used.

MR. SALTMAN: I'm going to renew my objection, because he testified, as I recall, for a good half hour or more as to the process he used, and I believe he answered the questions regarding things like lag time.

You are free to continue your questioning.

MR. HARRINGTON: I am interested in the specific lag time that was used in analyzing each of these contracts, and I can assure you that we did not get, last week or today, any information on specific lag times that were used, and that's what I'm asking Mr. --

MR. SALTMAN: You can ask away, and I'm going to object away.

MR. HARRINGTON: That's fine.

Q. BY MR. HARRINGTON: Do you know what lag time was used in performing your analysis of the St. Joe contract?

MR. SALTMAN: Objection; asked and answered.

You are free to answer.

THE WITNESS: The question is on each specific --

Q. BY MR. HARRINGTON: Specifically on the St. Joe contract.

A. I don't remember the specific time in relation to that. I just know when I did it, I felt it was as accurate as I could get it.

Q. Do you know how you would figure out what lag time was used for the St. Joe contract?

A. Simply by watching it go through the mill and transported and actually produced at the other mill.

Q. Let me phrase the question differently.

When you did this analysis, can you now go back to anything to figure out what lag time you used in analyzing the St. Joe contract?

A. Can I now go back to anything? I doubt there's anything that is specifically written down that says it was three weeks or two weeks or four weeks.

I don't think there's anything like that that I jogged down in my memory. I just went through it piece by piece and said it was in my best estimate, and in watching it go through, this is the best estimate I could make.

Q. Do you know what lag time was used in your analysis of the U-bar contract?

MR. SALTMAN: Objection; asked and answered.

THE WITNESS: Same scenario.

Q. BY MR. HARRINGTON: And you mean right now you do not know what specific lag time --

A. Similar as St. Joe, watching it, seeing the lumber at the different mills.

Q. I'm not asking how you did it. I simply want to know what specific lag time was, in fact, used.

A. Then I can't tell you.

Q. Is there anything you could look at so that you could determine what lag time you used in your analysis on the U-bar contract?

A. Not that I'm aware of.

Q. Can you tell me what lag time you used in your analysis of the Hutch-Boondock contract?

MR. SALTMAN: Objection; asked and answered.

THE WITNESS: Same answer. I can't tell you the specific lag time I used. I just know it was done most accurately I could do it.

Q. BY MR. HARRINGTON: Do you have anything that you could refer back to with respect to the Hutch-Boondock contract to figure out what lag time you used in the analysis of that contract?

A. Probably not.

Q. You say, "Probably not." Is there something you might be able to refer to?

A. No. I think that it would be with -- all the time that's gone by, I don't think there's a way in the world you could look for it.

Q. Do you know what specific lag time you used in your analysis of the Brann contract?

MR. SALTMAN: Objection; asked and answered.

THE WITNESS: Same answer.

Q. BY MR. HARRINGTON: No, you don't know what specific time was used?

A. The same answer I had in reference to the others. No, I don't know specifically. I just know that I knew at the time specifically what I was using.

Q. How about the Mud contract; do you know what lag time you used to analyze the Mud contract?

MR. SALTMAN: Objection; asked and answered.

THE WITNESS: Same answer there, that there is nothing specific that I know that is recorded other than what I used.

Q. BY MR. HARRINGTON: And here today you don't know what that specific period of time was?

A. No, I don't.

Q. And how about the Brookbank contract; do you know what lag time you used in analyzing the Brookbank contract?

MR. SALTMAN: Objection; asked and answered.

THE WITNESS: I don't know specifically.

Q. BY MR. HARRINGTON: And do you know of anything you could refer to to figure out the answer with respect to the Brookbank contract?

A. I don't know specifically at this time.

Q. Is there anything you might be able to

refer to?

A. Nothing that I'm aware of, other than my experience.

Q. Looking at the second to last page of this exhibit --

MR. SALTMAN: Are you talking about the charts or the text?

MR. HARRINGTON: The charts.

MR. SALTMAN: Okay.

Q. BY MR. HARRINGTON: Under the Brookbank contract, it has a list of products produced.

A. Yes.

Q. What is Paragraph 99 redress?

A. A specific grade of lumber.

Q. What is that sort of grade?

A. Paragraph 99 is a grade that we would sell to an industrial manufacturer to rerip the lumber. It has specific rules. If you want me to go over those, I can probably tell you what they are.

I think it was 50 percent, nine inches long, two and a half inches wide.

Q. How about five-quarter RWL radius edge; what does that mean?

A. Five quarter random width and length