**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-720C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE PLAINTIFF'S EX. 287 AND RELATED TESTIMONY**

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: April 21, 2005

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ..... iii

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

I. Precision Pine's Determination Of Lumber Prices For Its Lost Profits Claim During The Suspension Period ..... 2

A. The Approach Taken by Precision Pine in PX 180 ..... 2

B. Defendant's Experts' Critiques of the Damage Calculations in PX 180: The Suggested Use of Weighted Averages and All Invoices ..... 3

C. Precision Pine's Use of Weighted Averages and All Invoices to Calculate Lost Profits in the Post-Suspension Period ..... 6

D. Defendant's Further Suggestion That Mr. Ness Should Independently Determine Lumber Product Mix-Ratios ..... 8

ARGUMENT ..... 9

I. Defendant's Attempt To Exclude PX 287 Based On RCFC 26(a)(2)(C) Is Misplaced ..... 10

II. PX 287 Is A Supplemental Exhibit Addressing Criticisms Of Mr. Ness' Initial Report Which Was Disclosed In Conformity With RCFC 26(e) ..... 11

III. The Timing Of The Disclosure Of PX 287 Was Justified Or Harmless ..... 14

A. The Timing of the Disclosure of PX 287 Was Substantially Justified in the Circumstances of the Case ..... 15

B. The Timing of the Disclosure of PX 287 Is Harmless to Defendant ..... 18

IV. Even If The Timing Of PX 287 Were Not Justified Or Harmless, The Sanction Of Exclusion Is Not Appropriate Here ..... 20

CONCLUSION ........................................................................................................................21

## TABLE OF AUTHORITIES

**CASES** **PAGE**

Baxter Diagnostics, Inc. v. Novatek Medical, Inc.,
No. 94 Civ. 5220, 1998 WL 665138, (S.D.N.Y. Sept. 25, 1998) ....................................10

Brennan's, Inc. v. Dickie Brennen & Co., Inc.,
376 F.3d 356 (5th Cir. 2004) ....................................14

Davis v. U.S. Bancorp,
383 F.3d 761 (8th Cir. 2004) ....................................14

Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.,
285 F.3d 609 (7th Cir. 2002) ....................................20

In re Kreta Shipping, S.A.,
181 F.R.D. 273 (S.D.N.Y. 1998) ....................................10

Luce v. United States,
469 U.S. 38 (1984) ....................................9

Luma Corp. v. Stryker Corp.,
226 F.R.D. 536 (S.D. W.Va. 2005) ....................................13

McCarthy v. Option One Mortg. Corp.,
362 F.3d 1008 (7th Cir. 2004) ....................................14

McNerney v. Archer Daniels Midland Co.,
164 F.R.D. 584 (W.D.N.Y. 1995) ....................................10

Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Group,
937 F. Supp. 276 (S.D.N.Y. 1996) ....................................10

Palmieri v. Defaria,
88 F.3d 136 (2nd Cir. 1996) ....................................10

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) ....................................2

Precision Pine & Timber, Inc. v. United States,
63 Fed. Cl. 122 (2004) ....................................7, 15, 16

RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,
94 Civ. 5587, 2002 WL 31780188 (S.D.N.Y. Dec. 11, 2002) ....................................10

Transamerica Ins. Corp., Inc. v. United States,
28 Fed. Cl. 418 (1993) .......... 10

Tritek Technologies, Inc. v. United States,
63 Fed. Cl. 740 (2005) .......... 14, 19

Tucker v. Ohtsu Tire & Rubber Co., Ltd.,
49 F. Supp. 2d 456 (D.Md. 1999) .......... 13

**STATUTES AND REGULATIONS**

RCFC
26 .......... 14
26(a) .......... 10, 14
26(a)(2)(B) .......... 11
26(a)(2)(C) .......... 10, 11, 14
26(a)(3) .......... 12
26(e) .......... 11, 12, 13
26(e)(1) .......... 12
37(c) .......... 13, 14, 20
37(c)(1) .......... 20

Fed. R. Civ. P.
26(a)(3) .......... 12
26(e)(1) .......... 12
37(c)(1) .......... 20

## INTRODUCTION

On April 7, 2005, defendant filed a Motion *in Limine* to Exclude Plaintiff's Exhibit 287 ("Def. Motion *in Limine*"). Defendant's motion is, however, not well-founded. The exhibit in question is not, as defendant asserts, a "rebuttal report" with respect to opinions advanced by defendant's experts. Rather, the exhibit is the product of recommendations made by defendant's own experts, uses data long in defendant's possession and employs methodologies that defendant's experts opined were preferable to the approach taken by Precision Pine & Timber, Inc. ("Precision Pine") in its damage calculations. Moreover, as demonstrated below, given the circumstances of this case, PX 287 was created as expeditiously as was reasonably possible and, even before it was formally completed, its existence was disclosed and immediately thereafter a copy was provided to defendant.

It is Precision Pine's intention to offer the exhibit in its rebuttal case following what it anticipates will be testimony from defendant's experts asserting that Precision Pine should have calculated its damages in a manner slightly different than the way it did, i.e., in the manner used in PX 287. Moreover, even though the changes advocated by the government's experts would, as it turns out, actually increase Precision Pine's damages, Precision Pine, however, does not seek to increase its damages based on PX 287. Thus, the calculations in PX 287, which use the manner of computation recommended by defendant's own experts as the correct way to determine damages, can come neither as a surprise to the government nor are its contents in any way prejudicial to the government as they are not offered to change the amount of Precision Pine's claim in any way.

## FACTUAL BACKGROUND

I. Precision Pine's Determination Of Lumber Prices For Its Lost Profits Claim During the Suspension Period

A. The Approach Taken by Precision Pine in PX 180

In recalculating its lost profits damages following Chief Judge Damich's ruling on liability,[1] Precision Pine used lumber price data from its invoices of actual lumber sales for each of the 13 categories of Ponderosa Pine lumber products manufactured and sold by Precision Pine during the period of the suspension. These are the same categories of lumber products that would have been produced from the breached sales during the suspension. More than 1,100 such invoices were used in determining the price of lumber products sold during the suspension period. This recalculation was performed in late 2001-early 2003, i.e., toward the end of a period of informal discovery during which Precision Pine sought to resolve its claim with the Forest Service, and long before Mr. Ness, or indeed any expert became involved in the case on behalf of Precision Pine or defendant.

In revising its lost profits calculations, Precision Pine used a simple average (not a weighted average) of these invoice prices for each lumber product sold during each quarter of the suspension to arrive at a quarterly price for each Ponderosa Pine lumber product.[2] Moreover, 31

[1]That ruling found that 11 of the 14 timber sale contracts that had been suspended had also been breached. Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35 (2001). Because Precision Pine's damage calculations had been premised on the breach of all 14 contracts, there was a need to re-quantify the damages, especially with respect to lost profits.

[2]As noted, the use of a simple average had been done by Precision Pine prior to the involvement of plaintiff's expert, Mr. Ness, in the case. Mr. Ness was not asked to review this aspect of Precision Pine's damages in his initial assessment of the claim and he did not do so.

of the more than 1,100 invoices were not used for a variety reasons, including that the prices reflected on them were so aberrationally low or high that their inclusion and would have resulted in inaccurately skewed pricing, especially if they had been used in calculating a simple average or were for lumber products other than Ponderosa Pine.[3]

B. Defendant's Experts' Critiques of the Damage Calculations in PX 180: The Suggested Use of Weighted Averages and All Invoices

Mr. Wayne Moosman, the government's putative accounting expert, testified at deposition that he did not agree with Precision Pine's approach to determining the quarterly price of each of Precision Pine's lumber products by using a simple average of invoice prices and fewer then all of the invoices:

> [What] PP&T calculated based on the invoices was a simple average of the invoice amounts. Did not take into account the volumes.
>
> My experience basically is that you need to look at a weighted average, and -- in order to be, get what the real average is on the sales prices that he would have received.
>
> The other problem that I had with it was that by virtue of the invoices that were provided, being sequentially numbered, I could tell that there were missing invoices, and they, it's been my experience that it's the missing invoices that tend to tell the greater story.

*See* Excerpts of the Deposition of Wayne Moosman attached hereto as Ex. 1 at 123-24.

---

Thus, Mr. Ness' analysis of Precision Pine's damages in PX 180 did not alter the basic approach to lumber pricing based on a simple average of invoices.

[3]The few invoices that Precision Pine did not use were identified and produced to the government in discovery and a written explanation of why each invoice was not used was also provided.

Mr. Moosman further acknowledged that, in furtherance of what he believed to be the preferred methodology, he had started to analyze the underlying lumber invoices used by Precision Pine for the purpose of his preparing a document that contained all of the invoices and showed the weighted (rather than the simple) average price for each of the Ponderosa Pine lumber products sold during the suspension. Ex. 1 at 269. However, as Mr. Moosman also testified, before completing that analysis he came across Precision Pine's Winslow sales record (which is also referred to as the "Winslow sales ledger" or "Winslow sales journal") which caused him to believe that his effort to review the actual sales invoices was no longer necessary. Id.[4] Moreover, at least part of the reason that Mr. Moosman did not complete his effort to calculate a weighted average of all of the actual lumber sales invoices was because he "didn't have the expertise to try to figure out where some of those products that were on those invoices should be plugged into," i.e., where each of the products on the invoices belonged among the 13 categories of lumber products produced by Precision Pine. Id. at 272-73.

In light of Mr. Moosman's conceded inability to properly categorize lumber product invoices, the following exchanges took place at his deposition with regard to his reliance on the Winslow sales record as a source of lumber pricing data during the suspension:

> Q: Would it affect your opinion [as to the proper price for any category of lumber products] if the lumber sales invoices were not always accurately recorded in the proper [lumber product] categories of the Winslow sales record?
>
> A: It may have an impact, yes.

* * * *

[4] The Winslow sales journal is a compendium of invoices and prices that was maintained by Precision Pine on a monthly basis.

Q: . . . if it were demonstrated to you that lumber price invoices were not always accurately categorized in the, with the proper lumber product, how would that impact your opinion?

A: May have to make adjustments.

* * * *

Q: . . . . Assume that there are lumber products that have been miscategorized, that there is the wrong the wrong product in with another product on the Winslow sales ledger. Assume that to be true.

A: Okay.

Q: If that's true, wouldn't you want to take out the lumber products that have been miscategorized?

A: If that is true that there are lumber products that have been mischaracterized, then I would think that they should be removed.

Id. at 125-129.[5] Mr. Moosman further conceded that he had not reviewed the invoices that were the source documents for the information in the Winslow sales journal. Id. at 129.

Based on these statements, Mr. Ness, who attended Mr. Moosman's deposition, sought to perform the weighted average calculations based on the invoices themselves as Mr. Moosman recommended be done and as Mr. Moosman himself had a least started to do.[6] In doing so, Mr.

---

[5]The use of weighted averages and all invoices was also advocated by another of defendant's experts, Jonathan A. Neuberger, in his report dated January 5, 2004 at pp. 21-22, ¶¶ 60-61. See Defendant's Exhibit 776.

[6]As Mr. Ness testified at his deposition:

> I mean if I was starting from scratch, I would use a weighted average, and I may or may not refine the product descriptions even more.
>
> If I felt that, that two products get lumped together in a way that could distort the average, I might have separated them out into separate products.

Ness discovered that the categorization of invoices on the Winslow sales journal had been done incorrectly:

> I found lumber products summarized in the same column of the [Winslow] sales journal, for the same quarter, where one lumber product sold for $1,340.00 per MBF and the other lumber product sold for $570.00 per MBF. Clearly, these are not similar products that can be averaged together. This is just one example - Many more could be cited. I also noticed invoices for the same lumber product were recorded in different columns at different times. . . . In total I found over 200 invoices out of about 1200 invoices that were either classified with dissimilar products or were not consistently classified.

Letter from Robert A. Ness to Alan I. Saltman dated February 26, 2005 attached hereto as Ex. 3 at 2. Mr. Ness further explained that the Winslow Sales journal had improperly grouped products produced from species other than Ponderosa Pine with Ponderosa Pine products, even though the prices for the same lumber products produced from different species could command significantly different prices. Id. In preparing PX 287, Mr. Ness reviewed and sorted all of the underlying invoices into the proper 13 categories of Ponderosa Pine lumber products produced by Precision Pine. Id. at 2-3. Then, he calculated the quarterly price of each lumber product on a weighted average basis. Id. at 3-4. As a result of all of his calculations in PX 287, Mr. Ness determined that Precision Pine's lost profits claim had been understated by $388,000. Id. at 4.

C. Precision Pine's Use of Weighted Averages and All Invoices to Calculate Lost Profits in the Post-Suspension Period

In an effort to narrow the areas of contention in the case, in his recent calculation of post-suspension profits (PX 182), Mr. Ness used the same technique that he uses in PX 287 and was recommended by defendant's experts, i.e., Mr. Ness made a determination of lumber product

---

Excerpts of the Deposition of Robert A. Ness, February 17, 2004, attached hereto as Ex. 2 at 112.

prices in a relevant portion of the post-suspension period by using a weighted average of all of the invoices for each product in 1997 and 1998.[7] See PX 182. Mr. Ness' efforts in doing so were applauded by another of the government's putative damages experts who also opined that this approach should have been used in determining lumber prices during the suspension:

> Mr. Ness' supplemental report contains certain inconsistencies from his previous analyses. For example, he conducted no analysis of the lumber prices in his original report and instead relied on prices prepared by plaintiff or plaintiff's counsel. I presented a critique of these prices in my original report. In his supplemental report, Mr. Ness performs a more thorough analysis of PP&T invoices and derives prices that are more consistent with company records.

Excerpts from the Supplemental Expert Witness Report of Jonathan A. Neuberger attached hereto as Ex. 4 at 3, ¶ 11 (emphasis supplied). Indeed, in his rebuttal report of March 21, 2005, Dr. Neuberger goes on to heartily endorse the approach to determining lumber product prices taken by Mr. Ness in his post-suspension report, i.e., the very same approach utilized by Mr. Ness in PX 287 for the suspension period:

> In contrast [to his original damages report], this time around Mr. Ness conducted his own pricing analysis, developing weighted average product prices from what appears to be a complete set of PP&T invoices during 1997 & 1998. **In my view this approach is the correct one**. . . . I would argue that this approach is superior to, and different from, the approach used in the earlier report.

Id. at 10, ¶ 28 (emphasis supplied).

For all of the bombast in its motion *in limine*, the government fails to inform the Court that the technique of determining lumber prices used in PX 287, i.e., using weighted averages

---

[7]As the Court is aware, it is Precision Pine's belief that no offset of profits in the post-suspension period is necessary due to its status as a lost volume seller. However, because the Court tasked Precision Pine with accounting for the amount of the post-suspension profits in the event Precision Pine was found not to have been a lost volume seller (see Precision Pine & Timber, Inc. v. United States, 63 Fed. Cl. 122, 133 (2004)), Mr. Ness prepared PX 182.

and all invoices, was the technique recommended by two of its own experts and would actually result in an increase of Precision Pine's damages.

D. Defendant's Further Suggestion That Mr. Ness Should Independently Determine Lumber Product Mix-Ratios

In his original report, and again in his supplemental report, defendant's putative expert, Dr. Neuberger, also takes Mr. Ness to task for uncritically accepting the percentage of each lumber product that Precision Pine determined would have been produced from the timber on the breached sales:

> One of these key assumptions [in plaintiff's damage calculations] involves "product-mix ratios," i.e., the mix of products to be produced from each timber sale. Plaintiff prepared these product mix ratios for the original damages claim; Mr. Ness takes these original ratios and applies them to the entire post-suspension period for each timber sale. I understand that Mr. Porter developed these ratios based on his expectations regarding the timber available on each sale. Yet, to my knowledge, <u>Mr. Ness has made no effort to confirm that these ratios are reasonable or realistic</u>.

<u>See</u> Ex. 4 at 8, ¶ 23 (emphasis supplied). In PX 287, however, Mr. Ness provides the very information suggested by Dr. Neuberger. That is, in PX 287, Mr. Ness calculated lumber product ratios based on the Ponderosa Pine lumber products that Precision Pine actually produced during the suspension using all of the invoices for the period. Those results were compared to the lumber product percentages anticipated by Mr. Porter to have been produced from lumber manufactured from the timber on each of the breached sales. <u>See</u> PX 288 at 1. Because these invoices are for sales of lumber products that were actually produced during the suspension, they may contain a higher amount of non-Forest Service timber than would otherwise have been the case, nevertheless, the results demonstrate that Mr. Porter's predicted

lumber product mix ratios for the suspended sales was quite consistent with the product mix actually achieved by Precision Pine during the suspension period.[8]

As noted above, Mr. Ness concluded that by making the calculations advocated by the government's own experts (something that they themselves had not undertaken to do) Precision Pine's damages during the suspension period would actually increase. However, and perhaps most significantly, Mr. Ness does not advocate that Precision Pine increase its damage claim at this point nor does Precision Pine seek to do so. Rather, the primary purpose of PX 287 is to demonstrate that Precision Pine's approach to calculating its lost profit damages, regardless of the quibbles the government has raised, is quite conservative and, if anything, is more favorable to the government than if Precision Pine has taken the approach advocated by its own experts. Accordingly, because PX 287, uses an approach to damages that both parties agree is "the correct one," PX 287 should greatly assist the Court in assessing the damages in this case and reducing areas of potential conflict.

**ARGUMENT**

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. See Luce v. United States, 469 U.S. 38, 41 n.4 (1984) (noting that, although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the trial court's inherent

[8] In this same regard, another comparable calculation shows that Mr. Porter's predicted lumber-product ratio also compares favorably with the lumber product ratio achieved by Precision Pine in the period July 1994 to July 1995, i.e., the 13 months immediately preceding the suspension. See PX 288 at 2.

authority to manage the course of trials); Palmieri v. Defaria, 88 F.3d 136, 141 (2nd Cir. 1996); Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Group, 937 F. Supp. 276, 283 (S.D.N.Y. 1996). Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds. See Baxter Diagnostics, Inc. v. Novatek Medical, Inc., No. 94 Civ. 5220, 1998 WL 665138, at * 3 (S.D.N.Y. Sept. 25, 1998) (denying a motion *in limine* to preclude presentation of evidence regarding a potential punitive damages claim because the motion was too sweeping in scope to be considered prior to trial). Moreover, the exclusion of expert testimony is a "drastic sanction." Transamerica Ins. Corp., Inc. v. United States, 28 Fed. Cl. 418, 421 (1993); see also McNerney v. Archer Daniels Midland Co., 164 F.R.D. 584, 587 (W.D.N.Y. 1995); RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., 94 Civ. 5587, 2002 WL 31780188, at *3-4 (S.D.N.Y. Dec. 11, 2002). Precluding testimony of an expert, even when there has not been strict compliance with Rule 26, "may at times tend to frustrate the Federal Rules' overarching objective of doing substantial justice to litigants." In re Kreta Shipping, S.A., 181 F.R.D. 273, 277 (S.D.N.Y. 1998). For the reasons set forth below, plaintiff requests that defendant's motion to exclude PX 287 should be denied.

## I. Defendant's Attempt To Exclude PX 287 Based On RCFC 26(a)(2)(C) Is Misplaced

Defendant argues that PX 287 is a rebuttal report and as such it is untimely because:

> Under RCFC 26(a), Precision Pine was required to serve upon the United States any rebuttal to Mr. Moosman's expert report by February 4, 2004. See RCFC 26(a)(2)(C)(requiring disclosure of any rebuttal report within 30 days of receipt of the principal report).

Def. Motion *in Limine* at 5.[9] RCFC 26(a)(2)(C) actually provides that a rebuttal report "intended solely to contradict or rebut evidence on the same subject matter identified by another party under paragraph (2)(B) [(disclosure of expert testimony)]" must be served within 30 days after the disclosure of the other party's expert opinion. RCFC 26(a)(2)(C) (emphasis supplied). As has been demonstrated above, PX 287 was created in acceptance of the criticisms of plaintiff's damages calculations made by two of defendant's experts with which Mr. Ness also agreed. As such, PX 287 is not being offered "solely" (or even primarily) to contradict or rebut evidence offered by those experts within the meaning of RCFC 26(a)(2)(C). Accordingly, the premise of defendant's motion, i.e., that RCFC 26(a)(2)(C) governs the timing of the disclosure of PX 287 is simply incorrect.

## II. PX 287 Is A Supplemental Exhibit Addressing Criticisms Of Mr. Ness' Initial Report Which Was Disclosed In Conformity With RCFC 26(e)

Pursuant to RCFC 26(e), the duty to amend a discovery disclosure extends to expert reports:

> A party who has made a disclosure under subdivision (a) or responded to a request for discovery with a disclosure or response is under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances:
>
>> (1) A party is under a duty to supplement at appropriate intervals its disclosures under subdivision (a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the

---

[9] Defendant, correctly, does not argue the requirement in RCFC 26(a)(2)(C) that initial disclosures of expert reports be made 70 days in advance of trial pertains to timing of the disclosure of PX 287. Indeed, that rule governs disclosure of expert opinions and testimony that that the expert "witness is expected to present during direct examination, together with and the reasons therefor." See Fed. R. Civ. P. 26 Advisory Committee Note (1993). As noted above, Precision Pine anticipates using PX 287 in its rebuttal case about "the correct" method of calculating lost profits, not in Mr. Ness's direct testimony.

> additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. With respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty extends both to information contained in the report and to information provided through a deposition of the expert.

RCFC 26(e) (emphasis supplied). Moreover, the obligation to make initial disclosures of expert reports is expressly subject to the ongoing obligation to supplement under 26(e)(1). "The parties shall supplement these disclosures when required under subdivision (e)(1)" RCFC 26(a)(2)(C). RCFC 26(e)(1) does not provide any specific deadline by which such supplements must be submitted and the Court's pretrial order of January 4, 2005 did not establish a deadline with respect to the parties' duties to supplement. The only requirement in RCFC 26(e)(1) is that supplementation be made at "appropriate intervals." As demonstrated in Section III.A below, the disclosure of PX 287 was timely.

Notably in this regard, although the RCFC 26(e)(1) is quoted in its entirety above, the Federal Rules of Civil Procedure upon which it is based contain a concluding clause that is not included in RCFC 26(e)(1), which provides: "and any additions or other changes to this information shall be disclosed by the time the parties' disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(1). Fed. R. Civ. P. 26(a)(3), in turn, governs pretrial disclosures including the provision of final witness and exhibit lists and states that these pretrial disclosures shall be provided "at least 30 days before trial." Fed. R. Civ. P. 26(a)(3). Thus, under the Federal Rules, supplements are due no later than final trial disclosures, i.e., at least 30 days before trial. However, the Rules of the Court of Federal Claims have retained the pretrial disclosures procedures of Appendix A, ¶¶ 13, 15, 16 rather those set forth in Fed. R. Civ. P. 26(a)(3). See RCFC 26(a)(3). Nevertheless, the fact remains that Precision Pine both disclosed the existence

of PX 287 more than 30 days in advance of trial and did so in its preliminary exhibit list, i.e., in well in advance of its final pretrial disclosures. Therefore, its disclosure of PX 287does not violate any rule of this Court and is timely within the spirit of Rule 26(e)(1). Luma Corp. v. Stryker Corp., 226 F.R.D. 536 (S.D. W.Va. 2005), (In the absence of a pretrial order specifying a deadline for supplementing expert opinions, the disclosure of such a supplement is timely if made with in the time allowed for pre-trial disclosure of witnesses and exhibits, citing Tucker v. Ohtsu Tire & Rubber Co., Ltd., 49 F. Supp.2d 456 (D.Md. 1999)).

Moreover, mindful of the stage of the proceedings at which PX 287 was completed, Precision Pine does not proffer PX 287 to increase its damages or in any way alter the opinions or calculations in Mr. Ness' initial report. Rather, PX 287, calculated as suggested by defendant, simply demonstrates that Precision Pine's existing claim is conservative and, if anything, favorable to the government. Because Precision Pine has complied with its obligation to supplement under RCFC 26(e), defendant's motion to exclude PX 287 should be denied. See RCFC 37(c) (only a failure to disclose supplemental information as required by RCFC 26(e)(1) would subject that information to potential exclusion).[10]

---

[10]Defendant's attempt to exclude Mr. Ness' supplement as untimely is ironic. That is, defendant itself has been guilty of providing numerous things in an untimely manner, i.e., defendant faxed supplemental calculations prepared by its putative damages expert Charles Adkins at 4:43 pm on the eve of his April 12, 2005 deposition. Moreover, defendant's putative expert, Jonathan Neuberger, admitted at his April 13, 2005 deposition that he possessed calculations that should have been submitted to plaintiff along with his expert report but which had been omitted due to an "oversight." Those calculations were provided the day after the deposition.

## III. The Timing Of The Disclosure Of PX 287 Was Justified Or Harmless

Even if defendant were correct that PX 287 is a rebuttal report, disclosure of which is governed by RCFC 26(a)(2)(C) because it is "intended solely to contract or rebut evidence on the same subject offered by" defendant's expert (which it its not), RCFC 37(c) does not provide that exclusion of the exhibit is mandated. See Davis v. U.S. Bancorp, 383 F.3d 761, 765 (8th Cir. 2004); McCarthy v. Option One Mortg. Corp., 362 F.3d 1008, 1012 (7th Cir. 2004) ("Rule 37 of the Federal Rules of Civil Procedure restrains courts from excluding relevant testimony when a party's failure to disclose  a witness is substantially justified or harmless"). Rather, even untimely evidence (which PX 287 is not) remains fully admissible under RCFC 37 if its disclosure was nonetheless either substantially justified or harmless. Id.[11] The decision as to whether the failure to disclose information pertaining to expert witnesses under RCFC 26(a) was justified or harmless is committed to the trial court's sound discretion. Brennan's, Inc. v. Dickie Brennan & Co., Inc., 376 F.3d 356, 375 (5th Cir. 2004) (upholding trial court's determination that damages expert's supplementation of his report at trial following jury verdict on liability should not be excluded even though the documents and calculations underlying that supplementation had not been timely provided to defendants). Although the test for admissibility is framed in the disjunctive, Precision Pine's disclosure of PX 287 was neither unjustified nor prejudicial. Therefore, even assuming that PX 287 is a rebuttal report, it remains fully admissible and defendant's motion should be denied.

[11] The Federal Circuit does not appear to have fashioned a test for applying the exclusion provisions of RCFC 26 and 37. Tritek Technologies, Inc. v. United States, 63 Fed. Cl. 740, 750 (2005).

### A. The Timing of the Disclosure of PX 287 Was Substantially Justified in the Circumstances of this Case

As demonstrated above, much of the impetus for PX 287 came from the deposition of defendant's own expert taken on February 19, 2004, just four days prior to the close of discovery on February 23, 2004.[12] Even more importantly, however, just three days later, on February 26, 2004, the government formally stated its intention to move for summary judgment on all aspects of Precision Pine's claim for lost profits. See Defendant's Notice of Intent to File Dispositive Motion dated February 26, 2004.[13] It would have made little sense for Precision Pine to have tasked its expert with the considerable time, effort and expense involved in finalizing a recalculation of its lost profits when defendant had already advised that it would seek to defeat this claim in its entirety as a matter of law.

Thereafter, defendant did, in fact, move for summary judgment on the issue of lost profits, seeking to have that claim dismissed in its entirety on numerous grounds. See Defendant's Partial Motion for Summary Judgment Regarding Damages dated April 15, 2004. The extensive briefing on defendant's motion and oral argument were completed in the summer of 2004 and the Court rendered its opinion on defendant's summary judgment motion on November 23, 2004. Precision Pine & Timber, Inc. v. United States, 63 Fed. Cl. 122 (2004). Although the Court's opinion did not grant defendant's motion on the lost profits claim, had the

[12]By order dated February 3, 2004, this Court granted the parties' joint motion to enlarge discovery to February 23, 2004.

[13]There was no surprise in the government's formal announcement of its intent. In fact, Precision Pine was aware that the government would likely contest its lost profits claim and had filed papers with the Court recommending that the government file its motion for summary judgment on damages at the end of paper discovery and prior to the parties engaging in lengthy expert discovery; however, this suggestion was rejected by Chief Judge Damich.

Court ruled in favor of defendant in whole or even in part, any effort made to date to revise the lost profits calculations could well have been futile. The opinion did indicate that the burden was on Precision Pine to calculate the amount of profits earned on the breached sales in the post-suspension period to be used in the event that it was found at trial not to be a lost volume seller. Id. at 132-133.

Almost immediately thereafter, Precision Pine requested that the Court hold in abeyance another round of expert reports and discovery on the amount of profits that Precision Pine earned on the breach sales it harvested in the post-suspension period until the question of whether Precision Pine was a lost volume seller was resolved at trial. Plaintiff's Motion for Immediate Status Conference dated November 29, 2004. Because counsel for defendant was in trial at that time, the Court could not schedule the requested Status Conference until December 16, 2004, i.e., approximately one week before Christmas. Order dated December 2, 2004. At that status conference the Court indicated that it was unwilling to adopt Precision Pine's suggested procedure of holding in abeyance the calculation of post-suspension lost profits.[14]

The due date for Precision Pine's expert report on the amount of post-suspension lost profits was set at the pre-trial scheduling conference conducted on January 3, 2005, where the Court denied Precision Pine's requested due date and instead ordered it to complete its post-suspension lost profit calculation in little more than one month's time, i.e., on or before February 7, 2005. Precision Pine & Timber, Inc. v. United States, No. 98-720C (Fed. Cl. Jan. 4, 2005)

[14]As plaintiff indicated in footnote 41 on page 52 of its June 4, 2004 Response to Defendant's Motion for Partial Summary Judgment, the calculation of post-suspension profits is a time consuming and laborious process.

(order setting pretrial schedule). In short, Mr. Ness was tasked with developing another complete set of lost profit calculations for the post-suspension period within exceedingly tight timeframes. Needless to say, Mr. Ness, who is employed full time as the Chief Financial Officer for a lumber manufacturing company, devoted virtually all of his available time to complying with the Court's order, completing his post-suspension profits analysis on time and thereafter preparing for deposition regarding this analysis.

Despite this heavy workload, Mr. Ness was nevertheless also able to complete the analyses contained in PX 287, albeit not until February 26, 2005.[15] Knowing that completion was imminent, even before the exhibit was formally completed, Precision Pine disclosed its existence to defendant in its Preliminary Exhibit List of February 22, 2005 (at that time the document was identified as Preliminary Exhibit 121). Thereafter, a copy of PX 287 was provided to defendant for inspection on March 1, 2005. On that day counsel for defendant specifically requested that he be provided with a copy of PX 287. Precision Pine complied with this request and provided a copy of the exhibit by hand-delivery on March 4, 2005. Thus, in light of the compressed circumstances of this case, it is clear that Precision Pine has not been dilatory nor was its disclosure of PX 287 delayed for any strategic advantage. Rather, Precision Pine completed the exhibit as expeditiously as possible and provided defendant with notice of, access to, and physical possession of the exhibit within days thereafter.

[15]Defendant suggests that Precision Pine was trying to "hide" this analysis from it. This is not correct. It was not known to counsel whether Mr. Ness, given his other considerable duties, would be able to complete this exhibit in time for it to be included on Precision Pine's preliminary exhibit list. Until it was clear that Mr. Ness would be able to complete the exhibit, it would not have been prudent for Precision Pine to disclose efforts that might never be made a part of the case. As noted above, Precision Pine, nevertheless, disclosed the existence of the exhibit as soon as reasonably possible.

B. The Timing of the Disclosure of PX 287 is Harmless to Defendant

Even if the timing of the disclosure of PX 287 were not justified (which it was), the timing of the disclosure of PX 287 was harmless to defendant. As noted above, the calculations performed by Mr. Ness in PX 287 were suggested by defendant's own experts, who have urged that the methodology used in PX 287 by Mr. Ness is the correct one. Additionally, this is the same methodology used by Mr. Ness in his February 7, 2005 report on post-suspension profits. Thus, it should have come as no surprise to defendant that this methodology has been employed nor can using the "correct method" be said to harm defendant in any way. Indeed, defendant has pressed no such argument and identified no specific prejudice to it by using methodologies suggested by its experts. Instead, defendant merely relies on the mantra that the timing of the exhibit makes it prejudicial.

Moreover, Precision Pine does not seek to add a single cent to its damage calculations in this case through PX 287 nor does it alter Mr. Ness' determination of those damages in his initial report. This is another point showing lack of prejudice to defendant which is wholly ignored by defendant. Furthermore, use of this exhibit at trial will be very helpful to the Court in resolving the lost profits damages issues on a basis that defendant has endorsed. Thus, the considerable utility of PX 287, which is a product of consensus of the parties' experts, can present no prejudice to defendant.

Although plaintiff does not see any need for analysis of the manner in which Mr. Ness followed the suggestions of defendant's own putative experts, if the Court requires it, Precision

Pine is willing to make Mr. Ness available for deposition with respect to PX 287 at a mutually convenient time prior to trial. In this regard, we also note that, based on information that the parties have exchanged concerning the length of anticipated direct testimony, it appears that the first government witness may not testify prior to June 1, 2005. Such being the case, it would seem the defendant's experts would have time to review PX 287 and formulate opinions on it (to the extent that they have not already done so). Indeed, in this regard, defendant's putative experts specifically purport to reserve the right to adduce additional opinions up to and through trial. For example, in both of his reports Dr. Neuberger includes the following statement:

> I respectfully reserve the right to express additional opinions, supplement or amend the opinions in this report, or provide additional reasons for these opinions, as additional documents are produced, the transcripts of expert and fact depositions become available for my review, and new facts are introduced during discovery <u>and trial</u>.

<u>See</u> Ex. 4 at 4, ¶ 14 (emphasis supplied). A similar reservation was made by Mr. Moosman in his report:

> I respectfully reserve the right to adjust, supplement, and/or amend the expressed results in this report, or provide additional reasons for these results, as additional documents are produced, the transcript of experts and fact depositions become available for my analysis, and new facts are introduced during discovery <u>and trial</u>.

Report of Mr. Wayne Moosman dated November 18, 2003 attached hereto as Ex. 5 at 4 (emphasis supplied). Clearly, defendant does not believe itself prejudiced by or unable to respond to new information, even should it arise during trial. Here, PX 287 has been in defendant's possession for weeks and trial remains weeks away.[16]

---

[16]One recent, non-binding case issued by the Court of Federal Claims has opined that the determination of whether or not a disclosure is justified or harmless devolves into a consideration of the following three factors: (1) surprise to the party against whom the evidence would be offered, (2) the importance of the information withheld, and (3) explanation for the failure to disclose the information. <u>Tritek Technologies, Inc.</u>, 63 Fed. Cl. at 750. These factors overlap

IV. Even If The Timing Of PX 287 Were Not Justified Or Harmless, The Sanction Of Exclusion Is Not Appropriate Here

RCFC 37(c) explicitly states in pertinent part that "in lieu of this sanction [of total exclusion], the court . . . may impose other appropriate sanctions." Thus, RCFC 37(c)(1) does not compel this Court to exclude PX 287. See Dura Auto. Sys. of Indiana, Inc. v. CTS Corp., 285 F.3d 609, 615-16 (7th Cir. 2002) ("As some cases fail to note, however, . . . the rule goes on to authorize the judge, 'in lieu of this sanction . . . to impose other appropriate sanctions'") (citations omitted); Fed. R. Civ. P. 37 Advisory Committee's Note (1993) (noting that "the rule provides the court with a wide range of other sanctions"). In this regard, the advisory note specifically lists "preventing contradictory evidence" as an alternative way to sanction a party. Id. Indeed, Precision Pine has already imposed this sanction on itself. That is, even though PX 287 justifies an increase in Precision Pine's damages, Precision Pine does not seek to use it for

---

substantially with a consideration of whether the disclosure was justified or harmless as discussed above and each is met here. That is, defendant cannot be surprised that Precision Pine would seek to investigate criticisms of its damage model along the lines that its own experts opined were correct but which they themselves did not carry out. Indeed, all of the information necessary for the defendant to carryout the analysis that they suggested and which Mr. Ness performed has long been in defendant's possession. The same analysis could just as easily been performed by defendant's experts. Indeed, Mr. Moosman had began to do just that. See Ex. 1 at 269. Moreover, although the information in PX 287 is important to show that Precision Pine's damages claims are, if anything, conservative, Precision Pine does not seek to increase it damages or change the opinions of Mr. Ness in his initial report based on PX 287. Thus, while the information PX 287 will be useful to the Court, it does not alter Precision Pine's damage claim by a single penny. Finally, with respect to the third factor, Precision Pine has explained in considerable detail above the reasons why PX 287 was disclosed when it was and why it could not have been disclosed sooner. In this regard, it is important to bear in mind that following the Court's ruling on summary judgment on damages, Mr. Ness had been given the considerable task of calculating the amount of lost profits in the post-suspension period. Because he was fully engaged in performing that analysis, it was not at all clear that he would also be able to perform the analysis in PX 287, let alone complete it in time for inclusion on Precision Pine's exhibit list. Of course, Precision Pine did not have an obligation to disclose an analysis before it was clear that it would be available for use in this case. Precision Pine did in fact disclose the existence of PX 287 in its preliminary exhibit list.

that purpose, nor does it intend to use PX 287 to contradict any previous opinion offered by its experts or to vary in anyway the amount of damages it seeks. Moreover, PX 287 conforms with the stated wishes of defendant's own experts with respect to the correct way that damages should be calculated in this case, even though they themselves did not undertake such a calculation. Accordingly, the Court in full recognition of the limited, albeit highly useful, purpose for which PX 287 is being offered, should, to the extent any sanction is warranted here, simply limit the use of PX 287.

**CONCLUSION**

In light of the foregoing, plaintiff, Precision Pine & Timber, Inc., respectfully requests that the Court deny defendant's motion *in limine* with respect to PX 287 and the related testimony of Mr. Ness.

Respectfully submitted,

s/Alan I. Saltman

SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: April 21, 2005