IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 98-720 C

(Filed January 30, 2004)

- - - - - - - - - - - - - - - - -x

PRECISION PINE & TIMBER, INC., :

Plaintiff, :

v. :

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - -x

Washington, D.C.

Thursday, February 19, 2004

Deposition of WAYNE G. MOOSMAN, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Saltman & Stevens, P.C., 1801 K Street, N.W., Washington, D.C. 20006, at 9:05 a.m., Thursday, February 19, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

CERTIFIED COPY



Ex. 1

MR. GOEKEN: Okay.

Whereupon,

WAYNE G. MOOSMAN,

the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. GOEKEN:

Q. Mr. Moosman, turning to Appendix 2 of your report, that appendix is titled overstated revenue due to, due to overstated revenue per unit rate.

What is it you were attempting to achieve with this appendix?

A. The rate --

MR. HARRINGTON: Go ahead.

THE WITNESS: That PP&T calculated based on the invoices was a simple average of the invoice amounts. Did not take into account the volumes.

My experience basically is that you need to look at a weighted average, and -- in order to be, get what the real average is on the sales prices that he would have received.

The other problem that I had with it was that by virtue of the invoices that were provided, being sequentially numbered, I could tell that there were missing invoices, and they, it's been my experience that it's the missing invoices that tend to tell the greater story.

So I looked for a document that would tell what the entire sales were for each one of those, for those periods.

During our Heber site visit, we came across a document called the Winslow sales record, and we also came across documents that were profit projections for each one of the different sales.

So this appendix is basically my attempt to combine the information in both of those documents.

BY MR. GOEKEN:

Q. Okay. Let's start with the Winslow sales record.

Are those, are those the documents that are Attachments 9b and d in your report?

A. That's correct.

Q. Okay. And that's the, what you used as the foundation for your pricing along with

the projections in this case, is that correct?

A. That's correct.

Q. Would it affect your opinion if the lumber sales invoices were not always accurately recorded in the proper categories of the Winslow sales record?

A. It may have an impact, yes.

Q. How would it impact your opinion?

MR. HARRINGTON: Objection -- speculative.

MR. GOEKEN: As an expert, is he qualified to answer a hypothetical question?

MR. HARRINGTON: He is, but the hypothetical question is lacking.

MR. GOEKEN: I'm asking him how it would affect.

If he doesn't have enough information, he can ask me.

MR. HARRINGTON: Okay.

THE WITNESS: Restate the question, please.

BY MR. GOEKEN:

Q. Sure. How, how would, how would this information, if it were demonstrated to you that lumber price invoices were not always accurately

categorized in the, with the proper lumber product, how would that impact your opinion?

A. May have to make adjustments.

Q. For example, if four quarter No. 1 shop were included with five quarter No. 1 shop, would that impact your opinion?

A. Probably not.

Q. Why not?

A. I don't have enough information to know that you wouldn't also be producing four quarter No. 1 shop from the sales that you -- from our sales.

Q. Is it your opinion that four quarter No. 1 shop and five quarter No. 1 shop sell for the same price?

A. No, I don't have that opinion.

Q. Is it your opinion that it's the same lumber product?

A. I don't have that opinion, either.

Q. Do you know one way or the other?

A. I'm pretty sure they're different products.

Q. Should they be categorized in the same lumber product category?

A. These are Precision Pine's

categorizations.
They're not mine.
Q. That's what I'm trying to get at. If there are invoices that are improperly categorized, that are lumber products that don't belong together, would you agree that those should be taken out and recategorized?
MR. HARRINGTON: Objection to form. You can answer.
BY MR. GOEKEN:
Q. You may answer.
MR. HARRINGTON: Just as a general rule, there have been certain times when I've objected and instructed you not to answer.
If I object and do not instruct you not to answer the question, once I'm done stating the objection, you may go ahead and answer the question to the extent you understand the question and there is sufficient information.
THE WITNESS: Okay. Restate the question again, please.
MR. GOEKEN: Can you read back the question?
THE REPORTER: "That's what I'm trying

to get at. If there are invoices that are improperly categorized, that are lumber products that don't belong together, would you agree that those should be taken out and recategorized?"

BY MR. GOEKEN:

Q. And referring to the Winslow sales ledger --

A. Hypothetically speaking, or speculatively speaking, if there are products included in those categories that are not products that would be produced from our sales, then I would say that adjustment would be probably the right thing to do.

Q. Okay. That's a little bit different than what I was asking.

I agree with you on that point, but if there are lumber products that are typically produced but have been put into the wrong category by administrative staff at Precision Pine, administrative error, should those, should those lumber products be taken out of the improper category?

A. Again, this is speculative since I don't know what you're talking about in that area hypothetical.

It's possible. That's all I can -- it would have to be demonstrated to me.

Q. That's another hypothetical. Assume that there are lumber products that have been miscategorized, that there is the wrong product in with another product on the Winslow sales ledger. Assume that to be true.

A. Okay.

Q. If that's true, wouldn't you want to take out the lumber products that have been miscategorized?

A. If that is true that there are lumber products that have been mischaracterized, then I would think that they should be removed.

Q. Okay. Did you go back and look at any of the individual invoices -- strike that.

MR. SALTMAN: Mr. Moosman, she's going to have a damn hard time -- I don't mean to be a school teacher on this one, either.

BY MR. GOEKEN:

Q. Have you looked at the underlying invoice data for the Winslow sales ledger?

A. No, I have not.

Q. Have you -- you testified earlier I believe that there are some missing invoices.

A. We had some conversation about the fact that they were a simple average, not a weighted average, but that was the extent of it.

Q. Do you know if Mr. Neuberger calculated the weighted average?

A. I don't know if he did that or not.

Q. Have you done that?

A. Yes, I did.

Q. Do you have a document containing the weighted average?

A. Yes, I do.

Q. For those reports?

A. Yes.

Q. Of the lumber invoices?

A. Um-hm.

Q. Have you included that in your report?

A. It was in probably, it was my intent to use it, and probably when I had the middle report, but when I came across the Winslow sales records, I decided that that superseded what I had done.

Q. Do you recall what the results of the weighted average pricing on the invoices was?

A. Not specifically.

Q. How about in general?

Q. Why did you do that?

A. Basically because I believe that was more valid than the simple average form.

Q. If the profit projections are actually worst case scenarios, do you believe the weighted average would be more valid than the profit projections?

A. No.

Q. Why not?

A. Because the weighted average is not all-inclusive of all the products that I calculated.

I could see on the invoice there were, even on the invoices that I had, there were products in there that were not included in those calculations.

Q. In what calculations?

A. In, in either the simple average or the weighted average; I didn't include them all.

Q. I'm confused. You took the --

A. Invoices; the invoices, sometimes there's multiple line items on a single invoice, and Precision Pine would take one line item but not a second line item.

Q. I'm talking about your weighted

average that you performed.

A. Right.

Q. Couldn't you have taken all the products off of all the invoices?

A. I didn't have the expertise to try to figure out where some of those products that were on those invoices should be plugged into.

MR. HARRINGTON: Could we take a short break, or are we close to wrapping things up?

MR. GOEKEN: Why don't we take a break?

That's fine if you want to take five.

MR. HARRINGTON: Yeah.

(A recess was taken.)

MR. GOEKEN: Go back on the record.

BY MR. GOEKEN:

Q. Yesterday, Mr. Adkins testified that, that there was a sawmill site visit by some of the individuals involved in this case on behalf of the government in New Mexico.

Did you attend that sawmill visit?

A. Yes, I did.

Q. What transpired during that visit?

A. Basically, a tour of the sawmill. People explained to us how it operated or just