IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC. | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 98-720C |
| THE UNITED STATES OF AMERICA | ) | March 21, 2005 |
| Defendant. | ) | |

SUPPLEMENTAL EXPERT WITNESS REPORT

OF

JONATHAN A. NEUBERGER, PH.D.

**Ex. 4**

He calculates lumber product prices, for example, from an analysis of PP&T invoices, which are presented in Exhibit 5 of his tables. In other instances, however, Mr. Ness utilizes data inputs that are simply assumed, are presented without documentary support, or were prepared by plaintiff or plaintiff's counsel for this litigation. A good example of this is the important product-mix ratios for the lumber products PP&T allegedly would have produced from timber harvested on the 11 contracts. These ratios were prepared by plaintiff for this litigation, were inputs to the original lost profits claim, and never change over time. Similarly, Mr. Ness relies on an overrun factor of 1.25 to determine the volume of lumber produced from a given volume of timber. This 1.25 factor, however, was not the consequence of any analysis performed by Mr. Ness. It is, instead, another number asserted by plaintiff for this litigation, and for which plaintiff has offered little or no documentary support.

11. Mr. Ness' supplemental report contains certain inconsistencies from his previous analyses. For example, he conducted no analysis of lumber prices in his original report and instead relied on prices prepared by plaintiff or plaintiff's counsel. I presented a critique of these prices in my original report. In his supplemental report, Mr. Ness performs a more thorough analysis of PP&T invoices and derives prices that are more consistent with other company records.

12. The methodology Mr. Ness uses to compute so-called additional overhead in his supplemental report is fatally flawed. In Exhibits 9-13 of his analysis, Mr. Ness purportedly shows how, compared to a "baseline" level of production during the suspension, overhead costs per unit of production were greater after the suspension. These additional overheads are then used to reduce the profits earned in the post-suspension period. In a footnote to these tables, however, Mr. Ness reveals that the so-called baseline is actually a fiction – production and sales in the baseline period include "anticipated production." That is, the costs per unit of production against which post-suspension costs are compared include production that never actually occurred. Adding substantial volumes of fictitious production to the base period produces baseline per-unit costs that are artificially low. By comparison, it is no surprise that actual post-suspension per-unit costs appear significantly higher. That

is, Mr. Ness uses a methodology that artificially inflates post-suspension "additional overheads." This methodology is flawed and produces meaningless results. The purpose of the exercise conducted by Mr. Ness was to identify actual profits earned in the post-suspension period, not to invent categories of costs based on a fictitious baseline in order to reduce those profits.

13. Finally, Mr. Ness asserts in the transmittal letter accompanying his tables that he believes the post-suspension profits he computes should not be deducted from plaintiff's claim for lost market-opportunity damages. He provides no support for this statement, nor any logic underlying the conclusion. In fact, this conclusion makes no economic sense. Plaintiff's contracts with the government entailed cutting timber. The 1995-96 suspension delayed PP&T's opportunity to harvest that timber, but did not eliminate this opportunity altogether. In fact, plaintiff was compensated for the delay through receipt of term extensions on all 11 contracts. Moreover, the fact that PP&T harvested at least a portion of the timber on these contracts after the suspension confirms that the company ultimately received the opportunity for which it originally contracted. Failing to offset the claimed damages with the profits actually earned from the same timber would enable plaintiff to benefit twice from these contracts – once when it actually harvested the contracted-for timber, and once again through its claim for damages to the Court. In effect, plaintiff is asserting that it can cut the same timber twice and is entitled to double profits on these 11 contracts. From an economic perspective, this cannot be the correct outcome and is contrary to every theory of economic damages of which I am aware.

14. In expressing these opinions, I make the following reservation. The opinions I express in this report are based on my review of available documents and various analyses I have performed. I respectfully reserve the right to express additional opinions, supplement or amend the opinions in this report, or provide additional reasons for these opinions, as additional documents are produced, the transcripts of expert and fact depositions become available for my review, and new facts are introduced during discovery and trial.

**B. Mr. Ness relies on certain data inputs that were created solely for purposes of this litigation, and performs no reality checks or other analyses to confirm them**

23. As stated above, PP&T does not track lumber production to individual timber sales. In the absence of this tracking, plaintiff must rely on certain critical assumptions in order to translate harvested timber into lumber products produced and sold. One of these key assumptions involves "product-mix ratios," i.e., the mix of products to be produced from each timber sale. Plaintiff prepared these product-mix ratios for the original damages claim; Mr. Ness takes these original ratios and applies them to the entire post-suspension period for each timber sale. I understand that Mr. Porter developed these ratios based on his expectations regarding the timber available on each sale. Yet, to my knowledge, Mr. Ness has made no effort to confirm that these ratios are reasonable or realistic.

24. In fact, Mr. Ness had a good opportunity to perform just such a reality check. He was provided two years of lumber invoices from PP&T. Based on these invoices, he computes lumber sales by product for each quarter of 1997 and 1998, as well as the weighted average prices at which these sales took place. Notably, some of the product-mix ratios asserted for individual contracts differ dramatically from the company's actual sales. For example, in the second and third quarters of 1998, PP&T apparently produced lumber from timber harvested on the Mud, Brookbank, and Manaco sales. The product mixes asserted by plaintiff and used by Mr. Ness have correlations with actual lumber sales during these same quarters that are statistically indistinguishable from zero. That is, there is no relationship between Mr. Ness' assumed product-mix ratios and actual sales. Even more striking is the fact that, in the second quarter of 1998, about half of the production implicit in the assumed product mixes for Brookbank and Manaco is in lumber categories of which no sales actually occurred. Despite this obvious disconnect, Mr. Ness credits PP&T with over $580,000 in lumber sales from these two timber sale contracts in the second quarter of 1998. This complete absence of a relationship between the assumed product mixes and PP&T's sales records raises serious doubts about the accuracy, and relevance, of the assumed product-mix ratios.

averages, rather than prices weighted by the volume of sales. The prices differed, sometimes dramatically, from price data derived from PP&T's own comprehensive Winslow Sales Reports. They also differed from prices supplied by the Western Wood Products Association.

28. In contrast, this time around Mr. Ness conducted his own pricing analysis, developing weighted average product prices from what appears to be a complete set of PP&T invoices during 1997 and 1998. In my view, this approach is the correct one. Moreover, given the detailed invoice data included in Exhibit 5 of Mr. Ness' spreadsheet, the data underlying these prices can be verified. I also crosschecked these prices with those derived from the Winslow Sales Reports. With a few exceptions, Mr. Ness' prices are largely consistent with the company's aggregate records. As mentioned above, it is unclear how Mr. Ness extended the 1997-98 invoice-based prices to later years. Nevertheless, I would argue that the approach used in the later report is superior to, and different from, the approach used in the earlier report.

### D. The computation of additional overhead expenses is fatally flawed

29. Plaintiff's lost market opportunity damages claim is based on the gross profits PP&T purportedly would have earned in the absence of the government's breach. Gross profits are defined as sales minus "cost of goods sold," or those costs that are directly associated with acquiring raw materials and processing them into finished goods. Most companies, including PP&T, allocate certain percentages of overhead expenses to cost of goods sold and thereby include them in gross profits. Overheads include such expenses as rent, employee salaries and benefits, among others. That portion of overhead expenses that is not attributable to cost of goods sold is included in the company's operating expenses. These expenses appear on financial statements below the gross profit line and are incorporated into alternative profit measures, such as operating profits or net income.

30. I argued in my earlier report that gross profits are an inappropriate measure of damages because they exclude costs that are relevant to plaintiff's financial condition and the extent to which it actually was impacted by the breach. Some of these costs