**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-720C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY FROM MARTIN DEVERE REGARDING THE APPROPRIATENESS OF A 1.25 OVERRUN FACTOR**

Precision Pine & Timber, Inc. ("Precision Pine") respectfully responds to defendant's motion *in limine* to exclude plaintiff's exhibit 51 ("PX 51"), the expert report of Martin Devere, and all testimony from Mr. Devere regarding the appropriateness of a 1.25 overrun factor.[1]

**INTRODUCTION**

Defendant has proffered no expert with the credentials to offer a competing opinion as to the appropriate overrun factor in this case.[2] This is likely because an overrun factor of 1.25 was readily attainable by a typical ponderosa pine sawmill in the mid-1990s utilizing the size of logs

[1] An "overrun factor" is that amount by which the volume of lumber produced at a sawmill exceeds the volume of logs that was used to produce that lumber. The Expert Report of Martin Devere at 1 (Ex. 1). For example, an overrun factor of 1.25 means that the measured volume of lumber produced exceeds the volume of logs used by 25%. Much of the overrun factor is attributable to the differences in the way that the volume of cylindrical logs is determined when compared to how the volume of resulting flat lumber produced from those logs is measured. *Id.* The existence of overrun is a well-recognized fact and has not been disputed in this case. The remaining factual question for the Court with respect to the overrun factor is what is the appropriate factor for Precision Pine's sawmills.

[2] Ironically, counsel for defendant actually contacted Mr. Devere about serving as an expert for the government in this case.

that were available to Precision Pine. Ex. 1 at 1-2, *see also* Excerpts of the Deposition of Martin Devere at 53-54, 75-76 (Ex. 2). Because Precision Pine's sawmills were of typical or better efficiency, its use of a 1.25 overrun factor in this case is conservative. *Id.*

The Forest Service's own calculation of the overrun factor for the ponderosa pine sawlogs on each of the sales at issue in this case indicated that each would be in excess of 1.25. *See* PX 243 at 1 (St. Joe – 1.2505, Jersey Horse – 1.3463, Manaco – 1.3597, Hutch-Boondock – 1.3935, Brookbank – 1.3720, Kettle – 1.3599, Brann – 1.3380, Salt – 1.3685, Mud – 1.3487, Monument – 1.3720), *see also* PX 1 (Hay – 1.3390), PX 3 (O.D. Ridge – 1.2767) and PX 6 (U-Bar – 1.2757). The lone exception is the Saginaw-Kennedy sale, which the Forest Service determined to have an overrun of 1.2450. *See* PX 243.

Rather than finding someone to offer a competing expert opinion as to the reasonableness of Precision Pine's use of a 1.25 overrun factor (which would be virtually impossible), defendant instead seeks to exclude the testimony of Mr. Devere in its entirety by bootstrapping Mr. Devere's reference to a one-page chart from the Beck Group study to support one part of his opinion.[3] As demonstrated below, Mr. Devere's opinion that the use of a 1.25 overrun factor in this case is appropriate is based on his visit to Precision Pine's sawmill, conversations with Mr. Porter about that mill and Precision Pine's other mills, the logs used by Precision Pine in the mid-1990s as well as Mr. Devere's years of experience with ponderosa pine sawmills in the

[3]The Beck Group study was performed in 1999 and compared the production of nine ponderosa pine sawmills in the Rocky Mountain West. These nine mills had an average overrun factor of 1.31. Mr. Devere became aware of the study while he was on the Board of Directors of the Fort Apache Timber Company, whose mill was included in the study. Due to the proprietary nature of the information in the study, each participating mill was given a report on its results. The results for the other mills participating in the study were reported anonymously, *i.e.*, neither the name of the sawmill nor its sawmill equipment were provided to the other companies. The Fort Apache Timber Company has declined to release its copy of the Beck Group report *en toto*.

Southwest, including the determination of overrun factors with respect to those mills.[4] Thus, his opinion that the use of a 1.25 overrun factor is fully admissible on these bases, which are entirely independently of the one page excerpt from the Beck Group study attached to Mr. Devere's report. Moreover, because the Fort Apache Timber Company, through which Mr. Devere obtained the excerpt from the Beck Group study, has not consented to the release of the proprietary information contained in the full Beck Group study, Mr. Devere no longer intends to refer to that excerpt in his testimony. Therefore, as set forth below, defendant's motion *in limine* to exclude Mr. Devere's report and testimony in their entirety is baseless.

**ARGUMENT**

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. *See Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (noting that, although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the trial court's inherent authority to manage the course of trials); *accord Palmieri v. Defaria,* 88 F.3d 136, 141 (2nd Cir.

[4] Mr. Devere has 40 years of experience in the timber and lumber business. Curriculum Vitae of Martin Devere attached hereto as Ex. 3, *see also* Ex. 2 at 3-12. Among other things, Mr. Devere has a degree in Forestry (Ex. 2 at 6), served as the manager of a sawmill in New Mexico (*id.* at 10), oversaw the production of lumber at four sawmills in the Southwest (*id.* at 9-10), and specifically participated in and directed multiple mill studies designed to determine the overrun factor at three sawmills in Arizona and one in New Mexico (*id.* at 17-18, Ex. 3 at 1). Mr. Devere was also on the board of directors for the Fort Apache Timber Company in Arizona from 1991 to 2001, serving the last two years as the Chairman of the Board. Ex. 2 at 12. During those years, several mill studies were performed at the Tribe's two sawmills, at least one of which Mr. Devere personally participated in and oversaw. *Id.* at 14-15.

Defendant does not challenge Mr. Devere's expertise with respect to Ponderosa Pine sawmill operations in the Southwest has proffered no competing expert. Thus, Mr. Devere's testimony, as the lone expert will undoubtedly be of aid to the Court in understanding the important issue of overrun factor in this case.

1996). However, evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds. *See Baxter Diagnostics, Inc. v. Novatek Medical, Inc.*, No. 94-CV-5220, 1998 WL 665138, at * 3 (S.D.N.Y. Sept. 25, 1998) (denying a motion *in limine* to preclude presentation of evidence regarding a potential punitive damages claim because the motion was too sweeping in scope to be considered prior to trial). Moreover, the exclusion of expert testimony is, of course, a "drastic sanction." *Transamerica Ins. Corp. v. United States*, 28 Fed. Cl. 418, 421 (1993); *McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 587 (W.D.N.Y. 1995). Precluding testimony of an expert, even when there has not been strict compliance with Rule 26, "may at times tend to frustrate the Federal Rules' overarching objective of doing substantial justice to litigants." *In re Kreta Shipping, S.A.*, 181 F.R.D. 273, 277 (S.D.N.Y. 1998). For the reasons set forth below, the exclusion of Mr. Devere's entire report and testimony is unwarranted in this instance.

I. Mr. Devere's Conclusion That an Overrun Factor of 1.25 is Appropriate Does Not Depend on the Beck Group Study

In its motion, defendant attempts to bootstrap Mr. Devere's inability to obtain the release of the proprietary portion of the Beck Group study into a rejection of Mr. Devere's report and testimony in their entirety. Def.'s Motion *in limine* at 7-10. This argument is quickly dispelled, however, by a review of Mr. Devere's report.

The first three paragraphs of Mr. Devere's report discuss overrun factor and how it is calculated, while the next two paragraphs elaborate on the determination of overrun and discuss Mr. Devere's factual investigation in this case. Ex. 1. at 1-2. That is, in the third paragraph, Mr. Devere explains how the method of measuring logs contributes to overrun factor. *Id.* Then, in the fourth and fifth paragraphs, Mr. Devere describes his visit to Precision Pine's remaining

sawmill at Heber, his review of the equipment there and his confirmation of the volume and size of the average log used by Precision Pine at the time of suspension. *Id.* at 1-2. From these facts alone, Mr. Devere is able to offer his opinion that an overrun factor of 1.25 is conservative:

> Based on the log size and the sawmill efficiency, an overrun factor of 1.25 would seem conservative.

*Id.* at 2.

Most importantly, Mr. Devere provides this opinion in his report before he makes any mention of the Beck Group study and, therefore, in doing so he does not rely on the Beck Group study. Thus, Mr. Devere's opinion that a 1.25 overrun factor is conservative is based on the facts he learned about Precision Pine's mill efficiency, the average size of logs available to it at the time of the suspension and his decades of experience with Ponderosa Pine sawmills and not on the Beck Group study. Accordingly, the entire premise of defendant's motion, i.e., that Mr. Devere's opinion is "based strictly" upon the Beck Group study is simply incorrect. Def.'s Motion *in limine* at 1.

Indeed, at deposition defendant inquired extensively into matters of mill efficiency and log size. In response, Mr. Devere further elaborated on the methodology he used apart from the Beck Group study by explaining that he had toured Precision Pine's Heber sawmill, observed its operations and confirmed what changes had been made in the sawmill since the suspension. Ex. 2 at 35-36. Mr. Devere determined that at the time of the suspension the Heber sawmill was of above average efficiency because it had been fitted with a computer-operated laser set works on the headrig which optimized volume and grade recovery. *Id.* at 56-57; Ex. 1 at 1. Moreover, Mr. Devere confirmed that apart from the lasers on the headrig, Precision Pine's other sawmills were

of comparable efficiency to the Heber mill. *Id.* at 53-54.[5] As Mr. Devere further explained, the basic equipment at Precision Pine's three sawmills (except for the laser set works at the Heber mill) was typical:

> If you're going to cut Ponderosa Pine in this area for recovery like they [Precision Pine] are, you're going to be using the equipment that they are using, say unless you really got into an extremely high tech operation, million and millions of dollars invested.

*Id.* at 54. Mr. Devere further elaborated on this point in the following exchange indicating that Precision Pine's mills were of a configuration typical in Arizona:

> Q: BY MR. HARRINGTON: You mentioned that Precision Pine had a seven-foot band headrig, horizontal resaw, wide board edger, and trimmer in your report.
>
> A: Uh-huh.
>
> * * * * *
>
> Q: Is that equipment, the seven-food band headrig, horizontal resaw, wide board edger, and trimmer, particularly efficient equipment?
>
> A: It's at least of average efficiency for a mill of that type. Say Fort Apache Timber Company has the same thing. The configurations don't change too much until you get into the really highly technical differences of these multi-million dollar operations.
>
> Q: Is it typical, then, for a mill operating in this area of Arizona?
>
> A: Yes.

*Id.* at 74-75. In short, Mr. Devere explained that virtually any ponderosa pine sawmill in that area of Arizona that is cutting lumber for grade recovery, like Precision Pine, is going to consist

[5] In a footnote, defendant complains that Mr. Devere did not visit Precision Pine's Eagar or Winslow mills. Def.'s Motion *in limine* at 10 n.12. Of course, he didn't. The Winslow mill was destroyed by fire in 1998 and the Eagar mill was permanently closed on or about August 1, 1997 and subsequently dismantled. Thus, these mills could not have been visited in 2003 when Mr. Devere prepared his report.

of a combination of the same basic elements of sawmill machinery. *Id.* at 86. As noted, having inspected the equipment at Precision Pine's Heber sawmill, Mr. Devere also confirmed that Precision Pine's other sawmills were comparably configured to it. *Id.* at 53-54.

In his report, Mr. Devere next went on to confirm the average volume of logs being cut by Precision Pine. Ex. 1 at 2. It is Mr. Devere's opinion that the average size of logs further supports an overrun factor of 1.25 as being conservative. *Id.* He reiterated that opinion at his deposition:

> Q: Is it your view that the log size used by Precision Pine's Heber mill supports the 1.25 overrun factor?
>
> A: Yes. In fact, it not only supports it, I would consider it being conservative.

Ex. 2 at 95. This opinion, like the one expressed in his report at Ex. 1 at 1-2, was not dependant upon any information in the Beck Group study.

Indeed, the Beck Group study was completed in 1999 and did not include any sawmill owned by Precision Pine. Moreover, Mr. Devere acknowledged that he did not know what sawmills were included in the Beck Group study, except for the Fort Apache Timber Company sawmill or what equipment was in use at any of those other sawmills. Therefore, the utility of the Beck Group study was simply the one page summary attached to Mr. Devere's report that confirmed that nine other ponderosa pine sawmills averaged an overrun of 1.31 and, therefore, that Precision Pine's use of an overrun factor of 1.25 was conservative by comparison. However, as the first part of his report makes clear, Mr. Devere did not rely on the summary from Beck Group study to provide his opinion that a 1.25 overrun based on the efficiency of Precision Pine's sawmills and the logs available to it was conservative. As demonstrated above, that opinion was based on his inspection of the equipment at Precision Pine's Heber sawmill, on

his experience with the standard equipment at use in a Ponderosa Pine sawmill of average efficiency in Arizona in the mid-1990's, the average log size used by Precision Pine during that period, and his experience in overseeing and operating sawmills, as well as performing mills studies over a period of decades. Thus, Mr. Devere's expert report and testimony on these points which are specific to Precision Pine's sawmills are independent of the Beck Group study and, therefore, this aspect of Mr. Devere's report should be received by the Court.[6]

A similar situation arose in *Baker Hughes Oilfield Operations, Inc. v. Seabulk Tankers, Inc.*, No. Civ. A. 03-1230, 2004 WL 859199 (E.D. La. Apr. 20, 2004) (copy attached as Ex. 4), where an expert's report had utilized information from a Coast Guard report that was inadmissible by law. The party opposing the expert sought to bar the expert's report and testimony in its entirety. *Id.* at *1. However, the court refused to do so and excised only that part of the expert's report that had used information from the Coast Guard report, but left intact those opinions that did not rely on the report. *Id.* A similar result should obtain here. That is, as noted above, Mr. Devere does not intend to refer to the Beck Group study or rely on it in offering his opinions in this case. However, the remainder of Mr. Devere's report should be received into evidence by the Court and he should be permitted to testify fully as to his opinion that a 1.25 overrun factor is conservative based on his experience in the industry and the facts he learned in the course of this case, including his visit to Precision Pine's Heber sawmill, information about Precision Pine's other sawmills, and the size of the average log used by Precision Pine at the time of the suspension.

[6]Defendant also tries to argue that Mr. Devere somehow relied on the *entire* Beck Group study and that without it his opinions are invalid. However, nothing in Mr. Devere's report suggests that he reviewed any part of the Beck Group study other that the one page chart attached to his report, upon which his opinion that use of a 1.25 overrun factor for Precision Pine is conservative does not depend.

The lone case appended to defendant's motion is not to the contrary. In that case, a magistrate judge had ordered a party's expert to turn over certain census data that it was relying on but to which only it had access. *Builders Assoc. of Greater Chicago v. City of Chicago*, No. 96-C-1122, 2002 WL 31027957, at *1 (N.D. Ill. Sept. 10, 2002). On review, the district court took a less strict view of the issue finding that "plaintiff's expert must have had an opportunity to test [defendant's expert's] results derived from the Census Bureau database before those results can be admitted." *Id.*[7] However, that is not the case here because Precision Pine does not seek to have any opinion based on the Beck Group study admitted as Mr. Devere is not relying on any information in the Beck Group report in support of his opinion that that a 1.25 overrun factor is conservative.

II. Additional Misleading Statements in Defendant's Motion

In a footnote, defendant wrongly asserts that Mr. Devere obtained *no* information about Precision Pine's other mills. Def.'s Motion *in limine* at 10 n.12. However, as set forth in Mr. Devere's deposition:

> Q: What did you do to try to figure out whether the Heber mill that Precision Pine was running was comparable to its mill in Winslow or its mill at Eagar?
>
> A: Just discussions with Lon Porter as to what was in those mills when we visited this one [the Heber mill]. And he told me that they were, you know, that they were very close to being the same.

---

[7]At no point did the district court bar defendant's expert from testifying and the district court stated several alternatives that might satisfy the plaintiff's need for the data. *Id.* at *2.

*Id.* at 53. Thus, defendant's assertion that Mr. Devere "obtained no information about the other mills" is simply incorrect.[8]

**CONCLUSION**

Precision Pine respectfully requests that the Court deny defendant's motion *in limine* with respect to PX 51 and permit Mr. Devere to express his opinions that the use of a 1.25 overrun factor by Precision Pine is conservative without reference to the proprietary Beck Group study.

Respectfully submitted,

s/Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: April 28, 2005

[8] In the same vein, defendant asserts in another footnote, that Mr. Devere "simply assumed that the same overrun factor would apply [at Precision Pine's Eagar and Winslow mills]." Def.'s Motion *in limine* at 2 n.1. This is also incorrect as Mr. Devere confirmed that those mills were essentially the same as the Heber mill. Ex. 2 at 53-54.