PRECISION PINE & TIMBER, INC., )
)
Plaintiff, )
)
vs. )
)
THE UNITED STATES, )
)
Defendant. )
)

DEPOSITION OF MARTIN DEVERE

Overgaard, Arizona

February 12, 2004

Certified Copy



Ex. 2

Pursuant to Notice, the deposition of MARTIN DEVERE, called by Defendant, was taken on Thursday, February 12, 2004, commencing at 9:04 a.m., at U.S. Forest Service, Black Mesa Ranger District, 2748 East Highway 260, Overgaard, Arizona, before S. ANNETTE SATTERLEE, RPR, CRR, and Arizona Certified Court Reporter, Certificate No. 50179.

APPEARANCES:

Alan I. Saltman, Esq.
Richard W. Goeken, Esq.
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140
Appearing on behalf of Plaintiff

David A. Harrington, Esq.
U.S. DEPARTMENT OF JUSTICE
Civil Division
1100 L Street, NW
Washington, D.C. 20530
(202) 307-0277
Appearing on behalf of Defendant

Also Present: David Harris, James Matson

MARTIN DEVERE,

called as a witness herein, having been first duly sworn by the Certified Court Reporter, was examined and testified as follows:

EXAMINATION

Q. BY MR. HARRINGTON: Good morning, Mr. Devere.
A. Good morning.
Q. Have you had your deposition taken before?
A. Yes.
Q. So you know the general process that we go through.
A. Yes.
Q. Today's deposition concerns your expert testimony in Precision Pine and Timber versus The United States. And as I'm sure you know, it involves the suspension of 14 of Precision Pine's timber sale contracts back in 1995 and 1996.
I'll be asking you questions during the course of the day, and if any of my questions are unclear, you don't understand them, you don't hear them, please let me know and I will repeat the

question.

Please answer any of the questions that I ask you fully and completely and to the best of your ability. Please answer your questions audibly. Obviously, we are transcribing the testimony today and the reporter has a hard time transcribing a nod or a shake of your head.

If at any course during the testimony you feel like you need a break, go ahead and let us know and we will work out a time to take a short break.

I guess the last thing is Mr. Saltman may object at various times during the course of your testimony. Unless he directs you not to answer a question, which I think is probably unlikely, you may feel free to go ahead and answer the question after he's stated his objection.

MR. SALTMAN: That's correct.

MR. HARRINGTON: Let me go ahead and mark right now as Exhibit No. 1 a November 14, 2003, letter which contains Mr. Devere's report, along with two attachments.

(Exhibit No. 1 was marked.)

Q. BY MR. HARRINGTON: Do you recognize this document, Mr. Devere?

A. Yes.
Q. And looking at the first two pages of this document, is this the report you provided in the Precision Pine case?
A. Yes.
Q. Before we get started, I would like to just talk a little bit about your educational and professional background.
A. All right.
Q. Could you tell me about the education that you had.
A. I have, other than elementary education and high school, I have a degree in forestry from Purdue University, 1962.
Q. After you got your degree in forestry at Purdue, have you taken any other, any other classes?
A. Not formal, college-type classes. I have gone to many seminars, you know, continuing education-type things, but not towards a further degree.
Q. Did any of the continuing education sort of classes that you took involve the determination of overrun factors?
A. Yes.

Q. What sort of classes did you take that involved that?

A. I went to several scaling schools and participated in that type of thing, which is scaling logs for the mills; and to some sawmill clinics where I studied manufacture and that type of thing of logs and timber through mills, sponsored by Western Wood Products Association and the -- they sponsored the sawmill clinics.

Q. When would you have been to the scaling schools as you describe them?

A. Most of those were several years ago, back in the '60s up through the '70s, early '70s.

Q. How about the sawmill clinics you were talking about? When would that have been?

A. Those came, some at that particular time, some a little later when I was with the trade association, and then even a couple since I have been out of that and back here in Arizona doing consulting work.

Q. And when were the most recent of these sawmill clinics?

A. Oh, probably five or six years ago. I don't remember the exact year.

Q. And what did the sawmill clinics

involve?

A. Well, they involved a number of things. Oftentimes, what I was going for was to get the latest technology that was available. And what we're talking about is attending, you know, our classes and describing, as I say, the latest technology, which include the type of lumber recovery, that type of thing.

Q. And the latest technology you're talking about would be in terms of mill equipment?

A. Yes. Primarily mill equipment, small logs. I was -- at the time of the last ones, I was chairman of the board of Fort Apache Timber Company and we were very interested in putting in small log operations. So as part of that, I was going to clinics to learn more about it myself.

Q. When you say small log operations, what sort of size logs are you talking about?

A. Well, when we were looking at this it was thinning material, which would have been anywhere from up to 16 inches in diameter, from a low of probably six or seven inches up to 16 inches.

Q. After you graduated from Purdue, what sort of jobs have you held?

A. Well, my first job for about a year and a half was in Los Angeles as a lumber salesman and working in two wholesale lumberyards. Then I came to work here in Arizona as a forester for Western Pine Industries, and I was with them for 12 years, from a field forester up to vice president of the company.

Q. When did you start with Western Pine Industries?

A. April the 1st, 1964.

Q. You remember it because it was April Fool's Day?

A. That's right.

Q. What was your first job with Western Pine?

A. As a field forester. It was cruising timber sales, going, looking at timber sales; not having direct responsibility for logging operations but overseeing them to see that they worked right, safety and that type of thing.

And then, at the same time, I was given, within literally a couple months, what they call production manager, and that was to oversee the recovery through the mills that Western Pine owned. And so I got an early indoctrination into

that type of thing.
Q. How many mills were you overseeing at that time?
A. Well, initially, they had two and then went to three and then four, and then I wound up being mill manager of their operations up in Chama, New Mexico.
Q. You say you were a mill manager in New Mexico?
A. Yes.
Q. What did you do as a mill manager?
A. Well, I was the general manager of the operations. I oversaw the sawmill, plating mill, logging operations there.
Q. When did you leave Western Pine Industries?
A. In 1975, September. Early September.
Q. And what did you do then?
A. I went to work for a timber trade association in Oregon, Northwest Timber Association. We represented the independent lumber and plywood manufacturers in western Oregon, southwestern Washington, a few in northwestern California.
Q. And how long were you there?

A. Eight years.
Q. Did you have any responsibilities over any mills while you were there?
A. No. It was strictly a trade association. What we did was tried to solve problems. And in most cases it wasn't solving particularly manufacturing problems, it was --
Q. When did you leave the trade association?
A. 1983. April of 1983.
Q. And what did you do then?
A. Well, and still do, my wife and I had the opportunity to have -- acquire a business in what was my family's hometown, and so we took that over. And I, shortly thereafter, I also started doing consulting work.
Q. What was the business you took over?
A. Well, we had, for ten years, we had the concession at Boot Hill Cemetery and Gift Shop in Tombstone, Arizona. Now, we own an art gallery there.
Q. So this was outside of the --
A. Oh, yeah.
Q. -- timber business.
Did you do anything else during that

time period?

A. Well, yes. My agreement with the trade association when I left was that for six months, they would have access to my expertise as such in various things and they could call. That was part of the deal. And, then, I started -- that was starting in April.

And in December, I started a consulting business and did work for various companies, and still do, all over the, all over the country.

Q. When you say December, was that December of 1983?

A. That's correct.

Q. It mentions on your resume that you were chairman of the board for Fort Apache Timber Company.

A. That's correct.

Q. When did you take that position?

A. That was about nineteen, it would have been 1991. I was on the board from '91 to 2001. The last two years on the board, I was chairman.

Q. What did you do as a board member for Fort Apache?

A. Well, we were primarily policy. We had, we had meetings every month through that period

Q. Okay.
A. But it was -- yes. And Fort Apache Timber Company was one of the mills that was in that particular study. We had different mill studies that were done during the course of that ten years, but the last one was one that the Beck Group headed up.
Q. Was this the study in 1999 that you referred to in your expert report?
A. Yes.
Q. Did you have any direct role in the study?
A. We served as just kind of a labor in it, to oversee it, did some things as part of the study.
When you do a highly intensified mill study like that, you have to count everything that's there and oversee all the varying areas. And so those of us on the board just took a day and went down and did just that. We performed three or four -- they weren't what you'd call highly technical jobs, but you had to oversee the entire operation, and so we would help in inventory, help in various things like that to see that it got -- so we knew that it got done

correctly.

Q. So that was you and the rest of the board that was doing that?

A. I believe all the board members were there. It just -- you know, that particular one lasted just a couple of days.

Q. Did you have any role in putting together the study?

A. Only from the standpoint of meeting with the Beck people to get it organized to begin with and how it was going to be set up and what was going to be done and all this.

Q. Looking at the one page of the study that you've attached to your report, which is the exhibit in front of you, could you flip to that page.

A. Yes.

Q. Can you identify which of the columns on the study was the mill operated by Fort Apache?

A. My agreement with Fort Apache, when I was able to get this study, was that it was proprietary information, and so I can't really divulge which mill they are.

For instance, when Fort Apache would receive that themselves, all of the other mills

this something that's being kept confidential, then?

A. Yes.

Q. So it's not a study that's been published anywhere.

A. No. Only for the participating members, and it was for their information. What it was done for was to compare a particular mill against somebody else's, how good you were doing as opposed to how the industry was doing as a whole, or at least the industry, the type of thing you would be involved in.

Q. Your resume also mentions, back under the Western Pine Industries part, that you participated and directed sawmill recovery studies at Heber, Cutter, and Williams, Arizona.

A. That's correct.

Q. What studies are you referring to there?

A. We did similar mill studies like this one. Maybe not done exactly the same way, but because part of my job classification was production manager, I used to have to set up those type of things. And we would go through basically the same thing. A couple were done in conjunction with the Forest Service but sometimes they were

done with Western Wood Products Association, or we did a few on our own if we were trying to check something in particular.

Q. The study at Heber, is that the same mill that is run and operated by Precision Pine?

A. Not the current mill, no. It was the mill that used to be at Heber years ago.

Q. And the mill at Williams, is that the mill that Precision Pine subsequently acquired in Williams?

A. They acquired what -- I'm sure the mill had been changed a number of times, but, yes. It was the mill -- it was that same mill.

Q. When were these studies that you participated in? Why don't we take them one at a time.

When was the study in Heber done?

A. Well, there were probably -- over my career, there was probably three or four, and they would have been done from sometime in the '60s up through the early '70s. The exact dates of each one, I don't remember.

Q. The studies at Cutter, were they done in the same time frame?

A. Same time frame.

is stripped off the log?

A. That's correct.

Q. When you're doing your studies, would you be measuring the log, then, after the bark had been removed?

A. Typically, when you do the scaling of the log, you do it before the bark is removed but you measure it inside the bark. I mean -- which is very easy to do. The problem is in the process of measuring the log physically, what they call scaling the log, measuring it after it's gone through the de-barker, you're usually not in a very good position to try to scale the log inside the mill unless -- depending on the configuration of the mill, but it's usually not the best place you want to be to try to do that.

Q. We talked a little bit about what you did in preparing your report.

Were there any things that you did in preparing your report that you haven't already mentioned?

A. Well, I did visit the mill that they still have up just outside of Heber here and went through the mill and looked at the equipment and saw how it operated and, you know, that type of

thing, and spent probably, I don't know, a couple hours there, I suppose, going through the operation so I could physically see how it was running.

Q. Do you know if the operations at the Heber mill have changed since 1995 or 1996?

A. I understand they have added one other piece of equipment in there, which it probably, from what I understand, it probably would not have affected the total output of the mill. It would have made it a little more efficient but probably wouldn't have affected the recovery.

Q. What was the equipment that was added?

A. I believe it was a resaw that was added.

Q. And what does that do?

A. I think it was. Well, it brings the log back through and cuts off a side that's usually put in to increase the grade recovery as opposed to the overall lumber recovery. And I understand that was -- I believe that was the piece of equipment that was added.

Q. Does increasing the grade recovery have any effect on the overrun?

A. No. No. It wouldn't unless, before that, you were just strictly looking at getting

that because you'd have to do it over time. But over time, yeah, it should be. At least, they would get the same recovery. I hesitate because some mills could go up in Idaho and other places that would be a little bit out of -- but if you took the mills in Arizona and New Mexico, southern Colorado, probably Utah, you're looking at, should look at a similar recovery.

Q. Would the WWPA Inland Rocky Mountain numbers be the best measure that you would look at to figure out what that would be?

A. Probably just about the only measure, frankly, that's available today. If there's others, I don't know of them.

Q. What did you do to try to figure out whether the Heber mill that Precision Pine was running was comparable to its mill in Winslow or its mill in Eagar?

A. Just discussions with Lon Porter as to what was in those mills when we visited this one. And he told me they were, you know, they were very close to being the same.

Q. Did you discuss the specific equipment that was in use at each mill?

A. No. I did not get into the specific

equipment. Just this one.

Q. So you simply took his word that they were comparable mills --

A. Yeah.

Q. -- in preparing your report?

A. And they would be a comparable mill to just about anything. Fort Apache Timber Company, for instance, is much larger but has very similar equipment. If you're going to cut Ponderosa pine in this area for recovery like they are, you're going to be using the equipment that they are using, say unless you really got into an extremely high tech operation, million and millions of dollars invested.

Q. We've talked about a couple of things that can affect the overrun factor. I guess broadly, you talked about efficiency of the mill.

What sorts of things generally would affect the efficiency of the mill and, therefore, affect the overrun factor?

A. Well, part of it would be, right off the bat, saw curve, how wide the saw is that you're using. You, again, have a point of diminishing returns. If they get too thin, then they don't cut good lumber.

A. You assume they were doing a good job. You can't do anything else. They have experienced people so they should know what they are doing.

Q. When you say the guy counting lumber, what does that refer to?

A. Well, as the lumber comes out on the green chain, it's pulled and stacked into bundles. Somebody has to go through and count those boards by length and determine the board foot in a bundle of logs. And that's how the production would be calibrated for that, for the mill.

Q. And is that the same as the scaling of the logs that you were talking about?

A. No. The scaling, that's at the other end of the process. That's when you're measuring the log going in.

Q. And would the sawyer operating the equipment in the mill also have a role to play in the efficiency?

A. Oh, yes. The sawyer, a good sawyer with good equipment. And as I understand, Precision Pine was one of the first people around here to install a laser on the headrig, the setworks, laser setworks, so that they could determine the best grade from that. And the sawyer would have

to be able to use that. That would increase their efficiency considerably.

Q. Do you know when that was installed?

A. Lon Porter told me that it was installed sometime prior to that point. He said it was in -- they had one of the very first ones, early '90s. They had one of the first ones in the southwest.

Q. Do you know if they had that equipment on their mills in Winslow or in Eagar?

A. I do not know that. I did not specifically ask that question. But it would have been something beyond what you'd consider average efficiency at this point, anyway.

Q. You talked about log size. Are you generally talking about the diameter of the log?

A. Yes.

Q. Given that what we are talking about is largely Ponderosa pine, would the taper be consistent within that species?

A. It would be consistent within that species for a given area. The taper for logs that would be coming into the mill here at Heber for the most part should be fairly even. If you put them in a different -- if you had them in a

THE WITNESS: Well, the overrun, the recovery, the log size. When you put them all together, you can pretty well visualize what that mill is probably doing.

MR. SALTMAN: The reason I stopped you is the record doesn't do a good job of picking up this and these, and --

THE WITNESS: Oh, I'm sorry.

MR. SALTMAN: -- if you're referring to something on this sheet, you would have to refer to it specifically.

THE WITNESS: Okay. And what I've been referring to is the Beck report, that sheet that I turned in.

Q. BY MR. HARRINGTON: You mentioned that Precision Pine had a seven-foot band headrig, horizontal resaw, wide board edger, and trimmer in your report.

A. Uh-huh.

Q. Is that information that was given to you by Mr. Porter about what was in use back in 1995, 1996?

A. It was what, when I went through the mill and asked him what changes had been made, that's what he -- I mean, I saw virtually

everything physically when I was there.

Q. And he didn't mention that those had been changed?

A. No. In fact, I asked him if there had been any changes since then, and they added that one piece of equipment I referred to earlier.

Q. Is that equipment, the seven-foot band headrig, horizontal resaw, wide board edger, and trimmer, particularly efficient equipment?

A. It's at least of average efficiency for a mill of that type. Say Fort Apache Timber Company has the same thing. I mean, it's basically the same thing. The configurations don't change too much until you get into the really highly technical differences of these multi-million dollar operations.

Q. Is it typical, then, for a mill operating in this area of Arizona?

A. Yes.

Q. You mentioned that lumber is hand stacked on the green chain in your report. What does that mean?

A. Well, that means that when -- the green chain is where, after the, all the process through the sawmill has been completed, down to trimming

right into that category.

Q. Without knowing what equipment was used on any of these mills except one, how can you know which equipment on these mills is comparable to Precision Pine?

A. Because of what they are cutting. If you're cutting Ponderosa pine, your standard Ponderosa pine mill is going to have basically the same equipment. You're going to have a headrig and you're going to have an edger. Those two things, you have to have. You may or may not have a gangsaw and you may or may not have a resaw. You're always going to have a trimmer.

So there's not going to be too many variations that you're going to have in how that log is cut up. It's going to be basically the same. The variations are going to be in the size of the log that goes into the mill, the quality of log that goes into the mill, but you're not going to -- you've got certain pieces of equipment that are going to be there, and the two variables will probably be a resaw and gangsaw. Most of the mills are going to have one or the other or both.

Q. So, then, you're assuming because these mills are cutting Ponderosa pine that they were

A. Well, yeah. This is the southern end of what they would consider the inter-mountain region.

Q. And I meant the region that they would fall into as defined by WWPA.

A. Yeah. All right.

Q. Is it your view that the log size used by Precision Pine's Heber mill supports the 1.25 overrun factor?

A. Yes. In fact, it not only supports it, I would consider it being conservative.

Q. And when you say log size, are you referring to the, what is the bucked log size on the table --

A. Yeah.

Q. -- here?

A. Yes.

MR. SALTMAN: When you said the table here, to what are you referring?

MR. HARRINGTON: The section four, which is the one page from the Beck Group mill study that Mr. Devere has produced.

MR. SALTMAN: Thank you.

Q. BY MR. HARRINGTON: The hundred board feet per log size that's in your report, that is