**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-720C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE PRODUCT MIX TESTIMONY FROM LORIN PORTER**

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Washington, D.C. 20006
(202) 452-2140

Dated: April 28, 2005

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ........ ii

INTRODUCTION ........ 1

I. Mr. Porter's Testimony Regarding Lumber Product Mix Is Not Expert Testimony Under Fed. R. Evid. 702 ........ 2

II. Mr. Porter's Testimony Regarding Lumber Product Mix Is Admissible As Lay Witness Opinion Under Fed. R. Evid. 701 ........ 2

A. Defendant's Argument Under 701(a) Is Without Merit ........ 4

B. Defendant's Argument Under Rule 701(b) Is Without Merit ........ 11

i. Defendant's Argument That Mr. Porter's Methodology Is Unreliable Goes To The Weight It Should Be Given, Not Its Admissibility ........ 12

ii. The Reliability Of Mr. Porter's Projection Of Lumber Product Mix From The Breached Sales Has Been Corroborated By Precision Pine's Actual Lumber Production Over A Two-Year Period ........ 15

C. Defendant's Argument Under Rule 701(c) Is Without Merit ........ 17

# TABLE OF AUTHORITIES

**CASES** PAGE

*Baumgart v. Transoceanic Cable Ship Co., Inc.*,
No. 01 Civ. 5990, 2003 WL 22520034 (S.D.N.Y. Nov. 7, 2003) ....................................8

*Bank of China v. NBM LLC*,
359 F.3d 171 (2nd Cir. 2004)....................................................................................6, 17

*Burlington N. R.R. Co. v. Nebraska*,
802 F.2d 994 (10th Cir. 1986) ..........................................................................................4

*Cuyahoga Metropolitan Housing Authority v. United States*,
60 Fed. Cl. 481 (2004)..................................................................................5, 6 19, 20

*Daubert v. Merrill Dow Pharmaceuticals*,
509 U.S. 579 (1993)..........................................................................................................1

*DIJO, Inc. v. Hilton Hotels Corp.*,
351 F.3d 679 (5th Cir. 2003) ............................................................................................7

*Ford Motor Co. v. Webster's Auto Sales, Inc.*,
361 F.3d 874 (1st Cir. 1966).............................................................................................15

*In re LTV Steel Co., Inc.*,
285 B.R. 259 (Bkrtcy. N.D. Ohio 2002)...........................................................5, 12, 18, 19

*In re Merritt Logan, Inc.*,
901 F.2d 349 (3rd Cir. 1990), *cert. denied*, 516 U.S. 1114 (1996)................................2, 18

*International Rental and Leasing Corp. v. McClean*,
303 F. Supp.2d 573 (D.C.V.I. 2004)...............................................................................14

*Lifewise Master Funding v. Telebank*,
374 F.3d 917 (10th Cir. 2004) ..................................................................19, 20 21

*Lighting Lube, Inc. v. Witco*,
4 F.3d 1153 (3rd Cir. 1993) ...........................................................................................5, 18

*Malloy v. Monahan*,
73 F.3d 1012 (10th Cir. 1996) ..........................................................................................18

*Meredith v. Hardy*,
554 F.2d 764 (5th Cir. 1997) ............................................................................................15

*Nichols v Johnson*,
Civ. No. 00 C 7785, 2002 WL 826482 (N.D. Ill. May 1, 2002)....................................5, 19

*Parker v. Reda*,
327 F.3d 211 (2nd Cir. 2003)..........................................................................................17

*Securitron Magnalock Corp. v. Schnabolk*,
65 F.3d 256 (2nd Cir. 1995)........................................................................................2, 18

*Tampa Bay Shipbuilding & Repair Co., Ltd. v. Cedar Shipping Co., Ltd.*,
320 F.3d 1213 (11th Cir. 2003) ...............................................................................3, 7, 14

*Texas A&M Research Found. v. Magna Transp., Inc.*,
338 F.3d 394 (5th Cir. 2003) .........................................................................................3, 7

*United States v. Leo*,
941 F.2d 181 (3rd Cir. 1991) ..............................................................................................4

*United States v. Novatron*,
271 F.3d 968 (11th Cir. 2001) ..........................................................................................14

*United States v. Oleander*,
338 F.3d 629 (6th Cir. 2003) ..............................................................................................7

**STATUTES AND REGULATIONS**

Fed. R. Evid.
701.................................................................................................................... *passim*
701(a) ..............................................................................................................4, 9 11
701(b)....................................................................................................................11
701(c) ......................................................................................................7, 17, 18, 21
702.........................................................................................................1, 2, 8, 17

RCFC
5.2...........................................................................................................................1
5.2(a)(4) ..................................................................................................................1

Precision Pine & Timber, Inc. ("Precision Pine") respectfully responds to defendant's motion *in limine* to exclude lumber product mix testimony from Precision Pine's president and owner Lorin Porter.

**INTRODUCTION**

The government's motion *in limine* seeks to exclude the projection, prepared by Mr. Porter, of the volume of lumber, by lumber product, that Precision Pine would have manufactured from the sawlogs on each of the breached sales on two grounds.[1] First, the government asserts that Mr. Porter's testimony relating to the making of these projections is really expert testimony that should be excluded because: (1) Precision Pine never identified him as an expert, (2) he did not provide a report, work papers or other backup documentation supporting the estimates and (3) his testimony would not satisfy the factors laid out by the Supreme Court in *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993), regarding the admissibility of expert testimony under Fed. R. Evid. 702. Motion in *limine* ("Motion") at 1. Second, the government contends that even if Mr. Porter's testimony is not excludable as expert testimony, it is still not admissible as lay witness opinion testimony because it fails to meet each of the three elements of Fed. R. Evid. 701. Motion at 10-15. As demonstrated below, however, the government's assertions are meritless.

[1]The government's motion is 15 pages in length but fails to comply with the formal requirements of RCFC 5.2. Accordingly, pursuant to RCFC 5.2(a)(4), the motion may be disregarded by the Court.

I. Mr. Porter's Testimony Regarding Lumber Product Mix Is Not Expert Testimony Under Fed. R. Evid. 702

Mr. Porter's proposed testimony as to how Precision Pine's lost lumber profits were computed is fully admissible. That is, any testimony that Mr. Porter gives on the subject is not expert testimony pursuant to Rule 702 because in the circumstances of this case business owners and officers are allowed to testify as lay witnesses under Fed. R. Evid. 701. *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 265 (2nd Cir. 1995) ("[A] president of a company . . . has 'personal knowledge of his business . . . sufficient to make . . . [him] eligible under Rule 701 to testify as to how lost profits could be calculated,'" *quoting In re Merritt Logan, Inc.,* 901 F.2d 349, 360 (3rd Cir. 1990) (allowing Rule 701 testimony by the principal shareholder of the plaintiff concerning that company's lost profits)), *cert. denied,* 516 U.S. 1114 (1996). This point, as elaborated upon further in the next section which demonstrates that Mr. Porter's testimony is fully admissible under Rule 701, dispatches defendant's contention that Mr. Porter's testimony is that of an expert that should be excluded under Rule 702.

II. Mr. Porter's Testimony Regarding Lumber Product Mix Is Admissible As Lay Witness Opinion Under Fed. R. Evid. 701

Fed. R. Evid. 701 provides that:

**Rule 701. Opinion Testimony by Lay Witnesses**

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Although Rule 701 was amended in 2000 to add subsection (c), the Advisory Committee Note to that amendment makes clear that the amendment was not intended to change the prior practice of allowing the owner or an officer of a business to offer opinions as a lay witness under the rule:

> [M]ost courts have permitted the owner or officer of a business to testify to the value or **projected profits of the business** without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See, e.g., Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153 (3rd Cir.1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. **The amendment does not purport to change this analysis.**

Fed. R. Evid. 701, Advisory Committee Note (emphasis supplied); *see also Texas A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 403 n.12 (5th Cir. 2003) ("Although Rule 701 was amended in 2000 to prohibit lay witnesses from offering opinions based on 'scientific, technical or other specialized knowledge within the scope of Rule 702 [expert evidence],'" the amendment "did not place any restrictions on the preamendment practice of allowing business owners or officers to testify based on particularized knowledge derived from their position," *citing Tampa Bay Shipbuilding & Repair Co., Ltd. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213, 1222-23 (11th Cir. 2003)).

This is precisely the situation presented in the instant case as Mr. Porter is both an owner and the President of Precision Pine (*see* Porter Dep. Day 1 at 16-19 (Ex. 1)) and his opinion as to the mix of lumber products that would have been obtained from the breached sales is based on particularized knowledge that he has by virtue of his position in the business. Moreover, the projected lumber product mix is an initial step in calculating Precision Pine's lost lumber profits,

something which lay business owners have traditionally been permitted to testify about, as the Advisory Committee Note to the 2000 Amendment of Rule 701 expressly states. Accordingly, the plain language of Rule 701 and the Advisory Committee Note make clear that Mr. Porter may offer lay opinion testimony as to Precision Pine's lost profit claim, which of necessity includes a determination of the lumber products upon which those calculations are based.

Nevertheless, defendant argues that Mr. Porter's testimony fails to meet the three subparts of Rule 701. As would be expected from the plain language of the rule and the Advisory Committee Note, however, defendant's arguments fail under each subpart.

### A. Defendant's Argument Under 701(a) Is Without Merit

Defendant claims that the first subpart of Rule 701, i.e., that "the opinion be rationally based on the perception of the witness" is violated by Mr. Porter's use of the Winslow sales journal as part of the support for his product mix projections on the suspended sales because that journal was maintained by a secretary at Precision Pine. Motion at 10-11. However, the law allows lay opinion testimony based on a review of business records that were not prepared by the witness. *See United States v. Leo*, 941 F.2d 181, 193 (3rd Cir. 1991) (upholding trial court's decision to admit lay opinion testimony from a company executive where witness reviewed purchasing department files and business records to form his opinion); *Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1004-05 (10th Cir. 1986) (concluding that district court abused its discretion in failing to consider lay opinion testimony from company executives where executives' opinions were based on years of experience in the railroad industry and a review of company records prepared in the ordinary course of business). The propriety of this result was

discussed in *Lightning Lube, Inc. v. Witco*, 4 F.3d 1153, 1175 (3rd Cir. 1993), where an officer of a company was permitted to testify with regard to projected lost profits. In creating his projections, the officer in *Lighting Lube* relied upon the reports of an accountant. *See id.* at 1175. The Court concluded that "given [the witness's] knowledge and participation in the day-to-day affairs of [the] business, [the witness's] partial reliance on [a] report, even if prepared by an outsider, does not render [the witness's] testimony beyond the scope of Rule 701." *Id.*; *see also Nichols v. Johnson*, Civ. No. 00 C 7785, 2002 WL 826482, at *6 (N.D. Ill. May 1, 2002) (Plaintiff and his partner both of whom participated in a business could properly base their lay opinions about profitability in part on information from books and records prepared by an accountant); *In re LTV Steel Co., Inc.,* 285 B.R. 259, 263 (Bkrtcy. N.D. Ohio 2002) (Permitting corporation's director of environmental control to offer opinion testimony concerning the projected cost of environmental liabilities that touched on scientific and technical matters, even though he relied on reports furnished by others because "[l]ay witnesses may rely on reports prepared by outsiders," *citing Lightning Lube, Inc.*, 4 F.3d at 1175).

Even the cases relied on by defendant in its motion are not to the contrary. That is, defendant cites *Cuyahoga Metropolitan Housing Authority v. United States,* 60 Fed. Cl. 481 (2004), in support of its view that Mr. Porter's use of the sales journal violates the first prong of Rule 701, however, that case actually found that:

> Moreover, while lay witness may testify as to perceptions acquired by them through review of records, those records must be prepared in the ordinary course of business. *See Allied Sys., Ltd. v. Teamsters Auto. Transport Chauffeurs,* 304 F.3d 785, 792 (8th Cir. 2002).

*Id.* at 483 n.1 (emphasis supplied). As Mr. Porter testified at deposition, the Winslow sales journal had been regularly prepared for years by a secretary at Precision Pine. Porter Dep. Day 2 at 363-64 (Ex. 2). Moreover, Mr. Porter personally reviewed the sales journal, a Precision Pine business record, in preparing the lumber product projections. *See* Precision Pine's Response to Interrogatory No. 41 (Ex. 3).[2]

Similarly, defendant's reliance on *Bank of China v. NBM LLC*, 359 F.3d 171 (2nd Cir. 2004), is misplaced because in that case lay witness opinions by a bank employee were found to be admissible because they were based on perceptions made by the employee within the scope of specific investigations that he had undertaken at the bank.[3] *Id.* at 181-82. In upholding the district court's admission of the lay opinion testimony, the court concluded:

> [T]o the extent Huang's testimony was grounded in the investigation he undertook in his role as a Bank of China employee, it was admissible pursuant to Rule 701 of the Federal Rules of Evidence because it was based on his *perceptions. See United States v. Glenn,* 312 F.3d 58, 67 (2d Cir. 2002) ("[A] lay opinion must be rationally based on the perception of the witness. This requirement is the familiar requirement of first-hand knowledge or observation." (citations and quotations omitted)).

*Id.* (emphasis in original). *Bank of China* does not hold that if a business owner or officer offers his lay opinion based on his review of records prepared by a third party that the opinion is no longer valid under Rule 701; rather the case permits lay opinions based on perceptions gained

[2]Precision Pine's response to defendant's Interrogatory No. 41 sets forth the method used by Precision Pine to make its projection of lumber product mix. The government questioned Mr. Porter extensively about this methodology over the course of a three-day deposition.

[3]By contrast, other opinions that the bank employee offered were based on his experience in international banking generally and the court found those to be expert opinions that could not be admitted under 701. *Id.* at 180-81.

during the course of an investigation, such as that undertaken by Mr. Porter in determining the lumber product mix on the breached sales.

Defendant also relies on *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679 (5th Cir. 2003), however, that case fully supports Precision Pine's view of the law. In *DIJO, Inc.*, the witness who offered to provide lay opinion testimony was neither a current nor former owner of the business at issue but rather was a financial consultant with advanced degrees in economics and extensive experience in real estate finance who was employed by an unrelated business entity. *Id.* at 685. In ruling against this proffered lay opinion testimony on the basis that the witness was a non-employee who was wholly unrelated to the day-to-day operation of the business, the court reaffirmed that the 2000 amendment that added Rule 701(c) did not change the law with respect to business owners or officers: "We have previously recognized that 'the amendment did not place any restrictions on the preamendment practice of allowing business *owners or officers* to testify based on *particularized knowledge* derived from their position.'" *Id.*, *quoting Texas A&M Research Found.*, 338 F.3d at 403 n.12 (emphasis in original), *citing Tampa Bay Shipbuilding*, 320 F.3d at 1222-23. Moreover, in *DIJO, Inc.*, the court went on to allow other proffered lay opinion testimony under Rule 701 as to a projection of lost profits because that projection had been made by one of the principals of the business and it was based on his own experience in developing the business. *DIJO, Inc.*, 351 F.3d at 687. Thus, *DIJO Inc.* directly supports the admissibility of Mr. Porter's testimony in this case.

Defendant's reliance on *United States v. Oleander*, 338 F.3d 629, 637-38 (6th Cir. 2003), is also unavailing because the proffered lay opinion testimony in that case was from a

criminologist (i.e., someone with scientific, technical, or other specialized knowledge within the scope of Rule 702) who sought to give opinion testimony as to a police investigation of a criminal offense and to repeat statements given to him in interviews by potential witnesses. This is a far cry from the testimony from a business owner offering a lay opinion based in part on his review of his own business records.

Finally, *Baumgart v. Transoceanic Cable Ship Co., Inc.*, No. 01 Civ. 5990, 2003 WL 22520034 (S.D.N.Y. Nov. 7, 2003), cited by defendant also supports Precision Pine's position because in excluding plaintiff's proffered lay opinion testimony about his future earning potential, the court indicated that:

> Unlike situations in which business owners have been allowed to provide lost profit estimates in the form of lay opinion testimony because of their personal knowledge of the business, here Bethel has admitted that the assumptions underlying his wage and benefit estimates were developed without any reference to Plaintiff's actual employment history.

*Id.* at *3 (emphasis supplied, footnote omitted).

Thus, even under cases relied on by defendant, Mr. Porter's lay opinion testimony is not objectionable because he reviewed and, in part, relied on the sales journal a Precision Pine business record. Indeed, rather than merely relying on his experience in trying to ascertain what lumber products would have been produced from the breached sales, Mr. Porter turned to the Winslow sales journal as a source of actual lumber sales that would help him substantiate his opinion of the lumber product mix that, but for the breach, would have been produced from the sales at issue in this case.

Moreover, by fixating solely on the sales journal, defendant wholly ignores Mr. Porter's personal perceptions of the quality of the timber on each sale, and his assessment of the lumber that could be manufactured from the timber on each of the sales at issue, which is another component of his opinion about lumber product recovery that is appropriate under Rule 701(a). *See* Ex. 3. That is, in addition to isolating a time period on the Winslow sales journal when he believed that lumber sales would have been made predominately from a particular sale which served as Mr. Porter's baseline, Mr. Porter also had to project product mix percentages for sales that had not been harvested or for sales that he was not able to isolate a time period on the sales journal where he believed that the lumber sales had come from those sales.

In making these projections, Mr. Porter also had to draw on other aspects of his experience as President and owner of Precision Pine, his knowledge about the characteristics of the timber available to Precision Pine as well as his specific knowledge about each of the breached sales. As Mr. Porter testified at deposition, he gained this knowledge in many ways, including by personally conducting a thorough on the ground inspection and assessment of the quality of the timber on every timber sale on which Precision Pine bid. Ex. 1 at 22-23. As Mr. Porter elaborated at Day 2 of his deposition, he would sometimes spend several days on a sale area, he would measure trees on the sale area, determine the lumber grades that could be produced, check sale boundaries and seek clarification from the Forest Service whenever necessary. Ex. 2 at 372-76.

Additionally, Mr. Porter, as part of his hands-on approach to managing Precision Pine's operations, oversaw operations at the Precision Pine mills, and spent a great deal of time

watching the lumber as it was being produced. Ex. 1 at 26-27. In this regard, Mr. Porter would regularly watch the logs as they were processed at Precision Pine's mills to see if the lumber being produced matched up with what Mr. Porter had expected when he had inspected the timber in the woods. Ex. 2 at 377-78. Sometimes he would track the lumber production from a group of logs. *Id.*[4] Mr. Porter would also talk to the sawyer who was cutting the logs to ascertain what product mix had been coming out a particular group of logs from a sale. Ex. 2 at 379.

Defendant also ignores testimony about Mr. Porter's considerable experience in assessing the quality of timber available to Precision Pine:

> Q. You said earlier you knew from experience what would come out of a tree. What experience is that you're referring to, and how did you get this sort of knowledge?
>
> A. Experience is my time in Chama, New Mexico, and my time managing the mills in Heber, and Snowflake was my father's company, and the time I spent with Evergreen, and also in my youth, that's, you know, that's where I worked. That was my summer jobs and that was my, my father's life, and I spent a lot of time with him and learned from his experience, and so all those things, just being there, and I spent time in the woods with my Dad. I'd seen the trees. I knew where they came from. I heard him talk of it. I'd seen them cut in mills, and so yeah, it was just a lifetime of experience.
>
> Q. So it was from your experience as opposed to some formal education that you had?
>
> A. Yeah, in relation to – I'm not sure there is formal education, the sum of that, you know.

*Id.* at 32-33.

---

[4]It was possible for Mr. Porter to know from what Forest Service sale a log had come during processing by looking at the hammer brands that the Forest Service required purchasers to place on the end of each log. Ex. 1 at 172. These hammer brands would still be visible on some finished lumber products. *Id.* at 184-85.

Mr. Porter further explained that part of his job as President of Precision Pine was to evaluate timber that was being offered for sale and that in doing so he had to know what lumber products could be produced from a tree:

> Q. And what has your role been with the company in, in the purchasing, the acquiring of timber?
>
> A. I have been generally the one that, you know, I would look at the timber. I would just evaluate the timber. I knew what, I knew from our experience what, what kind of lumber would come out of what kind of tree. I knew the basic area. I had been around it most of my life. I had been down in these other mills and seen timber go through them, so I, I became familiar with what, what grades and those kind of things I could expect from timber in different areas and different locations. . . .

*Id.* at 21-22. *See also id.* at 48-49. Thus, Mr. Porter as the owner and President of Precision Pine properly based his opinion about the lumber products that would be obtained from the sales at issue not only on the Winslow sales record but his opinion was further informed by his experience as President of Precision Pine. Accordingly, his view as to the mix of products that would have been produced from the breached sales, as part of his effort to quantify the amount of lost profits Precision Pine has sustained, is the appropriate subject of lay opinion testimony under Rule 701(a).

B. Defendant's Argument Under Rule 701(b) Is Without Merit

At page 12, the government argues that Mr. Porter's testimony should be excluded under Rule 701(b), because it will not be "helpful" to the Court. However, defendant cites no authority in support of its argument and in this case it is simply untrue. As demonstrated in the preceding section, Mr. Porter has extensive knowledge of the geographic areas in which the timber sales at issue lie, of the timber sales at issue in this case themselves, and the lumber that could have been produced from those sales at Precision Pine's mills but for the breach. Thus, Mr. Porter's

testimony brings to light valuable and probative information for the Court. As other courts have recognized, this is the very situation that Rule 701 is designed to address:

> Most witnesses in complex matters have helpful background and experience, as did most of the witnesses in this case. Most testimony lies somewhere in the vast region between the illiterate eyewitness, who testifies only that "the light was green," and the Nobel laureate, who explains the mapping of the human genome. Commentary, practice, and case law support recognizing this reality.
>
> The Advisory Committee Notes accompanying Rule 701 explain that the rule's amendment was not intended to ban all lay scientific or technical testimony. **The Advisory Committee Notes specifically address the admissibility of lay witness testimony, in corporate situations similar to this case, involving business projections.**

*In re LTV Steel Co., Inc.*, 285 B.R. at 264 (emphasis supplied). Therefore, as demonstrated further below, Mr. Porter's projection of the lumber products that would have been produced by his company from the timber sales he evaluated and purchased to supply raw material to his company is extremely helpful to the Court and just the sort of lay witness testimony Rule 701 is designed to permit.

i. Defendant's Argument That Mr. Porter's Methodology Is Unreliable Goes To The Weight It Should Be Given, Not Its Admissibility

In response to Interrogatory No. 41, an inquiry by defendant as to how Precision Pine made its estimate of product mix for the breached sales, Precision Pine provided a detailed answer describing the means used by Mr. Porter in forming his opinion as to the product mix for each sale. Ex. 3. As explained therein, Mr. Porter used Forest Service Timber Sale Statements of Account (TSSAs), timber sale status reports, and the Winslow sales record in order to isolate periods of time during which Mr. Porter concluded that sales of lumber products

from a breached sale were being sold. Ex. 3 at 1.[5] He was able to do this for the following six sales: the St. Joe sale during May and June of 1995, the U-Bar sale during January of 1994 and February of 1995, the Hutch-Boondock sale during December of 1995 and January of 1996, the Brann sale during February and March of 1996, the Mud sale during September and October of 1996 and the Brookbank sale during July and August of 1995.[6] *Id.* at 10-12 (Charts).

For the remaining eight suspended sales that either had not been harvested or had been harvested but where Mr. Porter was unable to isolate a specific time period in the Winslow sales journal when he believed he could identify lumber being sold from the sales, Mr. Porter determined lumber product percentages on those sales based on how the timber on those sales compared to timber on the six sales for which he did have lumber product mix data from the sales journal. *Id.* at 2-5, 10-12. In doing so, he used his experience in conjunction with data on the Forest Service's own appraisals for each of the sales such as average diameter at breast height and percent of clear faces. *Id.* at 2. Thus, defendant's argument that Mr. Porter relied solely on his experience in determining the comparability of sales for purposes of determining the lumber product mix is flatly wrong. *See* Motion at 8.[7]

---

[5]Precision Pine does not maintain records that track logs from a given timber sale through to lumber product sales. Mr. Porter determined that the best means of doing so was to use the Winslow sales journal in the manner he has described in response to Interrogatory No. 41 and at his deposition.

[6]The chart for the Brookbank sale contains a typographical error, the title of the third column should read "August 1995" not "August 1996."

[7]Indeed, in a footnote, defendant conceded that it is "undisputed" that diameter at breast height and percent grade affect the mix of lumber products that can be produced from timber. Motion at 2 n.1. Defendant's willingness to contort the record by suggesting that Mr. Porter

Moreover, in addition to the information provided in response to Interrogatory No. 41, defendant deposed Mr. Porter in three separate sessions during which counsel delved into the means used by Mr. Porter to determine the product mix and during which additional details were disclosed to the government. Suffice it to say, that there are no surprises about how Mr. Porter determined the product percentages and defendant will, of course, be permitted to engage in cross-examination of Mr. Porter on this point at trial.

Even if, as defendant contends that Mr. Porter's testimony lacks a proven technical basis, the Court as the trier of fact in this bench trial is not likely to be confused or misled by it. Again, the government, of course, will have an opportunity to try to expose any such perceived weaknesses on cross-examination.[8] Thus, the government's argument goes to the weight of Mr. Porter's testimony not to its admissibility. *See Tampa Bay Shipbuilding*, 320 F.3d at 1221 ("'To the extent that [the witnesses] opinion lacked a technical/medical basis, [the defendant] had the opportunity to expose this on cross-examination' and the defendant's objections more properly went to the weight and not the admissibility of the evidence") (alterations in original), *quoting United States v. Novatron*, 271 F.3d 968 (11th Cir. 2001). *Accord International Rental and Leasing Corp. v. McClean*, 303 F. Supp.2d 573, 578 n.7 (D.C.V.I. 2004) ("Whether or not

---

relied solely on his experience and ignoring factors that defendant admits have an impact on lumber mix (and which Mr. Porter actually considered) in an effort to prevail, short of trial, is an additional reason that the Court should not exclude relevant evidence based on defendant's characterization of it. Instead, the Court should hear and weigh the evidence for itself.

[8]Such perceived weaknesses include the issue of "lag time" (Motion at 7) about which Mr. Porter has testified at deposition, including the fact that he had taken lag time into consideration when determining lumber product percentages (Porter Dep. Day 3 at 30-31 (Ex. 4)) as well as the issue of inventory (Motion at 7-8) about which Mr. Porter has not been questioned by defendant. Of course, defendant will be free to do so at trial.

[business owner's lay witness] opinion is accurate goes to the weight of the testimony, not its admissibility," *citing Meredith v. Hardy,* 554 F.2d 764, 765 (5th Cir. 1977); *Ford Motor Co. v. Webster's Auto Sales, Inc.,* 361 F.2d 874, 886 (1st Cir. 1966) (plaintiff's method of valuation of damages attacked by defendant; accuracy of plaintiff's testimony goes to weight not admissibility)).

ii. The Reliability Of Mr. Porter's Projection Of Lumber Product Mix From The Breached Sales Has Been Corroborated By Precision Pine's Actual Lumber Production Over A Two-Year Period

Defendant's attack on Mr. Porter's methodology notwithstanding, the inherent reliability of Mr. Porter's opinion as to lumber product mix is demonstrated by the fact that it is entirely consistent with Precision Pine's actual lumber product production over a relevant two-year period. That is, page two of PX 288 summarizes Precision Pine's weighted average of lumber production by lumber product from July 1994 to July 1995, i.e., the thirteen-month period immediately prior to the suspension at issue in this case. The lumber production figures used on this part of PX 288 are summarized from the Winslow sales ledger, a document used by Mr. Porter in making his projection. This information is set forth in the chart below in the second column.

Secondly, in PX 287, Mr. Ness determined the weighted average of the lumber product mix from all of the suspended sales as projected by Mr. Porter. This data is set forth in the third column of the chart below.

Finally, Mr. Ness calculated the weighted average of lumber actually produced and sold by Precision Pine from the 3rd Quarter of 1995 through the 2nd Quarter of 1996, i.e., during the suspension. The results of that calculation are set forth in the chart below in column 4. A comparison of Mr. Porter's projection of lumber product mix (column 3), the lumber product mix actually achieved by Precision Pine from July 1994 to July 1995 (column 2) and during the first year of the suspension (column 3) is as follows:

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| Precision Pine Lumber Product | % of Actual Sales July 1994 to July 1995[9] | % as Projected by Mr. Porter for the Breached Sales[10] | % of Actual Sales During Suspension[11] |
| 1. Moulding & Better | 5.16 | 4.35 | 4.00 |
| 2. 5/4 #1 Shop | .88 | 1.52 | .52 |
| 3. 5/4 #2 Shop | 8.02 | 7.32 | 6.23 |
| 4. 5/4 #3 Shop | 22.45 | 20.69 | 19.45 |
| 5. Paragraph 99 Redress | 11.28 | 13.51 | 16.26 |
| 6. 5/4 RWL Radius Edge | 10.37 | 16.86 | 7.99 |
| 7. #2, #3, #4 & Better | 9.27 | 8.55 | 14.62 |
| 8. #3 Common Utility | 9.93 | 6.86 | 8.74 |
| 9. #4 Common Economy | 7.02 | 7.62 | 9.73 |
| 10. #5 Common | .25 | .23 | 1.24 |
| 11. Rough | 2.67 | 2.84 | 3.79 |
| 12. Timbers | 3.95 | 2.48 | .29 |
| 13. Miscellaneous Shop Outs | 8.77 | 7.18 | 7.14 |

[9] PX 288 – Page 2, weighted average of Winslow sales journal, July 1994 to July 1995.

[10] PX 287 – Ex. 2, page 3, weighted average of Mr. Porter's projection of lumber product mix percentages for the breached sales.

[11] PX 288 – Page 1 – Actual Sales for Period August 24, 1995-June 30, 1996. Weighted average of lumber product mix as taken from actual sales invoices.

As the Court can readily see, the weighted average of Mr. Porter's opinion as to the lumber production from all of the breached sales compares quite favorably both with actual lumber production and sales in the 13 months preceding the suspension and during the 3rd Quarter through the 2nd Quarter of the suspension period itself.[12] This is not surprising because one would not expect the average quality of Ponderosa Pine timber available to Precision Pine to vary wildly from one year to the next. This independent corroboration of the essential accuracy of Mr. Porter's projection by two years of actual lumber production from the company itself goes a long way to dispel those issues raised by defendant.

### C. Defendant's Argument Under Rule 701(c) Is Without Merit[13]

Lastly, at pages 12-15, the government claims that Precision Pine's attempt to admit Mr. Porter's testimony under Rule 701 would circumvent the requirements of Rule 702 that scientific, technical or other specialized knowledge by introduced through an expert. This argument has been tried and rejected in other cases:

> Specifically, objectors argue that [a corporation's director of environmental control's] testimony about projected environmental costs is inadmissible because the projections involve scientific, technical, or other specialized knowledge. Following objectors' logic, a Court may never permit a lay witness to testify

---

[12] Because the lumber inventory carried by Precision Pine was not large and did not vary significantly, production essentially equals sales during these periods.

[13] A trial court's admission of lay witness testimony under Rule 701(c) is reviewed under the harmless error standard, *i.e.*, an appellate court will order a new trial only if the introduction of inadmissible evidence was a clear abuse of discretion and was so clearly prejudicial to the outcome of the trial that the court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice. *Bank of China*, 359 F.3d at 183, *citing Parker v. Reda*, 327 F.3d 211, 213 (2nd Cir. 2003). Such an error is highly unlikely in this bench trial and the Court should admit the proffered lay witness testimony by Mr. Porter and assign to it the weight the Court deems appropriate.

> about scientific or technical data. This theory is not supported by common sense or precedent.

*In re LTV Steel Co., Inc.*, 285 B.R. at 264 (footnote omitted). Moreover, as noted above, although the requirements set forth in Rule 701(c) were added in 2000, the Advisory Committee Note to that amendment makes clear that the amendment was not intended to change the prior practice under the rule of allowing the owner or an officer to testify as a lay witness, especially with respect to lost profits:

> [M]ost courts have permitted the owner or officer of a business to testify to the value or **projected profits of the business** without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See*, *e.g.*, *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3rd Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. **The amendment does not purport to change this analysis.**

Fed. R. Civ. 701, Advisory Committee Note (emphasis supplied). The cases scrupulously follow the prior law in allowing business owners and officers to provide projections related to their businesses especially in the realm of lost profits. *Lightning Lube, Inc.*, 4 F.3d at 1175 (an officer of a company was permitted to testify to projected lost profits based on knowledge and participation in the day-to-day affairs of the business); *Securitron Magnalock Corp.*, 65 F.3d at 265 ("Accordingly, a president of a company, such as Cook, has "personal knowledge of his business . . . sufficient to make . . . [him] eligible under Rule 701 to testify as to how lost profits could be calculated," *quoting In re Merritt Logan, Inc.*, 901 F.2d at 360 (Allowing Rule 701 testimony by the principal shareholder of the plaintiff concerning that company's lost profits); *Malloy v. Monahan*, 73 F.3d 1012, 1015-16 (10th Cir. 1996) (real estate developer permitted to offer lay opinion as to profits he would have made "by rehabilitating and selling two houses that

he currently owned, using those profits to purchase, rehabilitate, and sell four additional houses and, thereafter purchasing, rehabilitating and selling four more houses"); *Nichols*, 2002 WL 826482, at *6 (Plaintiff and his partner both of whom participated in a business could offer lay opinion testimony on profitability of business); *In re LTV Steel Co., Inc.*, 285 B.R. at 265 (Permitting corporation's director of environmental control to offer testimony concerning the projected cost of environmental liabilities that touched on scientific and technical matters).

In an effort to overcome this law, the government relies on *Cuyahoga*, 60 Fed. Cl. at 481, and *Lifewise Master Funding v. Telebank*, 374 F.3d 917 (10th Cir. 2004), however, the cases are unavailing.

In *Cuyahoga*, an employee of HUD opined in a declaration for purposes of summary judgment that "the proposed adjusted rent sought by plaintiff exceeds the amounts needed to operate comparable projects." *Cuyahoga*, 60 Fed. Ct. at 481. This opinion, however, was based not on his own investigation of rents at comparable properties but rather was based on determinations of rent at properties deemed to be comparable by others in the agency that had been prepared at the request of the witness for use in the litigation. *Id.* at 482. Accordingly, the determinations of rents at comparable properties was not made during the ordinary course of business and they also failed to meet the Rule 701 requirement that they be "rationally based on the perception of the witness." *Id.* Moreover, the court found that HUD's internal regulations indicated that its own employees were not qualified to make the type of determinations that had been made about the comparability of properties and required HUD to use a qualified appraiser when making such determinations because of the specialized and scientific nature of the

endeavor. *Id.* at 484.[14] Here in contrast, Mr. Porter's testimony is rationally based on his own perceptions including his personal experience with the timber sales at issue, viewings of the mill's output and a review of business records regularly created by Precision Pine. Thus, the factors that made the testimony inadmissible in *Cuyahoga* do not exist in this case and the ruling in that case has no application to defendant's effort to exclude Mr. Porter's testimony.

In *Lifewise*, the president of that company, in his fourth effort to quantify his company's damages, resorted to a highly technical damage model that including moving averages, compounded growth rates and S-curves. *Lifewise*, 374 F.3d at 928-30. The company president could not, however, recall any prior instances where he used such complex and technical methodologies in his work. *Id.* at 930. The court concluded that:

> [The company president] does not have personal knowledge of the factors used by Lifewise's fourth damages model to estimate its lost profits. On the other hand, the district court acknowledged that he could have testified solely as a business person based on his personal knowledge and experience as president of the company.

*Id.* As the court in *Lifewise* noted with approval, many cases allow a business owner's testimony under Rule 701 because the owners had sufficient personal knowledge of their business and the factors on which they relied to estimate lost profits. *Id.* at 929.

Here, Mr. Porter's opinion is not based on any academic theory of damages, but rather on his own projection of lumber product mix based on his experience with the breached sales and the records of his own business. As Mr. Porter explained to the government at the third day of

[14] Indeed, the Court did not even directly decide the threshold issue of whether the business owner's and officer's exception to Rule 701 applied to the agency employee at issue in *Cuyahoga*. *Id.* at 484.

his deposition, it was these factors that allowed him to make his projection of lumber mix, not some abstruse scientific theory better presented by an expert:

> Q. BY MR. HARRINGTON: Is the methodology that you used to come up with the mix of products a methodology that is recognized by the industry?
>
> A. I don't know what is recognized by the industry in that regard. I can tell you that I believe I knew what we were cutting and making from the types of logs we had under contract.
>
> Q. Did you consult any textbooks or studies in coming up with the methodology you used?
>
> A. Just the studies we made ourselves. But as far as textbooks, I don't know if there are any textbooks that can tell you what you're going to get from a specific sale and log and area.
>
> Q. Did you talk to anyone else in coming up with the mix of products that Precision Pine claims it would have derived from the timber sales?
> A. Not that I'm aware of, other than reviewing it with counsel.

Ex. 4 at 26-27. This is precisely the type of lay opinion testimony that the court in *Lifewise* deemed to be appropriate under Rule 701. Clearly, Mr. Porter is giving lay opinion testimony based on his experience with his own company, the timber sales at issue and the company's actual business records in order to provide a reasonable estimate of lumber mix and lost profits. Admittedly, Mr. Porter does not rely on any sophisticated formulae, regression analyses, S-curves or the like that could come within the bar of Rule 701(c) as being based "on scientific, technical, or other specialized knowledge within the scope of Rule 702." Mr. Porter is prepared to testify, however, as to how he used his experience as company President and documents that he was familiar with in that role to determine the mix of lumber products that he anticipated would have been produced from the breached sales.[15] This is what is contemplated by Rule 701.

[15]Defendant contends that Mr. Porter's estimate of lumber product production from the relatively small volume of Douglas-fir and Englemann Spruce, *i.e.*, species other than Ponderosa

Finally, given the independent indicia of the reliability of Mr. Porter's projection of lumber product mix based on Precision Pine's actual lumber product production over a two-year period, as set forth in the chart above, this Court should accept Mr. Porter's lay opinion and afford it the weight that the Court deems to be appropriate.

Respectfully submitted,

s/Alan I. Saltman

SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: April 28, 2005

Pine contained on three of the breached sales is unreliable. *See* Motion at 9-10. However, Mr. Porter also testified to his method of determining the product mix from these species. Ex. 3 at 6-7; Ex. 4 at 41-45.