PRECISION PINE & TIMBER, INC., )
)
Plaintiff, )
)
v. )
)
THE UNITED STATES, )
)
Defendant. )
)

DEPOSITION OF LORIN PORTER

Overgaard, Arizona
February 11, 2004
2:30 p.m.

Prepared for: The Court (Original)

Prepared by: Bonnie Ponce, Certified Court Reporter No. 50669



Ex. 4

A. I believe so, yes.

Q. How did you derive the mix of products that Precision Pine claims it would have produced from the suspended contracts?

MR. SALTMAN: Objection; asked and answered.

THE WITNESS: How did I come up with the list of products? I think I explained that in Washington, D.C., and that is the same thing we used.

Q. BY MR. HARRINGTON: Is the methodology that you used to come up with the mix of products a methodology that is recognized by the industry?

A. I don't know what is recognized by the industry in that regard. I can tell you that I believe I knew what we were cutting and making from the types of logs we had under contract.

Q. Did you consult any textbooks or studies in coming up with the methodology you used?

A. Just the studies we made ourselves. But as far as textbooks, I don't know if there are any textbooks that can tell you what you're going to get from a specific sale and log and area.

Q. Did you talk to anyone else in coming up with the mix of products that Precision Pine claims

it would have derived from the timber sales?

A. Not that I'm aware of, other than reviewing it with counsel.

(Deposition Exhibit Number 54 was marked for identification.)

Q. BY MR. HARRINGTON: Marked as Porter Exhibit 54, a series of Precision Pine & Timber profit projections dated July 17th, 1995 --

MR. SALTMAN: For the record, they're not labeled as profit projections. They may be. I don't know. I don't know how many pages we have. I'd like to count them and put that on the record, though.

MR. HARRINGTON: That will be marked and included with the record, but feel free.

MR. SALTMAN: These are 25 unnumbered pages. All appear to be dated on July 17, 1995, and I believe that there is one for -- well, looks like for most of the sales there are only one and -- most, but not all of them, are Forest Service sales.

Q. BY MR. HARRINGTON: Mr. Porter, are each of these sheets in the format of the profit projection that we discussed earlier?

A. Yes, they are. I think they're labeled a little differently, but I think they would have --

I'm almost sure they came from my computer.
Q. Would you have developed these profit projections?
A. Yes.
Q. And is it accurate to refer to these as profit projections?
A. I think so.
Q. Do any of these profit projections have an entry on them projecting profits for roundwood or pulpwood?
A. I doubt it. I didn't look on each one of them. I didn't ever have that on my form. I'm sure these are the ones I prepared for Mr. Tenney.
(Deposition Exhibit Number 55 was marked for identification.)
Q. BY MR. HARRINGTON: I've marked as Plaintiff's Exhibit 55 Plaintiff's Additional Information Regarding Interrogatory 41, which was Plaintiff's Second Supplemental Answer to United States 41st Interrogatory.
MR. SALTMAN: It is nine pages, undated, and there is a chart of two pages -- three pages attached thereto.
Q. BY MR. HARRINGTON: Mr. Porter, did you assist in the preparation of the answer to this

interrogatory?
A. Yes.
Q. Does this interrogatory describe the process you used in deriving the mix of products that Precision Pine claims it would have produced on the suspended timber sale contracts?
A. I think as well as you can explain it on paper and get the explanation. It's difficult to explain everything in written form.
Q. That's why I want to talk to you a little about it now.
There on the first page it makes reference to a lag time.
MR. SALTMAN: Where on the first page are you referring?
MR. HARRINGTON: It's not on the first page. Hold on.
It's about four lines down in the answer in parentheses, and it says, "In doing so, Mr. Porter took into account lag time from timber harvest to lumber sale."
Q. BY MR. HARRINGTON: What was the lag time you used in your methodology?
A. It --
MR. SALTMAN: I'm going to object. He

has testified extensively about the process he used, and I think in the course of that answer he has provided an answer.

With that, you are free to answer the question.

THE WITNESS: The lag time is -- there is a period of time, you bring logs in and cut them at the mill and you -- depending on which mill it was at. If you are in Winslow, you are right there.

If you are at Heber or Eagar, you had to transport the material, so there was a lag time that had to be considered to try to calculate what the percentages were, and so I used the best of my knowledge and ability in watching the lumber go through as a lag time.

Q. BY MR. HARRINGTON: What was the period of time used as a lag time?

A. It varied from mill to mill.

Q. So you didn't use the same lag time on each of the contracts that you were analyzing?

A. I tried to be as accurate as I possibly could in putting this together, and that's all I tried to do.

Q. Did you use the same lag time on each of the contracts that you were analyzing?

A. Probably not. I can't remember specifically, but I probably did not use the exact same lag time.

Q. Do you know what lag time you used in analyzing the St. Joe contract?

A. I would have considered -- when the St. Joe was harvested at the mill, I would have watched that lumber from the time it was harvested at the mill and it was transported to Winslow, and I would have taken whatever that period of time as I watched that -- could have been two, three weeks. Whatever I felt was accurate is what I used.

MR. SALTMAN: I'm going to renew my objection, because he testified, as I recall, for a good half hour or more as to the process he used, and I believe he answered the questions regarding things like lag time.

You are free to continue your questioning.

MR. HARRINGTON: I am interested in the specific lag time that was used in analyzing each of these contracts, and I can assure you that we did not get, last week or today, any information on specific lag times that were used, and that's what I'm asking Mr. --

MR. SALTMAN: Since Interrogatory 28 -- the answer refers to filling in some of the charts, I would ask if you would provide that to Mr. Porter so he can look at it.

MR. HARRINGTON: I'm going to be asking Mr. Porter about the methodology that he used rather than specific numbers.

MR. SALTMAN: I would still reiterate my request that you do that.

Q. BY MR. HARRINGTON: Mr. Porter, looking at the section of the answer titled "Lumber Products - Douglas-fir" --

A. Uh-huh.

Q. -- it says, "Three products would have been made from the Douglas-fir timber."

Did you assist in providing this answer on behalf of Precision Pine?

A. Yes.

Q. And was it you that determined the amount of Douglas fir that would have been produced or the distribution that would have been produced?

A. The distribution, yes.

Q. And did you also determine the distribution of the Engelmann spruce products that would have been produced?

A. Yes.
Q. Down below it says, under "Number 2 & Better," "This product would have accounted for 85 percent of the Douglas-fir lumber produced."
MR. SALTMAN: What page are you on?
MR. HARRINGTON: Number 2.
THE WITNESS: Right.
Q. BY MR. HARRINGTON: How did you determine that 85 percent of the Douglas fir would be Number 2 and better?
A. More past experience in cutting Douglas fir from these sales or sales in similar areas.
Q. Was there any specific methodology that you used?
MR. SALTMAN: Objection. I think he just answered that.
You can answer it again.
THE WITNESS: My specific methodology was taken from our experience with the lumber we had previously cut and milled and sold from Douglas fir.
Q. BY MR. HARRINGTON: Where there any documents that you consulted?
A. Other than our internal documents, our sales records and those kinds of thing.
Q. What did you consult?

A. Would have been sales records and invoices in the past on sales that we had cut Douglas fir, and that was just -- that was a standard percentage that we had received from when you cut Douglas fir.

Q. Was that from the Winslow sales record that you would have looked?

A. I'm not sure if it was the Winslow sales record or production records. It would probably have been a combination of both, probably.

Q. What sort of production records?

A. Just records we would have kept on what was produced and sold.

Q. Do you know which of those, if either, you consulted in determining these distribution numbers?

MR. SALTMAN: Objection; asked and answered.

THE WITNESS: I think I tried to use both of them.

Q. BY MR. HARRINGTON: How did you use them?

A. I would have gone to them and found out what percentage we cut and sold the material.

Q. Did Precision Pine ever produce any other sorts of product from Douglas fir?

A. Not that I'm aware of.

Q. How about from the spruce; how did you determine the product distribution for the spruce?

A. The way I remember, spruce was a little tougher thing. There's just not a whole lot of spruce in this country that we cut, and so we did basically the same thing as accurately as we could to figure how we cut it and what was cut in the past and what the prices and percentages were.

Q. It says the volume was sufficiently small, that you didn't use actual invoices for determining the prices.

Was the volume sufficiently small that it was difficult to determine the product distribution?

A. I think the smaller the amount of information you have, it makes it a little more difficult. I'm sure of that. But we just did the best we could with the experience we had, and that's all we could do.

Q. Were there any documents you consulted in coming up with the numbers for the spruce?

A. I'm sure I consulted the same type of documents as the Douglas fir.

Q. Did you do any written analysis when you consulted those documents?

A. I don't believe so, no.
Q. Did you do any written analysis when you consulted the documents for the Douglas fir?
A. I don't believe so, no.
Q. So you didn't take and compile a list of all the --
A. I'm sure I did, but I don't have any idea. It's not in the records here or records that we may have had. I don't know.
Q. Did you do something in writing when you were coming up with these numbers?
A. I would have at least done it on a calculator. I'm not sure that it was in writing, but I would have at least done it on a calculator.
Q. Looking at the page on spruce, each of the entries down on the bottom half of the page says you took the random length's price plus $50.
A. Yes.
Q. Why did you add $50?
A. The prices are based on Portland, Oregon, and the freight rates coming down to this country for the spruce would have been about $50. That's what we estimated. And that comes from actual freighting lumber.
Q. So are you saying the freight of lumber