IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PRECISION PINE & TIMBER, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 98-720C (Judge George W. Miller) |

**DECLARATION OF RONALD D. LEWIS**

I, **Ronald D. Lewis**, hereby declare, under the penalties of perjury that:

1. I am a retired employee of the United States Forest Service by whom I was employed for 30 years. A copy of my resume is attached.

2. As my resume indicates, in the course of my employment with the Forest Service I was involved in nearly every aspect of the Forest Service's commercial timber sale program having not only served as a contracting officer, but also in several staff positions overseeing a great many aspects of the program on a Forest, Regional and later National level. In the latter regard, from February 1989 through September 1994, I served as the Staff Specialist, Timber Sale Contract Administration in the Forest Service's Washington D.C. office, Timber Products Group.

**ATTACHMENT A**

3. In this capacity, among other things, I regularly provided information and advice to regional and forest level personnel on matters regarding commercial timber sale contract preparation, interpretation and administration.

4. Suffice it to say, that as a result of the positions that I held in my 30 years with the Forest Service I was well acquainted with the Forest Service's commercial timber sale program and matters related to Forest Service timber sale contracts.

5. One of the primary purposes for which the national forests were established was "to furnish a continuous supply of timber for the use and necessities of the citizens of the United States," i.e., to provide raw material for lumber products.

6. This is one of the fundamental premises for the existence of the Forest Service's commercial timber sale program, pursuant to which the primary item sold is sawlogs (also referred to as sawtimber).

7. Sawlogs (and sawtimber) are portions of trees which, principally by virtue of their diameter and length, are suitable to be processed into lumber at a sawmill.

8. With the promise of a continuous supply of sawlogs, the Forest Service openly encouraged the building of sawmills on or near the federal forests in support of small rural communities. As a result, many such companies that did so became heavily dependent on federal forests for nearly all raw material to feed their sawmills.

9. Not surprisingly, the Forest Service has always been aware that the primary customers for its sawlogs are companies, both large and small, that own sawmills and who purchase those sawlogs for the purpose of making them into various lumber products which they then sell to wholesale or retail outlets or construction companies.

10. This fact was and is still recognized in the provisions of the Forest Service Manual. For example, Forest Service Manual (FSM) § 2430.2, effective 2/12/90 stated that:

> [The] specific objectives for commercial timber sales are:
>
> ...4. To provide a continuous flow of raw material to local forest industries.

P. App. 259. This exact language is also contained in the currently applicable portion of the FSM. Amendment 2400-2004-3, 4/5/04. P. App. 260-61. While preceding editions of the FSM expressed the view that, "A major objective of National Forest management is to provide a continuous flow of raw material to local forest industries." FSM § 2430.2, effective 5/83 per Amendment 129. P. App. 262.

11. Moreover, as further evidence that lumber production by the purchaser of Forest Service timber was anticipated by the Forest Service, until the early 1990s the minimum acceptable price for sawlogs on each and every Forest Service timber sale was based on a so-called residual value appraisal which took into account the potential selling value of the lumber to be produced from the sawlogs on the sale, a potential purchaser's cost of producing that lumber, i.e., the cost of manufacture as well as the cost of logging and hauling the sawlogs. This appraisal method is still

used in parts of the national forest system and can, in fact, be used throughout the system.

12. For these and many other reasons, the Forest Service knew that in making commercial timber sales it was selling sawlogs to companies that had sawmills and who needed those sawlogs to supply those mills and produce lumber to fulfill orders from lumber buyers.

13. Such being the case, my colleagues and I in the Forest Service were at all times aware that unexpected delays in harvesting could have a substantially negative effect on the profitability of a timber sale and could increase the purchaser's per mbf sawmill costs. That is, it was understood that an ordered suspension or other sudden interruption of harvesting operations on one or more sales could very well necessitate a purchaser's reducing or halting sawmill activity, either of which would result in lost profits and increased costs to the purchaser. We were also very much aware of the fact that such negative impacts to a purchaser would be exacerbated if the suspension were a prolonged one, all sales it had under contract were suspended, and/or at the same time the Forest Service timber sale program in the area were halted for any length of time.

14. In the face of this recognition, to say that the Forest Service did not foresee or could not have foreseen that a suspension of Forest Service timber sales in a purchaser's portfolio would likely result in a loss of profits is simply not true.

15. Given this, any assertion that the Forest Service also did not foresee or could not have foreseen that suspending the flow of sawlogs to purchasers counting on that raw material to run their sawmills would result in sawmill damages is equally fanciful.

16. Similarly, my colleagues and I in the Forest Service were at all times aware that a prolonged suspension of harvesting Forest Service timber sales could likely cause purchasers to take steps to minimize their losses such as shutting down sawmills (or even closing them permanently), consolidating manufacturing operations at a single facility, and incurring, among other things, additional timber procurement and/or hauling costs in the process.

17. Likewise, since inflation is a fact of life in the timber harvesting business as well as the rest of the world, should the suspension of a timber sale be a prolonged one (and suspensions that lasted for the better portion of two operating seasons, such as the ones in this litigation did, would certainly be prolonged ones) the Forest Service could and would easily have foreseen that post-suspension logging, hauling and road building costs would likely have increased.

18. The Forest Service was also fully aware, given the capital-intensive nature of the timber business (i.e., the need for a substantial investment in sawmill plant and equipment), that purchasers frequently had substantial amounts of outstanding debt which they paid off out of the proceeds of their operations. In sum, things such as lost profits, increased cost of procuring replacement sawlogs (if they could be found to keep the sawmill operating to meet lumber orders), increased manufacturing costs,

increased logging and hauling costs are and always have been viewed as damages that would very likely be incurred in the ordinary course of things if one or more of a purchaser's Forest Service timber sale contracts were suspended for any significant length of time.

19. The amount of time provided to harvest a contract varies and depends on many things including the amount of roadwork to be performed, the volume of sawlogs to be harvested, the length of the normal operating season for the sale area at issue and other contract restrictions that limit the time available for harvest.

Dated: June 7, 2004

RONALD D. LEWIS