**U.S. Department of Justice**

Civil Division

DMC:KAB:DHarrington
DJ No. 154-98-720

Telephone: (202) 307-0277
Facsimile: (202) 307-0972

*Washington, D.C. 20530*

March 10, 2005

*Via Facsimile & U.S. Mail*

Alan I. Saltman, Esq.
Richard W. Goeken, Esq.
Saltman & Stevens, P.C.
1801 K Street, N.W.
Washington, D.C. 20006

Re: *Precision Pine & Timber, Inc. v. United States*,
Fed. Cl. No. 98-720C (Judge George W. Miller)

Gentlemen:

Please find enclosed revised draft stipulations. As you will see, these draft stipulations are very similar to the drafts that we sent you previously and that were discussed during the meeting of counsel on February 28, 2005.

Stipulations 1–49 are in fact unchanged except insofar as they were modified in the course of our February 28, 2005 discussions. Please note that we include a stipulation (stipulation 41) stating that the MSO suspension ended on December 4, 1996. If you are unwilling to agree to this stipulation, it will need to be removed.

Starting with stipulation 50, we add a series of stipulations regarding post-suspension sales offered by the Forest Service on the Apache-Sitgreaves, Coconino, Kaibab, and Tonto National Forests. These stipulations, which have been added at your request, generally track the data that you provided from Timber Data Company. The actual volumes offered for sale on the Coconino National Forest in 1997 and 1998 are somewhat higher, however. Additionally, we include in the stipulations the volume of roundwood that was included with Forest Service sale offerings. Then, starting with stipulation 67, we modify three stipulations that were included in our most recent draft regarding the Salt, Monument and Saginaw-Kennedy sales. The information in these proposed stipulations is derived from DX785 and DX791. Please confirm that these additional stipulations meet with your approval.

Based upon discussions at our February 28, 2005 meeting, it was my understanding that Precision Pine would be proposing additional stipulations. I did not receive any such stipulations until about 11:00 a.m. today, when I received an e-mail which apparently attaches new proposed stipulations. Given tomorrow's deadline for filing initial stipulations, the need for review of new

**Exhibit 2**

stipulations by the Forest Service, and my obligations in other matters, it will not be possible to review new stipulations in time to include them in our initial filing. Consequently, I suggest that we limit the initial filing to the first 49 stipulations in the attached draft. Naturally, I am prepared to review and discuss additional stipulations for possible inclusion in subsequent filings with the Court. See Order at 1 (Mar. 3, 2005) (allowing the parties to file additional stipulations after March 10, 2005).

Very truly yours,

David A. Harrington
Trial Attorney
Commercial Litigation Branch

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Judge George Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## JOINT STIPULATION OF FACTS

The parties, plaintiff, Precision Pine & Timber, Inc. ("Precision Pine"), and defendant, the United States, respectfully submit the following joint stipulation of facts for use at trial in this matter.

1. Precision Pine was founded in Heber, Arizona, in 1984. Heber is located in a largely rural area of Arizona.

2. In 1984, Precision Pine constructed and opened a sawmill in Heber, Arizona.

3. Prior to June 1991, Precision Pine purchased a planer in Snowflake, Arizona.

4. The Snowflake planer was closed in March 1995.

5. In December 1991, Precision Pine purchased a sawmill and planer in Winslow, Arizona, from Duke City Lumber Company.

6. The Winslow sawmill was damaged by fire and closed on September 17, 1998.

7. The Winslow planer was closed in or about September 1999.

8. In October 1992, Precision Pine purchased a sawmill in Williams, Arizona, from Grand Canyon Forest Industries.

9. Precision Pine closed the Williams sawmill in October 1994. The equipment from the Williams sawmill was sold at auction shortly thereafter.

10. In June 1993, Precision Pine purchased a sawmill in Payson, Arizona, from Kaibab Forest Products Company.

11. Precision Pine never operated the Payson sawmill. The Payson sawmill's equipment was sold at auction in or about August 1993.

12. Prior to June 1991, Precision Pine purchased a sawmill in Show Low, Arizona. Precision Pine never operated the Show Low sawmill.

13. Prior to June 1991, Precision Pine purchased a sawmill in Clay Springs, Arizona. Precision Pine closed the Clay Springs sawmill in the early 1990s.

14. During 1993, Precision Pine constructed a sawmill in Eagar, Arizona using equipment from the Show Low and Clay Springs sawmills. Precision Pine opened the Eagar sawmill in or about October 1993.

15. Precision Pine permanently closed the Eagar sawmill in August 1997.

16. As of August 25, 1995, Precision Pine was operating sawmills located in (1) Heber, Arizona, (2) Eagar, Arizona, and (3) Winslow, Arizona.

17. As of August 25, 1995, Precision Pine was operating a planer mill and kilns in Winslow, Arizona.

18. Forest Service timber sale contracts and multi-product sale contracts are generally competitively bid and awarded.

19. Precision Pine was the high bidder upon the O.D. Ridge timber sale contract, the U-Bar timber sale contract, the Jersey Horse timber sale contract, the Salt multi-product sale contract, the Hutch-Boondock multi-product sale contract, the Saginaw-Kennedy multi-product sale contract, the Mud multi-product sale contract, the Monument multi-product sale contract, the Brann multi-product sale contract, the Manaco multi-product sale contract, the Brookbank multi-product sale contract and the Kettle multi-product sale contract.

20. Precision Pine was awarded the O.D. Ridge contract on August 14, 1992.

21. Precision Pine was awarded the U-Bar contract on October 5 1992.

22. Precision Pine was awarded the Jersey Horse contract on December 13, 1993.

23. Precision Pine was awarded the Salt contract on February 28, 1994.

24. Precision Pine was awarded the Hutch-Boondock contract on June 29, 1994.

25. Precision Pine was awarded the Saginaw-Kennedy contract on August 29, 1994.

26. Precision Pine was awarded the Mud contract on September 14, 1994.

27. Precision Pine was awarded the Monument contract on September 28, 1994.

28. Precision Pine was awarded the Brann contract on September 29, 1994.

29. Precision Pine was awarded the Manaco contract on January 17, 1995.

30. Precision Pine was awarded the Brookbank sale contract on April 13, 1995.

31. Precision Pine was awarded the Kettle multi-product sale contract on July 20, 1995.

32. Precision Pine was not the high bidder upon the Hay timber sale contract, which originally was awarded to Reidhead Lumber Company, Inc., on January 17, 1990.

33. The Hay contract was transferred to Precision Pine by contract modification on June 24, 1991.

34. Precision Pine was not the high bidder upon the St. Joe timber sale contract, which originally was awarded to Grand Canyon Forest Industries on April 14, 1992.

35. The St. Joe contract was assigned to Precision Pine by Grand Canyon Forest Industries on October 16, 1992.

36. On August 24, 1995, the United States District Court for the District of Arizona entered an order in Silver v. Babbitt, 924, F. Supp. 976 (D. Ariz. 1995), enjoining all timber harvesting on United States Forest Service timber sales in Forest Service Region 3. Forest Service Region 3 principally encompasses the states of Arizona and New Mexico.

37. On August 25, 1995, following entry of the court order, the Forest Service suspended operations on the Hay, St. Joe, O.D. Ridge, U-Bar, Jersey Horse, Salt, Hutch-Boondock, Saginaw-Kennedy, Mud, Monument, Brann, Manaco, Brookbank and Kettle contracts.

38. On October 18, 1995, the Forest Service entered into a stipulation with the plaintiffs in Silver v. Babbitt, which was subsequently approved by the Court, and which allowed certain sales to be released from the injunction.

39. The Forest Service lifted the suspension of operations on the St. Joe, Hutch-Boondock and Brann contracts on or about October 18, 1995.

40. The Forest Service lifted the suspension of operations on the Mud contract on March 11, 1996.

41. The Forest Service lifted the suspension of operations on the Brookbank, Hay, Jersey Horse, Kettle, Manaco, Monument, O.D. Ridge, Saginaw-Kennedy, Salt and U-Bar contracts on December 4, 1996.

42. Southwest Forest Industries, and later Stone Forest Products, operated a plant that produced wood pulp in Snowflake, Arizona. The plant was first opened in the 1960s. The plant used substantial quantities of pulpwood and wood chips.

43. The price index applicable to the escalation and de-escalation of stumpage prices for the contracts at issue is the Western Wood Products Association Inland Rocky Mountain Ponderosa Pine index.

44. As a result of the manufacturing of logs into lumber, Precision Pine created the following by-products: (i) bark; (ii) chips; (iii) shavings; and (iv) grindings.

45. For a variety of reasons, including the skill of the sawyer, the efficiency of sawmill equipment, the size and quality of logs being milled, and the types of lumber products being produced, the volume of lumber in mbf (known as "lumber tally") will commonly exceed the volume of logs in mbf (known as "log scale"). The ratio of the volume of lumber (in mbf (l.t.)) to the volume of logs used to produce the lumber (in mbf (l.s.)) is commonly referred as the "overrun factor."

46. Before, during and after the MSO suspension, Precision Pine categorized the lumber products it produced from Ponderosa Pine logs as follows: (i) Moulding & Better; (ii) #1 Shop; (iii) #2 Shop; (iv) #3 Shop; (v) Paragraph 99 Redress; (vi) RWL Radius Edge; (vii) #2, #3, #4 & Better; (viii) #3 Common Utility; (ix) #4 Common Economy; (x) #5 Common; (xi) Rough; (xii) Timbers; and (xiii) Misc. Shop Outs.

47. Before, during and after the MSO suspension, Precision Pine categorized the lumber products it produced from Douglas Fir logs as follows: (i) #2 & Better; (ii) #3; and (iii) #4.

48. Before, during and after the MSO suspension, Precision Pine categorized the lumber products it produced from Englemann Spruce logs as follows: 1 x 4: (i) #2 & Better; (ii) #3; and (iii) #4; and 1 x 6: (i) #2 & Better; (ii) #3; and (iii) #4.

49. Precision Pine requested contract term adjustments for each contract affected by the MSO suspension. The Forest Service granted each of Precision Pine's requests for contract term adjustments and provided adjustments equivalent to the days lost during the contract's normal operating season.

50. Between August 25, 1995, and December 31, 1995, 3,556 mbf of sawtimber and 1,503 mbf of roundwood were offered by the Forest Service for sale from the Apache-Sitgreaves National Forest.

51. During calendar year 1996, 215 mbf of sawtimber were offered by the Forest Service for sale from the Apache-Sitgreaves National Forest.

52. During calendar year 1997, 5,190 mbf of sawtimber and 10,426 mbf of roundwood were offered by the Forest Service for sale from the Apache-Sitgreaves National Forest.

53. During calendar year 1998, 9,782 mbf of sawtimber and 18,831 mbf of roundwood were offered by the Forest Service for sale from the Apache-Sitgreaves National Forest.

54. Between August 25, 1995, and December 31, 1995, 75 mbf of sawtimber and 2 mbf of roundwood were offered by the Forest Service for sale from the Coconino National Forest.

55. During calendar year 1996, 2,279 mbf of sawtimber were offered by the Forest Service for sale from the Coconino National Forest.

56. During calendar year 1997, 13,803 mbf of sawtimber and 11,765 mbf of roundwood were offered by the Forest Service for sale from the Coconino National Forest.

57. During calendar year 1998, 11,063 mbf of sawtimber and 12,749 mbf of roundwood were offered by the Forest Service for sale from the Coconino National Forest.

58. Between August 25, 1995, and December 31, 1995, no sawtimber or roundwood was offered by the Forest Service for sale from the Kaibab National Forest.

59. During calendar year 1996, 6,008 mbf of sawtimber were offered by the Forest Service for sale from the Kaibab National Forest.

60. During calendar year 1997, 29,379 mbf of sawtimber and 5,397 mbf of roundwood were offered by the Forest Service for sale from the Kaibab National Forest.

61. During calendar year 1998, 13,304 mbf of sawtimber and 4,421 mbf of roundwood were offered by the Forest Service for sale from the Kaibab National Forest.

62. Between August 25, 1995, and December 31, 1995, no sawtimber or roundwood was offered by the Forest Service for sale from the Tonto National Forest.

63. During calendar year 1996, no sawtimber or roundwood was offered by the Forest Service for sale from the Tonto National Forest.

64. During calendar year 1997, no sawtimber or roundwood was offered by the Forest Service for sale from the Tonto National Forest.

65. During calendar year 1998, 2,291 mbf of sawtimber and 822 mbf of roundwood were offered by the Forest Service for sale from the Tonto National Forest.

66. During the period from August 25, 1995 to December 31, 1998, the Forest Service generally offered multi-product sales. Multi-product sales contain both sawtimber and roundwood components, and generally obligate the purchaser to cut and remove all sawtimber and roundwood within a specified period.

67. As a result of Forest Guardians v. Dombeck, Case Nos. 97-16206, 97-16446 (9th Cir.) (the "Forest Guardians litigation"), the Salt contract was partially suspended from June 2, 1997 to December 15, 1997. During the normal operating season in 1997 (i.e., from May 1 to July 15, and from August 15 to November 15), Precision Pine chose not to harvest before the Forest Guardians suspension, and chose not to harvest unaffected units during the Forest Guardians suspension, for business reasons.

68. After the Forest Guardian suspension was lifted, and before the normal operating season in 1998, Precision Pine declined to pay a required cash deposit on the Salt contract. As a result, the Salt contract was suspended and terminated for default.

69. During the normal operating seasons in 1997, 1998 and 1999 (i.e., from April 15 to November 30), Precision Pine chose not to harvest the Monument contract for business reasons.

70. As a result of the Forest Guardians litigation, the Saginaw-Kennedy contract was partially suspended from June 2, 1997 to December 15, 1997. During the normal operating season in 1997 (i.e., from April 1 to December 1), Precision Pine chose not to harvest before the Forest

Guardians suspension, and chose not to harvest unaffected units during the Forest Guardians suspension, for business reasons.

71. During the normal operating seasons in 1998 and 1999 (i.e., from April 1 to December 1, and from August 15 to November 15), Precision Pine chose not to harvest the Saginaw-Kennedy contract for business reasons.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277
(202) 307-0972 (fax)

Attorneys for Defendant

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
M-110
Washington, D.C. 20006
(202) 452-2140
(202) 775-8217 (fax)

Attorney for Plaintiff