No. 98-720C
(Judge George W. Miller)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PRECISION PINE & TIMBER, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S POST-TRIAL MEMORANDUM OF LAW

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DAVID A. HARRINGTON
MARLA T. CONNEELY
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277

Attorneys for Defendant

OF COUNSEL:

LORI POLIN JONES
PATRICIA L. DISERT
Office of General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

Dated: September 2, 2005

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . 1

QUESTIONS PRESENTED . . . . . . . . . . 2

DEFENDANT'S CONTENTIONS OF LAW . . . . . . . . . . 3

I. The Nature Of The Breaches Found By The Court . . . . . . . . . . 3

A. The Breach Of Warranty Resulted From The Forest Service's Failure To Suspend Logging To Consult With The Fish and Wildlife Service During The Fall Of 1994 . . . . . . . . . . 4

B. The Court Ruled That The MSO Suspensions Were A Breach Only Insofar As They Substantially Exceeded 135 Days . . . . . . . . . . 6

II. Precision Pine Has Failed To Present A Coherent Theory Of Damages . . . . . . . . . . 8

III. Precision Pine Is Entitled Only To Damages For "Partial Breach" . . . . . . . . . . 9

IV. Precision Pine's Claimed Common Law Breach of Contract Damages . . . . . . . . . . 11

A. Precision Pine Is Not Entitled To Recover Lost Lumber Profits . . . . . . . . . . 12

1. Profits From The Sale Of Lumber Are Not Recoverable For Breach Of A Timber Cutting Contract Because The Production And Sale Of Lumber Products Constitutes A Collateral Undertaking . . . . . . . . . . 12

2. Precision Pine Misuses The "Lost Volume Seller" Concept, Which Is Inapplicable Here Because The United States Does Not Seek To Offset Profits From "Substitute Transactions" . . . . . . . . . . 15

3. Even If Lumber Profits Were Potentially Recoverable, Precision Pine Failed To Make The Requisite Showing . . . . . . . . . . 19

a. Precision Pine's Brookbank, Jersey Horse, Kettle, Manaco, Monument, Mud, Saginaw-Kennedy, Salt and U-Bar Contracts Would Not Have Been Profitable During The MSO Suspensions . . . . . . . . . . 21

b. Precision Pine Has Failed To Establish That Its Alleged Lost Profits Were Directly And Primarily Caused By The MSO Suspensions . . . . . . . . . . 23

(1) Precision Pine Failed To Show What Contracts Would Have Been Harvested Had The MSO Suspensions Not Occurred . . . . . . . . . . 24

(I) The Mud Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

(ii) The Manaco Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

(2) Any Lost Profits Suffered By Precision Pine Were Caused By Its Own Business Decisions – Not The Suspension Of Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

c. The Loss Of Profits Resulting From A Suspension Was Not Contemplated By The Parties At The Time Of Contracting . . . . . . . . . . . . . 28

d. Precision Pine Has Not Established Lost Profits With Reasonable Certainty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

(1) Mr. Ness's Calculations Are Not Based Upon Valid "But For" Harvesting And Milling Schedules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

(I) Precision Pine Would Not And Could Not Have Followed Mr. Ness's Harvest Schedule . . . . . . . . . . . . . . . . . . . . . . . 32

(ii) The Milling Schedule Used By Mr. Ness Is Not Based Upon Precision Pine's Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

(2) Mr. Ness Inflates Damages At Virtually Every Step Of His Calculations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

(I) Lumber . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

(ii) Roundwood . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

(iii) Lumber By-Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

(3) Mr. Ness's Offset Calculations Understate Profits . . . . . . . . . . . . . . . . . 46

B. Precision Pine Is Not Entitled To Recover Alleged Sawmill Inefficiency Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

1. Precision Pine Has Not Established What Increased Sawmill Costs Were Directly and Primarily Caused By A Breach Of Contract . . . . . . . . . . . . . 49

2. Sawmill Inefficiency Costs Were Not Legally Foreseeable . . . . . . . . . . . . . . . . 51

3. Precision Pine's Calculation Of Damages Is Flawed And Uncertain . . . . . . . . . 53

C. Precision Pine's Claim For Increased Log Hauling Costs Should Be Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

1. Any Increase In Hauling Costs Was The Direct Result Of Precision Pine's Business Decisions And The *Forest Guardians* Suspensions . . . . . . . . . 56

2. Increased Log Hauling Costs Were Not Legally Foreseeable . . . . . . . . . . . . . . . 59

3. Precision Pine Overstates The Change In Log Hauling Costs . . . . . . . . . . . . . . . 60

V. Precision Pine's Claims For Compensation Pursuant To CT 6.01 . . . . . . . . . . . . . . . . . . 61

A. Precision Pine's Claim For Employee Claim Preparation Costs Is Not Recoverable Under CT 6.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

B. Precision Pine's Claims For "Miscellaneous Costs" Pursuant To CT 6.01 Should Be Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

1. The United States Does Not Dispute Precision Pine's Claims For Bond Costs In The Amounts Previously Awarded . . . . . . . . . . . . . . . . . . . . . . . . 64

2. Precision Pine Has Not Demonstrated An Entitlement To "Move Out" Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

3. Interest Is Not Payable Under CT 6.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

4. Precision Pine Has Failed To Demonstrate An Entitlement To Snow Removal Costs Pursuant To CT 6.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

5. Precision Pine Has Failed To Demonstrate An Entitlement To Log Transfer Costs Pursuant To CT 6.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

6. Overhead And Profits Are Not Recoverable Under CT 6.01 . . . . . . . . . . . . . . . 68

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

## TABLE OF AUTHORITIES

**Cases:**

Admiral Fin. Corp. v. United States,
378 F.3d 1336 (Fed. Cir. 2004) . . . . . . . . 8, 61

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) . . . . . . . . 8, 19, 62

Bighorn Lumber Co. v. United States,
49 Fed. Cl. 768 (2001) . . . . . . . . 36, 59

Bluebonnet Savings Bank, FSB v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . 9, 17

Bohac v. Dept. of Agriculture,
239 F.3d 1334 (Fed. Cir. 2001) . . . . . . . . 28, 59

California Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005) . . . . . . . . passim

Cavalier Clothes, Inc. v. United States,
51 Fed. Cl. 399 (2001) . . . . . . . . 49

Chain Belt Co. v. United States,
127 Ct. Cl. 38, 115 F. Supp. 701 (1953) . . . . . . . . 19, 28, 29, 59

Cities Service Helex, Inc. v. United States,
211 Ct. Cl. 222, 543 F.2d 1306 (1976) . . . . . . . . 9, 10, 11, 15

Clary v. United States,
333 F.3d 1345 (Fed. Cir. 2003) . . . . . . . . 66, 67

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004) . . . . . . . . 19

Croman Corp. v. United States,
44 Fed. Cl. 796 (1999) . . . . . . . . 47

Emeco Indus. v. United States,
202 Cl. Ct. 1006, 485 F.2d 652 (1973) . . . . . . . . 34

Energy Capital Corp. v. United States,
47 Fed. Cl. 382 (2000),
aff'd in part, rev'd in part, 302 F.3d 1314 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 29

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 19

Everett Plywood Corp. v. United States,
512 F.2d 1082 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

First Heights Bank v. United States,
___ F.3d ___, 2005 WL 1962989 (Fed. Cir. Aug. 17, 2005) . . . . . . . . . . . . . . . . . . . . . 13

Gulf Contracting, Inc. v. United States,
23 Cl. Ct. 525 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Hadley v. Baxendale,
9 Ex. 341, 156 Eng. Rep. 145 (1854) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Hansen Bancorp, Inc. v. United States,
376 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16, 17

Hi-Shear Tech. Corp. v. United States,
356 F.2d 1372 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19, 22

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

International Air Response v. United States,
324 F.3d 1376 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

LaMirage, Inc. v. United States,
44 Fed. Cl. 192 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

LaSalle Talman Bank v. United States,
317 F.3d 363 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Landmark Land Co. v. FDIC,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Library of Congress v. Shaw,
478 U.S. 310 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

M.A. Mortenson Co. v. Brownlee,
363 F.3d 1203 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Marathon Oil Co. v. United States,
374 F.3d 1123 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

In re Nangle,
274 F.3d 481 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Nicon, Inc. v. United States,
331 F.3d 878 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Olin Jones Sand Co. v. United States,
225 Ct. Cl. 741 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Pacific Rivers Counsel v. Thomas,
30 F.3d 1050 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Petrofky v. United States,
203 Ct. Cl. 347, 488 F.2d 1394 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Pinewood Realty Limited Partnership v. United States,
223 Ct. Cl. 98, 617 F.2d 211 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Precision Pine & Timber, Inc. v. United States,
62 Fed. Cl. 635 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 28, 47

Precision Pine & Timber, Inc. v. United States,
63 Fed. Cl. 122 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 47, 59

Precision Pine & Timber, Inc. v. United States,
64 Fed. Cl. 165 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Precision Pine & Timber, Inc. v. United States,
No. 02-131 (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (1951),
cert. denied, 343 U.S. 977 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 15

Rocky Mountain Constr. Co. v. United States,
218 Ct. Cl. 665 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Rumsfeld v. Freedom, N.Y.,
329 F.3d 1320 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

San Carlos Irrigation & Drainage Dist. v. United States,
877 F.2d 957 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Scott Timber Co. v. United States,
333 F.3d 1358 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 15, 51, 52

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Singer Co. v. United States,
215 Ct. Cl. 281, 568 F.2d 695 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Smokey Bear, Inc. v. United States,
31 Fed. Cl. 805 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Southwest Center For Biological Diversity v. United States Forest Service,
No. CIV-95-1927-PCT-RCB (D. Ariz.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Thompson v. Cherokee Nation,
334 F.3d 1075 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 15, 51

White v. United States,
187 Ct. Cl. 564, 410 F.2d 773 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Wilner v. United States,
23 Cl. Ct. 241 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Wilner v. United States,
24 F.3d 1397 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

**<u>Statutes and Other Authority</u>:**

16 U.S.C. § 1536(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Restatement (Second) of Contracts § 347 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S POST-TRIAL MEMORANDUM OF LAW**

**INTRODUCTION**

At most, the Mexican Spotted Owl ("MSO") suspensions delayed the cutting and removal of timber from some of Precision Pine's timber and multi-product sale contracts. Yet Precision Pine has declined to seek delay damages under the common law. Given the failure to assert claims for the only recovery that Precision Pine might be entitled to receive, the Court should enter judgment in favor of the United States.

Precision Pine has instead asserted a hodgepodge of claims that suffer from innumerable legal and factual deficiencies. Precision Pine (i) disregards key aspects of the Court's July 30, 2001 decision on liability, (ii) ignores its own decision to continue the contracts after the MSO suspensions were lifted, (iii) seeks profits based upon independent and collateral lumber manufacturing operations, and (iv) fails to present a true "but for" model upon which to base calculations. In addition, Precision Pine ignores its own historic practices and contemporaneous business records, as well as the risks inherent in the company's strategy of expanding operations in a declining market. Simply put, Precision Pine has failed to prove, and is not legally entitled to recover, the damages it seeks in this action.

## QUESTIONS PRESENTED

1. Whether Precision Pine, by electing to continue – not cancel – the contracts at issue following the MSO suspensions, is limited to the recovery of damages for partial breach.

2. Whether the manufacture and sale of lumber products is a collateral undertaking that is not recoverable for an adjudicated breach of a timber cutting contract.

3. Whether the claims for profits from the sale of lumber products asserted by Precision Pine should be denied because:

   (a) Precision Pine has not developed a valid "but for" model upon which to base a calculation of damages;

   (b) Precision Pine's contracts would not have been profitable during the period of the MSO suspensions;

   (c) Precision Pine has not established that planned harvesting was prevented by the MSO suspensions because it cannot establish which contracts would have been harvested had the suspensions not occurred;

   (d) Precision Pine's business decision not to harvest contracts to completion after the MSO suspensions were lifted was the direct and primary cause of any loss of profits;

   (e) lost lumber profits do not result in the ordinary course from a delay of timber harvesting and, at the time of contracting, the Forest Service had been apprised of no special circumstances relating to the contracts at issue; or

   (f) lost lumber profits have not been proved with reasonable certainty.

4. Whether claims for sawmill costs are recoverable as damages for breach of a timber cutting contract.

5. Whether Precision Pine's claim for increased log hauling costs with respect to the Hay contract should be denied because:

   (a) the alleged increase in log hauling costs resulted from Precision Pine's business decisions; or

   (b) the alleged increase in log hauling costs was not foreseeable at the time of contracting.

6. Whether Precision Pine is entitled to recover employee claim preparation costs, "overhead and profits," "interest" or other miscellaneous costs pursuant to contract clause CT 6.01.

## DEFENDANT'S CONTENTIONS OF LAW

### I. The Nature Of The Breaches Found By The Court

The Court in this action found two independent breaches of the implied duty of good faith and fair dealing: (1) a breach of warranty with respect to the Brann, Brookbank, Kettle, Manaco, Monument, Mud and Saginaw-Kennedy contracts; and (2) a breach of the implied duty not to hinder with respect to the Brookbank, Hay, Jersey Horse, Kettle, Manaco, Monument, Mud, O.D. Ridge, Saginaw-Kennedy, Salt and U-Bar contracts. Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 73-74 (2001).[1] Additionally, the Court held that, although the

[1] The Court noted that the implied duty not to hinder and the implied duty to cooperate are "subspecies" of the duty of good faith and fair dealing, see Precision Pine, 50 Fed. Cl. at 58-59 & n.31, and, additionally, that a breach of warranty is synonymous with a breach of the implied duty to cooperate, id. at 59.

Hutch-Boondock and St. Joe contracts were suspended for a period of two months, they were not breached. Id. at 73-74.

### A. The Breach Of Warranty Resulted From The Forest Service's Failure To Suspend Logging To Consult With The Fish and Wildlife Service During The Fall Of 1994

In ruling on liability, the Court found that a breach of warranty resulted from the Forest Service's delay in suspending contracts in Region 3 after the decision of the United States Court of Appeals for the Ninth Circuit in Pacific Rivers Counsel v. Thomas, 30 F.3d 1050 (9th Cir. 1994). The Court explained:

> On July 7, 1994, the Ninth Circuit, in Pacific Rivers, held that LRMPs implemented prior to the listing of an endangered or threatened species were "agency action" for the purposes of the ESA, and therefore were required to be submitted for consultation with the FWS. Pacific Rivers, 30 F.3d at 1051- 52. In the face of this clear ruling, . . . Region 3 should have taken two actions. First, it should have submitted its pre-existing LRMPs for consultations with the FWS pursuant to 16 U.S.C. § 1536(a)(2). Second, to prevent "any irreversible and irretrievable commitment of resources," the Forest Service should have suspended all logging activities within Region 3 during the course of consultations as required by 16 U.S.C. § 1536(d). . . .
>
> Instead of . . . submitting its LRMPs for consultation, Region 3 of the Forest Service . . . prepar[ed] amendments to LRMPs and submitt[ed] only the amendments for consultation with the FWS. . . . [T]he Forest Service's failure to engage in formal consultations with the FWS in Region 3, from the Ninth Circuit's decision in Pacific Rivers onwards, was unreasonable. . . . Therefore, . . . the Forest Service breached an express warranty contained in those contracts . . . entered into after July 7, 1994, the date of the Ninth Circuit's decision in Pacific Rivers.

Precision Pine, 50 Fed. Cl. at 68-70 (emphasis added). Thus, the Court concluded that the Forest Service's failure to suspend logging activities in Region 3 in July or August 1994 resulted in the breaches of warranty at issue here.

Precision Pine was logging various Forest Service contracts during the fall of 1994. Compare DX753 (volumes harvested as of Aug. 31, 1994) with DX549 (volumes harvested as of Dec. 31, 1994); see also Tr. 1624-25 (Porter). The logging of these contracts would have been suspended by the Forest Service during the period of formal consultations with the Fish and Wildlife Service ("FWS") but for the Forest Service's breach. See Precision Pine, 50 Fed. Cl. at 70 (regulations provide for consultation with the FWS over a period of 135 days). Yet at trial, Precision Pine presented no evidence regarding the impact of a suspension of logging during the fall of 1994. Indeed, because the market for lumber was better in 1994 than in 1995 or 1996 (when the suspensions ultimately did occur), see PX305, and because it was Precision Pine's practice to build log inventories for winter operations during the fall, see Smith Dep. Tr. 24-25, Precision Pine likely benefitted by the Forest Service's failure to suspend logging operations in 1994. In any event, the burden of proving damages with reasonable certainty rests with Precision Pine. E.g., Energy Capital Corp. v. United States, 302 F.3d 1314, 1325 (Fed. Cir. 2002). Having presented no evidence whatsoever about the effect of a suspension of logging during the fall of 1994, Precision Pine has not met its burden with respect to any claims premised upon the breach of warranty.[2]

---

[2] While Precision Pine does not state whether its claimed damages are based upon a breach of warranty or a breach of the implied duty to not to hinder, it is instructive that (1) Precision Pine seeks lost lumber profits upon the 11 contracts where the Court found a breach of the implied duty not to hinder, and (2) Precision Pine does not seek lost lumber profits upon the (continued...)

### B. The Court Ruled That The MSO Suspensions Were A Breach Only Insofar As They Substantially Exceeded 135 Days

In ruling on liability, the Court also addressed whether the MSO suspensions were unreasonably long such that they breached the implied duty not to hinder. Precision Pine, 50 Fed. Cl. at 70-71. The Court found that the length of the suspensions of the Brann, Hutch-Boondock, and St. Joe contracts, which were approximately 60 days, were not unreasonable and were not a breach. The suspensions of the other contracts were found to be a breach.[3] The Court explained its reasoning as follows:

> Under the regulations implementing the ESA, formal consultations are to last no more tha[n] 90 days. . . . The Biological Opinion is to be issued by the FWS within 45 days. . . . Thus, had the suspensions been conducted according to the regulations, the suspension should have not lasted much more than 135 days. In fact, the suspensions lasted from August 25, 1995, until December 4, 1996, for a total of 467 days. Notwithstanding the protracted length of the suspensions, the mere fact that the suspensions remained in effect far longer than provided for in the regulations does not in itself suggest that the length of the delay was unreasonable . . . .

Precision Pine, 50 Fed. Cl. at 70 (citations omitted; emphasis omitted); see also id. at 61 ("even if the Forest Service had violated a statute or regulation, this would not *ipso facto* mean that there was an unreasonable delay"). After discussing the reasons for the delay, the Court turned to the suspensions of individual contracts.

---

[2](...continued)
Brann contract – the one contract where the Court found a breach of warranty, but no breach of the implied duty not to hinder.

[3] In its opinion, the Court incorrectly states that the suspension of the other contracts lasted for 467 days. 50 Fed. Cl. at 70. The suspension of the Mud contract in fact lasted 198 days, i.e., from August 25, 1995 to March 11, 1996. See PX109.

> [T]he Court does not find that the length of the suspensions for the Brann, Hutch-Boondock, and St. Joe timber sale contracts were unreasonable. According to the order approving the joint stipulation between the environmental plaintiffs and the Forest Service in Silver v. Thomas, performance of timber sale contracts could proceed for those three contracts. . . . The two-month suspension of these contracts, in light of the regulations which normally would prescribe consultations to be completed within 135 days, is reasonable.
>
> [T]he Court finds that the length of the suspension was unreasonable and the fault of the Forest Service with respect to all contracts at issue with the exception of the Brann, Hutch-Boondock, and St. Joe contracts.

Precision Pine, 50 Fed. Cl. at 71 (citations omitted). The Court thus concluded, under the particular circumstances of this case, that it was unreasonable for the suspensions to substantially exceed 135 days. On the other hand, a suspension "not last[ing] much more than 135 days" was not unreasonable and, therefore, was not a breach. See id. at 70-71.

Precision Pine has previously argued that any delay in initiating consultations between the Forest Service and the FWS was "unreasonable" and, therefore, a suspension of any duration was a breach the implied duty not to hinder. Of course, if Precision Pine were correct, the Court would have found a breach of all 14 contracts. Plainly, it did not do so. Precision Pine, 50 Fed. Cl. at 71.

In sum, then, the Court held that only that part of the suspensions that "lasted much more than 135 days" constituted a breach of the implied duty not to hinder.[4] As discussed below,

---

[4] The contracts were suspended on August 25, 1995. Thus, a suspension of 135 days would have ended on January 6, 1996, i.e., after the end of the 1995 operating season on Precision Pine's contracts.

Precision Pine's damages claims fail to take this important aspect of the Court's ruling into account.

## II. Precision Pine Has Failed To Present A Coherent Theory Of Damages

Precision Pine's damages claims fall into two broad categories: (1) damages for common law breach of contract; and (2) claims for reimbursement pursuant to contract clause CT 6.01. With respect to a given contract, these are alternative avenues of relief. Precision Pine may seek compensation pursuant to the common law or contract clause CT 6.01 – but not both. E.g., Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1344 (Fed. Cir. 2004) (expectancy damages and restitution are alternatives).

Similarly, Precision Pine's common law claims, which seek both profits and increased costs, are incompatible. See, e.g., Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 402 (2004) (the "theories of expectancy, . . . reliance, and restitution" are "alternative measures"); Tr. 3315, 3357-60 (Neuberger). An expectancy damages claim for lost profits accounts for the difference between the plaintiff's actual costs and costs that the plaintiff would have incurred in a "but for" (i.e., non-breach) world. See LaSalle Talman Bank v. United States, 317 F.3d 363, 1371 (Fed. Cir. 2003). Thus, any increase in costs is captured by a claim for lost profits.

Here, Precision Pine seeks lost lumber profits and, at the same time, asserts separate claims for increased log hauling costs and increased sawmill costs. Both log hauling and lumber manufacturing costs are included in Mr. Ness's lost profit analyses. See PX131 (tab 4); PX182 (tab 2). Consequently, allowing Precision Pine to recover both profits and increased costs would confer a double recovery contrary to the well-established principle that "the non-breaching party should not be placed in a better position through the award of damages than if there had been no

breach." Bluebonnet Savings Bank, FSB v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003); see also Hansen Bancorp, Inc. v. United States, 376 F.3d 1297, 1315 (Fed. Cir. 2004) ("Courts should avoid bestowing an 'unfair windfall' on the plaintiff by compensating him or her above and beyond the losses suffered under the breached agreement.").

## III. Precision Pine Is Entitled Only To Damages For "Partial Breach"

In this action, the Court concluded that the duration of the MSO suspensions resulted in a breach of Precision Pine's timber and multi-product sale contracts.[5] Precision Pine, 50 Fed. Cl. at 70-71. Upon breach, the injured party can elect to cancel the contract or continue it. Cities Service Helex, Inc. v. United States, 211 Ct. Cl. 222, 543 F.2d 1306, 1313 (1976). Precision Pine elected to continue the Forest Service contracts affected by the MSO suspensions. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 651 (2004) ("Precision waived its right to cancel the contracts . . . through its continued manifestation of an understanding that the contracts remained in effect."); Tr. 1479 (Porter); DX800; DX832; see also Joint Stip. of Facts ¶ 34 (stipulating that Precision Pine requested and received contract term adjustments upon each of its contracts after the MSO suspensions were lifted).[6]

---

[5] While the Court also concluded that the Forest Service breached a warranty in clause CT 6.25 of seven of the contracts, Precision Pine, 50 Fed. Cl. at 70, 73, as discussed above, Precision Pine failed to present sufficient evidence of damages caused by the breach of warranty. Furthermore, the Court erred in finding clause CT 6.25 contains an express warranty and in ruling that reliance upon a warranty is not required. This latter ruling is directly contrary to the Federal Circuit's subsequent decision in Scott Timber Co. v. United States, 333 F.3d 1358 (Fed. Cir. 2003). Because Scott Timber is controlling precedent, the breach of warranty aspect of the liability decision is no longer viable.

[6] The doctrine of collateral estoppel bars Precision Pine from re-litigating this issue, which has already once been litigated and decided. E.g., International Air Response v. United States, 324 F.3d 1376, 1378 (Fed. Cir. 2004) ("Under the doctrine of collateral estoppel, . . . the (continued...)

The implications of Precision Pine's decision to continue performance are significant – particularly with respect to the assessment of damages. As the Court of Claims explained in Cities Service Helex:

> If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

543 F.2d at 1313 (citing cases) (emphasis added); see also Pinewood Realty Limited Partnership v. United States, 223 Ct. Cl. 98, 617 F.2d 211, 214 (1980) (if a contract is breached but "the injured party ignores the breach, and continues to perform, it has waived its right to terminate the contract, and has only retained its claim for damages for partial breach"). This is because a party that elects to continue contract performance receives the benefit of the bargain through performance of the contract itself – not through a damages claim for lost profits. See Cities Service Helex, 543 F.2d at 1313.

The "normal measure" of damages for a "partial breach" due to delayed performance is the difference in value between what was conveyed and what was supposed to have been conveyed. White v. United States, 187 Ct. Cl. 564, 410 F.2d 773, 779 (1969). Thus, in the case of the suspension of a timber sale contract for an unreasonable duration, damages for partial breach are measured as the difference between the contract price/market value differential for

---

[6](...continued)
judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.") (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n. 5 (1979)); In re Nangle, 274 F.3d 481, 485 (8th Cir. 2001).

timber at the time of breach (i.e., on the date when the suspension became unreasonable) and the contract price/market value differential when the suspension was lifted. See Everett Plywood Corp. v. United States, 512 F.2d 1082 (1975) ("The usual measure of damages for the failure to deliver goods is the difference between the contract price the buyer was to pay and the fair market value of those goods."); Uniform Commercial Code § 2-713 (providing compensation for the differential between contract and market value). For instance, if the purchaser had a contract price for timber $15.00/mbf less than market value at the time of breach, but had a contract price of only $10.00/mbf less than market value when the suspension was lifted, the purchaser's damages for partial breach (i.e., delay) would be $5.00/mbf.

Precision Pine has made no attempt to quantify such damages for partial breach. Instead, Precision Pine persists in seeking lost profits – the very measure of damages that is barred by the Cities Service Helex decision. 543 F.2d at 1313. Accordingly, the Court should enter judgment in favor of the United States on Precision Pine’s common law claim for lost profits.

## IV. Precision Pine's Claimed Common Law Breach of Contract Damages

Precision Pine has subdivided its common law breach claims into three separate categories: (1) gross profits from the sale of lumber products; (2) sawmill inefficiency costs; and (3) increased log hauling costs. As we explain below, each of Precision Pine's common law claims suffers from fatal flaws that preclude Precision Pine's recovery in this action.

## A. Precision Pine Is Not Entitled To Recover Lost Lumber Profits

### 1. Profits From The Sale Of Lumber Are Not Recoverable For Breach Of A Timber Cutting Contract Because The Production And Sale Of Lumber Products Constitutes A Collateral Undertaking

The contracts at issue are timber cutting contracts. Each contract requires the purchaser to cut and remove designated timber and (for multi-product sales) roundwood by the contract's termination date. Each contract prescribes the manner in which logging, hauling and land restoration work is to be performed. And each contract establishes a pricing mechanism for the timber and roundwood that is to be cut and removed. E.g., Tr. 3791-92, 3796-99, 3803 (Harris); PX169-79 (clauses AT2, AT5, and BT 2.2). On the other hand, the contracts do not require that timber or roundwood be processed at the purchaser's sawmill – or, for that matter, any sawmill – after it is removed from Forest Service land. E.g., Tr. 3770 (Harris), 1540-43 (Porter); PX44; PX169-79. Indeed, purchasers of Forest Service timber sales frequently do not own or have access to a sawmill. See Tr. 1762-63, 1765 (Reidhead) (testifying that Tri-Star was awarded and performed Forest Service timber sale contracts, but never owned or operated a sawmill or planer); Tr. 1651 (Porter) (Zellner Firewood bid on, was awarded, and performed Forest Service multi-product sale contracts, though Zellner did not own or operate a sawmill). Purchasers are free to (and often do) put logs from Forest Service contracts to various uses.[7] See, e.g., Tr. 1651 (Porter) (Zellner sold logs from its Forest Service contracts as firewood); Tr. 2920-21 (Matson) (it is up to the purchaser to decide how to use harvested timber). Simply put, any milling and

[7] Precision Pine itself took advantage of the flexibility afforded by its Forest Service contracts. Some logs from Precision Pine's contracts were milled and planed, and the resulting lumber sold. Other logs were not processed by Precision Pine at all, but instead were (i) sold to third parties for use in their own mills, (ii) sold to third parties for use as pulpwood, (iii) sold to third parties to use as firewood, or (iv) stacked and left unused. See, e.g., DX477; DX553.

planing of logs taken from a Forest Service sale is independent of, and collateral to, the purchaser's contractual obligations. See PX169-79.

Profits upon "independent and collateral undertakings" are not recoverable under the common law. E.g., First Heights Bank v. United States, ___ F.3d ___, 2005 WL 1962989 (Fed. Cir. Aug. 17, 2005); Rumsfeld v. Freedom, N.Y., 329 F.3d 1320, 1333 (Fed. Cir. 2003); Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996); see also Olin Jones Sand Co. v. United States, 225 Ct. Cl. 741, 743-44 (1980) (damages based on future contracts "too remote and speculative to be recoverable" when Government wrongdoing caused contractor to lose bonding capacity and thus be unable to obtain contracts); Rocky Mountain Constr. Co. v. United States, 218 Ct. Cl. 665, 666 (1978) (damages based on future contracts are "too remote, indirect and speculative to permit recovery" when, absent Government delay, contractor would have been able to bid on other contracts); Smokey Bear, Inc. v. United States, 31 Fed. Cl. 805, 808 (1994) ("Damages for the loss of future profits and lost profitable business opportunities arising from potential contracts with others are per se unrecoverable."). In Wells Fargo, for instance, the Federal Circuit considered whether a bank could recover profits on loans it would allegedly have made but for the unavailability of capital occasioned by the defendant's breach. 88 F.3d at 1022-23. Using capital to make loans was a part of the bank's regular business operations and the bank asserted that it anticipated profits upon the loans it was unable to make. Id. at 1023. The Federal Circuit nevertheless held that such loans constituted a collateral undertaking upon which profits were unrecoverable as a matter of law. Quoting Ramsey v. United States, 121 Ct. Cl. 426, 101 F. Supp. 353, 357-58 (1951), cert. denied, 343 U.S. 977 (1952), the Federal Circuit first explained:

> The profits lost from the corporation's over-all business activities . . . may not be recovered . . . . The lost profits of these collateral undertakings, which the corporation was unable to carry out, are too remote to be classified as a natural result of the Government's delay . . . . "[T]here is a distinction by which all question[s] of this sort can be easily tested. If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. . . . But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit."

Wells Fargo, 88 F.3d at 1022-23 (quoting Ramsey, 101 F. Supp. at 357-58 (quoting Myerle v. United States, 33 Ct. Cl. 1, 26 (1897))) (emphasis added). The Federal Circuit then held that the reasoning in Ramsey was "equally applicable to the present case." Id. at 1023.

> Here the Court of Federal Claims awarded damages for the profits Wells Fargo allegedly would have made on the additional loans it could have made if the guarantee had been issued. Like the lost profits in Ramsey, Wells Fargo's loss of interest on additional loans it allegedly could have made had there been no breach is "too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit."

88 F.3d at 1023.

Like the plaintiffs in Wells Fargo and Ramsey, Precision Pine seeks profits upon its "over-all business activities," namely, profits derived from the sale of lumber produced by its lumber manufacturing operations – operations that were, in turn, supplied logs from Forest Service (and other) timber sales.[8] However, Precision Pine's Forest Service contracts required

---

[8] Precision Pine obtained timber from the State of Arizona, Indian tribes, private parties,
(continued...)

only the cutting and removal of trees from Forest Service lands – not the milling, planing, drying or sale of lumber products. See PX169-79. As a result, like the additional loans in Wells Fargo, Precision Pine's manufacture of lumber products constitutes "an independent and collateral undertaking . . . entered into in consequence and on the faith of the principal contract." 88 F.2d at 1022. The recovery of alleged lost profits from lumber manufacturing operations is, therefore, "too uncertain and remote to be taken into account" for breach of a timber cutting contract. Id. at 1023; see also Ramsey, 101 F. Supp. at 358 (lost profits must be "part and parcel of the contract itself"); Scott Timber, Inc. v. United States, 333 F.3d at 1372 (increased sawmill manufacturing costs "are not directly related" to the suspension of a timber sale contract).

**2. Precision Pine Misuses The "Lost Volume Seller" Concept, Which Is Inapplicable Here Because The United States Does Not Seek To Offset Profits From "Substitute Transactions"**

Precision Pine's attempt to invoke the lost volume seller concept in this action is misplaced. While the MSO suspension may have delayed the harvesting of timber, it did not prevent Precision Pine from harvesting timber on the contracts at issue. To the contrary, by choosing to continue the contracts, Precision Pine reaffirmed its contractual obligations, including the obligation to fully harvest all timber upon the contracts. See Cities Service Helex, 543 F.2d at 1313. Because Precision Pine was entitled (and indeed obligated) to harvest all timber on the contracts after the suspensions were lifted, it received the very timber for which it had bargained.

---

[8](...continued)
and its own lands, as well as from the Forest Service. Tr. 1653, 2037 (Porter).

As explained above, Precision Pine's decision to go forward with the contracts should preclude the recovery of lost profits. See section III, supra. However, even if Precision Pine possessed a viable claim for lost lumber profits, claimed damages would, at a minimum, have to be reduced by the amount Precision Pine actually earned from harvesting in the post-suspension period.[9] A failure to take into account revenues from post-suspension harvesting would place Precision Pine in a better position through litigation than through full performance of its contracts, because Precision Pine would obtain profits once by performing the contracts and a second time through this lawsuit. Tr. 3411-15 (Neuberger); DX796. The law does not bestow such a windfall. Hansen, 376 F.3d at 1315.

An analysis of the example quoted by the Court in its summary judgment decision illustrates the basic fallacy of Precision Pine's putative lost volume seller claim.

> A contracts to pave B's parking lot for $10,000. B repudiates the contract and A subsequently makes a contract to pave a similar parking lot for $10,000. A's business could have been expanded to do both jobs. Unless it is proved that he would not have undertaken both, A's damages are based on the net profit he would have made on the contract with B, without regard to the subsequent transaction.

Precision Pine & Timber, Inc. v. United States, 63 Fed. Cl. 122, 133 (2004) (quoting Restatement (Second) of Contracts § 347 illus. 16 ("Restatement § __")). If A is a lost volume seller, it could have performed both contracts, and the subsequent contract should have no effect

---

[9] As explained in greater detail below, Precision Pine should also be precluded from seeking damages based upon volumes that were not harvested. Precision Pine had a contractual obligation to harvest all timber under contract. Precision Pine should not be permitted to use its failure to harvest – in breach of its contractual duties – to increase its damages claims. Indeed, if Precision Pine had fully harvested the contracts, it would have earned more revenue from post-suspension operations than its claimed revenue during the MSO suspension. E.g., DX834.

upon damages claimed against B. A's damages are, therefore, net profits upon the contract with B. This action is not analogous to the example in the illustration because there is no subsequent contract. The United States has not argued that profits upon other timber sale contracts should offset damages in the post-suspension period. Other timber sale contracts would be analogous to the subsequent paving contract entered into by A. Rather, the United States argues that post-suspension profits earned upon the once-suspended contracts must be taken into account. These contracts are analogous to the original contract between A and B. Since Precision Pine actually earned profits upon these contracts after the suspension, it must, at a minimum, reduce its claimed damages by the amount of post-suspension profits.[10] See, e.g., Hi-Shear Tech. Corp. v. United States, 356 F.2d 1372, 1382 (Fed. Cir. 2004) ("[T]he recovery of damages must not serve as a windfall to the non-breaching party.").

In addition, Precision Pine has failed to establish as a factual matter that it is a lost volume seller. Precision Pine's lost volume seller claim is predicated upon the factual allegation that, but for the MSO suspensions, Precision Pine would have harvested and processed all timber

[10] To make the illustration analogous to this action, assume that after A contracts with a third party to pave its parking lot, B changes its mind and reinstates the contract with A. A as a volume seller can perform both contracts. In this situation, A's profits earned on the eventual performance of the contract with B must offset any claim for damages against B. Otherwise, A would get paid twice for its contract with B – once from the eventual performance, and once again when it sued. See DX796. Likewise, here, if Precision Pine's claimed damages are not reduced by post-suspension profits, Precision Pine would be paid twice – once when it earns profits by harvesting and processing the contracted-for timber, and once again through this action. Id. Neither the common law nor the lost volume seller concept authorizes such a double recovery. Bluebonnet Savings Bank, FSB v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003) ("the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach"); Hansen Bancorp, Inc. v. United States, 376 F.3d 1297, 1315 (Fed. Cir. 2004) ("Courts should avoid bestowing an 'unfair windfall' on the plaintiff by compensating him or her above and beyond the losses suffered under the breached agreement.").

upon the suspended contracts during 1995 and 1996, and that it would have purchased, harvested, and processed a similar volume of Forest Service timber in 1997 and 1998. See Pl.'s Pretrial Br. at 16-17. However, at trial, Mr. Porter explained that Precision Pine did not stop bidding on Forest Service contracts. After the MSO suspensions, Precision Pine bid on and was in fact awarded various contracts in 1997 and 1998. Tr. 671-76, 1089 (Porter). Mr. Porter was unable to identify a single additional contract that Precision Pine would have bid on had the MSO suspensions had not occurred. Tr. 1288-89 (Porter). Nor was Mr. Porter able to identify any additional contracts that Precision Pine would have been awarded but for MSO suspensions. Tr. 1288-89 (Porter); see also Tr. 1278 (Porter) (bidding on timber contracts was always competitive). Precision Pine has, therefore, failed to establish the factual predicate necessary under its own lost volume seller theory, i.e., that it would have bid on and been awarded additional Forest Service timber sale contracts in 1997 and 1998 but for the MSO suspensions.[11]

Finally, Precision Pine has presented no viable calculation of damages under its lost volume seller theory. The Court ruled that a lost volume seller is entitled to recover only "net profit." Precision Pine, 63 Fed. Cl. at 133. Precision Pine's expert, Robert Ness, calculated only "gross profit before manufacturing overhead." Tr. 2428, 2666-67 (Ness); see also PX1012. Mr. Ness did not make any deduction for manufacturing overhead, general and administrative expenses, other income and expenses, or taxes – deductions that would be required to provide a

[11] In ruling upon the United States' motion for summary judgment, the Court held that the question of whether subsequent transactions are substitutes for the breached contracts can present difficult factual issues. Precision Pine, 63 Fed. Cl. at 133 (quoting Restatement § 347 cmt. f). Precision Pine has identified no "subsequent transaction" that could potentially be a substitute for Precision Pine's timber sale contracts. See id. at 133. For this additional reason, Precision Pine cannot prevail upon its lost volume seller claim.

figure for net profits. Tr. 2592-94, 2717 (Ness); PX1012; see also Tr. 2586 (Ness) (net income is equivalent to net profit). Thus, even if Precision Pine's lost volume theory were viable, it failed to proffer a net profit figure as damages.

**3. Even If Lumber Profits Were Potentially Recoverable, Precision Pine Failed To Make The Requisite Showing**

To recover lost profits, or indeed any damages, it is insufficient for the plaintiff simply to establish a contractual breach. See Alaska Pulp, 59 Fed. Cl. 400 (awarding no damages upon plaintiff's $8.7 billion claim notwithstanding the Government's breach of a 50-year timber sale contract); Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97 (2004) (rejecting plaintiff's damages claims, including a claim for lost profits, where a breach had previously been established). Where a plaintiff seeks alleged lost profits, "it [first] must be 'definitely established' that without the government's breach there would have been a profit." Hi-Shear, 356 F.3d at 1379 (quoting California Fed. Bank v. United States, 245 F.3d 1342, 1349 (Fed. Cir. 2001)). In addition, the plaintiff must establish, by a preponderance of the evidence, that (1) the breach caused the loss of profits "'directly and primarily,' and 'inevitably and naturally, not possibly or probably;'" (2) the loss of profits was foreseeable as a probable result of the breach because it follows from the breach in the ordinary course of events, or as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know, and (3) a sufficient basis exists for determining the amount of lost profits with reasonable certainty. Precision Pine & Timber, Inc. v. United States, 64 Fed. Cl. 165, 166 (2005) (citing California Fed. Bank v. United States, 395 F.3d 1263, 1278-79 (Fed. Cir. 2005)); Energy Capital Corp. v. United States, 302 F.3d 1314, 1326 (Fed. Cir. 2002) (citing Chain Belt Co. v.

United States, 127 Ct. Cl. 38, 58, 115 F. Supp. 701, 714 (1953)); Landmark Land Co. v. FDIC, 256 F.3d 1365, 1378 (Fed. Cir. 2001).

The starting point for the Court's analysis of Precision Pine's claims for lost profits is the nature of the breach in this action. Although Precision Pine's contracts were suspended for varying periods of time, the MSO suspensions did not prevent Precision Pine from harvesting the timber that it purchased. To the contrary, after the suspensions were lifted, Precision Pine elected to continue performance of the contracts and, accordingly, was able (and obligated) to harvest timber upon the once-suspended contracts. Thus, at most, the MSO suspensions delayed the harvesting of timber.[12] Additionally, this Court did not rule that the suspensions of Precision Pine's contracts were unauthorized; rather, the Court found that the length of the suspensions (as to 11 of the 14 contracts) was unreasonable and, thus, constituted a breach. See Precision Pine, 50 Fed. Cl. at 70-71.

Precision Pine's 11 lost profits claims are deficient for numerous reasons. First, due to low prices for lumber products and the lack of an outlet for roundwood during the period of the MSO suspensions, most of the contracts at issue were not profitable. Second, Precision Pine has failed to establish that planned harvesting on any given contract was prevented by the MSO suspensions. Third, at the time of contracting, lost lumber profits were not legally foreseeable as the probable result of a contract's suspension. Fourth, Precision Pine's damage estimates are so badly flawed that they fail to provide reasonably certain estimates of lost profits. Fifth, according to its own numbers, if Precision Pine had fully harvested the contracts after the MSO

---

[12] Precision Pine in fact harvested timber and/or roundwood from the O.D. Ridge, Kettle, Hay, Brookbank, Jersey Horse, Manaco, St. Joe, Hutch-Boondock, Mud, Brann and U-Bar sales after the suspension of the respective contracts was lifted. See, e.g., DX791; DX800; DX821.

suspensions were lifted (as it was contractually obligated to do), it would have earned more than the claimed lost revenues during the period of the MSO suspensions. See DX834 (showing increased revenue per mbf post-suspension). Accordingly, for each of these reasons, the 11 claims for lost lumber profits asserted by Precision Pine in this action are properly rejected.

**a. Precision Pine's Brookbank, Jersey Horse, Kettle, Manaco, Monument, Mud, Saginaw-Kennedy, Salt and U-Bar Contracts Would Not Have Been Profitable During The MSO Suspensions**

Precision Pine would have been unable to earn a profit upon most of its timber and multi-product sale contracts during the MSO suspensions. During the period of the suspensions, market prices for lumber products were low. PX305; DX776; see also DX271; DX570. Indeed, prices were markedly higher both before the suspensions in 1993 and 1994, and after the suspensions in 1997. PX305; DX776. Furthermore, during the MSO suspensions, Precision Pine had no outlet for roundwood. DPFOF ¶¶ 65-66. The unavailability of an outlet for roundwood during the suspensions adversely affected the profitability of Precision Pine's multi-product sale contracts because, in order to harvest sawtimber for its mills, Precision Pine was obligated to cut and remove both roundwood and sawtimber components. See, e.g., Tr. 1827, 2025 (Porter); PX172 (clause BT 2.2). With no outlet for roundwood, Precision Pine would have incurred stumpage, harvesting and hauling costs, but would have earned no offsetting revenues from roundwood sales. Thus, during the MSO suspensions, the roundwood component of Precision Pine's multi-product sale contracts was a dead loss, not the break-even proposition Precision Pine was hoping to achieve. This caused many of Precision Pine's contracts to be unprofitable during the suspensions.

According to analyses that Precision Pine itself conducted just over a month before the MSO suspensions, many of Precision Pine’s contracts were not profitable, including the Jersey Horse, Salt and U-Bar contracts.[13] See DX519, DX521-45. Moreover, Precision Pine's contemporaneous analyses do not take into account the roundwood component of multi-product sales and make no deductions for corporate overhead (i.e., they reflect gross profit – not net profit). See DX521-527; DX530-539. Precision Pine lacked an outlet for roundwood during the period of the MSO suspensions. DPFOF ¶¶ 65-66. Had Precision Pine actually harvested its contracts without an outlet for roundwood, according to figures developed by Precision Pine’s own expert, the company would have incurred losses on roundwood of not less than $75 per ccf. DPFOF ¶ 561; DX131; Tr. 2597-99, 2754, 2843 (Ness). Consequently, when roundwood losses are taken into account, nine of Precision Pine’s contracts (Brookbank, Jersey Horse, Kettle, Manaco, Monument, Mud, Saginaw-Kennedy, Salt, and U-Bar) show no gross profit. See DX521-527; DX530-539; PX131. Deducting general overhead to obtain a net profit figure would increase the projected loss still further.

In sum, as a result of depressed lumber prices and Precision Pine's lack of an outlet for roundwood, only the Hay and O.D. Ridge timber sales would have been profitable to harvest during the period of the MSO suspensions. Consequently, Precision Pine's lost profits claims for its other nine contracts are not viable. See Hi-Shear, 356 F.3d at 1379 (the contract's profitability in the absence of the breach must be "definitely established" by the plaintiff);

[13] The analysis of Precision Pine's claims by former DCAA auditor, Wayne G. Moosman, confirms that most of Precision Pine’s contracts were not profitable during the MSO suspensions. Tr. 4866, 4919, 4923-24, 4927 (Moosman); DX777 at 15 (showing negative contribution margins for Precision Pine’s contracts before taking into account roundwood losses and general overhead).

California Federal Bank v. United States, 395 F.3d 1263, 1368 (Fed. Cir. 2005) ("The inability to prove by a preponderance of the evidence that profits would have been made but for the breach will . . . preclude recovery on a lost profits theory.").

### b. Precision Pine Has Failed To Establish That Its Alleged Lost Profits Were Directly And Primarily Caused By The MSO Suspensions

The Federal Circuit recently reaffirmed that the "but for" standard of causation applies in a breach of contract action. California Federal, 395 F.3d at 1368. Consequently, as this Court explained, a breach must cause the alleged injury "directly and primarily." Precision Pine, 64 Fed. Cl. at 166; see also Myerle, 33 Ct. Cl. at 27 ("There must not be two steps between cause and damage."). Further, the plaintiff must show that alleged lost profits resulted "inevitably and naturally, not possibly nor even probably" from the breach. California Federal, 395 F.3d at 1267 (quoting Myerle, 33 Ct. Cl. at 27); Precision Pine, 64 Fed. Cl. at 166. And while the existence of "other factors operating in confluence with the breach" do "not necessarily preclude recovery," see California Federal, 395 F.2d at 1268 (emphasis added), damages are unrecoverable if they are due to an intervening cause, see Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1071 (Fed. Cir. 2001) (holding that the plaintiff's "independent business decision" constituted an intervening cause that precluded damages); Myerle, 33 Ct. Cl. at 27 ("there must appear no intervening incident . . . to complicate or confuse the certainty of the result between the cause and the damage").

Here, as a threshold matter, Precision Pine must show that it would have harvested each of the contracts for which it seeks lost profits (i.e., the Brookbank, Hay, Jersey Horse, Kettle, Manaco, Monument, Mud, O.D. Ridge, Salt, Saginaw-Kennedy and U-Bar contracts) "but for"

the MSO suspensions. California Federal, 395 F.3d at 1268; Precision Pine, 64 Fed. Cl. at 166. Further, for each of these contracts, Precision Pine must establish that the loss of profits resulted "directly and primarily" from the unreasonable duration of the suspension. Id. Precision Pine has not met this burden.

**(1) Precision Pine Failed To Show What Contracts Would Have Been Harvested Had The MSO Suspensions Not Occurred**

Precision Pine has failed to establish that the MSO suspensions prevented planned timber harvesting in 1995 or 1996 had the MSO suspensions not occurred. Precision Pine prepared no business plan, scheduling plan, operating plan, or other contemporaneous documents describing anticipated harvesting. Tr. 2089 (counsel); Tr. 1441 (Porter). While Precision Pine did give the Forest Service an annual operating schedule pursuant to the terms of its timber sale contracts in early 1995, see DX294, Mr. Porter testified that this schedule misrepresented company plans.[14] Tr. 1630-31, 1633 (Porter). As a result, there is no document from which company plans for harvesting can be derived. Tr. 1441 (Porter). Moreover, Precision Pine's witnesses were unable to provide this essential information. Precision Pine's president, Lorin Porter, was responsible for selecting contracts to harvest. Tr. 1436 (Porter). Yet Mr. Porter was unable to say which contracts Precision Pine would have harvested but for the MSO suspensions or when any harvesting would have occurred. Tr. 1442-48 (Porter). Indeed, Mr. Porter could not even identify the contracts that would have been logged in September 1995 – the very first month

[14] Significantly, Mr Porter also testified that Precision Pine knew the 1995 annual operating schedule misrepresented company plans at the time it was given to the Forest Service. Tr. 1630-31, 1633 (Porter). Precision Pine does not rely upon this schedule, which conflicts the *post hoc* schedule used in Mr. Ness's damages calculations. Tr. 1634 (Porter).

after the suspension began. Tr. 1439-41 (Porter). Because Precision Pine has not established which timber sales it would have logged (and when it would have logged them) had the MSO suspensions not occurred, it has not established that the MSO suspensions were a "but for" cause of its alleged lost lumber profits.[15]

In addition, for a number of contracts, timber harvesting was not prevented by the MSO suspensions because harvesting was already precluded by contractual timing of harvest restrictions, other litigation, fire closures, and the Endangered Species Act.

**(i) The Mud Contract**

The Mud contract was the subject of a separate lawsuit – Southwest Center For Biological Diversity v. United States Forest Service, No. CIV-95-1927-PCT-RCB (D. Ariz.) – that prevented harvesting upon the Mud contract. See Tr. 3937-39, 4094-95, 4097-101 (Harris); PX106 ¶ 5; . The Forest Service settled the Southwest Center suit on October 18, 1995, by agreeing to partially cancel the Mud sale. PX106 ¶ 5; see also DX311; PX175. By March 11, 1996, sufficient work on the partial cancellation had been accomplished that the Forest Service ended the suspension of the Mud contract. PX109.

Due to the Southwest Center action, the Mud sale would not have been available for Precision Pine to harvest before March 11, 1996, even if the sale had been unaffected by the

[15] Precision Pine has averred generally that it would have completely logged all 14 contract in 1995 and 1996 had the MSO suspensions not occurred. Mr. Porter's own testimony belies this claim. Mr. Porter acknowledges that the MSO suspensions increased the pressure to harvest available contracts. Tr.1449 (Porter). Despite this, Precision Pine did not completely harvest those contracts it had available (i.e., Brann, Hutch-Boondock and Mud) during 1995 and 1996. DPFOF ¶¶ 137, 206, 303. Plainly, with more timber available and less pressure to harvest, Precision Pine would not have fully harvested all 14 contacts if the MSO suspensions had not occurred.

MSO suspensions. See PX106 ¶ 5. Precision Pine cannot establish, therefore, that lost profits (or other damages) were caused by a breach of the Mud contract. Additionally, by 135 days into the MSO suspension of the Mud contract (i.e., January 6, 1996), the normal operating season for the Mud sale had ended. See PX175 (clause AT17). The suspension of the Mud contract was lifted before the beginning of the next operating season. PX109. Because Precision Pine was not entitled to harvest outside the normal operating season, and because the suspension prior to the end of the 1995 operating season was not unreasonable, Precision Pine cannot establish that any damages were caused by a breach of the Mud contract.

**(ii) The Manaco Contract**

By 135 days into the MSO suspensions (i.e., January 6, 1996), the normal operating season for the Manaco sale had ended. See PX178 (clause AT17). The operating season in 1996 began on May 1. Id. However, additional contract restrictions for the protection of wildlife precluded harvesting upon much the Manaco sale until October 1. Id. (clause CT6.25). Further, from May 6 to July 9, 1996, all timber sales on the Tonto National Forest, including the Manaco sale, were suspended due to extreme fire danger. See Tr. 4499, 4533 (Harris). Finally, a Mexican Spotted Owl was discovered adjacent to the Manaco sale area during the summer of 1996. Tr. 4625 (Dils). This required consultation with the FWS and a suspension of timber harvesting. Tr. 4625-27 (Dils). This consultation was completed in March 1997, at which point the suspension of the Manaco sale was lifted. Tr. 4625 (Dils).

In sum, the adjudicated breach of the Manaco contract did not prevent timber harvesting as Precision Pine would have been unable to harvest in any event. Thus, Precision Pine cannot establish that any damages were caused by a breach of the Manaco contract.

**(2) Any Lost Profits Suffered By Precision Pine Were Caused By Its Own Business Decisions – Not The Suspension Of Contracts**

Lost profits must result directly and primarily from the breach. Precision Pine, 64 Fed. Cl. at 166. Losses due to intervening causes are unrecoverable. Hughes Communications, 271 F.3d at 1071; Myerle, 33 Ct. Cl. at 27 ("there must appear no intervening incident . . . to complicate or confuse the certainty of the result between the cause and the damage").

It is not disputed that market prices for lumber products were low during most of 1995 and 1996, and were markedly higher in 1997. See PX305. As a result, when the MSO suspensions ended on December 4, 1996, Precision Pine was free to harvest timber and take advantage of the improved marketplace. Precision Pine did not do so. Indeed, Precision Pine harvested only 45 percent of the timber available under the contracts at issue before the Forest Service terminated its uncompleted contracts for default. DX832.

Precision Pine attributes its failure to harvest after the MSO suspensions were lifted to its own "business decisions," as well as to the Forest Guardians suspension in June 1997, the closure of Stone Container Corporation's (“Stone’s”) pulpmill in February 1998, and a fire at the Winslow mill in September 1998. DX791; DX800. Thus, Precision Pine's failure to complete harvesting in the years following the MSO suspensions was the direct result of business decisions and subsequent unforeseen events. DX570 (stating that the loss of Stone as an outlet for roundwood and the “severe downturn in the market for wood products” were “entirely unforeseeable” at the time of contracting); see also DX791; DX800. Moreover, Precision Pine’s own breach of the Salt contract in 1998, and the Brookbank, Jersey Horse, Manaco, Monument, O.D. Ridge, Saginaw-Kennedy and U-Bar contracts in 2000, prevented the completion of

harvesting. See Precision Pine, 62 Fed. Cl. at 656 (affirming the Forest Service's termination for default).

While Precision Pine was free to play the market once the MSO suspensions ended, the Forest Service did not become a guarantor of Precision Pine's profits. The fact that Precision Pine suffered the consequences when its post-suspension deferral of harvesting did not work out is not chargeable to the Forest Service. See Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002) ("At most, the government's acts indirectly made performance of the . . . contract unprofitable. . . . Seaboard simply made a business decision not to harvest. Timber prices fell and Seaboard must bear this market risk"). Precision Pine's alleged loss of profits were directly and primarily caused by post-suspension events, namely, its own business decision not to harvest in a favorable market in 1997 and its own contractual breaches – not by the MSO suspensions. Its claims for lost profits should, therefore, be rejected. Hughes Communications, 271 F.3d at 1071; Seaboard, 308 F.3d at 1294.

**c. The Loss Of Profits Resulting From A Suspension Was Not Contemplated By The Parties At The Time Of Contracting**

With respect to each contract, Precision Pine must establish that the loss of profits was legally foreseeable at the time of contracting. Landmark, 256 F.3d at 1378; see also Bohac v. Dept. of Agriculture, 239 F.3d 1334, 1340 (Fed. Cir. 2001); San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 960 (Fed. Cir. 1989); Chain Belt, 115 F. Supp. at 714. In Chain Belt, the Court of Claims discussed the standard for legal foreseeability of lost profits as follows:

> It must . . . be established that loss of profits in the event of breach was within the contemplation of the contracting parties either (1)

> because the loss was natural and inevitable upon the breach so that the defaulting party may be presumed to have foreseen it; or (2) if the breach resulted in lost profits because of some special circumstances, those circumstances must have been known to the defaulting party at the time the contract was entered into.

127 Ct. Cl. at 58, 115 F. Supp. at 714 (emphasis added); accord Energy Capital Corp. v. United States, 47 Fed. Cl. 382, 396 (2000), aff'd in part, rev'd in part, 302 F.3d 1314 (Fed. Cir. 2002). More recently, the Federal Circuit explained that a loss is "foreseeable as a probable result of breach [if] it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." Landmark, 256 F.3d at 1378 (quoting Restatement § 351(2)). "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Id. (quoting Restatement § 351, cmt. a). Furthermore, where "several circumstances have contributed to a loss, the party in breach is not liable for it unless he had reason to foresee all of them." Restatement § 351 cmt. d.

With respect to legal foreseeability, the nature of the alleged breach is significant. As explained above, at most, Precision Pine's timber sale contracts were delayed by the MSO suspensions. When the suspensions ended, Precision Pine elected to continue the contracts and, therefore, the very same trees upon the very same contracts were available to Precision Pine. The time for performance was likewise unaffected because, in accordance with contract clause BT 8.21, contract terms were adjusted to give Precision Pine additional time.[16] See First Joint

[16] The length of the contract term enlargement granted pursuant to BT 8.21 is the same as the time lost as a result of the contract suspension. First Joint Stip. ¶ 34.

Stip. ¶ 34. Because there was no change in the trees being harvested and no change in the time available to harvest, no loss of profits would be expected to occur "in the ordinary course of events." Landmark, 256 F.3d at 1378. Furthermore, the Forest Service was aware of no "special circumstances" at the time of contracting. Tr. 1855-57 (Porter). Consequently, lost profits were not within the contemplation of the contracting parties as the probable result of a suspension of harvesting at the time of contracting. Precision Pine cannot, therefore, recover lost profits.

Precision Pine has previously sought to muddy the waters regarding legal foreseeability. Precision Pine has asserted that the Forest Service was aware that Precision Pine has sawmills, that Precision Pine informed the Forest Service that it was a "manufacturer," and that Precision Pine certified that it used Forest Service timber in its sawmills. See Pl.'s Pretrial Br. at 10-13. Precision Pine's argument misses the point. Performance of the Precision Pine's contracts was merely delayed. As a result, after the suspension, Precision Pine had the opportunity to cut and remove the timber, produce lumber using its sawmills and planer, and sell the resulting lumber products. At the time of contracting, there was no reason to think that delay caused by a suspension would have resulted in a loss of profits, as opposed to the mere deferral of profits. See id. Consequently, Precision Pine has failed to establish legal foreseeability and its lost lumber profit claims should be rejected.

#### d. Precision Pine Has Not Established Lost Profits With Reasonable Certainty

Precision Pine contends that but for the MSO suspensions it would have harvested timber, would have processed the resulting logs in its sawmills and then in its planer to produce

various lumber products, and would have sold these lumber products at a substantial profit.[17] Precision Pine's expert, Robert Ness, developed a "model" upon which Precision Pine bases its calculation of alleged lost gross profits. See PX131. Mr. Ness testified that his model does not attempt to describe what Precision Pine would have done "but for" the suspensions. To the contrary, according to Mr. Ness, Precision Pine would not have followed the harvesting and manufacturing schedules used as the underpinnings of his damages model. In addition, as explained below, Mr. Ness's model uses inaccurate and unverified data, employs faulty assumptions, seeks damages that have already been rejected by Court rulings, and is based upon invalid methodologies. As a result, Mr. Ness has not provided a reasonably certain calculation of the net profit that would have been earned upon each contract "but for" the MSO suspensions. See California Federal, 395 F.3d at 1268 (affirming the "but for" requirement for causation).

**(1) Mr. Ness's Calculations Are Not Based Upon Valid "But For" Harvesting And Milling Schedules**

Accurate harvesting and milling schedules are central to the calculation of lost lumber profits. Yet, neither the harvesting schedule nor the milling schedule used in Mr. Ness's model would have been followed by Precision Pine "but for" the MSO suspensions. Having failed to develop an appropriate "but for" model, Mr. Ness's calculations are of absolutely no use.

[17] The alleged gross profit is dramatically higher than what Precision Pine expected to achieve prior to the MSO suspensions. DX806; see also DX804; DX805. Indeed, Mr. Ness projects both higher revenues and lower costs than did Mr. Porter just six weeks before the MSO suspensions. DX808; DX810. Moreover, this discrepancy cannot be accounted for by Mr. Porter's dubious claim that he prepared "worst case" projections. Mr. Porter testified that his "worst case" was developed by simply using a lower overrun factor – he did not modify manufacturing costs, lumber prices, or other factors used in his projections. Tr. 3132-34 (Porter).

**(i) Precision Pine Would Not And Could Not Have Followed Mr. Ness's Harvest Schedule**

Mr. Ness's damages model is based upon a hypothetical harvesting schedule. See PX131 (App. A at 4); see also DX1004; Tr. 2091 (Porter) (DX1004 shows the harvesting schedule used by Mr. Ness in greater detail). Yet Mr. Ness testified clearly and forcefully that Precision Pine would not have followed the schedule used in his model in the "but for" world. Tr. 2622, 2626, 2848 (Ness). Indeed, Precision Pine could not have followed the harvesting schedule used by Mr. Ness. The schedule projects timber harvests during periods when logging was barred by the normal operating season, by fire closures, by timing of harvest restrictions and by the Endangered Species Act. See DX1004; DPFOF ¶¶ 78-79, 145, 161-62, 212-13, 230, 249-50, 255-56, 269, 285, 311, 329-30, 345, 374-75.

The schedule used by Mr. Ness is also unrealistic when viewed against the backdrop of Precision Pine's historic practices and then-existing market conditions. Mr. Ness assumes that Precision Pine would have harvested timber at a rate sufficient to operate its sawmills at their putative capacity of approximately 35 million board feet per year. Precision Pine had never operated its mills at this level. See Tr.1410, 2144 (Porter); DX802. Nor had Precision Pine ever harvested sufficient timber to operate at such a level. DX559. Indeed, because the volume of timber being offered by the Forest Service, and even more importantly, the volume of timber Precision Pine had under contract, had been steadily declining during the 1990s, Tr. 3310-11, 3323-28 (Neuberger); DX559, Precision Pine was under pressure to reduce the level of its operations. This pressure was only increased by the declining lumber market in 1995, which, by July 1995, was preventing the profitable operation of close to half of Precision Pine's contracts. See DX519, DX521-45. Indeed, shortly before the MSO suspension occurred, it had become

apparent that Precision Pine was almost certainly going to have to close one or more of its sawmills. See DX463. The harvesting schedule used by Mr. Ness simply disregards the overall decline of the timber and lumber industry in the Southwest, continuing reductions in timber offered by the Forest Service, the significant decline of lumber prices throughout 1995, and the pressures these changes were putting on Precision Pine.

Even putting aside contractual restrictions and practical considerations, the harvesting schedule used by Mr. Ness's model fails to take into account the nature of the breach found by this Court. As explained above, the Court held that the Forest Service's suspension was unreasonable (and, therefore, a breach) only insofar as the suspensions substantially exceeded 135 days.[18] See section I.B., supra. Thus, damages that flow from contracts being suspended prior to January 6, 1996 should not be compensable. Because Mr. Ness's model calculates damages over the entire period of the MSO suspensions – not just the part of the suspensions that constituted a breach – the model does not provide a valid basis for awarding damages.

Finally, Precision Pine should be barred from using the harvesting schedule in Mr. Ness's model. Mr. Ness uses a schedule that is dramatically different than the annual operating schedule Precision Pine supplied to the Forest Service for 1995. Compare PX131 and DX1004 to DX294. Precision Pine was required to provide (and update) an annual operating schedule for 1995. Tr. 1628-29 (Porter); Tr. 3808-09 (Harris); PX169-79 (BT6.31). Mr. Porter testified that, although an operating schedule was given to the Forest Service, the schedule misrepresented

---

[18] The Court found no breach of warranty as to five of the 11 contracts upon which Precision Pine seeks lost lumber profits. Precision Pine, 50 Fed. Cl. at 73-74. Further, as explained above, Precision Pine has not presented damages calculations based upon the Court's breach of warranty ruling. See section I.A., supra.

Precision Pine's plans. Tr. 1630-33 (Porter). Moreover, Mr. Porter stated that Precision Pine knew the schedule was false when it was handed over. Id. Precision Pine thus breached its contractual obligation under BT6.31. See PX169-79. The Forest Service relied upon the annual operating schedule it was provided. Tr. 3809 (Harris), 4594 (Dils). Precision Pine should, therefore, be estopped by its misrepresentation from using a different schedule as the basis for damages in this action. See LaMirage, Inc. v. United States, 44 Fed. Cl. 192, 201 (1999); Emeco Indus. v. United States, 202 Cl. Ct. 1006, 1015, 485 F.2d 652, 657 (1973).

**(ii) The Milling Schedule Used By Mr. Ness Is Not Based Upon Precision Pine's Plans**

Mr. Ness's model also includes a schedule for manufacturing lumber products at Precision Pine's sawmills. PX131 (App. A at 5). This milling schedule is particularly important as it affects both total profits and the distribution of profits among the contracts at issue. Tr. 2858-59 (Ness); DX1005; see also Tr. 2849-60 (Ness). Mr. Ness developed the milling schedule himself. Tr. 2860 (Ness). He did not consult Mr. Porter, did not review any Precision Pine documents, and did not attempt to determine what schedule Precision Pine would have followed "but for" the MSO suspensions. Tr. 2860 (Ness). Indeed, Mr. Ness candidly described his milling schedule as "arbitrary." Tr. 2677, 2849 (Ness).

Mr. Ness's milling schedule, in combination with his harvesting schedule, results in the build up of a very large log inventory at Precision Pine's sawmills. The projected inventory exceeds 8 million board feet during the summer of 1996 and is maintained at about this level for a full year. Tr. 5689-96 (Ness); DX1013. Not only does the projected inventory far exceed the company's historic average inventory, it is more than twice the size of the largest log inventory

Precision Pine ever accumulated. See DX828. This "harvest and hold" approach is completely contrary to Precision Pine's practice of maintaining a relatively small inventory during the summer to prevent logs from degrading.[19] Smith Dep. Tr. at 24-29.

Mr. Ness also ignores the cash crunch that would necessarily result from a "harvest and hold" strategy. If timber were cut, but the resulting logs not milled, Precision Pine would have to pay for stumpage, logging and hauling long before it received revenues from lumber sales. Precision Pine did not have adequate cash reserves to implement the harvest and hold approach without outside financing. See Tr. 5666, 5669-84, 5687 (Ness); PX293; DX1012.

Furthermore, in keeping with the arbitrary character of his schedule, Mr. Ness does not use a standard treatment (e.g., first-in, first-out ("FIFO"), or last-in, first-out ("LIFO")) for drawing down this inventory. See Tr. 2677, 2849 (Ness). Indeed, given that using either LIFO or FIFO would result in lower profits, Tr. 4915-16 (Moosman), it appears that the schedule was selected to maximize Precision Pine's putative lost profits.

Mr. Ness's milling schedule is as he described it: an arbitrary schedule that does not attempt to reflect what Precision Pine would have done if the MSO suspensions had not

---

[19] In April, at the beginning of the harvesting season, Precision Pine sought to have little or no inventory at its sawmills. Smith Dep. Tr. 24, 25; Tr. 2102-03 (Porter). When harvesting commenced, Precision Pine would build a two to three week supply of logs at each sawmill. Smith Dep. Tr. 24, 26. Precision Pine sought to maintain this inventory through the summer, which is commonly referred to as "bluing season," because logs kept in inventory during the summer will frequently be attacked by a fungus that causes "blue stain." See Smith Dep. Tr. 24, 26-28. Blue stain reduces the grade and, therefore, substantially reduces the value of molding and shop products. Smith Dep. Tr. 27; Tr. 1790-91 (Porter). Beginning in September, Precision Pine would increase its log inventory in order to have logs to mill during winter months. Smith Dep. Tr. 24-25, 28. During Mr. Smith's many years at Precision Pine, the company never intentionally deviated from this plan for log inventories. Smith Dep. Tr. 28-29.

occurred. It is, therefore, not a valid basis for awarding damages. See, e.g., California Federal, 395 F.3d at 1268.

**(2) Mr. Ness Inflates Damages At Virtually Every Step Of His Calculations**

At virtually every stage of his multi-step calculations, Mr. Ness inflates Precision Pine's claimed damages. The cumulative effect on the bottom line of the many errors in Mr. Ness's calculations is dramatic – suggesting that numerous money-losing contracts actually would have shown gross profit before manufacturing overhead. The most blatant problems with Mr. Ness's calculations are described below.

**(i) Lumber**

First, in the very first step of his calculations, Mr. Ness uses a "rule of thumb" factor to convert timber volumes from ccf to mbf. See Tr. 2251 (Ness) (using 0.5000); PX131. There exists no single, fixed conversion factor for converting log volumes from ccf to mbf. Tr. 1616 (Porter). Consequently, the Forest Service develops contract-specific conversion factors for each contract sold on a ccf basis. See PX4-5, 9-10, 13-14. This contract-specific conversion factor is provided to potential purchasers and used in contract administration. Id. Mr. Ness ignores this more accurate conversion factor. Tr. 2251 (Ness). As a result, he overstates raw timber volumes on seven Forest Service contracts by as much as 12 percent. See DPFOF ¶¶ 434-36, 438; DA1.

Second, Mr. Ness suppresses Precision Pine's stumpage costs by assuming aggressive harvesting during a depressed market during the period of the MSO suspensions. The stumpage price owed to the Forest Service on most of Precision Pine's contracts was variable. PX169-79 (AT5). As a result, the stumpage cost changed significantly over the course of the suspension

period. See DPFOF ¶¶ 538-47. For instance, the stumpage for the Brookbank contract ranged from a low of $17.15 to a high of $110.78. Tr. 4882; DX1010 at 3. By manipulating the harvest schedule (i.e., using a schedule that Precision Pine would not have followed), Mr. Ness is able to use artificially low stumpage prices, which reduces log costs and, in turn, inflates putative profits.

Third, Mr. Ness inflates lumber revenues by deferring the milling of logs from Precision Pine's Forest Service sales, which allows Mr. Ness to take advantage of higher lumber prices in late 1996 and early 1997. See PX131 (tab 21) (showing an increase of $1.3 million from changes to the milling schedule). Not only does this "harvest and hold" strategy result in a large, long-term log inventory that is contrary to Precision Pine's actual business practices, DX1013; Smith Dep. Tr. 24-29 (Ness), it presupposes a knowledge of future lumber markets that neither Precision Pine, nor any other lumber manufacturer, would have. Further, it would require a significant cash outlay as payments for stumpage, logging and hauling would be due long before revenues from lumber sales would be realized. Tr. 4150-51 (Harris); DX1012; see also Tr. 5666, 5669-84, 5687 (Ness); PX293. Precision Pine did not possess adequate cash reserves to implement this harvest and hold approach, see PX293; Tr. 5666 (Ness), and Mr. Ness's model fails to consider (and deduct) the additional financing costs that would be part and parcel of such an approach, see Tr. 5703 (Ness); PX131.

Fourth, Mr. Ness uses inflated sales prices for lumber products. Mr. Ness did not independently analyze company sales records or invoices to develop lumber sale prices.[20]

---

[20] Mr. Ness developed Ponderosa Pine prices for the post-suspension period. He did not use the same methodology that counsel used to generate prices during the suspensions. See

Tr. 1659 (Porter), 2641 (Ness). Rather, he adopted prices supplied by counsel. The derivation of Ponderosa Pine prices was performed principally by Precision Pine's attorney, Richard Goeken, who, by his own admission, lacked the necessary expertise to review and categorize Precision Pine's invoices. E.g., Goeken Decl. ¶¶ 5; Tr. 1659, 1661 (Porter) (admitting that he did not look at most invoices). Not surprising, the resulting lumber prices were seriously flawed. Indeed, Mr. Goeken failed to use Precision Pine's comprehensive record of lumber sales – the Winslow Sales Record – to derive Ponderosa Pine sale prices. Tr. 1658 (Porter). Instead, he came up with lumber prices by taking a straight average of selected sales invoices. Id. As a result of Mr. Goeken's deliberate omission of invoices that would lower sale prices, his failure to use a weighted average, and his arbitrary decision to use #4 common prices for inferior #5 common products, Precision Pine's lumber prices result in an overstatement of revenues from the sale of Ponderosa Pine products of more than $650,000.[21] Tr. 3316, 3367-79 (Neuberger); DX776; see also Tr. 1668, 1674, 1681-21, 1791, 1796 (Porter).

Fifth, Mr. Ness also uses an inflated "overrun factor" of 1.25 in his damages calculations.[22] See PX131 (App. A at 6). The effect is to increase the total volume of lumber

---

[20](...continued)
PX172.

[21] Precision Pine's prices for Engleman Spruce and Douglas Fir products is equally flawed. For Engleman Spruce, Mr. Porter took the market price from an industry publication (Random Lengths) and added $50. Tr. 1809, 1813-14 (Porter). For Douglas Fir, Mr. Porter took the Random Lengths price and added $60. Tr. 1805 (Porter). Neither logic, nor sales invoices, demonstrates that Precision Pine could sell its products at $50 to $60 above the market rate.

[22] For a variety of reasons, including the skill of the sawyer, the efficiency of sawmill equipment, the size and quality of logs being milled, and the types of lumber products being produced, the volume of lumber in mbf (known as "lumber tally") produced by a given sawmill
(continued...)

products that Precision Pine would supposedly have produced from Forest Service timber, which, in turn, increases putative gross profits. Mr. Ness reviewed no documents and performed no independent analysis to determine an appropriate overrun factor. Tr. 2697 (Ness). If he had, Mr. Ness would have learned that Precision Pine actually achieved a 1.08 overrun at its Winslow mill in 1995 and 1996.[23] DX547. Indeed, the overrun that Mr. Porter used in his July 1995 profit projections is very similar. See, e.g., DX521-27 (July 17, 1995) (using a 1.10 overrun factor). In an attempt to undercut its own contemporaneous records, Precision Pine retained an expert, Martin Devere, to attempt to justify a higher overrun. However, Mr. Devere reviewed no mill studies, interviewed no Precision Pine employees, and examined no contemporaneous records from Precision Pine's files. Tr. 1174, 1205-06 (Devere). He simply based his opinion upon a discussion he had with Mr. Porter about what Precision Pine's sawmills supposedly could accomplish. Tr. 1205-07 (Devere). As such, Mr. Devere's opinion is entitled to no weight.

Sixth, Mr. Ness adopts product mixes that he failed to independently verify and that are skewed toward high value products. See Tr. 2696-97 (Ness). Precision Pine did not track the timber from its respective timber sale contracts through the manufacturing process. Tr. 1323 (Porter), 4292-95 (Munn). As a result, Precision Pine has no reports or other contemporaneous documents showing what products were derived from any of the contracts at issue. Id. Lacking direct evidence, Mr. Porter came up with product mix estimates in the course of this litigation.

---

[22](...continued)
commonly exceeds the volume of logs in mbf (known as "log scale") used by the sawmill. The ratio of the volume of lumber (in mbf (l.t.)) to the volume of logs used to produce that lumber (in mbf (l.s.)) is commonly referred as the "overrun factor." Tr. 1210 (Devere).

[23] Mr. Devere testified that he was told by Mr. Porter that Precision Pine's studies of overrun were lost or destroyed. Tr. 1238 (Devere).

Precision Pine's product mix estimates were derived using an ill-conceived, misapplied methodology that Mr. Porter could not even fully describe.[24] See Tr. 4277 (Munn), 1342-46 (Porter) (testifying that he did not know, and that there was no way to ascertain, what "lag time" between the timber harvesting and lumber sale was used in estimating product mixes).

Mr. Porter used the Winslow Sales Record as the starting point for his estimates. Tr. 4279 (Munn). Using this sales data, Mr. Porter purports to determine a product mix for six timber sales contracts. See Tr. 4279 (Munn); DX775. He first selected a period of two consecutive months when the contract under consideration was (purportedly) the only contract being harvested. Tr. 1332, 1339 (Porter) (describing the step of isolating a single sale as "critical"), 4279 (Munn). Applying some unspecified lag time, Mr. Porter then assumed that the mix of lumber products sold by Precision Pine in a subsequent month was identical to the mix of lumber products derived from the timber sale under consideration. See Tr. 1338 (Porter).

As Dr. Munn explained, Mr. Porter's methodology cannot reasonably be expected to accurately predict the actual product mix that would be generated if each contract were completely harvested. Mr. Porter's methodology would provide an accurate product mix only if (1) timber harvesting was occurring on a single timber sale, (2) the appropriate lag time from timber harvest to lumber sale was used, (3) Precision Pine accounted for any inventory of lumber products, and (4) the mix of lumber products sold to Precision Pine's customers was identical to

---

[24] Mr. Porter consulted no textbooks, treatises or studies in developing a methodology to derive product mix estimates. Mr. Porter's methodology is untested, has not been subjected to peer review, and has never been published. And Mr. Porter could not say whether his technique enjoys a general acceptance because he does not know what is recognized by the industry. Tr. 1306-08 (Porter).

the mix of products that manufactured from the contract under consideration. Tr. 4287-88 (Munn); DX775.

Mr. Porter established none of these prerequisites. Mr. Porter does not know (and cannot determine) what lag time he used to prepare his estimates. Tr. 1342-47 (Porter). Precision Pine carried varying lumber inventories from month to month – inventories that Mr. Porter did not consider in coming to his estimates. See Tr. 1304 (Porter), 4288-89 (Munn); DX478-500. Mr. Porter was unable to isolate particular timber sale contracts. See Tr. 4297-98 (Munn); DX1009. For instance, timber from the Brookbank contract – a contract Mr. Porter used to develop the product mix for four other contracts – produced no more than 21 percent of the lumber sold in the months Mr. Porter reviewed. Eighty percent of the lumber was produced from several far superior timber sales that Precision Pine was harvesting at the same time. Tr. 4297-302 (Munn); DX1008 at 7; see also Tr. 5574-75, 5581-83 (Porter); DX1011. And finally, the products sold during any given month are a function of the needs of Precision Pine's customers. Only by sheer coincidence would customer needs precisely match lumber products derived from a specific timber sale in terms of both quantity and product mix. Simply put, the methodology used by Mr. Porter is deficient in both its concept and application.

The flaws in Mr. Porter's analysis are magnified with respect to eight contracts where insufficient sales data is available to use the Winslow Sales Record. Mr. Porter purportedly used Forest Service pre-sale cruise data to assess which sales were comparable. See Tr. 1349-50 (Porter). However, as Dr. Munn explained at trial, Mr. Porter did not correctly use this data to identify comparable sales. See Tr. 4305-08 (Munn); DX1008 at 4-5; see also DX775 at10. Instead, Mr. Porter used this step to, once again, increase the proportion of high value products

in the respective Ponderosa Pine product mixes.[25] Tr. 4307-10. In sum, Precision Pine's product mix estimates are based upon an invalid methodology that overstates the volume of high value products and, consequently, inflates Precision Pine's claimed gross profits.

Seventh, Mr. Ness understates logging and hauling costs. Mr. Ness did not independently derive these costs. Tr. 2493-94, 2697 (Ness). Rather, Mr. Ness applied figures supplied by counsel for Precision Pine. Id. Mr. Ness disregarded Precision Pine's annual financial statements, which contain a separate line item for logging and hauling costs for each contract and, thus, provide a comprehensive picture of costs actually incurred. PX248. Had Mr. Ness used comprehensive financial data, Precision Pine's logging and hauling costs would have been substantially higher and gross profits correspondingly lower. See DPFOF ¶¶ 548- 55.

Eighth, Mr. Ness underestimates Precision Pine's lumber manufacturing costs across the board. Mr. Ness ignores various categories in Precision Pine's contemporaneous "cost comparison reports." See, e.g., DX802. These reports show that the company's actual sawmill and planer costs were much (over 50 percent) higher than the cost Mr. Ness used to calculate damages.[26] Compare DX814 (showing actual costs between $74.71 and $79.86 for the Heber sawmill, between $80.00 and $95.36 for the Eagar sawmill, between $91.42 and $121.66 for the Winslow sawmill, and between $58.14 and $69.14 for the Winslow planer) with PX131 (using a manufacturing cost of $48.40 for the Heber sawmill, $48.91 for the Eagar sawmill, $63.98 for

---

[25] The product mixes Mr. Porter provides for Douglas Fir and Engleman Spruces are completely unmoored. They are not based upon (or supported by) an analysis of the Winslow Sales Record, upon sales invoices or upon any other written record or document. Tr. 1805, 1809, 1813-14 (Porter).

[26] The manufacturing costs used by Mr. Porter in his July 1995 profit projections also were significantly higher than Mr. Ness's cost figures. DX814; see also DX521-527; DX530-539.

the Winslow sawmill, and $42.63 for the Winslow planer); see also DX802 (September 1995 report). By low balling lumber manufacturing costs, Mr. Ness again inflates claimed lumber profits.

**(ii) Roundwood**

Precision Pine had no use for the roundwood component of its multi-product sale contracts. Tr. 681 (Porter). Moreover, Precision Pine had no outlet for roundwood during the period of the MSO suspensions.[27] DPFOF ¶¶ 65-66. Because Precision Pine's contracts required it to cut and remove all "included timber" (i.e., all sawtimber and roundwood), the roundwood on Precision Pine's multi-product sales would have been a dead loss. See, e.g., Tr. 1827, 2025 (Porter); PX169-79 (AT2, BT2.1 & 2.2). Thus, Precision Pine would have incurred the cost of cutting and removing roundwood, but would have earned no revenues from roundwood sales.

The amount that Precision Pine owed to the Forest Service for roundwood was $10.25 per ccf. PX131 (exhibit 4 at 27). In addition, Precision Pine would have incurred logging and hauling costs. The actual cost to Precision Pine's logger – Tri-Star Logging – to cut and remove roundwood was $62.45 per ccf. See Tr. 2597-99, 2754, 2846 (Ness); PX131 (App A at 10). Because Tri-Star would have charged more than its actual cost (in order to obtain some profit), the cost to Precision Pine to cut and remove roundwood would not have been less than $75.00 per ccf. See Tr. 2843 (Ness). Mr. Ness ignores this substantial loss in his gross profit calculations.

---

[27] Precision Pine also had difficulty disposing of roundwood in the post-suspension period. See DPFOF ¶ 65. In fact, Precision Pine entered into only one contract with Stone for the sale of roundwood after August 25, 1995. See PX223 (selling roundwood from Mud in late 1997).

**(iii) Lumber By-Products**

As a result of the manufacturing of logs into lumber, Precision Pine produced bark, chips, shavings, and grindings (i.e., sawdust) as by-products. First Joint Stip. ¶ 33. Mr. Ness overstates the revenues that Precision Pine would have obtained from these by-products.

Precision Pine sold its output of chips to Stone pursuant to a contract between the two companies. See PX311; PX313. However, Precision Pine's contract for the sale of chips to Stone expired on September 30, 1995, and Stone stopped taking chips from January 15 to April 15, 1996. PX311; DX476; Tr. 597-98, 1923-24 (Porter). Precision Pine did not enter into a new contract with Stone until April 22, 1996. PX313. Precision Pine fails to make any deduction for the three-month suspension of chips sales to Stone.

Mr. Ness credits Precision Pine with revenues from bark sales. PX131 (exhibit 4). However, Precision Pine had no contract to sell the output of bark produced by its sawmills and proffers no invoices verifying any bark sales. Tr. 1924-25, 1934 (Porter). Precision Pine did introduce a "bark journal" that identifies Transporting Renewable Resources, Inc. ("TRRI") as a "carrier" of bark for Precision Pine. PX316. TRRI is a trucking company that was a wholly-owned subsidiary of Precision Pine. Tr. 1930, 2042 (Porter). Thus, Precision Pine's "bark journal" indicates nothing more than that a subsidiary was providing Precision Pine hauling services; it does not evidence bark sales to TRRI or to any third party. See PX316; Tr. 1930, 2042 (Porter); see also DX548; DX560-61. Precision Pine's financial statements show that the company earned only $5.87 per mbf (l.t.) from bark between April 1, 1994 and March 31, 1996. DX831. This is 30 percent less than the $8.23 per mbf (l.t.) rate used by Mr. Ness. See PX131 (tab 4 at 27).

Precision Pine also had no contract to sell the output of grindings (i.e., sawdust) produced by its sawmills, has proffered no invoices showing grindings sales, and Precision Pine maintained no "grindings journal" showing the volume of grindings produced. Tr. 1924-25, 1934, 1937-38, 2042 (Porter). Mr. Porter projected no revenue from grindings in his profit projections, PX77, PX78; PX83; PX85; DX519; DX521-45, and Precision Pine in fact earned no revenue from the grindings sales during FYE 1995 or FYE 1996 (i.e., from Apr. 1, 1994 to Mar 31, 1996), DX831. This is almost certainly because Precision Pine burned grindings in wood waste fired boilers at the company's sawmills. Tr. 1932 (Porter); DX548; DX560; DX561. In any event, Precision Pine has established no basis for awarding any damages for lost grinding sales.

Similarly, Precision Pine had no contract to sell the output of shavings from its planers and has proffered no invoices showing sales of shavings to customers.[28] See Tr. 1924-25, 1934 (Porter). Mr. Porter included no revenue from shavings sales in his profit projections, PX77, PX78; PX83; PX85; DX519, DX521-45, and Precision Pine earned no revenue from the sale of shavings during FYE 1995 or FYE 1996 (i.e., from Apr. 1, 1994 to Mar 31, 1996). DX831. This is because Precision Pine used shavings itself. Precision Pine owned and operated a "pellet plant" that made compressed wood pellets, which were then sold to use for heating homes. Tr. 1935 (Porter). Additionally, Precision Pine would use shavings in its wood waste fired

---

[28] Precision Pine maintained a "shavings journal" that identifies TRRI as a "carrier" of shavings. PX316. As with the case of bark, Precision Pine's "shavings journal" simply indicates that TRRI provided hauling services; it does not show shavings sales to TRRI or any third parties. See PX316; Tr. 1930, 2042 (Porter); see also DX548; DX560-61.

boilers. Tr. 1941 (Porter); DX548; DX560-61. Accordingly, Precision Pine should not be awarded damages for lost shavings sales.

Precision Pine's claims for by-product revenue suffer from an additional shortcoming: any lost revenue was due solely to Precision Pine's decision not to harvest once the MSO suspensions were lifted. According to Precision Pine, by-product prices did not change during or after the period of the MSO suspensions. See PX131; PX182. Therefore, had Precision Pine finished harvesting its contracts, it would have earned the same revenue that was available during the suspension period. Precision Pine's failure to complete harvesting was due to its business decisions and its own post-suspension breaches. By-product revenues are, therefore, not recoverable. E.g., Hughes Communications, 271 F.3d at 1071.

**(3) Mr. Ness's Offset Calculations Understate Profits**

Deficiencies with Mr. Ness's calculation of an offset for post-suspension profits are similarly pervasive. See DX795. While Mr. Ness did develop his own lumber price estimates for the post-suspension period, he accepted without analysis alleged increases in logging and hauling costs, an alleged overrun factor, and the alleged product mixes. Further, Mr. Ness attempts to increase Precision Pine's damages by reducing post-suspension profits in several illegitimate ways.

First, and perhaps most egregiously, Mr. Ness deducts default damages that he expects to be assessed by this Court in Precision Pine & Timber, Inc. v. United States, No. 02-131 (Fed. Cl.). PX182. Mr. Ness provided no explanation for this deduction of nearly $1 million from Precision Pine's total post-suspension profits, Tr. 2402 (Ness), and there exists no basis to recoup

in this action default damages that are owed to the Forest Service pursuant to the Court's decision in Case No. 02-131. See Precision Pine, 62 Fed. Cl at 656.

Second, Mr. Ness increases logging and hauling costs in the post-suspension period in order to reduce post-suspension profits. PX182. The Court granted summary judgment in favor of the United States upon Precision Pine's claims for increased logging costs upon the O.D. Ridge and Hay sales. Precision Pine, 63 Fed. Cl. at 135-36 (rejecting Precision Pine's claims for increased logging costs). And with the exception of the pending claim for hauling costs upon the Hay contract, see section IV.C., infra, Precision Pine has asserted no claims for increased logging or hauling cost in this action. See Pl.'s Pretrial Br. at 47-52; PX131. Mr. Ness's attempt to resurrect (or assert for the first time) claims for increased logging and hauling costs is improper.[29]

Third, Mr. Ness reduces post suspension profits by “increased overhead.” Mr. Ness’s deduction suffers from a number of problems. As an initial matter, Mr. Ness artificially lowers the “baseline” for his overhead calculation using phantom volumes. Tr. 3398-407 (Neuberger) (explaining that Mr. Ness reduces the sawmill and general overhead baselines by overstating actual production volumes for FYE 1996); see also PX182 (tab 9 and 12) (referring to “anticipated production” and “anticipated sales”). More broadly, Mr. Ness erroneously bases his alleged sawmill overhead and general overhead on per unit changes. These per unit increases in Mr. Ness’s calculations are not a function of increases in overhead costs caused by the MSO

---

[29] Claims for increased logging and hauling costs were not included in Precision Pine's claim letters. See PX194; PX196; PX198; PX200; PX202; PX206; PX208; PX;210; PX212; PX214; PX216; PX218; PX220. As a result, the Court lacks jurisdiction to entertain such claims. E.g., Croman Corp. v. United States, 44 Fed. Cl. 796, 800 (1999).

suspensions, but rather, are a function of costs being spread over diminished lumber production (and lower total sales) in the post-suspension period. See PX182. Mr. Ness is simply taking advantage of the effect of Precision Pine's inevitable decision to scale back its business as a result of the continuing contraction of timber and lumber markets in Arizona. Precision Pine is not entitled to a reduction of post-suspension profits (and an increase in damages) due to broad market forces – forces that did not result from the MSO suspensions and that were affecting Precision Pine long before and long after the suspension period.

Finally, based upon Mr. Ness's calculations, it is apparent that the MSO suspensions worked largely to Precision Pine's benefit as Precision Pine was better off harvesting after the suspensions were lifted than during the suspension period. For instance, according to Mr. Ness's own calculations, overall revenues available to Precision Pine were higher in the post-suspension period. DX834. The Hay contract – one of the few contracts that Precision Pine fully harvested – provides a good example. Precision Pine claims it would have earned $2.6 million during the MSO suspensions. PX131 (tab 4 at 21). It actually earned more ($3.1 million) from post-suspension harvesting. PX182 (tab 2 at 15).

### B. Precision Pine Is Not Entitled To Recover Alleged Sawmill Inefficiency Costs

Precision Pine asserts a common law claim for sawmill inefficiency costs.[30] Pl.'s Pretrial Br. at 26-30, 52-53. According to Precision Pine, it incurred such costs because its mills were

[30] As explained above, Mr. Ness incorporates increased sawmill costs into his calculation of post-suspension profits. See section II, supra. As a result, Precision Pine is seeking a double recovery of alleged sawmill costs – once as a part of plaintiff's lost profits claims, and a second time in plaintiff's stand-alone sawmill inefficiency claim. This is inappropriate.

less efficient during the period of the MSO suspensions due to the unavailability of a steady supply of logs. Tr. 2378, 2677 (Ness); PX131 at 12.

Precision Pine's sawmill inefficiency costs were calculated by Mr. Ness. See PX131. In calculating these costs, Mr. Ness first purports to calculate baseline sawmill costs on a per mbf basis during a 17-month period prior to the MSO suspensions. Id. (tab 10). Mr. Ness then purports to calculate actual per mbf sawmill costs during the period of the suspensions. Id. (tab 15). Mr. Ness makes no attempt to attribute changes in sawmill efficiency to individual contracts or to that part of the MSO suspensions that the Court found to constitute a breach (i.e., the part exceeding 135 days). Nor does Mr. Ness take into account log inventories that provided Precision Pine a "steady supply" of logs during much of the period of the suspensions, the Court's determination that some of the suspended contracts were not breached, or Precision Pine's own actions that reduced (by many millions of board feet) the supply of logs available to its sawmills during the period of the MSO suspensions. Instead, Mr. Ness would have the Court assume the entire difference in costs is properly attributable to the suspensions. In this way, Mr. Ness's calculations resemble the disfavored "total cost" approach in the construction context. See, e.g., Cavalier Clothes, Inc. v. United States, 51 Fed. Cl. 399, 417 (2001) (the total cost method is "highly disfavored").

**1. Precision Pine Has Not Established What Increased Sawmill Costs Were Directly and Primarily Caused By A Breach Of Contract**

In an action for breach of contract, the plaintiff must establish that damages resulted from the contract's breach "'directly and primarily,' and 'inevitably and naturally, not possibly or probably.'" Precision Pine, 64 Fed. Cl. at 166 (citing California Federal, 395 F.3d 1263); see

also Hughes Communications, 271 F.3d at 1071; Myerle, 33 Ct. Cl. at 27. In Precision Pine's "increased manufacturing costs" claim, Mr. Ness allocates alleged inefficiency costs to Precision Pine's milling and planing facilities as follows: (1) Eagar sawmill: $107,047.47; (2) Heber sawmill: $17,931.93; (3) Winslow sawmill: $56,131.40; and (4) Winslow planer: $199,600.31. PX131 (tab 1). However, Mr. Ness does not and cannot attribute sawmill inefficiency costs to the unavailability of logs from specific contracts – much less specific breached contracts. Tr. 2382, 2808-09 (Ness); PX131; see also Tr 2864-66 (Ness) (suggesting paradoxically that additional logs from contracts with small diameter trees might actually worsen – not improve – sawmill efficiency).

Mr. Ness makes no attempt to allocate sawmill inefficiency costs between breached contracts and contracts that, though unavailable, were not breached. Tr. 2382 (Ness); see also Tr. 2678-79 (Ness) (conceding that inefficiencies due to the unavailability of St. Joe (3,471 mbf) and Hutch-Boondock (2,196 mbf) should not be recoverable). Similarly, Mr. Ness fails to allocate inefficiency costs between the first 135 days of the MSO suspensions, which were not a breach, and the remainder of the suspensions, which the Court concluded were a breach. See Tr. 2382 (Ness). And Mr. Ness simply ignores inefficiencies caused by Precision Pine's own actions, namely, Precision Pine's decisions to cancel, voluntarily default, and defer harvesting on contracts containing over 7 million board feet of timber in the midst of the MSO suspensions. See Tr. 2677, 2679-81 (Ness) (admitting Precision Pine's default on the Park sale, cancellation of the Barber and Campbell sales, and failure to harvest available sawtimber would affect sawmill efficiency). As a result, Precision Pine has failed to demonstrate that any increase in sawmill costs was caused by the breach of a particular timber or multi-product sale contract.

Moreover, even if an increase in sawmill costs could be traced indirectly to the suspension of one of Precision Pine's timber cutting contracts, damages would not be recoverable under the common law. In Scott Timber, the Federal Circuit explained that increases in sawmill costs are not the direct result of the suspension of a timber cutting contract. 333 F.3d at 1372. The Federal Circuit's conclusion is equally applicable here, as Precision Pine's claim is indistinguishable from the failed claim asserted by Scott Timber. See id.

Precision Pine's claim should be rejected for the additional reason that Precision Pine lacked a long-term plan for operating its sawmills. Tr. 1480, 1482-83 (Porter). Precision Pine determined the level at which its sawmills would be operated 30 days in advance. See, e.g., DX505 (providing the company's "goal" for production in the upcoming month); Tr 1433, 1483, 2101-02 (Porter); DX784. Consequently, even if sawmill costs could potentially be recovered, Precision Pine lacks a valid baseline against which to measure alleged "lost efficiency." Put differently, having no specific planned volume of production at its sawmills, Precision Pine cannot show that operations were affected by any changes in the supply of logs that resulted directly from the MSO suspensions.

**2. Sawmill Inefficiency Costs Were Not Legally Foreseeable**

In common law breach of contract actions, absent knowledge of "special circumstances" communicated at the time of contracting, only losses that result from the breach in the ordinary course of events are recoverable. E.g., Landmark, 256 F.3d at 1378. In other words, "remote and consequential damages are not recoverable in a common law suit for breach of contract." Wells Fargo, 88 F.3d at 1021 (quoting Northern Helex Co. v. United States, 207 Ct. Cl. 862, 524

F.2d 707, 713, 720 (1975), cert. denied, 429 U.S. 866 (1976)); accord Scott Timber, 333 F.3d at 1372.

Sawmill inefficiency costs do not result "in the ordinary course" from a suspension (even a lengthy suspension) of a timber sale contract. See Tr. 4133-34 (Harris), 4559 (Lee), 4637-38 (Dils). This is because timber is a largely fungible commodity and mill operators such as Precision Pine ordinarily obtain timber from many different sources through many different contracts. See Tr. 1653, 2037 (Porter); see also Tr. 1656-57 (Precision Pine did not report to the Forest Service about its non-Forest Service contracts). Only in "special circumstances" where it is known at the time of contracting that a particular contract will be essential to the operation of a particular mill at a particular time would mill inefficiency costs be potentially foreseeable as the result of a suspension. And even in such an unusual situation, no effect upon mill operations would be foreseeable unless there was no other timber available as a substitute, i.e., it was not possible to "cover." See Restatement § 351 cmt. d (explaining that the inability to obtain cover must itself be foreseeable at the time of contracting). Here, at the various times of contracting, Precision Pine informed the Forest Service of no such special circumstances concerning the contracts at issue. Tr. 1855-57 (Porter). As a result, the claimed sawmill inefficiency costs are not legally foreseeable.

This conclusion is confirmed by Scott Timber. In Scott Timber, the Federal Circuit found that a claimed increase in sawmill costs due to the inability to perform a timber cutting contract is consequential and remote. 333 F.3d at 1372 (holding, in addressing a claim for reimbursement under CT 6.01, that increased sawmill costs allegedly due to the suspension of

timber sale contracts are "remote and speculative . . . and therefore not recoverable").[31] Precision Pine's claim that its sawmill and planing operations were less efficient because its mills were deprived of "a steady supply of logs" by the MSO suspensions falls squarely into this category. Indeed, Precision Pine's claim for increased mill costs depends upon myriad factors, none of which were communicated to the Forest Service at the time of contracting. Tr. 1855-57 (Porter). Such factors include: the availability of timber from other timber contracts to be processed at the sawmill; the rate at which logs are to be used at the sawmill; the log inventory to be maintained at the sawmill; and the availability of replacement timber from state lands, Indian lands and private lands. Accordingly, Precision Pine's mill cost claims are legally remote and unrecoverable under the common law.

### 3. Precision Pine's Calculation Of Damages Is Flawed And Uncertain

Timber and sawmill operations in the southwestern United States are cyclical. Sawmill operations are typically slower during the winter and early spring. Indeed, Precision Pine's sawmills frequently closed or ran at lower levels during this period due to a lack of logs and scheduled mill maintenance. See DX798; Tr. 2102-03 (Porter). Operations then generally pick up during the summer and into the fall. Mr. Ness used a 17-month baseline (April 1994 – August 1995) that covered much of two operating seasons. He compared that baseline to a 19-month period (September 1995 – March 1997) that included two winters. DX131 (exhibits 15 & 16). Thus, it is hardly surprising that this skewed analysis showed some increase in costs.

---

[31] Damages that are "remote" for purposes of CT 6.01 are likewise "remote" under the common law. See Scott Timber, 333 F.3d at 1372 (citing common law damages cases as support for its conclusion).

Furthermore, as explained above, Mr. Ness's projections of harvesting in the "but for" world are in error. The Mud contract would not have been available to log even if the MSO suspensions had not occurred. See PX106 ¶ 5 (settling the Southwest Center litigation). Similarly, logging on the Manaco contract could not have taken place due to contractual restrictions and the presence of a Mexican Spotted Owl. See Tr. 4625-26 (Dils); PX178 (clause CT 6.25). And many other contracts were unavailable during the months in which Mr. Ness assumed that timber harvesting would occur. See DPFOF ¶¶ 78-79, 145, 161-62, 212-13, 230, 249-50, 255-56, 269, 285, 311, 329-30, 345, 374-75 (identifying timing of harvest restrictions, fire closures, and operating season limitations ignored by Mr. Ness's model). Precision Pine would not, therefore, have had logs to process on the schedule projected in Mr. Ness's model.

In addition, Mr. Ness assumes that Precision Pine would have continued operating its mills at pre-suspension levels had the MSO suspensions not occurred. This assumption is unrealistic. For most of the period of the MSO suspensions the lumber market was depressed. DPFOF ¶¶ 72-74; PX305. In addition, Stone was refusing to accept roundwood from Precision Pine's multi-product sales. DPFOF ¶ 65. Consequently, during the period of the MSO suspensions, most of the effected contracts were unprofitable. DPFOF ¶¶583-91. In light of this business reality, Precision Pine would have deferred harvesting and reduced the pace of sawmill operations. Tr. 1084 (Porter) (explaining that contract profitability was a factor in determining when to harvest); see also DX463 (showing that by early 1995 Precision Pine's logging subcontractor anticipated that Precision Pine would be closing one of its sawmills).

In any event, Precision Pine's efficiency during the MSO suspension was affected by its decision to cancel the Barber and Campbell contracts, its decision to default upon the Park

timber sale, its decision not to complete harvesting of the Brann and Mud contracts, and the unavailability of the St. Joe and Hutch-Boondock contracts. See PX108 ¶ 4; DX699; Tr. 2678-81 (Ness). As of August 25, 1995, these sales contained a total of nearly 15 million board feet of timber. See DPFOF ¶¶ 39, 196, 366. However, due to the total cost methodology used by Mr. Ness to calculate sawmill inefficiency damages, it is impossible to distinguish among inefficiencies due to (i) the unavailability of this large volume of timber, (ii) the unavailability of other timber sale contracts due to factors unrelated to the MSO suspensions, and (iii) the unavailability of contracts resulting from the MSO suspensions. Precision Pine's calculation of sawmill inefficiency costs simply fails to provide a reasonably certain estimate of inefficiency costs caused by Forest Service breaches.

Finally, Precision Pine fails to offset any inefficiency costs with efficiency benefits that Precision Pine obtained as a result of the suspensions. Precision Pine did not forego opportunities to obtain timber for its sawmills as a result of the MSO suspensions. Tr. 671-76, 1089 (Porter). Consequently, the MSO suspensions did not effect the sum total of timber that Precision Pine had available for its sawmills. Precision Pine argues that its mills were less efficient because they processed a smaller volume of timber during the MSO suspension. However, the converse should be equally true. Because Precision Pine processed less timber during the MSO suspension, it had more timber available in the post-suspension period and its sawmills should have experienced efficiency gains from the "steady supply" of timber available during this period. Mr. Ness's total cost claim fails to quantify or credit any post-suspension gains in sawmill efficiency.

In sum, Precision Pine has failed to provide a fair or reasonable estimate of sawmill inefficiency damages. Precision Pine's claim for such damages should, therefore, be denied.

### C. Precision Pine's Claim For Increased Log Hauling Costs Should Be Denied

Precision Pine seeks increased log hauling costs in connection with the Hay contract under the common law. According to Precision Pine, when logs from the Hay contract were harvested in the post-suspension period, the Eagar sawmill was closed and Precision Pine incurred a cost to haul the logs to other sawmills. Pl.'s Pretrial Br. at 47-52.

Precision Pine’s hauling costs claim seeks a double recovery. Moreover, Precision Pine’s log hauling costs were not directly and primarily caused by the suspension of the Hay contract, and were not legally foreseeable at the time of contracting. Accordingly, the Court should enter judgment for the United States upon Precision Pine’s increased hauling costs claim.

#### 1. Any Increase In Hauling Costs Was The Direct Result Of Precision Pine’s Business Decisions And The *Forest Guardians* Suspensions

In December 1996, soon after the MSO suspensions were lifted, Precision Pine sought and received Forest Service permission to operate the Hay sale outside of the normal operating season. PX257; DX54. At about the same time, Precision Pine began preparations to reopen its Eagar sawmill. See Tr. 1869-73; DX265; DX798.

In late December 1996, Precision Pine resumed logging on the Hay sale. DX68. Precision Pine could have hauled logs from the Hay sale to the Eagar sawmill, decked them, and used them several weeks later once the mill reopened. DPFOF ¶ 175; Tr. 1874 (Porter). Instead, during December 1996 and January 1997, Precision Pine chose to haul logs from the Hay sale to the company’s sawmill in Winslow. DPFOF ¶ 176; Tr. 1875 (Porter).

In February 1997, the Eagar sawmill was reopened and began processing logs.[32] DX798. Precision Pine continued to operate the Eagar sawmill until July 30, 1997, when the mill was forced to close due to a log shortage. See Tr. 1255, 1258 (Porter); DX798. This log shortage was, in turn, caused by the Forest Guardians litigation, which had resulted in a suspension of the Hay and O.D. Ridge contracts, and by Precision Pine's decision to transfer the Kettle multi-product sale to Stone Container Corporation.[33] Tr. 893 (Porter); PX117; PX119. Precision Pine chose not to reopen the Eagar sawmill after the Forest Guardians suspensions were lifted in December 1997. First Joint Stip. ¶ 7; Tr. 1255.

Under the common law, damages are recoverable only if they result from the breach "'directly and primarily,' and 'inevitably and naturally, not possibly or probably.'" Precision Pine, 64 Fed. Cl. at 166 (citing California Federal, 395 F.3d 1263); see also Hughes Communications, 271 F.3d at 1071; Myerle, 33 Ct. Cl. at 27. Here, after the MSO suspensions were lifted, Precision Pine chose to haul logs from the Hay sale to Winslow, rather than Eagar. Tr. 1874 (Porter). At that time, Precision Pine was in the process of reopening its Eagar sawmill. Precision Pine was, of course, free to haul logs to Winslow, rather than deck them for use at the Eagar sawmill. On the other hand, Precision Pine is not entitled to breach damages for a business expense that it freely chose to incur.[34]

---

[32] Precision Pine elected to haul some logs from the Hay sale to Winslow even after the Eagar mill reopened in February 1997. See DX96.

[33] Hay, O.D. Ridge and Kettle are the only timber and multi-product sales that were to be processed at the Eagar mill. See PX131 (tab 4).

[34] If Precision Pine wanted logs for its Winslow mill, it had numerous closer contracts that it could have harvested – two of which had a normal operating season that ran to December 31.

(continued...)

Precision Pine's hauling costs in late 1998 are even further removed from the MSO suspensions. Indeed, Precision Pine reopened the Eagar sawmill in 1997 and operated the mill for nearly six months. E.g., DX798. The mill's unavailability in 1998 resulted not from the MSO suspension of the Hay contract, but from (1) Precision Pine's decision to close the Eagar mill in July 1997, and (2) its subsequent decision not to reopen the mill after the Forest Guardians suspensions were over in December 1997. See Tr. 1255, 1258 (Porter); First Joint Stip. ¶ 7.

The Federal Circuit's decision in Hughes Communications is instructive. In that action, Hughes sought compensation for "increased launch insurance costs." 271 F.3d at 1071. This Court denied Hughes' claim on the ground that "Hughes made an independent business decision to obtain launch insurance." Id. The Federal Circuit agreed explaining that:

> Hughes made the independent business decision to obtain launch insurance. This intervening cause precludes the award of increased insurance costs as direct damages. See Myerle v. United States, 33 Ct. Cl. 1, 27 (1897) ("For a damage to be direct there must appear no intervening incident (not caused by the defaulting party) to complicate or confuse the certainty of the result between the cause and the damage. There must not be two steps between cause and damage.").

Id.

The very same rationale applies to Precision Pine's claim for increased log hauling costs. As in Hughes Communications, the cost of hauling logs from the Hay sale to Winslow, and later

---

[34](...continued)
PX131 (tab 4) (identifying Hutch-Boondock, Mud, Saginaw-Kennedy, Brann, U-Bar and Monument as contracts that Precision Pine intended to process at its Winslow sawmill); PX179; DX342. However, if Precision Pine simply did not want to hold logs from the Hay contract a few weeks until the Eagar sawmill was up and running, Precision Pine's impatience is not somehow chargeable to the Forest Service.

to Heber, was the direct result of Precision Pine's business decisions – not the MSO suspensions. See Hughes Communications, 271 F.3d at 1071; Myerle, 33 Ct. Cl. at 27. Accordingly, the claimed log hauling costs are not recoverable as direct damages under the common law.

**2. Increased Log Hauling Costs Were Not Legally Foreseeable**

Consequential damages are recoverable only if they were legally foreseeable at the time of contracting.[35] Bighorn Lumber Co. v. United States, 49 Fed. Cl. 768, 773 (2001) (citing Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145 (1854)). Damages are legally foreseeable only if they "follow from breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." E.g., Landmark, 256 F.3d at 1378.

An increase in log hauling costs does not follow from the suspension of a timber contract in the ordinary course of events. Tr. 4133 (Harris), 4558-59 (Lee), 4637 (Dils). Not only does Precision Pine’s claim no increase in hauling costs with respect to 13 of the 14 contracts at issue,[36] see PX131 (tab 3), increased log hauling costs did not result from previous suspensions of the Hay contract, see Tr. 1815-16 (Porter). Thus, Precision Pine's log hauling costs claim is

---

[35] In ruling on the United States motion for partial summary judgment, the Court suggested that "[t]here may be . . . valid reason to assess foreseeability at the time of the breach rather than at the time of the agreement." Precision Pine, 63 Fed. Cl. at 130 (citing Gardner Displays Co. v. United States, 171 Ct. Cl. 497, 505, 346 F.2d 585, 589 (1965)). The law in this circuit is both settled and clear: the foreseeability of alleged consequential damages is assessed "at the time of contracting." Bohac, 239 F.3d at 1340 ("The concept of 'consequential damages' in contract law relates to the concept of foreseeability at the time the contract is executed, not, as the petitioner would have it, foreseeability at the time of the breach"); see also California Federal, 395 F.3d at 1267; Hughes Communications, 271 F.3d at 1066; Chain Belt, 127 Ct. Cl. at 59, 115 F. Supp. at 714.

[36] While Precision Pine also asserted a claim for increased hauling costs in connection with the O.D. Ridge sale, that claim was withdrawn in November 2003. See PX131 (tab 3).

legally remote unless, at the time of contracting, the Forest Service was aware of "special circumstances." Landmark, 256 F.3d at 1378.

Precision Pine's increased log hauling cost claim is premised upon the fact that timber from the Hay sale was to be hauled to Precision Pine's sawmill in Eagar, Arizona. However, Precision Pine did not apprise the Forest Service of this fact or any other "special circumstances" at the time of contracting. Tr. 1855 (Porter). This is hardly surprising. The Hay sale was awarded in January 1990 to Reidhead Lumber Company – not Precision Pine.[37] First Joint Stip. ¶ 24. This was years before Precision Pine opened a sawmill in Eagar. See First Joint Stip. ¶ 6. Indeed, it was not until November 1994, over four years after the contract award (and over three years after the contract was transferred to Precision Pine), that Precision Pine first informed the Forest Service that it intended to haul timber from the Hay sale to Eagar. See Tr. 720-22, 1867-68 (Porter); PX260. Put simply, at the time of contracting, Precision Pine did not anticipate hauling timber from the Hay sale to its Eagar mill because (i) it was not awarded the contract and (ii) the Eagar mill did not exist. Thus, Precision Pine's increased hauling costs, which allegedly resulted from the closure of Precision Pine's Eagar mill, were not foreseeable at the time of contracting.

**3. Precision Pine Overstates The Change In Log Hauling Costs**

Precision Pine calculates increased log hauling costs using a per mile rate that it claims its logging subcontractor, Tri-Star Logging, would have charged. Tr. 756 (Porter); PX318; see also PX1006-07. However, given that cost figures taken directly from Precision Pine’s financial

[37] On June 24, 1991, the Hay sale was transferred to Precision Pine. Joint Stip. ¶ 25.

statements show a smaller change in costs, Precision Pine's calculation of a hypothetical cost increase overstates the change in logging costs that actually occurred.

According to Precision Pine's financial statements, the logging and hauling costs incurred upon the Hay contract were $93.70 per mbf (l.s.) prior to the suspension, see PX248 (FYE1996); DX68, were $154.64 per mbf (l.s.) in late 1996 and early 1997, see PX248 (FYE1997); DX68, and were $137.47 mbf (l.s.) during 1998, see PX248 (FYE1999); DX68. Thus, the actual increase in logging and hauling costs was $60.94 per mbf (l.s.) in late 1996 and early 1997, and $43.77 per mbf (l.s.) in 1998 – substantially less than claimed by Precision Pine, see PX318.

Additionally, Precision Pine adds a surcharge for overhead (7.6%) and profit (10.0%) to the cost that it calculates. See PX318. This surcharge does not represent a cost incurred by Precision Pine upon the Hay contract; it is simply a bold and baseless attempt to inflate claimed damages.

Correcting the errors in Precision Pine's calculations, and assuming for the sake of argument that the costs claimed were compensable under the common law, Precision Pine's increased log hauling costs would be $31,768.30 for 1996 and 1997, and $58,203.24 for 1998. See DA3.

## V. Precision Pine's Claims For Compensation Pursuant To CT 6.01

In addition to its common law damages claims, Precision Pine seeks recovery pursuant to contract clause CT 6.01. See Pl.'s Pretrial Br. at 54 & 56 n.25. As explained above, clause CT 6.01 is an alternative avenue of recovery. Consequently, with respect to each contract, Precision Pine must elect to recover either pursuant to the contract or for breach of the contract.

It cannot do both. E.g., Admiral, 378 F.3d at 1344; Petrofky v. United States, 203 Ct. Cl. 347, 488 F.2d 1394, 1404 (1973) ("restitution and a suit for damages are alternative remedies"); Alaska Pulp Corp., 59 Fed. Cl. at 402 (the "theories of expectancy, . . . reliance, and restitution" are "alternative measures").

The starting point for the analysis of Precision Pine's CT 6.01 claims is the provision's "plain language." E.g., M.A. Mortenson Co. v. Brownlee, 363 F.3d 1203, 1206 (Fed. Cir. 2004) ("we begin by examining the plain language of the contract"). CT 6.01 provides, in pertinent part:

> Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer. . . .
>
> Purchaser agrees that in the event of interruption or delay of operations [exceeding 30 days during the Normal Operating Season], that its sole and exclusive remedy shall be: . . . Contract Term Adjustment pursuant to BT8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, replacement cost of timber, or any other anticipatory losses suffered by Purchaser. Purchaser agrees to provide receipts or other documentation to the Contracting Officer which clearly identify and verify actual expenditures.

E.g., PX170-79 (emphasis added). Put simply, only "out-of-pocket expenses" that result directly from an interruption or delay of timber harvesting operations are recoverable. Id. In addition, out-of-pocket expenses must be shown by receipts or other documents that clearly verify "actual expenditures." Id.

Pursuant to CT 6.01, Precision Pine seeks, among other things, payment for time allegedly spent by its employees preparing claim letters, snow removal costs, log transfer costs,

interest, and "overhead and profit." Pl.'s Pretrial Mem. at 54 & 56 n.25; see also PX131 (tab 2). None of these costs result directly from an interruption of timber harvesting operations. Consequently, reimbursement pursuant to CT 6.01 is unavailable.

Furthermore, Precision Pine cannot meet the substantive and evidentiary requirements of CT 6.01. At trial, Precision Pine presented virtually no evidence supporting its CT 6.01 claims and, consequently, has failed to meet its burden of proof. Accordingly, judgment should be entered in favor of the United States.

**A. Precision Pine's Claim For Employee Claim Preparation Costs Is Not Recoverable Under CT 6.01**

Claim preparation costs – like attorney fees – are not ordinarily recoverable by a plaintiff. E.g., Singer Co. v. United States, 215 Ct. Cl. 281, 568 F.2d 695, 721 (1977); Wilner v. United States, 23 Cl. Ct. 241, 261 (1991); Gulf Contracting, Inc. v. United States, 23 Cl. Ct. 525, 532 (1991). In Singer, the Court of Claims held that, unless claim preparation costs are shown to be beneficial to contract performance, such costs are not allowable. 568 F.2d at 721. Here, as in Singer, Precision Pine's claims concerned only the recovery of damages. Tr. 1885-86 (Porter). Precision Pine’s claim preparation costs are, therefore, unrecoverable.

The language of CT 6.01 warrants the same result. CT 6.01 provides reimbursement of expenses that result directly from an interruption or delay of timber harvesting operations. Precision Pine avers that its workers put in time that might have been spent on other tasks, but Precision Pine does not contend that it incurred any additional cost because its workers were preparing claim letters. See Tr. 1883 (Porter). To the contrary, the workers identified by

Mr. Porter were salaried employees who were not paid any additional amount as a result of work on Precision Pine's claim letters. Tr. 1883, 1886-87 (Porter).

Furthermore, Precision Pine has produced no receipts or documents that verify reimbursable out-of-pocket expenditures. See Tr. 1884-85 (Porter). Having failed to produce documentation verifying that the company incurred "actual expenditures" because its employees performed work upon the claim letters, no reimbursement for alleged claim preparation costs is available under the terms of CT 6.01.

**B. Precision Pine's Claims For "Miscellaneous Costs" Pursuant To CT 6.01 Should Be Denied**

**1. The United States Does Not Dispute Precision Pine's Claims For Bond Costs In The Amounts Previously Awarded**

With respect to those contracts upon which Precision Pine elects to seek reimbursement pursuant to CT 6.01, rather than damages under the common law, the United States does not dispute Precision Pine's entitlement to bond costs in the amount previously paid by the Forest Service. See PX131 (tab 2). However, Precision Pine has not demonstrated an entitlement to the additional bond costs sought in connection with the Brann, Hay, Hutch-Boondock, and St. Joe contracts.[38] See PX131 (tab 2).

At trial, Precision Pine presented absolutely no evidence supporting additional bond costs. Mr. Ness conceded that he had not looked into these sums, could not testify as to the basis for the requested increases, and included them in his report merely because counsel told him that

---

[38] Precision Pine also seeks overhead and profit in addition to the company's actual bond costs. The United States discusses this aspect of Precision Pine's claim separately. See section V.B.6., infra.

the stated sum was due.[39] Tr. 2549-50, 2558-59 (Ness). Accordingly, Precision Pine's request for additional bond costs in connection with the Brann, Hay, Hutch-Boondock and St. Joe contracts should, therefore, be denied.

**2. Precision Pine Has Not Demonstrated An Entitlement To "Move Out" Costs**

Precision Pine seeks $2,000 in "move out" costs with respect to the Brookbank contract. PX131 (tab 2). However, Precision Pine presented no documents, testimony or other evidence that such costs were incurred.

Precision Pine's logging work was being performed by Tri-Star Logging in August 1995. The Court heard testimony from Mr. Porter and Mr. Reidhead about Precision Pine's relationship with Tri-Star. E.g., Tr. 233 (Porter). However, neither witness testified that Tri-Star levied a surcharge to "move out" of a contract, much less that Precision Pine actually paid such a charge when Tri-Star moved off of the Brookbank sale.

In addition, the harvest schedule used by Mr. Ness shows that Precision Pine would have moved out of the Brookbank sale at the end of August 1995 if the MSO suspensions had not occurred. See DX131 (App. A at 4); DX1004; see also Tr. 2091 (Porter) (DX1004 shows the harvesting schedule used by Mr. Ness in greater detail). Mr. Porter, who was responsible for scheduling timber harvesting for Precision Pine, did not know what Precision Pine's plans were with respect to the Brookbank sale. See Tr. 1440-41 (Porter). Thus, Precision Pine failed to establish that any move out costs resulted directly from the MSO suspensions.

[39] Precision Pine's claim letters did not request (or include documentation supporting) the payment of bond costs for the St. Joe and Hay contracts. PX200; PX204. Furthermore, because the Hay contract does not contain CT 6.01, reimbursement is unavailable. See PX169.

Finally, because there is no presumption that a contracting officer's decision is correct, the mere fact that the Forest Service previously paid move out cost provides no ground for awarding them here. Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc) ("[A] contractor is not entitled to the benefit of any presumption arising from the contracting officer's decision. De novo review precludes reliance upon the presumed correctness of the decision.").

In sum, there has been a total failure of proof with respect to Precision Pine's claim for move out costs. Precision Pine has failed to demonstrate that any move out costs on the Brookbank sale were incurred, much less that any costs were a direct result of the MSO suspensions. Accordingly, the Court should enter judgment in favor of the United States on Precision Pine's claim for move out costs.

**3. Interest Is Not Payable Under CT 6.01**

Under the "no interest rule," an express and unambiguous waiver of sovereign immunity is necessary to permit an award of interest against the United States.

> As sovereign, the United States, in the absence of consent, is immune from suit. . . . A waiver of sovereign immunity must be unequivocally expressed, or a court must infer that Congress did not intend to create a waiver.
>
> * * *
>
> With respect to waiver of sovereign immunity for interest . . . "[t]he no interest rule provides an added gloss of strictness upon these usual rules. . . . "[T]here can be no consent by implication or use of ambiguous language. Nor can an intent on the part of the framers of a . . . contract to permit the recovery of interest suffice where the intent is not translated into affirmative . . . contractual terms. The consent necessary to waive the traditional immunity must be express, and it must be strictly construed."

Marathon Oil Co. v. United States, 374 F.3d 1123, 1127 (Fed. Cir. 2004) (quoting Library of Congress v. Shaw, 478 U.S. 310, 318 (1986)) (internal cites omitted); see also Clary v. United States, 333 F.3d 1345, 1351-52 (Fed. Cir. 2003) ("absent a waiver of sovereign immunity, no interest may be paid").

Interest is not payable under CT 6.01. CT 6.01 provides for reimbursement of certain "out-of-pocket" expenses if documentation verifying the "actual expense" is produced. Id. It does not expressly authorize the payment of interest. See DX1. Nor is interest that was never earned an out-of-pocket expense. Accordingly, neither the language of CT 6.01, nor the law, supports Precision Pine's claims for interest pursuant to CT 6.01. Indeed, Precision Pine conceded at trial that no provision in any of the contracts requires the payment of interest on contract downpayments, on cash balances, or on the effective purchaser credit. Tr. 1906-07 (Porter); Tr. 1910-11, 1913 (stipulation of counsel).

Because CT 6.01 does not expressly authorize the payment of interest, and because Precision Pine has produced no receipts or other documents that meet the requirements of CT 6.01, Precision Pine's claims for interest should be rejected.

### 4. Precision Pine Has Failed To Demonstrate An Entitlement To Snow Removal Costs Pursuant To CT 6.01

Precision Pine's claim for reimbursement of snow removal costs under CT 6.01 is meritless. Precision Pine claims to have incurred snow removal costs in January 1996 to harvest the Hutch-Boondock, St. Joe and South Black Aspen contracts. See PX131 (exhibit 2 at 2). Not only were these contracts not breached by the Forest Service, the South Black Aspen sale was never affected by the MSO suspensions. Further, Precision Pine was able to harvest in January

1996 – months after the suspensions were lifted – only because the Forest Service consented to operations outside the normal operating season. Tr. 1498-99, 1503-04 (Porter); see also PX106; DX211; DX238. Simply put, Precision Pine paid for snow removal because Precision Pine made the decision to continue operations after the normal operating season ended – not because harvesting operations were interrupted or delayed. Reimbursement under CT 6.01 is, therefore, not authorized.

**5. Precision Pine Has Failed To Demonstrate An Entitlement To Log Transfer Costs Pursuant To CT 6.01**

The "cost of transferring logs (due to the closure of Eagar)," see PX131, is likewise not payable under CT 6.01. According to Precision Pine, such costs were incurred when it decided to close its Eagar mill. See PX131 (tab 2). However, Precision Pine fails to identify the contact from which the transferred logs were harvested and, consequently, the contract pursuant to which reimbursement is allegedly due. Furthermore, log transfer costs were incurred only because Precision Pine decided to haul logs from the Eagar mill yard to the Winslow sawmill, rather than continue to operate the Eagar mill for an additional half day.

Reimbursement under CT 6.01 is unavailable because Precision Pine has failed to identify the contract pursuant to which payment is allegedly owed, and because log transfer costs were not the direct result of the MSO suspensions.

**6. Overhead And Profits Are Not Recoverable Under CT 6.01**

Precision Pine contends that it is entitled to add overhead and profit as a "markup" to various out-of-pocket expenses for which compensation is sought under CT 6.01. See Pl.'s Pretrial Br. at 56 n.25; PX131. CT 6.01 expressly denies reimbursement for lost profits and

anticipatory losses. Therefore, "profits" are not recoverable directly or as a "markup" to other costs. Likewise, "overhead" is unrecoverable under CT 6.01. Overhead is by definition an indirect expense. E.g., Nicon, Inc. v. United States, 331 F.3d 878, 882 (Fed. Cir. 2003) ("Indirect costs include such things as . . . overhead."); Thompson v. Cherokee Nation, 334 F.3d 1075, 1081-82 (Fed. Cir. 2003) ("administrative or other expenses related to the overhead incurred by [a] contractor" are "[i]ndirect costs"). Furthermore, overhead is incurred without regard to whether a timber sale is being operated. Consequently, overhead is not incurred as the result, much less the "direct result," of an interruption or delay of harvesting operations. Precision Pine's claims for profit and overhead pursuant to CT 6.01 should, therefore, be denied.

## CONCLUSION

For these reasons, the Court should enter judgment in favor of the United States upon Precision Pine's common law claims for lost lumber profits, sawmill inefficiency costs and increased log hauling costs, enter judgment for Precision Pine on its claim for bond costs in the amount of $14,278.85, and deduct from that amount the sum already paid by the Forest Service.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

s/ David A. Harrington

OF COUNSEL:

LORI POLIN JONES
PATRICIA L. DISERT
Office of General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

DAVID A. HARRINGTON
MARLA T. CONNEELY
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
(202) 307-0277
(202) 307-0972 (fax)

September 2, 2005

Attorneys for Defendant