**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF FACT**

Pursuant to the Court's orders of June 21, 2005, and June 28, 2005, defendant, the United States, respectfully submits the following proposed findings of fact with respect to the claims of plaintiff, Precision Pine & Timber, Inc. ("Precision Pine").

## I. ARIZONA LUMBER AND TIMBER – AN INDUSTRY IN DECLINE

1. In terms of volume and value, Arizona is a relatively small producer of timber and lumber. As of 1992, the total timberland in Arizona was approximately 4 million acres. More than two-thirds of that area was designated as National Forest. In terms of volume of available sawtimber, the percentage of public ownership is even higher. Despite the fact that timber and timberland in Arizona are predominately public owned, timber production in the state has been largely from non-Federal sources. Tr. 3428 (Neuberger); DX776.

2. The production of lumber from Arizona sawmills fell in every year from 1988 to 1996, from 447 million board feet ("mmbf") in 1998 to 105 million board feet in 1996. This secular (i.e., non-cyclical) decline in production continued after 1996. By 1998, lumber production in Arizona had fallen to 78 million board feet. Tr. 3330-31 (Neuberger); DX776.

3. Logging restrictions on national forest land have been largely responsible for the downward trend in lumber production volumes in Arizona. While Federal timber sales in Arizona have been limited since the late 1980s, these limitations have become increasingly restrictive over time. For instance, during the 1990's, wildlife restrictions designed to protect the Northern Goshawk and the Mexican Spotted Owl substantially reduced amount of timber put up for sale by the Forest Service. As a result, the amount of timber on national forest land offered for sale declined significantly during the late 1980s and throughout the 1990s. Tr. 3327-28 (Neuberger), 3821 (Harris); DX776; see also Tr. 1111, 1112 (Porter) (acknowledging that the supply of timber in Arizona has been diminishing).

4. Offers of timber on Federal lands in Arizona were approximately 250 million board feet in 1988, down from more than 300 million board feet in 1984 and 1985. By 1995, the amount of timber offered for sale had fallen below 70 million board feet. Since 1998, Forest Service timber offers have averaged approximately 60 million board feet per year. Tr. 3323-24 (Neuberger); DX776.

5. In terms of the volume of timber cut, amounts have fallen from approximately 280 million board feet in 1988, to approximately 40 million in 1995. Annual harvests have averaged about 30 million board feet per year since 1997. Tr. 3310-12 (Neuberger); DX776.

## II. PRECISION PINE'S UNSUCCESSFUL STRATEGY OF AGGRESSIVE GROWTH

### A. Precision Pine Acquires Sawmills And Triples Its Mill Capacity

6. While Arizona timber and lumber markets were largely on the decline throughout the early and mid-1990s, Precision Pine chose to embark on a substantial expansion of its operations. DX776; DX798.

7. In 1990, Precision Pine was operating a single sawmill in Heber, Arizona with a putative single-shift capacity of 850 thousand board feet ("mbf") per month. See DX798; Tr. 94, 1433 (Porter); see also Tr. 1074; DX559. At the same time, Precision Pine was operating a single planer in Snowflake, Arizona. DX798; Tr. 619 (Porter).

8. Precision Pine purchased a sawmill in Show Low, Arizona prior to June 1991. Precision Pine did not operate the Show Low sawmill. DX798, Tr. 1484 (Porter).

9. Precision Pine purchased a sawmill in Clay Springs, Arizona prior to June 1991. Precision Pine operated the Clay Springs sawmill for a short period. The Clay Springs sawmill was closed permanently in the early 1990s. DX798.

10. In December 1991, Precision Pine purchased from Duke City Lumber Company a sawmill and two planers in Winslow, Arizona. First Joint Stip. ¶¶ 3-4; DX798; Tr. 90, 96 (Porter) (stating also that Precision Pine acquired three dry kilns from Duke City). The putative capacity of the Winslow sawmill is 1150 mbf (lumber tally) per month. Tr. 94, 1432 (Porter); see also Tr. 1074 (Porter).

11. Precision Pine operated the newly-acquired Winslow sawmill in tandem with the company's sawmill in Heber. See DX559; DX798. Similarly, Precision Pine operated both the

newly-acquired planers and its Snowflake planer. DX798; see also DX294 (April 1995 to March 1996 summary).

12. In October 1992, Precision Pine purchased a sawmill in Williams, Arizona from Grand Canyon Forest Industries. Tr. 106 (Porter); DX798. The Williams sawmill had a capacity of about 1,100 mbf (l.t.) per month. Tr. 106 (Porter).

13. Precision Pine operated the newly-acquired Williams sawmill together with its sawmills in Winslow and Heber. Tr. 106, 1485 (Porter); DX798.

14. Thus, by late 1992, Precision Pine was operating three sawmills and had more than tripled its alleged single-shift capacity. DX798; DX559 (identifying sawmills in Heber, Winslow and Williams); Tr. 94, 106, 1074 (Porter) (indicating that these mills had a production capacity in excess of 35 million board feet (lumber tally) per year). Likewise, Precision Pine had substantially increased its planing capacity and was operating planers in both Winslow and Snowflake. See DX798.

15. In June 1993, Precision Pine purchased a sawmill in Payson, Arizona from Kaibab Forest Products Company. Precision Pine did not operate the Payson sawmill. DX798; Tr. 106-08, 1486 (Porter).

16. During 1993, Precision Pine assembled a sawmill in Eagar, Arizona using equipment from the sawmills it had bought in Show Low and Clay Springs. DX798; Tr. 1855-56 (Porter). The putative capacity of the Eagar sawmill is 850 mbf (l.t.) per month. Tr. 94, 1432 (Porter); see also Tr. 1074 (Porter).

17. In October 1993, Precision Pine opened the Eagar sawmill. At about the same time, Precision Pine permanently closed its Williams sawmill. DX798; DX559; Tr.106, 1485 (Porter).

**B. Precision Pine's Acquisition Of Timber For Expanded Mill Operations**

18. In order to secure raw material for its three sawmills from increasingly restricted sources of supply, during the early and mid-1990s, Precision Pine bid on timber and multi-product sale contracts offered by various sources: the Forest Service; the State of Arizona; Indian tribes; and private landowners. DX776; Tr. 1653, 2037 (Porter).

19. Bidding for timber sale contracts was competitive. Tr. 1278 (Porter). And Precision Pine's bidding strategy was aggressive as evidenced by the bid premiums that the company was willing to pay over and above minimum bid prices. Tr. 3463 (Neuberger); DX776; see also Tr. 4139 (Harris), 4630-32 (Dils), 4563-65 (Lee); DX554 (writing, during bidding, "[d]on't give Stone anything over here"); DX559 (showing the per mbf payment to the Forest Service (i.e., the stumpage fee) was increasing during the 1990s).

20. While Precision Pine's aggressive bidding practices enabled the company to win many contracts upon which it bid, and to secure some additional timber for its expanded mill operations, it also meant that the company had to pay high prices for timber – prices that were likely to be uneconomical. DX776; Tr. 3351-57 (Neuberger).

21. This exposed the company to considerable market risk. This market risk was especially acute during periods in which lumber prices were depressed because the lower the market prices for lumber products, the greater the number of Precision Pine's contracts that were rendered unprofitable. Tr. 3312-14 (Neuberger); DX776.

### C. Precision Pine's Sawmill Overcapacity

22. Precision Pine harvested 25,399 mbf (log scale) in 1992. DX559.

23. Precision Pine harvested 23,541 mbf (l.s.) in 1993. DX559.

24. Precision Pine harvested 18,673 mbf (l.s.) in 1994. DX559.

25. Precision Pine harvested 11,011 mbf (l.s.) through late 1995. DX559.

26. Precision Pine never harvested a sufficient volume of timber to run its three sawmills at their putative 35 million board foot annual capacity. See Tr. 1414-15, 1421-22 (Porter); DX559; see also; 1074 (Porter) (testifying that the annual capacity for Eagar, Heber and Winslow was about 35 mmbf (l.t.)/year).

27. Precision Pine's three sawmill operation was never run at its putative 35 million board foot capacity. See Tr. 1410, 2144 (Porter); DX802.

28. Despite Precision Pine's aggressive bidding, and despite the fact that Precision Pine's mills were operating at less than capacity, the volume of timber that Precision Pine had under contract declined steadily during the mid-1990s. DX559.

29. In 1992, Precision Pine had 51,571 mbf (l.s.) timber under contract. DX559.

30. In 1993, Precision Pine had 51,097 mbf (l.s.) timber under contract. DX559.

31. In 1994, Precision Pine had 49,647 mbf (l.s.) timber under contract. DX559.

32. In 1995, Precision Pine had 40,786 mbf (l.s.) timber under contract. DX559.

33. In December 1995, Precision Pine had 34,288 mbf (l.s.) timber under contract. DX559.

34. Thus, Precision Pine had 50 percent more timber under contract in 1992 – the year in which Precision Pine opened a third sawmill – than at the close of 1995. DX559.

35. In March 1995, Precision Pine began reducing operations by closing its Snowflake planer – a planer that Precision Pine had operated continuously since the 1980s. DX798.

36. In April 1995, recognizing that additional downsizing would be necessary, Tri-Star Logging – Precision Pine's long-time logging contractor for the Winslow and Heber sawmills, Tr. 1107-09 (Porter) – sought and obtained an agreement that it would perform all logging "for the remaining two mills" if Precision Pine is "forced to shut down another sawmill." DX463.

37. At about the same time, Precision Pine vice president, Lewis Tenney, suggested that company would have to close its Eagar sawmill. DX85 (stating that the renewed availability of the Hay contract would "enable the small mill [in Eagar] to keep running and save jobs for a while longer") (emphasis added); see also DX81; DX82.

**D. Precision Pine Cancels Timber Contracts And Defers Harvesting**

38. By July 1995, lumber prices had fallen substantially from where they stood in 1993 and 1994, the time period when Precision Pine was bidding on the timber it currently had under contract. See PX305; DX776 (exhibit 3).

39. As a result, even with an outlet for roundwood from its multi-product sales,[1] Precision Pine was unable to profitably harvest more than a third of the timber it had under contract. See, e.g., DX523 (Jersey Horse) (1,700 mbf); DX526 (Salt) (2,120 mbf); DX528

---

[1] As discussed below, by September 1995, Stone Container Corporation was unwilling to purchase roundwood coming from Precision Pine's contracts. See paragraphs 55-56, infra. This lack of an outlet for roundwood caused still more contracts to be unprofitable during the period of the MSO suspensions. See paragraphs 584-92, infra.

(Campbell) (2,280 mbf); DX535 (U-Bar) (1,900 mbf); DX540 (Merritt) (700 mbf); DX542 (Hualapai) (790 mbf); DX543 (Dutch Joe) (750 mbf); DX544 (Park) (900 mbf); DX545 (Barber) (2,275 mbf).

40. To address this situation, Precision Pine (1) took advantage of opportunities to cancel overpriced contracts, (2) operated its mills at a reduced level (substantially below their alleged capacities), and (3) deferred the harvesting of less profitable contracts. See, e.g., PX106; DX559; DX505; DX802; Tr. 1063-64 (Porter).

41. In October 1995, Precision Pine used the opportunity provided by the MSO suspensions to negotiate the cancellation of its two highest priced (and biggest money losing) contracts – Barber and Campbell. PX106 ¶ 4; Tr. 1848-49 (Porter). The cancellation of these contracts reduced by about 5 million board feet the timber Precision Pine had under contract during the period of the MSO suspensions, DX528; DX545, and eliminated two (of three) principal sources of large diameter logs, see PX99 (identifying Barber, Campbell and Hay as having "large diameter trees" needed by Precision Pine); Tr. 1849 (Porter). However, it allowed Precision Pine to avoid performing two contracts upon which Precision Pine expected to lose over $800,000. See DX545 (Barber) (loss of $503,646); DX528 (Campbell) (loss of $342,839).

42. Similarly, in September 1996, Precision Pine negotiated a "friendly default" with the State of Arizona on the Park multi-product sale. See DX546; DX699; DX709; DX717; Tr. 1841-42 (Porter). The default reduced the volume of timber Precision Pine had under contract during the period of the MSO suspension by nearly one million board feet, see DX544 (990 mbf), but allowed Precision Pine to avoid performing another contract on which it expected to

lose money for a relatively small penalty. See DX546 (requiring payment of a $8,190 penalty); DX544 (projecting a loss, without accounting for roundwood losses, of $45,151).

43. During 1994, a year that Precision Pine's operations were not affected by Forest Service suspensions, Precision Pine chose to operate its sawmills at 70 percent of their alleged annual capacity. See DX559; Tr. 1419-22 (Porter).

44. Similarly, prior to the MSO suspensions in 1995, Precision Pine chose to operate its sawmills at less than their alleged capacity. DX802 (showing that Precision Pine's mills operated below their supposed capacity from April to September 1995); DX505 (showing that none of Precision Pine's mills were operating at capacity in April 1995); see also Tr.1425-29 (Porter) (Precision Pine's sawmills would have run through all logs harvested by late May had they been operating at capacity in 1995); DX559 (showing timber harvests of 11,011 mbf (l.s.)).

45. In subsequent years, Precision Pine continued to run its mills at less than capacity and, additionally, never operated more than two mills at any given time. See Tr. 1080-82 (Porter); DX798.

46. In 1994 and prior to the MSO suspension in 1995, Precision Pine deferred harvesting numerous timber and multi-product sales that were under contract and available. See, e.g., DX3 (cutting no timber on O.D. Ridge in 1995); DX128 (cutting no timber on Jersey Horse in 1994 or 1995); DX152 (cutting no timber on Salt in 1994 or 1995); DX251 (cutting no timber on Hutch-Boondock in 1994 or 1995); DX291 (cutting no timber on Mud in 1994 or 1995); DX320 (cutting no timber on Saginaw-Kennedy in 1994 or 1995); DX361 (cutting no timber on Brann in 1994 or 1995); DX437 (cutting no timber on Monument in 1994 or 1995); Tr. 1063-64

(Porter) (admitting Precision Pine deferred harvesting – and in fact never harvested – timber from the Salt, Monument and Saginaw-Kennedy contracts).

47. Precision Pine continued to defer harvesting on available timber under contract during and after the period of the MSO suspensions. See, e.g., DX791; DX800; Tr. 1063-64 (Porter).

**E. Precision Pine Loses Its Outlet For Roundwood**

48. In July 1995, Stone Container Corporation a/k/a Stone Forest Industries ("Stone") inquired about purchasing Precision Pine. Tr. 1566 (Porter), 2948-49 (Tenney).

49. Stone was a competitor of Precision Pine. Tr. 1283 (Porter), 1741 (Reidhead) (Precision Pine competed "very strongly" with Stone); DX554 ("Don't give Stone anything over here").

50. Precision Pine's vice president, Lewis Tenney, handled negotiations with Stone. Tr. 1566-67 (Porter), 2948-52, 3035 (Tenney).

51. Precision Pine's president, Lorin Porter, was less interested in selling the company to Stone than was Mr. Tenney. Tr. 1568 (Porter), 2949, 3033 (Tenney).

52. In order to provide Mr. Tenney information on the value of timber under contract, on July 17, 1995, Mr. Porter prepared a set of profit projections addressing each of Precision Pine's timber and multi-product sale contracts. Tr. 1568, 2063 (Porter); DX519; DX521-45.

53. Mr. Porter's profit projections showed the anticipated gross profit for the sale of lumber and by-products. See Tr. 1568, 1570 (Porter); DX519; DX521-45.

54. The profit projections did not address the roundwood component of multi-product sales and did not provide a net profit figure, i.e., they did not deduct general and administrative overhead expenses. See Tr. 1571, 2137 (Porter); DX519; DX521-45.

55. During the course of negotiations with Stone, Precision Pine provided detailed information about its timber sale contracts (e.g., the volume of timber and roundwood remaining under contract, sale area maps, the periodic payment dates) and allowed Stone representatives to tour Precision Pine's lumber manufacturing facilities. Tr. 1567 (Porter), 1948-52, 3033, 3035 (Tenney); DX458; DX473.

56. Based in part on Mr. Porter's profit projections, Mr. Tenney offered to sell the Precision Pine to Stone for the sum of $10 million. Tr. 2950-51, 3033-34, 3043-44 (Tenney).

57. Stone did not make a counteroffer and a sale of Precision Pine to Stone was never consummated. Tr. 3034, 3043 (Tenney).

58. As of August 1995, as Stone had learned during negotiations, the total volume of roundwood remaining to be harvested on the contracts at issue was 19,306 hundred cubic feet ("ccf"). See Third Joint Stip. ¶¶ 2, 4, 6, 9, 11, 13, 15, 17, 19, 21 & 23; see also DX473.

59. Stone was the only substantial purchaser of roundwood from Precision Pine's multi-product sale contracts. See Tr. DX566; DX570; DX800.

60. On occasions when Stone would purchase roundwood from Precision Pine, Precision Pine and Stone would execute a contract that established the sale price, the quantity of roundwood that Stone would accept, and the multi-product sale contract from which the roundwood would be harvested. See DX457; DX470; DX471; PX223.

61. Precision Pine was not usually able to cover the roundwood stumpage cost owed to the Forest Service. Tr. 1731 (Reidhead).

62. As of August 25, 1995, no contracts between Precision Pine and Stone required Stone to purchase roundwood harvested from any of the contracts at issue. See DX457; DX470; DX471; PX223.

63. In September 1995, shortly after the MSO suspensions had begun, Mr. Tenney sent a letter to Stone stating that he had recently heard that Stone was interested in purchasing roundwood. DX474. Mr. Tenney expressed "surprise" that no one at Stone had contacted Precision Pine. Id. He offered to sell Stone 1,000 cords of roundwood from the Park timber sale – a multi-product sale that had been awarded to Precision Pine by the State of Arizona. Id.

64. On October 3, 1995, Stone rejected Mr. Tenney's offer to purchase roundwood from Precision Pine. Stone explained that it was "not looking to make any new commitments" for roundwood during the 1995-96 season. DX475.

65. For the next two years, Stone continued to refuse to purchase roundwood from Precision Pine’s multi-product sale contracts. See DX263 (Oct. 31, 1995); DX242 (Nov. 6, 1995); DX243 (Nov. 14, 1995); DX667 (Nov. 30, 1995); DX375 (Jan. 26, 1996); DX349 (Jan. 30, 1996); DX306 (Apr. 9, 1996); DX555 (June 6, 1996); DX309 (July 12, 1996); DX313 (Sept. 26, 1996); DX455 (Mar. 7, 1997); DX454 (Mar. 22, 1996); DX279 (Jan. 22, 1997); DX41 (Apr. 28, 1997); DX21 (May 12, 1997); DX403 (June 6, 1997); DX339 (June 20, 1997); DX392 (June 20, 1997); DX280 (July 1, 1997); DX47 (Aug. 23, 1997); DX461 (Aug. 29, 1997); see also Tr. 1741 (Reidhead) (Stone would refuse to buy roundwood because Precision Pine would often compete “very strongly” with Stone and “Stone would get upset”);

Tr. 3857-61, 3864 (Harris) (during 1996 Stone refused to take roundwood from Art Daley upon learning that Mr. Daley was obtaining the roundwood from a Precision Pine sale); Tr. 1942 (Porter) (Precision Pine did not enter into any contracts with Stone concerning roundwood during the period of the MSO suspensions); Tr. 682-83 (Porter) (Stone did not consistently buy roundwood from Precision Pine or from Tri-Star Logging); Tr. 1642, 1648-49, 1956, 1969-72, 2015 (Porter) (Precision Pine had difficulty moving roundwood in 1996); Tr. 1947-48 (Porter) (Precision Pine decked roundwood at its Eagar mill in 1997 as it had no outlet for roundwood).

66. Because Stone declined to accept roundwood from Precision Pine, on numerous occasions during and after the period of the MSO suspensions, Precision Pine informed the Forest Service that it had no outlet for roundwood. See, e.g., DX263 (Oct. 31, 1995) ("PP&T does not have an outlet for pulpwood at this time"); DX306 (Apr. 9, 1996) ("we have no outlet for pulpwood"); DX555 (June 6, 1996) ("Stone Container has in the recent past declined to purchase pulpwood from PP&T"); DX309 (July 12, 1996) (stating that Stone still remained unavailable as an "outlet for our roundwood"); DX279 (Jan. 22, 1997) (noting continuing uncertainty about "the availability of a market for our pulpwood"); DX403 (June 6, 1997) ("Stone is not accepting any pulpwood at this time"); DX280 (July 1, 1997) (citing current "problems with marketing the smaller size material"); DX47 (Aug. 21, 1997) (noting "Stone's unwillingness to buy . . . roundwood from us").

67. For the fiscal year ending March 31, 1996 ("FYE 1996"), Precision Pine's financial statement shows no revenue from roundwood sales. PX248; DX777 (page 6a1).

68. For the fiscal year ending March 31, 1997 ("FYE 1997"), Precision Pine's financial statement shows no revenue from roundwood sales. PX248; DX777 (page 6c1).

69. In August 1997, Precision Pine transferred the Kettle multi-product sale contract to Stone. PX117. Precision Pine informed the Forest Service that it was transferring the contract because of "Stone's unwillingness to buy the roundwood from us." DX47; Tr. 1964-65 (Porter). Stone obtained roundwood as part of its acquisition of the Kettle multi-product sale. See PX117; DX553 (accepting roundwood from the Kettle sale that Precision Pine had cut and decked (i.e., stacked) at the Eagar mill).

70. In November 1997, Stone and Precision Pine executed a contract selling roundwood from the Mud multi-product sale to Stone. This was the only roundwood contract between Precision Pine and Stone that was entered into after August 25, 1995. Tr. 2121-22 (Porter); PX223; see also Tr. 1942-43 (Porter) (Precision Pine did not enter into any contracts with Stone concerning roundwood during the period of the MSO suspensions).

71. On February 12, 1998, Stone announced that it intended to stop purchasing roundwood as Stone would be using only recycled material at its paper mill. See Tr. 991-92 (Porter); PX126.

**F. Lumber Prices During The Period Of The MSO Suspensions**

72. The price for wood products hit bottom during middle of the MSO suspensions. PX305; DX776 (exhibit 3); Tr. 3311 (Neuberger).

73. Ponderosa Pine prices were better both before the suspensions in 1993 and 1994 and after the suspensions in 1997. PX305 (showing that WWPA's annual average lumber price index for Inland Rocky Mountain Ponderosa Pine was: $460.50 in 1993; $473.23 in 1994; $423.32 in 1995; $426.38 in 1996; and $471.10 in 1997); see also DX776 (exhibit 3).

74. Lumber prices for Ponderosa Pine remained below pre-suspension levels until late 1996. PX305; see also DX776 (exhibit 3).

75. Due to the drastic downturn in lumber prices in 1995 and 1996, in March 1996, the Forest Service offered Precision Pine contract term adjustments pursuant to contract clause CT 8.212. This gave Precision Pine the option of requesting a contract term adjustment of four months for each of its contracts. See DX271; DX272.

76. Precision Pine requested and obtained market-related term adjustments on several contracts. See DX2; DX239; DX436.

**G. Forest Service Fire Closures During The Summer Of 1996**

77. The summer of 1996 was an unusually severe fire season. Tr. 3900-01, 4165 (Harris); see also Tr. 3871, 4499, 4533 (Harris). As a result, the Forest Service was forced to implement progressively more stringent restrictions on timber harvesting operations in the Apache-Sitgreaves, Coconino, Kaibab, and Tonto National Forests. See, e.g., Tr. 3900-01, 4165-66 (Harris) (explaining that the Forest Service took the extraordinary step of closing entire National Forests to the public).

78. On or about May 6, 1996, the Forest Service implemented Industrial Fire Plan D on the Apache-Sitgreaves, Coconino, Kaibab, and Tonto National Forests timber. E.g., Tr. 3900-01, 4165-66, 4533 (Harris); PX113; DX118; DX275; DX277; DX308; DX333; DX378; DX380; see also Tr. 2095-96 (Porter) (discussing fire closures on the Apache-Sitgreaves and Kaibab National Forests). This required the suspension of all timber harvesting operations. Tr. 1506 (Porter); Tr. 3900 (Harris).

79. Conditions on the ground improved and Industrial Fire Plan D was lifted on July 9, 1996, at which time timber harvesting operations were permitted to resume. See, e.g., Tr. 4123, 4165 (Harris), 2096 (Porter).

80. Precision Pine could have requested and received contract term adjustments for time lost as a result of the fire closures but for the MSO suspensions. Tr. 3905-06, 4123-24 (Harris), 4555-56 (Lee), 1521-22 (Porter); DX277.

**H. The MSO Suspensions Are Lifted And Precision Pine Elects To Continue The Contracts**

81. When the MSO suspensions were lifted, Precision Pine elected to continue – not cancel – its contracts. Precision Pine chose instead to reaffirm its contractual obligations, including the obligation to harvest all sawtimber and roundwood. E.g., Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 651 (2004); First Joint Stip. ¶ 34; Tr. 1479 (Porter).

**1. Precision Pine's Post-Suspension Timber Harvesting**

82. During the post-suspension period (i.e., from December 4, 1996 to January 31, 2001), Precision Pine cut and removed approximately 45 percent of the sawtimber available from the Brookbank, Hay, Jersey Horse, Kettle, Manaco, Monument, Mud, O.D. Ridge, Saginaw-Kennedy, Salt and U-Bar contracts. DX832.

83. Precision Pine did not cut the remainder for various "business reasons." DX800; DX791.

84. Precision Pine could have earned more by fully harvesting the contracts during the post-suspension period than it claims it would have earned during the period of the MSO suspensions. See DX834 (showing a claimed revenue for Ponderosa Pine products of $666.01

per mbf (l.t.) during the period of the MSO suspensions, and an actual revenue of $700.71 per mbf (l.t.) obtained in the post-suspension period).

**2. Precision Pine's Post-Suspension Sawmill Operations**

85. Before and after the MSO suspensions, Precision Pine's sawmills were periodically closed for days or weeks due to holidays, maintenance, log shortages or equipment breakdown. See DX798; Tr. 2102-03, 2140 (Porter).

86. Precision Pine closed the Heber sawmill in September 1995. The Heber sawmill was reopened by Precision Pine in November 1995. DX798.

87. Precision Pine closed the Heber sawmill in June 1996. The Heber sawmill was reopened by Precision Pine in October 1997. DX798.

88. Precision Pine closed the Eagar sawmill in December 1995. DX798. The Eagar sawmill was reopened by Precision Pine in February 1997. DX96-97.

89. Precision Pine closed the Eagar sawmill on July 30, 1997 due to a lack of logs resulting from the Forest Guardians suspension and the impending sale of the Kettle contract to Stone. See Tr. 1255, 1258 (Porter); PX117 (sale to Stone dated August 15, 1997). The Eagar mill was never reopened. Tr. 1255 (stipulation of counsel); First Joint Stip. ¶ 7.

90. The Winslow sawmill was severely damaged by fire, and as a result permanently closed, on September 17, 1998. First Joint Stip. ¶ 4.

91. Precision Pine did not run its sawmills at their alleged annual capacity of approximately 35 mmbf in 1997. Tr. 1074, 1080 (Porter).

92. Precision Pine did not run its sawmills at their alleged annual capacity of approximately 35 mmbf in 1998. Tr. 1074, 1080-82 (Porter).

### I. Payment Of Claims Regarding The MSO Suspensions

93. Between August 15, 1997, and November 17, 1997, Precision Pine sent to the Forest Service claims letters seeking compensation as a result of the MSO suspensions, which were submitted pursuant to the Contract Disputes Act ("CDA") and certified by Mr. Porter. PX194; PX196; PX198; PX200; PX202; PX204; PX206; PX208; PX210; PX212; PX214; PX216; PX218; PX220.

94. Between November 28, 1997, and March 16, 1998, Precision Pine received final decisions from Forest Service contracting officers that granted in part, and denied in part, the claims that had been submitted. PX195; PX197; PX199; PX201; PX203; PX205; PX207; PX209; PX211; PX213; PX215; PX217; PX219; PX221. Precision Pine was awarded, and the Forest Service paid, total compensation in the amount of $16,278.85 in connection with the claims. PX195; PX197; PX199; PX201; PX203; PX205; PX207; PX209; PX211; PX213; PX215; PX217; PX219; PX221; see also PX131 (exhibit 2).

## III. THE CONTRACTS

### A. Awarding Forest Service Timber And Multi-Product Sale Contracts

95. The Forest Service manages National Forest lands for multiple uses. The harvesting of timber is only one of many such uses. Tr. 3749-53 (Harris).

96. When the Forest Service concludes that conducting a timber sale would be consistent with its overall strategy for managing a National Forest, the Forest Service establishes a sale area and determines parameters for harvesting that are consistent with environmental requirements and management objectives. Tr. 3753-55 (Harris).

97. One of the steps in preparing a timber sale to be offered to the public is surveying the sale area to determine the volume, size, and quality of timber that is present. To do this, the Forest Service conducts a "cruise" of trees in the cutting units of the proposed sale area. Tr. 3755-58 (Harris).

98. A cruise assesses the total volume, the average diameter at breast height (dbh), and the percent clear faces of the sawtimber being sold. Forest Service cruises are specifically designed for the sale area under consideration and use statistical principles to reach an error of less than 10 percent with a 95 percent confidence level. Tr. 3755-58, 3777-78 (Harris); Tr. 4323-24 (Munn).

99. From the standpoint of potential bidders, a timber sale commences when the Forest Service issues an advertisement and prospectus that describe the timber to be harvested, the estimated volume of sawtimber and (for multi-product sales) roundwood being sold, and the dates bids must be submitted. Tr. 3767 (Harris). Included in the advertisement is a minimum bid price. Tr. 3766 (Harris). See generally Seaboard Lumber Co. v. United States, 48 Fed. Cl. 814, 816 (2001), aff'd, 308 F.3d 1283 (Fed. Cir. 2002).

100. A prospectus and sample contract are made available to interested bidders. Tr. 3766 (Harris). The prospectus identifies the length of time the contractor will be allowed to perform the contract, establishes the contract's operating season, specifies the timing of contractor payments for the sawtimber, and, for multi-product sales, states the fixed price for the sale's roundwood component. Tr. 3766 (Harris). Interested parties are invited to examine the site and available timber prior to bidding. Tr. 3768-69, 4183 (Harris). See generally Seaboard Lumber, 48 Fed. Cl. at 816.

101. Forest Service contracts generally define "sawtimber" as trees larger than 9 inches dbh. "Roundwood" refers to smaller trees that are between 5.0 and 8.9 inches dbh. See, e.g., PX169-79.

102. The price of the roundwood component of a multi-product sale is fixed and is administratively-established by the Forest Service. Tr. 3781 (Harris). The bid price affects only the stumpage price paid for sawtimber component of the sale. See, e.g., PX169-79.

103. Forest Service contracts require the removal of all “included timber” – both roundwood and sawtimber – and, therefore, a prospective bidder must take into account the fixed roundwood cost in determining what to bid for the sawtimber component of a multi-product sale. See, e.g., PX169-79; Tr. 1827, 2025 (Porter).

104. Forest Service timber sale contracts and multi-product sale contracts are generally competitively bid and awarded to the highest bidder. First Joint Stip. ¶ 10; Tr. 1286 (Porter).

105. Forest Service timber and multi-product sales frequently are awarded to purchasers who do not own a sawmill or planer, and who not to have access to such manufacturing facilities. Such purchasers are fully capable of performing the logging and hauling required by Forest Service timber sale contracts. Tr. 1762-65 (Reidhead), 2920-21 (Matson), 3116-17 (Lewis), 3770 (Harris).

106. Tri-Star Logging, which has never owned or operated a sawmill or a planer, bid on, was awarded, and performed several Forest Service timber sale contracts. Tr. 1762-63, 1765 (Reidhead).

107. Similarly, Zellner Firewood bid on, was awarded, and performed Forest Service multi-product sale contracts. Zellner did not own or operate a sawmill and ordinarily sold the logs obtained from Forest Service sales as firewood. Tr. 1651 (Porter).

**B. The Contracts At Issue**

108. This action concerns 14 contracts: (1) the O.D. Ridge timber sale; (2) the Kettle multi-product sale; (3) the Hay timber sale; (4) the Brookbank multi-product sale; (5) the Jersey Horse timber sale; (6) the Salt multi-product sale; (7) the Manaco multi-product sale; (8) the St. Joe timber sale; (9) the Hutch-Boondock multi-product sale; (10) the Mud multi-product sale; (11) the Saginaw-Kennedy multi-product sale; (12) the Brann multi-product sale; (13) the U-Bar timber sale; and (14) the Monument multi-product sale. Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 38 (2001); see also PX169-79; DX211; DX238; DX342.

109. The contracts are spread across four National Forests: (1) the Apache-Sitgreaves National Forest; (2) the Coconino National Forest; (3) the Kaibab National Forest; and (4) the Tonto National Forest. See PX169-79; DX211; DX238; DX342.

110. The contracts each establish a normal operating season in which harvesting operations are to be performed. See PX169-79; DX211; DX238; DX342; Tr. 3800-01 (Harris) (discussing clause AT17).

111. The contracts require the purchaser to submit to the Forest Service an annual operating schedule. The contracts also require the purchaser to meet with the Forest Service prior to commencing or restarting harvesting operations to discuss their operating plan, as well

as issues unique to the sale and sale area. See PX169-79; DX211; DX238; DX342; Tr. 3808-09 (Harris) (discussing clause BT6.31).

112. Each contract requires the purchaser to cut and remove all sawtimber and (for multi-product sales) roundwood by the contract's termination date. Each contract prescribes the manner of conducting logging and hauling operations, as well as land restoration work. See PX169-79; DX211; DX238; DX342; Tr. 3803, 3805-07, 3831-32 (Harris).

113. Each contract establishes a pricing mechanism for sawtimber and a fixed price for roundwood. The price for sawtimber is frequently based upon the Inland Rocky Mountain Ponderosa Pine index published by the Western Wood Products Association. See PX169-79; DX211; DX238; DX342; First Joint Stip. ¶ 32.

114. Payment for timber and roundwood occurs when the logs are cut and removed from the sale area. However, each Forest Service contract also contains a midpoint payment date that requires an initial payment even if no work on the contract has occurred. See PX169-79; DX211; DX238; DX342; Tr. 4150-52 (Harris).

115. The contracts require the purchaser to make a down payment and to maintain payment and performance bonds. See PX169-79; DX211; DX238; DX342.

116. The contracts each contain a sale area map. The sale area for each contract is divided into payment units. Payment units are further subdivided into cutting units. See PX169-79; DX211; DX238; DX342; Tr 3799, 4168-69 (Harris).

117. At any given time, operations can occur upon only three payment units. Only when all work on a payment unit (i.e., all cutting and hauling of timber and roundwood, and all

land restoration work) is completed may the next payment unit be opened and work commence. See PX169-79; DX211; DX238; DX342; Tr. 3802, 3830-31 (Harris).

118. Forest Service contracts do not require the purchaser to process logs from the sale at its sawmill or at any sawmill whatsoever. See PX169-79; DX211; DX238; DX342; Tr. 3770 (Harris), 1541-43 (Porter), 1762-65 (Reidhead), 3116-18 (Lewis).

119. Once the purchaser has cut, removed and paid for the logs, subject only to statutory and regulatory constrains such as the statutory prohibition on exporting unprocessed logs from Federal lands, the purchaser is free to put harvested logs to any use it chooses. See PX169-79; DX211; DX238; DX342; Tr. 4151-52 (Harris), Tr. 2920-21 (Matson).

120. Precision Pine took advantage of the flexibility afforded by its Forest Service contracts. At times, Precision Pine milled logs and planed and sold the resulting lumber. At other times, logs from Forest Service sales were (1) milled and sold as rough cut (unplaned) lumber products, (2) sold to third parties for use in the other parties' milling or manufacturing operations, (3) sold for use as pulpwood, (4) sold as firewood, (5) sold for resale as vigas or firewood, and (6) stacked and left unused. E.g., DX468-71; DX553; DX795; Tr. 1652 (Porter).

**1. The Brann Multi-Product Sale Contract**

121. Brann was a multi-product sale. As a multi-product sale, the Brann contract contained both sawtimber and roundwood components. See, e.g., DX342.

122. The Brann contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Brann contract was 1,827 ccf sawtimber and 1,812 ccf roundwood. DX342 (AT2).

123. The sawtimber component of the Brann contract had an average dbh of 12.2 inches and 9.0 percent grade. PX13.

124. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Brann contract was 0.5000. PX13.

125. The Brann contract's normal operating season ran from April 15 to December 31. DX342 (clause AT17).

126. The Brann contract contained additional restrictions that further limited timber harvesting as a result of endangered, threatened and sensitive species. See DX342 (clause CT6.25).

127. The Brann contract was awarded to Precision Pine on September 29, 1994. First Joint Stip. ¶ 20.

128. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Brann contract at or before its award. Tr. 1856-57 (Porter).

129. The Forest Service suspended the Brann contract on August 25, 1995. First Joint Stip. ¶ 29.

130. As of August 25, 1995, the volume remaining to be cut and removed from the Brann contract sale area was 1,827 ccf (or 914 mbf (l.s.)) sawtimber and 1,812 ccf roundwood. DX361; PX13.

131. The Forest Service lifted the suspension and, subject to the terms and conditions of the contract, made Brann available for harvesting by Precision Pine on October 18, 1995.

First Joint Stip. ¶ 30; Precision Pine, 50 Fed. Cl. at 47 & n.18; see also PX106 (paragraph 3(m)); Tr. 3858-59 (Harris).

132. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Brann contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

133. Precision Pine partially harvested the Brann contract beginning in January 1996. Tr. 3849-56 (Harris); DX347; DX348; DX361.

134. Precision Pine stopped harvesting the Brann contract in February 1996. Tr. 3869 (Harris); see also DX361. Precision Pine informed the Forest Service that it was leaving the Brann contract so that it could harvest the C-12 timber sale on the Hualapai Indian Reservation. Tr. 3869 (Harris); DX800 at 2.

135. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log both the Hualapai and Brann contracts at the same time. See Tr. 1743-44, 1755 (Reidhead).

136. Stone subsequently refused to accept roundwood that a small third party operator – Art Daley – had removed from the Brann sale. Stone informed Mr. Daley, who subsequently informed Mr. Porter, that Stone would not take roundwood, directly or indirectly, from Precision Pine. Tr. 3861, 3864, 3867 (Harris); DX454.

137. During the period when other contracts remained suspended (i.e., from October 19, 1995 to December 4, 1996), Precision Pine did not complete harvesting the Brann contract. Tr. 1469 (Porter), 3872 (Harris). As of December 1996, only 57 percent of available sawtimber and 14 percent of available roundwood had been cut and removed by Precision Pine. Tr. 1456, 1459-60 (Porter); DX360; DX361; DX552.

138. Although the contract was subsequently available, Precision Pine never resumed work or completed timber harvesting upon the Brann contract. Tr. 3872 (Harris); DX361.

139. The Forest Service terminated the Brann contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (case no. 02-131).

140. Pursuant to CT 6.01, the Forest Service paid Precision Pine $44.65 in connection with the suspension of the Brann contract. See PX211; PX131 (exhibit 2).

**2. The Brookbank Multi-Product Sale Contract**

141. Brookbank was a multi-product sale. As a multi-product sale, the Brookbank contract contained both sawtimber and roundwood components. See, e.g., PX172.

142. The Brookbank contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Brookbank contract was 4,393 ccf sawtimber and 5,992 ccf roundwood. PX172 (AT2).

143. The sawtimber component of the Brookbank contract had an average dbh of 12.6 inches and 22.9 percent grade. PX4; DX820; see also Tr. 1366-67 (Porter) (stating agreement with the Brookbank appraisal).

144. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Brookbank contract was 0.4780. PX4.

145. The Brookbank contract's normal operating season ran from April 15 to November 15. PX172 (clause AT17); DX800 at 5.

146. The Brookbank contract was awarded to Precision Pine on April 13, 1995. First Joint Stip. ¶ 22.

147. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Brookbank contract at or before its award. Tr. 1856-57 (Porter).

148. The Forest Service suspended the Brookbank contract on August 25, 1995. First Joint Stip. ¶ 29.

149. As of August 25, 1995, the volume remaining to be cut and removed from the Brookbank contract sale area was 2,711 ccf (or 1,296 mbf (l.s.)) sawtimber and 5,347 ccf roundwood. Third Joint Stip. ¶¶ 10-11; PX4.

150. The suspension of the Brookbank contract was lifted on December 4, 1995. First Joint Stip. ¶ 31; Precision Pine, 50 Fed. Cl. at 39, 70; DX 800 at 6.

151. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Brookbank contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

152. The Brookbank contract was unaffected by the Forest Guardians suspension. See DX800 at 6.

153. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the Brookbank contract in 1997 or in subsequent years. See Tr. 1743-44, 1755 (Reidhead).

154. Precision Pine chose not to commence post-suspension harvesting upon the Brookbank contract until November 1997. DX109; DX800 at 6-7; DX791 (describing Precision Pine's decision as based upon "business reasons").

155. Precision Pine never completed harvesting the Brookbank contract. DX109.

156. The Forest Service terminated the Brookbank contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (case no. 02-131).

157. Pursuant to CT 6.01, the Forest Service paid Precision Pine $2,565.89 in connection with the suspension of the Brookbank contract. See PX197; PX131 (exhibit 2).

**3. The Hay Timber Sale Contract**

158. Hay was a not a multi-product sale. See, e.g., PX169.

159. The Hay contract was a "scaled" sale, that is, the Forest Service measured the volume of logs removed by Precision Pine from the sale area. Charges to Precision Pine were based upon the actual log volume measured by the Forest Service. Tr. 4135, 4151-52 (Harris); PX169; PX265.

160. The sawtimber on the Hay contract had an average dbh of 17.2 inches and 20.6 percent grade. PX1; DX820.

161. The Hay contract's normal operating season ran from April 15 to November 30. PX169 (clause AT17); DX 800 at 9.

162. The Hay contract contained additional restrictions that further limited timber harvesting as a result of endangered, threatened and sensitive species. Specifically, logging on cutting units 1-6, 9-15, 19-21, 23-25, 33, 36 and 41 could only take place between September 1 and November 30. Logging on cutting unit 7 could only take place between June 30 and November 30. See PX169 (clause CT6.25); DX800 at 9.

163. Unlike the other contracts at issue, the Hay contract did not contain clause CT 6.01. PX169; Tr. 1878 (Porter).

164. The Hay contract originally was awarded to Reidhead Lumber Company, Inc., on January 17, 1990. First Joint Stip. ¶ 24. The Hay contract was transferred to Precision Pine by contract modification on June 24, 1991. Id. ¶25.

165. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Hay contract at or before its award in January 1990. Tr. 1852 (Porter).

166. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Hay contract at or before its transfer to Precision Pine in June 1991. Tr. 1855 (Porter).

167. Precision Pine first notified the Forest Service that it intended to haul logs from the Hay sale to Precision Pine's sawmill in Eagar, Arizona on November 23, 1994. Tr. 720-22, 1867-68 (Porter); PX260. Precision Pine requested that the Forest Service establish an area for scaling logs from the Hay sale at the Eagar sawmill. PX260.

168. Precision Pine's pre-suspension (FYE 1996) logging and hauling costs for the Hay contract were $93.70 per mbf (l.s.). See PX248 (total logging and hauling cost of $173,358); PX290 (total volume of 1,851 mbf (l.s.)).

169. The Forest Service suspended the Hay contract on August 25, 1995. First Joint Stip. ¶ 31.

170. As of August 25, 1995, the volume sawtimber remaining to be cut and removed from the Hay contract sale area was 3,819 mbf (l.s.) sawtimber and no roundwood. Third Joint Stip. ¶¶ 18-19.

171. The suspension of the Hay sale was lifted on December 4, 1996. First Joint Stip. ¶ 31; Precision Pine, 50 Fed. Cl. at 39, 70; DX800 at 9.

172. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Hay contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

173. In December 1996, Precision Pine requested and was granted permission by the Forest Service to operate the Hay timber sale outside of the contract's normal operating season. See PX257; DX54.

174. Precision Pine resumed logging upon the Hay contract in December 1996. DX68.

175. Precision Pine could have hauled logs from the Hay sale to Eagar and decked them at the Eagar sawmill during December 1996 and January 1997. Tr. 1874 (Porter).

176. Precision Pine made a "business decision" to haul to Winslow rather than Eagar in December 1996 and January 1997. Tr. 1875 (Porter).

177. Precision Pine requested that the Forest Service re-establish an area for scaling logs at the Eagar sawmill on January 30, 1997. Tr. 1869-73 (Porter); PX265.

178. Precision Pine made a business decision to continue hauling some logs from the Hay sale to Winslow after January 30, 1997. Tr. 1874 (Porter).

179. Precision Pine stopped logging the Hay contract in February 1997. DX68.

180. Precision Pine's logging and hauling costs for the Hay contract between December 1996 and February 1997 were $154.64 per mbf (l.s.). See PX248 (total logging and hauling cost of $333,518); PX290 (total volume of 2,157 mbf (l.s.)).

181. The Forest Service suspended the Hay timber sale in June 1997 as a result of the Forest Guardians action.[2] Tr. 983 (Porter); PX119; DX800 at 9.

182. The Forest Guardians suspension was lifted in December 1997. Tr. 983 (Porter); DX800 at 9.

183. In October 1998, Precision Pine resumed harvesting the Hay contract; harvesting was completed in January 1999. DX68; Tr. 853, 1834 (Porter).

184. Precision Pine's logging and hauling costs for the Hay contract between October 1998 and January 1999 were $137.47 per mbf (l.s.). See PX248 (total logging and hauling cost of $228,548); PX290 (total volume of 1,662 mbf (l.s.)).

185. If Precision Pine had not closed the Eagar sawmill in July 1997, it would have been available for logs from the Hay sale in 1998. Tr. 1863 (Porter).

186. Precision Pine earned more by harvesting the Hay contract in the post-suspension period that it allegedly would have earned by harvesting during the period of the MSO suspensions. PX131 ($2.61 million claimed); PX182 ($3.07 million earned); see also DX834 (showing higher revenue per mbf).

**4. The Hutch-Boondock Multi-Product Sale Contract**

187. Hutch-Boondock was a multi-product sale. As a multi-product sale, the Hutch-Boondock contract contained both sawtimber and roundwood components. See, e.g., DX238.

---

[2] Precision Pine has filed a separate action seeking compensation as a result of the Forest Guardians suspension. See Precision Pine & Timber, Inc. v. United States, No. 01-415C (Fed. Cl.) (filed July 17, 2001).

188. The Hutch-Boondock contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Hutch-Boondock contract was 4,717 ccf sawtimber and 1,645 ccf roundwood. DX238 (AT2).

189. The sawtimber component of the Hutch-Boondock contract had an average dbh of 12.6 inches and 0.8 percent grade. PX14; DX820.

190. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Hutch-Boondock contract was 0.4656. PX14.

191. The Hutch-Boondock contract's normal operating season ran from April 15 to November 30. DX238 (clause AT17).

192. The Hutch-Boondock contract contained no additional restrictions that further limited timber harvesting as a result of endangered, threatened and sensitive species. See DX238 (clause CT6.25).

193. The Hutch-Boondock contract was awarded to Precision Pine on June 29, 1994. First Joint Stip. ¶ 16.

194. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Hutch-Boondock contract at or before its award. Tr. 1856-57 (Porter).

195. The Forest Service suspended the Hutch-Boondock contract on August 25, 1995. First Joint Stip. ¶ 29.

196. As of August 25, 1995, the volume remaining to be cut and removed from the Hutch-Boondock contract sale area was 4,717 ccf (or 2,196 mbf (l.s.)) sawtimber and 1,645 ccf roundwood. DX249; DX251.

197. The Forest Service lifted the suspension and, subject to the terms and conditions of the contract, made Hutch-Boondock available for harvesting by Precision Pine on October 18, 1995. First Joint Stip. ¶ 30; Precision Pine, 50 Fed. Cl. at 47 & n.18; see also PX106 (paragraph 3(m)).

198. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Hutch-Boondock contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

199. On October 31, 1995, Precision Pine informed the Forest Service that it had no outlet for roundwood from the Hutch-Boondock contract. DX263.

200. Based upon Precision Pine's representation, the Forest Service allowed Precision Pine to defer harvesting the roundwood component of the Hutch-Boondock contract. Tr. 3919-21 (Harris).

201. Precision Pine conducted harvesting the Hutch-Boondock contract from November 1995 to January 1996. DX251.

202. Precision Pine conducted additional harvesting between July and December 1996. DX251; see also DX800 at 10.

203. Although the Hutch-Boondock contract was unaffected by the Forest Guardians suspension, Precision Pine conducted no harvesting during 1997. See DX251; DX800 at 11.

204. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the Hutch-Boondock contract in 1997 and in subsequent years. See Tr. 1743-44, 1755 (Reidhead).

205. Although the contract was subsequently available, Precision Pine never completed timber harvesting upon the Hutch-Boondock contract. See DX251.

206. During the period when other contracts remained suspended (i.e., from October 19, 1995 to December 4, 1996), Precision Pine did not complete harvesting of the Hutch-Boondock contract. Tr. 1469 (Porter); DX251. As of December 1996, only 96 percent of available sawtimber and 24 percent of available roundwood had been cut and removed by Precision Pine. Tr. 1456, 1459-60 (Porter); DX249; DX251; DX552.

207. The Forest Service terminated the Hutch-Boondock contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (case no. 02-131).

208. Pursuant to CT 6.01, the Forest Service paid Precision Pine $128.80 in connection with the suspension of the Hutch-Boondock contract. See PX221; PX131 (exhibit 2).

**5. The Jersey Horse Timber Sale Contract**

209. Jersey Horse was a not multi-product sale. See PX170.

210. The Jersey Horse contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Jersey Horse contract was 3,163 ccf sawtimber and no roundwood. PX170 (AT2).

211. The sawtimber on the Jersey Horse contract had an average dbh of 17.9 inches and 37.9 percent grade. PX2; DX820.

212. The Jersey Horse contract's normal operating season ran from April 15 to November 15. PX170 (clause AT17).

213. The Jersey Horse contract contained additional restrictions that further limited timber harvesting as a result of endangered, threatened and sensitive species. Specifically, logging, hauling and road construction in payment units 2-7 was only permitted between

September 1 and November 15, and logging, hauling and road construction in cutting unit 14 was permitted only between October 1 and November 15. See PX170 (clause CT6.25).

214. The Jersey Horse contract was awarded to Precision Pine on December 13, 1993. First Joint Stip. ¶ 20.

215. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Jersey Horse contract at or before its award. Tr. 1856-57 (Porter).

216. The Forest Service suspended the Jersey Horse contract on August 25, 1995. First Joint Stip. ¶ 29.

217. As of August 25, 1995, the volume remaining to be cut and removed from the Jersey Horse contract sale area was 3040 ccf sawtimber and no roundwood. Third Joint Stip. ¶¶ 12-13.

218. The suspension of the Jersey Horse contract was lifted on December 4, 1996. First Joint Stip. ¶ 30; Precision Pine, 50 Fed. Cl. at 39, 70; DX 800 at 15.

219. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Jersey Horse contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

220. The Jersey Horse contract was unaffected by the Forest Guardians suspension. See DX800 at 15.

221. Precision Pine partially harvested the Jersey Horse contract beginning between September 1997 and January 1998. DX128.

222. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the Jersey Horse contract in 1997 and in subsequent years. See Tr. 1743-44, 1755 (Reidhead).

223. Although the contract was subsequently available, Precision Pine never resumed work or completed timber harvesting upon the Jersey Horse contract. DX128.

224. The Forest Service terminated the Jersey Horse contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (case no. 02-131).

225. Pursuant to CT 6.01, the Forest Service paid Precision Pine $1,335.25 in connection with the suspension of the Jersey Horse contract. See PX203; PX131 (exhibit 2).

**6. The Kettle Multi-Product Sale Contract**

226. Kettle was a multi-product sale. As a multi-product sale, the Kettle contract contained both sawtimber and roundwood components. See, e.g., PX173.

227. The Kettle contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Kettle contract was 5,702 ccf sawtimber and 3,958 ccf roundwood. PX173 (AT2).

228. The sawtimber component of the Kettle contract had an average dbh of 12.3 inches and 23.0 percent grade. See PX5; DX820.

229. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Kettle contract was 0.4757. See PX5.

230. The Kettle contract's normal operating season ran from May 15 to October 31. PX173 (clause AT17); DX800 at 5.

231. The Kettle contract was awarded to Precision Pine on July 20, 1995. First Joint Stip. ¶ 23.

232. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Kettle contract at or before its award. Tr. 1856-57 (Porter).

233. The Forest Service suspended the Kettle contract on August 25, 1995. First Joint Stip. ¶ 29.

234. As of August 25, 1995, the volume remaining to be cut and removed from the Kettle contract sale area was 5,702 ccf (or 2712 mbf (l.s.)) sawtimber and 3,958 ccf roundwood. Third Joint Stip. ¶¶ 20-21; PX5.

235. Precision Pine informed local government officials in December 1995 that the Kettle was not profitable to operate. DX722.

236. The suspension of the Kettle contract was lifted on December 4, 1995. First Joint Stip. ¶ 31; Precision Pine, 50 Fed. Cl. at 39, 70; DX 800 at 17.

237. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Kettle contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

238. The Kettle contract was unaffected by the Forest Guardians suspension. See DX800 at 17.

239. Precision Pine began harvesting the Kettle contract in May 1997. DX31; DX800 at 17.

240. The Forest Service did not authorize the deferred harvesting of roundwood on the Kettle contract. As a result, because Precision Pine had no outlet for roundwood, Precision Pine decked (i.e., stacked) harvested roundwood at its Eagar sawmill. Tr. 1947-48 (Porter); DX553.

241. Precision Pine did not fully harvest the Kettle contract. DX31. Rather, on August 15, 1997, Precision Pine sold the Kettle contract to Stone. PX117; DX477 (same).

242. Stone paid $60,495 and agreed to accept the roundwood that Precision Pine had previously cut and decked at the Eagar sawmill. DX477; DX553; DX587. Precision Pine sold the Kettle contract because it had been unable to find an outlet for the roundwood on the sale. DX47.

243. The price at which Precision Pine sold the Kettle sale to Stone ($60,495) was much lower than Precision Pine's "worst case" profit projection of July 17, 1995 ($120,351), PX117; DX514, despite the fact that lumber prices in August 1997 were substantially higher, see PX305.

244. Pursuant to CT 6.01, the Forest Service paid Precision Pine $1,344.91 in connection with the suspension of the Kettle contract. See PX207; PX131 (exhibit 2).

**7. The Manaco Multi-Product Sale Contract**

245. Manaco was a multi-product sale. As a multi-product sale, the Manaco contract contained both sawtimber and roundwood components. See, e.g., PX178.

246. The Manaco contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Manaco contract was 5,692 ccf sawtimber and 1,587 ccf roundwood. PX178 (AT2).

247. The sawtimber component of the Manaco contract had an average dbh of 12.9 inches and 0.7 percent grade. PX10; DX820.

248. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Manaco contract was 0.4845. PX10.

249. The normal operating season for payment unit one of the Manaco contract ran from May 1 to the weekend before Memorial Day and from the day after Labor Day to November 30. The normal operating season for payment units two through ten of the Manaco contract ran from May 1 to July 15 and from August 15 to November 30. PX178 (clause AT17).

250. The Manaco contract contained additional restrictions that further limited timber harvesting as a result of endangered, threatened and sensitive species. See DX238 (clause CT6.25). Specifically, activities in cutting units 7, 12-16, 19, 30-33, 36, 38 and 39 could take place only between October 1 and November 30. Log hauling from cutting units 9-11, 17, 20 and 37 could only take place between October 1 and November 30. Road building, maintenance and usage of specified Forest Service roads was prohibited until October 1. See PX178 (clause CT6.25); DX800 at 18.

251. The Manaco contract was awarded to Precision Pine on January 17, 1995. First Joint Stip. ¶ 21.

252. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Manaco contract at or before its award. Tr. 1856-57 (Porter).

253. The Forest Service suspended the Manaco contract on August 25, 1995. First Joint Stip. ¶ 29.

254. As of August 25, 1995, the volume remaining to be cut and removed from the Manaco contract sale area was 5,006 ccf (or 2,425 mbf (l.s.)) sawtimber and 1,348 ccf roundwood. Third Joint Stip. ¶¶ 14-15; PX10.

255. A Mexican Spotted Owl was discovered adjacent to the Manaco sale during the summer of 1996. Precision Pine was informed that the discovery of the owl – a threatened species protected by the Endangered Species Act – would require a suspension of operations and consultation with the Fish and Wildlife Service. See Tr. 4625 (Dils); DX800 at 18.

256. As a result of the presence of the owl, the suspension of the Manaco contract continued after December 4, 1996. The suspension of the Manaco contract was lifted in March 1997. Tr. 4625 (Dils); DX 800 at 18-19.

257. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Manaco contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

258. The Forest Service suspended parts of the Manaco sale in June 1997 as a result of the Forest Guardians action. DX800 at 18.

259. The partial suspension resulting from the Forest Guardians action was lifted in December 1997. DX800 at 18.

260. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the Manaco contract in 1997 or in subsequent years. See Tr. 1743-44, 1755 (Reidhead).

261. Precision Pine did not to commence post-suspension harvesting upon the Manaco contract until May 1998. DX186; see also DX800 at 19; DX791 (describing Precision Pine's decision to defer harvesting as based upon "business reasons").

262. Precision Pine never completed harvesting the Manaco contract. DX186.

263. The Forest Service terminated the Manaco contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (case no. 02-131).

264. Pursuant to CT 6.01, the Forest Service paid Precision Pine $545.53 in connection with the suspension of the Manaco contract. See PX199; PX131 (exhibit 2).

**8. The Monument Multi-Product Sale Contract**

265. Monument was a multi-product sale. As a multi-product sale, the Monument contract contained both sawtimber and roundwood components. See, e.g., PX176.

266. The Monument contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Monument contract was 1,461 ccf sawtimber and 1,100 ccf roundwood. PX176 (AT2).

267. The sawtimber component of the Monument contract had an average dbh of 11.5 inches and 0.0 percent grade. PX8; DX820.

268. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Monument contract was 0.4456. PX8.

269. The Monument contract's normal operating season ran from April 15 to November 30. PX176 (clause AT17).

270. The Monument contract was awarded to Precision Pine on September 28, 1994. First Joint Stip. ¶ 19.

271. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Monument contract at or before its award. Tr. 1856-57 (Porter).

272. The Forest Service suspended the Monument contract on August 25, 1995. First Joint Stip. ¶ 29.

273. As of August 25, 1995, the volume remaining to be cut and removed from the Monument contract sale area was 1,461 ccf (or 651 mbf (l.s.)) sawtimber and 1,100 ccf roundwood. Third Joint Stip. ¶¶ 1-2; PX8.

274. The suspension of the Monument contract was lifted on December 4, 1995. First Joint Stip. ¶ 31; Precision Pine, 50 Fed. Cl. at 39, 70; DX 800 at 21.

275. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Monument contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

276. The Monument contract was unaffected by the Forest Guardians suspension. See DX800 at 22.

277. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the Monument contract in 1997 or in subsequent years. See Tr. 1743-44, 1755 (Reidhead).

278. Precision Pine did not conduct harvesting upon the Monument contract at any time. DX437; Tr. 1063-64 (Porter); DX791 (stating that Precision Pine decided to forego harvesting for "business reasons").

279. The Forest Service terminated the Monument contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (case no. 02-131).

280. Pursuant to CT 6.01, the Forest Service paid Precision Pine $245.43 in connection with the suspension of the Monument contract. See PX217; PX131 (exhibit 2).

**9. The Mud Multi-Product Sale Contract**

281. Mud was a multi-product sale. As a multi-product sale, the Mud contract contained both sawtimber and roundwood components. See PX175.

282. The Mud contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. As of the award date, the volume of "included timber" on the Mud contract was 6,199 ccf sawtimber and 4,060 ccf roundwood. PX175 (AT2).

283. As of the award date, the sawtimber component of the Mud contract had an average dbh of 11.6 inches and 0.0 percent grade. PX7; DX820.

284. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Mud contract was 0.4516. PX7.

285. The Mud contract's normal operating season ran from June 1 to December 31. PX175 (clause AT17).

286. The Mud contract was awarded to Precision Pine on September 14, 1994. First Joint Stip. ¶ 18.

287. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Mud contract at or before its award. Tr. 1856-57 (Porter).

288. As a result of a court order entered in the Silver v. Babbit action, the Forest Service suspended the Mud contract on August 25, 1995. First Joint Stip. ¶ 29.

289. As of August 25, 1995, the volume remaining to be cut and removed from the Mud contract sale area was 6,199 ccf (or 2,799 mbf (l.s.)) sawtimber and 4,060 ccf roundwood. Third Joint Stip. ¶¶ 3-4; PX7.

290. The Mud contract was the subject of a second lawsuit – Southwest Center For Biological Diversity v. United States Forest Service, No. CIV-95-1927-PCT-RCB (D. Ariz. filed Sept. 13, 1995) – that also prevented timber harvesting by Precision Pine. PX106 ¶ 4.

291. On October 18, 1995, the Forest Service settled the Southwest Center action. The settlement called for the Forest Service to partially cancel the Mud sale by deleting the larger trees on specified payment units. PX106 ¶ 5.

292. Pursuant to the settlement, the Forest Service and Precision Pine executed a bilateral contract modification that cancelled parts of the Mud sale. PX175; DX311.

293. Precision Pine was paid $65,796.66 in consideration for the sale's partial cancellation. PX175; DX311; see also PX131 (exhibit 1).

294. The partial cancellation reduced the volume of "included timber" on the Mud contract, such that the volume of timber remaining to be cut was 4,173 ccf sawtimber and 2,744 ccf roundwood. PX175 (AT2).

295. On March 11, 1996, having sufficiently implemented the settlement in the Southwest Center lawsuit, the Forest Service lifted the suspension and, subject to the terms and conditions of the contract, made Mud available for harvesting by Precision Pine. DX300; DX316.

296. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Mud contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

297. On April 9, 1996, Precision Pine requested that the Forest Service waive normal operating season and other harvest restrictions and further sought permission to defer the removal of roundwood because Precision Pine had no outlet for such material. DX306.

298. The Forest Service denied Precision Pine's request to waive the contractual operating season restrictions. DX307.

299. Precision Pine began harvesting the Mud contract in July 1996. DX287; DX291. The Forest Service allowed Precision Pine to defer roundwood harvesting on the Mud sale due to Precision Pine's continuing lack of an outlet for such material. DX306; DX309.

300. Precision Pine logged the sale's sawtimber component with the understanding that it would return to harvest roundwood and that it would have to incur the cost of performing closing work on the sale twice. DX313.

301. Precision Pine stopped logging the Mud contract in October 1996. DX291.

302. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to complete harvesting of the Mud contract in 1996. See Tr. 1743-44, 1755 (Reidhead).

303. During the period when other contracts remained suspended (i.e., from October 19, 1995 to December 4, 1996), Precision Pine did not complete harvesting of the Mud contract. Tr. 1469 (Porter). As of December 1996, only 56 percent of available sawtimber and 6 percent of available roundwood had been cut and removed by Precision Pine. Tr. 1456, 1464, 1467 (Porter); DX291; DX552; DX799.

304. Although the Mud contract was unaffected by the Forest Guardians suspension, Precision Pine chose not to conduct timber harvesting on the Mud contract in 1997. DX291; DX800 at 26.

305. In November 1997, Precision Pine entered into a contract with Stone to accept roundwood from the Mud sale. PX223.

306. Precision Pine resumed and completed timber harvesting upon the Mud contract in 1998. DX291; Tr. 1834 (Porter).

307. Pursuant to CT 6.01, the Forest Service paid Precision Pine $556.80 in connection with the suspension of the Mud contract. See PX219; PX131 (exhibit 2).

**10. The O.D. Ridge Timber Sale Contract**

308. O.D. Ridge was not a multi-product sale. See PX171.

309. The O.D. Ridge contract was sold on a mbf basis, that is, volumes were measured by the Forest Service in mbf (l.s.). The volume of "included timber" on the O.D. Ridge contract was 3,650 mbf (l.s.) Ponderosa Pine sawtimber, 910 mbf (l.s.) Douglas Fir, and 600 mbf (l.s.) Engleman's Spruce. The sale contained no roundwood. PX171 (AT2).

310. The sawtimber on the O.D. Ridge contract had an average dbh of 17.6 inches and 54.3 percent grade. PX3.

311. The O.D. Ridge contract's normal operating season ran from May 15 to October 15. PX171 (clause AT17).

312. The O.D. Ridge contract was awarded to Precision Pine on August 14, 1992. First Joint Stip. ¶ 12.

313. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the O.D. Ridge contract at or before its award. Tr. 1856-57 (Porter).

314. The Forest Service suspended the O.D. Ridge contract on August 25, 1995. First Joint Stip. ¶¶ 28-29.

315. As of August 25, 1995, the volume remaining to be cut and removed from the O.D. Ridge contract sale area was 2,626 mbf (l.s.) sawtimber and no roundwood. Third Joint Stip. ¶¶ 22-23.

316. The suspension was lifted on December 4, 1995. First Joint Stip. ¶ 30; Precision Pine, 50 Fed. Cl. at 39, 70; DX800 at 26.

317. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the O.D. Ridge contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

318. Precision Pine conducted logging on the O.D. Ridge sale during May 1997. DX3.

319. The Forest Service suspended the O.D. Ridge timber sale in June 1997 as a result of the Forest Guardians action. DX800 at 27.

320. The Forest Guardians suspension was lifted in December 1997. DX800 at 27.

321. Although the contract was subsequently available, Precision Pine never completed timber harvesting upon the O.D. Ridge contract. See DX3.

322. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the O.D. Ridge contract in subsequent years. See Tr. 1743-44, 1755 (Reidhead).

323. The Forest Service terminated the O.D. Ridge contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (case no. 02-131).

324. Pursuant to CT 6.01, the Forest Service paid Precision Pine $1,734.57 in connection with the suspension of the O.D. Ridge contract. See PX209; PX131 (exhibit 2).

**11. The Saginaw-Kennedy Multi-Product Sale Contract**

325. Saginaw-Kennedy was a multi-product sale. As a multi-product sale, the Saginaw-Kennedy contract contained both sawtimber and roundwood components. See PX179.

326. The Saginaw-Kennedy contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Saginaw-Kennedy contract was 2,268 ccf sawtimber and 1,658 ccf roundwood. PX179 (AT2).

327. The sawtimber component of the Saginaw-Kennedy contract had an average dbh of 11.6 inches and 0.6 percent grade. PX11; DX820.

328. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Saginaw-Kennedy contract was 0.5000. PX11.

329. The Saginaw-Kennedy contract's normal operating season ran from April 1 to December 31. PX179 (clause AT17).

330. The Saginaw-Kennedy contract contained additional restrictions that further limited timber harvesting as a result of endangered, threatened and sensitive species. Specifically, no harvesting or other activities could occur in cutting units 12-14 before July 1. See PX179 (clause CT6.25).

331. The Saginaw-Kennedy contract was awarded to Precision Pine on September 29, 1994. First Joint Stip. ¶ 17.

332. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Saginaw-Kennedy contract at or before its award. Tr. 1856-57 (Porter).

333. The Forest Service suspended the Saginaw-Kennedy contract on August 25, 1995. First Joint Stip. ¶ 28-29.

334. As of August 25, 1995, the volume remaining to be cut and removed from the Saginaw-Kennedy contract sale area was 2,268 ccf (or 1,134 mbf (l.s.)) sawtimber and 1,658 ccf roundwood. Third Joint Stip. ¶¶ 5-6; PX11.

335. The suspension of the Saginaw-Kennedy contract was lifted on December 4, 1995. First Joint Stip. ¶ 31; Precision Pine, 50 Fed. Cl. at 39, 70; DX 800 at 35.

336. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Saginaw-Kennedy contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

337. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the Saginaw-Kennedy contract in 1997 or in subsequent years. See Tr. 1743-44, 1755 (Reidhead).

338. Precision Pine did not conduct harvesting upon the Saginaw-Kennedy contract at any time. DX320; Tr. 1063-64 (Porter); DX791 (stating that Precision Pine decided to forego harvesting for "business reasons").

339. The Forest Service terminated the Saginaw-Kennedy contract as a result of Precision Pine's default on January 9, 2001. Precision Pine, 62 Fed. Cl. at 638 (case no. 02-131).

340. Pursuant to CT 6.01, the Forest Service paid Precision Pine $350.72 in connection with the suspension of the Saginaw-Kennedy contract. See PX213; PX131 (exhibit 2).

**12. The Salt Multi-Product Sale Contract**

341. Salt was a multi-product sale. As a multi-product sale, the Salt contract contained both sawtimber and roundwood components. See PX177.

342. The Salt contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Salt contract was 4,460 ccf sawtimber and 1,835 ccf roundwood. PX177 (AT2).

343. The sawtimber component of the Salt contract had an average dbh of 11.9 inches and 1.8 percent grade. PX9; DX820.

344. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Salt contract was 0.4652. PX9.

345. The Salt contract's normal operating season ran from May 1 to July 15 and August 15 to November 30. PX177 (clause AT17).

346. The Salt contract was awarded to Precision Pine on April 13, 1995. First Joint Stip. ¶ 22.

347. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Salt contract at or before its award. Tr. 1856-57 (Porter).

348. The Forest Service suspended the Salt contract on August 25, 1995. First Joint Stip. ¶ 28-29.

349. As of August 25, 1995, the volume remaining to be cut and removed from the Salt contract sale area was 4,460 ccf (or 2,075 mbf (l.s.)) sawtimber and 1,835 ccf roundwood. Third Joint Stip. ¶¶ 16-17; PX9.

350. The suspension of the Salt contract was lifted on December 4, 1995. First Joint Stip. ¶ 31; Precision Pine, 50 Fed. Cl. at 39, 70; DX 800 at 32.

351. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Salt contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

352. The Forest Service suspended parts of the Salt sale in June 1997 as a result of the Forest Guardians action. DX800 at 32.

353. The partial suspension resulting from the Forest Guardians action was lifted in December 1997. DX800 at 32.

354. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the Salt contract in 1997 or in subsequent years. See Tr. 1743-44, 1755 (Reidhead).

355. Precision Pine never harvested the Salt contract before or after the MSO suspensions. Tr. 1063-64 (Porter); DX152; DX791 (stating that Precision Pine decided to forego harvesting for "business reasons").

356. Precision Pine defaulted on the Salt contract, and the contract was therefore terminated by the Forest Service, in 1998. Tr. 1064 (Porter); DX570.

357. Pursuant to CT 6.01, the Forest Service paid Precision Pine $2,565.89 in connection with the suspension of the Salt contract. See PX197; PX131 (exhibit 2).

**13. <u>The St. Joe Timber Sale Contract</u>**

358. St. Joe was not a multi-product sale. DX211.

359. The volume of "included timber" on the St. Joe contract was 8,310 mbf (l.s.) sawtimber and no roundwood. DX211 (AT2).

360. The sawtimber on the St. Joe contract had an average dbh of 21.2 inches and a 58.2 percent grade. PX12.

361. The St. Joe contract's normal operating season ran from April 15 to November 30. DX211 (clause AT17).

362. The St. Joe contract was awarded to Grand Canyon Forest Industries on October 16, 1992. First Joint Stip. ¶ 26.

363. The St. Joe contract was assigned to Precision Pine by Grand Canyon Forest Industries on October 16, 1992. First Joint Stip. ¶ 27.

364. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the St. Joe contract at or before the date of its assignment. Tr. 1856-57 (Porter).

365. The Forest Service suspended the St. Joe contract on August 25, 1995. First Joint Stip. ¶¶ 28-29.

366. As of August 25, 1995, the volume remaining to be cut and removed from the St. Joe contract sale area was 3,471 mbf (l.s.) sawtimber and no roundwood. <u>See</u> DX220.

367. The Forest Service lifted the suspension and, subject to the terms and conditions of the contract, made St. Joe available for harvesting by Precision Pine on October 18, 1995. First Joint Stip. ¶ 30; <u>Precision Pine</u>, 50 Fed. Cl. at 47 & n.18; <u>see also</u> PX106 (paragraph 3(m)).

368. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the St. Joe contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

369. Precision Pine completely harvested the St. Joe contract after the suspension was lifted. See DX220; Tr. 1835 (Porter).

370. Precision Pine did not seek, and therefore was not awarded, bond costs as part of its claim on the St. Joe contract. See PX200 (claim letter); PX201 (final decision).

**14. The U-Bar Timber Sale Contract**

371. U-Bar was not a multi-product sale. See PX174.

372. The U-Bar contract was sold on a mbf basis, that is, volumes were measured by the Forest Service in mbf (l.s.). The volume of "included timber" on the U-Bar contract was 6,856 mbf (l.s.) of Ponderosa Pine and 1,324 mbf (l.s.) of Douglas Fir. The U-Bar sale contained no roundwood. PX174 (AT2); see also Tr. 1019 (Porter).

373. The sawtimber component of the U-Bar contract had an average dbh of 15.7 inches and 39.9 percent grade. PX6; DX820.

374. The U-Bar contract's normal operating season ran from April 15 to November 30. PX174 (clause AT17).

375. The U-Bar contract contained additional restrictions that further limited timber harvesting as a result of endangered, threatened and sensitive species. See DX174 (clause CT6.25).

376. The U-Bar contract was awarded to Precision Pine on October 5, 1992. First Joint Stip. ¶ 13.

377. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the U-Bar contract at or before its award. Tr. 1856-57 (Porter).

378. The Forest Service suspended the U-Bar contract on August 25, 1995. First Joint Stip. ¶¶ 28-29.

379. As of August 25, 1995, the volume remaining to be cut and removed from the U-Bar contract sale area was 3,194 mbf (l.s.) sawtimber and no roundwood. Third Joint Stip. ¶¶ 7, 9.

380. The suspension was lifted on December 4, 1996. First Joint Stip. ¶ 31; Precision Pine, 50 Fed. Cl. at 39, 70; DX 800 at 29.

381. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the U-Bar contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

382. Precision Pine conducted logging on the U-Bar sale during May and June 1997. DX407.

383. Although the contract was subsequently available, Precision Pine never completed timber harvesting upon the U-Bar contract. DX407.

384. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the U-Bar sale in 1997 and in subsequent years. See Tr. 1743-44, 1755 (Reidhead).

385. The Forest Service terminated the U-Bar contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (case no. 02-131).

386. Pursuant to CT 6.01, the Forest Service paid Precision Pine $6,432.09 in connection with the suspension of the U-Bar contract. See PX215; PX131 (exhibit 2).

## IV. FACTS CONCERNING PRECISION PINE'S LOST LUMBER PROFIT CLAIMS

### A. Legal Foreseeability

387. Precision Pine did not report to the Forest Service about non-Forest Service timber sales or about cutting timber from Precision Pine's own land. Tr. 1656-57 (Porter).

388. The Forest Service's suspension of the Hay timber sale in 1993 did not result in the closure of any of Precision Pine's sawmills. Tr. 1815-16.

389. Although the Forest Service suspended multiple contracts in 1993, the suspensions did not result in the closure of any of Precision Pine's sawmills. Tr. 1817.

### B. Precision Pine's 1995 Annual Operating Schedule

390. Precision Pine's contracts require Precision Pine to provide an annual operating schedule to the Forest Service each year. See PX169-79 (clause BT 6.31 & CT 6.3); Tr. 1628-29 (Porter), 3808-09 (Harris). Precision Pine was required to provide the Forest Service "reasonable notice" of any changes to this operating schedule. PX169-79 (BT 6.31); Tr. 1629 (Porter).

391. In February 1995, Precision Pine submitted to the Forest Service an annual operating schedule for the 1995 operating season. The schedule shows Precision Pine harvesting the Barber, Brann, Hutch-Boondock, Merritt, Mud, Saginaw-Kennedy and U-Bar contracts between September and December 1995. DX294

392. Precision Pine "did not make any attempt" to ensure the annual operating schedule for 1995 that was given to the Forest Service was accurate. Tr. 1631 (Porter); see also

Tr. 1630 (Porter) (denying that the operating schedule provided to the Forest Service "was the best estimate [that the company] could make" based upon currently available information).

393. The 1995 annual operating schedule provided to the Forest Service was false and Precision Pine knew the schedule was false when it submitted the schedule to the Forest Service. Tr. 1633 (Porter).

394. The Forest Service relied upon the annual operating schedule for 1995 submitted by Precision Pine. Tr. 3808-09 (Harris); Tr.4594, 4603-04 (Dils).

395. Precision Pine's damages calculations are not based upon the 1995 annual operating schedule. Tr. 1634 (Porter).

**C. Precision Pine's Harvesting Plans For 1995 And 1996**

396. Mr. Porter was responsible for scheduling the harvesting of Precision Pine's contracts. Tr. 1436 (Porter).

397. Mr. Porter does not know what timber and multi-product sale contracts Precision Pine would have harvested in September 1995 had the MSO suspensions not occurred in August 1995. Tr. 1442-48 (Porter).

398. Mr. Porter does not know when Precision Pine would have harvested timber and multi-product sale contracts between September 1995 and December 1996 had the MSO suspensions had not occurred. Tr. 1442-48 (Porter).

399. Other than the 1995 annual operating schedule, see DX294, Precision Pine prepared no business plan, scheduling plan, operating plan or other document that described timber harvesting plans for 1995 or 1996. Tr. 1439, 1441 (Porter); see also Tr. 1775 (Reidhead)

(while other companies that Tri-Star Logging worked for would establish an annual harvesting schedule, Precision Pine never gave Tri-Star Logging an annual schedule to follow).

400. Precision Pine did not prepare, and does not possess, documents that could be reviewed to determine when Precision Pine would have harvested its timber and multi-product sale contracts had the MSO suspensions not occurred. Tr. 1441 (Porter); Tr. 2089 (stipulation of counsel).

**D. Timber Harvesting Outside the Normal Operating Season**

401. Precision Pine was required to request and obtain Forest Service permission to operate outside a contract's normal operating season. Tr. 1498-99, 1503-04 (Porter), 3801 (Harris); see also PX169-79 (AT17).

402. The Forest Service was not required to grant permission to operate outside the normal operating season even if ground conditions were adequate for harvesting. Tr. 1504 (Porter).

**E. Precision Pine's Derivation Of Lumber Sales Prices**

403. All lumber sales by Precision Pine during the period of the MSO suspensions were recorded in the ordinary course of business in the Winslow Sales Record. Tr. 392-95 (Porter); see also PX294 (Winslow Sales Record).

404. The lumber prices used by Precision Pine to calculate alleged gross lumber profits during the period of the MSO suspensions are higher than the prices in Precision Pine's comprehensive Winslow Sales Record. Tr. 3367-72 (Neuberger); DX776.

405. Precision Pine used selected sales invoices to come up with alleged Ponderosa Pine lumber prices during the period of the MSO suspensions. Tr. 1674 (Porter).

406. Some sales invoices had been voided, lost or destroyed, and were missing from Precision Pine's records. Tr. 1668, 1797 (Porter).

407. Precision Pine excluded sales invoices for certain products that Precision Pine actually produced and sold, such as 4/4" molding, 4/4" shop, stained molding and stained shop, because these products commanded lower prices. Tr. 1674-75, 1680-82, 1790-71 (Porter), 3369 (Neuberger).

408. At Precision Pine's Winslow sawmill, 2.32 percent of the material cut between April 1993 and March 1997 was 4/4" molding and shop. DX817.

409. At Precision Pine's Heber sawmill, 4.06 percent of the material cut between April 1993 and March 1997 was 4/4" molding and shop. DX817.

410. Precision Pine applied #4 common prices to #5 common lumber produced during the period of the MSO suspensions. Number 4 common lumber is a higher grade and commands a higher price than #5 common lumber. Tr. 1796, 2057 (Porter).

411. Precision Pine did not use a weighted average of sales invoice prices, but rather, used a "straight average" of invoice prices to develop lumber sale prices. This inflates sales prices if the standard practice of giving large purchasers lower prices than the purchasers of small volumes of lumber is followed. See Tr. 3373-74 (Neuberger), 1658 (Porter).

412. The methodology used by Precision Pine to develop lumber sale prices for Ponderosa Pine during the period of the MSO suspensions overstated actual sale prices, which, in turn, caused Precision Pine's claimed gross profits to be overstated by approximately $650,000. Tr. 3379 (Neuberger); DX776.

413. Mr Porter did not review most of Precision Pine's sales invoices in order to determine product prices during the period of the MSO suspensions. Rather, the determination of sales prices during the period of the MSO suspensions was performed principally by one of Precision Pine attorneys, Richard Goeken. Tr. 1659, 1661 (Porter).

414. Mr. Porter did not know how the products on Precision Pine's invoices were categorized by Mr. Goeken. Tr. 1664 (Porter) (testifying that he was unable to say how products shown in the very first invoice used by Precision Pine were categorized by Mr. Goeken).

415. Selecting the correct category (or categories) for lumber products on a given invoice calls for expertise and professional judgment. Tr. 1664, 1667-68 (Porter).

416. Mr. Goeken lacked the knowledge and expertise required to independently categorize Precision Pine's sales invoices in order to calculate product prices. Goeken Decl. ¶ 5 (filed May 22, 2005). Further, Mr. Goeken does not recall any instructions and guidance provided by Mr. Porter. Id. ¶ 8.

417. Precision Pine did not use sales invoices to develop sale prices for Douglas Fir products during the period of the MSO suspensions, but rather, took the sales price from an industry publication (Random Lengths) and added $60. Tr. 1805 (Porter).

418. The prices derived by Mr. Ness for Douglas Fir products during the first quarter of 1997 are $40 to $200 lower than Mr. Porter's Random Lengths plus $60 prices (i.e., the Precision Pine used to calculate alleged lost lumber profits) for the same timber period. Tr. 2712-15 (Ness); see also Tr. 479-84, (Porter); PX182 (exhibit 4 at 1).

419. Precision Pine did not use sales invoices to develop sale prices for Engleman Spruce products, but rather, took the sales prices from an industry publication (Random Lengths)

and added $50. Tr. 1809, 1813-14 (Porter). The prices derived by Mr. Ness for Engleman Spruce products for early 1997 are substantially lower than Mr. Porter's Random Lengths plus $50 prices (i.e., the Precision Pine used to calculate alleged lost lumber profits). See also Tr. 486-97, (Porter); PX182 (exhibit 4 at 1).

420. Precision Pine's records contain no sales invoices for Engleman Spruce product. Tr. 2710 (Ness).

421. Precision Pine used a different methodology to develop lumber sale prices for the post-suspension period. The prices developed for lumber sales in the post-suspension period are generally consistent with prices in the Winslow Sales Record. Tr. 3320 (Neuberger).

422. The analysis of Precision Pine's invoices in the post-suspension period was performed by Robert Ness. Tr. 2696 (Ness).

**F. The Overrun Achieved By Precision Pine's Sawmills**

423. For a variety of reasons, including the skill of the sawyer, the efficiency of sawmill equipment, the size and quality of logs being milled, and the types of lumber products being produced, the volume of lumber in mbf (known as "lumber tally") produced by a given sawmill commonly exceeds the volume of logs in mbf (known as "log scale") used by the sawmill. The ratio of the volume of lumber (in mbf (l.t.)) to the volume of logs used to produce that lumber (in mbf (l.s.)) is commonly referred as the "overrun factor." Tr. 1179, 1210-15 (Devere).

424. Precision Pine conducted no formal mill studies at any of its mills prior to the MSO suspensions to determine the actual overrun that it was achieving. Tr. 883, 1546-48 (Porter).

425. As shown by a contemporary analysis performed by Precision Pine, the overrun actually achieved at Precision Pine's Winslow sawmill from April 1995 to March 1996 was 1.08. DX547; Tr. 5324 (Smith); Smith Dep. Tr. 252-53, 257.

426. Precision Pine possesses no other records that show the overrun actually achieved at its sawmills before, during or after the MSO suspension. See Tr. 1548-49 (Porter) (Precision Pine kept no record of any informal, part-day mill studies).

427. On July 17, 1995, about six weeks before the MSO suspensions, Mr. Porter prepared profit projections for each of Precision Pine's timber sale contracts. See DX519; DX521-45. These projections were prepared to analyze the profitability of Precision Pine's contracts in view of the possible sale of the company to Stone. Tr. 1568, 2063 (Porter); Tr. 2949-50 (Tenney).

428. The overrun factor Precision Pine used in Precision Pine's July 1995 profit projections was 1.10. DX519, 521-45.

429. Many other profit projections prepared by Precision Pine after 1993, which Mr. Porter characterized as "mid" or "high" projections, use an overrun factor of 1.10 or less. See, e.g., DX506 (using a 1.07 overrun and designated as "high"); DX510 (1.07 overrun; designated "mid"); DX511 (1.05 overrun; designated "mid"); DX513 (1.10 overrun; designated "now"); DX514 (1.07 overrun; designated "mid"); DX515 (1.05 overrun; designated "mid"); DX517 (1.07 overrun; designated "mid"); DX518 (1.05 overrun; designated "average").

430. No projection of a contract's gross profits prepared by Precision Pine's after 1993 uses an overrun higher than 1.2. See PX74; PX78; PX83-85; DX506-18; cf. PX80 (using a higher overrun only when looking at the "smallwood" component of a contract).

431. Forest Service appraisals contain a line that appears to provide an estimated overrun factor. See PX1-14. This line is a relic of an old appraisal system that was phased out in Region 3 (Arizona and New Mexico) in the mid-1980's. Tr. 3763, 4192-93 (Harris).

432. The Forest Service did not use the listed factor in appraising any of Precision Pine's contracts. Tr. 3763, 4192 (Harris).

433. The listed factor in Forest Service appraisals does not indicate the overrun that the purchaser of a timber sale should expect to obtain. Tr. 3764-65, 4192 (Harris).

**G. Conversion Factors For "CCF" Multi-Product Sales**

434. There exists no fixed conversion factor for converting log volumes from ccf to mbf (l.s.). Tr. 1616 (Porter). As a result, it is more accurate to use a contract-specific conversion factor, rather than a single, fixed conversion factor. Tr. 1616-17 (Porter).

435. The Forest Service developed contract-specific conversion factors for each multi-product sale offered on a ccf basis, and included the appropriate conversion factor for sawtimber in the appraisal summary given to prospective bidders. PX4-5, 7-11, 13-14.

436. The Forest Service used the contract-specific conversion factor in administering Precision Pine's contracts. See, e.g., PX4-5, 9-10, 13-14 (providing "converted Scribner" appraisals using the Forest Service's contract-specific conversion factor).

437. Precision Pine used the FS conversion factor for a variety of significant calculations. See, e.g., PX70 (Kettle multi-product sale profit projection); DX587 (determining the volume of timber sold to Stone Container and, thus, the amount owed by Stone to Precision Pine).

438. Precision Pine used a fixed conversion factor in its damages calculations, which has the effect of overstating the amount of timber available on a contract by as much as 12 percent. See Appendix A.

**H. Log Inventories At Precision Pine's Sawmills**

439. Precision Pine monitored the inventory of logs at its sawmills. The log inventory would vary from month-to-month and over the course of a year. See DX478-500; Tr. 5319 (Smith).

440. In April, at the beginning of the harvesting season, Precision Pine sought to have little or no inventory. Smith Dep. Tr. 24, 25; Tr. 2102-03 (Porter).

441. When harvesting commenced, Precision Pine sought to build a two to three week supply of logs at each of its sawmills. Smith Dep. Tr. 24, 26.

442. Precision Pine sought to maintain no more than a two to three week log inventory through the summer months. Smith Dep. Tr. 24, 26-28.

443. The summer months are referred to as "bluing season." See Smith Dep. Tr. 27. This is because logs kept in inventory during the summer will frequently be attacked by a fungus that causes "blue stain." Smith Dep. Tr. 26-27.

444. Blue stain reduces the grade and, therefore, substantially reduces the value of molding and shop products. Smith Dep. Tr. 27; Tr. 1790-91 (Porter).

445. During the fall, beginning in September, Precision Pine would seek to increase its log inventory in order to have logs to use at the mill during winter months. Smith Dep. Tr. 24-25, 28.

446. Precision Pine never intentionally deviated from this plan for log inventories. Smith Dep. Tr. 28-29.

447. The historic average log inventory at Precision Pine's Eagar mill was 670 mbf (l.s.). DX827.

448. At no point did Precision Pine's log inventory at the Eagar mill exceed 1,444 mbf (l.s.). DX827.

449. The historic average log inventory at Precision Pine's Heber mill was 510 mbf (l.s.). DX826.

450. At no point did Precision Pine's log inventory at the Heber mill exceed 1,385 mbf (l.s.). DX826.

451. The historic average log inventory at Precision Pine's Winslow mill was 481 mbf (l.s.). DX825.

452. At no point did Precision Pine's log inventory at the Winslow mill exceed 928 mbf (l.s.). DX825.

453. The historic average log inventory at Precision Pine's mills in Eagar, Heber and Winslow was 1,661 mbf (l.s.). DX828.

454. The combined log inventory at Precision Pine's mills in Eagar, Heber and Winslow never exceeded 3,195 mbf (l.s.). DX828.

**I. Precision Pine's Lumber Product Mix**

455. Precision Pine has no documents or other data that shows what mix of lumber products was produced from logs from a particular timber sale. DX784; Tr.1323 (Porter).

456. The inventory of lumber products (rough and finished) that Precision Pine had for sale varied from month to month as a result of both variations in production quantities and customer demand. See DX478-500.

457. A product mix is a set of products that can be manufactured from a given set of logs. Tr. 4278 (Munn).

458. Because different lumber products have different prices, an incorrect product mix will result in an incorrect estimate of total revenue. Consequently, determining an accurate product mix is essential for determining the profits on the lumber produced from a specific timber sale. Tr. 4278 (Munn).

459. Changing an expected product mix could significantly change the expected profits from a timber sale. Tr. 4278 (Munn).

460. Precision Pine determined the product mix for timber sales it had harvested by using lumber sales reported in its Winslow sales journal during a two-month period. Tr. 4279 (Munn).

461. Precision Pine determined its product mix for timber sales it had not harvested, or for which it had no information, by comparing those sales with the product mixes of Precision Pine's other timber sales. Tr. 4304 (Munn).

462. Timber from a two-month or a limited time period of a harvest is not representative of the product mix from the timber sale as a whole because timber quality varies greatly within a given sale. Tr. 4281 (Munn).

463. High-grading is a practice of cutting the best timber first and leaving the rest for harvesting later or not at all. Tr. 4282 (Munn).

464. High-grading increases the quality of the product mix of a given timber sale. Tr. 4284 (Munn).

465. The two months of lumber sales used by Precision Pine to determine its product mixes reflected the timber harvested during the first two to three months of harvesting on the timber sale for which Precision Pine was determining a product mix. Tr. 4285-86 (Munn).

466. Except for the St. Joe timber sale, Precision Pine's method for determining its product mixes reflects a pattern of high-grading. Tr. 4286 (Munn).

467. It is beneficial to a purchaser of a timber sale to high-grade where the purchaser knows that a Forest Service suspension is imminent. Tr. 4286-87 (Munn).

468. Precision Pine's process for determining its product mixes is fundamentally flawed unless (1) the lumber sold during the representative two-month period is identical to the volume and mix of timber that came from the specific sale in the previous month; and (2) Precision Pine sold all of the lumber manufactured from that specific sale in its entirety by the end of each month. Tr. 4287 (Munn).

469. The lumber sold during the representative two-month periods used by Precision Pine was not identical to the volume and mix of timber that came from the specific sale in the previous month. Tr. 4291 (Munn).

470. Precision Pine carried over an inventory of lumber products from month to month. Tr. 4288-89 (Munn); DX478-500.

471. Timber from all of Precision Pine's timber sales would be delivered to one of three sawmills where they would be intermingled with logs from different timber sales and concurrently milled. Tr. 4292-93 (Munn).

472. After being run through the sawmills, the resulting lumber from different timber sales would be intermingled and sent to Precision Pine's planer. Tr. 4293 (Munn).

473. Precision Pine had no formal method for tracking its logs through the milling process. Tr. 4294-95 (Munn).

474. Lumber products were recorded on the Winslow sales journal when they were sold. Tr. 4293 (Munn).

475. There is a lag time between the time timber is harvested and the time that lumber manufactured from such timber is actually sold. Tr. 4297 (Munn).

476. The following timber sales were being harvested and the resulting timber delivered to Precision Pine's sawmills at the same time: Brookbank, St. Joe, Hay, U-Bar and Manaco. Tr. 4297-98 (Munn).

477. Lumber products from timber harvested from the Brookbank, St. Joe, Hay, U-Bar and Manaco timber sales were used to determine the product mix for the Brookbank sale. Tr. 4297-98 (Munn).

478. The quality of timber on the St. Joe, Hay, and U-Bar timber sales was significantly better than the quality of timber on the Brookbank sale. Tr. 4300 (Munn).

479. 808,000 board feet log scale was harvested on the Brookbank sale in July and August of 1995. Tr. 4301 (Munn).

480. The total volume of lumber sold based on the Winslow sales journal for July and August of 1995 was 4,900,000 board foot lumber tally. Tr. 4301 (Munn).

481. Using Precision Pine's proposed overrun factor of 1.25, timber harvested from the Brookbank sale was, at most, 20% of the total volume of lumber sold during July and August of 1995. Tr. 4302 (Munn).

482. Precision Pine presented no formula for how it compared one sale to another for determining product mixes. Tr. 4306 (Munn).

483. The quality of timber from the Brookbank timber sale was significantly better than the quality of timber on the Saginaw-Kennedy timber sale. Tr. 4305-07 (Munn).

484. Precision Pine used its product mix for the Brookbank timber sale as a proxy to determine the product mix for the Saginaw-Kennedy timber sale. Tr. 4305 (Munn).

485. Precision Pine's claimed adjustment of the product mix for the Saginaw-Kennedy timber sale was minor and did not reflect the dramatic difference in timber quality between the Brookbank timber sale and the Saginaw-Kennedy timber sale. Tr. 4305 (Munn).

486. Although the quality of timber on the Mud timber sale was more comparable to the quality of timber on the Saginaw-Kennedy timber sale, Precision Pine did not use the product mix for the Mud sale as a proxy to determine the product mix for the Saginaw-Kennedy timber sale. Tr. 4305 (Munn).

487. Precision Pine used the proposed product mix for Saginaw-Kennedy as a proxy to determine the product mixes for the Salt, Manaco and Monument timber sales. Tr. 4308 (Munn).

488. Because Precision Pine's product mix for the Saginaw-Kennedy timber sale was inflated, Precision Pine's product mixes for the Salt, Manaco and Monument timber sales are also inflated. Tr. 4308 (Munn).

489. The timber on the Hay timber sale was of a substantially poorer quality than the timber on the U-Bar timber sale. DX 775 at 10.

490. The product mix of lumber manufactured from the Hay timber sale would be much poorer than the product mix of lumber manufactured from the U-Bar timber sale. DX 775 at 10.

491. Precision Pine used the product mix for the U-Bar timber sale to determine the product mix for the Hay timber sale. DX 775 at 10.

492. The timber on the O.D. Ridge timber sale was of a substantially poorer quality than the timber on the St. Joe timber sale. DX 775 at 10.

493. Precision Pine used the product mix for the St. Joe timber sale to determine the product mix for the O.D. Ridge timber sale. DX 775 at 10.

494. A timber sale cruise conducted by the Forest Service would provide a more accurate estimate of the timber quality on a given timber sale than an estimate of timber quality derived from an individual's visual inspection of the timber sale. Tr. 4310-11 (Munn).

495. Cruising is a systematic way to measure the volume, quantity and quality of timber on a particular sale. Tr. 4312 (Munn).

496. In cruising, sampling plots are established throughout the sale area and the trees within the sample are actually measured for dbh, height and percent grade. Tr. 4313 (Munn).

497. It is common in the forest industry for a potential bidder of a timber sale to conduct its own cruise of the sale area. Tr. 4313 (Munn).

498. Precision Pine did not conduct its own cruise of any of the timber sales at issue in this case. Tr. 4313 (Munn).

499. Little or no shop and molding grade lumber can be derived from smaller sawlogs. Tr. 1172, 1213 (Devere). A 100 board foot log would be a smaller sawlog. Tr. 1213 (Devere). This (100 bf) was about the size of Precision Pine's average sawlog at the time of the MSO suspensions. See PX51

500. The Western Wood Products Association ("WWPA") regularly reports the average product mix for all commodities sold in the Rocky Mountain region. Tr. 4315-16 (Munn).

501. Precision Pine's proposed product mixes are dramatically of a higher quality than the product mixes reported by the WWPA for the Rocky Mountain region during the relevant time period. Tr. 4317 (Munn).

502. The product mixes claimed by Precision Pine are much better than the product mixes that would have been produced if the timber sales had been harvested completely. DX 775

503. The procedure that Precision Pine used to assign product mixes to specific timber sales is fundamentally flawed. DX 775

504. The procedure that Precision Pine used to assign product mixes cannot reasonably be expected to accurately predict the actual product mix that would have been generated from each sale if they were completely harvested. DX 775

**J. The Production And Sale Of Lumber By-Products**

505. As a result of the manufacturing of logs into lumber, Precision Pine produced the following by-products: (I) bark; (ii) chips; (iii) shavings; and (iv) grindings (i.e., sawdust). First Joint Stip. ¶ 33.

506. There are no additional costs associated with the production of by-products. See Tr. 608 (Porter).

**1. Chips**

507. Precision Pine sold its output of chips to Stone pursuant to contract between the two companies. See PX311; PX313.

508. Precision Pine's contract for the sale of chips to Stone expired on September 30, 1995. PX311.

509. Stone stopped taking chips from Precision Pine from January 15 to April 15, 1996. DX476; Tr. 597-98, 1923-24 (Porter).

510. Precision Pine entered into a new contract and Stone resumed taking chips from Precision Pine on April 22, 1996. The contract price for chips paid by Stone under the new contract was lower than the prior contract. PX313.

**2. Bark**

511. Precision Pine had no contract to sell the output of bark produced by its sawmills. Tr. 1924-25 (Porter).

512. Precision Pine has no invoices showing sales of bark to customers. See Tr. 1934 (Porter).

513. Precision Pine's "bark journal" identifies Transporting Renewable Resources, Inc. ("TRRI") as a "carrier" of bark for Precision Pine. PX316. TRRI is a trucking company that was a wholly-owned subsidiary of Precision Pine. Tr. 1930, 2042 (Porter). Thus, Precision Pine's "bark journal" indicates that a subsidiary was providing the company hauling services; it

does not show bark sales to TRRI or to any third party. See PX316; Tr. 1930, 2042 (Porter); see also DX548; DX560-61.

514. Precision Pine's financial statements show an average of $5.87 per mbf (l.t.) earned from sales of bark during FYE 1995 and FYE 1996 (i.e., from Apr. 1, 1994 to Mar. 31, 1996). DX831.

**3. Shavings**

515. Precision Pine had no contract to sell the output of shavings produced by its planers. Tr. 1924-25 (Porter).

516. Precision Pine has no invoices showing sales of shavings to customers. See Tr. 1934 (Porter).

517. Precision Pine's "shavings journal" identifies TRRI as a "carrier" of shavings for Precision Pine. PX316. Thus, Precision Pine's "shavings journal" indicates that a subsidiary was providing the company hauling services; it does not show shavings sales to TRRI or to any third parties. See PX316; Tr. 1930, 2042 (Porter); see also DX548; DX560-61.

518. Precision Pine earned no revenue from the sale of shavings during FYE 1995 or FYE 1996 (i.e., from Apr. 1, 1994 to Mar 31, 1996). DX831.

519. Precision Pine's profit projections show no revenue being earned from sales of shavings. PX77, PX78; PX83; PX85; DX519, DX521-45.

520. Precision Pine owned and operated a "pellet plant" that made compressed wood pellets that were burned and used to heat homes. Tr. 1935 (Porter).

521. Precision Pine used shavings produced by its planers at the company's pellet plant. Tr. 1935 (Porter); DX548; DX560-61.

522. Precision Pine kept no record of the volume of shavings that it used in the company's pellet plant. Tr. 1935 (Porter).

523. Precision Pine also burned shavings in wood waste fired boilers at the company's sawmills. Tr. 1941 (Porter).

**4. Grindings**

524. Precision Pine had no contract to sell the output of grindings (i.e., sawdust) produced by its sawmills. Tr. 1924-25 (Porter).

525. Precision Pine has no invoices showing sales of grindings to customers. See Tr. 1934 (Porter).

526. Precision Pine maintained no "grindings journal" showing the volume of grindings produced. Tr. 1937-38, 2042 (Porter).

527. Precision Pine earned no revenue from the sale of grindings during FYE 1995 or FYE 1996 (i.e., from Apr. 1, 1994 to Mar 31, 1996). DX831.

528. Precision Pine's profit projections show no revenue being earned from the sale of grindings. PX77, PX78; PX83; PX85; DX519; DX521-45.

529. Precision Pine burned grindings in wood waste fired boilers at the company's sawmills. Tr. 1932 (Porter); DX548; DX560; DX561.

530. Precision Pine kept no record of what volume of grindings it used to fire its boilers and what volume, if any, it sold. Tr. 1933, 2042 (Porter).

**K. Precision Pine's Planing Operations**

531. In addition to rough cut lumber produced at its own sawmills, Precision Pine processed rough cut lumber from other (non-Precision Pine) sawmills in its planers. Tr. 1657 (Porter).

532. Precision Pine purchased rough cut lumber from Mexico and other sources, and ran this material through the company's planers. Tr. 1657 (Porter).

**M. Precision Pine's "Lost Volume Seller" Claims**

533. Bidding on timber sale contracts was always competitive. Tr. 1278 (Porter); see also Tr. 1741 (Precision Pine would compete "very strongly" with Stone); DX554 ("Don't give Stone anything over here").

534. Precision Pine did not forego bidding on Forest Service timber sales, and did not forego other opportunities to acquire timber for its mills, in the post-suspension period. To the contrary, Precision Pine continued looking for profitable contracts after the MSO suspensions were lifted. Tr. 671-77, 1089 (Porter).

535. Precision Pine bid on timber sale contracts in calendar year 1997 and acquired six new contracts, including contracts with the Forest Service, the State of Arizona, and Indian tribes. Tr. 671-77, 1089 (Porter); see also PX248 (identifying sales under contract).

536. Precision Pine would not have bid upon additional contracts had the MSO suspensions not occurred. Tr. 1288 (Porter) (stating that he was unable to identify any such contracts).

537. No additional contracts would have been awarded to Precision Pine by the Forest Service had the MSO suspensions not occurred. Tr. 1289 (Porter) (stating that he was unable to identify any such contracts).

**N. Logging , Hauling And Stumpage Costs For Sawtimber**

538. Brookbank, Hay, Jersey Horse, Manaco, Mud, O.D. Ridge, Salt and U-Bar are variably priced contracts. See PX169-72, PX174-75; PX177-78. The price index governing the escalation and de-escalation of stumpage prices for these contracts is the Western Wood Products Association's ("WWPA's"), Inland Rocky Mountain Ponderosa Pine index. First Joint Stip. ¶ 32.

539. During the period of the MSO suspensions (i.e., between August 25, 1995 and December 4, 1996), applicable WWPA index reached a low during the first quarter of 1996 and a high during the fourth quarter of 1996. PX305.

540. During the period of the MSO suspensions, the cost of timber from the Brookbank contract varied from $17.15 to $101.78. Tr. 4882; DX1010 at 3; see also PX172; PX305.

541. During the period of the MSO suspensions, the cost of timber from the Hay contract varied from $140.78 to $175.00. Tr. 4882; DX1010 at 3; see also PX169; PX305.

542. During the period of the MSO suspensions, the cost of timber from the Jersey Horse contract varied from $321.90 to $400.82. Tr. 4882; DX1010 at 3; see also PX170; PX305.

543. During the period of the MSO suspensions, the cost of timber from the Manaco contract varied from $115.81 to $194.96. Tr. 4883; DX1010 at 3; see also PX178; PX305.

544. During the period of the MSO suspensions, the cost of timber from the Mud contract varied from $46.18 to $140.62. Tr. 4883; DX1010 at 3; see also PX175; PX305.

545. During the period of the MSO suspensions, the cost of timber from the O.D. Ridge contract varied from $273.52 to $325.77. Tr. 4883; DX1010 at 3; see also PX171; PX305.

546. During the period of the MSO suspensions, the cost of timber from the Salt contract varied from $183.06 to $289.77. Tr. 4883; DX1010 at 3; see also PX177; PX305.

547. During the period of the MSO suspensions, the cost of timber from the U-Bar contract varied from $381.40 to $443.95. Tr. 4883; DX1010 at 3; see also PX174; PX305.

548. Precision Pine paid logging and hauling costs of $188.03 per mbf (l.s.) to cut and remove sawtimber from the Brookbank sale prior to the MSO suspensions. PX248 ($151,178 in FYE 1996); DX109 (1682 ccf); PX4 (0.4780 mbf/ccf).

549. Precision Pine paid logging and hauling costs of $93.70 per mbf (l.s.) to cut and remove sawtimber from the Hay sale prior to the MSO suspensions. See PX248; DX68.

550. Precision Pine paid logging and hauling costs of $234.24 per mbf (l.s.) to cut and remove sawtimber from the Jersey Horse sale prior to the MSO suspensions. PX248 ($14,406 for FYE 1996); DX128 (123 ccf).

551. Precision Pine incurred logging and hauling costs of $162.03 per mbf (l.s.) to cut and remove sawtimber from the Kettle sale. PX248 ($115,847 for FYE 1998); DX31 (1504 ccf); PX5 (0.4757 mbf/ccf).

552. Precision Pine paid logging and hauling costs of $298,16 per mbf (l.s.) to cut and remove sawtimber from the Manaco sale prior to the MSO suspensions prior to the MSO suspensions. PX248 ($66,074 for FYE 1996); DX186 (652 ccf); PX10 (0.4845 mbf/ccf).

553. Precision Pine paid logging and hauling costs of $185.38 per mbf (l.s.) to cut and remove sawtimber from the Mud sale during the period of the MSO suspensions. PX248 ($290,748 for FYE 1997); DX291 (3473 ccf); PX7 (0.4516 mbf/ccf).

554. Precision Pine paid logging and hauling costs of $94.86 per mbf (l.s.) to cut and remove sawtimber from the O.D. Ridge sale prior to the MSO suspensions. PX248 ($240,484 for FYE 1995); DX3 (2535 mbf).

555. Precision Pine incurred logging and hauling costs of $150.03 per mbf (l.s.) to cut and remove sawtimber from the U-Bar sale prior to the MSO suspensions. PX248 ($185,891 for FYE 1996); DX407 (1239 mbf).

**O. <u>Logging , Hauling And Stumpage Costs For Roundwood</u>**

556. Precision Pine generally contracted with Tri-Star logging to cut and remove roundwood from its multi-product sale contracts. Tr. 1107-09 (Porter), 1771 (Reidhead); DX463.

557. The stumpage fee for roundwood on the contracts at issue was fixed at $9.40/ccf. <u>See</u> PX172-73; PX175-79.

558. The total amount owed by Precision Pine to the Forest Service for roundwood was $10.25 per ccf. PX131 (exhibit 4, at 27); <u>see also</u> PX131 (App. A at 9).

559. The cost incurred by Tri-Star Logging to cut and remove roundwood from Precision Pine's multi-product sales was $49.17 per cord (or $62.45 per ccf). See Tr. 2598-99, 2841 (Ness); PX131 (exhibit 4) (using Mr. Ness's conversion factor of 1.27 cords/ccf).

560. In order to make a profit from roundwood harvesting, Tri-Star Logging would have charged Precision Pine more than its actual logging and hauling cost for roundwood. Tr. 2843 (Ness).

561. The total cost (stumpage, logging, and hauling) to Precision Pine to harvest the roundwood component of its multi-product sale contracts was not less than $75.00 per ccf. PX131 (exhibit 4 & App. A); Tr. 2597-99, 2754, 2843 (Ness).

562. On those occasions when Precision Pine had arranged for Tri-Star to harvest roundwood, haul the roundwood to Stone, and accept payment for the roundwood directly from Stone, Tri-Star retained the full amount paid by Stone. Tri-Star made no remittance to Precision Pine to cover the stumpage Precision Pine owed to the Forest Service. Tr. 1730-31 (Reidhead).

563. Precision Pine was not usually able to cover the stumpage owed for roundwood. Tr. 1731 (Reidhead).

## P. Lumber Manufacturing Costs

### 1. The Winslow Sawmill

564. The manufacturing cost that Mr. Porter projected to be incurred by the Winslow sawmill in his July 1995 profit projections was $75.00 per mbf (l.t.). DX814.

565. The manufacturing cost incurred by the Winslow sawmill for the fiscal year ending March 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $91.42 per mbf (l.t.). DX814.

566. The manufacturing cost actually incurred by the Winslow sawmill between April 1, 1995 and August 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $121.66 per mbf (l.t.). DX814.

567. The manufacturing cost incurred by the Winslow sawmill for the fiscal year ending March 31, 1996 (reported by Precision Pine in its contemporaneous cost comparison report) was $117.61 per mbf (l.t.). DX814.

**2. <u>The Heber Sawmill</u>**

568. The manufacturing cost that Mr. Porter projected to be incurred by the Heber sawmill in his July 1995 profit projections was $70.00 per mbf (l.t.). DX814.

569. The manufacturing cost incurred by the Heber sawmill for the fiscal year ending March 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $74.71 per mbf (l.t.). DX814.

570. The manufacturing cost actually incurred by the Heber sawmill between April 1, 1995 and August 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $75.58 per mbf (l.t.). DX814.

571. The manufacturing cost incurred by the Heber sawmill for the fiscal year ending March 31, 1996 (reported by Precision Pine in its contemporaneous cost comparison report) was $79.86 per mbf (l.t.). DX814.

572. The variable cost of manufacturing for the Heber sawmill (calculated from Precision Pine's year end financial statements) was $74.17 per mbf (l.t.). Tr. 4991 (Moosman); DX777 at 147.

**3. The Eagar Sawmill**

573. The manufacturing cost that Mr. Porter projected to be incurred by the Eagar sawmill in his July 1995 profit projections was $75.00 per mbf (l.t.). DX814.

574. The manufacturing cost incurred by the Eagar sawmill for the fiscal year ending March 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $97.38 per mbf (l.t.). DX814.

575. The manufacturing cost actually incurred by the Heber sawmill between April 1, 1995 and August 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $80.00 per mbf (l.t.). DX814.

576. The manufacturing cost incurred by the Heber sawmill for the fiscal year ending March 31, 1996 (reported by Precision Pine in its contemporaneous cost comparison report) was $95.36 per mbf (l.t.). DX814.

577. The variable cost of production for the Eagar sawmill during the period of the MSO suspensions (calculated from Precision Pine's year end financial statements) was $85.57 per mbf (l.t.). Tr. 4991 (Moosman); DX777 at 149.

**4. The Winslow Planer**

578. The manufacturing cost that Mr. Porter projected to be incurred by the Winslow planer in his July 1995 profit projections was $80.00 per mbf (l.t.). DX814.

579. The manufacturing cost incurred by the Winslow planer for the fiscal year ending March 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $69.28 per mbf (l.t.). DX814.

580. The manufacturing cost actually incurred by the Winslow planer between April 1, 1995 and August 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $58.14 per mbf (l.t.). DX814.

581. The manufacturing cost incurred by the Winslow planer for the fiscal year ending March 31, 1996 (reported by Precision Pine in its contemporaneous cost comparison report) was $62.02 per mbf (l.t.). DX814.

582. The variable cost of production for the Winslow planer during the period of the MSO suspensions (calculated from Precision Pine's year end financial statements) was $39.30 per mbf (l.t.). Tr. 4991 (Moosman); DX777 at 157.

**L. The Unprofitability Of Precision Pine's Contracts During The MSO Suspensions**

583. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Brookbank contract would result in $238,187 in gross profits from lumber and by-products derived from the contract's sawtimber component. DX539. Because of Precision Pine's lack of an outlet for roundwood, harvesting the roundwood component of the Brookbank contract would resulted in a loss of at least $401,025. Third Joint Stip. ¶ 11; PX131 (exhibit 4); Tr. 2597-99, 2754, 2843 (Ness). Thus, even without accounting for general and administrative overhead costs, it would have been unprofitable for Precision Pine to harvest the Brookbank contract. See DX539; Third Joint Stip. ¶ 11; PX131 (exhibit 4); see also DX777 at 15 (calculating a loss for the Brookbank contract before deducting roundwood losses and general overhead).

584. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Jersey Horse contract would result in a loss of $52,985. DX523.

585. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Kettle contract would result in $120,352 in gross profits from lumber and by-products derived from the contract's sawtimber component. DX525. Because of Precision Pine's lack of an outlet for roundwood, harvesting the roundwood component of the Kettle contract would have resulted in a loss of at least $296,850. Third Joint Stip. ¶ 21; PX131 (exhibit 4); Tr. 2597-99, 2754, 2843 (Ness). Thus, even without accounting for general and administrative overhead costs, it would have been unprofitable for Precision Pine to harvest the Kettle contract. See DX525; Third Joint Stip. ¶ 21; PX131 (exhibit 4); see also DX777 at 15 (calculating a loss for the Kettle contract before deducting roundwood losses and general overhead); Tr. 3021 (Tenney); DX727 ("The Kettle timber sale we cannot sell the pulpwood. Stone's refuses to take the pulpwood, so it makes the logging costs prohibitive") .

586. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Manaco contract would result in $43,277 in gross profits from lumber and by-products derived from the contract's sawtimber component. DX524. Because of Precision Pine's lack of an outlet for roundwood, harvesting the roundwood component of the Manaco contract would have resulted in a loss of at least $101,100. Third Joint Stip. ¶ 15; PX131 (exhibit 4); Tr. 2597-99, 2754, 2843 (Ness). Thus, even without accounting for general and administrative overhead costs, it would have been unprofitable for Precision Pine to harvest the Manaco contract. See DX524; Third Joint Stip. ¶ 15; PX131 (exhibit 4); see also DX777 at 15 (calculating a loss for the Manaco contract before deducting roundwood losses and general overhead).

587. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Monument contract would result in $20,437 in gross profits from lumber and by-products derived from the contract's sawtimber component. DX532. Because of Precision Pine's lack of an outlet for roundwood, harvesting the roundwood component of the Monument contract would have resulted in a loss of at least $82,500. Third Joint Stip. ¶ 2; PX131 (exhibit 4); Tr. 2597-99, 2754, 2843 (Ness). Thus, even without accounting for general and administrative overhead costs, it would have been unprofitable for Precision Pine to harvest the Monument contract. See DX532; Third Joint Stip. ¶ 2; PX131 (exhibit 4).

588. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Mud contract would result in $211,913 in gross profits from lumber and by-products derived from the contract's sawtimber component. DX533. Because of Precision Pine's lack of an outlet for roundwood, harvesting the roundwood component of the Mud contract would have resulted in a loss of at least $304,500. Third Joint Stip. ¶ 4; PX131 (exhibit 4); Tr. 2597-99, 2754, 2843 (Ness). Thus, even without accounting for general and administrative overhead costs, it would have been unprofitable for Precision Pine to harvest the Mud contract. See DX533; Third Joint Stip. ¶ 4; PX131 (exhibit 4); see also DX777 at 15 (calculating a loss for the Mud contract before deducting roundwood losses and general overhead).

589. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Saginaw-Kennedy contract would result in $68,028 in gross profits from lumber and by-products derived from the contract's sawtimber component. DX534. Because of Precision Pine's lack of an outlet for roundwood, harvesting the roundwood component of the

Saginaw-Kennedy contract would have resulted in a loss of at least $124,350. Third Joint Stip. ¶ 6; PX131 (exhibit 4); Tr. 2597-99, 2754, 2843 (Ness). Thus, even without accounting for general and administrative overhead costs, it would have been unprofitable for Precision Pine to harvest the Saginaw-Kennedy contract. See DX534; Third Joint Stip. ¶ 6; PX131 (exhibit 4); see also DX777 at 15 (calculating a loss for the Saginaw-Kennedy contract before deducting roundwood losses and general overhead).

590. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Salt contract would result in a loss of $94,387 from lumber and by-products derived from the contract's sawtimber component. DX526. Because of Precision Pine's lack of an outlet for roundwood, harvesting the roundwood component of the Salt contract would have resulted in an additional loss of at least $137,625. Third Joint Stip. ¶ 17; PX131 (exhibit 4); Tr. 2597-99, 2754, 2843 (Ness). Thus, even without accounting for general and administrative overhead costs, it would have been unprofitable for Precision Pine to harvest the Salt contract. See DX526; Third Joint Stip. ¶ 17; PX131 (exhibit 4); see also DX777 at 15 (calculating a loss for the Salt contract before deducting roundwood losses and general overhead).

591. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the U-Bar contract would result in a loss of $22,494. DX535-36.

## V. ADDITIONAL FACTS CONCERNING SAWMILL INEFFICIENCY COSTS

592. Precision Pine had no plan for the production of a specified volume of lumber at any of its sawmills. See Tr. 1433, 1480, 1482-83, 2101-02 (Porter); DX505.

593. The Park sale, which was awarded to Precision Pine by the State of Arizona, was unaffected by the MSO suspensions. Tr. 1841 (Porter).

594. Precision Pine often closed mills in late winter or early spring for maintenance or due to a shortage of logs. See DX798; Tr. 2102-03 (Porter).

## VI. ADDITIONAL FACTS CONCERNING REIMBURSEMENT PURSUANT TO CT 6.01

### A. Claim Preparation Costs

595. Mr. Porter, Mr. Tenney and Ms. Kehret were salaried employees of Precision Pine. Tr. 1883 (Porter); see also Tr. 1886-87 (Porter) (the sum paid by Precision Pine to an employee would not change because the employee was working on a claim letters).

596. Mr. Porter, Mr. Tenney and Ms. Kehret were not paid overtime for work performed on Precision Pine's claim letters. Tr. 1883 (Porter).

597. None of Precision Pine's claim letters included receipts or other documents verifying actual expenditures in connection with the preparation of claim letters by Precision Pine employees. Tr. 1884-85 (Porter); PX194; PX196; PX198; PX200; PX202; PX204; PX206; PX208; PX210; PX212; PX214; PX216; PX218; PX220.

598. Precision Pine's claim letters were not submitted to facilitate performance of the timber sale contracts. Tr. 1885-86 (Porter).

### B. Bond Costs

599. Precision Pine did not seek bond costs in its claim concerning the suspension of the St. Joe contract. See PX200.

600. Precision Pine did not seek bond costs in its claim concerning the suspension of the Hay contract. See PX204.

601. The Hay contract does not contain clause CT 6.01. See PX169.

**C. Move Out Costs**

602. Tri-Star Logging did not charge Precision Pine to move between timber sales. See Tr. 1729-31 (Reidhead), 233 (Porter).

603. Precision Pine would allegedly have moved off the Brookbank sale even if the MSO suspensions had not occurred. DX131 (App. A at 4); DX1004; see also Tr. 2091 (Porter) (DX1004 shows the harvesting schedule used by Mr. Ness in greater detail).

604. Precision Pine's claim letter regarding the Brookbank contract does not include any receipts or other documents verifying actual expenditures incurred in moving off the Brookbank sale. See PX196.

**D. Interest**

605. Contract clause CT 4.23 provides for a refund of cash balances in certain circumstances. Tr. 1909 (Porter).

606. The Forest Service did not deny any refund of cash balances owed to Precision Pine pursuant to CT 4.23. Tr. 1911 (Porter).

607. The contracts contain no provision that requires the Forest Service to pay interest on "cash balances." Tr. 1910 (stipulation by counsel).

608. Contract clause CT4.222 allows a refund of 95 percent of the contractually-required downpayment in certain circumstances. Tr. 1906 (Porter).

609. The Forest Service refunded downpayments when sought by Precision Pine in accordance with CT 4.222. Tr. 1908 (Porter).

610. The contracts contain no provision that directs the Forest Service to pay interest on contract downpayments. See Tr. 1906-07 (Porter).

611. Precision Pine made no payment to the Forest Service to obtain the effective purchaser credit. Tr. 1911 (stipulation by counsel).

612. The contracts contain no provision that directs the Forest Service to pay interest on the effective purchaser credit. Tr. 1911, 1913 (stipulation by counsel).

**E. Snow Removal Costs**

613. In 1995, Precision Pine sought Forest Service permission to continue timber harvesting upon the St. Joe and Hutch-Boondock contracts after the end of the normal operating season. See Tr. 1915 (Porter).

614. The Forest Service granted Precision Pine's request to continue harvesting after the end of the normal operating season. See Tr. 1915 (Porter).

615. Precision Pine incurred snow removal costs because harvesting operations on St. Joe and Hutch-Boondock were allowed to continue after the normal operating season. Tr. 1915 (Porter).

**F. Log Transfer Costs**

616. Precision Pine had no planer at its Eagar sawmill. DX798. As a result, Precision Pine would have had to haul rough green lumber milled at Eagar to the company's planer in Winslow, Arizona. Tr. 1918 (Porter).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

s/ David A. Harrington

DAVID A. HARRINGTON
MARLA T. CONNEELY
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
(202) 307-0277
(202) 307-0972 (fax)

Attorneys for Defendant

OF COUNSEL:

LORI POLIN JONES
PATRICIA L. DISERT
Office of General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

September 2, 2005