**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-720C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT**
**IN SUPPPORT OF PLAINTIFF'S POST-TRIAL BRIEF**

**INTRODUCTORY FACTS**

1. The following terms were used and defined in the course of trial:

   a. Board foot ("bd ft" or "bf"): The amount of wood contained in an unfinished (i.e., rough or unplaned) board 1" thick, 12" long, and 12" wide. In trees or logs, board-foot volume is a measure of merchantability, and therefore the relationships between board feet and cubic feet (defined below) depends on tree diameter, amount of slab, and saw kerf, Tr. 2912 (Matson); commonly 1,000 bd ft is written as 1 mbf, and 1,000,000 bd ft is written 1 mmbf. Tr. 2912 (Matson).

   b. Buck: To cut a felled tree into smaller segments, called logs. Tr. 142 (Porter); 1727 (Reidhead).

   c. Ccf: One hundred cubic feet (see below). Tr. 110 (Porter).

d. Clear Face: One quarter of the diameter of a standing tree in the first 16' segment from the tree's base that has no protrusions from the trunk such as limbs, knots or conks. Tr. 131-134 (Porter); Tr. 5531 (Porter).

e. Cubic foot (cf): A unit of measure, 1' x 1' x 1', used by the Forest Service to quantify the volume of timber sold; commonly 100 cubic feet is written 1 ccf. Tr. 110, 243 (Porter); Tr. 1173 (Devere).

f. Cutting Unit: A defined sub-set of trees on a contiguous piece of land subject to a Forest Service timber sale contract. Several Cutting Units are aggregated into a Payment Unit. A single timber sale contract will contain multiple Payment Units. See Tr. 226-28 (Porter); PX 170 at JRH-170 (Map of Jersey Horse sale area showing cutting and payment units); Tr. 3802-03, 4521-22 (Harris).

g. Deck: A pile of logs. DX 838, Smith Deposition, at 25. Logs at Precision Pine's mills are separated into decks according to the contract that was the source of the logs. Tr. 368 (Porter).

h. Dbh: Diameter at breast height. Tr. 111 (Porter).

i. Diameter at breast height: The diameter of a tree outside of the bark at about 4 feet off the ground , i.e., about breast height on a person, used, among other purposes, for estimating the volume of wood in a tree, and categorizing trees into sawtimber or pulpwood/roundwood. Tr. 110-11 (Porter).

j. Fall, fell, felling: to cut down a tree. Tr. 1724-25 (Reidhead); see, e.g., Tr. 4471-72 (Harris).

k. Grade: The quality of a piece of lumber. A term also sometimes used to refer to higher quality lumber. See Tr. 127, 419-20 (Porter); Tr. 4395 (Munn). Lumber products are categorized by quality into "grades." See Tr. 75-78 (Porter). Lumber grades include:

i. Moulding: high quality lumber used for ornamental materials such as baseboards, crowns and doors casings. Tr. 76-77 (Porter).

ii. Shop: a high to mid-grade lumber product. Tr. 127-28 (Porter).

iii. Dimension: a mid to low-grade lumber product designated for structural features such as 2x4 studs, and not for visual or ornamental features. Tr. 76 (Porter).

l. Grade material: A term used to refer to portions of a tree from which lumber of a relatively high quality can be manufactured. See, e.g., Tr. 420 (Porter); 2897 (Matson).

m. Grade recovery: The proportion of higher quality lumber produced in comparison to overall lumber produced from a given source. See Tr. 75-78, 122 (Porter); 4183 (Harris).

n. Graderman: The member of a sawmill's crew specially trained and certified by industry standard-setting organizations to categorize lumber by its quality (i.e., by grade). Tr. 128-131, 429-31 (Porter); 1180 (Devere).

o. Green lumber (also rough lumber): Lumber that has been cut in a sawmill, but not yet dried or planed for sale. Tr. 74, 79, 361 (Porter.)

p. Green haul: Transporting green rough lumber from the sawmill that produced it to a kilning and/or planing facility where it can be dried and/or planed into a final product for sale. Tr. 2174-75, 2240, 2271, 2573 (Ness).

q. High Grading: The removal of the most commercially valuable trees (high-grade trees), often leaving a residual stand composed of trees of poor condition or species composition. Tr. 2912 (Matson).

r. Kiln: Oven-like facility for drying green lumber into a final product for sale. Tr. 97 (Porter).

s. Log Scale: A designation for the volume of timber, in mbf, contained in timber or logs. Abbreviated mbf (LS). Tr. 137, 140, 145 (Porter).

t. Lumber Tally: A designation for the volume of lumber, in mbf, produced by a mill. Abbreviated mbf(LT). Tr. 137, 140, 145 (Porter);

u. Mbf: One thousand board feet. Tr. 110 (Porter); Tr. 2912 (Matson).

v. Mbf (LS): One thousand board feet in Log Scale. See "Log Scale," above. Tr. 110 (Porter).

w. Mbf (LT): One thousand board feet in Lumber Tally. See "Lumber Tally," above. Tr. 110 (Porter).

x. Mmbf: One million board feet. Tr. 2912 (Matson).

y. Mill Study: A process for accurately calculating the overrun factor for a mill, under which each log entering the mill is individually scaled under the Scribner Decimal C system (defined below) and each board produced by the mill from those logs is individually measured. Tr. 1143 (Devere).

z. Millwright: Tradesman skilled in building, maintaining and repairing sawmills and sawmill equipment. Tr. 74 (Porter):

aa. Overrun factor: The ratio between the volume of lumber in mbf (LT) and the volume of the logs in mbf (LS) used to manufacture that lumber. DX 840,

Forest Service Timber Sale Preparation Handbook § 45.23c(9), made effective by WO Amendment 2409.18-90-1, October 31, 1990; Tr. 137, 139-40 (Porter).

bb. Payment Unit: A defined portion of a timber sale, which in turn is sub-divided into Cutting Units. Tr. 224-230 (Porter); Tr. 4170, 4510-11, 4521-22 (Harris).

cc. Percent of Clear Faces: Data reported by the Forest Service in its appraisal summary for a timber sale contract showing the percent of the sampled trees that had a single clear face (defined above). Tr. 131-34 (Porter).

dd. Planer (Planing): Device used to smooth rough lumber into a finished lumber product. (Lumber can occasionally be sold without planing as a "rough" product.) Tr. 357-58 (Porter).

ee. Product Mix/Product Percentages: The amount of each individual lumber product produced from certain logs as a percent of the total volume of all lumber products produced from those logs. Tr. 4278 (Munn).

ff. Pulp: Separated wood fibers used in manufacturing paper and allied products. Tr. 2913 (Matson).

gg. Pulpwood (also Roundwood): Trees between 5" and 9" in diameter at breast height, used primarily as a source for pulp. Tr. 111-12 (Porter).

hh. RL or RWL: Abbreviations for "random length" and "random width and length," respectively. Frequently, wholesale lumber is sold only to the specific thickness of the boards in a bundle (see "4/4" and "5/4," below), but the bundle will contain boards of various, i.e., random, widths and/or lengths. For example, an invoice may record the purchase of a certain quantity of lumber described as "5/4 x RWL." This means that the lumber sold consisted of

boards all 1-1/4" thick, but of various widths and lengths. Tr. 1665 (Porter). Alternatively, an invoice might record the purchase of a certain quantity of timber described as "5/4 x 10 x RL." This means the lumber sold consisted of boards 1-1/4" thick, 10" wide but of various lengths. Tr. 2344-45 (Ness).

ii. Sawlog/Sawtimber: Logs or trees 9" or greater in diameter and meeting other criteria suitable as a source for sawmills to produce lumber. Tr. 111-12 (Porter); Tr. 2914-15 (Matson). See Tr. 3079 (Lewis).

jj. Sawyer: The member of a sawmill crew with particular training and skill in operating the mill's saws efficiently to produce the best overall grade recovery. Tr. 358-361 (Porter); Tr. 2915 (Matson).

kk. Saw Kerf: The portion of a log lost to grindings (sawdust) from the width of the saw. As technology improved, saws grew narrower, reducing kerf. Tr. 1144 (Devere).

ll. Scaling: The measurement or estimation of the quantity or quality of felled timber. The person who conducts scaling is a Scaler. Tr. 2915-16 (Matson).

mm. Scribner rule/Scribner decimal C log rule: The Scribner rule is a method for estimating, in board feet, the amount of lumber that will be recovered from a tree or log. Tr. 140 (Porter); Tr. 1142-43 (Devere). The Scribner rule assumes 1" boards, 1/4" kerf, is measured based on diameter at the small end of the log, disregards taper, and does not provide for overrun. The Scribner rule underestimates lumber yield especially on small diameter logs and on long logs with taper. Tr. 2917 (Matson); Tr. 139-145 (Porter explaining taper & overrun using PX 1001); see "overrun factor," above. The Scribner decimal C log rule

is then a modification of the Scribner rule in which board foot volume is rounded to the closest 10 bd bf, and then the last digit is dropped. Tr. 2916 (Matson). The Forest Service traditionally estimated the volume of timber sold based on the Scribner decimal C log rule, changing in the early 90's to using ccf as its unit of measure. Tr. 243-44 (Porter).

nn. Skidding: Dragging felled trees or logs to an area where they can be loaded onto trucks for shipment to a sawmill. See Tr. 1724-25 (Reidhead).

oo. Slab: The rounded side of a log first cut off to square the log in preparation for further processing. Tr. 1168 (Devere). A well-trained sawmill crew can recover merchantable lumber from slab, increasing the mill's overrun factor and product mix (grade recovery). Tr. 1180-81 (Devere); see Tr. 2912 (Matson) (definition of "board feet", supra); Tr. 140-145 (Porter) (using PX 1001 to describe overrun).

pp. Stumpage: The amount, generally quantified in $/mbf(LS) or $/ccf, that a timber purchaser pays the Forest Service for the right to cut and remove standing timber from Forest Service land, i.e., stumpage is the purchase price paid the Forest Service for logs. Tr. 113 (Porter).

qq. T.E.A.: Transaction Evidence Appraisal (see below).

rr. Transaction Evidence Appraisal: A system by which the Forest Service appraises the value of a timber on a sale based on the weighted average selling price of all timber sale contracts in the Region in the preceding four fiscal quarters, adjusted based on how factors such as anticipated hauling distance, slash disposal costs, road maintenance cost and tree quality compared between

the sale being appraised and the regional weighted average for each of those factors. Tr. 3759, 3762, 4183-89 (Harris).

ss. TSSA (Timber Sale Statement of Account): Document normally issued each month by the Forest Service to a timber sale purchaser reflecting activity and charges under the contract, including a statement of the volume harvested that month and the total volume harvested for the life of that contract to that point in time. Tr. 237-38 (Porter). The TSSAs are numbered sequentially for each contract, and so instances where the Forest Service stopped issuing the TSSA for a specific sale on a monthly basis (because activity on that sale temporarily ceased) can be identified by noting the TSSA's numbers. See PX 290 (compilation of TSSAs).

tt. WWPA: Trade organization for the forest products industry in the Western United States, which, among other activities, sets and enforces lumber product grading standards by certifying gradermen (defined above) and inspecting member's facilities. Tr. 128-29 (Porter); Tr. 1180-82 (Devere).

uu. 4/4 ("four quarter"): A measure of the thickness of a board equal to one inch (i.e., four quarter inches). See, e.g., Tr. 456-57 (Porter).

vv. 5/4 ("five quarter"): A measure of thickness of a board equal to 1-1/4" (i.e., five quarter inches). Tr. 167 (Porter). Similarly, 6/4 would be "six quarter" or 1½". See id.

2. Plaintiff, Precision Pine & Timber, Inc. ("Precision Pine"), was founded in 1984 in Heber, Arizona by Lon Porter, Lewis Tenney and Danny Peterson to make precision lumber

products from timber grown in northeastern Arizona. Joint Stipulation of Fact (March 11, 2005); Tr. 2927-28 (Tenney); Tr. 72, 84-85 (Porter). Since its inception, Mr. Porter has served as president of the company. Tr. 71-72, 84-85 (Porter).

3. Mr. Porter has with extensive experience with Ponderosa Pine timber and sawmills in the southwest. Mr. Porter's father was the owner/operator of a sawmill and was engaged in obtaining timber for the production and sale of lumber products in Northern Arizona and New Mexico, and from a very young age, Mr. Porter participated in the family business of assessing and acquiring standing timber, all facets of sawmill operations as well as the production and sale of lumber products. Tr. 72-75, 78-79 (Porter).

4. Totaled, Mr. Porter has more than 29 years of employment experience in ponderosa lumber manufacturing, including approximately 20 years of experience buying standing timber. See Tr. 72-75, 78-79, 84-85 (Porter stating that he was in charge of procurement for Precision Pine since it foundation in 1984).

5. Heber is located in a rural area of northeastern Arizona, on the Mogollon Rim, in the heart of a swath of virtually unbroken Ponderosa Pine forest that extends in an arc from nearly the Arizona-Nevada boundary into New Mexico. Joint Stipulation of Fact (March 11, 2005); Tr. 79-81, 85-86 (Porter); see also PX 104 (map of Arizona, Heber Sawmill indicated by red dot; Forest Service land indicated by green shading).

6. Approximately 83% of the land in Arizona is owned by the Federal or State government, and/or designated as Indian reservation, and virtually all of the forested land that produces sawlogs in Arizona is government-owned. Tr. 82-83 (Porter); see also PX 104 (map of Arizona, Federal, State and Indian lands indicated by shading); Tr. 3418 (Neuberger).

7. At all times relevant to this case, Precision Pine's sawmills, as well as all other non-Indian-owned sawmills in Northern Arizona, were substantially dependant upon the Forest Service's commercial timber sale program for their supply of raw material, i.e., logs for their sawmills. Tr. 82-83; 214-15; 223 (Porter); see also Tr. 2194 (Ness) (stating that when the Forest Service suspended the contacts, Precision Pine had "no other place to go and buy" timber). Specifically, more than 75% of Precision Pine's supply of raw material historically came from the Forest Service's timber sale program on National Forests in northeast Arizona, particularly the Tonto, Coconino, Apache-Sitgreaves and Kaibab National Forests. Tr. 94-5 (Porter).

8. In each and every year from its inception in 1984 until 1995, Precision Pine bid on and was awarded contracts by the Forest Service for the harvesting of timber, harvested timber pursuant to those contracts, paid the Forest Service for the timber removed, manufactured that timber into lumber and by-products and sold the lumber and by-products at a profit. Indeed, prior to the suspension, Precision Pine was consistently profitable. Tr. 365-66, 631-32, 643 (Porter); Tr. 3418-19 (Neuberger); see also Tr. 2193-94 (Ness).

9. As a result of manufacturing of logs into lumber, Precision Pine also produced the following by-products: (i) bark; (ii) chips; (iii) shavings; and (iv) grindings. Joint Stipulation of Fact (March 11, 2005).

10. As of August 25, 1995, Precision Pine was operating sawmills strategically located in (1) Heber, Arizona, (2) Eagar, Arizona, and (3) Winslow, Arizona. Tr. 86-87, 1074 (Porter); Joint Stipulation of Fact (March 11, 2005); see also PX 104 (red dot indicating Heber mill, blue dot indicating Eager mill and yellow dot indicating Winslow mill).

11. The Heber sawmill, constructed in 1984, drew its timber supply primarily from the Tonto National Forest and the western (Sitgreaves) side of the Apache-Sitgreaves National Forest. Joint Stipulation of Fact (March 11, 2005); Tr. 85-88; see also PX 104 (red dot indicating Heber mill, and the Tonto and the Sitgreaves portion of the Apache-Sitgreaves National Forests outlined and labeled "T" and "S", respectively). The Heber sawmill had the capacity to produce approximately 9 to 10 million board feet of lumber per year when operating one eight-hour shift per day. Tr. 94 (Porter).

12. Precision Pine obtained its Winslow facility from Duke City Lumber Company in 1991. Joint Stipulation of Fact (March 11, 2005). The Winslow sawmill drew its timber supply primarily from the Coconino and Kaibab National Forests. Tr. 88-89 (Porter); see also PX 104 (yellow dot indicating Winslow mill, and the Coconino and Kaibab National Forests outlined and labeled "C" and "K", respectively). The Winslow sawmill had the capacity to produce

approximately 14 to 15 million board feet of lumber per year on a one shift basis. Tr. 94 (Porter).

13. As of August 25, 1995, the Winslow facility also contained a planer mill and kilns, where rough green lumber from all of Precision Pine's sawmills was surfaced and dried. Tr. 89-90 (Porter). The Winslow planer and kilns had an annual capacity well in excess of the combined annual output of Precision Pine's sawmills. Stipulation of Fact (March 11, 2005); Tr. 96-97 (Porter).

14. The Winslow sawmill was severely damaged by fire and as a result closed on September 17, 1998, and the Winslow planer was closed in or about September 1999. Joint Stipulation of Fact (March 11, 2005).

15. During 1993, Precision Pine constructed a sawmill in Eagar, Arizona; completing it in or about October 1993. Joint Stipulation of Fact (March 11, 2005). The Eagar sawmill drew on the supply of timber sold by the Forest Service on the eastern (i.e., Apache) side of the Apache-Sitgreaves National Forest. Tr. 87 (Porter); see also PX 104 (Blue dot indicating Eager mill, and the Apache portion of the Apache-Sitgreaves National Forests outline and labeled "A"). Prior to the suspension, the Eager mill had a capacity of 9-10 million board feet per year on a one shift basis, but Precision was at the time of the suspension expanding its capacity by 15 or 20 percent, to approximately 11 million board feet of lumber per year on a one shift basis. Tr. 94 (Porter).

16. Precision Pine was the high bidder on the O.D. Ridge timber sale contract, the U-Bar timber sale contract, the Jersey Horse timber sale contract, the Salt multi-product sale contract, the Hutch-Boondock multi-product sale contract, the Saginaw-Kennedy multi-product sale contract, the Mud multi-product sale contract, the Monument multi-product sale contract, the Brann multi-product sale contract, the Manaco multi-product sale contract, the Brookbank multi-product sale contract and the Kettle multi-product sale contract. Precision Pine was awarded these sales on the following dates:

| Contract | Award Date |
|---|---|
| Jersey Horse | 12/13/1993 |
| O.D. Ridge | 8/14/1992 |
| Brookbank | 4/13/1995 |
| Kettle | 7/20/1995 |
| U-Bar | 10/5/1992 |
| Mud | 9/14/1994 |
| Monument | 9/28/1994 |
| Salt | 2/28/1994 |
| Manaco | 1/17/1995 |
| Saginaw-Kennedy | 9/29/1994 |
| Brann | 9/29/1994 |
| Hutch-Boondock | 6/29/1994 |

Joint Stipulation of Fact (March 11, 2005).

17. The Hay timber sale contract originally was awarded to Reidhead Lumber Company, Inc. on January 17, 1990, and then transferred to Precision Pine by contract modification on June 24, 1991. Joint Stipulation of Fact (March 11, 2005).

18. The St. Joe timber sale contract was originally awarded to Grand Canyon Forest Industries on April 14, 1992. It was assigned to Precision Pine by Grand Canyon Forest Industries on October 16, 1992. Joint Stipulation of Fact (March 11, 2005).

19. The price index applicable to the escalation and de-escalation of stumpage prices for eight of the contracts at issue that is the Western Wood Products Association (WWPA), Inland Rocky Mountain Ponderosa Pine index. Joint Stipulation of Fact (March 11, 2005).

20. On August 24, 1995, the United States District Court for the District of Arizona entered an order in Silver v. Babbitt, 924 F. Supp. 976 (D. Ariz. 1995), enjoining all timber harvesting on United States Forest Service timber sales in Forest Service Region 3. Forest Service Region 3 principally encompasses the states of Arizona and New Mexico. Joint Stipulation of Fact (March 11, 2005).

21. On August 25, 1995, following entry of the court order, the Forest Service suspended operations on the Hay, St. Joe, O.D. Ridge, U-Bar, Jersey Horse, Salt, Hutch-Boondock, Saginaw-Kennedy, Mud, Monument, Brann, Manaco, Brookbank and Kettle contracts. Joint Stipulation of Fact (March 11, 2005), i.e., the Forest Service suspended operations an all of Precision Pine's Forest Service sales including Campbell and Barber (which are not part of this litigation). Tr. 2933-38 (Tenney). The suspension for the Hay, O.D. Ridge, U-Bar, Jersey Horse, Salt, Saginaw-Kennedy, Monument, Manaco, Brookbank and Kettle contracts lasted until December 4, 1996, Joint Stipulation of Fact (March 11, 2005), a total of 466 days.

22. At the time of the suspension, the remaining volume of Ponderosa Pine timber remaining on 11 breached contracts for which lost profit damages are sought was:

| Sale | Sawlogs | Roundwood | Topwood |
|---|---|---|---|
| Monument | 1461 ccf | 1100 ccf | N/A |
| Mud | 6199 ccf | 4060 ccf | N/A |
| Saginaw-Kennedy | 2268 ccf | 1658 ccf | N/A |
| U-Bar | 3194.12 mbf | N/A | 48 cords |
| Brookbank | 2711.29 ccf | 5346.8 ccf | N/A |
| Jersey Horse | 3040 ccf | N/A | N/A |
| Manaco | 5006 ccf | 1348 ccf | N/A |
| Salt | 4460 ccf | 1835 ccf | N/A |
| Hay | 3819.22 mbf | N/A | N/A |
| Kettle | 5702 ccf | 3958 ccf | N/A |
| O D Ridge | 2626 mbf | N/A | N/A |

Third Joint Stipulation of Facts (June 3, 2005); PX 320. The remaining volume of timber other than Ponderosa Pine timber was:

| Sale Name | Specie | Sawlogs |
|---|---|---|
| U-Bar | Douglas-fir | 1,361 mbf |
| Hay | Douglas-fir | 257.55 mbf |
| O.D. Ridge | Douglas-fir | 441 mbf |
| O.D. Ridge | Englemann Spruce | 264 mbf |

PX 131 at Ex. 9.

23. Using a conversion factor of 2 ccf per mbf (LS) for the above volumes listed in ccf (see Tr. 244-45 (Porter)), at the time of the suspension the total remaining sawtimber volume on the 11 breached sales for which lost profit damages are sought was:

| Volume remaining on the 11 breached sales as of August 25, 1995 | | | |
|---|---|---|---|
| Sale | Sawlog volume in units listed in contract | | Sawlog volume in mbf (LS) |
| Monument | 1461 | ccf | 730.50 |
| Mud | 6199 | ccf | 3099.50 |
| Saginaw-Kennedy | 2268 | ccf | 1134.00 |
| U-Bar | 3194.12 | mbf | 3194.12 |
| Brookbank | 2711.29 | ccf | 1355.65 |
| Jersey Horse | 3040 | ccf | 1520.00 |
| Manaco | 5006 | ccf | 2503.00 |
| Salt | 4460 | ccf | 2230.00 |
| Hay | 3819.22 | mbf | 3819.22 |
| Kettle | 5702 | ccf | 2851.00 |
| O D Ridge | 2626 | mbf | 2626.00 |
| | | | |
| | | TOTAL: | 25,062.99 mbf (LS) |

See PX 1013.[1]

24. In this action, among other things, Precision Pine seeks to recover the profits that it lost by not being able to harvest the timber on these sales as it anticipated between August 25, 1995 and December 4, 1996 and manufacturing and selling the lumber there from between August 25, 1995 and April 15, 1997 (a period covering the suspension and the ensuing winter).

25. The remaining volume of sawlogs on the 11 breached contracts for which Precision Pine is seeking lost profits represents an approximately 10.5 month supply of sawlogs for Precision Pine's sawmills. Tr. 344, 664 (Porter).

[1]In Precision Pine's damage calculations it had found the remaining volume of sawlogs on the 11sales to be only 24,943.79 mbf (LS). See PX 131, App. A at 4. This was 119.2 mbf (LS) less than resulted from the stipulation entered into by the parties during trial.

26. On October 18, 1995, the Forest Service entered into a stipulation with the plaintiffs in Silver v. Babbitt, which was subsequently approved by the Court, and which allowed certain sales to be released from the injunction. Joint Stipulation of Fact (March 11, 2005).

27. On December 4, 1996, the Arizona District Court found that the Forest Service had completed consultation on its Forest Plans under the Endangered Species Act and dissolved the injunction. As a result, the Forest Service lifted the suspension of the Brookbank, Hay, Jersey Horse, Kettle, Manaco, Monument, O.D. Ridge, Saginaw-Kennedy, Salt and U-Bar contracts. Joint Stipulation of Fact (March 11, 2005). The total length of the suspension of these sales was 466 days.

28. In 1997, Precision Pine submitted claims under the Contract Disputes Act ("CDA") for breach of contract with respect to 14 of its Forest Service timber sale contracts that had been suspended beginning on August 25, 1995 and seeking, among other things, lost profits. See PX 194, 196, 198, 200, 202, 204, 206, 208, 210, 212, 214, 216, 218, 220.

29. In the final decisions on Precision Pine's claims, the government denied liability for the breach of contract as well as for Precision Pine's lost profit claim. See PX 195, 197, 199, 201, 203, 205, 207, 209, 211, 213, 215, 217, 219, 221. Pursuant to contract clause C(T)6.01, the Forest Service did pay Precision Pine a total of $18,242.78 in out-of-pocket expenses for the protracted suspension of 14 contracts. Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 52 (2001).

30. Precision Pine brought suit in this Court, appealing the Contracting Officers' final decisions. This Court's finding at summary judgment was that the Forest Service had, in fact, breached 12 of the 14 timber sale contracts that were suspended. Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 73-74 (2001) (finding a breach of duty not to hinder for 11 contracts, and the breach of duty not to cooperate for six of those 11 (plus an additional contract), for a total of 12 breached contracts).

**COMPOSITION OF PRECISION PINE'S CLAIMS**

31. Precision Pine hired Robert Ness, CPA, as an independent expert to conduct a review, analysis and, as necessary, recalculation of Precision Pine's damages in this case. Tr. 2163-64 (Ness).

32. Mr. Ness is currently, and was from the time Precision Pine engaged him to do his analysis, also employed as the Controller for Sundance Lumber Company in Springfield, Oregon, a lumber manufacturer. Tr. 2151-52 (Ness).

33. Mr. Ness graduated near the top of his class from Oregon State University in 1977 with a Bachelor of Science Degree in Business Administration, concentrating on Accounting and Finance, as well as minors in Computer Science and Applied Mathematics. Tr. 2152-53 (Ness); PX 56 (Mr. Ness' Curriculum Vitae).

34. A year after graduation, Mr. Ness went to work for the "Big Eight" accounting firm of Coopers & Lybrand in Eugene, Oregon, and remained there until 1982. He began as an auditor and eventually moved into business consulting, completing special engagements such as analyzing cash flow models, conducting performance evaluations and verifying internal controls. During his tenure at Coopers & Lybrand, Mr. Ness worked for a variety of clients, including some in the forest products industry such as lumber manufacturers, particle board plants, and timber operations. Tr. 2153-54 (Ness); PX 56.

35. Mr. Ness earned his Certified Public Accounting accreditation in 1981. PX 56.

36. In 1982, Mr. Ness left Cooper & Lybrand to work within companies as a Chief Financial Officer and/or Controller. Tr. 2154-55 (Ness). From that point to the present, Mr. Ness has, with one exception when he worked for the international clothier, Levi Strauss & Co., been the highest-ranking financial manager for every firm at which he worked. Tr. 2158 (Ness). During his 23 years in industry, Mr. Ness has spent seven to eight years working specifically in the forest products industry, including his current position at Sundance Lumber Company. Tr. 2155 (Ness). In addition, in his college years, Mr. Ness worked as a laborer in sawmills during vacations, learning their operations first hand. Tr. 2168 (Ness). In his professional career, Mr. Ness, among other achievements, helped shepherd a construction firm through a period of significant growth, making their books auditable for the first time. Tr. 2156-57 (Ness). Indeed, Mr. Ness has centered his career on guiding growing or struggling companies through periods of change. Tr. 2155; 2160 (Ness).

37. Mr. Ness has served as an expert witness, fact witness and/or company representative on behalf of his employer or one of his former employers with respect to damages computations in litigation on four prior occasions. Tr. 2160-63 (Ness).

38. Mr. Ness is an expert in the area of accounting for forest products companies. Tr. 2171 (Court).

39. After reviewing and analyzing Precision Pine's damages claim, Mr. Ness agreed with the overall approach that Precision Pine had taken in calculating its damages. However, Mr. Ness had a number of disagreements with particular calculations made by Precision Pine, and reduced

the claim from Precision Pine's original estimate by about $1.252 million. Tr. 2173, 2190 (Ness).

40. Precision Pine's damages claim is divided into the following categories:

a. Gross profits that Precision Pine would have earned, but for the Forest Service's breach, from harvesting the remaining timber on the breached contracts, then processing that timber into lumber and by-products at its mills, and selling that lumber and those by-products on the open market.

b. Increased costs arising from manufacturing inefficiencies that resulted directly from the Forest Service's breach of contract and severe restriction of the volume of timber available for Precision Pine's sawmills during the suspension.

c. Other extra costs that Precision Pine incurred as a direct result of the Forest Service's breach of contract.

Tr. 2190 (Ness).

**Increased Hauling Costs From The Hay Timber Sale**

41. Precision Pine seeks to recover its increased hauling costs on the Hay timber sale contract. Tr. 2208 (Ness); see PX 318 (a revision to the spreadsheet that was originally included as Exhibit 3 to Mr. Ness's report, PX 131, and containing Mr. Ness's calculations for this item);[2] see also Tr. 2210-16 (explanation of what prompted the revised calculations).

[2] As Mr. Ness testified, due to adjustments in the volume of timber actually transported to Winslow and Heber, Ex. 3 of his original report needed to be revised. Tr. 2211 (Ness); see PX 1006.

42. The severe reduction in volume of logs available to Precision Pine as a result of the Forest Service's suspension and breach of Precision Pine's contracts caused Precision Pine to suspend operations at its mill in Eagar on December 1, 1995, and to keep it closed throughout the suspension period. Tr. 2209 (Ness); Tr. 725-26, 729 (Porter); PX 262; PX 116; PX 163 (Summary of mill shutdowns). In fact, due to the shortage of sawlogs caused by the protracted suspension, on or about June 19, 1996, Precision Pine consolidated its manufacturing operations at its Winslow facility. Tr. 720 (Porter).

43. Immediately after the suspension was lifted in December of 1996, Precision Pine sought the Forest Service's permission to begin harvesting on the Hay timber sale outside of the Normal Operating Season. Tr. 719 (Porter); PX 262.

44. The Hay sale, unlike most sales, was located at an elevation that allowed for a very high likelihood of extended winter logging. Tr. 719-20 (Porter); PX 262.

45. At that time the suspension was lifted, the Eagar sawmill was not due to the log shortage caused by the suspension. Accordingly, Precision Pine also sought and obtained Forest Service permission to haul sawlogs removed from the Hay sale to its Winslow sawmill which, due to the suspension, was also in need of logs. Tr. 750-52 (Porter); PX 257; PX 258.

46. In February 1997, Precision Pine reopened the Eagar sawmill, and logs from the Hay sale were again hauled to Eagar. Tr. 753 (Porter).

47. Precision Pine operated the Eagar sawmill in February and March of 1997 and from May through July of 1997, Tr.746-47 (Porter); PX 163; PX 20 (Eagar production ledger), at which time it was permanently closed in the wake of continuing logs shortages caused by yet another injunction entered against the Forest Service, i.e., the "Forest Guardians" suspension in June 1997, Tr. 743-4, 1268-9 (Porter), which, among other things, caused Hay to be suspended from June 4, 1997 to mid-December 1997. Tr. 983 (Porter); PX 119.

48. During December 1996 and January 1997, when the Eagar sawmill was still closed, Precision Pine hauled logs from the Hay sale to the Winslow sawmill, which was considerably further away from the Hay sale than was the Eagar sawmill. Tr. 2209 (Ness); Tr. 720-22 (Porter); PX 260; see also PX 104 (Map of Arizona, indicating the location of the Hay sale by a handwritten "H" near the blue dot indicating the Eagar sawmill, and indicating the Winslow sawmill by a yellow dot).

49. Hauling the sawlogs from the Hay sale to the Winslow sawmill instead of the Eagar sawmill entailed an additional 272 miles in roundtrip hauling. Tr. at 756 (Porter); Tr. 2209 (Ness); see also PX 104 (Map of Arizona, indicating the location of the Hay sale by a handwritten "H" near the blue dot indicating the Eagar mill, and indicating the Winslow mills by a yellow dot).

50. Mr. Porter and Mr. Reidhead agreed the cost for hauling the logs from the Hay sale would $1.10 per mile. Tr. 756 (Porter); Tr. 1728 (Reidhead).

51. During December 1996 and January 1997, Precision Pine removed 1070 mbf (LS) of sawlogs from the Hay timber sale. PX 290, Vol. I Hay Sale. All of this sawlog volume was hauled to the Winslow sawmill. Tr. 794 (Porter).

52. Mr. Ness calculated the increased haul cost by multiplying the increased mileage of the haul (272 miles) by the haul rate of $1.10 per mile, and then dividing the product by the average volume of timber hauled in one load (4 mbf (LS) per load). Tr. 2209-10, 2239-41 (Ness); PX 318. The result is the increased cost per mbf (LS) of hauling logs to Winslow -- $74.80 per mbf (LS). PX 318. To determine the total increased cost of hauling to Winslow, Mr. Ness then multiplied the volume hauled from the Hay sale to Winslow in December 1996 and January 1997 (1,070 mbf (LS)) by the average increase in haul cost, i.e., $74.80/mbf (LS). Tr. 2209-10 (Ness); PX 318. The total of damages incurred by Precision Pine due to the increased cost of hauling sawlogs from Hay to Winslow in 1996 and 1997 was $80,036. Id.

53. Mr. Ness then reduced this total by $33,437.50 which is the cost that Precision Pine saved by not having to incur the $25 per mbf (LT) cost to haul green lumber produced from Hay from the Eagar mill to the Winslow facility for planing and drying. Tr. at 2213, 2240 (Ness), PX 318. The difference represents the net increase that Precision Pine incurred as a result of the Forest Service's breach for hauling sawlogs from the Hay timber sale to Winslow.[3]

[3]This amounts to a net of $46,598.50. Adding the 7.6% overhead and 10% profit markup that Mr. Ness determined to be appropriate for all increased hauling costs to this amount yields a total of $55,153.98 for the increased hauling costs incurred in December 1996 and January 1997. Tr. 2210-11 (Ness).

54. Mr. Ness repeated the above process with regard to sawlogs that in 1998 Precision Pine was forced to haul to Heber because Eagar had been permanently closed. Tr. 2208-10 (Ness).

55. After the Forest Guardians suspension of Hay had been lifted in December of 1997 and Precision Pine recommenced harvesting the Hay sale in late 1998, Precision Pine was forced to haul the timber from Hay to its sawmill at Heber because at that time the Eagar sawmill had been permanently closed and the Winslow sawmill has suffered a catastrophic fire and was also permanently closed. Tr. 620, 763 (Porter).

56. During 1998, Precision Pine removed 1,662 mbf (LS) of sawlogs from the Hay timber sale. PX 290, Vol. I, Hay Sale. All of this sawlog volume was hauled to Precision Pine's Heber sawmill. Tr. 853 (Porter).

57. Hauling the sawlogs from the Hay sale to the Heber sawmill instead of the Eagar sawmill entailed an additional 190 miles in roundtrip hauling. Tr. 780 (Porter); see also PX 104 (Map of Arizona, indicating the location of the Hay sale by a handwritten "H" near the blue dot indicating the Eagar mill, and indicating the Heber mill by a red dot).

58. Mr. Ness again calculated the increased haul cost by multiplying the increased mileage of the haul by the haul rate of $1.10 per mile, and then dividing the product by the average volume of timber hauled in one load (4 mbf (LS) per load). Tr. 2209-10 (Ness); PX 318. The result is the increased cost per mbf of hauling logs to Heber -- $52.25 per mbf (LS). PX 318. To determine the increased cost of haul, Mr. Ness then multiplied the volume of timber hauled from

the Hay sale to Heber in 1998 (1,662 mbf (LS)) by the $52.25. Tr. 2239-41 (Ness); PX 318. The total amount of damage incurred by Precision Pine due to the increased cost of hauling sawlogs from Hay to Heber in 1998 was $80,036. Id.

59. Mr. Ness then reduced this total by $14,542.50 which is the $7 per mbf (LT) that Precision Pine saved by only having to haul green lumber produced from Hay from the Heber sawmill rather than the more distant Eagar sawmill to the Winslow facility for planing and drying. Tr. at 2213, 2240 (Ness); PX 318. The difference represents the net increase that Precision Pine incurred as a result of the breach in hauling sawlogs from the Hay timber sale to Winslow.[4]

60. The total net increase in costs incurred by Precision Pine for hauling sawlogs from the Hay sale to Winslow and Heber rather than to Eagar was $118,895.50, to which Mr. Ness then added 7.6% overhead and 10% profit, producing total damages for increased hauling costs of $140,724.72. Tr. 2240-41 (Ness); PX 318.

61. Mr. Ness calculated the general and administrative overhead rate of 7.6% by adding all of Precision Pine's general and administrative overhead costs for the year prior to the suspension, and then determining the percent that the general and administrative overhead costs were of all costs, including logging & manufacturing costs. PX 131, Ex. 8; Tr. 2198-99 (Ness).

---

[4]This amounts to $72,297. Adding the 7.6% overhead and 10% profit markup that Mr. Ness determined to be appropriate for all increased hauling coats to this amount yields a total of $85,570.14 for the increased hauling costs incurred by Precision Pine in 1998. Tr. 2210-11 (Ness).

**Lost Market Opportunity (Lumber & By-Products)**

62. The next (and by far the largest) item of damages is Precision Pine's lost market opportunity, i.e., its lost gross profits for the lumber and by-products that but for the Forest Service's breach Precision Pine would have produced and sold from the timber that it would have harvested on the breached sales during the suspension period. Tr. 2217-18 (Ness); PX 131, Ex. 1, item 3.

63. Mr. Ness' general approach to calculating lost profits for lumber and by-products was to determine "what would have changed" between what Precision Pine actually did during the period of the suspension and ensuing winter, and what Precision Pine would have done absent the Forest Service's breach. Tr. 2218-19 (Ness).

64. In broad terms, to calculate lost profits, Mr. Ness determined the gross profits before manufacturing overhead that Precision Pine would have generated from producing and selling lumber and by-products from the timber on the breached sales that, absent the breach, Precision Pine would have harvested between August 25, 1995 and December 4, 1996. To do so, he calculated what Precision Pine's total revenue would been for lumber and by-products produced from the timber remaining on the breached sales, and then deducted the various direct manufacturing costs Precision Pine would also have incurred had it harvested that timber and produced lumber and by-products from it. Tr. 2218-19 (Ness).

65. Specifically, after Mr. Ness first calculated total revenue (by determining what products Precision Pine would have produced and at what prices Precision Pine would have sold those

products) in order to calculate what Precision Pine's gross profits before manufacturing overhead would have been from the breached sales, he then deducted the following cost items from total revenue:

- direct manufacturing costs (including stumpage for the timber itself);
- logging and hauling costs;
- severance tax;
- sawmill (i.e., direct manufacturing) costs;
- green lumber hauling costs;
- dry kiln and planer costs; and

Tr. 2220 (Ness).[5]

66. In Mr. Ness' expert accounting opinion, gross profits before manufacturing overhead is the appropriate measure of damages in this case. Tr. 2218, 2755 (Ness). Taking into account operating as well as general & administrative overhead is not appropriate here, because those items remain static whether or not a suspension occurs. Tr. 2755-56 (Ness). In other words, to calculate what "would have changed" between the scenario that Precision Pine faced because of the breach and the scenario that Precision Pine would have faced absent the breach, Mr. Ness did not need to factor in these static costs. Tr. 2756-57 (Ness). Taking into account other sources of income or loss after operating income is also not appropriate, because those type of income or losses do not reflect timber operations. Tr. 2222 (Ness).

---

[5]Deducting manufacturing overhead (e.g., property taxes, general insurance, supervisor wages, repairs and maintenance, etc.) then determines what Precision Pine's gross profit would have been. Tr. 2220 (Ness). Subtracting general & administrative overhead (officer salaries, sales expenses, accounting department payroll taxes, workman's comp, group medical insurance, etc.) from gross profit then yields operating income. Tr. 2221-22 (Ness). Finally, deducting from operating income other items such as interest income, interest expenses, gains & losses, and gains & losses from subsidiaries, yields net income before taxes, otherwise termed "net income." Tr. 2222 (Ness); see also PX 1011 (demonstrating this testimony).

**Milling Schedule**

67. To calculate gross profits before manufacturing overhead, Mr. Ness had to determine what Precision Pine would have produced from the timber it would have harvested but for the suspension. Tr. 2244 (Ness).

68. In determining what Precision Pine would have produced but for the suspension, Mr. Ness assumed that Precision Pine would have operated its mills at or near capacity during the suspension, based on the fact that running at or near capacity: (1) was what Precision Pine has always done, (2) allows a sawmill to achieve the highest level of profit possible, and (3) was confirmed by Mr. Porter as Precision Pine's goal. Tr. 2283 (Ness).

69. Mr. Ness then determined that total anticipated production for all three mills for the 19¾ months of the suspension plus the ensuring winter, i.e., from August 25, 1995 to April 15, 1997, was 57.134 mmbf (LT) (57,134 mbf (LT)). Mr. Ness then calculated the annual capacity that the 57.134 mmbf (LT) over 19¾ months represented, by deriving a monthly rate, i.e., by dividing the total capacity by the number of months in the suspension and then multiplying by 12. He found annual capacity/anticipated rate of production to be 34.7 mmbf (LT) (34,714 mbf (LT)). Tr. 2284 (Ness).

70. Mr. Ness verified (i.e., performed a "reality check" on) his determined annual capacity/ anticipated rate of production of 34.7 mmbf (LT) by reviewing Precision Pine's actual production records in the two fiscal years prior to the suspension. For the fiscal years ending ("FYE") March 31, 1994 and March 31, 1995, Mr. Ness found that Precision Pine had produced

slightly over 30 mmbf each year. (The exact figures were 30,088,892 bf in FYE 3/31/94 and 30,197,841 bf in FYE 3/31/95.) Tr. 2320 (Ness). As of August, 1995, Precision Pine was in the process of making several improvements to its sawmills to increase capacity. PPFF 15. Accordingly, Precision Pine could have achieved annual capacity of 34.7 mmbf during the suspension period but for the Forest Service's breach. Tr. 2285 (Ness). As an additional verification, Mr. Ness confirmed with Mr. Porter that Precision Pine could have produced lumber at this rate. Tr. 2284 (Ness).

71. After calculating production capacity, Mr. Ness had to determine the volume of timber remaining on the breached sales for which Precision Pine is claiming lost profits at the time of the breach. Mr. Ness' understanding of this volume is set forth at Exhibit 9 of his report, and shows total volumes remaining as:

| | |
|---|---|
| - Ponderosa Pine: | 22,620 mbf (LS) |
| - Douglas Fir: | 2,060 mbf (LS) |
| - Spruce: | 264 mbf (LS) |
| TOTAL: | 24,944 mbf (LS) |

Tr. 2244-45 (Ness); PX 131, Ex. 9; but see PX 1013 (showing a total of 25,062 mbf (LS) remaining volume based on the Third Joint Stipulation of Facts, and assuming a ccf-mbf conversion factor of 2 to 1).

72. After determining the total volume of sawtimber remaining on the 11 breached sales at the time of the suspension, Mr. Ness then had to determine in which fiscal quarters those volumes would have been processed into lumber. To do so, he started with the harvest

projection prepared by Mr. Porter (see PX 131, App. A at 4, column headed "Previous").[6] In verifying Precision Pine's harvest projection, Mr. Ness found several discrepancies and asked Precision Pine to resolve them, which it did. Mr. Ness then distributed any adjustments in the volume remaining pro rata across each quarter in which harvest took place and then verified with Mr. Porter that Precision Pine could have harvested the slightly increased volumes. Tr. 2434-5. Precision Pine's revised remaining volume calculations are recorded in Mr. Ness' report (PX 131) at Ex. 9 in the column headed "Revised." Tr. 2244-45 (Ness).

73. The slightly adjusted harvest schedule upon which Mr. Ness' report is based did not change Mr. Porter's original projection of the quarter in which harvesting of the breached sales would have taken place had there been no suspension. Tr. 2245 (Ness). Compare PX 131 at App. A, p. 4 with PX 131, Ex. 9.

74. Mr. Ness then had to determine when Precision Pine had sawmill capacity available to process this timber, assuming total capacity based on a one-shift basis. The per-sawmill capacity/anticipated production (verified with Mr. Porter) for each sawmill is set forth in left hand column of p. 4 of Exhibit 7 to Mr. Ness' report (PX 131). Tr. 2246 (Ness).

75. To do so, Mr. Ness determined how much lumber Precision Pine actually produced under the constraints of the suspension and breach. In this regard, Precision Pine provided Mr. Ness with monthly production figures by mill. See PX 131, Ex. 7 at 4 (columns headed "Actual Production"); Tr. 2247 (Ness).

[6] See PPFF 245 infra.

76. Mr. Ness grouped the actual lumber production data by quarter and set forth that data in the first two rows on pages 1, 2 and 3 of Exhibit 7 of his report (PX 131) for the Winslow, Heber and Eagar sawmills, respectively.

77. To determine the available capacity at a given sawmill in a given quarter, Mr. Ness subtracted the actual production of lumber for the quarter from the anticipated production of lumber for the quarter and then converted the result into a sawlog volume by dividing it by 1.25. Tr. 2247-49 (Ness).

a. E.g., for the 3rd quarter of 1995 Winslow's anticipated production capacity was 1.194 mmbf (LT) (1,194 mbf (LT)), but actual production was only 1.089 mmbf (LT) (1,089 mbf (LT)), meaning that Winslow could have produced 104 mbf (LT) more lumber in that quarter in the absence of the suspension and breach. Tr. 2247 (Ness); see PX 131, Ex. 7 at 1.

b. To convert lost production in lumber tally into excess capacity in log scale, Mr. Ness divided by an overrun factor of 1.25. So, for example, the 104.57 mbf (LT) lost production for Winslow in the 3rd quarter of 1995 coverts to 83.66 mbf (LS) excess capacity. Tr. 2248 (Ness); PX 131, Ex. 7 at 1.

78. Mr. Ness used the same approach to determine excess capacity, by sawmill, in each quarter during the suspension, taking into account that anticipated capacity can vary by month based on the number of working days in the month, as well as other factors. Tr. 2248 (Ness).

a. E.g., when Mr. Ness applied his methodology for calculating excess capacity by mill and by quarter to the Winslow mill in the 4th quarter of 1995, he determined

that there was 757 mbf (LS) of excess capacity for that mill in that quarter. Tr. 2248-9 (Ness).

79. After calculating excess capacity for each sawmill in each quarter during the suspension and ensuing winter, Mr. Ness then referred to the harvesting schedule supplied by Mr. Porter (PX 131, App. A at 4) to determine from which of the breached sales Precision Pine would have obtained timber to fill each sawmill's excess capacity in each quarter. Tr. 2249-50, 5606 (Ness).

a. E.g., for the 757 mbf (LS) excess capacity for the Winslow sawmill in the 4th quarter of 1995, Mr. Ness determined that Precision Pine could have obtained sawtimber from one of four of the breached sales that Precision Pine was using to supply its Winslow mill, i.e., Monument, Mud, Saginaw- Kennedy or U-Bar. Because, according to Mr. Porter's schedule, the Mud sale was the next of those four to be harvested, Mr. Ness determined that Precision Pine would have filled the excess capacity at the Winslow mill in the 4th quarter of 1995 with timber from the Mud sale. Tr. 2249-50 (Ness).

80. Using this methodology, Mr. Ness determined the additional volume of sawlogs in mbf (LS) that Precision Pine would have processed from each of the breached sales, by quarter, and recorded those volumes on page 1 of Exhibit 7 to his report (PX 131) under the heading "Logs that would have been processed." Tr. 2249-50 (Ness).

81. Once Mr. Ness calculated the amount of additional timber that Precision Pine would have processed in each quarter, by mill, he then calculated the total cost of obtaining that additional

timber (i.e., the cost of purchasing, felling, hauling the timber plus severance tax; this total cost is termed the "delivered log cost" of the timber). Tr. 2250-51 (Ness). Mr. Porter supplied the amounts of the various components of delivered log cost (log cost, miscellaneous costs, logging & hauling costs, and severance tax) for each quarter, and Mr. Ness recorded those amounts on pages 7-8 of App. A to his report (PX 131). Using these figures, Mr. Ness first calculated the delivered log cost for each sale which would have supplied additional timber, by quarter, and recorded those amounts on pages 1-3 of on Exhibit 7 of his report under the heading "Log Cost – Based on Quarter Logged." Tr. 2250-52 (Ness).

82. Mr. Ness then itemized and totaled all of the components of delivered log cost for each sale, by quarter, in Exhibit 4 of his report (PX 131).

a. E.g., in itemizing delivered log costs for the 760 additional mbf (LS) of timber that Precision Pine would have obtained from the Mud sale in the 4th quarter of 1995 (see PX 131, Ex. 4 at 2), Mr. Ness calculated the following figures:

  i. Log costs: $59,257.20 (760 mbf x $77.97/mbf log cost for Mud sale in the 4th quarter of 1995 reflected on App. A, p. 7, line 160, column C);

  ii. Miscellaneous costs: $7159.20 (760 mbf x $9.42/mbf reflected on App. A, p. 7, line 160, column D);

  iii. Logging and hauling costs: $95,000.00 (760 mbf x $125/mbf on App. A, p. 7, line 160, column E); and

  iv. Severance tax: $1,618.80 (760 mbf x $2.13/mbf reflected on App. A, p. 8, line 201, column B).

Tr. 2250-54 (Ness). Then, Mr. Ness summed the components to determine total delivered log cost for the excess volume that Precision Pine would have consumed from the Mud sale in the 4th quarter of 1995: $163,035.20. PX 131, Ex. 4 at 2.

83. Mr. Ness used the methodology described above to calculate delivered log costs for each sale from which Precision Pine would have obtained timber to fill its excess capacity in each quarter of the suspension, and recorded the results in Exhibit 4 of his report, by sale and by quarter. Tr. 2254 (Ness); PX 131, Ex. 4.

84. Mr. Ness then set about computing the total revenue that Precision Pine would have earned from the timber it milled to fill that excess capacity. To do so, Mr. Ness started by taking the volume of timber in mbf (LS) from a breached sale that would be milled by sale by quarter and multiplying it by an overrun factor of 1.25 to determine the volume of lumber that would be produced from the timber on that sale in that quarter. Tr. 2254 (Ness).

a. E.g., for the Mud sale in the 4th quarter of 1995, Mr. Ness took the 760 mbf (LS) of additional timber that he determined would be processed from Mud in that quarter and calculated that it would yield 960 mbf of lumber (960 mbf (LT)). Tr. 2254-5; PX 131, Ex 4 at 2, column headed "volume," row labeled "lumber sales-Ponderosa Pine."

**Product Mix**

85. After determining the additional volume that a sawmill would have produced in a particular quarter from timber from a particular breached sale or sales, Mr. Ness needed to know

how much of each of 13 different Ponderosa Pine lumber products that Precision Pine makes would have been yielded from that additional volume. Tr. 2254-55 (Ness). Mr. Porter provided Mr. Ness with projections, by sale, of how much lumber Precision Pine would have produced in each of the 13 product categories as a percentage of all lumber produced from that sale. (These percentages are referred to as the "product mix.") Mr. Ness recorded Mr. Porter's projected data on pages 2 and 3 of App. A to his report (PX 131) and used them in his calculations. Tr. 2254-55 (Ness).

a. E.g., Mr. Porter projected that 0.4% of all lumber produced from timber from the Mud sale would be graded and sold as moulding & better lumber (PX 131, App. A, p. 2, col. C, line 38), and 0.6% of that lumber would be graded and sold as 5/4 #1 Shop lumber (id., col. C, line 39). Tr. 2255 (Ness).

86. Mr. Ness performed a "reality check" on Mr. Porter's product mix projections by calculating a weighted average of all of the by-sale projected product mixes, and then comparing that weighted average to the product mix that Precision Pine had actually achieved in the fiscal year prior to the suspension, as recorded in the Winslow Sale Journal. Tr. 2322, 230-33 (Ness); PX 288; PX 290. Mr. Ness' comparison displayed graphically is:

| Grade | As Projected by Mr. Porter | Precision Pine Historical |
|---|---|---|
| Moulding & Better | 4.35% | 5.3% |
| 5/4 # 1 Shop | 1.52% | 1.0% |
| 5/4 # 2 Shop | 7.32% | 7.7% |
| 5/4 # 3 Shop | 20.69% | 21.9% |
| Par 99, Redress | 13.51% | 10.8% |
| 5/4 RWL Radius Edge | 16.86% | 12.2% |
| #2, #3, # 4 & Better | 8.55% | 10.1% |
| # 3 Common Utility | 6.86% | 11.2% |
| # 4 Common Economy | 7.62% | 4.9% |
| # 5 Common | 0.23% | 0.3% |
| Rough | 2.84% | 2.9% |
| Timbers | 2.48% | 2.3% |
| Shop Outs | 7.18% | 9.5% |

The figures in the "Projected" column show the results of Mr. Ness' weighted averaging of the by-sale projections Mr. Porter provided. See PX 288 (first page, right column). The figures in the "Historical" column are taken from Winslow Sale Journal for FYE 3/31/95. See PX 290 (page headed "April 1994 through March 1995").

87. Through the above comparison, Mr. Ness concluded that Mr. Porter's projections were a reasonable estimation of the overall product mix that Precision Pine would have achieved had it been able to process the timber from breached sales into lumber. Tr. 2332 (variations still compared favorably), 2335-36 (no substantial difference on an absolute basis) (Ness). For example, Mr. Porter projected that from all of the lumber that would have been produced from the breached sales, 4.35% of it would have been moulding & better, Tr. 2334 (Ness); see PX

288, but historically, Precision Pine had actually achieved a more favorable recovery percentage, 5.3%, for this high-grade product.

88. With respect to the comparison of Radius Edge and #2, #3, #4 & Better products, Mr. Ness discovered that from identical timber Precision Pine had a choice of making either lumber product, and therefore, that the two product categories are interchangeable for the purposes of product mix. Tr. 2336-37 (Ness). Thus, adding the percentages in each category together reveals that the Winslow Sales Journal shows recovery of 22.3% for both products combined during FYE 3/31/95, and that Mr. Porter's projection shows recovery of about 25% for both types. See PX 288. Based on this, Mr. Ness again concluded that the Mr. Porter's projections were a reasonable estimation of the product mix that would have been obtained from the breached sales. Tr. 2338-39 (Ness).

89. Mr. Ness performed a similar comparison of Mr. Porter's projected product mix for the breached sales and the product mix that Precision Pine actually achieved in the FYE 3/31/94 and found the same type of relatively close percentages. Tr. 2341; PX 290 (page headed "Year Total/April 1993 March 1994). Also, Mr. Porter told Mr. Ness that the quality of the logs that Precision Pine processed in the FYE March 1994 and March 1995 were relatively similar to that of the logs on the breached sales. Tr. 2342 (Ness).

90. Satisfied of the veracity of Mr. Porter's projected by-sale product mix for each of the breached sales, Mr. Ness then applied the appropriate percentages to the total amount of excess timber that Precision Pine would have processed from each sale in each quarter.

a. E.g., applying the percentages for Mud to the 950.00 mbf (LT) of additional lumber that would have been produced in the 4th quarter 1995 from timber from the Mud sale yields the volume of by-particular lumber product that Precision Pine would have produced that is set out in the middle of the first page of Exhibit 6 to Mr. Ness' report (PX 131). Specifically, for 950 mbf (LT) of lumber produced from timber from the Mud sale in the 4th quarter of 1995, 3.80 mbf (LT) would have been in the moulding & better grade. Tr. 2255 (Ness).

**Lumber Product Prices & Gross Revenue From Lumber Sales**

91. After determining the additional amount of each Ponderosa Pine lumber product that would have been produced on a quarterly basis at each mill in the absence of the breach, Mr. Ness then needed to calculate the gross revenue that Precision Pine would have earned by selling those products. To do so, he multiplied the additional volume of each product that would have been produced in a quarter by the per-mbf unit price for that product type and quarter that Mr. Porter supplied to him based on Mr. Porter's analysis of Precision Pine's invoices. Tr. 2256, 2350 (Ness); see Tr. 443-497 (Porter's pricing analysis).

92. In most cases, to determine a product's pricing, Mr. Porter had averaged the prices, by quarter, at which Precision Pine had actually sold the product during the suspension as reflected on Precision Pine's invoices. Tr. 443-44 (Porter).

a. E.g., for moulding & better in the 3rd quarter of 1995, Mr. Porter found three invoices reflecting sales prices of $1,340, $1,350 and $1,350 per mbf. The simple average of these prices is $1,346.67. Tr. 443-44 (Porter).

93. In some cases, although Mr. Porter had projected that but for the suspension Precision Pine would have produced a certain product in a certain quarter, Precision Pine did not actually produce any of that product in that quarter during the suspension. In those cases, Mr. Porter moved the volume that he projected that Precision Pine would have produced into a similarly-priced product category. Tr. 447-48 (Porter).

a. E.g., in some quarters, Mr. Porter projected that but for the suspension Precision Pine would have produced timbers. However, in reality, Precision Pine chose to produce #3 dimension lumber instead of timbers. (Both products can be produced from identical timber.) Accordingly, in this situation, Mr. Porter added the projected volume of timbers into his calculations for #3 dimension lumber. Tr. 447-48 (Porter).

94. In other cases, Mr. Porter had projected that but for the suspension Precision Pine would have produced a certain product in a certain quarter, but in actuality Precision Pine had invoices containing prices for that product in only one or two months of the quarter. In theses cases, Mr. Porter consulted am industry publication entitled *Random Lengths* (see, e.g., PX 232) to derive the monthly price for the month that Precision Pine had no invoice containing that product's price, and included the *Random Lengths* price in his average. Tr. 449-54 (Porter).

a. E.g., for the 3rd quarter of 1996, Precision Pine had only one invoice that reflected a sales price for moulding & better, which was in July. So Mr. Porter consulted *Random Lengths* for a price for moulding & better in August and September, 1996. Tr. 454 (Porter).

95. Lastly, Mr. Porter excluded a few (less than 35) of the more than 1,100 invoices that Precision Pine had used to arrive at an average price for each of the 13 lumber products. Tr. 455-58. See PX 227, at tab labeled "inapplicable invoice from the period of the suspension."[7] Some of these were excluded on the basis that the prices reflected on them, when compared to prices for the same lumber product on other numerous invoices in the same time period, were either so high (which would have favored Precision Pine) or so low (which would have favored the government) that excluding them was fair to both sides rather than skewing the quarterly price either up or down. Id. Mr. Porter also excluded a few invoices such as 4/4 Shop which is a product that Precision Pine did not intentionally make on a regular basis and which have improperly brought down some of the Shop lumber prices if included on an simple average basis. Id.[8]

Mr. Moosman testified at trial that, based on his review of the sequential numbering on the invoices, he believed that a total of 93 invoices had not been used in determining Precision Pine's lumber product prices. Tr. 5231 (Moosman). Although Mr. Moosman conceded that the

---

[7]Many of the invoices record prices for sales of more than one lumber product. See, e.g., PX 227, at V 00001 showing lumber sales prices for three different lumber products. Accordingly, the number of actual lumber sales used to derive lumber product prices greatly exceeds the number of invoices.

[8]In calculating the post-suspension lumber prices, Mr. Ness with the assistance of Mr. Porter, also excluded some 49 invoices on the same basis as invoices had been excluded during the suspension period. Tr. 3571-72 (Neuberger). Dr. Neuberger, nevertheless described Mr. Ness' approach to determining lumber product prices in the post-suspension period as the correct one. DX 796, p. 10, ¶28.

As the court noted at trial, perhaps a less "controversial" way of calculating lumber prices would have been to have used the excluded invoices among comparably priced lumber products, something which would not have appreciably changed Precision Pine's product pricing. Tr. at 3571-72.

Winslow Sales Journal also contained a sequential collection of the numbered invoices and the data on them (Tr. 5002-03, 5090 (Moosman)), he had not tried to use the sales journal to determine what was on the "missing" invoices. Tr. 5231-32, 34 (Mossman). Moreover, Mr. Moosman's report does not mention the 93 allegedly missing invoices. Tr. 5231-32 (Moosman). In fact, Mr. Moosman did not try to quantify or and did not offer any opinion as to the impact, if any, of the allegedly missing invoices on Precision Pine's lumber prices.

96. Mr. Porter used this methodology to produce a sales price for each Ponderosa Pine lumber product that but for the suspension Precision Pine would have produced in each quarter of the suspension and recorded his findings in his initial calculations of his damages, which he then had Mr. Ness review. Tr. 454-55 (Porter); Tr. 2163-64 (Ness); see also Tr. 466-75 (Mr. Porter's conclusions for Ponderosa Pine product prices in each quarter of the suspension).

97. To verify Mr. Porter's price data Mr. Ness traced the unit prices of lumber products sold by Precision Pine during the suspension back to individual invoices to see whether the prices had been properly transcribed. Tr. 2343 (Ness). After doing so, Mr. Ness disagreed with the way the averages were calculated. In his opinion, Precision Pine could have significantly increased product prices for certain items based on the count, i.e., thickness, of the lumber being sold. Tr. 2347 (Ness). Specifically, in Mr. Ness' opinion Precision Pine could have raised its estimated price on some items from $380 per mbf (LT) to $506.66 per mbf (LT), a 33% increase. Tr. 2348-49. Mr. Ness did not, however, use the increased unit prices, because Precision Pine wanted to keep the pricing as a conservative estimate, and Mr. Ness could not compel a client to increase its claim against the government. Tr. 2348-49 (Ness).

98. Having verified Mr. Porter's price data, Mr. Ness recorded the prices on page 1 of App. A of his report (PX 131) and applied the prices to the volumes of each product produced from lumber from each contract in each quarter. Tr. 2256, 2350 (Ness).

a. E.g., the unit price for moulding & better products that Precision Pine sold in the 4th quarter of 1995 is $1241.67/mbf (LT) as set forth at App. 1, p. 1, line 3, column C of Mr. Ness's report (PX 131). Multiplying the $1241.67/mbf unit price by the additional volume of moulding & better that would have been produced in the 4th quarter of 1995 from timber from the Mud sale produces revenue of $4718.35. Tr. 2256-57 (Ness); PX 131, Ex. 6 at 1 (chart in center of page). Mr. Ness used the same methodology to produce the revenue figures for the other products sold and produced from additional timber from the Mud sale in the 4th quarter of 1995. Tr. 2257. He then summed revenue from each product to produce aggregate revenue of $341,446.52 that Precision Pine would have earned from lumber it would have sold and produced from the Mud sale in the 4th quarter of 1995. Tr. 2258; PX 131, Ex. 6 at 1 (chart in center of page).

99. Mr. Ness then computed the average freight cost that was included in the invoice prices (which Precision Pine had not done in its original calculations) in order to exclude those costs. Mr. Ness had to deduct these costs from the sales price, because, although Precision Pine sold much of its lumber FOB mill or FOB mill plus freight thereby incurring no freight charge, it also sold some items FOB Phoenix or Albuquerque, thereby artificially increasing the sales price with freight component. Tr. 2259-60; 2348 (Ness).

100. As is reflected in Ex. 8 of his report, PX 131, Mr. Ness did this for each month by (1) taking the total freight from the sales journal (Tr. 2260 (Ness)) and (2) from the invoices for the month, totaling the freight not included in the lumber sales price. Tr. 2260 (Ness). By subtracting the latter from the total freight for the month, he determined the total amount of freight that had been included in the sales price on the invoices each month. See Ex. 8 of PX 131. Using the monthly totals, Mr. Ness computed quarterly amounts, and by dividing the total amount of freight that had been included in the sales price on the invoices for a quarter by the total volume of lumber sold during that quarter he calculated the amount of freight that had been included in the sales price per mbf (LT) of all timber sold in the quarter. Tr. 2260-63 (Ness).

101. He then attribute freight costs to particular timber sales by multiplying the per mbf figure for each quarter by the additional volume produced from that sale in that quarter. Tr. 2263 (Ness).

a. E.g., for the Mud sale in the 4th quarter of 1995, Mr. Ness multiplied the figure ($8.62) that appears under the heading "Freight Per M" for the 4th quarter of 1995 on Exhibit 8 of his report (PX 131) by the 950 mbf (LT) of additional lumber that Precision Pine would have produced in that quarter from the timber from the Mud sale. Tr. 2262-63. The product of this multiplication is $8,189. See PX 131, Ex 4 at 2.

102. Mr. Ness then subtracted the resulting figure, which represents the amount of excess freight attributable to the sale of lumber from a particular timber sale in a given quarter, from the revenue produced from lumber sales from that contract in that quarter.

a. E.g., for Mud in the 4th quarter of 1995, he subtracted $8,189.00 from the total value of lumber (from Mud) that would have sold that quarter, $341,446.42. Tr. 2263 (Ness). This calculation produces a figure of $333,257.42.

103. Mr. Ness had made another reduction to gross sales to reflect the 1% prompt payment discount that Precision Pine offers customers and which almost every customer takes. Tr. 2264. As such, he determined that this fact needed to be reflected in the calculation of Precision Pine's damages and did so by reducing lumber sales revenue by 1% for each sale in each quarter. PX 131 at p. 9 ¶ 18.

a. E.g., for the Mud sale in the 4th quarter of 1995, this reduction is 1% of $333,257.42, i.e., $3,332.57. See PX 131, Ex. 4 at 2.

104. Subtracting the attributable freight component and the prompt payment discount from gross sales results in net sales for a particular timber sale in a particular quarter.

a. E.g., for the 4th quarter 1995 on the Mud contract, net sales would have been $329, 924.85. Tr. 2264; PX 131, Ex. 4 at 2.

105. After computing net sales and delivered log cost, Mr. Ness then computed the cost of manufacturing the lumber, i.e., the sum of sawmill, planing and (if applicable) green lumber haul costs. Tr. 2272 (Ness). To do so, he referred to Precision Pine's financial statements and took the direct manufacturing cost that Precision Pine had incurred at each of its sawmills and at its planer in the 17-month period preceding the suspension and divided each cost by the amount of

lumber produced at each facility to come up with respective direct manufacturing costs per mbf (LT).[9] His results are recorded at Exhibit 10 of his report (PX 131). Tr. 2267-9 (Ness).

a. E.g., for the Winslow sawmill where Precision Pine would have produced green timber from the Mud sale, Precision Pine's direct manufacturing cost per mbf (LT) was $63.98. Tr. 2270 (Ness); PX 131, Ex. 10 at 1.

**Manufacturing Cost**

106. Applying the appropriate sawmill manufacturing cost to a particular volume of lumber to be produced from a given contract at a given sawmill in a given quarter results in the direct manufacturing cost that would have been incurred with regard to that volume of lumber.

a. E.g., for the Mud sale in the 4th quarter of 1995, the green lumber manufacturing costs at the Winslow mill that Precision Pine would incurred were $60,781. PX 131, Ex. 4 at 2 (950 mbf (LT) multiplied by the manufacturing costs of $63.98 per mbf (LT) taken from page 1 of Exhibit 10 of PX 131). Tr. 2270 (Ness).

107. Mr. Ness performed similar calculations to determine planer costs. Tr. 2270-79 (Ness).

a. E.g., for the Mud sale in the 4th quarter of 1995, the direct manufacturing costs that would have been incurred as a result of planing the timber were $40,498.50. PX 131, Ex. 4 at 2 (950 mbf (LT) multiplied by manufacturing costs of $42.63 per mbf (LT) taken from page 2 of Ex 10 of PX 131). Tr. 2270-71 (Ness). Because the Winslow sawmill and Winslow planer are at the same place, no freight cost

[9]Notably, as Mr. Ness testified, he did not calculate manufacturing costs for August 1995 to April 1997 on the basis of efficiencies that he anticipated would have occurred during that period. Tr. 2676-77 (Ness).

(green lumber haul cost) needed to be included with regard to Mud. Accordingly, no amount for green log haul cost is shown on the line labeled "Freight" above the Manufacturing cost item on page 2 of Exhibit 4 of Mr. Ness' report (PX 131). Tr. 2272 (Ness).

108. Total manufacturing costs for a given sale in a given quarter is the sum of sawmill, planing and (if applicable) green lumber haul costs. Tr. 2272 (Ness). These costs were totaled to produce a total manufacturing cost by sale, by quarter. See, e.g., PX 131 at Ex 7; Tr. 2270 (Ness).

**Gross Profit – Ponderosa Pine**

109. To determine lost gross profits for a particular sale in a particular quarter, Mr. Ness then simply subtracted delivered log costs and manufacturing costs from net sales for the lumber produced in that quarter from the sale.

a. E.g., for the Mud sale in the 4th quarter of 1995, from total net sales ($329,924.85), Mr. Ness subtracted total delivered log costs ($163,035.20) and manufacturing costs ($101,279.50) to determine gross profit for lost lumber sale as $65,239.65. Tr. 2272 (Ness); PX 131, Ex. 4 at 2.

110. For a sale that only contained Ponderosa Pine timber, once Mr. Ness computed the gross profit for Ponderosa Pine lumber products in one quarter, he simply repeated the above process for all relevant quarters for that breached sale.

a. E.g., for the Mud sale he calculated the gross profits for the 1st , 2nd 3rd and 4th quarters of 1996. PX 131, Ex. 4 at 3-4. Mr. Ness then summed the relevant quarters for the Mud sale to calculate Precision Pine's total gross lost profits for lumber sales from the Mud contract as $343,325.97. Tr. 2273 (Ness); PX 131, Ex. 4 at 5.

**Lumber Profits – Douglas-fir And Englemann Spruce**

111. For sales that contained Douglas-fir or Englemann Spruce in addition to Ponderosa Pine, Mr. Ness computed lost profits for those other species in substantially the same way as he had for Ponderosa Pine products. Tr. 2389 (Ness).

112. Specifically, Mr. Ness computed excess capacity for Douglas-fir timber based on a 1.25 overrun factor, which, as he testified, was a ridiculously conservative estimate, because the species always produces an overrun of 1.60 or even 1.80. Tr. 2389-90 (Ness).

113. He then derived stumpage prices and miscellaneous costs from the timber sale contracts. However, logging and hauling costs, sawmill costs, planing costs and by-product production rates (see infra) were the same for all species so no modification was required. Tr. 2390 (Ness).

114. Mr. Porter supplied Mr. Ness with product mix and pricing data for Douglas-fir and Englemann Spruce products. Tr. 2389-91 (Ness); see also Tr. 477-484 (Mr. Porter's conclusions for Douglas-fir product prices in each quarter of the suspension); Tr. 484-497 (Mr. Porter's conclusions for Spruce product prices in each quarter of the suspension).

115. The product mix that Mr. Porter provided for Douglas-fir was:

- # 2 & better Shop: 85%
- #3 Shop: 10%
- #4 Shop: 5%

Tr. 2391 (Ness); Tr. 430 (Porter).

116. To determine the sales price for Precision Pine's Douglas-fir products, Mr. Porter consulted the industry publication *Random Lengths* (see, e.g., PX 232) to first determine the sales price for identical Douglas fir products sold FOB Portland, Oregon. Purchasers of Douglas-fir products in Phoenix, where Precision Pine usually sold its products, would have to pay freight of $75 per mbf to obtain Douglas-fir from Portland. However, Precision Pine's freight cost to Phoenix was only $15 per mbf. Accordingly, Precision Pine could sell Douglas-fir products delivered to Phoenix for $60 over the *Random Lengths* FOB Portland price. Mr. Porter therefore calculated Precision Pine's sales price for Douglas-fir products by adding $60 to the price published in *Random Lengths*. Tr. 458-60 (Porter). (The difference between Precision Pine's sales prices and the *Random Lengths* price was not the amount that Mr. Ness reduced from sales as a result of adding freight charges to invoices. See Tr. 2259-63 (Ness). Rather, the "freight advantage" represents a competitive advantage Precision Pine had over Oregon-based Douglas-fir producers based on Precision Pine's geographic proximity to its customers.)

117. Mr. Porter used the above methodology for all Douglas-fir products except #4 grade products, because *Random Lengths* publishes no sales figures for that grade. Instead, Mr. Porter found that Precision Pine usually sold #4 grade Douglas-fir products for $130/mbf less than it sold #3 grade Douglas-fir products. Tr. 461 (Porter). Accordingly, Mr. Porter first took the

*Random Lengths* price for #3 products sold FOB Portland, deducted $130 dollars, and then added back $60 for freight advantage to Phoenix to derive a price for #4 grade Douglas-fir delivered to Phoenix. Tr. 460-61 (Porter).

118. Mr. Porter repeated his methodology for determining Precision Pine's Douglas-fir product prices for the relevant period and then averaged the monthly prices by quarter. Tr. 461-62 (Porter).

119. The prices that Mr. Porter calculated for Douglas-fir during the relevant period were as follows:

| **Englemann Spruce product prices per MBF** | | | | | | |
|---|---|---|---|---|---|---|
| | #2 & Btr, 1x4 | #3, 1x4 | #4, 1x4 | #2 & Btr, 1x6 | # 3, 1x6 | #4, 1x6 |
| Aug '95 | $547 | $311 | $245 | $575 | $393 | $275 |
| Sept '95 | $584 | $293 | $245 | $583 | $380 | $275 |
| Oct '95 | $609 | $278 | $244 | $586 | $366 | $260 |
| Nov '95 | $620 | $279 | $235 | $593 | $355 | $250 |
| Dec '95 | $624 | $306 | $235 | $594 | $380 | $246 |
| Jan '96 | $577 | $310 | $235 | $560 | $380 | $245 |
| Feb. '96 | $546 | $311 | $235 | $539 | $380 | $240 |
| Mar '96 | $554 | $328 | $236 | $554 | $380 | $241 |
| Apr '96 | $553 | $344 | $254 | $548 | $380 | $258 |
| May '96 | $553 | $345 | $272 | $553 | $383 | $272 |
| June '96 | $571 | $348 | $280 | $578 | $393 | $280 |
| Jul '96 | $575 | $350 | $295 | $587 | $395 | $281 |
| Aug '96 | $605 | $354 | $295 | $528 | $398 | $280 |
| Sept '96 | $663 | $359 | $295 | $695 | $400 | $280 |
| Oct '96 | $660 | $360 | $291 | $695 | $400 | $276 |
| Nov '96 | $673 | $373 | $291 | $705 | $413 | $279 |
| Dec '96 | $676 | $385 | $294 | $719 | $425 | $294 |
| Jan '97 | $636 | $388 | $295 | $695 | $428 | $296 |
| Feb. '97 | $575 | $390 | $306 | $663 | $448 | $219 |
| Mar '97 | $541 | $390 | $315 | $643 | $463 | $243 |
| Apr '97 | $510 | $378 | $304 | $630 | $471 | $355 |

Tr. 486-497 (Porter).

120. Mr. Porter followed a nearly identical methodology for determining Precision Pine's prices for Englemann Spruce products, except that he used a lower freight advantage for delivery to Phoenix ($50), because Englemann Spruce is lighter than Douglas-fir, which means that it is cheaper to ship. Tr. 462-64 (Porter).

121. The prices that Mr. Porter calculated for Spruce during the relevant period were as follows:

| **Douglas-fir product prices per MBF** | | | |
|---|---|---|---|
| | #2 & Better | #3 | #4 |
| Aug '95 | $459 | $285 | $155 |
| Sept '95 | $454 | $285 | $155 |
| Oct '95 | $378 | $280 | $150 |
| Nov '95 | $374 | $270 | $140 |
| Dec '95 | $385 | $270 | $140 |
| Jan '96 | $371 | $268 | $138 |
| Feb. '96 | $404 | $278 | $148 |
| Mar '96 | $411 | $290 | $160 |
| Apr '96 | $407 | $309 | $179 |
| May '96 | $446 | $339 | $209 |
| June '96 | $469 | $350 | $220 |
| Jul '96 | $505 | $350 | $220 |
| Aug '96 | $599 | $345 | $215 |
| Sept '96 | $534 | $338 | $208 |
| Oct '96 | $485 | $321 | $191 |
| Nov '96 | $500 | $329 | $199 |
| Dec '96 | $485 | $328 | $198 |
| Jan '97 | $491 | $326 | $196 |
| Feb. '97 | $498 | $336 | $206 |
| Mar '97 | $482 | $339 | $209 |

Tr. 479-484 (Porter).

122. Mr. Ness recorded Mr. Porter's determination for Douglas-fir and Englemann Spruce product prices at App. A, p. 1 of his report (PX 131). Tr. 2256 (Ness).

123. To determine lumber sales revenue for Douglas-fir products, Mr. Ness simply took the volume of Douglas-fir lumber that would have been produced from a sale in a given quarter, applied the above product percentages to determine the volume of each lumber product that would be produced, and then applied the applicable quarterly price to each product. Tr. 2391 (Ness).

a. E.g., for the Hay sale in the 3rd quarter of 1996, based on available sawmill capacity, Precision Pine would have run 257.55 mbf (LS) of Douglas-fir logs thorough its Eagar sawmill. PX 131, Ex 7 at 3. Using a 1.25 overrun factor, this volume of logs would have yielded 321.94 mbf (LT) of lumber. PX 131, Ex 4 at 21. 85% of this lumber (273.65 mbf (LT)) would have been #2 & better, 10% (32.19 mbf (LT)) would have been #3, and 5% (16.01 mbf (LT)) would have been #4. See PX 131, Ex. 6 at 10. Applying the applicable selling prices for Douglas-fir lumber produces total anticipated sales of $164, 913.59 for Douglas-fir lumber that would have been produced from timber on the Hay sale in the 3rd quarter of 1996. Tr. 2391; PX 131, Ex. 4 at 21.

124. For sales that contained Spruce timber, Mr. Ness followed an identical procedure. Tr. 2389 (Ness).

**By-products**

125. Mr. Ness next calculated lost profits on by-products by first determining the production rates (also referred to as conversion factors) for each by-product. The production rate is the amount of a by-product that is produced per thousand board feet of lumber either produced in the sawmills (for grindings, chips and bark) or processed at the planer (for shavings). See Tr. 2363-2375 (Ness).

126. For chips, Precision Pine supplied Mr. Ness with a production rate, which Mr. Ness verified using two test-months of production data from each sawmill. Mr. Ness simply had to verify that the figures shown on the production data matched the invoices generated by Stone Container. Tr. 2364 (Ness).

127. Precision Pine also supplied Mr. Ness with the production rate of .70 tons/mbf for grindings. Tr. 2365 (Ness).

128. Mr. Ness determined the production rate for bark in tons per mbf (LT) of lumber produced by analyzing Precision Pine's Bark Sales Ledger (PX 316) for each month during the suspension and computing the weighted average in order to arrive at a rate of .40 tons of bark per mbf (LT) produced. Tr. 2368-70 (Ness).

129. Mr. Ness derived the production rate for shavings from Precision Pine's Shavings Journal (PX 317) in a method similar to that he used to determine the bark production rate, except that he used lumber processed at the planer, instead of green lumber produced by the sawmills, because

shavings are produced at the planer, not the sawmill. He first determined actual production of shavings from August 1995 through March 1996 by totaling the volumes shown in the Shavings Journal (PX 317) and recorded those figures in Exhibit 14 of his report (PX 131). He then divided the amount of shavings produced (3,410.37 tons) by the amount of lumber planed during that time period (11,416 mbf (LT)) to calculate a production rate of .30 tons of shavings per mbf of lumber (rounded from .299 tons/mbf). Tr. 2372-74 (Ness).

130. Mr. Ness recorded the production rates in App. A, p. 10, lines 253-257 of his report (PX 131). Tr. 2276 (Ness).

131. After determining the production rate for each by-product, Mr. Ness then calculated, by quarter, how much of each by-product would have been produced from the breached sales but for the breach.

a. E.g., for the Mud sale in the 4th quarter of 1995, using the production rate of 1.41 tons of chips per mbf (LT) of lumber produced, Mr. Ness calculated that the 950 mbf (LT) of additional lumber that would have been produced from timber from the Mud sale in that quarter would have yielded 1,339.5 tons of chips. He recorded this conclusion in the volume column in the row for chips revenue for Mud in the 4th quarter of 1995. Tr. 2276; PX 131, Ex 4 at 2. He performed similar calculations for the other by-products: grindings, bark and shavings. Tr. 2276 (Ness); see also Tr. 2370-72 (laying-out exact calculations for bark produced from processing timber from the Mud contract in the 4th quarter of 1995); Tr. 2373-74 (shavings).

132. Mr. Ness then had to determine the unit price at which the additional by-products would have been sold.

a. For chip prices, Stone Container had contracted to purchase Precision Pine's entire output of chips from all three of its sawmills and these contracts were in place during the suspension. Tr. 593-606 (Porter). Mr. Ness further determined from reviewing Stone's chip purchase invoices that Stone had often made small deductions for chips that did not meet the contract specifications. After aggregating the deductions, Mr. Ness determined that Precision Pine was paid, on average, 97.7% of the price established by contract. Accordingly, he took the contract prices applicable during the suspension and multiplied them by 97.7% to determine the actual unit price that Precision Pine would have received for chips during the suspension. Tr. 2281-82 (Ness); PX 131, Ex. 12. Mr. Ness recorded the unit price for each by-product, by quarter, in Appendix A, p. 10 of his report (PX 131). Tr. 2276-77 (Ness).

b. The price at which Precision Pine sold bark is reflected in its Bark Ledger, a document maintained by Precision Pine to keep track of bark production and sales. PX 316; Tr. 608-12 (Porter). Bark was sold to companies that resold it for use in decorative landscaping and as mulch. Tr. 609 (Porter). Throughout the period of the suspension, Precision Pine's sales price for bark as documented in the Bark Ledger was $4.25/cubic yard which converts to $20.58/ton. Tr. 608-12 (Porter); see PX 316 at p. III.(c)-3. Mr. Ness reviewed the Bark Ledger (Tr. 2367-68 (Ness)) and used $20.58/ton as the sales price for bark that would have

been obtained from breached contracts during the suspension period. PX 131, Ex. 4, pp. 1-27 (line items for By-Product Revenue: Bark).

c. The price at which Precision Pine sold shavings is reflected in its Shavings Ledger, a document maintained by Precision Pine to keep track of shavings production and sales. PX 317; Tr. 617-22 (Porter). The shavings were sold to customers for use as animal bedding, especially at area stables. Tr. 617 (Porter). Throughout the period of the suspension, Precision Pine's sales price for shavings as documented in the Shavings Ledger was $9.50/ton. Tr. 617-22 (Porter); see PX 317 at p. III.(d)-3. Mr. Ness reviewed the Shavings Ledger (Tr. 2367-68 (Ness)) and used $9.50/ton as the sales price for shavings that would have been made from breached contracts during the suspension period. PX 131, Ex. 4, pp. 1-27 (line items for By-Product Revenue: Shavings).

d. The price at which Precision Pine would have sold grindings during the period of the suspension was based on Mr. Porter's experience with Precision Pine's grindings sales over the years. Tr.1031-32 (Porter). Mr. Porter determined that the sales price would have been $5.00/ton during the suspension period and Mr. Ness used this as the price for grindings that would have been made from breached contracts but for the suspension. PX 131, Ex. 4, pp. 1-27 (line items for By-Product Revenue: Grindings).

133. Once Mr. Ness determined by-product volumes and prices, he determined the gross revenue that Precision Pine would have received from selling by-products by simply multiplying the amount of by-products that would have been produced from lumber produced from each of

the breached sales during each quarter of the suspension by the corresponding unit price listed at App. A, p. 10. See PX 131, Ex. 4 (lost profits by sale and quarter).

a. E.g., the applicable selling price for chips in the 4th quarter of 1995 was $17.82/ton. PX 131, App. A at 10, line 260. Thus, revenue from sales of the 1,339.5 tons of chips that Precision Pine would have produced as a by-product of producing lumber from timber from the Mud sale in the 4th quarter of 1995 would have been $23,869.89. Tr. 2276-77; 2283; PX 131, Ex. 4 at 2.

134. Mr. Ness performed the same calculation for each by-product for each sale in each quarter of the suspension. Tr. 2277 (Ness); PX 131, Ex. 4 at 2; see also Tr. 2370-72 (exact calculations for bark produced from processing timber from the Mud contract in the 4th quarter of 1995).

a. E.g., for the sale of by-products produced from timber milled from the Mud sale in the 4th quarter of 1995, Mr. Ness calculated the following revenue:

- $3,325 for grindings;
- $7820 for bark; and
- $2707 for shavings.

Summing the above figures produces total lost revenue from by-products for the 4th quarter of 1995 for the Mud sale as $37,722.79. Tr. 2277 (Ness); PX 131, Ex 4 at 2.

135. By-product revenue is not reduced by any additional costs of production, i.e., no additional costs need to be deducted from revenue for by-products, because, as a "by-product" of lumber production, all of the costs of producing the by-products are contained in the costs of lumber production. Tr. 2278 (Ness).

**Total Lost Gross Profits (Lost Market Opportunity)**

136. Adding the gross profits from lumber (Ponderosa Pine, Douglas-fir and Spruce) to the by-product revenue produces Mr. Ness' determination of lost gross profits for a particular contract in a particular quarter. (This conclusion is "revised" because each of the sales that had a roundwood component also had a calculation of Tri-Star's lost roundwood profit, see, e.g., PX 131, Ex. 4 at 2, and that pass-through claim was dismissed by the Court last November. Tr. 2274 (Ness)).

a. E.g., for the Mud contract in the 4th quarter of 1995, the lost gross profit from lumber and by-products is $103,332 ($65,610 lumber gross profits + $37,772.79 by-product revenue). Tr. 2277-78 (Ness); PX 131, Ex. 4 at 2.

137. To determine the total amount of gross profits that Precision Pine lost as a result of the suspension, Mr. Ness performed the above analysis for each breached contract for each quarter of the suspension. He summarized his calculations on page 27 of Exhibit 4 of his report (PX 131). To calculate revised total lost gross profit from lumber and by-products only (i.e., excluding roundwood), he simply subtracted Tri-Star's total gross profits for roundwood as shown on page 27 of Exhibit 4 ($313,385.49) from total lost gross profits ("Lost Market Opportunity," $6,865,541.21) to conclude that Precision Pine's total lost gross profits were $6,552,156. Tr. 2279 (Ness).

138. Ness verified the reasonableness of his lost profits calculation by comparing the effect that his findings would have had on Precision Pine's operating income compared with Precision Pine's historical operating income as reported in its financial statements. Tr. 2351 (Ness); see

also 2356 (Ness). To do his comparison, Mr. Ness first added the operating losses that Precision Pine sustained in FYE 3/31/96 ($1,438,000) and FYE 3/31/97 ($611,000). Tr. 2357; PX 247, 248; see also Tr. 2353-55 (explanation of summary at PX 247). This sum, approximately $2,050,000, represents Precision Pine's actual operating losses during the suspension period. See Tr. 2357 (Ness). Deducting the actual operating losses ($2.05 million) from the additional profits that Precision Pine would have earned but for the suspension ($6.5 million), Mr. Ness calculated that, but for the suspension, for those two years, Precision Pine operating income would have been about $4.45 million, or about $2.2 million per year. Tr. 2358 (Ness). Mr. Ness then compared this $2.2 million figure to what was Precision Pine's operating income in FYE 3/31/93. Tr. 2358 (Ness). (He chose FYE 3/93 because, like the suspension time period (see PX 168), FYE 3/31/93 was a time where the lumber market had bottomed out and then sharply risen -- conditions in which sawmills make a lot of money. Tr. 2360 (Ness).)

139. In FYE 3/31/93, Precision Pine's operating income was $2.7 million. Tr. 2358 (Ness); PX 247; PX 248. Mr. Ness thereby concluded that if Precision Pine had made $2.7 million in operating income in FYE 3/31/93 while saddled with some of the inefficiencies it had at that time, that Precision Pine could, to a reasonable certainty, have earned $2.2 million per year in operating income in FYE 3/31/96 and in FYE 3/31/97. Tr. 2360-62 (Ness).

140. Accordingly, Mr. Ness concluded that Precision Pine's lost gross profits of $6.5 million were the actual damages that would compensate Precision Pine for the operating losses it actually incurred as a result of the suspension, $2.05 million, *plus* the operating income it would

have made but for the suspension, $4.45 million, which again, totals about $6.5 million. Tr. 2357-58 (Ness).

**Lost Volume**

141. In Mr. Ness's expert opinion, based on both accounting and economic principles, Precision Pine's damage claim for $6.5 million lost gross profits should not be reduced, for any sums it eventually did earn after the suspension was lifted. Tr. 2361 (Ness).

142. The critical factor for Mr. Ness' opinion that no reduction is needed is that Precision Pine lost a market opportunity as result of the suspension that cannot be replaced, i.e., it is impossible to go back in time and fill-in the holes in production that occurred during the 20-month period. In contrast, had the suspension been much shorter, Precision Pine might have made up for the lost production time by running additional shifts, extending shifts, and/or working weekends. Precision Pine could not, however, go back and make up for the loss of 50 percent of its production over such an extended period. Anything that happened in the post-suspension period, i.e., the sale of lumber or by-products, would have been additional market opportunities that would have existed with or without the suspension. That is, with or without the suspension, Precision Pine would have had sawmills after the suspension, would have been able to buy other timber and earn profits by processing that timber into lumber. Thus, it would have made post-suspension profits in addition to the profits that it would have made in the suspension period. Tr. 2362-63 (Ness).

143. Mr. Porter testified that offsetting Precision Pine's lost profits by any post-suspension profits earned with respect to lumber and by-products from the breached sales was absolutely inappropriate. Tr. 629 (Porter). The basis of his opinion was that "We had a period of time there that was taken from us that we could not produce, we could not sell, we could not do anything with that timber that was taken from us and therefore it's something that you never get back." Id.

**Increased Manufacturing Cost**

144. The next major item of damage, item 4 on Exhibit 1 of Mr. Ness' report (PX 131), are the increased manufacturing costs that Precision Pine incurred because its sawmills were not as efficient during the suspension as they would have been but for the breach. These inefficiencies were caused by the lower volume of logs feeding the mills as well as the lower quality of the mix of logs that fed the mill, both of which resulted from Precision Pine being denied access to timber on the breached contracts. Tr. 2375 (Ness).

145. To calculate the loss of efficiency, Mr. Ness first computed the actual direct manufacturing costs for each sawmill and the Winslow planer per mbf (LT) that Precision Pine incurred in the 17 months just prior to the suspension (from April 1, 1994 through August 30, 1995). He recorded his result at Exhibit 10 of his report (PX 131). Tr. 2376 (Ness). (As noted, Mr. Ness could have but did not calculate manufacturing costs for August 1995 to April 1997 on the basis of efficiencies that he anticipated would have occurred during that period. Tr. 2676-77 (Ness)). He then computed the direct manufacturing costs per mbf (LT) that Precision Pine actually incurred during the suspension and ensuing winter (from September 1, 1995 through

March 30, 1997). He recorded these result on Exhibit 16 of his report (PX 131). Tr. 2377 (Ness). He then compared the direct manufacturing costs per mbf (LT) that Precision Pine incurred in the 17 months prior to the suspension with the direct manufacturing costs per mbf (LT) that it incurred during the suspension period and recorded the results of that comparison on Exhibit 15 of his report (PX 131). Tr. 2376-77 (Ness).

146. Based on this comparison, Mr. Ness calculated that the total increased manufacturing cost was $380,717.20. Tr. 2380 (Ness); PX 131, Ex. 15.

147. During his analysis, Mr. Ness found that Precision Pine's increased manufacturing costs varied substantially between mills on a per mbf (LT) basis, finding the greatest increase at the Eagar mill. This made intuitive sense, because the Eagar mill was the mill with the least steady timber supply during the suspension. Tr. 2378 (Ness).

148. Because the lost inefficiencies are in variable, as opposed to fixed, costs, the fact that the 17 month baseline (April 1, 1994 through August 30, 1995) contained only one winter, but the damages period (September 1, 1995 through March 30, 1997) contained two winters, would have minimal effect on his comparison. In other words, the direct costs of manufacturing during the winter and early spring of the baseline period are not substantially different than the direct costs of manufacturing during the summer of the baseline period. Tr. 2381 (Ness).

149. The inefficiencies that Mr. Ness calculated cannot be tied to any particular contract because they result as a cumulative effect of all the breached contracts. Tr. 2382-83 (Ness).

**Claim Preparation Costs Incurred By Precision Pine**

150. To calculate Precision Pine's claim preparation costs (PX 131, Ex. 1, item 7), Mr. Ness began with the total hours and the hourly rates for work in preparing Precision Pine's original CDA claim letters performed by various Precision Pine employees as supplied by Mr. Porter, to find that Precision Pine had paid $17,910 in direct labor expense for claim preparation. Tr. 2385; PX 131, Ex. 20, C6.01 - Client Preparation Costs (line labeled "Wages – Claim Preparation").

151. Mr. Ness then calculated the appropriate labor burden rate using Precision Pine's financial statements, and found it to have been approximately 20%. He multiplied the direct labor expense for Precision Pine's claim preparation costs by the calculated labor burden rate. The result was $3,582. Summing the labor burden and direct labor expenses for claim preparation, produced a total payroll cost resulting from claim preparation of $21,492.00. Tr. 2386 (Ness). <u>See</u> PX 131, Ex. 20, C6.01 - Client Preparation Costs (line labeled "Total Payroll Cost").

152. Mr. Ness then added 10% profit to the $21,492 figure, which resulted in a total increased costs of $23,641. <u>See</u> PX 131, Ex. 20. (It was not appropriate to add overhead to this cost because this cost represents lost employee wages and salaries, which are already counted as overhead costs.) Tr. 2386 (Ness).

153. However, because one of the 14 suspended contracts did not contain clause C(T)6.01 (which provides the legal basis for the recovery of Precision Pine's claim preparation damages),

Mr. Ness had to reduce the claim by the costs associated with the time spent preparing the claim for that specific contract. Tr. 2386-87 (Ness). To do so, Mr. Ness first estimated that 75% of the total cost incurred ($17,730.90) was spent developing data applicable to the claims as a whole and 25% ($5,910.30) was spent manipulating the data to compute damages on specific sales. Assuming that the costs for manipulating data for specific sales was distributed to each sale evenly, Mr. Ness reduced the portion allocated to specific sales, $5,910.30, by 1/14 to represent the portion of these costs attributable to the one, non-C(T)6.01 contract. The result, $5,488.14, represents the cost associating with preparing the 13 specific contracts containing C(T)6.01, which Mr. Ness added back to the cost associated with preparing all the claims. The resulting total, $23,219.04, represented total claim preparation costs recoverable by Precision Pine under C(T)6.01. Tr. 2387-8; PX 131, Ex. 20, C6.01 - Client Preparation Costs; PX 131, Ex. 1, item 7.

**Credit For Partial Cancellation Of Mud**

154. Mr. Ness also reduced Precision Pine's total claim by a small amount due to the partial cancellation of the Mud sale during the suspension. That is, on or about October 18, 1995, as part of its settlement of Silver v. Babbitt, the Forest Service agreed with the environmental plaintiffs in that case to partially cancel the Mud contract by deleting trees in excess of 12" dbh in three cutting units.[10] PX 106 at 6, ¶ 5. This was accomplished by a unilateral partial

[10]Notably, the Forest Service did not lift the suspension of harvesting operations even on the timber not being deleted from the sale until March 11, 1996, i.e., nearly six months later. PX 109. At that time, due to a contract restriction which prevented operations until June 1 (see PX 109) and a subsequent fire closure (PX 113), Precision Pine was not able to begin road building operations and commence harvesting of the sale until approximately August 1, 1996. PX 114. But for the suspension and the Forest Service's unilateral deletion of the timber from the contract, Precision Pine would have harvested the contract to completion during the suspension period and earned the gross profits as determined by Mr. Ness. PX 131, Ex. 4 at 3-5.

cancellation of the sale by the Forest Service on August 15, 1996, DX 311, as a result of which Precision Pine was paid $65,796.66 for the timber that had been deleted. PX 131 at 13. Because Mr. Ness' model used remaining footage under contract as of the beginning of the suspension, August 25, 1995, it included profits that would have been earned on the volume of timber that the unilateral partial cancellation subsequently deleted from the contract. As such, Mr. Ness determined that Precision Pine needed to credit the government for the compensation that Precision Pine received for the partial cancellation. Tr. 2393-94 (Ness); PX 131, Ex. 1, item 6.

**Miscellaneous Extra Costs**

155. At Exhibit 1, item 1 of his report (PX 131), Mr. Ness summarized the miscellaneous costs that Precision Pine incurred as a direct result of the suspension and calculated them to be $19,954.53. Tr. 2196 (Ness). These items are further itemized at Exhibit 2 of Mr. Ness' report (PX 131).

156. The first miscellaneous item of damages is unpaid bond costs. PX 131, Exs. 1 and 2. The Forest Service's suspension and breach of Precision Pine's timber sale contracts were the direct cause of increased bond costs because the suspension forced Precision Pine to extend the performance bonds on its contracts that it was required under the contract to have in place. Tr. 2197 (Ness).

157. To calculate unpaid bond costs, Mr. Ness first calculated the increased bond costs that Precision Pine incurred by taking the basic yearly bond cost for each sale as reported by Precision Pine, dividing that rate by 12 to calculate a monthly rate for each sale and then

multiplying that monthly rate by the number of months the sale was suspended. Tr. 2197-98 (Ness). Mr. Ness then added general & administrative overhead at a rate of 7.6%[11] and profit at a rate of 10% to the figure for each sale to produce a total increased bond cost for each sale. Mr. Ness then subtracted any amounts that the Forest Service had already paid Precision Pine for increased bond costs from the total figure for each sale to produce a total amount still owed to Precision Pine. The amount due for each sale is then summed on Exhibit 2 of Mr. Ness' report (PX 131) under the heading "Unpaid Bond Costs." Tr. 2198-2201 (Ness).

158. Applying overhead to unpaid bond costs is required, because overhead needs to be attributable to all costs. Tr. 2200 (Ness). Business owners that do not attribute overhead to all costs are ignoring reality and pretending that overhead only covers direct costs. Tr. 2200 (Ness).

159. Applying profit to unpaid bond costs is also required, because a business must cover its cost of capital and interest expenses in order to maintain wholeness. Tr. 2200 (Ness).

160. The total amount due for unpaid bond costs is $9,461.50. PX 131, Ex. 2.

161. The next miscellaneous item of damage is unpaid overhead and profit on move-out costs. The Forest Service compensated Precision Pine for its direct move-out costs, but did not compensate it for overhead and profit on those costs. Overhead and profit are required for this cost for the same reason overhead and profit are required for the unpaid bond costs -- viz., overhead and profit must be applied to all costs uniformly. Applying overhead at 7.6% and

[11] See PPFF 61 supra.

profit at 10% for move-out costs produces an amount due of $367.20. Tr. 2202-03 (Ness); PX 131, Ex. 2.

162. The next miscellaneous item of damage is unpaid interest on cash balances on the Brookbank, Hay and U-Bar contracts, which Precision Pine included in its original claim and Mr. Ness reviewed for accuracy. After review, Mr. Ness accepted the Precision Pine's calculation of unpaid interest on cash balances totaling $319.45. Tr. 2203 (Ness); PX 131, Ex. 2.

163. The next miscellaneous item of damage is unpaid interest on down payments on the Brann, Brookbank, Hutch-Boondock, Kettle, Manaco, Monument, Saginaw-Kennedy and Salt contracts, which Precision Pine included in its original claim and Mr. Ness reviewed for accuracy. After review, Mr. Ness accepted Precision Pine's calculation of unpaid interest on down payments totaling $2,763.04. Tr. 2204 (Ness); PX 131, Ex. 2.

164. The next miscellaneous item of damage is unpaid interest on unused effective purchaser road credits on the Brann, Jersey Horse and Saginaw-Kennedy contracts, which Precision Pine included in its original claim. Mr. Ness reviewed this item for accuracy by, among other things, verifying how long effective purchaser road credits that Precision Pine had earned on each contract remained unused as reported on the Timber Sale Statements of Account for those contracts. After review, Mr. Ness calculated the amount due for unpaid interest on effective purchaser road credits as $4,208.62. Tr. 2205 (Ness); PX 131, Ex. 2.

165. The next miscellaneous item of damage is unpaid costs of removing snow to access timber on these sales that Precision Pine harvested later in the season than it would have but for the suspension. Mr. Ness verified the amount of the cost by referring to documentation provided to him in Precision Pine's original damages claim and then adding 7.6% overhead and 10% profit to that amount. After review, Mr. Ness calculated the amount due for unpaid costs of removing snow to access timber was $1,207.27. Tr. 2205-06 (Ness); PX 131, Ex. 2.

166. The final miscellaneous item of damage is the unpaid costs of transferring logs from the Eagar sawmill to the Winslow sawmill due to the closure of the Eagar sawmill due to the suspension. Mr. Ness verified the amount of the cost by referring to documentation provided to him by Precision Pine and then adding 7.6% overhead and 10% profit to that amount. After review, Mr. Ness calculated the amount due for unpaid costs of transferring logs as $1,627.45. Tr. 2207-08 (Ness); PX 131, Ex. 2.

**Total Claim**

167. In sum, Precision Pine's total claim after trial is $7,051,000, and is composed as follows:

| | | |
|---|---|---|
| **Miscellaneous Items** | | |
| Unpaid Bond Costs | $ 9,461.50 | |
| Unpaid Move-in/Move-out Costs | 367.20 | |
| Interest on Cash Balances | 319.45 | |
| Interest on Down Payment | 2,763.04 | |
| Interest on Unused Effective Purchaser Credit | 4,208.62 | |
| Snow Removal | 1,207.27 | |
| Log Transfer Due to Closure of Eagar | 1,627.45 | |
| | $ 19,954.53 | $ 19,954.53 |
| | | |
| **Increased Logging & Hauling Costs** | $ 140,724.72 | $ 140,724.72 |
| | | |
| **Lost Market Opportunity (lumber & by-products)** | $ 6,552,156.00 | $ 6,552,156.00 |
| | | |
| **Increased Manufacturing Cost due to Suspension** | | |
| Eagar Sawmill | $ 107,047.47 | |
| Heber Sawmill | 17,931.93 | |
| Winslow Sawmill | 56,131.49 | |
| Winslow Planer | 99,600.31 | |
| | $ 380,711.20 | $ 380,711.20 |
| | | |
| | | |
| **Credit for Partial Cancellation of Mud Timber** | | |
| **Sale per Agreement Dated on 8/15/96** | | $ (65,796.66) |
| | | |
| | | |
| **Claim Preparation Costs (Client)** | $ 23,219.04 | $ 23,219.04 |
| | | |
| | | |
| **Total Damages** | | $ 7,050,968.83 |

**THE PRODUCTION AND SALE OF LUMBER AND BY-PRODUCTS AT A SAWMILL WAS FORESEEABLE; THESE ACTIVITIES ARE NOT COLLATERAL TO A TIMBER SALE CONTRACT**

168. The Organic Act of 1897 which authorized the creation of the National Forests provides that "[n]o national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessity of citizens of the United States." 16 U.S.C. § 475.

169. The Organic Act envisioned only two purposes for the national forests: conserving water flows and furnishing continuous supplies of timber. United States v. New Mexico, 438 U.S. 696, 707 (1978).

170. The Forest Service's Manual has provided at all times relevant to this case that an objective of the Forest Service's commercial timber sale program is "[t]o provide a continuous flow of raw material to local forest industries." PX 132-34; see also Tr. 179-182 (Porter).

171. Mr. Ronald Lewis, a 30-year veteran of the Forest Service's commercial timber sale program, also confirmed that a purpose of the Forest Service's commercial timber sale program was to supply a continuous supply of timber to local sawmills, and that the Forest Service was "absolutely" aware that sawmill owners were the primary customers for Forest Service timber sales. Tr. 3079-82. (Lewis).[12]

---

[12]Historically, and at the time of the suspension, Precision Pine obtained at least 75 percent of its timber supply from the Forest Service commercial timber sale program. In fact, all

172. At all times relevant to this case, the Forest Service was in the business of selling commercial timber either directly to sawmills or to loggers who in turn sold the timber to sawmills. Tr. 3080 (Lewis).

173. The Forest Service at many levels was well aware that Precision Pine had purchased the sales at issue in this case as a source of raw material to supply its sawmills. Tr. 174-75 (Porter).

174. The Forest Service has long been aware that the sawmills in Arizona produce by-products including, bark, chips, grindings (sawdust) and planer shavings (PX 37, at p. 14) and that such by-products were produced by Precision Pine. Id. at 16.

175. In bidding on Forest Service timber sale contracts a prospective purchaser was required to identify whether or not they are a manufacturer, i.e., a company that processed logs into lumber. PX 44 at p. 2.

176. In each of the bids it submitted on the instant contracts Precision Pine identified itself as a manufacturer. Tr. 187-189 (Porter); see also PX 44 at p. 2.

177. In the forest products industry and to the Forest Service, "processing" and "manufacturing" mean the same thing. See 36 C.F.R. § 223.186 (2000) ("Manufacturing facility means a permanently located processing plant used to convert unprocessed timber into

---

of the non-Indian-owned sawmills in Arizona, including those operated by Precision Pine, were dependant upon Forest Service timber sales. PPFF 7.

products"); see also 36 C.F.R. § 223.160(f) (1989-90); 36 C.F.R. § 223.187(a). Precision Pine regularly certified to the Forest Service both before and after contracting that it was processing the timber from its Forest Service timber sale contracts at its sawmills. Tr. 184-86 (Porter); PX 21-25, PX 135, last page.

178. As part of the standard Forest Service bid package, a purchaser also had to complete a "Certificate of Non-Substitution of Timber Purchased and Disposition of Timber Domestically Processed and Exported Timber" which requires the purchaser to identify where it had processed other Forest Service timber during the previous calendar year as well as the plant at which the timber being bid on was to be processed and to advise the Forest Service prior to hauling logs from the sale area if there was to be a change in the point to which the logs were to be delivered. See, e.g., PX 21, 24, PX 135, last page; Tr. 201 (Porter).

179. The primary item being offered for sale under each of the contracts at issue in this case is "sawlogs."[13]

180. Prior to commencing operations on a Forest Service timber sale, Precision Pine and its logging subcontractor were required to meet with the Forest Service and provide specific information about how logging was going to be conducted on the sale, as well as a haul route map which identified the roads to be taken to deliver the logs to Precision Pine's mill site. Tr. 1746-47 (Reidhead).

[13] See, e.g., PX 170 at JRH 5. As noted in PPFF 1, supra, a sawlog is defined as "a log or tree 9" or greater in diameter meeting other criteria suitable as a source for sawmills to produce lumber."

181. All of the sawlogs removed by Tri-Star Logging from Precision Pine's timber sales went to one of Precision Pine's sawmills. Tr. 1787 (Reidhead).

182. But for the suspension, Precision Pine would have operated its sawmills at or near capacity and produced approximately 35 mmbf of lumber per year during the fiscal years ending 1996 and 1997. Tr. 632-633 (Porter).[14]

183. During the suspension period, Precision Pine would have run at or near capacity because: that is the most efficient and cost-effective way to operate, Precision Pine would have sought to retain its skilled employees by keeping them fully employed, and the market price for lumber products increased considerably during the suspension period. Tr. 633-34 (Porter).

184. Precision Pine's primary logging subcontractor was readily capable of supplying the approximately 27.4 mmbf of logs per year necessary from Precision Pine's timber sales to keep its sawmills operating at or near capacity. Tr. 1757-58 (Reidhead) (Tri-Star could easily have supplied 27.4 mmbf of sawlogs per year, i.e., enough to produce 34.25 mmbf lumber tally, to Precision Pine's mills); accord Tr. 290, 310-11 (Porter).

---

[14]As set forth above, the breached sales contained approximately 25,000 mbf of sawlogs, PPFF 71, supra, i.e., a 10.5-month supply of raw material for Precision Pine's sawmills. PPFF 25, supra. As Mr. Ness testified, but for the suspension, Precision Pine would have harvested all of the logs on the breached sales during the 16-month suspension (PPFF 246 infra) and utilized them at its mills plus all of the sawlogs that it actually used during the suspension period. PPFF 389 infra.

185. Contract clause B(T)8.21, which is a standard provision contained in all of the contracts at issue, provides a contractor with additional time to harvest the timber when unforeseen events such as fire, flood and strike "affect the disposition or processing of included timber." Tr. 205-6 (Porter); see also, e.g., PX 170 at JRH-39.

186. Contract clause CT8.21 provides a purchaser with the ability to seek up to an additional two years to harvest timber under the contract due to impacts such as fire, flood, etc. on a sawmill. Tr. 207 (Porter) and, e.g., PX 170 at JRH 112-13.

187. Contract clause CT8.641 requires a purchaser to certify that timber removed under the contract will not be exported and will be domestically processed (e.g., PX 170 at JRH 116), to specifically identify where the timber will be processed (id.) and to advise the Forest Service if there is a change in the location where the timber is to be processed. Id. Failure to meet these requirements is a breach of contract. Id.; see also Tr. 183-84 (Porter).

188. The Forest Service also required purchasers, including Precision Pine, to submit a certificate on an annual basis certifying where timber from each of its Forest Service timber sale contracts was processed. PX 21-25; Tr. 185-86 (Porter).

189. Pursuant to contract clause CT8.212, which is included in each of the contracts at issue, the Forest Service provides a purchaser with "Market Related Contract Term Addition," i.e., additional time within which the purchaser is permitted to harvest the timber on the contract if

there is a significant downturn in the lumber market. Tr. 208-10 (Porter) and, e.g., PX 170 at JRH-112. See PX 169-178; 36 C.F.R. § 223.52.

190. The stated purpose for the inclusion of such a contract provision was the Forest Service's recognition of the need to avoid purchaser defaults in periods of severe economic downturn, because:

> Such economic distress broadly affects community stability and the ability of industry to supply construction lumber and other products for public use and threatens the maintenance of plant capacity necessary to meet future needs of the Nation for wood products from domestic sources. Accordingly, in order to insure the retention of a viable established industry capable of supplying the wood fiber needs of the public for housing and other products, the Chief of the Forest Service has determined that if there is a drastic reduction in wood product prices . . . it would be in the substantial overriding public interest to extend the contract term (36 C.F.R. 223.115(b)).

55 Fed. Reg. 50643 (Dec. 7, 1990) (emphasis added); PX 222. at p. 2.

191. For the five contracts with escalated and de-escalated pricing, it is simply impossible to even determine the price to be paid for the Forest Service timber under the contract without reference to an index of lumber product prices established by the Western Wood Products Association (WWPA). See contract clause B(T)3.2 (e.g., PX 170 at JRH-29).

192. Standard contract clause C(T)6.01 issued in 1990 states in pertinent part that, in the event of a suspension under the clause, a purchaser is entitled to certain relief, i.e.:

> Contract Term Adjustment pursuant to B8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations. . . . Out-of-pocket expenses do not include **lost profits**, . . .

E.g., PX 168-179 (emphasis added).

193. Defendant conceded after the close of all the evidence at trial that the Forest Service was aware that Precision Pine had sawmills and was in the lumber business:

> THE COURT: . . . but here, when the sale is awarded to Precision Pine, isn't it a fact that everybody knows that Precision Pine is in the lumber business and it's going to take the timber to its mill and cause it to be turned into lumber?
>
> MR. HARRINGTON: Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine's had sawmills. We'd certainly concede that fact. The Forest Service knew that Precision Pine had sawmills.

Tr. 5416-17.

194. In a declaration made to the United States Court of Appeals for the Ninth Circuit, Milo Larson, the then Director of Forestry and Forest Health for Region 3, stated that:

> When many timber sale contracts in a large geographic area are affected for a long period of time, there is the potential to destroy businesses that <u>cannot operate any of their contracts and consequently their manufacturing plants</u>. Because the individual contract delay provisions were not envisioned to be applied to more than one contract at a time, the government could face potentially broad damages for businesses being unable to operate enough of their contracts to avoid <u>loss[es] from mill closings and other losses outside an individual contract. This could result in millions of dollars in damages being paid by the government</u>.

PX 49 (¶ 6) (emphasis added).

195. Alan Lucas, the then Timber Sale Preparation and Sale Administration Forester for Region 3, submitted an affidavit on behalf of the government to the United States District Court for the District of Arizona in <u>Greater Gila Biodiversity Project v. USFS</u>, Civ. 95-0242-PCT-PGR (a case that involved a request for an injunction pending the Forest Service's compliance with NEPA), which stated that if an injunction were issued necessitating the Forest Service to suspend operations on timber sale contracts "[e]xpenses associated with the interruption or shutdown and

Start-up of [a] Purchaser's sawmill . . ." were costs for which the Forest Service could expect claims. PX 50.

196. On August 28, 1995, just three days after suspending Precision Pine's contracts, the Forest Service evaluated "the effects of this shutdown" and stated that "September, October and November are critical months for logging in the Southwestern Region" and further stated that:

> [I]f this injunction continues for 2-3 months, it is essentially a 12 month delay for a very high percentage of our sales. It also means that many mills will have to shut down for extended periods. Since they have been operating "on the edge" for some time due to low availability of logs to process, this injunction could cause mills to close permanently.

PX 138, last page.

197. By letter dated September 5, 1995, Precision Pine advised the Forest Service that the injunction threatened Precision Pine's continued existence and that Precision Pine intended to hold the Forest Service responsible for the damages that the suspension caused. PX 299.

198. Thereafter, the Forest Service evaluated the situation with respect to the ongoing suspension of operations again on September 14, 1995 and found that:

> The effect on the timber industry is very serious. . . . The logging season is restricted in most places to fall months due to protective requirements for the owl and goshawks. Thus we expect to lose the 1995 year of production which will put several mills out of business permanently. . . . The [sic] represents about 1300 job [sic] or families that will lose some or all of their annual income with another 700 secondary jobs affected. Twelve communities in Arizona and 28 in New Mexico will feel the effects. We expect about three sawmills to go out of business permanently if the injunction lasts through this logging season.

PX 103, first page; see also Precision Pine & Timber Inc. v. United States, 50 Fed. Cl. 35, 47 (2001).

199. Again, by letter dated October 4, 1995, Precision Pine advised the Forest Service that Precision Pine intended to hold the Forest Service responsible for its "inability to operate our mills on the timber that is contractually ours to cut. The damages we have incurred due to these curtailments should be yours to bear." PX 300.

200. In letter dated June 25, 1996, Precision Pine continued to advise the Forest Service of the severe adverse impact that the suspension was having on its operations and that it was out of timber at all of its mills due to the Forest Service's breach of contract. PX 115.

201. In another letter sent to the Contracting Officers and received in the Regional Office on June 26, 1995, Precision Pine explained in considerable detail how the Forest Service's breach of contract had resulted in closures at all of its sawmills as well as lost profits and reiterated Precision Pine's belief that the Forest Service was responsible for compensating Precision Pine for the damages it had sustained. PX 116.

202. In a letter dated October 25, 1996, Precision Pine again advised the Forest Service of the hardship that the ongoing suspension imposed on its operations: "Our facilities are down and we continue to be damaged by the suspension. Unless we can get some more wood almost immediately there is no way we that can reopen before spring if then." PX 262.

**LUMBER PROFITS**

**Gross Profits**

203. As Mr. Ness testified at trial, Precision Pine is seeking the gross profits (before manufacturing overhead) that it would have made if it had been allowed by the Forest Service to harvest the breached sales as planned. Tr. 2190, 2755. As he further stated at trial, the recovery of gross profits (before manufacturing overhead) is appropriate here because the items below the gross profits (before manufacturing overhead) line, see PX 1010, i.e., manufacturing overhead (depreciation, insurance, property taxes, Tr. 2756) and general & administrative overhead (G&A) (PX 131, Ex. 18; Tr. 2198-2200) tend not to change based on the volume of logs running through the sawmills. Tr. 2756.

204. The lost opportunity caused by the suspension which Precision Pine seeks to recoup relates only to how much the variable items on Precision Pine's income statement for the period August 25, 1995 to April 15, 1997 would have changed if the sawlogs on the breached sales would have been harvested, milled and the resulting lumber sold in that period. Tr. 2756-57 (Ness).

205. In this regard, Dr. Neuberger conceded that if costs below the gross profits (before manufacturing overhead) line (i.e., manufacturing overhead and G&A) on an "actual world" income statement for a particular period were no different than the costs below that line for the same period on a "but for world" statement of income, in subtracting the "actual" numbers from the "but for" numbers the items below the line would net out. Tr. 3590.

**CONVERSION FACTOR**

206. In the forest products industry, lumber is sold in a unit of volume called thousand board feet, lumber tally ("mbf (LT")). Tr. 242-43 (Porter). Accordingly, Precision Pine calculated its damages based on the volume of lumber in mbf (LT) that it would have processed and sold from the timber that it would have harvested on the breached sales but for the suspension. See PX 131. To calculate the volume of lumber in mbf (LT) that it would have sold, Precision Pine first had to calculate the volume of timber in mbf (log scale) ("mbf (LS)") remaining on its breached sales at the time of the suspension. Tr. 2244, 2251 (Ness).

207. Although the Forest Service traditionally denoted the volume of timber sold in its contracts in mbf (LS), during the period of time in which the Forest Service prepared and sold the contracts at issue in this case, it was changing to another unit of volume called "hundred cubic feet" ("ccf"). Tr. 242-43 (Porter); e.g., PX 183, Saginaw-Kennedy Timber Sale Prospectus, ¶ 1. As a result, some of the breached contracts denoted the volume of timber on them in mbf (LS), and some denoted the volume in ccf. Tr. 243-44 (Porter). For the contracts denoting volume in ccf, Precision Pine had to covert the volume remaining on those contracts at the time of the suspension into mbf (LS). Tr. 244-45 (Porter); Tr. 2251 (Ness).

208. To convert the volume remaining on the sales that denoted volume in ccf to mbf (LS), Mr. Porter used a factor of 2 ccf to 1 mbf (LS). Tr. 245 (Porter); see also Tr. 2251 (Ness). This conversion factor was suggested to Precision Pine by the Forest Service and worked in practice. Tr. 246-47 (Porter).

**OVERRUN FACTOR**

209. Overrun is the amount by which the volume of lumber produced exceeds the volume of logs used to produce it. See Tr. 139-40 (Porter); Tr. 1142-43 (Devere). As stated in § 45.23c(9) of the Forest Service Timber Sale Preparation Handbook made effective on October 31,1990 by WO Amendment 2409.18-90-1: "Recovery Factor (Overrun) . . . If a mill produces 12,000 mbf of lumber from 10,000 mbf of logs, the recovery [overrun] factor of that mill is 12,000 divided by 10,000 or 1.20." DX 840.

210. Plaintiff's expert with regard to overrun was Mr. Martin Devere, an individual very well qualified to speak on the subject based on his 40 years in the timber business, 30 of which involved Ponderosa Pine sawmills in the southwest. PX 52; Tr. 1130- 1142; Tr. 1164.

211. As Mr. Devere explained, among the reasons that overrun occurs is the way logs are measured in the Scribner system, the fact that logs have taper, the use of thinner saws at the mill, (Tr. 1144- 46 (Devere)) and the way various lumber products are measured, e.g., a 2 x 4, which for purposes of determining lumber volume is treated as if it were actually 2"x 4", is in fact only 1½" x 3 ½". Tr. 1171 (Devere). See also Tr. 147, 163-4 (Mr. Porter discussing overrun in dimension lumber) and Tr. 139 *et seq.* Mr. Porter discussing PX 1001 and overrun due to log taper).

212. In computing its lost lumber profits, Precision Pine used an overall overrun factor of 1.25 for all species of sawlogs on the breached sales, i.e., Ponderosa Pine, Douglas-fir and Spruce. Tr. 858-59 (Porter); Tr. 2389-90 (Ness). This was a very conservative approach to the overrun

that Precision Pine would have experienced in manufacturing the timber from the breached sales into lumber. Tr. 355 (Porter).

213. Both in his expert report and at trial, Mr. Devere opined that, based on his experience, Precision Pine's use of an overall overrun factor of 1.25 for all species on the breached sales was very conservative. PX 51 at 2; Tr. 1164, 1197, 1199. No defense expert directly disputed Mr. Devere's opinion.

214. The conservatism of an overall 1.25 overrun factor is further supported by the facts that:

a. Approximately 10% of the volume remaining on the breached sales was either Douglas-fir or Spruce. See PX 320; see also PX 131, App. A, p. 5.

b. Lumber production from these species is substantially dimension lumber, i.e., 2x4, etc. Tr. 163, 169 (Porter).

c. There is an inherent overrun associated with the production of dimension lumber by virtue of the fact that it is counted as being larger than it actually is, e.g., a 2 x 4 is in fact only 1 ½ " x 3 1/2". Tr. 147, 163-4 (Porter); Tr. 1171-72 (Devere). That is, as Mr. Porter indicated with regard to dimension lumber, the mill is making a piece of lumber that is a good deal smaller than what it is being sold as. Tr.147, 164 (Porter).

d. The overrun associated with Douglas-fir and Spruce is normally greater than 1.3 because lumber produced from the species is all dimension lumber. See Tr. 169 (Porter).

e. Mr. Ness testified that the use of a 1.25 overrun factor for Douglas-fir was ridiculous in that he had never heard of a Douglas-fir mill having a 1.25 overrun, Tr. 2389-90. Rather, his experience was that they always had overrun factors significantly higher, i.e., 1.60 or more likely 1.80. Id.

f. Even defendant's expert, Mr. Moosman, accepted 1.3 as the appropriate overrun factor for Douglas-fir and Spruce. DX 777, App. 3 at 97; Tr. 5109-10.

215. The Forest Service itself determined that the overrun factor just for the Ponderosa Pine on each of the 11 sales here in issue would be between 1.2450[15] to 1.3935, i.e.,

| **Contract** | **Avg. DBH Ponderosa Pine (in.)** | **Forest Service Est'd Overrun Factor for Ponderosa Pine** | |
|---|---|---|---|
| Saginaw-Kennedy | 11.6 | 1.2450 | |
| St. Joe | 21.2 | 1.2505 | |
| Brann | 12.2 | 1.2955 | from PX 13 |
| Hay | 17.2 | 1.3390 | from PX 1 |
| Jersey Horse | 17.9 | 1.3463 | |
| Mud | 11.6 | 1.3484 | |
| Manaco | 12.9 | 1.3597 | |
| Kettle | 12.3 | 1.3599 | |
| Salt | 11.9 | 1.3685 | |
| Monument | 11.5 | 1.3720 | |
| Brookbank | 12.6 | 1.3720 | |
| Hutch-Boondock | 12.6 | 1.3935 | |

PX 243 (except as otherwise indicated).

[15] Mr. Porter testified, without contradiction, that the overrun factor of 1.2450 on the Saginaw-Kennedy sale was erroneously low, Tr. 151. This view is supported by the fact that the smaller the diameter of the log, generally the greater the overrun factor. Tr. 160 (Porter); Tr. 1143 (Devere). See also PX 243, on which sales having an average DBH for Ponderosa Pine similar to the 11.6" on Saginaw-Kennedy, such as the Mud and Monument sales, according to the Forest Service had overrun factors for Ponderosa Pine of 1.3484 and 1.3720, respectively.

216. The Forest Service's overrun factors for Ponderosa Pine were based on a mill study it had conducted in the mid-'80's at Stone's mill in Eagar, Tr. 152-56 (Porter), and were set forth in the Forest Service's timber sale appraisal summary for each of the 11 sales on which Precision Pine seeks lost profits. PX 1-11. Notably, defendant had no expert witness that could or did refute the general accuracy of these overrun factors for the Ponderosa Pine timber on the very sales in issue.

217. Both Mr. Porter and Mr. Devere testified without contradiction that in August of 1995 each of Precision Pine's mills was every bit as, if not more, efficient than was Stone's sawmill was at the time of the mill study. Tr. 157-58 (Porter); Tr. 1186 (Devere). The configuration of Stone's Eagar sawmill was similar to that of Precision Pine's mills, except that as of the time of the suspension Precision Pine's mills were more modern and designed to produce more lumber, as opposed to chips. Tr. 157-60 (Porter).

218. That is, unlike the Stone sawmill, at the time of the suspension each of Precision Pine's three mills had computerized laser setworks on the headrig, Tr. 97-8 (Porter); something that would have had a positive effect on both overrun and grade recovery, Tr. 97, 101, 157-58, 360-61 (Porter); Tr.1175-76 (Devere), and was not common in sawmills in the southwest at the time. Tr. 1177 (Devere); Tr. 98 (Porter)

219. In the course of his testimony, Mr. Devere stated that Ponderosa Pine sawmills in the southwest are generally configured in similar ways and contain the same basic equipment. Tr. 1231. Given this, he further opined that if the same logs were sawn in various sawmills, each of

which had the same equipment, the resulting overrun factor would be approximately the same. Tr. 1231.

220. In this regard, Mr. Porter testified that Precision Pine's three mills were similarly equipped. Tr. 98-101 (Porter).

221. As Mr. Porter also testified, he took the Forest Service's stated overrun factors to be an aid to bidders to help them estimate what recovery they might achieve (Tr. 148 (Porter)) and used them for that purpose. Tr. 152 (Porter).

222. No defense expert directly disputed the evidence that Precision Pine readily could have achieved at least an overall overrun factor of 1.25 on the timber from the breached sales.

223. Mr. David Harris, the only Forest Service witness to testify about the agency's inclusion of overrun figures for Ponderosa Pine in its appraisal summaries for each of the breached timber sales contracts, PX 1-11, testified that overrun factors are not part of the Forest Service's Transaction Evidence Appraisal (TEA) System (Tr. 4446-47 (Harris)) and that the Forest Service put an overrun factor for Ponderosa Pine on the appraisal summary for a timber sale merely as a service to potential bidders. Tr. 3764 (Harris).

224. Mr. Harris' testimony notwithstanding, the Forest Service does, however, have a use for the overrun factors in its TEA System. As Mr. Harris acknowledged: as part of the TEA process the Forest Service is sometimes required to make market adjustments (Tr. 4456-57 (Harris))

which could be based on changes in the WWPA Index (Tr. 4449-50 (Harris)). In fact, the appraisal for at least one of the sales, Manaco, specifically indicated that "a present market value adjustment" was made. PX 38, ¶ c at p. 10. Mr. Harris also acknowledged that the WWPA Index is an index of lumber product prices. Tr. 4450 (Harris), accord Tr. 4315-18 (Munn); Tr. 3321-23 (Neuberger). As stated in § 45.33 of the Forest Service Timber Sale Preparation Handbook, made effective by WO Amendment 2409-18-2002-4, February 20, 2002 (DX 840), suggested ways to make such market adjustments include adjusting the base period price by a lumber or other product index or market indicator [such as the Western Wood Products (WWPA) lumber price indices. The Forest Service's Handbook section further indicates that:

> If a reliable overrun factor is available, the index change [which is on a lumber tally basis] may be multiplied by an overrun factor to approximate price changes on a log scale basis.

225. Earlier versions of the Forest Service Timber Sale Preparation Handbook indicated similar uses for overrun factors, e.g., Handbook § 45.32(1) made effective by WO Amendment 2409.18-96-2, dated May 5, 1996 (DX 840) indicated that market adjustments may be made by use of a lumber or other product index which, in turn, may be multiplied by an overrun factor to increase the sensitivity of the appraised price to market changes. In this same regard, the Handbook provisions made effective on October 31, 1990 by WO Amendment 2409.18-90-1 (DX 840) indicate at § 45.35 that, in Transaction Evidence Appraisals, adjustments of market value of the timber being sold should be made as needed. As noted with more specificity in later amendments (e.g., the May 8, 1996 amendment set forth in DX 840, the principal way to do this is by use of an index such as WWPA's multiplied by an appropriate overrun factor to put the

index on a log scale basis. In this regard, § 45.23c(9)[16] of the Handbook made effective October 31, 1991 provided that:

> To convert costs and selling values per unit [such as the WWPA indices] from lumber tally basis to log scale, multiply by the recovery [overrun] factor.

226. In fact, Mr. Harris acknowledged that overrun factors could have been used by the Forest Service in the appraisal of the sales in issue. Tr. 4457-58.

227. Although Mr. Moosman, defendant's accounting expert, asserted that, based on Mr. Porter's July 17, 1995 profit projections (DX 519-545), an overrun factor for all species of 1.10 is appropriate (DX 777, App. 3 at 97):

a. Defendant did not submit any testimony by a sawmill expert or other evidence that such a low overrun could have been anticipated from the timber on the breached sales;

b. Moreover, as the evidence at trial indicated:

   i. The July 17, 1995 profit projections were worst-case scenarios prepared by Mr. Porter in the wake of overtures from Stone to purchase Precision Pine. Tr. 919 (Porter); Tr. 2948-49, 3031, 3042 (Tenney).

   ii. These projections were prepared, using Mr. Porter's shorthand method for adjusting the level of pessimism of any projection (Tr. 882 , 897-9

[16]Although § 45.23c is located in the portion of the Handbook dealing with Residual Value Appraisals, as later amendments, e.g., 2409-18-2002-4, make clear, the advice set forth therein with respect to converting lumber values to log values through multiplication by an overrun fact is equally applicable to Transaction Evidence Appraisals, such as were performed for each of the sales at issue in this case.

(Porter)), i.e., his technique of reducing the overrun factor used on his projection allowed him to quickly inject more pessimism into the analysis because, based on the way the spreadsheet was set up on his computer, that one change to overrun, both reduced the volume of lumber that would be produced and also increased Precision Pine's per unit costs. Tr. 882 (Porter).

iii. The 1.1 overrun factor indicated on the July 17, 1995 profit projections was not an indication that Precision Pine anticipated achieving only a 1.1 overrun on all of its sales at all of its mills. Tr. 922 (Porter).

iv. Mr. Porter testified that he always knew that Precision Pine would achieve at least a 1.25 overrun factor. Tr. 899 (Porter).

v. Mr. Porter's purpose in preparing the July 17, 1995 projections for every sale that Precision Pine owned was simply to show Mr. Tenney the very least that he anticipated that Precision Pine would be able to make on the sales. Tr. 919 (Porter).

228. As Mr. Tenney testified, if he and Mr. Porter had actually thought Precision Pine was going to perform as was reflected in the July 17, 1995 profit projections, they would have lowered the price to Stone and sold the company. Tr. 3044.

229. Further evidence that the 1.10 overrun factor set out on the worst-case scenario profit projections of July 17, 1995 was not indicative of the overrun factor that Precision Pine actually

anticipated achieving on the breached sales can be seen in the additional testimony of Mr. Porter summarized below:

| Transcript cite | Sale | Overrun factor used by Mr. Porter in pre-bid analyses of the sale | PX | Date | Overrun factor assigned by the Forest Service See PX 243 | Overrun factor set forth for the sale in Mr. Porter's July 17, 1995 profit projection | Circumstances that had changed between the two dates |
|---|---|---|---|---|---|---|---|
| 924-26 | Barber | 1.25 and 1.2 | 73 | 12/27/93 | | 1.10 | Nothing |
| 926-28 | St. Joe | 1.25 | 82 | 12/11/91 | 1.250 | 1.10 | Nothing |
| 928 | All other breached sales | 1.25 | | | | 1.10 | Nothing |

230. Counsel for defendant even urged the Court to rule that a 1.08 overrun factor for all species was appropriate. Tr. 5445 (Harrington). This was based on a crude estimate of overrun at the Winslow sawmill done by John Smith. DX 547.

231. The use of Mr. Smith's estimate to determine Precision Pine's actual overrun factor is, however, inappropriate because:

a. It indicates two significantly different overrun estimates, i.e., one of 8% and another of 15% (the estimate of 8% that was done on March 12, 1996, and the other was done on March 13, 1996). See DX 547 at page US 05717.

b. Mr. Smith admitted at trial that 8% and 15% overruns were not anywhere near the actual overrun at the facility; they were just estimates. Tr. 5334.

c. Mr. Smith didn't know what Precision Pine's actual experience with overrun was at the Winslow sawmill. Id.

d. The monthly overrun figures in DX 547 both contained inexplicable negative overruns and varied wildly both within and between months as follows:

| | | |
|---|---|---|
| 28 April 95 | -8% | +10% |
| 31 May 95 | 0% | -7% |
| 30 June 95 | 9% | |
| 31 July 95 | -11% | -20% |
| 5 Sept 95 | 6% | 4% |
| 29 Sept 95 | 26% | |
| 31 Oct 95 | -2% | |
| 30 Nov 95 | 30% | 76% |
| 29 Dec 95 | 11% | 21% |
| 31 Jan 96 | 16% | 79% |
| 29 Feb 96 | 19% | 25% |
| Mar 96 | 5% | |

e. Preparing reports such as DX 547 was not part of Mr. Smith's duties. Tr. 5339 (Smith).

f. Mr. Smith did not measure each log that went into the Winslow sawmill in FYE 3/31/96. Tr. 5347 (Smith).

g. The results which Mr. Smith came up with are totally inconsistent with the uncontroverted testimony of Mr. Porter that at the time of the suspension, due to

upgrades that had been done to it, the Winslow sawmill was the most efficient one in Arizona. Tr. 98-99 (Porter).

232. At his deposition Mr. Smith testified that he had no recollection as to why there were two sets of numbers throughout DX 547 with regard to 'mill use (logs).' DX 838, p. 251. He also had no idea, for example, why on the sheet for April 28, 1995 he had two overrun numbers, one of which was -8% and the other was +10%. DX 838, p. 253.

233. Even counsel for the defendant acknowledged that the proper way to determine overrun is through a mill study, see Tr. 5443 (Harrington), accord Tr. 1143 (Devere); Tr. 1546 (Porter), i.e., a study where the volume of each log going into the mill is individually and precisely measured (Tr. 1143, 1210, 1241 (Devere); Tr. 5346 (Smith)), and the lumber produced from those logs is carefully determined. Tr. 1143, 1210 (Devere); Tr. 5346 (Smith). In making his estimate in DX 547, Mr. Smith didn't try to do anything like a mill study. Tr. 5347 (Smith).

234. Because Mr. Smith did not measure each log going into the mill for the entire fiscal year ending 3/31/95 (Tr. 5347 (Smith)) by definition, he did not make any allowance in his volume figures for defect that existed in the logs run through the mill (id.) which is something that a scaler would have done to obtain an accurate measure of log volume. Tr. 5348 (Smith).

235. Mr. Smith did not scale logs for Precision Pine. Tr. 5317 (Smith).

236. There never was a record made of the volume of each log that Mr. Smith estimated to have gone through the Winslow sawmill in FYE 3/31//95. Tr. 5348 (Smith).

237. Mr. Devere testified that the primary factors affecting overrun are log size and the products to be manufactured out of them. Tr. 1238 (Devere). This was confirmed by Mr. Porter who testified that the smaller the average diameter of a log the greater the overrun (Tr. 160 (Porter), PX 243). This fact is also reflected in the Forest Service's own calculation of dbh and overrun on the breached sales:

| Contract | Avg. DBH Ponderosa Pine sawlogs (in.) | Forest Service Est'd Overrun Factor for Ponderosa Pine | |
|---|---|---|---|
| St. Joe | 21.2 | 1.2505 | |
| Jersey Horse | 17.9 | 1.3463 | |
| Hay | 17.2 | 1.3390 | From PX 1 |
| Manaco | 12.9 | 1.3597 | |
| Hutch-Boondock | 12.6 | 1.3935 | |
| Brookbank | 12.6 | 1.3720 | |
| Kettle | 12.3 | 1.3599 | |
| Brann | 12.2 | 1.2955 | From PX 13 |
| Salt | 11.9 | 1.3685 | |
| Mud | 11.6 | 1.3484 | |
| Saginaw-Kennedy | 11.6 | 1.2450 [17] | |
| Monument | 11.5 | 1.3720 | |

PX 243. The smaller the diameter of the log the greater the percentage of taper of the log (Tr.161 (Porter)) and hence the greater the overrun. As Mr. Porter testified, the smaller the log the greater the percentage of the total lumber from the log would come from the cross-hatched area shown on PX 1001, Tr. 162 (Porter).

[17] Mr. Porter testified that the overrun factor on the appraisal for Saginaw-Kennedy was not correct. PPFF 215.

238. Likewise, as the grade quality of a sale decreases, less moulding and shop grade lumber are produced and more dimension lumber is produced (see Tr. 357-358 (Porter)); consequently, overrun increases. See Tr. 147, 163-4 (Porter); Tr. 1171-72 (Devere).

239. Another way of achieving overrun lies in the fact that lumber can be made out of some defective parts of a log, which would not even be counted as part of the net volume of the log in Scribner scaling. Tr. 143-44, 162-3 (Porter).

240. With regard to overrun, Mr. Ness testified that if, as the witnesses in this case have testified, a normal type of overrun factor would have been in the range of 1.25, he would not expect a company that processed logs with an overrun factor 15 percentage more points or more lower, to have been profitable in a highly competitive business except in the very, very best of times. Tr. 2773. Precision Pine's historic financial statements show that it was always profitable. Tr. 2773. As such, Mr. Ness would have rejected a 1.1 overrun figure just as he would, in the absence of extraordinary profits even in bad markets, have rejected a very high overrun factor such as 1.5. Tr. 2774 (Ness). Such a seemingly aberrant figure would be suspicious and require additional investigation. Tr. 2774 (Ness).

**HARVESTING**

**Defendant's assertion that Precision Pine cannot tell when it would have harvested any of the breached sales**

241. In accordance with standard contract clause B(T)6.31 which was contained in all of the contracts in issue (see, e.g., PX 170 at JRH-35), Precision Pine submitted tentative annual operating schedules. Tr. 260-3 (Porter). The clause permits changes in the schedule due to a wide variety of circumstances, including changes in the market for lumber products produced from the timber. See, e.g., PX 170, at JRH-35; Tr. 262 (Porter). Precision Pine seldom, if ever, followed the tentative annual operating schedules it submitted. Tr. 263, 1629 (Porter).[18] The schedules did not even necessarily contain the best information available to the company at the time of its submission. Tr. 1630 (Porter).

242. Precision Pine did not prepare (or follow) fixed, long-term schedules for harvesting sales it had under contract. Tr. 259, 287 (Porter), accord Tr. 1775 (Reidhead). Once Precision Pine started harvesting a timber sale, it did not generally continue harvesting it to completion without interruption. Tr. 224 (Porter), accord Tr. 1778 (Reidhead). Rather, upon completion of a payment unit it would frequently decide to move to another sale (Tr. 224 (Porter)), at which time it could move rapidly to another sale. Tr. 233 (Porter).

243. The decision to stay on a sale or move to another would be made a variety of reasons including operating conditions (Tr. 224, 231 (Porter)), weather (both actual and anticipated) (Tr.

[18] As Mr. Porter testified, the Forest Service understood that the schedule was only tentative because the Forest Service was aware of these deviations from the schedule and raised no objections. Tr. 264-65 (Porter); see also Tr. 4207, 4465-67 (Harris).

230 (Porter)), the termination date of sales (Tr. 230 (Porter)), operating restriction(s) (Tr. 1442 (Porter)), the needs of the Precision Pine's mills (Tr. 233, 287, 1442 (Porter)), in particular, the need to maintain a proper mix of large and small sawlogs going through the mills (Tr. 971, 2142[19] (Porter)) as well as conditions in the lumber market. Tr. 233, 259 (Porter).

244. Having this flexibility in its harvesting operations was a real asset to the company. Tr. 233 (Porter). This was particularly true because Precision Pine reassessed its harvesting plans on a virtual daily basis. Tr. 287 (Porter). As Mr. Reidhead testified, Precision Pine often gave Tri-Star short notice of where harvesting was going to occur next. Tr. 1776 (Reidhead).

245. Because Precision Pine did not prepare fixed, long-term schedules for harvesting sales it had under contract, as part of preparing Precision Pine's claims in 1997 after determining how much timber remained on the breached sales at the time of the suspension, Mr. Porter figuratively had to go "back in time," i.e., to August 24, 1995, in order to ascertain in which quarters the Precision Pine would have harvested timber on the breached sales had there been no suspension. Tr. 259, 2084, 2091 (Porter). In making his projection Mr. Porter testified that he considered operating restrictions contained in the contract, contract termination dates, and the needs of the Precision Pine's sawmills at various points in time, including the need to maintain a proper mix of large and small sawlogs at each of the mills. Tr. 344, 971, 1442 (Porter).[20]

---

[19]Without a mix of small and large logs running through the mills Precision Pine would not be able to make the full range of lumber products that it wants as often as it would have had there been a proper mix of small and large logs. Tr. 2142 (Porter).

[20]These same quarterly harvest projection numbers appear again in DX 1004, a document prepared by Mr. Porter in 2003, which simply took the 1997 projection and broke out the

246. Precision Pine would have harvested all of the remaining timber on the breached sales between August 25, 1995 and December 4, 1996 because:

a. Seven of the eleven sales were going to expire by the end of December 1996. Tr. 344 (Porter).

b. The volume of sawlogs remaining on these sales represented only about a 10.5-month supply of timber to Precision Pine's sawmills, whereas the period of the suspension plus the ensuing winter, i.e., the period for which Precision Pine would have needed this timber to help supply its sawmills, was 20 months long. Tr. 344, 664 (Porter).

c. During the suspension, the Forest Service's timber sale program came to a virtual halt. Tr. 1289 (Porter); see PX 304.

d. Precision Pine was in the business of producing and selling lumber and thus wanted to keep its sawmills supplied so that they could run at their capacity. Tr. 344 (Porter).

e. After bottoming out in January-February 1996, the market for Ponderosa Pine lumber products took off like a rocket. Tr. 641 (Porter); Tr. 2750 (Ness) (prices "soaring"); PX 168; see Tr. 3604-06 (Neuberger) (describing page 9 of DX 1006, entitled "WWPA Rocky Mountain Ponderosa Pine Price Index"); see also PX 305 (source documents for WWPA index lines in DX 1006 and PX 168).

---

harvesting by month when defendant asked in discovery for the volumes that Precision Pine projected to harvest by month. Tr. 2091 (Porter), discussing DX 1004. These same quarterly harvest projection numbers were provided to Mr. Ness by Precision Pine and used by him in his damage computation. Tr. 2245 (Ness); see PX 131, App. A, p. 4.

247. Based on his experience in Oregon, the normal operating season applicable in the southwest and his discussions on the subject with Mr. Porter, Mr. Ness believed that it was normal for a timber company in the southwest to harvest heavily in the fall of the year in anticipation that harvesting in the winter could be much more difficult. Tr. 2774-75 (Ness). He also testified that this fact was reflected in Precision Pine's harvest projection, as set out in page 4 of App. A of his report, PX 131. Tr. 2775 (Ness).

248. The fall harvesting season is critical to mills in the southwest (PX 138 and Tr. 349 (Porter)) and the Forest Service's suspension deprived Precision Pine of its ability to conduct harvesting on these 11 contracts during two such fall harvesting seasons (i.e., 1995 and 1996).[21]

**Defendant's assertion that Precision Pine had never harvested that much timber before and didn't have the capability of harvesting that much timber**

249. As set forth on page 4, Ex. 7 of Mr. Ness' original report (PX 131), Precision Pine's total anticipated production for the period of the suspension plus the ensuing winter was 57,134 mbf (LT). Tr. 2284 (Ness); see also Tr. 308, (Porter). This amounts to a monthly production rate of 2,850 mbf (LT) (Tr. 308 (Porter)) and an annualized rate of 34,700 mbf (LT) per year for Precision Pine's sawmills. Tr. 2284 (Ness).

250. In order to supply sufficient timber to produce this volume of lumber, Precision Pine would have had to log at an annual rate of 27,360 mbf (LS) per annum. Tr. 310 (Porter). While

[21]Precision Pine was substantially dependant on the Forest Service for timber to run its sawmills, i.e., at least 75 percent of the timber that it ran through its mills historically came from Forest Service timber sales. PPFF 7.

defendant asserts that doing so was impossible, not only did both Messrs. Reidhead and Porter testify, without contradiction, that Tri-Star had the capability to log at this rate, (Tr. 1757-58 (Reidhead); Tr. 290, 310 (Porter))[22] but Precision Pine had in preceding years logged at 93% of this rate (Tr. 311 (Porter)), i.e., as indicated on DX 559, in 1993 [(see Tr. 311-12 (Porter)]), Precision Pine logged 25,399 mbf (LS) of timber, produced 30,088 mbf (LT) of lumber and using this timber (in the fiscal year ending 3/31/94). Tr. 2320 (Ness).

251. Defendant's argument that Precision Pine/Tri-Star did not have the capacity to log at the rate necessary to harvest the breached timber during the suspension is further undercut by the suggestion made by its counsel at trial that in the post-suspension period Reidhead had the capability to simultaneously log all of the breached sales plus additional contracts. Tr. 3191-2 (Harrington).

252. Logging at a rate of 27,360 mbf (LS) per year was achievable. Tr. 1758 (Reidhead); Tr. 312 (Porter).

253. Tri-Star had sufficient men and equipment to operate six sales simultaneously and that, if needed, it could have hired logging subcontractors to gain additional capacity. Tr. 1743-44 (Reidhead).

---

[22]Tri-Star was readily capable of supplying the 27.4 mmbf of logs per year necessary from Precision Pine's timber sales to keep its sawmills operating at or near capacity. PPFF 184.

**Defendant's assertion that Precision Pine could not have harvested the breach sales during the suspension period due to their having limited Normal Operating Seasons**

254. Precision Pine's harvesting projection indicated an intention to harvest some sawlogs on the U-Bar, Jersey Horse, Hay and O.D. Ridge timber sales in the 1st quarter of 1996. PX 131, App. A at p. 4. This would have been outside of the Normal Operating Season for each of these sales. Tr. 316 (Porter); see also PX 174, 170, 169, 171 (for the respective timber sale contracts).

255. Harvesting outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T) 6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead). During the winter of 1995-1996, Precision Pine in fact removed a substantial volume of timber, 4,106 mbf (LS), from a variety of sales, i.e., Hutch-Boondock, St. Joe and Brann. Tr. 316-334 (Porter), calculating amount removed from December 1995 to February 1996 on PX 1002; DX 251, 221, 342. As Mr. Porter testified, given the widely varying locations and elevations of the Hutch-Boondock, St. Joe and Brann sales, the fact that substantial harvesting took lace in the winter of 1995-1996 indicated that the ground on sales at varying elevations throughout Precision Pine's operating area was either dry, frozen or both (Tr. 338 (Porter)) and thus that Precision Pine's projected harvesting of the U-Bar, Jersey Horse, Hay, and Kettle sales in the winter of 1995-1996 (see PX 131, App. A at p. 4; DX 1004) would certainly have been possible. Tr. 339 (Porter).

**Defendant's assertion that Precision Pine could not have harvested the breach sales during the suspension period due to their having wildlife restrictions**

256. With regard to operating restrictions relating to wildlife, Mr. Harris testified that on DX 1004 Precision Pine had projected harvesting timber from Manaco during the month of September in both 1995 and 1996 (Tr. 4169-70 (Harris)), but that on certain of the cutting units on Manaco all harvesting was precluded from March 1 to August 31 and on other units from March 1 to September 30. Tr. 4169 (Harris). However, he also admitted that harvesting could have taken place in the month of September on cutting units 6, 21, 22, 40, and 41. Tr. 4175 (Harris). Mr. Dils, the contracting officer on the Manaco sale, testified that some of the units on the sale did not have operating restrictions and that for those units operations in September would have been possible. Tr. 4645 (Dils). These units were 1-5, 8, 23-29, 31, 34-35, and 42-43, PX 131 (Manaco timber sale contract) at p. 117. Mr. Dils further admitted that for cutting units 9, 10, 11, 17, 20, and 37 the only operating restriction in September was that no hauling could be done (Tr. 4645-46 (Dils)), i.e., that on these units a contractor could do all that was required to harvest the timber except put it on a truck and haul it out of the forest. Tr. 4646 (Dils). Mr. Dils also agreed that if a contractor had felled, bucked and skidded the sawtimber on those units and all that was left to do was to haul it, that hauling could be done in a month or less, depending on the total volume involved. Tr. 4646-47 (Dils).

**Defendant's assertion that Precision Pine could not have harvested the breach sales during the suspension period due to fire closures**

257. Defendant asserts that harvesting operations on the breached sales that Precision Pine had on the Kaibab and Coconino National Forests (i.e., the Saginaw-Kennedy, U-Bar, Mud and Monument sales) would have been precluded by the fire closures that occurred on those forests

in 1996. Although both the Coconino and Kaibab National Forests may have been shut down due to fire from May 6 through July 9, 1996 (DX 380, accord Tr. 4122-23 (Harris)), Precision Pine's harvesting of the U-Bar, Mud and Monument timber sales would not have been affected by these fire closures because Precision Pine did not project any harvesting of these sales in May, June or July of 1996. See DX 1004, Tr. 4481-4 (Harris). Because Precision Pine did not project any harvesting of the Saginaw-Kennedy sale in May and June 1996, the closure of the Kaibab National Forest in those months would have had no impact on the harvesting of that sale. See DX 1004, Tr. 4477 (Harris).

258. Precision Pine did project some harvesting of the Saginaw-Kennedy sale in July. DX 1004. However, although the Kaibab National Forest remained closed through July 9, 1996, as Mr. Harris testified, harvesting of the 378 mbf (LS) that Precision Pine projected to have been removed in July 1996 could have started on July 10th. Tr. 4479 (Harris).

259. With regard to Precision Pine's timber sales on the Apache-Sitgreaves (Brookbank, Jersey Horse Hay, Kettle and O.D. Ridge), there is no evidence that any of Precision Pine's projected harvesting in 1996 would have been affected by any fire closure. The only witness for defendant on this subject, Susan Lee, who was a contracting officer on the Apache-Sitgreaves in 1996 (Tr. 4551 (Lee)), could not recall either if fire shutdowns on the Apache-Sitgreaves National Forest in 1996 were forest-wide or the dates of any fire shutdowns. Tr. 4568-69 (Lee). Defendant submitted no exhibits to show when and where on the forest any alleged shutdown occurred or if any alleged shutdown coincided with a period when Precision Pine projected harvesting a sale that would have been subject to an alleged shutdown.

260. Although defendant introduced a November 26, 1996 letter (DX 118) from Precision Pine's Purchaser Representative, John Smith, to the Forest Service referencing a fire shutdown from April 29 through July 9, 1996 on the Brookbank and Jersey Horse timber sales: (1) Precision Pine projected no harvesting on Jersey Horse in April, May or June of 1996 (PX 131, App. A, p. 4; DX 1004) and (2) the "shutdown" in question may not even have been complete, i.e., it could have been a so-called "Hoot Owl" where equipment can be operated, but only in the morning. Tr. 1505-06 (Porter). (A Hoot Owl shutdown is also referred to as Fire Condition C, whereas a total halting of operations is referred to as Fire Restriction D. Tr. 1506 (Porter).) Although the contracting officer for these sales testified with regard to DX 118, she did not refute Mr. Porter's position that the "shutdown" which might have related to Brookbank and to a lesser extent Jersey Horse was a Hoot Owl. Tr. 4555 (Lee).

261. Mr. Porter testified that if he had projected harvesting at a time when operations would have been precluded due to a fire closure, Precision Pine would simply have moved to another sale and rescheduled operations on the sale for a period when there was sufficient rains, such as July and August. Tr. 2097 (Porter). In Northern Arizona the rainy season starts sometime in early July. Tr. 3902 (Harris).

262. No evidence was presented to show when, where or if any fire shutdown occurred on the Tonto National Forest or if any alleged shutdown coincided with a period when Precision Pine projected harvesting a sale on the Tonto that would have been subject to an alleged shutdown.

**Defendant's assertion that Precision Pine would not have harvested the breached sales during the suspension because when Precision Pine had the opportunity to harvest other sales it did not do so**

263. The original volume of sawlogs on the Hutch-Boondock sale was 4,717 ccf (2,358.50 mbf (LS)). DX 238. During the suspension, Precision Pine harvested 4,571.49 ccf (2,285 mbf (LS)), i.e., 97% of the sawlogs on the sale. PX 290, Vol. I – Hutch-Boondock sale.

264. Precision Pine went on to the Mud sale area as soon it could do so following the Forest Service's release of the sale in 1996. Tr. 974-975, PX 290, Vol. III – Mud sale. Precision Pine opened three payment units simultaneously and removed 3,473.71 ccf (1,736.86 mbf (LS)) of sawlogs in August, September and October of 1996.

265. For the Brann sale, Precision Pine harvested approximately 1,007.04 ccf (approximately 500 mbf (LS)) of sawlogs from the sale outside of the Normal Operating Season in 1996 (PX 290, Vol. I – Brann sale) at a time when Precision Pine was also harvesting large logs from the St. Joe sale. Tr. 290, Vol. III – St. Joe sale.

266. In order to obtain the most efficient and profitable operations, Precision Pine required a mix of both large and small logs at its sawmills and particularly at the Winslow sawmill where the timber from Brann and Mud was to have been sawn. Tr. 2104-05 (Porter); see also Tr. 3017 (Tenney). Since the logs on the Brann and Mud sales were, however, relatively small (Tr. 2104-05 (Porter); see also Tr. 3017(Tenney)), Precision Pine did not harvest Brann and Mud to completion during the suspension, but rather waited to finish the sale when larger timber became available. Tr. 2104-05 (Porter); see also Tr. 3017 (Tenney).

267. Mr. Ness testified that had Precision Pine harvested these sales and processed all of the small logs from Brann and Mud at the Winslow sawmill during the suspension, it would have incurred addition inefficiency and its claim for such damages would thus have been larger than it is. Tr. 2809-10, 2867 (Ness).

**PULPWOOD**

268. Seven of the breached timber sales were multi-product sales which contained both pulpwood (also known as roundwood) and sawlogs. Tr. 112 (Porter).

269. Since pulpwood was, as its name implies, suitable for the production of wood pulp from which paper is made (Tr. 111-112 (Porter)) and given that Precision Pine did not own a paper plant (Tr. 590-91 (Porter)), Precision Pine had no use for pulpwood at its sawmills. Tr. 681 (Porter).

270. Mr. Porter, Precision Pine's president, testified that:

a. The primary buyer for pulpwood in the area was Stone Container (Tr. 591 (Porter)) which had a large paper mill located at Snowflake, Arizona, which is only four miles from Precision Pine's sawmill at Heber. Tr. 681.

b. Prior to the suspension, Precision Pine sometimes sold pulpwood directly to Stone but that, given that there were times when Stone refused to purchase pulpwood directly from Precision Pine (Tr. 682 (Porter)), most of the time pulpwood was disposed of through Precision Pine's logging subcontractors. Tr. 681 (Porter).

c. Under this arrangement, the logger would harvest the pulpwood and haul it off of the sale area at its own expense and from the proceeds of the sale of the pulpwood pay Precision Pine the costs (stumpage and related costs) that Precision Pine had

to pay the Forest Service. Tr. 1015-1016 (Porter). Any profit that was derived from the transaction would belong to the logger. Tr. 1020-1022 (Porter).[23]

d. This is the arrangement that Precision Pine had with its principal logging contractor, Tri-Star Logging Co. Tr. 1020-1022 (Porter).

e. Tri-Star had long been in the pulpwood business and as over the years had developed a relationship with Stone enabling it to sell pulpwood to Stone at times when Stone would not take it directly from Precision Pine. Tr. 682-3 (Porter), accord Tr. 1719, 1722, 1742 (Reidhead).

f. There were, however, times prior to the suspension when Stone wouldn't take any pulpwood, even from Precision Pine's loggers. Tr. 683 (Porter).

g. In those instances, as necessary, Precision Pine had: (1) sought to include a C clause (C3.43; PX 297) into its Forest Service timber sale contracts allowing it to deck, but not remove, the pulpwood (Tr. 684 (Porter)) or (2) had deferred the harvesting of pulpwood. Tr. 684 (Porter).

h. Regardless of the occasional vagaries of Stone's pulpwood purchasing, over the years Precision Pine had always been able to dispose of the pulpwood on its multi-product sales either to Stone or others that utilized the pulpwood. Tr. 685 (Porter), accord Tr. 1742 (Reidhead).

271. Mr. Porter testified that if, during the suspension, Stone would not buy pulpwood that originated on Precision Pine's sales even from Tri-Star, then:

[23] For this reason, Mr. Ness testified that all of the roundwood revenue as well as the logging and hauling costs from the multi-product sales set forth on page 27 of Ex. 4 of PX 131 would have inured to Tri-Star. Tr. 2753-55, 2278-79 (Ness).

a. Precision Pine could have asked the Forest Service that it be allowed to defer the removal of pulpwood. Tr. 323 (Porter). During the suspension, Precision Pine did request the deferral of pulpwood on several of the sales that had been released from the suspension, i.e., the Mud, Hutch-Boondock, and Brann timber sales (Tr. 686, 697 (Porter)) and each such request was granted. See Tr. 688, 697-700 (Porter). Mr. Harris testified that in his in-depth review of the sales on the Coconino and Kaibab and his more cursory review of the sale files of the other breached sales, he did not see that the Forest Service ever denied a request by Precision Pine to defer harvesting pulpwood. Tr. 4504-05 (Harris). By having to return to the sale area at a later time and remove pulpwood, Precision Pine would have incurred the additional minor expense of having to redo erosion control work on the unit. Tr. 1971 (Porter).

b. Alternatively, Precision Pine could have allowed the pulpwood to be hauled to its sawmills and had it decked there pending eventual sale to Stone. Tr. 703 (Porter). This had been done at times in the past, i.e., some pulpwood had been hauled to and decked at the Eagar mill site. Tr. 703 (Porter).

c. Additionally, subject to the limitation to have no more than three uncompleted payment units open at any one time, on its multi-product sales Precision Pine could have opened and logged the three largest payment units. Tr. 702-03 (Porter).

272. Even without Forest Service permission to defer the harvesting of pulpwood or being relieved of its obligation to cut and remove the pulpwood, Precision Pine could still have

harvested in excess of 80% of the sawlog volume remaining on the breached sales. Tr. 3144-45 (Porter). (Precision Pine could have removed an even larger percentage of the sawtimber if the Forest Service had allowed it to have a fourth unit open simultaneously (Tr. 3145 (Porter)), something which Mr. Reidhead testified he was allowed to do "pretty often." Tr. 1757.)

273. Sawlog harvesting, without the removal of all corresponding pulpwood, was possible as follows:

a. The U-Bar, Jersey Horse, Hay and O.D. Ridge sales contained no pulpwood. Tr. 3130 (Porter); see PX 102. Accordingly, Precision Pine could have harvested the sawlog volume remaining on those sales, 11,150.67 mbf (LS) (11,150,670 bf) (Tr. 3134 (Porter); PX 1013), between August 1995 and December 1996, irrespective of any problems that may have existed with regard to an outlet for pulpwood. Tr. 3136 (Porter). This harvest alone would have represented 45% of the total volume of sawlogs on the breached sales at the time of the suspension. Tr. 3135.

b. For sales with fewer than three payment units remaining, Precision Pine could have removed all of the sawlogs on the sale. Tr. 3136 (Porter). Even if the Forest Service had strictly enforced the limitation to have no more than three uncompleted payment units open at any one time, Precision Pine could still have removed the sawlogs in the three largest payment units on sales that had more than the payment units remaining.

c. Accordingly, Precision Pine could have harvested the breached sales, even with no outlet for roundwood, as follows:

| | Did sale(s) require pulpwood removal | Total number of payment units remaining | Payment units that would have been harvested | Sawlog volume that would have been harvested August '95 to December '96 in mbf (LS) |
|---|---|---|---|---|
| U-Bar, Jersey Horse, Hay and O.D. Ridge | No | NA | All | 11,150.67 |
| Monument | Yes | Three or less | All | 730.5[24] |
| Saginaw-Kennedy | Yes | More than three | 3, 4, 5[25] | 744[26] |
| Mud | Yes | More than three | 2, 3, 4 | 2340 |
| Manaco | Yes | More than three | 1,[27] 2, 5, 4, 7,[28] | 1472 |
| Brookbank | Yes | More than three | 1,[29] 3, 4, 5,[30] 6[31] | 1114 |
| Salt | Yes | More than three | 2, 3, 6 | 1031 |
| Kettle | Yes | More than three | 1, 2, 3 | 1988 |

---

[24]PX 1013.

[25]The three largest payment units as stated in the contract. PX 179 at p. S-K 11.

[26] The volume in ccf on the three largest payment units as stated in the contract, PX 179 at p. S-K 11, divided by two to determine the volume in mbf (LS).

[27]This was a small unit on which Precision Pine would have removed both the sawlogs and the pulpwood. Tr. 3137-38 (Porter)

[28]A unit that had been partially harvested as of the date of the suspension. Under the circumstances, Precision Pine would have removed both the sawlogs and the pulpwood remaining on the unit. Tr. 3141 (Porter).

[29]A unit that had been partially harvested as of the date of the suspension. Under the circumstances, Precision Pine would have removed both the sawlogs and the pulpwood remaining on the unit. Tr. 3143 (Porter).

[30]This was a small unit on which Precision Pine would have removed both the sawlogs and the pulpwood. Tr. 3142 (Porter).

[31]This was a small unit on which Precision Pine would have removed both the sawlogs and the pulpwood. Tr. 3142 (Porter).

This totals 20,570.17 mbf or 82%[32] of the 25,062.99 mbf (LS) of sawlogs remaining on the breached sales at the time of the suspension.[33] Tr. 1757.

274. While Mr. Harris testified that he would have viewed an annual operating schedule that suggested that a company would open three payment units and remove only the sawlogs thereon with some concern (Tr. 4128 (Harris)), the fact is that such testimony was not elicited from any other contracting officer. This is perhaps the case because (1) such detail was not provided in annual operating schedules. (Precision Pine's annual operating schedules merely showed that they anticipated operating on certain sales at certain times. Tr. 4129 (Harris)); (2) the operating schedules did not indicate the payment units on which Precision Pine would ostensibly have operated, let alone the timber within the payment units that it anticipated removing, e.g., PX 292, Tr. 4129 (Harris)) and (3) there is nothing in the clause that requires annual operating schedules to be submitted (B(T)6.31) that also requires the Forest Service to approve the schedule. Tr. 4445-46 (Harris).

275. Mr. Harris, who conducted a review of the Forest Service's files for each of the breached sales (Tr. 4464 (Harris)), could not recall seeing any letter asking Precision Pine to update their annual operating schedule. Tr. 4207.

---

[32]This number is slightly lower than the 83.4% to which Mr. Porter testified at trial. However, that testimony was based on the erroneous assumption that Precision Pine could have harvested all of the remaining sawlogs on all five of the remaining payment units on Saginaw-Kennedy, rather than just the largest three.

[33]Precision Pine would have been able to harvest even more of the sawlogs on the breached sales if the Forest Service had permitted the opening of a fourth payment unit, something which, as Mr. Reidhead testified, it frequently allowed him to do. PPFF 272.

276. At the time Precision Pine wanted to harvest the timber on any of the breached multi-product sales there had been no outlet for pulpwood as defendant asserts, pursuant to standard Forest Service contract clause B(T)6.4, Precision Pine would have been relieved of its obligation to cut and remove the pulpwood. Tr. 706-7 (Porter).

277. Standard Forest Service contract clause B(T)6.4 states, in pertinent part, that:

> Unless otherwise specifically provided herein, Purchase shall fell trees designated for cutting and shall remove the portions which meet utilization standards, except that for occasional trees inadvertently not cut **or** trees or pieces not removed for good reason including possible damage to forest resources or gross economic impracticability at the time of removal of other timber.

See, e.g., PX 170 at JRH-36 (emphasis added).

278. In contrast, Mr. Harris testified that B(T)6.4 meant only that where, during the post-harvesting inspection of a payment unit by the Forest Service, the Forest Service found trees inadvertently not cut and/or logs inadvertently not skidded and it was grossly economically impracticable to remove them, then the clause could permit a purchaser to leave that material in the woods. Tr. 4154-56 (Harris).

279. In this regard, he gave an example of gross economic impracticability, i.e., it would be grossly economically impracticable for the purchaser to load its logging equipment and haul it back – one mile, three miles, five miles – to return to a sale area to go pick up three logs. Tr. 4509 (Harris); see also Tr. 4156 (Harris). In essence, Mr. Harris testified that the test for gross economic impracticability under the clause was whether there was a sufficient cost-benefit to removing the timber in question. See Tr. 4154-57, 4507-11 (Harris).

280. When asked if his interpretation of the clause would change if the determination of whether the removal of certain of the trees were grossly economically impracticable were required to be made before harvesting operations occurred, he testified that "I think that would be a misinterpretation of the contract provision." Tr. 4509 (Harris).

281. Mr. Harris testified that even if Precision Pine had no outlet for pulpwood, if it had suggested that B(T)6.4 relieved it of the obligation to remove roundwood from a multi-product sale he would have responded, "No, [expletive deleted] no!" Tr. 4158.

**MILLING SCHEDULE**

282. Both in preparing and recalculating its claims, Precision Pine made the overly-simplistic assumption that sawtimber on a sale would have been harvested, milled and sold in the same quarter in which it was harvested. Tr. 350 (Porter). Because Precision Pine had made this erroneous assumption, Mr. Ness in his computation of Precision Pine's damages was required to develop a different model of when milling would have taken place. Tr. 2613 (Ness).

283. Mr. Ness prepared his milling schedule on the basis that during the period from August 25, 1995 through April 15, 1997 (the period of the suspension, plus the ensuing winter) Precision Pine would have operated its mills at or near capacity because that is what Precision Pine had always done, that is the way that a company maximizes it profits and Mr. Porter confirmed that is what Precision Pine would have done. PPFF 68. As noted previously, Mr. Ness calculated that Precision Pine's anticipated production rate for the period August 25, 1995 through April 15, 1997 was 34,714 mbf (LT) per year (PPFF 69) and confirmed that Precision Pine could have operated at that level. PPFF 70.

284. Mr. Ness noted that even if, between August 1995 and April 1997, the capacity of Precision Pine's mills were a bit lower than 34,700 (LT) per year, this would not require a change in his calculations because, as he confirmed with Mr. Porter, where there is a good lumber market it is typical for mills to work extra hours or an occasional Saturday. Tr. 2528-9 (Ness).

285. Taking into account anticipated production on a sawmill-by-sawmill basis (PX 131, Ex. 7 at page 4 of 4), by quarter (PX 131, Ex. 7 at pages 1-3 (first row) and subtracting therefrom the actual quarterly production at the sawmill being analyzed (PX 131, Ex. 7 at pages 1-3 (third row), Mr. Ness determined the remaining capacity (in mbf (LT)) at that sawmill by quarter. Tr. 2247, 5606 (Ness).

286. Mr. Ness then assigned a volume of timber already harvested from one or more sales destined for a particular sawmill as a volume to be milled in the quarters when he determined that there would have been remaining capacity at the mill. He did so until the volume to be sawn in a particular quarter filled the sawmill's capacity for the quarter. Tr. 2249-50, 5606 (Ness).

287. Mr. Ness' milling schedule is based on Mr. Porter's projected harvest schedule. Tr. 2519 (Ness). Mr. Ness was, however, careful to note that his milling schedule does not depend on strict compliance with that harvest projection (Tr. 2519 (Ness)), but rather, only that the logs be harvested prior to the time when he scheduled them to be processed in the mill. Tr. 2518, 2544 (Ness).

288. As Mr. Ness testified at trial, his model was attempting to reflect the real world. Tr. 2779 (Ness). As such, he had to take as a given what Precision Pine had actually milled during the period. Id. Upon this basis, Mr. Ness calculated the remaining capacity of each sawmill in each quarter and added additional production from the breached sales to those periods when Precision Pine had production capacity available to mill it. Tr. 2780.

289. As Mr. Moosman admitted at trial, the model used in his report assumed that harvesting the sawlogs on the breached contracts, milling those sawlogs and selling the resulting lumber would all take place in the same quarter. Tr. 5054-57 (Moosman). Mr. Moosman, like Mr. Porter before him (see PPFF 282), recognized that this was not a good foundation for calculating damages as it was typically not the case at Precision Pine. Tr. 5051 (Moosman). Indeed, Mr. Moosman also admitted that if harvesting and milling would have occurred in different quarters, in order to assess profits, "the Court would have to obtain additional information on what the applicable prices would be for those products at that time." Tr. 5055 (Moosman).

290. Because Mr. Moosman's model is admittedly based on a totally faulty premise, his report is of no value whatsoever in determining the amount of profits that Precision Pine would have earned by selling the lumber from the breached sales.

**PRODUCT MIX**

291. Precision Pine manufactures the following 13 distinct lumber products:

- Moulding & Better,
- 5/4 #1 Shop,
- 5/4 #2 Shop,
- 5/4 #3 Shop,
- Para 99 Redress,
- 5/4 RWL Radius Edge,
- #2, #3, #4, & Better,
- #3 Common Utility,
- #4 Common Economy
- #5 Common, Rough,
- Timbers,
- Shop Out

Tr. 363, 357-58 (Porter).

292. Each of the breached sales would have yielded different percentages of each of the lumber products that Precision Pine manufactures (i.e., different "product mixes"). Tr. 363 (Porter).

293. A product mix is a set of lumber products that can be manufactured from a given set of logs. Tr. 4278 (Munn). Because different lumber products have different selling prices, determining a product mix is essential for determining the profits that would be made on the lumber produced from a timber sale. Tr. 4278 (Munn).

294. The percentage of given products manufactured from Ponderosa Pine timber on a sale is influenced by, among other things, the average dbh of the timber. Tr. 364 (Porter). Moreover, the distance up to the first limb of the tree makes a big difference in what kind of products you

can produce. Tr. 364 (Porter). That is, the higher up the first limb is on a tree the more of the high grade material you're going to get out of the logs. Tr. 364 (Porter).

295. Precision Pine didn't keep records that tracked logs through the sawmills on a sale-by-sale basis, however, Ponderosa Pine logs awaiting processing were kept in separate decks by sale and Precision Pine would frequently run logs from only one sale through the sawmill at any given time, Tr. 368 (Porter).

296. The prospectuses for the sales state that: "**Bidders are urged to examine the timber sale and make their own estimates**. . . . Inspect the sale area and the sample contract before submitting a bid." See, e.g., PX 188 at p. 1 (Prospectus for the Manaco timber sale contract). This position is further amplified in the standard forms for bidding on Forest Service timber sale contracts which provide:

> **DISCLAIMER OF ESTIMATES AND BIDDER'S WARRANTY OF INSPECTION**: BEFORE SUBMITTING THIS BID, BIDDER IS ADVISED AND CAUTIONED TO INSPECT THE SALE AREA, REVIEW THE REQUIREMENTS OF THE SAMPLE TIMBER SALE CONTRACT, AND TAKE SUCH OTHER STEPS AS MAY BE REASONABLY NECESSARY TO ASCERTAIN THE LOCATION, ESTIMATED VOLUMES, CONSTRUCTION ESTIMATES, AND OPERATING COSTS OF THE OFFERED TIMBER. FAILURE TO DO SO WILL NOT RELIEVE BIDDERS FROM RESPONSIBILITY FOR COMPLETING THE CONTRACT.
>
> BIDDER/PURCHASER WARRANTS THAT THIS BID/OFFER IS SUBMITTED SOLELY ON THE BASIS OF ITS EXAMINATION AND INSPECTION OF THE QUALITY AND QUANTITY OF THE TIMBER OFFERED FOR SALE AND IS BASED SOLELY ON ITS OPINION OF THE VALUE THEREOF AND ITS COSTS OF RECOVERY, WITHOUT ANY RELIANCE ON FOREST SERVICE ESTIMATES OF TIMBER QUALITY, QUANTITY OR COSTS OF RECOVERY. BIDDER FURTHER ACKNOWLEGES THAT THE FOREST SERVICE: (I) EXPRESSLY DISCLAIMS ANY WARRANTY OF FITNESS OF TIMBER FOR ANY

> PURPOSE; (II) OFFERS THIS TIMBER AS IT WITHOUT ANY WARRANTY OF QUALITY (MERCHANTABILITY) OR QUANTITY AND; (III) EXPRESSLY DISCLAIMS ANY WARRANY AS TO THE QUANTITY OR QUALITY OF TIMBER SOLD EXCEPT AS MAY BE EXPRESSLY WARRANTED IN THE SAMPLE CONTRACT.
>
> BIDDER/PURCHASER FURTHER HOLDS FOREST SERVICE HARMLESS FOR ANY ERROR, MISTAKE, OR NEGLIGENCE REGARDING ESTIMATES EXCEPT AS EXPRESSLY WARRANTED AGAINST IN THE SAMPLE CONTRACT.

PX 44 at p. 3.

297. In light of such language in the bid documents, Mr. Porter always personally assessed the timber before he bid on it, including the timber on the sales at issue in this case. Tr. 127, 365 (Porter).

298. When doing so, based on his experience, Mr. Porter made a determination of what percentage of each lumber product Precision Pine would get from the trees. Tr. 365 (Porter).

299. For those sales that had been partially harvested prior to the suspension, Mr. Porter also: observed the logs as they were being sawn at the sawmill and the resulting lumber as it was graded at which time he also talked to the sawyer and the graderman about the kind of lumber that was being produced from the timber. Tr. 367-68, 371-2 (Porter). As a result, Mr. Porter had a good idea of what was being produced from those sales. Tr. 366-7 (Porter).

300. Each log removed from a timber sale was hammerbranded, i.e., whacked at both ends with a four pound hammer containing a sale-specific letter and number combination. Tr. 369 (Porter).

301. These hammerbrands were still visible as logs came through the sawmill. Tr. 370 (Porter). For upper grade lumber, hammerbrands were still be visible on the ends of some boards even after the lumber was planed which allowed Mr. Porter to look at finished lumber to see from what sale the lumber had come. Tr. 370-71 (Porter).

302. Mr. Porter was in each of his sawmills once a week, if not more often and was in at least one of the three sawmills each day. Tr. 373-74 (Porter).

303. He used the information he obtained at the mills, planners and inventory yard to confirm the belief he had from his pre-bid analysis of how a sale was going to cut out. Tr. 370-72 (Porter).

304. Mr. Porter determined time periods when timber from a particular sale would have been run through the sawmill. Tr. 375 (Porter). He also went back to the TSSAs and verified that harvesting operations had taken place on the sales before the logs ran through the mill. Tr. 389-90 (Porter).

305. For those sales that had been harvested in part and run through the sawmill, Mr. Porter also used the Winslow Sales Journal, PX 294, which shows volume of Ponderosa Pine lumber

sold by product (Tr. 394) as a verification of what he had seen in the sawmill. Tr. 366, 374 (Porter). Prior to this case, although Mr. Porter had referred to the sales journal in connection with determining the product mix on contracts other than the ones in litigation that Precision Pine had milled, he had never used the sales journal as the starting point for determining product mix and didn't do so in this case either. Tr. 1309-10 (Porter).

306. He was able to determine product mix in conjunction with the sales journal for the St. Joe, U-Bar, Hutch-Boondock, Mud, Brookbank and Brann timber sales. Tr. 384 (Porter).

307. Using this process, Mr. Porter further confirmed his pre-bid estimate as to how the sale would cut out. Tr. 374 (Porter).

308. Mr. Porter used the Winslow sales journal rather than sawmill production records to do this because the production records did not classify output into all of the different grades of lumber sold by Precision Pine. Tr. 390 (Porter).

309. Using this process for purposes of obtaining product percentages, Mr. Porter attributed the May and June 1995 sales of Ponderosa Pine products from the Winslow Sales Journal to the St. Joe. Tr. beginning at 401.

310. Mr. Porter then totaled the production for these two months totaled the production by product and divided each product total by the total of all Ponderosa Pine production for the two

months. Tr. 403-04 (Porter). This process resulted in the following product percentages for St. Joe:

| Grade | Total Volume Produced May 1995 as Set Out in the Winslow Sales Journal (in bf) (PX 294) | Total Volume Produced June 1995 as Set Out in the Winslow Sales Journal (in bf) (PX 294) | Total Volume Produced May and June 1995 as Set Out in the Winslow Sales Journal (in bf) (PX 294) | % of Total Volume Produced May and June 1995 |
|---|---|---|---|---|
| **Moulding & Better** | 142,690 | 133,976 | 276,666 | **6.97%** |
| **5/4 #1 Shop** | 19,366 | 19,177 | 38,543 | **0.97%** |
| **5/4 #2 Shop** | 227,797 | 242,507 | 470,304 | **11.85%** |
| **5/4 #3 Shop** | 544,714 | 593,948 | 1,138,662 | **28.70%** |
| **Para 99 Redress** | 323,979 | 321,346 | 645,325 | **16.26%** |
| **5/4 RWL Radius Edge** | 52,132 | 114,220 | 166,352 | **4.19%** |
| **#2, #3, #4 & Better** | 127,969 | 85,563 | 213,532 | **5.38%** |
| **#3 Common Utility** | 27,996 | 159,472 | 187,468 | **4.72%** |
| **#4 Common Economy** | 29,846 | 220,156 | 250,002 | **6.30%** |
| **#5 Common** | 0 | 0 | 0 | **0.00%** |
| **Rough** | 49,625 | 83,934 | 133,559 | **3.37%** |
| **Timbers** | 28,724 | 222,470 | 251,194 | **6.33%** |
| **Shop Outs** | 105,004 | 91,538 | 196,542 | **4.95%** |
| **TOTAL** | 1,679,342 | 2,288,307 | 3,967,649 | **100%** |

311. Mr. Porter then used the St. Joe product percentages for O.D. Ridge, a sale on which harvesting had not occurred. He did this based on the similarity of O.D Ridge and St. Joe in average diameter and grade percentage. Tr. 405 (Porter).

312. Using the same procedure as he had used for St. Joe, Mr. Porter isolated Ponderosa Pine production from U-Bar in January and February 1994. Tr. 407 (Porter).

313. The product percentages that he obtained in this way were in-line with what he expected from the U-Bar sale. Tr. 407-08 (Porter).

314. As he had done with St. Joe and O.D. Ridge, Mr. Porter used U-Bar product percentages to determine product percentages for Ponderosa Pine lumber from Hay on the basis of similarities in average diameters and percentage of grade on the sales. Tr. 408-09 (Porter).

315. Mr. Porter also used U-Bar product percentages to determine the product percentages for Jersey Horse. Tr. 410 (Porter). Again, this was done on the basis of the relatively similar average diameters and percentage grade on the two sales. Tr. 411 (Porter).

316. Mr. Porter used production from September and October 1996 to determine the product mix on Mud (Tr. 411 (Porter)) and production from July and August 1995 to determine the product mix on Brookbank. Tr. 413 (Porter). In each case, the product percentages that Mr. Porter obtained were in-line with what he expected from the sales. Tr. 412-13 (Porter) (Mud), Tr. 414 (Porter) (Brookbank).

317. Mr. Porter used the Brookbank product percentages (with adjustments upward) for Saginaw-Kennedy. Tr. 414 (Porter). He did this because, notwithstanding the Forest Service's figures which indicated that the timber on Brookbank had an average dbh of 12.6" and an

average percent grade of 22.9% (PX 4) and that the timber on Saginaw-Kennedy had an average dbh of 11.6" and an average percent grade of .6% (PX 11), he believed, based on his observations, that the quality of the timber on Saginaw-Kennedy was, in fact, better than that on Brookbank. Tr. 414-5, 1367 (Porter). He reached this conclusion by examining all of the timber on the two sales, not just the sample examined by the Forest Service in its cruise, and by taking into account all relevant factors relating to determining the percent of upper lumber grade material present in the trees (not just if there is a clear face on the first 16' log of a tree as was done by the Forest Service). Tr. 5529-31 (Porter). Moreover, as he testified, there is no fixed relationship between the percentage of clear faces and the amount of high grade lumber products obtainable. Tr. 1365.

318. Mr. Porter used Saginaw-Kennedy product percentages for Manaco, Salt and Kettle. Tr. 415 (Porter).

319. He also used Saginaw-Kennedy product percentages with some downward adjustments to determine the product mix for the Monument sale. Tr. 420 (Porter).

320. Mr. Porter provided the product percentage figures he determined to Mr. Ness. Tr. 424 (Porter). These product percentages are reflected in Mr. Ness' damage calculation in the column entitled "Grade Breakdown" on each of the fourteen pages of Ex. 6 of his report, PX 131.

321. Mr. Porter based product percentages for that portion of the Douglas-fir volume remaining on the sales as of the date of breach on his experience with producing Douglas-fir lumber over the years. Tr. 430. Based on that experience he estimated that:

a. 85% of the Douglas-fir lumber that would have been produced would have been #2 and better;

b. 10% would have been #3; and

c. 5% would have been #4.

Tr. 430 (Porter).

322. Mr. Porter was forced to estimate Douglas-fir product percentages based on his experience because there was little Douglas-fir lumber production and no record of it at any relevant time period. Tr. 430 (Porter).

323. For the small amount of Spruce lumber that would have been produced from the breached sales, Mr. Porter estimated that, based on past production experience of Precision Pine, 30% would have been cut into1 x 4s and 70% would been cut into 1 x 6s. Tr. 431 (Porter). Of this Spruce production, 10% would have been #2 and better grade, 65% would have been #3 and 25% would have been #4. Tr. 432 (Porter).

324. Again, Mr. Porter was forced to estimate Spruce product percentages because there were no records of Spruce lumber sales for any relevant period. Tr. 433 (Porter).

325. The product mix figures that Mr. Porter provided to Mr. Ness for Douglas-fir and Spruce are set forth in the lumber sale analysis that Mr. Ness did with regard to sales that contained either or both of these species. See, e.g., PX 131, Ex. 6 at p. 13 (anticipated lumber sales for the O.D. Ridge sale).

326. In an attempt to prove his thesis that Precision Pine's overall product mix for the breached sales was inflated, Dr. Munn took Mr. Porter's product mix for each sale and came up with an average. Tr. 4343 (Munn); DX 775, Ex. 1.

327. Although Dr. Munn did a simple average, he testified that had he had a definitive statement of the volume remaining on each sale at the time of the suspension he would have done a weighted average. Tr. 4344-5 (Munn). Such a weighted average was done by Mr. Ness and is set forth in the right-hand column on page 1 of PX 288.

328. Dr. Munn did not, however, compare the average that he computed of Precision Pine's per sale product mixes (or the product mix information set forth in the right-hand column on page 1 of PX 288) to any Precision Pine's historical product mix. Tr. 4368 (Munn). When asked during cross-examination, "Wouldn't doing so have made sense?," he responded that he did not have Precision Pine's pervious production records. Tr. 4368 (Munn). Of course, he also admitted that he never asked for them either. Id.

329. Both the average product mix and the weighted average of products that Precision Pine determined it would have obtained from the sales in issue are quite close, and a bit less rich than

both the product mix that Precision Pine had actually achieved in the 13 months preceding the suspension and the product mix it achieved for the fiscal year ending 3/31/95. See Tr. 5533 (Porter). As Mr. Ness testified, the product mix that Precision Pine actually achieved for the fiscal year ending 3/31/95, as set forth in the Winslow Sales Journal, "compared favorably" to the product mix that Precision Pine anticipated producing from the sawlogs on the breached sales. Tr. 2332-3 (Ness).

| **Grade** | **PP's Production % as Set Out in Dr. Munn's Report (DX 775 Ex. 1)** | **Production % Projected by Lon Porter for Breached Sales (PX 288)** | **PP's Actual Production % July 1, 1994 – July 31, 1995 (PX 289)** | **PP's Actual Production % as Set Out in the Winslow Sales Journal FYE 3/31/95 (PX 294)** |
|---|---|---|---|---|
| **Moulding & Better** | 4.6% | **4.35%** | 5.16% | 5.3% |
| **5/4 #1 Shop** | 1.3% | **1.52%** | 0.88% | 1.0% |
| **5/4 #2 Shop** | 7.6% | **7.32%** | 8.02% | 7.7% |
| **5/4 #3 Shop** | 21.3% | **20.69%** | 22.45% | 21.9% |
| **Para 99 Redress** | 14.2% | **13.51%** | 11.28% | 10.8% |
| **5/4 RWL Radius Edge** | 16.1% | **16.86%** | 10.37% | 12.2% |
| **#2, #3, #4 & Better** | 8.9% | **8.55%** | 9.27% | 10.1% |
| **#3 Common Utility** | 6.3% | **6.86%** | 9.93% | 11.2% |
| **#4 Common Economy** | 8.1% | **7.62%** | 7.02% | 4.9% |
| **#5 Common** | 0.1% | **0.23%** | 0.25% | 0.3% |
| **Rough** | 2.9% | **2.84%** | 2.67% | 2.9% |
| **Timbers** | 2.3% | **2.48%** | 3.95% | 2.3% |
| **Shop Outs** | 6.4% | **7.18%** | 8.77% | 9.5% |

330. Mr. Ness also compared Precision Pine's projected product mix with the product mix set forth in the Winslow Sales Journal for FYE 3/31/94 and didn't see anything significantly

different, i.e., the product percentages for FYE 3/31/94 and for the breached sales were relatively close. Tr. 2341-42.

331. Mr. Ness asked Mr. Porter about the quality of the logs that had been milled in the FYE 3/31/94 and FYE 3/31/95 and was advised that they were relatively similar in quality to the logs on the breached sales. Tr. 2342 (Ness).

332. Although the timber harvested in FYE 3/31/95 contained timber from four of the better sales that the Forest Service breached on August 25, 1995, the volume of timber harvested on those sales in 1995 represented only a very small percentage of the total that Precision Pine harvested that year. Tr. 5599-5601 (Porter). Precision Pine harvested many other contracts having a wide variety of average diameters in that period. Tr. 5601 (Porter). Indeed, as Mr. Porter testified without being controverted, the timber milled in the year or so before the suspension was not of an appreciably better quality than that on the breached sales. Tr. 5534 (Porter).

333. Rather than compare the product mix that Precision Pine would have obtained from the sales in issue with Precision Pine's historical production, Dr. Munn instead compared it to WWPA's reported mix for all Ponderosa Pine products sold in its Rocky Mountain region. Tr. 4316 (Munn). That product mix, used by WWPA to compute its monthly index prices throughout the suspension period, is set forth in PX 62.[34] As Dr. Munn noted there were some

[34] In fact, WWPA monthly index prices were computed on the 1992-93 basis before, during and after the suspension. See PX 305 which indicates that index prices for at least 1993

products in Precision Pine's product mix that were not on the WWPA product mix and vice versa. Tr. 4316 (Munn).

334. Mr. Devere testified that comparing the product mix of a sawmill located in Arizona or New Mexico with the product mix used by WWPA for the entire Inland Rocky Mountain Region would be like comparing apples and oranges because: (1) in the northern end of WWPA Inland Region, products are produced that are not produced in Arizona and New Mexico (Tr. 1225 (Devere)) and (2) more high grade products, i.e., moulding and shop, is produced in the southwest than in the northern parts of the WWPA Inland Region. Tr.1240 (Devere).

335. As indicated by the map contained in PX 62, the WWPA Inland Rocky Mountain Region is composed of the states of Montana, Wyoming, Utah, Colorado, Arizona and New Mexico in their entirety, plus the eastern portion of Idaho, the western portion of South Dakota.

336. Dr. Munn admitted that growing conditions were not uniform throughout the Inland Rocky Mountain Region. Tr. 4348 (Munn).

337. Given this large region and the different geographies and growing conditions that it encompasses, the WWPA itself indicates that "Grade recovery by individual mills may vary considerably from [those set forth on PX 62 -- the product percentages it used to formulate index prices for Ponderosa Pine in the Inland Rocky Mountain Region]." PX 62.

---

through 1999 were computed on the (1992-93 basis). The last page of PX 302 indicates that effective in 2000, WWPA started computing its index on a new basis, i.e., the one for 1997-98.

338. This very point was echoed by Dr. Neuberger, defendant's economic expert, who testified that he was sure that there were probably regional differences within the entire Rocky Mountain Region and that market for Ponderosa Pine lumber products probably wasn't as broad as the entire Inland Rocky Mountain Region that the WWPA covers. Tr. 3607 (Neuberger).

339. Dr. Munn testified that, given these facts, he expected that Precision Pine's product mix would be better than the average for all of WWPA's Rocky Mountain Region. Tr. 4351-2 (Munn). As he stated, he had investigated enough to understand that the particular area in which the breached sales were located, i.e., the Mogollon Rim, was a particularly good region for growing timber. Id. Nevertheless, he questioned the veracity of Precision Pine's anticipated product mix because it was so much better than the WWPA product mix. Tr. 4316-17 (Munn).

340. Notwithstanding Dr. Munn's "investigation" into the quality of the timber on the Mogollon Rim and the lumber produced there as part of his work in this case, he had virtually no professional experience with Ponderosa Pine timber and/or Ponderosa Pine lumber products;[35]

---

[35]Except for a summer job that he had in Oregon in 1979 (Tr. 4234 (Munn)), Dr. Munn, a professor from Mississippi State, admitted that his experience dealt with species that grow in the south and not Ponderosa Pine, i.e.,

- His dissertation dealt with timber in North Carolina, a state where Ponderosa Pine does not grow. Tr. 4249-50 (Munn).
- None of the work set out on this Curriculum Vitae dealt with Ponderosa Pine. See Tr. 4257-4265 (Munn).
- Of his 20 referenced publications, none dealt with the production of Ponderosa Pine lumber in the southwest. Tr. 4266-7 (Munn).
- Of the 49 proceedings and symposia in which he has participated, none dealt with the production of Ponderosa Pine lumber in the southwest. Tr.4267 (Munn).
- Of his 5 other publications, none dealt with the production of Ponderosa Pine lumber in the southwest. Tr. 4268 (Munn).

prior to trial he didn't even know were the Mogollon Rim was and the basis for his opinion as to the quality of timber in Arizona was a week-long tour he took several years ago during which a few days were spent in Arizona. Tr. 4269-71 (Munn).

341. Dr. Munn accused Precision Pine of high-grading in the initial months of operations on its sales, something which ostensibly increased the product mix then applied to other non-harvested sales. DX 775, p. 8. However, on cross-examination, he admitted that:

a. The evidence that he relied on to reach this conclusion came from preliminary drafts of the initial report of defendant's disqualified "expert," Mr. Adkins. Tr. 4360 (Munn).

b. He had also had some discussions on the subject with Dave Harris who had simply indicated a belief that Precision Pine had engaged in high-grading. Tr. 4409-10 (Munn).

More importantly, he testified that, notwithstanding the definitive statement on the subject in his report, he, in fact, has no expert opinion as to whether or not Precision Pine engaged in high-grading on any of the breached sales. Tr. 4361, 4440 (Munn).

342. Defendant also elicited testimony from Mr. Maurer, a Forest Service employee who claimed familiarity with the harvesting on the Brookbank sale in the summer of 1995 even though he had no official role in administering that sale and only visited the sale area once or twice a month. Tr. 4733-34 (Maurer).

---

- Of the 29 or 30 grants and awards he's received, none dealt with the production of Ponderosa Pine lumber in the southwest. Tr. 4268 (Munn).

343. Mr. Maurer testified that:

a. During the first two months of harvesting on the sale (which, based on the TSSA, PX 290, Vol. 1, Supporting statements Nos. 3 & 4; Tr. 5538 (Porter) was June and July of 1995), Precision Pine engaged in high-grading. Tr. 4730 (Maurer).

b. More specifically, during the first two months of harvesting on the sale Precision Pine was taking out the larger sawlogs, i.e., 16" and greater and was leaving the smaller sawlogs, i.e., the majority. Tr. 4727-28 (Maurer).

c. The sawlogs that Precision Pine removed in the first two months of harvesting were not representative of the sawtimber on the sale as a whole. Tr. 4729 (Maurer).

d. His visits would include going out with the sale administrator at which time they would go to areas that had been logged. Tr. 4747 (Maurer).

e. He revisited the sale area after Precision Pine left the sale (which would have been shortly after the suspension was imposed on August 25, 1995, PX 119-124), and saw that Precision Pine had removed the large diameter trees that had been marked but that there were quite a few small trees, i.e., those having a diameter of less than 16" and quite a bit of pulpwood left. Tr. 4730 (Maurer).

344. Despite Mr. Maurer's specific testimony, the objective facts surrounding the Brookbank sale are that:

a. The Brookbank timber sale contract was awarded to Precision Pine on April 13, 1995, PX 172, p. BRB 1.

b. The TSSAs for the Brookbank sale indicated that:

i. The first payment unit that Precision Pine opened on the sale was Unit 5 which it opened in May of 1995. PX 290, Vol.1; Tr. 5538 (Porter).

ii. The estimated volume of sawlogs on Payment Unit No.5, as stated in the contract, was 554 ccf. PX 179, p. BRB 6.

iii. All 554 ccf of sawlogs on Payment Unit 5 had been removed from the sale in June and July. See PX 290, Vol. I, p. 4 of Supporting Statement No. 4 for Brookbank; Tr. 5538-39 (Porter).

As such, the record clearly belies Mr. Maurer's testimony that during the first two months of harvesting on the sale Precision Pine was taking out the larger sawlogs and leaving the smaller ones which constituted the majority of them.

345. The TSSAs for the Brookbank sale further indicated that Precision Pine also removed all sawlogs on Payment Unit 6. Unit 6, which was opened in late May or early June 1995 (see PX 290, Vol. 1; Tr. 5539-40 (Porter)), had an estimated sawlog volume of 899 ccf. PX 179, p. BRB-6. The TSSAs for the sale again indicate that all 899 ccf was harvested on that unit in July and August 1995. PX 290, Vol. I, p. 4 of Supporting Statement No. 4 for Brookbank July 1995; p. 2 of Supporting Statement No. 5 for Brookbank August 1995; Tr. 5539 (Porter).

346. The TSSAs for Brookbank also indicates that during the period of operations prior to the suspension, i.e., June, July and August 1995, Precision Pine removed a total of 1681.71 ccf of sawlogs and 645.20 ccf of pulpwood. Page 2 of Supporting Statement No. 5 for Brookbank August 1995, PX 290.

347. Mr. Panks, the Forest Service's timber sale administrator on the Mud timber sale contract (Tr. 4681-82 (Panks), testified (1) that "They removed all the sawtimber" (Tr. 4683-84 (Panks)); (2) in 1995 Mr. Dils, the Forest Service's contracting officer on the Coconino National Forest, presented an award from the Society of American Foresters, in which he concurred, to the owners of Precision Pine, Messrs Porter and Tenney, for distinguished professional forest resource management (Tr. 4640 (Dils)); (3) no such similar accusations of high-grading were made by anyone officially assigned to the Brookbank sale including Ms. Lee, the contracting officer for the Brookbank sale, who further testified that in her review of the files for the breached sales on the Apache-Sitgreaves she did not recall coming across any letter to Precision Pine advising it that its harvesting operations were not being accomplished in a workmanlike and orderly manner (Tr. 4579 (Lee)); and (4) Mr. Harris similarly testified that he had never sent a letter to Precision Pine advising it that its harvesting operation were not being accomplished in a workmanlike and orderly manner and that in his in-depth review of the files of the breached sales on the Kaibab and Coconino and review of the files of the breached sales on the other forests, he did not recall seeing any such letter on any other sale. Tr. 4203-5 (Harris).

348. Mr. Reidhead, President of Tri-Star Logging, Precision Pine's principal logging subcontractor, testified that he had never been directed by Precision Pine either to engage in high-grading or even to move into better quality units first and that usually weather or soil conditions were more of a factor as to what timber was harvested. Tr. 1750-51 (Reidhead).

349. In sum, defendant presented no credible evidence that Precision Pine engaged in high-grading on any sale and thus inflated its product mixes as a result.

350. Dr. Neuberger professed at trial that he did not have an expert opinion as to whether or not Precision Pine's product mixes are reasonable. Tr. 3550 (Neuberger). However, his testimony with regard to page 21 of DX 1006; Tr. 3391-96 (Neuberger), see Tr. 3327 (identifying DX 1006), attempts to suggest that the lumber that Precision Pine produced in the 2nd quarter of 1998 was of lower quality than what Mr. Porter had projected would have been produced from the timber on the Manaco and Brookbank timber sales. Tr. 5535 (Porter).[36] Dr. Neuberger did not, however, review any records to try to determine why this was the case, and thus had no opinion as to what was happening with regard to products being produced and sold by Precision Pine in the 2nd quarter of 1998. Tr. 3551-2 (Neuberger).

351. Had Dr. Neuberger done such an investigation, he would have learned that, contrary to his assumption that all of the lumber sold in the 2nd quarter of 1998 was produced from timber from the Manaco and Brookbank sales, see p. 21 of DX 1006; in fact, based on Mr. Porter's confirmation of the records, 49% of the timber that Precision Pine sawed into lumber that quarter came from salvage sales (i.e., the Kendrick fire salvage and the Highway salvage). Tr. 5536 (Porter). Much of this timber had been burned in a forest fire two years earlier and contained virtually no upper grade material from which quality lumber products such as moulding and No. 1 and No. 2 Shop can be produced. Tr. 5536-37 (Porter). As Mr. Porter testified, this would be a basis for explaining why the percentage of quality lumber products such as moulding, shop, etc. would have been low in the 2nd quarter of 1998. Tr. 5537 (Porter).

[36]This chart was the subject of a strong objection from plaintiff as to its admissibility because it was not referenced or contained in Dr. Neuberger's supplemental report, DX 796; Tr. 3386-90 (Goeken). As the Court stated, rather than take up time at trial arguing the subject it would welcome briefing on the point. Tr. 3390.

**DEFENDANT'S APPROACH TO LUMBER PRICING**

352. Mr. Moosman's attempt at an analysis of lumber product prices used two single-page summaries of lumber revenue from the Winslow Sales Journal by lumber product by month, i.e., one for the FYE 3/31/96 (*i.e.*, Attachment 9b1 to DX 577) and the other for the FYE 3/31/97 (Attachment 9d1) and divided the figures thereon by the volumes set forth on two other summary sheets (Attachments 9b2 and 9d2, respectively) from the sales journal indicating that volume of each lumber produced by month. Tr. 5001 (Moosman).

353. Although Mr. Moosman agreed that it is "standard auditing procedure" to try to test a summary document before using it, he did not test the contents of the summary documents he relied on from the Winslow Sales Journal to determine product pricing. Tr. 5090 (Moosman). These untested four pages constitute the sum total of Mr. Moosman's product pricing data for all species of all lumber products during the entire 16-month suspension period. Tr. 5001 (Moosman).

354. Mr. Moosman acknowledged that his methodology of using the summaries to determine pricing arrived at results which "surprised" him, such as the price for No. 2 Shop being considerably higher than the price for No. 1 Shop, which is a more valuable lumber product. Tr. 5067-68 (Moosman).

355. Despite his surprise at this (clearly incorrect) result, Mr. Moosman did not try to do a reality check on his calculations and simply continued to rely on his approach to using a few pages of the sales journal. Tr. 5068-69 (Moosman).

356. Indeed, when it was suggested to Mr. Moosman that he could have gone to Precision Pine's invoices to do a reality check on his calculations, he admitted that he initially started trying to calculate a weighted average of lumber products from the invoices but that he didn't have the expertise to determine in which categories some of those products set out on the invoices belonged. Tr. 5069 (Moosman).

357. Mr. Moosman further conceded that he had improperly included 4/4 Shop lumber in four of his eight lumber product categories. Tr. 5083. In Mr. Moosman's opinion offered at trial, 4/4 Shop lumber does not belong with the shop products, i.e., No. 1 Shop, No. 2 Shop or No. 3 Shop, but rather should only have been categorized with the common and dimension lumber products category he used. Tr. 5083-84. By so testifying, Mr. Moosman has endorsed the approach taken by Precision Pine, which removed 4/4 products when calculating an average price for the Shop grades of lumber products. PPFF 95. Moreover, had Precision Pine included the 4/4 Shop products among the less valuable common and dimension lumber products, Precision Pine would have increased prices for common and dimension lumber products as well as its overall claim for lost profits.

358. In addition to improperly including 4/4 products in the normal shop categories, Mr. Moosman also admitted that "it appeared" based on the wide disparity between prices for "rough" lumber and "timbers" that his decision to put those lumber products in the same category had been incorrect and that he also could have made similar mistakes in combining lumber products when going from 13 lumber products on the sales journal to the eight lumber categories of lumber products he ultimately used. Tr. 5117-18 (Moosman).

359. As part of his determination of lumber product pricing, Mr. Moosman went on to condensed the 13 lumber products actually produced by Precision Pine into eight lumber product categories. Tr. 5070-5071 (Moosman).

360. Because Mr. Moosman realized that he did not have the expertise to do this, he asked "some Forest Service people that were in timber" to help him. Tr. 5069-71 (Moosman). However, the result, in Mr. Moosman's own words, was little more than a guess:

> We all admitted that it was our best attempt at it, or they [the FS employees] admitted that it was their best attempt at it, and so that was the method. They did not claim to be real knowledgeable.

Tr. 5070-71 (Moosman).

361. Despite the fact Precision Pine had identified and claimed damages associated with six different Douglas-fir lumber products it actually produced, Mr. Moosman created a single product category for Douglas-fir which he dubbed "4/4 Shop, common and dimension." Tr. 5097 (Moosman). Mr. Moosman admitted that he did not know if any 4/4 Shop would have been made from Douglas-fir logs (Tr. 5093 (Moosman)) and he just "assumed" that Precision Pine's Douglas-fir lumber products matched up with four lumber products on the sales journal Tr. 5106-07 (Moosman). In doing so: (1) he did not know whether this assumption was accurate (Tr. 5098-99 (Moosman)), (2) he did not make any attempt to separate out Douglas-fir products or pricing in the sales journal (Tr. 5100 (Moosman)), nor (3) did he even know if Douglas-fir lumber products were included in Precision Pine's sales journal. Tr. at 5100 (Moosman). Furthermore, he had no idea whether Ponderosa Pine and Douglas-fir lumber products sold for the same price. Tr. 5108 (Moosman).

362. Moreover, Mr. Moosman's report does not explain how he performed his calculations to determine Douglas-fir pricing. Tr. 5114 (Moosman).

363. Mr. Moosman used the same "methodology" to determine prices for Spruce product pricing, which again he did not attempt to explain anywhere in his report. Tr. 5115-16 (Moosman).

**LOST VOLUME SELLER**

364. Mr. Porter testified that for many years Precision Pine was a regular purchaser of substantial quantities of Ponderosa Pine timber. Tr. 632 (Porter).

365. Precision Pine, which owned very little timber land (Tr. 214 (Porter)), was required to buy timber from outside sources on a relatively constant basis in order to keep its mills operating at the rate that was desired. See Tr. 630-32, 1089 (Porter). In each of the two fiscal years prior to the suspension, Precision Pine used a sufficient amount of timber to produce in excess of 30,000 mbf (LT) each year (PPFF 70), i.e., it consumed approximately 24,000 mbf (LS) of timber each year. Tr. 630 (Porter).

366. Because of the suspension, at the time that the suspension was lifted in December 1996, Precision Pine had a significant amount of timber under contract. See Tr. 632-63 (Porter).

367. During the period of the suspension the Forest Service's timber sale program came to a virtual halt. Tr. 1289 (Porter); see PX 304.

368. If, however, there had been no suspension of harvesting on existing contracts but the Forest Service had not sold timber between August 25, 1995 and December 4, 1996, then by December of 1996 Precision Pine would have harvested all of the timber that it had and by April 1997 it would have manufactured all of that timber into lumber. Tr. 660-62 (Porter).

369. Had Precision Pine been able to harvest the timber on the breached sales during the suspension period, Precision Pine would have tried harder to buy sales offered by the Forest Service in late 1996 and 1997. Tr. 2105, 661 (Porter). Moreover, in the absence of any suspension, having made substantial profits in 1995, 1996 and early 1997 on the sale of the lumber from the 11 breached sales, in December of 1996 and in 1997 Precision Pine would have had considerable money available to buy timber from the Forest Service. Tr. 663-4 (Porter).

370. A substantial volume of sawtimber (i.e., 56,871 mbf (LS)) was available from the Forest Service in late 1996 and in 1997. Tr. 663 (Porter); PX 304. Between December 6 and December 31, 1996 the four forests on which Precision Pine normally operated offered 8,502 mbf (LS) of sawtimber for bid and during calendar year 1997 offered an additional 48,369 mbf (LS). PX 304. Thus, the total volume of timber offered by the Forest Service between December 6, 1996 and December 31, 1997 was 56,872 mbf (LS). An additional 36,440 mbf (LS) of saw timber was offered for sale by the Forest Service in 1998. Id.

371. Given the availability of Forest Service timber again after December 1996, plus the availability of some timber from the State of Arizona and the Hualapai tribe (Tr. 664 (Porter)) in the absence of the suspension, it would not have been difficult for Precision Pine to have purchased 25,000 mbf (LS) of sawlogs (a volume equal to that which remained on the 11 breached sales) between December of 1996 and the spring of 1998.

372. 25,000 mbf (LS) represented approximately a 10.5-month supply of timber for Precision Pine's mills. PPFF 25. Because the volume on the breached sales plus what other timber

Precision Pine had or obtained during the suspension would roughly have carried Precision Pine's mills through April 15, 1997 (see Ex. 7 of PX 131), an additional 25,000 mbf (LS) would have sustained Precision Pine's sawmills until March 1998. See Tr. 664 (Porter).

373. Notwithstanding the fact that it still had a substantial amount of timber remaining on the breached sales under contract, during 1997 Precision Pine actually purchased six new timber sales from the Forest Service, the state of Arizona and Indian tribes (Tr. 672-6 (Porter)), i.e., the Reneke, Highway, Navajo, Slate, Pot and Side timber sales. PX 248. Compare Precision Pine's income statement for FYE 3/31/97 with the income statement for FYE 3/31//98.

**INCREASED HAULING COSTS**

374. The Forest Service takes into account the cost of hauling sawlogs to a nearby sawmill in establishing the minimum acceptable bid price for the sawlogs on all of its timber sales. See, e.g., PX 1-17, line item re: haul cost.

375. If the sawmill to which the Forest Service had appraised the timber did not also have a planer, the Forest Service would make an additional allowance to account for the increased cost of hauling the green lumber produced at the sawmill to the planer for finishing. See, e.g., PX 38 p. 9, § III.A.1.

376. The Forest Service's pre-sale appraisal prepared for the Hay timber sale anticipated that the sale would be hauled to a sawmill in Eagar. PX 1, upper left:

| Product: | Appraised to: |
|---|---|
| 1 | Eagar |

377. In a letter dated November 23, 1994, Precision Pine had advised the Forest Service that it was ready to begin harvesting of the Hay timber sale and that "[w]e intend to haul all of the timber from the Hay sale to our Eagar, Arizona plant." PX 260, see also Tr. 720-22 (Porter).

378. Precision Pine had advised the Forest Service that it had built the Eagar mill in large measure to handle the timber from the Hay sale, rather than incurring the costs to haul the timber from the Hay sale a greater distance to one of Precision Pine's other sawmills. PX 259.

379. Precision Pine projected harvesting the Hay timber sale in the 3rd and 4th quarters of 1995 and the 1st and 2nd quarters of 1996, PX 131, App. A at p. 4; DX 1004. The sawlogs from the Hay sale were also projected to have been sawn at the Eagar in those quarters, PX 131, Ex. 7 at p. 3.

380. Pursuant to the milling schedule prepared by Mr. Ness, but for the suspension, the Eagar mill would have had sufficient timber to keep it running throughout the suspension period. See PX 131, Ex. 7, at p. 3.

381. As a result of the suspension, Precision Pine consolidated its manufacturing operation at its Winslow facility during the last six months of the suspension. Tr. 720, 929 (Porter); PX 116. The Winslow facility also contained a planer mill. Stipulation dated March 11, 2005 at ¶ 9.

382. The Hay sale, unlike most sales, was at an elevation that allowed for a very high likelihood of extended winter logging. PPFF 44; Tr. 719-20 (Porter). Immediately after the suspension was lifted in December of 1996, Precision Pine sought the Forest Service's permission to begin harvesting on the Hay timber sale outside of the Normal Operating Season. PPFF 43; Tr. 719 (Porter). Because the Eagar mill was not then operating and it would take some time for Precision Pine to reassemble a skilled mill crew and reopen the Eagar mill, Tr. 399 (Porter), Precision Pine also sought and obtained Forest Service permission to haul sawlogs removed from the Hay sale to its Winslow sawmill which, due to the suspension, was also in need of logs during that winter. PPFF 45; Tr. 748-55 (Porter); PX 257, 258.

383. In December of 1996, Precision Pine harvested and removed 391.18 mbf (LS) of timber from the Hay sale, while in January of 1997 it harvested and removed 678.83 (LS). All of this timber, i.e., a total of 1070.01 mbf (LS), was hauled to the Winslow sawmill. Tr. 729-34 (explaining PX 1005), 754 (Porter); PX 290, Vol. I, Hay TSSA Nos. 69 & 70. By letter to the Contracting Officer dated January 30, 1997, Precision Pine indicated its intention to resume hauling from the Hay timber sale to its Eagar sawmill on February 3, 1997. PX 257. Precision Pine did in fact do so (Tr. 753 (Porter)) and resumed operations at the Eagar sawmill on February 17, 1997. Tr. 746 (Porter); PX 20 (production sheet for February 1997).

384. Mr. Reidhead, Precision Pine primary logging subcontractor, testified that whenever Precision Pine asked him to haul the timber a greater distance than had been originally agreed to he sought a price increase. Tr. 1729 (Reidhead).

385. Mr. Reidhead specifically sought and obtained such an increase when Precision Pine asked him to haul timber from the Hay sale to Winslow rather than Eagar. Tr. 1729 (Reidhead).

386. In 1998, the Forest Service approved Precision Pine's request to have logs from the Hay sale delivered and scaled at Precision Pine's Heber sawmill site. PX 266. Precision Pine hauled logs from the Hay sale to its Heber sawmill in 1998 because the Eagar sawmill had been permanently closed. PPFF 55.

**INCREASED COSTS OF RUNNING THE SAWMILL CAUSED BY THE FOREST SERVICE'S BREACH**

387. How the suspension caused the increased manufacturing costs incurred by Precision Pine was described by, plaintiff's accounting expert, Mr. Ness as follows:

> During the suspension period, the sawmills and planer were not as efficient as they would have been with a steady supply of logs from the suspended sales. As noted above, I have calculated the actual direct manufacturing cost per MBF during the 17-month period before the suspension. Using the same methodology, I calculated the manufacturing cost per MBF that Precision Pine experienced during the suspension. See Exhibits 10 and 16 [of PX 131). The difference between these two rates represents the inefficiency that Precision Pine experienced during the suspension period to which I applied the actual volume of lumber production during the suspension period. See Exhibit 15 [of PX 131).

PX 131 at p. 12, ¶ 2.[37]

388. Precision Pine had the capacity at its sawmills to process all of the sawlogs that it actually did during the suspension plus all of the sawlogs from the breached sales and would have done so but for the suspension. PX 131 at Ex. 7.

---

[37] As set forth supra:

- At the time of the suspension, Precision Pine was operating sawmills located in Heber, Winslow and Eagar, Arizona (PPFF 10) as well as a planer and kilns at the Winslow plant site, PPFF 13;
- The Heber sawmill had an annual capacity of 9-10 mmbf (LT), PPFF 11;
- The Winslow sawmill had an annual capacity of 14-15 mmbf (LT), PPFF 12;
- The Eagar mill had annual capacity of 9-10 mmbf, PPFF 15;
- The planer and kilns at Winslow had the capacity to handle all of the planning and drying required by Precision Pine's lumber production, PPFF 13;
- During the suspension period, Precision Pine had substantial reasons for running at or near capacity (35,000 mbf (LT)), PPFF 182, 183;
- Precision Pine's primary logging subcontractor was readily capable of supplying the volume of timber needed for Precision Pine to do so. PPFF 184.

389. But for the suspension Precision Pine would have harvested all of the logs on the breached sales during the 16-month suspension and utilized them at its mills plus all of the sawlogs that it actually used during the suspension period. Tr. 2778-80 (Ness); PX 131 at Ex. 7.

390. Due to the protracted suspension, Precision Pine suffered log shortages and extended closures at all three of its sawmills during the 16 month suspension. PX 163. For example, during the suspension the Eagar sawmill was shut down from December 1, 1995 through and beyond the end of the suspension in December of 1996; the Heber sawmill was shut down from September 19, 1995 to November 26, 1995 and again from June 19, 1996 to the end of the suspension in December of 1996; and although Precision Pine's operations were increasingly consolidated during the suspension at the Winslow facility where a planer and sawmill were located, the Winslow mill was shut down from March 12, 1996 to April 15, 1996. Id.

391. The shortage of sawlogs caused by the Forest Service's breach resulted directly in an increase in Precision Pine's per unit manufacturing costs at each of its mills. PX 131 at Ex. 15.

392. At trial, defendant argued that a factor in causing Precision Pine's increased manufacturing costs during the suspension was the availability of certain timber contracts that Precision Pine either did not fully cut or relinquished the rights to cut. Tr. 64 (Harrington), i.e., timber from the Mud, Brann, Campbell, Barber and Park timber sales. Tr. 57-59, 64-65 (Harrington). However, contrary to defendant's assertion:

a. Following the Forest Service's release of the Mud sale in August 1996 (Tr. 974-75 (Porter)), Precision Pine went on to the sale area as soon it could do so

following release of the sale in 1996 (Tr. 970 (Saltman & Harrington)), opened three payment units simultaneously (PX 110; PX 114) and removed 3,473.71 ccf of sawlogs on the sale in August, September and October of 1996 (PX 182 at Ex. 6, p. 1). The timber harvested was 81% of the sawtimber remaining on the sale area. Id.[38]

b. Following release of the Brann sale, Precision Pine harvested over 1,000 ccf of sawlogs from the sale in January and February of 1996, i.e., outside of the Normal Operating Season for the Brann sale (DX 342 at BRN 10; PX 290, Vol. I, TSSA for Brann, Jan. & Feb. 1996) at a time when Precision Pine was also harvesting the St. Joe sale which contained larger logs. (PX 290, Vol. III, TSSA St. Joe, Jan & Feb. 1996).[39]

c. Both Campbell and Barber had been suspended along with all of Precision Pine's other Forest Service timber sale contracts (PPFF 21) and only as part of a settlement agreement with the Forest Service in exchange for the cancellation of the Campbell and Barber contracts, which contained some of the largest timber in

[38]Defendant argued without support that Precision Pine only removed 56% of the timber remaining on the Mud sale area during the suspension period. Tr. 59 (Harrington). However, the TSSAs for the sale demonstrate that Precision Pine removed all the remaining sawlogs and pulpwood after the suspension of Mud was lifted, and that 81% (not 57%) of the sawlogs were removed during the period before December 4, 2005, when the suspension of the other sales remained in place. See PX 182 at Ex. 6, p. 1.

[39]The Brann timber sale consisted of three payment units. BRN 6. There were harvest restrictions on Payment Unit 1 from March 1 through August 30, and on designated areas of Payment Unit 3 from February 1 thorough August 30. BRN 69; Tr. 3820 (Harris). Accordingly Precision Pine conducted harvesting operations on Payment Unit 2 of the sale beginning in January and February of 1996 and completed the sawlog harvest on Unit 2. PX 290, Vol. I, TSSA Jan. & Feb. 1996; Tr. 3869 (Harris). Thereafter, Precision Pine moved onto a sale offered by the Hualapai Indian tribe (id.) due to the harvest restrictions on the other two units. Precision Pine returned to the Brann sale area and removed both sawlogs and pulpwood in the 3rd and 4th quarters of 1996. See PX 290, Vol. I, TSSA, Aug., Sept., Oct., & Nov. 1996.

Precision Pine's Forest Service portfolio, did the environmental plaintiffs in Silver v. Babbitt agree to the release of three other of Precision Pine sales. Tr. 2941-42, 2970 (Tenney); PX 99; PX 106.

d. Likewise there was no evidence presented at trial that there was any sawtimber on Park which was actually "available" for cutting that Precision Pine did not harvest. All that was elicited at trial was that:

   i. Precision Pine and the State of Arizona entered into the Park timber sale contract with apparently differing views as to what timber was included in the sale and covered by Precision Pine's contract price. See Tr. 2055 (Porter).

   ii. Rather than litigate over whose position was correct, the State agreed to allow Precision Pine to enter into a "friendly default" whereunder Precision Pine paid only $8,190 rather than the significantly greater amount that the State was demanding (Tr. 2055-56 (Porter); Tr. 2957-58 (Tenney)), Precision Pine's performance bond was returned and it was released from the contract. Tr. 2958 (Tenney).

   iii. The circumstances were unfortunate from each party's point of view (Tr. 2056 (Porter)) but "This solution was one that was beneficial both to the State of Arizona and to Precision Pine." Tr. 2054 (Porter). Precision Pine felt that it was beneficial for it to maintain a good relationship with the State of Arizona because Precision Pine might have future dealings with it involving timber. Tr. 2056 (Porter).

**CLAIM PREPARATION COSTS**

393. Precision Pine's claim for expenses is based on its employees having been taken away from their usual duties in order to engage in claim preparation activities. Tr. 794-96 (Porter). That is, Precision Pine actually paid its employees their usual wages during the time they were engaged in accumulating data necessary to put together claim letters. Tr. 795 (Porter).

394. Shortly after the suspensions were lifted Precision Pine contacted the Forest Service seeking compensation for the damages it had incurred as a result of the suspension. E.g., PX 152. In responding to this inquiry, the Forest Service instructed Precision Pine to review clause C(T)6.01 and file formal claims letters. E.g., PX 152-154.

395. C(T)6.01 (6/90), which is contained each of the suspended timber sale contracts except Hay, provides in pertinent part that in the event of an interruption or delay of operations that exceeds 30 days during the Normal Operating Season, the Purchaser shall receive

> out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, replacement cost of timber or any other anticipatory losses suffered by Purchaser.

396. At the request and under the direction of Mr. Porter, each employee kept track of the time spent in claim preparation and then submitted that time to him. Tr. 795-96 (Porter).

397. Mr. Porter then calculated the claim preparation costs based on the hourly rate of each employee multiplied by the hours each had spent in claim preparation. Tr. 796-98, 810-20 (Porter).

398. Mr. Ness further refined the claim preparation expenses; he began with the hours and rates supplied by Mr. Porter and determined that Precision Pine paid $17,910.00 in direct labor expense for claim preparation. Tr. 2385; PX 131 at Ex. 20 (line labeled "Wages – Claim Preparation"). Mr. Ness then calculated the applicable labor burden rate using Precision Pine's financial statements and found it to have been approximately 20%. Id. (line labeled "labor burden @ 20%"); Tr. 2386 (Ness). Mr. Ness then multiplied the direct labor expense by the labor burden rate he had calculated and arrived at the result of $3,582. Id. Summing the labor burden and direct labor expenses, Mr. Ness produced the total payroll cost resulting from claim preparation activities of $21,492.00. Id. (line labeled "total payroll cost"); Tr. 2386 (Ness). Mr. Ness then added 10% profit to the $21,492 figure, resulting in $23,641. PX 130 at Ex 20; Tr. 2386 (Ness).

399. Because the administrative labor expenses in question are an overhead item already, Mr. Ness did not add any markup for overhead. Tr. 2836 (Ness).

400. Because one of the 14 suspended contracts, the Hay contract, did not contain clause C(T)6.01, which provides the legal justification for the recovery of claim preparation expenses, Mr. Ness reduced the claim by expenses associated with preparation of the claim for damages suffered on the Hay contract. Tr. 2386-87 (Ness). To do so, he first estimated that 75% of the

total expenses incurred, i.e., $17,730.90, had been spent developing data applicable to the claims as a whole (PX 131 at Ex. 20 (under column titled "General")) and 25% of the total expenses incurred, i.e., $5,910.30, was spent using that data to compute damages on specific sales. PX 131 at Ex. 20 (under column titled "Allocate"); Tr. 2386 (Ness). Mr. Ness then reduced the portion allocated to preparing the claims for specific sales, $5,910.30, by 1/14 to represent that portion of these expenses attributable to Hay, i.e., the one non-C(T)6.01 contract. PX 131 at Ex. 20 (at line labeled "Suspended C6.01 Timber Sales (13/14)). The result, $5,488.14, represents the expenses associating with preparing the claim letters for the 13 specific contracts containing C(T)6.01, which Mr. Ness added back to the cost associated with compiling data useful to preparing all the claims. Id. The resulting total, $23,219.04, represented total out of pocket expenses incurred by Precision Pine in preparing and submitting claims letters as a direct result of the suspension and which is, therefore, recoverable under clause C(T)6.01. Tr. 2387-8 (Ness); PX 131, Ex. 1, item 7.

401. On or about October 18, 1995, as part of its settlement of Silver v. Babbitt, the Forest Service agreed with the environmental plaintiffs in that case to partially cancel the Mud contract by deleting trees in excess of 12" dbh in three cutting units. PX 106 at 6, ¶ 5. This was accomplished by a unilateral partial cancellation of the sale on August 15, 1996, DX 311. As a result of which Precision Pine was paid $65,796.66 for the timber that had been deleted. PX 131 at 13. Mr. Ness credited the Forest Service in this amount by deducting it from Precision Pine's damage claim. Id.

402. Notwithstanding the Forest Service's agreement with the plaintiffs in Silver v. Babbitt in October 1995, the Forest Service did not lift the suspension of harvesting operations on Mud with respect to the timber not being deleted until March 11, 1996, i.e., nearly six months later. PX 109. At that time, due to a contract restriction which prevented operations until June 1 (see PX 109) and a subsequent fire closure (PX 113), Precision Pine was not able to begin road building operations and commence harvesting of the sale until approximately August 1, 1996. PX 114. But for the suspension and the Forest Service's unilateral deletion of the timber from the contract, Precision Pine would have harvested the contract to completion during the suspension period and earned the gross profits as determined by Mr. Ness. PX 131, Ex. 4 at 3-5.

Respectfully submitted,

s/Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
Bryan T. Bunting
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: September 2, 2005