**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-720C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S CORRECTED POST-TRIAL BRIEF**

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
Bryan T. Bunting
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Washington, D.C. 20006
(202) 452-2140

Dated: September 12, 2005

# TABLE OF CONTENTS

**PAGE**


TABLE OF AUTHORITIES .......... iv

I. Applicable Legal Standards .......... 1

A. Causation .......... 1

B. Foreseeability. .......... 2

C. Reasonable Certainty .......... 3

II. As A Preliminary Matter, Precision Pine's Damages Do Not Arise From Activities That Are Collateral To The Contracts At Issue .......... 4

A. Damages Incurred Due To The Unavailability Of The Use Of The Subject Of The Contract Are Recoverable Under The Law Of This Circuit .......... 4

B. The Manufacture And Sale Of Lumber From The Timber Under Contract Is Not Collateral Because It Is Contemplated By The Statue Establishing The National Forests, The Forest Service's Timber Sale Program, The Bidding Documents And The Timber Sale Contract .......... 8

III. As Another Preliminary Matter, The Breach Of All Eleven Contracts Occurred On August 25, 1995; It Did Not Occur 135 Days Later .......... 11

IV. Precision Pine's Right To Recover Its Expectancy Damages, Including Lost Profits, Is Not Limited Under The Law Relating To Partial Breach .......... 13

V. Precision Pine's Lost Profits On Lumber And By-Products Are Recoverable .......... 15

A. But For The Suspension, Precision Pine Would Not Have Sustained Lost Profits With Regard To Lumber And By-Product Sales .......... 15

B. Precision Pine Introduced Ample Evidence That Its Lost Profits Were Foreseeable To The Forest Service .......... 16

C. Precision Pine Has Proven Its Lost Profits With Reasonable Certainty .......... 17

1. The Methodology Used To Calculate Lost Profits .......... 17

a. The Volume Of Sawlogs Remaining On The Breached Sales At The Time Of The Suspension .......... 18

b. Harvest Schedule ....................19

c. Milling Schedule ....................21

d. Delivered Log Costs ....................23

e. Calculation Of The Volume Of Each Lumber Product That Would Have Been Produced From The Breached Sales ....................24

i. Precision Pine's Use Of A 1.25 Overrun Factor Is Reasonable And, If Anything, Conservative ....................24

ii. Precision Pine's Determination Of The Mix Of Lumber Products That Would Have Been Produced From The Ponderosa Pine On The Breached Sales During The Suspension Was Reasonable ....................28

f. The Determination Of Prices For Ponderosa Pine Lumber Products During The Suspension Period ....................32

g. The Determination Of The Volume, Product Mix, And Pricing For Douglas-fir And Spruce Lumber Products During The Suspension Period ....................35

h. Defendant's Approach To Lumber Product Pricing And Product Mix Is Unreliable ....................36

i. Mr. Ness' Calculation And Deduction Of Freight Costs And Prompt Payment Discounts From Gross Lumber Revenue ....................39

j. Mr. Ness' Calculation And Deduction Of Manufacturing Costs From Net Lumber Sales Revenue ....................40

k. Mr. Ness' Calculation Of Gross Profits-Lumber ....................41

l. Mr. Ness' Calculation Of By-Product Revenue (Lost Profits) ....................41

m. Total Lost Gross Profits (Lost Market Opportunity) ....................42

D. Because Precision Pine Was A Lost Volume Seller, No Deduction For Post-Suspension Profits Is Required .....44

E. Pulpwood Harvesting Would Not Have Prevented Profitable Operations On The Sales During The Suspension .....47

VI. The Increased Manufacturing Costs That Precision Pine Experienced At Its Sawmills Due To The Suspension Are Recoverable .....51

A. But For The Suspension, Precision Pine Would Not Have Incurred Increased Manufacturing Costs .....51

B. It Was Foreseeable To The Forest Service That A Prolonged And Widespread Suspension Would Increase The Cost Of Precision Pine's Manufacturing Operations .....56

C. Precision Pine Has Established Its Increased Manufacturing Costs With Reasonable Certainty .....56

VII. Precision Pine's Increased Hauling Costs On The Hay Sale Are Recoverable .....57

A. But For The Suspension, Precision Pine Would Not Have Incurred Any Increased Timber Hauling Costs On The Hay Sale .....57

B. It Was Foreseeable That The Protracted Suspension Would Increase Precision Pine's Hauling Costs .....60

C. Precision Pine Has Computed Its Increased Hauling Costs With Reasonable Certainty .....62

1. Increased Hauling Costs in 1996 & 1997 .....62

2. Increased Hauling Costs in 1998 .....63

VIII. Precision Pine's Out-of-Pocket Expenses Incurred In Preparing Its Claim Letters Were A Direct Result of The Suspension .....64

IX. Credit For The Partial Cancellation Of The Mud Sale .....67

X. Precision Pine Is Entitled To Recover Its "Miscellaneous Costs" .....67

Conclusion .....70

# TABLE OF AUTHORITIES

**CASES** **PAGE**

Am. Line Builders, Inc. v. United States,
26 Cl. Ct. 1155 (1992) ....................60

Bank of America, FSB et al v. United States,
__ Fed.Cl. __, 2005 WL 1792182 (Fed.Cl. July 21, 2005) ....................14

Bluebonnet Sav. Bank, F.S.B. v. United States,
266 F.3d 1348 (Fed.Cir. 2001)....................2

Big Chief Drilling Co. v. United States,
26 Cl.Ct. 1276 (1992) ....................64

Boston Edison Co. v. United States,
64 Fed.Cl. 167 (2005) ....................14

California Fed. Bank, FSB v. United States,
245 F.3d 1342 (Fed.Cir. 2001)....................5

California Fed. Bank v. United States,
395 F.3d 1263, 1268 (2005), *petition for cert. filed*, 73 U.S.L.W. 3721
(May 19, 2005)....................1, 2

Chain Belt Co. v. United States,
127 Ct.Cl. 38, 115 F.Supp. 701 (1953)....................6

Cities Service Helex, Inc. v. United States,
211 Ct.Cl. 222, 543 F.2d 1306 (1976)....................13

Citizens Federal Bank v. United States,
66 Fed.Cl. 179 (2005) ....................4

Coley Properties Corp. v. United States,
219 Ct.Cl. 227, 593 F.2d 380 (1979)....................66

Commercial Fed. Bank v. United States,
59 Fed.Cl. 388 (2004) ....................5

Cuyahoga Metro. Hous. Auth. v. United States,
65 Fed.Cl. 534 (2005) ....................14

Dale R. Horning Co. v. Falconer Glass Ind., Inc.,
730 F.Supp. 962 (S.D. Ind. 1990) ....................64

Desonia Constr Co., Inc.,
ENGBCA No 3231, 73-1 BCA ¶ 9797 (Nov. 17, 1972) ....................66

District Concrete Co., Inc. v. Bernstein Concrete Corp.,
418 A.2d 1030 (D.C. 1980) ....................64

Draft Systems Inc. v. Rimar Manufacturing Inc.,
524 F.Supp 1049 (E.D. Pa. 1981) ....................64

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed.Cir. 2002)....................1, 2

Entergy Nuclear Indian Point 2, LLC v. United States,
64 Fed.Cl. 515 (2005) ....................14

Everett Plywood Corp. v. United States,
206 Ct.Cl. 244, 512 F.2d 1082 (1975) ....................5

Everett Plywood Corp. v. United States,
651 F.2d 723 (Ct.Cl. 1981) ....................7

Franconia Assocs. v. United States,
61 Fed.Cl. 718 (2004) ....................1, 2, 4, 52, 53

Gardner Displays Co. v. United States,
171 Ct.Cl. 497, 346 F.2d 585 (1965) ....................3, 62

Glendale Fed. Bank v. United States,
43 Fed.Cl. 390 (1999) aff'd in part, vacated in part, and remanded,
239 F.3d 1374 (Fed.Cir. 2001)....................8

Globe Savings Bank, F.S.B. v. United States,
65 Fed.Cl. 330 (2005) ....................53

Hawthorne Indus., Inc. v. Balfour Maclaine Int'l, Ltd.,
676 F.2d 1385 (11th Cir. 1982)....................51

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed.Cir. 2001)....................7

J.D. Hedin Constr. Co. v. United States,
171 Ct.Cl. 70, 347 F.2d 235 (1965) ....................59

Kutner Buick, Inc. v. American Motor Corp.,
868 F.2d 614 (3rd Cir. 1989) ....................................................18

LaSalle Talman Fed. Bank v. United States,
317 F.3d 1363 (Fed.Cir. 2003)....................................................4, 30

Matt Allen Logging,
AGBCA Nos. 2002-124-1, 04-1 BCA ¶ 32,596 (April 8, 2004) ......................66

Miller v. Robertson,
266 U.S. 243, 45 S.Ct. 73 (1924)....................................................47

Morris v. United States,
33 Fed.Cl. 733 (1995) ....................................................14

Neely v. United States,
167 Ct.Cl. 407, 1964 WL 8619 (1964) ....................................................6

Olin Jones Sand Co. v. United States,
225 Ct.Cl. 741, 1980 WL 13211 (1980) ....................................................7, 8

Pacific Rivers v. Thomas,
30 F.3d 1050 (9th Cir. 1994) ....................................................11

Peck Iron & Metal Co., Inc. v. United States,
221 Ct.Cl. 37, 603 F.2d 171 (1979) ....................................................6

Poston Logging,
AGBCA No. 97-168-1, 99-1 BCA ¶ 30,188 (Dec. 15, 1998) ...................... 63-64

Precision Pine & Timber, Inc. v. United States,
50 Fed.Cl. 35 (2001) ....................................................11, 12, 13, 16, 61

Precision Pine & Timber, Inc. v. United States,
63 Fed.Cl. 122 (2004) .................................................... *passim*

Reidhead Bros. Lumber Co.,
AGBCA No. 2000-126-1, 01-2 BCA ¶ 31,486 (June 29, 2001) ...................61, 65, 66

Rocky Mountain Const. Co. v. United States,
218 Ct.Cl. 665 (1978), 1978 WL 8468 (1978) ....................................................7

Rumsfeld v. Freedom NY, Inc.,
329 F.3d 1320 (Fed.Cir. 2003)....................................................7

San Carlos Irrigation and Drainage Dist. v. United States,
111 F.3d 1557 (Fed.Cir. 1997)....1

Scott Timber Co. v United States,
333 F.3d 1358 (Fed.Cir. 2003)....12, 51, 66

Scott Timber, Inc. v. United States,
64 Fed.Cl. 130 (2005)....1, 2, 56

Smith-Wolf Construction, Inc., v. Hood,
756 P.2d 1027 (Colo.App. 1988)....64

Smokey Bear, Inc. v. United States,
31 Fed.Cl. 805 (1994)....7, 8

Snyder-Lynch Motors, Inc. v. United States,
154 Ct.Cl. 476, 292 F.2d 907 (1961)....25

Stoner-Caroga Corp. v. United States,
3 Cl.Ct. 92 (1983)....6

T.C. Bateson Constr. Co. v. United States,
162 Ct.Cl. 145, 319 F.2d 135 (1963)....52

United States v. Spearin,
248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918)....25

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed.Cir. 1996)....4, 5, 6

White v. United States,
187 Ct.Cl. 564, 410 F.2d 773 (1969)....15

Womack v. United States,
182 Ct.Cl. 399, 389 F.2d 793 (1968)....25

Youngdale & Sons Constr. Co. v. United States,
27 Fed.Cl. 516 (1993).... 59-60

**STATUTES AND REGULATIONS**

16 U.S.C. § 475....9

Uniform Commercial Code
§ 2-708, cmt. 2 ....................45
§ 2-708(2)....................64
§ 2-715 ....................64

**MISCELLANEOUS**

U.S. Forest Service, Handbook No. 2409.15, Timber Sale Administration
§ 37.5 (Amendment 92-6, Aug. 3, 1992 ....................69

U.S. Forest Service. Handbook No. 2409.15, Timber Sale Administration
§ 61.3 (Amendment 92-6 Aug. 3, 1992)....................51

1 Robert A Dunn, RECOVERY OF DAMAGES FOR LOST PROFITS § 2.4 (5th ed. 1998)....................7

1 James J. White & Robert S. Summers, UNIFORM COMMERCIAL CODE
§ 6-3 at 298 (4th ed. 1998)....................46

3 E. Allen Farnsworth, FARNSWORTH ON CONTRACTS § 12.9 (2nd ed. 1998)....................14

5 CORBIN ON CONTRACTS § 1011 (1964)....................7

13 Richard A. Lord, WILLISTON ON CONTRACTS § 39:32 (4th ed. 2000) ....................14

29 Charles Alan Wright & Victor James Gold, FEDERAL PRACTICE AND
PROCEDURE § 6273 (1997)....................38

RESTATEMENT (SECOND) OF CONTRACTS § 347, cmt. f (1981) ....................45

## I. Applicable Legal Standards.

At trial, Precision Pine & Timber, Inc. ("Precision Pine") proved, among other elements of damage discussed below, its entitlement to certain expectancy damages, the largest portion of which was lost profits. The well-established goal of expectancy damages is to provide the aggrieved plaintiff with the benefit he expected to receive from the breached transaction, Energy Capital Corp. v. United States, 302 F.3d 1314, 1324 (Fed.Cir. 2002), i.e., "to place the injured party in as good a position as he or she would have been had the breaching party fully performed." San Carlos Irrigation and Drainage Dist. v. United States, 111 F.3d 1557, 1562-63 (Fed.Cir. 1997).

A plaintiff is entitled to lost profits for breach of a contract upon a showing by a mere preponderance of the evidence that:

> (1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty.

Energy Capital Corp., 302 F.3d at 1324-25.

### A. Causation.

The "but for" test as set forth in California Fed. Bank v. United States, 395 F.3d 1263, 1267-68 (2005), *petition for cert. filed*, 73 U.S.L.W. 3721 (May 19, 2005) (No. 04-1557), is the appropriate standard for causation and, furthermore, is wholly consistent with the "substantial factor" standard of causation, Scott Timber, Inc. v. United States, 64 Fed.Cl. 130, 138 n.2 (2005) (citing Precision Pine & Timber, Inc. v. United States, 63 Fed.Cl. 122, 128 (2004), i.e., lost profits that are the direct and primary result of a breach are recoverable. Franconia Assocs. v. United States, 61 Fed.Cl. 718, 747 (2004). As this Court also explained:

> The breach need not "be the sole factor or sole cause in the loss of profits. The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." Cal. Fed. Bank, 395 F.3d 1263, 1268. . . .

Scott Timber, 64 Fed.Cl. at 183 n.2 (citations omitted). Thus, plaintiff need only show that the lost profits it claims as damages arose as a natural consequence of defendant's breach and that the breach was a proximate cause of the losses. See Cal. Fed. Bank, 395 F.3d at 1268; Franconia Assocs., 61 Fed.Cl. at 747 n.50, n.51.

B. Foreseeability.

A plaintiff seeking expectancy damages must also establish by a simple preponderance of the evidence that "the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting." Energy Capital Corp., 302 F.3d at 1325 (emphasis added, citations omitted); see also Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed.Cir. 2001). As this Court found at summary judgment:

> A plaintiff's recovery is not contingent on a defendant's having actually foreseen the injury which occurred. Rather,
>
> > The existing rule requires only reason to foresee, *not actual foresight*. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefor in case of breach.

63 Fed.Cl. at 130 (emphasis in original, citation omitted). From this, the Court concluded that "Precision Pine need not show that a particular type of breach was foreseeable, but must prove that both the general magnitude and type of damages were foreseeable." Id. Thus, Precision Pine's specific damages need not have been within the actual "contemplation" of the Forest Service at the time of contracting; rather, the Forest Service need only have been able to

objectively anticipate that the general type of damages suffered by Precision Pine could result from a suspension of the magnitude and duration that the Forest Service imposed either at the time of contracting or at the time of breach.[1]

As demonstrated below, Precision Pine has provided ample factual evidence showing that the Forest Service had every reason to foresee (and in fact foresaw) that a protracted and widespread suspension such as the one that took place in this case could result in the type of damages sustained by Precision Pine.

C. Reasonable Certainty.

With respect to the third element, reasonable certainty as to the amount of damages, this Court recently recognized that although a plaintiff must carry its burden by a preponderance of the evidence:

> The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" Bluebonnet, 266 F.3d at 1355 (quoting Elec. & Missile Facilities, Inc. v. United States, 189 Ct.Cl. 237, 416 F.2d 1345, 1358 (1969) (internal quotation marks and citation omitted)). Where, as here, "'a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery,' and the court's duty is to 'make a *fair and reasonable approximation* of the damages.'" Id. at 1356-57 (citing *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed.Cir. 2000) (quoting Locke v. United States, 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960))) (emphasis added). "[C]omplete certainty and mathematical precision is not necessary once the fact of damages has been established." Peck Iron & Metal Co. v. United States, 221 Ct.Cl. 37, 603 F.2d 171, 174 (1979).

[1]At summary judgment this Court also found that in appropriate circumstances, such as those present here, the issue of foreseeability could also be determined as of the time of the breach. 63 Fed.Cl. at 131 (citing Gardner Displays Co. v. United States, 171 Ct.Cl. 497, 346 F.2d 585, 586-87 (1965)).

Citizens Federal Bank v. United States, 66 Fed.Cl. 179, 199 (2005); accord Precision Pine, 63 Fed.Cl. at 131. The courts of this Circuit have been careful not to allow the calculation of damages to devolve into "a quixotic quest for delusive precision or worse, an insurmountable barrier to any recovery." Franconia Assocs., 61 Fed.Cl. at 746. Thus, the risk of limited available evidence to prove damages must fall on the breaching party, not the aggrieved party. See LaSalle Talman Fed. Bank v. United States, 317 F.3d 1363, 1374 (Fed.Cir. 2003) (citations omitted). These salutary rules have special application where, as here, defendant's breach necessitates a "what if" analysis. Defendant should not, therefore, be heard to complain about the reasonable and, if anything, conservative, approach employed by Precision Pine to quantifying the harm it sustained.

## II. As A Preliminary Matter, Precision Pine's Damages Do Not Arise From Activities That Are Collateral To The Contracts At Issue.

### A. Damages Incurred Due To The Unavailability Of The Use Of The Subject Of The Contract Are Recoverable Under The Law Of This Circuit.

At trial, defendant argued that virtually any activity beyond felling and removing the timber from the forest is "collateral" to the contracts at issue. Tr. at 3200-04, 3244 (Harrington). In doing so, defendant relied heavily on Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022-1023 (Fed.Cir. 1996) (see Tr. 3156-60 (Harrington)), for the proposition that if lost profits would have been realized from "other independent and collateral undertakings" they are not recoverable. However, defendant's reliance on Wells Fargo to support its position is belied by the case itself as well as numerous precedents in this Circuit decided both before and after Wells Fargo was issued. As Wells Fargo itself recognizes, the recovery of lost profits "on the use of the subject of the contract itself" is appropriate. Id. at 1023 (emphasis added). The court in Wells Fargo held that the plaintiff bank was entitled to recover lost profits it would have made

on a loan to a third party had the government not breached its contract to issue a loan guarantee to plaintiff. Id. at 1523-34.

Wells Fargo has not proved to bar recovery even in the Winstar context (where lost profits have sometimes been difficult to recover). See Cal. Fed. Bank v. United States, 245 F.3d 1342, 1349 (Fed.Cir. 2001) ("Profits on the use of the subject of the contract itself, here supervisory goodwill as regulatory capital, are recoverable as damages"); see also Commercial Fed. Bank v. United States, 59 Fed.Cl. 388, 345-46 (2004) (The court, citing Wells Fargo, ruled in the plaintiff's favor because even though the profit being sought was to have been made on collateral undertakings, such as mortgage loan activity, those profits were the result of the use of the subject of the contract itself).

Wells Fargo and its focus on the use to which the subject of the contract would have been put is also fully in accord with the law of this Circuit that where the government is supplying materials (such as timber) to one in the business of manufacturing and reselling a resulting product (such as lumber), the activities associated with the manufacture of the raw materials and their subsequent sales to third parties are not collateral to the contract. In Everett Plywood Corp. v. United States, 206 Ct.Cl. 244, 512 F.2d 1082 (1975), the Court of Claims did not believe that the sale of lumber products manufactured from the timber which was the subject of the Forest Service contract at issue was somehow too remote or somehow broke the causal chain for damages to be recoverable. See id. at 1091. Although the Court of Claims did reject plaintiff's lost profit claim, which had been premised on resale of the logs into the export market, the court did not do so because such a transaction was "collateral" to the timber sale contract. To the contrary, the court denied plaintiff's claim because plaintiff was a manufacturer of plywood, and had no track record of selling logs into the export market. Id. The court noted that Everett

purchased timber to supply its plywood operations, not for export. Id. The clear implication of the court's decision was that had the plaintiff sought to recover its lost profits on plywood sales that would have been made in the usual course of its business, such damages, if proven, would have been entirely appropriate. Accord Neely v. United States, 167 Ct.Cl. 407, 1964 WL 8619 (1964) (*per curiam*) (Government breached a lease by virtue of its refusal to allow plaintiff to strip mine coal on the leased property, and the Court of Claims awarded plaintiff the estimated profits it would have made on its resale of the mined coal to third parties); Peck Iron & Metal Co., Inc. v. United States, 221 Ct.Cl. 37, 603 F.2d 171, 175-81 (1979) (Due to the government's wrongful cancellation of a contract to deliver a surplus aircraft carrier, the Court of Claims awarded plaintiff its lost profit on ten types of metal that the plaintiff would have salvaged from the aircraft carrier and resold to third parties); Stoner-Caroga Corp. v. United States, 3 Cl.Ct. 92, 93, 96 (1983) (plaintiff, who was in the business of buying, repairing and reselling mobile homes, contracted to purchase two surplus mobile homes from the government for $456 and was found to be entitled to its lost profits (which plaintiff alleged were $10,800) in selling refurbished mobile homes to third parties); see also Chain Belt Co. v. United States, 127 Ct.Cl. 38, 115 F.Supp. 701, 718 (1953) (The government's breach of contract by failing to timely vacate a portion of plaintiff's manufacturing plant was the direct and proximate cause of plaintiff's lost profits on unfilled orders to third parties).

These long-standing precedents in this Circuit are consistent with the view that where a contract to supply raw materials to one in the business of manufacturing is breached, lost profits on manufactured goods that would have been produced are not collateral to the contract:

> One who has contracted to supply a factory with machinery necessary to run it, or with special materials necessary to the product of the factory and not obtainable elsewhere, is likely to have reason to foresee that his failure to supply as agreed

> will cause the factory to cease production and to prevent the making of profits from the operation of the factory and the sale of its product. . . . There are cases holding that for breach of the supplier of necessary materials the manufacturer can recover damages for his loss of operating profits.

5 CORBIN ON CONTRACTS § 1011 (1964). See also 1 Robert A. Dunn, RECOVERY OF DAMAGES FOR LOST PROFITS § 2.4 (5th ed. 1998).[2] Accordingly, where, as here, profits are prevented by a breach of a contract to supply raw material to one in the business of manufacturing that raw material and reselling the resulting products, such lost profits are recoverable.

The cases cited by defendant in its pre-trial Memorandum of Facts and Law as precluding the recovery of damages on "collateral" undertakings are readily distinguishable from the instant case. None of the cases address a situation such as the instant one where the government is a seller providing raw material to one in an established business of processing that material and reselling the resulting products. Rather, in three of the cases cited by defendant, the government, as a buyer of goods or services, was simply obliged to make payment under the contract for services rendered/goods provided, and as such, the court refused to award the plaintiff profits that could have been made on another, wholly unrelated transaction.[3]

The government's reliance on Smokey Bear, Inc. v. United States, 31 Fed.Cl. 805 (1994), is misplaced. In that case the government entered into a license agreement to permit

[2] This view is also found in Official Comment 6 to U.C.C. § 2-715: "In the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know. . . ." (emphasis added). The U.C.C. has been applied as an aid in interpreting Forest Service timber sale contracts, e.g., Everett Plywood Corp., 651 F.2d at 729, 733, and has deemed to be a "useful guidance" in applying general contract principles. Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed.Cir. 2001).

[3] Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1333 (Fed. Cir. 2003); Olin Jones Sand Co. v. United States, 225 Ct.Cl. 741, 1980 WL 13211 (1980); Rocky Mountain Const. Co. v. United States, 218 Ct.Cl. 665 (1978), 1978 WL 8468 (1978).

plaintiff to market merchandise using the Smokey the Bear logo. After the government breached the contract, plaintiff was allowed to proceed to trial to recover its lost profits on sales to third parties that were contemplated by the license agreement. Id. at 808-09 (distinguishing, *inter alia*, Olin Jones Sand Co., 225 Ct.Cl. 741)). As demonstrated below, Smokey Bear supports Precision Pine's position in the present litigation because in both situations the government by contract was providing something that it anticipated (if not desired) would be the subject of other activities on which its contracting partner might earn profits.

B. The Manufacture And Sale Of Lumber From The Timber Under Contract Is Not Collateral Because It Is Contemplated By The Statue Establishing The National Forests, The Forest Service's Timber Sale Program, The Bidding Documents And The Timber Sale Contract.

Not only would the lost profits here in issue have been earned as a result of the use of the subject of the breached contracts themselves (i.e., timber) but the contracts and the program under which they were authorized refer both expressly and implicitly to the production of lumber from the subject of the contracts.[4]

Ever since the National Forests were established in the late 19th century, one of their primary purposes has been to supply timber for the use of the American public. Indeed, the Organic Act of 1897 which authorized the creation of National Forests provides that no national forest "shall be established, except to improve and protect the forest . . ., or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the

[4] In Glendale Fed. Bank v. United States, 43 Fed.Cl. 390, 398 (1999) aff'd in part, vacated in part, and remanded, 239 F.3d 1374 (Fed.Cir. 2001), the trial court stated that in determining the limits on the recoverability on lost profits that "Critical to the inquiry, then, is what the purpose of the contract is. . . . The question is not whether the profits are to be derived from undertakings with third parties, but what the subject and purpose of the contract is."

use and necessity of citizens of the United States." 16 U.S.C. § 475 (emphasis added). PPFF 168.

The means by which the Forest Service meets this statutory duty is its commercial timber sale program. At all times relevant to this case, an objective of the Forest Service's commercial timber sale program as recognized by the Forest Service's own manual was to provide a continuous flow of raw material to local forest industries. PPFF 170. The Forest Service was also well aware that sawmill owners were the primary customers for Forest Service timber sales. PPFF 171.

Additional evidence that the use of Forest Service timber to produce lumber at a sawmill is not collateral to the instant contracts was presented in the form of the Forest Service's bid documents and contract provisions. For example, in bidding on Forest Service timber sale contracts a prospective purchaser is required to identify whether or not it is a manufacturer (PPFF 175) and in each of the bids Precision Pine submitted on the breached contracts, Precision Pine identified itself as a manufacturer, i.e., a company with the ability to process logs into lumber. PPFF 176. Moreover, in other documents submitted as part of the standard Forest Service bid package, a potential purchaser must also identify the plant at which the timber is to be processed into lumber and agree to advise the Forest Service if there is to be a change in the plant to which the logs are to be delivered. PPFF 178.

The provisions of the standard Forest Service timber sale contract also demonstrate that the manufacture of the timber and sale of the resulting wood products is not collateral to the contracts. For example, pursuant to standard clause C(T)8.212, which is included in each of the contracts at issue, the Forest Service provides a purchaser with additional time within which to harvest the timber on the contract if there is a significant downturn in the lumber market. PPFF

189. The Forest Service's purposes in adopting this contract provision included maintaining plant capacity to supply the country with construction lumber, and the retention of a viable, established industry capable of supplying the wood fiber needs of the public for housing and other products. PPFF 190.

Additionally, standard contract clause C(T)8.641 requires a purchaser to certify that timber removed under the contract will not be exported and will be domestically processed into lumber (PPFF 187), to specifically identify where the timber will be processed (id.) and to advise the Forest Service if there is a change in the location where the timber is to be processed. Id. The Forest Service also requires purchasers to certify annually where timber from each of its Forest Service timber sale contracts has been processed. PPFF 188.

Contract clauses B(T)8.21 and C(T)8.21, which are also standard provisions contained in all of the contracts at issue, also provide a contractor with additional time to harvest the timber covered by the contract when unforeseen events such as fire, flood and strike "affect the disposition or processing of included timber" (emphasis added). PPFF 185-186.[5]

As further evidence that the production of lumber from the timber sold pursuant to Forest Service timber sales is not collateral to the contracts, plaintiff introduced the sworn statements of Forest Service officials which demonstrate that the Forest Service was fully aware that a suspension, such as the one here at issue, that affected a large number of sales across the region

---

[5]That clause B(T)8.21 refers to "disposition **or** processing" demonstrates that the Forest Service is aware that a sale may be purchased by a logger, in which case "disposition" would be impacted by a sawmill shutdown or by a sawmill owner, in which case "processing" would be impacted by the sawmill shutdown. Therefore, regardless of who purchases a timber sale the Forest Service is aware that the availability of a sawmill is pivotal to the "disposition or processing" of the timber.

would have very serious impacts on timber contractors and their sawmills. PPFF 194, 195; see also PPFF 196-202.

Finally, for the five contracts at issue in this case with escalated and de-escalated pricing, it is simply impossible to even determine the price to be paid for the Forest Service timber under the contract without reference to lumber product prices established by the Western Wood Products Association ("WWPA"). PPFF 191.

Based on the above, it is clear that the Forest Service timber sale contract was designed with the production and sale of lumber from the timber in mind. As such, lumber production and sale cannot be termed "collateral" to the Forest Service timber sale contracts at issue in this case.

## III. As Another Preliminary Matter, The Breach Of All Eleven Contracts Occurred On August 25, 1995; It Did Not Occur 135 Days Later.

In its decision on liability in this case, the Court found a breach of the duty to cooperate and a separate breach of the duty not to hinder. Precision Pine & Timber, Inc. v. United States, 50 Fed.Cl. 35, 59 n.31 (2001). With respect to the former, the Court found that in light of the decision in Pacific Rivers v. Thomas, 30 F.3d 1050 (9th Cir. 1994), the Forest Service's decision thereafter to offer and award seven of the timber sale contracts without having first entered into consultation under the Endangered Species Act (ESA) breached the warranty contained in contract clause C(T)6.25. The contracts that were subject of this breach were Mud, Monument, Saginaw-Kennedy, Brann, Manaco and Brookbank. 50 Fed.Cl. at 69 n.42. With the exception of Brann, Precision Pine seeks breach damages with regard to each of these contracts.

Precision Pine, of course, also seeks breach damages with regard to six other timber sale contracts, i.e., Kettle, Hay, Jersey Horse, O.D. Ridge, Salt, and U-Bar. As to each of these six sales (plus five where the duty of cooperation had also been breached), the Court found that the

Forest Service breached its implied duty not to hinder the performance of the contract. Id. at 70-72. The test laid out by the Court in this regard was whether: (1) the hindrance was caused by the fault of the government, and (2) in the surrounding circumstances of the contract, the length of the suspension was unreasonable. Id. at 70.

With respect to the first prong, the Court reiterated its holding that the Forest Service's failure to enter into consultation under the ESA until ordered to do so by the Arizona District Court on August 24, 1995 was unreasonable and was a basis to hold the Forest Service culpable for the suspension of all 14 contracts. Id. at 70.

Regarding the second prong of the test, the Court concluded that:

> [T]he Plaintiff's operations were significantly hindered. Therefore, the Court finds that the Forest Service breached its implied duty not to hinder the performance of all contracts at issue with the exception of the Brann, Hutch-Boondock, and St. Joe contracts [which were released some eight weeks after being suspended].

Id. at 72. At trial, defendant argued that because of the distinction that the Court made between the two duties, the Forest Service was entitled to 135 days to consult under the ESA for which Precision Pine could recover no damages for a breach of the duty not to hinder. Tr. 46, 5453-34 (Harrington).[6] This contention is fallacious in several respects.

First, as the Federal Circuit found in Scott Timber Co. v United States, 333 F.3d 1358, 1369 (Fed.Cir. 2003), because the provisions of the ESA are not incorporated into standard Forest Service timber sale contracts, a government violation of the time period specified in the statute is only one factor in whether the suspension is reasonable. Given this reasoning, there is no basis to conclude, as defendant suggests, that the converse is somehow true, i.e., compliance

[6]At most, defendant's contention would apply to the five sales (Hay, O.D. Ridge, U-Bar, Jersey Horse and Salt) for which Precision Pine seeks breach damages and regarding which the Court found that only the duty not to hinder had been violated. Id. at 73-74.

with the deadlines specified in the ESA for consultation would render a suspension reasonable *per se* or give the Forest Service *carte blanche* to hinder a contractor's performance for 135 days.

Indeed, that the Court did not intend the anomalous result now urged by defendant is evident from the fact that it determined that the delay between the district court's order of August 24, 1995 and the initiation of formal consultation that was caused by the Forest Service's failure to provide the information necessary to begin consultation until 77 days later was, in and of itself, "unreasonable." 50 Fed.Cl. at 70.

Moreover, even assuming that, irrespective of an agency's conduct during the consultation, completion of consultation within 135 days renders a suspension of that length reasonable *per se*, the fact remains that here the Forest Service did not complete consultation within 135 days, but rather engaged in unreasonable and dilatory conduct throughout the protracted consultation, thereby prolonging the suspension period. Id. at 47-51. As a result, the suspension did not last 135 days or less but rather lasted from August 25, 1995 to December 4, 1996, a total of 466 days. PPFF 21.

**IV. Precision Pine's Right To Recover Its Expectancy Damages, Including Lost Profits, Is Not Limited Under The Law Relating To Partial Breach.**

In its pre-trial memorandum and again at trial, defendant asserted that because Precision Pine continued with the breached contracts once the suspension was lifted, it is limited to the recovery of damages for "partial breach," citing Cities Service Helex, Inc. v. United States, 211 Ct Cl. 222, 543 F.2d 1306 (1976). Defendant offers numerous views at to what these damages might consist of nearly all of which have in common, of course, that Precision Pine would

recover little. The law is, however, not as draconian as defendant wishes it to be. As expressed by the commentators:

> When one party commits a material breach of contract the other party . . . can either elect to allege a total breach, terminate the contract and bring an action, or, instead, elect to keep the contract in force, declare the default only a partial breach, and **recover those damages caused by that partial breach**.

13 Richard A. Lord, WILLISTON ON CONTRACTS § 39:32 at 645 (4th ed. 2000) (emphasis added). In this regard, ". . . an election is not [as the defendant asserts] a waiver of any rights under the contract." Id. at 646. Indeed, the non-breaching party is to be compensated "for the loss caused by the shortfall in the other party's performance." 3 E. Allen Farnsworth, FARNSWORTH ON CONTRACTS § 12.9 at 201 (2nd ed. 1998).

It is well-established that among the damages available for a partial breach are a plaintiff's expectancy damages. Entergy Nuclear Indian Point 2, LLC v. United States, 64 Fed.Cl. 515, 522 (2005) (citing Boston Edison Co. v. United States, 64 Fed.Cl. 167, 179-80 (2005)); accord Morris v. United States, 33 Fed.Cl. 733, 740, 749 (1995); see also Cuyahoga Metro. Hous. Auth. v. United States, 65 Fed.Cl. 534, 561 (2005).[7]

Defendant has provided no authority for its view that damages for "partial breach" do not include all of the damages sought by Precision Pine, including its lost profits. Defendant did

---

[7]Defendant even admitted that expectancy damages are recoverable for a partial breach of contract during a dialogue with the Court by agreeing that if Precision Pine had been able to affect cover in the wake of the Forest Service's suspension, the increased costs of cover would have been recoverable. Tr. 3161-2. Given that the purpose of providing compensation for the increased cost of cover is the same as providing for the recovery of lost profits (as it is for all expectancy damages), i.e., to put the plaintiff in the same economic position it would have been in had there been no breach, there is no basis for the distinction that defendant attempts to create as to why lost profits are not recoverable for a partial breach. See Bank of America, FSB et al v. United States, __ Fed.Cl. __, 2005 WL 1792182 *8, n.21 (Fed.Cl. July 21, 2005) (Noting the absence of authority or compelling reason to distinguish between cover damages, one subset of expectancy damages, and lost profits, another subset of expectancy damages).

assert in its pretrial memorandum that the "'normal measure' of damages for 'partial breach' due to delayed performance is the difference between value of what was conveyed and what was supposed to be conveyed." Defendant's Memorandum of Fact and Law at 22 (April 4, 2005) (citing White v. United States, 187 Ct.Cl. 564, 410 F.2d 773, 779 (1969)). White, however, is inapposite because it did not address damages for delayed performance of a contract to supply raw materials. Rather, White involved defective performance of a contract to convey real property, i.e., the government's failure to provide all that it had it promised -- title to land subject to a railroad easement for two tracks, rather than title subject to an easement for four tracks, which is what it timely delivered. Id. at 773-75. Whatever the rule may be for delivery of less than the specified title to real property, as demonstrated above, there is ample authority for the proposition that expectancy damages, including lost profits, are an entirely appropriate remedy for a partial breach of contract to supply raw material to a manufacturer.

## V. Precision Pine's Lost Profits On Lumber And By-Products Are Recoverable.

### A. But For The Suspension, Precision Pine Would Not Have Sustained Lost Profits With Regard To Lumber And By-Product Sales.

At the time of the suspension on August 25, 1995, the remaining volume of sawtimber on the 11 breached sales for which Precision Pine seeks lost profits was some 25,000 mbf "Log Scale" (LS). PPFF 23. These 11 sales would have been harvested between August 25, 1995 and December 4, 1996. PPFF 246. The unavailability of the timber from these sales resulted in the closure of Precision Pine's Eagar sawmill as of December 1, 1995 and the shutdowns during the suspension of Precision Pine's other sawmills at Winslow and Heber. PPFF 390. By causing a protracted suspension, the Forest Service directly and proximately caused Precision Pine to lose

profits on the sale of lumber and by-products manufactured from the timber on the breached sales that would have been harvested in late 1995 and in 1996.

B. Precision Pine Introduced Ample Evidence That Its Lost Profits Were Foreseeable To The Forest Service.

Many of the facts that demonstrate that Precision Pine's sawmill operations and lumber sales were not collateral to its timber sale contracts also demonstrate that it was entirely foreseeable to the Forest Service that its protracted and widespread breach would lead to lost profits. These facts are set forth in § II, supra, and will not be repeated here.

A great deal with respect to foreseeability has also already been addressed by the Court and is now law of the case. That is, it has already been determined "that the Defendant was aware that the Plaintiff's operations would be significantly hindered by the delay," 50 Fed.Cl. at 71, and that, "[t]he Forest Service was [also] aware of the effects of the suspension of the timber sales contracts on the timber industry as a whole within Region 3." Id. at 71, 47. In documents prepared just days after it imposed the suspension, the Forest Service stated that it was aware of the impact of the suspensions on the profitability of the timber companies to which it sold timber, and that a suspension of even a few months could result in permanent mill closures. PPFF 196. In fact, in denying defendant's motion for summary judgment last November, the Court found that such evidence:

> Reflects facts likely long known to the Forest Service, i.e., the logging season is restricted and a suspension can cause a contractor to lose an entire year of production and such a loss can result in lost profits and several sawmills going out of business permanently.

63 Fed.Cl. at 131. Moreover, in denying the government's motion to "clarify" the decision on liability, after reiterating the fact that shortly after the suspensions were imposed Precision Pine

had notified the Forest Service that it was suffering economic harm and had been forced to shut down its sawmills as a result of the suspensions, this Court stated that:

> It is simply not credible that the Forest Service would somehow be unaware that the Plaintiff's performance of the contract[s] would be significantly hindered in the face of a 2-year suspension.

Order of November 20, 2001 at 2 (emphasis added). Based on the above, there is more than sufficient factual evidence to establish that the Forest Service could reasonably have foreseen (or actually foresaw) that the probable result of its widespread and protracted suspensions would be Precision Pine's lost profits on lumber and by-product sales.

C. Precision Pine Has Proven Its Lost Profits With Reasonable Certainty.

1. The Methodology Used To Calculate Lost Profits.

The general approach taken by Precision Pine's damage expert, Mr. Robert Ness, for determining Precision Pine's lost profits for lumber and by-products that it would have produced and sold in 1995, 1996 and early 1997 from the timber harvested under the contracts was to calculate "what would have changed" between what Precision Pine actually did during the period of the suspension and ensuing winter and what Precision Pine would have done but for the Forest Service's breach. PPFF 63.

In broad terms, to calculate lost profits, Mr. Ness determined the gross profits before manufacturing overhead that Precision Pine would have earned in 1995, 1996 and early 1997 from producing and selling lumber and by-products from the timber on the breached sales that, but for the breach, Precision Pine would have harvested between August 25, 1995 and December 4, 1996. PPFF 64. To do so, he calculated what Precision Pine's total revenue would been with regard to the sawtimber harvested from the breached sales during this period, and then deducted

the various direct manufacturing costs Precision Pine would have also incurred had it harvested that timber and produced lumber and by-products from the sales as planned. Id.

In Mr. Ness' expert accounting opinion, gross profits before manufacturing overhead is the appropriate measure of damages in this case, because manufacturing overhead as well as general & administrative expenses remained static irrespective of the suspension. PPFF 66. In other words, to calculate what "would have changed" between the situation that Precision Pine actually experienced because of the breach, and the scenario that Precision Pine would have faced had there been no breach, Mr. Ness did not need to include these static costs. PPFF 66.[8]

At trial, Precision Pine presented ample evidence demonstrating the reasonableness of its lost profit calculations for lumber and by-products, which is summarized below:

a. The Volume Of Sawlogs Remaining On The Breached Sales At The Time Of The Suspension.

The starting point for the calculation of lost profits on lumber and by-products is the determination of the volume of sawtimber remaining on the breached sales at the time of the

[8]There would appear to be no real disagreement between the parties that calculation of the lost opportunity that the suspension caused Precision Pine by determining the gross profits without regard to manufacturing overhead and general & administrative expenses is appropriate. In this regard, defendant's expert, Dr. Neuberger, conceded that if costs below the gross profits (before manufacturing overhead) line, i.e., manufacturing overhead and G&A, on an "actual world" income statement were no different than the costs below that line for the same period of time on a "but for" world statement of income, then subtracting the "actual" numbers from the "but for" numbers the items below the gross profits before manufacturing overhead line would net out. PPFF 205; Tr. 3589-90 (Neuberger).

This common sense approach was endorsed in Kutner Buick, Inc. v. American Motor Corp., 868 F.2d 614 (3rd Cir. 1989), which involved lost profits resulting from AMC's breach of an agreement giving Kutner an exclusive franchise. In determining the amounts to which Kutner was entitled, the court stated that fixed costs remain the same over a relevant range of activity; as such they are irrelevant to a determination of loss of net profit and the only proper focus is the revenue that would have been generated less the variable costs of doing so. Id. at 617-18.

suspension. During the trial the parties reached a stipulation as to that volume. Third Joint Stipulation of Fact, June 3, 2005.

Although the Forest Service traditionally denoted the volume of the timber sold in its contracts in mbf (LS), during the time in which the Forest Service prepared and awarded the contracts at issue in this case, it was changing to another unit of volume measurement called hundred cubic feet ("ccf") (PPFF 207). As a result, for eight of the breached contracts the volume of timber was denoted by the Forest Service in ccf. See PX 320. To compute its damages, Precision Pine had to convert the volume remaining on those eight contracts at the time of the suspension into mbf (LS). PPFF 207. Precision Pine did so by using a factor of 2 ccf per mbf (LS). PPFF 208.

The next step in computing lost profits was to determine when that volume would have been harvested, milled and sold.

b. Harvest Schedule.

As required by standard contract clause B(T)6.31, each year Precision Pine submitted tentative annual operating schedules to the Forest Service. PPFF 241. The clause permits the contractor to make changes in the tentative schedule due to a wide variety of circumstances, including changes in the market for lumber products to be produced from the timber (PPFF 241), and Precision Pine seldom, if ever, followed its operating schedules nor did the Forest Service treat the schedules submitted as binding. PPFF 241.

Moreover, in the decade prior to the suspension, during which time Precision Pine was continuously profitable (PPFF 8), it had never prepared or followed fixed, long term schedules for harvesting the sales it had under contract. PPFF 242. Given the above, Mr. Porter testified that, as part of preparing Precision Pine's claims in 1997, after he determined how much timber

remained on the breached sales at the time of the suspension, he figuratively had to go "back in time," i.e., to August 24, 1995, in order to ascertain in which quarters the timber on the breached sales Precision Pine would have been harvested had there been no suspension.[9] PPFF 245. In making this projection Mr. Porter testified that he considered operating restrictions contained in the contract, contract termination dates, and the needs of the Precision Pine's sawmills at various points in time, including the need to maintain a proper mix of large and small sawlogs at each of the mills. PPFF 245.

With regard to his projection, Mr. Porter further explained that all of the remaining timber on the breached sales would have been harvested between August 25, 1995 and December 4, 1996, because:

a. Seven of the eleven sales were going to expire by the end of December 1996. PPFF 246;

b. The volume of sawlogs remaining on these sales represented only an approximately 10.5-month supply of timber to Precision Pine's mills, while the period of the suspension plus the ensuing winter, i.e., the period for which Precision Pine would need timber was nearly 20 months long. PPFF 246;

c. Precision Pine was in the business of producing and selling lumber and thus wanted to keep its mills supplied so that they could run at their capacity. PPFF 246; and

d. During the nearly 20-month period between August 25, 1995 and April 15, 1997, after bottoming out in the January-February 1996, the market for Ponderosa Pine lumber products took off like a rocket. PPFF 246.

Mr. Ness' understanding of the total volumes remaining on the breached sales at the time of the suspension by species was:

---

[9]These same quarterly harvest projections numbers are set forth in DX 1004, were provided to Mr. Ness by Precision Pine (see footnote to PPFF 245), and used by him in his damage computation. Footnote to PPFF 245.

| | |
|---|---|
| Ponderosa Pine: | 22,620 mbf (LS) |
| Douglas Fir: | 2,060 mbf (LS) |
| Spruce: | 264 mbf (LS) |
| **TOTAL**: | 24,944 mbf (LS) |

PPFF 71.[10]

After determining the total volume of sawtimber remaining on the 11 breached sales at the time of the suspension, using the quarterly harvest projection prepared by Mr. Porter for each affected sale, Mr. Ness distributed the slight adjustments to the volume remaining at the time of breach that he had made *pro rata* across each quarter. PPFF 72. Mr. Ness also confirmed with Mr. Porter that the harvesting schedule itself was feasible, that sufficient harvesting capability existed and discussed other general parameters to make sure that the harvesting projection was reasonable. PPFF 72. The harvest schedule upon which Mr. Ness' report is based did not change Mr. Porter's original projection of the quarter in which harvesting of the breached sales would have taken place had there been no suspension. PPFF 73.

c. Milling Schedule.

In initially calculating its damages, Precision Pine had used the overly-simplistic assumption that sawlogs on a sale would have been harvested, milled and sold all in the same quarter. PPFF 282. Because of this, Mr. Ness was required to develop a more accurate model of when milling of the timber on the breached sales would have taken place. PPFF 282.

Mr. Ness' milling schedule was prepared on the basis that, but for the suspension, during the period from August 25, 1995 through April 15, 1997, Precision Pine would, for many

[10]This was slightly different than the volume which Precision Pine had calculated. PPFF 72. However, based on the Third Joint Stipulation of Facts entered into by the parties during the trial, and assuming a ccf-mbf conversion factor of 2, the total remaining volume of sawlogs on the 11 sales was 25,062 mbf (LS). PPFF 23; see PX 1013.

reasons, have operated its mills at or near capacity. See PPFF 283. Moreover, Mr. Porter confirmed that is what Precision Pine would have done. PPFF 283.

Mr. Ness then determined that the total anticipated production for all three sawmills operating at or near capacity for the 19¾ months from August 25, 1995-April 15, 1997 would have been 57,134 mbf (LT) (PPFF 69) which represented lumber production at an annual rate of 34,714 mbf (LT) (PPFF 69) and confirmed with Mr. Porter that Precision Pine could have produced lumber at that rate. PPFF 70. Mr. Ness also independently confirmed the feasibility of this rate of production based on Precision Pine's having produced in excess of 30,000 mbf (LT) in each of the two fiscal years preceding the suspension (PPFF 70) and that at the time of the suspension Precision Pine was making improvements to its sawmills. PPFF 70.[11]

Next, in determining the available capacity at each mill during the suspension to saw timber from the breached sales, Mr. Ness started with the total quarterly capacity at each sawmill and subtracted from that Precision Pine's actual quarterly lumber production during the suspension. PPFF 77, 285. Mr. Ness then assigned a volume of timber that, absent the breach, would already have been harvested from one or more of the breached sales destined for a particular sawmill as a volume of additional timber that would have been milled in the quarters when there would have been remaining capacity at the sawmill. PPFF 79, 80. He did so until the volume to be sawn in a particular quarter reached the mill's anticipated production for the quarter. PPFF 79.

[11]Mr. Ness noted that even if, between August 1995 and April 1997, the capacity of Precision Pine's mills were a bit lower than 34,700 (LT) per year, this would not require a change in his calculations because, as he confirmed with Mr. Porter, during a good lumber market it is typical for mills to work extra hours or an occasional Saturday. PPFF 284.

As Mr. Ness testified, the milling schedule was based on Mr. Porter's projected harvest schedule. PPFF 287. Mr. Ness was, however, careful to note that the milling schedule does not depend on strict compliance with that harvest projection, but rather only that the logs be harvested prior to the time when they are scheduled to be processed at the sawmill. PPFF 287.

In response to Precision Pine's milling schedule, defendant proffered the approach to determining lost profits developed in Mr. Moosman's report (DX 777; Tr. 52 (Harrington)) which purports to show that selling the lumber from many, but not all, of the breached sales would not have been profitable during the suspension period. Id. However, as Mr. Moosman admitted at trial, his model assumes that harvesting the sawlogs on the breached contracts, milling those sawlogs and selling the resulting lumber would all take place in the same quarter. PPFF 289. Of course, as Mr. Porter testified and as Mr. Moosman acknowledges, this was generally not the way that Precision Pine actually operated or would have operated in the "but for" world. PPFF 282, 289. Moreover, Mr. Moosman also admitted that if, in fact, harvesting, milling and lumber sales would have occurred in different quarters, in order to assess profits, "the Court would have to obtain additional information on what the applicable prices would be for those products at that time." PPFF 289. Because Mr. Moosman's model is based on a premise that even he admits is invalid and must be revised before it can possibly be accurate, his report is of no value whatsoever to the Court in determining the profits that Precision Pine would have earned from the breached sales.

d. Delivered Log Costs.

Once Mr. Ness calculated, by mill, the amount of timber from the suspended sales that Precision Pine would have processed in each quarter, he then calculated the total cost of

obtaining that timber (the cost of purchasing, felling, and hauling the timber to a sawmill plus severance tax), i.e., its "delivered log cost." PPFF 81.

e. Calculation Of The Volume Of Each Lumber Product That Would Have Been Produced From The Breached Sales.

Mr. Ness next set about computing the total revenue that Precision Pine would have earned from processing the timber from the breached sales during the suspension. To do so, Mr. Ness started by taking the volume of timber in mbf (LS) that would have been processed by sale by quarter and multiplied it by an overrun factor of 1.25 to determine the volume of lumber that would have been produced from the timber in that sale in that quarter. PPFF 84.

i. Precision Pine's Use Of A 1.25 Overrun Factor Is Reasonable And, If Anything, Conservative.

Mr. Ness utilized an overrun factor of 1.25, i.e., a factor which indicates that for every 1,000 mbf (LS) of logs run through a sawmill, 1,250 mbf (LT) of lumber would have been produced. See PPFF 209.[12] Both Mr. Porter and Mr. Devere, plaintiff's overrun expert, testified that the use of a factor of 1.25 for all species to be processed into lumber on the 11 breached sales was very conservative. PPFF 212, 213.[13]

There were several bases for this conclusion. First, the Forest Service itself determined that the overrun factor for just the Ponderosa Pine sawlogs on each of the 11 sales was 1.245 or

---

[12]As both Mr. Porter and Mr. Devere explained, among the reasons that overrun occurs are: the way logs are measured in the Scribner system, the fact that logs have taper, the use of thinner sawblades at sawmills and the way various lumber products are measured, e.g., a "two-by-four," which for purposes of determining lumber volume is treated as if it were actually 2" x 4", is in fact only 1½" x 3 ½". PPFF 211.

[13]Mr. Devere has 40 years of experience in the timber business, 30 of which is with Ponderosa Pine sawmills in the Southwest. PPFF 210. As the Court noted, there is no doubt that [Mr. Devere] . . . is very well qualified to speak on the subjects on which he's being proffered." Tr. 1142.

greater. PPFF 215. These Forest Service's overrun factors were based on a mill study it conducted in the mid-1980's at Stone's sawmill in Eagar. PPFF 216.[14] There was uncontroverted testimony that as of the time of the suspension in August of 1995 each of Precision Pine's sawmills was every bit as, if not more, efficient than Stone's sawmill was at the time of the mill study.[15] PPFF 217, 218.

Additionally, there was also uncontroverted testimony that overrun for Douglas-fir and Spruce species, which constituted approximately 10% of the volume of the 11 breached sales (see PPFF 71), is generally manufactured into dimension lumber which generates considerably higher overruns. See PPFF 214. In fact, in his report, Mr. Moosman, defendant's accounting expert, used an overrun of 1.3 for Douglas-fir and Spruce, i.e., a factor 20% greater than the overrun he used for Ponderosa Pine. PPFF 214.

Defendant baldly asserts that Precision Pine's overrun factor is overstated. However, this assertion is incorrect because:

---

[14]Mr. Harris of the Forest Service testified that the Forest Service put its determination of the overrun factor for Ponderosa Pine on the appraisal summary "as a service" to potential bidders. PPFF 223. In this regard, the government impliedly warrants the accuracy of such items set forth in contract documents. See United States v. Spearin, 248 U.S. 132, 137, 39 S.Ct. 59, 63 L.Ed. 166 (1918). As the court held in Womack v. United States, 182 Ct.Cl. 399, 389 F.2d 793, 801 (1968), if the bidder were not entitled to regard a representation made by the government in bid documents as the product of such relevant underlying information as is available to the author of the invitation, its inclusion in the invitation would be surplusage at best or deception at worst. Thus, assuming that the bidder acts reasonably, he is entitled to rely on government representations as representing honest and informed conclusions. Id. (citing Snyder-Lynch Motors, Inc. v. United States, 154 Ct.Cl. 476, 292 F.2d 907, 909-910 (1961). As Mr. Porter testified, he took the Forest Service's stated overrun factors to be an aid to bidders to help them estimate what recovery they might achieve, and he used them for that purpose. PPFF 221.

[15]Although Mr. Devere did not get the opportunity to examine Precision Pine's mills at Winslow and Eagar while they were operating (the former having been destroyed by fire in 1998, PPFF 14, and the latter having been permanently shut down in 1997, PPFF 47), he opined that if the same log were sawn in various mills each of which had the same basic equipment (as was the case with Precision Pine's three mills, PPFF 220), the resulting overrun factor would be approximately the same. PPFF 219.

1. As the average dbh of logs on a sale decreases, the overrun factor for the sale increases. PPFF 237;

2. As the grade quality of a sale decreases, less moulding and shop grade lumber and more dimension lumber is produced. PPFF 238;

3. The production of more dimension lumber from a sale results in a higher overrun. See PPFF 214; and

4. Due to the foregoing point 3, an appropriate overrun factor for the 10% of the volume on the breached sales that is Douglas-fir/Spruce, from which largely dimension lumber is produced, is 1.30 or greater. PPFF 214.

Despite these facts, defendant avers on the one hand that the size of the trees offered in Forest Service timber sale contracts was declining and, therefore, that the timber on the breached sales was not large or of high quality (Tr. 5472 (Harrington)); yet, inconsistently asserts on the other hand that the Court should rule that an unquestionably low overrun factor of 1.08 is somehow also appropriate. Tr. 5445 (Harrington). PPFF 230. Defendant further argues, again quite incongruously, that in the face of declining timber size and quality, Precision Pine began to use a lower, not a higher, overrun factor in its own profit projections after 1995. Tr. 5444 (Harrington). However, as amply demonstrated by PX 243 and the testimony of plaintiff's witnesses: as the size of logs decreases the overrun factor increases. PPFF 237. Thus, if defendant's premises about tree size and quality were to be to be accepted, it would of necessity: (1) dictate a high overrun factor, i.e., that an overrun well in excess of the conservative 1.25 is appropriate; and (2) certainly would not support a conclusion that the extremely low one that defendant urges the Court to adopt is appropriate.

Absent from defendant's case was any expert qualified to discuss what overrun factor was normal for a Ponderosa Pine sawmill or what overrun would have been reasonable for the sawlogs from these sales. Moreover, no defense expert directly disputed either the conservatism

of an overall overrun factor of 1.25 or the evidence that Precision Pine readily could have achieved at least a 1.25 overrun factor on the timber from the breached sales. PPFF 213-218. Perhaps more importantly, defendant had no expert who could refute the general accuracy of the Ponderosa Pine overrun factors set forth in the Forest Service's own pre-bid documents. PPFF 216. In fact, defendant did not submit any testimony by a sawmill expert or the like to indicate that an overrun of 1.1 or less could, in fact, have been anticipated from the timber on the breached sales. PPFF 227.

Neither of the two pieces of evidence which defendant claims support a 1.1 or lower overrun factor, i.e., Mr. Porter's July 17, 1995 "profit projections" (DX 519-545) and a document dated March 1996 prepared by John Smith (DX 547), actually do so. In the former regard, the evidence indicated that the July 17, 1995 "profit projections" were in fact worst-case scenarios prepared by Mr. Porter in the wake of overtures from Stone to purchase Precision Pine (PPFF 227) and that these projections were prepared using Mr. Porter's short-hand method for adjusting the level of pessimism of any of his computerized projections. PPFF 227.[16] The 1.1 overrun on the "profit projections" was not an indication that Precision Pine anticipated achieving only a 1.1 overrun on all of its sales at all of its sawmills (PPFF 227); rather, Mr. Porter always knew that Precision Pine would achieve at least a 1.25 overrun, but merely used the overrun factor as a means to quickly assess changes to a number of variables. PPFF 227.

Reliance on Mr. Smith's document (DX 547) to determine Precision Pine's overrun factor is similarly inappropriate because Mr. Smith agreed at trial that: the overruns indicated in DX 547 were just rough estimates (PPFF 231); DX 547 indicates two significantly different

[16]Because of the way that his computerized spreadsheet was configured, a change to the overrun factor both reduced the volume of lumber that would be produced and increased Precision Pine's per unit costs. PPFF 227.

overrun estimates (PPFF 231); DX 547 contains inexplicably negative overruns in some months as well as figures that vary wildly both within and between months (PPFF 231); and most importantly, in coming up with his overrun estimates on DX 547, he admittedly did not measure each log that went into the Winslow sawmill. PPFF 231.

Lastly, if (as the evidence in this case demonstrated), a typical overrun factor for a Ponderosa Pine sawmill of average efficiency in the Southwest was in the range of 1.25, Mr. Ness opined that a company that processed logs with an overrun factor of 15 or more percentage points below this average could not have been profitable in a highly competitive business, except in the very, very best of times. PPFF 240. However, since Precision Pine's historic financial statements showed that prior to the suspension it had always been profitable, both in good lumber markets and bad, Mr. Ness would have rejected a 1.1 overrun figure. PPFF 240. On this same basis he would also, in the absence of extraordinary profits even in bad markets, have rejected a 1.5 overrun factor. PPFF 240. As Mr. Ness testified, a 1.1 or lower overrun factor is such a seemingly aberrant figure that it would require additional investigation to be supportable (PPFF 240), something that defendant here deliberately chose not to do.

Simply put, as numerous witnesses testified and the evidence demonstrated at trial, Precision Pine's use of an overall overrun factor of 1.25 was not only reasonable, it was quite conservative. PPFF 213.

#### ii. Precision Pine's Determination Of The Mix Of Lumber Products That Would Have Been Produced From The Ponderosa Pine On The Breached Sales During The Suspension Was Reasonable.

Mr. Porter testified that as part of his pre-bid inspection of timber on Forest Service sales, including each of the sales in issue, he assessed the quality of the timber and the mix of lumber

products that could be produced from it,[17] i.e., he made a general determination of the volume of the 13 lumber products that Precision Pine produces that would be produced from the timber on the sale. PFFF 298. Moreover, as timber from sales was run through the Precision Pine sawmills, Mr. Porter would also check on the mix of various lumber products being produced by watching the logs as they were sawn, and also discussing the quality of lumber that was being produced with his sawyer and graderman. PPFF 299.

To verify his pre-bid assessment of the product mix that would have been obtained from the timber on the breached sales, Mr. Porter located time periods when timber from the St. Joe, U-Bar, Hutch-Boondook, Mud, Brookbank and Brann sales had been harvested, processed and the resulting lumber had been sold. PPFF 303-307. From this, he was able to confirm the mix of lumber products from those sales was consistent with his pre-bid expectation. PPFF 298-307.

For those sales on which Precision Pine had not performed any harvesting as of the time of the suspension, Mr. Porter confirmed his pre-bid analyses of the sales by comparing the quality and average size of the timber on the sale to a sale that had already been partially harvested and processed. PPFF 311-315, and 317-319. In making these comparability determinations among sales, Mr. Porter again relied on his personal assessment of the quality of the timber on the breached sales prior to award and the average dbh of the timber on the sales as determined by the Forest Service. See, e.g., PPFF 317.

The cumulative result of Mr. Porter's assessments was a percentage of each lumber product, i.e., the product mix, that would have been produced from the sawtimber remaining on the breached sales. PX 288 (first page, right-hand column). The total product mix for all of the

---

[17]This is due in part to the fact that the Forest Service disclaims the reliability of its own estimates of quality and quantity of timber on its sales. PPFF 296-297.

breached sales was very similar to, but represented a slightly lower quality mix than, that which Precision Pine had achieved from processing timber both in the 16 months immediately prior to the suspension and in the full fiscal year preceding the suspension. See PPFF 329.

Defendant, nevertheless, takes issue with Precision Pine's projected mix, asserting that it represents too high a quality.[18] Dr. Munn opined that Mr. Porter's overall product mix was inflated when compared to the product mix used by the WWPA (PPFF 339), i.e., the product mix used by WWPA during the period 1993-1999 to formulate its index prices for Ponderosa Pine in the Inland Rocky Mountain Region. Footnote to PPFF 333. However, the Inland Rocky Mountain Region encompasses a huge area that extends from Idaho, Montana and South Dakota to Arizona (PPFF 335), a fact which results in the undeniable conclusion that timber quality, like growing conditions (see PPFF 336), is not uniform throughout the Region. In fact, the WWPA itself indicates that "Grade recovery by individual mills may vary considerably from [the product percentages WWPA used to formulate index prices for Ponderosa Pine in the Inland Rocky Mountain Region]" (PFFF 337), the very product percentages upon which Dr. Munn based his comparison. PPFF 333. Thus, even the WWPA disclaims the applicability of its Region-wide data to a particular localized area.[19]

---

[18]In response to the Court's question about what better method than that used by Mr. Porter is available to a company that did not track every single log through its sawmills, defendant's counsel answered "an industry wide source such as the WWPA product mix." Tr. 5474 (Harrington). The Court then rhetorically asked whether in such an instance the government would simply assert that there are dramatic variations in the timber within the area covered by the WWPA. Id. The Court thereafter noted, and correctly so, that keeping the kind of log-by-log, sale-specific lumber production data that the government is really asserting that Precision Pine should have maintained is a very difficult task. Tr. 5477. It is well-established that the risk of limited available evidence to prove damages falls on the breaching party, not the aggrieved party. LaSalle Talman Fed. Bank, 317 F.3d at 1374.

[19]The government did not offer a single expert from within this vast region of Ponderosa Pine lumber production willing to espouse the views offered by Dr. Munn, whose professional

Dr. Munn's incredulity at the quality of Precision Pine's anticipated product mix compared to the product mix used to compute the WWPA Index is quite surprising because the overall product mix that Precision Pine had actually achieved from processing predominantly Forest Service timber from Northeastern Arizona both in the 16 months prior to the suspension and in the full fiscal year preceding the suspension was of even higher quality than that anticipated from the breached sales. PPFF 329. That is, in the time just before the suspension Precision Pine had actually produced a product mix that exceeded the WWPA product mix (which remained constant during the relevant time period) by an even greater margin than did the mix it anticipated from the breached sales. See PPFF 329. Dr. Munn, who never even considered Precision Pine's actual, historical production (PPFF 328), remained blithely ignorant of this important fact.[20]

Another ill-founded attack on Precision Pine's determination of product mix was made by Forest Service employee David Maurer who claimed that he "saw" high-grading by Precision Pine on the Brookbank sale in the summer of 1995. PPFF 342.[21] However, the evidence presented at trial shows that Precision Pine was not harvesting the larger sawlogs and leaving the smaller ones as Mr. Maurer testified, but rather that Precision Pine was harvesting **all** sizes of

---

life has dealt solely with yellow pine in the Southeastern United States. When questioned, Dr. Munn admitted that virtually all of his experience, save a summer job in Oregon in 1979, is with species other than Ponderosa Pine (PPFF 340), as are his writings, presentations and grants. PPFF 340.

[20]At trial, defendant's counsel argued that the timber on the sales processed by Precision Pine during FYE 3/31/95 were of substantially lesser quality than the timber on the breached sales; however, defendant proffered no evidence to support this assertion. As Mr. Harrington admitted, no analysis of them was done. Tr. 5470 (Harrington).

[21]As the president of Precision Pine's principal logging subcontractor testified, he had never been directed by Precision Pine either to engage in high-grading or even to move into better quality units first. PPFF 348.

sawlogs and was also removing considerable volumes of pulpwood during that summer. PPFF 344-6. This record evidence is so at odds with Mr. Maurer's uncorroborated testimony as to suggest that Mr. Maurer was badly in need of glasses or did not truly remember the harvesting on the Brookbank sale.[22]

In preparing his report, Mr. Ness used the Ponderosa Pine lumber product percentages for each of the sales developed by Mr. Porter. PPFF 85. Before doing so, Mr. Ness did, however, perform two separate "reality checks" on Mr. Porter's product mix projections based on Precision Pine's historic product mix from two different time periods which demonstrated that Mr. Porter's projected product mix was in line with, and somewhat lower in overall quality than, the mix that Precision Pine had historically obtained. PPFF 86. Satisfied with the veracity of Mr. Porter's projected product mix by-sale, Mr. Ness then applied the appropriate percentages to the timber that Precision Pine would have processed from each sale in each quarter. PPFF 90.

f. The Determination Of Prices For Ponderosa Pine Lumber Products During The Suspension Period.

To determine the prices at which Precision Pine would have sold the various Ponderosa Pine lumber products that it would have manufactured from the timber on the breached sales, Mr. Porter averaged the prices, by quarter, as reflected on Precision Pine's actual lumber sales invoices from the suspension period (PPFF 92), e.g., for moulding & better lumber in the 3rd

[22]The Court will recall rather than elicit testimony on this point from the Contracting Officer or other Forest Service official who had responsibility for operations on the Brookbank sale, the government called only Mr. Maurer, who admitted that he had no official responsibilities with respect to the sale and only went to the sale area one or two times per month. PPFF 342-343.

quarter of 1995, Mr. Porter found three invoices reflecting sales prices of $1,340, $1,350 and $1,350 per mbf. The simple average of these prices is $1,346.67. PPFF 92.[23]

Although simply averaging invoice prices by quarter was the technique used to determine most of the prices at which Precision Pine would have sold the lumber from the breached sales, it could not be used in a few instances. That is, Mr. Porter had projected that but for the suspension, Precision Pine would have produced a certain lumber product in a certain quarter, but Precision Pine did not actually produce any of that product in that quarter during the suspension. PPFF 93. In those cases, Mr. Porter moved the volume that he projected that Precision Pine would have produced to a similarly-priced product category. PPFF 94.

Relatedly, in a few other instances, Mr. Porter projected that but for the suspension, Precision Pine would have produced a certain product in a certain quarter, but in actuality Precision Pine had invoices containing prices for that product in only one or two months of that quarter. PPFF 94. In these cases, Mr. Porter consulted Random Lengths, an industry publication (see, e.g., PX 232), to obtain the price for the months for which Precision Pine had no invoice containing that product's price, and utilized the Random Lengths price along with available invoice pricing in determining an average price for the quarter. PPFF 94.

Lastly, in determining its product prices during the suspension, Mr. Porter excluded a few (less than 35) of the more than 1,100 invoices that it generated during that period. PPFF 95. Some of these invoices were excluded because the prices reflected on them, when compared to the other invoices in the same time period, were either so high (which would have favored

---

[23]This is but one simple example. Precision Pine used over 1,100 sales invoices containing thousands of lumber sales transactions from the suspension period. PX 227. In many quarters for many products there are dozens of sales transactions from which an accurate average price was determined.

Precision Pine) or so low (which would have favored the government) that excluding them was fair to both sides rather than skewing the quarterly price either up or down. Id. Mr. Porter also excluded a few of the invoices such as the ones for 4/4 Shop which is a product that Precision Pine did not intentionally make on a regular basis and which would have improperly brought down some of the Shop lumber prices if included on an simple average basis. Id.

Although Mr. Moosman criticized the exclusion of invoices generally and claimed that additional invoices were missing from the numbered sequence of invoices (PPFF 95), he neither tried to use the sales journal to determine the prices on the "missing" invoices nor did he proffer an opinion as to the effect, if any, of Precision Pine's exclusion of any invoice(s) on its determination of lumber prices. PPFF 95.[24]

Mr. Porter used the methodology described above to obtain a sales price for each Ponderosa Pine product that, but for the suspension, Precision Pine would have produced in each quarter of the suspension, and recorded his findings in his initial calculations of Precision Pine's damages, which he then had Mr. Ness review. PPFF 96.

Mr. Ness verified Mr. Porter's price data by tracing the unit prices of lumber products sold by Precision Pine during the suspension back to individual invoices to see whether the prices had been properly used. PPFF 97. After doing so, Mr. Ness actually disagreed with the way the averages were calculated and, in his opinion, Precision Pine could have significantly increased product prices for certain items based on the count, i.e., various thicknesses, at which different lumber products are sold. PPFF 97. Specifically, in Mr. Ness's opinion Precision Pine

[24]Mr. Moosman's criticism is at odds with the view expressed by another of defendant's experts who testified that Mr. Ness' exclusion of similarly aberrational invoices in the post-suspension period was the "correct" way to determine lumber product pricing. Footnote to PPFF 95.

could have raised its estimated price on some lumber products from $380 per mbf (LT) to $506.66 per mbf (LT), a 33% increase. PPFF 97. Mr. Ness did not, however, use the increased unit prices, because Precision Pine consistently kept its decisions on pricing on the conservative side, and Mr. Ness could not compel a client to increase its claim against the government. PPFF 97.

Having verified that Mr. Porter's price data was both reasonable and conservative, Mr. Ness applied the prices to the volumes of each product that would have been produced from the timber on each contract in each quarter to determine the amount of Ponderosa Pine lumber sales revenue that, but for the suspension, would have been generated from the breached sales. PPFF 98.

g. The Determination Of The Volume, Product Mix And Pricing For Douglas-fir And Spruce Lumber Products During The Suspension Period.

For the three sales that contained Douglas-fir and Englemann Spruce in addition to Ponderosa Pine, Mr. Ness computed lost profits for those other species in substantially the same way as he had for Ponderosa Pine products. PPFF 111. Specifically, he computed capacity for Douglas-fir and Englemann Spruce volume at the sawmills based on a 1.25 overrun factor.[25] Mr. Ness then derived stumpage prices and miscellaneous costs from the timber sale contracts.

Mr. Porter supplied Mr. Ness with product mix and pricing data for Douglas-fir and Englemann Spruce products. PPFF 114.

[25] Mr. Ness testified that this was a ridiculously conservative overrun factor, because in his experience Douglas-fir always produces an overrun of 1.60 or even 1.80. PPFF 214.

h. Defendant's Approach To Lumber Product Pricing And Product Mix Is Unreliable.

By contrast, defendant's proffered alternative approach to determining lumber product pricing and product mix as performed by Mr. Moosman is unreliable. First, to determine product pricing, Mr. Moosman simply used two, single-page summaries of lumber revenue by lumber product by month from the Winslow Sales Journal, i.e., one for the FYE 3/31/96 and the other for the FYE 3/31/97, and divided the figures thereon by the lumber product volumes set forth on two other summary sheets from the sales journal.[26] PPFF 352. In doing so, Mr. Moosman candidly acknowledged that he arrived at results which "surprised" him, such as the price for No. 2 Shop being considerably higher than the price for No. 1 Shop, which is a more valuable lumber product. PPFF 354. Despite his surprise at this (clearly incorrect) result, Mr. Moosman did not try to do a reality check on his calculations and simply continued to rely on his approach of using a few pages of the sales journal to determine product pricing. PPFF 355. Indeed, when it was suggested to Mr. Moosman that he could have gone to Precision Pine's invoices to do a reality check on his calculations, he admitted that he initially started to calculate an average of lumber product prices from the invoices but that he didn't have the expertise to determine in which of Precision Pine's product categories some of the products set out on the invoices belonged. PPFF 356.

Mr. Moosman further conceded that he had improperly included 4/4 Shop lumber in four of his eight lumber product categories. PPFF 357. As Mr. Moosman testified, 4/4 Shop lumber

[26]Although Mr. Moosman agreed that it is "standard auditing procedure" to try to test a summary document before using it, he did not test the contents of the summary documents he relied on from the Winslow sales journal to determine product pricing. PPFF 353. These untested four pages constitute the sum total of Mr. Moosman's product pricing data for all species of all lumber products during the entire 16-month suspension period. PPFF 353.

does not belong with the shop products, i.e., No. 1 Shop, No. 2 Shop or No. 3 Shop, but rather should have been included only in the common and dimension lumber products category he used. PPFF 357. By so testifying, Mr. Moosman endorsed part of the approach taken by Precision Pine, which was to remove 4/4 products when calculating an average price for the Shop grades of lumber products. PPFF 95. Had Precision Pine included the 4/4 Shop products among the common and dimension lumber products, as Mr. Moosman suggested, it would, however, have unduly increased prices for common and dimension lumber products and as a result increased its overall calculation of lost profits. PPFF 95.

Mr. Moosman's admitted limitations notwithstanding, as part of his determination of lumber product pricing, he nevertheless went on to condensed the 13 lumber products actually produced by Precision Pine into eight lumber product categories. PPFF 359. Given his admitted lack of expertise to do this (PPFF 360), he asked "some Forest Service people that were in timber" to help him. PPFF 360. However, based on Mr. Moosman's and their limited capability, the result, in Mr. Moosman's own words, was little more than a guess:

> We all admitted that it was our best attempt at it, or they [the FS employees] admitted that it was their best attempt at it, and so that was the method. They did not claim to be real knowledgeable.

PPFF 360.[27] Of course, a putative expert cannot rely solely on the uniformed guess-work of a party as the lone basis for his opinion; "evidence" of this sort is of no assistance to this Court in determining Precision Pine's damages.[28]

Although it scarcely seems possible, Mr. Moosman's approach to lumber pricing for Douglas-fir and Spruce lumber products was even more haphazard and divorced from reality than his approach to Ponderosa Pine pricing. That is, despite the fact that Precision Pine had identified and claimed damages associated with six different Douglas-fir lumber products it traditionally produces, Mr. Moosman decided to create a single product category for Douglas-fir which he dubbed "4/4 Shop, common and dimension." PPFF 361. Mr. Moosman admitted, however, that he did not know if any 4/4 Shop would have been made from Douglas-fir logs but rather he just "assumed" that Precision Pine's Douglas-fir lumber products matched up with four lumber products on the sales journal. PPFF 361. However: (1) he did not know whether this assumption was accurate (PPFF 361), (2) he did not make any attempt to separate out Douglas-

---

[27]Mr. Moosman also admitted that "it appeared" based on the wide disparity between prices for "rough" lumber and "timbers" that his decision to combine those lumber products in the same category had been incorrect and that he also could have made similar mistakes in combining lumber products when going from the 13 lumber products on the sales journal to the 8 lumber categories of lumber products he used. PPFF 358.

[28]Precision Pine sought to exclude Mr. Moosman's testimony on these points because he admitted it was not based on any aspect of his claimed expertise. Tr. 5071-72 (Goeken). Although it is permissible for an expert to rely on information provided by a party in forming his expert opinion, this is only the case where the expert actually has some expertise in the given area about which the expert requests information from the party. Here, however, Mr. Moosman admittedly had no expertise as to how lumber product categories could be grouped together (Tr. 5069 (Moosman)) and turned for assistance to individuals who did not how to do the job either. Tr. 5071 (Moosman). Whatever the result may be called, it is certainly not expert testimony and should be given absolutely no weight by the Court. <u>See</u>, <u>e.g.</u>, 29 Charles Alan Wright & Victor James Gold, FEDERAL PRACTICE AND PROCEDURE § 6273 at 312, n.22 (1997) (Expert who has no expertise of his own may not simply relay the opinions of others). Notably, no one apparently thought it a good idea to seek advice from Dr. Munn, defendant's putative expert on product mix.

fir products or pricing in the sales journal (PPFF 361), and (3) he did not even know if Douglas-fir lumber products were even included in Precision Pine's sales journal. PPFF 361. Furthermore, he had no idea whether Ponderosa Pine and Douglas-fir lumber products sold for the same price. PPFF 361. Finally (and perhaps not surprisingly), Mr. Moosman's report does not explain how he performed his calculations to determine Douglas-fir pricing. PPFF 362. Nevertheless, and despite these glaring problems in his Douglas-fir pricing, Mr. Moosman used the same "methodology" to determine prices for Spruce product pricing (PPFF 363), which again he did not attempt to explain anywhere in his report. (PPFF 363).

i. Mr. Ness' Calculation And Deduction Of Freight Costs And Prompt Payment Discounts From Gross Lumber Revenue.

During his review of Precision Pine's invoices, Mr. Ness ascertained that sometimes freight costs had been included in Precision Pine's lumber prices. That is, although Precision Pine sold much of its lumber FOB mill or FOB mill plus freight, it also sold some lumber FOB Phoenix or Albuquerque, in which case the sales price and a freight component were combined. PPFF 99. In those instances, in order to properly determine the true price of the lumber, the freight component had to be excised from the total amount invoiced (PPFF 100), something which Precision Pine had not done when it originally computed its lost lumber profits (PPFF 99) but which Mr. Ness did. See PPFF 100-102.

Mr. Ness also observed that Precision Pine offered its customers a 1% prompt payment discount and that a great many customers took advantage of it. PPFF 103. As such, he determined that this fact needed to be reflected in the calculation of Precision Pine's damages and did so by reducing lumber sales revenue by 1% for each sale in each quarter. PPFF 103.

By deducting the "included" freight cost contained in Precision Pine's invoice prices and the 1% prompt payment discount, Mr. Ness obtained Net Lumber Sales Revenue for each sale in each quarter. PPFF 104.

j. Mr. Ness' Calculation And Deduction Of Manufacturing Costs From Net Lumber Sales Revenue.

After calculating Net Sales and Delivered Log Cost, Mr. Ness then computed what Precision Pine's cost to manufacture the timber into lumber would have been, i.e., the sum of sawmill, and (when applicable) green lumber haul and planing costs. PPFF 105. In calculating these components, Mr. Ness referred to Precision Pine's financial statements and took the direct manufacturing cost that Precision Pine had incurred at each of its sawmills and at its planer in the 17-month period preceding the suspension and divided each such cost by the amount of lumber produced at each facility to arrive at the respective direct manufacturing costs per mbf (LT) at each sawmill.[29] PPFF 105.

Applying the appropriate unit sawmill manufacturing cost to a particular volume of lumber to be produced from a given sale at a given sawmill in a given quarter, he determined the direct manufacturing cost at the sawmill that would have been incurred to produce that volume of lumber. PPFF 106.

Mr. Ness performed similar calculations to determine planer costs, PPFF 107, and in his calculation, for each sale for each quarter manufacturing costs at the sawmill and planer were totaled to produce a total manufacturing cost by sale, by quarter. PPFF 108.

---

[29]Notably, as Mr. Ness testified, he did not calculate Precision Pine's increased manufacturing costs for August 1995 to April 1997 by taking into account efficiencies that he anticipated would have occurred during that period. PPFF 145.

k. Mr. Ness' Calculation Of Gross Profits-Lumber.

To determine lost gross profits for lumber on a particular sale in a particular quarter, Mr. Ness simply subtracted delivered log costs and manufacturing costs from net sales for the lumber produced in that quarter from the sale. PPFF 109.

l. Mr. Ness' Calculation Of By-Product Revenue (Lost Profits).

Precision Pine seeks to recover lost profits on the by-products that are created during the lumber manufacturing process; namely, bark, chips, grindings (i.e., sawdust) and planer shavings. Mr. Ness calculated lost profits on by-products by first determining the production rates for each by-product, i.e., the amount of a by-product that is produced per mbf (LT) either at the sawmill (for grindings, chips and bark) or at the planer (for shavings). PPFF 125.

For chips, Precision Pine supplied Mr. Ness with a production rate of 1.41 tons of chips/mbf (LT). PPFF 126. Mr. Ness verified this rate using two test months of lumber production data from each sawmill and dividing it by the monthly production of chips in tons by lumber production over the same period in mbf. PPFF 126.

With regard to bark, Mr. Ness determined the production rate for bark in tons per mbf (LT) of lumber produced by analyzing Precision Pine's Bark Sales Ledger (PX 316) for each month during the suspension and divided the tons of bark produced by the mbf (LT) produced at the sawmill to arrive at a production rate of .40 tons of bark per mbf (LT) produced. PPFF 128.

Precision Pine supplied Mr. Ness with the production rate of .7 tons/mbf (LT) for grindings. PPFF 127.

For shavings Mr. Ness derived the production rate from Precision Pine's Shavings Sales Ledger in a method similar to that used to determine the bark production rate, except that he used

lumber processed at the planer, instead of green lumber produced at the sawmills, as shavings are produced at the planer. PPFF 129.

After determining the production rates for each by-product, Mr. Ness then calculated, by quarter, how much of each by-product would have been produced from the breached sales but for the breach. PPFF 131.

Mr. Ness then determined the unit price at which each by-product would have been sold and recorded the unit price for each by-product, by quarter in his report. PPFF 132.

Once Mr. Ness had determined by-product volumes and prices, he determined the gross revenue that Precision Pine would have received from selling by-products by multiplying the amount of by-products that would have been produced from the lumber from each of the breached sales during each quarter of the suspension by the corresponding unit price listed. PPFF 133. The result for each by-product is set forth for each sale at PX 131, Ex. 4.

m. Total Lost Gross Profits (Lost Market Opportunity).

Adding the gross profits from lumber and the by-product revenue produces lost gross profits for a particular contract in a particular quarter. PPFF 136. To determine the total amount of gross profits that Precision Pine lost as a result of the suspension, Mr. Ness totaled the results for each breached contract and quarter of the suspension. PPFF 137. His original calculation of lost profits included Tri-Star's pass-through claim for lost profits on the sale of roundwood (PPFF 137) which the Court dismissed last fall on the basis that under its agreement with Tri-Star, Precision Pine was not liable for Tri-Star's lost roundwood profits. 63 Fed.Cl. at 139. To calculate revised total lost gross profits from lumber and by-products only (excluding roundwood), he simply subtracted the total gross profits shown for roundwood on page 27 of Exhibit 4 of PX 131 ($313,385.49) from total lost gross profits ("Lost Market Opportunity,"

$6,865,541.21) to conclude that Precision Pine's total lost gross profits – lumber and by-products – were $6,552,156. PPFF 137.

Mr. Ness verified the reasonableness of his lost profits calculation by comparing his findings with Precision Pine's historical operating income as reported in its financial statements. PPFF 138. To do his comparison, Mr. Ness first added the operating losses that Precision Pine sustained for FYE 3/31/96 and FYE 3/31/97. PPFF 138. This sum, approximately $2,050,000, is Precision Pine's actual operating losses during the suspension period. PPFF 138. Deducting this operating loss ($2.05 million) from the additional profits that Precision Pine would have earned but for the suspension ($6.5 million), Mr. Ness calculated that but for the suspension in FYEs 3/31/95 and 3/31/96, Precision Pine's operating income would have totaled $4.45 million, or about $2.2 million per year. PPFF 138. Mr. Ness then compared this $2.2 million figure to Precision Pine's operating income in FYE 3/31/93. PPFF 138. He chose FYE 3/93, because like the suspension time period, FYE 3/31/93 was a time where the lumber market had also bottomed out and then sharply risen. PPFF 138. In FYE 3/31/93, Precision Pine's operating income was $2.7 million. PPFF 139. Mr. Ness thereby concluded that if Precision Pine made $2.7 million in operating income in FYE 3/31/93 while saddled with some of the inefficiencies it had at that time, that it could, to a reasonable certainty, have earned $2.2 million per year in operating income in both FYE 3/31/96 and FYE 3/31/97. PPFF 139.

Accordingly, Mr. Ness concluded that Precision Pine's actual lost gross profits of $6.5 million as a result of the suspension were actual damages that would compensate Precision Pine for the operating losses it actually incurred as a result of the suspension, $2.05 million, *plus* the operating income it would have made but for the suspension, $4.45 million. PPFF 140.

D. Because Precision Pine Was A Lost Volume Seller, No Deduction For Post-Suspension Profits Is Required.

In Mr. Ness' expert opinion, based on accounting and economic principles, Precision Pine's lost profits should not be reduced for any sums it eventually earned from lumber and by-products produced from the breached sales after the suspension was lifted. PPFF 141. Mr. Ness' opinion is based on the fact that, as a result of the suspension, Precision Pine lost an opportunity to produce and sell lumber that can never be replaced. PPFF 142.[30] That is, it is impossible to go back in time and recapture the 20-month period from August 1995 to April 1997 when, but for the suspension, Precision Pine would have processed an additional 25,000 mbf (LS) of timber and sold the resulting lumber in the markets that existed at that time. PPFF 142.

Mr. Ness' expert opinion and Mr. Porter's real world experience is bolstered by the fact that, absent the breach, between August 25, 1995 and April 15, 1997, Precision Pine would have made $X in profits on the sale of lumber and by-products made from sawlogs harvested on the 11 breached sales **and** thereafter would have made $Y in profits on the sale of lumber and by-products made from an equal volume of other sawlogs which it would have purchased and processed thereafter, i.e., Precision Pine's total profit would thus have been $X+$Y. By offsetting any actual post-suspension profits that Precision Pine would have earned in any event ($Y) against the profits that Precision Pine lost due to the suspension, Precision Pine would obtain only $X-$Y in profit, a far lesser sum.

Defendant's contrary view is based on the premise that the government merely delayed Precision Pine's harvesting the timber on the breached sales. This view fails to address the fact that Precision Pine is a lost volume seller. As this Court concluded in denying the government's

[30]Mr. Porter also believed that due to the breach Precision Pine had lost an opportunity to produce and sell lumber that can never be replaced. PPFF 143.

motion for summary judgment, if Precision Pine were a lost volume seller, it would not be required to offset the profits from its post-suspension harvesting:

> Lost volume damages are premised on the notion that had the supplier fully performed, plaintiff would have had the benefit of the original sale, and as a trader of the particular good, the profits from the subsequent sale as well.

63 Fed.Cl. at 132.

The Court also found that Precision Pine had raised genuine issues of material fact on the issue of lost volume when Precision Pine asserted that it would have manufactured the sawlogs from the breached contracts into lumber products in 1995, 1996, and early 1997, sold those products, *and* would still have entered into subsequent lumber sales in 1997 and 1998 using other sawlogs to manufacture that lumber. Id. at 132-33.

In this regard, "[i]f the injured party could and would have entered into a subsequent contract even if the first one had not been broken and could have had the benefit of both, he can be said to have 'lost volume' . . .," RESTATEMENT (SECOND) OF CONTRACTS § 347, cmt. f (1981); accord U.C.C. § 2-708, cmt. 2. In the context of this case the question is: Absent the breach, between August 25, 1995 and April 15, 1997, would Precision Pine have entered into certain transactions involving the sale of lumber manufactured from timber on the breached sales and thereafter have entered into other transactions involving the sale of a like volume of lumber manufactured from other timber? Importantly, it is defendant that bears the burden of resolving this question:

> [i]t should be the responsibility of the defendant (who seeks to reduce plaintiff's damages) to show that it is more probable than not that the plaintiff would *not* have had both sales, would not have enjoyed the second resale profit, and thus that the second resale profit (as the child of the breach) should be used to reduce the plaintiff's recovery.

1 James J. White & Robert S. Summers, UNIFORM COMMERCIAL CODE § 6-3 at 298 (4th ed. 1998). At trial, defendant failed to carry its burden as it did not prove either that: (1) Precision Pine would not have harvested and milled the sawtimber on the breached sales between August 1995 and April 1997 and sold the resulting lumber and by-products or (2) Precision Pine would not have purchased a substantial quantity of additional timber in late 1996 and 1997 from which it would have manufactured and sold lumber and by-products in 1997 and 1998. Indeed, the evidence at trial demonstrated quite the opposite, i.e., it indicated that

> 1. But for the suspension, during the period August 25, 1995 through April 15, 1997, Precision Pine would have produced substantial amounts of lumber and in doing so would have used all of the sawtimber in its portfolio as of August 25, 1995, including all of the sawtimber remaining on the breached sales, plus whatever small amounts of timber Precision Pine was able to buy during the suspension (PPFF 368, 372);[31]
>
> 2. In the absence of the breach, by late 1996 Precision Pine would have needed timber to replenish its log supply (see PPFF 368);
>
> 3. Precision Pine would have had cash due in part to profits made on the breached sales to purchase new timber sales (PPFF 369); and
>
> 4. Starting in December 1996 the Forest Service was again selling substantial quantities of sawtimber. PPFF 370.

In fact, between December 6, 1996 and the end of 1997, the four forests on which Precision Pine primarily operated offered 56,871 mbf (LS) of sawtimber for sale and offered another 36,440 mbf (LS) in 1998. PPFF 370. For this reason, Mr. Porter testified that, in the absence of the suspension, it would not have been difficult for Precision Pine to have purchased 25,000 mbf (LS) of sawlogs between December of 1996 and the spring of 1998. PPFF 371.

At trial, defendant argued that Precision Pine's position that it was a lost volume seller must fail because Mr. Porter could not identify a single contract that it would have been awarded

[31] During the period of the suspension, the Forest Service's timber sale program came to a virtual halt. PPFF 367.

had there been no suspension. Tr. 3186, 3192 (Harrington). However, in a demonstration of the utter sophistry of its assertion, defendant responded to an inquiry from the Court by saying that, even if Mr. Porter had been able to identify some contracts, defendant's position that Precision Pine was not a lost volume seller would remain unchanged. Tr. 3187-8 (Harrington). Moreover, contrary to defendant's assertion, there is no requirement in the law that the non-breaching party demonstrate with exactitude the precise sources from which it would have obtained the raw materials it needed. Rather, a showing of the general availability of the raw material has long been held to be sufficient. See, e.g., Miller v. Robertson, 266 U.S. 243, 256, 45 S.Ct. 73 (1924) (Breach damages need not be offset by the profits that smelting company later made on zinc ore that was the subject of the breached contract because if smelting company had not used the subject ore it could have obtained zinc on the open market and processed it). No tribunal since Miller has imposed the requirement which defendant seeks to have this Court impose, i.e., that Precision Pine, in addition to identifying a ready source from which it could buy timber (i.e., the substantial volume of timber contained in the Forest Service's timber sale offerings after December 6, 1996 (PX 304)), must further specifically identify the sales on which it would have been the successful bidder.[32]

E. Pulpwood Harvesting Would Not Have Prevented Profitable Operations On The Sales During The Suspension.

Defendant attacks Precision Pine's claim for lost profits on the additional basis that Precision Pine could not have harvested sawlogs on the breached sales and/or could not have

[32] Defendant also presented no evidence which indicated that Precision Pine could have made up for the lack of lumber production, sales and profit on those sales during the suspension by effectively producing and selling twice as much lumber in the post-suspension period.

done so profitably during the suspension because it had no outlet for pulpwood. See, e.g., Tr. 52 (Harrington). Neither assertion is true.

First, 45% of the remaining sawlog volume was contained in four of the breached sales that did not include any pulpwood. PPFF 273. Moreover, recognizing that historically there were times when Stone would not take pulpwood directly from Precision Pine (PPFF 270), the pulpwood on the remaining sales was subject to an agreement with Precision Pine's principal logger, Tri-Star, pursuant to which Tri-Star would, at its own expense, log, haul and sell the pulpwood and then reimburse Precision Pine the amount which Precision Pine had to pay the Forest Service for the pulpwood. PPFF 270.

To the extent that Stone would, however, have been unwilling to accept pulpwood from either Precision Pine or from Tri-Star at times when Precision Pine wanted to harvest the seven sales containing some pulpwood, Precision Pine had several other options. That is, Precision Pine could have requested that the Forest Service allow it to defer the removal of pulpwood and hence the costs associated with logging and hauling the pulpwood. During the suspension, Precision Pine did in fact request the deferral of pulpwood on several sales that had been released and on each such occasion the Forest Service granted Precision Pine's request. PPFF 271.

Additionally, because Precision Pine was allowed to have as many as three, and perhaps four, payment units open on a sale simultaneously (PPFF 272), as Mr. Porter testified, by essentially harvesting only the sawlogs on the three largest payment units on the sales, Precision

Pine would have been able to harvest 82% of the sawtimber (PPFF 272)[33] and postpone roundwood harvest until a market was available.[34]

Although deferral of pulpwood removal would have permitted the harvesting of all or at least a substantial percentage of the sawtimber remaining on the breached sales, it would not have obviated Precision Pine's contractual obligation to the Forest Service to cut, remove and pay for the pulpwood on the sales. As such, because it had always been a matter of time until Stone agreed to resume taking the pulpwood from Precision Pine's sales (PPFF 270), the pulpwood could have been harvested and hauled to Precision Pine's mill to await the time when Stone would take it.[35] PPFF 271. Conversely, if, as defendant asserts, at no time from August 25, 1995 through December 1996 did Precision Pine have an outlet for pulpwood, then Precision Pine would have been relieved of its obligation to harvest pulpwood pursuant to the terms of the contracts.

That is, B(T)6.4, a standard clause contained in each of the breached contracts (PPFF 277), states that:

> Unless otherwise specifically provided herein, Purchase shall fell trees designated for cutting and shall remove the portions which meet utilization standards, except

[33]If the Forest Service allowed four units to be opened, as it had in the past (PPFF 272), even more sawlog volume could have been removed. Footnote to PPFF 273.

[34]Although Mr. Harris testified that he would not have accepted an annual operating schedule required by clause B(T)6.31 that indicated an intention to only harvest sawlogs on the three largest payment units, he overlooks the fact that annual operating schedules were not submitted in such specificity (PPFF 274) annual operating schedules were rarely, if ever, followed by Precision Pine (PPFF 241) and most importantly, unlike initial Operating Plans required by B(T)6.3, no approval by the Forest Service was required for annual operating schedules. PPFF 274.

[35]This would have caused the cost of stumpage, logging and hauling to be incurred well in advance of their being recouped upon the sale of the pulpwood. However, this approach also would have generated profits when Stone ultimately bought the pulpwood.

> that for occasional trees inadvertently not cut **or** trees or pieces not removed for good reason including possible damage to forest resources or gross economic impracticability at the time of removal of other timber.

See, e.g., PX 170 at JRH-36 (emphasis added). If there were absolutely no outlet during the suspension for pulpwood as defendant alleges, had Precision Pine attempted to remove the pulpwood concurrently with the sawlogs, it would have faced "gross economic impracticability" thereby triggering clause B(T)6.4. As Mr. Harris testified, the clause had a low threshold, i.e., whether there would have been much, if any, cost-benefit to Precision Pine's removal of the pulpwood. PPFF 279. Without an outlet for pulpwood, by definition, harvest and removal would have generated significant costs without any possibility of offsetting revenue, let alone profit.

Mr. Harris testified that B(T)6.4 only meant that if during the inspection of a recently harvested payment unit, the Forest Service found standing trees or logs that the contractor had failed to remove, the contractor need not be ordered to remove them if the cost of doing so was prohibitive. PPFF 278. When asked if his interpretation of the B(T)6.4 would change if the determination of whether the removal of certain of the trees was grossly economically impracticable were required to be made before harvesting operations occurred, Mr. Harris testified that "I think that would be a misinterpretation of the contract provision." PPFF 280

However, Mr. Harris' interpretation of the clause does not comport with either the plain language of the clause and Mr. Porter's consistent interpretation of it (PPFF 276) or even with the Forest Service's own directive with regard to it. First, contrary to Mr. Harris' view, the clause applies either when occasional trees are inadvertently not cut **or** where there is good reason for not cutting some trees. In the latter regard, the clause plainly provides that "good reason" for non-removal includes gross economic impracticability of harvesting some trees "**at**

**the time**" that other timber is being removed. Thus, leaving uneconomical pulpwood at the time that the sawlogs in a payment unit are being removed is contemplated by the clause. In fact, contrary to Mr. Harris' testimony, this reading of the plain language of the clause is dictated by the portion of Forest Service Timber Sale Administration Handbook dealing with clause B(T)6.4 which states that, "The determination of gross economic impracticability should always be made prior to beginning operations in a given area." U.S. Forest Service, Handbook No. 2409.15, Timber Sale Administration § 61.3 (Amendment 92-6 Aug. 3, 1992), available at www.fs.fed.us/im/directives/fsh/2409.15/2409.15,60-61.txt.

In sum, pulpwood simply would not, as defendant asserts, have been an insurmountable barrier to Precision Pine's profitably harvesting the sawtimber on the 11 breached sales between August 25, 1995 and December 1996.

## VI. The Increased Manufacturing Costs That Precision Pine Experienced At Its Sawmills Due To The Suspension Are Recoverable.

### A. But For The Suspension, Precision Pine Would Not Have Incurred Increased Manufacturing Costs.

At summary judgment, the government attempted to preclude Precision Pine's claim for its increased manufacturing costs by seeking to extend an aspect of Scott Timber Co. v. United States, 333 F.3d 1358 (Fed.Cir. 2003) (which had been decided under contract clause C6.01), to this breach of contract case. This Court correctly rejected that attempt and found Scott Timber to be inapposite. 63 Fed.Cl at 136. Indeed, contrary to defendant's position, it is well-established that "[i]ncreased production costs are unquestionably proper items of recovery as consequential damages when adequately attributed to a breach [of a contract to supply raw materials to a manufacturer]." Hawthorne Indus., Inc. v. Balfour Maclaine Int'l, Ltd., 676 F.2d 1385, 1387 (11th Cir. 1982) (and cases cited therein) (case remanded for determination of carpet

manufacturer's damages for lost efficiencies at its carpet mill that arose from the seller's failure to deliver conforming raw material). Precision Pine established facts at trial which readily demonstrate by a preponderance of the evidence that the Forest Service's breach of the timber sale contracts proximately caused Precision Pine to incur increased costs at its sawmills.

Mr. Ness described how the suspension caused the increased manufacturing costs incurred by Precision Pine:

> During the suspension period, the sawmills and planer were not as efficient as they would have been with a steady supply of logs from the suspended sales. As noted above, I have calculated the actual direct manufacturing cost per mbf during the 17-month period before the suspension. Using the same methodology, I calculated the manufacturing cost per mbf that Precision Pine experienced during the suspension. See Exhibits 10 and 16 [of PX 131]. The difference between these two rates represents the inefficiency that Precision Pine experienced during the suspension period to which I applied the actual volume of lumber production during the suspension period. See Exhibit 15 [of PX 131].

PPFF 387. Defendant asserted that a factor in causing Precision Pine's increased manufacturing costs during the suspension was the alleged availability of certain timber contracts that Precision Pine either did not fully cut or relinquished the rights to cut. Tr. 64 (Harrington).[36] However, defendant's arguments are unavailing.

---

[36]At bottom, defendant's argument with respect to the availability of certain timber sales is that Precision Pine failed to reasonably mitigate its damages. Although Precision Pine will treat defendant's argument here because it is readily dispatched, it is important to note that for mitigation the burdens of proof and persuasion shift from the plaintiff to the defendant. The burden is on the breaching party to show that the injured party's efforts at mitigation were unreasonable. Franconia Assocs., 61 Fed.Cl. at 741 (citing T.C. Bateson Constr. Co. v. United States, 162 Ct.Cl. 145, 319 F.2d 135, 160 (1963)). As Judge Lettow recently observed:

> Were the rule otherwise, the breaching party "would benefit from a pervasive causation defense not subject, like mitigation, to the bounds of reasoned decisionmaking. A breaching party simply could spin out a tangled web of damage-reducing hypothetical events in hopes that the injured party would become ensnared in failing to disprove at least one of them."

Defendant first identifies the Hutch-Boondock, Mud and Brann as Forest Service timber sale contracts that were available but not fully harvested during at least a part of the suspension period.[37] However, defendant's own records demonstrate that during the suspension Precision Pine harvested 97% of the sawlogs on the Hutch-Boondock sale. PPFF 263. With respect to the Mud sale, following release of the sale in 1996 (PPFF 264), Precision Pine opened three payment units simultaneously (id.) and removed 81% of the sawtimber remaining on the sale area in August, September and October of 1996. PPFF 264.[38] Similarly, for the Brann sale, Precision Pine harvested over 500 mbf (LS) of sawlogs from the sale in January and February of 1996 at a time when Precision Pine was also harvesting the St. Joe sale which contained larger logs. PPFF 265.

In order to achieve the most efficient and profitable operations at its sawmills Precision Pine obtained a portfolio of timber sales containing a mix of both large and small logs for use at its sawmills, especially at the Winslow sawmill (where Brann and Mud were sawn) which was configured to handle large and small logs simultaneously. PPFF 266. The logs on the Brann and Mud sales were relatively small (id.) and during the suspension, of course, Precision Pine did not have access to the larger logs on its other Forest Service timber sales to mix with the smaller logs

---

Globe Savings Bank, F.S.B. v. United States, 65 Fed.Cl. 330, 349 (2005) (quoting Franconia Assocs., 61 Fed.Cl at 750).

[37]Precision Pine sought and obtained Forest Service concurrence to defer pulpwood harvesting during the suspension on the Brann, Hutch-Boondock and Mud timber sales. PPFF 271.

[38]Defendant claimed that Precision Pine only removed 56% of the timber remaining on the Mud sale area during the suspension. Tr. 59 (Harrington). While the argument of counsel is not evidence, it does bear correcting. The TSSAs for the sale demonstrate that Precision Pine removed all the remaining sawlogs and pulpwood after the suspension of Mud was lifted, and that 81% (not 56%) of the sawlogs were removed during the period before December 4, 1996, when the suspension of the other sales remained in place. Id.

on Brann and Mud. Therefore, although Precision Pine did harvest a fair portion of the sawtimber on the Brann and Mud sales during the suspension, it did not harvest those sales to completion at that time. Id.[39] Thus, contrary to defendant's position, Mr. Ness testified that had Precision Pine harvested more timber than it did from sales with relatively small logs (such as Brann and Mud) and processed them at the Winslow sawmill during the suspension, Precision Pine's claim for increased sawmill costs would have been increased. PPFF 267. Accordingly, to the extent that it did not harvest the remaining logs on these sales during the suspension period, the uncontroverted evidence indicates that by doing so, Precision Pine mitigated its damages.

At trial, defendant also complained that Precision Pine's agreement to a mutual cancellation of the Campbell and Barber contracts and the resulting unavailability of the timber on these two sales contributed to Precision Pine's increased costs at its sawmills during the suspension. Tr. 64 (Harrington). This is nonsense. Both Campbell and Barber were Forest Service sales and had been suspended along with all of Precision Pine's other Forest Service timber sale contracts. PPFF 21. Thus, even if not cancelled, timber from them would not have been available to harvest and process during the suspension in any event. Moreover, only as part of the settlement agreement with the Forest Service, in exchange for the cancellation of the Campbell and Barber contracts, did the environmental plaintiffs in Silver v. Babbitt agree to the release of three other of Precision Pine sales. PPFF 392. Accordingly, absent the cancellation of Campbell and Barber, not even the three released sales would have been available for harvest during the suspension. As such, rather than decreasing the volume of timber processed at Precision Pine's sawmills, the cancellation of Campbell and Barber actually increased the

[39]Once the suspension was lifted and some larger timber harvested, Precision Pine returned to complete the Mud sale. PPFF 266.

volume harvested during the suspension and therefore mitigated damages that Precision Pine would otherwise have suffered had all of its timber sale contracts remained suspended throughout the entire 16-month suspension.

Finally, with respect to the Park sale, during the suspension period Precision Pine entered into what the State of Arizona termed a "friendly default." PPFF 392. Again, defendant complains that, by doing so, Precision Pine increased costs at its sawmills by foregoing "available" timber. Tr. 64 (Harrington). However, there was no evidence presented at trial that there was any sawtimber on Park that was actually "available" for cutting that Precision Pine did not harvest. Rather, the evidence showed that:

1. Precision Pine and the State of Arizona entered into the Park timber sale contract with apparently differing views as to what timber was included in the sale and covered by Precision Pine's contract price. PPFF 392;

2. Rather than litigate over whose position was correct, the State accepted Precision Pine's proposal to allow for a "friendly default" whereunder Precision Pine paid only $8,190 rather than the significantly greater amount that the State was demanding. PPFF 392;

3. Under this agreement, Precision Pine was released from the contract and its performance bond was returned. PPFF 392; and

4. By avoiding litigation, Precision Pine was able to maintain its good relationship the State. PPFF 392.

Finally, even if as defendant suggests foregoing these sales contributed in some way to the increase in Precision Pine's per unit sawmill costs, which they did not, that fact should not preclude recovery because, as this Court has already ruled:

> In order to establish that losses were 'proximately caused' by defendant's breach, plaintiff need not show that defendant's conduct was the 'sole' cause of its damages . . . plaintiff 'need not show that each dollar claimed was entirely unaffected by outside events'" (citations omitted).

Scott Timber, 64 Fed.Cl. at 138 n.2 (quoting Precision Pine, 63 Fed.Cl. at 128). In the instant case, it is abundantly clear that, but for the suspension, Precision Pine would have operated its sawmills at or near capacity and avoided all of the increased manufacturing costs that it suffered during the suspension period. Accordingly, these increased costs were proximately caused by defendant and defendant should not be heard to complain about steps Precision Pine took to keep its sawmills operating as efficiently as possible under the exceedingly adverse circumstances caused by defendant's breach.

B. It Was Foreseeable To The Forest Service That A Prolonged And Widespread Suspension Would Increase The Cost Of Precision Pine's Manufacturing Operations.

The government's knowledge that Precision Pine, like other members of the timber industry, would suffer increased costs at its sawmills as the result of a protracted and widespread suspension of Forest Service timber sales is, again, demonstrated by many of the facts that show that the contracts are not collateral to sawmill operations and lumber sales and that the Forest Service foresaw that Precision Pine would incur lost profits as a result of the suspension. See discussion, supra, at § II. See also PPFF 7, 193-202; Precision Pine, 63 Fed.Cl. at 131.

Based on the above, Precision Pine has presented more than sufficient factual evidence to establish by a preponderance of the evidence that the Forest Service actually foresaw or could reasonably have foreseen that the result of its widespread and protracted suspensions would be Precision Pine's lost profits on lumber and by-product sales.

C. Precision Pine Has Established Its Increased Manufacturing Costs With Reasonable Certainty.

As noted above, during the suspension period, Precision Pine's sawmills and planer did not operate at or even near the level anticipated, suffered starts and stops in production and

operated on logs of overall lesser quality than those on the suspended sales. PPFF 144. Accordingly, Precision Pine's manufacturing operations were not as efficient as they would have been with a steady supply of logs from the suspended sales. Id. To quantify the dollar impact of this inefficiency, Mr. Ness first calculated the actual direct manufacturing cost per mbf at each of the mills during the 17-month period before the suspension. PPFF 145.[40] Then, using the same methodology, Mr. Ness calculated the actual manufacturing cost per mbf that Precision Pine experienced at each of its mills during the suspension and the ensuing winter. PPFF 145. The difference between these two rates is the inefficiency that Precision Pine experienced during the suspension period at each of its sawmills and planer. PPFF 145. By applying this difference to the actual volume of lumber produced during the suspension period, Mr. Ness determined the increased manufacturing costs sustained by Precision Pine at its sawmills and planer due to the suspension to be $380,711.20. PPFF 146.

## VII. Precision Pine's Increased Hauling Costs On The Hay Sale Are Recoverable.

### A. But For The Suspension, Precision Pine Would Not Have Incurred Any Increased Timber Hauling Costs On The Hay Sale.

At trial, Precision Pine also proved its entitlement to the additional costs it incurred after the suspension was lifted in December of 1996 to haul timber harvested from the Hay sale (1) to the Winslow rather than the Eagar sawmill in December 1996 and February 1997 and (2) to the Heber sawmill in 1998.

[40] See fn. 29 supra.

Prior to the suspension, Precision Pine advised the Forest Service that it intended to haul all of the timber from the Hay sale to its Eagar sawmill. PPFF 377.[41] Absent the suspension, Precision Pine would have harvested the Hay sale in the 3rd and 4th quarters of 1995 and the 1st and 2nd quarters of 1996. PPFF 379. Moreover, the timber from the Hay sale would have been milled at Eagar in these quarters, which would have had sufficient timber to remain in continuous operation throughout the suspension period. PPFF 379-380.[42]

However, due to the shortage of sawlogs caused by the suspension, on December 1, 1995, Precision Pine suspended operations at its Eagar mill and on June 19, 1996, Precision Pine consolidated all of its manufacturing operations at its Winslow facility. PPFF 42.

Immediately after the suspension was lifted in December of 1996, Precision Pine sought the Forest Service's permission to begin harvesting on the Hay timber sale outside of the Normal Operating Season (PPFF 43) because the Hay sale, unlike most, was located at an elevation where there was a very high likelihood that extended winter logging could be accomplished. PPFF 44. As noted, at the time that the suspension was lifted, the Eagar sawmill was not operating. Accordingly, at that time Precision Pine also sought and obtained Forest Service permission to haul sawlogs removed from the Hay sale to its Winslow sawmill which, due to the suspension, was also in need of logs. PPFF 45.

The Winslow sawmill was located a substantially greater distance from the Hay sale than was the Eagar sawmill. PPFF 49. The President of Tri-Star Logging, Precision Pine's primary

---

[41]Indeed, Precision Pine advised the Forest Service that it had built the Eagar mill in large measure to handle the timber from the Hay sale and to avoid incurring the costs to haul the timber from the Hay sale a greater distance to another of Precision Pine's sawmills. PPFF 378.

[42]Even defendant's expert found that the Hay sale would have been profitable if harvested during the suspension period. Tr. 4919, 4929 (Moosman).

logging subcontractor, testified that whenever Precision Pine asked him to haul timber from a sale a greater distance than had been originally agreed to, he sought a price increase (PPFF 384) and that he specifically sought and obtained such an increase based on Precision Pine's asking him to haul timber from the Hay sale to Winslow rather than Eagar. PPFF 385. Hauling timber from the Hay sale to Winslow occurred in December 1996 and January 1997, after which hauling to Eagar resumed. PPFF 383. Precision Pine reopened the Eagar mill on February 17, 1997. PPFF 383.

Thereafter, the Eagar mill ran until the end of July 1997 (PPFF 47) at which time it was permanently closed in the wake of continuing logs shortages caused by the Forest Guardians suspension which, among other things, caused Hay to be suspended from June 7, 1997 to December 15, 1997. PPFF 47. By the time that this latest suspension of Hay was lifted and Precision Pine recommenced harvesting the sale in late 1998, the Winslow sawmill had suffered a catastrophic fire. PPFF 55. Accordingly, with the Eagar mill closed and dismantled and the Winslow sawmill destroyed, Precision Pine had no choice other than to haul the remaining timber on Hay to its mill at Heber.

The Forest Service is liable for the increased hauling costs Precision Pine incurred in hauling timber from the Hay sale to Winslow and later to Heber because -- but for the suspension on August 25, 1995, the Hay sale would have been completed during the suspension period and all of the timber from the sale would have been hauled to Precision Pine's mill in Eagar. In this regard, when the government delays contract operations and thus forces them to occur under conditions that would not have existed but for the delay, the government is liable for the increased costs incurred by the contractor. See, e.g., J.D. Hedin Constr. Co. v. United States, 171 Ct.Cl. 70, 347 F.2d 235, 256 (1965); Youngdale & Sons Constr. Co. v. United States, 27

Fed.Cl. 516, 547-557 (1993); Am. Line Builders, Inc. v. United States, 26 Cl.Ct. 1155, 1211-12 (1992).

B. It Was Foreseeable That The Protracted Suspension Would Increase Precision Pine's Hauling Costs.

As this Court found in denying the government's motion for summary judgment on this issue, "The parties agree that the 'Forest Service knew that Precision Pine had [a] sawmill at Eagar.'" 63 Fed.Cl. at 134. As noted, Precision Pine had also informed the Forest Service prior to the suspension that it planned to haul all of the timber from the Hay sale to Eagar. PPFF 377.

It was also foreseeable to the Forest Service that logs from Hay would be hauled to Eagar because in establishing the minimum acceptable bid price for the sawlogs on a timber sale the Forest Service takes into account the cost of hauling the timber to be sold to the sawmill near the sale (PPFF 374) and with respect to Hay this was a sawmill located in Eagar. PPFF 375. Even more importantly, under Forest Service appraisal procedures, if the sawmill to which the Forest Service had appraised the timber did not also have a planer mill associated with it, the Forest Service would make an additional stumpage price adjustment to account for the increased cost of hauling the green lumber to a planer mill for finishing. PPFF 375. Thus, at the time of contracting, the Forest Service not only reasonably foresaw that the timber from the Hay sale would be hauled to a sawmill in Eagar (and knew that there were costs associated with doing so) but also knew that, if additional hauling were required beyond Eagar, that the purchaser would, *ipso facto*, incur additional costs.

Moreover, as discussed in detail in § II supra, it was also entirely foreseeable to the Forest Service that the prolonged suspension of the contracts at issue would result in sawmill

shutdowns such as the one that occurred at Eagar and as a result the sawmill would be unavailable to accept timber from nearby sales. See also PPFF 7, 193-202; 63 Fed.Cl. at 131.

The issue of whether increased logging and hauling costs resulting from a suspension are recoverable was addressed in Reidhead Bros. Lumber Co., AGBCA No. 2000-126-1, 01-2 BCA ¶ 31,486 (June 29, 2001). There, the purchaser asserted that after the suspension was lifted, its logging subcontractor sought and was given an increase in the price of that work. Id. at 155,441. The AGBCA concluded that this increased cost was incurred as "a direct result of the suspension," and, thus, that it was compensable. Id. Similarly here, because of the suspension, Precision Pine could not harvest the Hay sale to completion and haul the resulting logs to its Eagar mill during the suspension period as it had planned, but rather was forced to haul logs from the Hay sale a greater distance to the Winslow mill in 1996 and 1997 and to the Heber mill in 1998.

Defendant claimed at trial that Precision Pine's increased hauling costs on the Hay sale were not foreseeable to the Forest Service at the time of contracting because Precision Pine had not yet opened its Eagar mill. However, as this Court found at summary judgment, "Precision Pine need not show that a particular type of breach was foreseeable, but must prove that the general magnitude and type of damages were foreseeable." 63 Fed.Cl. at 130.

Moreover, in documents quoted by the Court in the decision on liability, the Forest Service recognized just after the suspension was imposed that if the injunction (and resulting suspension of ongoing sales and proposed sales in Region 3) continued for just two to three months, "that many mills will have to shut down for extended periods" and that "due to low availability of logs to process, this injunction could cause mills to close permanently." 50 Fed.Cl. at 47; see also PPFF 194-195. At summary judgment on damages this Court also ruled

that the Forest Service **likely long knew** that "the logging season is restricted and a suspension can cause a contractor to lose an entire year of production and such a loss can result in lost profits and several sawmills going out of business permanently." 63 Fed.Cl. at 131. Moreover, under the law of this Circuit, the relevant time for assessing foreseeability may, in appropriate circumstances, such as those existing here, include what was known by the breaching party at the time of breach. Id. at 131 (citing Gardner Displays Co., 171 Ct.Cl. at 505, 346 F.2d at 589). Certainly, because it was foreseeable to the Forest Service both at the time of contracting and the time of breach that a protracted suspension would result in sawmill closures, it was also quite foreseeable that timber from a sale proximate to a closed mill would have to be hauled greater distances to another mill at increased cost to timber sale contractors. Because this is precisely what happened in the instant case with respect to the Hay sale, increased hauling costs incurred by Precision Pine in 1996-1998 are fully recoverable.

C. Precision Pine Has Computed Its Increased Hauling Costs With Reasonable Certainty.

At trial, Precision Pine presented evidence including expert testimony and calculations as to the amount of increased hauling costs sustained by it on the Hay sale in the winter of 1996-1997 and again in 1998. PPFF 41; see PX 318.

1. Increased Hauling Costs in 1996 & 1997

In December of 1996 and January of 1997 Precision Pine hauled a total of 1070.01 mbf of timber from Hay to Winslow rather than Eagar. PPFF 51. Hauling the sawlogs to the Winslow sawmill instead of the Eagar sawmill entailed an additional 272 miles per trip. PPFF 49. Mr. Porter and Mr. Reidhead agreed the cost for hauling the logs from the Hay sale would be $1.10 per mile. PPFF 50. Mr. Ness calculated the increased hauling cost to Winslow in

December 1996 and January 1997 to be $80,036 and the savings that Precision Pine experienced by not having to haul green lumber from Eagar to the Winslow planer to be $33,437.50.[43] PPFF 52, 53; PX 318.

2. Increased Hauling Costs in 1998

Mr. Ness repeated the foregoing calculation, with minor variations, to determine the increased costs that Precision Pine incurred to haul sawlogs from the Hay sale to the Heber sawmill in 1998. PPFF 54. Hauling timber from the Hay sale to the Heber sawmill instead of to the Eagar sawmill entailed an additional 190 miles per trip. PPFF 57. Precision Pine harvested 1,662 mbf (LS) from the Hay sale in the 3rd and 4th quarters of 1998 and hauled that timber to its sawmill in Heber. PPFF 56. In doing so, Mr. Ness calculated that Precision Pine incurred increased hauling costs of $86,839.50 and savings by having to haul green lumber only from Heber rather than Eagar to the planer at Winslow of $14,542.50 [44] PPFF 58-59; PX 318.

Thus, as set forth on PX 318, due to the suspension Precision Pine incurred total net increased hauling costs of $118,895.50 to which Mr. Ness added G&A overhead costs of 7.6% (which he computed, PPFF 61) and profit of 10% to arrive at a total increased haul cost on the Hay sale of $140,724.72. PPFF 60; PX 318.

There are a number of cases in which such a markup has been allowed on breach damages of this nature. For example in Poston Logging, AGBCA No. 97-168-1, 99-1 BCA ¶ 30,188 (Dec. 15, 1998), which involved the breach of a Forest Service timber sale contract, the

[43] This amounts to a net of $46,598.50. Adding the 7.6% overhead and 10% profit markup that Mr. Ness deemed appropriate to all increased hauling costs to this amount yields a total of $55,153.98 for the increased hauling costs incurred in December 1996 and January 1997. PPFF 53.

[44] This amounts to $72,297. Adding the 7.6% overhead and 10% profit markup that Mr. Ness deemed appropriate to all increased hauling costs to this amount yields a total of $85,570.14 for the increased hauling costs incurred in 1998. PPFF 59.

Board granted the Appellant a markup for profit on unabsorbed overhead and a markup for both overhead and profit on the additional cost that the Appellant incurred as a consequence of the breach to conduct a detailed reexamination of the timber on the sale, accord Big Chief Drilling Co. v. United States, 26 Cl.Ct. 1276, 1321 (1992) (Awarding profit markup on consequential damages; overhead markup disallowed due to lack of proof). Similarly, in cases such as Dale R. Horning Co. v. Falconer Glass Ind., Inc., 730 F.Supp. 962 (S.D. Ind. 1990), the courts have found plaintiffs entitled to a markup for overhead and profit on additional costs incurred as a consequence of defendants' breach pursuant to U.C.C. § 2-715.[45] See, e.g., Draft Systems, Inc. v. Rimar Manufacturing, Inc., 524 F.Supp 1049 (E.D. Pa. 1981); see also, e.g., District Concrete Co., Inc. v. Bernstein Concrete Corp., 418 A.2d 1030 (D.C. 1980) (awarding plaintiff overhead expenses of keeping facilities and personnel on site under § 2-715). Some courts have even relied on § 2-708(2) to grant a plaintiff-buyer overhead on the direct costs that it incurred as a consequence of defendant's breach of contract. E.g., Smith-Wolf Construction, Inc., v. Hood, 756 P.2d 1027 (Colo.App. 1988).

## VIII. Precision Pine's Out-of-Pocket Expenses Incurred In Preparing Its Claim Letters Were A Direct Result Of The Suspension.

In contract clause C(T)6.01 (6/90), which is contained in each of the 14 suspended timber sale contracts that were the original subject of this lawsuit except Hay, the government has agreed to pay a timber contractor's "out-of-pocket expenses" incurred as a "direct result" of an interruption or delay of operations when the interruption lasts for more than 30 days during the Normal Operating Season. PPFF 395. Here, Precision Pine seeks to recover the out-of-pocket

[45]As the Court is aware, U.C.C. § 2-715 provides in pertinent part that consequential damages include: "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonable have been prevented by cover or otherwise."

expenses it incurred as a direct result of the suspension in the preparation of its claim letters. Because this aspect of Precision Pine's damages is being brought under clause C(T)6.01, Precision Pine seeks to recover its out-of-pocket expenses incurred in preparing claims on all 14 of its suspended contracts, regardless of whether the contract was breached, with the sole exception of the Hay contract.

That Precision Pine's claim preparation costs are an out-of-pocket expense incurred as a direct result of the suspension is apparent, i.e., but for the suspension, Precision Pine would have had no reason to pay its employees for participating in the preparation of suspension claims. In fact, the preparation of the claims was done at the direction of the Forest Service. That is, shortly after the suspensions were lifted Precision Pine contacted the Forest Service seeking compensation for the damages it had incurred as a result of the suspension. PPFF 394. In responding to this inquiry, the Forest Service instructed Precision Pine to review clause C(T)6.01 and file formal claim letters. PPFF 394.

Precision Pine's claim for expenses is based on its employees having been taken away from their usual duties to engage in claim preparation activities. PPFF 393. At the request and under the direction of Mr. Porter, each employee kept track of the time spent in claim preparation and then submitted that time to him. PPFF 396. Mr. Porter then calculated the claim preparation costs based on the hourly rate of each employee multiplied by the hours each had spent in claim preparation. PPFF 397.

The case law demonstrates that claim preparation costs are recoverable under contract clause C(T)6.01. See Reidhead Bros. Lumber Co., 01-2 BCA ¶ 31,486 at 155,441-42 (Awarding

attorneys' fees incurred in preparing claim letters prior to litigation).[46] Additionally, costs incurred when a timber contractor's staff prepared CDA claims were actually paid by the government under clause C6.01 in Scott Timber. See Scott Timber Co. v. United States, No. 94-784C, Judgment (Fed.Cl. July 8, 2002).

Mr. Ness further refined the claim preparation expenses by taking the hours and rates used by Mr. Porter, calculating and applying an appropriate labor burden rate (PPFF 400), recalculating and removing that portion of Precision Pine's claim preparation costs attributable to the Hay sale (PPFF 400), and applying a 10% markup (PPFF 398, 399).[47] The resulting total, $23,219.04, represented total out-of-pocket expenses incurred by Precision Pine in preparing and

---

[46]At summary judgment this Court rejected Precision Pine's claim for attorneys fees under clause C(T)6.01 (and, implicitly, the award of such fees by the AGBCA in Reidhead), it did so based on sovereign immunity and the "American Rule" in favor of both sides paying their own attorneys' fees. 63 Fed.Cl. at 140. Although Precision Pine respectfully disagrees with this ruling, no such considerations preclude the award of Precision Pine's costs incurred in having its own employees participate in preparing its claim letters.

[47]Given that these costs are normally overhead items, no overhead markup is appropriate. PPFF 152. The profit markup applied by Mr. Ness is, however, quite appropriate. The Agriculture Board of Contract Appeals has found an overhead and profit markup on direct costs, such as increased hauling, compensable under C(T)6.01 as an "out-of-pocket" expense. See, e.g., Reidhead Lumber Co., 01-2 BCA ¶ 31,486 at 155,441; see also Matt Allen Logging, AGBCA Nos. 2002-124-1 *et. al*, 04-1 BCA ¶ 32,596 (April 8, 2004). Although unstated, the basis for such entitlement could include the fact that the term "out-of-pocket" costs or expenditures has been defined to include items such as home office overhead expenses, real estate taxes, field and supervisory payroll, etc. Coley Properties Corp. v. United States, 219 Ct.Cl. 227, 593 F.2d 380, 383 (1979). Also, unless specifically precluded, a profit markup along with an overhead markup is appropriate under contract clauses that allow for the recovery of out-of-pocket or "incidental" costs. See Reidhead, 01-2 BCA ¶ 31,486 at 155,441 (allowing a profit markup along with an overhead markup under C(T)6.01, because a profit markup was not the "lost profits" damages that C(T)6.01 precludes); Desonia Constr Co., Inc., ENGBCA No 3231 *et. al*, 73-1 BCA ¶ 9797 at 45,765-66 (Nov. 17, 1972) (allowing a profit and overhead markup for costs resulting from a change order, but only allowing an overhead markup, and not a profit markup, for costs resulting from a suspension of work, because the contract's suspension of work clause specifically precluded a profit markup).

submitting claims letters as a direct result of the suspension and which is, therefore, recoverable under clause CT 6.01. PPFF 400; PX 131, Ex. 1, item 7.

**IX. Credit For The Partial Cancellation Of The Mud Sale.**

In Mr. Ness' report he sets forth the lost profits that Precision Pine experienced on the Mud sale as a result of its being precluded from harvesting all of the sawlog volume on the sale as planned. See PX 131, Ex 4 at 2-5. In his report Mr. Ness also considered the impact of the partial cancellation of the Mud contract during the suspension period. That is, on or about October 18, 1995, as part of its settlement of Silver v. Babbitt, the Forest Service agreed with the environmental plaintiffs in that case to partially cancel the Mud contract by deleting trees in excess of 12" dbh in three cutting units.[48] PPFF 401. This was accomplished by a unilateral partial cancellation of the sale on August 15, 1996, as a result of which Precision Pine was paid $65,796.66 for the timber that had been deleted. PPFF 401. Mr. Ness credited the Forest Service in this amount by deducting it from Precision Pine's damage claim. PPFF 401.

**X. Precision Pine Is Entitled To Recover Its "Miscellaneous Costs."**

Precision Pine's damages include seven items of "miscellaneous cost" that were incurred as a result of the suspension, and which in the aggregate total $19,954.53. Mr. Ness summarized the miscellaneous costs that Precision Pine incurred at Exhibit 1, item 1 and at Exhibit 2 of his report. PPFF 155. As demonstrated below, each cost was incurred by Precision Pine as a direct

[48]The Forest Service did not lift the suspension of harvesting operations even on the timber not being deleted until March 11, 1996, i.e., nearly six months later. PPFF 402. At that time, due to a contract restriction which prevented operations until June 1 (see PX 109) and a subsequent fire closure (PPFF 402), Precision Pine was not able to begin road building operations and commence harvesting of the sale until approximately August 1, 1996. PX 114. But for the suspension and the Forest Service's unilateral deletion of the timber from the contract, Precision Pine would have harvested the contract to completion during the suspension period and earned the gross profits as determined by Mr. Ness. PPFF 402.

result of the suspension and each is therefore recoverable either under C(T)6.01 or, alternatively, as a consequential damage of the government's breach of the instant contracts.

The first item of miscellaneous damage is unpaid bond costs. PPFF 156. The Forest Service's suspension and breach of Precision Pine's timber sale contracts were the direct cause of increased bond costs because the suspension forced Precision Pine to extend the time that performance bonds on its contracts were in place. Id. To calculate unpaid bond costs, Mr. Ness first calculated the additional bond costs that Precision Pine incurred by taking the basic yearly bond cost for each sale as reported by Precision Pine in its original claim, dividing that rate by 12 to calculate a monthly rate for each sale and then multiplying that monthly rate by the number of months that the sale was suspended. PPFF 157. Mr. Ness then added general & administrative overhead at a rate of 7.6% and profit at a rate of 10% to the figure for each sale to produce a total increased bond cost for each sale. Id.[49] Mr. Ness then subtracted any amounts that the Forest Service already paid Precision Pine for additional bond costs from the total figure for each sale to produce a total amount still owed to Precision Pine. The amount due for each sale is then summed on Exhibit 2 of Mr. Ness' report (PX 131) under the heading "Unpaid Bond Costs." Id. The total amount due for unpaid additional bond costs is $9,461.50. PPFF 160.

The second miscellaneous item of damage is unpaid overhead and profit on move-out costs. The Forest Service compensated Precision Pine for its direct move-out costs, but did not compensate it for overhead and profit on those costs. Overhead and profit are required for this cost and compensable for the same reason overhead and profit are required and compensable

[49]As set forth supra at footnote 47, these amounts are compensable in the context of payments pursuant to C(T)6.01. As also indicated, supra, alternatively they are also compensable under a theory of breach.

under C(T)6.01 for the unpaid bond costs. Applying overhead at 7.6% and profit at 10% for move-out costs produces an amount due of $367.20. PPFF 161.

The third, fourth and fifth items of miscellaneous item of damage are interest on various amounts that Precision Pine had on deposit on the sales during the suspensions, i.e., respectively, unpaid interest on cash balances on the Brookbank, Hay and U-Bar contracts ($319.45), unpaid interest on downpayments on the Brann, Brookbank, Hutch-Boondock, Kettle, Manaco, Monument, Saginaw-Kennedy and Salt contracts ($2,763.04), and unpaid interest on unused effective purchaser road credits on the Brann, Jersey Horse and Saginaw-Kennedy contracts ($4,208.62). Each of these items was included in Precision Pine's original claim and reviewed for accuracy by Mr. Ness. PPFF 162-164. Moreover, they are compensable as an out-of-pocket expense under clause C(T)6.01. In this regard, the relevant provisions of the Forest Service's Timber Sale Administration Handbook indicate that such items are compensable because "Out-of-pocket costs include . . . interest on deposits." U.S. Forest Service, Handbook No. 2409.15, Timber Sale Administration § 37.5 (Amendment 92-6 Aug. 3, 1992), available at www.fs.fed.us/im/directives/fsh/2409.15/2409.15,35-38.txt.

The sixth miscellaneous item of damage is unpaid costs of removing snow to access timber on sales that Precision Pine harvested later in the season than it would have but for the suspension. Mr. Ness verified the amount of the cost by referring to documentation provided to him in Precision Pine's original damages claim and then adding 7.6% overhead and 10% profit to that amount. After review, Mr. Ness calculated the amount due for unpaid costs of removing snow to access timber was $1,207.27. PPFF 165.

The final miscellaneous item of damage is the unpaid costs of transferring logs from the Eagar mill to the Winslow mill due to the closure of the Eagar mill due to the suspension. Mr.

Ness verified the amount of the cost by referring to documentation provided to him in Precision Pine's original damages claim this was not part of our CDA claim and then adding 7.6% overhead and 10% profit to that amount. After review, Mr. Ness calculated the amount due for unpaid costs of transferring logs as $1,627.45. PPFF 166.

**Conclusion**.

In light of the foregoing, Precision Pine respectfully requests that the Court enter an order granting it the damages it proved at trial in the amount of $7,050,968.83 (PPFF 167) plus appropriate CDA interest.

Respectfully submitted,

s/Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
Bryan T. Bunting
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: September 12, 2005