No. 98-720C
(Judge George W. Miller)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PRECISION PINE & TIMBER, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL MEMORANDUM OF LAW

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

DAVID A. HARRINGTON
MARLA T. CONNEELY
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277

Attorneys for Defendant

OF COUNSEL:

LORI POLIN JONES
PATRICIA L. DISERT
Office of General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

Dated: November 14, 2005

**TABLE OF CONTENTS**


INTRODUCTION . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . 2

I. Ignoring Key Aspects Of The Court's July 30, 2001 Ruling, Precision Pine Inaccurately Describes The Breaches Found By The Court . . . . . . . . . . 2

A. The Court Found Breaches Of Warranty Because Timber Harvesting Was Suspended In August 1995, Rather Than August 1994 . . . . . . . . . . 2

B. The MSO Suspensions Were A Breach Of The Implied Duty Not To Hinder Only Insofar As They Lasted Substantially "More Than 135 Days" . . . . . . . . . . 4

II. The Manufacture And Sale Of Lumber From Forest Service Timber Constitutes An Independent And Collateral Undertaking . . . . . . . . . . 6

III. Precision Pine's Claim For Profits Is Barred By *Cities Service Helex* . . . . . . . . . . 12

IV. Precision Pine Has Failed To Prove Its Claims For Common Law Damages . . . . . . . . . . 15

A. Precision Pine's Claim For Alleged Lumber Profits Should Be Denied . . . . . . . . . . 16

1. The Lost Volume Seller Concept Is Inapplicable Because The United States Does Not Seek An Offset Of Profits From Post-Suspension Timber Sale Contracts . . . . . . . . . . 16

2. Precision Pine Has Not Established That Lost Lumber Profits Were Directly And Primarily Caused By The Suspensions . . . . . . . . . . 19

3. Lost Lumber Profits Are Not Legally Foreseeable As The Result Of A Contract Suspension . . . . . . . . . . 24

4. Numerous Errors In Mr. Ness's Calculations Cause Lumber Profits To Be Grossly Overstated . . . . . . . . . . 26

a. Lumber . . . . . . . . . . 28

(1) Precision Pine Uses An Inaccurate Conversion Factor . . . . . . . . . . 28

(2) Mr. Ness's Does Not Use Valid "But For" Harvesting And Milling Schedules . . . . . . . . . . 29

(a) Harvesting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

(b) Milling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

(3) Delivered Log Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

(a) Precision Pine's Stumpage Costs Are Understated . . . . . . . . . . . . . . . . . . 32

(b) Precision Pine's Logging And Hauling Costs Are Understated . . . . . . . 33

(4) Mr. Ness Should Have Used A 1.08 Overrun Factor – The Overrun Precision Pine Actually Achieved In 1995 And 1996 . . . . . . . . . . . . . . . . . . 34

(5) Precision Pine Uses A Fundamentally Flawed Methodology To Derive Its Claimed Product Mix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

(a) Ponderosa Pine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

(b) Douglas Fir and Engleman Spruce . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

(6) Precision Pine Overstates Lumber Product Prices During The Period Of The MSO Suspensions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

(a) Ponderosa Pine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

(b) Douglas Fir and Engleman Spruce . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

(7) Lumber Manufacturing Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

b. Roundwood . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

c. Lumber By-Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

(1) Chips . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

(2) Bark . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

(3) Grindings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

(4) Shavings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

5. Precision Pine's Contracts Were Not Profitable . . . . . . . . . . . . . . . . . . . . . . . . . 46

B. Precision Pine's Claim For Sawmill Costs Should Be Denied . . . . . . . . . . . . . . . . . . 49

1. Precision Pine Has Not Proved That Higher Sawmill Costs Were The Direct And Primary Result Of A Contractual Breach . . . . . . . . . . . . . . . . . . . . . . . . 49

2. Increased Sawmill Costs Are Not The Legally Foreseeable Result Of The Suspension Of A Timber Sale Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

3. Precision Pine's Calculations Are Flawed And Uncertain . . . . . . . . . . . . . . . . . . . . 56

C. Alleged Increased Hauling Costs On The Hay Timber Sale . . . . . . . . . . . . . . . . . . . . . . 58

1. Increased Hauling Costs Were Not The "Direct And Principal" Result Of The Suspension Of The Hay Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

2. Increased Log Hauling Costs Were Not Legally Foreseeable At The Time Of Contracting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

3. The Alleged Increase In Precision Pine's Log Hauling Costs Is Inaccurate . . . . . . . 63

V. Precision Pine Seeks To Rescind The Bi-Lateral Cancellation Of The Mud Sale In Order To Boost It Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

VI. Precision Pine's CT 6.01 Damages Claims Are Unsupported Or Unrecoverable . . . . . . 65

A. Precision Pine Is Not Entitled To Employee Claim Preparation Costs . . . . . . . . . . . . . . 65

B. Precision Pine's Claims For Miscellaneous Costs Are Unsupported . . . . . . . . . . . . . . . 67

1. Precision Pine's Claims For Additional Bond Costs Are Unsupported . . . . . . . . . . 67

2. Precision Pine Is Not Owed "Move Out Costs" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

3. Precision Pine Is Not Entitled To The Payment Of Interest . . . . . . . . . . . . . . . . . . . 68

4. Precision Pine Is Not Entitled To Snow Removal Costs . . . . . . . . . . . . . . . . . . . . . . 68

5. Precision Pine Is Not Entitled To Log Transfer Costs . . . . . . . . . . . . . . . . . . . . . . . . 69

6. Under CT 6.01, Precision Pine Is Not Entitled To A Markup For Overhead And Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

## TABLE OF AUTHORITIES

**Cases:**

Abbott v. Federal Forge, Inc.,
912 F.2d 867 (6th Cir. 1990) . . . . . . . . . . 50

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) . . . . . . . . . . 16

Barron Bancshares, Inc. v. United States,
366 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . 68

Baskett v. United States, 8 Cl. Ct. 201 (1985),
aff'd, 790 F.2d 93 (Fed. Cir. 1986),
cert. denied, 478 U.S. 1006 (1986) . . . . . . . . . . 51

Big Chief Drilling v. United States,
26 Cl. Ct. 1276 (1992) . . . . . . . . . . 64

Bluebonnet Savings Bank, FSB v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . 3, 6, 16, 64

Bohac v. Dept. of Agriculture,
239 F.3d 1334 (Fed. Cir. 2001) . . . . . . . . . . 24, 55

California Federal Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005) . . . . . . . . . . passim

Chain Belt Co. v. United States,
127 Ct. Cl. 38, 115 F. Supp. 701 (1953) . . . . . . . . . . 10, 24

Cities Service Helex, Inc. v. United States,
211 Ct. Cl. 222, 543 F.2d 1306 (1976) . . . . . . . . . . 1, 12, 13, 15

Cuyahoga Metro. Housing Auth. v. United States,
65 Fed. Cl. 534 (2005) . . . . . . . . . . 15

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) . . . . . . . . . . 50, 52

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002) . . . . . . . . . . 4

Entergy Nuclear Indian Point 2 v. United States,
64 Fed. Cl. 515 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Everett Plywood v. United States,
206 Ct. Cl. 224, 512 F.2d 1082 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

First Heights Bank v. United States,
422 F.3d 1311 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 11

Hansen Bancorp, Inc. v. United States,
376 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 16, 64

Hawthorne Indus., Inc. v. Balfour Maclaine Int’l,
676 F.2d 1385 (11th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53-54

Hi-Shear Technology Corp. v. United States,
356 F.3d 1372 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 52, 60

Kozulin v. INS,
218 F.3d 1112 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Landmark Land Co. v. FDIC,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Loesch v. United States,
227 Ct. Cl. 34, 645 F.2d 905 (1981),
cert. denied, 454 U.S. 1099(1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

M.A. Mortenson Co. v. Brownlee,
363 F.3d 1203 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Marathon Oil Co. v. United States,
374 F.3d 1123 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Matt Allen Logging,
AGBCA Nos. 202-124-1, 04-1 BCA ¶ 32,596 (Apr. 8, 2004) . . . . . . . . . . . . . . . . . . . . 70

McClain v. Metabolife Int'l, Inc.,
401 F.3d 1233 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 54

Morris v. United States,
33 Fed. Cl. 733 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 60

Neely v. United States,
167 Ct. Cl. 407 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Nicon, Inc. v. United States,
331 F.3d 878 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Olin Jones Sand Co. v. United States,
225 Ct. Cl. 741 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Owen v. United States,
20 Cl. Ct. 574, 584 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Pacific Rivers .v Thomas,
30 F.3d 1050 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Peck Iron & Metal Company v. United States,
221 Ct. Cl. 37, 603 F.2d 171 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Precision Pine & Timber, Inc. v. United States,
62 Fed. Cl. 635 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Precision Pine & Timber, Inc. v. United States,
63 Fed. Cl. 122 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Precision Pine & Timber, Inc. v. United States,
64 Fed. Cl. 165 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Reidhead Bros. Lumber Company,
AGBCA No. 2000-126-1, 01-2 BCA ¶ 31,486 (June 29, 2001) . . . . . . . . . 28, 62, 65, 70

Rocky Mountain Constr. Co. v. United States,
218 Ct. Cl. 665, 666 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Rumsfeld v. Freedom, N.Y.,
329 F.3d 1320 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

San Carlos Irrigation & Drainage Dist. v. United States,
877 F.2d 957 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Schiller & Schmidt, Inc. v. Nordisco Corp.,
969 F.2d 410 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Scott Timber v. United States,
333 F.3d 1358 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 66

Sheperd v. American Honda Motor Co.,
822 F. Supp. 625 (N.D. Cal. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Sierra Club v. Bosworth,
Case No. C 05-00397 CRB, 2005 WL 2204986 (N.D. Cal. Sept. 9, 2005) . . . . . . . . . . 25

Singer Co. v. United States,
215 Ct. Cl. 281, 568 F.2d 695 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Smokey Bear, Inc. v. United States,
31 Fed. Cl. 805 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 18

Stoner-Caroga Corp. v. United States,
3 Cl. Ct. 92 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Sunward Corp. v. Dun & Bradstreet, Inc.,
811 F.2d 511 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 10, 54

Western Radio Servs. Co. v. Epsy,
79 F.3d 896 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Wilner v. United States,
24 F.3d 1397 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Yazel v. United States,
93 F. Supp. 1000 (Ct. Cl. 1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**Statutes:**

Fed. R. Evid. 602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Fed. R. Evid. 602, 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Fed. R. Evid. 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

U.C.C. § 2-713 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Other Authorities:**

13 Richard A. Lord, Williston on Contracts § 39:32 at 642-44 (4th ed. 2000) . . . . . . . . . . . . . 12

2 E. Allan Farnswroth, Farnsworth on Contracts § 8.15 at 437 (1990) . . . . . . . . . . . . . . . . . . . 13

11 Walter H.E. Jaeger, Willison on Contracts § 1293 at 28 (3d ed. 1968) . . . . . . . . . . . . . . . . 13

Restatement (Second) of Contracts § 347 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Restatement (Second) of Contracts § 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 55

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S POST-TRIAL MEMORANDUM OF LAW**

**INTRODUCTION**

In this action, plaintiff, Precision Pine & Timber, Inc. ("Precision Pine"), presents a hodgepodge of claims under both the common law and contract clause CT 6.01 that are not legally viable, that seek double (or triple) recoveries, that ignore key aspects of the Court's 2001 ruling on liability and that are unsupported by record evidence.

Under the common law, Precision Pine seeks lumber profits, sawmill costs and log hauling costs. Lumber profits simply are not recoverable because (1) Precision Pine chose to continue the timber sale contracts after the Mexican Spotted Owl ("MSO") suspensions were lifted, and (2) the production of lumber is independent of, and collateral to, the timber cutting contracts in this action. Equally problematic is Precision Pine's failure to take into account important aspects of the Court's July 2001 ruling, most notably, that the MSO suspensions were a breach only insofar as they substantially exceeded 135 days. And even if the Court were to reach the merits of the lumber profits claims, Precision Pine has failed to prove causation, establish legal foreseeability, and provide a reasonably accurate estimate of damages.

Precision Pine's other common law claims fare no better. The claimed sawmill costs are not the direct result of the MSO suspensions and are legally remote. Similarly, the log hauling costs sought by Precision Pine were neither caused by the MSO suspensions nor legally foreseeable at the time of contracting. Accordingly, as explained below, Precision Pine is entitled only to reimbursement of certain out-of-pocket costs pursuant to CT 6.01.

## ARGUMENT

### I. Ignoring Key Aspects Of The Court's July 30, 2001 Ruling, Precision Pine Inaccurately Describes The Breaches Found By The Court

#### A. The Court Found Breaches Of Warranty Because Timber Harvesting Was Suspended In August 1995, Rather Than August 1994

The Court's breach of warranty ruling is based upon the Forest Service's failure to conduct consultations (and suspend timber harvesting) pursuant to the Endangered Species Act upon receiving and reviewing the Pacific Rivers v. Thomas decision. See Pl.'s Br. at 11; Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 68 (2001) ("the Forest Service should have suspended all logging activities within Region 3 during the course of consultations"). Essentially, the Court ruled that the MSO suspensions in August 1995 should have occurred a year earlier. The belated suspension of timber harvesting, the Court concluded, constituted a breach of warranty with respect to seven contracts.[1] Id. at 69 n.42.

The Pacific Rivers decision was issued by the United States Court of Appeals for the Ninth Circuit on July 7, 1994. See 30 F.3d 1050 (9th Cir. 1994). Consequently, had the Forest Service seasonably initiated consultations, timber harvesting in Region 3 would have been

[1] The date of breach with respect to plaintiff's breach of express warranty claims is August 25, 1995, i.e., the date of the suspensions that breached the supposed warranties.

suspended from late summer through the end of the 1994 harvesting season. Precision Pine, 50 Fed. Cl. at 68; see also id. at 70 (explaining that applicable regulations provide 135 days to conduct consultations with the Fish and Wildlife Service).

Precision Pine blithely ignores the Court's finding that it was the Forest Service's failure to suspend harvesting in 1994 that resulted in the breach of warranty. By ignoring this key aspect of the Court's ruling, Precision Pine disregards the substantial benefit the company obtained by harvesting during a superior lumber market in the Fall of 1994. See PX305. Indeed, it was the collapse of lumber markets in 1995 and 1996 that apparently prompted the Court to suggest that the Forest Service's breaches may have worked to Precision Pine's advantage. See Precision Pine, 50 Fed. Cl. at 73 (questioning "whether the Forest Service's failure to timely consult with the FWS was a 'felix culpa' for the Plaintiff, who up until the suspensions were imposed may have, knowingly or not, benefitted"). In any event, any claim for breach of warranty damages must account not just for harm resulting from the MSO suspensions in 1995, but also for benefits accruing to Precision Pine from the ability to harvest Forest Service timber in the Fall of 1994. See Bluebonnet Savings Bank, FSB v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003) ("the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach"); Hansen Bancorp, Inc. v. United States, 376 F.3d 1297, 1315 (Fed. Cir. 2004) ("Courts should avoid bestowing an 'unfair windfall' on the plaintiff by compensating him or her above and beyond the losses suffered under the breached agreement."). Precision Pine has chosen not to acknowledge (much less quantify) such benefits.[2]

---

[2] The only evidence adduced at trial shows that Precision Pine benefitted by having the suspensions required by Pacific Rivers delayed until the Fall of 1995. E.g., Tr. 1419-22, 1624-
(continued...)

Consequently, Precision Pine has failed to prove any breach of warranty damages with reasonable certainty. See, e.g., Energy Capital Corp. v. United States, 302 F.3d 1314, 1325 (Fed. Cir. 2002) (the burden of proof rests with plaintiff).

**B. The MSO Suspensions Were A Breach Of The Implied Duty Not To Hinder Only Insofar As They Lasted Substantially "More Than 135 Days"**

The Court found that the MSO suspensions, when they ultimately did occur, were unreasonably long as to 11 of 14 contracts. Precision Pine, 50 Fed. Cl. at 70-72. Significantly, it was the unreasonable length of the suspensions – not the mere fact that the suspensions occurred – that breached the implied duty not to hinder. Id. at 70 ("in order to hold that the Forest Service breached the implied duty not to hinder, the Court must determine whether . . . the length of the suspension was unreasonable"). Precision Pine nevertheless argues that the MSO suspensions should be treated as a breach of the implied duty not to hinder from day one. Pl.'s Br. at 12-13. Precision Pine's argument cannot be squared with the Court's ruling.

Opening its analysis, the Court explained that "[t]here can be no doubt" that the Forest Service possessed authority to unilaterally suspend Precision Pine's timber sales. Id. at 58 (citing CT 6.01). In addition, the Court ruled that the Forest Service was required to suspend all contracts in Region 3 (i.e., Arizona and New Mexico) by the Endangered Species Act and the Pacific Rivers decision. Id. at 68. Plainly, where a suspension is required by a binding Court of Appeals decision, the length of the suspension cannot be unreasonable on day one.

---

[2](...continued)
25 (Porter) (testifying that Precision Pine was operating its sawmills at a substantial level in 1994); PX305 (showing that lumber prices were higher in 1994 than in 1995); see also DX549; DX753 (establishing that Precision Pine harvested numerous contracts during the Fall of 1994).

This leaves the question of when the MSO suspensions became unreasonable – a question addressed and answered in the Court's liability decision. The Court first noted that regulations implementing the Endangered Species Act provide a 135 day period to conduct consultations with the Fish and Wildlife Service. Id. at 70 (citing 50 C.F.R. § 402.14). Additionally, the Court explained that the "the mere fact" that a suspension lasts "far longer" than 135 days does not by itself establish a breach. Id. Turning to the particular facts of this action, the Court found Forest Service suspensions lasting 467 days to be unreasonable. Id. at 70-71. On the other hand, suspensions of fewer than 135 days were not a breach of the implied duty not to hinder. Id. at 71. As the Court explained in addressing the Brann, Hutch-Boondock and St. Joe contracts, a "two month suspension" in light of regulations "prescribing consultations to be completed within 135 days, is reasonable." Id. Put simply, only that part of the MSO suspensions lasting "much more than 135 days" was found to breach the implied duty not to hinder.[3]

Precision Pine appears to contend that once a suspension is deemed unreasonably long, the entire period of the suspension should be treated as a breach. See Pl.'s Br. at 13. In other words, according to Precision Pine, if a suspension lasts 136 days when a suspension of 135 days is reasonable, damages should be based upon the entire 136-day period. Precision Pine provides no legal or logical basis for such a rule, which plainly would confer an unjustified windfall upon plaintiffs. Hansen, 376 F.3d at 1315 ("Courts should avoid bestowing an 'unfair windfall' on the plaintiff by compensating him or her above and beyond the losses suffered under the breached

[3] The 136th day of the MSO suspensions was January 8, 2005, which is after the close of the 1995 normal operating season. See PX169-179 (AT17). Consequently, alleged damages based upon the suspension of Precision Pine's contracts during the Fall of 1995 are unrecoverable. Precision Pine & Timber, Inc. v. United States, 64 Fed. Cl. 165, 166 (2005) (damages must result "directly and primarily" from "the breach").

agreement."); see also Bluebonnet Bank, 339 F.3d at 1345. Precision Pine's argument should, therefore, be rejected.

## II. The Manufacture And Sale Of Lumber From Forest Service Timber Constitutes An Independent And Collateral Undertaking

Only profits that "would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment" are "a just and proper item of damages." First Heights Bank v. United States, 422 F.3d 1311, 1318 (Fed. Cir. 2005); Rumsfeld v. Freedom, N.Y., 329 F.3d 1320, 1333 (Fed. Cir. 2003); Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996). Consequently, Precision Pine's claims for lumber profit are not viable.

It is undisputed that Forest Service timber sale contracts do not concern or require the manufacture of lumber products.[4] E.g., Tr. 1540-43 (Porter), 1762-63, 1765 (Reidhead), 3770 (Harris). Indeed, the Forest Service frequently awards contracts to purchasers who neither own nor have access to a sawmill. Tr. 1651 (Porter), 1762-63, 1765 (Reidhead). Forest Service contracts merely require purchasers such as Precision Pine to cut and remove timber from the sale area. Tr. 3770 (Harris); see also PX169-79 (BT2.1 & 2.2). Consequently, the manufacture of lumber constitutes an independent and collateral undertaking.

Precision Pine's lumber profits claims are no different than a claim by a purchaser who planned to use logs from a Forest Service timber sale to build log homes, and sought profits from the anticipated sale of such homes as damages. The standard Forest Service contract permits a

[4] The manufacture of lumber requires (i) debarking the raw logs, (ii) cutting the debarked logs in a sawmill, (iii) taking the resulting rough green lumber to a planing facility, (iv) planing the rough green lumber, (v) grading the resulting planed lumber, and (vi) drying the planed lumber. See Tr. 89-90, 96, 129, 391-92, 608 (Porter). This occurs weeks or months after the timber has been cut and removed from Forest Service land. See id.

purchaser to use Forest Service timber to construct log homes. Tr. 4151-52 (Harris), 2920-21 (Matson) . Nevertheless, profits from the sale of log homes do not arise as “the direct and immediate result of [the] fulfillment” of a Forest Service contract. An independent and collateral undertaking – construction of the homes – must first occur. Thus, profits from the anticipated sale of log homes built by a purchaser of Forest Service timber would be unrecoverable. And, as Federal Circuit case law makes clear, the fact that the purchaser planned to build homes “in consequence and on the faith of the principal contract” does not alter this conclusion. E.g., Wells Fargo, 88 F.3d at 1022-23.

First Heights Bank, a recent Federal Circuit case applying the holding in Wells Fargo, is instructive. In First Heights Bank, the plaintiffs appealed the trial court’s denial of lost profits resulting from a Government breach. 422 F.3d at 1318. The plaintiffs alleged that funds lost as a result of the Government’s breach were to have been used in their home building business. Id. The Government was generally aware of this potential use of funds during negotiations of the breached agreement. Id. Nevertheless, the Federal Circuit affirmed the denial of lost profits.

> We agree that whatever additional profits plaintiffs might have earned on whatever additional projects might have been undertaken had the government not breached the Assistance Agreement are too remote to be compensable. Although the government was aware of background information about Pulte being a profitable homebuilder, . . . [t]he subject of the contract in this case was simply money. Plaintiffs could have used the money in any number of ways, including, but not limited to, funding additional homebuilding projects. Accordingly, we conclude that the lost profits plaintiffs seek are not "such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment" and, therefore, cannot be awarded.

First Heights Bank, 422 F.3d at 1318 (quoting Wells Fargo, 88 F.3d at 1023) (emphasis added).

The Federal Circuit's analysis is equally applicable here. The Forest Service was generally aware that Precision Pine owned and operated sawmills. Nevertheless, the subject of the contracts was simply the harvesting of timber. Precision Pine was free to use harvested timber in any number of ways, including, but not limited to, the manufacture of lumber products. E.g., Tr. 4151-52 (Harris), 2920-21 (Matson). Consequently, here, as in First Heights Bank, the profits Precision Pine seeks are too remote to be compensable.

In its post-trial brief, ignoring First Heights Bank, Precision Pine cites a litany of cases that supposedly support the proposition that lumber profits do not result from a collateral undertaking. See Pl.'s Br. at 5-7. Precision Pine relies principally upon Everett Plywood v. United States, 206 Ct. Cl. 224, 512 F.2d 1082 (1975). Pl.'s Br. at 5-6. However, Everett, far from supporting the recovery of lumber profits, holds that the correct measure of damages (where the plaintiff has not procured replacement timber) is the difference between the contract price and the "fair market value" of timber under contract. Everett, 512 F.2d at 1091 (citing Dulien Steel Products, Inc. v. United States, 43 Ct. Cl. 484 (1958), and Uniform Commercial Code § 2-713).

In Everett, the Forest Service was found to have breached a timber sale contract by denying a contract term extension.[5] This prevented Everett from harvesting approximately three million board feet of timber. Everett sought damages based upon the market value that cut timber would have commanded if sold in the export market. Id. at 1091. However, Everett was not in the business of reselling logs for export. The Court ruled, therefore, that export market prices were not pertinent to the determination of damages. Id. In addition, because "the contract

[5] After the contract term extension was denied, the Forest Service resold the timber remaining on Everett's contract. See 512 F.2d at 1086. As a result, unlike this action, the discussion of damages in Everett does not concern delayed harvesting of timber.

price . . . was reasonably reflective of fair market value," the Court concluded that Everett "suffered no compensable damages by the denial of the timber." Id. at 1092.

Precision Pine asserts that the "clear implication" of Everett is that the recovery of "lost profits on plywood sales . . . would have been perfectly appropriate." Pl.'s Br. at 6. The Court in Everett implied no such thing.[6] Rather, the Court ruled that the proper measure of damages for breach of a timber sale contract is "the extent the contract price was below [the] fair market value" of timber. Id. at 1092 (explaining that "plaintiff is entitled to the benefit of its bargain as measured by that difference"). Further undermining Precision Pine's assertion is the fact that, in the 30 years since Everett was decided, there is no instance in which this Court has awarded lumber profits for breach of a timber sale contract, much less cited Everett as the basis for such an award. Simply put, Everett demonstrates that Precision Pine's damages claims should be based upon the difference between the contract price and the fair market value of timber – not putative profits from the sale of lumber products.

The other cases cited by Precision Pine are equally unavailing. In Neely v. United States, 167 Ct. Cl. 407 (1964), the Government was found to have breached a lease agreement by refusing to permit the strip mining of coal on the leased property. Id. at 407. As damages, the plaintiff was awarded the sum that would have been earned from selling coal that would have been mined but for the breach. The Court did not award profits derived from using the coal in a manufacturing operation. Neely affords no support to Precision Pine. The mined coal in Neely

---

[6] The plaintiff in Everett never claimed profits on the sale of plywood. Consequently, the Court had no need to consider whether plywood manufacturing would constitute "an independent and collateral undertaking." See 512 F.2d at 1091. Of course, even if the Court had discussed the viability of a claim for lost plywood sales, its discussion would be mere dicta.

is analogous to harvested logs. The United States has never contended that Wells Fargo would bar damages based upon the fair market value of harvested logs.[7] See Def.'s Br. at 10-11 (citing Everett). Only profits from Precision Pine's independent and collateral lumber manufacturing operations are precluded.

Peck Iron & Metal Company v. United States, 221 Ct. Cl. 37, 603 F.2d 171 (1979), is similar. In Peck, the Government wrongfully cancelled the sale of a surplus aircraft carrier for scrap. Id. at 172. Had the contract not been cancelled, the purchaser would have extracted various kinds of scrap metal from the ship. See id. at 175-76. While the Court awarded Peck the sum that would have been obtained from the sale of scrap metal, it did not award Peck profits upon products manufactured from scrap metal obtained from the aircraft carrier. Id. Scrap metal extracted from the ship is analogous to timber cut and removed pursuant to a timber sale contract. Consequently, like Neely, Peck merely stands for the proposition that Precision Pine should base its claims upon the market value of harvested timber, not the sale of lumber products manufactured from that timber.[8]

---

[7] Of course, as we also explain, the recovery of any profits would have to take into account the fact that Precision Pine elected to continue its contracts. As a result, only damages resulting directly from a delay in harvesting the logs would be compensable.

[8] Precision Pine also identifies Stoner-Caroga Corp. v. United States, 3 Cl. Ct. 92 (1983), and Chain Belt Co. v. United States, 127 Ct. Cl. 38, 115 F. Supp. 701 (1953). Pl.'s Br. at 6. In Stoner-Caroga, the plaintiff resold the very product (mobile homes) that it had purchased from the United States. The case did not involve (or seek profits for) the manufacture of a new product. As a result, the Court did not address whether profits arose from an independent and collateral undertaking. Similarly, Chain Belt, which was decided decades before the seminal Wells Fargo decision, does not discuss whether damages arose from an independent and collateral undertaking. The cases, therefore, provide no guidance on this issue.

Precision Pine refers to certain non-judicial sources as well. Pl.'s Br. at 7 (citing 5 Corbin on Contracts § 1011 (1960), and the official comment to U.C.C. § 2.715). The cited (continued...)

Precision Pine also discusses Smokey Bear, Inc. v. United States, 31 Fed. Cl. 805 (1994).[9] Smokey Bear concerned the alleged breach of a license issued to plaintiff "to use the Smokey Bear logo to promote the sale of clothing and various other items." Id. at 806. The plaintiff's license in Smokey Bear was granted in return for royalties generated from the sale of merchandise bearing the Smokey Bear logo. The future sale of licensed merchandise was, thus, part and parcel of the license agreement itself. Forest Service contracts are not analogous. Precision Pine's payment to the Forest Service does not depend upon the manufacture of lumber products. Precision Pine's contracts only concern the cutting and removal of timber from Forest Service land. The fact that one of the many permissible uses for cut timber is the production of lumber is immaterial. See, e.g., First Heights Bank, 422 F.3d at 1318.

Precision Pine also refers the Court a motley assortment of documents, statues and contract provisions that merely indicate a general awareness of the unremarkable proposition that cut timber might ultimately be used to produce lumber. See Pl.'s Br. at 8-11 (pointing out, for example, that one purpose of the National Forest system is "to supply timber for the use of the American public"). Yet, Precision Pine identifies no authority – contractual or otherwise – that compels the use of timber at the purchaser's sawmill. See, e.g., Tr. 2920 (Matson) ("it is up to the purchaser . . . to determine how it wants to dispose of its harvested timber"). In the absence

---

[8](...continued)
authorities do not address the availability of profits earned from "independent and collateral undertakings." Rather, they concern the question of legal foreseeability. Legal foreseeability is a different and distinct inquiry. See section IV.A.3., infra. Precision Pine's reference to this authority is, therefore, misplaced.

[9] In Smokey Bear, the Court denied the defendant's motion to dismiss. No damages were awarded. The Court was clear, however, that denial of the motion was based upon the need to develop a full factual record. 31 Fed. Cl. at 809 (concluding that the damages claims should not be dismissed "without a factual inquiry").

of such authority, Precision Pine cannot establish that lumber profits accrue as the direct and immediate result of fulfilment of its timber sale contracts.

In sum, it is the production of cut timber that results from the direct and immediate fulfillment of a Forest Service timber sale contract. Lumber, log homes, and other products that might be made from trees taken from a Forest Service sale are produced only through independent, collateral undertakings. Profits from the sale of such products are, therefore, unavailable as a matter of law. Accordingly, the Court should enter judgment in favor of the United States on Precision Pine's claim for lumber profits.

## III. Precision Pine's Claim For Profits Is Also Barred By *Cities Service Helex*

When a contract is breached in the course of performance, the non-breaching party may elect to either continue the contract or cancel the contract. See Cities Service Helex, Inc. v. United States, 211 Ct. Cl. 222, 543 F.2d 1306, 1313 (1976); 13 Richard A. Lord, Williston on Contracts § 39:32 at 642-44 (4th ed. 2000) (the non-breaching party "has the choice of one of two alternative and inconsistent . . . remedies, and in choosing one necessarily foregoes the other"). This election has significant ramifications for the recovery of damages. As the Court of Claims explained:

> [When the non-breaching party] decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the [non-breaching] party may retain only a claim for damages for partial breach.

543 F.2d at 1313 (emphasis added). The distinction between damages for total breach and partial breach is described by Farnsworth as follows:

> If the injured party chooses to terminate the contract, it is said to treat the breach as *total*. The injured party's claim for damages for total breach takes the place of its remaining substantive rights under the contract. Damages are calculated on the assumption that neither party will render any further performance. . . .
>
> If the injured party does not terminate the contract, . . . the injured party is said to treat the breach as *partial*. The injured party has a claim for damages for partial breach, in addition to its remaining substantive rights under the contract. Damages are calculated on the assumption that both parties will continue to perform in spite of the breach. They therefore compensate the injured party for the loss it suffered as the result of the delay or other defect in performance that constituted the breach, not for the loss of the balance of the return performance.

2 E. Allan Farnswroth, Farnsworth on Contracts § 8.15 at 437 (1990) (italics in original, underlining added). Thus, where a party elects to continue the contract, partial breach damages are based upon the assumption that performance of the contract will be completed. Cities Service Helex, 543 F.2d at 1313; Farnsworth on Contracts § 8.15 at 438; 11 Walter H.E. Jaeger, Willison on Contracts § 1293 at 28 (3d ed. 1968) ("if the breach is not such as will involve the non-performance of the contract altogether, the damages recovered will be calculated on the assumption that the contract will be carried out in the future"). Losses that result directly from the defect in performance that constituted the breach, e.g., delay, are compensable. Precision Pine, 64 Fed. Cl. at 166 (damages must result "directly and primarily" from "the breach"). On the other hand, prospective profit is obtained from continued performance – not a damages award. See Cities Service Helex, 543 F.2d at 1313; Farnsworth on Contracts § 8.15 at 438.

It is undisputed that Precision Pine chose to continue its Forest Service contracts once the MSO suspensions were lifted. E.g., Tr. 1479 (Porter). Profits available from completing the contracts are, therefore, not recoverable. Cities Service Helex, 543 F.2d at 1313; 2 Farnsworth,

Farnsworth on Contracts § 8.15 at 438. Yet, this is precisely what Precision Pine's claims for lumber profit seek. See PX131 (claiming profits derived from timber that was available to cut in the post-suspension period after Precision Pine chose to continue contract performance).

Precision Pine responds that "expectancy damages" are available for a partial breach. Pl.'s Br. at 14. This argument is a strawman. The United States has never disputed that true delay damages – a particular form of expectancy damages – would, if proved, be available in this action. As explained in our principal brief, the measure of damages for "partial breach" resulting from delayed performance is the difference in value between what was conveyed and what was supposed to have been conveyed on the date of breach. Def.'s Br. at 10 (citing White v. United States, 187 Ct. Cl. 564, 410 F.2d 773, 779 (1969)).

Precision Pine attempts to distinguish White on the ground that it does not concern a contract for the sale of "raw materials." Pl.'s Br. at 15. However, Precision Pine offers no reason that this supposed distinction should affect a calculation of delay damages. Id. Indeed, the "difference in value" approach in White is the same approach used by the Court of Claims in Everett. Everett, 512 F.2d at 1091 (the remedy for breach of a timber sale contract is the difference between the contract price and the "fair market value" of timber on the date of breach); see also id at 1092 ("plaintiff is entitled to the benefit of its bargain as measured by th[e] difference"); U.C.C. § 2-713 (using a "difference in value" measure of damages for private timber sale contracts).

Moreover, Precision Pine identifies no case awarding prospective lost profits to a party that elected to continue a breached contract. See Pl.'s Br. at 14. The cases cited by Precision

Pine simply permit the recovery of delay damages.[10] In Entergy Nuclear Indian Point 2 v. United States, 64 Fed. Cl. 515 (2005), for example, plaintiff filed suit concerning the delayed availability of a Government repository for highly radioactive nuclear waste. The plaintiff, rather than cancelling its contract for waste storage, asserted a claim for partial breach. The Court concluded that the plaintiff had standing to seek increased costs resulting from the delay, including the cost of designing and constructing a storage facility, the cost of procuring storage containers and ancillary equipment, and the cost of private fuel storage. Id. at 522. Thus, Entergy Nuclear stands for the unremarkable proposition that where contract performance is delayed (and the contract is not cancelled), costs resulting directly from the delay are compensable.

In sum, Precision Pine's claims for lumber profits are the very kind of claim barred by the company's election to continue its contracts. Precision Pine's position is that there is no difference between total breach and partial breach damages. See Pl.'s Br. at 13. This position is not only contrary to White and Everett, it would render meaningless the ruling in Cities Service Helex that the "only" recovery where a party chooses to continue contract performance is "damages for partial breach." 543 F.2d at 1313. Accordingly, the Court should enter judgment for the United States upon Precision Pine's lumber profit claims.

## IV. Precision Pine Has Failed To Prove Its Claims For Common Law Damages

Precision Pine asserts claims under common law for both profits and increased costs. Because manufacturing cost increases are captured by a claim for profits, Precision Pine's

---

[10] Other cases contain nothing more than a restatement of the holding in Cities Service Helex or a boilerplate statement that expectancy damages are available for partial breach. See Morris v. United States, 33 Fed. Cl. 733, 751 (1995); Cuyahoga Metro. Housing Auth. v. United States, 65 Fed. Cl. 534, 543, 561 (2005). As noted above, this latter principle has no bearing upon the pertinent issue.

theories are incompatible. See, e.g., Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 402 (2004) (the "theories of expectancy, . . . reliance, and restitution" are "alternative measures"); Tr. 3315, 3357-60 (Neuberger).

Specifically, Precision Pine seeks lumber profits and, at the same time, asserts independent claims for alleged increases in log hauling costs and sawmill costs. Both log hauling costs and sawmill costs are accounted for in Mr. Ness's lost profit analyses. See PX131 (tab 4); PX182 (tab 2). Thus, if Precision Pine's lumber profit claims were viable, allowing Precision Pine to recover both profits and increased costs would confer a double recovery. This would be improper. See Bluebonnet, 339 F.3d at 1345; Hansen, 376 F.3d at 1315.

### A. Precision Pine's Claim For Alleged Lumber Profits Should Be Denied

#### 1. The Lost Volume Seller Concept Is Inapplicable Because The United States Does Not Seek An Offset Of Profits From Post-Suspension Timber Sale Contracts

The lost volume seller concept comes into play where a breached contract is cancelled and the non-breaching party subsequently enters into a contract that is performed. See Precision Pine & Timber, Inc. v. United States, 63 Fed. Cl. 122, 133 (2004) (quoting Restatement (Second) of Contracts § 347 illus. 16 ("Restatement § __")). As the Court explained, this raises the question whether the subsequent transaction is a substitute for the breached contract. Id.

> Whether a subsequent transaction is a substitute for the broken contract sometimes raises difficult questions of fact. If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have "lost volume" and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then based on the net profit that he has lost as a result of the broken contract. . . .

Id. (quoting Restatement § 347, cmt. f).

There exists no judicial precedent that applies the lost volume seller concept where, as here, the breached contract was not cancelled. See, e.g., Sheperd v. American Honda Motor Co., 822 F. Supp. 625, 633 (N.D. Cal. 1993) ("a lost-volume seller . . . brings a breach of contract action against a reneging buyer based on a lost sale"). Additionally, the United States does not seek to offset profits from "subsequent transactions" such as post-suspension contracts awarded to Precision Pine.[11] See Def.'s Br. at 17. Precision Pine's misplaced reference to the lost volume seller doctrine concerns something very different.

In its post-trial brief, Precision Pine argues that it should be entitled to profits from two different sets of contracts. Precision Pine contends that it would have "made $X in profits" from the 11 contracts affected by the MSO suspensions (the "MSO contracts"). Pl.'s Br. at 44. Precision Pine contends that it also would have "made $Y in profits" from contracts it would have entered into in the post-suspension period had the MSO suspensions not occurred (the "post-suspension contracts"). Pl.'s Br. at 44, 45.

The MSO contracts are the proper focus of this action. Once the MSO suspensions were lifted, in the exercise of sound business judgment, Precision Pine was able to harvest and process timber from the MSO contracts. Consequently, as explained in our post-trial brief, at a minimum, the actual profits earned upon the MSO contracts after the suspensions were lifted must be taken into account. Def.'s Br. at 17; see also sections II & III, supra (explaining that lost lumber profit claims are precluded by Cities Service Helex and Wells Fargo).

---

[11] Because the United States does not seek to offset profits from post-suspension contracts, Precision Pine's argument regarding the burden of proof in lost volume seller cases is irrelevant. See Pl.'s Br. at 45-47. This argument nevertheless highlights another peculiarity of Precision Pine's claim, namely, that an offset would necessarily be based upon phantom post-suspension contracts, i.e., timber sale contracts that Precision Pine did not bid on and was not awarded.

On the other hand, Precision Pine's claim for "$Y in profits" upon hypothetical post-suspension contracts is legally and factually unsound. It is well-established that profits upon future contracts that allegedly would have been executed but for a breach are "too remote and speculative to be recoverable." E.g., Olin Jones Sand Co. v. United States, 225 Ct. Cl. 741, 743-44 (1980) (damages based upon future contracts are "too remote and speculative to be recoverable" even when Government's breach allegedly caused contractor to be unable to obtain such contracts); Rocky Mountain Constr. Co. v. United States, 218 Ct. Cl. 665, 666 (1978) (damages based on future contracts are "too remote, indirect and speculative to permit recovery" when, absent Government delay, contractor would have been able to bid on other contracts); Smokey Bear, Inc. v. United States, 31 Fed. Cl. 805, 808 (1994) ("Damages for the loss of future profits and lost profitable business opportunities arising from potential contracts with others are per se unrecoverable."). Further, Precision Pine introduced no evidence that it in fact elected to forego timber sale contracts in the post-suspension period. Tr. 671-76, 1089, 1288-89 (Porter) (testifying that he was unaware of any contracts that Precision Pine did not bid on as a result of the MSO suspensions). Precision Pine's attempt to invoke the lost volume seller concept to obtain profits upon the post-suspension contracts should, therefore, be rejected.

Precision Pine's putative lost volume seller claim should fail for the additional reason that Precision Pine did not suffer "lost volume" as a result of the MSO suspensions. According to Mr. Ness, the underpinning of Precision Pine's claim is that the company lost production volumes during the MSO suspensions and could not make up those lost volumes in the post-suspension period. See Pl.'s Br. at 44, 47 n.32. This underlying proposition is belied by the facts. During cross-examination, Mr. Porter conceded that Precision Pine did not operate its

sawmills at their supposed 35 million board foot capacity in the post-suspension period. See Tr. 1074, 1080-82 (Porter). In fact, Precision Pine produced only 8.3 million board feet from April 1997 to March 1998 (FYE1998), and only 6.5 million board from April 1998 to March 1999 (FYE1999). PX182 (exhibit 8). Consequently, Precision Pine had ample sawmill capacity in 1997 and 1998 to produce lumber from both newly-purchased contracts and the once-suspended contracts.[12] Therefore, even if Precision Pine's dubious take on the lost volume seller doctrine were accepted, its lost volume claims still should be denied.

**2. Precision Pine Has Not Established That Lost Lumber Profits Were Directly And Primarily Caused By The Suspensions**

In an action for breach of contract, the "but for" standard of causation applies. California Federal, 395 F.3d at 1368. Under this standard, while the existence of "other factors operating in confluence with the breach" do "not necessarily preclude recovery," see id., the breach must cause the alleged harm "directly and primarily," Precision Pine, 64 Fed. Cl. at 166; see also Myerle v. United States, 33 Ct. Cl. 1, 27 (1897) ("There must not be two steps between cause and damage."). Further, alleged harm must result from the breach "inevitably and naturally, not possibly nor even probably." California Federal, 395 F.3d at 1267 (quoting Myerle, 33 Ct. Cl. at 27); Precision Pine, 64 Fed. Cl. at 166. Thus, an intervening cause or incident will render claimed damages unrecoverable. See Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1071 (Fed. Cir. 2001) (holding that the plaintiff's "independent business decision" constituted an intervening cause that precluded damages); Myerle, 33 Ct. Cl. at 27

[12] According to Precision Pine's own allegations, the company had spare capacity of 26.7 mmbf (lumber tally) in FYE 1998, and 28.5 mmbf (l.t.) in FYE1999. See Tr. 94, 106, 1074 (Porter); PX182 (exhibit 8).

("there must appear no intervening incident . . . to complicate or confuse the certainty of the result between the cause and the damage").

In this action, if the Court considers that Precision Pine's lumber profits claim, Precision Pine must prove that "but for" the MSO suspensions it would have fully harvested each contract for which it seeks lost profits (i.e., the Brookbank, Hay, Jersey Horse, Kettle, Manaco, Monument, Mud, O.D. Ridge, Salt, Saginaw-Kennedy and U-Bar contracts) during the suspension period. California Federal, 395 F.3d at 1268; Precision Pine, 64 Fed. Cl. at 166. Further, for each contract, Precision Pine must demonstrate that the loss of profits resulted directly and primarily from the unreasonable duration of the suspension. Precision Pine, 64 Fed. Cl. at 166 (claimed loss must result "directly and primarily" from "the breach"). Precision Pine has not met this burden.

Precision Pine has provided no direct evidence that it would have completed any of the contracts at issue had the MSO suspensions not occurred. The scheduling of timber harvesting was the sole responsibility of company president Lorin Porter. At trial, Mr. Porter testified that he did not know what contracts Precision Pine would have harvested but for the suspensions. Tr. 1442-48 (Porter). In addition, Precision Pine offers no harvesting plans, operating schedules, business plans, notes or other written records indicating which contracts it would have harvested. Despite the utter failure to offer any documents or relevant witness testimony, Precision Pine argues that the Court should infer that it would have fully harvested all of its contracts. See Pl.'s Br. at 20. Such an inference is not reasonable.

To harvest all of the contracts at issue during the suspension period, Precision Pine would have had to ramp up its sawmill operations, and deplete virtually the entire inventory of timber

under contract. See Tr. 2284 (Ness) (basing calculations on increased production of 34.7 mmbf). However, there is no evidence that it intended to increase the level of its sawmill operations in late 1995 or 1996.

At the time of the MSO suspensions, Precision Pine had been operating its sawmills at substantially less than their putative 35 million board foot capacity.[13] DX802 (showing lumber production of only 12.3 mmbf from April to September 1995); see also Tr. 1410, 2144 (Porter) (admitting that Precision Pine was not operating at 35 mmbf per year); DX559 (showing timber harvesting of only 18.7 mmbf in 1994 and 11.0 mmbf in 1995). Not only did Precision Pine operate its sawmills at less than capacity before the MSO suspensions, it continued to do so after the MSO suspensions were lifted. Tr. 1074, 1080-82 (Porter). This is significant because lumber prices – the motivation for high levels of sawmill production – were higher before the suspensions in 1993 and 1994 and after the suspensions in 1997. PX305; DX776 (exhibit 3). Thus, there is absolutely no reason to conclude that Precision Pine would have substantially increased lumber production at a time of poor market conditions in late 1995 and 1996. Simply put, Precision Pine's actions before, during and after the MSO suspensions belie the claims fashioned for this litigation.

In its post-trial brief, Precision Pine makes several arguments that the Court should infer – despite the utter lack of direct evidence – that Precision Pine would have completely harvested the contracts at issue between August 25, 1995 and December 4, 1996. See Pl.'s Br. at 20. None withstand scrutiny.

---

[13] Even at this lower level of operations, the amount of timber Precision Pine had under contract had been declining steadily since 1992. DX559 (showing a decline from 51.5 mmbf to 34.3 mmbf).

First, Precision Pine asserts that the contract completion date (on seven unidentified contracts) would have required the company to complete timber harvesting by December 31, 1996. See Pl.'s Br. at 20. Precision Pine is mistaken. As the Court is aware, Precision Pine actually sought and obtained contract extensions through a variety of mechanisms that permitted contract completion dates to be extended through 2001. See Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (affirming the termination for default of Precision Pine's contracts on January 9, 2001). Indeed, as explained at trial, Precision Pine was offered 60 day contract term adjustments in March 1996 as the result of the poor lumber market. DPFOF ¶ 75. And Precision Pine was entitled to additional term adjustments as the result of fire closures from May to July 1996. DPFOF ¶¶ 77-80. A contract term adjustment of, for example, 60 days provides an additional 60 days to harvest during the normal operating season. Consequently, in the "but for" world, Precision Pine was eligible for term adjustments for most, if not all, of 1997.[14] Precision Pine was, therefore, under no contractual obligation to complete harvesting on any of the contracts at issue by December 31, 1996.

Second, Precision Pine asserts the suspended sales represented only a 10.5 month supply of timber and, therefore, that it needed to cut all of the timber in order to run its mills at capacity. See Pl.'s Br. at 20. As an initial matter, Precision Pine's assertion the contracts at issue contain only a 10.5 month supply of timber is factually inaccurate as the statement is based upon an

---

[14] The O.D. Ridge contract has a normal operating season that runs from May 15 through October 15. PX171 (AT17). Consequently, assuming this contract had a December 31, 1996 termination date, a 60-day term adjustment for market conditions would permit harvesting to continue through July 14, 1997. An additional 64 day term adjustment for fire closures in 1996 would permit harvesting through September 16, 1997. The O.D. Ridge contract would also have been eligible for term adjustments due to other occurrences such as, for example, the Forest Guardians suspensions. See PX171 (BT8.21)

inflated 35 million board foot annual sawmill capacity – a level of operation that the company did not achieve before, during or after the MSO suspensions. As explained above, Precision Pine did not operate its mills at this level even when lumber prices were much better than during the period of the MSO suspensions. Nor is it accurate to suggest that Precision Pine would have fully cut the contracts at issue in order to run its three sawmills at their real-world capacity.[15] Precision Pine had been depleting its existing supply of timber for years. DX559. By early 1995, due to continuing declines in the amount of timber being offered for sale, see DX776, Precision Pine's long-term logging subcontractor expected Precision Pine would soon be closing one of its sawmills. See DX463 (entering into an agreement in April 1995 that Tri-Star Logging would harvest timber "for the remaining two mills"). Even more significantly, during the suspension period, Precision Pine actually had available millions of board feet of timber that it chose not to use in its sawmills. DX552 (Brann – 393 mbf; Hutch-Boondock – 70 mbf; Mud – 1,295 mbf ; Park – 538 mbf; Saddle – 2,027 mbf); see also DPFOF ¶¶ 137, 206, 303. The very premise of Precision Pine's claims is that the company had a much greater need for timber during period of the MSO suspensions than in the "but for" (i.e., no suspension) world. By choosing not to cut over 4 million board feet of available timber – including timber on three of the contracts at issue in this action – Precision Pine demonstrated that complete harvesting would not have occurred in the "but for" world. Simply put, Precision Pine's actions speak louder than its words.

Third, Precision Pine states that the "lumber market took off like a rocket" after bottoming out in January and February 1996. See Pl.'s Br. at 20. As an initial matter, while

[15] During the entire 1990s, Precision Pine was frequently opening and closing various sawmills. See DPFOF ¶¶ 7-13, 15-17. Its three sawmill operation in Eagar, Heber and Winslow ran for only about two years. See First Joint Stip. ¶¶ 17, 86, 88-89.

prices bottomed out in early 1996, the lumber market did not rebound to pre-suspension levels until much later in the year. See PX305. Moreover, this fact says nothing about what timber volumes and which timber contracts Precision Pine would have harvested had the MSO suspension not occurred. Indeed, as noted above, Precision Pine did not harvest timber at the rate projected during the MSO suspension period during much better market conditions in 1993, 1994 and 1997. E.g., DPFOF ¶ 26; DX559; Tr. 1074, 1080-82, 1410, 2144 (Porter).

In sum, Precision Pine has failed to establish which contracts would have been harvested between August 25, 1995 and December 4, 1996 (and, equally important, when harvesting would have taken place) if the MSO suspensions had not occurred. Therefore, Precision Pine has failed to prove that claimed lumber profits resulted directly and primarily from the MSO suspensions.

**3. Lost Lumber Profits Are Not Legally Foreseeable As The Result Of A Contract Suspension**

With respect to each contract, Precision Pine must establish that the loss of profits was legally foreseeable at the time of contracting. E.g., Landmark Land Co. v. FDIC, 256 F.3d 1365, 1378 (Fed. Cir. 2001); Bohac v. Dept. of Agriculture, 239 F.3d 1334, 1340 (Fed. Cir. 2001); San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 960 (Fed. Cir. 1989); Chain Belt, 115 F. Supp. at 714. A loss is "foreseeable as a probable result of breach [if] it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." Landmark, 256 F.3d at 1378 (quoting Restatement § 351(2)). "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Id. (quoting Restatement § 351, cmt. a). Furthermore, where "several circumstances have contributed to a loss, the party

in breach is not liable for it unless he had reason to foresee all of them." Restatement § 351 cmt. d.

In assessing legal foreseeability, the nature of the alleged breach is significant. Here, the availability of Precision Pine's timber sale contracts was delayed by Forest Service suspensions that the Court found should not have lasted "much more than 135 days." Precision Pine, 50 Fed. Cl. at 71. When the suspensions ended, Precision Pine elected to continue the contracts and the very same trees upon the very same contracts were available to harvest.[16] As a result, no loss of profits would be expected to occur "in the ordinary course of events." Landmark, 256 F.3d at 1378; Sierra Club v. Bosworth, Case No. C 05-00397 CRB, 2005 WL 2204986, at *12, (N.D. Cal. Sept. 9, 2005) ("At bottom, while intevenors may be correct that delay in initiation of the [timber sale] contract might cause them temporary losses, they have not demonstrated that such losses will not be recovered if and when the project finally commences."). Furthermore, the Forest Service was aware of no "special circumstances" at the time of contracting. Tr. 1855-57 (Porter). Consequently, lost lumber profits were not within the contemplation of the parties as the probable result of a suspension of harvesting. Precision Pine cannot, therefore, recover lost profits.

In its post-trial brief, Precision Pine ignores the framework governing legal foreseeability that the Federal Circuit laid out in Landmark. Precision Pine instead refers the Court to its discussion of "independent and collateral undertakings" – a very different and distinct legal

---

[16] The Forest Service suspended Precision Pine's contracts and Precision Pine itself chose not to cancel the contracts at the conclusion of the MSO suspensions. Consequently, the question of what damages are legally foreseeable as the result of the cancellation of a timber sale contract is not presently before the Court.

inquiry. Pl.'s Br. at 16 (citing section II). Precision Pine simply fails to come to terms with the fact that, at the time of contracting, the Forest Service had no reason to believe that the delay caused by a suspension (even a very lengthy suspension) would result in a loss of profits, as opposed to the mere deferral of profits.

Precision Pine quotes certain out-of-context statements from the Court's prior decisions to the effect that a delay in consulting with the Fish and Wildlife Service would significantly hinder harvesting operations. See Pl.'s Br. at 16-17. As an initial matter, as explained above, the fact that harvesting may have been hindered (i.e., delayed) does not imply a loss of profits. Moreover, the Court's statements were based upon Forest Service statements made during or after the MSO suspensions. See 50 Fed. Cl. at 71. The Court did not purport to address what the Forest Service understood at the time of contracting, which was as much as five and one half years before the suspensions occurred. Rather, the Court ruled that legal foreseeability involves open issues that were to be resolved using evidence admitted at trial. Precision Pine, 63 Fed. Cl. at 131. Precision Pine's attempt to invoke "law of the case" is, therefore, misplaced.

Accordingly, Precision Pine has failed to establish legal foreseeability and its lost lumber profit claims should be rejected.

#### 4. Numerous Errors In Mr. Ness's Calculations Cause Lumber Profits To Be Grossly Overstated

Precision Pine purports to describe the "general approach" taken by Mr. Ness as a comparison of what Precision Pine did during the period of the MSO suspensions and what Precision Pine would have done but for the Forest Service's breach. Pl.'s Br. at 17. While this describes the analysis that should have been performed, it does not describe the work that was actually done.

According to Mr. Ness, the starting point for his report was an inadmissible document – Precision Pine's February 26, 2003 claim binders – that was prepared by counsel in the midst of this litigation. E.g., Tr. 2183-84 (Ness); PX131 (exhibit 22). Mr. Ness did not do his own work to establish key facts that provide the foundation for Precision Pine's claims. For instance, Mr. Ness did not develop (1) a "but for" harvesting schedule, (2) a lumber product mix, (3) suspension period lumber prices, (4) suspension period by-product prices, (5) logging and hauling costs, (6) the overrun factor, or (7) claims for CT 6.01 damages. E.g., Tr. 2183-84, 2493-94, 2622, 2626, 2677, 2697, 2848-49 (Ness). Mr. Ness merely adopted the claims previously prepared by counsel. PX131 (exhibit 22); see also Loesch v. United States, 227 Ct. Cl. 34, 645 F.2d 905, 915 (1981) ("[O]pinion evidence is only as good as the facts upon which it is based."), cert. denied, 454 U.S. 1099 (1981).

Additionally, the bottom line provided by Mr. Ness's report is "gross profits before manufacturing overhead." Pl.'s Br. at 17. Without citation to legal authority, Precision Pine argues that this "is the appropriate measure of damages" for its lumber profit claims. Pl.'s Br. at 18. It has already been established that "net profit" is the proper measure of a claim for lost profits. Precision Pine, 63 Fed. Cl. at 133. Mr. Ness's report does not provide a "net profits" figure or even provide sufficient information to derive net profits. Tr. 2428, 2666-67 (Ness); see also PX1012; Tr. 2586 ("net income" is equivalent to "net profits").

The erroneous bottom line is but one of many deficiencies in Mr. Ness's work. In fact, there are errors at nearly every stage of Mr. Ness's multi-step calculations that almost invariably increase Precision Pine's claimed damages. The total effect of these errors is so dramatic that contracts that Precision Pine itself concluded were unprofitable a mere six weeks before the

MSO suspensions are shown to produce substantial gross profits (before manufacturing overhead) during much worse market conditions. Consequently, even assuming that the lumber profits it seeks are potentially recoverable, as explained further below, Precision Pine has failed to provide an accurate estimation of damages.

**a. Lumber**

**(1) Precision Pine Uses An Inaccurate Conversion Factor**

As explained in Precision Pine's post-trial brief, timber volumes on the contracts at issue were measured in either hundred cubic feet ("ccf") or thousand board feet ("mbf"). Pl.'s Br. at 19. Consequently, the first step in Mr. Ness's calculations was to convert timber volumes from ccf to mbf. Pl.'s Br. at 19. Mr. Ness used a "rule of thumb" factor of 0.5000 mbf (l.s.) per ccf for all contracts. Pl.'s Br. at 19 (describing the factor as 2.0 ccf/mbf (l.s.)); Tr. 2251 (Ness). This conversion factor is inappropriate.

There exists no single, fixed conversion factor for converting log volumes from ccf to mbf. Tr. 1616 (Porter). Consequently, the Forest Service develops a contract-specific conversion factor for contracts sold on a ccf basis.[17] See PX4-5, 9-10, 13-14. This contract-specific conversion factor is provided to potential purchasers and is used in contract administration. Id. Mr. Ness fails to use the more accurate, contract-specific conversion factor. Tr. 2251 (Ness). As a result, he overstates raw timber volumes on seven Forest Service contracts by as much as 12 percent. See DPFOF ¶¶ 434-36, 438; DA1.

[17] Precision Pine used contract-specific conversions factors both in internal business records and in correspondence with third parties. DPFOF ¶ 437; see also DX552 at 2.

**(2) Mr. Ness's Does Not Use Valid "But For" Harvesting And Milling Schedules**

Mr. Ness uses hypothetical harvesting and milling schedules in the calculation of lumber profits. However, Mr. Ness concedes that neither the harvesting schedule nor the milling schedule used in his damages model would have been followed by Precision Pine in the "but for" (i.e., no suspension) world. As a result, his model does not provide a reasonable estimation of damages.

**(a) Harvesting**

At trial, Precision Pine presented no evidence concerning the harvesting schedule the company would have followed had the MSO suspensions not occurred. In its post-trial brief, Precision Pine concedes that it never prepared long term schedules or plans and, additionally, that the annual operating schedule submitted to the Forest Service pursuant to BT 6.31 was inaccurate. Pl.'s Br. 19-20; see also Tr. 1630-33 (Porter). Furthermore, while Mr. Porter testified that he had the sole responsibility for determining which contracts to harvest, Tr. 1436 (Porter), he was unable to say when any contracts would have been harvested had the MSO suspension not occurred. Tr. 1442-48 (Porter). In fact, Mr. Porter stated that did not know what timber Precision Pine would have cut in September 1995 – the very first month of the MSO suspensions. Id.

In its post-trial brief, Precision Pine notes that Mr. Porter prepared a harvesting schedule as part of the claims process. Pl.'s Br. at 19-20. Of course, Precision Pine's claim letters are hearsay and, therefore, were not admitted for their truth. Tr. 75-76 (May 5, 2005). For the same reason, the February 2003 claim that Precision Pine's counsel prepared during the course of this litigation was excluded. See Tr. 97-98 (May 5, 2005).

Nor can Precision Pine cure this lack of evidence through Mr. Ness. Factual evidence must be introduced through a witness having personal knowledge of the pertinent fact. Fed. R. Evid. 602. Mr. Ness testified solely as an expert. Tr. 2171. Having no personal knowledge of Precision Pine's plans in 1995 and 1996, Mr. Ness is not competent to provide the factual predicate for Precision Pine's claims. Fed. R. Evid. 602; see also Fed. R. Evid. 703 (Advisory Committee Notes) (if "otherwise inadmissible evidence is admitted [through an expert] . . . the underlying information must not be used for substantive purposes"); 4 Weinstein's Federal Evidence § 703.05 ("Rule 703 is not, itself, an exception to or exclusion from the hearsay rule or any other evidence rule that makes the underlying information inadmissible"). And, in any event, Mr. Ness testified that Precision Pine would not have followed the schedule used in his model in the "but for" world. Tr. 2622, 2626, 2848 (Ness).

Moreover, the harvesting schedule used by Mr. Ness could not have been followed by Precision Pine. Mr. Ness scheduled harvesting during periods when logging was prevented by the normal operating season restriction, by fire closures, by timing of harvest restrictions, and by the Endangered Species Act. See DX1004; DPFOF ¶¶ 78-79, 145, 161-62, 212-13, 230, 249-50, 255-56, 269, 285, 311, 329-30, 345, 374-75. Mr. Ness's harvesting schedule is, therefore, not a valid starting point for assessing damages. See California Federal, 395 F.3d at 1268; Precision Pine, 64 Fed. Cl. at 166.

**(b) Milling**

At trial, Precision Pine also presented no evidence regarding the milling schedule it would have followed had the MSO suspensions not occurred. If such lumber profits were found to be recoverable, the milling schedule would affect total profits and the distribution of profits

among the contracts at issue. Thus, using an accurate milling schedule is critically important. Tr. 2858-59 (Ness); DX1005; see also Tr. 2849-60 (Ness).

While Mr. Ness's model does include a schedule for manufacturing lumber products at Precision Pine's sawmills, PX131 (App. A at 5), Precision Pine presented no evidence that the company would have followed this milling schedule "but for" the MSO suspensions. Mr. Ness testified that he developed the milling schedule without any input from Mr. Porter, without reviewing contemporaneous business records, and without attempting to determine what Precision Pine would have done "but for" the MSO suspensions. Tr. 2860 (Ness); see also Pl.'s Br. at 21 (conceding that Mr. Ness developed the milling schedule). In fact, Mr. Ness described his own milling schedule as "arbitrary."[18] Tr. 2677, 2849 (Ness). Such a schedule – a schedule that does not purport to show what Precision Pine would have done if the MSO suspensions had not occurred – does not provide a valid basis for calculating lumber profits. See California Federal, 395 F.3d at 1268; Precision Pine, 64 Fed. Cl. at 166.

**(3) Delivered Log Costs**

Mr. Ness's calculation of "delivered log costs" – the cost that would have been incurred by Precision Pine to cut and remove timber from its Forest Service contracts – is similarly flawed. Mr. Ness understates both the stumpage owed to the Forest Service and the company's logging and hauling costs.

---

[18] In keeping with the arbitrary character of his milling schedule, Mr. Ness does not use a standard treatment for the large log inventory in his model. See Tr. 2677, 2849 (Ness). Remarkably, lower lumber profits would result from either a first-in, first-out approach ("FIFO") or a last-in, first-out approach ("LIFO"). Tr. 4915-16 (Moosman). Consequently, it appears that Mr. Ness crafted a milling schedule to maximize Precision Pine's putative profits. See id.

**(a) Precision Pine's Stumpage Costs Are Understated**

The stumpage cost – the amount paid to the Forest Service for harvested timber – on most of Precision Pine's contracts was a variable rate based on the Western Wood Products Association ("WWPA"), Inland Rocky Mountain Ponderosa Pine index. First Joint Stip. ¶ 32; see also PX169-79 (AT5). As a result, stumpage costs were low during the first half of the suspension period (i.e., through the first quarter of 1996) and rose significantly during the second half of the suspension period (i.e., during the second, third and fourth quarters of 1996). See DPFOF ¶¶ 538-47; PX305; DX776. For instance, the stumpage cost for the Brookbank contract ranged from a low of $17.15 in the first quarter of 1996 to a high of $110.78 in the fourth quarter of 1996. Tr. 4882; DX1010 at 3.

Mr. Ness's model assumes that Precision Pine would have aggressively harvested timber during the first half of the MSO suspensions and built log inventories to unprecedented levels. See Def.'s Br. at 34-35; DPFOF ¶¶ 447-54. Of course, the lumber market was particularly poor during the first half of the MSO suspensions. Indeed, Precision Pine concluded in July 1995 that many of its contracts were, at best, marginally profitable. DPFOF ¶¶ 583-91; see also DA3; DSA2. Moreover, by September 1995, Stone Container had stopped taking roundwood from Precision Pine's multi-product sales. DPFOF ¶¶ 62-65. This reduced the profitability of Precision Pine's contracts still further. See DPFOF ¶¶ 583-91; see also DA3; DSA2.

Mr. Ness's projection of aggressive harvesting is not reasonable when viewed against this backdrop. Mr. Ness's approach boosts claimed profits by using lower stumpage costs from early in the suspension period, while taking advantage of improved lumber prices in late 1996

and early 1997. See PX305. Of course, unlike Mr. Ness, Precision Pine did not know that the market would rebound in late 1996 and early 1997.

Simply put, Mr. Ness uses 20/20 hindsight to reduce stumpage costs and, in turn, to inflate putative profits. This is not a valid approach to calculating breach damages.

**(b) Precision Pine's Logging And Hauling Costs Are Understated**

Precision Pine's annual financial statements contain a line item for logging and hauling costs on each contract harvested by Precision Pine. This provides a comprehensive picture of the logging and hauling cost that the company actually incurred. PX248. Mr. Ness did not use this logging and hauling cost data to independently verify the cost figures used in his report. Tr. 2493-94, 2697 (Ness). Rather, Mr. Ness adopted figures supplied by Precision Pine's attorneys, which were in turn based upon cherry-picked invoices. Tr. 2493-94, 2697 (Ness); see also Tr. 545-46 (Porter).

The comprehensive data from Precision Pine's financial statements shows substantially higher logging and hauling costs than those in Mr. Ness's report. See DPFOF ¶¶ 548- 55; PX131 (exhibit 4). For instance, during FYE1996, Precision Pine cut 1682 ccf on the Brookbank sale, DX109, at a cost of $151,178, PX248. Using the ccf-to-mbf conversion factor in the Brookbank appraisal, see PX4 (0.4780 mbf/ccf), Precision Pine actually paid $188.03 per mbf (log scale) for logging and hauling. DPFOF 548. However, the logging and hauling cost for the Brookbank sale used in Mr. Ness's report is only $115.00 per mbf. PX131 (exhibit 4 at 10-11).[19] Had Mr. Ness conducted his own analysis using cost data from Precision Pine's annual

[19] On Brookbank alone, logging and hauling costs are understated by approximately $100,000. See PX131 (exhibit 4 at 11) (understated logging costs of $73.03 per mbf (l.s.) over a (continued...)

financial statements – the very documents that he relied on for other aspects of his report– Precision Pine's logging and hauling costs would have been far higher.

**(4) Mr. Ness Should Have Used A 1.08 Overrun Factor – The Overrun Precision Pine Actually Achieved In 1995 And 1996**

In 1996, Precision Pine's long-time employee, John Smith, compared the volume of logs used at the Winslow sawmill to the volume of lumber produced by the Winslow sawmill during FYE1996 (i.e., April 1995 to March 1996). See Tr. 5324 (Smith); Smith Dep. Tr. 252-53, 257. (Smith). The overrun achieved by the Winslow sawmill during this year of operation was 1.08. DPFOF ¶ 425; DX547; Smith Dep. Tr. 257 (verifying that 1.08 was the overrun for Winslow). Mr. Smith's analysis is the only record establishing the overrun that Precision Pine actually attained at its sawmills.[20] See DPFOF ¶ 426. It is notably close to the 1.10 overrun used by Mr. Porter in his July 1995 profit projections. See DX519; DX521-45.

According to Precision Pine, the Court should ignore the documented performance of its mills. Pl.'s Br. at 27-28. Precision Pine relies upon two witnesses – Mr. Porter and Mr. Devere – who testified that an overrun of 1.25 was reasonable. Pl.'s Br. at 24. Mr. Porter simply is not credible. He testified that Precision Pine had never performed a formal mill study to determine the actual overrun achieved by the company's sawmills. Tr. 883, 1546-48 (Porter).

---

[19](...continued)
timber volume of 1355.65 mbf (l.s.)).

[20] Precision Pine suggests that this study is inaccurate because there are two sets of numbers, the numbers vary from month to month, and some months show a negative number. None of these criticisms is valid. First, Mr. Smith testified that his study derived a 1.08 overrun factor. Smith Dep. Tr. 257. Second, given the numerous factors that affect overrun, it is not unexpected that overruns will vary from month to month. See DPFOF ¶ 423. Finally, a negative number is not "inexplicable;" it merely shows that Precision Pine was unable to attain an overrun in some months due to mill inefficiencies, large diameter logs or other factors.

Additionally, the only informal studies conduced by Precision Pine lasted less than a day, were not retained by the company, and obtained results that are unknown. Tr. 1548-49 (Porter). Thus, aside from Mr. Smith's study, there is not a shred of direct evidence concerning overrun. See Tr. 1208 (Devere) ("You know, you can't measure the logs that are coming off the head rig while you're watching this process and come up with [a precise overrun.] I don't think anybody could."). Additionally, in the post-suspension period, Mr. Porter prepared numerous profit projections – none of which contains an overrun higher than 1.20. See, e.g., DX506 (1.07 overrun; designated "high"); DX510 (1.07 overrun; designated "mid"); DX511 (1.05 overrun; designated "mid"); DX513 (1.10 overrun; designated "now"); DX514 (1.07 overrun; designated "mid"); DX515 (1.05 overrun; designated "mid"); DX517 (1.07 overrun; designated "mid"); DX518 (1.05 overrun; designated "average"). There is no reason to conclude that Mr. Porter's testimony about a 1.25 sawmill overrun is anything more than a product of wishful thinking.

Mr. Devere's testimony is equally unsound. Mr. Devere testified that the best way to assess a sawmill's overrun is to review "hard data" showing actual mill performance. Tr. 1208 (Devere). The analysis performed by Mr. Smith provides hard data on sawmill performance over an entire year. See DX547. Precision Pine failed to provide Mr. Smith's analysis to Mr. Devere. Indeed, Mr. Devere reviewed no mill studies, interviewed no Precision Pine employees, and examined no contemporaneous records from Precision Pine's files. Tr. 1174, 1205-06 (Devere). Nor did Mr. Devere ever see Precision Pine's sawmills in Eagar or Winslow. Tr. 1204-06 (Devere) (explaining that he visited Heber on only one occasion about seven years after the MSO suspensions). The sole basis for Mr. Devere's opinion is a single discussion with Mr. Porter about what Precision Pine's sawmills supposedly could accomplish. Tr. 1205-07 (Devere). As a result, Mr. Devere's opinion regarding overrun is entitled to no weight. See

Loesch, 645 F.2d at 915 ("[O]pinion evidence is only as good as the facts upon which it is based.").

Precision Pine notes that Forest Service appraisals contain a line that appears to provide an estimated overrun. See Pl.'s Br. at 24-25. This line is a relic from an old appraisal system that was phased out in Region 3 (Arizona and New Mexico) twenty years ago. Tr. 3763, 4192-93 (Harris) (explaining that the putative overrun is not used). Moreover, the Forest Service had no basis to estimate – and the appraisals do not purport to indicate – the overrun expected at Precision Pine's sawmills. See Tr. 3764-65, 4192 (Harris).

Lastly, Precision Pine asserts that tree size was declining during the 1990s and, therefore, that its overrun would have been rising. Pl.'s Br. at 26. Tree diameter and overrun generally have an inverse relationship. Tr. 1143 (Devere). However, numerous other factors, such as the skill of the sawyer, also affect sawmill overrun. DPFOF ¶ 423; Tr. 1179 (Devere) (describing the sawyer's skill as "very important"). In any event, because Precision Pine introduced no evidence about the company's actual overrun in the early 1990s, there is no baseline against which to measure any changes in overrun caused by decreasing tree diameters.

**(5) Precision Pine Uses A Fundamentally Flawed Methodology To Derive Its Claimed Product Mix**

**(a) Ponderosa Pine**

Precision Pine, through its interrogatory answers and Mr. Porter's testimony at trial, described a methodology for deriving product mix based upon the company's comprehensive Winslow sales record. At trial, the United States presented Dr. Ian Munn, a well-respected Professor of Forestry, to analyze this methodology. See DX775. Dr. Munn explained that Precision Pine's approach was "fundamentally flawed" and that it did not provide an accurate

description of the product mix that would actually have been obtained from the contracts at issue. Tr. 4277 (Munn); DX775.

Having no rebuttal to Dr. Munn's testimony and, indeed, no expert testimony of any kind on product mix, Precision Pine's post-trial brief does not attempt to justify the methodology that up and until this point was the basis for Precision Pine's product mix numbers.[21] Instead, Precision Pine puts forward a new justification, namely, that product mixes are based upon Mr. Porter's "pre-bid inspection of timber on Forest Service sales." Pl.'s Br. at 28; see also Pl.'s Br. at 29 (claiming that "Mr. Porter relied on his personal assessment of the quality of the timber," "confirmed his pre-bid assessment," and "verif[ied] his pre-bid assessment"). This new argument is unsupported by the evidence.

Precision Pine's timber sales each contain tens of thousands of trees spread across thousands of acres of land. See PX169-79 (AT1). Mr. Porter's pre-bid visits occurred sporadically between 1989 and 1995 and, not surprisingly, his memory of these visits was extremely vague. Significantly, Mr. Porter performed no formal cruise of the timber on the sale areas, and if he took any notes, they were not produced in this litigation or introduced at trial. Even more significantly, Mr. Porter testified that he made absolutely no adjustments to data taken from the Winslow Sales Record based upon pre-bid visits to the sale areas.[22] Tr. 1317-18

[21] As explained in our motion in limine, Mr. Porter's testimony is properly characterized as expert testimony and, therefore, should have been excluded pursuant to Federal Rule of Evidence 702. The Court nevertheless chose to admit Mr. Porter's testimony as lay opinion testimony. See Fed. R. Evid. 701.

[22] Similarly, Mr. Porter made no adjustments to product mix based upon discussions with his sawmill employees or time spent watching his sawmills in operation. Tr. 1318-19 (Porter).

(Porter). Precision Pine's suggestion that Mr. Porter's recollection of his pre-bid visits form the basis for the product mix estimates used in this action is pure fiction.

In fact, Mr. Porter relied upon the Winslow Sales Record to come up with product mix estimates. Tr. 4279 (Munn). Using data from the sales record, Mr. Porter testified that he picked a two month period when the contract under consideration was supposedly the only contract being harvested. Tr. 1332, 1339 (Porter) (describing the step of isolating a single sale as "critical"), 4279 (Munn). Then, using an unknown lag time, Mr. Porter assumed that the mix of lumber products sold in a subsequent month was identical to the mix of lumber products derived from the timber sale being considered. See Tr. 1338 (Porter). As Dr. Munn explained, not only does this methodology fail to provide an accurate product mix, it was not correctly applied by Mr. Porter.[23] E.g., Tr. 4277-310 (Munn).

Mr. Porter's approach would give an accurate product mix only if (1) timber harvesting was occurring on a single timber sale, (2) an appropriate lag time from timber harvest to lumber sale was used, (3) Precision Pine accounted for the inventory of lumber products, and (4) the mix of lumber products sold to Precision Pine's customers was identical to the mix of products that it manufactured from the contract under consideration. Tr. 4287-88 (Munn); DX775. As explained in our post-trial brief, Mr. Porter established none of these prerequisites. Def. Br. at 41.

Even worse are the estimates where Mr. Porter concluded that there was insufficient data in the Winslow Sales Record. For such contracts, Mr. Porter said that he used Forest Service

[23] Precision Pine is critical of Dr. Munn's use of the WWPA's Inland Rocky Mountain Region as indicative of an appropriate product mix in this action. Pl.'s Br. at 30. However, Precision Pine's own expert testified that grade recovery in the southwest would likely be lower than in other parts of the Inland Rocky Mountain Region. Tr.1228-29 (Devere).

cruise data to determine which sales were comparable. See Tr. 1349-50 (Porter). However, as Dr. Munn explained at trial, Mr. Porter did not correctly use this data to identify comparable sales. See Tr. 4305-08 (Munn); DX1008 at 4-5; see also DX775 at10. Nor was Mr. Porter even able to explain how he used Forest Service data to assess comparability. Tr. 1349-59 (Porter).

Precision Pine argues that Mr. Porter's product mix estimates should nevertheless be deemed valid because they are similar to the average product mix in the Winslow Sales Record. Pl.'s Br. at 31. This is hardly surprising as Mr. Porter's starting point was the Winslow Sales Record. Precision Pine's circular reasoning provides no support for the validity of Mr. Porter's approach. This is particularly so because most of the suspended contracts contained low quality, small diameter trees. See PX1-14. Unlike the Winslow Sales Record product mix, such trees would produce "very little in the way of [high value] shop and molding products." Tr. 1213 (Devere).

Thus, as explained in detail by Dr. Munn, Precision Pine's product mix estimates are based upon an invalid methodology that overstates the volume of high value products. Such product mix estimates do not provide a valid basis for estimating lumber profit.

**(b) Douglas Fir and Engleman Spruce**

Precision Pine has provided no foundation for the product mix that Mr. Ness uses for Douglas Fir and Engleman Spruce. These product mixes are not supported by an analysis of the Winslow Sales Record, by sales invoices, or by any other written record or document. Tr. 1805, 1809, 1813-14 (Porter). Indeed, Mr. Ness found no invoices demonstrating that Precision Pine had ever produced or sold Engleman Spruce wood products. Tr. 2710 (Ness). Precision Pine has, therefore, not met its burden of providing a reasonably certain estimate of damages.

**(6) Precision Pine Overstates Lumber Product Prices During The Period Of The MSO Suspensions**

**(a) Ponderosa Pine**

In its post-trial brief, Precision Pine admits the fundamental flaws in its derivation of lumber product prices during the period of the MSO suspensions. Precision Pine admits that the comprehensive Winslow Sales Record was not used to derive sale prices. See Pl.'s Br. at 32. Rather, Mr. Goeken derived prices using a straight average (not a weighted average) of sale prices, arbitrarily disregarded invoices containing prices deemed too low,[24] and ignored invoices showing sales of 4/4 shop materials. Id. Additionally, Precision Pine conceded #4 common prices were used for inferior #5 common material. See Pl.'s Br. at 33 (referring to the use of a different "product category"). As Dr. Neuberger explained at trial, these basic flaws resulted in prices that overstated lumber profits by approximately $650,000 when compared with the prices contained in the company's Winslow Sales Record. Tr. 3316, 3367-79 (Neuberger); DX776; see also Tr. 1668, 1674, 1681-21, 1791, 1796 (Porter).

**(b) Douglas Fir and Engleman Spruce**

Precision Pine states, without explanation, that Mr. Porter supplied prices for Engleman Spruce and Douglas Fir products. Pl.'s Br. at 35. In fact, for Engleman Spruce, Mr. Porter arbitrarily added $50 to the market price taken from an industry publication. Tr. 1809, 1813-14 (Porter). Similarly, for Douglas Fir, Mr. Porter added $60 to the published market price.

[24] Precision Pine suggests that invoices deemed too high were also dropped, but provides not a single example where such an action was taken. See Pl.'s Br. at 32-33. In any event, Precision Pine offers no justification for simply ignoring invoices that reflect products that the company actually produced and sold.

Tr. 1805 (Porter). Neither logic, nor sales invoices, nor any other evidence demonstrates that Precision Pine was able to sell its lumber at $50 to $60 above the market rate.

**(7) Lumber Manufacturing Costs**

In determining lumber manufacturing costs, Mr. Ness ignored the cost comparison reports that Precision Pine prepared every month in the ordinary course of business. See, e.g., DX802. These reports show that Precision Pine's sawmill and planer costs were more than 50 percent higher than the manufacturing costs used by Mr. Ness. Compare DX814 (showing actual costs between $74.71 and $79.86 for the Heber sawmill, between $80.00 and $95.36 for the Eagar sawmill, between $91.42 and $121.66 for the Winslow sawmill, and between $58.14 and $69.14 for the Winslow planer) with PX131 (using a manufacturing cost of $48.40 for the Heber sawmill, $48.91 for the Eagar sawmill, $63.98 for the Winslow sawmill, and $42.63 for the Winslow planer); see also DX802 (September 1995 report). Thus, Mr. Ness once again understates costs and overstates Precision Pine's claimed lumber profits.

**b. Roundwood**

During the period of the MSO suspensions, Precision Pine had no outlet for the roundwood component of its multi-product sales . DPFOF ¶¶ 65-66. Because Precision Pine's contracts required it to cut and remove all "included timber" (i.e., all sawtimber and roundwood), had Precision Pine fully harvested all of its Forest Service contracts during the suspension period, the roundwood on its multi-product sales would have been a total loss. See, e.g., Tr. 1827, 2025 (Porter); PX169-79 (AT2, BT2.1 & 2.2). In other words, Precision Pine would have paid to cut and remove the roundwood, but would have earned no revenue from roundwood sales. This loss would have been no less than $75.00 per ccf. Def.'s Br. at 43.

In its post-trial brief, Precision Pine asserts that it had “several other options” with respect to roundwood. Pl.’s Br. at 48. First, Precision Pine states it “could have requested that the Forest Service allow it to defer the removal of [roundwood] and hence the costs associated with” its removal. Id. Precision Pine does not suggest that the Forest Service would have granted a blanket request to defer removal of roundwood on all of Precision Pine’s contracts and the only evidence presented at trial is that the Forest Service would have denied such a request.[25] Tr. 3890-93 (Harris), 4561 (Lee). Of course, the deferral of roundwood harvesting was not a solution in any event as Precision Pine remained contractually bound to harvest the roundwood and continued to lack an outlet even after the MSO suspensions were lifted in December 1996.[26] See Pl.’s Br. at 50 (admitting that deferral “would not have obviated Precision Pine’s contractual obligation . . . to cut, remove and pay for” roundwood).

Second, Precision Pine states that it could have opened three payment units on each contract and harvested just sawtimber on those units. Pl.s Br. at 49-50. According to Precision Pine, this would have enabled the company to cut most of the sawtimber on its sales. Pl.’s Br. at 50 (82 percent). This proposed practice, however, would not have complied with Precision Pine’s duty to perform harvesting in a workmanlike manner. See Tr. 4128-29, 4204 (Harris); PX169-79 (BT6.3). And, once again, a deferral of harvesting would only have delayed the day of reckoning. Moreover, Precision Pine has performed no damages calculations based upon the

[25] The Forest Service did in fact deny Precision Pine’s requests to add a contractual provision that would have made roundwood harvesting optional. Tr. 3889-90 (Harris), 4636 (Dils) (discussing CT 3.43).

[26] Stone Container refused to take roundwood from Precision Pine until November 1997 – a period of more than two years. DPFOF ¶¶ 65-66. Even then, Stone purchased roundwood from only a single contract (Mud) before ending its roundwood purchases entirely. See DX564.

harvesting of 82 percent of sawtimber and a deferral of harvesting remaining sawtimber and roundwood. See PX131. Consequently, even if Precision Pine could theoretically have performed partial harvesting in this manner, it has presented no calculation of alleged damages based upon this approach.

Lastly, Precision Pine asserts that it could have invoked BT 6.4, which would have relieved it of the obligation to harvest roundwood. This novel argument ignores the plain language of the contractual provision. BT 6.4 allows a timber purchaser to leave "occasional trees inadvertently not cut or trees or pieces not removed for good reason." See PX169-79 (providing that "damages to forest resources or gross economic impracticability" can constitute "good reason"). The plain language of BT 6.4, thus, applies only to "occasional trees" or "trees or pieces" – not all roundwood on all cutting units of a contract. As Mr. Harris explained at trial, BT 6.4 applies when a purchaser has neglected to cut a few trees or logs and it would not be practicable to move equipment and manpower back to remove them. Tr. 4154-58 (Harris).

Mr. Harris's explanation is consistent with the parties' contemporaneous understanding of BT 6.4. In 1998, after Stone Container closed its pulpmill and stopped taking roundwood, Precision Pine asked the Forest Service to add CT 3.43 – a contract provision that would have made roundwood removal operation – to its contracts. Tr. 3889-90 (Harris); DX375. This request would have been unnecessary if Precision Pine merely had to invoke BT 6.4. Notably, neither before nor after asking to add CT 3.43 did Precision Pine suggest that BT 6.4 relieved it of the obligation to cut and remove roundwood.[27] Tr. 4157-58 (Harris). Precision Pine's

---

[27] In its post-trial brief, Precision Pine cites an out-of-context Forest Service Handbook provision. The Forest Service Handbook is not a binding statute or regulation, was not introduced as evidence at trial and, therefore, is not properly before the Court. See Western (continued...)

conduct, thus, belies the company's claim that BT 6.4 obviates the contractual obligation to cut, remove and pay for roundwood.

Precision Pine's eleventh hour attempt to invoke BT 6.4 merely reflects an implicit acknowledgment that the company had no outlet for roundwood during the period of the MSO suspension. This, in turn, is fatal to its claim for profits upon the multi-product sale contracts at issue in this action. See section IV.A.5., infra.

**c. Lumber By-Products**

In the course of milling and planing logs, Precision Pine produced bark, chips, shavings, and grindings (i.e., sawdust) as by-products. First Joint Stip. ¶ 33. With the exception of chips, Precision Pine has failed to prove that its by-products could have been sold, the price at which any sales would have taken place, and that any lost sales were the direct and primary result of the MSO suspensions. Additionally, Mr. Ness's analysis of by-product sales suffers from a number of errors.

**(1) Chips**

Precision Pine's contract to sell the output of its chips to Stone expired on September 30, 1995. See PX311; PX313. After the expiration of the contract, between January 15, 1996 and April 15, 1996, Stone declined to take chips from Precision Pine. PX311; DX476; Tr. 597-98, 1923-24 (Porter). Mr. Ness makes no deduction for the inability to sell chips to Stone during this three-month period. See PX131 (exhibit 4).

---

[27](...continued)
Radio Servs. Co. v. Epsy, 79 F.3d 896, 901 (9th Cir. 1996) (Forest Service Handbook does not have "not have independent force and effect of law").

**(2) Bark**

Precision Pine had no contract to sell the output of bark produced by its sawmills and introduced no invoices verifying bark sales at trial. Tr. 1924-25, 1934 (Porter). Mr. Ness relies instead upon a "bark journal" that identifies Transporting Renewable Resources, Inc. ("TRRI") as a "carrier" of bark for Precision Pine. PX316. TRRI is a trucking company that was at the time wholly-owned by Precision Pine. Tr. 1930, 2042 (Porter). Thus, Precision Pine's "bark journal" does not establish that bark was sold by Precision Pine, much less the price at which any sales took place. See PX316; Tr. 1930, 2042 (Porter); see also DX548; DX560-61. Consequently, Precision Pine neither established that it could sell the large quantities of bark produced by its sawmill operations, nor the market price for bark during the period of the MSO suspension.

**(3) Grindings**

Precision Pine had no contract to sell the output of grindings produced by its sawmills, has proffered no invoices showing grindings sales, and Precision Pine maintained no "grindings journal" showing the volume of grindings produced. Tr. 1924-25, 1934, 1937-38, 2042 (Porter). Mr. Porter projected no revenue from grindings in his profit projections, PX77, PX78; PX83; PX85; DX519; DX521-45, and Precision Pine in fact earned no revenue from the grindings sales during FYE 1995 or FYE 1996 (i.e., from Apr. 1, 1994 to Mar 31, 1996), DX831. Consequently, there is no basis for awarding any damages for lost grinding sales.

**(4) Shavings**

Precision Pine had no contract to sell the output of shavings from its planers and has proffered no invoices showing sales of shavings to customers.[28] See Tr. 1924-25, 1934 (Porter). Mr. Porter included no revenue from shavings sales in his profit projections, PX77, PX78; PX83; PX85; DX519, DX521-45, and Precision Pine earned no revenue from the sale of shavings during FYE 1995 or FYE 1996 (i.e., from Apr. 1, 1994 to Mar 31, 1996). DX831. This is because Precision Pine used shavings to make compressed wood pellets in a "pellet plant" at the Winslow sawmill, Tr. 1935 (Porter), and, additionally, used shavings in its wood waste fired boilers, Tr. 1941 (Porter); DX548; DX560-61. Accordingly, Precision Pine should not be awarded damages for lost shavings sales.

**5. Precision Pine's Contracts Were Not Profitable**

As explained above, Mr. Ness overstates revenue, understates costs, ignores roundwood losses and makes various other errors that increase claimed lumber profits. In fact, Precision Pine would have been unable to earn a profit upon most of its timber and multi-product sale contracts during the MSO suspensions.

During the period of the suspensions, market prices for lumber products were low. PX305; DX776; see also DX271; DX570. Additionally, beginning in September 1995, Precision Pine had no outlet for roundwood from multi-product sales. DPFOF ¶¶ 65-66. The inability to sell roundwood adversely affected profitability because, in order to harvest

---

[28] Precision Pine maintained a "shavings journal" that identifies TRRI as a "carrier" of shavings. PX316. As with the case of bark, Precision Pine's "shavings journal" simply indicates that TRRI provided hauling services; it does not show shavings sales to TRRI or any third parties. See PX316; Tr. 1930, 2042 (Porter); see also DX548; DX560-61.

sawtimber, Precision Pine was contractually obligated to cut and remove both roundwood and sawtimber components. See, e.g., Tr. 1827, 2025 (Porter); PX172 (clause BT 2.2). In other words, without an outlet for roundwood, the roundwood component of Precision Pine's multi-product sale contracts was a complete loss. As a result, most of Precision Pine's contracts were unprofitable during the suspensions. DA3; see also DSA1-2.

According to analyses that Precision Pine conducted just over a month before the MSO suspensions, many of Precision Pine's contracts were not profitable, including the Jersey Horse, Salt and U-Bar contracts.[29] See DX519, DX521-45. Moreover, Precision Pine's contemporaneous analyses do not take into account the roundwood component of multi-product sales and make no deductions for corporate overhead (i.e., they reflect gross profit – not net profit). See DX521-527; DX530-539. Had Precision Pine actually harvested its contracts without an outlet for roundwood, according to figures developed by Precision Pine's own expert, the company would have incurred losses on roundwood of not less than $75 per ccf. DPFOF ¶ 561; DX131; Tr. 2597-99, 2754, 2843 (Ness). Consequently, when roundwood losses are taken into account, nine of Precision Pine's contracts (Brookbank, Jersey Horse, Kettle, Manaco, Monument, Mud, Saginaw-Kennedy, Salt, and U-Bar) show no gross profit. See DX521-527; DX530-539; PX131. Deducting general overhead to obtain a net profit figure would increase the loss even more.

---

[29] The analysis of Precision Pine's claims by former DCAA auditor, Wayne G. Moosman, confirms that most of Precision Pine's contracts were not profitable during the MSO suspensions. Tr. 4866, 4919, 4923-24, 4927 (Moosman); DX777 at 15 (showing negative contribution margins for contracts before taking into account roundwood losses and general overhead).

Precision Pine asks the court to disregard Mr. Porter's July 17, 1995 analyses on the ground that they are "worst case" projections of profitability. See Pl.'s Br. at 27. Mr. Porter explained that these projections were prepared following a tentative offer from Stone Container to purchase Precision Pine. Tr. 918-19, 1566-68 (Porter). Mr. Porter was not interested in selling the company. Tr. 1568 (Porter). On the other hand, Mr. Tenney, who conducted the negotiations with Stone, was much more inclined to sell. Tr. 1567-68 (Porter). In these circumstances, there is no reason to believe that Mr. Porter's projections were anything other than an accurate attempt to assess Precision Pine's profitability.

The July 17, 1995 profit projections are not labeled "low," as are many of Mr. Porter's other projections. Moreover, Mr. Porter claims he wanted to discourage the company's sale. To achieve this, and to obtain the highest possible sale price if a sale to Stone were in fact consummated, Mr. Porter would want to prepare projections containing high projected profits, while at the same time suggesting to his partner that the projections contained the lowest price that should be considered in negotiations.

Additionally, the only aspect of the July 17, 1995 projections that Mr. Porter claims to have adjusted to create a worst-case projection is the overrun factor. Tr. 1558-59, 2132-34 (Porter) (testifying that he went from a 1.25 to a 1.10 overrun). Inputs such as product mix, lumber pricing, and sawmill costs were not altered. Id. This is highly significant. First, it undercuts Mr. Porter's testimony that he actually was producing "worst-case" projections. Mr. Porter created numerous projections in the post-suspension period that use a 1.10 overrun (or lower) that were described as "mid" or "high" projections. See DPFOF ¶ 429 (citing examples). Thus, Mr. Porter's testimony that he only deviated from a 1.25 overrun in order to produce

"low" or "worst-case" projections is, at best, highly suspect. Second, because changing the overrun factor affects a single input – lumber volume – going from a 1.25 overrun to 1.10 overrun simply decreases total lumber volume by 13.6 percent. See DSA1. Consequently, even if Mr. Porter's testimony were fully credited, an unadjusted projection would simply show 13.6 percent greater profit (or loss) than the putative worst case projections. See DSA1 (attached hereto). Even if the gross profit in Mr. Porter's July 17, 1995 projections is increased by 13.6 percent, the Brookbank, Jersey Horse, Kettle, Manaco, Monument, Mud, Saginaw-Kennedy, Salt, and U-Bar still show no gross profit. DSA2; see also DX521-527; DX530-539; PX131.

Accordingly, due to low lumber prices and the lack of an outlet for roundwood during the suspension period, the lumber profits claims upon the Brookbank, Jersey Horse, Kettle, Manaco, Monument, Mud, Saginaw-Kennedy, Salt, and U-Bar contracts are not viable. E.g., Hi-Shear Tech. Corp. v. United States, 356 F.3d at 1379 (profitability in the absence of the breach must be "definitely established" by plaintiff); California Federal Bank v. United States, 395 F.3d 1263, 1368 (Fed. Cir. 2005) ("The inability to prove by a preponderance of the evidence that profits would have been made but for the breach will . . . preclude recovery on a lost profits theory.").

**B. Precision Pine's Claim For Sawmill Costs Should Be Denied**

**1. Precision Pine Has Not Proved That Higher Sawmill Costs Were The Direct And Primary Result Of A Contractual Breach**

As discussed above, the plaintiff must prove that claimed damages were caused by the contract's breach "directly and primarily, and inevitably and naturally, not possibly or probably." Precision Pine, 64 Fed. Cl. at 166. Precision Pine has presented no evidence that the unavailability of any particular contract adversely affected its sawmill efficiency – much less that sawmill efficiency was affected by the breach of a particular timber sale contract. Rather,

Precision Pine asks the Court to assume that all changes in sawmill efficiency should be attributed to the MSO suspensions using a *post hoc, ergo propter hoc* (after this, therefore on account of this) rationale. See Pl.'s Br. at 52. This approach is legally insufficient.

During his direct examination, Mr. Ness suggested that Precision Pine's sawmills were less efficient during the suspension period because they lacked a "steady supply" of logs. Tr. 2378 (Ness); see also PX131 at 12. Mr. Ness, who was offered solely as an accounting expert, see Tr. 2171, has no education in forestry, no experience managing a sawmill, and no knowledge about the lumber industry in the southwestern United States. Tr. 2166-68, 2170 (Ness). But even putting aside his insufficient qualifications, Mr. Ness offered no facts, and performed no analysis, demonstrating that the lack of "a steady supply of logs" caused any changes in mill efficiencies. See PX131 at 12.

An expert's reasoning must be "more than subjective belief or unsupported speculation." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590 (1993); see also Loesch, 645 F.2d at 915 ("[O]pinion evidence is only as good as the facts upon which it is based."). Mr. Ness's opinions do not measure up to this standard. Indeed, his reasoning is based solely upon *post hoc ergo propter hoc* logic. This type of argument has been widely and roundly criticized as a method of establishing causation. E.g., McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1243 (11th Cir. 2005) ("Drawing . . . a conclusion from temporal relationships leads to the blunder of the *post hoc ergo propter hoc* fallacy."); Kozulin v. INS, 218 F.3d 1112, 1117 (9th Cir. 2000) (logical fallacy); Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 415 (7th Cir. 1992) (insulting to the intelligence); Abbott v. Federal Forge, Inc., 912 F.2d 867, 875 (6th Cir. 1990) (not a rule of legal causation); Sunward Corp. v. Dun & Bradstreet, Inc., 811 F.2d

511, 521 n.8 (10th Cir. 1987) (gives rise to mere speculation and conjecture). Specifically, the Court of Federal Claims has rejected application of this type of argument when there is more than one possible causative factor because it can "easily lead to wrong inferences." Owen v. United States, 20 Cl. Ct. 574, 584 (1990); see also Loesch, 645 F.2d at 915; Yazel v. United States, 93 F. Supp. 1000 (Ct. Cl. 1950); Baskett v. United States, 8 Cl. Ct. 201 (1985), aff'd, 790 F.2d 93 (Fed. Cir. 1986), cert. denied, 478 U.S. 1006 (1986). This is just such a case.

Precision Pine's per mbf sawmill costs have never been static; rather, they have varied from month to month as the result of many different factors. See DX802; DX814. For instance, between FYE1995 (April 1994-March 1995) and pre-suspension FYE1996 (April-August 1995) Precision Pine saw considerable changes in overall milling costs. DX814. The change at individual sawmills was even more dramatic. DX814 (costs up 33 percent at one facility, but down 18 percent at another); see also DX802 (mill costs in Sept. 1995). Given that Precision Pine's sawmill costs varied significantly during periods when the company was unaffected by suspensions, the only reasonable conclusion is that factors other than the availability of "a steady supply of logs" were at work. Yet Mr. Ness pretends that these other factors do not exist.

Additionally, Mr. Ness's "steady supply" explanation for increased costs disregards the fact that large volumes of timber were available to Precision Pine through contracts that Precision Pine chose not to harvest, chose to voluntarily terminate, or chose to cancel through a "friendly default." Def.'s Br. at 50, 55. Indeed, according to Precision Pine's own records, the company left standing over 1.7 million board feet of sawtimber on the Brann, Hutch-Boondock, and Mud contracts despite receiving Forest Service permission to defer the harvesting of roundwood. DX552; see also Tr. 1454-56 (Porter). The Barber, Campbell and Park sales

contained an additional five million board feet.[30] See DX528; DX544; DX545; DX552 (showing Park as only 55 percent complete). And over two million board feet were left uncut on the Saddle timber sale – a contract that Precision Pine was awarded in May 1996, but chose not to fully harvest during the period of the MSO suspensions. DX552. Precision Pine's business decision to cancel contracts, and to leave available timber on others, bars the recovery of damages claimed for increased sawmill costs. E.g., Hughes Communications, 271 F.3d at 1071.

During cross-examination, when faced with the fact that Precision Pine had not harvested available timber, Mr. Ness fashioned a new justification for damages. Specifically, Mr. Ness stated that using readily available, small diameter trees at Precision Pine's mills might have worsened – not improved – sawmill efficiency. Tr. 2809-10, 2867 (Ness) (discussing Hutch-Boondock (12.6" dbh) and Brann (12.2" dbh)). There is ample reason to doubt Mr. Ness's statement. Not only does he fail to mention this conclusion anywhere in his 161 page report, he couched his statement in a way that suggests "unsupported speculation." Tr. 2809 (stating "[t]here is a possibility . . . .); see also Daubert, 509 U.S. at 590 (expert testimony must be based on more than "unsupported speculation"). However, if accurate, Mr. Ness's statement would be highly significant because most of the suspended contracts consisted of relatively small diameter trees. See PX1-14. In fact, according to a letter that Precision Pine sent to the Forest Service in September 1995, only three contracts – Barber, Campbell and Hay – had "any quantity of [the]

---

[30] Precision Pine asserts that Barber and Campbell would not have been available to harvest even if the company had not sought their cancellation. Pl.'s Br. at 54. No evidence is cited for this proposition. Precision Pine also suggests that no timber was left to be harvested when the Park contract was cancelled in the Fall of 1996. Precision Pine's own business records show otherwise. See DX552 (showing that over 500 mbf (l.s.) remained to be harvested as of Precision Pine's default).

large diameter trees" that Precision Pine needed to "operate profitably." PX99. And only one of those contracts – Hay – is at issue here. Thus, if Mr. Ness's statement is credited, he has established that the suspension of contracts with smaller diameter trees increased – not decreased – Precision Pine's sawmill efficiency. On the other hand, if Mr. Ness's statement is treated as nothing more than unsupported speculation, Precision Pine has failed to prove causation.

This result is confirmed by the Scott Timber decision. Scott Timber v. United States, 333 F.3d 1358 (Fed. Cir. 2003). In Scott Timber, the Federal Circuit ruled that increased sawmill costs are not the direct result of the suspension of a timber sale contract. 333 F.3d at 1372. Although Scott Timber concerned the application of CT 6.01, the Federal Circuit cited common law damages rulings as the basis for its conclusion. Id. Moreover, Precision Pine has presented no factual basis for distinguishing the sawmill cost claims rejected in Scott Timber from the claims asserted in this action.

The only authority cited in support of Precision Pine's sawmill costs claims is a 20-year old decision in a diversity action from the Eleventh Circuit. Pl.'s Br. at 51 (citing Hawthorne Indus., Inc. v. Balfour Maclaine Int'l, 676 F.2d 1385 (11th Cir. 1982)). Hawthorne does not concern the sale of timber, is governed by Georgia law and, unlike Scott Timber, is not binding authority. Precision Pine quotes Hawthorne for the proposition that "increased production costs" are recoverable "as consequential damages when adequately attributed to a breach." Pl.' Br. at 51. However, this begs the question. In Hawthorn, there was "no speculation as to the causation of damages." 676 F.2d at 1387. Here, on the other hand, there has been no proof that has "adequately attributed" increased sawmill costs to a breach. Indeed, under Hawthorne, the speculative *post hoc ergo propter hoc* rationale used by Mr. Ness would not suffice. Id. ("the

rule preventing the recovery of speculative damages referred more especially to the uncertainty as to the cause"); see also McClain, 401 F.3d at 1243.

In sum, Precision Pine attempts to establish causation using the discredited *post hoc, ergo propter hoc* approach. There are numerous potential causes for the changes in Precision Pine's sawmill efficiency. Consequently, Precision Pine has failed to established that any increase in per unit sawmill costs (i.e., decreased efficiency) resulted "directly," "principally," or "inevitably" from the breach a timber sale contract. See Loesch, 645 F.2d at 914-15; Precision Pine, 64 Fed. Cl. at 166.

**2. Increased Sawmill Costs Are Not The Legally Foreseeable Result Of The Suspension Of A Timber Sale Contract**

Precision Pine provides no meaningful discussion of the legal foreseeability of sawmill costs in its post-trial brief. Precision Pine simply refers the Court to a discussion concerning "independent and collateral undertakings." See Pl.'s Br. at 56. However, as explained above, this is a distinct and different inquiry. See section IV.A.3., supra; see also Wells Fargo, 88 F.3d at 1022-23 (explaining that the collateral undertaking inquiry requires identifying the benefits that result from "the direct and immediate result of [the] fulfillment" of the contract); Landmark, 256 F.3d at 1378 (explaining that legal foreseeability concerns the loss that flows from a breach in the ordinary course of events).

Precision Pine makes the bare assertion that increased sawmill costs are the foreseeable result of the suspension of its Forest Service timber sale contracts.[31] Pl.'s Br. at 56. However,

[31] Precision Pine's refers to the foreseeability of "a protracted and widespread suspension." Pl.'s Br. at 56. This characterization misstates the question. Where "several circumstances have contributed to a loss, the party in breach is not liable for it unless he had reason to foresee all of (continued...)

Precision Pine identifies no logical nexus between the suspension of a Forest Service contract and an increase in sawmill costs. Furthermore, Precision Pine ignores the applicable legal standard.

Legal foreseeability is analyzed "at the time of contracting." Landmark, 256 F.3d at 1378; Bohac, 239 F.3d at 1340. Consequently, because Precision Pine's contracts were each awarded on a different day over a five year period, see First Joint Stip. ¶¶ 12-27, the question of legal foreseeability cannot be resolved without considering the contracts one at a time. Additionally, as to each contract, plaintiff must demonstrate that the claimed loss "follow[s] from breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." E.g., Landmark, 256 F.3d at 1378 (quoting Restatement § 351(2)).

Precision Pine has not made the requisite showing. As explained in our post-trial brief, increased sawmill costs do not result in the ordinary course from the suspension of a timber sale contract. Def.'s Br. at 51-53. Furthermore, Mr. Porter confirmed that the Forest Service had not been informed of any special circumstances, plans or considerations at the time of contracting. Tr. 1855-57 (Porter). Therefore, even if sawmill costs are potentially recoverable, Precision Pine has failed to demonstrate that its claimed sawmill costs were legally foreseeable.

---

[31](...continued)
them." Restatement § 351 cmt. d. Thus, if Precision Pine seeks damages based upon a "widespread suspension," i.e., the simultaneous suspension of many contracts, then it must establish that the simultaneous suspension of many contracts was foreseeable when the contract at issue was awarded. For example, for the O.D. Ridge contract, Precision Pine would have to present evidence that a widespread suspension was foreseeable as of August 14, 1992. Precision Pine presented no such evidence at trial.

### 3. Precision Pine's Sawmill Cost Calculations Are Also Flawed And Uncertain

Not only has Precision Pine failed to establish causation, Mr. Ness's calculations fail to provide a reasonable estimate of those sawmill costs that allegedly result from the contractual breaches at issue. First, the comparison methodology used by Mr. Ness is flawed. Timber harvesting and lumber manufacturing are affected by seasonal fluctuations. See DX798; Tr. 2102-03 (Porter). Mr. Ness nevertheless selected a "baseline period" with two summers and one winter to compare to a "suspension period" with one summer and two winters. As a result, the "baseline period" and the "suspension period" compared by Mr. Ness are not comparable and the results are skewed in a way that is likely to show an increase in costs. Remarkably, Mr. Ness includes a second winter in the suspension period by treating the suspension as lasting four months longer than it actually did. PX131 (exhibit 16) (using March 31, 1997 – not December 4, 1996 – as the end date of the MSO suspensions); see also Pl.'s Br. at 57 (Mr. Ness's calculations are based upon "the suspension and the ensuring winter"). Mr. Ness also fails to account for the fact that the first 135 days of the MSO suspensions were not a breach of contract.[32] See section I.B., supra. It is only increased sawmill costs resulting from the lack of "a steady supply of timber" in the 1996 operating season (i.e., from May 1996 to December 1996) that are potentially due to the breach. Having failed to assess the appropriate suspension period, Mr. Ness's calculations cannot provide a reasonably certain estimate of damages.

---

[32] Mr. Ness's calculations also mistakenly include periods when a sawmill was completely shutdown. Because an inefficiency claim (i.e. higher costs / volume) is based upon the premise that the mill is operating, albeit at less than full efficiency, periods when a mill is closed should be excluded from the analysis. By failing to do this, Mr. Ness increases costs while adding no volume. As a result, he shows a higher per mbf cost during the suspension than is appropriate.

In addition, Mr. Ness's calculations fail to acknowledge and take into account factors unrelated to the MSO suspensions that affected sawmill efficiency.[33] In periods that were unaffected by suspensions Precision Pine experienced significant fluctuations in per mbf sawmill costs. See DX802; DX814. The "noise level" of these month-to-month efficiency changes is substantially greater than the changes in efficiency that Mr. Ness attributes to the MSO suspensions. Compare DX802 (showing a one month rise or decline of $21.01 per mbf (Heber), $33.86 per mbf (Eagar), and $18.34 per mbf (Winslow)) with PX131 (exhibit15) (claiming damages for a $2.83 per mbf change at Heber, a $ 44.12 per mbf change at Eagar, and a $3.77 per mbf change at Winslow). This is yet another reason that Mr. Ness's calculations fail to provide a reasonably certain estimate.

Similarly, Mr. Ness fails to distinguish between changes in efficiency attributable to the suspensions and changes in efficiency caused by Precision Pine's business decisions. In this regard, the key facts are undisputed: (1) the Hutch-Boondock and St. Joe contracts were suspended but were not breached during the period of the MSO suspensions; (2) despite the fact that the Forest Service allowed the deferral of roundwood harvesting, Precision Pine did not completely harvest available sawtimber on the Brann, Hutch-Boondock and Mud contracts during the period of the MSO suspensions; (3) Precision Pine voluntarily cancelled the Barber and Campbell contracts; (4) Precision Pine stopped harvesting and voluntarily defaulted upon the Park timber sale; and (5) Precision Pine did not fully harvest the Saddle timber sale during the period of the MSO suspensions. Each of these actions reduced the volume of timber available

[33] These factors would likely include employee turnover, the gradual deterioration of equipment, the replacement of older equipment, changes in fuel and utilities costs and various other events occurring in the ordinary course of business.

for Precision Pine's sawmills. If reduced sawmill efficiencies were in fact due to the lack of "a steady supply of logs," as Mr. Ness contends, then Precision Pine's own decisions were largely responsible for the problem. See Tr. 2678-81 (Ness) (Precision Pine's business decisions, by reducing the supply of logs at its sawmills, could have adversely affected mill efficiencies). By failing to account for the effect of Precision Pine's own actions, Mr. Ness's calculations are inaccurate.

Accordingly, by attributing all changes in sawmill costs to the MSO suspensions and none to Precision Pine's business decisions or other significant real-world considerations, Mr. Ness has failed to provide a reasonably certain estimate of damages.

### C. Alleged Increased Hauling Costs On The Hay Timber Sale

#### 1. Increased Hauling Costs Were Not The "Direct And Primary" Result Of The Suspension Of The Hay Contract

Under the common law, damages must result from the breach "'directly and primarily,' and 'inevitably and naturally, not possibly or probably.'" Precision Pine, 64 Fed. Cl. at 166. Precision Pine's claimed log hauling costs do not meet this standard.

Precision Pine has not established that the Hay contract would have been harvested during late 1995 or 1996 but for the suspension. The only factual evidence admitted at trial – Precision Pine's annual operating plan for 1995 – shows no harvesting of the Hay timber sale. See DX294. Precision Pine points to the schedule in Mr. Ness's expert report. See PPFOF ¶ 379 (citing PX131). However, Mr. Ness stated that Precision Pine would not have followed this schedule in the "but for" world. Tr. 2622, 2626, 2848 (Ness). More fundamentally, as explained above, Mr. Ness was presented as an expert witness. As an expert, he is not competent to provide the factual predicate for Precision Pine's claims. See, e.g., Fed. R. Evid. 602, 703.

Precision Pine offered testimony from the company's two principal officials – Lorin Porter and Lewis Tenney – neither of whom testified that the harvesting schedule in Mr. Ness's report would have been followed by Precision Pine had the MSO suspensions not occurred. Tr. 1442-48 (Porter) (testifying that he did not know what contracts would have been harvested had the MSO suspensions not occurred). As a result, Precision Pine has failed to establish that the harvesting of timber from Hay would have occurred in 1995 or 1996 but for the contract's suspension.

Moreover, neither the hauling of logs to Winslow in December 1996 and January 1997, nor to Heber in late 1998, resulted "directly and primarily" from the Hay contract's suspension. In December 1996, Precision Pine began making preparations to reopen the Eagar sawmill. Tr. 754-55 (Porter). Consequently, in December and January, Precision Pine could have taken cut timber from the Hay sale to Eagar in order to prepare for the mill's reopening. See Tr. 1874 (Porter). Not only would this have avoided any additional haul costs, it would have provided a ready supply of logs for the Eagar sawmill's operations.[34] Precision Pine chose not to do so.

Precision Pine may respond that it wanted logs from Hay for its Winslow sawmill. Of course, Precision Pine has identified six timber sales that it intended to haul to Winslow. See Tr. 112 (Porter); PX131 (exhibit 4). Two of these (Brann and Saginaw-Kennedy) had a normal operating season that ran through December 31. DX342; PX179. They were, therefore, available for harvesting. Precision Pine nevertheless chose not to harvest these contracts.

[34] According to Precision Pine, it was forced to curtail operations at the Eagar sawmill in April 1997 because it lacked a sufficient supply of logs. Pl.'s Br. at 59. This difficulty would have been prevented if Precision Pine had hauled timber from the Hay contract to Eagar.

Simply put, Precision Pine made a business decision to haul logs from Hay to the Winslow sawmill in December 1996 and January 1997. This business decision was not somehow compelled by the Hay contract's suspension in 1995 and 1996. Consequently, Precision Pine's claim for increased costs should be denied. Hughes Communications, 271 F.3d at 1071 (holding that an "independent business decision" constitutes an intervening cause that precludes damages).

Precision Pine's claim for increased haul costs in late 1998 is even further removed from the MSO suspensions. Precision Pine asserts that it hauled logs from the Hay contract to Heber in 1998 because it had permanently closed the Eagar sawmill and the Winslow sawmill had been destroyed by a fire. Pl.'s Br. at 59. The closure of the Eagar sawmill in mid-1997 was due to "continuing log shortages caused by the Forest Guardians suspension." Pl.'s Br. at 59. Consequently, it was the Forest Guardians suspensions, not the suspensions at issue in this action, that caused the Eagar sawmill to be unavailable in 1998. Precision Pine is, therefore, not entitled to any increase in costs due to hauls to the Heber sawmill in 1998. E.g., Myerle, 33 Ct. Cl. at 27 ("there must appear no intervening incident . . . to complicate or confuse the certainty of the result between the cause and the damage").

### 2. Increased Log Hauling Costs Were Not Legally Foreseeable At The Time Of Contracting

As explained above, damages are legally foreseeable only if they "follow from breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." E.g., Landmark, 256 F.3d at 1378. Increased log hauling costs do not occur "in the ordinary course of events" as the result of a contract suspension. Indeed, in this action, Precision Pine only claims to have

incurred such costs with respect to one of 14 contracts. Consequently, if log hauling costs are legally foreseeable, it must be because the Forest Service was aware of "special circumstances" at the time of contracting. See Landmark, 256 F.3d at 1378.

The Hay timber sale contract was awarded to Reidhead Lumber on January 17, 1990, and was transferred from Reidhead Lumber to Precision Pine on June 24, 1991. DPFOF ¶ 164. The Forest Service had been apprised of no special circumstances, plans, or considerations relating to the Hay contract as of June 1991. DPFOF ¶ 166; Tr. 1855 (Porter). In fact, Precision Pine did not inform the Forest Service that logs from the Hay sale would be hauled to Eagar for another three and a half years. DPFOF ¶ 167. And at no point prior to the MSO suspensions did Precision Pine indicate that the Hay sale was of particular importance to its Eagar sawmill. See PX260 (stating only that logs from Hay would be hauled to Eagar). Simply put, the Forest Service was aware of no "special circumstances" relating to the Hay timber sale at the time of contracting. Consequently, Precision Pine's claimed log hauling costs are not legally foreseeable.

Precision Pine opens its argument with two accurate, but irrelevant, facts – that the Forest Service knew Precision Pine had a sawmill in Eagar, and that Precision Pine informed the Forest Service that it would haul logs from Hay to the Eagar mill. Pl.'s Br. at 60. Precision Pine neglects to mention that the Eagar mill was not built until late 1993 and, as noted above, that it did not inform the Forest Service that logs would be hauled from Hay to Eagar until late 1994.

Simply put, because the company had no sawmill in Eagar at the time of contracting, it was not foreseeable that Precision Pine would be hauling logs to Eagar.[35]

Precision Pine points out that the Hay contract was appraised to a sawmill in Eagar. Pl.'s Br. at 60. This is a red herring. For the sake of consistency, Forest Services appraises timber sales to the nearest sawmill. In 1990, the nearest sawmill to the Hay sale happened to be in Eagar. It was not Precision Pine's mill. See First Joint Stip. ¶ 6. Moreover, a pre-sale appraisal does not indicate where timber is expected to be processed because the location of processing (if the timber is processed at all) is determined by whoever becomes the contract's awardee.

Precision Pine also cites the board of contract appeals decision in Reidhead Bros. Lumber Company, AGBCA No. 2000-126-1, 01-2 BCA ¶ 31,48 (June 29, 2001). The board's decision in Reidhead contains no discussion whatsoever of legal foreseeability. Indeed, the board was not presented with a common law claim for hauling costs. Accordingly, the Reidhead decision is inapposite.

Lastly, Precision Pine quotes certain statements in the Court's denial of summary judgment. Pl. Br. at 61. However, at the summary judgment stage, the Court was merely affording Precision Pine the opportunity to present the factual evidence establishing legal foreseeability at trial. See Precision Pine, 63 Fed. Cl. at 130-31. Precision Pine has now been afforded that opportunity, but has presented no evidence that the Forest Service was aware of special circumstances relating to the Hay contract at the time of contracting. Indeed, Precision

---

[35] At the time of contracting (whether deemed January 1990 or June 1991), the only sawmill operated by Precision Pine was in Heber, Arizona. See First Joint Stip. ¶¶ 2-3.

Pine's president acknowledged that the Forest Service was not informed of special circumstances concerning the Hay contract. Tr. 1855 (Porter).

Precision Pine's unsupported, conclusory allegations regarding legal foreseeability merely highlight the lack of evidence supporting its claim. Judgment should be entered in favor of the United States upon Precision Pine's common law claim for increased log hauling costs.

### 3. The Alleged Increase In Precision Pine's Log Hauling Costs Is Inaccurate

Even if Precision Pine's increased log hauling cost claim were not barred by the failure to prove causation and the absence of legal foreseeability, Precision Pine would not be entitled to the damages claimed. Precision Pine calculates a hypothetical increase in log hauling costs using a per mile haul rate. See Pl.'s Br. at 62-63. Precision Pine ignores the actual haul costs for the Hay sale contained in the company's annual financial statements.[36] Id. Had Precision Pine used actual cost data, its claimed damages would be far lower. See Def.'s Br. at 60-61.

Precision Pine also seeks to add overhead and profits to its claimed cost increase. Pl.'s Br. at 64 (citing PX318). Precision Pine states in its post-trial brief that this markup was "deemed appropriate" by Mr. Ness. Pl.'s Br. at 64 n.43 & 44. Yet, at trial, Mr. Ness said he "had no idea" whether a markup for profits and overhead was appropriate. Tr. 2547 (Ness). Rather, he testified that the markup was done at counsel's direction. See Tr. 2546-48 (Ness).

Aside from its reference to Mr. Ness, Precision Pine provides no justification for adding profit and overhead to claimed cost increases. Under the common law, "the non-breaching party

[36] Precision Pine's financial statements contain a line item showing the logging and hauling cost for each contract operated during the fiscal year. PX248. The volume of timber removed from the sale is shown on the respective Timber Sale Statements of Account ("TSSA"). DX68. Thus, the per mbf cost in a particular year is easily derived. See Def.'s Br. at 60; DA3.

should not be placed in a better position through the award of damages than if there had been no breach." E.g., Bluebonnet, 339 F.3d at 1345. Adding a markup to actual costs would confer the very windfall that is not permitted under the common law. See Hansen, 376 F.3d at 1315.[37]

Because Precision Pine does not use the company's actual haul costs for its damages calculations, and because it then adds overhead and profit to already inflated costs, Precision Pine's claimed increase in haul costs is inaccurate. Consequently, even if such costs were recoverable, Precision Pine has failed to provided a valid calculation of damages.

## V. Precision Pine Seeks To Rescind The Bi-Lateral Cancellation Of The Mud Sale In Order To Boost It Damages

Mr. Ness provides a "credit" for the amount that Precision Pine was paid in 1996 for the partial cancellation of the Mud multi-product sale. PX131 (exhibits 1 & 4). Mr. Ness then calculates damages as if the cancellation had never occurred. Pl.'s Br. at 67 (citing PX131, Ex. 4 at 2-5). Mr. Ness offers no basis for disregarding the partial cancellation of this contract.

Attempting to justify Mr. Ness's approach, Precision Pine asserts that the modification of the Mud contract "was accomplished by a unilateral partial cancellation." Id. Precision Pine's assertion is false. The company executed a contract amendment in which it and the Forest Service "mutually agreed" to the partial cancellation. PX175 (page MUD164). This contract amendment was executed by Mr. Porter, was duly witnessed by the corporation's secretary, and was introduced into evidence at trial. Id. Thus, Precision Pine includes in its damages

---

[37] Precision Pine points to a number of cases from various jurisdictions that it mistakenly contends support a "markup" of profits and overhead in addition to actual costs. Pl.'s Br. at 63-64. In Big Chief Drilling v. United States, 26 Cl. Ct. 1276 (1992), for example, the Court allowed a recovery of profits because the contractor had to perform additional work because of erroneous Government design specifications. Such a "markup" is unique to construction cases in which the contractor is required to perform additional work.

calculations timber volumes that were deleted by mutual agreement – volumes for which Precision Pine has already been paid. Not only does this error boost Precision Pine's claimed damages, it distorts the putative harvesting and milling schedules by incorporating the cutting and processing of timber that the company did not have under contract.

## VI. Precision Pine's CT 6.01 Damages Claims Are Unsupported Or Unrecoverable

Precision Pine seeks reimbursement of certain costs pursuant to contract clause CT 6.01. Pl.'s Br. at 64-67. As explained in our principal brief, reimbursement pursuant to clause CT 6.01 is an alternative to common law damages. Def.'s Br. at 8, 61-62. Therefore, if Precision Pine is awarded common law damages upon a given contract, its claim for reimbursement pursuant to CT 6.01 should be denied.

### A. Precision Pine Is Not Entitled To Employee Claim Preparation Costs

Precision Pine seeks reimbursement of alleged employee claim preparation costs pursuant to CT 6.01. These claims lack legal and factual support.

As explained in our principal brief, claim preparation costs ordinarily are not recoverable as a matter of law. Def.'s Br. at 63 (citing cases). Lacking authority to rebut this legal proposition, Precision Pine boldly proclaims that "[t]he case law demonstrates that claim preparation costs are recoverable." Pl. Br. at 65 (citing Reidhead Bros. Lumber Mill, AGBCA No. 2000-126-1, 01-2 BCA ¶ 31,486 (June 29, 2001)). However, the single board decision cited by Precision Pine never addresses whether claim preparation costs are recoverable under CT 6.01.[38] Precision Pine also refers to a stipulated judgment from Scott Timber. Pl.'s Br. at 66.

---

[38] Rather, without explanation, the board awarded attorney fees pursuant to CT 6.01. Reidhead Bros., 01-2 BCA ¶31,486. The Court previously rejected this aspect of the ruling in (continued...)

At the pretrial conference, the Court ruled that this document was inadmissible. Tr. 107-10 (May 5, 2005) (excluding PX151). Apparently not feeling bound by Court's ruling, Precision Pine argues nevertheless that the Scott Timber settlement warrants the payment of claim preparation costs in this action. It does no such thing. It is black letter law that claim preparation costs are payable only where the claim was submitted to further contract performance. E.g., Singer Co. v. United States, 215 Ct. Cl. 281, 568 F.2d 695, 721 (1977). Precision Pine's claims were not submitted for this purpose and, consequently, it is not due reimbursement under CT 6.01.

Additionally, Precision Pine's alleged claim preparation costs do not qualify as an out of pocket expense. Precision Pine once again proclaims that it is "apparent" that the company incurred "out-of-pocket costs" as the direct result of the MSO suspensions. Pl. Br. at 65. However, Precision Pine's employees were paid a fixed salary. DPFOF ¶¶ 595-96. In fact, Precision Pine admits that it only "paid its employees their usual wages" for work on the claim letters. PPFOF ¶ 393. Consequently, the company incurred no "out of pocket" expense.

Finally, Precision Pine failed to present evidence establishing the amount of time its employees spent on claim preparation. Mr. Ness again simply adopted numbers from an inadmissible claim document – numbers that Mr. Porter was unable to verify at trial.[39] See

---

[38](...continued)
Reidhead. See Precision Pine, 63 Fed. Cl. at 140 (granting summary judgment upon Precision Pine's claim for attorney fees under CT 6.01).

[39] Precision Pine asserts that "each employee kept track of the time spent in claim preparation." Pl.'s Br. at 65. This statement is, at best, grossly misleading. Mr. Porter admitted Precision Pine has no contemporaneous time records. Tr. 796-98, 800-08 (Porter). While Mr. Porter supposedly canvassed his employees in 1997, these notes were never produced to the United States. Rather, they were destroyed in 2003 after allegedly being incorporated into Precision Pine's claim. Id. Precision Pine should not be permitted to base a claim for (continued...)

Tr. 796-808 (Porter). Thus, the factual basis for Precision Pine's claim is lacking. The Court should, therefore, deny Precision Pine's claim for employee claim preparation costs.

### B. Precision Pine's Claims For Miscellaneous Costs Are Unsupported

#### 1. Precision Pine's Claims For Additional Bond Costs Are Unsupported

The United States does not dispute that Precision Pine is entitled to $14,278.85 on its respective claims for bond costs pursuant to CT 6.01. See Def.'s Br. at 64. However, Precision Pine has failed to prove that it is due any additional amount. Id.

The sole basis for Precision Pine's claim for additional bond costs is the testimony of Mr. Ness. Pl.'s Br. at 68. Yet on cross-examination, Mr. Ness admitted that he had performed no meaningful analysis of the bond cost claims. See Tr. 2545-51, 2555, 2558-60 (Ness). Mr. Ness described the claims as "not significant" and stated that they "didn't warrant a lot of investigation." Tr. 2549 (Ness) ("I did not trace back [the] bond costs or [do] any of those kind of things because they are very minor items."). Even where there were differences between the amount claimed by Precision Pine and the amount paid by the Forest Service, Mr. Ness conceded that he did not "dig deeper." Tr. 2550 (Ness) (stating that he simply accepted counsel's representation). Mr. Ness's testimony, therefore, provides no basis for an additional award of bond costs to Precision Pine.

---

[39](...continued)
reimbursement on after-the-fact notes that were never produced to the United States particularly where Precision Pine chose not call its employees to testify at trial. Consequently, having failed to establish the time spent by its employees, Precision Pine is not entitled to recover claim preparation costs.

**2. Precision Pine Is Not Owed "Move Out Costs"**

Precision Pine has failed to establish that it incurred "move out costs" on the Brookbank sale. Mr. Ness did no independent investigation, neither Mr. Porter nor Mr. Reidhead testified that Tri-Star Logging charged move out costs, and Precision Pine offered no receipts or other documentation demonstrating that it had paid move out costs. See Tr. 2561-62 (Ness).

Precision Pine relies solely upon the fact that move out costs were awarded by the contracting officer. Pl.'s Br. at 68; Tr. 2561-62 (Ness). However, "a contractor is not entitled to the benefit of any presumption arising from the contracting officer's decision." Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc). Having presented no evidence that it incurred move out costs on the Brookbank sale, Precision Pine's claim should be rejected.

**3. Precision Pine Is Not Entitled To The Payment Of Interest**

Neither contract clause CT 6.01, nor any other contractual provision, provides for the payment of interest. Tr. 1906-07 (Porter), 1910-11, 1913 (stipulation of counsel). Consequently, no interest is payable. Marathon Oil Co. v. United States, 374 F.3d 1123, 1127 (Fed. Cir. 2004).

Precision Pine refers the Court to a Forest Service handbook provision that was neither introduced into evidence, nor the subject of trial testimony. Pl.'s Br. at 69. Of course, even if the handbook were properly before the Court, it would provide no basis for disregarding the contracts' plain language. E.g., Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); M.A. Mortenson Co. v. Brownlee, 363 F.3d 1203, 1206 (Fed. Cir. 2004).

**4. Precision Pine Is Not Entitled To Snow Removal Costs**

Precision Pine seeks snow removal costs in connection with three contracts: (1) South Black Aspen; (2) Hutch-Boondock; and (3) St. Joe. Tr. 2569 (Ness). South Black Aspen is not

one of the contracts at issue in this action. See Tr. 2570 (Ness) ("I know nothing of the South Black Aspen contract."). Nor are snow removal costs payable on Hutch-Boondock or St. Joe. Precision Pine's only witness on snow removal costs was unable to explain why such costs are due. Tr. 2570-72 (Ness). Further, the suspensions of Hutch-Boondock and St. Joe were lifted on October 18, 1995. See Joint Stip. of Facts ¶ 30; PX106. This was well before the close of the normal operating season. See DPFOF ¶¶ 191, 361. Consequently, any costs are the result of Precision Pine's subsequent decision to conduct out-of-season harvesting. Precision Pine is, therefore, due no reimbursement for snow removal costs.

**5. Precision Pine Is Not Entitled To Log Transfer Costs**

Precision Pine has failed to establish that any log transfer costs were incurred as a direct result of the MSO suspensions. Precision Pine asserts that Mr. Ness "verified" these costs. Pl.'s Br. at 70. However, Mr. Ness did not know when the transferred logs arrived at the Eagar sawmill or whether the logs came from one of the contracts at issue. See Tr. 2573-74 (Ness). Consequently, there exists no basis to conclude that the claimed costs were "the direct result of interruption or delay of operations" of a contract at issue in this action. Reimbursement pursuant to CT 6.01 is, therefore, unavailable.

**6. Under CT 6.01, Precision Pine Is Not Entitled To A Markup For Overhead And Profits**

Mr. Ness adds a "markup" of overhead and profits in a attempt to inflate Precision Pine's claims for reimbursement under CT 6.01. However, Mr. Ness testified that he "had no idea" whether overhead and profit should be recoverable. Tr. 2547 (Ness). He added overhead and profit because he was told to do so by counsel. See Tr. 2546-48 (Ness) (stating that it was "represented by counsel" that such sums were appropriate). Given that the recovery of profits is

expressly barred by CT 6.01, and that overhead is inherently an indirect cost, neither profits nor overhead is allowable under CT 6.01.[40] Def.'s Br. at 68-69; see also Nicon, Inc. v. United States, 331 F.3d 878, 882 (Fed. Cir. 2003). The Court should, therefore, reject Precision Pine's attempt to add overhead and profit to costs payable pursuant to CT 6.01.

## CONCLUSION

For these reasons, and those provided in our earlier filings and at trial, the Court should (I) enter judgment in favor of the United States upon Precision Pine's common law claims for lumber profits, sawmill inefficiency costs and increased log hauling costs, (ii) award Precision Pine $14,278.85 on its respective claims for bond costs pursuant to CT 6.01, (iii) deduct from that sum the amount previously paid by the Forest Service, i.e., $16,278.85, and (iv) enter judgment in favor of the United States upon Precision Pine's other claims pursuant to CT 6.01.[41]

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

[40] Precision Pine cites two board decisions. See Pl.'s Br. at 66 n.47 (citing Reidhead, 01-2 ¶ 31,486 at 155,441; Matt Allen Logging, AGBCA Nos. 202-124-1, 04-1 BCA ¶ 32,596 (Apr. 8, 2004) (allowing $139 in overhead costs that were "unrebutted"). Neither decision explains how CT 6.01 warrants a payment of overhead or profit. See Pl.'s Br. at 66 n.47 (admitting that the board's rationale is "unstated"). Consequently, these decisions have no persuasive value.

[41] The Court's orders do not contemplate a response to plaintiff's proposed findings of fact. The United States is, therefore, not filing a response, However, the United States disagrees with many of plaintiff's proposed findings, which are inaccurate or unsupported by record evidence.

s/ David A. Harrington

OF COUNSEL:

LORI POLIN JONES
PATRICIA L. DISERT
Office of General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

DAVID A. HARRINGTON
MARLA T. CONNEELY
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
(202) 307-0277
(202) 307-0972 (fax)

November 14, 2005

Attorneys for Defendant