**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-720C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S POST-TRIAL RESPONSE BRIEF**

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
Bryan T. Bunting
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Washington, D.C. 20006
(202) 452-2140

Dated: November 14, 2005

# TABLE OF CONTENTS

**PAGE**


INTRODUCTION ..... 1

I. Several Of Defendant's Arguments Are Barred By The Law Of The Case Doctrine ..... 2

II. Defendant's Hypothetical Legal Argument That It *Might* Have Avoided A Breach Of Warranty Had It Suspended Operations In 1994 Does Not Absolve It Of Liability For Actually Breaching The Contracts In 1995 ..... 3

III. Defendant's Argument That It Could Breach The Contracts With Impunity For At Least 135 Days Remains Groundless ..... 5

IV. Defendant's Argument With Respect To "Partial Breach" Damages Is Unavailing ..... 6

V. Precision Pine's Lost Profits Are Not The Product Of Collateral Activities ..... 7

VI. Precision Pine Is A Lost Volume Seller ..... 8

VII. Precision Pine's Damages Claims Are Fully Compatible With One Another ..... 10

VIII. Precision Pine's Damages Calculations Are Sufficiently Certain ..... 12

A. All Of Precision Pine's Contracts Would Have Been Completed Profitably During The Suspension ..... 12

B. The Existence Of Pulpwood On Some Sales Would Not Have Precluded The Profitable Harvesting Of The Sawlogs Remaining On The Breached Sales ..... 13

C. But For The Suspension, All Of The Timber On The Breached Contracts Would Have Been Harvested In Order To Operate Precision Pine's Sawmills At Or Near Capacity ..... 15

1. Harvest Of The Mud Contract Was Not Precluded By Other Litigation ..... 18

2. But For The Forest Service's Breach, Precision Pine Would Have Conducted Substantial Harvesting Of The Manaco Timber Sale As Planned ..... 19

3. Defendant's Reliance On Events That Occurred In The Post-Suspension Period Is Unavailing ..... 21

D. It Was "Legally" Foreseeable That A Protracted Suspension And Breach of 11 of Precision Pine's Forest Service Timber Sale Contracts Would Result In Lost Profits ..... 21

E. Precision Pine Has Established Its Lost Profits With Reasonable Certainty ..... 25

1. Mr. Ness Used Mr. Porter's Projected Harvest Schedule With Minor Adjustment To Reflect Corrected Volumes ..... 26

2. Precision Pine's Milling Schedule Provides A Reasonably Certain Basis For Determining Its Damages ..... 29

3. Precision Pine's Damages Calculations Are Both Reasonably Certain And Conservative ..... 34

a. Precision Pine's Determination Of Lost Profits On Lumber Is Reasonably Certain And Conservative ..... 34

(i) Defendant's Assertion That Precision Pine Ignored Pulpwood Logging And Hauling Costs ..... 45

b. Precision Pine's Calculation Of Its Lost By-Products Revenue Is Reasonably Certain ..... 45

(i) Chips ..... 46

(ii) Bark ..... 47

(iii) Shavings ..... 48

(iv) Grindings ..... 49

(v) By-Products Revenue As A Whole ..... 49

4. Mr. Ness' Calculation Of Profits In The Post-Suspension Period, Though Unnecessary To The Determination Of Damages In This Case, Is Reasonably Certain ..... 50

F. Precision Pine's Increased Mill Costs Caused By The Suspension Are Fully Recoverable ..... 55

1. Precision Pine's Increased Mill Costs Were Caused By The Government's Protracted Suspension and Breach ..... 55

2. Precision Pine's Mill Inefficiency Claims Were Foreseeable To The Forest Service ..... 57

3. Precision Pine's Calculation Of Its Mill Inefficiency Costs Is Reasonably Certain ..... 58

G. Precision Pine's Increased Hauling Costs On The Hay Sale Were Caused By The Forest Service's Breach ........ 60

1. The Increased Hauling Costs On The Hay Sale Were A Reasonable Effort By Precision Pine To Mitigate Its Damages Caused The Forest Service's Breach ........ 60

2. Precision Pine's Increased Hauling Costs Were Foreseeable ........ 62

3. Precision Pine's Calculation Of Its Increased Hauling Costs Is Reasonably Certain ........ 64

IX. Precision Pine's Claims For Out-Of-Pocket Expenses Under CT6.01 Are Fully Recoverable ........ 65

A. Precision Pine's Out-of-Pocket Expenses Incurred In Preparing Its Claim Letters Are Recoverable Under Clause CT6.01 ........ 65

B. Precision Pine's Claims For Items Of Miscellaneous Damage Are Recoverable ........ 66

1. Precision Pine Is Entitled To Recover Its Additional Bond Costs ........ 66

2. Precision Pine Is Entitled To Recover Its Overhead And Profit On Move-Out Costs ........ 66

3. Precision Pine Is Entitled To Recover Interest On Deposits As An Out-Of-Pocket Expense Under CT6.01 ........ 67

4. Precision Pine's Snow Removal Costs In January of 1996, Which Were A Direct Result Of The Suspension, Are Recoverable ........ 68

5. Precision Pine's Costs Of Transferring Logs From Eagar To Winslow In 1996, Which Were A Direct Result Of The Suspension, Are Recoverable ........ 69

6. Overhead And Profit Are Recoverable On Those Costs That Precision Pine Seeks To Recover Under CT6.01 ........ 69

CONCLUSION ........ 70

# TABLE OF AUTHORITIES

**CASES** **PAGE**

Admiral Fin. Corp. v. United States,
378 F.3d 1336 (Fed.Cir. 2004) ........ 11

Aluminum Distributors, Inc. v. Gulf Aluminum Rolling Mill Co.,
1989 WL 157515 (N.D. Ill.) ........ 10

Aptus Co. v. United States,
62 Fed.Cl. 808 (2004) ........ 3

Assurance Co. v. United States,
813 F.2d 1202 (Fed.Cir. 1987) ........ 67

Bohac v. Dept. of Agriculture,
239 F.3d 1334 (Fed.Cir. 2001) ........ 24

Cavalier Clothes v. United States,
51 Fed.Cl. 399 (2001) ........ 59

Chain Belt v. United States,
115 F.Supp. 702 (Ct.Cl. 1953) ........ 22

Cities Service Helex v. United States,
543 F.2d 1306 (Ct.Cl. 1976) ........ 6

Danac, Inc.,
ASBCA No. 33394, 97-2 BCA ¶ 29,184 (1997) ........ 60

Everett Plywood Corp. v. United States,
512 F.2d 1082 (Ct.Cl. 1975) ........ 6

Fertico Belgium S.A. v. Phosphate Chemicals Export Assoc., Inc.,
70 N.Y.2d, 510 N.E.2d 334, 517 N.Y.S.2d 465 (1987) ........ 10

First Heights Bank, FSB v. United States,
57 Fed.Cl. 162 (2003) ........ 8

First Heights Bank, FSB v. United States,
422 F.3d 1311 (Fed.Cir. 2005) ........ 7

Franconia Assocs. v. United States,
61 Fed.Cl. 719 (2004) ........ 51, 61, 70

Gardner Displays Co. v. United States,
171 Ct.Cl. 497, 346 F.2d 585 (1965) ........ 24

Glendale Federal Bank, FSB v. United States,
239 F.3d 1374 (Fed.Cir. 2001)........................................................................................ 12

Globe Savings Bank, FSB v. United States,
65 Fed.Cl. 330 (2005) .................................................................................................... 51

Gulf Contracting, Inc. v. United States,
23 Cl.Ct. 525 (1991) ...................................................................................................... 65

Hercules Incorporated v. United States,
49 Fed.Cl. 80 (2001), aff'd, 292 F.3d 1378 (Fed.Cir. 2002)........................................... 18

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed.Cir. 2001)................................................................................. 61, 62

International Terminal Operating Co.,
ASBCA No. 18118, 75-2 BCA ¶ 11,470 (1975) ............................................................ 60

Kutner Buick, Inc. v. American Motors Corp.,
868 F.2d 614 (3rd Cir. 1989) .......................................................................................... 10

Landmark Land Co., Inc. v. F.D.I.C.,
256 F.3d 1365 (Fed.Cir. 2001)........................................................................................ 23

Lane County Audubon Soc'y. v. Jamison,
958 F.2d 290 (9th Cir. 1992).......................................................................................... 4, 5

LaSalle Talman Bank v. United States,
317 F.3d 1363 (Fed.Cir. 2003)........................................................................................ 12

Lewis v. United States,
1982 WL 36718 (Ct.Cl. July 16, 1982)........................................................................... 24

Long Island Savings Bank v. United States,
67 Fed.Cl. 616 (2005) .................................................................................................... 51

Miller v. Robertson,
266 U.S. 245 (1924)..................................................................................................... 9, 10

Myerle v. United States,
33 Ct.Cl. 1 (1867) .......................................................................................................... 24

Northern States Power Co., Inc. v. United States,
224 F.3d 1361 (Fed.Cir. 2005)........................................................................................ 11

Pacific Rivers Council v. Thomas,
30 F.3d 1050 (9th Cir. 1994).......................................................................................... 4, 5

Pinewood Realty Ltd. Partnership v. United States,
617 F.2d 211 (Ct.Cl. 1980) ............................................................................................ 22

Precision Pine & Timber, Inc. v. United States,
50 Fed.Cl. 35 (2001) ........................................ 3, 4, 5, 6

Precision Pine & Timber, Inc. v. United States,
62 Fed.Cl. 635 (2004) ........................................ 4

Precision Pine & Timber, Inc. v. United States,
63 Fed.Cl. 122 (2004) ........................................ *passim*

Prudential Ins. Co. of America v. United States,
801 F.2d 1295 (Fed.Cir. 1986)........................................ 24

Ramsey v. United States,
121 Ct.Cl. 426, 101 F.Supp. 353 (1951), cert. denied, 343 U.S. 977 (1952)........................................ 8

Raytheon Co. v. White,
305 F.3d 1354 (Fed.Cir. 2002), *reh'g denied* (2002)........................................ 70

Scott Timber Co. v. United States,
333 F.3d 1358 (Fed.Cir. 2003)........................................ 2, 6, 58

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed.Cir. 2002)........................................ 21

Silver v. Babbitt,
924 F.Supp. 972 (D. Ariz. 1995) ........................................ 5, 18, 19, 28, 57

Singer Co. v. United States,
215 Ct.Cl. 281, 568 F.2d 695 (1977) ........................................ 65

Solar Turbines v. United States,
16 Cl.Ct. 304 (1989) ........................................ 11

Southwest Center For Biological Diversity v. United States,
No. CIV-95-1927-PCT-RCB (D. Ariz.)........................................ 18

Specialty Assembling & Packing Co., Inc. v. United States,
174 Ct.Cl. 153, 355 F.2d 544 (Ct.Cl.)........................................ 24

T.C. Bateson Constr. Co. v. United States,
319 F.2d 135 (Ct.Cl. 1963) ........................................ 51

U.S. Industries v. Blake Construction Co., Inc.,
671 F.2d 539 (D.C. Cir. 1982) ........................................ 60

United International Holdings, Inc. v. Wharf (Holdings) Limited,
210 F.3d 1207 (10th Cir. 2000)........................................ 10

Wilner v. United States,
23 Cl.Ct. 241 (1991) ........................................ 65

Wilner v. United States,
24 F.3d 1397 (Fed.Cir. 1994)........................................................................................ 67

Yankee Atomic Elec. Co. v. United States,
42 Fed.Cl. 223 (1998), aff'd, 225 F.3d 1336 (Fed.Cir. 2000)........................................................ 10

**STATUTES AND REGULATIONS**

U.C.C. § 2-708(2) ........................................................................................................... 6

**MISCELLANEOUS**

M.A. Eisenberg, "The Principle of Hadley v. Baxendale,"
80 Cal. L. Rev. 563 (May 1992) ...................................................................................... 24

Ralph C. Nash and John Cibinic Jr., ADMINISTRATION OF GOVERNMENT
CONTRACTS, 3rd ed., 1995........................................................................................... 60

Alan I. Saltman, Must Profits Made In Transactions Involving Late-Delivered
Goods Be Deducted From The Injured Party's Breach Damages? If Not,
What Impact Should Late-Delivered Goods Have?, 78 St. John's L. Rev.
131 (2004)........................................................................................................... 10

RESTATEMENT (SECOND) OF CONTRACTS
§ 347 .............................................................................................................. 12
§ 347 (a) and (b)................................................................................................. 12
§ 347 cmt. a.................................................................................................. 11, 23
§ 351 .............................................................................................................. 23
§ 351(3)........................................................................................................... 23

11 Samuel Williston, WILLISTON ON CONTRACTS § 1338 (3d ed. 1968)........................................... 12

28 Wright & Gold, FEDERAL PRACTICE & PROCEDURE § 6184 (1993) ............................................. 16

**INTRODUCTION**

In its post-trial brief ("D's Br."), defendant repeats several fallacious arguments in an attempt to prevent Precision Pine & Timber, Inc. ("Precision Pine") from recovering all of the damages it sustained.[1] In doing so, defendant seeks to obscure the fact that its breach of the 11 contracts at issue precluded plaintiff from making substantial profits in 1995 through early 1997 and that plaintiff can only be made whole if it is awarded those lost profits unreduced by any post-suspension profits. The Court's determination of the damages to which plaintiff is entitled will be greatly facilitated if the following issues are disposed of at the outset:

I. Defendant Has Repeated Several Arguments That Are Barred By The Law Of The Case.

II. Defendant's Hypothetical Legal Argument That It *Might* Have Avoided Breach Of Warranty Had It Suspended Operations In 1994 Does Not Absolve It Of Liability For Actually Breaching The Contracts In 1995.

III. Defendant's Argument That It Could Breach The Contracts With Impunity For 135 Days Remains Groundless.

IV. Defendant's Argument With Respect to "Partial Breach" Damages Is Unavailing.

V. Precision Pine's Lost Profits Are Not The Product Of Collateral Activities.

VI. Precision Pine Is A Lost Volume Seller.[2]

VII. Precision Pine's Damages Claims Are Fully Compatible With One Another.

VIII(A). Precision Pine's July 17, 1995 "Profit Projections" Reflect A Worst-Case Scenario.[3]

VIII(B). The Existence Of Pulpwood On Some Of The Breached Sales Would Not Have Precluded The Profitable Harvesting Of The Sawlogs Remaining On The Breached Sales.

---

[1]Defendant's repetitive arguments are catalogued and cross-referenced in Plaintiff's Appendix of Arguments which Defendant Raises on Multiple Occasions. See Appendix 1 attached hereto.

[2]No less than four of defendant's arguments are obviated by the fact that Precision Pine is a lost volume seller.

[3]Defendant, asserting without evidence that the projections accurately reflected the return that Precision Pine anticipated obtaining from the contracts, cites them to support no less than six arguments.

A central premise of defendant's brief is that the Forest Service "merely" delayed plaintiff's performance and thus, once defendant lifted the suspensions after 16 months, plaintiff should have simply resumed timber harvest of the breached contracts as if it were the day that the Forest Service first imposed the suspensions. In essence, defendant seeks to convince this Court that somehow time simply "stood still" during the 16-month suspension. See, e.g., D's Br. at 20. As the evidence at trial showed, however, time did not stand still for Precision Pine and real opportunities to process the 25,000 mbf of sawlogs that remained on the breached sales and sell the resulting lumber between August 1995 and April 1997 were lost forever, plus it experienced costs that would not have been incurred but for defendant's breach. Plaintiff's quantification of these damages is reasonably certain and, if anything, conservative. Nothing in defendant's brief alters this conclusion.

**I. Several Of Defendant's Arguments Are Barred By The Law Of The Case Doctrine.**

In its April 18, 2005 "Motion in Limine With Respect To Defendant's Contentions That Are Barred By The Law Of The Case Doctrine," Precision Pine pointed out that defendant is barred from re-litigating legal points that have already been decided against it, sometimes on more than one occasion.

On April 29, 2005, the Court issued an order denying Precision Pine's motion in the interest of the Court receiving full briefing, but noting that "[i]n its response Plaintiff would be within its rights to argue that the law of case precludes a finding in favor of the Government on certain issues." Unfortunately (but predictably), defendant has made all of these failed points yet again. Because defendant's position on these points is both well-understood and has been rejected by the Court, plaintiff respectfully requests that prior to oral argument the Court enter an order precluding defendant from continuing to contend that:

1. Scott Timber Co. v. United States, 333 F.3d 1358, 1372 (Fed.Cir. 2003), holds that increased sawmill costs are unrecoverable at common law. Precision Pine & Timber, Inc. v. United States, 63 Fed.Cl. 122, 136 (2004). See discussion infra at 58;

2. Contract clause CT6.25 does not contain a warranty. Order and Opinion on Reconsideration dated January 27, 2004 at 3. See discussion infra at 5 n.8;

3. The processing, manufacturing, and selling of timber are a collateral activity. 63 Fed.Cl. at 131.

4. The first 135 days of the suspension were not a breach. Precision Pine & Timber, Inc. v. United States, 50 Fed.Cl. 35, 70 (2001). See discussion infra at 5.

5. Lost profits as a result of a protracted suspension were not foreseeable. Precision Pine, 63 Fed.Cl. at 131. See discussion infra at 21-22.

6. The actual loss that occurred must have been foreseeable. Precision Pine, 63 Fed.Cl. at 130. See discussion infra at 23.

## II. The Government's Hypothetical Legal Argument That It *Might* Have Avoided A Breach Of Warranty Had It Suspended Operations In 1994 Does Not Absolve It Of Liability For Actually Breaching The Contracts In 1995.

As its leading argument, defendant contends for the first time, albeit without citation to any supporting authority, that it *might* not be responsible for all of the damages caused by its breach in 1995, because it *might* have lawfully suspended other of Precision Pine's contracts in 1994, but failed to do so. D's Br. at 5. Carrying this argument one step further, defendant contends that it was plaintiff's duty to determine how its damages might have been affected if the government had, hypothetically, submitted its Forest Plans for consultation in 1994.[4] Notably, none of the government's five experts opined that Precision Pine failed to consider this issue in its damage calculations, nor did the government identify this legal issue at summary judgment, in its pre-trial memorandum or its opening statement at trial. This silence is likely because this newly hatched argument is fatally flawed in several respects.[5]

First, even accepting the premise that defendant might have taken some action to comply with its consultation obligation under the ESA without breaching the contracts at some point in time (something

---

[4]In its new litigating position, the government is really seeking further reconsideration of the Court's July 30, 2001 liability ruling, albeit in the guise of an argument on damages. The government, however, has not identified any change in the law or other appropriate circumstance as to why it could not have made its argument during the liability phase of this case that could justify reconsideration at this time. Aptus Co. v. United States, 62 Fed.Cl. 808, 811 (2004).

[5]The government makes its argument by cobbling together three passages from the liability ruling, each of which appears on a different page of the decision, and then distorting the meaning of these passages by excising key aspects of them through the use of seven ellipses. Compare D's Br. at 5 with Precision Pine, 50 Fed.Cl. at 68-70.

that for obvious reasons was not litigated in this case), defendant is not absolved from actually breaching the contracts at a later time. Indeed, as this Court recently discussed in the context of the government seeking breach of contract damages against a contractor, the fact that the contractor might have declared material breach and walked away form the contracts during an earlier period did not relieve it of liability for a subsequent breach of contract. See Precision Pine & Timber, Inc. v. United States, 62 Fed.Cl. 635, 647-50 (2004). Certainly, **if** defendant here had acted lawfully with respect to some of the breached contracts, then plaintiff's damages might be different, but that is simply not what happened.

Second, the government's hypothetical assumes without any factual support that the Forest Service's consultation on the Forest Plans would have taken place in the fall of 1994 and thereby resulted in the suspension of other of plaintiff's contracts during that harvest season. D's Br. at 5. Neither assumption is necessarily correct. Rather than taking place during the 1994 fall harvest season, the consultation on the Forest Plans could just as easily have taken place at another point in time and entirely avoided impacts to Precision Pine's operation of its contracts. Indeed, if one wishes to engage in hypotheticals, it is entirely possible that the Forest Service could have avoided any additional impact to plaintiff's harvesting operations simply by submitting its Forest Plans for consultation at the same time that it engaged in consultation on all sales in the Region following the listing of the Mexican spotted owl in 1993.[6] In fact, in 1993 the Fish & Wildlife Service ("FWS") repeatedly urged the Forest Service to submit its Forest Plans as part of a programmatic consultation; the Forest Service, however, refused to do so. See Precision Pine, 50 Fed.Cl. at 42-43. Thus, the government's hypothetical suspension of contracts

[6]This is certainly true in light of the fact that the Ninth Circuit's opinion in Lane County Audubon Soc'y. v. Jamison, 958 F.2d 290, 293 (9th Cir. 1992), issued prior to the listing of the Mexican Spotted Owl, found that Forest Plans are "'agency action' pursuant to the ESA and that consultations must be reinitiated on an existing [forest plan] if a new endangered species is listed." Precision Pine, 50 Fed.Cl. at 41. For that matter, the Forest Service might also have consulted in the winter of 1993-1994 following the Ninth Circuit ruling in Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1053 (9th Cir. 1994) (again requiring consultation on Forest Plans) and expeditiously completed consultation outside of the normal operating season for all of Precision Pine's timber sales.

in the fall of 1994 is just one, and not even the best, conjectural alternative to breaching the contracts in 1995-1996 – which, of course, is what the Forest Service actually did.

Even if the Forest Service did not decide to submit its Forest Plans for consultation until after the 1994 ruling in Pacific Rivers, it still could have minimized or eliminated the impact on Precision Pine by engaging in and completing the consultation on them in the winter of 1994-1995, i.e., outside of the normal operating season of the sales. Rather than doing so, however, it chose instead to thumb its nose at the ESA, the Ninth Circuit's rulings in Lane County and Pacific Rivers and to take no action until ordered to so by the Arizona district court in Silver v. Babbitt, 924 F.Supp. 972 (D. Ariz. 1995), at perhaps the worst possible time for plaintiff, the eve of the fall harvesting season.

In such circumstances, it is emphatically not plaintiff's obligation to consider the many ways in which the Forest Service *might* have acted differently and the various ways in which such hypothetical actions *might* have impacted plaintiff's damages. The fully litigated fact remains that the Forest Service breached the contracts beginning on August 25, 1995 and remains for liable for the damages that plaintiff proved at trial.

## III. Defendant's Argument That It Could Breach The Contracts With Impunity For At Least 135 Days Remains Groundless.

Precision Pine anticipated that defendant would contend that this Court found in its decision on liability that defendant could suspend the contracts at issue with impunity so long as the suspension did not substantially exceed 135 days. See P's Br. at 11-13. Defendant makes its argument (see D's Br. at 6) despite the fact that this Court found that defendant unreasonably failed to enter into consultations until ordered to do so by a court and thus significantly hindering Precision Pine's operations. Indeed, the Court ruled that the government's two-month delay in starting consultation with regard to all 11 sales here in issue was both "inexplicable" and "unreasonable." Id. at 70.[7] Thus, contrary to defendant's contention,

[7]This breach determination based on unreasonable delay was wholly apart from the government's breach of the warranty made in **six** contracts. 50 Fed.Cl. at 73-74.

with respect to the breached contracts, the Court did not find that a suspension of less than 135 days was per se reasonable and, therefore, not a breach.[8] Simply put, this Court found that all of the sales which the Forest Service suspended on August 25, 1995 were breached, i.e., the Forest Service violated its duty not to hinder performance, except for the two sales that were released a few weeks after being suspended. 50 Fed.Cl. at 73-74.

**IV. Defendant's Argument With Respect To "Partial Breach" Damages Is Unavailing.**

Defendant argues that because plaintiff elected not to terminate the contracts upon defendant's material breach, it is entitled to only what it earned from continued performance and is "barred" from recovering lost profits. D's Br. at 9-11, citing Cities Service Helex v. United States, 543 F.2d 1306 (Ct.Cl. 1976). This argument is fallacious for the reasons set forth in P's Br. at 13-15.

Similarly, defendant's reliance on Everett Plywood Corp. v. United States, 512 F.2d 1082 (Ct.Cl. 1975), in support of its contention that the appropriate measure of damages for partial breach is merely the difference between contract price and the market value of timber at the time of breach is misplaced for several reasons. The clear implication of Everett Plywood is that where, as here, a plaintiff in the business of manufacturing timber into lumber products is unable to obtain cover, the appropriate market price to be considered is the market price of the manufactured lumber products that would have been made and sold but for the breach, id. at 1091 -- which is precisely what Precision Pine has done. Moreover, defendant ignores the fact that U.C.C. § 2-708(2), the portion of the U.C.C. upon which the

---

[8]In a footnote, the government argues that in the liability ruling, "the Court erred in finding clause CT6.25 contains an express warranty." D's Br. at 9 n.5. The government then further claims that the Federal Circuit's decision in Scott Timber invalidates this Court's ruling on the warranty issue. Id. The government, however, has already raised precisely these same arguments in "Defendant's Motion for Partial Reconsideration of the Court's July 30, 2001 Ruling Upon Liability," dated November 14, 2003. There, the government argued that "the liability decision [with respect to the existence of a warranty in clause CT6.25] in the present case is contrary to the recent Federal Circuit decision in Scott Timber. . . ." See Order and Opinion dated January 27, 2004 at 3. This Court rejected that argument, holding that Scott Timber did not effectuate a change in controlling law. Id. at 4. This Court also rejected the defendant's "new legal theories and facts" as to its liability for breach of warranty and reaffirmed the Court's ruling that the Forest Service remained liable for breaching the warranty in clause CT6.25. Id. at 5-6.

concept of lost volume is based, indicates that if the contract price/market price difference is inadequate to put plaintiff in as good a position as performance would have done, then the measure of damages is the profit that it would have made by full performance plus any incidental damages.

## V. Precision Pine's Lost Profits Are Not The Product Of Collateral Activities.

Defendant contends that Precision Pine's lost profits are the product of collateral activities (D's Br. at 12-15) for all of the reasons stated in P's Br. at 4-8, however, this is not the case.[9]

As Mr. Lewis testified, he was unaware of any purchaser who removed the sawlogs from a sale and then never processed them or who sold sawlogs that could have been used for lumber production for firewood. Tr. at 3120. Moreover, defendant did not provide any examples of sawlogs that were harvested by Precision Pine and used for anything but the production of lumber.[10] The simple fact remains that a goal of the Forest Service's timber sale program was to supply local industry with raw material from which lumber would be manufactured and sold. PPFF 170. As the Forest Service required its purchasers to certify, this is precisely what historically happened to the sawlogs on all of Precision Pine's timber sales. PPFF 177.

Virtually all of the cases cited by defendant were addressed in P's Br. at 4-8 and for the reasons set forth there are inapposite. The recent decision in First Heights Bank, FSB v. United States, 422 F.3d

[9]Although defendant claims that "purchasers of timber sales **frequently do not** . . . **have access to a sawmill**" (D's Br. at 12), the testimony cited does not support this proposition. See, e.g., Tr. 1720-21, 1730, 1740 (Reidhead) (All sawlogs removed from Precision Pine's sales went to Precision Pine's sawmills); id. at 1765-66 (The logs from the few sales purchased by Tri-Star Logging were sold to entities with processing facilities).

[10]In a footnote, defendant misleadingly contends that Precision Pine sold "logs" to third parties for use in their mills, sold "logs" to third parties for use as pulpwood, sold "logs" to third parties as firewood or stacked and left "logs" unused. While some of these things may have occurred with respect to pulpwood logs, something for which Precision Pine had no use in its operations, defendant has cited no evidence that the sawlogs that Precision Pine harvested from its Forest Service timber sales were ever used for anything but the production of lumber at its own sawmills. Indeed, defendant's lone citation for a situation where Precision Pine allegedly sold sawlogs to a third party is the agreement whereby Precision Pine transferred the Kettle contract to Stone Container, who operated a sawmill in Eagar, following the closure of Precision Pine's Eagar sawmill at which the Kettle sale was to have been processed.

1311 (Fed.Cir. 2005), is not to the contrary. There, the court, after affirming the trial court's award of $48.7 million in lost tax benefit, found that plaintiffs were not entitled to lost profits that they claimed would have made by reinvesting money from the breached contract into another business, because:

> [N]o specific reference was made during negotiations to homebuilding projects for which the tax benefits [conferred under the breached contract] were to be used. Nor did the [breached contract] inherently refer to the alleged additional home building projects. The subject of the contract in this case was simply money.

Id. at 1318 (As the trial court had observed, "Nothing plaintiffs have offered the court, however, supports an understanding by the United States that the plaintiffs needed the net tax savings for purpose of investing in home building projects." First Heights Bank, FSB v. United States, 57 Fed.Cl. 162, 174 (2003)). By contrast, the evidence in this case is overwhelming that the Forest Service's contract was prepared and administered with the production of lumber from the timber being sold in mind (see Section II, of P's Br.).[11]

## VI. Precision Pine Is A Lost Volume Seller.

At trial, Precision Pine demonstrated that it was a lost volume seller because, but for the government's breach, it would have processed all of the timber on the breached contracts during the period of the suspension and the ensuing winter (PPFF 389) and, thereafter, would have purchased sufficient timber from sales offered by the Forest Service in the post-suspension period and earned profits on that timber in that time period as well. P's Br. at 44-47.

Defendant studiously avoids these facts and maintains instead that providing Precision Pine with the profits it lost during the suspension period would result in a "windfall." Defendant's approach is fundamentally incorrect under the law of this Circuit because, as the parties agree, the goal of expectancy

---

[11]Defendant's citation to Ramsey v. United States, 121 Ct.Cl. 426, 101 F.Supp. 353, 355 (1951), cert. denied, 343 U.S. 977 (1952), is also misplaced. There, the government's sole obligation under the contract was to pay for goods manufactured and delivered by plaintiff, while the lost profits sought were those it would have allegedly made in its over-all business activities. Rejecting authority to the contrary, the court found that, "in the circumstances and under the terms of the contact involved in this case," the lost profits claimed were on collateral undertakings and, therefore, not recoverable. Id. at 357 n.1.

damages is to put the non-breaching party into as good a position as it would have been in but for the breach. E.g., Bluebonnet Sav. Bank, FSB v. United States, 266 F.3d 1348, 1355 (Fed.Cir. 2001). Deducting post-suspension profits from the amounts that Precision Pine would have earned but for the breach, does not accomplish this goal but rather would put Precision Pine into a much worse position than it would have been in but for the government's breach because, as a lost volume seller, it would have earned profits on lumber sales both during the period of the suspension as well as in the "post-suspension" period.

As explained in P's Br. at 46-47, defendant's contention that Precision Pine is not a lost volume seller because at trial it failed to specify exactly which contracts it would have bid on had the government not breached the instant contracts misstates the law. A showing of the general availability of raw material from which the second profit could have been made is sufficient. Miller v. Robertson, 266 U.S. 245, 256 (1924). Because Precision Pine demonstrated the availability of significant quantities of Forest Service timber after the suspension (see PPFF 370-71), it is entitled as a lost volume seller to the full measure of its lost profits it sustained during the period of the suspension, without the offset of any post-suspension profits.[12]

Seizing on an illustration from the RESTATEMENT noted by the Court in last fall's decision on summary judgment (see 63 Fed.Cl. at 133), defendant asserts that the only possible measure of lost profit is "net profits."[13] Of course, this Court did not find that "net profits" are the only appropriate measure of

---

[12]Having established that raw material was available in the post-suspension period, the burden shifted to defendant to demonstrate that Precision Pine could not have had both sales and therefore that the profit on the "second" sale should be used to reduce plaintiff's profit. See P's Br. at 45. Defendant did not, however, carry its burden on this point. In fact, defendant concedes that Precision Pine actually bought six timber sale in the immediate post-suspension period. Tr. 671-77, 1089 (Porter).

[13]Even defendant believes that the illustration from the RESTATEMENT would have to be recast to comport with its own view of the lost volume seller situation presented by the instant case. D's Br. at 17 n.10. However, defendant's hypothetical in footnote 8 misses the mark in that the reinstatement of the original contract between A and the third-party "C" appears to have permitted A to do what it had planned to do (pave both B's and C's parking lots) in a manner very close to that originally contemplated.

lost profits in this case nor does anything in the RESTATEMENT illustration specifically consider, let alone mandate, this result. Moreover, defendant proffers neither legal authority nor analysis in support of its position but simply points to the fact that the words "net profits" appear in the RESTATEMENT. For all of the reasons explained by Mr. Ness (and concurred in by defendant's expert, Dr. Neuberger), Mr. Ness' calculation of profits in this case is wholly appropriate. P's Br. at 17-18; PPFF 64, PPFF 205; Tr. 3589-90 (Neuberger); accord Kutner Buick, Inc., v. American Motors Corp., 868 F.2d 614, 617-18 (3rd Cir. 1989) (fixed costs, which remain the same over the range of relevant activities, are irrelevant to the determination of the loss of net profit due to a breach).

**VII. Precision Pine's Damages Claims Are Fully Compatible With One Another.**

Defendant makes two related arguments suggesting that some elements of Precision Pine's damages claim are incompatible, i.e., that (1) damages for common law breach and out-of-pocket costs under clause CT6.01 cannot both be recovered, and (2) common law claims which seek both lost profits and increased costs are incompatible.

As to the former, it is well-settled that where, as here, the government has not clearly and fully exculpated itself under the contract for all damages caused by its breach, a contractor may obtain that relief provided under the contract and also retains a cause of action at common law for damages. Yankee

---

Examples applicable to the instant case deal with sequential transactions where the plaintiff was unable to proceed with a transaction as it had originally planned. Such an example is where a buyer is unable to resell the relatively fungible corpus of the contract or items produced from it during a particular period but was able to proceed with a subsequent transaction once the defendant finally acted in accordance with its obligations. In those instances, where the plaintiff would have been able to accomplish the subsequent transaction even if the defendant had not performed under the contract, not considering profits realized on the post-breach transactions is entirely appropriate. Fertico Belgium S.A. v. Phosphate Chemicals Export Assoc., Inc., 70 N.Y.2d 76, 510 N.E.2d 334, 517 N.Y.S.2d 465 (1987); see Aluminum Distributors, Inc. v. Gulf Aluminum Rolling Mill Co., 1989 WL 157515 (N.D. Ill.); Miller, 266 U.S. at 243; United International Holdings, Inc. v. Wharf (Holdings) Limited, 210 F.3d 1207, 1230-31 (10th Cir. 2000). See also Plaintiff's Response to Defendant's Motion for Partial Summary Judgment Regarding Damages at pages 53-60 (Appended hereto for the convenience of the Court in Appendix 2); Alan I. Saltman, Must Profits Made In Transactions Involving Late-Delivered Goods Be Deducted From The Injured Party's Breach Damages? If Not, What Impact Should Late-Delivered Goods Have?, 78 St. John's L. Rev. 131 (2004).

Atomic Elec. Co. v. United States, 42 Fed.Cl. 223, 232-33 (1998), aff'd, 225 F.3d 1336 (Fed.Cir. 2000). See Northern States Power Co., Inc. v. United States, 224 F.3d 1361 (Fed.Cir. 2005); Solar Turbines v. United States, 16 Cl.Ct. 304, 306 (1989).

As to the latter argument, defendant cites a single case, Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1344 (Fed.Cir. 2004), for the unremarkable proposition that expectancy damages and restitution are alternatives. D's Br. at 8. Although a plaintiff has the option of suing for damages or seeking restitution upon the occurrence of a material breach, Precision Pine is not seeking "restitution."[14]

Defendant's related contention that because Precision Pine's lost profits calculation takes into account the costs that would have been incurred in hauling and milling the breached contracts, Precision Pine's recovery of its increased hauling and milling costs caused by the breach along with its lost profits would represent a "double recovery" is equally incorrect. D's Br. at 8. Although defendant properly asserts that in determining lost profits Mr. Ness accounted for the costs that Precision Pine would have actually incurred in hauling and milling the timber on each of the breached contracts had there been no suspensions, Precision Pine merely seeks to recover its increased costs, i.e., those costs over and above what it would have incurred had there been no breach both at its sawmills (due to the inefficiencies foisted on it by the government's breach, see P's Br. at 51-6; PPFF 387) and in the form of additional costs it incurred in hauling timber from the Hay sale a greater distance due to the breach. P's Br. at 57-63. These additional costs are distinct items of damages, wholly separate from Precision Pine's claim for lost profits. As the authorities cited above make clear, expectancy (i.e., benefit of the bargain) damages

---

[14]As set forth in the RESTATEMENT:

> A party is entitled to restitution under the rules stated in this Restatement only to the extent that he has conferred a benefit on the other party by way of part performance or reliance.

Id. at § 370 (emphasis supplied). See id. cmt. a., illustration 1. Here, as noted, the out-of-pocket expenses that Precision Pine seeks to recover have not been paid to the government but, rather, are part of Precision Pine's expectancy damages.

include both gains prevented and losses caused by the breach. See 11 WILLISTON § 1338; RESTATEMENT § 347(a) and (b). These increased costs caused by the suspension do not constitute a "double recovery," nor would their award to plaintiff represent a "windfall." Defendant's reliance on LaSalle Talman Bank v. United States, 317 F.3d 1363, 1371 (Fed.Cir. 2003), is misplaced as the case does not support the contention that any increase in costs is subsumed in a claim for lost profits. Indeed, LaSalle Talman recognizes that "expectancy damages often are equated with lost profits, and may include other damage elements." Id. quoting Glendale Federal Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed.Cir. 2001) (citing RESTATEMENT (SECOND) OF CONTRACTS § 347). These authorities explain that, under the umbrella of expectancy damages, an

> injured party has a right to damages based on his expectation interest as measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, **plus** (b) any other loss, including incidental or consequential loss, caused by the breach.

RESTATEMENT § 347 (emphasis added). It is precisely such "other damage elements," i.e., the increased costs imposed on it by the government's breach, that Precision Pine seeks to recover.

## VIII. Precision Pine's Damages Calculations Are Sufficiently Certain.

### A. All Of Precision Pine's Contracts Would Have Been Completed Profitably During The Suspension.

Defendant argues that some of plaintiff's timber sale contracts would have been unprofitable had they been harvested during the suspension. D's Br. at 21-23. The alleged bases for this are: (1) lumber prices were "low" during the suspension; (2) plaintiff's July 17, 1995 projections show that "many" of the contracts would not have been profitable; and (3) the cost of harvesting pulpwood at a time when there was allegedly no outlet for it would have rendered some of the contracts unprofitable.

Contrary to the picture defendant seeks to paint, lumber product prices were hardly low throughout the period of the suspension; rather, lumber product prices bottomed in about January of 1996 and rose rapidly throughout the remainder of the suspension. PPFF 246(e). Additionally, whenever Ponderosa Pine lumber product prices were low as reflected in the WWPA index, Precision Pine received

a corresponding reduction in the stumpage price it was required to pay under its Forest Service contracts. PPFF 11. Thus, defendant's contention that lumber prices were "low" for the first few months of the suspension, in no way demonstrates that the contracts could not or would not have been operated profitably at that time or throughout the suspension period.

Moreover, the fact that Precision Pine would have completed the subject contracts profitably is actually confirmed by the artificially low profits reflected in the July 17, 1995 projections. (DX 521-45.) That is, even under these worst case conditions, the projections show that plaintiff would have earned more than $1.6 million. PPFF 1382. Moreover, because the lumber product prices during the bulk of the suspension period were far better than those set out in Mr. Porter's worst case scenario (see PX 131, App. A at 1), plaintiff's overrun would have been far greater than 1.1 (PPFF 209-240) and its costs would not have been as great as indicated in DX 519, 521-545 (PPFF 1384) by definition Precision Pine's profits would have been considerably higher than $1.6 million reflected in D's Br., App. A at DA2.[15]

B. The Existence Of Pulpwood On Some Sales Would Not Have Precluded The Profitable Harvesting Of The Sawlogs Remaining On The Breached Sales.

Defendant's argument that the existence of pulpwood on some of the sales would have prevented the profitable harvest of the sales is erroneous. Indeed, more than 45% of the sawtimber at issue was on sales that had no pulpwood component. PPFF 273. Additionally, defendant's contention that there was no outlet for roundwood during the suspension is incorrect. As the TSSAs for the Brann, Hutch-Boondock and Mud contracts demonstrate, pulpwood was harvested during the suspension. PPFF 1270.

Moreover, even assuming that the Stone would not have taken any pulpwood directly from

[15]Defendant relegates its discussion of the "contribution margin" analysis of Precision Pine's profitability as made by its accounting expert, Mr. Moosman, to a footnote. D's Br. at 22 n.13. Mr. Moosman's opinions, however, are not even worthy of that passing mention because his analysis is fatally flawed in so many ways as to be worthless. For example, defendant cites to a calculation contained on DX 777 at page 15 in support of its contention that Precision Pine's sales would have had a negative contribution margin if harvested during the suspension; however, Mr. Moosman himself disavowed that calculation. Tr. 5247-5249 (Moosman). Additionally, Mr. Moosman bases much of his report on the wholly incorrect assumption that the July 17, 1995 "profit projections" were an attempt to accurately determine the profitability of the contracts, which they were not. PPFF 1381.

Precision Pine during the period of the suspension, the pulpwood on the sales would not have prevented profitable harvest of the sawtimber because:

1. Sale of the pulpwood could have been achieved by Tri-Star Logging (Tri-Star), Precision Pine's logging subcontractor. P's Br. at 48.

2. Precision Pine could have sought Forest Service concurrence in the deferral of pulpwood harvesting until Stone was willing to take it at a later time.[16] P's Br. at 48.

3. Even without Forest Service concurrence, at least 82% of the sawtimber on the sales could have been harvested during the suspension by essentially operating on the three largest payment units and not removing the pulpwood until such time as there was a market for it. P's Br. at 47-49, or

4. If there were absolutely no outlet for pulpwood during the suspension period as defendant asserts, Precision Pine would have been relieved of its obligations to remove the pulpwood pursuant to contract clause B(T)6.4 (contained in all the contracts) due to "gross economic impracticability." P's Br. at 49-51.

Thus, under no circumstances would Precision Pine actually have sustained large losses on pulpwood harvesting as asserted by defendant.[17]

Moreover, Precision Pine's arrangement with Tri-Star further insulated it from losses on pulpwood. P's Br. at 48. That is, Tri-Star would harvest the pulpwood and haul if off of the sale area at its own expense and from the proceeds of the sale of the pulpwood pay Precision Pine the stumpage and related costs that Precision Pine had to pay the Forest Service. PPFF 270. Any profit that was derived

[16]The evidence at trial showed that the Forest Service consistently granted Precision Pine's requests to defer pulpwood harvest during the suspension period. PPFF 271.

[17]In support of its contention that Stone was not taking pulpwood from Precision Pine during the suspension period, defendant has drafted misleading proposed findings of fact which claim that the Precision Pine's financial statements for FYE 1996 and 1997 show no revenue for roundwood. See DPFF 67-68. However, Precision Pine's financial statements do not show revenue (or for that matter costs) for roundwood harvesting, even in periods when there is no dispute that Stone was taking pulpwood from Precision Pine's sales. See, e.g., Tr. 5226 (Moosman). For example, in the summer of 1995 which is in Precision Pine's FYE 3/31/96, the evidence at trial demonstrated that significant quantities of pulpwood were being removed from Precision Pine's sales and sold to Stone. Tr. 1733-38 (Reidhead) (explaining PX 1010). Yet, no line item for pulpwood costs or revenues appears in that statement. This is because, as the evidence at trial showed, the revenues and costs for pulpwood inured to Tri-Star, not Precision Pine. PPFF 270.

from the transaction would belong to Tri-Star. Id.[18] In fact, Tri-Star had presented and provided support for the pulpwood costs and revenues from its own financial statements as the basis for its pass-through claim for $300,000+ in lost pulpwood profits; however, the Court dismissed that claim at summary judgment. 63 Fed.Cl. at 139. Thus, defendant's assumptions that "Precision Pine would have incurred the cost of cutting and removing roundwood, but would have earned no revenues from roundwood sales" and that Mr. Ness should have included Precision Pine's "cost" of logging and hauling roundwood in his calculation of damages are simply incorrect.

Defendant compounds its incorrect assumptions by charging all of these alleged costs of harvesting pulpwood against the profits shown on Precision Pine's worst case scenario profit projections of July 17, 1995 and thus claims that nine of the eleven contracts would have been unprofitable. D's Br. at 22.[19] These arithmetic exercises purport to show just how unprofitable the sales really were. They do not; rather, they simply and improperly take worst case scenarios as a baseline and then heap additional costs on them that were not Precision Pine's to bear. This approach is completely divorced from the reality that if and when harvesting of pulpwood occurred any costs of logging and hauling were going to be incurred by Tri-Star, not Precision Pine.

C. But For The Suspension, All Of The Timber On The Breached Contracts Would Have Been Harvested In Order To Operate Precision Pine's Sawmills At Or Near Capacity.

At pages 24-25 of its brief, defendant repeats its argument that plaintiff would not have harvested any of the sales at issue in the absence of a detailed written plan establishing, as of August 25, 1995, exactly how harvesting would have been accomplished on each sale during the 16-month period of the

---

[18]For this reason, Mr. Ness testified that all of the roundwood revenue as well as the logging and hauling costs from the multi-product sales set forth on page 27 of Ex. 4 of PX 131 would have inured to Tri-Star. PPFF 270 n.23. The fact that the costs of roundwood logging and hauling used in Mr. Ness' report were Tri-Star's was confirmed at trial by Mr. Moosman. Tr. 5186. See PPFF 270(c).

[19]Further reinforcing the fact that pulpwood harvest would have resulted in neither profits nor losses for Precision Pine, even the worst case scenario profit projections for the multi-product sales contain no reference to pulpwood harvesting costs or profits. PX 63-85; see PPFF 268-70.

suspension. Apparently, defendant continues to believe that in the absence of such a detailed written plan, Mr. Porter and his employees could not operate. This argument is, of course, belied by the fact that Precision Pine operated profitably at all times prior to the suspension (PPFF 242), yet defendant has identified no written "harvest plan" (which it claims is the *sine qua non* for all timber harvesting) for any of those time periods.

Contrary to defendant's assertion that plaintiff could not identify which of the sales would have been harvested during the suspension, Mr. Porter explained that all of the remaining timber on the breached sales would have been harvested between August 25, 1995 and December 4, 1996 and provided the reasons why this would have occurred. See PPFF 246. Defendant erroneously avers that Mr. Porter's inability at trial to recall the precise sequence of harvesting during the 16-month suspension without referring to data that he had prepared many years ago (i.e., the data reflected in PX 131, App. A at 4) somehow proves that Precision Pine never had any idea as to when or if it would have harvested each of the breached sales. It does not. It simply means, quite unsurprisingly, that Mr. Porter could not testify to that level of detail without reference to documents that he had prepared on the subject in the past.[20]

Defendant argues that in DX 294, the February 1995 annual operating schedule that plaintiff submitted to the Forest Service pursuant to contract clause BT6.31, Precision Pine "misrepresented" its anticipated harvesting projection and that as a result plaintiff should be barred from using the harvesting schedule prepared by Mr. Porter and used by Mr. Ness in computing Precision Pine's damages. D's Br. at 24 n.14, 33. As defendant well knows: clause BT6.31 simply calls for the submission of a listing of "anticipated" major operations on a sale and can always be altered "upon reasonable notice to the Forest Service" for a host of reasons including "weather, markets, or other unpredictable circumstances" (PPFF 1244); that Precision Pine had never followed such plans without change in the past (PPFF 242); that

[20]It is for this reason that a judge may permit a trial witness to consult documents containing factual detail, especially where the subject of her testimony is so lengthy or detailed that even a fresh memory would be unable to recite the items unaided. 28 Wright & Gold, FEDERAL PRACTICE & PROCEDURE § 6184 at 463 (1993) (and cases cited therein).

plaintiff's February 1995 pre-season harvest schedule clearly demonstrated that it was tentative and subject to change (PPFF 1244);[21] the February schedule cited by defendant does not include all of Precision Pine's operations planned for 1995 (id.);[22] the Forest Service introduced no evidence (because there is none) of the Forest Service refusing to allow Precision Pine to operate on a sale that was not part of its tentative plan, or requiring Precision Pine to operate on a sale because it had been identified on Precision Pine's tentative plan (PPFF 1243); and the clause contains no requirement that the Forest Service concur in any change to the anticipated schedule. Id. As Mr. Porter testified, after the submission of an annual operating schedule Precision Pine would continue to bid on timber sales and sometimes would begin harvesting on a new contract that was not even part of its portfolio at the time that its annual operating schedule was submitted. Tr. 263-64 (Porter). For example, on April 13, 1995, Precision Pine was awarded the Brookbank sale and began harvesting the contract in June of 1995.[23] PPFF 344. Given the above, it is simply not possible to "misrepresent" something that neither party believed would ultimately be followed.

These facts notwithstanding, defendant now claims that it nevertheless "relied" on the operating schedule. D's Br. at 33-34. Given the above, this is highly doubtful and to the extent that it did, its

---

[21]Mr. Porter testified that the harvest schedule was tentative, an "estimate of an estimate" that neither Precision Pine nor the Forest Service relied upon. Tr. 263-65, 1629-30. Indeed, the tentative harvest schedule could not be accurate because, as Mr. Porter testified, he frequently reassessed the situation on his sales and made changes to the harvest schedule as events warranted such as weather, termination dates of the contracts, proximity of the sales to sawmills, elevation of the sales.

[22]That is, the 1995 harvest schedule cited by defendant, DX 294, was submitted by Mr. Smith, whose duties did not cover all of Precision Pine's sawmills (Tr. 1231-32 (Porter)) and addresses sales located on just two of the four National Forests on which plaintiff's sales were located.

[23]Obviously, these operations were not included in Precision Pine's 1995 pre-season harvest schedule (DX 294), yet, Precision Pine conducted a pre-work meeting with the Forest Service at which time its 1995 operations on the Brookbank sale were approved. In this same regard, Precision Pine was not awarded the Kettle sale until July 20, 1995 and, therefore, harvest of this sale simply could not have appeared on any harvest schedule prepared prior to that.

reliance was not reasonable and no estoppel would be appropriate.[24]

1. Harvest Of The Mud Contract Was Not Precluded By Other Litigation.

Defendant asserts that due to events in a separate lawsuit, "the Mud sale would not have been available for Precision Pine to harvest before March 11, 1996, even if the sale had been unaffected by the MSO suspensions." D's Br. at 25-6 (emphasis supplied). This is categorically untrue. First, the only evidence cited by defendant in support of its proposition is paragraph 5 of the October 18, 1995 stipulated settlement between the Forest Service and the plaintiffs in Silver v. Babbitt (PX 109) and the testimony of Mr. Harris. The settlement agreement states only that the Mud contract is "the subject of other litigation" captioned Southwest Center For Biological Diversity v. United States, No. CIV-95-1927-PCT-RCB (Dist. Ariz.). It in no way states or even intimates that the Southwest Center litigation was preventing the Mud sale from being harvested. Similarly, defendant's citation to Mr. Harris' testimony is unavailing as he does not state that the Southwest Center litigation was preventing harvest on the Mud sale.[25] See Tr. 3937-39, 4094-95, 4097-101 (Harris). Thus, defendant has provided no evidence that anything in the Southwest Center litigation required the suspension of the Mud sale. Indeed, the only reasons why the

[24]As the Court of Federal Claims has recognized, in order to apply equitable estoppel, the party asserting the estoppel must, among other things, have been ignorant of the true facts. Hercules Incorporated v. United States, 49 Fed.Cl. 80, 88 (2001), aff'd, 292 F.3d 1378 (Fed.Cir. 2002). As noted above, here the Forest Service was fully aware as to the tentativeness of any annual operating schedule submitted by Precision Pine. Moreover, the fact remains that defendant has provided no support to show that it relied on the content of DX 294 to its injury, such detrimental reliance also being a pre-requisite for the application of equitable estoppel. Id. Indeed, Mr. Harris testified that the Forest Service merely looked to the schedule as an aid in assigning personnel to administer the sale, but understood that there would be changes to the proposed schedule. PPFF 1243. The only other evidence cited by the defendant on this point is the testimony of another contracting officer, that testimony, however, relates solely to a **plan of operations** submitted pursuant to clause CT6.3 by Precision Pine for a single sale in 1994 not 1995. Tr. 4594-96 (Dils). A plan of operations is completely different than the annual operating plan provided for by clause BT6.31. Compare PX 170, JRH-84, clause CT6.31 "Plan of Operations" with JRH-35, clause BT6.31 "Operating Schedule." Thus, the testimony of Mr. Dils sheds no light on whether the Forest Service reasonably "relied" on Precision Pine's partial tentative 1995 pre-season operating schedule.

[25]The docket sheet in the Southwest Center litigation, available through PACER, reveals that the court had entered no order as of the time that the Forest Service entered into the settlement agreement which could have prevented harvest on the Mud sale.

Mud sale could not be operated in the Fall of 1995 was that on August 25, 1995 defendant suspended operations on the sale in the wake of the injunction in Silver v. Babbitt and subsequently continued that suspension pursuant to the terms agreed to by the Forest Service in its subsequent pretrial settlement of that litigation.

Defendant also asserts that it was permitted to breach the Mud contract for 135 days with impunity under the ESA until January 6, 1996, i.e., a point outside of the sale's Normal Operating Season, when Precision Pine was "not entitled" to harvest. As such, it claims that because the Forest Service lifted the suspension of the sale before the start of the normal operating season in 1996, Precision Pine was not harmed by the suspension of the Mud timber sale. D's Br. at 26. Defendant's assertions are fallacious. As noted, supra, this Court never found that defendant was not liable for the first 135 days of the suspension of any of the contracts here in issue. Indeed, the Court specifically found that simply by "suspending" the Mud contract (and six others), the Forest Service breached its implied duty to cooperate by breaching the warranty set forth in clause CT6.25 of those contracts. See 50 Fed. Cl. at 70. Moreover, Precision Pine projected that the entire sale would have been harvested in the 4th quarter of 1995, PX 131, at Ex. 9, and to the extent that this would have required some harvesting outside of the Normal Operating Season in December of 1995, as demonstrated at trial, there is no basis to conclude that this would not have been possible in that: (a) the Forest Service regularly granted its contactors' requests to harvest outside of the normal operating season so long as conditions on the ground were sufficiently dry or frozen to allow for operations (PPFF 255), and (b) the Forest Service, in fact, allowed Precision Pine to conduct extensive harvesting operations outside of the normal operating season in the winter of 1995-96 on a number of sales located at different elevations. Id. In sum, but for the Forest Service's breach, the Mud sale would have been harvested to completion during the suspension as projected by Precision Pine.

2. But For The Forest Service's Breach, Precision Pine Would Have Conducted Substantial Harvesting Of The Manaco Timber Sale As Planned.

Defendant also claims that even in the absence of its breach no harvesting could have taken place on the Manaco timber sale during the suspension period. D's Br. at 26. Defendant again starts its

argument with the fallacious premise that the ESA allowed it to breach all of the contracts, including Manaco, with impunity for at least 135 days, however, this is not the case. See p. 5 supra.

Defendant next asserts that "extreme fire danger" resulted in the suspension of all timber sales on the Tonto National Forest, including Manaco, from May 6 to July 9, 1996, citing solely to the testimony of Mr. Harris. This assertion is unsupported by the record.[26] However, even if it were, the fact is that Precision Pine did not project any harvesting on Manaco between May 6 and July 9, 1996. PPFF 1246.

Defendant also alleges that operating restrictions would have precluded harvesting "upon much [sic] the Manaco sale until October 1," citing only to contract clause CT6.25 of the contract. PX 178. While there were varying restrictions on some of the cutting units on Manaco, Mr. Dils, the contracting officer for the sale, also testified that units 1-5, 8, 23-29, 31, 34-35, and 42-43 did not have operating restrictions. PPFF 256. Mr. Harris also admitted that harvesting could have taken place in the month of September on cutting units 6, 21, 22, 40, and 41. Id. Moreover, for cutting units 9, 10, 11, 17, 20, and 37, the only operating restriction in the 3rd quarter was that no hauling could be done (id.), i.e., that on these units a contractor could do all that was required to harvest the timber except put it on a truck and haul it out of the forest. Id. Mr. Dils also agreed that if a contractor had felled and skidded the sawtimber on those units and all that was left to do was to haul it, that hauling could be done in a month or less, depending on the total volume involved. Id. Given the above, Precision Pine both could and would have conducted substantial harvesting on Manaco sale during the 3rd quarter as it had planned. See PX 131,

[26]At the time of the suspension, Mr. Harris was a Contracting Officer on the Kaibab National Forest and had no duties with respect to the Tonto. Tr. 3745. The government has identified no documents for Precision Pine's sales on the Tonto nor testimony from anyone with responsibilities on the Tonto indicating that a suspension of timber sale operations due to extreme fire danger was in place on that forest at any time during the suspension. Moreover, Mr. Harris merely testified that "to the best of his recollection" parts of the Tonto National Forest were closed down for fire although he could not recall the specific dates (see PPFF 262; Tr. 4499-4500 (Harris)) and, even more nebulously, that weather conditions were "consistent with" fire closures in the summer of 1996 (Tr. 4533 (Harris)) -- hardly the definitive statements that defendant seeks to ascribe to him. In short, there is no evidence that operations on the Manaco sale were precluded by "extreme fire danger" during the summer of 1996 as claimed by defendant.

App. A at 4.

3. Defendant's Reliance On Events That Occurred In The Post-Suspension Period Is Unavailing.

At pages 27-28 of its brief, defendant argues that any lost profits that Precision Pine experienced: (a) occurred in the post-suspension period and (b) were the result of business decisions made by Precision Pine or unforeseen events.[27] Notably, defendant fails to discuss the lost profits that Precision Pine experienced in 1995 to early 1997, notwithstanding the fact that this case is not about profits lost or expenses incurred by plaintiff in any other period.[28]

Whatever revenues were generated and expenses incurred on the breached sales in the post-suspension period are only relevant if defendant proved that Precision Pine was not a lost volume seller. For the reasons set forth supra at 8, however, defendant has failed to do so. See also P's Br. at 44-47.

D. It Was "Legally" Foreseeable That A Protracted Suspension And Breach Of 11 Of Precision Pine's Forest Service Timber Sale Contracts Would Result In Lost Profits.

Defendant argues that because the contracts were "merely delayed" that a loss of profits was not "legally" foreseeable to the Forest Service. D's Br. at 29-30. Once again, however, defendant turns a blind eye to the fact that its argument is only relevant if plaintiff is deemed not to be a lost volume seller. Nevertheless, defendant contends that "[b]ecause there was no change in the trees being harvested and no

---

[27]In doing so, defendant makes numerous misstatements of fact. Plaintiff will not, however, waste the Court's time correcting facts irrelevant to the proper determination of Precision Pine's damages.

[28]Defendant also fails to recognize that, even under its thesis, because its breach forced the contracts into periods when performance was more difficult, more expensive and/or less profitable, it and not Precision Pine must bear the consequence. See P's Br. at 15-16, 51-60. Defendant's reliance on Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (Fed.Cir. 2002), in support of its assertion that Precision Pine and not the government bore the risk of these occurrences in the post-suspension period is misplaced. In Seaboard Lumber, there was no government breach that forced the contractor's performance into a period of increased difficulty/impossibility, but rather the case involved the *contractor's breach* and its "defense" that government monetary policy, which had led to higher interest rates, was an "act of government" that qualified it for additional time to perform under B8.21, the *force majeure* clause of the contract. The court, after noting that the contractor had not even properly invoked the protection of the clause, also, not surprisingly, concluded that at most the government's fiscal policy had an "attenuated" effect on the contracts at issue. Id. at 1292-93.

change in the time available to harvest [as the termination dates of the contracts were extended] no loss of profits would be expected to occur in the ordinary course of events." Id. at 30. Defendant seeks to ignore the fact that the opportunity to make a profit on these sales during the period of the suspension was lost forever due to the government's breach and that this fact was both reasonably foreseeable and actually foreseen by the Forest Service, which fully appreciated the horrific consequences that a suspension would have on the profitability of affected sawmills. PPFF 140-43, 364-69. Indeed, as this Court found at summary judgment, the extremely adverse impacts to timber companies that would follow from a suspension, including the loss of profits, were facts likely

> long known to the Forest Service, i.e., the logging season is restricted and a suspension can cause a contractor to lose an entire year of production and such a loss can result in lost profits and several sawmills going out of business permanently.

63 Fed.Cl. at 131 (emphasis supplied). Defendant's position that lost profits are, as a matter of law, not the foreseeable result of the Forest Service's protracted suspension in the instant case has been previously considered and rejected by this Court. 63 Fed.Cl. at 129-131. Moreover, as both Mr. Ness and Mr. Porter testified, the opportunity to make a profit on those sales in that time period was denied to Precision Pine by the breach and was in no way remedied by the return of the contracts some 16 months later. PPFF 143.

The law (including cases cited by defendant) demonstrate that, contrary to defendant's position, lost profits are recoverable where defendant's breach consists of delay. See, e.g., Chain Belt v. United States, 115 F.Supp. 701, 718-20 (Ct.Cl. 1953) (Government's 67-day delay in moving out of premises plaintiff intended to use as manufacturing facility entitled plaintiff to lost profits on goods that would have been manufactured and sold to third parties during that period); Pinewood Realty Ltd. Partnership v. United States, 617 F.2d 211, 217-18 (Ct.Cl. 1980) (Plaintiff entitled to lost profits, i.e., rent minus costs of maintenance of property, due to government delay in conveying title to apartment building). If defendant's legal argument here that lost profits for "mere delay" are unforeseeable were correct, no recovery should have been had in those cases. In each of those cases, however, the courts correctly

recognized that the opportunity to make profits during the period of the delay had been lost due to the breach and was fully compensable.[29]

Defendant also relies on a quotation from comment a to § 351 of the RESTATEMENT in Landmark Land Co., Inc. v. F.D.I.C., 256 F.3d 1365, 1378 (Fed.Cir. 2001), for the proposition that the actual loss that occurred must have been foreseeable.[30] Defendant neglects to include, however, the very next sentence of the comment which provides that: "It is enough, however, that the loss was foreseeable as a probable, as distinguished from a necessary result of such a breach."

More importantly, this Court has already ruled that:

> A plaintiff's recovery is not contingent on a defendant's having actually foreseen the injury which occurred. Rather,
>
> > The existing rule requires only reason to foresee, *not actual foresight*. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefor in case of breach.

63 Fed.Cl. at 130 (emphasis in original, citation omitted). That is, "Precision Pine need not show that a particular type of breach was foreseeable, but must prove that both the general magnitude and type of damages were foreseeable." Id.

---

[29] A plaintiff is entitled to recover its expectation interest where, as here, a delay has caused him to miss an invaluable opportunity. RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. a.

[30] The court in Landmark was not quoting comment a to § 351 of the RESTATEMENT as a definitive statement of the law in this Circuit, but rather merely included the quotation as the second of two "see" cites in support of the proposition "In order to be entitled to reliance damages, a plaintiff must prove that both the magnitude and type of damages were foreseeable." Id. (emphasis supplied). The initial "see" cite is as follows:

> *see* Arthur Corbin, *Corbin on Contracts,* § 1012 at 88 (1964) ("[In order to have been foreseeable] the injury that occurs must be one of such a kind and amount as a prudent man would have realized to be a probable result of his breach.")

Id. Moreover, § 351(3) of the RESTATEMENT provides that the issue of foreseeability with respect to reliance damages only arises upon the determination that lost profits are not available. Thus, the unremarkable statement of law from Landmark relating to reliance damages sheds no light on the law of this Circuit with respect to the foreseeability of lost profits in this case.

Moreover, as this Court found at summary judgment there may be reasons to assess foreseeability at the time of breach, a point at which there can be no dispute that the impact to Precision Pine was actually foreseen by the Forest Service. Precision Pine, 63 Fed.Cl. at 130, 131, citing Gardner Displays Co. v. United States, 171 Ct.Cl. 497, 505, 346 F.2d. 585, 589 (1965)). In an effort to over come this ruling, defendant relies on Bohac v. Dept. of Agriculture, 239 F.3d 1334, 1340 (Fed.Cir. 2001), for the proposition that foreseeability may only be assessed at the time of contracting. Bohac, however, affirmed an appeal from a ruling by the Merit Services Protection Board that plaintiff's non-pecuniary damages, such as pain and suffering, were not recoverable under the Whistle Blower Protection Act. Thus, Bohac was a case of statutory, not contract, interpretation and only considered non-economic damages that are not typically recoverable in a breach of contract case. Accordingly, any discussion in Bohac of the appropriate time for considering the foreseeability of economic damages for the breach of a government contract is *dicta*.[31]

In addition to Gardner Displays, other cases and distinguished commentators recognize that foreseeability may be properly addressed at the time of breach. E.g., Lewis v. United States, 1982 WL 36718 *17 (Ct.Cl. July 16, 1982) ("The concept of consequential damages involves consideration of the type of loss foreseeable by the contracting parties at the time of their agreement or at the time of breach"). See also Specialty Assembling & Packing Co., Inc. v. United States, 174 Ct.Cl. 153, 355 F.2d 544, 566-68 (Ct.Cl.); Myerle v. United States, 33 Ct.Cl. 1, 27 (1867)). Accord M. A. Eisenberg, "The Principle of Hadley v. Baxendale," 80 Cal. L. Rev. 563, 613 (May, 1992) (In a breach of contract case "when lost profits or forgone opportunities are involved, the baseline standard of reasonable foreseeability should be applied; and the relevant standard should be applied at the time of breach"). Thus, this Court's ruling

[31]Bohac cites Prudential Ins. Co. of America v. United States, 801 F.2d 1295 (Fed.Cir. 1986), which found that foreseeability of a breach of a commercial lease could only be considered at the time contracting because "although this may place a more difficult burden on the lessor seeking damages against the government as a holdover tenant, lessors may have an alternative avenue of relief under the Takings Clause. . . ." In the instant case, of course, no property interest exists independently of the timber sale contracts.

recognizing that foreseeability may be assessed at the time of breach is not contrary to and is, in fact, amply supported by the law of this Circuit. In any event, as demonstrated by the foregoing, regardless of whether foreseeability is assessed at the time of contracting or the time of breach, Precision Pine has established that its damages were plainly foreseeable to the Forest Service.

E. Precision Pine Has Established Its Lost Profits With Reasonable Certainty.

In an attempt to undermine the reasonable certainty of Precision Pine's lost profit calculations, defendant unleashes a barrage of often contradictory, half-true and flatly untrue arguments in the apparent hope that "something will stick" and, even if nothing ultimately sticks, that the methodology used to calculate damages may become confused. As demonstrated below, upon examination, these arguments simply do not hold up.

For example, defendant argues that Precision Pine's calculation of lost profits includes higher revenue and lower costs than those used by Mr. Porter in his worst case profit projections. D's Br. at 31 n.17. Of course, the fact that Mr. Ness calculated that plaintiff would have incurred lower costs and obtained higher revenue than shown on the July 17, 1995 profit projections is completely consistent with Mr. Porter's testimony that those profit projections were worst case scenarios. See PPFF 1381. Moreover, there was no testimony that the costs in the July 17, 1995 profit projections were actual costs or anything other than a worst-case guestimates as to futures costs.[32] See id. In stark contrast, Mr. Ness' calculation of what plaintiff's manufacturing costs would have been during the suspension was based on the costs actually incurred by Precision Pine in the 17 months prior to the suspension. PPFF 105. Therefore, defendant's attempt to undermine Precision Pine's use of its actual costs by relying on the

[32]In an attempt to show that the costs used on those projections were accurate, defendant argues that Mr. Porter only used a reduced overrun factor to arrive at his worst case scenario on the profit projections but did not "modify" manufacturing costs. The only evidence defendant cites in support of its contention is Mr. Porter's testimony at Tr. 3132-34. The testimony at the pages cited, however, does not relate to how the profit projections were prepared.

worst case scenario "profit projections" is wholly unavailing.[33]

1. Mr. Ness Used Mr. Porter's Projected Harvest Schedule With Minor Adjustment To Reflect Corrected Volumes.

At trial Precision Pine demonstrated why harvest of all of the contracts at issue would have taken place during the suspension period and how Mr. Porter had projected that harvesting of the sales would have proceeded "but for" the suspension. P's Br. at 18-20.[34]

At page 32 of its brief defendant claims that Mr. Ness, despite having actually used Mr. Porter's quarterly harvest projections, testified that Precision Pine would not have followed the harvesting schedule set forth in his report in the "but for" world. This mischaracterizes Mr. Ness' testimony. In fact, Mr. Ness testified that in preparing his report he did not modify the harvest schedule (PPFF 73; Tr. 2624-25 (Ness)).[35] Rather, he confirmed with Mr. Porter that the harvesting schedule itself was feasible, that sufficient harvesting capability existed and discussed other general parameters to make sure that the harvesting projection was reasonable. PPFF 72. Furthermore, in response to questioning from counsel for defendant Mr. Ness also made clear that "but for" the suspension, Precision Pine would have followed Mr. Porter's harvest schedule:

---

[33]In footnote 17 defendant seeks to rely on certain "summary" computations prepared by its disqualified expert, Mr. Adkins, which purport to compare Precision Pine's damage claims with the "profit projections." DX 804-06, 808, 810. As set forth in "Plaintiff's Motion to Strike the Putative Summary Exhibits of Defendant's Disqualified Expert, Charles Adkins," these exhibits were not properly disclosed as summaries, are not summaries and are inherently unreliable and should, therefore, be stricken.

[34]The timber on the breached sales only represented a 10.5-month supply of timber to Precision Pine's sawmills, while the period of the suspension plus the ensuing winter, i.e., the period during which Precision Pine would have processed the timber from the breached sales was nearly 20 months long. PPFF 246. Thus, of necessity, Precision Pine would have harvested all of the timber on the breached contracts during the suspension.

[35]Mr. Ness did take into account relatively small corrections to the volume remaining on some of the breached sales as of the date of the suspension. PPFF 72; PX 131, Ex. 9. Mr. Ness simply applied any changes in volume to the existing harvest period on a *pro rata* basis. PPFF 72; Tr. 2618-19 (Ness).

Q: So the [harvest] schedule that you use in your analysis is not what you contend Precision Pine would have done, if there had been no suspension at all?

A: It's what they would have done if there had been no suspension, but it is not what they would have done, given that there was a suspension.

Tr. 2621 (Ness) (emphasis supplied).[36] See also Tr. 2628 (Ness).

Also at page 32 of its brief defendant argues that Precision Pine's "historic practices" and "then-existing market conditions" suggest that it would not have operated its mills at their "putative" capacity of approximately 35,000 mbf (LT) per year. Contrary to defendant's argument, as set forth on page 22 of P's Br., Mr. Ness determined that the anticipated production rate for all three sawmills from August 25, 1995-April 15, 1997 was 34,714 mbf (LT) per year (PPFF 69). A rate of production that he confirmed with Mr. Porter could have been accomplished. PPFF 70. Mr. Ness also independently confirmed the feasibility of such production based on Precision Pine's having produced in excess of 30,000 mbf (LT) in each of the two fiscal years preceding the suspension (id.) and that at the time of the suspension Precision Pine was making improvements to its sawmills. Id. Additionally, not only did both Messrs. Reidhead and Porter testify, without contradiction, that Tri-Star had the capability to harvest at the rate necessary to supply the sawmills (PPFF 250), but Precision Pine had harvested at 93% of the requisite rate in preceding years. Id. As such, defendant's argument as to "historic limitations" is nonsensical.[37]

Defendant further contends that "Precision Pine was under pressure to reduce its level of operations" because the volume of timber it had under contract had been steadily declining. D's Br. at 32. In support of this contention defendant relies on DX 559, which in fact shows that during 1993, 1994 and 1995 Precision Pine's supply of timber remained relatively steady and it was only in late 1995 that

[36] Mr. Ness repeatedly makes clear that once the suspension was imposed, Precision Pine, of course, could not have and, in fact, did not follow the harvest schedule. Tr. 2625-2626 (Ness).

[37] The same can be said of defendant's assertion that market conditions would have precluded the anticipated level of operations because, after bottoming-out in January-February 1996, the market for Ponderosa Pine lumber products took off like a rocket through the remainder of the suspension. PPFF 246.

Precision Pine's supply of timber dropped from more than 40,000 mbf to less than 35,000 mbf.[38] This drop, of course, coincided with the Court's August 1995 order in Silver v. Babbitt halting the Forest Service timber sale program until it completed its ESA obligations.

To support its argument, defendant also relies on the testimony of Dr. Neuberger for the proposition that the volume of timber being offered by the Forest Service in Arizona was in decline from the late-1980s forward. As Mr. Porter testified, however, at the same time that the volume of Forest Service timber being offered was putatively declining, so too was the total sawmill capacity of the companies against which Precision Pine competed for Forest Service timber. PPFF 1406. Indeed, from the late-1980s until the suspension occurred, the annual capacity of the sawmills that competed with Precision Pine for Forest Service timber in Northern Arizona decreased by 47 million board feet.[39] Id. Simply put, the alleged decline in the volume of Forest Service timber sale offerings in Arizona would have had no affect on Precision Pine's projected harvest of the breached sales during the suspension period.[40]

---

[38]Many of the numbers on DX 599, including the annual volume under contract figures, were placed in the wrong columns. PPFF 1247.

[39]At the time of the suspension, there were only two other sawmills that remained in competition with Precision Pine, the Reidhead sawmill in Nutrioso and the Stone sawmill in Eagar, both of which were proximate to the Apache-Sitgreaves National Forest. PPFF 1406. As a result there was effectively no competition for Forest Service timber sales for Precision Pine's sawmills in Heber or Winslow, which drew their source of supply primarily from the Tonto, the Coconino and the Kaibab National Forests. Id. As Dr. Neuberger correctly conceded: there had been a "dramatic" reduction in sawmill capacity competing with Precision Pine for Forest Service timber sales; given the location of the remaining competitors, Precision Pine may have been well-situated to obtain Forest Service timber sales offered on the Coconino, Tonto, Kaibab and the western half of the Apache-Sitgreaves National Forests; and most importantly Precision Pine was well-positioned to cut the timber it had under contract at the time of the suspension. Id.

[40]At page 23 defendant points to DX 463 in support of its contention that due to declining lumber markets "it had become apparent that Precision Pine was almost certainly going to have to close one or more of its sawmills;" however, DX 463 says nothing of the sort. The exhibit, a letter from Precision Pine to Mr. Reidhead, the president of Tri-Star Logging, dated April 18, 1995 simply stated that "**If** [prior to July 15, 1999] we are required to shut down another sawmill we will contract with you to do the logging for the remaining two." All the letter did was to guarantee that Tri-Star, which had just purchased

2. Precision Pine's Milling Schedule Provides A Reasonably Certain Basis For Determining Its Damages.

Defendant also attacks Precision Pine's schedule for milling the timber that would have been harvested "but for" the suspension as something Mr. Ness created wholly on his own and as being arbitrary. D's Br. at 34. Defendant is mistaken in both regards. First, Mr. Ness did not create the milling schedule in a vacuum, but rather conferred with Mr. Porter about the schedule and Mr. Porter reviewed and adopted the milling schedule on behalf of Precision Pine. PPFF 283-84.

Secondly, in preparing the milling schedule Mr. Ness was, as a practical matter, severely constrained. That is, Mr. Ness assumed that, but for the suspension, during the period from August 25, 1995 through April 15, 1997, Precision Pine would have processed all of the timber that it actually did mill during that period plus all of the timber remaining on the breached sales.[41] On that premise, Mr.

---

Precision Pine's logging arm, PFMI (PPFF 1241), would retain the right to perform the logging and hauling to supply Precision Pine's remaining two mills in the event that Precision Pine had to close down a sawmill sometime in the next four years. DX 463. Thus, far from confirming the virtual certainty of a mill closure as defendant alleges, DX 463 is merely an assurance to Tri-Star of what would happen in the event such a mill closure did occur. In fact, even in the wake of the adverse effects of the instant suspension, and the subsequent Forest Guardians suspension, none of Precision Pine's sawmills were permanently closed down until more than two years after DX 463 was sent.

[41]The source of defendant's apparent confusion regarding the milling schedule may be that Mr. Ness' model takes as a given the lumber that was actually produced at the sawmills during the suspension. PX 131 at Ex. 7. Both Mr. Porter and Mr. Ness were clear that given the capacity at Precision Pine's sawmills **all** of the timber that was actually milled, plus all of the timber on the breached sales would have been harvested and milled during the suspension period and the ensuing winter. PPFF 389. Thus, Mr. Ness' approach of taking as a given the sawmill production that actually took place during the suspension and then using the breached sales to bring the sawmill production to capacity makes eminent, practical sense. The alternative to this approach would have been to start by making certain assumptions about when the breached sales would have been milled during the suspension, to have calculated the financial impact of doing so, and then reallocated the milling of the timber actually processed on the basis of (a) some sort of projected harvest schedule for that timber and (b) a milling schedule for it based on the availability of capacity. In such a model, the volume of timber that would have been subject to conjecture about when it would have been processed (and the financial impact thereof to the company's damages) would not have been just the 25,000 mbf (LS) presently in issue, but would have been every log that Precision Pine would have processed between August 25, 1995 and April 15, 1997, i.e., some 45,000 mbf (LS) (the total anticipated lumber production of Precision Pine's mills during the period, 57,134 mbf (LT) (PPFF 249) divided by 1.25). The multiple complaints that would have come from the government had such an approach been employed by Precision Pine is easily imagined.

Ness prepared the milling schedule, in conformity with the harvest schedule provided by Mr. Porter, by simply utilizing the timber that would have been harvested pursuant to that schedule to fill capacity at the sawmill during periods when the sawmill would otherwise have had some idle capacity. PPFF 79; see also Tr. 2778-84 (Ness).

Mr. Ness did describe the selection of exactly which logs would have been used at the mills as being somewhat "arbitrary." This was only the case, however, within the constraints of the harvesting schedule and the availability of capacity at the sawmills just discussed. As Mr. Ness further explained, the timber used from the breached sales to fill sawmill capacity was selected on a consistent basis with the goal of simplifying his report, not to influence the amount of Precision Pine's damages. PPFF 74-80; Tr. 2788-89 (Ness). As Mr. Ness testified during cross-examination, the method he used to determine the quarter for processing the timber from a sale did not distort his damage calculations and the resulting damages were neither the highest nor the lowest possible, if one had set out with the goal of skewing the results one way or the other. Tr. 2858-59 (Ness).[42]

Indeed, as the Court stated in a rejoinder to defendant's argument that the milling schedule was "arbitrary:"

---

Given this alternative, as the Court recognized at trial the approach used in Mr. Ness' model is both practical and sensible. PPFF 1286; Tr. 3225-26.

[42]At trial, counsel for defendant presented a demonstrative that he created which purported to show that had Mr. Ness shown the Jersey Horse sale as having been milled in the 4th quarter of 1995 rather than the 1st quarter of 1997 and the Manaco sale having been harvested in the 1st quarter of 1997 rather than the 4th quarter of 1995, Precision Pine's revenue would have decreased by some $37,725.62. Assuming that this information were in evidence and were correct, the change computed by counsel would represent a decrease of .2249%, i.e., two-tenths of one percent, in the lumber revenue that Precision Pine would have generated from the timber on the breached sales, i.e., $37,725.62/ $16,772,495.08 (PX 131, Ex. 6 at 14).

Because Mr. Ness' damage calculations were neither the highest nor the lowest possible, plaintiff can also show that swapping the quarters in which timber under Mr. Ness' model was milled would have increased the revenue that Precision Pine would have generated from the timber on the breached sales by similarly small amounts. See, e.g., PFFF 1291.

> It's arbitrary in the sense that he [Mr. Ness] knew he had a certain amount of capacity to fill up, and he looked at, given the harvesting schedule, what would be coming available, and he picked and chose from the sales that would be available to add to his milling schedule until he got up to capacity. Doesn't that make some sense in terms of what would have been done if there had been no suspension?

Tr. at 3253.

Based on the above, the milling schedule provides more than a reasonably certain basis for calculating Precision Pine's lost profits damages.

On page 34 of its brief, defendant asserts that Mr. Ness' milling schedule would have resulted in log decks at Precision Pine's sawmills, which "far exceed[ed] the company's historic average inventory."[43] This too is incorrect.[44] Mr. Ness testified that under the milling schedule the largest log inventory that would have existed at any mill would have been a 150-day supply, and that in many quarters during the suspension, log decks would be far smaller than that. Tr. 5610 (Ness). He also added that Precision Pine had room at its mills for decks of that size (Tr. 5611 (Ness); accord Tr. 703 (Porter)), and that there had been times in the past when Precision Pine had had larger decks than that. Tr. 5611, 5699-700 (Ness). Mr. Ness further testified that he had never known a mill owner who thought that a 150-day inventory at a mill was wildly excessive. Tr. 5610 (Ness).

---

[43]Defendant, citing the testimony of Mr. Ness and DX 1013 (a demonstrative created by counsel), argues that the milling schedule produces total log inventory at Precision Pine's three sawmills that would have exceeded 8 MMBF (LS) during the summer of 1996 and would have been maintained at about this level for a full year. Defendant is incorrect. Mr. Ness' model only goes though April of 1997 and therefore does not contain a full year of information after the summer of 1996, but more importantly, it shows log decks diminishing from a high of 8.4 MMBF in the fall of 1996 to zero by April of 1997. See DX 1013.

[44]In support of these contentions, defendant cites only to a "summary" exhibit prepared by its disqualified expert, Mr. Adkins. Mr. Adkins' so-called "historical average" and "historical maximum" inventories are purportedly based on the period April 1994 to August 1995, a fact that Mr. Adkins could not even recall until prompted by counsel for defendant to refer to a portion of his "expert" report that was never received in evidence. Tr. 4061-63. Given that the "historical" data for Precision Pine that Mr. Adkins selected covers a period of a little over one year for a company that has been in continuous existence since 1984, the underlying data identified by Mr. Adkins was never admitted into evidence, there was no evidence that the log decks during this brief period were in any way typical for Precision Pine and the fact that historical experience at Precision Pine flatly contradicts Mr. Adkins' "summary" (Tr. 5699-700 (Ness)), the Court should give no weight to this document.

Defendant relies on excerpts from the deposition testimony of John Smith for the proposition that plaintiff would only maintain a two to three week inventory of logs through the summer. However, Mr. Smith was not as definitive on this point as defendant claims, testifying instead that in summer the size of the decks depended on the size of the sawmill and could contain a month's supply of logs "or whatever." DX 838 - Designations from Smith Dep. Tr. at 24-26. Moreover, while Mr. Smith testified that Precision Pine would try to avoid the occurrence of fungus referred to as "blue stain" in its logs during the summer months, there was no testimony from any government witness as to how long log decks could be maintained before blue stain would have occurred in the summer of 1996 or that blue stain could not be prevented by simply sprinkling the log decks with water. PPFF 1283

Defendant also suggests that had the milling schedule been employed by Precision Pine, it would have resulted in a "cash crunch." D's Br. at 35. Defendant's citations to Mr. Ness' testimony in support of this proposition are unavailing, however, as Mr. Ness dismissed the idea that substantial cash flow problems would have been generated by the log inventories that resulted from Precision Pine's milling schedule on the breached sales because:

a. At the time of the suspension, Precision Pine did not have cash flow problems, Tr. 2193-95 (Ness); see PPFF 8.

b. If it hadn't been for the suspension, the breached sales would have provided Precision Pine with a good cash flow; PPFF 23-25, 141-143, 246; Tr. 5616 (Ness).

c. As indicated in Precision Pine's financial statements, during the 36 months from 3/31/95 to 3/31/98, Precision Pine had been able to reduce its outstanding debt from resources other than profits by $2.3 million (Tr. 5612-15 (Ness)) and, if Precision Pine could do this, it would have been very easy for it to have financed inventory, which, because it turns over very quickly, is easy to finance with a bank. Tr. 5615-17 (Ness); and

d. At the time of the suspension, Precision Pine had a $2 million line of credit available to it, Tr. 5615-16 (Ness), i.e., if Precision Pine had been allowed to operate the breached sales, it would have been able to finance a significant portion of the log inventory with cash flow from operations. Tr. 5706 (Ness).

Further, defendant's non-specific citation to PX 293, which contains all of Precision Pine's financial statements from FYE 3/31/91 through 3/31/98, certainly does not prove defendant's point. The same is

true of defendant's reliance on DX 1012, a demonstrative prepared by counsel, about which Mr. Ness emphatically testified:

> I don't know what it [DX 1012] shows. It shows a bunch of accrual basis numbers mixed with cash numbers and so I really don't know what it represents. It means nothing to me . . . if you're trying to have me draw some sort of conclusion from this, I can't. This is not a good accounting document.

Tr. 5687. In sum, defendant has proffered no evidence of the alleged "cash crunch" that it claims plaintiff would have faced had it followed the harvest and milling schedules. Quite the contrary, the evidence demonstrates that Precision Pine would have been able to afford its projected operations during the suspension period.

Finally, defendant takes Mr. Ness to task for failing to use "a standard treatment (e.g., first-in, first out ("FIFO")), or last-in, first out ("LIFO") for drawing down inventory." D's Br. at 35. This argument is meritless.[45] First of all, Precision Pine did not track individual logs from harvest through its sawmills so it is not possible to know which "standard treatment," if any, for drawing down inventory was actually used by plaintiff. Moreover, it is difficult to conceive of how either system advocated by defendant would work in practice. Using a FIFO approach would entail removing logs **from the bottom** of the deck (i.e., utilizing those first in), something which even someone with no sawmill experience would recognize is not feasible. Similarly, a LIFO approach would always entail removing logs from the most recently constructed deck. Such an approach, however, could lead to logs on the bottom of the first deck constructed remaining unutilized for extended periods of time even if this resulted in a deterioration of the quality of those logs. As such, this approach, too, makes no sense. Of course, there was no testimony from any witness that any timber company ever used "LIFO," "FIFO" or any other such

[45] The only testimony about LIFO and FIFO came from Mr. Moosman, over the objection of Precision Pine, which complained that Mr. Moosman had expressed no opinion in his report regarding either LIFO or FIFO. Tr. 4910-4913. Although the Court permitted the testimony, it also reserved judgment as to whether the testimony could be appropriately relied upon. Id. As demonstrated herein, the testimony that LIFO or FIFO should have been used is unreliable, not the product of any expertise this witness had and was, as defendant admitted (Tr. 4910-11), not disclosed in his report.

formalistic system of inventory control.[46]

3. Precision Pine's Damages Calculations Are Both Reasonably Certain And Conservative.

On page 36 of its brief, defendant attacks Mr. Ness' calculations with the remarkable claim that "[A]t virtually every stage of his multi-step calculations, Mr. Ness inflates Precision Pine's claimed damages." It is important to recall, however, that as his first item of business in this case Mr. Ness reviewed plaintiff's claim and recommended elimination of some elements of the claims (e.g., increased logging and hauling on certain non-breached sales) and the addition of new cost elements such as severance tax, prompt payment discount and freight charges.[47] By doing so, Mr. Ness actually reduced Precision Pine's claim by $1,252,106.94. PPFF 1031. Never letting the facts get in the way of its theory of the case, however, defendant does not try to explain how an expert who allegedly "inflated" Precision Pine's damages at virtually every turn could actually recommend significant reductions in the claim. Defendant does, however, purport to identify eight of "the most blatant problems" with Mr. Ness' calculations. As discussed below, each of these arguments misstates the facts.

a. Precision Pine's Determination Of Lost Profits On Lumber Is Reasonably Certain And Conservative.

**Defendant's First Contention:** Defendant's initial complaint is with plaintiff's use of a standard factor of two mbf (LS) per ccf to convert from ccf to mbf (LS) (the reciprocal of which is .5 mbf per ccf). As Mr. Porter testified, the use of this conversion factor was appropriate because: there is no way to go

---

[46]There also was no testimony as to the "implications" of Mr. Ness not having used a LIFO or FIFO approach to utilizing the log decks at the sawmills, and the Court correctly sustained an objection to Mr. Moosman providing this testimony as being beyond his expertise. Tr. 4916-17. Despite the ruling, counsel for defendant has attempted to supply just such an opinion by claiming in the brief (without citation) that the schedule Mr. Ness used was "selected to maximize Precision Pine's putative lost profits." D's Br. at 35. However, not surprisingly, counsel's "opinion" is not correct as Mr. Ness testified unequivocally that he confirmed that the approach to milling used by Precision Pine resulted in neither the highest nor the lowest possible damages to Precision Pine. Tr. 1858-2860 (Ness).

[47]An accounting of the changes made by Mr. Ness is set forth in his report. PX 131, Ex. 22.

precisely from ccf to mbf (LS) as the two scales measure different things, there are a number of different approaches to converting from ccf to mbf (LS), all of which have in common that they are approximately 2, and the Forest Service's "contract specific" conversion factors are based on estimates of the volume on the sale. Tr. 245-47 (Porter). As such, a standard approach to conversion is equally valid, the Forest Service advised Precision Pine that a conversion factor of 2 ccf per mbf was appropriate to use, and in Mr. Porter's experience it worked well and was accurate. PPFF 208.

Defendant asserts, without citation to any evidence, that the "contract specific" conversion factors are more accurate than the approach used by Precision Pine. D's Br. at 36.[48] It is notable, however, that even defendant's own experts did not use the Forest Service's "contract specific" conversion factors. Tr. 3465 (Neuberger); Tr. 5132 (Moosman). See PPFF 1206. Rather, the conversion factors used by defendant's experts were taken from certain of plaintiff's documents, even though the experts did not know who at Precision Pine had prepared them or how they had been prepared. Tr. 5134 (Moosman); Tr. 3466 (Neuberger). Moreover, defendant did not call any witness from Precision Pine to testify as to the accuracy of these conversion factors (PPFF 1207), and Mr. Porter testified that no one at Precision Pine had sufficient knowledge to derive sale specific conversion factors. Tr. 1617-18 (Porter). In fact, the only approach to converting from ccf to mbf about which there was testimony supporting its reasonable accuracy was the factor of 2 ccf per mbf (LS) used by Mr. Porter.

In the Appendix to its brief at Table 1, defendant also asserts that the use of a conversion factor of 2 overstates the timber volume on some of the sales sold in ccf. That table, which was not offered, let alone admitted into evidence at trial, purports to be based on PX 4-5, 9-10,13-14. Those documents, however, do not contain the "contract specific conversion factors" that defendant has listed for the

---

[48]Such an assertion is curious given that the Forest Service only estimates the ccf volume on its sales and then expressly disclaims the reliability of its estimates (PPFF 296), but defendant now asserts that if one applies a "contract specific" conversion factor to its unreliable estimate of volume the result is somehow superior to and more accurate than the proven approach relied upon by Mr. Porter. Defendant claims that the Forest Service's conversion factors were "used in contract administration" but does not explain how they were used and provides no evidence showing that they were used for this purpose.

Monument, Kettle, Mud, Saginaw-Kennedy, or Salt sales. Compare DA1 with PX 4-5, 9-10,13-14. Moreover, for reasons not explained, defendant conveniently ignores two breached sales, i.e., Jersey Horse for which the Forest Service calculated conversion factor was greater than .5 mbf per ccf (less than 2 ccf/mbf), and Brann for which the Forest Service determined that the appropriate conversion factor was .5 mbf per ccf. The inaccuracies and omissions contained in Table 1 seriously undermine the probative value of the document and are contradicted by data relied on by defendant's own experts.

**Defendant's Second Contention:** Defendant argues on page 36 that Mr. Ness "manipulated" the harvest schedule by placing harvesting into periods when stumpage prices were low. Of course, this is incorrect in that the testimony at trial demonstrated that Mr. Porter prepared the harvest schedule and that Mr. Ness simply adopted Mr. Porter's projection of when harvesting would have taken place on the breached sales, with minor volume adjustments that in no way altered the quarter during which Precision Pine would have performed harvesting on the contracts. PPFF 72-73.

**Defendant's Third Contention:** Defendant argues on page 37 that "Mr. Ness inflates lumber revenues by deferring the milling of logs from Precision Pine's Forest Service timber sales." In support of its contention, defendant repeats arguments that have been dispatched earlier in this brief.

**Defendant's Fourth Contention:** Defendant argues on pages 37-38 that Mr. Ness used "inflated" sale prices for lumber products.[49] That is, defendant claims that only "selected" invoices were used to determine lumber product prices. It is true that of the over 1,100 invoices that reflected the actual

[49]With respect to its contention that lumber product prices were somehow arrived at by counsel, again, defendant advances an argument it has already made and lost before this Court. As this Court well knows, at trial defendant sought to disqualify one of plaintiff's attorneys, Mr. Goeken, from participating in the case based on a putative need to call Mr. Goeken as a witness because, as the argument went, Mr. Goeken had actually developed Precision Pine's lumber product pricing. Upon full ventilation of these contentions, this Court not only concluded that Mr. Goeken should not be disqualified but also found that there did not even appear to be an adequate basis for Mr. Goeken to be called as a witness because "Mr. Porter's testimony is more than sufficient to explain the calculations that were made, and he is the person who can respond to any cross-examination about how that was done that might be thought to be appropriate." Tr. 1996; see also plaintiff's comment to DPFF 413. Accordingly, defendant's contention about the participation of counsel in the development of lumber product pricing remains what it always has been: a red herring.

lumber sales made by Precision Pine during the period of the suspension, 34 invoices which, in Mr. Porter's opinion, would have unfairly skewed the price of lumber products **either up or down** were excluded. PPFF 95. Significantly, defendant does not contend that any of the 1,100 invoices (many of which contain multiple sales transactions) used by Precision Pine in determining the price for each lumber product were improperly categorized. Rather, defendant claims that the average price of each lumber product should have been calculated directly from the Winslow sales journal without any review of what made up that data. As Mr. Porter testified without contradiction, however, the sales journal was created and maintained by a secretary at Precision Pine and lumber sales were frequently placed in the wrong lumber category by her. PPFF 1093. Chief among the problems with simply using the Winslow sales journal as the source of lumber product pricing was the secretary's inclusion of sales of 4/4 (or "one inch") lumber products in the same category as 5/4 (or "1¼ inch") lumber products. Id.; Tr. 1669-70 (Porter).

As Mr. Porter explained, her doing so was improper because, generally speaking, 4/4 products are sold in rough form (Tr. 1672 (Porter)), although small amounts of the 4/4 material were occasionally finished at the planer and sold as shop or moulding. PPFF 1092. Such "4/4 shop" or "4/4 moulding" lumber was a hybrid that truly belonged in neither the normal "shop" or "moulding" categories nor the category for rough lumber. PPFF 1091. Moreover, given its hybrid character, 4/4 shop or moulding was sold at prices that were considerably higher than those for rough 4/4 lumber, but considerably lower than prices for 5/4 moulding or shop. Id. As a result, the few invoices reflecting sales of this material precluded the determination of accurate prices for lumber sold in the shop, moulding or rough categories. Id.[50] Accordingly, Mr. Porter determined that, in fairness to both parties, these few invoices for 4/4 shop or moulding should simply not be used. Tr. 457, 1679 (Porter).

[50]The essential ambiguity with respect to how 4/4 material would ultimately be sold is reflected in the profit projections, wherein Mr. Porter referred to "4/4 shop and commons" in a single category. See, e.g., PX 63-85. Of course, shop and commons are entirely different lumber products that differ

In support of its contention that the use of the invoices from the actual lumber sales Precision Pine made during the period of the suspension somehow inflated Precision Pine's lost profits claim, defendant points to the testimony of Dr. Neuberger that Precision Pine's anticipated revenue is overstated by "more than" $650,000.[51] As Dr. Neuberger's report makes clear, however, his opinion is simply based on using the average prices set out in the Winslow sales journal. DX 776, ¶ 71. Doing so resulted in the same clearly incorrect results obtained by Mr. Moosman, e.g., a price for number No. 1 Shop is almost always lower than the price for the lower grade No. 2 Shop. DX 776, Ex. 7; PPFF 354-55; Tr. 5067-69 (Moosman).

While there is no dispute between the parties that using the invoices rather than the sales journal results in different prices, the question remains: Which is the better approach? For all of the reasons set forth above, using the actual invoices from the suspension period to determine the prices at which the lumber products were being sold during that period is preferable to using the sales journal which the uncontradicted evidence showed sometimes combines sales of dissimilar lumber products in the same category. It is worth noting that in determining prices in the post-suspension period, Mr. Ness, with the assistance of Mr. Porter, also used the prices shown on invoices from that period but excluded even more invoices (on exactly the same basis) than had been excluded during the suspension period. PPFF 95 n.8. Of course, the result again was higher prices (and greater post-suspension profits) than would have been the result if the Winslow sales journal for the same period had been used uncritically. Despite this fact,

---

considerably in price. In this regard, Mr. Moosman testified that 4/4 lumber products did not belong in with shop grade lumber products, and believed that they should be properly included among lower grade lumber such as commons. PPFF 357. Had Precision Pine followed Mr. Moosman's approach, rather than excluding the invoices entirely, it would have increased the average price for its lower grade lumber products. Id.

[51]In his report, Dr. Neuberger actually concluded that the claim was overstated by less than $650,000. DX 776, at p. 25.

Dr. Neuberger praised Mr. Ness' approach to post-suspension pricing as the "correct one."[52] Id.[53]

In sum, in its critique of Precision Pine's use of the actual invoice prices for which it was selling lumber during the suspension, defendant does not provide any independent determination of the market price for lumber products during the suspension. Instead, defendant bases its theory of alternative pricing solely on plaintiff's Winslow sales journal.[54] As Mr. Porter explained, however, the sales journal was neither developed nor suitable for this purpose. In the absence of any meaningful evidence to the contrary, plaintiff's use of the actual prices it received from the period of the suspension must stand.[55]

---

[52]Defendant cites to, but does not discuss, Dr. Neuberger's testimony regarding his use of "correlation coefficients" and "least squares regression analysis" to investigate lumber product pricing. D's Br. at 38. In the wake of cross-examination (Tr. 3576-84), however, Dr. Neuberger conceded, in what can only be characterized as a considerable understatement, that his correlation coefficient is "not a test of great statistical power" and "it is what it is." Tr. 3584-85 (Neuberger). A point that was not lost on the Court. Tr. 3586 (THE COURT: If the correlation coefficient doesn't tell us anything about the magnitude of the difference in prices as shown in the sales journal compared to what is referred to as Precision Pine's proposed price, what then is the significance or relevance of the coefficient correlation?) Additionally, Dr. Neuberger acknowledged that he had not taken freight costs into account in doing either his correlation coefficient or his least squares analysis, which, he admitted, could impact the validity of his comparison of pricing taken from the Winslow sales journal to Precision Pine's invoice pricing, which does take freight into account. Tr. 3587-89 (Neuberger).

[53]In footnote 20, defendant contends that Mr. Ness did not use the same methodology in calculating post-suspension Ponderosa Pine lumber product prices as plaintiff had used during the suspension period. This is not true. Although Mr. Ness did use a weighted average, whereas for the suspension period he had used a simple average (something that would have had a *de minimus* effect on prices (Tr. 2642 (Ness)), it is also clear that, in calculating lumber product prices in the post-suspension period, Mr. Ness, used exactly the same approach of excluding, among other things, invoices for 4/4 shop and moulding lumber. See PX 182 at Ex. 5; Tr. 3572-73 (Neuberger).

[54]If anything, plaintiff's lost profits based on invoice prices are understated. As Mr. Ness testified, Precision Pine had not accounted for the different "counts" in lumber sales. Tr. 2344-49 (Ness). Plaintiff , however, declined to seek the additional amounts that Mr. Ness deemed appropriate. Id.

[55]Defendant argues that plaintiff's claim that it would have sold Douglas-fir lumber products for $60 above *Random Lengths* pricing and Englemann Spruce lumber products for $50 above *Random Lengths* pricing is not supported. D's Br. at 38 n.21. As Mr. Porter testified, however: To determine the sales price for Precision Pine's Douglas-fir products, he first consulted the industry publication *Random Lengths* (see, e.g., PX 232) to determine the sales price for identical Douglas-fir products sold FOB Portland, Oregon. PPFF 116. Purchasers of Douglas-fir products in Phoenix, where plaintiff usually sold its products, thus would have to pay the *Random Lengths* price plus freight of $75 per mbf to obtain Douglas-fir from Oregon, the closest location to Phoenix from which substantial quantities of Douglas-fir lumber could be obtained. PPFF 116. By comparison, plaintiff's cost to transport Douglas-fir from

**Defendant's Fifth Contention:** Defendant argues that Precision Pine's overrun factor is inflated because it does not correspond to either a document prepared by plaintiff's Winslow mill yard manager or the overrun factor identified in the worst case scenario profit projections. That defendant would raise both of these contentions was anticipated by plaintiff and rebutted in its post-trial brief at pp. 27-28.

The government's additional claim that Mr. Devere, plaintiff's expert with respect to overrun factor, "simply based his opinion [that use of a 1.25 overrun factor was conservative] upon a discussion he had with Mr. Porter about what Precision Pine's sawmills could produce" is specious. D's Br. at 39. As Mr. Devere's testimony and expert report make clear, he based his opinion on a number of things including a site visit to plaintiff's sawmill in Heber, conversations with Mr. Porter about that sawmill and how it compared to plaintiff's other sawmills, and his 40 years of experience in the timber business, 30 years of which is with Ponderosa Pine sawmills in the Southwest. PPFF 210. As the Court noted, there is no doubt that [Mr. Devere] . . . is very well qualified to speak on the subjects on which he's being proffered." Tr. 1142. In this regard, it is disingenuous in the extreme for the defendant, who tried to hire Mr. Devere as its own expert in this matter (Tr. 1150-51), to now claim that his opinion is entitled to "no weight."

Finally, and perhaps most notably, defendant proffers no explanation as to why the Forest Service's own calculation of overrun for each and every one of the sales at issue was between 1.245 and 1.3935. PPFF 215.

**Defendant's Sixth Contention:** Defendant argues that plaintiff's estimate of the percentages of each lumber product that would have been produced from the timber on the breached sales is not reasonably certain. Plaintiff has already dealt with the majority of defendant's points in its post-trial brief at pp. 28-32.

---

Northern Arizona to Phoenix was only $15 per mbf. Id. Accordingly, plaintiff could sell Douglas-fir products delivered to Phoenix for $60 over the *Random Lengths* FOB Portland price because, in doing so, sales of plaintiff's Douglas-fir lumber in Phoenix would have been made exactly the same price as sales of Douglas-fir from Oregon.

Most importantly, despite defendant's argument that "Mr. Porter's methodology cannot reasonably be expected to accurately predict the actual product mix . . .," the simple fact remains that Mr. Porter's product mix for the breached sales is completely in line with the mix of products that Precision Pine had historically produced predominantly from Forest Service timber.[56]

**Defendant's Seventh Contention:** Defendant asserts that Mr. Ness underestimated the true logging and hauling costs for sawlogs on the breached sales by (1) applying figures "supplied by counsel" and (2) ignoring plaintiff's financial statements. Defendant's allegation that Mr. Ness relied on logging and hauling costs supplied by counsel is just plain wrong. Plaintiff's logging and hauling costs for the breached sales were based on its "logger pay records," i.e., documents showing the actual rate that it paid its logger for logging and hauling a sale. Tr. 516, 560, 577-80 (Porter); PX 306-10.[57]

Unable to directly dispute the propriety of plaintiff's use of its actual logger pay records, defendant ignores these documents and the specific logging and hauling rates stated in them. Instead, defendant asserts that Mr. Ness should have derived a rate per mbf for logging and hauling for each sale by taking the cost set forth on Precision Pine's annual financial statement for logging and hauling on that sale and dividing it by what in most cases was a Forest Service estimate of the volume removed from that sale during the year. D's Br. at 42 and DFF cited therein. Defendant has only used its approach to calculate logging and hauling costs for some, but not all, of the sales and then only for a fraction of the total harvest that took place on those sales. See DPFF 548-555. Moreover, defendant has cited no expert

---

[56]In a footnote, defendant complains that the product mixes used for the relatively small volume of Douglas-fir and Englemann Spruce on the breached sales are "completely unmoored." D's Br. at 42 n.25. This is not correct as plaintiff presented the testimony of Mr. Porter regarding the percentage of lumber products that it would have made from these species of timber based on its historical production. PPFF 114-115. By contrast the government offered no contrary evidence on these points, accordingly Precision Pine has more than met its burden on the issue.

[57]The volumes reflected on Precision Pine's logger pay sheets were not taken from the TSSAs but are based on an independent sample scale of the logs removed made by Precision Pine. PPFF 1032. It is on Precision Pine's determination of volume that the logger was paid. Id.

report in support of its approach and the logging and hauling costs it derives for the first time in the post-trial filings, differ in all but one instance from those calculated by Mr. Moosman in his report. PPFF 1379A. Compare DPFF ¶¶ 548-55 with DX 771 (App. 1 to Moosman Report).[58]

Nevertheless, defendant asserts that had Mr. Ness used the approach that it now advocates, plaintiff's logging and hauling costs would have been "substantially higher," citing only to DPFF ¶¶ 548-55. These proposed facts demonstrate nothing of the sort. To derive them, defendant divides the total value of payments made by plaintiff for logging and hauling costs as shown in its financial statements (which, as noted, above are based Precision Pine's determination of volume removed from the sale) by the Forest Service's estimate of volume that had been removed on portions of the sale areas as shown on the TSSA. There is simply no way that defendant's convoluted apples to oranges approach could, however, arrive at rate(s) for logging and hauling that are more accurate than the ones set forth on the contemporaneous logger pay records.

This point was made well when, in response to a question from the Court, Mr. Smith explained that the sample scale that plaintiff did of the volume harvested on Hutch-Boondock in 1995 showed that plaintiff removed 60% or more timber than what the Forest Service had estimated had been removed from the sale on its TSSA. Tr. 5325-5326 (Smith). See also PPFF 1032. Because, as noted above, plaintiff paid its logger based on its estimates of the volume of timber that the logger hauled to its mill (PPFF 1032) taking the total of payments made by plaintiff to its logger on Brookbank in 1995 and dividing it by the volume of sawlogs shown as having been harvested that year on the Forest Service's TSSAs would result in a rate for logging and hauling that is 60% higher than that which plaintiff actually paid its logger.

Moreover, because the Forest Service only estimates the total volume of timber on a sale area as whole, a figure the accuracy of which the Forest Service also expressly disclaims (PPFF 296), any subset

---

[58]For the first time at trial, and without prior notice to plaintiff, Mr. Moosman attempted to back away from the logging and hauling costs that he had calculated in his report (Tr. 4933-39); however, he offered no quantification of the results of his new methodology for determining logging and hauling costs.

of the timber on the entire sale area, being based on a smaller sample, is by definition even less accurate. Yet, each of the logging and harvest rate "calculations" set forth in DPFF 548-555 are based on a cherry-picked period when harvesting constituted less than the entire sale area.

That defendant's method of deriving a rate for logging and hauling on a given sale is fanciful can also be seen when applied to the Hay sale for the FYE 3/31/95. That is, according to the TSSAs, between March 1994 and March 1995 plaintiff removed 92.52 mbf (LS) of sawlogs from that sale. PPFF 1041. Precision Pine's financial statement indicates that for FYE 3/31/95 it expended $89,843.01 for logging and hauling on Hay. DX 677. Defendant's method for determining the rate at which plaintiff paid its logger to harvest and remove this small volume, indicates, quite absurdly, that in FYE 1995 Precision Pine paid its loggers $970/mbf (LS) for logging and hauling on Hay ($89,843.01 divided by 92.52 mbf (LS)). Compared even to defendant's overstated rates, almost all of which are under $200/mbf (see DPFF ¶¶ 548-55), such a rate for contract logging and hauling is beyond credibility.

Additionally, in converting from ccf to mbf on the Brookbank, Kettle, Manaco, and Mud sales, defendant used the conversion factors as determined by the Forest Service, something that Precision Pine did not do in calculating the timber volume for which it would pay its loggers. DPFF ¶¶ 548-55, e.g., PX 307, 308, 310.[59] The use of the Forest Service's conversion factor only adds to the likelihood that defendant's calculations of volumes removed from the sale do not correspond to those upon which the logger was actually paid by Precision Pine. In sum, defendant's attempt to determine the logging and hauling costs on the breached sales by comparing the amounts paid for timber to volumes of timber that those payments are not based on is inherently unreliable.

**Defendant's Eighth Contention:** Defendant, relying solely on "cost comparison reports," asserts that Mr. Ness ignored "various categories" of costs and, as a result, has understated manufacturing

[59]Defendant provides no explanation of how it converted from ccf to mbf for the Jersey Horse sale. See DPFF ¶ 550. Moreover, it provides no specific dollar or volume figures for its claim that Precision Pine's logging and hauling costs on the Hay sale were $93.70 "prior to the suspension." See DPFF ¶ 549.

costs at the sawmills and planer. D's Br. at 42-3. Defendant does not identify the "various categories of costs" that Mr. Ness allegedly ignored. Moreover, a comparison of Mr. Ness's calculation of manufacturing costs (PX 131, Ex. 10) and the cost comparison reports (e.g., DX 802) reveals not only that the same basic cost categories appear on both but that in calculating manufacturing costs Mr. Ness added the following items: payroll taxes, workers compensation, group insurance and saws and knives that do not appear on the cost comparison reports. Indeed, Mr. Moosman testified that there were costs on financial statements used by Mr. Ness that were not on the cost comparison reports.[60] Tr. 5225 (Moosman).

During his review of plaintiff's claim, Mr. Ness found that a calculation of what Precision Pine's manufacturing costs during the suspension period should have been based on the cost comparison reports was unreliable and would have to be revised using the actual historical cost data from Precision Pine's financial statements. PPFF 1144; Tr. 2177 (Ness); see also Tr. 718-19 (Porter). Accordingly, Mr. Ness derived what Precision Pine's average manufacturing costs at each of its sawmills and its planer facility during the suspension should have been by using the detailed financial statements for the 17 months immediately preceding the suspension. PPFF 105.

To support its allegation that the cost comparison reports show higher costs than were determined by Mr. Ness, defendant relies heavily on DX 814 -- yet another "summary" from its disqualified expert, Mr. Adkins, as to the contents of selected cost comparison reports. Notably, however, the cost comparison for FYE 1996 cited by Mr. Adkins includes the suspension period when one would expect higher costs at Precision Pine's sawmills. Of course, this is not an accurate means of determining what costs would have been "but for the suspension."

Moreover, defendant identifies no specific error in Mr. Ness' decision to use Precision Pine's actual costs from the company's financial statements, nor is there any testimony as to the reliability of the

---

[60] Mr. Moosman's use of the cost comparison reports, however, was based on Precision Pine's claim before Mr. Ness had reviewed it. Tr. 5367 (Moosman).

cost comparison reports for any purpose, let alone the use to which defendant wishes to put them. PPFF 1145. To the contrary, Mr. Moosman, tried to use the cost comparison reports to determine plaintiff's manufacturing costs, but that he was unable to reconcile the costs as set forth on them with the actual costs set forth in Precision Pine's financial statements. Id. Mr. Moosman further conceded that he had no idea for what purpose the cost comparison reports were prepared. Id. In sum, there is simply no reason to accept the cost comparison reports (particularly as summarized by Mr. Adkins) as a better source of manufacturing cost data than the actual costs taken by Mr. Ness from Precision Pine's financial statements.

(i) Defendant's Assertion That Precision Pine Ignored Pulpwood Logging And Hauling Costs.

At page 43 of its brief, without citation to the record, defendant argues that during the suspension "Precision Pine would have incurred the cost of cutting and removing roundwood, but would have earned no revenues from roundwood sales." This argument, however, is built on several faulty premises. First, there was testimony from numerous witnesses that, in the absence of the breach, costs and revenues associated with harvesting pulpwood would have inured to Tri-Star Logging.[61] PPFF 270 n.23. See discussion supra at 14. Moreover, for all of the reasons set forth in P's Br. at 47-51 and supra at 21-22, all or most of the sawlogs on the breached sales could have been harvested without the need for any significant quantity of pulpwood harvest. Thus, even assuming that these costs were Precision Pine's to bear, which they were not, the costs could have been avoided.[62]

b. Precision Pine's Calculation Of Its Lost By-Products Revenue Is Reasonably Certain.

---

[61]As Mr. Moosman testified, no pulpwood costs or revenue appeared on Precision Pine's financial statements for FYE 3/31/96, even though pulpwood was harvested from Precision Pine's sales during that time. See, e.g., PX 290, Vol. I, "Brookbank" tab, Statement Nos. 3-5; Tr. 5180 (Moosman).

[62]At trial, even counsel for defendant had a grasp on this fundamental point. PPFF 1269. In fact, only after acknowledging this point did defendant go on to a series of hypothetical questions premised on the faulty assumption that Precision Pine would have incurred the costs for pulpwood logging and hauling.

There is no dispute that, as a part of manufacturing the timber on the sales into lumber, Precision Pine created four types of by-products: chips, bark, grindings (i.e., sawdust) and shavings. Moreover, each by-product had a valuable use. Unable to dispute these key facts, defendant focuses on the reasonable certainty of Precision Pine's calculation of its lost profits for by-products. As demonstrated below, however, these arguments are unavailing.

(i) Chips

The evidence at trial demonstrated that from at least October 1, 1992 to September of 30, 1995, Stone was obligated by contract to purchase Precision Pine's entire output of chips. PX 311; PPFF 132a; Tr. 593-95 (Porter). The price for chips under the contract at the time of the suspension was $18.25/ton. PX 312. After that contract expired on September 30, 1995, Stone continued to buy Precision Pine's output of chips at $18.25. PPFF 1126; DX 476; Tr. 596 (Porter). By letter dated December 27, 1995, Stone indicated that it would be suspending its chip purchases from January 15, 1996 to April 15, 1996. DX 476. The letter stated that Stone would be open to discussing the possibility that Precision Pine would store the chips it produced during the three-month suspension for future purchase by Stone. Id. From January 15, 1996 to April 15, 1996, Stone did not take any chips from Precision Pine and Precision Pine stored the chips that it produced at its mill yards. PPFF 1128. On April 22, 1996, however, Precision Pine and Stone entered into a contract whereby Stone again agreed to accept Precision Pine's entire output of chips for $17.00/ton and to purchase the chips that Precision Pine had produced from January 15 to April 15, 1996 at the new contract price of $17.00. Id.

Defendant complains that Precision Pine did not make any deduction for the three-month suspension of chips sales to Stone. However, as noted above, Stone did purchase the entire backlog of chips produced during those three months, albeit at the new contract price of $17.00/ton. At trial, Mr. Ness estimated that the purchase of the backlog of chips at a price of 17.00/ton rather than the old price of $18.25/ton would have resulted in a reduction in plaintiff's chip revenue during the suspension of between 5 and 10 thousand dollars. PPFF 1129. Accordingly, Precision Pine has proven its lost profits

on chips with reasonable certainty to be $674,724.18, i.e., Precision Pine's claimed lost profits on chips of $682,224.18 (PX 131, Ex. 4, p. 27) minus $7,500 for the reduction in the price paid by Stone for the chips produced by Precision Pine from January 15, 1996 through April 15, 1996.[63] PPFF 1130, 1167.

(ii) Bark

As Mr. Tenney testified, Precision Pine has since, well before the suspension, sold bark to Western Organics (Tr. 2985-86 (Tenney)), a landscaping company.[64] See also Tr. 609 (Porter). Defendant complains, nevertheless, that Precision Pine's Bark Ledger (PX 316) does not reflect sales of bark. This is not correct. The Bark Ledger in fact records actual invoice numbers, amounts billed and billing dates. Tr. 2654-55 (Ness). See PX 316, III (c)-3 through (c)-29. Based on the Bark Ledger, Mr. Ness determined Precision Pine's rate of bark production in tons/mbf (LT) (PX 131, Ex. 13) and multiplied it by the constant sales price of $20.58/ton during the suspension period which resulted in total revenue of $256,671.31. PPFF 132-6. As defendant correctly contends this works out to $8.23/mbf (LT).

Precision Pine's financial statements during the suspension period support this price. That is, plaintiff's financial statement for FYE 1996 shows total bark sales of $179,725.02 (PX 248). Based on corresponding total lumber production of 22,363,116 board feet (LT) (PX 246), this results in an average price of $8.03/mbf (LT). Precision Pine's financial statement for FYE 1997 shows total bark sales in the amount of $98,738.54 (PX 248). Based on total lumber production in FYE 1997 of 12,260,475 board feet (LT) (PX 246), this amounts to an average price of $8.05/mbf. Thus, Mr. Ness' determination that but for the suspension Precision Pine would have earned profits on bark at the rate of $8.23/mbf, which is within 2.4% of the actual rate of profits earned by Precision Pine during the suspension, is quite reasonable.

[63] In this regard, Precision Pine's financial statements show actual total chips revenue for FYEs 3/31/96 and 3/31/97 of $696,650.71. PX 247, Statement of Income for FYE 3/31/96 at 1, Statement for Income for FYE 3/31/95 at 1. This was during a period when Precision Pine's lumber production and hence its chip production was constrained due to the suspension.

[64] Western Organics "was the major purchaser and always has been of [Precision Pine's] bark product." Tr. 2985 (Tenney). PPFF 1125.

Relying on a "summary," DX 831, prepared by its disqualified expert, Mr. Adkins, defendant, nevertheless, asserts that between April 1, 1994 and March 31, 1996, a period which covered seven of the 16 months of the suspension, plaintiff "earned only $5.87 per mbf (LT) from bark." D's Br. at 44. However, once again Mr. Adkins' analysis does not support defendant's contention. That is, Mr. Adkins' "summary" is actually for bark revenue received by plaintiff between April 1, 1993 and March 31, 1995, i.e., two fiscal years that occurred prior to the suspension on August 25, 1995. DX 831. Indeed, defendant presented no evidence that the price of bark was the same during the suspension as it was prior thereto.

(iii) Shavings

In opposition to Precision Pine's claim for lost profits on shavings, defendant complains that plaintiff had no output contract to sell shavings and presented no invoices reflecting sales. D's Br. at 45. Mr. Porter did, however, identify customers for shavings by testifying that Precision Pine generally sold its shavings to Arabian horse farms in Scottsdale, Az. Tr. 617 (Porter). Moreover, as was the case with bark, Precision Pine maintained a shavings ledger wherein it recorded actual sales of shavings by invoice number. PX 316. Thus, defendant's complaints are unfounded.

Defendant further asserts that from April l, 1994 to March 31, 1996 plaintiff earned no revenue from shavings.[65] Without citation to any evidence, defendant even sets forth reasons for this, i.e., plaintiff used the shavings at its pellet plant and/or in its wood waste fired boiler. D's Br. at 45. Contrary to the scenarios that counsel for defendant weaves, however, Precision Pine's financial statements covering the suspension period disclose that during FYE 3/31/96 it earned $18,251 from the sale of shavings and in FYE 3/31/97 it earned $14,057.97.[66] PX 248. Moreover, the testimony at trial indicated that the volumes

[65]In support of this incorrect assertion, defendant purports to rely on a summary exhibit (DX 831) prepared by Mr. Adkins, its disqualified expert, which, however, only covers a period ending on 3/31/95.

[66]To the extent that defendant's citation to the pre-suspension 3/31/95 financial statement is relevant to this issue, that financial statement shows that although plaintiff did not have a line item for shavings sales at that time, it did record in excess of $266,000 in miscellaneous sales. PX 248. The

shown in plaintiff's Shavings Journal (from which Mr. Ness derived plaintiff's production rate for shavings (PPFF 129)) did not include amounts that went to the pellet plant. Tr. 1937 (Porter).

Indeed, as Mr. Porter testified, given that shavings were used in the pellet plant and, due to the breach, Precision Pine experienced reduced shavings production, Precision Pine could have also brought a claim for the reduced pellet production and sales that it experienced. Tr. 1935-1936 (Porter). However, in the interest of simplicity, Precision Pine based its entire shavings claim on shavings that, but for the suspension, would have been produced and sold to third parties during the suspension period.[67] Id.

(iv) Grindings

Defendant also argues that because Precision Pine did not have an output contract for grindings or show grindings revenue on its "profit projections" that no revenue would have been generated from the production of grindings. The profit projections do not show shavings revenue either, but, as noted above, the financial statements demonstrate that shavings were in fact sold by Precision Pine. PX 248, FYE 3/31/96 and thereafter. Moreover, Precision Pine's financial statements (PX 248) indicated amounts for "miscellaneous sales" that included the sale of grindings. Tr. 2661 (Ness).

(v) By-Products Revenue As A Whole

As a practical matter, there is little disagreement between the parties with respect to plaintiff's by-product revenue. That is, Mr. Moosman, the only expert for defendant who offered any testimony with respect to by-products, stated that based on its financial statements Precision Pine earned $29.41/mbf in FYE 1996 and $29.18/mbf in FYE 1997 in by-product revenue. DX 777 at 139. Mr. Moosman determined that, in total, Precision Pine would have earned $767,230 in by-products sales during the

---

logical conclusion is that prior to FYE 3/31/96 shaving sales were simply included in miscellaneous sales on the financial statements and thereafter broken out separately. See discussion infra regarding grindings.

[67] As to defendant's claim that Precision Pine used shavings in its waste fired boiler, Mr. Porter testified that such was "rarely" the case and that he had personally dismantled the pipe by which this had been accomplished in the past. Tr. 1941 (Porter). Moreover, even assuming that Precision Pine used shavings in its boiler during the period of the suspension to fire its boiler (for which there is no evidence), any lack of shavings would have resulted in additional costs for propane gas to fire the boiler.

suspension. In his calculations, however, Mr. Moosman assumes that by-products were generated from a volume of lumber determined by application of an overrun factor of 1.1 rather that 1.25. Adjusting Mr. Moosman's lumber production figures to account for this discrepancy increases his determination of by-product revenue as well and changes Mr. Moosman's calculations as follows: $767,230 x 1.15 = $882,314.50.

Because he could find no specific line item denominated "grindings" on the financial statements, Mr. Moosman did not credit Precision Pine with any revenue for the sale of grindings. Tr. 5157-59. Mr. Moosman acknowledged, however, that the FYE 1996-1997 financial statements both had line items for miscellaneous sales, which could have included grindings revenue. Id.[68] Crediting plaintiff with the grindings revenues as determined by Mr. Ness, brings Mr. Moosman's total by-products revenue to $991,739.37, i.e., $882,314.50 (by-products revenue without grindings + $109,424.87 (grindings revenue)).

Finally, Mr. Moosman admitted that he deducted by-products revenue associated with the cancelled timber on the Mud sale in the amount of $43,340. See PX 777; Tr. 5164-65. Precision Pine does not agree with this approach. See discussion supra at 18-19. Simply adding that amount to Mr. Moosman's calculation of by-products results in total by-products revenue of $1,035,079.3, which is 92% of the adjusted by-products revenue ($1,129,387.04) calculated by Mr. Ness. PPFF 1129. Thus, upon the Court's determination of the appropriate overrun factor, grindings revenue and treatment of the government's cancellation of the Mud sale, Precision Pine's lost by-products revenue largely resolves itself.

4. Mr. Ness' Calculation Of Profits In The Post-Suspension Period, Though Unnecessary To The Determination Of Damages In This Case, Is Reasonably Certain.

[68]Indeed, as noted above, Mr. Ness testified that he saw records of miscellaneous sales transactions involving grindings. Tr. 2661 (Ness). Mr. Moosman did not credit Precision Pine in any way for its miscellaneous sales. Tr. 5393 (Moosman).

Defendant contends that it is entitled to offset the profits that plaintiff earned on the breached contracts in the post-suspension period from the profits it lost during the suspension.[69] Defendant even implies that it is entitled to offset alleged profits that plaintiff would have made on the portions of the sales that were never even harvested.[70] D's Br. at 16 n.9. Defendant's contention, however, depends on whether plaintiff is a lost volume seller. Precision Pine, 63 Fed.Cl. at 133 ("In the event that Precision Pine is a 'lost volume seller,' it would not be required to offset the profits from its post-suspension harvesting"). For all of the reasons set forth supra at 8-10 and in P's Br. at 44-47, plaintiff has demonstrated that it is a lost volume seller.

Moreover, even assuming that the defendant is entitled to offset profits made in the post-suspension period (which it is not), and assuming even further that the burden is on plaintiff to establish the amount of that offset,[71] none of defendant's arguments demonstrate that plaintiff has not calculated those profits with reasonable certainty.[72]

Defendant asserts that plaintiff's calculation of post-suspension profits improperly deducted the

---

[69]Defendant has not attempted to quantify the amount of this putative offset.

[70]Of course, had harvesting this timber been profitable late in the post-suspension period, as defendant claims, of course, Precision Pine would have harvested it.

[71]As the Court will recall, plaintiff argued that the amount of the offset, if any, to which defendant is entitled should be proven with reasonable certainty by defendant. The Court did not agree and instead required plaintiff to "consider the beneficial effects of **mitigation** in its damage calculations." Precision Pine, 63 Fed.Cl. at 133 (emphasis supplied). Plaintiff continues to respectfully except to this ruling. See, e.g., Franconia Assocs. v. United States, 61 Fed.Cl. 719, 741 (2004) (With respect to the issue of mitigation of damages, the burden shifts to the breaching party to show that the injured party's efforts at mitigation were unreasonable, citing T.C. Bateson Constr. Co. v. United States, 319 F.2d 135, 160 (Ct.Cl. 1963). Accord, Globe Savings Bank, FSB v. United States, 65 Fed.Cl. 330, 349 (2005), Long Island Savings Bank v. United States, 67 Fed.Cl. 616 (2005).

[72]Defendant complains that in calculating the post-suspension profits, Mr. Ness "accepted without analysis . . . an alleged overrun factor, and alleged product mixes." Of course, Mr. Ness used all of the same factors that plaintiff had used in calculating lost profits in the suspension period, which defendant argued were too high and served to increase Precision Pine's profits. The application of these same factors in the post-suspension period also served to "increase" the amount of profits earned on the sales during that time period.

government's claim for default damages on the breached sales from the profits it actually made on the sales. D's Br. at 46. Defendant cites no law, expert opinion or other evidence in support of its argument, but merely asserts that there is "no basis" for doing so. This assertion is not true. But for the suspension, all of the contracts would have been harvested during the period of the suspension and, *ipso facto*, none would have been subject to default proceedings in the post-suspension period. As Mr. Ness testified, his post-suspension report quantifies the total financial impact of the breached sales to Precision Pine in the post-suspension period and, therefore, the cost of the defaults, which directly impacted the profitability of these sales, must be taken into account. PPFF 1405.[73]

Moreover, to allow defendant to reduce the amount that it owes plaintiff without regard to these costs sustained by Precision Pine during that same time would put plaintiff in a worse position than it would have been in had the breach not occurred. Allowing defendant to offset profits without regard to the cost of the defaults artificially increases the profitability of the sales in the post-suspension period. More importantly, it is apparent that defendant will continue to pursue a separate recovery of these same default damages in Precision Pine & Timber, Inc. v. United States, No. 02-131 (Fed.Cl.). Allowing the government both to ignore the cost of the defaults in the post-suspension period, thereby presuming that the contracts were much more profitable than they actually were, and to recover those very same default damages from Precision Pine in No. 02-131 would be to confer a double benefit on the government for the value of the defaults. This is improper. Tr. 2463-64 (Ness).

Defendant next argues that plaintiff's calculation of post-suspension profits is not reasonably certain because it used the actual logging and hauling costs it incurred in the post-suspension period to do so. This, defendant asserts, "improperly" reduced the profitability of those sales. D's Br. at 47. Quite

[73]Dr. Neuberger, the only one of defendant's experts who testified regarding Mr. Ness' determination of post-suspension profits acknowledged that he had no expert opinion as to whether Precision Pine's deduction of the default damages from the profits earned on the breached sales was appropriate. Tr. 3547 (Neuberger). Defendant has simply proffered no testimony or other evidence on the matter and, accordingly, Precision Pine has carried its burden in this regard.

frankly, defendant's assertion is absurd. The actual costs that Precision Pine experienced are the only appropriate costs to use in determining the actual profitability of these sales when harvested. For obvious reasons, defendant has provided no testimony or case law to the contrary.

Defendant's third argument is that plaintiff's calculation of increased overhead costs during the suspension period is not reasonably certain. D's Br. at 47. Whether defendant likes it or not, the fact remains that plaintiff's overhead costs per mbf of lumber produced in the post-suspension period were a good deal higher than they were during the suspension period. PX 182, Ex. 9. Accordingly, such actual cost increases must be taken into account in determining the post-suspension profitability of the breached sales if plaintiff is not to be put into a worse position by defendant's breach. Tr. 2815 (Ness).

Defendant argues that the baseline for manufacturing overhead used by Mr. Ness of $33.71/mbf (LT), i.e., the manufacturing overhead that plaintiff would have incurred during FYE 3/31/96, is inappropriate because it assumes sawmill operations at full capacity on some volume that was not available due to the breach. D's Br. at 47. As Mr. Ness explained, however, FYE 3/31/96 is an appropriate baseline year because it is the closest year to the post-suspension period in which there was sufficient lumber volume actually produced to derive a good overhead calculations. Tr. 2827-28, 2446 (Ness). As Mr. Ness also testified, FYE 3/31/95 or even FYE 3/31/94 could have been used as the baseline year, and the result would not have been much different since his investigation disclosed that the manufacturing overhead rates in those years did not vary significantly from the baseline that he used. Tr. 2826-27 (Ness). The reasonableness of Mr. Ness' calculation of manufacturing overhead rate as $33.71/mbf (LT) in the baseline FYE 3/31/96 is also confirmed by the fact that by FYE 3/31/99 plaintiff was actually achieving a slightly lower manufacturing rate of $33.20/mbf (LT), even though its level of production was considerably lower and general conditions were worse in FYE 3/31/99 than they had been

in FYE 3/31/96. Tr. 5651-52 (Ness).[74]

Just as he had done with manufacturing overhead, Mr. Ness also determined that using FYE 3/31/96 as the baseline was the best way to determine the amount by which G&A per mbf of lumber increased in the post-suspension period. Tr. 2828 (Ness). Use of FYE 3/31/96 as a baseline is again supported by Precision Pine's actual experience, i.e., the rate of 7% for FYE 3/31/96 was just slightly higher than the approximately 6.2 % rate Precision Pine had achieved in FYE 3/31/95. Tr. 2726-28, 2828 (Ness). Had Mr. Ness used the FYE 3/31/95 rate, there would have been an increase in the disparity between the baseline year and the post-suspension, which would have further reduced the profitability of the sales in the post-suspension period. Accordingly, Mr. Ness' calculation of increased overhead G&A costs in the years immediately following the suspension by using FYE 3/31/96 as a baseline is reasonably certain and, if anything, conservative.

Defendant also challenges Mr. Ness' calculation of increased manufacturing overhead and G&A during the post-suspension period on the basis that the increases are largely a function of the lesser overhead costs that plaintiff actually incurred during the post-suspension period being spread out over substantially diminished lumber production. D's Br. at 48. Although defendant erroneously asserts that it was the contraction of the timber and lumber markets, rather than the Forest Service's various failures to meet its contract obligations that caused plaintiff to scale back its business in the post-suspension period, the fact that cannot be avoided is that the scaling back occurred and that, as a result, plaintiff actually experienced much higher unit overhead costs in the post-suspension period. Therefore, if there is to be an offset, the increased overhead that Precision Pine experienced must be taken into account in order to

[74]Similar efficiencies were not, however, achieved at Precision Pine's planer because, in the years following the suspension plaintiff always had greater unused capacity at the planer than at the sawmills and, therefore, manufacturing overhead per mbf of production at the planer was a good deal higher in the post-suspension period than it had been in the baseline period. PX 182, Ex. 9. In any event, even if plaintiff were to remove the so called "phantom footage" to which defendant objects during the baseline year, this would only have effectively reduced the increased overhead costs in the post-suspension period at the planer by 40 cents/mbf. Tr. 5652-53 (Ness).

properly determine the financial impact that operating these sales in the post-suspension period had on the company. Tr. 2443-44 (Ness).

Finally, defendant's contention that the Forest Service's protracted breach "worked largely to Precision Pine's benefit" is ludicrous. The lone example cited by defendant of the alleged "benefit" that it bestowed on plaintiff by breaching its contracts involves the Hay sale, on which defendant claims that plaintiff "earned more" in the post-suspension period ($3.1 million) (citing PX 182, Ex. 2 at 21) than it would have earned in the suspension period ($2.8 million), citing PX 131, Ex. 4 at 21. A review of Mr. Ness' expert reports, upon which defendant purports to rely, however, readily exposes that defendant has compared the **net sales** line item for the Hay sale in the two periods. Of course, this comparison discloses nothing about the ultimate profitability of the sale. Had defendant correctly represented the facts, it would have indicated that plaintiff actually earned profits of $1,289,628.24 on the Hay sale in the post suspension-period (PX 182, Ex. 2 at 15), an amount which is a less than the $1,357,800.81 in profits that it would have earned had it been allowed to harvest and process the timber on the Hay sale during the suspension. PX 131, Ex. 4 at 21.

F. Precision Pine's Increased Mill Costs Caused By The Suspension Are Fully Recoverable.

1. Precision Pine's Increased Mill Costs Were Caused By The Government's Protracted Suspension and Breach.

Defendant argues that plaintiff's increased costs at its sawmills and planer mill cannot be attributed to specific breached contracts.[75] D's Br. at 50. What the significance of this would be if it were true is not discussed. In any event, however, defendant is incorrect. The fact remains that "but for" the suspension plaintiff would have operated at or near capacity during the suspension. PPFF 68. As Mr. Ness testified, the mill inefficiencies experienced by Precision Pine during the suspension were, as one

[75]In dealing with the recoverability of increased direct manufacturing costs (D's Br. at 48-56), defendant repeats numerous arguments that have been rebutted earlier in this brief. The repeated arguments and the references to where they are rebutted are set out in Appendix 1 hereto.

would expect, the result of the cumulative effect of the breaches. Tr. 2382-83 (Ness). Mr. Ness also explained that, to the extent it is necessary to assign a portion of the inefficiency at the mills to particular contracts, this could be easily and validly accomplished by simply prorating the damages at a given mill by the volume of timber from each contract that would have been processed at that mill. Id.[76] Mr. Ness so testified in response to cross examination as well:

> Q: But you can't tie specific amounts of the increased manufacturing costs that you are alleging to the breach of a specific contract?
>
> A: But I can tie them to the 11 breached contracts as a whole, and I could allocate them back [to specific contracts].

Tr. 2676 (Ness). At page 50 defendant also contends that inefficiencies due to the unavailability of St. Joe and Hutch-Boondock (the only two sales which the Court found had not been breached because they did not involve a breach of warranty under CT 6.25 and had only been suspended for approximately eight weeks) "should not be recoverable." This argument incorrectly assumes that plaintiff is seeking to recover for inefficiencies caused by the unavailability of this timber for eight weeks. During the suspension the sawlogs on both St. Joe and Hutch-Boondock were harvested and processed into lumber. PPFF 255. As such, these sales did not contribute to the manufacturing inefficiencies that plaintiff experienced. Rather, plaintiff's ability to harvest these sales and process the sawlogs from them caused Precision Pine's direct manufacturing cost per/mbf (LT) during the suspension (and hence its damages) to

---

[76]In a footnote, defendant argues that because Precision Pine also incorporates "increased sawmill costs" into the calculation of post-suspension profits, a recovery by Precision Pine of the increased manufacturing costs it sustained during the suspension would amount to a "double recovery." D's Br. at 48 n.30. This is patently false. The increased costs during the suspension that plaintiff seeks are the actual result of the inefficiencies caused by the suspension during that time and are, therefore, fully recoverable. The actual sawmill costs in the post-suspension period are just that -- the costs Precision Pine incurred to process the timber during that time period and, as such, are the only appropriate costs to be used in determining the post-suspension profitability of the breach contracts. In no way is Precision Pine advancing a "claim" for the recovery of increased mill costs in the post-suspension period.

be less than it otherwise would have been.[77]

2. Precision Pine's Mill Inefficiency Claims Were Foreseeable To The Forest Service.

Defendant argues that sawmill inefficiency costs do not result in the ordinary course from the suspension of a timber sale contract. D's Br. at 52. In doing so, however, defendant ignores two key aspects of the suspension: (1) that at all times relevant to this case plaintiff, like all sawmill operators in Northern Arizona, was dependant upon Forest Service timber sale offerings (both those under contract and new offerings) to run its sawmills (PPFF 7); and (2) the entire Forest Service timber sale program, including sales under contract as well as the sale of new timber contracts in the states of Arizona and New Mexico was suspended on August 25, 1995 as a result of Silver v. Babbitt.[78] In such circumstances, not only was it entirely foreseeable to the Forest Service that mill impacts would result from a protracted, region-wide suspension, as the evidence in this case indicates, the Forest Service actually and accurately predicted this very result. PPFF 196-198; see also PPFF 170, 171,173, 175-181, 185-188, 194, 195, 199-202; Precision Pine, 63 Fed.Cl. at 131 (It was likely long-known to the Forest Service that "the logging season is restricted and a suspension can cause a contractor to lose an entire year of production, and such a loss can result in lost profits and several sawmills going out of business permanently"). Thus, contrary to defendant's contention, no "special circumstances" unique to plaintiff were at play about which the

[77]The volume of timber produced from these two sales is included within the total of 23,677,384 board feet of lumber that plaintiff actually produced from September 1, 1995 to March 30, 1997 (PX 131, Ex. 16) and which was used to calculate Precision Pine's direct manufacturing cost per mbf (LT) for that period ($93.03). Had the volume of lumber produced from these sales not been included, direct manufacturing cost per mbf would have been greater.

[78]Defendant also asserts that for lost profits to be recoverable, a lack of cover must also have been foreseeable to the Forest Service. Defendant cites no case law in this Circuit for the proposition, but even assuming that it is correct, the Forest Service was well aware that timber purchasers in northeastern Arizona were dependant on the Forest Service timber sale program as the primary source of raw material (PPFF 7). Accordingly, a region-wide injunction of the Forest Service's timber sale program would not simply make the unavailability of cover reasonably foreseeable but, in fact, would make it a virtual certainty.

Forest Service was not aware at the time of contracting; rather, at all times the natural result of a protracted, region-wide suspension was clear to the Forest Service.[79]

To rebut the mountain of facts showing that mill impacts resulting from the suspension were entirely foreseeable, the government presents the testimony of three contracting officers. Each was simply asked whether he or she had received or addressed claims for sawmill inefficiency in the past, to which each responded "no." Tr. 4134 (Harris); Tr. 4559 (Lee); Tr. 4637-38 (Dils). This testimony is hardly dispositive of the issue. It merely indicates in the limited time that these individuals had been contracting officers prior to August 25, 1995 they had never been presented with a mill inefficiency claim. See PPFF 1402-1404.

Finally, defendant again points to Scott Timber in support of its contention that increased sawmill costs are not recoverable at common law. As this Court has already found, however, this argument "overstates the precedential value of Scott Timber." Precision Pine, 63 Fed.Cl. at 136 The issue before the court in Scott Timber was one of contract interpretation, not common law breach, id., moreover, the holding of the court was expressly limited to facts of that case. Id. It is long past time for defendant to refrain from improperly relying on Scott Timber in this breach of contract action.

3. Precision Pine's Calculation Of Its Increased Mill Costs Is Reasonably Certain.[80]

Defendant's first complaint with plaintiff's calculation of its increased mill costs is that Mr. Ness "skewed" the analysis by comparing the actual costs incurred during the 19 months of production that were impacted by the suspension that included two winters, with a baseline of costs incurred by plaintiff in the 17 months immediately prior to the suspension that only included one winter. D's Br. at 53.

---

[79]As noted above at p. 24, it is also entirely appropriate under the law of this circuit to consider the issue of foreseeability at the time of breach.

[80]At pages 54-55 defendant reprises, but does not develop, a medley of arguments from earlier in its brief. Each of these arguments have been dealt at the points indicated in Plaintiff's App. of Arguments Which Defendant Raises on Multiple Occasions.

Defendant's complaint hinges on its belief that, because production was lower in winter months, comparison of the period impacted by the suspension with a baseline period containing one winter artificially increased the costs during the period of the suspension. As Mr. Ness testified, however, if defendant's contention were true, then costs always should have been lower during winter months than in non-winter months. Tr. 2381-82 (Ness). This was not the case at Precision Pine, which sometimes experienced lower costs in non-winter months. Id., discussing PX 131, Ex. 10 (weather is not a factor in sawmill operations). See also Tr. 2673-74 (Ness).

Based on the incorrect premise that "most" of the contracts were unprofitable during the suspension period (which premise is rebutted at 12-13, as well as in plaintiff's comments to DPFF ¶¶ 583-91) on page 54, defendant asserts that plaintiff would have "deferred harvesting and reduced the pace of sawmill operations." Defendant does not specify when, for how long, or on which sales this alleged deferral would have taken place. Additionally, the "evidence" it cites in support of this contention proves nothing, i.e., Mr. Porter's innocuous testimony that profitability was "a factor" in determining when to harvest and defendant's wholly bogus claim that plaintiff's logging subcontractor anticipated that Precision Pine would be closing one of its sawmills.[81] See supra at pp. 28 n.40.

Based on a variety of fallacious underpinnings, at pages 49 and 55, defendant also asserts that Mr. Ness' calculation of Precision Pine's mill inefficiency costs was inappropriately done on a total cost basis, i.e., was based on the difference between total costs incurred by the contractor in the performance of the contract and its bid price. Cavalier Clothes v. United States, 51 Fed.Cl. 399, 417 (2001). Here, Precision Pine has not used a total cost approach to calculate the inefficiency of its mills during the suspension nor

---

[81]On page 55 defendant also alleges that, due to the availability of the breached contracts, plaintiff "should have experienced efficiency gains" in the post-suspension period and that plaintiff should have credited defendant for these alleged efficiency gains. There is no evidence and defendant cites none to show that the efficiency that Precision Pine experienced in the post-suspension period was any higher than that which would have been achieved if there had been no suspension. To the contrary, it is abundantly clear that Precision Pine's operations in the post-suspension period were not as efficient as they had been prior to the breach, let alone more efficient. PPFF 387-92.

does defendant point to any evidence of deficiencies in Precision Pine's proof of this element of its damages. What Precision Pine has done is provide details of the actual production costs experienced during the period in question, production costs in the period of normal efficiency that immediately preceded the suspension and an explanation of why those costs differ. As Professors Nash & Cibinic indicate, comparing the period when the loss of efficiency occurred to a period during which efficiency was normal is "[o]ne of the most common techniques used in estimating loss of efficiency." Ralph C. Nash Jr. and John Cibinic Jr., ADMINISTRATION OF GOVERNMENT CONTRACTS, 3rd ed., 1995 at 746. Accord Danac, Inc, ASBCA No. 33394, 97-2 BCA ¶ 29,184 (citing U.S. Industries v. Blake Construction Co., Inc. 671 F.2d 539, 547 (D.C. Cir. 1982)); International Terminal Operating Co., ASBCA No. 18118, 75-2 BCA ¶ 11,470 (1975).

G. Precision Pine's Increased Hauling Costs On The Hay Sale Were Caused By The Forest Service's Breach.

The facts supporting Precision Pine's claim for increased hauling costs on the Hay sale in the winter of 1996-1997 and again in 1998 are set forth at P's Br. at 57-64 and will not be repeated here.

1. The Increased Hauling Costs On The Hay Sale Were A Reasonable Effort By Precision Pine To Mitigate Its Damages Caused The Forest Service's Breach.

Defendant argues that the cost of hauling logs from the Hay sale to the Winslow (rather than the Eagar) sawmill in the winter of 1996-1997 was a cost that Precision Pine "freely chose to incur" and which should, therefore, not be charged to defendant. D's Br. at 57. Defendant ignores the fact, however, that when the suspension was finally lifted in December of 1996, the sale, due to its elevation, with the greatest likelihood of extended winter logging was Hay. PPFF 382. Defendant complains that there were two other unidentified sales that were scheduled to be milled at Winslow, that had normal operating seasons that ended on December 31, 1996 and, therefore, might have been harvested to supply the Winslow sawmill. Regardless of whether this is true, it was plaintiff's judgment that the best way to ensure the availability of sawlogs sufficient to maintain operations at its Winslow sawmill and to also recommence operations at Eagar was to supply both sawmills by harvesting the Hay sale immediately.

Not only was this strategy reasonable but it worked, as the Winslow mill remained in continuous operation throughout the winter of 1996 and the Eagar mill was reopened by mid-February 1996, barely two months after the suspension was lifted. PX 163.

Had Precision Pine not achieved this favorable result, its claim for sawmill inefficiency costs would have increased significantly. In such circumstances, defendant would doubtless have argued that it should have mitigated its damages by harvesting logs from the Hay sale to supply both mills. In short, defendant is simply "spin[ning] out a tangled web of damage-reducing hypothetical events in the hopes that the injured party would become ensnared in failing to disprove at least one of them." Franconia Assocs. v. United States, 61 Fed.Cl. at 750. As the cases make clear, this is improper and the burden is on defendant to prove that plaintiff's successful efforts to mitigate its damages by resuming operations on Hay was somehow unreasonable; something that defendant has not done.

With regard to the increased costs to haul sawlogs from the Hay sale to the Heber sawmill following the permanent closure of Eagar in July of 1997, there is no dispute that (1) the Hay sale would have been profitable during the period of the suspension (D's Br. at 22) and, therefore, that (2) "but for" the Forest Service's breach, Hay would have been harvested to completion during that period. As cases set forth in P's Br. at 51-52 n.36 indicate, where, as here, the government's breach forces a contractor's performance into a period when costs are increased, the government is liable for those increased costs.

Defendant's citation to Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1071 (Fed.Cir. 2001), for the proposition that costs that are increased as a result of an independent business decision are not recoverable, has no application to the increased hauling costs claimed by Precision Pine. In Hughes, the government breached its contract to launch Hughes' satellites in the wake of the space shuttle *Challenger* disaster. Hughes covered by finding substitute means to launch its satellites and then filed suit for its increased costs. One of the items for which Hughes sought recovery was the cost of insurance to cover the risk of a failed substitute launch. The original space shuttle launch contract had provided Hughes with a restricted right, should a shuttle launch fail, to have another satellite

launched for free; a right which the trial court found was "so limited that its value was questionable." 47 Fed.Cl. at 246. In securing cover, rather than purchasing insurance that provided Hughes with rights comparable to those under its contract with the government, Hughes opted (and paid higher premiums) for insurance that provided for a cash refund if a launch did not take place. Id. The trial court, after awarding plaintiff in excess of $102,000,000 in breach damages, rejected Hughes' claim for the increased costs of insurance because "The evidence did not establish that the options Hughes chose were comparable to what they would have received under the [original space shuttle contract]." Id.[82]

Here, unlike the situation in Hughes, plaintiff s damages are not based on the comparability of cover to what was to have been provided under the breached contract. Plaintiff simply seeks the difference between performing the hauling that was contemplated under the original contract, i.e., to the Eagar sawmill, and the hauling that it had to do because of the changed circumstances (the inability to sustain operations at the Eagar sawmill) into which its performance was forced by the Forest Service's breach. Hughes does not speak to, let alone preclude, the recovery of such increased costs.

2. Precision Pine's Increased Hauling Costs Were Foreseeable.[83]

Defendant asserts that plaintiff's increased logging costs do "not follow in the ordinary course from the suspension of a timber sale contract" and, therefore, were not foreseeable. D's Br. at 59. In support of this contention, defendant again points to the testimony of three contracting officers who stated that, based on their limited experience of not having received claims for increased logging costs in the past, they did not think that such costs necessarily arose from "a contract" suspension. Tr. 4133-34 (Harris); Tr. 4558-59 (Lee); Tr. 4637 (Dils). Such testimony is certainly not dispositive of the issue of

[82]On appeal the Federal Circuit simply found that the trial court had not abused its discretion in so ruling because the original contract had not provided such insurance and Hughes had not been required to obtain it. Hughes, 271 F.3d at 1071.

[83]The foreseeability of Precision Pine's increased costs of hauling the Hay sale due to the unavailability of the Eagar sawmill was demonstrated in P's Br. at 60-61. In the instant brief plaintiff will only address new arguments raised by defendant.

foreseeability nor, more importantly, does it speak to what was foreseeable to the Forest Service in the circumstances of this case. As this Court found, it was likely long known to the Forest Service that a suspension of the magnitude that occurred in this case would result in the closure of sawmills, perhaps permanently. 63 Fed.Cl. at 131. It disingenuous in the extreme for defendant to maintain the litigating position that it could not have foreseen a purchaser's need to haul timber a greater distance in the wake of sawmill shutdowns caused by the protracted and wide-spread suspension in this case.

Defendant also argues that plaintiff's increased hauling costs are the result of "special circumstances," i.e., the processing of the Hay sale at the Eagar sawmill, of which the Forest Service was unaware because the Eagar sawmill had not been opened at the time of contracting.[84] First, as this Court found at summary judgment, "the existing rule requires only reason to foresee, not actual foresight. . . . It is erroneous, therefore, to refuse damages for an injury merely because its possibility was not in fact in contemplation of the parities at the time they made the contract." 63 Fed.Cl. at 130. By virtue of the Forest Service's method of appraising the timber, it was aware both of the distinct possibility of the sawlogs from the Hay sale being hauled to a sawmill in Eagar and the probability that this material would have, thereafter, been hauled to a planing facility more distant. P's Br. at 60; PPFF 374-5. This awareness was compounded by the fact that it was entirely foreseeable to the Forest Service (and actually foreseen by it) that the protracted and wide-spread suspensions at issue in this case would result in sawmill closures and the need to haul timber a greater distance to a sawmill that was still operating. Nothing more is required.

---

[84]Defendant argues, without citation to any authority, that the "time of contracting" with Precision Pine is the date of award of the Hay contract to another purchaser in January of 1990. This is not correct, as the Hay timber sale contract was subsequently transferred to Precision Pine by a contract entered into between the Forest Service and Precision Pine dated June 24, 1991. PX 169 at p. Hay 172. In any event, regardless of the time of contracting, as this Court found at summary judgment, there is good reason to assess foreseeability, especially in a case of delay, from the date of the breach and not at the time of contracting. Precision Pine, 63 Fed.Cl. at 130; see also p. 24 supra.

3. Precision Pine's Calculation Of Its Increased Hauling Costs Is Reasonably Certain.

In an effort to undercut plaintiff's calculation of increased hauling costs, defendant repeats and even expands on its argument that logging and hauling costs should have been derived from a line item in Precision Pine's year-end financial statements. D's Br. at 60-61.[85] Defendant's new approach is not discussed, let alone endorsed, in the report of any of its experts. Defendant's new approach is also flawed in several fundamental ways. First, with respect to the increased hauling costs during the winter of 1996-1997, plaintiff hauled logs from Hay to both the Winslow and Eagar sawmills. PPFF 383. Accordingly, the costs in plaintiff's financial statement for FYE 3/31/97 necessarily combine the costs to haul timber from Hay to Winslow with the lower costs of hauling logs from Hay to Eagar. As such, it is not possible to use the total year-end costs to accurately determine the cost of hauling logs to Winslow alone. Moreover, as noted supra at 42, defendant's contention that logging and hauling rates should have been determined on each sale by referencing the total amount indicated in its financial statement for the fiscal year is absurd. In sum, the "Corrected Hauling Costs" calculations set forth at DA3 are meaningless.

Defendant also complains that plaintiff's claim for overhead and profit on its increased hauling costs is a "bold and baseless attempt to inflate claimed damages." D's Br. at 61. Defendant provides no authority in support of its rhetoric and, as demonstrated in P's Br. at 63-64, 66 n.47, there is ample authority for the proposition that both overhead and profit are appropriate components of increased costs resulting from a breach of contract, such as the increased hauling costs that plaintiff seeks to recover here.

---

[85]Defendant now contends that the proper way to calculate the increased cost that Precision Pine incurred in hauling logs from the Hay sale area to Winslow rather than to Eagar in 1996-1997 and Heber rather than Eagar in 1998 is basically to (a) derive a per mbf rate for logging and hauling from Precision Pine 's financial statement for the requisite year (b) compare it to a rate for "pre-suspension Logging & Hauling costs" of $93.70 from some undisclosed source and (c) multiply the difference by the volume which Precision Pine was required to haul to a more distant mill. See D's App. at DA3.

## IX. Precision Pine's Claims For Out-Of-Pocket Expenses Under CT6.01 Are Fully Recoverable.[86]

### A. Precision Pine's Out-of-Pocket Expenses Incurred In Preparing Its Claim Letters Are Recoverable Under Clause CT6.01.

Contract clause CT6.01 provides for the recovery of "out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision." See, e.g., PX 170 at JRH-79. The only things excluded from the definition of out-of-pocket expenses are "lost profits, replacement cost of timber, or any other anticipatory losses." Id. Here, of course, it cannot be disputed that plaintiff's need to submit claim letters was caused directly by the suspension. Indeed, the Forest Service demanded that formal claim letters be prepared and submitted. PPFF 394. Moreover, plaintiff has provided authority demonstrating that costs incurred in CDA claim preparation under a timber sale contract are recoverable pursuant to CT6.01 and has further documented that under CT6.01 the Forest Service has previously paid costs incurred by a timber contractor in having its employees prepare claims. P's Br. at 65-66. Defendant does not address these authorities but, instead, relies primarily on Singer Co. v. United States, 215 Ct.Cl. 281, 568 F.2d 695, 721 (1977), which did not involve a timber sale contract, CT6.01, or any other clause that even arguably provided for the recovery of such costs.[87]

Apparently recognizing the weakness of its cited authorities, defendant asserts that the language of CT6.01 precludes the recovery of costs incurred in claim preparation. Notably, defendant does not deny that costs incurred as a result of the suspension are recoverable under CT6.01, but argues instead that the costs incurred were not "additional costs" because the employees who prepared the claims "were salaried employees who were not paid any additional amount as a result of the work on Precision Pine's claim letters." D's Br. at 64-65. This is absurd. First, defendant's premise is incorrect as Mr. Porter

---

[86]Defendant attacks plaintiff's claims for out-of-pocket expenses under contract clause CT6.01 by repeating its argument that a recovery may either be had under CT6.01 or for breach of contract, but not both. Plaintiff respectfully refers the Court to p. 11 supra, where this contention is rebutted.

[87]Defendant's citation to Wilner v. United States, 23 Cl.Ct. 241, 261 (1991), and Gulf Contracting, Inc. v. United States, 23 Cl.Ct. 525, 253 (1991), are, if possible, even less relevant as in both cases applicable regulations precluded the recovery of the costs sought by plaintiffs.

identified both salaried and non-salaried employees who were engaged in the extensive amount of work required to gather information and prepare the claim letters. Tr. 794-820 (Porter). More importantly, it is a truism that had the employees not been engaged in working on gathering information and preparing the claims, they would have been doing other work to the benefit of Precision Pine. Thus, the time spent on the claims was an additional cost to Precision Pine. See Tr. 1886-87 (Porter).

Finally, defendant argues that plaintiff has failed to produce documentation verifying the amount of the expenses incurred by it in preparing its claims. Mr. Porter testified, however, that he personally instructed his employees to keep track of the time each spent in gathering information and preparing the claim letters and to submit documentation to him of those hours. PPFF 396. It was based on this documentation that Mr. Porter personally calculated the expenses incurred by plaintiff in preparing its claims. Id. Mr. Ness reviewed these calculations and refined them further. PPFF 398-400. Notably, defendant does not dispute the hourly rate of any employee or the amount of time each employee spent in helping to prepare the claims. Indeed, given the sheer volume of data and complexity of plaintiff's claim letters (see, e.g., PX 194), the expenses that plaintiff seeks to recover for the preparation of the claim letters for the 13 contracts containing CT6.01 in the total amount of $23,219.04 are quite modest.

B. Precision Pine's Claims For Items Of Miscellaneous Damage Are Recoverable.[88]

1. Precision Pine Is Entitled To Recover Its Additional Bond Costs.

The bases for plaintiff's entitlement to these additional bond costs, which represent approximately half of the miscellaneous expenses sought by plaintiff, are set forth in P's Br. at 68.

2. Precision Pine Is Entitled To Recover Its Overhead And Profit On Move-Out Costs.

Defendant states that "Precision Pine seeks $2,000 in 'move-out costs' with respect to the Brookbank contract." Defendant misapprehends plaintiff's claim. Because the Forest Service paid

[88]Defendant disputes Precision Pine's entitlement to seven categories of miscellaneous damages incurred as a direct result of the suspension which, in the aggregate, total less than $20,000. Each of these are dealt with in P's Br. at 67-70 and again, to the extent necessary, in turn, herein.

$2,000 in response to plaintiff's claim letter seeking its move-out costs on the Brookbank sale, Precision Pine did not appeal and, therefore, never has sought to recover in this Court these move-out costs. Susan Lee, the contracting officer on the Brookbank sale, was called by defendant to testify at trial but did not in anyway call into question the Forest Service's decision to pay plaintiff's out-of-pocket expenses for move-out costs on Brookbank. In these circumstances, it is not possible for the Court to enter judgment in favor of defendant on Precision Pine's claim for move-out costs, as defendant suggests.[89]

Additionally, even assuming that defendant could seek review in this Court of the contracting officer's award to Precision Pine of its move-out costs (even though that decision has not been appealed), defendant has presented no evidence that it is entitled to any such recovery. Indeed, the only evidence that defendant cites in support of its contention that plaintiff would have moved off of the sale at the end of August 1995 is PX 131, App. A at 4, which simply shows that harvesting was projected on the Brookbank sale during the 3rd quarter of 1995. This in no way proves that, even if there had been no suspension, plaintiff would have moved off of the sale at the same time as the suspension forced it to do.

Plaintiff does contend, however, that it is entitled to its additional claim for overhead and profit, in the amount of $367.20, which the contracting officer denied. As demonstrated in P's Br. at 66 n.47, there is ample authority for the proposition that claims for both overhead and profit are appropriate items of out-of-pocket expenses recoverable under clause CT6.01.

3. Precision Pine Is Entitled To Recover Interest On Deposits As An Out-Of-Pocket Expense Under CT6.01.

---

[89]Defendant properly stops short of directly claiming that it is entitled to recover the $2,000 in move-out costs that the Forest Service paid to Precision Pine and, of course, no such affirmative claim was timely presented by defendant. In this regard, defendant's citation to Wilner v. United States, 24 F.3d 1397 (Fed.Cir. 1994), is unavailing (trial court rejected government's attempt to recover entire award made by CO because CO had never made demand for return of entire award. The only issue on appeal was the government's challenge to the portion of the award that had been appealed by the contractor. See id. at 1399 n.6). Accord Assurance Co. v. United States, 813 F.2d 1202, 1206 n.6 (Fed.Cir. 1987) (noting that the government's ability to challenge a CO's award to a contractor was limited to the "very same claim" appealed by the contractor).

Precision Pine's inability to use the cash (downpayments, deposits) or its equivalent (purchaser credits) that it had on deposit on the breached sales during the suspension was an out-of-pocket expense in the form of interest and, as such, is recoverable under contract clause CT6.01. Defendant argues that because contract clause CT6.01 does not "expressly" use the word interest, sovereign immunity bars the recovery. However, any fair reading of CT6.01 leads to the conclusion that interest is readily included within its purview. In this regard, even the Forest Service, i.e., the drafter of the clause, has the same understanding of CT6.01 as does plaintiff; namely, that "Out-of-pocket costs include interest on deposits." P's Br. at 69. Consistent with the agency's view (its present litigating posture notwithstanding), some contracting officers, in fact, paid interest on certain deposits in this case. PX 199, 203 and 207.

4. Precision Pine's Snow Removal Costs In January of 1996, Which Were A Direct Result Of The Suspension, Are Recoverable.

Plaintiff seeks $1,207.27 in snow removal costs that it incurred to access the Hutch-Boondock, St. Joe and South Black Aspen timber sales due to the suspension. Tr. 2205 (Ness).[90] At the time of the suspension, plaintiff had no intention of harvesting any of these sales in the winter of 1996. PX 131, App. A at 4. Indeed, as no harvesting had been projected for these sales, operations on them took place in the winter of 1996 only because they were among the few sources of timber available to plaintiff at that time. See Tr. 1916-17 (Porter). Accordingly, these items of damages for snow removal in January of 1996, which were incurred and paid by plaintiff as a direct result of the suspension, are fully recoverable under CT6.01.[91]

---

[90]To the extent that these costs are not compensable under CT6.01, they are recoverable as a consequential damage incurred by Precision Pine as a result of the breach of its contracts.

[91]Moreover, these costs are also costs of mitigation, because plaintiff incurred them in an attempt to keep its operations going and avoid even larger losses in the very difficult circumstances foisted on it by the Forest Service's simultaneous breach of 12 of its contracts. Accordingly, the burden shifts to defendant to prove that plaintiff was unreasonable in incurring these costs, something about which defendant has presented no evidence.

5. Precision Pine's Costs Of Transferring Logs From Eagar To Winslow In 1996, Which Were A Direct Result Of The Suspension, Are Recoverable.

Plaintiff seeks to recover $1,627.45 in costs it incurred when it transferred a small volume of logs that remained at its Eagar sawmill in October of 1996 due to the suspension. Tr. 2207-08 (Ness).[92] Again, but for the suspension the Eagar sawmill would have remained in continuous operation (PX 131, Ex. 7 at 3). However, due to the suspension, the Eagar sawmill was closed down in the winter of 1995 and remained closed for the remainder of the suspension. PX 163. Rather than lose the value of these few remaining logs at the Eagar mill site, plaintiff transferred them to Winslow. Tr. 2207-08 (Ness). This cost, paid by plaintiff in order to capture the value of the logs that would otherwise have been lost, is something that it incurred as a direct result of the suspension and is, therefore, compensable.

Defendant further complains, without citation to the record, that:

> the log transfer costs were incurred only because Precision Pine decided to haul logs from the Eagar mill yard to the Winslow sawmill, rather than continue to operate the Eagar mill for an additional half day.

D's Br. at 68. Defendant is again attempting to argue that plaintiff did not properly mitigate its damages. The burden is on defendant, however, to show that plaintiff's actions in incurring costs of $1,627.45 to transfer the logs to Winslow rather than operate the entire Eagar sawmill for another half day were not reasonable. Because defendant has cited no evidence in support of its claim, it has failed to meet its burden on this point.

6. Overhead And Profit Are Recoverable On Those Costs That Precision Pine Seeks To Recover Under CT6.01. [93]

---

[92]Defendant asserts that Precision Pine seeks the recovery of this item of damage as an out-of-pocket expense under CT6.01, this is not correct as it is simply an item of consequential damage incurred by Precision Pine as a result of the suspension and breach of its Forest Service timber sale contracts.

[93]At page 68, defendant again argues that plaintiff is not entitled to overhead and profit on direct costs that it seeks to recover under CT6.01. This point has been addressed at P's Br. at 66 n.47. Indeed, overhead and profit are appropriate on all items of direct cost which Precision Pine seeks to recover, regardless of whether they are sought under CT6.01. See P's Br. at 63-64.

Defendant contends that because CT6.01 excludes the recovery of "lost profits," plaintiff may not recover profit on an item of direct cost. This is absurd. The profit sought on the direct cost is not "lost profits," P's Br. at 66 n.47, but rather is that profit allocated to the cost which must be accounted for if a company is not simply to break even on its operations. See Tr. 2691-93 (Ness).

Similarly absurd is defendant's argument that "indirect costs" in the accounting sense may not be recovered under clause CT6.01 because the clause provides that to be reimbursable a cost must be the "direct result" of the suspension. Clearly, a cost that is "indirect" in the accounting sense may nevertheless be a "direct" result of suspension in the sense used in CT6.01, e.g., unabsorbed overhead, idle equipment cost.

**CONCLUSION**

Based on the discussion above and in its initial brief, plaintiff believes that it has satisfied the legal requirements for awarding the damages that it seeks. This includes having demonstrated the amount of its damages for each item with sufficient certainty so that the Court can make a fair and reasonable determination that plaintiff is entitled to that amount. For these reasons, plaintiff requests that the Court enter judgment in its favor in the amount of $7,043,468,83 plus interest under the Contract Disputes Act.[94] PPFF 1167.

[94]To the extent that the Court may, however, have some uncertainty as to the amount to which Precision Pine is entitled on any item(s), the case law provides it with alternative means to fairly compensate an injured plaintiff. For example, this Court may employ the jury verdict method when the plaintiff has shown: "(1) that clear proof of injury exists; (2) that there is no more reliable method for calculating damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of the damages." Raytheon Co. v. White, 305 F.3d 1354, 1367 (Fed.Cir. 2002), *reh'g denied* (2002).

A recent case presenting a variation on the jury verdict approach is Franconia Assocs., 61 Fed. Cl. at 718, wherein the court largely endorsed the damages methodology presented by the plaintiff, albeit with minor modifications. Therefore, the court remanded the calculation of damages to the parties to be completed in light of the court's rulings based on the evidence at trial. Id. at 769.

Thus, depending upon the findings of the Court in the instant case, a jury verdict approach or a remand to the parties for further calculations in conformity with the court's ruling on aspects of the damage claim could prove to be of assistance to the Court by allowing it to draw on the resources and experience of the parties and their experts in dealing with the damage calculations in this case.

Respectfully submitted,

s/Alan I. Saltman

SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
Bryan T. Bunting
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: November 14, 2005