**b. In the circumstances of this case no offset is, in fact, required**

In support for its position that in order to determine the profits lost as a result of the Forest Service's suspension, Precision Pine must offset "the revenues that it subsequently derived by harvesting these sales," defendant cites to Bluebonnet Sav. Bank, 339 F.3d at 1345 ("the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach"), and Miller v. Robinson, 266 U.S. 243, 257 (1924), which makes a similar statement. G's Br. at 26. However, as discussed in detail below, the absence of an offset in the instant case will not place Precision Pine in a better position than had there been no breach and, in fact, if such a deduction were made, Precision Pine would be in a far worse position than had there been no breach.[42]

It is not surprising that defendant offers little more than truisms to support its position that Precision Pine must offset any post-suspension profits made on the suspended timber. At deposition, defendant's putative expert on timber manufacturing damages testified that the totality of the reasons why post-suspension profits, both actual and potential, need be deducted were that: the timber cut after the suspension is the same timber as is in the claim, "it's the only thing that makes any sense," and equity, i.e., "you can't have your cake and eat it too."

---

[42]When the shoe is on the other foot and it is the Forest Service that is seeking damages for the breach of a timber sale contract by a purchaser, the Federal Circuit has held that the Forest Service is entitled to the difference between the contract price and value of the timber at the time of default irrespective of any future benefit which the government may derive from the unharvested timber, i.e., "[a]ny subsequent decision made by the government as to what to do with the timber land cannot negate the fact that [the purchaser's] breach deprived the government of the benefit of its bargain." Madigan v. Hobin Lumber Co., 986 F.2d 1401, 1406 n.4 (Fed. Cir. 1993). This fact notwithstanding, here the government seeks to reduce the damages due Precision Pine by every bit of benefit that the company may have derived subsequent to the government's material breach.



**APPENDIX 2**

Deposition of Charles Adkins at 221-23 [hereinafter "Adkins Dep."], P. App 462-464. Such reasoning, while superficially appearing to have logic, does not withstand scrutiny in the circumstances here, i.e., (1) this case involves a federal timber sale contract (one of the few situations in federal government contracting where the government is a seller of goods[43]), (2) the buyer is a constant quantity buyer/processor of such goods, (3) the goods were not made available in the time frame that the buyer planned to use them in its manufacturing facilities, and (4) the buyer lost volume as a result.[44]

In non-commercial situations involving the late delivery of goods, it may be appropriate to conclude that post-breach performance by a breaching seller obviates the non-breaching party's damages.[45] Unfortunately, this view is often the basis for some courts' initially negative reaction to a non-breaching commercial buyer's claim for cover costs or lost profits caused by the seller's initial failure to deliver while retaining the profits that it made on its subsequent use and/or disposition of the late-delivered goods.

This view, however, fails to recognize both the state of the law and the fact that in the commercial world, given buyers' frequently more critical needs, late delivery is often not a cure-all. See generally 3 E. Allan Farnsworth, FARNSWORTH ON CONTRACTS (2nd ed. 1998) (hereinafter "Farnsworth") § 12.11 at 221. Moreover, in many commercial circumstances, the

---

[43]As set out in Uniform Commercial Code ("U.C.C.") § 2-107, the sale of standing timber to be severed by the buyer is a transaction involving the sale of goods.

[44]This presents a radically different situation than one involving a standard procurement contract where the government is the buyer of goods and services.

[45]See the simple example set forth in Alan I. Saltman, Must Profits Made In Transactions Involving Late-Delivered Goods Be Deducted From The Injured Party's Breach Damages? If Not, What Impact Should Late-Delivered Goods Have?, 78 St. John's L. Rev. 131, 132 (2004) (hereinafter "the Article").

injured party may have "lost volume" because of the breach.[46] See U.C.C. § 2-708(2) (the basis in the Code for recovery for lost volume); Anchor Sav. Bank, 59 Fed. Cl. at 126. Indeed, to many resellers or manufacturers the failure of a supplier to make timely delivery may result in a lost opportunity that can never be recovered. John Hackley, Note, U.C.C. Section 2-714(1) and the Lost-Volume Theory: A New Remedy for Middlemen?, 77 Ky. L.J. 189, 219 (1989). In such situations, not considering post-breach transactions which the breaching party asserts constitute mitigation is entirely appropriate. Fertico Belgium S.A. v. Phosphate Chemicals Export Assoc., Inc., 517 N.Y.S.2d 465 (1987); Aluminum Distributors, Inc. v. Gulf Aluminum Rolling Mill Co., 1989 WL 157515 (N.D. Ill.). See United International Holdings, Inc. v. Wharf (Holdings) Limited, 210 F.3d 1207, 1230-31 (10th Cir. 2000).

That the non-breaching party has actually "lost volume" is most apparent where, as here, Precision Pine was unable to cover, and, but for the breach, would have manufactured the sawlogs from the breached contracts into lumber products in 1995, 1996 and early 1997, sold those products and would still have entered into subsequent lumber sales in 1997 and 1998 using other sawlogs to manufacture that lumber. Porter Decl. ¶¶ 32, 34, P. App. 651.[47] (Indeed, in

[46]That is, the total volume that the non-breaching party would have provided/produced/ sold was reduced by the breach, i.e., even though the goods were subsequently provided by the breaching party and used or sold by the non-breaching party, that use or sale did not replace production/sales that would have occurred had there been no breach. See examples, the Article at 133, 134 n.5, 145.

[47]During the period of the injunction, August 24, 1995 to December 4, 1996, the Forest Service, which is the largest single landholder in northeastern Arizona and by far the largest source of timber in the Southwest, offered very little sawlog volume for sale. In fact, the four National Forests on which Precision Pine bought timber and was the source for the overwhelming majority of its raw material supply, offered only 3.6 million board feet of sawlogs during that time. P. App. 363-431 (3 million of that was sold on September 20, 1995 and no sawlog volume whatsoever was offered in 1996). Id. Porter Decl. ¶ 32, P. App. 651. The injunction resulted in 35 planned sales containing 61 million board feet of timber being put on

response to a deposition question as to whether Precision Pine would have lost profits even if the sale price for Precision Pine's lumber had gone up substantially after the suspension, Mr. Porter vehemently asserted "Absolutely. Absolutely . . . There is no way that you're ever going to recover that amount of time that you were . . . withheld from [operating]." Porter Dep. Day 2 at 438-439, P. App. 572.) As Professor Farnsworth indicates "if a recipient is a buyer of goods for resale whose volume is limited by supply because it is exceeded by demand, the recipient may claim to have lost volume if the supplier does not deliver what the contract requires." Farnsworth, supra, § 12.11. This is true in a variety of circumstances other than those involving resellers, e.g., where the injured party is a manufacturer that could not replace goods which were the subject of the breached contract[48] (id. at § 12.10, pages 215-6), or where a construction company which could have performed two contracts simultaneously only gets to perform one because of the owner's repudiation.[49] Id.

**(i). Fertico – an application of the lost volume concept**

Perhaps the most notable case dealing with the issue of how, in a commercial context, post-breach performance by the breaching party should affect the damages recoverable by the non-breaching party is Fertico Belgium S.A. v. Phosphate Chemicals Export Assoc., Inc., 517 N.Y.S.2d, supra.[50] In October of 1978, Fertico, a Belgian commodity broker, contracted with

---

hold. P. App. 255. Upon the lifting of the suspension the Forest Service did, however, increase its offerings substantially. See Porter Decl. ¶ 36, P. App. 652.

[48]See also example set forth in the Article at 133-4.

[49]See example set forth in the Article at 133 n.3. See also the Article at 146 n.67 and accompanying text.

[50]Fertico, while notable, is nothing new. That profits made on a post-breach transaction involving the corpus of the breached contract need not be offset against breach damages where

Phoschem, an American exporter of phosphate fertilizer, for 35,000 tons of fertilizer to be delivered in two lots. As requested, Fertico provided Phoschem with a $1.7 million letter of credit, an amount sufficient to cover full payment for the initial shipment. The first shipment of 15,000 tons was to be delivered no later than November 20, 1978, and the remaining 20,000 tons were to be delivered by November 30, 1978. Phoschem was aware that Fertico needed these shipments by those dates so that the bulk fertilizer could be bagged and shipped in sufficient time to satisfy a secondary contract that Fertico had with Iraq's Agricultural Ministry ("Altaweed").

Well prior to the initial delivery date, Phoschem advised Fertico that the fertilizer would not arrive until December 4, 1978, i.e., two weeks late. In response, Fertico informed Phoschem that the delay would cause "huge problems" with its contract with Altaweed. Phoschem's impending breach compelled Fertico to act and on November 15, 1978, so as to avoid breaching its secondary contract with Altaweed, Fertico acquired 35,000 tons of substitute fertilizer on the open market at a price some $700,000 higher than the contract price with Phoschem.

---

that subsequent transaction would have been accomplished irrespective of the breach was recognized by the Supreme Court as early as 1924 in Miller, 266 U.S. at 243, a case relied on by the defendant. G's Br. at 26. Miller involved a suit against a buyer of zinc ore that breached its contract with the seller. Upon the breach, the seller (the Mammoth Co.) resold the ore to United Smelting Co. (which like the seller was a subsidiary of the Mining Co.) at the best price obtainable. Thereafter, Mammoth Co. sought and received a judgment for the difference between the original contract price and the lower price at which the resale to United Smelting Co. was made. The breaching buyer objected to the award claiming that it should be reduced by the profits that United Smelting Co. made in processing the ore. The Supreme Court disagreed. Not only did the Court find the intercorporate relationship to be no basis for the offset requested but, more tellingly, observed that even, if that had not been the case, no offset was appropriate because, if there had been no breach, United Smelting Co. would have obtained ore to process on the open market (and made the profits thereon which the buyer sought to offset). This is almost exactly the position in which Precision Pine would have been absent the breach. That is, even if there had been no breach, Precision Pine would have made all of the post-suspension lumber sales that it did and more by obtaining and processing other timber. Porter Decl. ¶ 34, P. App. 651. See discussion infra.

The shipment from Phoschem did not, in fact, arrive in Belgium until December 17, 1978 and was not off-loaded until December 21, 1978. Despite Phoschem's breach, Fertico took possession of the fertilizer because it believed that it "had no other choice" given that Phoschem had already drawn down the $1.7 million letter of credit that Fertico had posted. Fertico did, however, cancel the second shipment. Id. at 467. Fertico stored the 15,000 tons that it had received in the first shipment from Phoschem while it sought a buyer for it and, on March 19, 1979, sold it to another customer at a profit of $454,000.

The New York Court of Appeals concluded that Fertico's damages did not have to be offset by the profits that Fertico made on the sale of the late-delivered fertilizer, because the subsequent sale was a transaction that was separate and independent, i.e., was one that Fertico would have been made regardless of any dealings with or breach by Phoschem. Id. at 469. Stated another way, the majority believed that in the absence of the breach, Fertico, as a dealer in such goods, would have acquired fertilizer on the open market and still made the subsequent sale.

The Court reasoned that "[i]t would be anomalous to conclude that had it not been for Phoschem's breach Fertico would not have continued its trade and upon such reasoning to counterpoise the profits from the . . . sale against the damages arising from Phoschem's breach." Id. In doing so and in also granting Fertico the increased cost of cover, the Court applied U.C.C. § 1-106 which directs that the remedies provided in the U.C.C. be liberally administered so as to put the aggrieved party in as good a position as if the other party had fully performed. In this regard, the Court stated that "[h]ad [the seller] fully performed, Fertico would have had the benefit of the [sale to Altaweed] and, as a trader of fertilizer, the profits from the [subsequent] sale as well." Id.

As both Professors White and Summers and the Restatement indicate, whether the Fertico approach is appropriate or instead, as defendant asserts here, the breaching party is entitled to offset the benefits derived by the non-breaching party from the use and/or disposition of the late-delivered goods, essentially turns on whether the non-breaching party regularly dealt in the goods of the type in question. The commentators point out that if, as the majority believed in Fertico, Phoschem had performed and Fertico would have made both its sale to Altaweed and the subsequent sale "then the [Fertico] majority is correct." James J. White & Robert S.. Summers, UNIFORM COMMERCIAL CODE § 6-3 at 298; RESTATEMENT (SECOND) OF CONTRACTS § 347, cmt. f (1981). That is, "[g]ains made by the injured party on other transactions after the breach are never to be deducted from the damages that are otherwise recoverable, unless such gains could not have been made, had there been no breach." Fertico, 517 N.Y.S.2d at 469, citing 5 Corbin, Contracts § 1041 at 256. See also § 347 of the Restatement, cmt. f ("[i]f the injured party could and would have entered into the subsequent contract, even if the [first] contract had not been broken, and could have the benefit of both, he can be said to have 'lost volume' and the subsequent transaction is not a substitute for the broken contract"). Accord Farnsworth, supra, § 12.11 at 226.

The basic "lost volume" test, i.e., whether, in the absence of the breach the injured party would have made both the originally contemplated transaction and the subsequent one which actually involved the late-delivered goods, applies both in the situation like Fertico where cover was obtained (and there was no loss of volume) and to situations such as in the instant one where, due to a lack of cover, volume was in fact lost. In terms of this case, because of the sudden failure of a huge portion of its primary raw material source, Precision Pine forever lost the opportunity to manufacture a certain volume of lumber during the term of the suspension.

As the court indicated in Anchor Sav. Bank, 59 Fed. Cl., supra, whether the non-breaching party has "lost volume" is a question of fact. Id. at 155-6, citing Restatement § 347, cmt. f (1981). In Anchor Sav. Bank, Judge Block concluded that were it otherwise, the court would have been faced with the impermissible duty of making findings as to whether the plaintiff could and would have entered into both transactions, something which he found Rule 56 did not permit the court to do on summary judgment. Under this view the defendant is precluded in this case from prevailing on this issue on summary judgment.

**(ii). Aluminum Distributors – the alternative test for determining lost volume**

The holding in Fertico notwithstanding, whether a plaintiff could and would have entered into both transactions is rarely provable with absolute certainty and generally requires affirmative testimony from the plaintiff that is often looked upon as being at least somewhat self serving. William H. Henning, *et al.*, The Law of Sales under the Uniform Commercial Code, 8-17 -8-18 (1981). Such being the case, the court in Aluminum Distributors suggested an alternative approach.

That is, although Aluminum Distributors indicated that the non-breaching party seeking to avail itself of the lost volume concept is required to demonstrate that it could otherwise have purchased a sufficient quantity of goods in time to enter into the transaction for which it actually used the late-delivered goods,[51] it also suggests that the inquiry as to whether it would have entered into both transactions should be limited to the much more manageable question of whether the non-breaching party was a regular, volume dealer in the goods.[52] Accord White and

[51] Aluminum Distributors at *5.

[52] The Article at 147.