**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-720C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S ADDITIONAL PROPOSED FINDINGS OF FACT**

Set forth below are Additional Proposed Finding of Fact that support the assertions in plaintiff's Response Brief. In an attempt to aid the Court, all additional findings have been numbered using four digits. Plaintiff has also attempted to order the additional Proposed Findings in the same manner as its initial Proposed Findings and has also attempted to correlate the numbers, e.g., additional findings relating to points contained in Plaintiff's Proposed Findings of Fact 282-290 start with Plaintiff's Proposed Findings of Fact No. 1282, etc.

**COMPOSITION OF PRECISION PINE' S CLAIM**

1031. Plaintiff's expert, Mr. Ness, reviewed Precision Pine's original claim that totaled $10,580,287.82. Tr. 2190-91 (Ness). Based on his review of the data and calculations used, Mr. Ness reduced the total claim to $9,328,180.88, a difference of $1,252,106.94. Id.; compare PX 180 at C-0002 with PX 131, Ex. 1.

1032. Both the amount that Precision Pine paid its contractors for logging & hauling and the amount that Precision Pine paid to the Forest Service for stumpage were based on a calculation of the volume of timber removed from the relevant sale. Tr. 124-26 (Porter); Tr. 1729-30 (Reidhead). With one exception,

the Hay sale (the only sale that was scaled), the method for calculating the volume for each purpose differed drastically. Compare Tr. 124-26, 510-12 (Porter) with Tr. 1729-30 (Reidhead) and DX 838 at 15; see also DX 838 at 258 (noting that sometimes Precision Pine paid for less logs in stumpage than it measured as delivered to its yard). With respect to paying its loggers, Precision Pine made an independent sample scale of the timber delivered to its mill yard, and recorded that amount on its logger pay sheets. Tr. 1729-30 (Reidhead); DX 838 at 15; Tr. 520-21 (Porter). Conversely, with respect to the amount due the Forest Service, the volume removed (and recorded on the Timber Sale Statement of Account (TSSA)), was based only on an estimated fraction of the Forest Service's original estimate of the amount of timber on the sale from which the logs were harvested. Tr. 124-26, 510-12 (Porter).

**Increased Hauling Costs from the Hay Timber Sale.**

1041. Between March 1994 and March 1995 Precision Pine removed 92.52 mbf (LS) of sawlogs from the Hay sale. PX 290, Vol. I, "Hay" tab (Statement No. 43 at 2 (March 1994), Statement No. 53 at 2 (April 1995)).

**Lumber Product Prices**

1091. "4/4 shop" and "4/4 moulding" are hybrid lumber products. That is, although 4/4 products are usually sold in rough form (Tr. 1672 (Porter)), a small amount of the 4/4 material is occasionally finished at a planer and sold as shop or moulding grade material (Tr. 1681 (Porter)). Shop and moulding grades as a group are completely different in terms of quality and price from rough grades. See PX 131, Apx. A at 1-2. However, 5/4 material is more valuable than 4/4 material. Tr. 456 (Porter); see Tr. 1681 (Porter). Accordingly, 4/4 shop or moulding was sold at prices that were considerably higher than those for rough 4/4 lumber, but considerably lower than prices for 5/4 moulding or shop. Tr. 1679-81 (Porter). In this way, 4/4 shop and moulding are anomalous, "hybrid" products.

1092. Because 4/4 shop and 4/4 moulding are hybrid lumber products (PPFF 1026), Precision Pine sold only very little of these products. Tr. 456-57, 1670, 1679-81 (Porter).

1093. The Winslow Sales Journal (PX 294) was created and maintained by a secretary at Precision Pine, who frequently mis-categorized lumber sales on the journal. Tr. 394-95, 1669-70 (Porter). Specifically, the secretary improperly included sales of 4/4 "hybrid" shop and moulding lumber products (PPFF 1026) in the same category as 5/4 shop and moulding lumber products. Tr. 1669-70 (Porter). Because 4/4 shop and moulding material are hybrid products (PPFF 1026), they do not belong in the normal "shop," "moulding" or "rough" categories.

**By-products**

1125. The major purchaser of Precision Pine's bark by-product was a company called Western Organics, which resold the bark to landscapers. Tr. 2982, 2985-86 (Tenney), Tr. 609 (Porter).

1126. After the contract by which Stone was obligated to purchase Precision Pine's entire output of chips (PX 311) expired on September 30, 1995, Stone continued to buy Precision Pine's output of chips at $18.25. Tr. 596 (Porter).

1127. By letter dated December 27, 1995, Stone stated that it would be suspending its chip purchases from January 15, 1996 to April 15, 1996. DX 476. The letter indicated that Stone would be open to discussing the possibility that Precision Pine would store the chips it produced during the three-month suspension for future purchase by Stone. Id.

1128. From January 15, 1996 to April 15, 1996, Stone did not take any chips from Precision Pine and Precision Pine stored the chips that it produced at its mill yards. Tr. 597-99 (Porter). However, on April

22, 1996, Precision Pine and Stone entered into a contract whereby Stone again agreed to accept Precision Pine's entire output of chips for $17.00/ton (PX 313) and to purchase the chips that Precision Pine had produced from January 15 to April 15, 1996 at the new contract price of $17.00/ton. PX 313; Tr. 599-601 (Porter).

1129. Mr. Ness estimated that the purchase of the backlog of chips at a price of $17.00/ton rather than the old price of $18.25/ton resulted in a reduction in Precision Pine's chip revenue during the suspension of between 5 and 10 thousand dollars. Tr. 2802 (Ness).

1130. Precision Pine has proven its lost profits on chips with reasonable certainty to be $674,724.18, i.e., Precision Pine's claimed lost profits on chips of $682,224.18 (PX 131, Ex. 4, p. 27) minus $7,500 for the reduction in the price paid by Stone for the chips produced by Precision Pine from January 15, 1996 through April 15, 1996. Based on this, Mr. Ness' adjusted calculation for by-products revenue is:

| | | |
|---|---|---|
| Chips | $ 674,724.18 | |
| Grindings | $ 109,129.15 | (PX 131, Ex. 4 pg 27) |
| Bark | $ 256,671.31 | (PX 131, Ex. 4 pg 27) |
| Shavings | $ 88,862.40 | (PX 131, Ex. 4 pg 27) |
| | $1,129,387.04 | |

**Increased Manufacturing Costs**

1144. During his review of Precision Pine's claim, Mr. Ness found that Precision Pine's calculation of what its manufacturing costs during the suspension period should have been based on the cost comparison reports was unreliable and would have to be revised using the actual historical cost data from Precision Pine's financial statements. Tr. 2177 (Ness); see also Tr. 718-19 (Porter) (In preparing its initial claims Precision Pine had utilized certain internal goal reports. This approach, however, had not been very scientific and Mr. Ness went back and determined Precision Pine's actual costs using historical data from the financial statements).

1145. Defendant suggests that Precision Pine should have calculated the manufacturing costs that it would have incurred but for the suspension by reference to its cost comparison reports. In doing so, however, defendant identifies no specific error in Mr. Ness' decision to calculate the manufacturing costs that Precision Pine should have anticipated during the suspension by reference to historical costs from the company's financial statements, nor was there any testimony as to the reliability of the cost comparison reports for any purpose, let alone the use to which defendant wishes to put them. To the contrary, Mr. Moosman, tried to use the cost comparison reports to determine Precision Pine's manufacturing costs, but he was unable to reconcile the costs as set forth on them with the actual costs set forth in Precision Pine's financial statements. Tr. 5204-06 (Moosman). Mr. Moosman further conceded that he had no idea for what purpose the cost comparison reports were prepared. Tr. 5197 (Moosman). There is simply no reason to accept the cost comparison reports as a better source of manufacturing cost data than the actual costs taken by Mr. Ness from Precision Pine's own financial statements.

**Total Claim**

1167. The following (which is a slight amendment to and replacement of PPFF 167) is the amount of damages that Precision Pine has proven with reasonable certainty:

| | | |
|---|---|---|
| **Miscellaneous Items** | | |
| Unpaid Bond Costs | $ 9,461.50 | |
| Unpaid Move-in/Move-out Costs | 367.20 | |
| Interest on Cash Balances | 319.45 | |
| Interest on Down Payment | 2,763.04 | |
| Interest on Unused Effective Purchaser Credit | 4,208.62 | |
| Snow Removal | 1,207.27 | |
| Log Transfer Due to Closure of Eagar | 1,627.45 | |
| | $ 19,954.53 | $ 19,954.53 |
| | | |
| **Increased Logging & Hauling Costs** | $ 140,724.72 | $ 140,724.72 |
| | | |
| **Lost Market Opportunity** | | |
| **lumber** | $ 5,415,268.88[1] | |
| **Byproducts** | $ 1,129,387.04[2] | $ 6,544,655.92 |
| | | |
| | | |
| **Increased Manufacturing Cost due to Suspension** | | |
| Eagar Sawmill | $ 107,047.47 | |
| Heber Sawmill | 7,931.93 | |
| Winslow Sawmill | 6,131.49 | |
| Winslow Planer | 99,600.31 | |
| | $ 380,711.20 | $ 380,711.20 |
| | | |
| | | |
| **Credit for Partial Cancellation of Mud Timber** | | |
| **Sale per Agreement Dated on 8/15/96** | | $ (65,796.66) |
| | | |
| | | |
| **Claim Preparation Costs (Client)** | $ 23,219.04 | $ 23,219.04 |
| | | |
| | | |
| **Total Damages** | | $ 7,043,468.83 |

[1]PX 131, Ex. 4, p. 27.

[2]$1,129,387.04 = $1,136,887.04 (PX 131, Ex. 4, p. 27) - $7500 (PPFF 1130).

**LUMBER PROFITS**

**Conversion Factor**

1206. Although defendant asserts, without citation to any evidence, that the "contract specific" conversion factors developed by the Forest Service are more accurate than the approach used by Precision Pine (D's Br. at 36), defendant's own experts did not use the Forest Service's "contract specific" conversion factors in their reports. Tr. 3465 (Neuberger); Tr. 5132 (Moosman). Rather, the conversion factors used by defendant's experts were taken from certain of Precision Pine's documents, even though the experts did not know who at Precision Pine had prepared them or how they had been prepared. Tr. 5134 (Moosman); Tr. 3466 (Neuberger). Moreover, the government did not call any Precision Pine witness to testify to the accuracy of these conversion factors (PPFF 1207) and Mr. Porter testified that no one at Precision Pine had sufficient knowledge to derive sale specific conversion factors. Tr. 1617-18 (Porter). The only approach to converting from ccf to mbf about which there was testimony supporting its reasonable accuracy was the factor of 2 ccf per mbf (LS) used by Mr. Porter.

1207. The government only called one of Precision Pine's employees, Mr. Smith. See Tr. 5311-5354 (Smith). The government also had portions of the transcript of Mr. Smith's deposition admitted. DX 838. At no point in the deposition or during live testimony did defendant interrogate Mr. Smith with respect to ccf-to-mbf conversion factor. See Tr. 5311-5354 (Smith); DX 838.

**Harvesting**

1241. Prior to the suspension Tri-Star purchased Precision Pine's logging subsidiary, Precision Forest Management, Inc., in order to handle all of Precision Pine's harvesting. Tr. 1720-23 (Reidhead). Tri-Star was performing all of Precision Pine's sawlog harvesting and virtually all of its pulpwood harvesting at the time of suspension. See Tr. 1721-22 (Reidhead).

1242. Contract clause CT6.3, which was included in each contract at issue, requires that the purchaser file with the Forest Service a general plan of operations under the contract within 60 days of award of the contract. E.g. PX170 at JRH-84. Clause CT6.3, like BT6.31 (which requires an annual operating schedule addressing anticipated major operations on a timber sale), permits the purchaser to alter the plan entirely or in part for almost any reason -- i.e., "when necessitated by weather, markets or other unpredictable circumstances." Compare id. at JRH-84 with id. at JRH-35.

1243. The annual operating schedule that a purchaser is required to file with the Forest Service under clause BT6.31 (e.g., PX 170 at JRH-35) is, at most, a formality, which purchasers can alter virtually at will. Tr. 3809 (Harris) ("We [the Forest Service] would anticipate and accept changes to the operating schedule"); Tr. 1628 (Porter) (the annual operating schedule "was a tentative schedule, and it was seldom followed. . . ."). BT6.31 does not require the Forest Service to concur in the change, only that the purchaser inform the Forest Service of the change. Id. Lastly, there was never a time that the Forest Service objected to Precision Pine's changing a schedule or prevented Precision Pine from operating in a way that was inconsistent with the annual schedule. Tr. 263-66 (Porter). The Forest Service uses the annual operating schedule for the limited purposes of aiding it to schedule its sale administration teams. Tr. 3509 (Harris).

1244. The opening sentences of Precision Pine's February 1995 annual operating schedule demonstrate that it was tentative and subject to change:

> The following will be our anticipated harvest schedule for April through December 1995. As in all of our endeavors this schedule is subject to change.

DX 294 (emphases added). Similarly, the concluding sentence states, "More detailed plans will be developed prior to or during the pre-work[meetings]." Id. Finally, the February 1995 annual operating schedule does not include Precision Pine's operations on National Forests other than the Kaibab and

Coconino, and therefore obviously does not address potential operations on sales located on the Tonto or Apache-Sitgreaves National Forests necessary to supply other of Precision Pine's sawmills. Id.

1245. The Forest Service awarded the Brookbank timber sale to Precision Pine on April 13, 1995. First Joint Stip. ¶ 22. Precision Pine began harvesting operations on the Brookbank timber sale in June of 1995. PX 190, Vol. I. "Brookbank" tab, Statement No. 3 at 2 (July 10, 1995).

1246. Mr. Porter did not project any harvesting on the Manaco timber sale between May 6 and July 9, 1996. Tr. 4171 (Harris); DX 1004; see also PX 131, Apx. A at 9.

1247. On DX 559, the figures for "Annual Volume Harvested" are in the wrong columns. Specifically, the figures are shifted one column to the left. Tr. 2105-10, 2143, 1409-10, 1417-18 (Porter). Thus:

a. it was in 1993 not 1992 that Precision Pine logged 25,399 mbf (LS) of timber;

b. it was in 1994 not 1993 that Precision Pine logged 23, 541 mbf (LS) of timber;

c. it was in 1995 (over four months of which were during the suspension) not in 1994 that Precision Pine logged 18,673 mbf (LS) of timber; and

d. it was in 1996 (over 11 months of which were during the suspension) not in 1995 that Precision Pine logged 11,011 mbf (LS) of timber.

Tr. 2105-10 (Porter).

**Pulpwood**

1268. As Mr. Ness testified, both the pulpwood costs and lost profits claims for pulpwood came from information provided by Tri-Star:

> Q: Where do you get, Mr. Ness, your $49.17 number for cutting and hauling [or pulpwood]?

A: I believe that that information was provided by Mr. Reidhead of Tri-Star Logging because this, in essence, was their claim.

Tr. 2599 (Ness).

1269. At trial, even counsel for defendant had a grasp on the fundamental point that the costs of cutting and removing pulpwood would have been incurred by Tri-Star and not Precision Pine:

BY MR. HARRINGTON:
Q: So, Mr. Ness -- and I believe we've touched on this -- the $49.17 per cord number in the roundwood section of your projection **represents the cost that Tri-Star would have incurred to cut and remove the roundwood from the sale**, correct?

A: That is correct.

Tr. 2841 (emphasis supplied). Only after acknowledging this point did defendant go on to a series of hypothetical questions premised on the faulty assumption that Precision Pine would have incurred the costs for pulpwood logging and hauling.

1270. During the suspension (i.e., from September 1995 through December 1996), Precision Pine removed pulpwood from the Brann, Hutch-Boondock and Mud sales. See PX 290 (Timber Sale Statements of Account). Specifically, for the Brann sale, the TSSA issued for the month after the suspension began, shows that Precision Pine had removed no pulpwood at that time. PX 290, Vol. I, "Brann" tab, Statement No. 12 (for the month of Sept. 1995, dated Oct. 5, 1995) at 2 (column headed "to-date quantity"). The TSSA issued for the Brann sale for the month the suspension was lifted shows that Precision Pine had removed 256 ccf at that time. Id., Statement No. 23 (for the month of Dec. 1996, dated Jan. 10, 1997) at 2 (column headed "to-date quantity"). Thus, Precision Pine removed 256 ccf of pulpwood from the Brann sale during the suspension. A similar analysis shows that Precision Pine removed 390.02 ccf from the Hutch-Boondock sale (PX 290, Vol. I, "Hutch-Boondock" tab, Statements No. 15 & 27) and 152.19 ccf from the Mud sale (Id., Vol. III, "Mud" tab, Statements No. 12 & 20) during the suspension.

**Milling Schedule**

1282. Under Mr. Ness' damages model (see PX 131), the largest log inventory (i.e., the largest log "deck") that would have existed at any mill would have been a 150-day supply of logs, and in most quarters, log decks would have been far smaller. Tr. 5610 (Ness). Precision Pine had room at its mills for decks of that size. Tr. 5611 (Ness); accord Tr. 703 (Porter). Also, Precision Pine had previously had decks that represented more than a 150-day supply. Tr. 5611 (Ness). Mr. Ness further testified that in his experience, mill owners do not find that a 150-day inventory of logs is excessive. Tr. 5610 (Ness).

1283. With regard to the possibility of deterioration in logs that have been decked for lengthy periods, i.e., so-called blue stain, Mr. Porter testified without contradiction that there are ways to avoid it and that Precision Pine had the ability to do so. Tr. 1677 (Porter). Mr. Ness knew that his employer in Oregon would sprinkle log decks with water in certain months to avoid blue stain and accordingly, in the context of determining the feasibility of maintaining the logs decks generated in his model, asked Mr. Porter about Precision Pine's doing so. Tr. 5700 (Ness). Mr. Porter indicated that Precision Pine also could and would take such precautions. Tr. 5700 (Ness).

1284. Mr. Ness dismissed the idea that substantial cash flow problems would have been generated by the log inventories that resulted from his model because:

a. At the time of the suspension, Precision Pine did not have cash flow problems; Tr. 2193-95 (Ness).

b. As indicated in Precision Pine's financial statements, during the 36 months from 3/31/95 to 3/31/98, Precision Pine had been able to reduce its outstanding debt from resources other than profits by $2.3 million (Tr. 5612-15 (Ness)) and, if Precision Pine could do this, it would have been very easy for it to have financed inventory, which, because it turns over very quickly, is easy to finance with a bank; Tr. 5615-17 (Ness).

c. At the time of the suspension, Precision Pine had a $2 million line of credit available to it; Tr. 5615-16 (Ness); and

d. If it hadn't been for the suspension, the breached sales would have provided Precision Pine with a good cash flow. Tr. 5616 (Ness).

1285. If Mr. Ness' damages model (PX 131) had ignored the timber that Precision Pine actually milled during the suspension (i.e., the "actually-harvested timber"), projecting instead that full mill capacity was available in each quarter, then the model would also have had to determine when but for the suspension Precision Pine would have processed the actually-harvested timber into lumber, which would have projected that the actually-harvested timber would have been milled but later than it in fact was. Because lumber prices were rising at least from January 1996 through and beyond April 1997 (PX 168), the damages model would, therefore, conclude that Precision Pine would have realized much more revenue (and profit) from the actually-harvested timber than it in fact did.

1286. With regard to the selection from harvested timber of which sale(s) would be milled in a particular quarter, Mr. Ness said that the actual quarter in which the timber from a sale would have been processed really doesn't affect the model so long as all of the timber is processed during the suspension plus the ensuing winter. Tr. 2788 (Ness). Accordingly, he was somewhat arbitrary and probably made the selection as a matter of convenience on the basis of which sale had been harvested in the fewest quarters, i.e., so that he didn't have as many quarters to deal with, thus shortening his report. Tr. 2788-9. As the Court noted:

> It's [the milling scheduled] arbitrary in the sense that he [Mr. Ness] knew he had a certain amount of capacity to fill up, and he looked at, given the harvesting schedule, what would be coming available, and he picked and chose from the sales that would be available to add to his milling schedule until he got up to capacity. Doesn't that make some sense in terms of what would have been done if there had been no suspension?

Tr. 3253.

1287. As Mr. Ness testified, the quarter selected for milling the timber and selling the lumber produced from it would not make a significant net difference in the company's profit (Tr. 2849 (Ness)), because for Precision Pine to have milled more of the timber from breached sales in quarters with substantially lower lumber prices, timber that was in fact processed in that quarter would have had to have been postponed and harvested in quarters with higher lumber prices. Tr. 2849-50 (Ness). Thus, for every instance where milling timber from a particular breached sale in a particular quarter had increased Precision Pine's profit calculation, there were just as many examples where harvesting and milling a sale earlier than it would otherwise may have been went the other way. Tr. 2859 (Ness). His milling schedule does not yield the highest or the lowest possible profit obtainable from milling the timber on the breached sales. Tr. 2859 (Ness). Producing a schedule that yielded the highest possible profit with regard to the timber on the breached sales was not Mr. Ness' intention. See Tr. 2770-2773 (Ness). As he testified, if he had spent enough time selecting the quarters in which timber would have been milled, he could have affected Precision Pine's profits, but only slightly, i.e., he could have made them either slightly higher or slightly lower. Tr. 2859 (Ness).

1288. At page 12 of Ex. 4 of Mr. Ness' original report (PX 131), he indicated that during the period January through April of 1997, under his model, Precision Pine would have produced 687.5 mbf (LT) of Ponderosa Pine lumber from 550 mbf (LS) of logs from the Jersey Horse sale and had gross sales with regard to that lumber of $489,766.57.

1289. Similarly at page 14 of Ex. 4 of Mr. Ness' original report (PX 131), he indicated that in the 4th quarter of 1995, under his model, Precision Pine would have produced 837.5 mbf (LT) of Ponderosa Pine

lumber from 670 mbf (LS) of logs from the Manaco sale and had gross sales with regard to that lumber of $398,951.

1290. At trial, defendant's counsel proffered a demonstrative (DX 1005), which he had prepared that purportedly showed that if the above milling of these two sales had been reversed, i.e., the Manaco volume had been milled in January-April 1997 and the Jersey Horse volume had been harvested in the 4th quarter of 1995, that Precision Pine's profits would have been $37,775.62 less than what Mr. Ness had calculated. The demonstrative, however, showed very little: First, part of the reason why Mr. Ness would have projected milling Manaco before Jersey Horse is because Manaco was going to be harvested before Jersey Horse, see Ex. 9 to PX 131, i.e., Manaco would have been harvested heavily in the 3rd quarter of 1995 whereas harvesting of Jersey Horse was projected to have occurred at a much more leisurely pace.

1291. An example of how swapping the quarters in which timber under Mr. Ness' model was milled would have increased the revenue that Precision Pine would have generated from the timber on the breached sales is set forth below:

a. Ponderosa Pine lumber that would have been produced from the O.D. Ridge in the 3rd quarter of 1996 would have had had an average selling price of $626.97 per mbf (LT). PX 131, Ex. 4, p. 25. The revenue Mr. Ness calculated from the milling and sale of the 588.75 mbf (LT) of Ponderosa Pine lumber from the timber on O.D. Ridge sale in the 3rd quarter of 1996 was $369,130.60. Id.

b. However, based on the grade breakdown of O.D. Ridge and the lumber product prices in the 4th quarter of 1996, had Mr. Ness shown this 588.75 as having been milled

and sold in the 4th quarter of 1996, at the resulting average selling price of $684.53 per mbf (LT), the revenue would have been $403,018.62.

| O.D. Ridge Timber Sale | | | | |
|---|---|---|---|---|
| | | | | |
| **Anticipated Sales Breakdown - Pine** | | | Selling prices in 4th quarter 1996 (See PX 131, Ex. 6, pg 12) | |
| Moulding & Better | 6.97% | 41.04 | $ 1,626.00 | $ 66,731.04 |
| 5/4 # 1 Shop | 0.98% | 5.77 | 1,129.89 | 6,519.47 |
| 5/4 # 2 Shop | 11.86% | 69.83 | 1,015.00 | 70,877.45 |
| 5/4 # 3 Shop | 28.70% | 168.97 | 832.50 | 140,667.53 |
| Paragraph 99 Redress | 16.26% | 95.73 | 539.35 | 51,631.98 |
| 5/4 x RWL Radius Edge | 4.19% | 24.67 | 500.36 | 12,343.88 |
| # 2, # 3, # 4 & Better | 5.38% | 31.67 | 404.89 | 12,822.87 |
| # 3 Common Utility | 4.72% | 27.79 | 280.00 | 7,781.20 |
| # 4 Common Economy | 6.30% | 37.09 | 179.90 | 6,672.49 |
| # 5 Common | 0.00% | 0.00 | N/A | 0.00 |
| Rough | 3.37% | 19.84 | 243.33 | 4,827.67 |
| Timbers | 6.32% | 37.21 | 335.00 | 12,465.35 |
| Misc Shop Outs | 4.95% | 29.14 | 332.11 | 9,677.69 |
| | 100.00% | 588.75 | $ 684.53 | $ 403,018.62 |

Accordingly, if the 588.75 mbf on the O.D. Ridge timber sale had been milled in the 4th quarter rather than in the 3rd quarter of 1996 (as Mr. Ness had indicated), lumber revenue from that sale would have increased by $33,888.02 ($403,018.62-$369,130.60).

c. Ponderosa Pine lumber produced from the Kettle sale in the 4th quarter of 1996 had an average selling price of $562.80 per mbf (LT), whereas lumber produced from the Kettle sale in the 3rd quarter of 1996 had an average selling price of only $525.95 per mbf (LT). PX 131, Ex. 4, p. 23. As such, had 588.75 mbf of lumber been milled from timber from Kettle in the 3rd quarter of 1996 rather than as shown by Mr. Ness in the 4th quarter

of 1996, the resulting revenue from Kettle would have declined by $21,695.44 (588.75 x ($562.80-$525.95)).

d. The net result of swapping the quarters in which 588.75 mbf (LT) of lumber was produced from O.D. Ridge and Kettle would have been to <u>increase</u> the revenue that Precision Pine lost due to the suspension by $12,192.58:

| | |
|---|---|
| Additional revenue that would have been earned milling 588.75 mbf (LT) from O.D. Ridge in the 4th rather than the 3rd quarter of 1996 | $33,888.02 |
| Reduction in revenue that would have been earned as a result of milling 588.75 mbf (LT) from Kettle in the 3rd rather than the 4th quarter of 1996 | ($21,695.44) |
| Resulting increase (decrease) in revenue | $12,192.58 |

**Stumpage prices**

1374. The stumpage prices for the breached sales during the 1st quarter of 1996 and the 4th quarter of 1996 are as follows:

| | | | | | | 1st Quarter '96 | | | 4th quarter '96 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Unit of measure | Base index | Base rate | Bid rate | Max escalated rate | WWPA index | Stumpage price | **Applicable stumpage price** | WWPA index | Stumpage price | **Applicable stumpage price** |
| Brookbank | mbf | 479.08 | 10.46 | 94.14 | 177.82 | 379.49 | -5.45 | **10.46** | 483.99 | 96.60 | **96.60** |
| Hay | mbf | 285.13 | 10.00 | 90.60 | 171.20 | 379.49 | 137.78 | **137.78** | 483.99 | 190.03 | **171.20** |
| O.D. Ridge | mbf | 307.52 | 29.12 | 223.77 | 418.42 | 379.49 | 259.76 | **259.76** | 483.99 | 312.01 | **312.01** |
| U-Bar | mbf | 400.08 | 10.00 | 397.00 | 784.00 | 379.49 | 376.41 | **376.41** | 483.99 | 438.96 | **438.96** |
| Mud | mbf | 479.01 | 11.07 | 115.59 | 220.11 | 379.49 | 16.07 | **16.07** | 483.99 | 118.08 | **118.08** |
| Jersey Horse | mbf | 423.06 | 56.84 | 350.32 | 643.80 | 379.49 | 306.75 | **306.75** | 483.99 | 380.79 | **380.79** |
| Manaco | mbf | 427.91 | 96.08 | 162.58 | 229.08 | 379.49 | 114.16 | **114.16** | 483.99 | 190.62 | **190.62** |
| Salt | mbf | 503.20 | 10.75 | 287.34 | 563.93 | 379.49 | 163.63 | **163.63** | 483.99 | 268.13 | **268.13** |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SK | Flat rate | | | | | | | | | | |
| | | | | | | | | | | | |
| Kettle | Flat rate | | | | | | | | | | |
| | | | | | | | | | | | |
| Monument | Flat rate | | | | | | | | | | |

Note: The Base Index, Base Rate, Bid Rate are taken from the "A section" of the contract documents (PX 169 to175), the WWPA index price is taken from PX 305. The prices are calculated pursuant to the formula in contract clause B[T]3.2.

**Logging and hauling Costs**

1375. The rate at which Precision Pine paid for logging and hauling the sawlogs on the Mud, Hutch-Boondock and Brann sales, i.e., contracts that were released and on which harvesting took place during the suspension, was $135/mbf on each sale. Tr. 523-526 (Porter); (PX 307).[3] As part of his initial claim preparation in this matter, Mr. Porter used the figure of $135/mbf from the Brann, Mud and Hutch-Boondock sales for the rate that Precision Pine would have paid for logging and hauling the timber on Saginaw-Kennedy and Monument because those sales were comparable to Mud and Hutch-Boondock, but had not been harvested at the time the claims were submitted. Tr. 536-540 (Porter). In the same way, Mr. Porter used the logger pay sheets for the U-Bar sale to determine that the rate paid by Precision Pine for the logging and hauling of that sale was $108/mbf. Tr. 450-41 (Porter); (PX 308).[4]

1376. Mr. Porter ascertained that the logger pay records for the Brookbank sale showed that $115/mbf was the rate that Precision Pine paid for logging and hauling just before the suspension was imposed and again after the suspension was lifted and, therefore, that $115/mbf was the correct rate to use in determining what logging and hauling costs would have been on the Brookbank sale during the

[3]Additional logger pay records demonstrating that the price paid by Precision Pine for logging and hauling on: the Brann sale during the suspension was $135/mbf can be found at PX 234, Tr. 526-531 (Porter); and the Hutch-Boondock sale during the suspension was $135/mbf can be found at PX 237, Tr. 531-533 (Porter).

[4]Additional support for the fact that the rate that Precision Pine actually used for logging and hauling on the U-Bar contract was $108 per mbf (LS) is found in logger pay records at PX 238.

suspension. Tr. 545-48 (Porter); PX 306, PX 309. Mr. Porter further determined that the logging and hauling rate for the Brookbank sale was what Precision Pine would also have incurred on the Kettle sale, which was yet to be harvested at the time of the suspension (Tr. 548-49), and with a slight upward adjustment of $10 per mbf, that $125/mbf was the rate that Precision Pine would have paid for logging and hauling on the Salt sale (which also had not been harvested at the time of the suspension) during the suspension.

1377. Mr. Porter also found that the logger pay records for the St. Joe sale on which the suspension had been lifted in October 1995 indicated that Precision Pine had paid $85 per mbf for logging and hauling on that sale. Tr. 549-52 (Porter); PX 252. Mr. Porter then applied the logging and hauling rate for St. Joe to the Jersey Horse sale based on his determination that the logging and hauling rates on the two sales would have been comparable. Tr. 552-53 (Porter).

1378. Mr. Porter determined, based on Precision Pine's logger pay records, the rate that Precision Pine actually paid for logging and hauling on the Manaco sale was $128.65/mbf. Tr. 553-55 (Porter); PX 310 (sans handwriting).

1379. Finally, Mr. Porter used the logger pay records for the Hay sale to determine that Precision Pine had paid for logging and hauling at the rate of $90/mbf on that sale prior to the suspension period (Tr. 582-583; PX 236) and that, due to similarities between the Hay and O.D. Ridge sales, on O.D. Ridge Precision Pine would have paid a rate close to, but slightly less than it had for logging and hauling on Hay, i.e., $85/mbf. Tr. 587-89.

1379A. Defendant only derives logging & hauling data for some of the breached sales. See DPFF 548-555. As shown below, with the exception of the Hay and Jersey Horse contracts, of those contracts for

which defendant did derive a putative logging and hauling rate, the rates differ from those calculated by Mr. Moosman in his report:

| Sale | Defendant's Proposed Findings of Fact | Mr. Moosman's report |
|---|---|---|
| Brookbank | $188.03/mbf (DPFF 548) | $131.88/mbf ($65.94/ccf x 2mbf/ccf) (DX 777 at 36) |
| Kettle | $162.03/mbf (DPFF 551) | $67.68 ($33.84/ccf x 2 mbf/ccf) (DX 777 at 73 |
| Manaco | $298.16 or, with correct arithmetic, $209.16/ mbf (DPFF 552) | $156.46 ($78.23/ccf x 2 mbf/ccf) (DX 777 at 47) |
| Mud | $185.38/mbf (DPFF 553) | $161.92 ($80.96/ccf x 2 mbf/ccf) (DX 777 at 19) |
| O.D. Ridge | $94.86/mbf (DPFF 554) | $101.55/mbf (DX 777 at 75-76) |
| U-Bar | $150.03/mbf (DPFF 555) | $138.84/mbf (DX 777 at 30) |

**Precision Pine's Profit Projections of July 17, 1995**

1380. In preparing to bid on a timber sale contract, Mr. Porter would frequently create a spreadsheet reflecting major items of revenue and costs that might be obtained and incurred from that contract. Tr. 857-861 (Porter); see also Tr. 1568-69 (Porter). Such internal spreadsheets are designed solely for the user's benefit and can reflect anything that the individual user wants. See Tr. 2590-91 (Ness). Accordingly, such documents cannot be understood standing alone, but rather require an explanation by the user. See Tr. 866-894 (Porter). In this case, the projections were merely a tool that Mr. Porter used to help derive a bid price for the timber sale contract, and nothing more. Tr. 876 (Porter); Tr. 2946-48 (Tenney). Accordingly, the "profit projections" would not constitute an accounting *pro forma*, and an accountant could not use Mr. Porter's "profit projections" for any formal accounting. Tr. 2590-92 (Ness). For example, the documents do not show what an accountant might regard as gross profit before operating overhead. Tr. 2590-91 (Ness); see also Tr. 1568-69 (Porter) (indicating that Mr. Porter included some operating overhead in his profit projections). In fact, there may be no accounting term that describes the results of Mr. Porter's spreadsheet projections. Tr. 2591 (Ness).

1381. The spreadsheets that Mr. Porter prepared on July 17, 1995 (DX519, 521-45 (the "July 17 Projections")) reflected a "worst case" scenario, were designed to show the minimum that Precision Pine would realize from the timber that it had under contract at that time, and were created to demonstrate to Mr. Tenney that Precision Pine could be profitable even in a disastrous business situation, thereby discouraging Mr. Tenney from undervaluing the company during buyout negotiations with Stone. (Mr. Tenney was more interested than Mr. Porter in selling Precision Pine to Stone.) Tr. 918-22, 2063-64 (Porter); Tr. 2948-50 (Tenney). Thus, the July 17 projections were never intended to reflect what Mr. Porter thought Precision Pine would actually recover from the sales.

1382. Although the July 17 projections were "worst case" scenarios and would not constitute any sort of *pro forma* accounting of gross profits that Precision Pine might have achieved from the breached sales (Tr. 2590-991 (Ness); PPFF* 1005), assuming that they provide some indication of absolute minimal profitability, they still show that Precision Pine would have made at least $1,638,269 from the breached sales:

| | |
|---|---|
| Brookbank | $238,187 |
| Hay | $947,785 |
| Jersey Horse | ($52,985) |
| Kettle | $120,352 |
| Manaco | $43,277 |
| Monument | $20,437 |
| Mud | $211,913 |
| O.D. Ridge | $158,256 |
| Sag-Kennedy | $68,028 |
| Salt | ($94,487) |
| U-Bar | ($22,494) |
| | $1,638,269 |

D's Post-trial Br. at DA 2.

1383. Although lumber prices fell going into the suspension, they bottomed out in January- February 1995, after which time they continued to elevate rapidly. DX 776 at Ex. 3 (pg. US 07812). By the latter part of the suspension, product prices were significantly higher than the prices that Mr. Porter assumed for

his "worst case" analyses in the July 17, 1995 projections. Compare DX 519, 521-544 and PX 131, Apx. A at 1, col. B with PX 131, Apx. A at 1, cols. F, G, H. In fact, lumber product prices during the latter part of the suspension were higher than prices both immediately before the suspension and at any time in 1998 and 1999. DX 776 at Ex. 3 (pg. US07812); PX 168.

1384.

| | Figures used by Mr. Porter in his July 17, 1995 worst case projections per mbf (LT) | Figures that Mr. Ness calculated that Precision Pine could have reasonably anticipated per mbf (LT) from PX 131, Ex. 15 |
|---|---|---|
| Sawmill costs | $70.00 - $80.00 | $48.08 - $63.98 |
| Planer costs | $80.00 - $93.00 | $42.63 |

1385. The figure "1.10" on the July 17 projections (see PPFF 1005, supra; DX 519-545) does not reflect Precision Pine's anticipated overrun. Tr. 922-23 (Porter). Although Mr. Porter had originally used the field marked "O.R.%" on his profit projections to indicate anticipated overrun, by the time he prepared the projections dated July 17, 1995, he used the field to reflect the degree of pessimism in the projection. Tr. 898-902 (Porter); see also Tr. 866-894 (Porter) (explaining his changing methods for reflecting pessimism or optimism in profit projects); PX 63-86.

**VARIOUS ADDITIONAL FINDINGS**

1402. David Harris became a contracting officer sometime in 1993. Tr. 3744 (Harris). Accordingly, he was a contracting officer for about two years when the suspension was imposed by the Forest Service in August 1995.

1403. Clifford Dils became a contracting officer in the fall of 1994. Tr. 4589 (Dils). Accordingly, he was a contracting officer for less than one year when the suspension was imposed by the Forest Service in August 1995.

1404. Susan Lee became a contracting officer sometime in 1992. Tr. 4550 (Lee). Accordingly, she was a contracting officer for about three years when the suspension was imposed by the Forest Service in August 1995.

1405. As Mr. Ness testified, his post-suspension report quantifies the total financial impact of the breached sales to Precision Pine in the post-suspension period and, therefore, the cost of the defaults, which directly impacted the profitability of these sales, must be taken into account. Tr. 2463-4; 4202 (Ness).

1406. In acquiring several of its competitors in Northern Arizona, Precision Pine reduced the total sawmill capacity in Northern Arizona, which in turn reduced demand for timber from Forest Service timber sales. Tr. 103-09 (Porter). Moreover, from the late-1980s until the suspension occurred, some 47 million feet (mmbf) of sawmill capacity that had competed with Precision Pine for Forest Service timber in Northern Arizona had been shut down. Id. at 109. As a result, there were only two other sawmills that remained in competition with Precision Pine when the suspension began, the Reidhead sawmill in Nutrioso (near Eagar) and the Stone sawmill in Eagar, Tr. 102-03 (Porter), both of which were proximate to the Apache-Sitgreaves National Forest. See PX 104 (Map of Arizona showing relative positions of Eager, Nutrioso and the Apache-Sitgreaves National Forest). Conversely, there was effectively no competition for Forest Service timber sales for Precision Pine's sawmills in Heber or Winslow, which drew their source of supply primarily from the Tonto, the Coconino and the Kaibab National Forests. PPFF 10-12; Tr. 88-89, 103 (Porter); PX 104 (Map of Arizona). As Dr. Neuberger correctly conceded:

(1) there had been a "dramatic" reduction in sawmill capacity competing with Precision Pine for Forest Service timber sales; (2) given the location of the remaining competitors, Precision Pine may have been well-situated to obtain Forest Service timber sales offered on the Coconino, Tonto, Kaibab and the western half of the Apache-Sitgreaves National Forests; and, most importantly, (3) Precision Pine was well-positioned to cut the timber it had under contract at the time of the suspension. Tr. 3448-49 (Neuberger); see PPFF 10-13.

Respectfully submitted,

s/Alan I. Saltman

SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
Bryan T. Bunting
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: November 14, 2005