**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

# PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF FACT

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
Bryan T. Bunting
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Washington, D.C. 20006
(202) 452-2140

Dated: November 14, 2005

**A substantial number of defendant's more than 600 proposed findings of "fact" suffer from the infirmity of being half-truths or worse. Indeed, defendant cites to no fewer than 25 exhibits which were never accepted into evidence.[1] Set forth below are plaintiff's comments on those of defendant's proposed findings that are both inaccurate in some fashion and have a modicum of relevance to issues before the Court. The fact that plaintiff has chosen not to comment on other of defendant's proposed findings should not be taken as an indication that plaintiff concurs with them. Rather, in most, if not all, instances, it is merely an indication of plaintiff's belief that the proposed finding is irrelevant to a determination of the amount of damages to which plaintiff is entitled.**

## I. ARIZONA LUMBER AND TIMBER – AN INDUSTRY IN DECLINE

1. In terms of volume and value, Arizona is a relatively small producer of timber and lumber. As of 1992, the total timberland in Arizona was approximately 4 million acres. More than two-thirds of that area was designated as National Forest. In terms of volume of available sawtimber, the percentage of public ownership is even higher. Despite the fact that timber and timberland in Arizona are predominately public owned, timber production in the state has been largely from non-Federal sources. Tr. 3428 (Neuberger); DX776.

**Plaintiff's Comment – For his opinion that "timber production in [Arizona] has been largely from non-Federal sources," Dr. Neuberger examined production in 1996, which is the anomalous year when, because of the MSO injunction giving rise to this case, Federal sources of timber were largely unavailable. Tr. 3428-29 (Neuberger) ("Clearly, 1996 was affected by the suspension in this case, so 1996 may not have been the best choice"). In reality, at all times relevant to this case, Precision Pine's sawmills, as well as <u>all other non-Indian-owned sawmills</u> in Northern**

**[1] Given the pervasiveness of defendant's citations to exhibits that were never admitted, Precision Pine moves the Court to disregard any DPFF which cites to such exhibits, including DPFF 37, 42, 59, 60, 62, 65, 66, 76, 78, 88, 120, 173, 235, 241, 242, 295, 299, 437, 455, and 603.**

**Arizona, were substantially dependant upon the Forest Service's commercial timber sale program for their supply of logs to their sawmills. PPFF 7.**

2. The production of lumber from Arizona sawmills fell in every year from 1988 to 1996, from 447 million board feet ("mmbf") in 1998 to 105 million board feet in 1996. This secular (i.e., non-cyclical) decline in production continued after 1996. By 1998, lumber production in Arizona had fallen to 78 million board feet. Tr. 3330-31 (Neuberger); DX776.

**Plaintiff's Comment (also for paragraphs 3-17 & 28, infra) – As an initial matter, the relevance of DPFF 1-17 is unclear. Defendant groups these "facts" under headings such as "an industry in decline" and a "strategy of aggressive growth." Even if such assertions, made without benefit of any citation, were true, however, it is left unstated by defendant what affect, if any, they would have had on Precision Pine's use of timber it had under contract to carry out its operations during the suspension or its entitlement to damages resulting from the Forest Service's established protracted suspension and breach of those contracts.**

**Moreover, defendant's attempts to insinuate that market conditions would have some how prevented Precision Pine from operating profitably in the absence of a suspension is incorrect because, as defendant's own experts agreed, prior to the suspension Precision Pine had been consistently profitable, even in times of market volatility. Tr. 3418-19 (Neuberger); Tr. 5015-16 (Moosman). Moreover, the market bottomed by late January-early February 1996, rising rapidly and consistently thereafter throughout the suspension. DX 776 at Ex. 3 (pg US07812).**

**As Mr. Porter testified, at the same time that the volume of Forest Service timber being offered and lumber production was putatively declining, so too was the total sawmill capacity of Precision Pine's competitors for Forest Service timber sales. Tr. 103-09 (Porter). Indeed, from the late-1980's until the suspension occurred, some 47 million feet (mmbf) of sawmill capacity that had competed with Precision Pine for Forest Service timber in Northern Arizona had been shut down.**

**Id. at 109. In fact, at the time of the suspension, there were only two other sawmills that remained in competition with Precision Pine, the Reidhead sawmill in Nutrioso (near Eager) and the Stone sawmill in Eagar (Tr. 102-03 (Porter)), both of which were proximate to the Apache-Sitgreaves National Forest (see PX 104, Map of Arizona showing relative positions of Eager, Nutrioso and the Apache-Sitgreaves National Forest). As a result, there was effectively no competition for Forest Service timber sales for Precision Pine's sawmills in Heber or Winslow, which drew their source of supply primarily from the Tonto, the Coconino and the Kaibab National Forests. PPFF 10-12; Tr. 88-89, 103 (Porter); PX 104. As Dr. Neuberger correctly conceded: (1) there had been a "dramatic" reduction in sawmill capacity competing with Precision Pine for Forest Service timber sales; (2) given the location of the remaining competitors, Precision Pine may have been well-situated to obtain Forest Service timber sales offered on the Coconino, Tonto, Kaibab and the western half of the Apache-Sitgreaves National Forests; and, most importantly, (3) Precision Pine was well-positioned to cut the timber it had under contract at the time of the suspension. Tr. 3448-49 (Neuberger); see PPFF 10-13. Simply put, the alleged decline in the volume of Forest Service timber sale offerings and lumber production as whole in Arizona would not have changed the fact that, absent the suspension, Precision Pine's would have harvested all of the timber on the breached sales that it had under contract to supply its three sawmills and sold the resulting lumber at profit, just as it always had done prior to the suspension.**

3. Logging restrictions on national forest land have been largely responsible for the downward trend in lumber production volumes in Arizona. While Federal timber sales in Arizona have been limited since the late 1980's, these limitations have become increasingly restrictive over time. For instance, during the 1990's, wildlife restrictions designed to protect the Northern Goshawk and the Mexican Spotted Owl substantially reduced the amount of timber put up for sale by the Forest Service. As a result, the amount of timber on national forest land offered for sale declined significantly during the

late 1980's and throughout the 1990's. Tr. 3327-28 (Neuberger), 3821 (Harris); DX776; see also Tr. 1111, 1112 (Porter) (acknowledging that the supply of timber in Arizona has been diminishing).

**Plaintiff's Comment – See plaintiff's comment to DPFF 2. Additionally, defendant's reliance on the testimony and report of Dr. Neuberger with respect to the putative harvest restrictions due to listings under the ESA is wholly unwarranted. Tr. 3436-43 (Neuberger).**

4. Offers of timber on Federal lands in Arizona were approximately 250 million board feet in 1988, down from more than 300 million board feet in 1984 and 1985. By 1995, the amount of timber offered for sale had fallen below 70 million board feet. Since 1998, Forest Service timber offers have averaged approximately 60 million board feet per year. Tr. 3323-24 (Neuberger); DX776.

**Plaintiff's Comment – See plaintiff's comment to DPFF 2.**

5. In terms of the volume of timber cut, amounts have fallen from approximately 280 million board feet in 1988, to approximately 40 million in 1995. Annual harvests have averaged about 30 million board feet per year since 1997. Tr. 33 10-12 (Neuberger); DX776.

**Plaintiff's Comment – See plaintiff's comment to DPFF 2. Of course, the suspension was in place during more than four months of 1995 and virtually all of 1996, thereby reducing the harvest in the relevant years.**

## II. PRECISION PINE'S UNSUCCESSFUL STRATEGY OF AGGRESSIVE GROWTH

### A. Precision Pine Acquires Sawmills And Triples Its Mill Capacity

6. While Arizona timber and lumber markets were largely on the decline throughout the early and mid-1990's, Precision Pine chose to embark on a substantial expansion of its operations. DX776; DX798.

**Plaintiff's Comment – See plaintiff's comments to DPFF 2. As defendant points out, Precision Pine bought other sawmills in the early 1990's, but either: never operated those mills (DPFF 8, 15); operated those sawmills for a short time on timber located proximate to them and then closed them (DPFF 9); and/or used those sawmills for parts to build sawmills in better strategic locations (DPFF 16; PPFF 10); see also Tr. 103-09 (Porter). Indeed, defendant's own proposed findings of fact suggest that Precision Pine's operations in 1992 were considerably larger than at the time of the suspension in 1995. See DFFF 14 (Precision Pine had annual lumber production capacity in excess of 35 mmbf and was operating two planers). Thus, before the suspension, Precision Pine was simply continuing to locate its sawmilling operations in proximity to those areas where it had timber under contract and not, as defendant asserts, "choosing to embark on a substantial expansion" of its sawmill capacity. See DPFF 6. In this regard, as Dr. Neuberger conceded, at the time of the suspension Precision Pine was well-positioned to operate on the timber it had under contract. Tr. 3448-49 (Neuberger).**

7. In 1990, Precision Pine was operating a single sawmill in Heber, Arizona with a putative single-shift capacity of 850 thousand board feet ("mbf") per month. See DX798; Tr. 94, 1433 (Porter); see also Tr. 1074; DX559. At the same time, Precision Pine was operating a single planer in Snowflake, Arizona. DX798; Tr. 619 (Porter).

**Plaintiff's Comment – See plaintiff's comments to DPFF 2 and 6.**

8. Precision Pine purchased a sawmill in Show Low, Arizona prior to June 1991. Precision Pine did not operate the Show Low sawmill. DX798, Tr. 1484 (Porter).

**Plaintiff's Comment – See plaintiff's comments to DPFF 2 and 6.**

9. Precision Pine purchased a sawmill in Clay Springs, Arizona prior to June 1991. Precision Pine operated the Clay Springs sawmill for a short period. The Clay Springs sawmill was closed permanently in the early 1990s. DX798.

**Plaintiff's Comment – See plaintiff's comments to DPFF 2 and 6.**

10. In December 1991, Precision Pine purchased from Duke City Lumber Company a sawmill and two planers in Winslow, Arizona. First Joint Stip. ¶¶ 3-4; DX798; Tr. 90, 96 (Porter) (stating also that Precision Pine acquired three dry kilns from Duke City). The putative capacity of the Winslow sawmill is 1150 mbf (lumber tally) per month. Tr. 94, 1432 (Porter); see also Tr. 1074 (Porter).

**Plaintiff's Comment – See plaintiff's comments to DPFF 2 and 6.**

11. Precision Pine operated the newly-acquired Winslow sawmill in tandem with the company's sawmill in Heber. See DX559; DX798. Similarly, Precision Pine operated both the newly-acquired planers and its Snowflake planer. DX798; see also DX294 (April 1995 to March 1996 summary).

**Plaintiff's Comment – See plaintiff's comments to DPFF 2 and 6.**

12. In October 1992, Precision Pine purchased a sawmill in Williams, Arizona from Grand Canyon Forest Industries. Tr. 106 (Porter); DX798. The Williams sawmill had a capacity of about 1,100 mbf (l.t.) per month. Tr. 106 (Porter).

**Plaintiff's Comment – See plaintiff's comments to DPFF 2 and 6.**

13. Precision Pine operated the newly-acquired Williams sawmill together with its sawmills in Winslow and Heber. Tr. 106, 1485 (Porter); DX798.

**Plaintiff's Comment – See plaintiff's comments to DPFF 2 and 6.**

14. Thus, by late 1992, Precision Pine was operating three sawmills and had more than tripled its alleged single-shift capacity. DX798; DX559 (identifying sawmills in Heber, Winslow and Williams); Tr. 94, 106, 1074 (Porter) (indicating that these mills had a production capacity in excess of 35 million board feet (lumber tally) per year). Likewise, Precision Pine had substantially increased its planing capacity and was operating planers in both Winslow and Snowflake. See DX798.

**Plaintiff's Comment – See plaintiff's comments to DPFF 2 and 6.**

15. In June 1993, Precision Pine purchased a sawmill in Payson, Arizona from Kaibab Forest Products Company. Precision Pine did not operate the Payson sawmill. DX798; Tr. 106-08, 1486 (Porter).

**Plaintiff's Comment – See plaintiff's comments to DPFF 2 and 6.**

16. During 1993, Precision Pine assembled a sawmill in Eagar, Arizona using equipment from the sawmills it had bought in Show Low and Clay Springs. DX798; Tr. 1855-56 (Porter). The putative capacity of the Eagar sawmill is 850 mbf (l.t.) per month. Tr. 94, 1432 (Porter); see also Tr. 1074 (Porter).

**Plaintiff's Comment – See plaintiff's comments to DPFF 2 and 6.**

17. In October 1993, Precision Pine opened the Eagar sawmill. At about the same time, Precision Pine permanently closed its Williams sawmill. DX798; DX559; Tr.106, 1485 (Porter).

**Plaintiff's Comment – See plaintiff's comments to DPFF 2 and 6.**

## B. Precision Pine's Acquisition Of Timber For Expanded Mill Operations

18. In order to secure raw material for its three sawmills from increasingly restricted sources of supply, during the early and mid-1990's, Precision Pine bid on timber and multi- product sale contracts

offered by various sources: the Forest Service; the State of Arizona; Indian tribes; and private landowners. DX776; Tr. 1653, 2037 (Porter).

**Plaintiff's Comment – See plaintiff's comments to DPFF 2 and 6. At all times, Precision Pine, like all timber purchasers in Northern Arizona, was dependant upon Forest Service timber sale offerings. PPFF 7. Precision Pine relied on the Forest Service for at least 75% of its supply of raw material. Id.**

19. Bidding for timber sale contracts was competitive. Tr. 1278 (Porter). And Precision Pine's bidding strategy was aggressive as evidenced by the bid premiums that the company was willing to pay over and above minimum bid prices. Tr. 3463 (Neuberger); DX776; see also Tr. 4139 (Harris), 4630-32 (Dils), 4563-65 (Lee); DX554 (writing, during bidding, "[d]on't give Stone anything over here"); DX559 (showing the per mbf payment to the Forest Service (i.e., the stumpage fee) was increasing during the 1990's).

**Plaintiff's Comment – See plaintiff's comment to DPFF 20, infra. The prices that Precision Pine bid for its contracts were not uneconomical, as evidenced by the fact that Precision Pine was profitable in every year prior to the suspension. Tr. 3418-19 (Neuberger); Tr. 5015-16 (Moosman). Indeed, but for the suspension, Precision Pine would have operated all of the breached contracts profitably during the period of the suspension. PX 131.**

20. While Precision Pine's aggressive bidding practices enabled the company to win many contracts upon which it bid, and to secure some additional timber for its expanded mill operations, it also meant that the company had to pay high prices for timber – prices that were likely to be uneconomical. DX776; Tr. 3351-57 (Neuberger).

**Plaintiff's Comment – Defendant purports to rely solely on the report and testimony of Dr. Neuberger in support of its contention that prices bid for timber by Precision Pine were "likely to**

**be uneconomical." Dr. Neuberger's "opinions" in this regard, however, are of no value to the Court as he admitted that he had no independent view as to whether Precision Pine had bid too high on any timber sale contract. Tr. 3456 (Neuberger). Rather, Dr. Neuberger relied exclusively on a few conversations with Forest Service employees and another expert in this case that suggested that one of Precision Pine's contracts "was not likely to be profitable." Id. As the Court commented, "cross-examination has elicited that he [Dr. Neuberger] independently is not in a position to say anything about whether bid prices were too high or not . . ." Tr. 3456-60 (Neuberger). Indeed, as the Court stated, the testimony of Dr. Neuberger on bidding had the appearance of "matter that comes in an ear and goes out the mouth without human intervention." Id.**

21. This exposed the company to considerable market risk. This market risk was especially acute during periods in which lumber prices were depressed because the lower the market prices for lumber products, the greater the number of Precision Pine's contracts that were rendered unprofitable. Tr. 3312-14 (Neuberger); DX776.

**Plaintiff's Comment – See plaintiff's comment to DPFF 20. Dr. Neuberger's report and testimony is of no assistance to the Court on this point. See also Tr. 3466-67 (Neuberger) ("I don't have an objective measure to say that the[bid] price is either to high or too low").**

**C. Precision Pine's Sawmill Overcapacity**

22. Precision Pine harvested 25,399 mbf (log scale) in 1992. DX559.

**Plaintiff' Comment – On DX 559 (cited here and in DPFF 23-26 and 28-34), the figures for "Annual Volume Harvested" are in the wrong columns. Specifically, the figures are shifted one column to the left. Tr. 2105-10, 2143, 1409-10, 1417-18 (Porter). Thus, it was in 1993 not 1992 that Precision Pine logged 25,399 mbf (LS) of timber. As set forth in PPFF 250, using this timber, in the**

**fiscal year ending March 31, 1994 Precision Pine produced 30,088 mbf (LT) of lumber. Tr. 2320 (Ness).**

23. Precision Pine harvested 23,541 mbf (1.s.) in 1993. DX559.

**Plaintiff' Comment – <u>See</u> plaintiff's comment to DPFF 22. It was in 1994 not 1993 that Precision Pine logged 23,541 mbf (LS) of timber. Tr. 2105-10 (Porter). Using this timber, in the fiscal year ending 3/31/95, Precision Pine produced 30,197 mbf (LT) of lumber. Tr. 2320 (Ness.)**

24. Precision Pine harvested 18,673 mbf (l.s.) in 1994. DX559.

**Plaintiff' Comment – <u>See</u> plaintiff's comment to DPFF 22. It was in 1995 (over four months of which were during the suspension), not in 1994 that Precision Pine logged 18,673 mbf (LS) of timber. Tr. 2105-10 (Porter). Using this timber, in the fiscal year ending 3/31/96, Precision Pine produced 22,363 mbf (LT) of lumber. Tr. 2320 (Ness).**

25. Precision Pine harvested 11,011 mbf (l.s.) through late 1995. DX559.

**Plaintiff' Comment – <u>See</u> plaintiff's comment to DPFF 22. It was in 1996 (over 11 months of which were during the suspension), not in 1995 that Precision Pine logged 11,011 mbf (LS) of timber. Tr. 2105-10 (Porter). Using this timber, in the fiscal year ending 3/31/97, Precision Pine produced 12,260 mbf (LT) of lumber. Tr. 2321 (Ness).**

26. Precision Pine never harvested a sufficient volume of timber to run its three sawmills at their putative 35 million board foot annual capacity. <u>See</u> Tr. 14 14-15, 1421-22 (Porter); DX559; <u>see also</u> 1074 (Porter) (testifying that the annual capacity for Eagar, Heber and Winslow was about 35 mmbf (1.t.)/year).

**Plaintiff' Comment – Prior to the suspension the capacity of Precision Pine's three sawmills at issue in this case was less than 35 mmbf (LT). The 35 mmbf (LT) figure was based on the fact that, at the time of the suspension, Precision Pine was completing upgrades to its Eagar facility. PPFF 15. Accordingly, before the suspension, there was no need for Precision Pine to harvest the volume of timber needed to produce 35 mmbf (LT). Instead, it was harvesting at about 93% of that rate. PPFF 250. Moreover, but for the suspension, Precision Pine would have harvested sufficient timber to produce 35 mmbf (LT) per year. PPFF 250-51.**

27. Precision Pine's three sawmill operation was never run at its putative 35 million board foot capacity. See Tr. 1410, 2144 (Porter); DX802.

**Plaintiff's Comment – See plaintiff's comment to DPFF 26.**

28. Despite Precision Pine's aggressive bidding, and despite the fact that Precision Pine's mills were operating at less than capacity, the volume of timber that Precision Pine had under contract declined steadily during the mid-1990s. DX559.

**Plaintiff's Comment – See plaintiff's comments to DPFF 2, 20 and 26 with respect to defendant's assertions about aggressive bidding and Precision Pine's sawmill operations. Most of the decline in Precision Pine's timber under contract occurred in late 1995. DX 559; DPFF 29-33. Accordingly, the decline corresponded with the Forest Service's drastic reduction of its timber offerings as a result of the MSO suspension. DPFF 3; see Joint Stipulation (May 12, 2005) ¶¶ 1, 6, 11, 16. Moreover, despite the alleged decline in the amount under contract, Precision Pine always had enough timber under contract, including at the time of the suspension to produce 35 mmbf (LT). See DX 559 (showing 34 mmbf (LS) of timber as the minimum amount under contract, more than enough to produce 35 mmbf (LT), even under the most unreasonable overrun factor suggested by defendant.)**

29. In 1992, Precision Pine had 51,571 mbf (l.s.) timber under contract. DX559.

**Plaintiff' Comment – <u>See</u> plaintiff's comment to DPFF 28.**

30. In 1993, Precision Pine had 51,097 mbf (l.s.) timber under contract. DX559.

**Plaintiff' Comment – <u>See</u> plaintiff's comment to DPFF 28.**

31. In 1994, Precision Pine had 49,647 mbf (l.s.) timber under contract. DX559.

**Plaintiff' Comment – <u>See</u> plaintiff's comment to DPFF 28.**

32. In 1995, Precision Pine had 40,786 mbf (1.s.) timber under contract. DX559.

**Plaintiff' Comment – <u>See</u> plaintiff's comment to DPFF 28.**

33. In December 1995, Precision Pine had 34,288 mbf (1.s.) timber under contract. DX559.

**Plaintiff' Comment – <u>See</u> plaintiff's comment to DPFF 28.**

34. Thus, Precision Pine had 50 percent more timber under contract in 1992 – the year in which Precision Pine opened a third sawmill – than at the close of 1995. DX559.

**Plaintiff' Comment – <u>See</u> plaintiff's comment to DPFF 28.**

35. In March 1995, Precision Pine began reducing operations by closing its Snowflake planer – a planer that Precision Pine had operated continuously since the 1980's.

DX798.

**Plaintiff's Comment – Precision Pine did not need the Snowflake planer after acquiring the two planers at Winslow, because one planer can handle the output of two sawmills. Tr. 96-97 (Porter). (So the planers at Winslow could have accommodated the output from yet a fourth**

**sawmill.) Thus, closing the Snowflake planer simply reflects Precision Pine's ongoing efficient refocusing of its productive capacity. Additionally, the closure of the Snowflake planer is inconsistent with defendant's theory that Precision Pine was engaged in "aggressive growth." The fact remains that Precision Pine regularly opened and closed mill facilities to best suit the efficiencies of its operations. <u>See</u> plaintiff's comment to DPFF 6.**

36. In April 1995, recognizing that additional downsizing would be necessary, Tri- Star Logging – Precision Pine's long-time logging contractor for the Winslow and Heber sawmills, Tr. 1107-09 (Porter) – sought and obtained an agreement that it would perform all logging "for the remaining two mills" if Precision Pine is "forced to shut down another sawmill." DX463.

**Plaintiff's Comment – The proposition set out in this paragraph is not supported by the document cited (DX 463). The document does not indicate that Precision Pine recognized that additional downsizing would be required. It merely provided that Tri-Star would remain Precision Pine's exclusive logging subcontractor, "<u>If</u> we are required to shut down another sawmill. . . ." DX 463. In fact, the Eagar mill was not permanently closed until more than two years after the date of this document. <u>See</u> DX 463 (dated April 18, 1995); PPFF 47 (Eager closed permanently at the end of July, 1997).**

37. At about the same time, Precision Pine vice president, Lewis Tenney, suggested that company would have to close its Eagar sawmill. DX85 (stating that the renewed availability of the Hay contract would "enable the small mill [ Eagar] to keep running and save jobs <u>for a while longer</u>" (emphasis added); <u>see also</u> DX81; DX82.

**Plaintiff's Comment – None of the exhibits cited in support of this proposition (DX 81, 82, 85) were ever proffered or accepted as evidence in this case. As such, defendant's citation to them**

**is improper. The Eager mill did not close down at that time or for more than two years thereafter. PPFF 47.**

D. Precision Pine Cancels Timber Contracts And Defers Harvesting

38. By July 1995, lumber prices had fallen substantially from where they stood in 1993 and 1994, the time period when Precision Pine was bidding on the timber it currently had under contract. See PX305; DX776 (exhibit 3).

**Plaintiff's Comment – The lumber market is cyclical and the market for Ponderosa Pine lumber is no exception. Ponderosa Pine lumber prices stopped falling by the 4th quarter of 1995, remained flat until January or February 1996, and then escalated very rapidly (i.e., "took off like a rocket") throughout the remainder of the suspension and damages periods. PPFF 246.e. When prices for lumber products fell, stumpage prices on a number of Precision Pine's contracts were correspondingly reduced. PPFF 19; see, e.g., PX 169 at HAY-37 (contract clause B3.2, establishing de-escalation procedures). In any event, contrary to defendant's proposed finding eight of Precision Pine's contracts were awarded either before 1993 or after 1994. See Precision Pine, 50 Fed.Cl. at 38 n.1.**

39. As a result, even with an outlet for roundwood from its multi-product sales,[2] Precision Pine was unable to profitably harvest more than a third of the timber it had under contract. See, e.g., DX523 (Jersey Horse) (1,700 mbf); DX526 (Salt) (2,120 mbf); DX528 (Campbell) (2,280 mbf); DX535 (U-Bar) (1,900 mbf); DX540 (Merritt) (700 mbf); DX542 (Hualapai) (790 mbf); DX543 (Dutch Joe) (750 mbf); DX544 (Park) (900 mbf); DX545 (Barber) (2,275 mbf).

[2] As discussed below, by September 1995, Stone Container Corporation was unwilling to purchase roundwood coming from Precision Pine's contracts. See paragraphs 55- 56, infra. This lack of an outlet for roundwood caused still more contracts to be unprofitable during the period of the MSO suspensions. See paragraphs 584-92, infra. **Plaintiff's Comment – See plaintiff's comment to DPFF 55-56, 584-92, infra.**

**Plaintiff's Comment – This assertion is based on documents dated July 17, 1995 that Mr. Porter prepared as a "worst case scenario" and never intended to use as projection of what revenues Precision Pine would actually recover from these sales. See plaintiff's comment to DPFF 583. Additionally, only three of the contracts identified are at issue in this case.**

40. To address this situation, Precision Pine (1) took advantage of opportunities to cancel overpriced contracts, (2) operated its mills at a reduced level (substantially below their alleged capacities), and (3) deferred the harvesting of less profitable contracts. See, e.g., PX106; DX559; DX505; DX802; Tr. 1063-64 (Porter).

**Plaintiff's Comment – These assertions were rebutted in plaintiff's opening brief. P's Post-Trial Br. at 52-56. Defendant also ignores the facts that, during the suspension, Precision Pine was forced to operate its mills at reduced levels because the Forest Service had suspended operation on nearly all of its Forest Service timber sale contracts for 16 months (PPFF 390), and the Forest Service was also not selling any new timber sales during the suspension, see Joint Stipulation of Fact (May 12, 2005), ¶¶ 2, 7, 12, 17.**

41. In October 1995, Precision Pine used the opportunity provided by the MSO suspensions to negotiate the cancellation of its two highest priced (and biggest money losing) contracts – Barber and Campbell. PX106 ¶ 4; Tr. 1848-49 (Porter). The cancellation of these contracts reduced by about 5 million board feet the timber Precision Pine had under contract during the period of the MSO suspensions, DX528; DX545, and eliminated two (of three) principal sources of large diameter logs, see PX99 (identifying Barber, Campbell and Hay as having "large diameter trees" needed by Precision Pine); Tr. 1849 (Porter). However, it allowed Precision Pine to avoid performing two contracts upon which Precision Pine expected to lose over $800,000. See DX545 (Barber) (loss of $503,646); DX528 (Campbell) (loss of $342,839).

**Plaintiff's Comments – See also P's Post-Trial Br. at 52-56. The Barber and Campbell sales contained high quality timber, would have produced high quality lumber, and were priced accordingly. Tr. 1849 (Porter); 2938, 2973 (Tenney). Precision Pine agreed to the Forest Service's cancellation of these two sales, because they were politically contentious in the Silver v. Babbitt litigation (because they contained high quality, older timber), and Precision Pine was cooperating with the Forest Service to appease the environmental litigants with the aim of shortening the suspension and obtaining the release of all of its timber sale contracts. See Tr. 2936-2942 (Tenney).**

**DX 545 & 528, cited in the last sentence of DPFF 41, are two of Precision Pine's July 17, 1995 "worst case scenario" projections and did not reflect what Precision Pine actually anticipated earning from the sales. See also plaintiff's comment to DPFF 583.**

42. Similarly, in September 1996, Precision Pine negotiated a "friendly default" with the State of Arizona on the Park multi-product sale. See DX546; DX699; DX709; DX717; Tr. 1841-42 (Porter). The default reduced the volume of timber Precision Pine had under contract during the period of the MSO suspension by nearly one million board feet, see DX544 (990 mbf), but allowed Precision Pine to avoid performing another contract on which it expected to lose money for a relatively small penalty. See DX546 (requiring payment of a $8,190 penalty); DX544 (projecting a loss, without accounting for roundwood losses, of $45,151).

**Plaintiff's Comment – See P's Post-Trial Br. at 52-56. Additionally, DX 709 & 717, relied on to support the first sentence of the above paragraph, were neither proffered nor accepted as evidence in this case. As such, defendant's citation to them is improper. DX 544, cited in the last sentence, is one of Precision Pine's July 17, 1995 "worst case scenario" projections and did not reflect what Precision Pine actually anticipated earning from the sale. See plaintiff's comment to DPFF 583, infra. Moreover, a dispute arose between Precision Pine and the State of Arizona**

**regarding the amount of timber remaining on the contract; thus, it is not clear that any timber remained under contract at the time of the friendly default. See PPFF 392.d; PPFF 270.**

43. During 1994, a year that Precision Pine's operations were not affected by Forest Service suspensions, Precision Pine chose to operate its sawmills at 70 percent of their alleged annual capacity. DX559; Tr. 1419-22 (Porter).

**Plaintiff's Comment – Defendant's proposed finding is incorrect. As Mr. Porter testified, the numbers on DX 559 are not set forth correctly. Tr. 1409-10 (Porter). In both fiscal years ending 3/31/94 and 3/31/95, which includes all of calendar year 1994, Precision Pine actually produced in excess of 30 mmbf of lumber (PX 246), some 93% of the capacity at the three sawmills at issue in this case.**

44. Similarly, prior to the MSO suspensions in 1995, Precision Pine chose to operate its sawmills at less than their alleged capacity. DX802 (showing that Precision Pine's mills operated below their supposed capacity from April to September 1995); DX505 (showing that none of Precision Pine's mills were operating at capacity in April 1995); see also Tr. 1425-29 (Porter) (Precision Pine's sawmills would have run through all logs harvested by late May had they been operating at capacity in 1995); DX559 (showing timber harvests of 11,011 mbf (l.s.)).

**Plaintiff's Comment – Defendant's putative facts are incorrect in several respects: DX 802 does not show that the sawmills were not operating at capacity "from April to September, 1995" as claimed; rather, the exhibit shows only that as of September 30, 1995, i.e., after the suspension had been in place for move than five weeks, Precision Pine's production for the year to date was below capacity. That DX 505 suggests that production might be below monthly capacity in April of 1995 is not surprising as April is typically a month of relatively low production (see Tr. 3101-03 (Porter)), nor is it surprising that production in any single month during the year is below capacity.**

**The fact remains that in FYE 3/31/96, i.e. April 1, 1995 to March 31, 1996, Precision Pine produced 22.363 mmbf of lumber (PX 246) even though the suspension had been in place since August, 1995 (i.e., more than seven months of the fiscal year) and both the Winslow and Eagar sawmills had been shutdown due to the suspension. PX 163. Thus, absent the suspension, Precision Pine would have operated at capacity in FYE 1996, as projected. PX 131.**

45. In subsequent years, Precision Pine continued to run its mills at less than capacity and, additionally, never operated more than two mills at any given time. See Tr. 1080-82 (Porter); DX798.

**Plaintiff's Comment – In 1995 and 1996, Precision Pine had to temporarily shut down some of its sawmills during the suspension as a direct result of the Forest Service's breach of contract. See P's Post-Trial Br. at 15-16, 51-52. After the suspension, in 1997, Precision Pine attempted to reopen the sawmills it closed, in order to have all three sawmills operational again, but eventually had to close Eagar mill permanently as the result of yet another Forest Service suspension. PPFF 374-386.**

46. In 1994 and prior to the MSO suspension in 1995, Precision Pine deferred harvesting numerous timber and multi-product sales that were under contract and available. See, e.g., DX3 (cutting no timber on O.D. Ridge in 1995); DX128 (cutting no timber on Jersey Horse in 1994 or 1995); DX152 (cutting no timber on Salt in 1994 or 1995); DX251 (cutting no timber on Hutch-Boondock in 1994 or 1995); DX291 (cutting no timber on Mud in 1994 or 1995); DX320 (cutting no timber on Saginaw-Kennedy in 1994 or 1995); DX361 (cutting no timber on Brann in 1994 or 1995); DX437 (cutting no timber on Monument in 1994 or 1995); Tr. 1063-64 (Porter) (admitting Precision Pine deferred harvesting – and in fact never harvested – timber from the Salt, Monument and Saginaw-Kennedy contracts).

**Plaintiff's Comment – Using the timber that Precision Pine did harvest in the fiscal year ending March 31, 1995, Precision Pine produced 30,197 mbf (LT) of lumber (Tr. 2320 (Ness)),**

**which was close to its capacity for that time period. See Tr. 94-95 (Porter) (before the 1995 upgrades, the Heber sawmill's capacity was about 15-20% less than what its capacity would have been but for the suspension). Accordingly, the fact that Precision Pine did not harvest some of the sales it had under contract at that time is explained by the simple fact that Precision Pine needed no more logs to fill its sawmill's capacity at that time.**

47. Precision Pine continued to defer harvesting on available timber under contract during and after the period of the MSO suspensions. See, e.g., DX791; DX800; Tr. 1063-64 (Porter).

**Plaintiff's Comment – With respect to the alleged "deferral" of timber harvest during the period of the suspension, see P's Post-Trial Br. at 52-56. The alleged deferral of timber harvest after the suspension is irrelevant to any issue before the Court as Precision Pine is a lost volume seller. Should the Court rule, however, that Precision Pine is not a lost volume seller, the extent to which profitable operations were possible on the breached sales during the post-suspension period is set forth in PX 182. (Mr. Ness' expert report on post-suspension profits).**

**Additionally, DX 791, a transcript of a status conference on November 4, 2003, cited by defendant in DPFF 47, is subject to Precision Pine's pending motion to strike, see Tr. 1072-74, 1085-88, 1115, 1244-45, 1687-1690. DX 791 should be stricken because plaintiff timely supplemented its answers to interrogatory 34 in accordance with the Court's order of November 4, 2003, which provided that the statement of plaintiff's counsel at a status conference would be admitted only if plaintiff failed to so supplement. Indeed, the government had plaintiff's supplemental answers admitted as evidence in this case as DX 786; accordingly, the statements of counsel at a status conference are not evidence in this matter.**

**E. Precision Pine Loses Its Outlet For Roundwood**

48. In July 1995, Stone Container Corporation a/k/a Stone Forest Industries ("Stone") inquired about purchasing Precision Pine. Tr. 1566 (Porter), 2948-49 (Tenney).

**Plaintiff's Comment – The fact that one of the two other remaining sawmill operations in Arizona approached Precision Pine to begin buyout negotiations supports Precision Pine's theories that market consolidation was occurring in Arizona, that Precision Pine was a profitable operation, that market integration can occur in the face of declining supply, and that Precision Pine's consolidating with other sawmills was not a "risky" business practice under such conditions. See plaintiff's comment to DPFF 2.**

49. Stone was a competitor of Precision Pine. Tr. 1283 (Porter), 1741 (Reidhead) (Precision Pine competed "very strongly" with Stone); DX554 ("Don't give Stone anything over here").

50. Precision Pine's vice president, Lewis Tenney, handled negotiations with Stone. Tr. 1566-67 (Porter), 2948-52, 3035 (Tenney).

51. Precision Pine's president, Lorin Porter, was less interested in selling the company to Stone than was Mr. Tenney. Tr. 1568 (Porter), 2949, 3033 (Tenney).

52. In order to provide Mr. Tenney information on the value of timber under contract, on July 17, 1995, Mr. Porter prepared a set of profit projections addressing each of Precision Pine's timber and multi-product sale contracts. Tr. 1568, 2063 (Porter); DX519; DX521-45.

**Plaintiff's Comment – Mr. Porter prepared the 7/17/95 documents in order to show Mr. Tenney the absolute minimum (i.e., the "worst case") that Precision Pine would realize from the timber that it had under contract at that time. Tr. 1567 (Porter); Tr. 2949 (Tenney). Even under**

**this worse case scenario, the projections show that Precision Pine would have earned more than $1.6 million. PPFFF* 1382.**[3]

53. Mr. Porter's profit projections showed the anticipated gross profit for the sale of lumber and by-products. Tr. 1568, 1570 (Porter); DX519; DX521-45.

**Plaintiff's Comment – Mr. Porter's profit projections do not show what an accountant might regard as gross profit before operating overhead. Tr. 2590-91 (Ness); Tr. 1568-69 (Porter) (indicating that Mr. Porter included some operating overhead in his profit projections). Indeed, there may be no accounting term that describes the results of Mr. Porter "profit projections." Tr. 2591 (Ness). Also, the "profit projections" dated July 17, 1995, were never intended to reflect what Mr. Porter thought Precision Pine would actually recover from the sales analyzed. See plaintiff's comment to DPFF 583.**

54. The profit projections did not address the roundwood component of multi-product sales and did not provide a profit figure, i.e., they did not deduct general and administrative overhead expenses. Tr. 1571, 2137 (Porter); DX519; DX521-45.

**Plaintiff's Comment – That Mr. Porter generally did not consider pulpwood profits or losses when preparing to bid on a sale (which was his primary purpose for using his computerized worksheet (Tr. 2950 (Tenney); Tr. 857-867 (Porter)) shows the fact that pulpwood was a break-even proposition for Precision Pine, i.e., neither profits nor losses would have inured to Precision Pine from pulpwood sales.**

55. During the course of negotiations with Stone, Precision Pine provided detailed information about its timber sale contracts (e.g., the volume of timber and roundwood remaining under

**[3] Plaintiff's citations to Proposed Findings of Fact numbered 1000 or higher are to supplemental facts filed in support of Plaintiff's Response Brief.**

contract, sale area maps, the periodic payment dates) and allowed Stone representatives to tour Precision Pine's lumber manufacturing facilities. Tr. 1567 (Porter), 1948-52, 3033, 3035 (Tenney); DX458; DX473.

**Plaintiff's Comment – There is no evidence that Precision Pine showed Stone the details of its timber sale contracts, other than the maps. Tr. 2952 (Tenney). Indeed, Mr. Porter indicated that Stone was not that concerned about the contracts. Tr. 1567 (Porter). Mr. Tenney testified that Stone only needed to know what portion of the volume it could harvest under the Small Business Administration rules. Tr. 2951-52 (Tenney). Also, defendant's citation to Tr. 1948-52 does not support defendant's proposed finding as that portion of the transcript deals with the Park Timber Sale contract with the State of Arizona.**

56. Based in part on Mr. Porter's profit projections, Mr. Tenney offered to sell the Precision Pine to Stone for the sum of $10 million. Tr. 2950-5 1, 3033-34, 3043-44 (Tenney).

57. Stone did not make a counteroffer and a sale of Precision Pine to Stone was never consummated. Tr. 3034, 3043 (Tenney).

**Plaintiff's Comment – Shortly after Stone's inquiry about purchasing Precision Pine, the Forest Service imposed the suspension (Tr. 3035-36 (Tenney)), which grossly affected the timber market in Arizona, and adversely affected Precision Pine's profitability. Additionally, a second suspension of many of Precision Pine's sales was imposed in late May of 1997 and remained in place until December 15, 1997, which further impacted the timber and lumber market in Northern Arizona. <u>See</u> PPFF 47.**

58. As of August 1995, as Stone had learned during negotiations, the total volume of roundwood remaining to be harvested on the contracts at issue was 19,306 hundred cubic feet ("ccf"). <u>See</u> Third Joint Stip. ¶¶ 2, 4, 6, 9, 11, 13, 15, 17, 19, 21 & 23; <u>see also</u> DX473.

**Plaintiff's Comment – None of the evidence cited indicates that Stone was advised during negotiations of the volume of pulpwood remaining in the contracts at issue as of August 1, 1995.**

59. Stone was the only substantial purchaser of roundwood from Precision Pine's multi-product sale contracts. See Tr. DX566; DX570; DX800.

**Plaintiff's Comment – DX 566 was neither proffered nor admitted as evidence in this case. The government's citation of it is improper. There were other purchasers of pulpwood. See plaintiff's comment to DPFF 556.**

60. On occasions when Stone would purchase roundwood from Precision Pine, Precision Pine and Stone would execute a contract that established the sale price, the quantity of roundwood that Stone would accept, and the multi-product sale contract from which the roundwood would be harvested. See DX457; DX470; DX471; PX223.

**Plaintiff's Comment – DX 471 was neither proffered nor admitted as evidence in this case. The government's citation to DX 471 is improper. The sale of pulpwood from Precision Pine's sales to Stone took many forms including: contracts between Stone and Precision Pine, loggers selling Precision Pine's pulpwood to Stone, loggers selling Precision Pine's roundwood to Stone but not disclosing its origin, Stone's purchase of pulpwood at its gate with no prior contractual arrangement. See PPFF 270.**

61. Precision Pine was not usually able to cover the roundwood stumpage cost owed to the Forest Service. Tr. 1731 (Reidhead).

**Plaintiff's Comment –The stumpage price for pulpwood was covered by Precision Pine as follows: In situations where Stone paid Precision Pine for pulpwood deliveries from Precision Pine's sales, Precision Pine retained sufficient revenue to cover its stumpage costs with the Forest**

**Service and paid the remainder to Tri-Star. Tr. 1014-16 (Porter). In situations, which were becoming more common, where Stone paid Tri-Star directly (whether wittingly or unwittingly) for deliveries of pulpwood from Precision Pine's sales, documentary evidence and testimony confirm that Tri-Star remitted the stumpage price to Precision Pine out of such proceeds. Tr. 1014-16 (Porter); PX 239 (Precision Pine withholds payments for logging and hauling performed by Tri-Star because Tri-Star still owed Precision Pine for stumpage on pulpwood).**

**Additionally, at times stumpage would be paid directly from Stone to Precision Pine. PX 242 (If Stone paid Precision Pine for pulpwood delivery then Precision Pine was to pay Tri-Star its logging and hauling costs; however, if Stone made payment to Precision Pine for only the stumpage on pulpwood, then Tri-Star should look to Stone for payment on pulpwood delivery). See also DX 564 (Stone paid the stumpage price for 3,500 cords of pulpwood directly to Precision Pine). These payment systems have in common that Precision Pine covered its stumpage costs for pulpwood and the additional revenue for pulpwood went to Tri-Star.**

**As Mr. Ness testified, in calculating Tri-Star's pass-through claim for lost profits on pulpwood he had relied on conversations with Mr. Reidhead and on Tri-Star documents that showed that Tri-Star absorbed the pulpwood stumpage costs, i.e., by remitting payment for them to Precision Pine. Tr. 2750-54 (Ness). At trial, Mr. Reidhead qualified his testimony in this regard, stating that he did not "think" that Tri-Star remitted the stumpage, implying that he was not sure that was the case. As demonstrated above, the evidence is to the contrary.**

62. As of August 25, 1995, no contracts between Precision Pine and Stone required Stone to purchase roundwood harvested from any of the contracts at issue. See DX457; DX470; DX471; PX223.

**Plaintiff's Comment – As an initial matter, DX 471 was neither proffered nor admitted as evidence in this case. Defendant's citation to this exhibit is improper.**

**Moreover, at the time of the suspension, Precision Pine was making sizable pulpwood deliveries from a number of its sales to Stone. Indeed, in August of 1995, Tri-Star removed 1,332.95 cords of pulpwood from the Dutch-Joe, Brookbank and Merritt sale areas and delivered it to Stone. Tr. 1731-39 (Reidhead); PX 101; PX 1010 (demonstrative exhibit prepared by Mr. Reidhead). These considerable pulpwood deliveries were made in the very month of the suspension, even though there is no evidence that a contract or other agreement between Stone and Precision Pine existed with respect to pulpwood removed from Dutch-Joe or Merritt.**

**Additionally, during the suspension, Stone took down time at its plant that utilized chips and pulpwood in October and only resumed operations in April of 1996. DX 476. During part of this time, Stone suspended deliveries of chips due to "market conditions" during the suspension (id.) and evinced a diminished need for pulpwood as well. DX 475 (Letter dated October 3, 1995 indicated that Stone's needs for pulpwood are secure for the current logging season). Thus, absent the market conditions caused by the suspension, Stone may well have continued operating during the suspension and continued to accept pulpwood deliveries from Precision Pine.**

**Indeed, shortly after the suspension was lifted, Stone resumed purchasing sizable quantities of pulpwood directly from Precision Pine, taking all of the pulpwood from the Kettle sale in 1997 (PX 117) and all of the pulpwood from the Mud sale in late-1997 and into 1998 (PX 223), in each instance Precision Pine received revenue sufficient to cover its stumpage costs. In early 1998, however, Stone announced that it was permanently closing it pulp-making facility and, therefore, would no longer be accepting pulpwood deliveries. PX 125.**

63. In September 1995, shortly after the MSO suspensions had begun, Mr. Tenney sent a letter to Stone stating that he had recently heard that Stone was interested in purchasing roundwood. DX474. Mr. Tenney expressed "surprise" that no one at Stone had contacted Precision Pine. He offered

to sell Stone 1,000 cords of roundwood from the Park timber sale – a multi-product sale that had been awarded to Precision Pine by the State of Arizona. Id.

**Plaintiff's Comment – See plaintiff's comment to DPFF 62.**

64. On October 3, 1995, Stone rejected Mr. Tenney's offer to purchase roundwood from Precision Pine. Stone explained that it was "not looking to make any new commitments" for roundwood during the 1995-96 season. DX475.

**Plaintiff's Comment – See plaintiff's comment to DPFF 62. Defendant overreaches in its characterization of the letter. Stone said it was not looking to make new commitments during the current, i.e., 1995, logging season. Moreover, Stone took down time at its facility that utilized pulpwood and chips from October 1995 to April 1996. DX 476. Precision Pine did harvest pulpwood during the suspension. PPFF 1270.**

65. For the next two years, Stone continued to refuse to purchase roundwood from Precision Pine's multi-product sale contracts. See DX263 (Oct. 31, 1995); DX242 (Nov. 6, 1995); DX243 (Nov. 14, 1995); DX667 (Nov. 30, 1995); DX375 (Jan. 26, 1996); DX349 (Jan. 30, 1996); DX306 (Apr. 9, 1996); DX555 (June 6, 1996); DX309 (July 12, 1996); DX313 (Sept. 26, 1996); DX455 (Mar. 7, 1997); DX454 (Mar. 22, 1996); DX279 (Jan. 22, 1997); DX41 (Apr. 28, 1997); DX21 (May 12, 1997); DX403 (June 6, 1997); DX339 (June 20, 1997); DX392 (June 20, 1997); DX280 (July 1, 1997); DX47 (Aug. 23, 1997); DX461 (Aug. 29, 1997); see also Tr. 1741 (Reidhead) (Stone would refuse to buy roundwood because Precision Pine would often compete "very strongly" with Stone and "Stone would get upset"); Tr. 3857-61, 3864 (Harris) (during 1996 Stone refused to take roundwood from Art Daley upon learning that Mr. Daley was obtaining the roundwood from a Precision Pine sale); Tr. 1942 (Porter) (Precision Pine did not enter into any contracts with Stone concerning roundwood during the period of the MSO suspensions); Tr. 682-83 (Porter) (Stone did not consistently buy roundwood from Precision Pine or from

Tri-Star Logging); Tr. 1642, 1648-49, 1956, 1969-72, 2015 (Porter) (Precision Pine had difficulty moving roundwood in 1996); Tr. 1947-48 (Porter) (Precision Pine decked roundwood at its Eagar mill in 1997 as it had no outlet for roundwood).

**Plaintiff's Comment – As an initial matter, regarding the documents defendant cites in DPFF 65, DX 41 was neither proffered or admitted as evidence in this case. DX 279, while initially proffered, was withdrawn by the government, and was never admitted as evidence in this case. Defendant's citation to these exhibits is improper.**

**Precision Pine did harvest pulpwood during the suspensions. PPFF 1270. With respect to the roundwood that Precision Pine decked in the Eagar yard in 1997, Precision Pine eventually did sell the entire quantity to Stone. Tr. 1946-48 (Porter). See also plaintiff's comment to DPFF 62. Although Stone took some six months of down time due to "market conditions" during the suspension (DX 476), after the suspension was lifted Stone purchased all the pulpwood on the Kettle sale in 1997(PX 117) and all of the pulpwood on the Mud sale in 1997 and 1998 (PX 223) before permanently closing its pulping facility in early 1998. PX 125.**

**Moreover, even if there had been no outlet during the suspension period, pulpwood harvest would not have had a significant impact on Precision Pine's profitable operations of the breached sales had there been no suspension. P's Post-Trial Br. at 47-51.**

66. Because Stone declined to accept roundwood from Precision Pine, on numerous occasions during and after the period of the MSO suspensions, Precision Pine informed the Forest Service that it had no outlet for roundwood. See, e.g., DX263 (Oct. 31, 1995) ("PP&T does not have an outlet for pulpwood at this time"); DX306 (Apr. 9, 1996) ("we have no outlet for pulpwood"); DX555 (June 6, 1996) ("Stone Container has in the recent past declined to purchase pulpwood from PP&T"); DX309 (July 12, 1996) (stating that Stone still remained unavailable as an "outlet for our roundwood"); DX279 (Jan. 22, 1997) (noting continuing uncertainty about "the availability of a market for our pulpwood");

DX403 (June 6, 1997) ("Stone is not accepting any pulpwood at this time"); DX280 (July 1, 1997) (citing current "problems with marketing the smaller size material"); DX47 (Aug. 21, 1997) (noting "Stone's unwillingness to buy . . . roundwood from us").

**Plaintiff's Comment – See plaintiff's comments to DPFF 62 and 65.**

**DX 279 and 403 were proffered, but withdrawn by the government upon the plaintiff's objection, and were not admitted as evidence in this case. Defendant's citation to these exhibits is improper.**

67. For the fiscal year ending March 31, 1996 ("FYE 1996"), Precision Pine's financial statement shows no revenue from roundwood sales. PX248; DX777 (page 6a1).

**Plaintiff's Comment – Precision Pine did harvest pulpwood during the suspension. PPFF 1270. That Precision Pine did not retain pulpwood revenue, except to offset stumpage costs, supports Precision Pine's assertion that pulpwood was a "break even proposition" for the company. PPFF 270; P's Post-Trial Br. at 48; see also plaintiff's comment to DPFF 62.**

68. For the fiscal year ending March 31, 1997 ("FYE 1997"), Precision Pine's financial statement shows no revenue from roundwood sales. PX248; DX777 (page 6c1).

**Plaintiff's Comment – See plaintiff's comment to DPFF 67.**

69. In August 1997, Precision Pine transferred the Kettle multi-product sale contract to Stone. PX117. Precision Pine informed the Forest Service that it was transferring the contract because of "Stone's unwillingness to buy the roundwood from us." DX47; Tr. 1964-65 (Porter). Stone obtained roundwood as part of its acquisition of the Kettle multi-product sale. See PX117; DX553 (accepting roundwood from the Kettle sale that Precision Pine had cut and decked (i.e., stacked) at the Eagar mill).

**Plaintiff's Comment – Defendant again overreaches – the letter states that among the reasons for the transfer of the Kettle sale is the one identified by defendant. See also PX 182, Ex. 4, p. 5 (showing significant pulpwood harvest in the post-suspension period and sales to Stone). Finally, as noted above, the post-suspension period is irrelevant to Precision Pine's damages as it is a lost volume seller.**

70. In November 1997, Stone and Precision Pine executed a contract selling roundwood from the Mud multi-product sale to Stone. This was the only roundwood contract between Precision Pine and Stone that was entered into after August 25, 1995. Tr. 2121-22 (Porter); PX223; see also Tr. 1942-43 (Porter) (Precision Pine did not enter into any contracts with Stone concerning roundwood during the period of the MSO suspensions).

**Plaintiff's Comment – Stone purchased considerable quantities of both standing and decked pulpwood from Precision Pine in the post-suspension period. See PX 117; PX 182, Ex. 4, p. 5 showing significant pulpwood harvest and sales to Stone. Finally, as noted above, the post-suspension period is irrelevant to Precision Pine's damages as it is a lost volume seller.**

71. On February 12, 1998, Stone announced that it intended to stop purchasing roundwood as Stone would be using only recycled material at its paper mill. See Tr. 99 1-92 (Porter); PX126.

**Plaintiff's Comment – But for the Forest Service's breach of contract, all of the timber (including the pulpwood) remaining on the breached sales would have been harvested before February 1998. See Tr. 2245-46 (Ness); PX 131, Apx. A at 4 (showing all remaining volume on breached sales harvested by December, 1996).**

**Precision Pine continued to harvest pulpwood even after the closure of Stone. PX 182, Ex. 4, p. 5.**

F. Lumber Prices During The Period Of The MSO Suspensions

72. The price for wood products hit bottom during [sic] middle of the MSO suspensions. PX305; DX776 (exhibit 3); Tr. 3311 (Neuberger).

**Plaintiff's Comment – The WWPA index for Ponderosa Pine prices in the Rocky Mountain region reached its lowest point during the suspension in late January to early February 1996, and rose steadily thereafter. PX 305. January is only the fifth full month of the 16-month suspension and, therefore, is not "in the middle" of the suspension. See also Tr. 3481-82 (Neuberger) (The price turnaround came maybe a third of the way through the suspension.) Additionally, as the WWPA index price decreased, so too did the stumpage price to be paid by Precision Pine under each of the eight breached contracts with escalated/de-escalated pricing. See, e.g., PX 169 at HAY-37 (clause BT 3.2); Tr. 3477 (Neuberger) (De-escalation provision insulated purchasers from the full effect of falling prices.) Despite the putatively "low" prices and the existence of the suspension after August of 1995, Precision Pine continued to harvest available timber during 1995, operated at least two sawmills after the suspension was imposed in 1995 (PX 163); and produced more than 22 mmbf of lumber in FYE 3/31/96 (PX 246), even though the suspension was in place during more than half of that fiscal year. Indeed, even in the "depths of the slump" in pricing in January to February 1996, Precision Pine was operating its two available sawmills at capacity. Tr. 3545 (Neuberger).**

**Additionally, as noted, under the eight contracts with escalated/deescalated pricing, Precision Pine was obtained a full reduction of its stumpage price to correspond with decreases in the Index price, although its stumpage price would increase by only 50% of any increase in the WWPA index. See, e.g., PX 169 at HAY-37 (clause BT 3.2). Moreover, once a payment unit is opened on a given sale, the price for timber becomes locked-in as of the time that the unit is opened. Id. Accordingly, a period of rising prices, such as existed after January 1996, is an ideal time to**

**open payment units and harvest Forest Service timber contracts with escalated/deescalated pricing. Tr. 641-42 (Porter).**

73. Ponderosa Pine prices were better both before the suspensions in 1993 and 1994 and after the suspensions in 1997. PX305 (showing that WWPA's annual average lumber price index for Inland Rocky Mountain Ponderosa Pine was: $460.50 in 1993; $473.23 in 1994; $423.32 in 1995; $426.38 in 1996; and $471.10 in 1997); see also DX776 (exhibit 3).

**Plaintiff's Comment – The issue for the Court is the extent to which the breached sales would have been profitable during the suspension. See PX 131. Prices before and after the suspension are irrelevant to that determination. All of Precision Pine's large diameter Forest Service timber was suspended again from late May to December 15, 1997 due to the Forest Guardians suspension. PX 119-124.**

74. Lumber prices for Ponderosa Pine remained below pre-suspension levels until late 1996. PX305; see also DX776 (exhibit 3).

**Plaintiff's Comment – In the month preceding the suspension, the WWPA index price for Ponderosa Pine was $397.26 and was actually slightly higher during the first month of the suspension. PX 305. The WWPA price never fell even $25/mbf from the pre-suspension price, i.e., a decrease of just 6%. Id. The pre-suspension price was surpassed in June/July of 1996, which is not "late 1996." Id.**

75. Due to the drastic downturn in lumber prices in 1995 and 1996, in March 1996, the Forest Service offered Precision Pine contract term adjustments pursuant to contract clause CT 8.212. This gave Precision Pine the option of requesting a contract term adjustment of four months for each of its contracts. See DX271; DX272.

**Plaintiff's Comment – See plaintiff's comment to DPFF 74. The "downturn" during the suspension was not drastic.**

76. Precision Pine requested and obtained market-related term adjustments on several contracts. See DX2; DX239; DX436.

**Plaintiff's Comment – The evidence defendant cites only establishes that Precision Pine received a market-related contract term adjustment on one of the contracts, Hutch-Boondock (which was not even breached), not "several" of them.**

**G. Forest Service Fire Closures During The Summer Of 1996**

77. The summer of 1996 was an unusually severe fire season. Tr. 3900-01, 4165 (Harris); see also Tr. 3871, 4499, 4533 (Harris). As a result, the Forest Service was forced to implement progressively more stringent restrictions on timber harvesting operations in the Apache-Sitgreaves, Coconino, Kaibab, and Tonto National Forests. See, e.g., Tr. 3900-01, 4165-66 (Harris) (explaining that the Forest Service took the extraordinary step of closing entire National Forests to the public).

**Plaintiff's Comment – Defendant does not contend that Precision Pine's projected harvesting in any quarter on any sale would have been prevented by any putative fire closure. See PPFF 257-262.**

78. On or about May 6, 1996, the Forest Service implemented Industrial Fire Plan D on the Apache-Sitgreaves, Coconino, Kaibab, and Tonto National Forests timber [sic]. Tr. 3900- 01, 4165-66, 4533 (Harris); PX113; DX118; DX275; DX277; DX308; DX333; DX378; DX380; see also Tr. 2095-96 (Porter) (discussing fire closures on the Apache-Sitgreaves and Kaibab National Forests). This required the suspension of all timber harvesting operations. Tr. 1506 (Porter); Tr. 3900 (Harris).

**Plaintiff's Comment – Defendant does not contend that Precision Pine's projected harvesting in any quarter on any sale would have been prevented by any putative fire closure. See PPFF 257-262. DX 333 was proffered by the Government, but the Court sustained plaintiff's objection, and, therefore, it was not admitted into evidence. Defendant's citation to this exhibit is improper.**

79. Conditions on the ground improved and Industrial Fire Plan D was lifted on July 9, 1996, at which time timber harvesting operations were permitted to resume. See, e.g., Tr. 4123, 4165 (Harris), 2096 (Porter).

**Plaintiff's Comment – Defendant does not contend that Precision Pine's projected harvesting in any quarter on any sale would have been prevented by any putative fire closure. See PPFF 257-262.**

80. Precision Pine could have requested and received contract term adjustments for time lost as a result of the fire closures but for the MSO suspensions. Tr. 3905-06, 4123-24 (Harris), 4555-56 (Lee), 1521-22 (Porter); DX277.

**Plaintiff's Comment – Defendant does not contend that Precision Pine's projected harvesting in any quarter on any sale would have been prevented by any putative fire closure. See PPFF 257-262.**

## H. The MSO Suspensions Are Lifted And Precision Pine Elects To Continue The Contracts

81. When the MSO suspensions were lifted, Precision Pine elected to continue – not cancel – its contracts. Precision Pine chose instead to reaffirm its contractual obligations, including the obligation to harvest all sawtimber and roundwood. E.g., Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 651 (2004); First Joint Stip. ¶ 34; Tr. 1479 (Porter).

**Plaintiff's Comment – As an initial matter, as the Court is aware, Precision Pine contends that, because it is a lost volume seller, operations in the post-suspension period are irrelevant to its damages claims in this case. Accordingly, all of defendant's proposed findings, specifically including DPFF 81-92, dealing with the post-suspension period should be disregarded.**

**Additionally, as the Court also observed in Precision Pine & Timber, Inc. v. United States, 62 Fed.Cl. 635, 651 (2004):**

> **The facts of this case are such that the Court recognizes that complete cancellation of the contracts posed substantial risk for Precision [including the fact that Precision did not have an alternative source of timber at the time, walking away from the contracts could have resulted in a default termination by the government and suspension and/or debarment of Precision Pine from bidding on future timber sale offerings.]**

**1. Precision Pine's Post-Suspension Timber Harvesting**

82. During the post-suspension period (i.e., from December 4, 1996 to January 31, 2001), Precision Pine cut and removed approximately 45 percent of the sawtimber available from the Brookbank, Hay, Jersey Horse, Kettle, Manaco, Monument, Mud, O.D. Ridge, Saginaw-Kennedy, Salt and U-Bar contracts. DX832.

**Plaintiff's Comment – Because this DPFF deals with the post-suspension period, and Precision Pine is a lost volume seller, it is irrelevant to the calculation of damages in this case. See plaintiff's comment to DPFF 12.**

**In support of its claim that Precision Pine "only" harvested 45% of the volume on the breached sales, defendant relies exclusively on a putative "summary" (DX 832) prepared by its disqualified expert, Mr. Adkins. For all of the reasons set forth in Precision Pine's Motion to Strike, the work of Mr. Adkins should not be relied upon by the Court. Moreover, DX 832 contains errors and is far from a simple summary of information set forth elsewhere. For example, with respect to the Mud sale, although Mr. Adkins claims to be summarizing data from Mr. Ness' report (see PX 131, Ex. 9 at p. 1), Mr. Adkins did not use the correct starting volume as shown on Mr.**

**Ness' report for that sale, but instead reduced the volume on the sale by nearly 1 mmbf based on judgments that he neither explained nor had the expertise to make. Moreover, Mr. Adkins' "summary" shows that the Mud sale was not completely harvested by Precision Pine, even though the evidence at trial demonstrated that the contract was harvested to completion and subsequently closed by the Forest Service. Tr. 4688 (Panks); compare PX 290, Vol. III, "Mud" tab, Statement No. 32 at 2 (showing volume removed) with PX 175 at MUD-3 (showing volume to be cut). Indeed, another of Mr. Adkins' own "summaries" indicates that the Mud sale was "fully harvested." DX 834.**

**Mr. Adkins' calculations of the volume harvested also ignore the fact that the Kettle sale was the subject of a third-party agreement, approved by the Forest Service, whereby Precision Pine transferred all of the remaining timber on the contract to Stone in 1997. PX 117. Thus, to claim as Mr. Adkins does that Precision Pine left nearly 2 mmbf of timber "unharvested" is misleading in the extreme, because the obligation to harvest the remaining timber on the Kettle contract was Stone's. A proper application of Mr. Ness' actual volume figures and the correction of errors made by Mr. Adkins results in a considerably higher percentage of timber harvested than that claimed by Mr. Adkins in his "summary."**

83. Precision Pine did not cut the remainder for various "business reasons." DX800; DX791.

**Plaintiff's Comment – Because this DPFF deals with the post-suspension period, and Precision Pine is a lost volume seller, it is irrelevant to the calculation of damages in this case. See plaintiff's comment to DPFF 12.**

**Additionally, DX 791 relied upon by defendant here remains subject to plaintiff's Motion to Strike. See plaintiff's comment to DPFF 47.**

**Finally, to the extent that actions taken in the post-suspension period may be relevant to this matter (which they are not), defendant appears to be arguing that Precision Pine failed to fully**

**mitigate its damages, however, the burden of proof is on defendant to establish that the actions taken in mitigation by Precision Pine were unreasonable. See, e.g., Franconia Assocs., 61 Fed.Cl. at 741 (With respect to the issue of mitigation of damages, the burden shifts to the breaching party to show that the injured party's efforts at mitigation were unreasonable), citing T.C. Bateson Constr. Co. v. United States, 319 F.2d 135, 160 (Ct.Cl. 1963); accord, Globe Savings Bank, FSB v. United States, 65 Fed.Cl. 330, 349 (2005).**

84. Precision Pine could have earned more by fully harvesting the contracts during the post-suspension period than it claims it would have earned during the period of the MSO suspensions. DX834 (showing a claimed revenue for Ponderosa Pine products of $666.01 per mbf (l.t.) during the period of the MSO suspensions, and an actual revenue of $700.71 per mbf (l.t.) obtained in the post-suspension period).

**Plaintiff's Comment - Because this DPFF deals with the post-suspension period, and Precision Pine is a lost volume seller, it is irrelevant to the calculation of damages in this case. See plaintiff's comment to DPFF 12.**

**In support of its claim that Precision Pine could have "earned" more in the post-suspension period than it could have "earned" during the suspension, defendant relies exclusively on a putative summary (DX 834) prepared by its disqualified expert, Mr. Adkins. For all of the reasons set forth in Precision Pine's Motion to Strike, the work of Mr. Adkins should not be relied upon by the Court.**

**Moreover, DX 834 purports to compare the "aggregate net revenue" (not profit) on the sales during the suspension with the post-suspension period. By doing so, the summary does not account for any costs on the sales. Of course, without taking costs into account, the profitability of the sales cannot be assessed. DX 834 also arrives at an average price/mbf (LS) on a simple average basis thereby giving undue weight to small, higher priced sales.**

**Additionally, the net revenue line used by Mr. Adkins does not include by-product revenue which the evidence showed would have been a center of pure profit during the suspension period (PPFF 135), but which was considerably less profitable in the post-suspension period.**

**Finally, although DX 834 purports to use data from Mr. Ness' report, it is clear that it has not done so. For example, had Mr. Adkins actually used Mr. Ness' numbers with respect to the Mud sale, even without including by-product revenue, the revenue/mbf(LS) should be $473.71 (see PX 131, Ex. 4, p. 27: $1,468,029.28 in lumber sales/ 3099 MBF (LS)). Yet, Mr. Adkins, for reasons that are not explained, determines that the revenue/mbf (LS) is $458.55. Clearly, DX 834 contains defective calculations and/or is the product of judgments that Mr. Adkins was not qualified to make. In either event it should be disregarded.**

**2. Precision Pine's Post-Suspension Sawmill Operations**

85. Before and after the MSO suspensions, Precision Pine's sawmills were periodically closed for days or weeks due to holidays, maintenance, log shortages or equipment breakdown. See DX798; Tr. 2102-03, 2140 (Porter).

86. Precision Pine closed the Heber sawmill in September 1995. The Heber sawmill was reopened by Precision Pine in November 1995. DX798.

87. Precision Pine closed the Heber sawmill in June 1996. The Heber sawmill was reopened by Precision Pine in October 1997. DX798.

**Plaintiff's Comment – Defendant's proposed finding is incomplete. The Heber sawmill was closed from September 19, 1995 to November 26, 1995 and again from June 19, 1996 through the remainder of the suspension. DX 798. Both closures were due to the impacts of the suspension and breaches of contract at issue in this case in an effort to mitigate Precision Pine's damages. Id.**

**To the extent that this DPFF deals with the post-suspension period, and Precision Pine is found to be a lost volume seller, it is irrelevant to the calculation of damages in this case. See plaintiff's comment to DPFF 12.**

88. Precision Pine closed the Eagar sawmill in December 1995. DX798. The Eagar sawmill was reopened by Precision Pine in February 1997. DX96-97.

**Plaintiff's Comment – The Eagar sawmill was closed from December 1, 1995 until February 17, 1997 due to the impacts of the suspension and breaches of contract at issue in this case in an effort to mitigate Precision Pine's damages. DX 798. Additionally, DX 96 cited by defendant was not admitted into evidence and defendant's citation to it is improper.**

89. Precision Pine closed the Eagar sawmill on July 30, 1997 due to a lack of logs resulting from the Forest Guardians suspension and the impending sale of the Kettle contract to Stone. See Tr. 1255, 1258 (Porter); PX117 (sale to Stone dated August 15, 1997). The Eagar mill was never reopened. Tr. 1255 (stipulation of counsel); First Joint Stip. ¶ 7.

90. The Winslow sawmill was severely damaged by fire, and as a result permanently closed, on September 17, 1998. First Joint Stip. ¶ 4.

**Plaintiff's Comment – To the extent that this DPFF deals with the post-suspension period, and Precision Pine is found to be a lost volume seller, it is irrelevant to the calculation of damages in this case. See also plaintiff's comment to DPFF 12.**

91. Precision Pine did not run its sawmills at their alleged annual capacity of approximately 35 mmbf in 1997. Tr. 1074, 1080 (Porter).

**Plaintiff's Comment – As noted above, at the time the suspension was lifted in December of 1996, Precision Pine was only operating one sawmill due to the impact of the suspension and breach**

**at issue in this case. See plaintiff's comments to DPFF 87, 88. If defendant seeks to imply that Precision Pine "chose" to forego profitable operations in 1997, defendant is incorrect. As defendant is well aware, key aspects of the Forest Service timber sale program were again suspended from late May 1997 until December 1997, including the larger diameter timber on Precision Pine's Forest Service timber sale contracts. PX 119-124. During the Forest Guardians suspension in 1997, the WWPA Index price for Ponderosa Pine fell from $529/mbf to $426/mbf. PX 305. As a result of the protracted suspension at issue in this case, followed by the Forest Guardians suspension, the resumption of operations at full capacity in mid-December 1997 was not possible. Despite these impediments Precision Pine did produce approximately 9 mmbf of lumber in FYE 3/31/98. PX 182, Ex. 8.**

**Additionally, to the extent that this DPFF deals with the post-suspension period, and Precision Pine is found to be a lost volume seller, it is irrelevant to the calculation of damages in this case. See plaintiff's comment to DPFF 12.**

92. Precision Pine did not run its sawmills at their alleged annual capacity of approximately 35 mmbf in 1998. Tr. 1074, 1080-82 (Porter).

**Plaintiff's Comment – As noted in the preceding comment, the larger diameter timber on Precision Pine's Forest Service timber sale contracts was suspended until December 15, 1997. Moreover, in February of 1998, i.e., before the resumption of the normal operating season in 1998, Stone announced that it would no longer be accepting either chips (PX 126) or pulpwood (PX 125) from any third party. Although Precision Pine had been able to abide Stone's periodic refusal to buy pulpwood, the permanent closure of the Stone outlet for both chips and roundwood had affected Precision Pine's ability to harvest Forest Service multi-product timber sales. The Forest Service did not help matters when, apparently in reaction to Stone's closure, it began selling pulpwood for $.78/ccf in 1998 when it had typically required purchasers to buy it at $9.40/ccf. Tr.**

**999-1002 (Porter); PX 164. Additionally, during 1998 the price for lumber continued to fall. PX 305.**

**Moreover, there is no dispute between the parties that the Winslow sawmill was destroyed in a fire in September of 1998 and the Eager mill had been permanently closed in 1997. See DPFF 90. Thus, by September 1998, Precision Pine's capacity had gone from approximately 35 mmbf per year (PPFF 69-70) to approximately 10 mmbf with a single sawmill facility located in Heber and a planer facility located in Winslow. PPFF 11 (Heber mill capacity); PPFF 47 (Eager mill closed in July 1997); PPFF 14 (Winslow mill burned in September 1998). Despite these serious disruptions to harvesting and efficient lumber production in 1998, Precision Pine produced nearly 6.5 mmbf of lumber in FYE 3/31/99. PX 182, Ex. 8.**

**Additionally, to the extent that this DPFF deals with the post-suspension period, and Precision Pine is a lost volume seller, it is irrelevant to the calculation of damages in this case. See plaintiff's comment to DPFF 12.**

## I. Payment Of Claims Regarding The MSO Suspensions

93. Between August 15, 1997, and November 17, 1997, Precision Pine sent to the Forest Service claims letters seeking compensation as a result of the MSO suspensions, which were submitted pursuant to the Contract Disputes Act ("CDA") and certified by Mr. Porter. PX194; PX196; PX198; PX200; PX202; PX204; PX206; PX208; PX210; PX212; PX214; PX216; PX218; PX220.

**Plaintiff's Comment – Contrary to defendant's assertion, Precision Pine did not submit CDA claim letters "as a result of the MSO suspensions," rather Precision Pine submitted claims as result of the Forest Service's failure to comply with its obligations under the ESA and its resulting breach of Precision Pine's timber sale contracts. Precision Pine & Timber, Inc. v. United States, 50 Fed.Cl. 35 (2001). Moreover, the Forest Service refused to consider Precision Pine's damages until it submitted formal claim letters. See PX 152-156.**

94. Between November 28, 1997, and March 16, 1998, Precision Pine received final decisions from Forest Service contracting officers that granted in part, and denied in part, the claims that had been submitted. PX195; PX197; PX199; PX201; PX203; PX205; PX207; PX209; PX211; PX213; PX215; PX217; PX219; PX221. Precision Pine was awarded, and the Forest Service paid, total compensation in the amount of $16,278.85 in connection with the claims. PX195; PX197; PX199; PX201; PX203; PX205; PX207; PX209; PX211; PX213; PX215; PX217; PX219; PX221; see also PX131 (exhibit 2).

**Plaintiff's Comment – Precision Pine submitted claims seeking millions of dollars in damages that it had sustained as result of the Forest Service's breaches of contract. 50 Fed.Cl. at 51. According to defendant, the Forest Service provided a total of $16,248.85 in total compensation to Precision Pine for suspending its contracts for up to 16 months and denied the remainder of the claims in their entirety. See DPFF 94.**

## III. THE CONTRACTS

### A. Awarding Forest Service Timber And Multi [sic] Sale Contracts

95. The Forest Service manages National Forest lands for multiple uses. The harvesting of timber is only one of many such uses. Tr. 3749-53 (Harris).

96. When the Forest Service concludes that conducting a timber sale would be consistent with its overall strategy for managing a National Forest, the Forest Service establishes a sale area and determines parameters for harvesting that are consistent with environmental requirements and management objectives. Tr. 3753-55 (Harris).

**Plaintiff's Comment – Precision Pine agrees that the Forest Service is legally obligated to design timber sales in a manner consistent with environmental requirements and management objectives. In the instant case, however, for all of those sales awarded after July 1994, the Forest Service warranted in contract clause C[T]6.25 that it had identified all measures necessary to**

**protect species listed under the ESA, but, in fact, had no basis for making that statement, thereby breaching its warranty. 50 Fed.Cl. at 68-9.**

97. One of the steps in preparing a timber sale to be offered to the public is surveying the sale area to determine the volume, size, and quality of timber that is present. To do this, the Forest Service conducts a "cruise" of trees in the cutting units of the proposed sale area. Tr. 3755-58 (Harris).

**Plaintiff's Comment – The Forest Service expressly denies the accuracy and reliability of its estimates of the timber quantity and quality of timber on a sale area, which are based on a review of only a portion of the timber. PPFF 296. The Forest Service encourages purchasers to visit the sale area themselves, which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

98. A cruise assesses the total volume, the average diameter at breast height (dbh), and the percent clear faces of the sawtimber being sold. Forest Service cruises are specifically designed for the sale area under consideration and use statistical principles to reach an error of less than 10 percent with a 95 percent confidence level. Tr. 3755-58, 3777-78 (Harris); Tr. 4323-24 (Munn).

**Plaintiff's Comment – The Forest Service expressly denies the accuracy and reliability of its estimates of the timber quantity and quality of timber on a sale area, which are based on a review of only a portion of the timber. PPFF 296. The Forest Service encourages purchasers to visit the sale area themselves, which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

99. From the standpoint of potential bidders, a timber sale commences when the Forest Service issues an advertisement and prospectus that describe the timber to be harvested, the estimated volume of sawtimber and (for multi-product sales) roundwood being sold, and the dates bids must be submitted. Tr. 3767 (Harris). Included in the advertisement is a minimum bid price. Tr. 3766 (Harris).

See generally Seaboard Lumber Co. v. United States, 48 Fed. Cl. 814, 816 (2001), aff'd, 308 F.3d 1283 (Fed. Cir. 2002).

100. A prospectus and sample contract are made available to interested bidders. Tr. 3766 (Harris). The prospectus identifies the length of time the contractor will be allowed to perform the contract, establishes the contract's operating season, specifies the timing of contractor payments for the sawtimber, and, for multi-product sales, states the fixed price for the sale's roundwood component. Tr. 3766 (Harris). Interested parties are invited to examine the site and available timber prior to bidding. Tr. 3768-69, 4183 (Harris). See generally Seaboard Lumber, 48 Fed. Cl. at 816.

**Plaintiff's Comment - Not only are interested parties invited to examine the sale area, the bid documents specify that:**

> **BIDDER/PURCHASER WARRANTS THAT THIS BID/OFFER IS SUBMITTED SOLELY ON THE BASIS OF ITS EXAMINATION AND INSPECTION OF THE QUALITY AND QUANTITY OF THE TIMBER OFFERED FOR SALE AND IS BASED SOLELY ON ITS OPINION OF THE VALUE THEREOF AND ITS COSTS OF RECOVERY, WITHOUT ANY RELIANCE ON FOREST SERVICE ESTIMATES OF TIMBER QUALITY, QUANTITY OR COSTS OF RECOVERY.**

**PPFF 296. As a result of such provisions, Mr. Porter always personally and thoroughly assessed the timber before he bid on it, including the timber on each of the sales at issue in this case. PPFF 297.**

101. Forest Service contracts generally define "sawtimber" as trees larger than 9 inches dbh. "Roundwood" refers to smaller trees that are between 5.0 and 8.9 inches dbh. See, e.g., PX169-79.

**Plaintiff's Comment – Sawlogs and Sawtimber, as the terms suggest, meet other criteria making them suitable as a source of raw material from which sawmills produce lumber. PPFF 1, ii.**

102. The price of the roundwood component of a multi-product sale is fixed and is administratively-established by the Forest Service. Tr. 3781 (Harris). The bid price affects only the stumpage price paid for sawtimber component of the sale. See, e.g., PX169-79.

**Plaintiff's Comment – Precision Pine agrees that the price to be paid for pulpwood under the contracts is set by the Forest Service and that following the closure of the Stone facility in 1998 the Forest Service dropped its fixed price for pulpwood from $9.40 to $.78. Tr. 2907-08 (Matson).**

103. Forest Service contracts require the removal of all "included timber" – both roundwood and sawtimber – and, therefore, a prospective bidder must take into account the fixed roundwood cost in determining what to bid for the sawtimber component of a multi-product sale. See, e.g., PX169-79; Tr. 1827, 2025 (Porter).

104. Forest Service timber sale contracts and multi-product sale contracts are generally competitively bid and awarded to the highest bidder. First Joint Stip. ¶ 10; Tr. 1286 (Porter).

105. Forest Service timber and multi-product sales frequently are awarded to purchasers who do not own a sawmill or planer, and who not to have access to such manufacturing facilities. Such purchasers are fully capable of performing the logging and hauling required by Forest Service timber sale contracts. Tr. 1762-65 (Reidhead), 2920-21 (Matson), 3116-17 (Lewis), 3770 (Harris).

**Plaintiff's Comment – The evidence cited by the government does not support its proposition that "timber sale contracts and multi-product sales are frequently awarded to purchasers who do not own a sawmill or planer, and who do not have access to such manufacturing facilities." None of the testimony cited recounted an actual instance where a purchaser bought a timber sale without having access to sell the sawlogs to a processing facility. See, e.g., Tr. 1787 (Reidhead) (All sawlogs removed from Precision Pine's sales went to Precision Pine's sawmills); id. at 1765 (The logs from the few sales purchased by Tri-Star Logging were sold to entities with processing facilities). As Mr. Lewis, a 30-year veteran of the Forest Service testified, he was**

**unaware of any purchaser of sawlogs who removed the logs from a sale area and then never processed them (Tr. at 3120 (Lewis)) ("I mean, why spend all that money for the logs and never utilize them? That doesn't make sense"). Mr. Lewis was also unaware of a purchaser who sold sawlogs that could have been used for lumber production for use as firewood instead. Id. Significant to the issues in this case, defendant did not provide any examples of sawlogs that were harvested by Precision Pine being used for anything but the production of lumber. This is not surprising because it is undisputed that at all times relevant to this case an objective of the Forest Service's commercial timber sale program is "[t]o provide a continuous flow of raw material to local forest industries." PX 170.**

106. Tri-Star Logging, which has never owned or operated a sawmill or a planer, bid on, was awarded, and performed several Forest Service timber sale contracts. Tr. 1762-63, 1765 (Reidhead).

**Plaintiff's Comment – The evidence at trial demonstrated that Tri-Star Logging had purchased two Forest Service timber sales (Tr. 1763-66 (Reidhead)). Mr. Reidhead did not recall any specifics about one of them, but the logs from the other were sold to a third party with processing facilities. Id.**

107. Similarly, Zellner Firewood bid on, was awarded, and performed Forest Service multi-product sale contracts. Zellner did not own or operate a sawmill and ordinarily sold the logs obtained from Forest Service sales as firewood. Tr. 1651 (Porter).

**Plaintiff's Comment – There is no evidence that Zellner "sold logs" as firewood. Mr. Porter said Zellner bid on sales that were "mainly pulpwood" and that he would process the logs from the sale into firewood. Tr. 1651 (Porter). Mr. Porter did not know for sure what Zellner did with any sawlogs that might exist on the sales it purchased. Id.**

**B. <u>The Contracts At Issue</u>**

108. This action concerns 14 contracts: (1) the O.D. Ridge timber sale; (2) the Kettle multi-product sale; (3) the Hay timber sale; (4) the Brookbank multi-product sale; (5) the Jersey Horse timber sale; (6) the Salt multi-product sale; (7) the Manaco multi-product sale; (8) the St. Joe timber sale; (9) the Hutch-Boondock multi-product sale; (10) the Mud multi- product sale; (11) the Saginaw-Kennedy multi-product sale; (12) the Brann multi-product sale; (13) the U-Bar timber sale; and (14) the Monument multi-product sale. <u>Precision Pine & Timber, Inc. v. United States</u>, 50 Fed. Cl. 35, 38 (2001); <u>see also</u> PX169-79; DX211; DX238; DX342.

109. The contracts are spread across four National Forests: (1) the Apache-Sitgreaves National Forest; (2) the Coconino National Forest; (3) the Kaibab National Forest; and (4) the Tonto National Forest. <u>See</u> PX169-79; DX211; DX238; DX342.

110. The contracts each establish a normal operating season in which harvesting operations are to be performed. <u>See</u> PX169-79; DX211; DX238; DX342; Tr. 3800-01 (Harris) (discussing clause AT17).

**Plaintiff's Comment – Harvesting is not limited to the Normal Operating Seasons and harvest outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T) 6.31, B(T)6.6; <u>see</u>, <u>e.g.</u>, PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead). During the winter of 1995-1996, Precision Pine in fact removed a substantial volume of timber, 4,106 mbf (LS), from a variety of sales, <u>i.e.</u>, Hutch-Boondock, St. Joe and Brann. Tr. 316-334 (Porter); PX 1002; DX 251, 221, 342. As Mr. Porter testified, given the widely varying locations and elevations of the Hutch-Boondock, St. Joe and Brann sales, the fact that substantial harvesting took place in the winter of 1995-1996**

**indicated that the ground on sales at varying elevations throughout Precision Pine's operating area was either dry, frozen or both (Tr. 338 (Porter)), and thus that Precision Pine's projected harvesting of the U-Bar, Jersey Horse, Hay and Kettle sales in the winter of 1995-1996 (see PX 131, App. A at p. 4; DX 1004) would certainly have been possible. Tr. 339 (Porter).**

111. The contracts require the purchaser to submit to the Forest Service an annual operating schedule. The contracts also require the purchaser to meet with the Forest Service prior to commencing or restarting harvesting operations to discuss their operating plan, as well as issues unique to the sale and sale area. See PX169-79; DX211; DX238; DX342; Tr. 3808-09 (Harris) (discussing clause BT6.3 1).

**Plaintiff's Comment – Clause B(T)6.31 simply calls for the submission of a schedule of "anticipated" major operations on a sale which can always be altered "upon reasonable notice to the Forest Service" for a host of reasons including "weather, markets, or other unpredictable circumstances." PPFF 1243. Precision Pine had never followed such schedules without change in the past. Id. The schedules submitted by Precision Pine indicated on their face that they were tentative and subject to change. PPFF 1243-44; see PX 294. The Forest Service introduced no evidence (because there is none) of the Forest Service refusing to allow Precision Pine to operate on a sale that was not part of its tentative schedule, or requiring Precision Pine to operate on a sale because it had been identified on Precision Pine's tentative schedule. PPFF 1243. Lastly, the clause contains no requirement that the Forest Service concur in any change to the anticipated schedule. Id.**

**Moreover, Precision Pine would have "absolutely" communicated to the Forest Service any changes to its operating schedule. Tr. 1633 (Porter), see also Tr. 264-266 (Porter) (Precision Pine advised Forest Service of moves from one sale to another and got approval of haul routes, so the Forest Service always knew what Precision Pine was doing on the sales); Tr. 1723, 1746-47 (Reidhead) (Haul route maps identifying the roads to be used to transport logs from the sale area to**

**mill yard were presented to and discussed with the Forest Service prior to commencing work). In this way the Forest Service knew and approved of the precise route Precision Pine used to haul timber from its sales to its sawmills.**

**Moreover, defendant continues to confuse the terminology of an "operating schedule" submitted on an annual basis pursuant to B[T]6.31 as discussed above with the requirement of the one-time submission of a "plan of operations" pursuant to C[T]6.3. Compare B[T]6.31 with C[T]6.3; see PPFF 1242.**

112. Each contract requires the purchaser to cut and remove all sawtimber and (for multi-product sales) roundwood by the contract's termination date. Each contract prescribes the manner of conducting logging and hauling operations, as well as land restoration work. See PX169-79; DX211; DX238; DX342; Tr. 3803, 3805-07, 3831-32 (Harris).

113. Each contract establishes a pricing mechanism for sawtimber and a fixed price for roundwood. The price for sawtimber is frequently based upon the Inland Rocky Mountain Ponderosa Pine index published by the Western Wood Products Association. See PX169-79; DX211; DX238; DX342; First Joint Stip. ¶ 32.

**Plaintiff's Comment – The contract price for roundwood is set administratively by the Forest Service and is not subject to change by the bidders. The contract price for sawlogs can be established in one of two ways: i.e., (1) permanently fixed at level of the highest bid received as was the case in three contracts ("flat rate" sales) or (2) subject to escalation (50% up) and de-escalation (100% down) based on changes in the WWPA Index for Inland Rocky Mountain Ponderosa Pine, as was the case in eight of the contracts.**

114. Payment for timber and roundwood occurs when the logs are cut and removed from the sale area. However, each Forest Service contract also contains a midpoint payment date that requires an

initial payment even if no work on the contract has occurred. See PX169-79; DX211; DX238; DX342; Tr. 4150-52 (Harris).

**Plaintiff's Comment – The Forest Service would typically issue a bill for payment toward the end of the month based on its estimate of the amount of timber that had been removed from a sale area. E.g., PX 290 (any TSSA). The Forest Service made no measurement of the timber harvested from a sale (with the exception of the Hay sale) and only charged a purchaser based on its estimate of what had been removed in that month. PPFF 1032.**

**Payments variously referred to as periodic payments or mid-point payments could be required and applied to future harvest if sufficient amounts of timber had not been removed by payment due date. See, e.g., PX 170 at JRH-49 (clause CT4.264#).**

115. The contracts require the purchaser to make a down payment and to maintain payment and performance bonds. See PX169-79; DX211; DX238; DX342.

**Plaintiff's Comment – In addition to the cash outlays on a contract mentioned, there also existed accounts for cash on the contract and for purchaser credits (essentially a cash equivalent in the form of "company scrip") earned by a purchaser for constructing roads. Tr. 1911-13 (stipulation between counsel).**

116. The contracts each contain a sale area map. The sale area for each contract is divided into payment units. Payment units are further subdivided into cutting units. See PX169- 79; DX211; DX238; DX342; Tr. 3799, 4168-69 (Harris).

**Plaintiff's Comment – The sale area map for the Hay timber sale is not divided into payment units as it is a scaled sale. PX 169. The Hay sale does contain cutting units. Id.**

117. At any given time, operations can occur upon only three payment units. Only when all work on a payment unit (i.e., all cutting and hauling of timber and roundwood, and all land restoration work) is completed may the next payment unit be opened and work commence. See PX169-79; DX211; DX238; DX342; Tr. 3802, 3830-31 (Harris).

**Plaintiff's Comment – It was possible for the Forest Service to permit a purchaser to begin operations in a fourth payment unit while cleanup of logging operations were still occurring in a previously opened unit and Tri-Star was allowed to open a fourth unit "pretty often." Tr. 1756-57 (Reidhead).**

118. Forest Service contracts do not require the purchaser to process logs from the sale at its sawmill or at any sawmill whatsoever. See PX169-79; DX211; DX238; DX342; Tr. 3770 (Harris), 1541-43 (Porter), 1762-65 (Reidhead), 3116-18 (Lewis).

**Plaintiff's Comment – It is undisputed that at all times relevant to this case an objective of the Forest Service's commercial timber sale program is "[t]o provide a continuous flow of raw material to local forest industries." PX 170. Indeed, the National Forests had been established for this purpose. See PPFF 168-69. As Mr. Lewis, a 30-year veteran of the Forest Service testified, he was unaware of any purchaser of sawlogs who removed the logs from a sale area and then never processed them. Tr. at 3120 (Lewis) ("I mean, why spend all that money for the logs and never utilize them? That doesn't make sense"). Mr. Lewis was also unaware of any purchaser who sold sawlogs that could have been used for lumber production for use as firewood. Id. This is not surprising and, significantly for the issues in this case, defendant did not provide any examples of sawlogs that were harvested by Precision Pine and used for anything but the production of lumber.**

**Moreover, prior to removing timber from a National Forest, Precision Pine would advise the Forest Service of the route it would use to haul sawlogs to its sawmill, Tr. 1723, 1746-47 (Reidhead). Precision Pine would also provide the Forest Service with annual Certificates of**

**Disposition, which advised the Forest Service of how Precision Pine disposed of the timber harvested that year. PPFF 178, 180; see, e.g., PX 21. In each case the sawlogs had been used at Precision Pine's sawmills. See also P's Post-Trial Br. at 4-11 (establishing that Precision Pine's mill operations are not collateral to its timber sale contract). Thus, at all times, the Forest Service knew and expected that sawlogs from its timber sales would be used to manufacture lumber.**

119. Once the purchaser has cut, removed and paid for the logs, subject only to statutory and regulatory constrains such as the statutory prohibition on exporting unprocessed logs from Federal lands, the purchaser is free to put harvested logs to any use it chooses. See PX169-79; DX211; DX238; DX342; Tr. 4151-52 (Harris), Tr. 2920-21 (Matson).

**Plaintiff's Comment – The "statutory and regulatory" constraints on log usage referred to further demonstrate that the Forest Service was vitally interested in and fully aware of what happened to Forest Service timber after it left the sale area. See also plaintiff's comment to DPFF 118.**

120. Precision Pine took advantage of the flexibility afforded by its Forest Service contracts. At times, Precision Pine milled logs and planed and sold the resulting lumber. At other times, logs from Forest Service sales were (1) milled and sold as rough cut (unplaned) lumber products, (2) sold to third parties for use in the other parties' milling or manufacturing operations, (3) sold for use as pulpwood, (4) sold as firewood, (5) sold for resale as vigas or firewood, and (6) stacked and left unused. E.g., DX468-71; DX553; DX795; Tr. 1652 (Porter).

**Plaintiff's Comment – As an initial matter, DX 468, 469, 471, 795 were never accepted into evidence and defendant's citation to them is improper.**

**Moreover, defendant misleadingly contends that Precision Pine sold "logs" to third parties for use in their mills, sold "logs" to third parties for use as pulpwood, sold "logs" to third parties as**

**firewood or stacked and left "logs" unused. While some of these things may have occurred with respect to pulpwood logs, something for which Precision Pine had no use in its operations, defendant has cited no evidence that the sawlogs that Precision Pine harvested from its Forest Service timber sales were ever used for anything but the production of lumber at its own sawmills. Indeed, defendant's lone citation for a situation where Precision Pine allegedly sold sawlogs to a third party is the agreement whereby Precision Pine, following the closure of Precision Pine's Eagar sawmill at which the Kettle sale was to have been processed, transferred the standing timber on the Kettle contract to Stone Container, who operated a sawmill in Eagar. As Mr. Porter testified, all sawlogs were manufactured into lumber. Tr. 1652 (Porter).**

### 1. The Brann Multi-Product Sale Contract

121. Brann was a multi-product sale. As a multi-product sale, the Brarm [sic] contract contained both sawtimber and roundwood components. See, e.g., DX342.

122. The Brann contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Brann contract was 1,827 ccf sawtimber and 1,812 ccf roundwood. DX342 (AT2).

123. The sawtimber component of the Brann contract had an average dbh of 12.2 inches and 9.0 percent grade. PX13.

**Plaintiff's Comment – The Forest Service's estimate of the average dbh and percent grade as set forth on the appraisal summary are as stated. The Forest Service disclaims its estimates of the quantity and quality of timber on its sales and urges purchasers to make their own estimates (PPFF 296), which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

124. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Brann contract was 0.5000. PX13.

**Plaintiff's Comment – For the Brann sale, the conversion factor used by the Forest Service is the same as that used by Precision Pine. There is no single, universally accepted method for converting from ccf to mbf. All methods, however, are approximately ccf x .5 = mbf (i.e., two mbf to one ccf), which Mr. Porter found to be an accurate and practical method and is what Precision Pine used in converting from ccf to mbf. See PPFF 23, 206-08.**

125. The Brann contract's normal operating season ran from April 15 to December 31. DX342 (clause AT17).

**Plaintiff's Comment – Harvesting is not limited to the Normal Operating Seasons and harvesting outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T) 6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead).**

126. The Brann contract contained additional restrictions that further limited timber harvesting as a result of endangered, threatened and sensitive species. See DX342 (clause CT6.25).

**Plaintiff's Comment –The version of clause CT6.25 contained in DX 342 was superseded prior to the suspension and defendant has not identified what if any restrictions were in place during the suspension on the Brann contract.**

127. The Brann contract was awarded to Precision Pine on September 29, 1994. First Joint Stip. ¶ 20.

128. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Brann contract at or before its award. Tr. 1856-57 (Porter).

**Plaintiff's Comment – Based on its years of experience of providing timber to Precision Pine for use as raw material at its sawmills for the production of lumber, the Forest Service was fully aware of Precision Pine's intended use of the sawlogs from the sale for this purpose. As counsel for the government conceded at trial:**

> **THE COURT: [B]ut here, when the sale is awarded to Precision Pine, isn't it a fact that everybody knows that Precision Pine is in the lumber business and it's going to take the timber to its mill and cause it to be turned into lumber?**
>
> **MR. HARRINGTON: Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine's had sawmills. We'd certainly concede that fact. The Forest Service knew that Precision Pine had sawmills.**

**Tr. 5417 (Harrington).**

129. The Forest Service suspended the Brann contract on August 25, 1995. First Joint Stip. ¶ 9.

130. As of August 25, 1995, the volume remaining to be cut and removed from the Brann contract sale area was 1,827 ccf (or 914 mbf (l.s.)) sawtimber and 1,812 ccf roundwood. DX361; PX13.

131. The Forest Service lifted the suspension and, subject to the terms and conditions of the contract, made Brann available for harvesting by Precision Pine on October 18, 1995. First Joint Stip. ¶ 30; Precision Pine, 50 Fed. Cl. at 47 & n.18; see also PX1O6 (paragraph 3(m)); Tr. 3858-59 (Harris).

**Plaintiff's Comment – The cited evidence does not indicate that the Forest Service actually lifted the suspension or made the sale available for harvest on October 18, 1995. In any event, Precision Pine does not seek lost profits on the Brann sale but merely seeks less than $1,000 in previously denied out-of-pocket expenses on the sale. PX 131, Ex. 2.**

132. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Brann contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

133. Precision Pine partially harvested the Brann contract beginning in January 1996. Tr. 3849-56 (Harris); DX347; DX348; DX361.

**Plaintiff's Comment – After engaging in road construction to access the sale, Precision Pine began harvesting the Brann sale outside of the Normal Operating Season on January 29, 1996. Tr. 532 (Porter); DX 800.**

134. Precision Pine stopped harvesting the Brann contract in February 1996. Tr. 3869 (Harris); see also DX361. Precision Pine informed the Forest Service that it was leaving the Brann contract so that it could harvest the C-12 timber sale on the Hualapai Indian Reservation. Tr. 3869 (Harris); DX800 at 2.

**Plaintiff's Comment – Precision Pine removed more than 500 mbf of sawtimber outside of the Normal Operating Season in February 1996 on the Brann sale, completing all of Unit 2. Tr. 532 (Porter); Tr. 3869 (Harris). Moreover, it appears that as of that time Art Daley, "a small third-party operator," had begun harvesting pulpwood and the small diameter sawlogs that remained on Brann. See DPFF 136.**

135. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log both the Hualapai and Brann contracts at the same time. Tr. 1743-44, 1755 (Reidhead).

**Plaintiff's Comment – Precision Pine agrees that Tri-Star had the capacity to log both the Hualapai and Brann sales, but notes that as of March 1996 Precision Pine only had one sawmill operating due to the impact of the suspension. See DX 798. Accordingly, Precision Pine did not need to have both sales harvested simultaneously.**

136. Stone subsequently refused to accept roundwood that a small third party operator – Art Daley – had removed from the Brann sale. Stone informed Mr. Daley, who subsequently informed Mr. Porter, that Stone would not take roundwood, directly or indirectly, from Precision Pine. Tr. 3861, 3864, 3867 (Harris); DX454.

**Plaintiff's Comment – The evidence cited is the unreliable recitation of a conversation that Mr. Daley allegedly had with someone at Stone, and then allegedly relayed to Mr. Harris. Tr. 3864 (Harris). Mr. Daley appeared on defendant's witness list but was not called.**

137. During the period when other contracts remained suspended (i.e., from October 19, 1995 to December 4, 1996), Precision Pine did not complete harvesting the Brann contract. Tr. 1469 (Porter), 3872 (Harris). As of December 1996, only 57 percent of available sawtimber and 14 percent of available roundwood had been cut and removed by Precision Pine. Tr. 1456, 1459-60 (Porter); DX360; DX361; DX552.

138. Although the contract was subsequently available, Precision Pine never resumed work or completed timber harvesting upon the Brann contract. Tr. 3872 (Harris); DX361.

**Plaintiff's Comment – Defendant is incorrect. As Mr. Harris testified, Precision Pine continued to remove pulpwood from the sale area from March of 1996 until 1998. Tr. 3870 (Harris). This was at the same time and after Stone allegedly would not take pulpwood from Precision Pine. See DPFF 136. Some of the issues preventing harvest in the post- suspension period are set forth in DX 800, pp. 1-5.**

139. The Forest Service terminated the Brann contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (case no. 02-131).

140. Pursuant to CT 6.01, the Forest Service paid Precision Pine $44.65 in connection with the suspension of the Brann contract. See PX211; PX131 (exhibit 2).

### 2. The Brookbank Multi-Product Sale Contract

141. Brookbank was a multi-product sale. As a multi-product sale, the Brookbank contract contained both sawtimber and roundwood components. See, e.g., PX172.

142. The Brookbank contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Brookbank contract was 4,393 ccf sawtimber and 5,992 ccf roundwood. PX172 (AT2).

143. The sawtimber component of the Brookbank contract had an average dbh of 12.6 inches and 22.9 percent grade. PX4; DX820; see also Tr. 1366-67 (Porter) (stating agreement with the Brookbank appraisal).

**Plaintiff's Comment – The Forest Service's estimate of the average dbh and percent grade as set forth on the appraisal summary are as stated. The Forest Service disclaims its estimates of the quantity and quality of timber on its sales and urges purchasers to make their own estimates (PPFF 296), which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

144. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Brookbank contract was 0.4780. PX4.

**Plaintiff's Comment – There is no universally accepted method for converting from ccf to mbf. All methods, however, are approximately ccf x .5 = mbf (i.e., two mbf to one ccf), which Mr.**

**Porter found to be an accurate and practical method and is what Precision Pine used in converting from ccf to mbf. See PPFF 23, 206-08.**

145. The Brookbank contract's normal operating season ran from April 15 to November 15. PX172 (clause AT 17); DX800 at 5.

**Plaintiff's Comment – Harvesting is not limited to the Normal Operating Seasons and harvest outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T)6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead).**

146. The Brookbank contract was awarded to Precision Pine on April 13, 1995. First Joint Stip. ¶ 22.

147. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Brookbank contract at or before its award. Tr. 1856-57 (Porter).

**Plaintiff's Comment – Based on its years of experience of providing timber to Precision Pine for use as raw material at its sawmills for the production of lumber, the Forest Service was fully aware of Precision Pine's intended use of the sawlogs from the sale for this purpose. As counsel for the government conceded at trial:**

> **THE COURT: [B]ut here, when the sale is awarded to Precision Pine, isn't it a fact that everybody knows that Precision Pine is in the lumber business and it's going to take the timber to its mill and cause it to be turned into lumber?**
>
> **MR. HARRINGTON: Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine's had sawmills. We'd certainly concede that fact. The Forest Service knew that Precision Pine had sawmills.**

**Tr. 5417 (Harrington).**

148. The Forest Service suspended the Brookbank contract on August 25, 1995. First Joint Stip. ¶ 29.

149. As of August 25, 1995, the volume remaining to be cut and removed from the Brookbank contract sale area was 2,711 ccf (or 1,296 mbf (l.s.)) sawtimber and 5,347 ccf roundwood. Third Joint Stip. ¶¶ 10-11; PX4.

**Plaintiff's Comment – Precision Pine does not agree that the factor used by the Forest Service to convert from ccf to mbf was demonstrated to be accurate or correct. There are several methods for converting from ccf to mbf, all of which are approximately ccf x .5 = mbf (i.e., two mbf to one ccf). Over years of practical experience in converting from ccf to mbf, Mr. Porter found this to be an accurate method that the Forest Service had endorsed to him and it is what Precision Pine used in converting from ccf to mbf. See PPFF 23, 206-08. Indeed, the Forest Service's own estimates of timber quantity and quality on the sales are expressly disclaimed by the Forest Service, which urges purchasers to make their own examination of the timber (PPFF 296) -- which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

150. The suspension of the Brookbank contract was lifted on December 4, 1995. First Joint Stip. ¶ 31; Precision Pine, 50 Fed. Cl. at 39, 70; DX 800 at 6.

151. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Brookbank contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

152. The Brookbank contract was unaffected by the Forest Guardians suspension. See DX800 at 6.

**Plaintiff's Comment – Although the Brookbank sale was not directly suspended by the Forest Guardians case, it is not correct to say that it was "unaffected" by that suspension. Rather, the suspension of all of the larger diameter timber on Precision Pine's sales for a third consecutive harvest season impacted Precision Pine's operations. PX 119-124. The Brookbank sale was to have been milled at Heber, but that sawmill did not reopen until October 20, 1997. PX 163.**

**Additionally, to the extent that this DPFF deals with the post-suspension period, and Precision Pine is found to be a lost volume seller, it is irrelevant to the calculation of damages in this case. See plaintiff's comment to DPFF 12.**

153. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the Brookbank contract in 1997 or in subsequent years. Tr. 1743-44, 1755 (Reidhead).

154. Precision Pine chose not to commence post-suspension harvesting upon the Brookbank contract until November 1997. DX109; DX800 at 6-7; DX791 (describing Precision Pine's decision as based upon "business reasons").

**Plaintiff's Comment – As noted in response to DPFF 152, the Heber sawmill remained closed until November 20, 1997, due to the impacts of the suspension and the Forest Guardians suspension. See DX 798. Precision Pine resumed harvesting the sale within weeks of reopening its Heber sawmill in 1997.**

**Additionally, PX 791 remains subject to Precision Pine's motion to strike. See plaintiff's comment to DPFF 47.**

155. Precision Pine never completed harvesting the Brookbank contract. DX1O9.

156. The Forest Service terminated the Brookbank contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (case no. 02-131).

157. Pursuant to CT 6.01, the Forest Service paid Precision Pine $2,565.89 in connection with the suspension of the Brookbank contract. See PX197; PX131 (exhibit 2).

### 3. The Hay Timber Sale Contract

158. Hay was a not a multi-product sale. See, e.g., PX169.

159. The Hay contract was a "scaled" sale, that is, the Forest Service measured the volume of logs removed by Precision Pine from the sale area. Charges to Precision Pine were based upon the actual log volume measured by the Forest Service. Tr. 4135, 4151-52 (Harris); PX169; PX265.

**Plaintiff's Comment –Forest Service personnel conducted scaling of the Hay sale at Precision Pine Eagar sawmill both before and after the suspension. See DPFF 167.**

160. The sawtimber on the Hay contract had an average dbh of 17.2 inches and 20.6 percent grade. PX1; DX820.

**Plaintiff's Comment – See plaintiff's comment to DPFF 97 (the Forest Service disclaimed any warranty as to the quantity or quality of timber sold).**

161. The Hay contract's normal operating season ran from April 15 to November 30. PX169 (clause AT 17); DX 800 at 9.

**Plaintiff's Comment – Harvesting is not limited to the Normal Operating Season and harvesting outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T) 6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground**

**was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead). Hay was at an elevation that made extended winter logging quite possible. PPFF 44.**

162. The Hay contract contained additional restrictions that further limited timber harvesting as a result of endangered, threatened and sensitive species. Specifically, logging on cutting units 1-6, 9-15, 19-21, 23-25, 33, 36 and 41 could only take place between September 1 and November 30. Logging on cutting unit 7 could only take place between June 30 and November 30. See PX169 (clause CT6.25); DX800 at 9.

**Plaintiff's Comment – Defendant has made no effort to identify what restrictions may have been in effect at the time of the suspension and/or the extent to which such restrictions would have had any impact on Precision Pine's projected harvesting.**

163. Unlike the other contracts at issue, the Hay contract did not contain clause CT 6.01. PX169; Tr. 1878 (Porter).

**Plaintiff's Comment – Because the Hay sale was a scaled sale, it could not have contained any "CT" clauses, however, Precision Pine agrees that the Hay sale did not contain clause C6.01.**

164. The Hay contract originally was awarded to Reidhead Lumber Company, Inc., on January 17, 1990. First Joint Stip. ¶ 24. The Hay contract was transferred to Precision Pine by contract modification on June 24, 1991. Id. ¶25.

165. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Hay contract at or before its award in January 1990. Tr. 1852 (Porter).

**Plaintiff's Comment – Based on its years of experience of providing timber to Precision Pine for use as raw material at its sawmills in its production of lumber, the Forest Service was fully**

**aware of Precision Pine's intended use of the sawlogs from the sale for this purpose. As counsel for the government conceded at trial:**

> **THE COURT: [B]ut here, when the sale is awarded to Precision Pine, isn't it a fact that everybody knows that Precision Pine is in the lumber business and it's going to take the timber to its mill and cause it to be turned into lumber?**
>
> **MR. HARRINGTON: Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine's had sawmills. We'd certainly concede that fact. The Forest Service knew that Precision Pine had sawmills.**

**Tr. 5417 (Harrington).**

166. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Hay contract at or before its transfer to Precision Pine in June 1991. Tr. 1855 (Porter).

**Plaintiff's Comment – <u>See</u> plaintiff's comment to DPFF 165.**

167. Precision Pine first notified the Forest Service that it intended to haul logs from the Hay sale to Precision Pine's sawmill in Eagar, Arizona on November 23, 1994. Tr. 720-22, 1867-68 (Porter); PX260. Precision Pine requested that the Forest Service establish an area for scaling logs from the Hay sale at the Eagar sawmill. PX260.

**Plaintiff's Comment – None of the evidence cited indicates when Precision Pine "first" informed the Forest Service that it would haul the Hay sale to Eagar. <u>See</u> PX 260. Prior to the award of the Hay sale, the Forest Service anticipated that logs from the Hay sale would be hauled to a mill in Eagar. PPFF 378.**

168. Precision Pine's pre-suspension (FYE 1996) logging and hauling costs for the Hay contract were $93.70 per mbf (l.s.). <u>See</u> PX248 (total logging and hauling cost of $173,358); PX290 (total volume of 1,851 mbf (l.s.)).

**Plaintiff's Comment – Defendant's method of calculating a rate for logging and hauling from the financial statement is fanciful as demonstrated by the Hay sale for FYE 3/31/95. That is, according to the TSSAs, Precision Pine removed 92.52 mbf (LS) of sawlogs from the Hay sale between March 1994 and March 1995. PX 290, Vol. I, "Hay" tab (Statement No. 43 at 2 (March 1994), Statement No. 53 at 2 (April 1995)). During this time, Precision Pine's financial statement indicates that it expended $89,843.01 for logging and hauling on Hay. DX 677. Using defendant's method for determining the rate at which Precision Pine paid its logger to harvest and remove this small volume of timber indicates that Precision Pine "paid" $970/mbf (LS) for logging and hauling on Hay in FYE 1995 ($89,843.01 divided by 92.52 mbf). Compared to even defendant's overstated rates, almost all of which are over $200/mbf (see DPFF 548-555), such a rate for contract logging and hauling is beyond credibility.**

169. The Forest Service suspended the Hay contract on August 25, 1995. First Joint Stip. ¶ 31.

170. As of August 25, 1995, the volume sawtimber remaining to be cut and removed from the Hay contract sale area was 3,819 mbf (l.s.) sawtimber and no roundwood. Third Joint Stip. ¶¶ 18-19.

171. The suspension of the Hay sale was lifted on December 4, 1996. First Joint Stip. ¶ 31; Precision Pine, 50 Fed. Cl. at 39, 70; DX800 at 9.

172. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Hay contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

173. In December 1996, Precision Pine requested and was granted permission by the Forest Service to operate the Hay timber sale outside of the contract's normal operating season. See PX257; DX54.

**Plaintiff's Comment – DX 54 was not admitted and its citation to that exhibit is improper.**

174. Precision Pine resumed logging upon the Hay contract in December 1996. DX68.

175. Precision Pine could have hauled logs from the Hay sale to Eagar and decked them at the Eagar sawmill during December 1996 and January 1997. Tr. 1874 (Porter).

**Plaintiff's Comment – The Hay sale was at an elevation that allowed for extended winter logging. PPFF 44. At the time the suspension was lifted, the Eagar sawmill was closed and had been closed since 1995 due to the log shortage caused by the suspension. Accordingly, Precision Pine also sought and obtained Forest Service permission to haul sawlogs removed from the Hay sale to its Winslow sawmill which was operating at the time and which, due to the suspension, was also in need of logs. PPFF 45. In February 1997, Precision Pine reopened the Eagar sawmill, and logs from the Hay sale were again hauled to Eagar. PPFF 46. Defendant has not shown that Precision Pine's efforts to mitigate its damages in this way were unreasonable.**

176. Precision Pine made a "business decision" to haul to Winslow rather than Eagar in December 1996 and January 1997. Tr. 1875 (Porter).

**Plaintiff's Comment – <u>See</u> plaintiff's comment to DPFF 175. Had Precision Pine not hauled logs from the Hay sale to the Winslow sawmill in the winter of 1996-1997, the Winslow sawmill would have shut down due to a shortage of logs caused by the suspension (Tr. 1875 (Porter)), which would have increased Precision Pine's claim for sawmill inefficiencies due to the suspension. Defendant has not shown that Precision Pine's efforts to mitigate its damages in this way were unreasonable.**

177. Precision Pine requested that the Forest Service re-establish an area for scaling logs at the Eagar sawmill on January 30, 1997. Tr. 1869-73 (Porter); PX265.

178. Precision Pine made a business decision to continue hauling some logs from the Hay sale to Winslow after January 30, 1997. Tr. 1874 (Porter).

**Plaintiff's Comment – Had Precision Pine not hauled logs from the Hay sale to the Winslow sawmill in the winter of 1996-1997, the Winslow sawmill would have shut down due to a shortage of logs caused by the suspension (Tr. 1875 (Porter)), which would have increased Precision Pine's claim for sawmill inefficiencies due to the suspension. Defendant has not shown that Precision Pine's efforts to mitigate its damages in this way were unreasonable.**

179. Precision Pine stopped logging the Hay contract in February 1997. DX68.

**Plaintiff's Comment – Precision Pine resumed harvesting on the sale thereafter, removed all of the Included Timber from the sale area and completed the contract. <u>See</u> DPFF 183.**

180. Precision Pine's logging and hauling costs for the Hay contract between December 1996 and February 1997 were $154.64 per mbf (l.s.). <u>See</u> PX248 (total logging and hauling cost of $333,518); PX290 (total volume of 2,157 mbf (l.s.)).

**Plaintiff's Comment - Defendant's method of calculating a rate for logging and hauling from the financial statement is fanciful as demonstrated by the Hay sale for FYE 3/31/95. That is, according to the TSSAs, Precision Pine removed 92.52 mbf (LS) of sawlogs from the Hay sale between March 1994 and March 1995. PX 290, Vol. I, "Hay" tab (Statement No. 43 at 2 (March 1994), Statement No. 53 at 2 (April 1995)). During this time, Precision Pine's financial statement indicates that it expended $89,843.01 for logging and hauling on Hay. DX 677. Using defendant's method for determining the rate at which Precision Pine paid its logger to harvest and remove this small volume of timber indicates that Precision Pine paid its loggers $970/mbf (LS) for logging and hauling on Hay in FYE 1995 ($89,843.01 divided by 92.52 mbf). Compared to even defendant's overstated rates, almost all of which are over $200/mbf (<u>see</u> DPFF 548-555), such a rate for contract logging is beyond credibility.**

181. The Forest Service suspended the Hay timber sale in June 1997 as a result of the Forest Guardians action.[4] Tr. 983 (Porter); PX119; DX800 at 9.

**Plaintiff's Comment – The injunction was issued in late-May 1997. Forest Guardians v. Thomas, 967 F.Supp. 1536, 1544 (D.Ariz. 1997).**

182. The Forest Guardians suspension was lifted in December 1997. Tr. 983 (Porter); DX800 at 9.

**Plaintiff's Comment – The injunction was lifted on December 15, 1997. Forest Guardians v. Dombeck, 131 F.3d 1309, 1313 (9th Cir. 1997).**

183. In October 1998, Precision Pine resumed harvesting the Hay contract; harvesting was completed in January 1999. DX68; Tr. 853, 1834 (Porter).

184. Precision Pine's logging and hauling costs for the Hay contract between October 1998 and January 1999 were $137.47 per mbf (1.s.). See PX248 (total logging and hauling cost of $228,548); PX290 (total volume of 1,662 mbf (l.s.)).

**Plaintiff's Comment - Defendant's method of calculating a rate for logging and hauling from the financial statement is fanciful as demonstrated by the Hay sale for the FYE 3/31/95. That is, according to the TSSAs, Precision Pine removed 92.52 mbf (LS) of sawlogs from the Hay sale between March 1994 and March 1995. PX 290, Vol. I, "Hay" tab (Statement No. 43 at 2 (March 1994), Statement No. 53 at 2 (April 1995)). During this time, Precision Pine's financial statement indicates that it expended $89,843.01 for logging and hauling on Hay. DX 677. Using defendant's method for determining the rate at which Precision Pine paid its logger to harvest and remove this**

---

[4] Precision Pine has filed a separate action seeking compensation as a result of the Forest Guardians suspension. See Precision Pine & Timber, Inc. v. United States, No. 01-415C (Fed. Cl.) (filed July 17, 2001).

**small volume of timber indicates that Precision Pine paid its loggers $970/mbf (LS) for logging and hauling on Hay in FYE 1995 ($89,843.01 divided by 92.52 mbf).**

185. If Precision Pine had not closed the Eagar sawmill in July 1997, it would have been available for logs from the Hay sale in 1998. Tr. 1863 (Porter).

**Plaintiff's Comment - Precision Pine closed the Eagar sawmill on or about August 1, 1997. DX 798, p. 3. At that time, the only timber sales proximate to that sawmill were Hay, O.D. Ridge and Kettle. Both Hay and O.D. Ridge had been suspended for months due to Forest Guardians. PX 119. As a result (as well as the fact that there was no way to tell how long the suspension would remain in place), Precision Pine removed sawlogs from the Kettle multi-product sale and hauled them to Eagar in the first half of 1997, and then transferred that sale by third-party agreement to Stone in August of 1997. PX 117, 118. Accordingly, Precision Pine was not in a position to incur the expense of leaving the Eagar sawmill open indefinitely with no supply of timber in the hope that the Forest Service might resolve the case at the Ninth Circuit quickly.**

186. Precision Pine earned more by harvesting the Hay contract in the post-suspension period that it allegedly would have earned by harvesting during the period of the MSO suspensions. PX131 ($2.61 million claimed); PX182 ($3.07 million earned); see also DX834 (showing higher revenue per mbf).

**Plaintiff's Comment – Defendant is attempting to play games with the word "earned" rather than addressing the profitability of the sale. A review of Mr. Ness' expert reports, upon which defendant purports to rely, discloses that defendant has compared the net sales line item for the Hay sale in the two periods which, because it does not contain any costs or by-products revenue, discloses nothing about the ultimate profitability of the sale. A correct representation of the facts indicates that Precision Pine actually obtained profits of $1,289,628.24 on the Hay sale in the post-**

**suspension-period (PX 182, Ex. 2 at 15), an amount which is a <u>less than</u> the $1,357,800.81 in profits that would have received had it been allowed to harvest and process the timber on the Hay sale during the suspension. PX 131, Ex. 4 at 21. Notably, defendant identifies no other sale where even its method of looking at "earnings" resulted in greater earnings in the post-suspension period than during the suspension.**

### 4. <u>The Hutch-Boondock Multi-Product Sale Contract</u>

187. Hutch-Boondock was a multi-product sale. As a multi-product sale, the Hutch Boondock contract contained both sawtimber and roundwood components. <u>See</u>, <u>e.g.</u>, DX238.

188. The Hutch-Boondock contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Hutch Boondock contract was 4,717 ccf sawtimber and 1,645 ccf roundwood. DX238 (AT2).

189. The sawtimber component of the Hutch-Boondock contract had an average dbh of 12.6 inches and 0.8 percent grade. PX14; DX820.

**Plaintiff's Comment – The Forest Service's estimate of the average dbh and percent grade as set forth on the appraisal summary are as stated. The Forest Service disclaims its estimates of the quantity and quality of timber on its sales and urges purchasers to make their own estimates (PPFF 296), which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

190. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Hutch-Boondock contract was 0.4656. PX14.

**Plaintiff's Comment – Precision Pine does not agree that the factor used by the Forest Service to convert from ccf to mbf was demonstrated to be accurate or correct. There are several methods for converting from ccf to mbf, all of which have in common that they are right around ccf x .5 = mbf (<u>i.e.</u>, two mbf to one ccf). Over years of practical experience in converting from ccf to**

**mbf, Mr. Porter found this to be an accurate method that had been endorsed to him by the Forest Service and it is what Precision Pine used in converting from ccf to mbf. See PPFF 23, 206-08. Indeed, the Forest Service's own estimates of timber quantity and quality on the sales are expressly disclaimed by the Forest Service, which urges purchasers to make their own examination of the timber (PPFF 296) -- which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

191. The Hutch-Boondock contract's normal operating season ran from April 15 to November 30. DX238 (clause AT17).

**Plaintiff's Comment – Harvesting is not limited to the Normal Operating Season and harvesting outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T) 6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead).**

192. The Hutch-Boondock contract contained no additional restrictions that further limited timber harvesting as a result of endangered, threatened and sensitive species. See DX238 (clause CT6.25).

193. The Hutch-Boondock contract was awarded to Precision Pine on June 29, 1994. First Joint Stip. ¶ 16.

194. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Hutch-Boondock contract at or before its award. Tr. 1856-57 (Porter).

**Plaintiff's Comment – Based on its years of experience of providing timber to Precision Pine for use as raw material at its sawmills in its production of lumber, the Forest Service was fully**

**aware of Precision Pine's intended use of the sawlogs from the sale for this purpose. As counsel for the government conceded at trial:**

> **THE COURT: [B]ut here, when the sale is awarded to Precision Pine, isn't it a fact that everybody knows that Precision Pine is in the lumber business and it's going to take the timber to its mill and cause it to be turned into lumber?**
>
> **MR. HARRINGTON: Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine's had sawmills. We'd certainly concede that fact. The Forest Service knew that Precision Pine had sawmills.**

**Tr. 5417 (Harrington).**

195. The Forest Service suspended the Hutch-Boondock contract on August 25, 1995. First Joint Stip. ¶ 29.

196. As of August 25, 1995, the volume remaining to be cut and removed from the Hutch-Boondock contract sale area was 4,717 ccf (or 2,196 mbf (l.s.)) sawtimber and 1,645 ccf roundwood. DX249; DX251.

**Plaintiff's Comment –The factor used by the Forest Service to convert from ccf to mbf was never demonstrated to be accurate or correct. There are several methods for converting from ccf to mbf, all of which are approximately ccf x .5 = mbf (i.e., two mbf to one ccf). Over years of practical experience in converting from ccf to mbf, Mr. Porter found this to be an accurate method that the Forest Service had endorsed to him and it is what Precision Pine used in converting from ccf to mbf. See PPFF 23, 206-08. Indeed, the Forest Service's own estimates of timber quantity and quality on the sales are expressly disclaimed by the Forest Service, which urges purchasers to make their own examination of the timber (PPFF 296) -- which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

197. The Forest Service lifted the suspension and, subject to the terms and conditions of the contract, made Hutch-Boondock available for harvesting by Precision Pine on October 18, 1995. First Joint Stip. ¶ 30; Precision Pine, 50 Fed. Cl. at 47 & n.18; see also PX106 (paragraph 3(m)).

**Plaintiff's Comment – The cited evidence does not indicate that the Forest Service actually lifted the suspension or made the sale available for harvest on October 18, 1995. Moreover, Precision Pine does not seek lost profits on the Hutch-Boondock sale but merely seeks less than $400 in previously denied out-of-pocket expenses on the sale. PX 131, Ex. 2.**

198. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Hutch-Boondock contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

199. On October 31, 1995, Precision Pine informed the Forest Service that it had no outlet for roundwood from the Hutch-Boondock contract. DX263.

**Plaintiff's Comment – The cited exhibit actually indicates that even though Precision Pine did not have an outlet for pulpwood as of October 31, 1995, Precision Pine would have an outlet in the spring. The TSSAs indicate that Precision Pine did harvest pulpwood on the sale beginning in April of 1996. DX 251 at HBD 398 (April 1996 TSSA).**

200. Based upon Precision Pine's representation, the Forest Service allowed Precision Pine to defer harvesting the roundwood component of the Hutch-Boondock contract. Tr. 3919- 21 (Harris).

**Plaintiff's Comment – See plaintiff's comment to DPFF 199.**

201. Precision Pine conducted harvesting [sic] the Hutch-Boondock contract from November 1995 to January 1996. DX2S1.

**Plaintiff's Comment – Precision Pine removed 4,571 ccf of sawlogs and 390 ccf of pulpwood from the sale area from November of 1995 to December of 1996. DX 251 at HBD 450.**

202. Precision Pine conducted additional harvesting between July and December 1996. DX251; see also DX800 at 10.

**Plaintiff's Comment – See plaintiff's comment to DPFF 201.**

203. Although the Hutch-Boondock contract was unaffected by the Forest Guardians suspension, Precision Pine conducted no harvesting during 1997. See DX251; DX800 at 11.

**Plaintiff's Comment – Although the sale was not directly suspended by the Forest Guardians case, it is not correct to say that it was "unaffected" by that suspension. Rather, the suspension of all of the larger diameter timber on Precision Pine's sales for a third consecutive harvest season severely impacted Precision Pine's ability to resume normal operations. Moreover, at the time of the Forest Guardians suspension, only a very small volume (less than 78 mbf) of sawlogs remained on the sale area. See PX 290, Vol. IV, TSSAs for Hutch-Boondock, TSSA for June 1997. (4,571.45 ccf of sawlogs harvested from a total of 4,717 ccf of sawlogs originally on the sale area.)**

204. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the Hutch-Boondock contract in 1997 and in subsequent years. Tr. 1743-44, 1755 (Reidhead).

205. Although the contract was subsequently available, Precision Pine never completed timber harvesting upon the Hutch-Boondock contract. See DX251.

**Plaintiff's Comment – Precision Pine removed 99.6% of the sawlogs on the sale. See PX 290, Vol. IV, TSSAs for Hutch-Boondock, TSSA for Sept. 2000. (4,698.8 ccf of sawlogs harvested from a total of 4,717 ccf of sawlogs originally on the sale area.)**

206. During the period when other contracts remained suspended (i.e., from October 19, 1995 to December 4, 1996), Precision Pine did not complete harvesting of the Hutch-Boondock contract. Tr. 1469 (Porter); DX251. As of December 1996, only 96 percent of available sawtimber and 24 percent of available roundwood had been cut and removed by Precision Pine. Tr. 1456, 1459-60 (Porter); DX249; DX251; DX552.

**Plaintiff's Comment – Given the impediments to conducting normal operations imposed on Precision Pine by the Forest Service's suspension and breach of contract, Precision Pine reasonably mitigated it damages by conducting the harvest that it did on the sale during the suspension period. See also PPFF 267. Defendant has not shown otherwise.**

207. The Forest Service terminated the Hutch-Boondock contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (case no. 02-131).

208. Pursuant to CT 6.01, the Forest Service paid Precision Pine $128.80 in connection with the suspension of the Hutch-Boondock contract. See PX221; PX131 (exhibit 2).

**Plaintiff's Comment – As noted above, Precision Pine continues to seek the unpaid amount of expenses on this contract. See PX 131, Ex. 2.**

### 5. The Jersey Horse Timber Sale Contract

209. Jersey Horse was a not multi-product sale. See PX170.

210. The Jersey Horse contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Jersey Horse contract was 3,163 ccf sawtimber and no roundwood. PXI7O (AT2).

211. The sawtimber on the Jersey Horse contract had an average dbh of 17.9 inches and 37.9 percent grade. PX2; DX820.

**Plaintiff's Comment – The Forest Service's estimate of the average dbh and percent grade as set forth on the appraisal summary are as stated. The Forest Service disclaims its estimates of the quantity and quality of timber on its sales and urges purchasers to make their own estimates (PPFF 296), which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

212. The Jersey Horse contract's normal operating season ran from April 15 to November 15. PX170 (clause AT17).

**Plaintiff's Comment – Harvesting is not limited to the Normal Operating Season and harvesting outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T) 6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead).**

213. The Jersey Horse contract contained additional restrictions that further limited timber harvesting as a result of endangered, threatened and sensitive species. Specifically, logging, hauling and road construction in payment units 2-7 was only permitted between September 1 and November 15, and logging, hauling and road construction in cutting unit 14 was permitted only between October 1 and November 15. See PX170 (clause CT6.25).

**Plaintiff's Comment –Defendant has not identified what restrictions, if any, were in place during the suspension on the contract or the extent to which any such restriction would have impacted projected harvesting during the suspension period.**

214. The Jersey Horse contract was awarded to Precision Pine on December 13, 1993. First Joint Stip. ¶ 20.

**Plaintiff's Comment - Defendant has cited the wrong paragraph of the first joint stipulation. The citation should be to paragraph 14 (not paragraph 20).**

215. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Jersey Horse contract at or before its award. Tr. 1856-57 (Porter).

**Plaintiff's Comment – Based on its years of experience of providing timber to Precision Pine for use as raw material at its sawmills in its production of lumber, the Forest Service was fully aware of Precision Pine's intended use of the sawlogs from the sale for this purpose. As counsel for the government conceded at trial:**

> **THE COURT: [B]ut here, when the sale is awarded to Precision Pine, isn't it a fact that everybody knows that Precision Pine is in the lumber business and it's going to take the timber to its mill and cause it to be turned into lumber?**
>
> **MR. HARRINGTON: Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine's had sawmills. We'd certainly concede that fact. The Forest Service knew that Precision Pine had sawmills.**

**Tr. 5417 (Harrington).**

216. The Forest Service suspended the Jersey Horse contract on August 25, 1995. First Joint Stip. ¶ 29.

217. As of August 25, 1995, the volume remaining to be cut and removed from the Jersey Horse contract sale area was 3040 ccf sawtimber and no roundwood. Third Joint Stip. ¶¶ 12-13.

218. The suspension of the Jersey Horse contract was lifted on December 4, 1996. First Joint Stip. ¶ 30; Precision Pine, 50 Fed. Cl. at 39, 70; DX 800 at 15.

219. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Jersey Horse contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

220. The Jersey Horse contract was unaffected by the Forest Guardians suspension. See DX800 at 15.

**Plaintiff's Comment – Although the sale was not directly suspended by the Forest Guardians case, it is not correct to say that it was "unaffected" by that suspension. Rather, the suspension of all of the larger diameter timber on Precision Pine's sales for a third consecutive harvest season severely impacted Precision Pine's ability to resume normal operations. Nevertheless, during the Forest Guardians suspension Precision Pine did conduct harvesting on the sale removing 1,294 ccf. See PX 290, Vol. II, TSSAs for the Jersey Horse sale, TSSAs June to December 1997.**

221. Precision Pine partially harvested the Jersey Horse contract beginning [sic] between September 1997 and January 1998. DX128.

**Plaintiff's Comment – Precision Pine removed a total of 60% of the volume on the sale (see PX 290, Vol. II, TSSAs for the Jersey Horse sale).**

222. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the Jersey Horse contract in 1997 and in subsequent years. See Tr. 1743-44, 1755 (Reidhead).

223. Although the contract was subsequently available, Precision Pine never resumed work or completed timber harvesting upon the Jersey Horse contract. DX 128.

224. The Forest Service terminated the Jersey Horse contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (case no. 02-131).

225. Pursuant to CT 6.01, the Forest Service paid Precision Pine $1,335.25 in connection with the suspension of the Jersey Horse contract. See PX203; PX13 1 (exhibit 2).

**Plaintiff's Comment – Precision Pine continues to seek the unpaid expenses on the contract. See PX 131, Ex. 2.**

**6. The Kettle Multi-Product Sale Contract**

226. Kettle was a multi-product sale. As a multi-product sale, the Kettle contract contained both sawtimber and roundwood components. See, e.g., PX173.

227. The Kettle contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Kettle contract was 5,702 ccf sawtimber and 3,958 ccf roundwood. PX173 (AT2).

228. The sawtimber component of the Kettle contract had an average dbh of 12.3 inches and 23.0 percent grade. See PX5; DX820.

**Plaintiff's Comment – There were two sawlog components to the Kettle contract 9" to 11.9" and 12" and greater. PX 190, p. 2 (Kettle contract). The average dbh for the 9" to 11.9" sawlog component was 10.2", and the average dbh for the 12" and greater sawlog component was 15.1". The percent grade stated is as set forth in the appraisal summary.**

229. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Kettle contract was 0.4757. See PX5.

**Plaintiff's Comment – PX 5 does not contain the conversion factor stated. The conversion factor as determined by the Forest Service for the 9" to 11.9" sawlog component was .4072, and the conversion factor for the 12" and greater sawlog component was .5118. Precision Pine does not agree that the factors used by the Forest Service to convert from ccf to mbf was demonstrated to be accurate or correct. There are several methods for converting from ccf to mbf, all of which are**

**approximately ccf x .5 = mbf (i.e., two mbf to one ccf). Over years of practical experience in converting from ccf to mbf, Mr. Porter found this to be an accurate methodology that the Forest Service had endorsed to him and it is what Precision Pine used in converting from ccf to mbf. See PPFF 23, 206-08. Indeed, the Forest Service's own estimates of timber quantity and quality on the sales are expressly disclaimed by the Forest Service, which urges purchasers to make their own examination of the timber (PPFF 296) -- which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

230. The Kettle contract's normal operating season ran from May 15 to October 31. PX173 (clause AT17); DX800 at 5.

**Plaintiff's Comment – Harvesting is not limited to the Normal Operating Season and harvesting outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T)6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead).**

231. The Kettle contract was awarded to Precision Pine on July 20, 1995. First Joint Stip. ¶ 23.

232. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Kettle contract at or before its award. Tr. 1856-57 (Porter).

**Plaintiff's Comment – Based on its years of experience of providing timber to Precision Pine for use as raw material at its sawmills in its production of lumber, the Forest Service was fully**

**aware of Precision Pine's intended use of the sawlogs from the sale for this purpose. As counsel for the government conceded at trial:**

> **THE COURT: [B]ut here, when the sale is awarded to Precision Pine, isn't it a fact that everybody knows that Precision Pine is in the lumber business and it's going to take the timber to its mill and cause it to be turned into lumber?**
>
> **MR. HARRINGTON: Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine's had sawmills. We'd certainly concede that fact. The Forest Service knew that Precision Pine had sawmills.**

**Tr. 5417 (Harrington).**

233. The Forest Service suspended the Kettle contract on August 25, 1995. First Joint Stip. ¶ 29.

234. As of August 25, 1995, the volume remaining to be cut and removed from the Kettle contract sale area was 5,702 ccf (or 2712 mbf (l.s.)) sawtimber and 3,958 ccf roundwood. Third Joint Stip. ¶¶ 20-2 1; PX5.

**Plaintiff's Comment – As noted above, the factor used by the Forest Service to convert from ccf to mbf was never demonstrated to be accurate or correct. There are several methods for converting from ccf to mbf, all of which are approximately ccf x .5 = mbf (i.e., two mbf to one ccf). See PFFF 23, 206-08.**

235. Precision Pine informed local government officials in December 1995 that the Kettle was not profitable to operate. DX722.

**Plaintiff's Comment – DX 722 was not admitted into evidence. Defendant's citation of this exhibit is improper.**

236. The suspension of the Kettle contract was lifted on December 4, 1995. First Joint Stip. ¶ 31; Precision Pine, 50 Fed. Cl. at 39, 70; DX 800 at 17.

237. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Kettle contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

238. The Kettle contract was unaffected by the Forest Guardians suspension. See DX800 at 17.

**Plaintiff's Comment – Although the sale was not directly suspended by the Forest Guardians case, it is not correct to say that it was "unaffected" by that suspension. Rather, the suspension of all of the larger diameter timber on Precision Pine's sales for a third consecutive harvest season severely impacted Precision Pine's ability to resume normal operations. Indeed, at the time of the Forest Guardians suspension, Precision Pine was operating the Kettle sale. See PX 290, Vol. II, TSSAs for the Kettle sale, TSSAs April to June 1997. However, the Forest Guardians suspension shut down the Hay and O.D. Ridge timber sales (PX 119, Forest Guardians suspension letters), both of which contained larger diameter sawlogs and which were the only two other sales that were going to Precision Pine's Eagar sawmill. See PX 131, Ex 7. In light of the ongoing suspension of Hay and O.D. Ridge as well as Stone's interest in obtaining the Kettle sale, Precision Pine sold the sale to Stone during the Forest Guardians suspension. See DX 800 at 17.**

239. Precision Pine began harvesting the Kettle contract in May 1997. DX31; DX800 at 17.

**Plaintiff's Comment – Precision Pine began harvesting the Kettle sale in April (not May) of 1997 and by June 1997 had removed 1502.20 ccf of sawlogs and 1040.1 ccf of pulpwood. See PX 290, Vol. II, TSSAs for the Kettle sale, TSSAs April to June 1997.**

240. The Forest Service did not authorize the deferred harvesting of roundwood on the Kettle contract. As a result, because Precision Pine had no outlet for roundwood, Precision Pine decked (i.e., stacked) harvested roundwood at its Eagar sawmill. Tr. 1947-48 (Porter); DX553.

**Plaintiff's Comment – Defendant has cited no evidence that Precision Pine requested or that the Forest Service denied it the ability to deck pulpwood on the sale area. Moreover, Precision Pine harvested 1,040 ccf of pulpwood in 1997 which is equivalent to 1,320.8 cords. See Tr. 2433 (Ness) (conversion factor for going from ccf to cords is 1.27). The pulpwood in Precision Pine's Eagar mill yard totaled only approximately 250 cords. See PX 117. Thus, Precision Pine was able to dispose of more than 1,070 cords of pulpwood from the Kettle sale.**

241. Precision Pine did not fully harvest the Kettle contract. DX31. Rather, on August 15, 1997, Precision Pine sold the Kettle contract to Stone. PX117; DX477 (same).

**Plaintiff's Comment – See plaintiff's comment to DPFF 238.**

242. Stone paid $60,495 and agreed to accept the roundwood that Precision Pine had previously cut and decked at the Eagar sawmill. DX477; DX553; DX587. Precision Pine sold the Kettle contract because it had been unable to find an outlet for the roundwood on the sale. DX47.

**Plaintiff's Comment – Neither DX 587 nor DX 477 were admitted into evidence and defendant's citation of these exhibits is improper. Among the reasons identified on DX 47 for the sale of the Kettle contract to Stone was "the most recent injunction placed on our other timber sales located in the Eagar area."**

243. The price at which Precision Pine sold the Kettle sale to Stone ($60,495) was much lower than Precision Pine's "worst case" profit projection of July 17, 1995 ($120,351), PX1 17; DX514, despite the fact that lumber prices in August 1997 were substantially higher, see PX305.

**Plaintiff's Comment – The profit projection was for the sale as a whole. As noted above, Precision Pine had already removed more than 1,500 ccf of the timber from the sale area, therefore, a comparison between the contract and the profit projection on a total dollar basis proves nothing.**

**See DPFF 238, 239. Moreover, the 1995 profit projections are based on processing the sale at Eagar, but because the Eagar sawmill had been permanently closed as of August 1, 1997 (DX 800), this was no longer possible and significant additional expense would have been incurred to haul timber from the Kettle sale to another sawmill. Additionally, pursuant to the contract to purchase the Kettle sale, Stone agreed to pay Precision Pine a total of $19,950 for roundwood from the sale. PX 117.**

244. Pursuant to CT 6.01, the Forest Service paid Precision Pine $1,344.91 in connection with the suspension of the Kettle contract. See PX207; PX13I (exhibit 2).

**Plaintiff's Comment – Precision Pine continues to seek the recovery of expenses not paid by the Forest Service. See PX 131, Ex. 2.**

### 7. The Manaco Multi-Product Sale Contract

245. Manaco was a multi-product sale. As a multi-product sale, the Manaco contract contained both sawtimber and roundwood components. See, e.g., PX178.

246. The Manaco contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Manaco contract was 5,692 ccf sawtimber and 1,587 ccf roundwood. PX178 (AT2).

247. The sawtimber component of the Manaco contract had an average dbh of 12.9 inches and 0.7 percent grade. PX10; DX820.

**Plaintiff's Comment – The Forest Service's estimate of the average dbh and percent grade as set forth on the appraisal summary are as stated. The Forest Service disclaims its estimates of the quantity and quality of timber on its sales and urges purchasers to make their own estimates (PPFF 296), which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

248. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Manaco contract was 0.4845. PX10.

**Plaintiff's Comment –The factor used by the Forest Service to convert from ccf to mbf was never demonstrated to be accurate or correct. There are several methods for converting from ccf to mbf, all of which are approximately ccf x .5 = mbf (i.e., two mbf to one ccf). Over years of practical experience in converting from ccf to mbf, Mr. Porter found this to be an accurate method that the Forest Service had endorsed to him and it is what Precision Pine used in converting from ccf to mbf. See PPFF 23, 206-08. Indeed, the Forest Service's own estimates of timber quantity and quality on the sales are expressly disclaimed by the Forest Service, which urges purchasers to make their own examination of the timber (PPFF 296) -- which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

249. The normal operating season for payment unit one of the Manaco contract ran from May 1 to the weekend before Memorial Day and from the day after Labor Day to November 30. The normal operating season for payment units two through ten of the Manaco contract ran from May 1 to July 15 and from August 15 to November 30. PX178 (clause AT 17).

**Plaintiff's Comment – Harvesting is not limited to the Normal Operating Seasons and harvest outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T) 6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead).**

250. The Manaco contract contained additional restrictions that further limited timber harvesting as a result of endangered, threatened and sensitive species. See DX238 (clause CT6.25). Specifically, activities in cutting units 7, 12-16, 19, 30-33, 36, 38 and 39 could take place only between October 1 and November 30. Log hauling from cutting units 9-1l, 17, 20 and 37 could only take place between October 1 and November 30. Road building, maintenance and usage of specified Forest Service roads was prohibited until October 1. See PX178 (clause CT6.25); DX800 at 18.

**Plaintiff's Comment – Contrary to defendant's assertion, activities in cutting units 7, 12-16, 19, 30-33, 36, 38 and 39 are "restricted" only between March 1 to September 30. PX 178 at MCO 119 (Contract clause CT6.25#). As such, there is no wildlife restriction on theses units between October 1 and February 28. Given this, plus the fact that operations outside of the Normal Operating season are quite customary, see plaintiff's comment to DPFF 249, defendant is incorrect when it states that activities in these units "could take place only between October 1 and November 30."**

**Moreover, contrary to defendant's assertion, hauling from units 9-11, 17, 20, and 37 is "restricted" only between March 1 to September 30. PX 178 at MCO 119 (Contract clause CT6.25#). As such, there is no wildlife restriction on theses units between October 1 and February 28. Given this, plus the fact that operations outside of the Normal Operating season are quite customary, see plaintiff's comment to DPFF 249, defendant is incorrect when it states that hauling from these units "could only take place between October 1 and November 30."**

**Likewise, contrary to defendant's assertion, the limitation on other operational activities between March 1 and September 30 applied only to certain roads or portions thereof and only to certain operations with regard to them. PX 178 at MCO 119 (Contract Clause CT6.25#). There was no across-the-board prohibition of any activity or activities on all roads on the sale. Id.; see also PPFF 256 (Discussing Contracting Officer's testimony confirming Precision Pine's ability to operate on the Manaco sale).**

251. The Manaco contract was awarded to Precision Pine on January 17, 1995. First Joint Stip. ¶ 21.

252. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Manaco contract at or before its award. Tr. 1856-57 (Porter).

**Plaintiff's Comment – Based on its years of experience of providing timber to Precision Pine for use as raw material at its sawmills in its production of lumber, the Forest Service was fully aware of Precision Pine's intended use of the sawlogs from the sale for this purpose. As counsel for the government conceded at trial:**

> **THE COURT: [B]ut here, when the sale is awarded to Precision Pine, isn't it a fact that everybody knows that Precision Pine is in the lumber business and it's going to take the timber to its mill and cause it to be turned into lumber?**
>
> **MR. HARRINGTON: Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine's had sawmills. We'd certainly concede that fact. The Forest Service knew that Precision Pine had sawmills.**

**Tr. 5417 (Harrington).**

253. The Forest Service suspended the Manaco contract on August 25, 1995. First Joint Stip. ¶ 29.

254. As of August 25, 1995, the volume remaining to be cut and removed from the Manaco contract sale area was 5,006 ccf (or 2,425 mbf (l.s.)) sawtimber and 1,348 ccf roundwood. Third Joint Stip. ¶¶ 14-15; PX10.

**Plaintiff's Comment –The factor used by the Forest Service to convert from ccf to mbf was never demonstrated to be accurate or correct. There are several methods for converting from ccf to mbf, all of which are approximately ccf x .5 = mbf (i.e., two mbf to one ccf). Over years of practical experience in converting from ccf to mbf, Mr. Porter found this to be an accurate method that the Forest Service had endorsed to him and it is what Precision Pine used in converting from ccf to mbf. See PPFF 23, 206-08. Indeed, the Forest Service's own estimates of timber quantity and**

**quality on the sales are expressly disclaimed by the Forest Service, which urges purchasers to make their own examination of the timber (PPFF 296) -- which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

255. A Mexican Spotted Owl was discovered adjacent to the Manaco sale during the summer of 1996. Precision Pine was informed that the discovery of the owl – a threatened species protected by the Endangered Species Act – would require a suspension of operations and consultation with the Fish and Wildlife Service. See Tr. 4625 (Dils); DX800 at 18.

**Plaintiff's Comment – At the time of the discovery of a Mexican spotted owl adjacent to the Manaco sale in the summer of 1996, the Manaco sale was already suspended as a result of the injunction issued against the Forest Service in this case. The cause of the suspension in this case was the ongoing consultation between the Forest Service and the U.S. Fish and Wildlife Service on 11 Forest Plans that had brought Region 3 to a virtual standstill. Precision Pine, 50 Fed.Cl. 35, 47-51 (2001). Indeed, the Arizona District Court had threatened to hold the Chief of the Forest Service in contempt for the Forest Service's failure to abide by the Court ordered consultation. Id. Needless to say, the agencies were fixated on this consultation for 16 months. Id. Defendant has not shown that in the absence of the consultation on the Forest Plans (that impacted all timber sale contracts across the region), that the Forest Service and the Fish and Wildlife Service would not have engaged in and completed consultation on the lone Manaco sale in a relatively short time span and avoided all impact to the Manaco sale during the period in the fall of 1996 when harvest was projected to have taken place. In fact, after the suspension resulting from the consultation on the Forest Plans was lifted in December of 1996, the Forest Service engaged in and completed "expedited consultation" in March, 1997. See DPFF 256, DX 800, pp. 18-19.**

**Moreover, defendant overlooks the fact that the second suspension (to consult with respect to a Mexican spotted owl in 1996) was also a breach of contract. That is, as this Court has already**

**found with respect to Manaco and clause CT6.25 thereof, the Forest Service warranted that it had identified special measures needed to protect species, such as the Mexican spotted owl. Id. at 66. There is no basis for the Forest Service to avoid liability for one breach by pointing to a subsequent breach to assert that performance was not possible.**

256. As a result of the presence of the owl, the suspension of the Manaco contract continued after December 4, 1996. The suspension of the Manaco contract was lifted in March 1997. Tr. 4625 (Dils); DX 800 at 18-19.

**Plaintiff's Comment – See plaintiff's comment to DPFF 255.**

257. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Manaco contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

258. The Forest Service suspended parts of the Manaco sale in June 1997 as a result of the Forest Guardians action. DX800 at 18.

**Plaintiff's Comment – The timber sales and portions of timber sales enjoined under Forest Guardians were the larger diameter sawlogs. See, e.g., PX 120 (sale could go forward if large diameter trees were deleted).**

259. The partial suspension resulting from the Forest Guardians action was lifted in December 1997. DX800 at 18.

**Plaintiff's Comment – The injunction ended on December 15, 1997. Forest Guardians v. Dombeck, 131 F.3d 1309, 1313 (9th Cir. 1997).**

260. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the Manaco contract in 1997 or in subsequent years. See Tr. 1743-44, 1755 (Reidhead).

261. Precision Pine did not to [sic] commence post-suspension harvesting upon the Manaco contract until May 1998. DX186; see also DX800 at 19; DX791 (describing Precision Pine's decision to defer harvesting as based upon "business reasons").

**Plaintiff's Comment – The Forest Guardians suspension was not lifted until December 15, 1997 (Response to DPFF 259), which was after the 1997 Normal Operating Season was over. See DX 249. The Normal Operating Season for only a portion of the sale began in May 1998 (DPFF 249), at which point Precision Pine commenced harvesting. PX 290, Vol. II, "Manaco" tab, Statement No. 41 for May 1998 (June 8, 1998).**

**DX 791 cited by defendant remains subject to Precision Pine's motion to strike. See plaintiff's comment to DPFF 47.**

262. Precision Pine never completed harvesting the Manaco contract. DX 186.

263. The Forest Service terminated the Manaco contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (case no. 02-131).

264. Pursuant to CT 6.01, the Forest Service paid Precision Pine $545.53 in connection with the suspension of the Manaco contract. See PX199; PX131 (exhibit 2).

**8. The Monument Multi-Product Sale Contract**

265. Monument was a multi-product sale. As a multi-product sale, the Monument contract contained both sawtimber and roundwood components. See, e.g., PX176.

266. The Monument contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Monument contract was 1,461 ccf sawtimber and 1,100 ccf roundwood. PX176 (AT2).

267. The sawtimber component of the Monument contract had an average dbh of 11.5 inches and 0.0 percent grade. PX8; DX820.

**Plaintiff's Comment – The Forest Service's estimate of the average dbh and percent grade as set forth on the appraisal summary are as stated. The Forest Service disclaims its estimates of the quantity and quality of timber on its sales and urges purchasers to make their own estimates (PPFF 296), which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

268. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Monument contract was 0.4456. PX8.

**Plaintiff's Comment –The factor used by the Forest Service to convert from ccf to mbf was never demonstrated to be accurate or correct. There are several methods for converting from ccf to mbf, all of which are approximately ccf x .5 = mbf (i.e., two mbf to one ccf). Over years of practical experience in converting from ccf to mbf, Mr. Porter found this to be an accurate method that the Forest Service had endorsed to him and it is what Precision Pine used in converting from ccf to mbf. See PPFF 23, 206-08. Indeed, the Forest Service's own estimates of timber quantity and quality on the sales are expressly disclaimed by the Forest Service, which urges purchasers to make their own examination of the timber (PPFF 296) -- which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

269. The Monument contract's normal operating season ran from April 15 to November 30. PX176 (clause AT17).

**Plaintiff's Comment – Harvesting is not limited to the Normal Operating Season and harvesting outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T) 6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead).**

270. The Monument contract was awarded to Precision Pine on September 28, 1994. First Joint Stip. ¶ 19.

271. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Monument contract at or before its award. Tr. 1856-57 (Porter).

**Plaintiff's Comment – Based on its years of experience of providing timber to Precision Pine for use as raw material at its sawmills in its production of lumber, the Forest Service was fully aware of Precision Pine's intended use of the sawlogs from the sale for this purpose. As counsel for the government conceded at trial:**

> **THE COURT: [B]ut here, when the sale is awarded to Precision Pine, isn't it a fact that everybody knows that Precision Pine is in the lumber business and it's going to take the timber to its mill and cause it to be turned into lumber?**
>
> **MR. HARRINGTON: Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine's had sawmills. We'd certainly concede that fact. The Forest Service knew that Precision Pine had sawmills.**

**Tr. 5417 (Harrington).**

272. The Forest Service suspended the Monument contract on August 25, 1995. First Joint Stip. ¶ 29.

273. As of August 25, 1995, the volume remaining to be cut and removed from the Monument contract sale area was 1,461 ccf (or 651 mbf (l.s.)) sawtimber and 1,100 ccf roundwood. Third Joint Stip. ¶¶ 1-2; PX8.

**Plaintiff's Comment – Precision Pine does not agree that defendant has properly converted from ccf to mbf.**

274. The suspension of the Monument contract was lifted on December 4, 1995. First Joint Stip. ¶ 31; Precision Pine, 50 Fed. Cl. at 39, 70; DX 800 at 21.

275. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Monument contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

276. The Monument contract was unaffected by the Forest Guardians suspension. See DX800 at 22.

**Plaintiff's Comment – Although the sale was not directly suspended by the Forest Guardians case, it is not correct to say that it was "unaffected" by that suspension. Rather, the suspension of all of the larger diameter timber on Precision Pine's sales for a third consecutive harvest season severely impacted Precision Pine's ability to resume normal operations. Moreover, the Monument sale was to be processed at the Winslow sawmill (see PX 131, Ex. 7) which operated most efficiently with a mix of large and small logs. See PPFF 243, 245. The Monument sale contained many smaller sawlogs. DPFF 267.**

277. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the Monument contract in 1997 or in subsequent years. Tr. 1743-44, 1755 (Reidhead).

278. Precision Pine did not conduct harvesting upon the Monument contract at any time. DX437; Tr. 1063-64 (Porter); DX791 (stating that Precision Pine decided to forego harvesting for "business reasons").

**Plaintiff's Comment – See DX 800 at 21-24. Additionally, Precision Pine did complete the roads necessary to access the timber on the sale. PX 161. DX 791 cited by defendant remains subject to Precision Pine's motion to strike. See plaintiff's comment to DPFF 47.**

279. The Forest Service terminated the Monument contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed, Cl. 635, 638 (2004) (case no. 02-131).

280. Pursuant to CT 6.01, the Forest Service paid Precision Pine $245.43 in connection with the suspension of the Monument contract. See PX217; PX131 (exhibit 2).

**Plaintiff's Comment – Precision Pine continues to seek recovery of expenses not paid by the Forest Service. See PX 131, Ex. 2.**

**9. The Mud Multi-Product Sale Contract**

281. Mud was a multi-product sale. As a multi-product sale, the Mud contract contained both sawtimber and roundwood components. See PX175.

282. The Mud contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. As of the award date, the volume of "included timber" on the Mud contract was 6,199 ccf sawtimber and 4,060 ccf roundwood. PX175 (AT2).

283. As of the award date, the sawtimber component of the Mud contract had an average dbh of 11.6 inches and 0.0 percent grade. PX7; DX820.

**Plaintiff's Comment – The Forest Service's estimate of the average dbh and percent grade as set forth on the appraisal summary are as stated. The Forest Service disclaims its estimates of**

**the quantity and quality of timber on its sales and urges purchasers to make their own estimates (PPFF 296), which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

284. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Mud contract was 0.45 16. PX7.

**Plaintiff's Comment – The factor used by the Forest Service to convert from ccf to mbf was never demonstrated to be accurate or correct. There are several methods for converting from ccf to mbf, all of which are approximately ccf x .5 = mbf (i.e., two mbf to one ccf). Over years of practical experience in converting from ccf to mbf, Mr. Porter found this to be an accurate method that the Forest Service had endorsed to him and it is what Precision Pine used in converting from ccf to mbf. See PPFF 23, 206-08. Indeed, the Forest Service's own estimates of timber quantity and quality on the sales are expressly disclaimed by the Forest Service, which urges purchasers to make their own examination of the timber (PPFF 296) -- which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

285. The Mud contract's normal operating season ran from June 1 to December 31. PX175 (clause AT17).

**Plaintiff's Comment – Harvesting is not limited to the Normal Operating Seasons and harvest outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T)6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead).**

286. The Mud contract was awarded to Precision Pine on September 14, 1994. First Joint Stip. ¶ 18.

287. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Mud contract at or before its award. Tr. 1856-57 (Porter).

**Plaintiff's Comment – Based on its years of experience of providing timber to Precision Pine for use as raw material at its sawmills in its production of lumber, the Forest Service was fully aware of Precision Pine's intended use of the sawlogs from the sale for this purpose. As counsel for the government conceded at trial:**

> **THE COURT: [B]ut here, when the sale is awarded to Precision Pine, isn't it a fact that everybody knows that Precision Pine is in the lumber business and it's going to take the timber to its mill and cause it to be turned into lumber?**
>
> **MR. HARRINGTON: Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine's had sawmills. We'd certainly concede that fact. The Forest Service knew that Precision Pine had sawmills.**

**Tr. 5417 (Harrington).**

288. As a result of a court order entered in the Silver v. Babbitt action, the Forest Service suspended the Mud contract on August 25, 1995. First Joint Stip. ¶ 29.

289. As of August 25, 1995, the volume remaining to be cut and removed from the Mud contract sale area was 6,199 ccf (or 2,799 mbf (l.s.)) sawtimber and 4,060 ccf roundwood. Third Joint Stip. ¶¶ 3-4; PX7.

**Plaintiff's Comment –Defendant has not properly converted from ccf to mbf. See plaintiff's comment to DPFF 284.**

290. The Mud contract was the subject of a second lawsuit – Southwest Center For Biological Diversity v. United States Forest Service, No. CIV-95-1927-PCT-RCB (D. Ariz. filed Sept. 13, 1995) – that also prevented timber harvesting by Precision Pine. PX106 ¶ 4.

**Plaintiff's Comment – Defendant provides no evidence that the referenced litigation prevented harvesting on the Mud sale in any way. In fact, a review of the docket sheet available through PACER in the case demonstrates that no order had been entered in that litigation that could have impacted harvest on the Mud sale.**

291. On October 18, 1995, the Forest Service settled the Southwest Center action. The settlement called for the Forest Service to partially cancel the Mud sale by deleting the larger trees on specified payment units. PX106 ¶ 5.

**Plaintiff's Comment – Precision Pine agrees that as part of its settlement of Silver v. Babbitt, on October 18, 1995 the Forest Service agreed with the environmental plaintiffs in that case to partially cancel the Mud contract by deleting trees in excess of 12" dbh in three cutting units. PX 106 at 6, ¶ 5; DPFF 154. The Forest Service did not satisfy its obligation to identify the trees to be deleted and release the Mud sale to Precision Pine until March 11, 1996, at which time operations were not possible due to contract restrictions that the Forest Service refused to waive and could not be resumed until August 1, 1996. Id.; PPFF 154 n.10.**

292. Pursuant to the settlement, the Forest Service and Precision Pine executed a bilateral contract modification that cancelled parts of the Mud sale. PX175; DX311.

**Plaintiff's Comment – Precision Pine was not a party to the settlement agreement.**

293. Precision Pine was paid $65,796.66 in consideration for the sale's partial cancellation. PX175; DX31 1; see also PX131 (exhibit 1).

**Plaintiff's Comment – Mr. Ness credited the Forest Service for this payment by reducing Precision Pine accordingly. PPFF 254.**

294. The partial cancellation reduced the volume of "included timber" on the Mud contract, such that the volume of timber remaining to be cut was 4,173 ccf sawtimber and 2,744 ccf roundwood. PX175 (AT2).

295. On March 11, 1996, having sufficiently implemented the settlement in the Southwest Center lawsuit, the Forest Service lifted the suspension and, subject to the terms and conditions of the contract, made Mud available for harvesting by Precision Pine. DX300; DX316.

**Plaintiff's Comment – The terms of the settlement were made in the Silver v. Babbitt litigation, PX 106 at 6, ¶ 5, not in Southwest Center. Neither DX 300 nor DX 316 were admitted into evidence and defendant's citation of these exhibits is improper. Additionally, no operations were possible on the Mud sale at the time that the Forest Service finally completed the identification of trees to be deleted and operations could not resume until approximately August 1, 1995. PPFF 154 n.10.**

296. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Mud contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

297. On April 9, 1996, Precision Pine requested that the Forest Service waive normal operating season and other harvest restrictions and further sought permission to defer the removal of roundwood because Precision Pine had no outlet for such material. DX306.

298. The Forest Service denied Precision Pine's request to waive the contractual operating season restrictions. DX307.

**Plaintiff's Comment – Precision Pine agrees that the Forest Service denied its request that would have permitted harvesting to resume on the Mud sale.**

299. Precision Pine began harvesting the Mud contract in July 1996. DX287; DX291. The Forest Service allowed Precision Pine to defer roundwood harvesting on the Mud sale due to Precision Pine's continuing lack of an outlet for such material. DX306; DX309.

**Plaintiff's Comment – Even though pulpwood harvest had been deferred, Precision Pine harvested 152 ccf of pulpwood between July and October of 1996. PX 290, Volume III, TSSAs for the Mud Sale, July to October, 1996. The exhibits cited by defendant do not indicate that Precision Pine had no outlet for roundwood, but rather DX 309 states that "Stone has indicated that it will probably take our pulpwood some time in the fall." DX 309 at 3. Given the quantity of pulpwood removed from Mud and other sales in 1996, this is apparently what occurred. See, e.g., PX 190, Vol. III, TSSA for the Mud sale.**

300. Precision Pine logged the sale's sawtimber component with the understanding that it would return to harvest roundwood and that it would have to incur the cost of performing closing work on the sale twice. DX313.

301. Precision Pine stopped logging the Mud contract in October 1996. DX291.

**Plaintiff's Comment – Between July and October of 1996, Precision Pine removed 3,473.71 ccf of sawlogs and, even though pulpwood harvest had been deferred (see DPFF 299), harvested 152 ccf of pulpwood. PX 290, Volume III, TSSAs for the Mud Sale, July to October, 1996. Thereafter, Precision Pine returned to the sale and harvested it to completion. DPFF 306.**

302. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to complete harvesting of the Mud contract in 1996. See Tr. 1743-44, 1755 (Reidhead).

303. During the period when other contracts remained suspended (i.e., from October 19, 1995 to December 4, 1996), Precision Pine did not complete harvesting of the Mud contract. Tr. 1469 (Porter).

As of December 1996, only 56 percent of available sawtimber and 6 percent of available roundwood had been cut and removed by Precision Pine. Tr. 1456, 1464, 1467 (Porter); DX291; DX552; DX799.

**Plaintiff's Comment – Defendant is incorrect. As of December 1996, Precision Pine had removed at least 83.2% of the sawtimber available on the Mud sale. See PPFF 264; P's Post-Trial Brief at 53. Following the Forest Service's deletion of timber from the sale area, the remaining volume of sawtimber available as of August 29, 1996 was 4,173 ccf. PX 175 at MUD-4, see also DPFF 294. By the end of October 1996, Precision Pine had removed 3,473.71 ccf of sawlogs from the Mud sale. PPFF 264l; PX 290, Vol. III, TSSAs for the Mud sale, October 1996.**

304. Although the Mud contract was unaffected by the Forest Guardians suspension, Precision Pine chose not to conduct timber harvesting on the Mud contract in 1997. DX291; DX800 at 26.

**Plaintiff's Comment – Precision Pine harvested both sawlogs and pulpwood from the Mud sale in December of 1997. See PX 290, Vol. III, TSSAs for Mud, December 1997. Additionally, although the sale was not directly suspended by the Forest Guardians case, it is not correct to say that it was "unaffected" by that suspension. Rather, the suspension of all of the larger diameter timber on Precision Pine's sales for a third consecutive harvest season severely impacted Precision Pine's ability to resume normal operations. Moreover, the Mud sale was to be processed at the Winslow sawmill (see PX 131, Ex. 7), which required a mix of both large and small logs which operated most efficiently with a mix of large and small logs. See PPFF 243, 245. Following the Forest Service's cancellation of much of the larger diameter timber on the Mud sale (see plaintiff's comment to DPFF 292), which had not contained much large timber to begin with (DPFF 283), the remaining timber consisted of primarily smaller sawlogs. As noted above, Precision Pine did complete harvest of all sawlogs and roundwood on the Mud sale. See plaintiff's comment to DPFF 301.**

305. In November 1997, Precision Pine entered into a contract with Stone to accept roundwood from the Mud sale. PX223.

**Plaintiff's Comment – Stone agreed to pay Precision Pine $7.92 per cord for the estimated 3,500 cords of pulpwood on the sale area and to arrange for the harvesting and hauling of the pulpwood at Stone's expense. PX 223.**

306. Precision Pine resumed and completed timber harvesting upon the Mud contract in 1998. DX291; Tr. 1834 (Porter).

307. Pursuant to CT 6.01, the Forest Service paid Precision Pine $556.80 in connection with the suspension of the Mud contract. See PX219; PX131 (exhibit 2).

**Plaintiff's Comment – Precision Pine continues to seek the recovery of expenses not paid by the Forest Service. See PX 131, Ex. 2.**

### 10. The O.D. Ridge Timber Sale Contract

308. O.D. Ridge was not a multi-product sale. PX171.

309. The O.D. Ridge contract was sold on a mbf basis, that is, volumes were measured by the Forest Service in mbf (l.s.). The volume of "included timber" on the O.D. Ridge contract was 3,650 mbf (1.s.) Ponderosa Pine sawtimber, 910 mbf (l.s.) Douglas Fir, and 600 mbf (l.s.) Engleman's Spruce. The sale contained no roundwood. PX171 (AT2).

310. The sawtimber on the O.D. Ridge contract had an average dbh of 17.6 inches and 54.3 percent grade. PX3.

**Plaintiff's Comment – The Forest Service's estimate of the average dbh and percent grade as set forth on the appraisal summary are as stated. The Forest Service disclaims its estimates of the quantity and quality of its timber sale and urges purchasers to make their own estimates (PPFF 296), which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

311. The O.D. Ridge contract's normal operating season ran from May 15 to October 15. PX171 (clause AT 17).

**Plaintiff's Comment – Harvesting is not limited to the Normal Operating Season and harvesting outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T) 6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead).**

312. The O.D. Ridge contract was awarded to Precision Pine on August 14, 1992. First Joint Stip. ¶ 12.

313. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the O.D. Ridge contract at or before its award. Tr. 1856-57 (Porter).

**Plaintiff's Comment – Based on its years of experience of providing timber to Precision Pine for use as raw material at its sawmills in its production of lumber, the Forest Service was fully aware of Precision Pine's intended use of the sawlogs from the sale for this purpose. As counsel for the government conceded at trial:**

> **THE COURT: [B]ut here, when the sale is awarded to Precision Pine, isn't it a fact that everybody knows that Precision Pine is in the lumber business and it's going to take the timber to its mill and cause it to be turned into lumber?**
>
> **MR. HARRINGTON: Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine's had sawmills. We'd certainly concede that fact. The Forest Service knew that Precision Pine had sawmills.**

**Tr. 5417 (Harrington).**

314. The Forest Service suspended the O.D. Ridge contract on August 25, 1995. First Joint Stip. ¶¶ 28-29.

315. As of August 25, 1995, the volume remaining to be cut and removed from the O.D. Ridge contract sale area was 2,626 mbf (1.s.) sawtimber and no roundwood. Third Joint Stip. ¶¶ 22-23.

316. The suspension was lifted on December 4, 1995. First Joint Stip. ¶ 30; Precision Pine, 50 Fed. Cl. at 39, 70; DX800 at 26.

317. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the O.D. Ridge contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

318. Precision Pine conducted logging on the O.D. Ridge sale during May 1997. DX3.

319. The Forest Service suspended the O.D. Ridge timber sale in June 1997 as a result of the Forest Guardians action. DX800 at 27.

320. The Forest Guardians suspension was lifted in December 1997. DX800 at 27.

**Plaintiff's Comment – The Forest Guardians injunction was lifted on December 15, 1997. Forest Guardians v. Dombeck, 131 F.3d 1309, 1313 (9th Cir. 1997).**

321. Although the contract was subsequently available, Precision Pine never completed timber harvesting upon the O.D. Ridge contract. See DX3.

**Plaintiff's Comment – See DX 800 at 27.**

322. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the O.D. Ridge contract in subsequent years. See Tr. 1743-44, 1755 (Reidhead).

323. The Forest Service terminated the O.D. Ridge contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (case no. 02-131).

324. Pursuant to CT 6.01, the Forest Service paid Precision Pine $1,734.57 in connection with the suspension of the O.D. Ridge contract. See PX209; PX131 (exhibit 2).

**Plaintiff's Comment – Precision Pine continues to seek recovery of expenses not paid by the Forest Service. See PX 131, Ex. 2.**

**11. The Saginaw-Kennedy Multi-Product Sale Contract**

325. Saginaw-Kennedy was a multi-product sale. As a multi-product sale, the Saginaw-Kennedy contract contained both sawtimber and roundwood components. See PX179.

326. The Saginaw-Kennedy contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Saginaw- Kennedy contract was 2,268 ccf sawtimber and 1,658 ccf roundwood. PX179 (AT2).

327. The sawtimber component of the Saginaw-Kennedy contract had an average dbh of 11.6 inches and 0.6 percent grade. PX11; DX820.

**Plaintiff's Comment – The Forest Service's estimate of the average dbh and percent grade as set forth on the appraisal summary are as stated. The Forest Service disclaims its estimates of the quantity and quality of timber on its sales and urges purchasers to make their own estimates (PPFF 296), which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter). Based on his investigation of the sale area, Mr. Porter testified that the percentage of clear faces on the Saginaw-Kennedy sale was higher than what the Forest Service had indicated on its appraisal summary. Tr. 1367 (Porter).**

328. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Saginaw-Kennedy contract was 0.5000. PX11.

**Plaintiff's Comment – The factor used by the Forest Service to convert from ccf to mbf was never demonstrated to be accurate or correct. There are several methods for converting from ccf**

**to mbf, all of which are approximately ccf x .5 = mbf (i.e., two mbf to one ccf). Over years of practical experience in converting from ccf to mbf, Mr. Porter found this to be an accurate method that the Forest Service had endorsed to him and it is what Precision Pine used in converting from ccf to mbf. See PPFF 23, 206-08. Indeed, the Forest Service's own estimates of timber quantity and quality on the sales are expressly disclaimed by the Forest Service, which urges purchasers to make their own examination of the timber (PPFF 296) -- which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

329. The Saginaw-Kennedy contract's normal operating season ran from April 1 to December 31. PX179 (clause AT17).

**Plaintiff's Comment – Harvesting is not limited to the Normal Operating Season and harvesting outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T) 6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead).**

330. The Saginaw-Kennedy contract contained additional restrictions that further limited timber harvesting as a result of endangered, threatened and sensitive species. Specifically, no harvesting or other activities could occur in cutting units 12-14 before July 1. See PX179 (clause CT6.25).

**Plaintiff's Comment – Defendant has made no effort to identify what restrictions may have been in effect at the time of the suspension and/or the extent to which such restrictions would have had any impact on Precision Pine's projected harvesting.**

331. The Saginaw-Kennedy contract was awarded to Precision Pine on September 29, 1994. First Joint Stip. ¶ 17.

332. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Saginaw-Kennedy contract at or before its award. Tr. 1856-57 (Porter).

**Plaintiff's Comment – Based on its years of experience of providing timber to Precision Pine for use as raw material at its sawmills in its production of lumber, the Forest Service was fully aware of Precision Pine's intended use of the sawlogs from the sale for this purpose. As counsel for the government conceded at trial:**

> **THE COURT: [B]ut here, when the sale is awarded to Precision Pine, isn't it a fact that everybody knows that Precision Pine is in the lumber business and it's going to take the timber to its mill and cause it to be turned into lumber?**
>
> **MR. HARRINGTON: Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine's had sawmills. We'd certainly concede that fact. The Forest Service knew that Precision Pine had sawmills.**

**Tr. 5417 (Harrington).**

333. The Forest Service suspended the Saginaw-Kennedy contract on August 25, 1995. First Joint Stip. ¶¶ 28-29.

334. As of August 25, 1995, the volume remaining to be cut and removed from the Saginaw-Kennedy contract sale area was 2,268 ccf (or 1,134 mbf (l.s.)) sawtimber and 1,658 ccf roundwood. Third Joint Stip. ¶¶ 5-6; PX11.

**Plaintiff's Comment –Defendant has not properly converted from ccf to mbf. <u>See</u> plaintiff's comment to DPFF 328.**

335. The suspension of the Saginaw-Kennedy contract was lifted on December 4, 1995. First Joint Stip. ¶ 31; <u>Precision Pine</u>, 50 Fed. Cl. at 39, 70; DX 800 at 35.

336. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Saginaw-Kennedy contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

337. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the Saginaw-Kennedy contract in 1997 or in subsequent years. See Tr. 1743-44, 1755 (Reidhead).

338. Precision Pine did not conduct harvesting upon the Saginaw-Kennedy contract at any time. DX320; Tr. 1063-64 (Porter); DX791 (stating that Precision Pine decided to forego harvesting for "business reasons").

**Plaintiff's Comment – See DX 800 at 35-38. Additionally, Precision Pine did complete the roads necessary to access the timber on the sale. DX 791 cited by defendant remains subject to Precision Pine's motion to strike. See plaintiff's comment to DPFF 47.**

339. The Forest Service terminated the Saginaw-Kennedy contract as a result of Precision Pine's default on January 9, 2001. Precision Pine, 62 Fed. Cl. at 638 (case no. 02-131).

340. Pursuant to CT 6.01, the Forest Service paid Precision Pine $350.72 in connection with the suspension of the Saginaw-Kennedy contract. See PX213; PX131 (exhibit 2).

**Plaintiff's Comment – Precision Pine continues to seek the recovery expenses not paid by the Forest Service. See PX 131, Ex. 2.**

### 12. The Salt Multi-Product Sale Contract

341. Salt was a multi-product sale. As a multi-product sale, the Salt contract contained both sawtimber and roundwood components. See PX177.

342. The Salt contract was sold on a ccf basis, that is, volumes were measured by the Forest Service in ccf. The volume of "included timber" on the Salt contract was 4,460 ccf sawtimber and 1,835 ccf roundwood. PX177 (AT2).

343. The sawtimber component of the Salt contract had an average dbh of 11.9 inches and 1.8 percent grade. PX9; DX820.

**Plaintiff's Comment – The Forest Service's estimate of the average dbh and percent grade as set forth on the appraisal summary are as stated. The Forest Service disclaims its estimates of the quantity and quality of timber on its sales and urges purchasers to make their own estimates (PPFF 296), which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

344. The contract-specific ccf-to-mbf conversion factor for the sawtimber component of the Salt contract was 0.4652. PX9.

**Plaintiff's Comment – The conversion factor claimed by the government does not appear on PX 9. Moreover, the factor used by the Forest Service to convert from ccf to mbf was never demonstrated to be accurate or correct. There are several methods for converting from ccf to mbf, all of which are approximately ccf x .5 = mbf (i.e., two mbf to one ccf). Over years of practical experience in converting from ccf to mbf, Mr. Porter found this to be an accurate method that the Forest Service had endorsed to him and it is what Precision Pine used in converting from ccf to mbf. See PPFF 23, 206-08. Indeed, the Forest Service's own estimates of timber quantity and quality on the sales are expressly disclaimed by the Forest Service, which urges purchasers to make their own examination of the timber (PPFF 296) -- which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

345. The Salt contract's normal operating season ran from May 1 to July 15 and August 15 to November 30. PX177 (clause AT17).

**Plaintiff's Comment – Harvesting is not limited to the Normal Operating Season and harvesting outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T) 6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale**

**contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead).**

346. The Salt contract was awarded to Precision Pine on April 13, 1995. First Joint Stip. ¶ 22.

**Plaintiff's Comment – Defendant is incorrect. The Salt contract was awarded to Precision Pine on February 28, 1994. First Joint Stip. ¶ 15.**

347. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the Salt contract at or before its award. Tr. 1856-57 (Porter).

**Plaintiff's Comment – Based on its years of experience of providing timber to Precision Pine for use as raw material at its sawmills in its production of lumber, the Forest Service was fully aware of Precision Pine's intended use of the sawlogs from the sale for this purpose. As counsel for the government conceded at trial:**

> **THE COURT: [B]ut here, when the sale is awarded to Precision Pine, isn't it a fact that everybody knows that Precision Pine is in the lumber business and it's going to take the timber to its mill and cause it to be turned into lumber?**
>
> **MR. HARRINGTON: Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine's had sawmills. We'd certainly concede that fact. The Forest Service knew that Precision Pine had sawmills.**

**Tr. 5417 (Harrington).**

348. The Forest Service suspended the Salt contract on August 25, 1995. First Joint Stip. ¶¶ 28-29.

349. As of August 25, 1995, the volume remaining to be cut and removed from the Salt contract sale area was 4,460 ccf(or 2,075 mbf (l.s.)) sawtimber and 1,835 ccf roundwood. Third Joint Stip. ¶¶ 16-17; PX9.

**Plaintiff's Comment – Defendant has not properly converted from ccf to mbf. See plaintiff's comment to DPFF 344.**

350. The suspension of the Salt contract was lifted on December 4, 1995. First Joint Stip. ¶ 31; Precision Pine, 50 Fed. Cl. at 39, 70; DX 800 at 32.

351. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the Salt contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

352. The Forest Service suspended parts of the Salt sale in June 1997 as a result of the Forest Guardians action. DX800 at 32.

**Plaintiff's Comment – The timber sales and portions of timber sales enjoined under Forest Guardians were the larger diameter sawlogs. See, e.g., PX 120 (sale could go forward if large diameter trees were deleted).**

353. The partial suspension resulting from the Forest Guardians action was lifted in December 1997. DX800 at 32.

**Plaintiff's Comment – The Forest Guardians suspension was lifted on December 15, 1997. Forest Guardians v. Dombeck, 131 F.3d 1309, 1313 (9th Cir. 1997).**

354. Precision Pine's logger –Tri-Star Logging – had sufficient capacity to log the Salt contract in 1997 or in subsequent years. See Tr. 1743-44, 1755 (Reidhead).

355. Precision Pine never harvested the Salt contract before or after the MSO suspensions. Tr. 1063-64 (Porter); DX 152; DX791 (stating that Precision Pine decided to forego harvesting for "business reasons").

**Plaintiff's Comment – See DX 800 pp. 31-34. Additionally, Precision Pine did complete the roads necessary to access the timber on the sale. PX 162. Moreover, DX 791, cited by defendant, remains subject to Precision Pine's motion to strike. See plaintiff's comment to DPFF 47.**

356. Precision Pine defaulted on the Salt contract, and the contract was therefore terminated by the Forest Service, in 1998. Tr. 1064 (Porter); DX570.

357. Pursuant to CT 6.01, the Forest Service paid Precision Pine $2,565.89 in connection with the suspension of the Salt contract. See PX197; PX131 (exhibit 2).

**Plaintiff's Comment – Precision Pine continues to seek the recovery of expenses not paid by the Forest Service. PX 131, Ex. 2.**

### 13. The St. Joe Timber Sale Contract

358. St. Joe was not a multi-product sale. DX211.

359. The volume of "included timber" on the St. Joe contract was 8,310 mbf (l.s.) sawtimber and no roundwood. DX21 1 (AT2).

360. The sawtimber on the St. Joe contract had an average dbh of 21.2 inches and a 58.2 percent grade. PX12.

**Plaintiff's Comment – The Forest Service's estimate of the average dbh and percent grade as set forth on the appraisal summary are as stated. The Forest Service disclaims its estimates of the quantity and quality on its timber sales and urges purchasers to make their own estimates (PPFF 296), which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

361. The St. Joe contract's normal operating season ran from April 15 to November 30. DX21 1 (clause AT17).

**Plaintiff's Comment – Harvesting is not limited to the Normal Operating Season and harvesting outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T) 6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead). Precision Pine did harvest the St. Joe sale outside of the Normal Operating Season in the winter of 1996. See PX 290, Vol. III, TSSAs for the St Joe sale, January to March 1996.**

362. The St. Joe contract was awarded to Grand Canyon Forest Industries on October 16, 1992. First Joint Stip. ¶ 26.

**Plaintiff's Comment – Defendant is incorrect. The St. Joe contract was awarded to Grand Canyon Forest Industries on April 14, 1992. First Joint Stip. ¶ 27.**

363. The St. Joe contract was assigned to Precision Pine by Grand Canyon Forest Industries on October 16, 1992. First Joint Stip. ¶ 27.

**Plaintiff's Comment – The Forest Service was fully aware of and approved the transfer of the St. Joe contract to Precision Pine. DX 211 at STJ-2-3.**

364. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the St. Joe contract at or before the date of its assignment. Tr. 1856-57 (Porter).

**Plaintiff's Comment – Based on its years of experience of providing timber to Precision Pine for use as raw material at its sawmills in its production of lumber, the Forest Service was fully aware of Precision Pine's intended use of the sawlogs from the sale for this purpose. As counsel for the government conceded at trial:**

> **THE COURT: [B]ut here, when the sale is awarded to Precision Pine, isn't it a fact that everybody knows that Precision Pine is in the lumber business and it's going to take the timber to its mill and cause it to be turned into lumber?**
>
> **MR. HARRINGTON: Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine's had sawmills. We'd certainly concede that fact. The Forest Service knew that Precision Pine had sawmills.**

**Tr. 5417 (Harrington).**

365. The Forest Service suspended the St. Joe contract on August 25, 1995. First Joint Stip. ¶¶ 28-29.

366. As of August 25, 1995, the volume remaining to be cut and removed from the St. Joe contract sale area was 3,471 mbf (l.s.) sawtimber and no roundwood. <u>See</u> DX220.

367. The Forest Service lifted the suspension and, subject to the terms and conditions of the contract, made St. Joe available for harvesting by Precision Pine on October 18, 1995. First Joint Stip. ¶ 30; <u>Precision Pine</u>, 50 Fed. Cl. at 47 & n.18; <u>see also</u> PX106 (paragraph 3(m)).

**Plaintiff's Comment – The cited documents do not demonstrate that the St. Joe sale was available for harvesting as of October 18, 1995.**

368. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the St. Joe contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

369. Precision Pine completely harvested the St. Joe contract after the suspension was lifted. <u>See</u> DX220; Tr. 1835 (Porter).

370. Precision Pine did not seek, and therefore was not awarded, bond costs as part of its claim on the St. Joe contract. See PX200 (claim letter); PX201 (final decision).

**Plaintiff's Comment – Precision Pine continues to seek the recovery of expenses not paid by the Forest Service. See PX 131, Ex. 2.**

## 14. The U-Bar Timber Sale Contract

371. U-Bar was not a multi-product sale. See PX174.

372. The U-Bar contract was sold on a mbf basis, that is, volumes were measured by the Forest Service in mbf (l.s.). The volume of "included timber" on the U-Bar contract was 6,856 mbf (l.s.) of Ponderosa Pine and 1,324 mbf (l.s.) of Douglas Fir. The U-Bar sale contained no roundwood. PX174 (AT2); see also Tr. 1019 (Porter).

373. The sawtimber component of the U-Bar contract had an average dbh of 15.7 inches and 39.9 percent grade. PX6; DX820.

**Plaintiff's Comment – The Forest Service's estimate of the average dbh and percent grade as set forth on the appraisal summary are as stated. The Forest Service disclaims its estimates of the quantity and quality of timber on its sales and urges purchasers to make their own estimates (PPFF 296), which is what Precision Pine did. PPFF 297; Tr. 5529-32 (Porter).**

374. The U-Bar contract's normal operating season ran from April 15 to November 30. PX174 (clause AT 17).

**Plaintiff's Comment – Harvesting is not limited to the Normal Operating Season and harvest outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T)6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"). Based on these clauses, it was customary for the Forest Service to allow**

**Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead).**

375. The U-Bar contract contained additional restrictions that further limited timber harvesting as a result of endangered, threatened and sensitive species. See DX174 (clause CT6.25).

**Plaintiff's Comment – Defendant has made no effort to identify what restrictions may have been in effect at the time of the suspension and/or the extent to which such restrictions would have had any impact on Precision Pine's projected harvesting.**

376. The U-Bar contract was awarded to Precision Pine on October 5, 1992. First Joint Stip. ¶ 13.

377. Precision Pine did not inform the Forest Service of any special circumstances, plans, or considerations relating to the U-Bar contract at or before its award. Tr. 1856-57 (Porter).

**Plaintiff's Comment – Based on its years of experience of providing timber to Precision Pine for use as raw material at its sawmills in its production of lumber, the Forest Service was fully aware of Precision Pine's intended use of the sawlogs from the sale for this purpose. As counsel for the government conceded at trial:**

> **THE COURT: [B]ut here, when the sale is awarded to Precision Pine, isn't it a fact that everybody knows that Precision Pine is in the lumber business and it's going to take the timber to its mill and cause it to be turned into lumber?**
>
> **MR. HARRINGTON: Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine's had sawmills. We'd certainly concede that fact. The Forest Service knew that Precision Pine had sawmills.**

**Tr. 5417 (Harrington).**

378. The Forest Service suspended the U-Bar contract on August 25, 1995. First Joint Stip. ¶¶ 28-29.

379. As of August 25, 1995, the volume remaining to be cut and removed from the U-Bar contract sale area was 3,194 mbf (l.s.) sawtimber and no roundwood. Third Joint Stip. ¶¶ 7-9.

380. The suspension was lifted on December 4, 1996. First Joint Stip. ¶ 31; Precision Pine, 50 Fed. Cl. at 39, 70; DX 800 at 29.

381. Precision Pine requested and obtained a contract term adjustment as a result of the suspension of the U-Bar contract, which provided an adjustment for days lost during the contract's normal operating season. First Joint Stip. ¶ 34.

382. Precision Pine conducted logging on the U-Bar sale during May and June 1997. DX407.

383. Although the contract was subsequently available, Precision Pine never completed timber harvesting upon the U-Bar contract. DX407.

**Plaintiff's Comment – The U-Bar contract was suspended from late May 1997 to December 15, 1997 due to the Forest Guardians suspension. See PX 123; Forest Guardians v. Dombeck, 131 F.3d 1309, 1313 (9th Cir. 1997); see also DX 800 at 28-31.**

384. Precision Pine's logger – Tri-Star Logging – had sufficient capacity to log the U-Bar sale in 1997 and in subsequent years. See Tr. 1743-44, 1755 (Reidhead).

385. The Forest Service terminated the U-Bar contract as a result of Precision Pine's default on January 9, 2001. Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 638 (2004) (case no. 02-131).

386. Pursuant to CT 6.01, the Forest Service paid Precision Pine $6,432.09 in connection with the suspension of the U-Bar contract. See PX215; PX131 (exhibit 2).

**Plaintiff's Comment – Precision Pine continues to seek the recovery of expenses not paid by the Forest Service. See PX 131, Ex. 2.**

## IV. FACTS CONCERNING PRECISION PINE'S LOST LUMBER PROFIT CLAIMS

### A. Legal Foreseeability

387. Precision Pine did not report to the Forest Service about non-Forest Service timber sales or about cutting timber from Precision Pine's own land. Tr. 1656-57 (Porter).

**Plaintiff's Comment – Defendant misstates Mr. Porter's testimony. Mr. Porter only testified that he did not remember if there was a requirement to report harvest of non-Forest Service timber to the Forest Service nor could he recall whether Precision Pine did in fact report such harvesting to the Forest Service. Tr. 1656-57 (Porter). Regardless of whether there was a formal requirement that it do so, Precision Pine did advise the Forest Service of its harvesting of non-Forest Service timber sales before and during the suspension period. For example, the 1995 operating schedule (DX 294) includes tentative harvesting on Indian (Hualapai Tribe) as well as State of Arizona timber sales. See also DPFF 134 (In 1996, "Precision Pine informed the Forest Service that it was leaving the Brann contract so that it could harvest the C-12 timber sale on the Hualapai Indian Reservation").**

388. The Forest Service's suspension of the Hay timber sale in 1993 did not result in the closure of any of Precision Pine's sawmills. Tr. 1815-16.

**Plaintiff's Comment – As Mr. Porter testified, the Eagar sawmill was not yet open at the time that the Hay sale was suspended in 1993 and the 1993 suspension lasted for a short period of time. Tr. 1816-17 (Porter). Of course, as Mr. Ness testified, a short term suspension of harvesting is not as likely to have as catastrophic effect on a sawmill's operations as a long-term suspension of multiple contracts such as is at issue in the instant case. See Tr. 2363 (Ness).**

**Moreover, prior to the suspensions at issue in this case the Forest Service foresaw that even a suspension of just the Hay sale for a protracted period of time could result in claims for damages**

**at a Precision Pine's Eagar sawmill. PX 50 The Forest Service also understood that the suspension of multiple sales could result in a purchaser incurring severe damages at its sawmills. PX 49 at ¶6.**

389. Although the Forest Service suspended multiple contracts in 1993, the suspensions did not result in the closure of any of Precision Pine's sawmills. Tr. 1817.

**Plaintiff's Comment – As Mr. Porter testified, the 1993 suspension lasted for a short period of time, affected different sales at different times and was nothing like the protracted and simultaneous suspension of 11 of Precision Pine's contracts that is at issue in the instant case. Tr. 1815-17 (Porter). The Forest Service was well aware that a protracted suspension of just one contract and/or the wide-spread suspension of multiple contracts could have severe impact at a purchaser's sawmill. PX 49 at ¶6, PX 50.**

**B. <u>Precision Pine's 1995 Annual Operating Schedule</u>**

390. Precision Pine's contracts require Precision Pine to provide an annual operating schedule to the Forest Service each year. <u>See</u> PX169-79 (clause BT 6.31 & CT 6.3); Tr. 1628-29 (Porter), 3808-09 (Harris). Precision Pine was required to provide the Forest Service "reasonable notice" of any changes to this operating schedule. PX169-79 (BT 6.31); Tr. 1629 (Porter).

**Plaintiff's Comment – Clause B(T)6.31 simply calls for the submission of a listing of "anticipated" major operations <u>on a sale</u> which can always be altered "upon reasonable notice to the Forest Service" for a host of reasons including "weather, markets, or other unpredictable circumstances." PPFF 1242.**

**Defendant's citation to CT6.3 in support of this proposed finding is inapposite as that provision pertains to a "plan of operation" which is a wholly separate document that is submitted once, within 60 days of award of a contract. PPFF 1243.**

391. In February 1995, Precision Pine submitted to the Forest Service an annual operating schedule for the 1995 operating season. The schedule shows Precision Pine harvesting the Barber, Brann, Hutch-Boondock, Merritt, Mud, Saginaw-Kennedy and U-Bar contracts between September and December 1995. DX294.

**Plaintiff's Comment – The 1995 harvest schedule cited by defendant, DX 294, was submitted by John Smith, whose duties did not cover all of Precision Pine's sawmills. Tr. 1231-32 (Porter). Indeed, DX 294 only addresses sales located on the Kaibab and Coconino National Forests, neither of which Forests supplied timber to Precision Pine's sawmill in Eagar. Tr. 87 (Porter). Thus, the schedule set forth in DX 294 does not even represent all of Precision Pine's anticipated pre-season harvesting for 1995. Notably, the schedule also includes tentative harvest on Tribal and State of Arizona sales. DX 294.**

392. Precision Pine "did not make any attempt" to ensure the annual operating schedule for 1995 that was given to the Forest Service was accurate. Tr. 1631 (Porter); see also Tr. 1630 (Porter) (denying that the operating schedule provided to the Forest Service "was the best estimate [that the company] could make" based upon currently available information).

**Plaintiff's Comment – Precision Pine's February 1995 pre-season harvest schedule stated on its face that it was tentative and subject to change. PPFF 1244. Mr. Porter testified that the harvest schedule was tentative (Tr. 263-64 (Porter)), i.e., an "estimate of an estimate" that neither Precision Pine nor the Forest Service relied upon. Tr. 263-65, 1629-30 (Porter). Indeed, the tentative harvest schedule could not be accurate because, as Mr. Porter testified, he frequently reassessed the situation on his sales and made changes to the harvest schedule as events warranted such as weather, termination dates of the contracts, proximity of the sales to sawmills, elevation of the sales as well as the purchase of new Forest Service timber sale by Precision Pine during the course of a harvest season. Tr. 231-32 (Porter). For example, on April 13, 1995, Precision Pine was**

**awarded the Brookbank sale and began harvesting the contract in June of 1995. PPFF 1245. Obviously, these operations were not included in Precision Pine's 1995 pre-season harvest schedule (DX 294), yet, Precision Pine conducted a pre-work meeting with the Forest Service at which time its 1995 operations on the Brookbank sale were approved. In this same regard, Precision Pine was not awarded the Kettle sale until July 20, 1995 (PX 173 at KET-1) and, therefore, harvest of this sale simply could not have appeared on any harvest schedule prepared prior to that. Mr. Smith, who prepared and submitted DX 294, testified that he did not make the final decision as to when sales would be harvested, the annual operating schedules he prepared were his estimate of what operations would take place, and that every year there would be multiple changes to the tentative operating schedules Mr. Smith sent to the Forest Service. DX 838 - Designations from Smith Dep. Tr. at 21-22, 35-36.**

**Moreover, the February schedule cited by defendant does not include all of Precision Pine's operations planned for 1995 as it only includes sales on two National Forests that supplied timber to, at most, only two of Precision Pine's sawmills. PPFF 1244, 1246, 1406.**

393. The 1995 annual operating schedule provided to the Forest Service was false and Precision Pine knew the schedule was false when it submitted the schedule to the Forest Service. Tr. 1633 (Porter).

**Plaintiff's Comment – DX 294 was only a schedule for some, but not all, of Precision Pine's operations in 1995. It was clearly labeled as being "subject to change." There was no requirement that it be followed, and the Forest Service also understood the schedule was, at most, an anticipated schedule that was subject to change that in years past had not been followed. <u>See</u> plaintiff's comments to DPFF 390-92, 394-95. Thus, the schedule was not "false" but complied fully with the contractual requirements.**

394. The Forest Service relied upon the annual operating schedule for 1995 submitted by Precision Pine. Tr. 3808-09 (Harris); Tr.4594, 4603-04 (Dils).

**Plaintiff's Comment – Given the language of the clause BT6.31, the express statement on its face that DX 294 was subject to change, and the course of dealings between the parties whereby Precision Pine frequently operated sales that were not on its operating schedule and also did not operate on sales that were on its schedule, defendant's proposed finding is absurd. See plaintiff's comments to DPPF 390-393.**

**Moreover, the "evidence" cited by defendant does not support its proposed finding. That is, Mr. Harris testified that the Forest Service merely looked to the schedule as an aid in assigning personnel to administer the sale, but understood that there would be changes to the proposed schedule. PPFF 1008. The only other evidence cited by the defendant on this point is the testimony of one contracting officer, however, that testimony relates solely to a plan of operations submitted pursuant to clause C[T]6.3 by Precision Pine for a single sale in 1994, not 1995. Tr. 4594-96 (Dils). The plan of operations provided for by clause C[T]6.3 is completely different than the annual operating schedule provided for by clause BT6.31. Compare PX 170, JRH-84, clause C[T]6.31 "Plan of Operations" with JRH- 35, clause BT6.31 "Operating Schedule." Thus, the testimony of Mr. Dils sheds no light on whether the Forest Service reasonably "relied" on Precision Pine's partial tentative 1995 pre-season operating schedule.**

395. Precision Pine's damages calculations are not based upon the 1995 annual operating schedule. Tr. 1634 (Porter).

**Plaintiff's Comment – See plaintiff's comments to DPFF 390-95. Mr. Porter explained how he determined the harvest schedule for the suspension period. See PPFF 245-46.**

C. Precision Pine's Harvesting Plans For 1995 And 1996

396. Mr. Porter was responsible for scheduling the harvesting of Precision Pine's contracts. Tr. 1436 (Porter).

397. Mr. Porter does not know what timber and multi-product sale contracts Precision Pine would have harvested in September 1995 had the MSO suspensions not occurred in August 1995. Tr. 1442-48 (Porter).

**Plaintiff's Comment – Mr. Porter explained how he determined the harvest schedule for the suspension period. PPFF 245-46. The cited testimony also shows that Mr. Porter made a detailed analysis of the contracts at issue to determine Precision Pine's harvest schedule but for the suspension:**

> **[Mr. Harrington]: Can you tell me here today what contracts you would have harvested and when you would have harvested them if the Mexican spotted owl suspension had not occurred in August of 1995?**
>
> **[Mr. Porter]: I had to do that. In this very case I had to do that. I had to go back and to the best of my ability say this is when I think I would have harvested. Still even though I was denied the opportunity to do so and so in that case, yes, I have done that.**

**Tr. 1442; see also Tr. 1778-79, 1785-86 (Reidhead), 2079 (Porter) (explaining DX 1004). The cited testimony only shows that Mr. Porter did not commit the schedule to memory.**

**Mr. Porter also explained that all of the remaining timber on the breached sales would have been harvested between August 25, 1995 and December 4, 1996 and provided the reasons why this would have occurred. See PPFF 246.**

398. Mr. Porter does not know when Precision Pine would have harvested timber and multi-product sale contracts between September 1995 and December 1996 had the MSO suspensions had not occurred. Tr. 1442-48 (Porter).

**Plaintiff's Comment – See plaintiff's comment to DPFF 397.**

399. Other than the 1995 annual operating schedule, see DX294, Precision Pine prepared no business plan, scheduling plan, operating plan or other document that described timber harvesting plans for 1995 or 1996. Tr. 1439, 1441 (Porter); see also Tr. 1775 (Reidhead) (while other companies that Tri-Star Logging worked for would establish an annual harvesting schedule, Precision Pine never gave Tri-Star Logging an annual schedule to follow).

**Plaintiff's Comment – There is no requirement that a purchaser submit a harvesting plan for it operations as a whole, rather BT6.31 only requires that the Forest Service be advised of "anticipated major activities" on a given contract. It is uncontroverted that Precision Pine operated profitably every year prior to the suspension (PPFF 242), yet defendant has identified no written "harvest plan" (which it claims is the *sine qua non* for all timber harvesting) for any of those years. Of course, it would not be surprising if Precision Pine did not submit a harvest schedule comparable to DX 294 in 1996, given that 11 of its Forest Service timber sale contracts remained suspended for virtually that entire year.**

**Moreover, the cited testimony does not support the assertion. Rather, Mr. Reidhead testified as follows:**

> **[Counsel for Defendant]: Tri-Star has received harvesting schedules from other companies before that it worked for, correct?**
>
> **[Mr. Reidhead]: Correct.**

**Tr. 1777. There is no evidence that the "harvesting schedules" that Tri-Star received from "other companies" and referred to by counsel were any different from the instructions that Precision Pine would provide to Tri-Star. See Tr. 1776-77 (Reidhead).**

400. Precision Pine did not prepare, and does not possess, documents that could be reviewed to determine when Precision Pine would have harvested its timber and multi-product sale contracts had the MSO suspensions not occurred. Tr. 1441 (Porter); Tr. 2089 (stipulation of counsel).

**Plaintiff's Comment – See plaintiff's comments to DPFF 397-99.**

**D. Timber Harvesting Outside the Normal Operating Season**

401. Precision Pine was required to request and obtain Forest Service permission to operate outside a contract's normal operating season. Tr. 1498-99, 1503-04 (Porter), 3801 (Harris); see also PX169-79 (AT 17).

**Plaintiff's Comment – Harvesting outside of the Normal Operating Season is dependant on ground conditions on the sale area(s). Standard Forest Service clauses B(T)6.31, B(T)6.6; see, e.g., PX 169 (Hay timber sale contract) ("Equipment shall not be operated when ground conditions are such that excessive damage will result"); Tr. 3926 (Harris). Based on these clauses, it was customary for the Forest Service to allow Precision Pine to work in the winter outside the Normal Operating Season so long as the ground was dry or frozen. Tr. 316-17 (Porter); Tr. 1751-52 (Reidhead). During the winter of 1995-1996, Precision Pine in fact removed a substantial volume of timber, 4,106 mbf (LS), from a number of sales, i.e., Hutch-Boondock, St. Joe and Brann. Tr. 316-334 (Porter) (calculating amount removed from December 1995 to February 1996); PX 1002; DX 251, 221, 342. As Mr. Porter testified, given the widely varying locations and elevations of the Hutch-Boondock, St. Joe and Brann sales, the fact that substantial harvesting took place in the winter of 1995-1996 on all of these sales indicated that the ground throughout Precision Pine's operating area was either dry, frozen or both (Tr. 338 (Porter)) and, thus, that Precision Pine's projected harvesting of the U-Bar, Jersey Horse, Hay, and Kettle sales in the winter of 1995-1996 (see PX 131, App. A at p. 4; DX 1004) would certainly have been possible but for the suspension. Tr. 339 (Porter).**

402. The Forest Service was not required to grant permission to operate outside the normal operating season even if ground conditions were adequate for harvesting. Tr. 1504 (Porter).

**Plaintiff's Comment – See plaintiff's comment to DPFF 401.**

## E. Precision Pine's Derivation Of Lumber Sales Prices

403. All lumber sales by Precision Pine during the period of the MSO suspensions were recorded in the ordinary course of business in the Winslow Sales Record. Tr. 392-95 (Porter); see also PX294 (Winslow Sales Record).

**Plaintiff's Comment – The testimony cited does not support the proposed finding. Mr. Porter did not testify that the sales record (which he referred to as the sales journal) contained all lumber sales. See Tr. 392-95 (Porter). The sales journal was maintained by a secretary, Karen Clay, at Precision Pine's Winslow Office. Id.**

404. The lumber prices used by Precision Pine to calculate alleged gross lumber profits during the period of the MSO suspensions are higher than the prices in Precision Pine's comprehensive Winslow Sales Record. Tr. 3367-72 (Neuberger); DX776.

**Plaintiff's Comment – Dr. Neuberger's testimony indicates that the invoice prices used by Precision Pine were different (not necessarily higher in all cases) from the sales journal prices. Tr. 3367-72 (Neuberger).**

**The Ponderosa Pine lumber prices calculated by Precision Pine are from more than 1,100 invoices reflecting thousands of sales during the period of the suspension. Significantly, defendant does not contend that any of the prices from these invoices were improperly categorized. Rather, defendant claims that the average price of each lumber product should have been calculated directly from the Winslow sales journal without any review of the underlying invoices that make up that data. However, as Mr. Porter testified without contradiction, the sales journal was created and maintained by a secretary at Precision Pine and lumber sales were frequently placed in the wrong lumber category by her. PPFF1028.**

**Chief among the problems with simply adopting the Winslow sales journal as the source of lumber product pricing was the secretary's inclusion of sales of 4/4 (or "one inch") lumber products in the same category as 5/4 (or "1¼ inch") lumber products. PPFF 1093; Tr. 1669-70 (Porter). As Mr. Porter explained, this was improper because, generally speaking, 4/4 products were sold in rough form (Tr. 1672 (Porter)), although small amounts of the 4/4 material were occasionally finished at the planer and sold as shop or moulding. Tr. 1681 (Porter). Such "4/4 shop" or "4/4 moulding" lumber was a hybrid product that truly belonged in neither the normal "shop" or "moulding" categories nor the category for rough lumber. PPFF 1091. Moreover, given its hybrid character, 4/4 shop or moulding was sold at prices that were considerably higher than those for rough 4/4 lumber, but considerably lower than prices for 5/4 moulding or shop. PPFF 1091; Tr. 1679-81 (Porter). As a result, the few invoices reflecting sales of this material precluded the determination of accurate prices for lumber sold in the shop, moulding or rough categories. Id. Accordingly, Mr. Porter determined that, in fairness to both parties, these few invoices for 4/4 shop or moulding should simply not be used. Tr. 1679 (Porter).**

405. Precision Pine used selected sales invoices to come up with alleged Ponderosa Pine lumber prices during the period of the MSO suspensions. Tr. 1674 (Porter).

**Plaintiff's Comment – All of the invoices from the suspension period that reflect actual sales were used for the pricing analysis with the exception of less than 35 invoices that reflected sales that were either too high or too low when compared with sales of the same product during the same time period. See plaintiff's comments to DPFF 403-04; Tr. 394-95, 1669-70 (Porter). All of these invoices, whether used or not, are included in PX 227.**

406. Some sales invoices had been voided, lost or destroyed, and were missing from Precision Pine's records. Tr. 1668, 1797 (Porter).

**Plaintiff's Comment – All available invoices were used in determining prices during the suspension. See plaintiff's comments to DPFF 403-405. The invoices that were voided did not reflect actual sales (Tr. 1797-1800 (Porter)) and, therefore, could not have been used in determining accurate lumber pricing during the suspension.**

407. Precision Pine excluded sales invoices for certain products that Precision Pine actually produced and sold, such as 4/4" molding, 4/4" shop, stained molding and stained shop, because these products commanded lower prices. Tr. 1674-75, 1680-82, 1790-71 (Porter), 3369 (Neuberger).

**Plaintiff's Comment – See plaintiff's comments to DPFF 404-406. Additionally, invoices which reflected aberrationally high prices were excluded. Tr. 394-96, 1669-70 (Porter).**

408. At Precision Pine's Winslow sawmill, 2.32 percent of the material cut between April 1993 and March 1997 was 4/4" molding and shop. DX817.

**Plaintiff's Comment – DX 817, a putative "summary" prepared by defendant's disqualified expert Mr. Adkins, shows only the amount of 4/4 lumber produced at the Winslow sawmill, i.e., before planning. For all of the reasons set forth in Precision Pine's Motion to Strike, the work of Mr. Adkins should not be relied upon by the Court. In this instance, the exhibit reveals nothing about the amount of lumber that was ultimately graded and sold as 4/4 moulding or shop. In this regard, production records for all of the sawmills place 4/4 cut lumber into one of the four following categories: moulding, shop, commons, or random lengths and widths. PX 18-20 (Sawmill production records for Eagar (a/k/a Round Valley), Heber and Winslow). These lumber products, and certainly the shop and moulding grades, are typically sold after going through the planer. Tr. 129 (Porter). As Mr. Porter testified, however, most 4/4 lumber was sold in the rough, i.e., not planed. Tr. 1672, 1681 (Porter). Moreover, even for that relatively small amount of 4/4 material that was sent to planer, the graderman made the final determination as to what category the**

**lumber would be sold in after the lumber went through the planer. Tr. 129 (Porter). As even Mr. Adkins conceded, DX 817 only shows what was on the sawmill production report, but the ultimate grading of lumber only takes place at the planer. Tr. 4021-22 (Adkins). Thus, the sawmill production records reveal nothing about the amount of 4/4 shop and moulding grade lumber ultimately produced and sold by Precision Pine, and based on the testimony of Mr. Porter regarding the actual production at Precision Pine, the amount of such lumber is much less than even the small amounts initially shown on the sawmill records.**

409. At Precision Pine's Heber sawmill, 4.06 percent of the material cut between April 1993 and March 1997 was 4/4" molding and shop. DX817.

**Plaintiff's Comment – See plaintiff's comment to DX 408.**

410. Precision Pine applied #4 common prices to #5 common lumber produced during the period of the MSO suspensions. Number 4 common lumber is a higher grade and commands a higher price than #5 common lumber. Tr. 1796, 2057 (Porter).

**Plaintiff's Comment – Precision Pine's use of #4 common pricing for #5 common lumber products during some, but not all, of the quarters during the suspension was entirely reasonable. That is, in some quarters during the suspension Precision Pine did not actually sell any #5 common lumber, because Precision Pine did not produce enough of that grade to sell in every quarter. Tr. 1794-96 (Porter). Rather, Precision Pine would let material of that grade accumulate, and then sell it. Id. Accordingly, Precision Pine did not calculate a price for #5 common for quarters where it did not actually sell any product of that grade. Instead, it adjusted its damages model to reflect that no #5 was sold in those quarters, and assumed that the lowest quality lumber that it would have sold in those quarters would have been #4 common. Id.; see also PPFF 93. The amount of lumber at issue is typically very small and the price for #4 common is the closest finished lumber**

**product in both grade and price to #5 common and, as set forth in Mr. Ness' expert report, the total effect of using #4 common pricing for #5 common lumber products was to increase damages by $1,051.70. See PX 131, report at page 6.**

411. Precision Pine did not use a weighted average of sales invoice prices, but rather, used a "straight average" of invoice prices to develop lumber sale prices. This inflates sales prices if the standard practice of giving large purchasers lower prices than the purchasers of small volumes of lumber is followed. See Tr. 3373-74 (Neuberger), 1658 (Porter).

**Plaintiff's Comment – While it may be true that Precision Pine's methodology could inflate prices under the condition assumed -- i.e., that Precision Pine gave large purchasers bulk discounts -- there is no evidence that Precision Pine actually engaged in this practice. As Mr. Ness testified, he did not believe there was a meaningful difference between using a weighted versus a straight average for determining lumber prices in this case. Tr. 2641-44. (Ness).**

412. The methodology used by Precision Pine to develop lumber sale prices for Ponderosa Pine during the period of the MSO suspensions overstated actual sale prices, which, in turn, caused Precision Pine's claimed gross profits to be overstated by approximately $650,000. Tr. 3379 (Neuberger); DX776.

**Plaintiff's Comment – Dr. Neuberger concludes that prices were overstated by less than $650,000. DX776. Moreover, in support of this proposed finding, defendant cites to, but does not discuss, Dr. Neuberger's testimony regarding his use of "correlation coefficients" and "least squares regression analysis" to investigate lumber product pricing. However, in the wake of cross-examination (Tr. 3576-84), Dr. Neuberger conceded, in what can only be characterized as a considerable understatement, that the correlation coefficient is "not a test of great statistical power" and "it is what it is." Tr. 3584-85 (Neuberger). A point that was not lost on the Court. Tr.**

**3586 (THE COURT: If the correlation coefficient doesn't tell us anything about the magnitude of the difference in prices as shown in the sales journal compared to what is referred to as Precision Pine's proposed price, what then is the significance or relevance of the coefficient correlation?). Additionally, Dr. Neuberger acknowledged that he had not taken freight costs into account in doing either his correlation coefficient or his least squares analysis, which, he admitted, could impact the validity of his comparison of pricing taken from the Winslow sales journal to Precision Pine's invoice pricing, which does take freight costs into account. Tr. 3587-89 (Neuberger).**

**Moreover, in determining prices in the post-suspension period, Mr. Ness, with the assistance of Mr. Porter, also used the prices shown on invoices from that period but excluded even more entries on more invoices than had been excluded during the suspension period. Tr. 2413-15, 2709 (Ness); <u>compare</u> Tr. 455 (product prices on 31 invoices excluded by Mr. Porter for suspension period pricing) <u>with</u> Tr. 3573-74, 3568 (Neuberger); PX 182, Ex. 5 (product entries categorized "misc." on 37 invoices -- <u>i.e.</u>, showing code "14" in the "prod. code" column – and excluded from pricing analysis in Mr. Ness' post-suspension report). The result again was "higher prices" (and greater post-suspension profits) than would have been the result if the Winslow sales journal for the same period had been used. Tr. 3575-76 (Neuberger). Despite this fact, Dr. Neuberger praised Mr. Ness' approach to post-suspension pricing as the "correct one." Tr. 3556 (Neuberger).**

413. Mr. Porter did not review most of Precision Pine's sales invoices in order to determine product prices during the period of the MSO suspensions. Rather, the determination of sales prices during the period of the MSO suspensions was performed principally by one of Precision Pine attorneys, Richard Goeken. Tr. 1659, 1661 (Porter).

**Plaintiff's Comment – The first sentence is incorrect as Mr. Porter testified that "At one time or another [in preparing lumber product prices] I probably looked at every single invoice."**

**Tr. 1799 (Porter). The second sentence contains a mischaracterization of the facts as previously found by this Court:**

> **[The Court]: [It] is consistent both with Mr. Porter's testimony and with Mr. Goeken's declaration, that in [categorizing the invoices] that . . . [Mr. Goeken] tried as best he could to follow the directions of Mr. Porter, who obviously is the person who has the requisite substantive knowledge as to how these invoices that Mr. Goeken reviewed should be categorized and who gave the instructions in that respect to Mr. Goeken.**
>
> **Therefore, it does seem to me that Mr. Porter is the witness who has the substantive knowledge about why the categorizations were made as they were, and I think the government has every opportunity, and has exercised it to a substantial degree, to inquire of him as to the basis for specific choices. . . .**

**Tr. 1995-96 (Court) (emphases added). The facts are that Mr. Porter developed the method for determining the product pricing based on a simple average of products sold in certain categories during the suspension period, determined what the appropriate categories should be, and then instructed his attorney to simply segregate the invoices into the appropriate categories. PPFF 91-97; Tr. 439-497, 1659-63 (Porter). As questions arose, Mr. Porter would supply additional direction regarding the proper categorization of the invoices. Tr. 1662 (Porter).**

414. Mr. Porter did not know how the products on Precision Pine's invoices were categorized by Mr. Goeken. Tr. 1664 (Porter) (testifying that he was unable to say how products shown in the very first invoice used by Precision Pine were categorized by Mr. Goeken).

**Plaintiff's Comment – Mr. Porter testified only that he did not recall exactly how he categorized one lumber sale recorded on PX 290 at V.0001, i.e., one of the more than 1,100 invoices used for lumber pricing, but also indicated that he could have recalled how the invoice was categorized if he could "look," presumably at PX 180, tab (e), where he had recorded the results of his methodology. Tr. 1664 (Porter); Tr. 439-440 (Porter). Moreover, in the very next portion of cross-examination Mr. Porter precisely identified how products on two other invoices were categorized. Tr. 1664-68 (Porter). As noted above, Mr. Porter developed the methodology by**

**which lumber product sales from the invoices were categorized (see plaintiff's comment to DPFF 413) and defendant has presented no evidence that any invoice price was improperly categorized.**

**Moreover, in preparing his expert report Mr. Ness conducted a review to make sure that the invoices had been categorized correctly. Tr. 2343-44 (Ness).**

415. Selecting the correct category (or categories) for lumber products on a given invoice calls for expertise and professional judgment. Tr. 1664, 1667-68 (Porter).

**Plaintiff's Comment – Mr. Porter actually testified that there was "not really" that much involved in categorizing the products reflected on the invoices once one became familiar with the terms used on the invoices. Tr. 1667. Moreover, no witness ever testified that categorizing the invoices requires "professional judgment." See Tr. 1664. The task that does require significant expertise in the timber industry is determining the methodology for separating the products into 13 discrete categories, which is exactly what Mr. Porter did. Tr. 363-377 (Porter) (describing the methodology for determining that the products recovered from each sale would be categorized into one of the 13 categories); see also Tr. 129-131, 170 (Porter).**

**Moreover, to the extent that such "professional judgment" as was required, Mr. Porter, who developed the methodology and supervised the categorization of lumber products, certainly possessed it.**

416. Mr. Goeken lacked the knowledge and expertise required to independently categorize Precision Pine's sales invoices in order to calculate product prices. Goeken Decl. ¶ 5 (filed May 22, 2005). Further, Mr. Goeken does not recall any instructions and guidance provided by Mr. Porter. Id. ¶ 8.

**Plaintiff's Comment – The fact that Mr. Goeken lacked the knowledge and expertise to independently categorize the invoices demonstrates that Mr. Goeken was simply performing a**

**ministerial task to carry out the analytical methodology developed by Mr. Porter, based on his experience. Again, the Court has already determined that such was the case. Tr. 1996 (Court) ("Mr. Porter is the witness who has the substantive knowledge about why the categorizations were made as they were. . . ."). That Mr. Goeken did not recall the guidance given several years earlier does not mean that the guidance was not provided and properly followed at the time the invoices were categorized.**

417. Precision Pine did not use sales invoices to develop sale prices for Douglas Fir products during the period of the MSO suspensions, but rather, took the sales price from an industry publication (Random Lengths) and added $60. Tr. 1805 (Porter).

**Plaintiff's Comment – Precision Pine did not have sufficient Douglas-fir invoices from the suspension period to develop pricing for each of the six Douglas-fir lumber products produced by Precision Pine. Tr. 430-31 (Porter). This is due to the fact that Ponderosa Pine is by far the predominant species in Arizona. See, e.g., PX 131, Ex. 9 (only three of the 11 breached sales contained any Douglas-fir which represented only 9% of the timber on the breached sales). The prices were based on Precision Pine's experience over the years with producing and selling Douglas-fir products at the going rate for Douglas-fir in Portland (which was the closest major producer of Douglas-fir lumber products) plus the freight advantage that Precision Pine enjoyed over Portland lumber producers selling into the Phoenix market. PPFF 116.**

418. The prices derived by Mr. Ness for Douglas Fir products during the first quarter of 1997 are $40 to $200 lower than Mr. Porter's Random Lengths plus $60 prices (i.e., the Precision Pine used to calculate alleged lost lumber profits) for the same timber period. Tr. 2712-15 (Ness); see also Tr. 479-84, (Porter); PX182 (exhibit 4 at 1).

**Plaintiff's Comment – As Mr. Ness testified (Tr. 2817 (Ness)) and as his post-suspension report reflects (PX 182, Ex. 5, pp. 1-5), Precision Pine did not have any sales of Douglas-fir lumber products in the 1st quarter of 1997. From this, Mr. Ness concluded that although some Douglas-fir timber had been harvested in the 1st quarter of 1997, it had been decked and not milled and sold until the 3rd quarter of 1997. Tr. 2818 (Ness). Indeed, the prices for Douglas-fir lumber in the first three quarters of 1997 are identical, which reflects Mr. Ness' conclusion that regardless of the quarter that Douglas-fir was harvested in 1997, all of the sales of Douglas-fir products occurred in the 3rd quarter of 1997. Ex. 4 at 1. Tr. 2818 (Ness).**

**More importantly, Precision Pine did not project that "but for" the suspension any Douglas-fir lumber would have been sold in the 1st quarter of 1997. PX 131, Ex. 4 (U-Bar, Hay and O.D. Ridge timber sales). Thus, defendant's comparison between 1st quarter 1997 Douglas-fir prices for the suspension period (when no Douglas-fir sales were projected) and the prices listed in 1st quarter of 1997 in the post-suspension (which actually reflects sales that took place in the 3rd quarter of 1997) is irrelevant.**

**Finally, when the relevant comparison is performed (i.e., a comparison of the Douglas-fir lumber prices for the 3rd quarter of 1997 as determined by Mr. Ness with the prices for the 3rd quarter of 1997 as projected by Mr. Porter), the total sales arrived at using Mr. Ness' prices is just $550 dollars lower (on total sales of more than $28,000) than Mr. Porter's methodology. Tr. 2819-21 (Ness). A similar result obtains when Douglas-fir invoice prices for the 4th quarter of 1998 are compared with Mr. Porter's projected prices for the same quarter. Tr. 2822-23 (Ness). Thus, the actual invoice pricing in Mr. Ness' post-suspension report confirms that Mr. Porter's approach to Douglas-fir pricing is quite reliable.**

419. Precision Pine did not use sales invoices to develop sale prices for Englemann Spruce products, but rather, took the sales prices from an industry publication (Random Lengths) and added $50.

Tr. 1809, 1813-14 (Porter). The prices derived by Mr. Ness for Englemann Spruce products for early 1997 are substantially lower than Mr. Porter's Random Lengths plus $50 prices (i.e., the Precision Pine used to calculate alleged lost lumber profits). See also Tr. 486-97, (Porter); PX182 (exhibit 4 at 1).

**Plaintiff's Comment – To calculate Englemann Spruce pricing in the post-suspension period, Mr. Ness used the same methodology as did Mr. Porter, i.e., they both added $50 to the Random Lengths prices. Tr. 2710-11 (Ness). As was the case with Douglas-fir pricing (see Tr. 2817-18 (Ness)), Mr. Ness determined that Precision Pine's practice was to accumulate Spruce logs after harvest until a sufficient volume of logs existed to warrant running them and producing the unique lumber products that were made from them. Tr. 426, 458 (Porter). Accordingly, Mr. Ness determined that Precision Pine accumulated Spruce logs, which it then manufactured and sold as lumber in the 4th quarter of 1999 and the 1st quarter of 2000. PX 182, Ex. 5, p. 3. There is no evidence that prices used by Mr. Ness for Spruce during these quarters differ from Mr. Porter's.**

**Moreover, the only sale that had any Spruce timber on it was the O.D. Ridge sale (Tr. 433 (Porter)) and all of the Spruce that was harvested from the O.D. Ridge sale was removed in the 4th quarter of 1999 or the 1st quarter of 2000, except a tiny amount (21 mbf) of Spruce that was harvested in 1997. PX 182, Ex. 4, p. 3. As noted above, Mr. Ness understood that Precision Pine's practice was to accumulate non-Ponderosa Pine species until a sufficient volume of logs existed to warrant milling them and producing the unique lumber products that were made from them. Tr. 2817-18 (Ness); Tr. 458 (Porter). Accordingly, Mr. Ness applied prices from the 1999/2000 time period to this 21 mbf of logs harvested earlier, which resulted in gross lumber profits of $224.60. See PX 182, Ex. 2, p. 18. In any event, even assuming the 21 mbf of Spruce was manufactured and sold in 1997 (for which there is no evidence) and that Spruce prices were 10 times higher in 1997 than in 1999/2000 (which they were not), defendant's complaint remains trifling.**

420. Precision Pine's records contain no sales invoices for Englemann Spruce product. Tr. 2710 (Ness).

**Plaintiff's Comment – See plaintiff's comment to DPFF 419.**

421. Precision Pine used a different methodology to develop lumber sale prices for the post-suspension period. The prices developed for lumber sales in the post-suspension period are generally consistent with prices in the Winslow Sales Record. Tr. 3320 (Neuberger).

**Plaintiff's Comment – Mr. Ness used the same methodology to categorizing invoices (as explained to him by and applied with the guidance of Mr. Porter) as Mr. Porter had used in the suspension period. Tr. 2709-10 (Ness). This included the exclusion of invoices for 4/4 moulding, shop and stained lumber products, i.e., defendant's primary complaint with pricing in the suspension period. Id. The only difference in the post-suspension pricing is that Mr. Ness used a weighted average of prices, something he did in an attempt to assuage defendant and not because it made any substantive difference in the result. Tr. 2641-44 (Ness).**

422. The analysis of Precision Pine's invoices in the post-suspension period was performed by Robert Ness. Tr. 2696 (Ness).

**Plaintiff's Comment – Mr. Ness used the same basic methodology to categorizing invoices (as explained to him by, and applied with the guidance of, Mr. Porter) as Mr. Porter had used in the suspension period. Tr. 2709-10. (Ness).**

**F. The Overrun Achieved By Precision Pine's Sawmills**

423. For a variety of reasons, including the skill of the sawyer, the efficiency of sawmill equipment, the size and quality of logs being milled, and the types of lumber products being produced, the volume of lumber in mbf (known as "lumber tally") produced by a given sawmill commonly exceeds the

volume of logs in mbf (known as "log scale") used by the sawmill. The ratio of the volume of lumber (in mbf (l.t.)) to the volume of logs used to produce that lumber (in mbf (l.s.)) is commonly referred as the "overrun factor." Tr. 1179, 1210-15 (Devere).

424. Precision Pine conducted no formal mill studies at any of its mills prior to the MSO suspensions to determine the actual overrun that it was achieving. Tr. 883, 1546-48 (Porter).

**Plaintiff's Comment – See plaintiff's comment to DPFF 425.**

425. As shown by a contemporary analysis performed by Precision Pine, the overrun actually achieved at Precision Pine's Winslow sawmill from April 1995 to March 1996 was 1.08. DX547; Tr. 5324 (Smith); Smith Dep. Tr. 252-53, 257.

**Plaintiff's Comment – Defendant cannot have it both ways. In paragraph 424, defendant asserts that Precision Pine conducted no study to determine the actual overrun factor at its mills, but then in paragraph 425, defendant invites the Court to find an actual overrun based on Precision Pine's documents. In fact, there are no records maintained by Precision Pine that would reflect its mills' exact overrun (see DPFF 426) which is precisely why Precision Pine used a conservative estimate of overrun based on industry practices as validated by expert testimony and the Forest Service's own reported estimated overrun factors to calculate its damages. See PPFF 209-222.**

426. Precision Pine possesses no other records that show the overrun actually achieved at its sawmills before, during or after the MSO suspension. Tr. 1548-49 (Porter) (Precision Pine kept no record of any informal, part-day mill studies).

**Plaintiff's Comment – See plaintiff's comment to DPFF 425.**

427. On July 17, 1995, about six weeks before the MSO suspensions, Mr. Porter prepared profit projections for each of Precision Pine's timber sale contracts. See DX519; DX521-45. These

projections were prepared to analyze the profitability of Precision Pine's contracts in view of the possible sale of the company to Stone. Tr. 1568, 2063 (Porter); Tr. 2949-50 (Tenney).

**Plaintiff's Comment – The profit projections prepared on July 17, 1995 were a "worst case" scenario, created by Mr. Porter to show Mr. Tenney that even in a disastrous business situation Precision Pine could be profitable, and thereby discourage Mr. Tenney from accepting a low-ball offer from Stone during buyout negotiations. (Mr. Tenney was more interested in selling Precision Pine to Stone than Mr. Porter was.) Tr. 918-22, 2063-64 (Porter); Tr. 2948-50 (Tenney).**

428. The overrun factor Precision Pine used in Precision Pine's July 1995 profit projections was 1.10. DX519, 521-45.

**Plaintiff's Comment – The figure "1.10" on DX 519-545 does not reflect Precision Pine's anticipated overrun. Tr. 922-23 (Porter). While Mr. Porter had originally used the field marked "O.R.%" on his profit projections to indicate anticipated overrun, by the time he prepared the projections dated July 17, 1995, he used the field to reflect the degree of pessimism in the projection. Tr. 898-902 (Porter); see also Tr. 866-894 (Porter) (explaining his changing methods for reflecting pessimism or optimism in profit projects); PX 63-86. As Mr. Ness noted, such internal documents are really designed solely for the user's benefit and would not constitute an accounting pro-forma. Tr. 2590-92 (Ness); see also Tr. 876 (Porter) (Profit projections were for his use); Tr. 2946-48 (Tenney) (same). Accordingly, such documents cannot be understood standing alone, but rather require an explanation by the user. See Tr. 866-894 (Porter).**

429. Many other profit projections prepared by Precision Pine after 1993, which Mr. Porter characterized as "mid" or "high" projections, use an overrun factor of 1.10 or less. See, e.g., DX506 (using a 1.07 overrun and designated as "high"); DX510 (1.07 overrun; designated "mid"); DX511(1.05 overrun; designated "mid"); DX513 (1.10 overrun; designated "now"); DX514 (1.07 overrun; designated

"mid"); DX515 (1.05 overrun; designated "mid"); DX517 (1.07 overrun; designated "mid"); DXS18 (1.05 overrun; designated "average").

**Plaintiff's Comment – It was before 1993 that Mr. Porter stopped using the "O.R.%" field to represent actual overrun, and started using it as a shortcut to reflect his degree of optimism or pessimism about overall market conditions. Compare PX 64-72, 75, 76, 81, 82 (all dated before 1993 and showing 1.25 in the "O.R.%" field) with PX 73, 74, 77, 78, 83-85 (all dated during and after 1993 and showing some entries less than 1.25 in the "O.R..%" field); see Tr. 898-902 (Porter). In adjusting the "O.R.%" figure as a shortcut for optimism or pessimism, Mr. Porter would generally use 1.25 on his "high" projections and then reduce that figure for his "mid" and "low" projections. Tr. 899 (Porter). Thus, the evidence cited by defendant in this proposed finding of fact supports plaintiff's theory that the "O.R.%" field on the July 17, 1995 projections (DX 519; 520-45) did not reflect the overrun factor in Precision Pine's sawmills, but rather was used by Mr. Porter to reflect pessimism in the projection.**

**Also, Mr. Porter would sometimes change the degree of pessimism on a projection, but neglect to change the label on the projection before he printed it. E.g., PX 70; Tr. 873-74 (Porter); PX 82 (second page); Tr. 878 (Porter). Thus, DX 506, the single profit projection presented by either party that is labeled "high" and showing an optimism factor of less than 1.25 most likely simply reflects a typo. This conclusion is supported by the fact that DX 506 was not printed on Mr. Porter's printer, as evidenced by the fact that the font on DX 506 differs from the font on the other profit projections (e.g., PX 70 and 82), and that Mr. Porter had never seen DX 506 until trial. Tr. 1581-83 (Porter). Thus, unlike PX 70 and 82, Mr. Porter did not have the opportunity to correct the label by hand. See Tr. 873-74, 878 (Porter).**

430. No projection of a contract's gross profits prepared by Precision Pine's after 1993 uses an overrun higher than 1.2. See PX74; PX78; PX83-85; DX506-18; cf. PX80 (using a higher overrun only when looking at the "smallwood" component of a contract).

**Plaintiff's Comment – See plaintiff's comment to DPFF 429. Additionally, Mr. Porter prepared many profit projections every year on his computer, but did not print out most of those projections. Tr. 895, 884-885 (Porter). Accordingly, the profit projections cited above represent only a small fraction of the profit projections Mr. Porter produced since 1993. Moreover, none of the profit projections cited except DX 506 are labeled as a "high" projection, and as Mr. Porter testified, when using the "O.R.%" field as a shortcut for optimism about overall market conditions, he would typically assign a value of 1.25 to his "high" projection and then reduce it for his "mid" or "low" projections. Tr. 899 (Porter). As for DX 506 (labeled "high" but showing an optimism factor below 1.25), it is most likely simply a typo.**

431. Forest Service appraisals contain a line that appears to provide an estimated overrun factor. See PX1-14. This line is a relic of an old appraisal system that was phased out in Region 3 (Arizona and New Mexico) in the mid-1980's. Tr. 3763, 4192-93 (Harris).

**Plaintiff's Comment – According to the Forest Service's publications for Timber Sale preparation, the Forest Service does use its estimated overrun factor in the new system (the Transaction Evidence Appraisal, or T.E.A., system). PPFF 224-26. In fact, defendant's witness, Mr. Harris, acknowledged that overrun factors could have been used by the Forest Service in the appraisal of the sales at issue in this case. Tr. 4457-58.**

432. The Forest Service did not use the listed factor in appraising any of Precision Pine's contracts. Tr. 3763, 4192 (Harris).

**Plaintiff's Comment – On cross-examination, Mr. Harris admitted he did not know for sure that the overrun factor listed on the Forest Service appraisals was not used; Mr. Harris then conceded that "it is possible" that the listed overrun factors could have been used by the Forest Service in the appraisal of the sales at issue in this case. Tr. 4457-58.**

433. The listed factor in Forest Service appraisals does not indicate the overrun that the purchaser of a timber sale should expect to obtain. Tr. 3764-65, 4192 (Harris).

**Plaintiff's Comment – The overrun factor published on the appraisals is derived from a formal mill study that the Forest Service conducted on Stone's sawmill in Eagar in the mid-1980s. PPFF 216. Although other purchasers may obtain an overrun factor that is different than the one that Stone obtained, a purchaser that had at least comparable equipment and crews would obtain at least a comparable overrun. Tr. 1231 (Devere). In this instance, Precision Pine's mills were at least as efficient as Stone's Eagar sawmill was in the mid-1980s (PPFF 217-18) and the Forest Service's estimated overrun for all the contracts at issue except one was at least 1.25. PPFF 215. The reported factor for the Saginaw-Kennedy contract was 1.245, which was most likely underestimated. Id., n.15. Accordingly, Precision Pine could reasonably expect to achieve, at a minimum, an overrun at least comparable to the overruns listed on the appraisals.**

**Further, Mr. Harris, whose testimony is the only thing defendant cites in support of its proposed finding, has no experience with sawmill operations. See Tr. 3729-47. Accordingly, Mr. Harris has no basis for knowing whether or not Precision Pine could achieve the overrun factor listed on the Forest Service appraisals.**

## G. Conversion Factors For "CCF" Multi-Product Sales

434. There exists no fixed conversion factor for converting log volumes from ccf to mbf (1.s.). Tr. 1616 (Porter). As a result, it is more accurate to use a contract-specific conversion factor, rather than a single, fixed conversion factor. Tr. 1616-17 (Porter).

**Plaintiff's Comment – Mr. Porter testified that "depending on who prepared" the contract-specific conversion factor, that such a factor may be more appropriate, but only when that person has "the correct information." Tr. 1616-17 (Porter). No witness testified definitively that a contract-specific conversion factor is always the preferred method. Further, no witness testified regarding the Forest Service's determination of a conversion factor or that the person that prepared the Forest Service's estimated conversion factor (whoever that may be) had the necessary data and expertise to determine an accurate conversion factor.**

435. The Forest Service developed contract-specific conversion factors for each multi- product sale offered on a ccf basis, and included the appropriate conversion factor for sawtimber in the appraisal summary given to prospective bidders. PX4-5, 7-11, 13-14.

**Plaintiff's Comment – The documents cited only show that the Forest Service developed a conversion factor, but there is no evidence to support the conclusion that those conversion factors were the "appropriate" ones. The Forest Service did not warrant the conversion factors listed on the appraisal summaries, stating that such conversion factors were included only "[a]s an aid to gaining familiarity with cubic-foot measurement," not as an official conversion factor. PX 183, ¶ 1. Further, the Forest Service's Sale Prospectuses make no mention of which of several methodologies for calculating the conversion factor is in use. See PX 183, Saginaw-Kennedy Timber Sale Prospectus; Tr. 246(Porter) (there are several methods for calculation ccf-to-mbf conversion). The Forest Service endorsed the use of 2 to 1 conversion factor as well. Tr. 245 (Porter).**

436. The Forest Service used the contract-specific conversion factor in administering Precision Pine's contracts. See, e.g., PX4-5, 9-10, 13-14 (providing "converted Scribner" appraisals using the Forest Service's contract-specific conversion factor).

**Plaintiff's Comment – See plaintiff's comment to DPFF 435. There is no testimony that the Forest Service actually used the conversion factors listed on the appraisal summaries for contract administration. To the contrary, the evidence shows that the Forest Service listed its conversion factor only "an aid to gaining familiarity with cubic-foot measurement." PX 183, ¶ 1.**

437. Precision Pine used the FS conversion factor for a variety of significant calculations. See, e.g., PX70 (Kettle multi-product sale profit projection); DX587 (determining the volume of timber sold to Stone Container and, thus, the amount owed by Stone to Precision Pine).

**Plaintiff's Comment – PX 70 actually relates to the Hidden timber sale, not the Kettle multi-product sale, and contains no reference to any conversion factor. DX 587 was not admitted into evidence. Even if had been admitted, the letter marked as DX 587 shows that Precision Pine on one occasion used a conversion factor that was virtually indistinguishable from 2.0, i.e., 2.0816. On several other occasions Precision Pine had used a conversion factor of 2 for Kettle. DX 550-52.**

438. Precision Pine used a fixed conversion factor in its damages calculations, which has the effect of overstating the amount of timber available on a contract by as much as 12 percent. See Appendix A.

**Plaintiff's Comment – Apparently, defendant seeks to refer to the appendix to its brief at Table 1, DA1. That table, however, was not offered let alone admitted into evidence at trial. Additionally, that table purports to be based on PX 4-5, 9-10, 13-14, yet none of those documents contain the "contract specific conversion factors" that defendant has listed for the Monument, Kettle, Mud, Saginaw-Kennedy, or Salt sales. Compare DA1 with PX 4-5, 9-10, 13-14. Moreover, for reasons not explained, defendant conveniently ignores the Jersey Horse sale, for which the Forest Service's calculated conversion factor was greater than .5 mbf per ccf (less than 2 ccf/mbf), and the Brann sale, for which the Forest Service determined that the appropriate conversion factor**

**was .5 mbf per ccf. PX 170 at JRH-5; PX 12 (Brann). The inaccuracies and omissions contained on DA1 seriously undermine the probative value of this document prepared after trial and are contradictory of data relied on by defendant's own experts at trial. <u>See</u> DX 766-77.**

**Finally, as Mr. Porter testified without contradiction, the Forest Service recommended the use of a 2:1 conversion factor, which he found was accurate based on his many years of practical experience. PPFF 208.**

### H. <u>Log Inventories At Precision Pine's Sawmills</u>

439. Precision Pine monitored the inventory of logs at its sawmills. The log inventory would vary from month-to-month and over the course of a year. DX478 Tr. 5319 (Smith).

**Plaintiff's Comment – The cited evidence does not demonstrate that Precision Pine monitored the inventory of logs at is sawmills. Rather, it demonstrates only that Mr. Smith kept an estimate of inventory based on a sample scale of some of the logs entering the Winslow mill yard. DX 478; Tr. 5319-21 (Smith).**

440. In April, at the beginning of the harvesting season, Precision Pine sought to have little or no inventory. Smith Dep. Tr. 24, 25; Tr. 2102-03 (Porter).

441. When harvesting commenced, Precision Pine sought to build a two to three week. supply of logs at each of its sawmills. Smith Dep. Tr. 24, 26.

**Plaintiff's Comment – Mr. Smith provided a "very rough explanation" of the "typical" logging season in the Southwest in which he explained that depending on the capacity of the sawmill, a lumber producer would begin a logging season by building an inventory of a two, three weeks, a month "or whatever." DX 838 – Smith Dep. Tr. 24 -26. The testimony at these pages is not necessarily specific to a given year at Precision Pine but refers to the typical way of doing things in the Southwest, that Precision Pine generally followed.**

442. Precision Pine sought to maintain no more than a two to three week log inventory through the summer months. Smith Dep. Tr. 24, 26-28.

**Plaintiff's Comment – Mr. Smith provided a "very rough explanation" of the "typical" logging season in the Southwest in which he explained that depending on the capacity of the sawmill, a lumber producer would begin a logging season by building an inventory of a two, three weeks, a month "or whatever." DX 838 - Smith Dep. Tr. 24 -26.**

443. The summer months are referred to as "bluing season." See Smith Dep. Tr. 27. This is because logs kept in inventory during the summer will frequently be attacked by a fungus that causes "blue stain." Smith Dep. Tr. 26-27.

**Plaintiff's Comment – The cited testimony only supports the assertion that blue stain "could" occur in the summer months. The witness did not use the term "bluing season," Mr. Harrington did. DX 838 – excerpts from Smith Dep. Tr. 27. There is no evidence or testimony stating that blue stain was a frequent or even common occurrence, merely that it was a possibility. DX 838 – excerpts from Smith Dep. Tr. at 26-28. Mr. Porter testified that blue stain could result from various causes and to the extent that blue stain ever presented an issue for Precision Pine, there were several means available to delay or prevent its onset. Tr. 1677, 1791 (Porter).**

444. Blue stain reduces the grade and, therefore, substantially reduces the value of molding and shop products. Smith Dep. Tr. 27; Tr. 1790-91 (Porter).

**Plaintiff's Comment – See plaintiff's comment to DPFF 455.**

445. During the fall, beginning in September, Precision Pine would seek to increase its log inventory in order to have logs to use at the mill during winter months. Smith Dep. Tr. 24-25, 28.

**Plaintiff's Comment – Mr. Smith provided a "very rough explanation" of the "typical" logging season in the Southwest. DX 838 – Smith Dep. Tr. 24 -26. The testimony at these pages is not necessarily specific to a given year at Precision Pine but refers to the typical way of doing things in the Southwest, that Precision Pine generally followed.**

446. Precision Pine never intentionally deviated from this plan for log inventories. Smith Dep. Tr. 28-29.

**Plaintiff's Comment – Mr. Smith provided a "very rough explanation" of the "typical" logging season in the Southwest. DX 838 – Smith Dep. Tr. 24 -26. The testimony at these pages is not necessarily specific to a given year at Precision Pine but refers to the typical way of doing things in the Southwest, that Precision Pine generally followed.**

447. The historic average log inventory at Precision Pine's Eagar mill was 670 mbf (l.s.). DX827.

**Plaintiff's Comment – The so-called "historical average" as calculated by Mr. Adkins is based on data purportedly from April 1994 to August 1995. Tr. 4063 (Adkins). This "historical period" does not consider any other years during which Precision Pine had at times carried a much larger log inventory at its sawmills. Tr. 5699-5700 (Ness). Moreover, for all of the reasons set forth in Precision Pine's Motion to Strike, the work of Mr. Adkins should not be relied upon by the Court.**

448. At no point did Precision Pine's log inventory at the Eagar mill exceed 1,444 mbf (l.s.). DX827.

**Plaintiff's Comment – When defendant says "at no point," it really means "at no point from April 1994 to August, 1995," which was the time period that Mr. Adkins used when preparing the**

**summary in DX 827. Tr. 4062-63 (Adkins). The same time period applies to Mr. Adkins' summaries at DX 825, 826 and 828 (cited below). Thus, all the summaries cited by defendant in support of paragraphs 447 through 454 suffer from the same deficiency -- viz., Mr. Adkins only analyzed the inventory that Precision Pine carried during a short period of its entire existence since 1984 (see PPFF 2) and ignored other time periods when much larger inventories were maintained. Tr. 5699-5700 (Ness). Accordingly, and for all of the reasons set forth in Precision Pine's Motion to Strike, the work of Mr. Adkins should not be relied upon by the Court.**

449. The historic average log inventory at Precision Pine's Heber mill was 510 mbf (l.s.). DX826.

**Plaintiff's Comment – See plaintiff's comments to paragraphs 447 and 448.**

450. At no point did Precision Pine's log inventory at the Heber mill exceed 1,385 mbf (l.s.). DX826.

**Plaintiff's Comment – See plaintiff's comments to paragraphs 447 and 448.**

451. The historic average log inventory at Precision Pine's Winslow mill was 481 mbf (l.s.). DX825.

**Plaintiff's Comment – See plaintiff's comments to paragraphs 447 and 448.**

452. At no point did Precision Pine's log inventory at the Winslow mill exceed 928 mbf (l.s.). DX825.

**Plaintiff's Comment – See plaintiff's comments to paragraphs 447 and 448.**

453. The historic average log inventory at Precision Pine's mills in Eagar, Heber and Winslow was 1,661 mbf (l.s.). DX828.

**Plaintiff's Comment – See plaintiff's comments to paragraphs 447 and 448.**

454. The combined log inventory at Precision Pine's mills in Eagar, Heber and Winslow never exceeded 3,195 mbf (l.s,). DX828.

**Plaintiff's Comment – See plaintiff's comments to paragraphs 447 and 448.**

**I. Precision Pine's Lumber Product Mix**

455. Precision Pine has no documents or other data that shows what mix of lumber products was produced from logs from a particular timber sale. DX784; Tr.1323 (Porter).

**Plaintiff's Comment – Although Precision Pine never formally recorded its product mix from each sale, Mr. Porter, as the President of the company, was constantly monitoring sawmill production and lumber sales, and based on his experience and knowledge of Precision Pine's operations, with the aid of the hammer brands on the timber and though conversations with the graderman and sawyers, he would confirm whether timber from a particular sale was producing the mix of lumber that he predicted when he examined the standing timber prior to bidding on the contract. PPFF 295-303.**

456. The inventory of lumber products (rough and finished) that Precision Pine had for sale varied from month to month as a result of both variations in production quantities and customer demand. See DX478-500.

**Plaintiff's Comment – The cited exhibits only show that inventory varied. There is no indication on the documents as to why inventory varied. See DX 478-500.**

457. A product mix is a set of products that can be manufactured from a given set of logs. Tr. 4278 (Munn).

458. Because different lumber products have different prices, an incorrect product mix will result in an incorrect estimate of total revenue. Consequently, determining an accurate product mix is essential for determining the profits on the lumber produced from a specific timber sale. Tr. 4278 (Munn).

459. Changing an expected product mix could significantly change the expected profits from a timber sale. Tr. 4278 (Munn).

460. Precision Pine determined the product mix for timber sales it had harvested by using lumber sales reported in its Winslow sales journal during a two-month period. Tr. 4279 (Munn).

**Plaintiff's Comment – Prof. Munn is testifying as to his understanding of Precision Pine's methodology, and as a result, the assertion is less than precise. Tr. 4279 (Munn). As described at PPFF 304-320, the evidence at trial showed that Mr. Porter actually used a much more detailed analysis that only began with isolating a two-month period where almost all the lumber produced would have been recovered from timber from a single contract.**

461. Precision Pine determined its product mix for timber sales it had not harvested, or for which it had no information, by comparing those sales with the product mixes of Precision Pine's other timber sales. Tr. 4304 (Munn).

**Plaintiff's Comment – Prof. Munn is testifying as to his understanding of Precision Pine's methodology, and as a result, the assertion is less than precise. Tr. 4304 (Munn). Precision Pine did in fact have information for each of the contracts at issue from the Forest Service appraisals (PX 1-11), the prospectuses (PX 183-193), and Mr. Porter's extensive pre-bid tour of the timber sale areas, PPFF 296-98.**

462. Timber from a two-month or a limited time period of a harvest is not representative of the product mix from the timber sale as a whole because timber quality varies greatly within a given sale. Tr. 4281 (Munn).

**Plaintiff's Comment – Despite Prof. Munn's opinion, Mr. Porter's methodology to determine product mixes did predict with reasonable accuracy what Precision Pine would have produced, as confirmed by Mr. Ness' verification of the product mixes, which demonstrates that Mr. Porter's predicted product mixes closely matched the historic product mix that Precision Pine actually achieved. PPFF 86-88.**

463. High-grading is a practice of cutting the best timber first and leaving the rest for harvesting later or not at all. Tr. 4282 (Munn).

464. High-grading increases the quality of the product mix of a given timber sale. Tr. 4284 (Munn).

465. The two months of lumber sales used by Precision Pine to determine its product mixes reflected the timber harvested during the first two to three months of harvesting on the timber sale for which Precision Pine was determining a product mix. Tr. 4285-86 (Munn).

466. Except for the St. Joe timber sale, Precision Pine's method for determining its product mixes reflects a pattern of high-grading. Tr. 4286 (Munn).

**Plaintiff's Comment – Prof. Munn <u>never</u> testified that in his opinion Precision Pine engaged in high grading. Rather, he qualified his opinion:**

> **Q: And would you consider that a pattern of possible high grading?**
>
> **A: <u>If I was concerned about a contractor high grading a sale</u>, I would be most concerned in the initial months that they started operating on a sale.**

**Tr. 4286 (Munn) (emphasis added). Thus, Prof. Munn only specified that the time in which a company might high grade is near the beginning of the contract, but he never opined that Precision**

**Pine engaged in high grading and he never examined the timber sales at issue for high grading. Tr. 4284 (Munn). Rather, as defendant points out in Proposed Finding 467, Prof. Munn stated that if a purchaser could anticipate a Forest Service suspension, then it might have a motive to high grade a sale in the initial months of harvesting. DPFF 467. However, defendant proffers no evidence that Precision Pine knew of the impending 16-month suspension that the Forest Service imposed on them before beginning harvest on any sale.**

467. It is beneficial to a purchaser of a timber sale to high-grade where the purchaser knows that a Forest Service suspension is imminent. Tr. 4286-87 (Munn).

**Plaintiff's Comment – There is no evidence that Precision Pine knew, prior to the suspension, that the Forest Service was about to suspend its operations for a period of approximately 16 months. See plaintiff's comment to DPFF 466.**

468. Precision Pine's process for determining its product mixes is fundamentally flawed unless (1) the lumber sold during the representative two-month period is identical to the volume and mix of timber that came from the specific sale in the previous month; and (2) Precision Pine sold all of the lumber manufactured from that specific sale in its entirety by the end of each month. Tr. 4287 (Munn).

**Plaintiff's Comment – The methodology used by Precision Pine is set forth at PPFF 304-320. The result of the methodology was a product mix that was quite comparable to the lumber product mix achieved by Precision Pine in the years preceding the suspension. See plaintiff's comment to DPFF 462.**

469. The lumber sold during the representative two-month periods used by Precision Pine was not identical to the volume and mix of timber that came from the specific sale in the previous month. Tr. 4291 (Munn).

**Plaintiff's Comment – The cited testimony does not support the assertion. Indeed, there is no way that Prof. Munn could know what the product mix was for any particular sale in the month before the two-month periods identified by Mr. Porter as being representative of production from a particular sale.**

470. Precision Pine carried over an inventory of lumber products from month to month. Tr. 4288-89 (Munn); DX478-500.

471. Timber from all of Precision Pine's timber sales would be delivered to one of three sawmills where they would be intermingled with logs from different timber sales and concurrently milled. Tr. 4292-93 (Munn).

**Plaintiff's Comment – The cited testimony actually supports the opposite of the assertion, as Prof. Munn testified that Precision Pine's method of decking logs would keep timber from different sales segregated. Tr. 4292-93 (Munn).**

472. After being run through the sawmills, the resulting lumber from different timber sales would be intermingled and sent to Precision Pine's planer. Tr. 4293 (Munn).

**Plaintiff's Comment – The cited testimony does not support the assertion. Prof. Munn merely opines that intermingling becomes possible, not that it actually occurred. Tr. 4293.**

473. Precision Pine had no formal method for tracking its logs through the milling process. Tr. 4294-95 (Munn).

**Plaintiff's Comment – Precision Pine could track logs from specific sales based on Mr. Porter's oversight of Precision Pine's operations, control measures such as segregated log decks and hammer brand markings. PPFF 295, 299-312.**

474. Lumber products were recorded on the Winslow sales journal when they were sold. Tr. 4293 (Munn).

**Plaintiff's Comment – The statement is irrelevant because Mr. Porter did not use the Winslow sales journal as the starting point for determining product mix; rather, he used it merely to verify his pre-bid analyses and experience with the timber as it was processed at Precision Pine's sawmills. PPFF 304-05.**

475. There is a lag time between the time timber is harvested and the time that lumber manufactured from such timber is actually sold. Tr. 4297 (Munn).

**Plaintiff's Comment – Again, the statement is of limited relevance because Mr. Porter did not use the sales journal as the starting point for his analysis. <u>See</u> plaintiff's comment to DPFF 474; PPFF 304-05.**

476. The following timber sales were being harvested and the resulting timber delivered to Precision Pine's sawmills at the same time: Brookbank, St. Joe, Hay, U-Bar and Manaco. Tr. 4297-98 (Munn).

**Plaintiff's Comment – The fact that logs were delivered to the mill yard at the same time does not mean that the logs were milled simultaneously. Again, Precision Pine kept segregated log decks. PPFF 295. Defendant has offered no evidence to the contrary.**

477. Lumber products from timber harvested from the Brookbank, St. Joe, Hay, U-Bar and Manaco timber sales were used to determine the product mix for the Brookbank sale. Tr. 4297-98 (Munn).

**Plaintiff's Comment – <u>See</u> plaintiff's comment to DPFF 476.**

478. The quality of timber on the St. Joe, Hay, and U-Bar timber sales was significantly better than the quality of timber on the Brookbank sale. Tr. 4300 (Munn).

**Plaintiff's Comment – Prof. Munn's opinion is based solely on two indicators of quality on the Forest Service appraisal forms, i.e., percent clear faces and average dbh. See Tr. 4299 (Munn); DX 466; Tr. 4383 (Munn) (explaining the figures on DX 466 were transferred directly from the Forest Service appraisals). The accuracy of these indicators is not warranted by the Forest Service, which disclaims its calculations of quality and quantity, and the Forest Service does not even attempt to reduce the accuracy of the indicators to any measurable margin of error. PPFF 296; Response to DPFF 97, supra. Of course, unlike Mr. Porter, Prof. Munn never personally inspected the standing timber to make his own assessment of its quality. PPFF 297.**

479. 808,000 board feet log scale was harvested on the Brookbank sale in July and August of 1995. Tr. 4301 (Munn).

480. The total volume of lumber sold based on the Winslow sales journal for July and August of 1995 was 4,900,000 board foot lumber tally. Tr. 4301 (Munn).

481. Using Precision Pine's proposed overrun factor of 1.25, timber harvested from the Brookbank sale was, at most, 20% of the total volume of lumber sold during July and August of 1995. Tr. 4302 (Munn).

482. Precision Pine presented no formula for how it compared one sale to another for determining product mixes. Tr. 4306 (Munn).

**Plaintiff's Comment – No formula exists that can translate the Forest Service's indicators of quality -- percent clear faces and average dbh -- into product mix recovered. Tr. 1365 (Porter). The most important factor in determining the comparability of sales is a physical inspection of the trees (Tr. 5529-32, 120-21, 1351 (Porter)), which Prof. Munn did not do. PPFF 297; see plaintiff's comment to DPFF 478.**

483. The quality of timber from the Brookbank timber sale was significantly better than the quality of timber on the Saginaw-Kennedy timber sale. Tr. 4305-07 (Munn).

**Plaintiff's Comment – Mr. Porter, who actually inspected the timber on the two sales, does not agree with Prof. Munn's assessment, which is based solely on the percentage of clear faces and dbh as determined by the Forest Service. Tr. 5532-33 (Porter). Indeed, it was Mr. Porter's view that the Forest Service's appraisal of the Saginaw-Kennedy contained significant errors. Tr. 1366-67 (Porter); see also Tr. 151 (overrun factor listed on appraisal summary for Saginaw-Kennedy sale probably an error); Tr. 414-415 (a portion of Saginaw-Kennedy sale had particularly high quality timber).**

484. Precision Pine used its product mix for the Brookbank timber sale as a proxy to determine the product mix for the Saginaw-Kennedy timber sale. Tr. 4305 (Munn).

**Plaintiff's Comment – See plaintiff's comment to DPFF 483**

485. Precision Pine's claimed adjustment of the product mix for the Saginaw-Kennedy timber sale was minor and did not reflect the dramatic difference in timber quality between the Brookbank timber sale and the Saginaw-Kennedy timber sale. Tr. 4305 (Munn).

**Plaintiff's Comment – See plaintiff's comment to DPFF 483.**

486. Although the quality of timber on the Mud timber sale was more comparable to the quality of timber on the Saginaw-Kennedy timber sale, Precision Pine did not use the product mix for the Mud sale as a proxy to determine the product mix for the Saginaw-Kennedy timber sale. Tr. 4305 (Munn).

**Plaintiff's Comment – See plaintiff's comment to DPFF 483.**

487. Precision Pine used the proposed product mix for Saginaw-Kennedy as a proxy to determine the product mixes for the Salt, Manaco and Monument timber sales. Tr. 4308 (Munn).

488. Because Precision Pine's product mix for the Saginaw-Kennedy timber sale was inflated, Precision Pine's product mixes for the Salt, Manaco and Monument timber sales are also inflated. Tr. 4308 (Munn).

**Plaintiff's Comment – See plaintiff's comment to DPFF 483.**

489. The timber on the Hay timber sale was of a substantially poorer quality than the timber on the U-Bar timber sale. DX 775 at 10.

**Plaintiff's Comment – See Mr. Porter inspected the timber on both sales and explained at trial his reasons that the timber on the sales were comparable. Tr. 408 (Porter).**

490. The product mix of lumber manufactured from the Hay timber sale would be much poorer than the product mix of lumber manufactured from the U-Bar timber sale. DX 775 at 10.

**Plaintiff's Comment – See plaintiff's comment to DPFF 489.**

491. Precision Pine used the product mix for the U-Bar timber sale to determine the product mix for the Hay timber sale. DX 775 at 10.

**Plaintiff's Comment – See plaintiff's comment to DPFF 489.**

492. The timber on the O.D. Ridge timber sale was of a substantially poorer quality than the timber on the St. Joe timber sale. DX 775 at 10.

**Plaintiff's Comment – Mr. Porter inspected the timber on both sales and explained at trial his reasons that the timber on the sales was comparable. Tr. 405 (Porter).**

493. Precision Pine used the product mix for the St. Joe timber sale to determine the product mix for the O.D. Ridge timber sale. DX 775 at 10.

**Plaintiff's Comment – See plaintiff's comment to DPFF 492.**

494. A timber sale cruise conducted by the Forest Service would provide a more accurate estimate of the timber quality on a given timber sale than an estimate of timber quality derived from an individual's visual inspection of the timber sale. Tr. 4310-11 (Munn).

**Plaintiff's Comment – The primary purpose of the Forest Service's timber sale cruise is to estimate the volume of timber. Tr. 4177-4182 (Harris). Assessing the quality of the trees on the sale is not a priority, and the only assessment made is whether the trees in the sample plot have one "clear face," which is an imperfect indicator of quality. Tr. 4180-82 (Harris). Of course, the Forest Service warranted neither its estimate of quantity nor its indicators of quality. Id. at 4182-83.**

495. Cruising is a systematic way to measure the volume, quantity and quality of timber on a particular sale. Tr. 4312 (Munn).

**Plaintiff's Comment – See plaintiff's comment to DPFF 494.**

496. In cruising, sampling plots are established throughout the sale area and the trees within the sample are actually measured for dbh, height and percent grade. Tr. 4313 (Munn).

**Plaintiff's Comment – See plaintiff's comment to DPFF 494.**

497. It is common in the forest industry for a potential bidder of a timber sale to conduct its own cruise of the sale area. Tr. 4313 (Munn).

**Plaintiff's Comment – Prof. Munn has no expertise with respect to common practices in Arizona as virtually all of his experience is limited to the Southeastern United States. See Tr. 4247-69.**

498. Precision Pine did not conduct its own cruise of any of the timber sales at issue in this case. Tr. 4313 (Munn).

**Plaintiff's Comment – Mr. Porter personally inspected the entirety of every sale that Precision Pine bid on, examining in detail all aspects of the quality of the trees on the sale for purposes of lumber production, as opposed to simply taking a sample of the trees on the sale and looking at them for the primary purpose of estimating volume as a Forest Service cruise would do. Tr. 5529-32 (Porter).**

499. Little or no shop and molding grade lumber can be derived from smaller sawlogs. Tr. 1172, 1213 (Devere). A 100 board foot log would be a smaller sawlog. Tr. 1213 (Devere). This (100 bf) was about the size of Precision Pine's average sawlog at the time of the MSO suspensions. See PX51

**Plaintiff's Comment – Mr. Devere did not say that little or no shop lumber would be developed from a 100 board foot log. Indeed, Precision Pine's production in the year prior to the suspension confirms that Precision Pine was producing shop and moulding products in higher percentages than Mr. Porter predicted from the breached sales. PPFF 86, 329.**

500. The Western Wood Products Association ("WWPA") regularly reports the average product mix for all commodities sold in the Rocky Mountain region. Tr. 4315-16 (Munn).

**Plaintiff's Comment – It is unclear as to what "commodities" defendant is referring to or what the average product mix for "all commodities" means. Although the proposed finding does reflect Prof. Munn's testimony, the testimony is likely due to Prof. Munn's lack of familiarity with**

**the WPPA index for the Rocky Mountain Region. As Prof. Munn also testified, there were some lumber products in Precision Pine's product mix that were not on the WWPA product mix and vice versa. Tr. 4316 (Munn).**

501. Precision Pine's proposed product mixes are dramatically of a higher quality than the product mixes reported by the WWPA for the Rocky Mountain region during the relevant time period. Tr. 4317 (Munn).

**Plaintiff's Comment – Precision Pine's performance in the year immediately preceding was even better when compared to the WWPA product mixes used during the relevant period. Compare PPFF 329 ("Precision Pine Actual Production % July 1, 1994 – July 31, 1995") with PX 62 (composition of the WWPA index log for the Rocky Mountain Region on a '92-'93 basis that remained in place during the suspension period). Accordingly, it is not surprising that Precision Pine would again outperform the WWPA average during the suspension. See also PPFF 334-340.**

502. The product mixes claimed by Precision Pine are much better than the product mixes that would have been produced if the timber sales had been harvested completely. DX 775.

**Plaintiff's Comment – Despite Prof. Munn's opinion, Mr. Porter's methodology to determine product mixes (see PPFF 304-320) did, in fact, accurately predict what Precision Pine would have produced, as evidenced by Mr. Ness' verification of the product mixes, which found that the weighted aggregate of the predicted product mixes closely matched the historic aggregate product mix that Precision Pine actually achieved. PPFF 86-88, 328-331.**

503. The procedure that Precision Pine used to assign product mixes to specific timber sales is fundamentally flawed. DX 775

**Plaintiff's Comment – See plaintiff's comment to DPFF 502.**

504. The procedure that Precision Pine used to assign product mixes cannot reasonably be expected to accurately predict the actual product mix that would have been generated from each sale if they were completely harvested. DX 775

**Plaintiff's Comment – See plaintiff's comment to DPFF 502.**

**J. The Production And Sale Of Lumber By-Products**

505. As a result of the manufacturing of logs into lumber, Precision Pine produced the following by-products: (i) bark; (ii) chips; (iii) shavings; and (iv) grindings (i.e., sawdust). First Joint Stip. ¶ 33.

506. There are no additional costs associated with the production of by-products. See Tr. 608 (Porter).

**1. Chips**

507. Precision Pine sold its output of chips to Stone pursuant to contract between the two companies. See PX 311; PX313.

508. Precision Pine's contract for the sale of chips to Stone expired on September 30, 1995. PX311.

**Plaintiff's Comment – After the contract expired on September 30, 1995, Stone continued to buy Precision Pine's output of chips at $18.25. PPFF 1126; DX 476; Tr. 596 (Porter).**

509. Stone stopped taking chips from Precision Pine from January 15 to April 15, 1996. DX476; Tr. 597-98, 1923-24 (Porter).

**Plaintiff's Comment – By letter dated December 27, 1995, Stone indicated that it would be suspending its chip purchases from January 15, 1996 to April 15, 1996. PPFF 1127; DX 476. The letter indicated that Stone would be open to discussing the possibility that Precision Pine would store the chips it produced during the three-month suspension for future purchase by Stone. Id. From January 15, 1996 to April 15, 1996, Stone did not take any chips from Precision Pine and Precision Pine stored the chips that it produced at its mill yards. PPFF 1128; Tr. 599 (Porter).**

510. Precision Pine entered into a new contract and Stone resumed taking chips from Precision Pine on April 22, 1996. The contract price for chips paid by Stone under the new contract was lower than the prior contract. PX313.

**Plaintiff's Comment – However, on April 22, 1996, Precision Pine and Stone entered into a contract whereby Stone again agreed to accept Precision Pine's entire output of chips for $17.00/ton, PPFF 1128; PX 313, and to purchase the chips that Precision Pine had produced from January 15 to April 15, 1996 at the new contract price of $17.00. PPFF 1128; PX 313; Tr. 600-01 (Porter).**

**2. Bark**

511. Precision Pine had no contract to sell the output of bark produced by its sawmills. Tr. 1924-25 (Porter).

**Plaintiff's Comment – During the suspension period, Precision Pine had a contract with Western Organics to sell almost all of its bark. PPFF 1125.**

512. Precision Pine has no invoices showing sales of bark to customers. Tr. 1934 (Porter).

**Plaintiff's Comment – This is not correct. The Bark Ledger in fact records actual invoice numbers, amounts billed and billing dates. Tr. 2654-55 (Ness). See PX 316, III (c)-3, (c)-5, (c)-7,**

**(c)-9, (c)-11, (c)-13, (c)-15, (c)-17, (c)-19, (c)-21, (c)-23, (c)-25, (c)-27, (c)-29. The entries in the Bark Ledger (PX 316) are invoices for accounting purposes. See Tr. 2654-55 (Ness). Based on Precision Pine's Bark Ledger, Mr. Ness determined Precision Pine's rate of bark production in tons/mbf (LT) (PX 131, Ex. 13) and multiplied it by the constant sales price of $20.58/ton during the suspension period which resulted in total revenue of $256,671.31. PPFF 132-6; PX 131, Ex. 4, at 27.**

513. Precision Pine's "bark journal" identifies Transporting Renewable Resources, Inc. ("TRRI") as a "carrier" of bark for Precision Pine. PX316. TRRI is a trucking company that was a wholly-owned subsidiary of Precision Pine. Tr. 1930, 2042 (Porter). Thus, Precision Pine's "bark journal" indicates that a subsidiary was providing the company hauling services; it does not show bark sales to TRRI or to any third party. See PX3 16; Tr. 1930, 2042 (Porter); see also DX548; DX560-61.

**Plaintiff's Comment – See plaintiff's comment to DPFF 512. Defendant is incorrect as the Bark Ledger is composed of bi-weekly entries spanning two pages. One page itemizes the quantity of each shipment in the two-week period, and the second page shows the invoiced amounts. PX 316. The invoices on the second page shows payments to Precision Pine for bark. See Tr. 2654-55 (Ness). See also plaintiff's comment to DPFF 512.**

514. Precision Pine's financial statements show an average of $5.87 per mbf (l.t.) earned from sales of bark during FYE 1995 and FYE 1996 (i.e., from Apr. 1, 1994 to Mar. 31, 1996). DX831.

**Plaintiff's Comment – Defendant is incorrect. Defendant asserts that DX 831, a "summary" prepared by its disqualified expert, Mr. Adkins, shows that between April 1, 1994 and March 31, 1996, Precision Pine "earned only $5.87 per mbf (LT) from bark." D's Br. at 44. For all of the reasons set forth in Precision Pine's Motion to Strike, the work of Mr. Adkins should not be relied upon by the Court.**

**Moreover, once again Mr. Adkins' analysis does not support defendant's contention as the "summary" is actually for bark revenue received by Precision Pine between April 1, 1993 and March 31, 1995, i.e., two fiscal years that occurred prior to the suspension on August 25, 1995. DX 831. Defendant has cited no evidence that the price of bark was the same in the pre-suspension period as it was during the suspension.**

**By contrast, Precision Pine's financial statements during the suspension period support a price for bark of $8.23/mbf (LT) as calculated by Mr. Ness. That is, Precision Pine's financial statement for FYE 1996 shows total bark sales of $179,725.02 (PX 248). Based on corresponding total lumber production of 22,363,116 board feet (LT) (PX 246), this amounts to an average price of $8.03/mbf (LT). Similarly, Precision Pine's financial statement for FYE 1997 shows total bark sales in the amount of $98,738.54 (PX 248). Based on total lumber production in FYE 1997 of 12,260,475 board feet (LT) (PX 246), this amounts to an average price of $8.05/mbf. Thus, Mr. Ness' determination that but for the suspension, Precision Pine would have earned profits on bark at the rate of $8.23/mbf, which is within 2.4% of the actual rate of profits earned by Precision Pine during the suspension, is quite reasonable.**

### 3. Shavings

515. Precision Pine had no contract to sell the output of shavings produced by its planers. Tr. 1924-25 (Porter).

**Plaintiff's Comment – Mr. Porter did identify its customers for shavings by testifying that Precision Pine sold its shavings to Arabian horse farms in Scottsdale, Az. Tr. 617 (Porter). Moreover, as was the case with bark, Precision Pine maintained a Shavings Ledger wherein it recorded actual sales of shavings by invoice number. PX 316.**

516. Precision Pine has no invoices showing sales of shavings to customers. See Tr. 1934 (Porter).

**Plaintiff's Comment – See plaintiff's comment to DPFF 515. The entries on the Shavings Ledger (PX 317) are invoices for accounting purposes. See Tr. 2654-55 (Ness) (testifying with respect to the Bark Ledger (PX 316), which is identical in format to Shavings Ledger).**

517. Precision Pine's "shavings journal" identifies TRRI as a "carrier" of shavings for Precision Pine. PX316. Thus, Precision Pine's "shavings journal" indicates that a subsidiary was providing the company hauling services; it does not show shavings sales to TRRI or to any third parties. See PX316; Tr. 1930, 2042 (Porter); see also DX548; DX560-61.

**Plaintiff's Comment – (Plaintiff assumes that defendant intended to refer to PX 317, the Shavings Ledger in this paragraph, and not PX 316, the Bark Ledger.) Defendant is incorrect. The Shavings Ledger is composed of bi-weekly entries spanning two pages. One page itemizes the quantity of each shipment in the two-week period, and the second page shows the invoiced amount by week for the period. PX 317. Contrary to defendant's proposed finding, the invoices on the second page shows payments to Precision Pine for shavings. See Tr. 2654-55 (Ness).**

518. Precision Pine earned no revenue from the sale of shavings during FYE 1995 or FYE 1996 (i.e., from Apr. 1, 1994 to Mar 31, 1996). DX831.

**Plaintiff's Comment – Precision Pine's financial statements covering the suspension period disclose that during FYE 3/31/96 it earned $18,251 from the sale of shavings and in FYE 3/31/97 it earned $14,057.97. PX 248.**

**In support of its incorrect proposed finding, defendant purports to rely on a summary exhibit (DX 831) prepared by Mr. Adkins, its disqualified expert, which actually only covers a**

**period from 3/31/93 to 3/31/95, i.e., prior to the suspension period. For all of the reasons set forth in Precision Pine's Motion to Strike, the work of Mr. Adkins should not be relied upon by the Court.**

**Moreover, to the extent that defendant's citation to the pre-suspension financial statements are relevant to this issue, the financial statements show that, although Precision Pine did not have a specific line item for shavings sales at that time, it did record in excess of $286,000 in miscellaneous sales. Id. The logical conclusion is that prior to FYE 3/31/96 shaving sales were simply included in miscellaneous sales on the financial statements and, thereafter, broken out separately.**

519. Precision Pine's profit projections show no revenue being earned from sales of shavings. PX77, PX78; PX83; PX85; DX519, DX521-45.

**Plaintiff's Comment – The "profit projections" were never intended to be used as an exhaustive pro-forma of Precision Pine's operations. As noted in plaintiff's comment to DPFF 519, Precision Pine's financial statements covering the suspension period disclose revenue for shavings in both FYE 3/31/96 and in FYE 3/31/97. PX 248.**

520. Precision Pine owned and operated a "pellet plant" that made compressed wood pellets that were burned and used to heat homes. Tr. 1935 (Porter).

**Plaintiff's Comment – See plaintiff's comment to DPFF 521.**

521. Precision Pine used shavings produced by its planers at the company's pellet plant. Tr. 1935 (Porter); DX548; DX560-61.

**Plaintiff's Comment – The volumes shown in Precision Pine's Shavings Ledger (from which Mr. Ness derived Precision Pine's production rate for shavings (PPFF 129)) do not include amounts that went to the pellet plant. Tr. 1937 (Porter). Rather, the Shavings Ledger dealt with sales transactions involving invoice numbers and money changing hands. Tr. 2829 (Ness). The**

**uncontroverted evidence from the shavings ledger (PX 317) is that Precision Pine produced and sold to third parties .30 tons of shavings for every thousand board feet of lumber processed at its planer. PPFF 129.**

522. Precision Pine kept no record of the volume of shavings that it used in the company's pellet plant. Tr. 1935 (Porter).

**Plaintiff's Comment – See plaintiff's comment to DPFF 521. Even assuming this is true, it does not change the fact that the Shavings Ledger records the volume of shavings actually sold to third parties by Precision Pine during the suspension.**

523. Precision Pine also burned shavings in wood waste fired boilers at the company's sawmills. Tr. 1941 (Porter).

**Plaintiff's Comment – See plaintiff's comment to DPFF 521-22.**

**4. Grindings**

524. Precision Pine had no contract to sell the output of grindings (i.e., sawdust) produced by its sawmills. Tr. 1924-25 (Porter).

**Plaintiff's Comment – See plaintiff's comment to DPFF 511.**

525. Precision Pine has no invoices showing sales of grindings to customers. See Tr. 1934 (Porter).

526. Precision Pine maintained no "grindings journal" showing the volume of grindings produced. Tr. 1937-38, 2042 (Porter).

527. Precision Pine earned no revenue from the sale of grindings during FYE 1995 or FYE 1996 (i.e., from Apr. 1, 1994 to Mar 31, 1996). DX831.

**Plaintiff's Comment – Precision Pine's financial statement (PX 248) indicated amounts for "miscellaneous sales" that included the sale of grindings. See Tr. 2661 (Ness).**

528. Precision Pine's profit projections show no revenue being earned from the sale of grindings. PX77, PX78; PX83; PX85; DX519; DX521-45.

**Plaintiff's Comment – The profit projections do not show shavings revenue either, but, as noted above, the financial statements demonstrate that shavings were in fact sold by Precision Pine. PX 248, FYE 3/31/96 forward.**

529. Precision Pine burned grindings in wood waste fired boilers at the company's sawmills. Tr. 1932 (Porter); DX548; DX560; DX561.

**Plaintiff's Comment – See plaintiff's comment to DPFF 530.**

530. Precision Pine kept no record of what volume of grindings it used to fire its boilers and what volume, if any, it sold. Tr. 1933, 2042 (Porter).

**Plaintiff's Comment – Defendant has presented no evidence that grindings were ever burned as fuel at any facility except Winslow or that this ever occurred during the period of the suspension. See Tr. 1932 (Porter); DX 548, 560. By contrast, the uncontroverted testimony shows that Precision Pine produced and sold grindings. PPFF 127, 131.d. The fact that Precision Pine may have produced grindings that it used in its Winslow boiler does not affect the amount that was routinely sold to third parties.**

### K. Precision Pine's Planing Operations

531. In addition to rough cut lumber produced at its own sawmills, Precision Pine processed rough cut lumber from other (non-Precision Pine) sawmills in its planers. Tr. 1657 (Porter).

**Plaintiff's Comment – Mr. Porter testified that such occasions were rare (Tr. 1657 (Porter)) and defendant has cited no evidence that Precision Pine processed lumber at its planer from any source other than Precision Pine's sawmills at any time relevant to this case.**

532. Precision Pine purchased rough cut lumber from Mexico and other sources, and ran this material through the company's planers. Tr. 1657 (Porter).

**Plaintiff's Comment – See plaintiff's comment to DPFF 531.**

**M. Precision Pine's "Lost Volume Seller" Claims**

533. Bidding on timber sale contracts was always competitive. Tr. 1278 (Porter); see also Tr. 1741 (Precision Pine would compete "very strongly" with Stone); DX554 ("Don't give Stone anything over here").

**Plaintiff's Comment – From the late-1980s until the suspension occurred, the annual capacity of the sawmills that competed with Precision Pine for Forest Service timber in Northern Arizona decreased by 47 million feet (47 MMBF). PPFF 1406. In fact, at the time of the suspension, there were only two other sawmills that remained in competition with Precision Pine, the Reidhead sawmill in Nutrioso and the Stone sawmill in Eagar, both of which were proximate to and drew timber from the Apache-Sitgreaves National Forest. Id. As a result, there was effectively no competition for Forest Service timber sales for Precision Pine's sawmills in Heber or Winslow, which drew their source of supply primarily from the Tonto, the Coconino and the Kaibab National Forests. Id. As Dr. Neuberger correctly conceded: there had been a "dramatic" reduction in sawmill capacity competing with Precision Pine for Forest Service timber sales; given the location of the remaining competitors, Precision Pine may have been well-situated to obtain Forest Service timber sales offered on the Coconino, Tonto, Kaibab and the western half of the Apache-Sitgreaves National Forests; and, most importantly, Precision Pine was well-positioned to cut the timber it had under contract at the time of the suspension. Id.**

534. Precision Pine did not forego bidding on Forest Service timber sales, and did not forego other opportunities to acquire timber for its mills, in the post-suspension period. To the contrary, Precision Pine continued looking for profitable contracts after the MSO suspensions were lifted. Tr. 671-77, 1089 (Porter).

**Plaintiff's Comment – As defendant is well aware, the contention made (without citation) in the first sentence of the proposed finding is not correct as this is an issue that was presented to the Court in pre-trial motions and decided against the defendant. That is, defendant attempted, improperly, to make this same point for the first time in its pre-trial memorandum of facts and law by arguing that Precision Pine's answer to Request for Admission # 10 (in which it indicated that it had not forgone opportunities to obtain timber during the suspension period) somehow pertained to the post-suspension period as well. In response to the incorrect argument, Precision Pine filed on April 15, 2005 its Motion For Leave to File a Response to a New and Unexpected Matter Raised In Defendant's Memorandum of Facts and Law, which stated:**

> **Of course, when the suspension was lifted and the 10 timber sale contracts that remained suspended at the time were returned to Precision Pine in December of 1996, its need for timber to supply is mills during the immediate post-suspension period was to that extent, reduced. Had this not been the case, and had Precision Pine not suffered the substantial financial impacts of the 1995-1996 suspension that it did, Precision Pine could had would have procured considerably more timber than it did in the post-suspension period.**

**Id. Ex. 1 at p. 2. In an order dated April 29, 2005, this Court found that it was "reasonable and appropriate to permit plaintiff to supplement its response in this manner."**

**The testimony cited by defendant in support of the second sentence of the proposed finding from Mr. Porter is not to the contrary, because Precision Pine did continue to seek and obtain additional timber in the post-suspension period -- just not to the same extent that it would have had the breached sales been harvested to completion as would have been the case had the Forest Service not suspended them. Tr. 2105 (Porter). Additionally, at trial Precision Pine presented evidence**

**that because it still had the breached sales under contract after the suspension was lifted it did not need to purchase as much timber in the post-suspension period. Id.**

535. Precision Pine bid on timber sale contracts in calendar year 1997 and acquired six new contracts, including contracts with the Forest Service, the State of Arizona, and Indian tribes. Tr. 671-77, 1089 (Porter); see also PX248 (identifying sales under contract).

**Plaintiff's Comment – Precision Pine did continue to seek and obtain additional timber in the post-suspension period -- just not to the same extent that it would have had the breached sales been harvested to completion as would have been the case had the Forest Service not suspended them. Tr. 2105 (Porter). Additionally, at trial Precision Pine presented evidence that because it still had the breached sales under contract after the suspension was lifted it did not need to purchase as much timber in the post-suspension period. Id.**

536. Precision Pine would not have bid upon additional contracts had the MSO suspensions not occurred. Tr. 1288 (Porter) (stating that he was unable to identify any such contracts).

**Plaintiff's Comment – Defendant is incorrect. See plaintiff's comment to DPFF 534-35. Moreover, in an effort to support its incorrect proposed finding, defendant distorts Mr. Porter's testimony, which is as follows:**

> **Q: Can you identify any additional timber sale that, in your view, you would have been awarded, if the Mexican spotted owl suspensions had not occurred?**
>
> **A: The Forest Service had a list of sales that they were to bring up and a program. They told us which ones were to be brought up. If you could show me a list, you know, I might be able to show you which sales were coming up and which ones I would have bid on for which mill.**

**Tr. 1288 (Porter). Mr. Porter testified at trial that Precision Pine tried to keep a sizable backlog of timber under contact and would have continued to buy timber at a relatively constant rate, but for the suspension. Tr. 631-33 (Porter). The simple fact remains that Precision Pine did not need to**

**purchase as much timber in the immediate post-suspension period because the breached contracts remained available to it as it would have had the Forest Service not breached its contracts. Tr. 2105 (Porter).**

537. No additional contracts would have been awarded to Precision Pine by the Forest Service had the MSO suspensions not occurred. Tr. 1289 (Porter) (stating that he was unable to identify any such contracts).

**Plaintiff's Comment – Mr. Porter testified at trial that Precision Pine tried to keep a sizable backlog of timber under contact to supply future operations and that he would have continued to buy timber at a relatively constant rate, but for the suspension. Tr. 631-33 (Porter). <u>See</u> plaintiff's comment to DPFF 536.**

**Again, defendant has resorted to distorting Mr. Porter's testimony, which is as follows:**

> **Q: Can you identify any specific timber sale contracts that you would have bid on, but you did not bid on, as a result of the Mexican spotted owl suspensions?**
>
> **A: Not without some Forest Service documents in front of me.**

**Tr. 1288 (Porter). For obvious reasons, defendant did not provide Mr. Porter with the list of sales offered by the Forest Service in the post-suspension period.**

**N. <u>Logging Hauling And Stumpage Costs For Sawtimber</u>**

538. Brookbank, Hay, Jersey Horse, Manaco, Mud, O.D. Ridge, Salt and U-Bar are variably priced contracts. <u>See</u> PX169-72, PX174-75; PX177-78. The price index governing the escalation and de-escalation of stumpage prices for these contracts is the Western Wood Products Association's ("WWPA's"), Inland Rocky Mountain Ponderosa Pine index. First Joint Stip. ¶ 32.

539. During the period of the MSO suspensions (i.e., between August 25, 1995 and December 4, 1996), applicable WWPA index reached a low during the first quarter of 1996 and a high during the fourth quarter of 1996. PX305.

**Plaintiff's Comment – When lumber prices went down, Precision Pine received a corresponding decrease in its stumpage price (clause B[T]3.2), however, when lumber prices went up, Precision Pine only sustained a stumpage price increase corresponding to 50% of the lumber market price increase. Id.**

540. During the period of the MSO suspensions, the cost of timber from the Brookbank contract varied from $17.15 to $101.78. Tr. 4882; DX1010 at 3; see also PX172; PX305.

**Plaintiff's Comment – Correctly computed, the stumpage price for Ponderosa Pine sawlogs would have been $10.46 in the 1st quarter of 1996 and $96.40 in the 4th quarter of 1996, which is the portion of the suspension referred to in defendant's demonstrative exhibit and the cited testimony. See PPFF 1374. Moreover, during this entire time that the Ponderosa Pine lumber market as evidenced by the WWPA index was increasing, however, the price escalation clause in each of Precision Pine's escalated contracts only passed along one-half of any such increase in lumber prices to Precision Pine in the form a stumpage price increase. See PX 172, clause BT3.2. Thus, any increase in stumpage prices during 1996 was offset by even greater increases in the lumber market.**

541. During the period of the MSO suspensions, the cost of timber from the Hay contract varied from $140.78 to $175.00. Tr. 4882; DX1010 at 3; see also PX169; PX305.

**Plaintiff's Comment – Correctly computed, the stumpage price for Ponderosa Pine sawlogs would have been $137.78 in the 1st quarter of 1996 and $171.20 in the 4th quarter of 1996, which is the portion of the suspension referred to in defendant's demonstrative exhibit and the cited**

**testimony. See PPFF 1374. Moreover, during this entire time the Ponderosa Pine lumber market as evidenced by the WWPA index was increasing, however, the price escalation clause in each of Precision Pine's escalated contracts only passed along one-half of any such increase in lumber prices to Precision Pine in the form a stumpage price increase. See PX 169, Hay Timber Sale Contract at HAY-37, clause B3.2. Thus, any increase in stumpage prices in 1996 was offset by even greater increases in the lumber market.**

542. During the period of the MSO suspensions, the cost of timber from the Jersey Horse contract varied from $321.90 to $400.82. Tr. 4882; DX1010 at 3; see also PX170; PX305.

**Plaintiff's Comment – Correctly computed, the stumpage price for Ponderosa Pine sawlogs would have been $306.75 in the 1st quarter of 1996 and $380.79 in the 4th quarter of 1996, which is the portion of the suspension referred to in defendant's demonstrative exhibit and the cited testimony. See PPFF 1374. Moreover, during this entire time the Ponderosa Pine lumber market as evidenced by the WWPA index was increasing, however, the price escalation clause in each of Precision Pine's escalated contracts only passed along one-half of any such increase in lumber prices to Precision Pine in the form a stumpage price increase. See PX 170, Jersey Horse Timber Sale Contract at clause BT3.2. Thus, any increase in stumpage prices in 1996 was offset by even greater increases in the lumber market.**

543. During the period of the MSO suspensions, the cost of timber from the Manaco contract varied from $115.81 to $194.96. Tr. 4883; DX1010 at 3; see also PX178; PX305.

**Plaintiff's Comment – Correctly computed, the stumpage price for Ponderosa Pine sawlogs would have been $114.16 in the 1st quarter of 1996 and $190.62 in the 4th quarter of 1996, which is the portion of the suspension referred to in defendant's demonstrative exhibit and the cited testimony. See PPFF 1374. Moreover, during this entire time the Ponderosa Pine lumber market**

**as evidenced by the WWPA index was increasing, however, the price escalation clause in each of Precision Pine's escalated contracts only passed along one-half of any such increase in lumber prices to Precision Pine in the form a stumpage price increase. See PX 178, Manaco Timber Sale Contract at clause BT3.2. Thus, any increase in stumpage prices in 1996 was offset by even greater increases in the lumber market.**

544. During the period of the MSO suspensions, the cost of timber from the Mud contract varied from $46.18 to $140.62. Tr. 4883; DX1010 at 3; see also PX175; PX305.

**Plaintiff's Comment – Correctly computed, the stumpage price for Ponderosa Pine sawlogs would have been $16.07 in the 1st quarter of 1996 and $118.08 in the 4th quarter of 1996, which is the portion of the suspension referred to in defendant's demonstrative exhibit and the cited testimony. See PPFF 1374. Moreover, during this entire time the Ponderosa Pine lumber market as evidenced by the WWPA index was increasing, however, the price escalation clause in each of Precision Pine's escalated contracts only passed along one-half of any such increase in lumber prices to Precision Pine in the form a stumpage price increase. See PX 175, Mud Timber Sale Contract at clause BT3.2. Thus, any increase in stumpage prices in 1996 was offset by even greater increases in the lumber market.**

545. During the period of the MSO suspensions, the cost of timber from the O.D. Ridge contract varied from $273.52 to $325.77. Tr. 4883; DX1010 at 3; see also PX171; PX305.

**Plaintiff's Comment – Correctly computed, the stumpage price for Ponderosa Pine sawlogs would have been $259.76 in the 1st quarter of 1996 and $312.01 in the 4th quarter of 1996, which is the portion of the suspension referred to in defendant's demonstrative exhibit and the cited testimony. See PPFF 1374. Moreover, during this entire time the Ponderosa Pine lumber market as evidenced by the WWPA index was increasing, however, the price escalation clause in each of**

**Precision Pine's escalated contracts only passed along one-half of any such increase in lumber prices to Precision Pine in the form a stumpage price increase. See PX 171, O.D. Ridge Contract at clause BT3.2. Thus, any increase in stumpage prices in 1996 was offset by even greater increases in the lumber market.**

546. During the period of the MSO suspensions, the cost of timber from the Salt contract varied from $183.06 to $289.77. Tr. 4883; DX1010 at 3; see also PX177; PX305.

**Plaintiff's Comment – Correctly computed, the stumpage price for Ponderosa Pine sawlogs would have been $163.63 in the 1st quarter of 1996 and $268.13 in the 4th quarter of 1996, which is the portion of the suspension referred to in defendant's demonstrative exhibit and the cited testimony. See PPFF 1036. Moreover, during this entire time the Ponderosa Pine lumber market as evidenced by the WWPA index was increasing, however, the price escalation clause in each of Precision Pine's escalated contracts only passed along one-half of any such increase in lumber prices to Precision Pine in the form a stumpage price increase. See PX 177, Salt U-Bar Timber Sale Contract at clause BT3.2. Thus, any increase in stumpage prices in 1996 was offset by even greater increases in the lumber market.**

547. During the period of the MSO suspensions, the cost of timber from the U-Bar contract varied from $381.40 to $443.95. Tr. 4883; DX1010 at 3; see also PX174; PX305.

**Plaintiff's Comment – Correctly computed, the stumpage price for Ponderosa Pine sawlogs would have been $163.63 in the 1st quarter of 1996 and $268.13 in the 4th quarter of 1996, which is the portion of the suspension referred to in defendant's demonstrative exhibit and the cited testimony. See PPFF 1036. Moreover, during this entire time the Ponderosa Pine lumber market as evidenced by the WWPA index was increasing, however, the price escalation clause in each of Precision Pine's escalated contracts only passed along one-half of any such increase in lumber**

**prices to Precision Pine in the form a stumpage price increase. See PX 174, U-Bar Timber Sale Contract at clause BT3.2. Thus, any increase in stumpage prices in 1996 was offset by even greater increases in the lumber market.**

548. Precision Pine paid logging and hauling costs of $188.03 per mbf (l .s.) to cut and remove sawtimber from the Brookbank sale prior to the MSO suspensions. PX248 ($151,178 in FYE 1996); DX109 (1682 ccf); PX4 (0.4780 mbf/ccf).

**Plaintiff's Comment – Defendant apparently divided the dollar amount shown on Precision Pine's financial statements for contract logging and hauling by the amount of timber removed as reported by the Forest Service on the TSSAs. See PX 248; DX 109. Defendant's method is seriously flawed for several reasons:**

**First, there is no testimony establishing that Precision Pine accounted for logging and hauling expenses in the same period that the Forest Service accounted for volume harvested. Indeed, there is likely some discrepancy, because Precision Pine paid its logger at least 15-30 days after logging and hauling was complete. Tr. 1782 (Reidhead).**

**Second, because the actual volume removed from a tree measurement sale is never ascertained by the Forest Service, by definition, the Forest Service's volume figures reported on the TSSAs are always estimates. (All of the timber sales at issue except the Hay sale were tree measurement sales, as opposed to scaled sales. Tr. 124-26 (Porter).) The volumes reflected on Precision Pine's logger pay sheets, however, are not taken from the TSSAs but are based on an independent sample scale of the logs removed performed by Precision Pine at its mill yard. PPFF 1032. Thus, trying to determine a per mbf logging and hauling cost by dividing Precision Pine's costs that are based on Precision Pine's sample scale by the Forest Service's estimated volume is to mix apples and oranges.**

**Third, defendant's method produces absurd results. For example, according to the TSSAs, Precision Pine removed 92.52 mbf of sawlogs from the Hay sale between March 1994 and March 1995. PX 290, Vol. I, "Hay" tab (Statement No. 43 at 2 (March 1994), Statement No. 53 at 2 (April 1995). Using defendant's method for determining what Precision Pine paid its logger to harvest this small volume would produce a figure of $970/mbf. See DX 677 (showing $89,843.01 expended). Compared even to defendant's calculations, almost all of which are overstated at less than $200/mbf, such a sum for contract logging is beyond credibility. See paragraphs 549-555, infra.**

**Lastly, for six of the eight contracts for which defendant calculates a logging and hauling rate herein (DPFF 548-555), the amount derived differs from even the amount derived by defendant's own expert for the same sales. PPFF 1379A.**

549. Precision Pine paid logging and hauling costs of $93.70 per mbf (l.s.) to cut and remove sawtimber from the Hay sale prior to the MSO suspensions. See PX248; DX68.

**Plaintiff's Comment – Defendant's methodology for deriving the hauling and logging price is fundamentally flawed, because: (a) it assumes that Precision Pine paid for all hauling and logging in the same period as the estimated volume removed appeared on the TSSAs; (b) the methodology produces absurd results; and (c) the results derived are different than those derived by defendant's own expert. See plaintiff's comment to DPFF 548.**

550. Precision Pine paid logging and hauling costs of $234.24 per mbf (l.s.) to cut and remove sawtimber from the Jersey Horse sale prior to the MSO suspensions. PX248 ($14,406 for FYE 1996); DX128 (123 ccf).

**Plaintiff's Comment – Defendant's methodology for deriving the hauling and logging price is fundamentally flawed, because: (a) it assumes that Precision Pine paid for all hauling and logging in the same period as the estimated volume removed appeared on the TSSAs; (b) the Forest**

**Service and Precision Pine used different methods for calculating the volume removed from the sales, with the exception of the Hay sale; (c) the methodology produces absurd results; and (d) the results derived are different than those derived by defendant's own expert. See plaintiff's comment to DPFF 548.**

551. Precision Pine incurred logging and hauling costs of $162.03 per mbf (l.s.) to cut and remove sawtimber from the Kettle sale. PX248 ($115,847 for FYE 1998); DX31 (1504 ccf); PX5 (0.4757 mbf/ccf).

**Plaintiff's Comment – Defendant's methodology for deriving the hauling and logging price is fundamentally flawed, because: (a) it assumes that Precision Pine paid for all hauling and logging in the same period as the estimated volume removed appeared on the TSSAs; (b) the Forest Service and Precision Pine used different methods for calculating the volume removed from the sales, with the exception of the Hay sale; (c) the methodology produces absurd results; and (d) the results derived are different than those derived by defendant's own expert. See plaintiff's comment to DPFF 548.**

552. Precision Pine paid logging and hauling costs of $298.16 per mbf (l.s.) to cut and remove sawtimber from the Manaco sale prior to the MSO suspensions prior to the MSO suspensions. PX248 ($66,074 for FYE 1996); DX186 (652 ccf); PX10 (0.4845 mbf/ccf).

**Plaintiff's Comment – Defendant does not explain how it calculated the logging and hauling rate it asserts. Assuming, however, that defendant used the same formula as the surrounding paragraphs (DPFF 548-551, 553-555), that formula would produce $209.16, not $298.16.**

**In any event, defendant's methodology for deriving the hauling and logging price is fundamentally flawed, because: (a) it assumes that Precision Pine paid for all hauling and logging in the same period as the estimated volume removed appeared on the TSSAs; (b) the Forest Service**

**and Precision Pine used different methods for calculating the volume removed from the sales, with the exception of the Hay sale; (c) the methodology produces absurd results; and (d) the results derived are different than those derived by defendant's own expert. See plaintiff's comment to DPFF 548.**

553. Precision Pine paid logging and hauling costs of $185.38 per mbf (1.s.) to cut and remove sawtimber from the Mud sale during the period of the MSO suspensions. PX248 ($290,748 for FYE 1997); DX291 (3473 ccf); PX7 (0.4516 mbf/ccf).

**Plaintiff's Comment – Defendant's methodology for deriving the hauling and logging price is fundamentally flawed, because: (a) it assumes that Precision Pine paid for all hauling and logging in the same period as the estimated volume removed appeared on the TSSAs; (b) the Forest Service and Precision Pine used different methods for calculating the volume removed from the sales, with the exception of the Hay sale; (c) the methodology produces absurd results; and (d) the results derived are different than those derived by defendant's own expert. See plaintiff's comment to DPFF 548.**

554. Precision Pine paid logging and hauling costs of $94.86 per mbf (l.s.) to cut and remove sawtimber from the O.D. Ridge sale prior to the MSO suspensions. PX248 ($240,484 for FYE 1995); DX3 (2535 mbf).

**Plaintiff's Comment – Defendant's methodology for deriving the hauling and logging price is fundamentally flawed, because: (a) it assumes that Precision Pine paid for all hauling and logging in the same period as the estimated volume removed appeared on the TSSAs; (b) the Forest Service and Precision Pine used different methods for calculating the volume removed from the sales, with the exception of the Hay sale; (c) the methodology produces absurd results; and (d) the**

**results derived are different than those derived by defendant's own expert. See plaintiff's comment to DPFF 548.**

555. Precision Pine incurred logging and hauling costs of $150.03 per mbf (l.s,) to cut and remove sawtimber from the U-Bar sale prior to the MSO suspensions. PX248 ($185,891 for FYE 1996); DX407 (1239 mbf).

**Plaintiff's Comment – Defendant's methodology for deriving the hauling and logging price is fundamentally flawed, because: (a) it assumes that Precision Pine paid for all hauling and logging in the same period as the estimated volume removed appeared on the TSSAs; (b) the Forest Service and Precision Pine used different methods for calculating the volume removed from the sales, with the exception of the Hay sale; (c) the methodology produces absurd results; and (d) the results derived are different than those derived by defendant's own expert. See plaintiff's comment to DPFF 548.**

**O. Logging, Hauling And Stumpage Costs For Roundwood**

556. Precision Pine generally contracted with Tri-Star logging to cut and remove roundwood from its multi-product sale contracts. Tr. 1107-09 (Porter), 1771 (Reidhead); DX463.

**Plaintiff's Comment – Precision Pine does not use pulpwood in its operations (PPFF 269) and its goal with respect to pulpwood on the sales was to break even, which it accomplished in a variety of ways. That is, Precision Pine often agreed with Tri-Star that it would pay Precision Pine the stumpage rate for the pulpwood, haul the pulpwood at its own expense, sell the pulpwood as it could, and then retain any profits. PPFF 270. The lost profit claim for pulpwood in this matter belonged to Tri-Star and was based on the costs it would have incurred in harvesting the pulpwood. Tr. 2754 (Ness)**

**In addition to pulpwood removal and sale by Tri-Star, other companies and individuals also engaged in purchasing and removing pulpwood from Precision Pine's sales, including Stone Container, see DX 564 (Stone purchased 3,500 cords of pulpwood from Precision Pine at a price that would cover stumpage); Zellner, see Tr. 2989 (Tenney) (Zellner purchased hundreds if not thousands of cords of pulpwood);George Obarts, see Tr. 3870 (Harris) and Art Daley, see Tr. 3858 (Harris).**

557. The stumpage fee for roundwood on the contracts at issue was fixed at $9.40/ccf. See PX172-73; PX175-79.

**Plaintiff's Comment – This is not correct. The price for pulpwood on the Kettle sale was $6.50/ccf. PX 131, App. A at p. 10.**

558. The total amount owed by Precision Pine to the Forest Service for roundwood was $10.25 per ccf. PX13 1 (exhibit 4, at 27); see also PX131 (App. A at 9).

**Plaintiff's Comment – This is not correct. The total amount owed for pulpwood per ccf on each of the multi-product sales is set forth at PX 131, App. A at p. 10.**

559. The cost incurred by Tri-Star Logging to cut and remove roundwood from Precision Pine's multi-product sales was $49.17 per cord (or $62.45 per ccf). See Tr. 2598-99, 2841 (Ness); PX131 (exhibit 4) (using Mr. Ness's conversion factor of 1.27 cords/ccf).

**Plaintiff's Comment – Precision Pine agrees that the cost of pulpwood logging and hauling was incurred by Tri-Star.**

560. In order to make a profit from roundwood harvesting, Tri-Star Logging would have charged Precision Pine more than its actual logging and hauling cost for roundwood. Tr. 2843 (Ness).

**Plaintiff's Comment – The facts at trial demonstrated that Tri-Star (and other companies) bore the costs of harvesting pulpwood on Precision Pine's sales but also retained the profits. See plaintiff's comment to DPFF 556. The cited testimony of Mr. Ness is in response to a set of hypothetical assumptions posed to him by counsel. See Tr. 2841-43 (Ness).**

561. The total cost (stumpage, logging, and hauling) to Precision Pine to harvest the roundwood component of its multi-product sale contracts was not less than $75.00 per ccf. PX131 (exhibit 4 & App. A); Tr. 2597-99, 2754, 2843 (Ness).

**Plaintiff's Comment – The facts at trial demonstrated that Tri-Star (and other companies) not Precision Pine bore the costs of harvesting pulpwood on Precision Pine's sales but also retained the profits. See plaintiff's comment to DPFF 556.**

**The testimony cited in the proposed finding was based on hypothetical assumptions posed by counsel that were never proven. Tr. 2597, 2841-43 (Ness). Further, the asserted cost of $75.00 per ccf is never stated in Mr. Ness' testimony nor is it set forth in Mr. Ness' report and the methodology defendant used to arrive at this figure was also not established at trial. See Tr. 2598-99 (Ness).**

562. On those occasions when Precision Pine had arranged for Tri-Star to harvest roundwood, haul the roundwood to Stone, and accept payment for the roundwood directly from Stone, Tri-Star retained the full amount paid by Stone. Tri-Star made no remittance to Precision Pine to cover the stumpage Precision Pine owed to the Forest Service. Tr. 1730-31 (Reidhead).

**Plaintiff's Comment – Mr. Reidhead's testimony in this regard was that he did not "think" that Tri-Star remitted the stumpage, implying that he was not sure that was the case. Contrary**

**documentary evidence and testimony show that Mr. Reidhead was simply mistaken, and that Tri-Star would remit the stumpage price to Precision Pine. Tr. 1015-16 (Porter); PX 239; Tr. 2750-54 (Ness) (in calculating Tri-Star's pass-through claim, Mr. Ness relied on Mr. Reidhead's previous statements as well as Tri-Star documents that showed that Tri-Star absorbed pulpwood stumpage costs – i.e., remitted pulpwood stumpage payments to Precision Pine).**

563. Precision Pine was not usually able to cover the stumpage owed for roundwood. Tr. 1731 (Reidhead).

**Plaintiff's Comment – Defendant's reliance on Mr. Reidhead as the sole source of support for this statement is misplaced. See plaintiff's comment to DPFF 562.**

**P. Lumber Manufacturing Costs**

**1. The Winslow Sawmill**

564. The manufacturing cost that Mr. Porter projected to be incurred by the Winslow sawmill in his July 1995 profit projections was $75.00 per mbf (1.t.). DX814.

**Plaintiff's Comment – The only evidence cited in support of this proposed finding is a "summary" prepared by defendant's disqualified expert, Mr. Adkins. For all of the reasons set forth in Precision Pine's Motion to Strike, the work of Mr. Adkins should not be relied upon by the Court.**

**Moreover, although Mr. Adkins claimed to use the July 17, 1995 "profit projections" as the source of information, these projections, however, do not identify any specific manufacturing cost at any sawmill. See DX 521-526. To the extent that Mr. Adkins somehow calculated the costs at a given sawmill based on the 26 "profit projections," his methodology is not explained nor was he competent, in any event, to engage in such an exercise. Moreover, defendant has cited no evidence explaining how any of the sawmill costs on the "profit projections" were calculated or that they**

**were accurate. By contrast, Mr. Ness determined Precision Pine's direct manufacturing costs at each of its sawmill from actual expenses itemized in Precision Pine's financial statements during a 17-month period immediately prior to the suspension. PX 131, Ex. 10.**

565. The manufacturing cost incurred by the Winslow sawmill for the fiscal year ending March 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $91.42 per mbf (l.t.). DX814.

**Plaintiff's Comment – <u>See</u> plaintiff's comment to DPFF 564. During his review of Precision Pine's claim, Mr. Ness found that determining manufacturing costs during the suspension period based on the cost comparison reports was unreliable and so he used the actual historical cost data from Precision Pine's financial statements. PPFF 1144; Tr. 2177 (Ness); <u>see also</u> Tr. 718-19 (Porter). Mr. Ness, in fact, derived what Precision Pine's average manufacturing costs at each of its sawmills and its planer facility during the suspension should have been by using the detailed financial statements for the 17 months immediately preceding the suspension. PPFF 105.**

**Mr. Moosman tried to use the cost comparison reports to determine Precision Pine's manufacturing costs, but testified that he was unable to reconcile the costs as set forth on them with the actual costs set forth in Precision Pine's financial statements. PPFF 1145; Tr. 5204-06 (Moosman). Mr. Moosman further conceded that he had no idea for what purpose the cost comparison reports were prepared. PPFF 1145; Tr. 5197 (Moosman). In sum, there is simply no reason to accept a "summary" of the cost comparison reports as a better source of manufacturing cost data than the actual costs taken by Mr. Ness from Precision Pine's own financial statements**.

566. The manufacturing cost actually incurred by the Winslow sawmill between April 1, 1995 and August 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $121.66 per mbf (l.t.). DX814.

**Plaintiff's Comment – See plaintiff's comments to DPFF 564-65.**

567. The manufacturing cost incurred by the Winslow sawmill for the fiscal year ending March 31, 1996 (reported by Precision Pine in its contemporaneous cost comparison report) was $117.61 per mbf (1.t.). DX814.

**Plaintiff's Comment – See plaintiff's comments to DPFF 564-65. Moreover, the cost comparison reports from this period include more than seven months of the suspension period when one would expect higher cost at Precision Pine's sawmills.**

**2. The Heber Sawmill**

568. The manufacturing cost that Mr. Porter projected to be incurred by the Heber sawmill in his July 1995 profit projections was $70.00 per mbf (1.t.). DX814.

**Plaintiff's Comment – The only evidence cited in support of this proposed finding is a "summary" prepared by defendant's disqualified expert, Mr. Adkins. For all of the reasons set forth in Precision Pine's Motion to Strike, the work of Mr. Adkins should not be relied upon by the Court.**

**Moreover, although Mr. Adkins claimed to use the July 17, 1995 "profit projections" as the source of information, these projections, however, do not identify any specific manufacturing cost at any sawmill. See DX 521-26. To the extent that Mr. Adkins somehow calculated the costs at a given sawmill based on 26 "profit projections," his methodology is not explained nor was he competent, in any event, to engage in such an exercise. Moreover, defendant has cited no evidence explaining how any of the sawmill costs on the "profit projections" were calculated or that they were accurate. By contrast, Mr. Ness determined Precision Pine's direct manufacturing costs at each of its sawmills from actual expenses itemized in Precision Pine's financial statements during a 17-month period immediately prior to the suspension. PX 131, Ex. 10.**

569. The manufacturing cost incurred by the Heber sawmill for the fiscal year ending March 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $74.71 per mbf (l.t.). DX814.

**Plaintiff's Comment – See plaintiff's comment to DPFF 568. During his review of Precision Pine's claim, Mr. Ness found that determining manufacturing costs during the suspension period based on the cost comparison reports was unreliable and so he used the actual historical cost data from Precision Pine's financial statements. PPFF 1144; Tr. 2177 (Ness); see also Tr. 718-19 (Porter). Mr. Ness, in fact, derived what Precision Pine's average manufacturing costs at each of its sawmills and its planer facility during the suspension should have been by using the detailed financial statements for the 17 months immediately preceding the suspension. PPFF 105.**

**Mr. Moosman tried to use the cost comparison reports to determine Precision Pine's manufacturing costs, but testified that he was unable to reconcile the costs as set forth on them with the actual costs set forth in Precision Pine's financial statements. PPFF 1145; Tr. 5204-06 (Moosman). Mr. Moosman further conceded that he had no idea for what purpose the cost comparison reports were prepared. PPFF 1145 Tr. 5197 (Moosman). In sum, there is simply no reason to accept a "summary" of the cost comparison reports as a better source of manufacturing cost data than the actual costs taken by Mr. Ness from Precision Pine's own financial statements**.

570. The manufacturing cost actually incurred by the Heber sawmill between April 1, 1995 and August 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $75.58 per mbf (l.t.). DX814.

**Plaintiff's Comment – See plaintiff's comments to DPFF 568-69.**

571. The manufacturing cost incurred by the Heber sawmill for the fiscal year ending March 31, 1996 (reported by Precision Pine in its contemporaneous cost comparison report) was $79.86 per mbf (l.t.). DX814.

**Plaintiff's Comment – See plaintiff's comments to DPFF 568-69. Moreover, the cost comparison reports from this period include more than seven months of the suspension period when one would expect higher cost at Precision Pine's sawmills.**

572. The variable cost of manufacturing for the Heber sawmill (calculated from Precision Pine's year end financial statements) was $74.17 per mbf (l.t.). Tr. 4991 (Moosman); DX777 at 147.

**Plaintiff's Comment – The cited testimony does not support the proposed finding. Moreover, the variable cost of manufacturing is based solely on Mr. Moosman's botched efforts to separate fixed from variable costs on the cost comparison reports (not the financial statements) by performing his version of a regression analysis. See Tr. 5208-26 (Moosman). As noted above, the use of the cost comparison reports for any purpose is not supported by the evidence (see comment to DPFF 565), Mr. Moosman conceded that he had no idea for what purpose if any the cost comparison reports were used by Precision Pine (Tr. 5197 (Moosman)) and Mr. Ness specifically rejected their use as a source of sawmill cost data as being wholly unreliable. PPFF 1144; Tr. 2177 (Ness); see also Tr. 718-19 (Porter).**

**Mr. Moosman testified that in performing his "regression analysis" he merely input a total of just two data points for each of three years into an Excel program and "allowed Excel to do its calculation of the regression." Tr. 5208-09 (Moosman). Mr. Moosman conceded that the small number of data points he used was a "weakness" in his calculation of costs. Tr. 5211-12 (Moosman). Mr. Moosman further conceded that the results he obtained using his version of a regression analysis for costs at the Winslow sawmill was "pretty unreasonable" (Tr. 5212-5213 (Moosman)), a point recognized by the Court as well. Tr. 5214 (". . . cross-examination pointed out**

**certain, shall we say, weaknesses in the regression analysis"). Nevertheless, Mr. Moosman used the same unreliable regression analysis methodology in an effort to isolate fixed from variable costs on the cost comparison reports (which are themselves not accurate) at all of the sawmills and the planer. DX 777, pp. 145-159. Tr. 5226 (Moosman). In sum, Mr. Moosman's determination of variable costs has no probative value.**

**3. The Eagar Sawmill**

573. The manufacturing cost that Mr. Porter projected to be incurred by the Eagar sawmill in his July 1995 profit projections was $75.00 per mbf (l.t.). DX814.

**Plaintiff's Comment – The only evidence cited in support of this proposed finding is a "summary" prepared by defendant's disqualified expert, Mr. Adkins. For all of the reasons set forth in Precision Pine's Motion to Strike, the work of Mr. Adkins should not be relied upon by the Court.**

**Moreover, although Mr. Adkins claimed to use the July 17, 1995 "profit projections" as the source of information, these projections, however, do not identify any specific manufacturing cost at any sawmill. See DX 521-26. To the extent that Mr. Adkins somehow calculated the costs at a given sawmill based on 26 "profit projections," his methodology is not explained nor was he competent, in any event, to engage in such an exercise. Moreover, defendant has cited no evidence explaining how any of the sawmill costs on the "profit projections" were calculated or that they were accurate. By contrast, Mr. Ness determined Precision Pine's direct manufacturing costs at each of its sawmills from actual expenses itemized in Precision Pine's financial statements during a 17-month period immediately prior to the suspension. PX 131, Ex. 10.**

574. The manufacturing cost incurred by the Eagar sawmill for the fiscal year ending March 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $97.38 per mbf (l.t.). DX814.

**Plaintiff's Comment – See plaintiff's comment to DPFF 573. During his review of Precision Pine's claim, Mr. Ness found that determining manufacturing costs during the suspension period based on the cost comparison reports was unreliable and so he used the actual historical cost data from Precision Pine's financial statements. PPFF 1144; Tr. 2177 (Ness); see also Tr. 718-19 (Porter). Mr. Ness, in fact, derived what Precision Pine's average manufacturing costs at each of its sawmills and its planer facility during the suspension should have been by using the detailed financial statements for the 17 months immediately preceding the suspension. PPFF 105.**

**Mr. Moosman tried to use the cost comparison reports to determine Precision Pine's manufacturing costs, but testified that he was unable to reconcile the costs as set forth on them with the actual costs set forth in Precision Pine's financial statements. PPFF 1145; Tr. 5204-06 (Moosman). Mr. Moosman further conceded that he had no idea for what purpose the cost comparison reports were prepared. PPFF 1145; Tr. 5197 (Moosman). In sum, there is simply no reason to accept a "summary" of the cost comparison reports as a better source of manufacturing cost data than the actual costs taken by Mr. Ness from Precision Pine's own financial statements**.

575. The manufacturing cost actually incurred by the Heber sawmill between April 1, 1995 and August 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $80.00 per mbf (1.t.). DX814.

**Plaintiff's Comment – See plaintiff's comments to DPFF 573-74.**

576. The manufacturing cost incurred by the Heber sawmill for the fiscal year ending March 31, 1996 (reported by Precision Pine in its contemporaneous cost comparison report) was $95.36 per mbf (l.t.). DX814.

**Plaintiff's Comment – See plaintiff's comments to DPFF 573-74. Moreover, the cost comparison reports from this period include more than seven months of the suspension period when one would expect higher cost at Precision Pine's sawmills.**

577. The variable cost of production for the Eagar sawmill during the period of the MSO suspensions (calculated from Precision Pine's year end financial statements) was $85.57 per mbf (l.t.). Tr. 4991 (Moosman); DX777 at 149.

**Plaintiff's Comment – The cited testimony does not support the proposed finding. Moreover, the variable cost of manufacturing is based solely on Mr. Moosman's botched efforts to separate fixed from variable costs on the cost comparison reports (not the financial statements) by performing his version of a regression analysis. See Tr. 5208-26 (Moosman). As noted above, the use of the cost comparison reports for any purpose is not supported by the evidence (see comment to DPFF 565), Mr. Moosman conceded that he had no idea for what purpose if any the cost comparison reports were used by Precision Pine (Tr. 5197 (Moosman)) and Mr. Ness specifically rejected their use as a source of sawmill cost data as being wholly unreliable. PPFF 1144; Tr. 2177 (Ness); see also Tr. 718-19 (Porter).**

**Mr. Moosman testified that in performing his "regression analysis" he merely input a total of just two data points for each of three years into an Excel program and "allowed Excel to do its calculation of the regression." Tr. 5208-09 (Moosman). Mr. Moosman conceded that the small number of data points he used was a "weakness" in his calculation of costs. Tr. 5211-12 (Moosman). Mr. Moosman further conceded that the results he obtained using his version of a regression analysis for costs at the Winslow sawmill was "pretty unreasonable" (Tr. 5212-5213**

**(Moosman)), a point recognized by the Court as well. Tr. 5214 (". . . cross-examination pointed out certain, shall we say, weaknesses in the regression analysis"). Nevertheless, Mr. Moosman used the same unreliable regression analysis methodology in an effort to isolate fixed from variable costs on the cost comparison reports (which are themselves not accurate) at all of the sawmills and the planer. DX 777, pp. 145-159. Tr. 5226 (Moosman). In sum, Mr. Moosman's determination of variable costs has no probative value.**

**4. The Winslow Planer**

578. The manufacturing cost that Mr. Porter projected to be incurred by the Winslow planer in his July 1995 profit projections was $80.00 per mbf (1.t.). DX814.

**Plaintiff's Comment – The only evidence cited in support of this proposed finding is a "summary" prepared by defendant's disqualified expert, Mr. Adkins. For all of the reasons set forth in Precision Pine's Motion to Strike, the work of Mr. Adkins should not be relied upon by the Court.**

**Moreover, although Mr. Adkins claimed to use the July 17, 1995 "profit projections" as the source of information, the planer costs on these projections, however, vary from $75 to $93. See DX 521-526. To the extent that Mr. Adkins somehow calculated the costs at the planer based on 26 "profit projections," his methodology is not explained nor was he competent, in any event, to engage in such an exercise. Moreover, defendant has cited no evidence explaining how any of the planer costs on the "profit projections" were calculated or that they were accurate. By contrast, Mr. Ness determined Precision Pine's direct manufacturing costs at its planer based on actual expenses itemized in Precision Pine's financial statements during a 17-month period immediately prior to the suspension. PX 131, Ex. 10.**

579. The manufacturing cost incurred by the Winslow planer for the fiscal year ending March 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $69.28 per mbf (l.t.). DX8 14.

**Plaintiff's Comment – During his review of Precision Pine's claim, Mr. Ness found that determining manufacturing costs during the suspension period based on the cost comparison reports was unreliable and so he used the actual historical cost data from Precision Pine's financial statements. PPFF 1144; Tr. 2177 (Ness); see also Tr. 718-19 (Porter). Mr. Ness, in fact, derived what Precision Pine's average manufacturing costs at each of its sawmills and its planer facility during the suspension should have been by using the detailed financial statements for the 17 months immediately preceding the suspension. PPFF 105.**

**Mr. Moosman tried to use the cost comparison reports to determine Precision Pine's manufacturing costs, but testified that he was unable to reconcile the costs as set forth on them with the actual costs set forth in Precision Pine's financial statements. PPFF 1145; Tr. 5204-06 (Moosman). Mr. Moosman further conceded that he had no idea for what purpose the cost comparison reports were prepared. PPFF 1145; Tr. 5197 (Moosman). In sum, there is simply no reason to accept a "summary" of the cost comparison reports as a better source of manufacturing cost data than the actual costs taken by Mr. Ness from Precision Pine's own financial statements**.

580. The manufacturing cost actually incurred by the Winslow planer between April 1, 1995 and August 31, 1995 (reported by Precision Pine in its contemporaneous cost comparison report) was $58.14 per mbf (l.t.). DX8 14.

**Plaintiff's Comment – See plaintiff's comments to DPFF 578-79.**

581. The manufacturing cost incurred by the Winslow planer for the fiscal year ending March 31, 1996 (reported by Precision Pine in its contemporaneous cost comparison report) was $62.02 per mbf (l.t.). DX814.

**Plaintiff's Comment – See plaintiff's comments to DPFF 578-79. Moreover, the cost comparison reports from this period include more than seven months of the suspension period when one would expect higher cost at Precision Pine's sawmills.**

582. The variable cost of production for the Winslow planer during the period of the MSO suspensions (calculated from Precision Pine's year end financial statements) was $39.30 per mbf (l.t.). Tr. 4991 (Moosman); DX777 at 157.

**Plaintiff's Comment – The cited testimony does not support the proposed finding. Moreover, the variable cost of manufacturing is based solely on Mr. Moosman's botched efforts to separate fixed from variable costs on the cost comparison reports (not the financial statements) by performing his version of a regression analysis. See Tr. 5208-26 (Moosman). As noted above, the use of the cost comparison reports for any purpose is not supported by the evidence (see comment to DPFF 565), Mr. Moosman conceded that he had no idea for what purpose if any the cost comparison reports were used by Precision Pine (Tr. 5197 (Moosman)) and Mr. Ness specifically rejected their use as a source of manufacturing cost data as being wholly unreliable. PPFF 1144; Tr. 2177 (Ness); see also Tr. 718-19 (Porter).**

**Mr. Moosman testified that in performing his "regression analysis" he merely input a total of just two data points for each of three years into an Excel program and "allowed Excel to do its calculation of the regression." Tr. 5208-09 (Moosman). Mr. Moosman conceded that the small number of data points he used was a "weakness" in his calculation of costs. Tr. 5211-12 (Moosman). Mr. Moosman further conceded that the results he obtained using his version of a regression analysis for costs at the Winslow sawmill was "pretty unreasonable" (Tr. 5212-5213**

**(Moosman)), a point recognized by the Court as well. Tr. 5214 (". . . cross-examination pointed out certain, shall we say, weaknesses in the regression analysis"). Nevertheless, Mr. Moosman used the same unreliable regression analysis methodology in an effort to isolate fixed from variable costs on the cost comparison reports (which are themselves not accurate) at all of the sawmills and the planer. DX 777, pp. 145-159. Tr. 5226 (Moosman). In sum, Mr. Moosman's determination of variable costs has no probative value.**

## L. The Unprofitability Of Precision Pine's Contracts During The MSO Suspensions

583. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Brookbank contract would result in $238,187 in gross profits from lumber and by- products derived from the contract's sawtimber component. DX539. Because of Precision Pine's lack of an outlet for roundwood, harvesting the roundwood component of the Brookbank contract would resulted in a loss of at least $401,025. Third Joint Stip. ¶ 11; PX131 (exhibit 4); Tr. 2597-99, 2754, 2843 (Ness). Thus, even without accounting for general and administrative overhead costs, it would have been unprofitable for Precision Pine to harvest the Brookbank contract. See DX539; Third Joint Stip. ¶ 11; PX131 (exhibit 4); see also DX777 at 15 (calculating a loss for the Brookbank contract before deducting roundwood losses and general overhead).

**Plaintiff's Comment – The proposed finding is premised on a series of false assumptions including that the "worst case" analyses that Mr. Porter performed on July 17, 1995 were intended to be accurate predictions of profit. See DX 519, 521-45. These analyses, however, were never intended to show what Precision Pine actually estimated its profits would be. PPFF 227. Moreover, the July 1995 lumber prices, which were obtained several months prior to the suspension and which were surpassed during much of the suspension, are irrelevant to an accurate determination of the profitability of the sales during the suspension.**

**Compounding this fundamental error, defendant goes on to assume, without citation to any authority, that the costs of pulpwood harvesting would have been borne by Precision Pine. The evidence at trial demonstrated, however, that the costs of pulpwood harvest as well as any profits on pulpwood belonged to Tri-Star. PPFF 270, n.23. In fact, the claim for lost profits on pulpwood in this matter was Tri-Star's and not Precision Pine's. See Precision Pine, 63 Fed.Cl. 122, 139 (2004). Moreover, the evidence shows that because Precision Pine was able to retain or recover its stumpage costs for pulpwood, that pulpwood was a break-even proposition for Precision Pine. See, e.g., PPFF 270.**

**Further, even assuming that pulpwood ever became a financial liability for Precision Pine, there was considerable evidence that Precision Pine could have harvested most if not all of the sawlogs on the sale without removing much if any pulpwood. PPFF 271-74. Even assuming defendant's incorrect premise that Precision Pine would have incurred huge losses on pulpwood harvesting, Precision Pine could have invoked contract provision BT6.31 to relieve itself of the obligation to cut and remove pulpwood. PPFF 276-81.**

**Defendant's reliance on Mr. Ness' testimony is misplaced as it was provided in response to defendant's hypothetical inquiry regarding pulpwood, which included the incorrect assumptions that there was no outlet for pulpwood during the suspension and that cost of pulpwood harvest would have been borne by Precision Pine. Tr. 2597 (Harrington) ("I want you to assume for me that Precision Pine had no outlet for roundwood, but that it was still obligated under the contract to cut, pay for, and remove the roundwood from the sale"). Neither assumption is supported by the evidence and, as Mr. Ness repeatedly testified, defendant's assumption resulted in a comparison of apples and oranges that was not appropriate. Tr. 2600 (Ness).**

584. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Jersey Horse contract would result in a loss of $52,985. DX523.

**Plaintiff's Comment – The proposed finding is premised on a series of false assumptions including that the "worst case" analyses that Mr. Porter performed on July 17, 1995 were intended to be accurate predictions of profit. These analyses, however, were never intended to show what Precision Pine actually estimated its profits would be. <u>See</u> plaintiff's comment to DPFF 583. Moreover, the July 1995 lumber prices, which were obtained several months prior to the suspension and which were surpassed during much of the suspension, are irrelevant to an accurate determination of the profitability of the sales during the suspension. <u>Id.</u>**

585. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Kettle contract would result in $120,352 in gross profits from lumber and by- products derived from the contract's sawtimber component. DX525. Because of Precision Pine's lack of an outlet for roundwood, harvesting the roundwood component of the Kettle contract would have resulted in a loss of at least $296,850. Third Joint Stip. ¶ 21; PX131 (exhibit 4); Tr. 2597-99, 2754, 2843 (Ness). Thus, even without accounting for general and administrative overhead costs, it would have been unprofitable for Precision Pine to harvest the Kettle contract. <u>See</u> DX525; Third Joint Stip. ¶ 21; PX 131 (exhibit 4); <u>see also</u> DX777 at 15 (calculating a loss for the Kettle contract before deducting roundwood losses and general overhead); Tr. 3021 (Tenney); DX727 ("The Kettle timber sale we cannot sell the pulpwood. Stone's refuses to take the pulpwood, so it makes the logging costs prohibitive").

**Plaintiff's Comment – <u>See</u> plaintiff's comment to DPFF 583. Additionally, although Stone did not take pulpwood from time to time, it always resumed accepting deliveries of pulpwood. Tr. 1742 (Reidhead); Tr. 685 (Porter); PPFF 270. Thus, even assuming that Stone was not taking pulpwood from Kettle in December of 1995 as indicated on DX 727, the fact remains that Stone subsequently took large quantities of pulpwood from the Kettle sale. PX 290, Vol. II, "Kettle" tab, Statement Nos. 13, 14, 15 (TSSAs showing large quantities of pulpwood harvested); PX 117 (Contract whereby Stone purchased the Kettle sale).**

586. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Manaco contract would result in $43,277 in gross profits from lumber and by- products derived from the contract's sawtimber component. DX524. Because of Precision Pine's lack of an outlet for roundwood, harvesting the roundwood component of the Manaco contract would have resulted in a loss of at least $101,100. Third Joint Stip. ¶ 15; PX131 (exhibit 4); Tr. 2597-99, 2754, 2843 (Ness). Thus, even without accounting for general and administrative overhead costs, it would have been unprofitable for Precision Pine to harvest the Manaco contract. DX524; Third Joint Stip. ¶ 15; PX131 (exhibit 4); see also DX777 at 15 (calculating a loss for the Manaco contract before deducting roundwood losses and general overhead).

**Plaintiff's Comment – See plaintiff's comment to DPFF 583. With respect to the cited calculations in Mr. Moosman's report (DX 777 at 15), Mr. Moosman himself disavowed their accuracy. Tr. 5247-49 (Moosman) (Q: Do you know if [the chart on page 15 of your report] is correct? A: Now, I know that it is incorrect). Additionally, Mr. Moosman bases much of his report on the wholly incorrect assumption that the July 17, 1995 "profit projections" were an attempt to accurately determine the profitability of the contracts, which they were not. PPFF 1381.**

587. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Monument contract would result in $20,437 in gross profits from lumber and by- products derived from the contract's sawtimber component. DX532. Because of Precision Pine's lack of an outlet for roundwood, harvesting the roundwood component of the Monument contract would have resulted in a loss of at least $82,500. Third Joint Stip. ¶ 2; PX131 (exhibit 4); Tr. 2597-99, 2754, 2843 (Ness). Thus, even without accounting for general and administrative overhead costs, it would have been unprofitable for Precision Pine to harvest the Monument contract. See DX532; Third Joint Stip. ¶ 2; PX131 (exhibit 4).

**Plaintiff's Comment – <u>See</u> plaintiff's comment to DPFF 583. With respect to the cited calculations in Mr. Moosman's report (DX 777 at 15), Mr. Moosman himself disavowed their accuracy. Tr. 5247-49 (Moosman) (Q: Do you know if [the chart on page 15 of your report] is correct? A: Now, I know that it is incorrect). Additionally, Mr. Moosman bases much of his report on the wholly incorrect assumption that the July 17, 1995 "profit projections" were an attempt to accurately determine the profitability of the contracts, which they were not. PPFF 1381.**

588. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Mud contract would result in $211,913 in gross profits from lumber and by- products derived from the contract's sawtimber component. DX533. Because of Precision Pine's lack of an outlet for roundwood, harvesting the roundwood component of the Mud contract would have resulted in a loss of at least $304,500. Third Joint Stip. ¶ 4; PX131 (exhibit 4); Tr. 2597-99, 2754, 2843 (Ness). Thus, even without accounting for general and administrative overhead costs, it would have been unprofitable for Precision Pine to harvest the Mud contract. <u>See</u> DX533; Third Joint Stip. ¶ 4; PX131 (exhibit 4); <u>see also</u> DX777 at 15 (calculating a loss for the Mud contract before deducting roundwood losses and general overhead).

**Plaintiff's Comment – <u>See</u> plaintiff's comment to DPFF 583. With respect to the cited calculations in Mr. Moosman's report (DX 777 at 15), Mr. Moosman himself disavowed their accuracy. Tr. 5247-49 (Moosman) (Q: Do you know if [the chart on page 15 of your report] is correct? A: Now, I know that it is incorrect). Additionally, Mr. Moosman bases much of his report on the wholly incorrect assumption that the July 17, 1995 "profit projections" were an attempt to accurately determine the profitability of the contracts, which they were not. PPFF 1381.**

589. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Saginaw-Kennedy contract would result in $68,028 in gross profits from lumber and by-products derived from the contract's sawtimber component. DX534. Because of Precision Pine's lack of an outlet

for roundwood, harvesting the roundwood component of the Saginaw-Kennedy contract would have resulted in a loss of at least $124,350. Third Joint Stip. ¶ 6; PX131 (exhibit 4); Tr. 2597-99, 2754, 2843 (Ness). Thus, even without accounting for general and administrative overhead costs, it would have been unprofitable for Precision Pine to harvest the Saginaw-Kennedy contract. See DX534; Third Joint Stip. ¶ 6; PX131 (exhibit 4); see also DX777 at 15 (calculating a loss for the Saginaw-Kennedy contract before deducting roundwood losses and general overhead).

**Plaintiff's Comment – See plaintiff's comment to DPFF 583. With respect to the cited calculations in Mr. Moosman's report (DX 777 at 15), Mr. Moosman himself disavowed their accuracy. Tr. 5247-49 (Moosman) (Q: Do you know if [the chart on page 15 of your report] is correct? A: Now, I know that it is incorrect). Additionally, Mr. Moosman bases much of his report on the wholly incorrect assumption that the July 17, 1995 "profit projections" were an attempt to accurately determine the profitability of the contracts, which they were not. PPFF 1381.**

590. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the Salt contract would result in a loss of $94,387 from lumber and by-products derived from the contract's sawtimber component. DX526. Because of Precision Pine's lack of an outlet for roundwood, harvesting the roundwood component of the Salt contract would have resulted in an additional loss of at least $137,625. Third Joint Stip. ¶ 17; PX131 (exhibit 4); Tr. 2597-99, 2754, 2843 (Ness). Thus, even without accounting for general and administrative overhead costs, it would have been unprofitable for Precision Pine to harvest the Salt contract. DX526; Third Joint Stip. ¶ 17; PX131 (exhibit 4); see also DX777 at 15 (calculating a loss for the Salt contract before deducting roundwood losses and general overhead).

**Plaintiff's Comment – With respect to the cited calculations in Mr. Moosman's report (DX 777 at 15), Mr. Moosman himself disavowed their accuracy. Tr. 5247-49 (Moosman) (Q: Do you know if [the chart on page 15 of your report] is correct? A: Now, I know that it is incorrect).**

**Additionally, Mr. Moosman bases much of his report on the wholly incorrect assumption that the July 17, 1995 "profit projections" were an attempt to accurately determine the profitability of the contracts, which they were not. PPFF 1381.**

591. Based upon second quarter 1995 lumber prices, Precision Pine projected that harvesting the U-Bar contract would result in a loss of $22,494. DX535-36.

**Plaintiff's Comment – The proposed finding is premised on a series of false assumptions including that the "worst case" analyses that Mr. Porter performed on July 17, 1995 were intended to be accurate predictions of profit. These analyses, however, were never intended to show what Precision Pine actually estimated its profits would be. <u>See</u> plaintiff's comment to DPFF 583. Moreover, the July 1995 lumber prices, which were obtained several months prior to the suspension and which were surpassed during much of the suspension, are irrelevant to an accurate determination of the profitability of the sales during the suspension. <u>Id.</u>**

**<u>Concluding Note</u>: Even under defendant's incorrect assumptions designed to improperly drive down the profitability of Precision Pine's contracts, defendant does not assert that that the Hay or O.D. Ridge timber sales would have been unprofitable.**

## V. <u>ADDITIONAL FACTS CONCERNING SAWMILL INEFFICIENCY COSTS</u>

592. Precision Pine had no plan for the production of a specified volume of lumber at any of its sawmills. <u>See</u> Tr. 1433, 1480, 1482-83, 2101-02 (Porter); DX505.

**Plaintiff's Comment – This is not correct. For a variety of reasons, Precision Pine could have and would have operated at or near capacity and produced approximately 34.7 MMBF on an annualized during the suspension but for the Forest Service's breach. <u>See</u> PPFF 68-70, 182-184, 246.**

593. The Park sale, which was awarded to Precision Pine by the State of Arizona, was unaffected by the MSO suspensions. Tr. 1841 (Porter).

**Plaintiff's Comment – The Park sale was not suspended as a result of the injunction entered in Silver v. Thomas.**

594. Precision Pine often closed mills in late winter or early spring for maintenance or due to a shortage of logs. See DX798; Tr. 2102-03 (Porter).

**Plaintiff's Comment – Defendant's proposed finding is not supported by the evidence cited. Mr. Porter testified that the log inventory would be at is lowest in April not that Precision Pine would shut down due to a log shortage. DX 798 shows short term shutdowns occurring at various times.**

## VI. ADDITIONAL FACTS CONCERNING REIMBURSEMENT PURSUANT TO CT6.01

### A. Claim Preparation Costs

595. Mr. Porter, Mr. Tenney and Ms. Kehret were salaried employees of Precision Pine. Tr. 1883 (Porter); see also Tr. 1886-87 (Porter) (the sum paid by Precision Pine to an employee would not change because the employee was working on a claim letters).

**Plaintiff's Comment – Defendant attempts mischaracterize Mr. Porter's testimony. Mr. Porter testified strongly that having salaried employees work on claim letters was a cost to Precision Pine. Tr. 1886-87 (Porter).**

596. Mr. Porter, Mr. Tenney and Ms. Kehret were not paid overtime for work performed on Precision Pine's claim letters. Tr. 1883 (Porter).

**Plaintiff's Comment – Defendant attempts mischaracterize Mr. Porter's testimony. Mr. Porter testified strongly that having salaried employees work on claim letters was a cost to Precision Pine. Tr. 1886-87 (Porter).**

597. None of Precision Pine's claim letters included receipts or other documents verifying actual expenditures in connection with the preparation of claim letters by Precision Pine employees. Tr. 1884-85 (Porter); PX194; PX196; PX198; PX200; PX202; PX204; PX206; PX208; PX210; PX212; PX214; PX216; PX218; PX220.

**Plaintiff's Comment – Mr. Porter testified that he personally instructed his employees to keep track of the time each spent in gathering information and preparing the claim letters and to submit documentation to him of those hours. PPFF 396. It was based on this documentation that Mr. Porter personally calculated the expenses incurred by Precision Pine in preparing its claims. Id. Mr. Ness reviewed these calculations and refined them further. PPFF 398-400. Notably, defendant does not dispute the hourly rate of any employee or the amount of time each employee spent in helping to prepare the claims. Indeed, given the sheer volume of data and complexity of Precision Pine's claim letters (see, e.g., PX 194), the expenses Precision Pine seeks to recover for the preparation of the claim letters for the 13 contracts containing CT6.01 in the total amount of $23,219.04 are quite modest.**

598. Precision Pine's claim letters were not submitted to facilitate performance of the timber sale contracts. Tr. 1885-86 (Porter).

**Plaintiff's Comment – Precision Pine's need to submit claim letters was caused directly by the suspension. Indeed, the Forest Service demanded that formal claim letters be prepared and submitted by Precision Pine before it would even consider any of Precision Pine's damages. PPFF 394.**

**B. Bond Costs**

599. Precision Pine did not seek bond costs in its claim concerning the suspension of the St. Joe contract. See PX200.

600. Precision Pine did not seek bond costs in its claim concerning the suspension of the Hay contract. See PX204.

601. The Hay contract does not contain clause CT 6.01. See PX169.

**C. Move Out Costs**

602. Tri-Star Logging did not charge Precision Pine to move between timber sales. See Tr. 1729-31 (Reidhead), 233 (Porter).

**Plaintiff's Comment – The testimony cited does not support the proposed finding. Moreover, Precision Pine did not appeal is claim for move-out costs to this Court because the government paid them.**

603. Precision Pine would allegedly have moved off the Brookbank sale even if the MSO suspensions had not occurred. DX131 (App. A at 4); DX1004; see also Tr. 2091 (Porter) (DX1004 shows the harvesting schedule used by Mr. Ness in greater detail).

**Plaintiff's Comment – See plaintiff's comment to DPFF 602. Plaintiff assumes defendant meant to refer to PX131.**

604. Precision Pine's claim letter regarding the Brookbank contract does not include any receipts or other documents verifying actual expenditures incurred in moving off the Brookbank sale. See PX196.

**Plaintiff's Comment – See plaintiff's comment to DPFF 602.**

**D. Interest**

605. Contract clause CT 4.23 provides for a refund of cash balances in certain circumstances. Tr. 1909 (Porter).

606. The Forest Service did not deny any refund of cash balances owed to Precision Pine pursuant to CT 4.23. Tr. 1911 (Porter).

607. The contracts contain no provision that requires the Forest Service to pay interest on "cash balances." Tr. 1910 (stipulation by counsel).

**Plaintiff's Comment – Plaintiff's claim for interest is not being made under CT4.23.**

608. Contract clause CT4.222 allows a refund of 95 percent of the contractually required downpayment in certain circumstances. Tr. 1906 (Porter).

609. The Forest Service refunded downpayments when sought by Precision Pine in accordance with CT 4.222. Tr. 1908 (Porter).

610. The contracts contain no provision that directs the Forest Service to pay interest on contract downpayments. See Tr. 1906-07 (Porter).

**Plaintiff's Comment – This is not correct. Mr. Porter only testified that CT4.222 did not provide for the recovery of interest. Tr. 1906-07. Contract clause CT6.01 provides that the Forest Service will pay costs incurred as a direct result of the suspension, and interest on money in contract accounts held by the Forest Service during a suspension is one such cost routinely paid by the Forest Service. PPFF 395.**

611. Precision Pine made no payment to the Forest Service to obtain the effective purchaser credit. Tr. 1911 (stipulation by counsel).

**Plaintiff's Comment – Precision Pine earned the purchaser credit by building roads that were retained by the Forest Service. Tr. 1911.**

612. The contracts contain no provision that directs the Forest Service to pay interest on the effective purchaser credit. Tr. 1911, 1913 (stipulation by counsel).

**Plaintiff's Comment – No such stipulation was made; counsel merely stated that the clause relating to effective purchaser credit does not provide for the payment of interest thereon. Tr. 1911, 1913 (referring to the earlier stipulation). Contract clause CT6.01 provides that the Forest Service will pay costs incurred as a direct result of the suspension, and interest on money in contract accounts held by the Forest Service during a suspension is one such cost routinely paid by the Forest Service. PPFF 395.**

**E. Snow Removal Costs**

613. In 1995, Precision Pine sought Forest Service permission to continue timber harvesting upon the St. Joe and Hutch-Boondock contracts after the end of the normal operating season. See Tr. 1915 (Porter).

614. The Forest Service granted Precision Pine's request to continue harvesting after the end of the normal operating season. See Tr. 1915 (Porter).

615. Precision Pine incurred snow removal costs because harvesting operations on St. Joe and Hutch-Boondock were allowed to continue after the normal operating season. Tr. 1915 (Porter).

**Plaintiff's Comment – Precision Pine seeks $1,207.27 in snow removal costs that it incurred to access the Hutch-Boondock, St. Joe and South Black Aspen timber sales due to the suspension. Tr. 2205 (Ness). At the time of the suspension, Precision Pine had no intention of harvesting any of these sales in the winter of 1996. PX 131, App. A at 4. Indeed, as no harvesting had been projected for these sales in the absence of the suspension, operations on them took place in the winter of 1996 only because they were among the few sources of timber available to Precision Pine at that time. See Tr. 1916-17 (Porter). Had there been no suspension, Precision Pine would not have harvested these sales in the winter of 1996 (id.) and, therefore, would not have incurred snow removal costs on**

**them. Accordingly, these items of damages for snow removal in January of 1996, which were incurred and paid by Precision Pine as a direct result of the suspension, are fully recoverable.**

**Moreover, these costs are also costs of mitigation, because Precision Pine incurred them in an attempt to keep its operations going and avoid even larger losses in the very difficult circumstances foisted on it by the Forest Service's simultaneous breach of 12 of its contracts. Accordingly, the burden shifts to defendant to prove that Precision Pine was unreasonable in incurring these costs, something about which defendant has presented no evidence.**

**F. Log Transfer Costs**

616. Precision Pine had no planer at its Eagar sawmill. DX798. As a result, Precision Pine would have had to haul rough green lumber milled at Eagar to the company's planer in Winslow, Arizona. Tr. 1918 (Porter).

**Plaintiff's Comment – The cost of the green lumber haul from Eagar to Winslow was $25/mbf (LT). Tr. 760 (Porter). There were 4½ truck loads of logs transferred from Eagar to Winslow. See Tr. 2207 (Ness). At 4 mbf/load (LS) (Tr. 781(Porter)), Precision Pine transferred 18 mbf (LS) which converts to 22.5 mbf (LT) from Eagar to Winslow. Thus, the green lumber haul saved by virtue of the log transfer would have been $562.50, and the direct log transfer cost of $1,375 should be reduced by this amount and revised to $812.50 plus overhead of 7.6% and profit of 10% for a total recoverable cost of $955.50.**

Respectfully submitted,

s/Alan I. Saltman

SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
Bryan T. Bunting
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: November 14, 2005