**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-720C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S MOTION TO STRIKE "SUMMARY" EXHIBITS OF DEFENDANT'S DISQUALIFIED EXPERT, CHARLES ADKINS**

At trial, the defendant proffered Mr. Charles Adkins as an expert in the area of "Cost Engineering." The Court correctly determined, however, that Mr. Adkins was not qualified to testify under FRE 702 as interpreted by Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993). Tr. 3691-92. Accordingly, Mr. Adkins' testimony and reports (DX 778 and DX 797) were not admitted into evidence. The next day defendant argued, for the first time, that several of the exhibits to Mr. Adkins' reports were really "summaries" under FRE 1006, and re-called Mr. Adkins as a purported lay witness to testify about the exhibits. See Tr. 3979-4092. The Court permitted Mr. Adkins to testify in this lay capacity, and admitted several of the exhibits from Mr. Adkins' report as summaries pursuant to FRE 1006.[1] Id.; see DX 804-14, 818-17, 820, 822-23, 824-837 (the "Adkins Exhibits"). Having had no

[1]Defendant's back-door attempt to admit the Adkins exhibits as summaries did not comply with the Rules of the Court Federal Claims, which requires that the offering party "shall provide" such exhibits to opposing counsel by the early meeting of counsel that should occur no later than 63 days before the pretrial conference. Appendix A, ¶13(b). At that time, offering counsel is also "required" to provide a statement for each such exhibit:

> describing the source(s) for the items or figures listed (e.g., ledgers, journals, payrolls, invoices, checks, time cards, etc.), the location(s) of the source(s), the time when the source(s) may be examined or audited by the opposing party, the name and address of the

advance warning of the alleged "summary" nature of the exhibits, in the midst of trial, plaintiff was unable to fully prepare to meet a motion to admit the Adkins Exhibits as summaries. It is now apparent that the foundational elements of certain of the Adkins Exhibits are lacking. Specifically, as demonstrated below, many of the exhibits: (1) do not accurately summarize the underlying documents that they purport to summarize (FRE 1006); (2) contain inadmissible opinion evidence (FRE 702);[2] and/or (3) are so misleading that their probative value is substantially outweighed by the danger of prejudice (FRE 403).[3]

A. **DX 805**. DX 805 purports to be a summary of "Gross Profit Projections" for 14 contracts as set forth on the July 17, 1995 projections. At trial, Mr. Adkins claimed that the footnote on DX 805 referred to the fact that he had to derive the data he used for the Ponderosa Pine on the O.D. Ridge sale from other sources because "there was not a July 17, 1995 profit projection for the O.D. Ridge sale." Tr. 3983 (Adkins). There is, in fact, a July 17, 1995 profit projection for Ponderosa Pine on the O.D. Ridge sale (see DX 537) which Mr. Adkins failed to consider and from which Mr. Adkins' calculations

---

> person(s) who prepared each summary and who will be made available to the opposing party during any examination or audit for the source material to provide information and explanations necessary for verification of the information in the summary.

Id. (emphasis added). Importantly, the sanction for an unexcused failure to comply with Paragraph 13(b) is exclusion of the exhibit. Id. Here, defendant first identified the exhibits as "summaries" at trial, the exhibits have never contained a statement as required by Paragraph 13(b) nor was Precision Pine afforded an opportunity before trial, to audit the summaries. Accordingly, Precision Pine continues to believe that all of Mr. Adkins' summaries should be disregarded by the Court.

[2]Because a summary exhibit must summarize otherwise admissible evidence pursuant to FRE 1006, it follows that a party should not be permitted to bootstrap inadmissible opinion evidence simply by dressing the opinion as a summary. See 31 Wright & Gold, FEDERAL PRACTICE & PROCEDURE § 8043 at 532 (2000) (citing United States v. Gold, 743 F.2d 800, 816 (11th Cir. 1984)); United States v. Selig, 622 F.2d 207 (6th Cir. 1980).

[3]Where a summary "cherry picks" certain data from underlying documents or includes data not contained in the underlying documents, the summaries may be so prejudicial as to outweigh their probative value. See 31 Wright & Gold, FEDERAL PRACTICE & PROCEDURE § 8043 at 526-27 (2000).

significantly diverged. Compare DX 805 with DX 537. Accordingly, DX 805 should be stricken because it ignores data that could properly have been included in the summary in favor of undisclosed calculations of Mr. Adkins.

Moreover, in DX 805 Mr. Adkins arrives at total gross profit percentages using three contracts that are not even the subject of Precision Pine's breach claims and excludes all by-products revenue from the gross profits on all of the sales. Why this is appropriate or even relevant to a gross profit calculation is not disclosed on the exhibit. Because DX 805 is based on unexplained calculations that Mr. Adkins performed without the requisite expertise to do so, it should be stricken.

B. **DX 808.** DX 808 purports to be a calculation of "revenue - unit price," and the column titled "expert report" purports to be a summary of Mr. Ness' calculations of unit price.[4] For reasons not explained, however, the revenue figures used were before Mr. Ness' deductions for prompt payment discounts and freight. Mr. Adkins used these figures despite Mr. Ness' testimony that accounting for prompt payment discounts and freight was both appropriate and necessary (Tr. 2264 (Ness)), and despite Mr. Ness actually having made such deductions in his report. PX 131, Ex. 4. No rationale for doing so is provided on the "summary." Thus, the summary misstates Mr. Ness' calculations and creates a misleading comparison with the July 1995 "profit projections," which eliminates any probative value of the exhibit. DX 808 should, therefore, be stricken.

C. **DX 810.** DX 810 is a table labeled "costs - unit price," and like DX 808, Mr. Adkins again sets forth a column labeled "expert report." Mr. Adkins testified that the figures in the "expert report"

[4]DX 807-812 claim to compare different aspects of the "July 1995 profit projections" with Precision Pine's February 2003 claim and Mr. Ness' report. At trial, however, defendant withdrew any reliance on information on these exhibits related to the February 2003 claim (Tr. 3991) and the Court ruled that it would disregard all information on the exhibits related to the 2003 claim. Tr. 3993.

column are intended to summarize the costs per mbf as set forth in Mr. Ness' report (PX 131). Tr. 3986-87 (Adkins). The figures shown on Mr. Adkins' chart, however, do not appear anywhere in Mr. Ness' calculation of costs. Compare PX 131, Ex. 4, App. A with DX 810.[5] The foundation for admitting DX 810 pursuant to FRE 1006 is therefore lacking.

Moreover, even if the figures on DX 810 could somehow be derived from the figures in Mr. Ness' expert report, such calculations would require expertise that Mr. Adkins lacked. Specifically, such calculation would require combining certain costs that are kept on a per mbf (LS) basis with other costs kept on a per mbf (LT) basis. This would require expertise that, as this Court has found, Mr. Adkins lacks. Moreover, to the extent that Mr. Adkins attempts to summarize all costs, including stumpage (which of course varies by quarter), defendant has provided no explanation of how Mr. Adkins calculated the total stumpage cost by quarter by sale and then applied those calculations in the process of deriving an average cost per undefined unit for each sale. Based on the above, DX 810 should also be excluded as inadmissible opinion evidence.

D. **DX 812.** DX 812 purports to compare gross profits per unit price as set forth in Precision Pine's July 1995 "profit projections" and as set forth in Mr. Ness' original report. Like DX 808 and 810, however, DX 812 does not accurately reflect the data that it purports to summarize, contains inadmissible opinion evidence, and misstates plaintiff's expert's opinion, thereby providing a misleading comparison. Specifically, like DX 808, DX 812 misstates plaintiff's expert's opinion by using data before reduction for prompt payment discounts and freight, which, as noted, was inappropriate in plaintiff's expert's opinion. Also, like DX 810, DX 812 does not summarize any figures presented in Mr. Ness' expert

[5] Again, because plaintiff did not know that defendant intended to proffer this exhibit as a summary, plaintiff had no opportunity until after trial to audit the data on the exhibit in this manner, see, e.g., Tr. 3990-91 (not permitting entry-by-entry verification of figures at trial).

report, and even if the figures on DX 812 could be derived from other figures in Mr. Ness' expert report, such calculations would require expertise that Mr. Adkins lacks. For all these reasons, DX 812 should be excluded.

E. **DX 814.** Defendant cites to DX 814 to support its allegation that the cost comparison reports show higher costs than were determined by Mr. Ness, but the source for DX 814 (the cost comparison for FYE 1996) includes data from the suspension period when one would expect higher costs at Precision Pine's sawmills. Of course, this is not an accurate means of determining what Precision Pine's costs would have been "but for the suspension." Moreover, there is no testimony as to the reliability of the cost comparison reports for any purpose, let alone the use to which defendant wishes to put them. PPFF 1054. Indeed, another of defendant's experts, Mr. Moosman tried to use the cost comparison reports to determine plaintiff's manufacturing costs, but was unable to reconcile the figures on the report with the actual costs set forth in Precision Pine's financial statements. PPFF 1054. Thus, defendant's use of DX 814 demonstrates that this exhibit was not intended to summarize voluminous data, but instead intended to offer a competing expert opinion. This, however, Mr. Adkins was not qualified to do and DX 814 should, therefore, be barred as inadmissible opinion.

F. **DX 817.** DX 817 purports to show the amount of 4/4 moulding and shop lumber that was produced at the Heber and Winslow sawmills, i.e., before planing. The exhibit reveals nothing, however, about the amount of lumber that was ultimately graded and sold as 4/4 moulding or shop. In this regard, production records for all of the sawmills place 4/4 cut lumber into one of the four following categories: moulding, shop, commons, or random lengths and widths. PX 18-20 (sawmill production records for Eagar (a/k/a/ Round Valley), Heber and Winslow). These lumber products, and certainly the shop and moulding grades, are typically sold after going through the planer. Tr. 129 (Porter). As Mr. Porter testified, however, most 4/4 lumber was sold in the rough, i.e., not planed. Tr. 1672, 1681 (Porter).

Moreover, even for that relatively small amount of 4/4 material that was sent to planer, the graderman made the final determination as to what category the lumber would be sold in only after the lumber went through the planer. Tr. 129 (Porter). As even Mr. Adkins conceded, DX 817 only shows what was on the sawmill production report, but the ultimate grading of lumber only takes place at the planer. Tr. 4021-22 (Adkins). Thus, the sawmill production records reveal nothing about the amount of 4/4 shop and moulding grade lumber ultimately produced and sold by Precision Pine, and based on the testimony of Mr. Porter regarding the actual production at Precision Pine, the amount of such lumber is much less than even the small amounts initially shown on the sawmill records. Accordingly, the sawmill production records as summarized by Mr. Adkins have no probative value to any contested matter in this case and should be disregarded.

G. **DX 825-828.** The calculations shown on DX 825-828 which claim to show "historical average" and "historical maximum" log inventory at Precision Pine are purportedly based on the period April 1994 to August 1995 (a fact that Mr. Adkins could not even recall until prompted by counsel for defendant to refer to a portion of his "expert" report that was never received in evidence). Tr. 4061-63. The probative value of these calculations is practically nil given that: (1) the "historical" data for Precision Pine that Mr. Adkins selected covers a period of a little over one year for a company that has been in continuous existence since 1984; (2) there was no evidence that the log decks during this relatively brief period were typical or representative of Precision Pine's practices; and (3) the historical experience at Precision Pine, in fact, contradicts Mr. Adkins' "summary." See Tr. 5699-700 (Ness) (discussing log inventory of between six to ten mmbf at Precision Pine). Accordingly, DX 825 should be stricken.

H. **DX 831.** According to defendant, DX 831 shows that between April 1, 1994 and March 31, 1996, a period which covered seven of the 16 months of the suspension, plaintiff "earned only $5.87 per

mbf (LT) from bark. " D's Br. at 44. Mr. Adkins' "summary," however, is actually for bark revenue received by plaintiff between April 1, 1993 and March 31, 1995, i.e., two fiscal years that occurred prior to the suspension on August 25, 1995. DX 831. Moreover, defendant presented no evidence that the price of bark was the same during the suspension as it was prior thereto. In short, defendant misstates the contents of DX 831 in an effort to give it probative value that it does not have. Thus, because DX 831 has no probative value with respect to prices at any time relevant to this case, and it has been used in a misleading way in defendant's brief, its inclusion in this case would be unduly prejudicial to Precision Pine.[6]

I. **DX 832.** DX 832 purports to contain a summary of the percentage of the timber originally sold under the breached contracts that was ultimately harvested. The calculation, however, contains errors and is far from a simple summary of information set forth elsewhere. For example, with respect to the Mud sale, although Mr. Adkins claims to be summarizing data from Mr. Ness' report (see PX 131, Ex. 9 at p. 1), Mr. Adkins did not use the correct starting volume as shown on Mr. Ness' report for that sale but instead reduced the volume on the sale by nearly 1 mmbf based on judgments that he neither explained nor had the expertise to make. Moreover, DX 832 claims that the Mud sale was not completely harvested by Precision Pine, even though the evidence at trial demonstrated that the contract was harvested to completion and subsequently closed by the Forest Service. Tr. 4688 (Panks); compare PX 290, Vol. III, "Mud" tab, Statement No. 32 at 2 (showing volume removed) with PX 175 at MUD-3 (showing volume to be cut). Indeed, another of Mr. Adkins' own "summaries" indicates that the Mud sale was "fully harvested." DX 834. For these reasons, DX 832 fails to comply with both FRE 1006 and 702, and should be stricken.

[6]Defendant again misstates the contents of DX 831 in its discussion of shavings revenue and grinding revenue. See D's Br. at 45-46.

Mr. Adkins' calculations of the volume harvested also ignore the fact that the Kettle sale was the subject of a third-party agreement, approved by the Forest Service, whereby Precision Pine transferred all of the remaining timber on the contract to Stone in 1997. PX 117-118. Thus, to claim, as Mr. Adkins does through his summary, that Precision Pine left nearly 2 mmbf of timber "unharvested" is misleading in the extreme, because Stone was fully obligated to complete the contract. A proper application of Mr. Ness' actual volume figures and the correction of errors made by Mr. Adkins results in a considerably higher percentage of timber harvested than that claimed by Mr. Adkins in his "summary." The prejudicial value of DX 832, therefore, outweighs its probative value.

J. **DX 834.** In DX 834, Mr. Adkins claims to have compared the "unit net revenue per mbf" on eight of the breached sales from Mr. Ness' original report to that in Mr. Ness' supplemental report. The summary, however, is unreliable in several respects. First, the foundation for DX 834 is lacking, because even though it purports to use data from Mr. Ness' report, it has not done so. For example, had Mr. Adkins actually used Mr. Ness' numbers with respect to the Mud sale, even without including by-product revenue, the revenue/mbf (LS) should be $473.71 (see PX 131, Ex. 4, p. 27: $1,468,029.28 in lumber sales/3,099 mbf (LS)). Yet, Mr. Adkins, for reasons that are not explained, determines that the revenue/mbf (LS) is $458.55. The exhibit therefore contains defective calculations and/or is the product of judgments that Mr. Adkins was not qualified to make. In either event it should be disregarded.

DX 834 also purports to compare the "aggregate net revenue" (not profit) on the sales during the suspension with the post-suspension period. By doing so, the summary does not account for any costs on the sales. Of course, without taking costs into account, the profitability of the sales cannot be assessed. DX 834 also arrives at an average price/mbf (LS) on a simple average basis thereby giving undue weight to small, higher priced sales. Additionally, the net revenue line used by Mr. Adkins does not include by-product revenue which the evidence showed would have been a center of pure profit during the

suspension period (PPFF 135), but which was considerably less profitable in the post-suspension period. These misleading characteristics of the exhibit fatally undermine its probative value in this matter and it should, therefore, be stricken.

**CONCLUSION**

For the reasons stated above, plaintiff respectfully requests that the Court strike the Adkins Exhibits.

Respectfully submitted,

s/Alan I. Saltman

SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
Bryan T. Bunting
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: November 14, 2005