IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S ADDITIONAL PROPOSED FINDINGS OF FACT**

Pursuant to the Court's November 18, 2005 order, defendant, the United States, respectfully submits this response to plaintiff's additional proposed findings of fact.

## DISCUSSION

### I. Plaintiff's Filing Is Primarily Legal Argument

Plaintiff's additional proposed findings of fact consists largely of argument – not proposed factual findings. E.g., Pl.'s Add'l PFOF ¶¶ 1091-93 (arguing that "4/4 shop and moulding material are hybrid products" that do not belong in the "normal shop" categories); id. ¶ 1269 (arguing that "even counsel for defendant had a grasp" on a particular point); see also id. ¶¶ 1032, 1130, 1144-45, 1206-07, 1243-44, 1247, 1285-87, 1290, 1380-82, 1406. Precision Pine's attempt to use this filing to present new arguments, and to expand upon arguments made in its post-trial response brief, is improper. Accordingly, the Court should strike or, in the alternative, disregard the arguments presented by Precision Pine. The United States nevertheless offers a brief response to Precision Pine's arguments below.[1]

[1] Precision Pine's filing is 21 pages using an 11-point font. The United States has been given a 10-page response. Order of Judge George W. Miller at 1 (Nov. 18, 2005). As a result, the United States has not addressed every point raised by Precision Pine. This should not

(continued...)

## II. The Court Should Rely Upon Contemporaneous Documents – Not Self-Serving, After-The-Fact Testimony

It is a well-established legal principle, as well as a matter of common sense, that records made by a party before a dispute has arisen should be given great weight. See, e.g., Montgomery Coca Cola Bottling Co. v. United States, 222 Ct. Cl. 356, 615 F.2d 1318, 1327-28 (1980) (citing United States v. Gypsum Co., 333 U.S. 364 (1947)). For this reason, contemporaneous documents are afforded far greater probative value than post-hoc, self-serving testimony. E.g., Applied Companies v. United States, 144 F.3d 1470, 1474-75 (Fed. Cir. 1998); Burns v. Secretary of DHHS, 3 F.3d 415, 417 (Fed. Cir. 1993); see also Cucuras v. Secretary of DHHS, 993 F.2d 1525, 1528 (Fed. Cir. 1993) ("oral testimony in conflict with contemporaneous documentary evidence deserves little weight"); Wilner v. United States, 23 Cl. Ct. 241, 261 n.15 (1991) (branding damages calculations as "suspect" where plaintiff's expert relied solely upon "conversations with plaintiff"); Argus, Inc. v. Eastman Kodak Co., 801 F.2d 38, 42 (2d Cir. 1986) ("The failure of business management to note at the time what is later claimed by its lawyers . . . weighs heavily against such a claim"), cert. denied, 479 U.S. 1088 (1987). Despite this basic principle, Precision Pine repeatedly argues that the Court should disregard the company's contemporaneous reports and records.

Looking only at its most recent filing, Precision Pine attempts to discredit no fewer than five kinds of contemporaneous company records: (1) monthly cost comparison reports, Pl.'s Add'l PFOF ¶¶ 1144-45; (2) the Winslow Sales Journal, id. ¶ 1093; (3) a summary of operations prepared by company vice president Lewis Tenney, id. ¶ 1247; (4) company records

[1](...continued)
be construed as agreement with Precision Pine's proposed factual findings or legal arguments.

showing that Precision Pine developed and used contract-specific factors to convert from hundred cubic feet ("ccf") to thousand board feet ("mbf"), id. ¶ 1206; and (5) Mr. Porter's July 1995 profit projections, id. ¶¶ 1380-85. Similarly, Precision Pine argues that the Forest Service's monthly Timber Sale Statements of Account ("TSSAs") are unreliable. The Court should reject Precision Pine's attempt to build a case using self-serving, post-hoc testimony that is contrary to numerous, contemporaneous documents.

## III. Defendant's Response To Specific Issues Raised By Precision Pine

### A. Paragraph 1032 (TSSAs)

Precision Pine argues that monthly Forest Service TSSAs show only an "estimated" volume of timber removed from a Forest Service sale. This new argument is contrary to the manner in which this action has been litigated. During discovery, Precision Pine informed the Court that the TSSAs were "totally correct." Tr. 118 (Oct. 1, 2003). Precision Pine subsequently introduced the TSSAs into evidence at trial, Tr. 845 (admitting PX290), relied upon TSSAs as the basis for its own calculations, see Tr. 729-33, and used the TSSAs as the basis for the parties' volume stipulations, compare PX290 and Third Joint Stip. ¶¶ 1-23 (filed June 3, 2005). Apparently, it is only when the United States invokes the TSSAs – as the United States did to demonstrate that Precision Pine's damages calculations understate logging and hauling costs, see Def.'s Br. at 42 (citing DPFOF ¶¶ 548-55) – that Precision Pine considers them to be inaccurate. Precision Pine cannot have it both ways.

**B. Paragraphs 1091-93 (4/4" Molding And Shop Products)**

Without citing testimony or record evidence, Precision Pine asserts that 4/4" shop and 4/4" molding are "hybrid lumber products." Using this "evidence" as a starting point, Precision Pine argues that a company secretary incorrectly aggregated 5/4" products and 4/4" products in the Winslow Sales Journal. Consequently, Precision Pine maintains that it was justified in ignoring the product prices in its comprehensive sales journal.

Precision Pine has in fact identified no error in entering data in the Winslow Sales Journal. To the contrary, Precision Pine deliberately combined 5/4" and 4/4" products in its journal entries over a period of at least seven years. See PX294 (using the following categories from 1994 to 2000: "5/4 & 4/4 Clear & Molding," "5/4 & 4/4 #1 Shop," "5/4 & 4/4 #2 Shop" and "5/4 & 4/4 #3 Shop"); Tr. 1671 (Porter) (testifying that he would expect 5/4" and 4/4" material to be combined in these categories). Indeed, Precision Pine embraces the Winslow Sales Journal when it comes to developing a product mix. The sales journal was both the starting point and ending point for Mr. Porter's analysis. See Tr. 1312-12, 1316-19 (Porter) (testifying that he did not change the mix derived from Winslow Sales Journal data).

Precision Pine's inconsistent treatment of the Winslow Sales Journal – using it to arrive at a product mix, but rejecting it as a basis to establish product prices – has significant implications. In arriving at a product mix, Precision Pine takes advantage of the fact that the Winslow Sales Journal combines 5/4" and 4/4" material to boost the percentage of high-value shop and molding products. On the other hand, in developing lumber product sale prices, Precision Pine disregards the Winslow Sales Journal and, instead, averages sale invoices for 5/4" products. See Tr. 1674, 1679-80 (conceding that Precision Pine ignored 4/4" sales invoices

because the prices were lower). The ultimate effect is to treat 4/4" products as being sold at 5/4" prices. Precision Pine should not be permitted to increase putative profits by such sleight of hand.

**C. Paragraphs 1144-45 (Cost Comparison Reports)**

Precision Pine asserts that Mr. Ness rejected the use of "cost comparison reports" in his analysis. Mr. Ness offered no such opinion. See Tr. 2177 (Ness) (questioning only the use of "target costs or projected costs"). Precision Pine's argument confuses two distinct reports that the company's accounting staff prepared each month: "goal reports" and "cost comparison reports." See DX505 (goal report for Apr. 1995); DX802 (cost comparison report for Sept. 1995). Precision Pine's goal reports project anticipated mill usage and anticipated costs. See DX505. On the other hand, Precision Pine's cost comparison reports show actual costs for the past month and the year-to-date. See DX802.

While Precision Pine would naturally prefer that its damages be calculated using Mr. Ness's lower cost figures, Mr. Ness acknowledged that he used only some cost categories to arrive at a figure for mill costs. Tr. 2264-65 (Ness). Precision Pine's cost comparison reports provide the more complete picture. See DX802; DX814.

**D. Paragraph 1167 (Alleged Damages)**

As explained in our post-trial briefs, Precision Pine is not entitled to recover lumber profits because such profits result from an independent and collateral undertaking and are precluded by Precision Pine's election to continue the contracts at issue. E.g., Def.'s Br. at 9-15. Additionally, Precision Pine has failed to use a valid but for model to establish alleged net profits with reasonable certainty. Id. at 30-48.

**E. Paragraph 1206 (Conversion Factor)**

Precision Pine suggests that a 0.5000 ccf-to-mbf conversion factor is appropriate. However, Precision Pine acknowledges that it and the Forest Service developed (and used) contract specific conversion factors.[2] Contract-specific conversion factors are employed because, as Mr. Porter acknowledged, there is no fixed factor for converting from ccf to mbf and a contract specific number is more accurate. Tr. 1616-17 (Porter). Mr. Porter suggests that a rule-of-thumb estimate would be good enough, but this is hardly surprising as the less accurate approach increases Precision Pine's claimed damages. See Def.'s Br. at 36. Indeed, Mr. Porter himself opted to use the Forest Service's contract-specific conversion factor when he had important calculations to perform. See DX587 (using the Forest Service factor to determine what Precision Pine was owed for selling the Kettle sale to Stone).

**F. Paragraphs 1241-44 (Annual Operating Schedule For 1995)**

It is a contractual requirement for timber purchasers to submit an annual operating schedule to the Forest Service. PX169-79 (BT6.31). Precision Pine provided the Forest Service an annual operating schedule in early 1995.[3] DX294. However, Precision Pine bases its damages claims upon an entirely different operating schedule. See PX131 (App. A).

---

[2] Precision Pine asserts that "defendant's own experts did not use" the Forest Service contract-specific conversion factor. Precision Pine neglects to mention that defendant's experts adopted the contract-specific conversion factors that Precision Pine used in contemporaneous business records. Tr. 3465 (Neuberger), 5132 (Moosman).

[3] Mr. Porter testified that Precision Pine knowingly submitted a false operating schedule to the Forest Service in 1995. Tr. 1633 (Porter). Precision Pine's intentional misrepresentation constitutes a breach of Precision Pine's contractual obligations and an additional reason that damages should be unavailable in this action.

Precision Pine argues that its operating schedule was "subject to change" and that it could alter the schedule without Forest Service consent. However, Precision Pine proffered no evidence that it did in fact submit a revised schedule for 1995. Consequently, as explained in our post-trial brief, Precision Pine should be precluded from using a harvesting schedule different than that provided to the Forest Service as the basis for its claims in this action. Def.'s Br. at 34.

**G. Paragraph 1246 (Harvesting The Manaco Sale)**

Precision Pine avers that Mr. Porter did not project timber harvesting on the Manaco sale between May 6 and July 9, 1996. However, Precision Pine fails to cite testimony by Mr. Porter projecting harvesting of Manaco at any time. This is not an oversight. Although Mr. Porter was responsible for Precision Pine's timber harvesting, Mr. Porter testified that he did not know when (or if) Precision Pine would have harvested the Manaco sale "but for" the MSO suspensions.[4] See Tr. 1436, 1442-48 (Porter).

The "evidence" that Precision Pine does cite is inapposite. Precision Pine points only to testimony by David Harris, a demonstrative exhibit, and Mr. Ness's expert report. Neither the demonstrative exhibit, nor Mr. Ness's report, provide substantive evidence regarding Precision Pine's harvesting plans. And Mr. Harris was merely describing the schedule in the demonstrative exhibit – not a harvesting plan received from Precision Pine. Tr. 4171 (Harris).

**H. Paragraph 1282-83 (Log Inventory)**

Precision Pine cites only Mr. Ness to support proposed findings of fact regarding the company's historic practices, the log inventory that mill owners find excessive, and the steps that

---

[4] Likewise, Mr. Porter was unable to state if or when Precision Pine would have harvested other contracts had the MSO suspensions not occurred. Tr. 1442-48 (Porter).

Precision Pine would have taken to prevent "blue stain" if it had a large log inventory. Because Precision Pine does not rely upon testimony by Mr. Porter, Mr. Tenney, John Smith or any other witness with personal knowledge, the proposed findings are not supported.

As explained in our post-trial briefs, Mr. Ness testified as an expert and, therefore, is not qualified to provide the factual predicate for Precision Pine's claims. Def.'s Resp. Br. at 30. Mr. Ness never worked for Precision Pine and has no knowledge about industry practices in the southwestern United States. Tr. 2170 (Ness). Furthermore, Mr. Ness's statements are contrary to the testimony of John Smith, a long-time Precision Pine employee who testified that the company never wanted more than a two to three week inventory of logs at its sawmills during the summer. Smith Dep. Tr. 24, 26-28.

**I. Paragraph 1284 (Cash Flow)**

Precision Pine asserts that Mr. Ness "dismissed" the notion that "substantial cash flow problems" would have resulted from his model. Notably, however, Precision Pine does not suggest that it had sufficient cash to follow Mr. Ness's "harvest and hold" model. Rather, Precision Pine boldly asserts that "it would have been very easy" to obtain financing to build larger log inventories. Mr. Ness did no analysis concerning the ability of Precision Pine to obtain additional financing in 1995 or 1996. PX131. Moreover, even if financing would have been available, Mr. Ness failed to take financing costs into account in his damages model. Id.

**J. Paragraph 1291 (Milling Schedule)**

Precision Pine cites an example that purports to demonstrate that a different milling schedule could increase its claimed damages. Yet after having over four months to carefully analyze Mr. Ness's model, the best example that Precision Pine could muster increased claimed

damages by a mere $12,192. The decrease in damages that the United States identified at trial was more than three times as large. See DX1005.

Moreover, Precision Pine's example demonstrates that minor modifications to the milling schedule result in significant changes to the distribution of claimed damages among the contracts at issue. As explained in our post-trial brief, even if lumber profits are potentially recoverable, profits upon all of the contracts at issue cannot be recovered. See Def.'s Br. at 25-26. Therefore, it is essential to correctly identify what profits, if any, are attributable to each of the respective contracts. The "arbitrary" milling schedule used by Mr. Ness does not do so.

**K. Paragraph 1374 (Stumpage Prices)**

Precision Pine provides a table that purports to show the stumpage price owed to the Forest Service for timber harvested from each contract. Precision Pine cites no testimony or other record evidence verifying the prices in the table. Significantly, the stumpage prices in Precision Pine's table do not reflect all costs owed to the Forest Service for timber cut and removed from the contracts at issue. See Tr. 4880-83; DX1010 at 3. Furthermore, the costs in the table do not consistently match the "log costs" used by Mr. Ness. Compare Pl.'s Add'l PFOF ¶ 1374 with PX131 (exhibit 4). In any event, Precision Pine's table plainly shows that stumpage prices vary dramatically over time and, therefore, that the use of a true "but for" harvesting schedule is critical. Mr. Ness does not use such a schedule. Tr. 2622, 2626 (Ness).

**L. Paragraphs 1380-85 (July 1995 Profit Projections)**

Once again, Precision Pine desperately attempts to distance itself from the profit projections that Mr. Porter prepared before, during and after the MSO suspensions. At trial, Mr. Porter testified that he changed the overrun factor to make the July 1995 projections a

"worst-case scenario."[5] Tr. 3132-34 (Porter). No other inputs to the profit projections were altered. Id. Precision Pine now concedes that Mr. Porter projected sawmill and planing costs that are nearly double the costs used by Mr. Ness. Precision Pine has apparently recognized that Mr. Ness failed to project accurate sawmill and planing costs in his analysis. See section III.A., supra.

**M. Paragraphs 1403-05 (Contracting Officer Experience)**

Precision Pine notes the number of years that Mr. Harris, Ms. Lee and Mr. Dils had been contracting officers as of August 1995. Precision Pine disregards that each of these witnesses had well over 10 years experience with the Forest Service timber sale program before becoming a contracting officer. See Tr. 3730-46 (Harris) (18 years), 4549-53 (Lee) (15 years), 4584-89 (Dils) (14 years). In addition, Mr. Harris, Ms. Lee and Mr. Dils continued performing work for the Forest Service, including work as contracting officers for the timber sale program, after August 1995.

**N. Paragraph 1406 (Competition)**

Precision Pine asserts that there was "effectively no competition" for Forest Service timber in the Tonto, Coconino and Kaibab National Forests at the time of the MSO suspensions. Mr. Porter's testimony that "[i]t was always competitive," even as companies were shutting down sawmills in the early 1990s, contradicts this proposed finding of fact. Tr. 1278 (Porter).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

[5] As explained in our post-trial briefs, there is ample reason to question this testimony. Def.'s Resp. Br. at 48-49.

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

s/ David A. Harrington

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Attorneys for Defendant

OF COUNSEL:

PATRICIA L. DISERT
LORI POLIN JONES
Office of the General Counsel
U.S. Department of Agriculture

December 15, 2005