# In the United States Court of Federal Claims

| | |
|---|---|
| PRECISION PINE & TIMBER, INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 98-720 C<br>Filed January 23, 2006 |

ORDER

On January 13, 2006, the Court held a status conference in *Precision Pine & Timber, Inc. v. United States*, Fed. Cl. No. 02-131C. During the status conference, counsel for the parties in Fed. Cl. No. 02-131C, who are also counsel for the parties in this case, requested that the Court identify questions that it would like the parties in this case to address during the closing argument scheduled for February 17, 2006. The Court ORDERS that the parties shall be prepared to address the following questions during closing argument:

**Defendant**

1. Does defendant allege that the 135-day period before which defendant claims that the suspensions were not a breach should apply to the duty to cooperate as well as the duty not to hinder? If so, where in Chief Judge Damich's Opinion, 50 Fed. Cl. 35 (2001), does defendant find this? If not, how does defendant recommend that the Court quantify damages attributable to the breach of the duty to cooperate as compared to the duty not to hinder for contracts where both duties were found to have been breached, when there is a 135-day grace period for the duty not to hinder but not for the duty to cooperate?

2. Defendant alleges that the lumber market was better in 1994 than in 1995 or 1996. How would defendant recommend quantifying the benefit that it alleges that plaintiff received by being able to harvest during the Fall of 1994 (when the suspension would have taken place, had defendant conducted the consultations immediately post *Pacific Rivers v. Thomas*, 30 F.3d 1050 (9th Cir. 1994))? Defendant claims that the fact that plaintiff has not quantified this benefit means that plaintiff has not calculated damages with reasonable certainty and should not be permitted to recover with respect to claims premised upon a breach of warranty. *See* Def.'s Post-Trial Memorandum of Law at 5. Assuming the Court does not agree, how should the Court quantify that benefit?

3. For chip sales, defendant claims that plaintiff should have to subtract the three months for which it had no chip contract with Stone. *See* Def.'s Post-Trial Memorandum of Law at 44. Plaintiff argues that Precision Pine stockpiled chips during that time, and ultimately sold them to Stone, albeit at a lower price. *See* Pl.'s Response to Def.'s Post-Trial Memorandum of Law at 46-47. Why shouldn't Precision Pine be able to recover for the additional chips that it would have sold to Stone at a later date?

4. If the Court finds that lost lumber profits are not collateral to the contract and were foreseeable, how does defendant propose that damages for partial breach should be quantified?

5. Defendant claims that Mr. Ness's analysis incorrectly assumes that all of the increased sawmill costs were attributable to the breach. *See* Def.'s Response to Pl.'s Post-Trial Memorandum of Law at 56-58. How does defendant propose calculating the increase in sawmill costs that was attributable to the breach vs. the increase that was attributable to other factors (such as defendant's allegation that plaintiff made a business decision not to fully harvest some of the sales)?

6. The Joint Stipulation of Fact filed March 11, 2005 states that the suspension of the Manaco contract was lifted on December 4, 1996. (¶ 31). Defendant's Corrected Proposed Finding of Fact No. 256 states that the suspension continued after December 4, 1996 and was not lifted until March 1997. Which is correct?

7. Please contrast the position that lumber sales are a collateral operation to a timber contract with the holding in *Mann v. United States*, 68 Fed. Cl. 666 (2005).

8. Defendant claims that because the suspensions were not unreasonable for the first 135 days, and because the 136th day fell outside the normal operating season, Precision Pine is not entitled to any damages for the Fall 1995 season. *See* Def.'s Response to Pl.'s Post-Trial Memorandum of Law at 5, fn. 3. Isn't it likely that, given the suspensions, Precision Pine would have been permitted to operate outside of the normal operating season?

9. Can defendant explain why it believes that damages for partial breach cannot include lost profits that are caused by that partial breach? Defendant argues that plaintiff cannot recover lost profits available from completing the contact. *See* Def.'s Response to Pl.'s Post-Trial Memorandum of Law at at 12-14. However, this does not explain why plaintiff cannot recover those lost profits specifically caused by the delay (minus any profits subsequently earned on completing the contract after the suspensions were lifted).

10. In regard to defendant's claim that plaintiff cannot recover under both CT 6.01 and under a theory of breach, what about a situation where a contract provided for recovery of attorneys' fees by the prevailing party in the event of litigation and plaintiff prevailed on

its claim of breach. Wouldn't plaintiff be able to recover both for breach and under the attorneys' fee provision? How is this case different from that scenario?

11. Defendant asks the Court to conclude that the sales would not have been fully harvested but for the suspension. Def.'s Response to Pl.'s Post-Trial Memorandum of Law at 20-24. Please describe the harvesting assumption that defendant would have the Court use instead.

12. Please present any legal authority in support of defendant's contention that plaintiff should not be able to recover increased sawmill costs because these costs cannot be tied to the breach of a particular individual timber contract. *See* Def.'s Response to Pl.'s Post-Trial Memorandum of Law at 49. Specifically, the Court would like defendant to discuss why it would be insufficient if plaintiff could demonstrate that the cumulative effect of the breach of all contracts caused the inefficiencies.

13. Recognizing that plaintiff may not fit into the traditional definition of a lost volume seller (because the contract at issue was not completely cancelled and because defendant does not seek to offset profits from separate subsequent transactions), what is the basis for defendant's position that plaintiff should have to offset post-suspension profits?

**Plaintiff**

1. Can plaintiff quantify or specify which damages are based on a breach of the duty to cooperate as compared to the duty not to hinder? Is plaintiff exclusively seeking damages based upon a breach of the duty to cooperate since no damages are sought on the sole contract (Brann) where the duty to cooperate but not the duty to hinder was breached?

2. If the Court finds that the suspensions were not a breach for the first 135 days of the suspension period, how does plaintiff recommend that the Court quantify damages attributable to the breach of the duty to cooperate as compared to the duty not to hinder for contracts where both duties were found to have been breached, if there is a 135-day grace period for the duty not to hinder but not for the duty to cooperate?

3. How does the fact that the input that Precision Pine needed to produce lumber products (i.e. timber) was not freely available in the market affect Precision Pine's claim that it is a lost volume seller?

4. How does Precision Pine harmonize its claim that it is a lost volume seller with the fact that it had not fully harvested the Brann and Mud contracts (which were released prior to December 1996) as of December 31, 1996? *See* Def's Corrected Proposed Findings of Fact ¶ 137 and ¶ 303. If there were really unlimited demand for lumber, why would it have chosen not to fully harvest these sales? Can Precision Pine claim that it is a lost volume seller while at the same time not taking advantage of the full volume available to

it? Doesn't this indicate that it may not have been profitable for Precision Pine to bid on any additional sales?

5. How is Precision Pine's lost volume seller argument affected by the fact that the government is seeking to offset profits earned on the same contracts that are at issue in this litigation, not other subsequently entered contracts as in a typical lost volume seller scenario? How is the claim affected by the fact that Precision Pine did bid on and was awarded subsequent contracts in 1997 and 1998?

6. In *Scott Timber*, the court held that increased sawmill costs were not foreseeable and were remote and consequential damages. 333 F.3d 1372 (2003). *Scott Timber* was limited to the facts in that case. *See Precision Pine & Timber, Inc. v. United States*, 63 Fed. Cl. 122, 136 (2004) ("The Federal Circuit's holding addressed only Scott Timber's claimed sawmill expenses, and did not attempt to create a global rule applicable to all sawmill expenses in all cases."). Please contrast the facts in this case with the facts in *Scott Timber* to demonstrate why the same findings should not be made here. What makes the increased sawmill costs more foreseeable in this case than they were in *Scott Timber*? The Court understands that in *Scott Timber*, increased sawmill costs were requested pursuant to CT 6.01. Please explain why foreseeability should be treated differently under CT 6.01 and the implied duty not to hinder.

7. In Mr. Ness's damage calculation, a monetary credit to defendant was included for the partial cancellation of the Mud contract due to the *Silver v. Babbitt* litigation. *See* Pl.'s Corrected Proposed Findings of Fact ¶ 154. However, it appears that the cancelled volume of the contract was not subtracted for purposes of calculating prospective lost profits. *See id*. Does the monetary credit fully offset the prospective profits that were calculated based on the volume of the Mud sale that was partially cancelled?

8. In calculating damages, how did Precision Pine account for the fact that there were restrictions on when particular units of the Manaco contract could be harvested? *See* Def.'s Corrected Proposed Finding of Fact No. 250. Harvesting was limited from October to the end of November on certain units, but on p. 4 of Ex. A to PX 131, no cutting is shown in the 4th quarter of any year for Manaco.

9. Why didn't Precision Pine make an effort to update the operating schedule provided to the Forest Service for 1995? Wasn't it required to do so by BT 6.31?

10. If the Court were to find that plaintiff could not recover both under CT 6.01 and for breach of the contract, could any of the items that plaintiff requests under CT 6.01 be recovered under a theory of breach?

11. Was Tri-Star required to remove the pulpwood from Precision Pine sales and attempt to sell it to third parties or was it simply provided with the option to do so? If it were

merely optional, as a matter of common sense, wouldn't Tri-Star have elected not to remove the pulpwood if no one were willing to buy pulpwood from it?

12. If Mr. Porter had no schedule of when particular contracts would have been logged, please review how he came up with the schedule relied upon by Mr. Ness in Ex. A. to PX 131.

13. Please explain the rationale for the 20% labor burden rate that Precision Pine added to the direct labor expense in its calculation of claim preparation costs. See Pl.'s Corrected Proposed Findings of Fact ¶¶ 150-51.

14. Why is Precision Pine seeking claim preparation costs for all 13 of the suspended contracts containing CT 6.01 and not simply for the 12 contracts that Chief Judge Damich found were breached in 50 Fed. Cl. 35 (2001)? See Pl.'s Corrected Proposed Findings of Fact ¶¶ 398-400.

The Court anticipates that it may identify additional questions that it would like the parties to address during closing argument. If the Court identifies such questions, it will endeavor to inform the parties of these questions with as much advance notice as possible prior to closing argument. However, the Court also reserves the right to pose additional questions to the parties at closing argument without advance notice.

IT IS SO ORDERED.

s/ George W. Miller
GEORGE W. MILLER
Judge