# United States Court of Appeals for the Federal Circuit

05-5059

OLD STONE CORPORATION,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Marvin C. Garbow, Arnold & Porter LLP, of Washington, DC, argued for plaintiff-appellee. Of counsel on the brief were Howard N. Cayne, David B. Bergman, Joshua P. Wilson of Washington, DC; and Kent A. Yalowitz and Allen Wong, of New York, New York.

William F. Ryan, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. On the brief were Stuart E. Schiffer, Deputy Assistant Attorney General, and David M. Cohen, Director. Of counsel on the brief were Jeanne E. Davidson, Deputy Director, and Jeffery T. Infelise, Trial Attorney.

Appealed from: United States Court of Federal Claims

Senior Judge Robert H. Hodges, Jr.

# United States Court of Appeals for the Federal Circuit

05-5059

OLD STONE CORPORATION,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

---

DECIDED: May 25, 2006

---

Before LINN, DYK, and PROST, Circuit Judges.

DYK, Circuit Judge.

This is a Winstar damages case. See United States v. Winstar Corp., 518 U.S. 839 (1996). The United States appeals the decision of the United States Court of Federal Claims, which awarded to Old Stone Corporation ("OSC") $192.5 million in damages for the government's breach of contract. Old Stone Corp. v. United States, 63 Fed. Cl. 65 (2004) ("Old Stone II"). The breach was the elimination of regulatory capital by the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183. We affirm the award of $74.5 million of post-breach mitigation payments, but reverse the award of $118 million of initial contributions. We conclude that the $118 million amount is not recoverable under a restitution theory because the appellant elected to continue performance under the

contract to the benefit of the appellant and to the detriment of the government, and is not recoverable under a reliance theory because the damages were not foreseeable as a matter of law.

## BACKGROUND

### I

Before the transactions that are the focus of this lawsuit, Old Stone Corporation ("OSC") was a bank holding company headquartered in Rhode Island. Its primary subsidiary was a commercial bank, Old Stone Bank ("Old OSB" or "OOSB"), which was insured by the Federal Deposit Insurance Corporation ("FDIC"). This dispute had its genesis in the acquisition of two thrifts by OSC.

The first transaction was an acquisition of a small thrift, Rhode Island Federal ("RIF"). In June 1984, OSC submitted a proposal to the Federal Savings and Loan Insurance Corporation ("FSLIC") to acquire RIF with cash assistance from FSLIC. As a result of the acquisition, OSC would become a "thrift holding company" owning all of the stock of RIF. OSC would also obtain a federal savings bank charter which would permit it to engage in commercial lending while allowing it to expand into other geographical areas.

FSLIC accepted OSC's offer and approved the transaction in August 1984. The transaction involved the following steps: (1) RIF converted from a mutual savings institution to a Federal stock savings bank (or "thrift"), "New" Old Stone Bank ("OSB"); (2) OSB formed a subsidiary, NEWCO, to which OSC transferred all of its stock in OOSB, valued at $103.2 million; (3) NEWCO caused OOSB to distribute its assets and liabilities to OSB; (4) OSC acquired all of OSB's stock for a nominal amount ($100).

Under an "Assistance Agreement" executed by OSC, FSLIC and OSB, FSLIC contributed $9.55 million cash to OSB, and OSC contributed $13.8 million cash. RIF's deficit net worth on the date of the acquisition, after the cash contributions, was $4.4 million, which was recorded as so-called "supervisory goodwill." The Assistance Agreement incorporated a Forbearance Letter, which obligated the government to permit OSB to count FSLIC's $9.55 million cash contribution (known as a "capital credit"), and the $4.4 million of goodwill as regulatory capital. Thus the RIF transaction generated approximately $13.95 million in regulatory capital--$4.4 million in goodwill, and $9.5 million in the form of a capital credit. The Forbearance Letter permitted OSB to amortize this regulatory capital over a thirty year period. Because the Forbearance Letter was incorporated into the Assistance Agreement signed by OSC, FSLIC and OSB, the government's promise of regulatory forbearance ran to both OSC and OSB.

OSC and FSLIC also executed a Net Worth Maintenance Stipulation ("NWMS") under which OSC agreed to downstream (contribute) additional funds needed to maintain OSB in compliance with regulatory requirements.

The second transaction (the "Citizens transaction") occurred on December 27, 1985. OSC acquired Citizens Federal, a FSLIC-insured, federally-chartered mutual association located in Seattle, Washington. As part of the transaction, Citizens Federal converted to a federal stock savings bank and was renamed Old Stone Bank of Washington ("OSBW"). Under an Assistance Agreement between FSLIC, OSC and OSBW, FSLIC contributed $78.5 million of cash assistance to OSBW, and OSC contributed $14.8 million. Taking into account the cash contributions, the bank had a net worth deficit of $2.76 million. This amount was recorded as supervisory goodwill.

The Assistance Agreement incorporated a Forbearance Letter, which permitted OSBW to count FSLIC's $78.5 million contribution, and the $2.76 million of supervisory goodwill as regulatory capital. Thus the Citizens transaction generated a total of $81.26 million in regulatory capital--$2.76 million in goodwill, and $78.5 million in capital credits. The Forbearance Letter permitted OSBW to amortize that regulatory capital over twenty five years. As in the RIF agreement, the government's promise of regulatory forbearance ran to both the thrift and to OSC.

On December 31, 1986, OSBW (formerly Citizens Federal) merged with and into OSB. Thereafter the combined OSB-OSBW entity made regulatory filings on a consolidated basis and was regulated on the basis of its combined regulatory capital.

The government contends that on December 31, 1987, the parties agreed to terminate the Citizens Assistance Agreement, pursuant to a termination provision of the Assistance Agreement that provided that "this Agreement shall terminate five years following the Effective Date or on such other date to which the parties or their successors agree in writing . . . ." J.A. at 200185 (emphasis added). The parties dispute the effect of this termination on the government's regulatory capital promise, but agree that it terminated the government's obligation to make assistance payments under the agreement.

II

In August of 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183. ("FIRREA"), which limited the ability of thrift institutions to count supervisory goodwill and capital credits towards their regulatory capital requirements. Winstar, 518 U.S. at 856-60.

At the time of the enactment of FIRREA, approximately $80 million of regulatory capital from the Citizens and RIF transactions had not yet been amortized pursuant to the 30-year and 25-year amortization provisions of the assistance agreements. Approximately $11.7 million of this capital was attributable to the RIF transaction, and the remainder to the Citizens transaction. FIRREA prevented OSB from recognizing these amounts as regulatory capital. As a result, OSB failed one of the government's regulatory capital requirements--the so-called "risk-based" capital requirement--by $36 million.[1] OSB was thus "undercapitalized" and subject to seizure. However, neither OSC nor OSB repudiated the assistance agreements or at the time filed suit against the government for breach of the contracts. Rather, OSC and OSB sought to achieve compliance with FIRREA, and to otherwise continue performance under the contract.

A thrift could address the problem of regulatory compliance created by FIRREA in one of two ways--either by shrinking the thrift (selling assets and using the proceeds to pay off liabilities) or by infusing additional capital into the thrift. Initially the thrift chose the former route.[2] It sold assets in December of 1989--a residential lending unit ("OsCal") and a tuition budget company ("Academic Management Services" or "AMS").

---

[1] Thrifts are regulated under FIRREA by reference to capital ratios -- i.e., the ratio of capital to assets. The "risk-based" capital ratio "is obtained by dividing [the thrift's] capital base . . . [which includes, inter alia, "common stockholders' equity"] by its risk-weighted assets . . . ." 12 C.F.R. Pt. 3, App. A (1990). Two other capital requirements are "tangible capital" and "core capital." The thrift here was in compliance with these latter two requirements.

It appears that the Court of Federal Claims erroneously referred to the unamortized amount of regulatory capital remaining on the date of seizure as $75 million. Old Stone II, 63 Fed. Cl. at 89.

[2] A bank may improve its capital ratio either by increasing capital (as by receiving an infusion of cash) or by shrinking its asset base. Old Stone II, 63 Fed. Cl. at

Thereafter OSB submitted a "Capital Plan," which required OSB to "maintain . . . compliance with the tangible and core capital requirements" and to meet the risk-based capital requirement of FIRREA by December 31, 1990. J.A. at 200935. Under the Plan, the government granted an "exemption from any penalties or sanctions that may be imposed on the [thrift] for failing to meet its capital requirements." J.A. at 200930. The Capital Plan called for further shrinkage of the thrift through the sale by OSB of the assets that were owned by Citizens before the merger of Citizens into OSB. On January 25, 1990, OSB entered into a definitive agreement to sell all of the branches of OSBW (formerly Citizens). It sold the assets in May 1990, for a gain of $9.2 million.

The Plan also required OSC to contribute additional capital under the NWMS, pursuant to a revised schedule. The government approved the Plan in March 1990. Pursuant to the Plan, OSC downstreamed $74.5 million of capital to OSB in three allotments: $45.463 million in 1990, $27.5 million in 1991 and $1.6 million in 1992. In order to fund these downstream payments, OSC sold assets including two of its subsidiaries, Old Stone Credit Corp and Old Stone Bank of North Carolina. OSC refers to these subsidiaries as its "crown jewels." The record does not reflect the exact relationships between the 1990, 1991 and 1992 payments and the amount of unamortized regulatory capital at the time of each payment, but the parties agree that

---

73. The asset base is shrunk by selling off assets and using the cash proceeds to repay liabilities.

these payments were even greater than the amount of unamortized regulatory capital ($65 million)[3] when the thrift was later seized in 1993.

It is undisputed that after the breach caused by the enactment of FIRREA, OSC was suffering from significant problems unrelated to the lost regulatory capital. As the Court of Federal Claims found, "Old Stone acknowledges that factors other than the breach affected the bank's operations during the period after the breach." 63 Fed. Cl. at 88. The court also found that "[t]hese problems resulted in part because of general economic conditions at the time." Id. However, OSC contended, as its expert stated, that "[w]hat the breach did was [take] away our ability to weather the storm, to solve the [other] problems." Id. at 89 (emphasis added).

III

Three years after the enactment of FIRREA, OSC and OSB filed a complaint in the Court of Federal Claims against the United States on September 16, 1992, alleging that the passage of FIRREA resulted in the breach by the government of contracts embodied in the RIF and Citizens assistance agreements, under which the government was obligated to permit the thrift to count capital credits and goodwill as regulatory capital. The complaint requested, inter alia, recovery of damages OSB had allegedly suffered in attempting to maintain regulatory compliance, and $15 million OSC had invested when it acquired Citizens.

On January 29, 1993, the government seized OSB and placed it in receivership. OSB was at that time "critically undercapitalized" under the statute because it had less

---

[3] OSC stated that the amount of unamortized regulatory capital "approximately $65 million." Pl's Supp. Br. at 9. There was some testimony that might support a finding of $68.5 million.

than two percent tangible equity. As noted above, absent the enactment of FIRREA, on the 1993 date of seizure the unamortized balance of regulatory capital would have been approximately $65 million.

The Court of Federal Claims action was stayed pending the Supreme Court's decision in Winstar, 518 U.S. 839, and pursuant to a pretrial agreement concerning many of the Winstar actions.

Eventually, after discovery, on April 10, 2003, the Court of Federal Claims granted summary judgment in favor of OSC on the issue of liability, finding that the enactment of FIRREA had breached the Assistance Agreements. Old Stone Corp. v. United States, No. 92-647C (Fed. Cl. Apr. 10, 2003) ("Old Stone I"). In that connection the court rejected the government's argument that the regulatory capital promises had been terminated by the parties pursuant to Section 15 of the Citizens Assistance Agreement before the enactment of FIRREA. Id., slip op. at 6-7. The court appeared not to address the government's contention that the promise of regulatory forbearance under the Citizens Assistance Agreement should not be considered because that promise would have ceased upon the sale of the OSBW assets in May 1990 without regard to the enactment of FIRREA.

A trial on damages was held beginning in May 2004. Old Stone II, 63 Fed. Cl. at 68. Following the trial, the Court of Federal Claims awarded OSC the following amounts in damages: (a) $74.5 million for the "post-breach" contributions OSC made to OSB after the enactment of FIREEA, under mitigation and reliance theories; (b) $103.2 million for the value of stock OSC transferred to the thrift in the RIF acquisition, under restitution and reliance theories; and (c) $14.8 million for the cash contribution OSC

made to Citizens in the Citizens acquisition, under restitution and reliance theories. These damages totaled $192.5 million.[4] In awarding these amounts, the court reasoned that the government's breach caused all of OSC's losses, because absent FIRREA, OSB would have had an additional $65 million in regulatory capital and would not have been seized. The court held that the requirements of restitution had been met because the contributions conferred a benefit on the government, and because the enactment of FIRREA constituted a total breach. The court rejected the government's argument that continued performance by OSC constituted an election that barred voiding the contract and seeking restitution. In finding that the $192.5 million should be awarded as reliance damages, the court found that the losses were foreseeable. The court also rejected the government's argument that returning the initial investments would result in a "windfall" to OSC.

The government timely appealed. Following oral argument, we ordered supplemental briefing on a variety of questions. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

We review the Court of Federal Claims' decisions on summary judgment and conclusions of law without deference. Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002); Alger v. United States, 741 F.2d 391, 393 (Fed. Cir. 1984). We review the court's findings of fact following trial under the clearly erroneous standard.

4 OSC abandoned a claim to an additional $13.8 million that it allegedly contributed to the RIF transaction.

Anderson v. City of Bessemer City, 470 U.S. 564, 573-76 (1985); Home Savings of Am. v. United States, 399 F.3d 1341, 1347 (Fed. Cir. 2005).

I

We first address the Court of Federal Claims' holding that under a mitigation theory OSC is entitled to recover the $74.5 million in downstream payments that it made to OSB in order to replace the regulatory capital eliminated by FIRREA. When FIRREA was enacted in August of 1989 it eliminated $80 million of regulatory capital that was available to OSB under the assistance agreements. By the time of seizure of the thrift in January 1993 the unamortized regulatory capital deficiency would only have been $65 million. Between the enactment of FIRREA and the seizure, OSC downstreamed $74.5 million to OSB to replace the regulatory capital lost by FIRREA. That amount is claimed and was allowed by the Court of Federal Claims on a theory of mitigation. Neither party disputes that the downstreamed amounts exceeded the unamortized regulatory capital which remained at the time of the seizure.

A non-breaching party may generally recover its mitigation costs incurred in a reasonable effort to avoid loss caused by a breach, even if its efforts prove unsuccessful. Restatement (Second) of Contracts §§ 350 cmt. h; id. at § 347 cmt. c (1981) ("[T]he injured party is [generally] entitled to recover for all loss actually suffered."). Consistent with this rule, we have upheld awards of the actual costs of generating replacement capital resulting from the elimination of regulatory capital by FIRREA. See, e.g., Home Savings, 399 F.3d at 1353; Cal. Fed. Bank, FSB v. United States, 245 F.3d 1342, 1350 (Fed. Cir. 2001) (affirming award of transaction costs as

measure of cost of replacing capital) ("Cal Fed"); see also Hughes Commc'ns Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed. Cir. 2001).

In Home Savings, for example, we affirmed an award of the cost incurred by shareholders in replacing supervisory goodwill eliminated by FIRREA. 399 F.3d at 1354. Likewise, in LaSalle Talman Bank v. United States, 317 F.3d 1363 (Fed. Cir. 2003), we affirmed an award of the cost of raising replacement capital "because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held by plaintiff in the form of supervisory goodwill." Id. at 1374. In our prior "cost of replacement" cases, the thrift was not seized and the replacement capital was not lost, so the cost of replacing the capital was limited to the cost of raising additional capital and did not include the replacement capital itself. Here, the Court of Federal Claims held that OSC's cost of replacing OSB's supervisory goodwill with tangible capital was not just the transaction costs incurred in raising the $74.5 million, but rather the $74.5 million itself.

We understand the government to contend that the Court of Federal Claims made several errors in allowing the $74.5 million as mitigation costs.

First, the government contends that the regulatory capital promise with respect to the Citizen's acquisition was eliminated by agreement in December 1987, before the enactment of FIRREA, and that FIRREA thus did not cause a breach of the government's promise. Since there was no breach of the Citizens agreement, there can be no recovery of mitigation payments that replaced the Citizens capital. Because only $11.7 million of RIF capital remained on the date of FIRREA, any mitigation payments in excess of $11.7 million are attributable to Citizens and are not recoverable.

There is no dispute that the Citizens agreement was terminated. The question is whether the termination applied to both executory (i.e., financial assistance) and non-executory (i.e., regulatory forbearance) provisions. The government asserts that the termination applied to both obligations and eliminated its obligation of regulatory forbearance before the enactment of FIRREA. The government agrees that the termination is described in a December 31, 1987, letter FHLBB sent to OSB stating that "[t]his letter serves as notification that the Assistance Agreement . . . has terminated as of December 31, 1987, pursuant to Section 15 of the Agreement." J.A. at 400003. Relying on our decision in Winstar, the Court of Federal Claims interpreted the parties' agreement to apply only to the executory provisions. Old Stone I, slip op. at 6-8. We agree with the Court of Federal Claims.

In Winstar Corp. v. United States, 64 F.3d 1531 (Fed. Cir. 1995) (en banc), affirmed, 518 U.S. 839 (1996), we held that a termination clause applied only to executory provisions. 64 F.3d at 1542. That termination clause stated in part, "[t]his agreement shall terminate and the obligations of the FSLIC to make any payments hereunder shall cease upon the expiration of 10 years . . . ." Glendale Federal Supervisory Action Agreement, § 9 (available in Old Stone II Supplemental Appendix (filed May 31, 2002)). The government claimed that after the passage of 10 years the regulatory forbearance expired. We rejected that construction and held that the "expiration provision . . . relat[ed only] to executory provisions set out in the SAA, which obligated the FSLIC to make certain payments to the merged thrift for a limited period of time." Winstar, 64 F.3d at 1542.

Section 15 of the Citizens Assistance Agreement is similar to the termination clause in the Winstar case. It provides that "this Agreement shall terminate five years following the Effective Date or on such other date to which the parties or their successors agree in writing . . . ." J.A. at 200185 (emphasis added). The emphasized language does not appear in the agreement involved in Winstar. However, this language merely allows the parties to accelerate the natural termination that would otherwise take place upon the passage of five years. That is exactly what the termination agreement did. It refers specifically to Section 15. J.A. at 400003 ("This letter serves as notification that the Assistance Agreement . . . has terminated as of December 31, 1987, pursuant to Section 15 of the Agreement.") (emphasis added). Thus the termination agreement did no more than accelerate a termination provision that was not designed to eliminate the promises of regulatory forbearance. The termination only applied to executory provisions, and the regulatory forbearance remained in force on the date of the enactment of FIRREA.

Second, the government argues that, even if the Citizens contract were not voluntarily terminated in 1987, any contractual right to count the Citizens capital credits and goodwill as regulatory capital would have ceased with the sale of Citizens/OSBW in May 1990. Again the government argues the amount of mitigation recovery should be reduced by eliminating payments that replaced the regulatory capital under the Citizens agreement and thus should be confined to $11.7 million (the amount under the RIF agreement).

After the execution of the two assistance agreements in 1984 and 1985, the two thrifts merged into OSB on December 31, 1986. The government admits that the

merged entity could claim the benefit of both assistance agreements. However, the government contends that the merged entity lost the right to enforce the Citizens Assistance Agreement when the Citizens assets were sold in May 1990. The government contends that Section 13 of the Citizens Assistance Agreement provides that generally accepted accounting principles ("GAAP") govern accounting computations made under the Agreement. It asserts that GAAP rules required that the goodwill attributable to the Citizens transaction be written off upon the sale of the Citizens assets. At that point, says the government, the Citizens agreement would no longer be enforceable.

Again we do not agree. The sale of the OSBW assets occurred after the enactment of FIRREA, and the Court of Federal Claims found that FIRREA caused the sale of the Citizens assets. Old Stone II, 63 Fed. Cl. at 72 ("Old Stone's Capital Plan also represented . . . that management would 'mitigate the capital reduction [by] . . . sell[ing] certain subsidiaries [including] . . . the Seattle, Washington-based thrift that was a division of Old Stone Bank [i.e., Citizens]."). On this point, the Court of Federal Claims' finding is supported by the record.

Finally, the government contends that the amount of mitigation recovery should be limited to $36 million rather than the $74.5 million awarded by the Court of Federal Claims because OSB needed only $36 million to bring it into capital compliance immediately after the enactment of FIRREA.

In Home Savings, we recognized that "[w]hen mitigating damages from a breach, a party 'must only make those efforts that are fair and reasonable under the circumstances.'" 399 F.3d at 1353 (quoting Robinson v. United States, 305 F.3d 1330,

1333 (Fed. Cir. 2002)); see also 11 Corbin on Contracts § 57.11, at 311 (2005 ed.) ("The doctrine of avoidable consequences merely requires reasonable efforts to mitigate damages."); 3 Dobbs: Law of Remedies § 12.6(1), at 127 (2d ed. 1993) ("[T]he damage recovery is reduced to the extent that the plaintiff could reasonably have avoided damages he claims and is otherwise entitled to."). The government has not shown that it was unreasonable for OSC to replace the entire amount of regulatory capital that was eliminated by FIRREA.

In Home Savings, we allowed a mitigation award that exceeded the minimum amount required to achieve regulatory compliance. 399 F.3d at 1352-53. The Home Savings court held that the full cost was recoverable because the holding company "was entitled to raise funds to replace the supervisory goodwill [the thrift] lost as a result of the government's breach," including the "excess" capital beyond that needed to achieve regulatory compliance. Id. Likewise, OSC was entitled to replace the entire amount of regulatory capital eliminated by FIRREA so that the thrift had a cushion against future losses. We agree with the Court of Federal Claims conclusion here that OSC's mitigation efforts were reasonable under the circumstances.

For the forgoing reasons, we conclude that the Court of Federal Claims correctly held that OSC is entitled to recover its mitigation payments of $74.5 million.

II

We next address the Court of Federal Claims' holding, and OSC's argument, that OSC is entitled to recover its $103.2 million stock contribution to the RIF transaction, and its $14.8 million cash contribution to the Citizens transaction. OSC claims these amounts under restitution and reliance theories. We first consider its restitution theory.

When one party to a contract commits a total breach, the other party "is entitled to restitution for any benefit that he has conferred on" the breaching party "by way of part performance or reliance." Mobil Oil Exploration, Prod. Southeast, Inc. v. United States, 530 U.S. 604, 608 (2000) (citing Restatement (Second) of Contracts § 373 (1979)); see also Landmark Land Co., Inc. v. F.D.I.C., 256 F.3d 1365, 1372 (Fed. Cir. 2001). A party may recover damages as restitution to the extent that party has conferred a benefit on the breaching party. Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1314 (Fed. Cir. 2004) (citing Restatement (Second) of Contracts § 373); see also Cal Fed, 245 F.3d at 1350-51 ("The idea behind restitution is to restore the non-breaching party to the position it would have been in had there never been a contract to breach.") (citing Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) ("Glendale").[5]

We have suggested that restitution of initial contributions of both stock and cash in Winstar transactions may be allowable because both forms of contribution confer a benefit on the government. See, e.g., Landmark, 256 F.3d at 1372-73; Hansen, 367 F.3d at 1317. In Landmark, we held that restitution of an initial cash contribution to a supervisory merger was appropriate when the contribution was expressly required by the assistance contract. 256 F.3d at 1372-73. In Hansen, we indicated that it might be

[5] In Hansen, we stated that where there has been a benefit to the breaching party "restitution may be measured by either 'the value of the benefits received by the defendant due to the plaintiff's performance' or 'the cost of the plaintiff's performance, which includes both the value of the benefits provided to the defendant and the plaintiff's other costs incurred as a result of its performance under the contract.'" Hansen, 367 F.3d at 1314 (quoting Landmark, 256 F.3d at 1372).

possible to consider a stock transfer as a "benefit conferred" in a Winstar case that would be subject to restitution. 367 F.3d at 1316-17.

Nonetheless, restitution is subject to an important limitation. Restitution is "available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach." Id. at 1309 (quoting Restatement (Second) of Contracts § 373 cmt. a). When a non-breaching party elects to continue performance, that party is said to elect to treat the breach as partial rather than total. 13 Williston on Contracts § 39:32 (4th ed. 2000). The consequence is that restitution is not available, and the non-breaching party must pursue a claim for damages instead. See 12 Corbin on Contracts, § 1223 at 514-16 ("Damages and restitution will not be given as concurrent remedies for the same injury."). Our Winstar precedent has not yet considered the effect of the election doctrine on damages arising from the enactment of FIRREA.[6]

In describing the election doctrine, Williston states

> When one party commits a material breach of contract, the other party has a choice between two inconsistent rights—he or she can either elect to allege a total breach, terminate the contract and bring an action [for

---

[6] However, our decisions have addressed the related doctrine of waiver, holding that continuing to receive payments under an assistance agreement is not a waiver of the right to recover damages for a breach (other than restitution). Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1360-61 (Fed. Cir. 2005). In Westfed, we rejected the argument that the holding company had waived the breach (and forfeited its right to recover reliance damages) by continuing to receive assistance payments from the government. As Williston makes clear, "[t]he doctrine of election and that of waiver should not be confused; an election is not a waiver of any rights under the contract but rather a choice between two inconsistent rights following a breach of the contract." Williston § 39:32; see also id. at n.56 (citing case precluding waiver of breach but applying election doctrine); cf. Barron Bancshares, Inc. v. United States 366 F.3d 1360, 1383 (Fed. Cir. 2004) (holding government waived right to assert prior material breach by performing under contract by making assistance payments to thrift).

> restitution], or, instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach . . . .

13 Williston § 39:32 (4th ed. 2000).[7] In Mobil Oil v. United States, the Supreme Court recognized that the election doctrine applies when the breach is the enactment of a statute. 530 U.S. 604 (2000).

The authorities differ on what conduct is required to establish an election. The Williston view appears to be that mere continued performance can result in an election. 13 Williston § 39:32 ("[A] party's actions are sometimes characterized as an election where that party continues to perform or to accept performance under a contract even though he or she knows that a contract provision has been breached."). Other authorities take a stricter position--that the mere failure to elect restitution at the time of the breach and the continuation of performance is not sufficient to result in an election. Rather, there must be either (1) detrimental reliance by the breaching party (here an injury to the government as the result of the delay), see 12 Corbin § 1220 (1993 ed.); Restatement (Second) of Contracts § 378; or (2) a benefit to the non-breaching party as a result of the delay (here a benefit to OSC), see Mobil Oil, 530 U.S. at 621-23.

The Supreme Court's decision in Mobil, in which the Court allowed a restitution remedy under a government contract, is ambiguous as to which standard applies. In that case the Court concluded that "[T]he Government [has not] convinced us that the companies' continued actions under the contracts amount to anything more than [the] urging of performance . . . . Consequently the Government's waiver claim must come

---

[7] Joseph M. Perillo, Calamari & Perillo on Contracts § 11.32-11.33 at 462-66 (5th ed. 2003); see also Barron Bancshares, 366 F.3d at 1383; Cities Service Helex, Inc. v. United States 543 F.2d 1306, 1313-15 (Ct. Cl. 1976).

down to a claim that the companies received at least partial performance." Id. at 622 (internal citations omitted) (emphasis in original). The Court concluded the plaintiff companies had not received partial performance from the government under the contracts after the breach. Id. at 623. While the decision is clear that the receipt of partial performance by the plaintiff will bar restitution (and the authorities cited make equally clear that detrimental reliance by the government would also be a bar),[8] it is unclear as to whether a plaintiff's continued performance without the receipt of benefits or detrimental reliance would be sufficient to bar restitution.

Here we need not decide which standard governs, because even the stricter election rule is satisfied. OSC plainly continued to treat the assistance agreements as in place by deciding not to terminate the contracts or to file suit for restitution after the enactment of FIRREA. Indeed, OSC's claim for restitution was not asserted until three years later. Instead of electing to terminate the agreement after the enactment of FIRREA, OSC on March 13, 1990, some seven months after FIRREA, agreed to a new Capital Plan with the Office of Thrift Supervision ("OTS"), under which it once again agreed to comply with the Net Worth Maintenance Stipulations of the original contracts and to make payments to the thrift to bring it into compliance with the requirements of

---

[8] The authorities cited by the Supreme Court (see Mobil, 530 U.S. at 622) make this clear. Restatement (Second) of Contracts § 373 ("An injured party's right to restitution may be barred by election under the rules stated in §§ 378 and 379") (emphasis added); Id. at § 378 ("If a party has more than one remedy under the rules stated in this Chapter, his manifestation of a choice of one of them by bringing suit or otherwise is not a bar to another remedy unless the remedies are inconsistent and the other party materially changes his position in reliance on the manifestation.") (emphasis added).

FIRREA.[9] See Old Stone II, 63 Fed. Cl. at 72 ("[OTS] approved the bank's Capital Plan conditioned on [OSC's] agreement that it would maintain the bank's capital position pursuant to the Net Worth Maintenance Stipulation.").

The government detrimentally relied on OSC's conduct. If OSC had elected to terminate the contract and seek restitution at the time of the enactment of FIRREA, the government could not have, and would not have, demanded that OSC make subsequent contributions to the thrift pursuant to the new Capital Plan and Net Worth Maintenance Stipulations of the terminated contracts[10] which resulted in the government's liability for $74.5 million in mitigation payments. And it is certain that the government would have seized the bank earlier, with the likely result that additional losses to the insurance fund would have been avoided.[11] There were also continued benefits to OSC received under the earlier agreements with the government--its ability to continue to operate the thrift; the government's willingness to defer enforcement of the obligation of OSC to contribute additional capital pursuant to the NWMS under the

---

9 While the government could use regulatory mechanisms to force OSC to comply with its contractual obligation to infuse additional capital, see, e.g., CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 741 (D.C. Cir. 1995), there is no claim that the government could have compelled OSC to infuse additional capital absent a continuing contractual obligation.

10 Old Stone II, 63 Fed. Cl. at 82 ("[OSC] downstreamed $75 million to [OSB] pursuant to the Net Worth Maintenance Stipulation after breach.").

11 As noted above, on the date of FIRREA, OSB failed the risk-based capital requirement by approximately $36 million. On the date of seizure, the risk-based capital shortfall had more than doubled, to $77.6 million.

earlier agreements; the non-seizure of the thrift before 1993 (despite its non-compliance with FIRREA standards); and continued federal deposit insurance.[12]

The election doctrine is designed to avoid the very kind of moral hazard that would result here if the thrift could postpone repudiation of the contract for several years, bet that it could make the thrift profitable, but secure restitution if the thrift failed. Our predecessor court, the Court of Claims, has recognized (in the waiver context), that "[a]s a general proposition, one side cannot continue after a material beach by the other . . . act as if the contract remains fully in force . . . , run up damages, and then go suddenly to court." Northern Helex Co. v. United States, 455 F.2d 546, 551 (Ct. Cl. 1972).[13]

Despite the clear applicability of the election doctrine, OSC argues that a provision in the assistance agreements here bars the argument that OSC's election

---

[12] An FHLBB Memorandum recommending approval of RIF Assisted Acquisition confirms that OSC was to receive deposit insurance. It stated:

> The OFSLIC recommends that the Bank Board approve the proposal, which will result in [OSC] acquiring the stock of [RIF], upon [RIF's] conversion to a federal stock savings bank [RIF-FSB], and the transfer of OSB's charter and trust operations to a subsidiary [Newco] of [RIF-FSB]. The remaining assets and liabilities of [OSB] will be transferred to [RIF-FSB], so [OSB's] deposit accounts will become FSLIC insured.

J.A. at 200052 (emphasis added).

[13] Our decision in First Nationwide Bank v. United States, 431 F.3d 1342, 1352 (Fed. Cir. 2005), does not foreclose an election theory. Although the First Nationwide court rejected an election argument and characterized the claim as one for "partial restitution," the plaintiff in that case claimed amounts that it was promised by the government, not amounts that it actually expended under the contract. Thus the claim in First Nationwide was not a true restitution claim. In any event, the plaintiff in First Nationwide "promptly protested the [breach], filing suit first against the FDIC and then against the United States" Id. at 1352.

prevents it from claiming restitution. Section 13 of the RIF assistance agreement, and Section 16 of the Citizens assistance agreement, entitled "Rights and Forbearances," provide:

> The rights, powers, and remedies given to the parties by this Agreement shall be in addition to all rights, powers, and remedies, given by any applicable statute or rule of law. Any forbearance, failure, or delay by any party in exercising or partially exercising any such right, power, or remedy shall not preclude its further exercise.

J.A. at 200109-10. In light of this provision, OSC's failure to promptly assert a breach of contract did not, of course, result in a waiver of its right to assert a breach at a later time and recover damages. See Westfed, 407 F.3d at 1360-61 (holding plaintiff did not waive its right to assert breach by continuing to receive assistance payments from the government). But here the restitution remedy is not precluded by inaction--"forbearance, failure or delay" in exercising the right to restitution--but rather by OSC's taking an action--election among inconsistent remedies by continuing to perform. The quoted provision does not restore a remedy forfeited by continued performance. In other words, the "Rights and Forbearances" clause of the RIF and Citizens agreements does not preclude the application of the common law election of remedies doctrine.

For the foregoing reasons, we conclude that OSC's initial contributions are not recoverable under a restitution theory.

III

Nor are the initial contract payments of $118 million recoverable under a reliance theory.

The purpose of reliance damages is to compensate the plaintiff "for loss caused by reliance on the contract." Restatement (Second) of Contracts § 344(b). We have

previously upheld awards of reliance damages in Winstar cases. See, e.g., Westfed, 407 F.3d at 1368, 1371. We have also held that reliance damages can be recovered for losses of pre-breach investments pursuant to the contract. See id.; Glendale, 239 F.3d at 1383.

The Court of Federal Claims found that the breach caused the seizure of OSB and the loss of OSC's investment. Old Stone II, 63 Fed. Cl. at 98 ("Defendant's breach was the cause of plaintiff's damages."); id. at 88 ("We think it highly unlikely that the regulators would have seized the bank in 1993, absent the breach."); id. ("[OSB's problems] would have been eased by the bank's having had a capital cushion.").

However, the Court of Federal Claims did not explain how the breach--the refusal to recognize the regulatory capital as promised in the assistance agreements--caused the seizure when that regulatory capital had been replaced by the mitigation payments before the seizure occurred. On this critical question the Court of Federal Claims' opinion is unfortunately entirely silent. Despite the absence of findings by the Court of Federal Claims, OSC urges that the causation finding is supportable on two theories--that the breach caused the shrinkage of the thrift and on the alternative (and primary) theory that the breach caused the depletion of the assets of the holding company, and that these events caused the seizure of the thrift and the loss of the OSC investment.

But even assuming that FIRREA caused the seizure by putting in motion this chain of events, reliance damages are subject to two pertinent limitations--the damages must have been both proximately caused by the breach, and foreseeable. Hughes, 271 F.3d at 1066.

As we have repeatedly held, "[i]n order to be recoverable as reliance damages, . . . plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation." Westfed, 407 F.3d at 1365 (quoting Landmark, 256 F.3d at 1378); see Hadley v. Baxendale 156 Eng. Rep. 145 (1854) (contract damages only recoverable if in "contemplation of both parties" at the time of contract formation); see also Restatement (Second) of Contracts § 351(1) ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.") (emphasis added).

Losses must also satisfy a closely related requirement--they must be proximately caused by the breach. Hughes, 271 F.3d at 1066; see also Nat'l Controls Corp. v. Nat'l Semiconductor Corp., 833 F.2d 491, 496 (3d Cir. 1987) (noting that lost profits, to be recoverable, must be a "proximate consequence," and not a "merely remote or possible" result of the breach) (internal citations and quotations omitted); Lewis Jorge Constr. Mgmt, Inc. v. Pomona Unified Sch. Dist., 102 P.3d 257, 265 (Cal. 2004) (holding breach did not "directly or necessarily cause [contractor's] loss," where contractor alleged breach caused contractor's surety to reduce contractor's "bonding" rating, and that reduction in bonding rating caused loss of other prospective contracts); Williston § 64:12.[14] Because these two doctrines are not meaningfully distinct, at least in the context of the case before us, we analyze them under the rubric of foreseeability.

---

[14] See Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 839-40 (1996) ("Although the principles of legal causation sometimes receive labels in contract analysis different from the "proximate causation" label most frequently employed in tort analysis, these principles nevertheless exist to restrict liability in contract as well").

Understanding foreseeability requires a more detailed description of OSC's theories. As we have noted, OSC theorizes that the initial shrinkage of the thrift (the sale of the Citizens/OSBW assets and of the stock of the two subsidiaries) caused damage because the thrift itself was made less profitable (by some $12 million per year), leading to its ultimate demise. OSC argues alternatively and primarily that the breach required OSC to sell its crown jewels in order to infuse additional capital into the thrift and that the sale of the crown jewels caused long-term adverse consequences.

The Court of Federal Claims here did not find that the forced shrinkage of the thrift had a foreseeable relationship to the seizure, indeed concluding that the shrinkage was not "a major issue in determining damages." Old Stone II, 63 Fed. Cl. at 85. OSC in its briefs has not called our attention to any testimony that would suggest that the seizure of the thrift by itself was a foreseeable result of the shrinkage. Indeed, the linkage was particularly speculative given the fact that the shrinkage is only alleged to have deprived the thrift of $12 million a year in profits when the total capital deficit at the time of seizure was $77 million. In any event, the foreseeability theory with respect to the sale of the thrift's own assets is subject to the same deficiencies that exist with respect to the primary OSC theory (concerning the forced sale of OSC's own assets) which we now discuss.

We turn then to OSC's primary theory -- that the forced sale of the OSC crown jewels had the foreseeable result of bringing about the seizure. Here the Court of Federal Claims did find that the loss was foreseeable both because the capital shortfall as a result of the breach was foreseeable and because "[i]t was also foreseeable that regulators subsequently would demand that [OSC] prop up its failing subsidiary with

infusions of capital once [OSB] fell short of its capital requirements." Old Stone II, 63 Fed. Cl. at 89-90. In other words the Court of Federal Claims found that the need for additional replacement capital infusions from OSC to the thrift as a result of the breach was foreseeable. But, even if the need for replacement capital was foreseeable, that hardly establishes that the adverse consequences alleged to flow from the need to make infusions were foreseeable. As the Restatement of Contracts explains, "[t]he mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Restatement (Second) of Contracts § 351 cmt a. (1981) (emphasis added).

For the damages from the sale of the crown jewels to be foreseeable, the parties, at the time of contract formation, would have had to foresee: (1) that the thrift would have other problems that would require additional infusions of regulatory capital; (2) that the crown jewels would be the only source of additional capital because neither the holding company nor the thrift would have access to alternative capital; (3) that the thrift's other problems would be so severe that the thrift would be seized; and (4) that the availability of the crown jewels would have been sufficient to avoid the seizure. OSC has not called our attention to any testimony in the record that will support the foreseeability of any of these assumptions, and we have been unable to locate any. Here we think that under established principles of foreseeability OSC has completely failed to establish that this extended chain of causation was foreseeable at the time of contract formation.[15]

---

[15] The Restatement of Contracts provides an instructive example:

Our prior Winstar cases do not support a contrary conclusion. Some cases have held that the need to replace regulatory capital,[16] or the failure of a thrift due to deficiency in regulatory capital,[17] is a foreseeable result of the government's breach of its promise of regulatory forbearance. But today we are allowing the recovery of the replacement capital, and this is not a case in which the thrift was seized because it lacked regulatory capital eliminated by FIRREA. OSC is claiming that the seizure

---

> A, a carrier, contracts with B, a miller, to carry B's broken crankshaft to its manufacturer for repair. B tells A when they make the contract that the crankshaft is part of B's milling machine and that it must be sent at once, but not that the mill is stopped because B has no replacement. Because A delays in carrying the crankshaft, B loses profit during an additional period while the mill is stopped because of the delay. A is not liable for B's loss of profit.
>
> That loss was not foreseeable by A as a probable result of the breach at the time the contract was made because A did not know that the broken crankshaft was necessary for the operation of the mill.

Restatement (Second) of Contracts § 351 cmt a., ill. 1 (1981). As in the illustration, the government did not have reason to know that the replacement capital was necessary to save the thrift from its other problems. See also id. at § 351, cmt d. (inability of injured party to make substitute arrangements must be foreseeable).

[16] See, e.g., LaSalle, 317 F.3d at 1374 (holding cost of replacement capital is recoverable by thrift and can be measured by dividends paid to issuer of investment capital; remanding for a calculation of cost of replacement capital); Home Savings, 399 F.3d at 1353-55 (holding cost of replacement capital is recoverable and can be based on cost of substituting expensive private capital, which counted towards regulatory requirements, for less expensive government-backed deposits, which did not); see also S. Cal. Fed. Sav. & Loan Ass'n. v. United States 422 F.3d 1319, 1336-37 (Fed. Cir. 2005) (rejecting government's argument that it was unforeseeable that the loss of regulatory capital forbearances would impact the health of a thrift and thus increase its costs of doing business); cf. Bluebonnet, 266 F.3d at 1355-56 (where holding company had agreed--prior to FIRREA--to infuse capital into the thrift, rejecting argument that it was unforeseeable that FIRREA would increase the cost of raising that capital).

[17] See, e.g., Westfed, 407 F.3d at 1366-67.

resulted from the fact that the replacement capital was unavailable to resolve other problems not caused by FIRREA.

OSC's foreseeability argument is analogous to a Winstar claim for lost profits. In numerous cases we have rejected claims for lost profits on the ground that lost profits are too speculative to be recovered. See Cal. Fed. Bank v. United States, 395 F.3d 1263, 1272-73 (Fed. Cir. 2005) ("Cal Fed II"); Glendale, 239 F.3d at 1380; Glendale Fed. Bank, FSB v. United States, 378 F.3d 1308 (Fed. Cir. 2004) ("Glendale II"). In Glendale II, we observed that

> [G]iven the speculative nature of [a lost profits] claim, one that has yet to be successfully established in any Winstar case . . . [and] experience suggests that it is largely a waste of time and effort to attempt to prove such damages.

Glendale II, 378 F.3d at 1313.[18] OSC's claim is even more speculative. A lost profits claim in a Winstar case typically assumes that it was foreseeable the breach would force the plaintiff to sell assets that otherwise would have generated profits and seeks to recover the profits. See, e.g., Cal Fed, 245 F.3d at 1349-50. OSC does not seek to recover lost profits. See Pl's Br. at 27 ("OSC did not seek expectancy damages [at trial]"). Nonetheless, OSC's theory does not merely assume that the loss of profits was foreseeable; it also assumes it was foreseeable that those profits (or the revenues from asset sales) would have resolved problems not caused by FIRREA, and that neither

---

[18] In one case, Cal Fed, we required a trial on the issue. There we held that lost profits, based on the theory that FIRREA forced the thrift to sell profitable assets, are not unforeseeable as a matter of law. 245 F.3d at 1349-50. After remand, we affirmed the Court of Federal Claims conclusion that the profits were unforeseeable. Cal Fed II at 1272-73; Cal. Fed. Bank v. United States. 54 Fed. Cl. 704, 713 (2002). We reasoned that the thrift's lost profits theory was "impractical," and "not susceptible to reasonable proof," and "ha[d] yet to be successfully established in any Winstar case." Cal Fed II, 395 F.3d at 1270 (quoting Glendale II).

OSC nor OSB would be able to resolve those problems by raising funds from other sources. There was no proof that the attenuated claim of causation on which OSC relies was foreseeable.

Accordingly, we hold that the loss of OSC's initial contributions were not a foreseeable result of the enactment of FIRREA and cannot be recovered under a reliance theory. In light of our conclusion we need not address the government's other arguments concerning these restitution and reliance claims.

IV

Finally we note that OSC's restitution claim is barred for another reason. Restitution or reliance damages are inappropriate where relief would result in an "unfair windfall" to the non-breaching party. As we explained in Bluebonnet, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." 339 F.3d at 1345; see also Hansen, 367 F.3d at 1315 (quoting Bluebonnet, 339 F.3d at 1345); LaSalle, 317 F.3d at 1371 (noting that "the non-breaching party is [generally] not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred."). Here the $74.5 million payments replaced the capital that the breach eliminated, and the award of the additional amounts as restitution or reliance damages would be duplicative.

CONCLUSION

For the foregoing reasons, we affirm the Court of Federal Claims' award of $74.5 million in damages for OSC's post-breach mitigation payments. We reverse the award of $103.2 million in damages for OSC's stock contribution under the RIF assistance

agreement. We also reverse the award of $14.8 million in damages for OSC's cash contributions under the Citizens assistance agreement.

REVERSED-IN-PART AND AFFIRMED-IN-PART

COSTS

No costs.