# In the United States Court of Federal Claims

No. 98-897 L

(Filed: August 4, 2006)

---

| | | |
|---|---|---|
| ROBERT BRACE, | * | Trial; Wetlands on farm property; Consent decree in enforcement action under the Clean Water Act; Fifth Amendment; Regulatory takings; Parcel as a whole; Categorical taking; Partial regulatory taking; *Penn-Central* factors; Economic impact; Reasonable investment-backed expectations; Character of government action; Physical takings; Impact of consent decree; Limitations on use of property properly considered as regulatory takings; Conservation easement; No taking found. |
| Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES, | * | |
| Defendant. | * | |

---

**OPINION**

---

*Nancie G. Marzulla, Roger J. Marzulla* and *Brenda D. Colella*, Marzulla & Marzulla, Washington, D.C., for plaintiff.

*Susan Cook Florentine* and *Sydney F. Cook*, U.S. Department of Justice, Washington, D.C., for defendant, with whom was *Acting Assistant Attorney Kelly A. Johnson.*

**ALLEGRA, Judge:**

"And then I know of no better way
To close a road, abandon a farm,
Reduce the births of the human race,
And bring back nature in people's place"[1]

This takings case is before the court following a trial in Washington, D.C. Plaintiff, Robert Brace, comes from a long line of farmers in Erie County, Pennsylvania. Significant portions of the land that now constitutes his farm were, for many years, drained with the complicity and assistance of the United States Department of Agriculture (USDA). But, when, after acquiring this property from his parents, plaintiff attempted to fill and drain the wetlands thereon, the Environmental Protection Agency (EPA) filed an enforcement suit against him, ultimately resulting in the entry of a consent decree that required plaintiff to take various

---

[1] Robert Lee Frost, *The Times Table* (1928).

remediation steps. Plaintiff contends, *inter alia*, that the actions of the government have effectuated either a regulatory or physical taking of his property under the Fifth Amendment.

## I. FINDINGS OF FACT

Based upon the record, including the parties stipulation of facts, as well as matters collaterally established in the prior enforcement proceeding between the parties, the court finds as follows:

Mr. Brace and his wife, in varying capacities, own approximately 600 acres in south-central Erie County, Pennsylvania, approximately 3 miles northwest of the town of Waterford. Among this land is an approximately 134-acre parcel that Mr. Brace purchased for $170,000 from his parents in December of 1975.[2] As the accompanying diagram illustrates, that parcel lies along Greenley Road, and is bisected into northern and southern tracts by South Hill Road. The portion to the north, approximately 69 acres, is the so-called "Homestead Farm," while the approximately 65 acres of property located to the south, which include the approximately 30 acres of wetlands at issue herein, is the so-called "Murphy Farm."[3] Over time, Mr. Brace has grown a variety of crops on this land, including oats, other grain, corn, cabbage (for which he is particularly known), and potatoes.




[2] Plaintiff claims that this acquisition occurred in a hand-shake deal in the spring of 1975, but, on balance, the record indicates that a legally-binding acquisition did not occur until at least September of that year, and, more likely, December thereof. The claim of an earlier sale is based entirely on the testimony of Mr. Brace. However, despite having been deposed on this subject for both this case and the earlier enforcement action, Mr. Brace never mentioned the hand-shake deal until the trial in this matter. Accordingly, the court discounts his testimony in this regard.

[3] These properties adjoin a 135.11 acre parcel owned by Robert Brace Farms, Inc. and a 46.16 acre parcel owned by Robert Brace & Sons, Inc.

Plaintiff's family first acquired portions of the land at issue during the 1930s. Plaintiff's father, Charles D. Brace, augmented his Erie County holdings in the early 1940s. In its natural state, this land is not the best farmland. According to an exhibit in the record, "[t]he soil in Erie County, Pennsylvania . . . requires continuous draining in order to be suitable for cultivation," "[e]xtensive underground drainage systems are typical and necessary aspects of farming in Erie County," and "installation of such systems is a normal farming activity in order to make land suitable for farming." Beavers have traditionally lived on and around the site. Due to the presence of Beaver dams, portions of the Murphy Farm have periodically been inundated with water.

In 1961, the Soil Conservation Service (SCS), part of the USDA and now known as the Natural Resources Conservation Service (NRCS), developed a "Soil and Water Conservation Plan" for plaintiff's father. This plan covered both farms, and identified which crops were appropriate for particular fields therein, as well as which fields could be improved by the installation of drainage. Like the drainage plans for many farms in Erie Country,[4] the SCS plan proposed using tiles and ditches to drain the fields in order to make them more suitable for farming, particularly for row crops.[5] Specifically, as illustrated by the accompanying diagram, the SCS's plan was designed to drain fields on the Homestead Farm labeled 3, 4, 6, 7, 8, 9, 10, and 11 in a southeasterly direction under South Hill Road and into an unnamed tributary located on the Murphy Farm in what was labeled field 14. From there, the unnamed tributary channeled the water drained from the Homestead Farm and the water from the Murphy Farm in a westerly direction across the Murphy Farm and into Elk Creek, located in what was labeled field 13. Elk Creek then flows in a northwesterly direction, under South Hill Road and onto the Homestead Farm before proceeding on to Lake Erie. As designed, the flow of water across the Murphy Farm was an integral part of the SCS's plan because the Murphy Farm acts as the conduit through which the Homestead Farm drains.

After obtaining the conservation plan, Mr. Brace's father began implementing some of its recommendations. He excavated ditches on both the Homestead and Murphy farms to get more productive pasture and row crop, and installed a diversion ditch that interconnected the drainage

---

[4] By one estimate, between 1978 and 1985, 75 percent of the soil conservation projects coordinated by the SCS involved installing drainage systems. Some of these involved fields that were being actively farmed, but would, but for that farming, have been considered wetlands subject to the permitting process of the Clean Water Act (CWA).

[5] At trial, Mr. Joseph Burawa, former County Executive Director for the USDA's Agricultural Stabilization and Conservation Service (ASCS) in Erie County, testified that, from the 1960s to the 1980s, it was common for the USDA to assist farmers in installing drainage or "tile underdrain" systems on farms in Erie County, noting that this was the "most popular practice." "During that era," he further testified, "I was aware of the fact that the government, through entitlements for tiling and diversions and conservation plans, there was money available for farmers to tile, to enhance their property, lower the water table if you will so they could actively farm that. Production agriculture."

plans on the farms. Mr. Brace's father also renovated pasture land and cleared brush in accordance with the SCS plan. He did not, however, complete all the work envisioned by the plan and, in at least one instance, employed a field as pasture that the conservation plan envisioned would be used as a wildlife area. During this period, the wetlands were used primarily as pastureland, particularly for grazing cattle.

The CWA, which was passed in 1972, prohibits the "discharge of any pollutant by any person" into "navigable waters" without a permit. 33 U.S.C. §§ 1311(a), 1344(a). On April 3, 1974, the Army Corps of Engineers (the Corps) published regulations implementing the CWA. *See* 42 Fed. Reg. 37,122, 37,123 (July 19, 1977). These regulations limited the application of the CWA to "waters that are subject to the ebb and flow of the tide shoreward to their mean high water mark (mean higher water mark on the West Coast) and/or waters that are presently used, were used in the past, or are susceptible to use to transport interstate or foreign commerce." *Id.* at 37,123. However, as a result of a court order, on July 25, 1975, the Corps published interim final regulations extending the jurisdiction of the CWA "over discharges of dredge and fill material to many areas that [had] never before been subject to Federal permits or to this form of water quality protection." 40 Fed. Reg. 31,320 (July 25, 1975). These regulations more broadly defined "navigable waters" to include those wetlands that were "periodically inundated by freshwater and normally characterized by the prevalence of vegetation that requires saturated soil conditions for growth and reproduction." *Id.*



Five months after the latter regulation was promulgated, the subject property was sold to plaintiff.[6] At this time, the site was vegetated with areas of scrub brush, including red brush and briars. Mr. Brace obtained a copy of the SCS plan prepared for his father; he previously knew the plan existed. On July 19, 1977, the Corps adopted final regulations implementing a number

[6] Sometime after this purchase, Mr. Brace purchased an additional adjacent 140 acres from his cousins, increasing his contiguous farm holdings to approximately 270 acres.

of proposed changes. 42 Fed. Reg. 37,125 (July 19, 1977). A few months later, Congress amended the CWA to exempt "normal farming activities" on "established farming operations" from the Section 404 permit requirement. Pub. L. 95-217, § 67, 91 Stat. 1566 (Dec. 27, 1977) (codified at 33 U.S.C. §§ 1344(f)(1)(A)) ("normal farming, silviculture and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber and forest products or upland soil and water conservation practices"); 1344(f)(2) ("Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.")).[7]

In the spring of 1977, plaintiff decided to discontinue the grazing that had occurred on the Murphy Farm. From 1977 through 1979, he obtained technical and financial assistance from agencies within the USDA, including surveying and funding for installing an underground drain system.[8] In particular, on March 7, 1977, Willie L. Ruffin, a District Conservationist with the ASCS, provided technical assistance in mapping out a drainage system entailing portions of both the Homestead and Murphy Farms. When completed on July 14, 1977, that plan entailed the installation of 4,920 feet of 4-inch underground drain tile, 50 feet of 6-inch steel pipe and 880 feet of 6-inch underground drain tile. On April 13, 1978, Mr. Ruffin provided technical assistance on a second drainage system. When completed on May 2, 1978, that system entailed the installation of 5,050 feet of 4-inch underground drain tile and 30 feet of 4-inch steel pipe outlets. On March 20, 1979, Lewis Steckler, another ASCS technician, provided technical assistance mapping out a third drainage system. When completed in July 1979, that system entailed the installation of 350 feet of 4-inch underground drain tile and 650 feet of six-inch underground drain tile. In addition, an 825-foot of sod waterway was constructed. As a result of these efforts, by the end of 1979, the site was dry, with the exception of times of excessive rainfall. Further maintenance on this drainage system was conducted in 1984, to repair damage from a flood. Sometime between July and October of 1984, the USDA provided funding for this maintenance, with officials in the local office of the ASCS operating on the view that farmers were exempt from the CWA.

---

[7] In 1993, the EPA and the Corps promulgated regulations which provide that the "normal farming activities" exemption is available only to discharge activities that are "part of an established (i.e., on-going) farming . . . operation," and expressly stipulate that the exemption is not available either: (i) for "[a]ctivities which bring an area into farming . . . use"; or (ii) where "modifications to the hydrological regime are necessary to resume operations." 33 C.F.R. § 323.4(a)(1)(ii) (1993); 40 C.F.R. § 232.3(c)(1)(ii)(A), (B) (1993).

[8] At the time this assistance was provided, the SCS had a policy prohibiting providing assistance with respect to wetlands. However, as defined at that time, such wetlands did not include property that was being actively farmed. Moreover, for property that was idle, the SCS definition of wetlands was narrower than that which would eventually be employed under the CWA.

Between 1985 and 1987, in an effort to further drain his property, Mr. Brace installed tile and rubber tubing beneath the ground and removed various materials that were impeding the flow of water through the various ditches. At some point during this period, Mr. Brace, without obtaining a permit under the CWA,[9] discharged dredged and fill material onto the 30-acre wetland site. In May of 1987, the United States became aware of this and, beginning on July 15, 1987, and then twice in 1988, it issued orders directing plaintiff to cease maintenance and operation of the drainage system on the property and to submit a plan to restore portions of the property to its prior wetlands condition. The orders and related correspondence threatened a range of civil penalties and possible criminal prosecution. In October of 1988, Mr. Brace received an administrative complaint in connection with his activities on the site, proposing to assess a penalty of $125,000 for various CWA violations. He requested a hearing to contest the complaint, but prior to the hearing, the complaint was dismissed.

During the summer 1988, after receiving the last of the orders, Mr. Brace contacted the ASCS and requested that his property be granted the status of "commenced conversion from wetlands" prior to December 23, 1985. Eventually, the ASCS granted "commenced conversion" status as to some of plaintiff's fields, including several on the Homestead Farm tract, but did not so designate any of the fields located within the wetlands area of the Murphy Farm tract.[10] In 1990, the United States filed an enforcement action against plaintiff in the U.S. District Court for the Western District of Pennsylvania. In 1993, the district court entered judgment in favor of Mr. Brace on the ground that his activities were exempt from the permitting requirements of section 404 of the CWA. On appeal, the United States Court of Appeals for the Third Circuit reversed, finding that Mr. Brace's "drainage activities on the thirty-acre wetland site were not exempt under the 'normal farming activities'" exception to the CWA permit requirement. *United States v. Brace*, 41 F.3d 117, 138 (3rd Cir. 1994), *cert. denied*, 515 U.S. 1158 (1995). On remand, the case was concluded by entry of a consent decree (the Consent Decree) which permanently enjoined Mr. Brace from "discharging any pollutants (including dredged or fill material) into the approximately 30 acre wetland site, . . . unless such discharge is in compliance with the CWA." That decree incorporated a wetlands restoration plan that required Mr. Brace to remove or disable drainage tile, excavate certain parts of his property and fill in certain surface drainage ditches, and install a check dam over a tributary that ran through the wetlands. That work was to be completed, if feasible, within 90 days after the entry of the Consent Decree and, in any event, no

---

[9] As amended in 1972, *see* the Federal Water Pollution Control Act Amendments of 1972, Pub. L. 92-500, 86 Stat. 816, the CWA bans all discharges of pollutants from point sources unless a permit has been obtained. *See* 33 U.S.C. §§ 1311-1344. Specifically, section 301 of the CWA states that "[e]xcept as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act, the discharge of any pollutant by any person shall be unlawful." *Id.* at § 1311(a). Section 404 authorizes the Secretary of the Army, acting through the Chief of Engineers, to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* at § 1344(a).

[10] A letter of February 2, 1989, from the Fish and Wildlife Service to the EPA confirmed that the ASCS had previously paid Mr. Brace for ditching and underground drainage.

later than one year after entry of the decree.[11] The Consent Decree mandated that "within thirty days after the entry of this Consent Decree, Defendants will record this Consent Decree in the applicable land records office."

As verified by EPA inspections and ASCS officials, plaintiff subsequently complied with the Consent Decree. Per the restoration plan, after digging trenches to intersect materials that had been buried underground, Mr. Brace removed extensive amounts of tile and drainage tunnels from his property. He thereby essentially destroyed portions of the system that had previously been constructed to drain portions of the property, all in an effort to restore what one EPA official described as the "hydrologic drive of the[] wetlands" to where it was in 1985. Per the plan, Mr. Brace also installed the check dam, which was designed to counteract dredging that had occurred on one of the tributaries on the property. For reasons that are unclear, the water table on plaintiff's property has risen, indeed, so much, as to create a large pond on the lower half of the property. Plaintiff contends that approximately 40 to 50 acres of the combined Murphy and Homestead Farms is now unusable. Plaintiff also construed the Consent Decree as making it impossible for him to farm uplands adjoining the wetlands, based on concerns that erosion from the uplands would impact the wetlands. However, despite claims that the Consent Decree was overreaching and impacted property outside the wetlands, plaintiff neither sought modification of the decree, nor clarification from the EPA, either formally or otherwise, as to his obligations thereunder or his ability to use the upland portions of the farm property. After 1996, no EPA official has ever visited the property to determine whether the restoration plan had broader impacts than were intended.

On November 25, 1998, Mr. Brace filed this action for the taking of his property without just compensation, in violation of the Fifth Amendment to the United States Constitution. On December 1, 2000, the court denied defendant's motion for summary judgment, but ruled against plaintiff with respect to certain aspects of his regulatory takings argument. *Brace v. United States*, 48 Fed. Cl. 272 (2000) (*Brace I*). Subsequently, the court again denied defendant's renewed motion for summary judgment, finding that material questions of fact existed. *Brace v. United States*, 51 Fed. Cl. 649 (2002) (*Brace II*). This court conducted a trial on liability and damages from January 11-14, 2005, taking testimony from witnesses and accepting exhibits into evidence. At the trial, the court received, *inter alia*, expert testimony regarding the impact of the Consent Decree and resulting restoration activities on the value of plaintiff's property. However, these experts were not instructed by counsel to evaluate the same parcels.

---

[11] The restoration plan further indicated that "[t]he site will be inspected at the completion of the trench work and again at the completion of the restoration work." Consistent with this provision, the decree indicated that "[i]n addition to any other legal authority, representatives of the United States will have the authority for a period of eighteen (18) months after the entry of this Consent Decree, at reasonable times and with proper identification, to enter upon the property affected by this Consent Decree for the purpose of monitoring and measuring compliance with this Consent Decree."

Thus, plaintiff's expert, James E. Lignelli, valued only the Murphy Farm portion of the property, a tract that he set at 58 acres, thirty of which constituted the wetlands. He testified that, despite 12.7 acres of the property being located within a 100-year flood plane, the highest and best use of the property was as a residential subdivision. In evaluating the property as a subdivision – the first of its type in the township of Waterford, Pennsylvania – Mr. Lignelli did not independently determine the feasibility of such a project, including whether appropriate approvals, zoning changes or variances, and permits could be obtained from the relevant Federal, state and local authorities. Rather, he relied on oral representations he received from Mr. Lynn Hofius (who did not testify) that it was likely the requisite approvals, zoning changes and permit would be obtained.[12] Mr. Lignelli set the price of the property at the level if would command under options if, in fact, those approvals, changes and permits were actually obtained.[13] He indicated that if any of his critical assumptions were not borne out, his conclusions would be "null and void." Relying on his discounted cash flow analysis and using various cost figures for the development of sewage, roadways and utilities that were supplied to him (again by individuals who did not testify), Mr. Lignelli opined that, absent the decree and restoration

---

[12] Nor did Mr. Lignelli account for the location of a water or sewer plant, or for the potential cost of developing a paved road to the subdivision. The former were not part of the plans that he received from a surveying group hired by plaintiff, and the latter was assumed to be a cost that the Waterford Township would volunteer toward the project.

[13] In concluding that the proposed development was economically feasible, Mr. Lignelli's report further assayed –

> Market data and analysis . . . indicates that adequate demand exists for single family dwelling and single family lots available for single family residential development whereby the absorption rate of single family lots priced between $32,000 and $66,000 is from six lots during the first year of the sell-out period to a range from eight to thirteen lots per year during years two through 12 of the projected 12-year sell-out period.

Although admitting that "no large scale residential subdivision has been developed in Waterford Township," Mr. Lignelli emphasized that population growth in Waterford Township supported his conclusion, noting that the population of the Township had increased, between 1980 and 1990, by 528 persons, to 3,402. While Mr. Lignelli projected that the population of Waterford Township would increase to 4,161 in 2000, census data contained in a report filed by defendant indicates that the total population of the township in that year was only 3,878. *See* U.S. Census Bureau, Table DP-1, Profile of General Demographic Characteristics: 2000, for Waterford Township, Erie Cty., Pa., available on http://www.census.gov/census2000/states/pa.html (as viewed on August 4, 2006). As reflected in defendant's report, between 1990 and 2000, the number of housing units in Waterford Township increased by 23.4 percent, from 1,173 to 1,446.

activities, the fair market value of the property in 1996 would have been $455,000.[14] Although he did not detail his reasoning in his report, he concluded that with the decree and restoration in place, the property had "scant value," that is, less than $5,000. The latter valuation, in his view, obtained even as to the uplands portion of the property, the value of which he believed was tainted by the "regulatory risk" of being associated with wetlands covered by a consent decree.

By comparison, defendant's expert, George F. Silver, valued a parcel corresponding to both the Murphy and Homestead Farms, representing a total acreage of 134.33 acres.[15] He found that the highest and best use of the property was as a diversified cash crop farm, particularly based upon the quality of certain soils (Howard and Phelps) found there. Using a sales comparison approach, Mr. Silver found that if the wetlands were drained and could be used for row crops – essentially the state of the land before its restoration – the fair market value of the property in 1996 would have been $355,000.[16] Mr. Silver rejected a highest and best use of the property as a subdivision, finding that the market for houses in the Waterford area was for large 5 to 10-acre lots. He further found that such a development was infeasible owing, in part, to the absence of public utilities and to the likelihood that state and local officials would refuse to provide the permissions and permits needed to convert the property because of its hydric soils.[17] Using comparable sales of property that included hydric soils, Mr. Silver found that with the wetlands restored – in other words, with the 30 acres now a wetlands area – the value of the

---

[14] Mr. Lignelli adopted this figure as compared to a value of $293,000 that he produced using a sales comparison approach. He viewed the latter figure as providing a "less reliable and accurate estimate of market value."

[15] The parties, in fact, even disagreed as to the overall size of the Murphy Farm, with Mr. Silver, relying on various tax records, setting that parcel at 65 acres, rather than the 58 acres used by Mr. Lignelli. Mr. Brace claimed to have had the property surveyed, but could neither provide the exact date of the survey, the name of the surveying firm, the name of the surveyor, nor a copy of the survey. The court, therefore, discounts his testimony on this point.

[16] Mr. Silver derived his figure based on 14 sales of improved agricultural properties in Erie County and other counties in the general area, for which he provided extensive data. Those sales involved parcels ranging from approximately 98 acres to 421 acres, with available tillage ranging from approximately 45 acres to 190 acres. Included among the preliminary information that Mr. Silver surveyed was the 2001 purchase by Robert Brace & Sons, Inc. of 249 acres in Waterford Township for $455,000. From these sales, Mr. Silver selected eight sales that he felt were most comparable. Mr. Silver adjusted these figures to account for, *inter alia*, the value of improvements and the types of soil involved.

[17] In reaching the latter finding, Mr. Silver talked directly with officials at the Waterford Planning Commission and the Pennsylvania Department of Environmental Protection.

property would have been reduced in 1996 to $305,000.[18] In reaching the latter conclusion, Mr. Silver discounted the notion that the existence of the Consent Decree would diminish the value of land on the property that is not wetlands. Ultimately, he determined that, as a result of the wetlands restoration, the value of the subject property was diminished by $50,000, or approximately 14 percent.

On April 8, 2005, the court conducted a site visit to the Murphy and Homestead Farms, as well as the surrounding area. Subsequently, the court received post-trial briefs and conducted a closing argument.

## II. DISCUSSION

In deceptively simple terms, the Takings Clause of the Fifth Amendment commands: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. As explained by the Supreme Court, "[t]he aim of the Clause is to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Eastern Enterprises v. Apfel*, 524 U.S. 498, 522 (1998) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)); *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001). Most cases interpreting the Clause fall into one of two classes. As explained by the Supreme Court –

> Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation. *See, e.g., Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982). But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole. *See, e.g., Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 123-125 (1978). The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.

*Yee v. City of Escondido*, 503 U.S. 519, 522-23 (1992) (parallel citations omitted); *see also Tahoe-Sierra Preserv. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321 (2002); *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1180-82 (Fed. Cir. 1994). Here, plaintiff

---

[18] In calculating this number, Mr. Silver valued portions of the property that, in the "before" state, he had viewed as "tillage" at $2,500 per acre as instead "open to wooded wetland" at $400 per acre. While Mr. Silver could not adjust his figures to correspond to the smaller acreage used by Mr. Lignelli, he testified that, all things being equal, the per acre value of a smaller parcel generally is higher than that of a comparable larger parcel.

alleges both forms of takings have occurred. The court will consider his regulatory and physical takings claims *seriatim*.

**A. Regulatory Taking**

Justice Holmes long ago opined that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922); *see also Palazzolo*, 533 U.S. at 617. This familiar language is the genesis of the so-called regulatory takings doctrine, first invoked to challenge mining and zoning laws, but here raised in contending that the regulation of plaintiff's farm has effectuated a takings.

A property owner may show that the government has effectuated a "categorical taking" by demonstrating that a regulation has denied him of "all economically beneficial or productive use of land." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992); *Norman v. United States*, 429 F.3d 1081, 1090 (Fed. Cir. 2005), *cert. denied*, 164 S.Ct. 2288 (2006). In addition, "[w]here a regulation places limitation on [property] that fall short of eliminating all economically beneficial use," the Supreme Court has stated, "a taking nonetheless may have occurred depending on a complex of factors." *Palazzolo*, 533 U.S. at 617; *see also Brown v. Legal Found. of Washington*, 538 U.S. 216, 233 (2003) (noting that such cases require an *"ad hoc* factual inquiry"); *Tahoe-Sierra*, 535 U.S. at 335 (must determine whether under "all the relevant circumstances" a taking is established). In 1978, the Supreme Court added some framework to this inquiry by identifying three criteria that are particularly significant in determining whether governmental action constitutes a taking: (i) "[t]he economic impact of the regulation on the claimant;" (ii) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (iii) "the character of the governmental action." *Penn Central*, 438 U.S. at 124; *see also Palazzolo*, 533 U.S. at 617.[19] None of these factors are "decisive in themselves but rather must be weighed in a balance that takes into account all of the circumstances." *Cienega Gardens v. United States*, 67 Fed. Cl. 434, 466 (2005); *see also Tahoe-Sierra*, 535 U.S. at 322; *Palazzolo*, 533 U.S. 635-36 (O'Connor, J., concurring). Yet, in the composite, these factors are designed to "identify those regulations whose effects are functionally comparable to government appropriation or invasion of private property." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 542 (2005).

---

[19] *See also Good v. United States*, 189 F.3d 1355, 1360 (Fed. Cir. 1999), *cert. denied*, 529 U.S. 1053 (2000); *Creppel v. United States*, 41 F.3d 627, 631 (Fed. Cir. 1994); *Loveladies Harbor,* 28 F.3d at 1179; *Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1567 (Fed. Cir.1994), *cert. denied*, 513 U.S. 1109 (1995); *Arctic King Fisheries, Inc. v. United States,* 59 Fed. Cl. 360, 368-69 (2004).

### 1. Defining the Parcel as a Whole

As a threshold matter, in applying either form of the regulatory takings analysis, the court must focus on the "parcel as a whole." As Justice Brennan's opinion in *Penn Central* emphasized –

> 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole . . . .

*Penn Central*, 438 U.S. at 130-31; *see also Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1348 (Fed. Cir. 2004), *cert. denied*, 543 U.S. 1188 (2005). In *Tahoe-Sierra*, 535 U.S. at 328, the Supreme Court indicated that defining the relevant parcel required consideration of the "aggregate . . . in its entirety." It rejected the notion of conceptual severance, under which the takings analysis could be applied only to the portion of a larger property most directly burdened by a regulation, reasoning –

> Of course, defining the property interest taken in terms of the very regulation being challenged is circular. . . . Petitioners' "conceptual severance" argument is unavailing because it ignores *Penn Central's* admonition that in regulatory takings cases we must focus on "the parcel as a whole." 438 U.S. at 130-131. We have consistently rejected such an approach to the "denominator" question.

*Id.* at 331; *see also Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 644 (1993) ("To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question.").

In applying the "parcel" as a whole concept, the court must focus on "the economic expectations of the claimant with respect to the property" and whether a given property is treated as a "single economic unit." *See Norman*, 429 F.3d at 1091; *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1365 (Fed. Cir.), *cert. denied*, 528 U.S. 951 (1999). Additional relevant factual considerations in making the "parcel as a whole" determination include: (i) the degree of contiguity between property interests; (ii) the dates of acquisition of property interests; (iii) the extent to which a parcel has been treated as a single income-producing unit, and (iv) the extent to which the regulated lands enhance the value of the remaining lands. *Loveladies Harbor*, 28 F.3d at 1180; *Cane Tennessee, Inc. v. United States*, 62 Fed. Cl. 703, 709 (2004); *Forest Props., Inc. v. United States*, 39 Fed. Cl. 56, 74 (1997), *aff'd*, 177 F.3d 1360 (Fed. Cir.), *cert. denied*, 528 U.S. 951 (1999); *Ciampitti v. United States*, 22 Cl. Ct. 310, 318 (1991). These factors often have led courts to combine wetlands with surrounding uplands, treating the composite property as the parcel as a whole. *See Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed. Cir. 1993) (stating that "[c]learly, the quantum of land to be considered [in a regulatory takings case

involving wetlands regulations] is not each *individual* lot containing wetlands or even the combined area of wetlands," but rather the "parcel as a whole") (emphasis in original); *Deltona Corp. v. United States*, 657 F.2d 1184, 1188 (Ct. Cl. 1981), *cert. denied*, 455 U.S. 1017 (1982); *Walcek v. United States*, 49 Fed. Cl. 248, 258-59 (2001), *aff'd*, 303 F.3d 1349 (Fed. Cir. 2002) (citing additional cases).

In the case *sub judice*, the evidence points to treating the Murphy and Homestead Farms together as the "parcel as a whole." These farms are contiguous, were acquired in a single conveyance for a single consideration of $170,000, are reflected in a single deed, and contain an integrated drainage system that begins on the Homestead Farm and drains into and through the Murphy Farm. Even before they were acquired by plaintiff, they were treated a single income-producing unit, a fact evident in the 1961 soil conservation plan that provides the backdrop for this action. In an attachment to that plan, plaintiff's father certified that both properties constituted a "farm enterprise," a characterization that appears to have remained accurate from then til today. *Compare Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1185-87 (Fed. Cir. 2004), *cert. denied*, 125 S.Ct. 2541 (2005) (production from multiple farms considered together as "parcel as a whole" where economically linked); *Apollo Fuel*, 381 F.3d at 1346 (two leases treated as parcel as a whole, even though purchased separately, where part of a single unified mining plan). Indeed, during the enforcement action, when plaintiff sought to exempt his fill activities as relating to farming, he convinced the district court that the Murphy and Homestead Farms were part of an integrated and on-going farm operation.[20] There is no indication that, prior to this lawsuit, he ever viewed matters otherwise. *See also Brace I*, 48 Fed. Cl. at 280 ("Plaintiff's alleged intentions was to use these parcels together in his farming operation.").

The meager evidence that plaintiff mustered on this point – that an unpaved road runs between the two properties, that the various fields have been used for different farming purposes (*e.g.*, row crops, haying, pasture), and his self-serving trial testimony – amounts to little more than wishful thinking and does not begin to address, let alone sway, the factors that the courts have employed for identifying what constitutes a "parcel as a whole." While plaintiff undoubtedly desires to shrink the acreage at issue so as to magnify the impact of the regulation here, a legion of cases makes clear that a property holder cannot carve up his property simply to maximize the likelihood that a taking will be found. *See Tabb Lakes*, 10 F.3d at 802 ("Clearly, the quantum of land to be considered is not each *individual* lot containing wetlands or even the combined area of wetlands. If that were true, the Corps' protection of wetlands via a permit system would, *ipso facto*, constitute a taking in every case where it exercises its statutory

---

[20] *See United States v. Brace*, Civil Action No. 90-229, at 12 (W.D. Pa. Dec. 16, 1993) ("This Court is persuaded and concludes that the subject site was during the entire period of time that ownership rested in the Brace family, an integral part of an established and on-going farm and ranching operations, and [Mr. Brace's] activities during the time frame of 1985-1987 did not bring a new area into the operation."); *see also Brace*, 41 F.3d at 125 (leaving this fact finding undisturbed).

authority.") (emphasis in original); *see also Concrete Pipe*, 508 U.S. at 642-44; *Jentgen v. United States*, 657 F.2d 1210, 1213 (Ct. Cl. 1981); *Walcek*, 49 Fed. Cl. at 259. Here, the parcel as a whole plainly includes both farms at issue and the court's analysis will proceed upon that sound factual footing.

**2. Categorical Taking**

As recently noted by the Federal Circuit, "a regulatory taking becomes 'categorical,' and therefore, requires compensation only if the owner is deprived of all beneficial use of the 'parcel as a whole.'" *Norman*, 429 F.3d at 1091; *see also Tahoe-Sierra*, 535 U.S. at 330-31. In the case *sub judice*, plaintiff was able to frame even a loosely colorable categorical taking claim only by treating the Murphy Farm as the "parcel as a whole." But, since the latter characterization is erroneous and because plaintiff did not contend – let alone prove – that the Homestead Farm was rendered valueless by the application of either the wetlands regulation or the Consent Decree, his categorical takings claim must fail.

**3. Partial Taking – Application of Factors**

The court next must determine whether the particular facts of this case, as anchored in the trial record, constitute a partial taking under the three-part *Penn Central* test.

**i. Economic impact.**

The first criterion – the economic impact of the regulation – is "intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim." *Loveladies Harbor*, 28 F.3d at 1176; *see also Pennsylvania Coal*, 260 U.S. at 413 ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."). "The cynosure of this factor," this court has noted, "is the change in the fair market value of the subject property caused by the regulatory imposition – in other words, the court must 'compare the value that has been taken from the property with the value that remains in the property.'" *Arctic King*, 59 Fed. Cl. at 374 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictus*, 480 U.S. 470, 497 (1987)); *see also Penn Central*, 438 U.S. at 130-31; *Florida Rock*, 18 F.3d at 1567. "The economic analysis is often expressed in the form of a fraction, the numerator of which is the value of the subject property encumbered by regulation and the denominator of which is the value of the same property not so encumbered." *Walcek*, 49 Fed. Cl. at 258; *see also Florida Rock*, 18 F.3d at 1567; *Arctic King*, 59 Fed. Cl. at 374; *Brace II,* 51 Fed. Cl. at 653.

Both parties agree that for takings purposes, a property owner is entitled to have the fair market value be based upon the "highest and best use" of the property. *See, e.g., Olson v. United States*, 292 U.S. 246, 255 (1934). "Highest and best use" has been defined as " '[t]he reasonably probable and legal use of [property], which is physically possible, appropriately supported, financially feasible, and that results in the highest value,' " including those uses to which the property " 'may be readily converted.'" *Loveladies Harbor, Inc. v. United States*, 21 Cl. Ct. 153,

156 (1990) (quoting *United States v. Powelson*, 319 U.S. 266, 275 (1943)); *see also Bassett, New Mexico, LLC v. United States*, 55 Fed. Cl. 63, 69 (2002). None of these cases, however, require the court to indulge blithely in "what if" fictions. As this court has stated, "the loss to be compensated for under the Takings Clause is not purely hypothetical, but must bear some grounding in reality, even in the case of a projected future use." *Arctic King*, 59 Fed. Cl. at 375. This is because "[t]he language of the Clause . . . no more envisions a taking of 'private property' the plaintiff does not own, than it does the payment of just 'compensation' for the loss of value that plaintiff never had nor reasonably could realize." *Id*. (citing *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710 (1999)).

Of course, in performing the foregoing analysis, it goes almost without saying that one has to value the ***correct*** parcel. Yet, plaintiff's expert did not. Instead of valuing the entire 134 acre-parcel that included both farms, Mr. Lignelli valued only the smaller Murphy Farm. Particularly since plaintiff knew defendant was prepared to argue that the relevant parcel included both farms, and especially given the state of the law and facts surrounding that issue, this approach was tantamount to betting heavy on a low pair in a game of high-stakes poker. Unfortunately for plaintiff, no miracle card appeared on the "river" – the court has rejected the notion that the Murphy Farm represents the parcel as a whole, leaving a sizeable hole in plaintiff's proof. Perhaps an alternative approach that included both farms was not employed to minimize costs or perhaps plaintiff felt that his case was not tenable if the larger parcel were considered, but the result, motivations aside, is that plaintiff has not shown the impact of the Consent Decree or the wetland regulation in diminishing the value of the true parcel as a whole. *Compare Norman*, 63 Fed. Cl. at 273 (finding expert appraisal unhelpful because it "did not address the economic impact of what the court has determined to be the relevant parcel"); *Arctic King*, 59 Fed. Cl. at 369 (warning of "apply[ing] the right test to the wrong corpus and yield[ing] seemingly valid, but ultimately misleading results"). Lest the court leave the impression that plaintiff properly valued even the Murphy Farm, a few additional observations are in order.

First, plaintiff did not remotely carry his burden of proving that the "highest and best" use of the Murphy Farm was as a large 125-lot subdivision, to be developed over a twelve-year period. Mr. Lignelli predicated the use of the land for this purpose on interviews with real estate brokers and developers, and on census data what he viewed as indicating that Waterford Township was the fastest growing town in Erie County. But, the brokers or developers with whom he spoke remained nameless and the statistics he relied upon showed in absolute, rather than percentage, terms a very small growth in population (a net increase of approximately 500 individuals over the course of a decade). Of course, per centums do not move into houses, people do. And to fully liquidate the lots in the proposed subdivision – the largest development, by far, to ever be constructed in the area – most of the projected housing growth for the entire area would, for the life of the project, have to be absorbed at this single site. Paradoxically, Mr. Lignelli could not explain why, if such a development was so feasible and desirable, no one had already built it on the ample land available in the area. One possible explanation, which was highlighted by defendant's expert, is that the typical lot in the Waterford area is actually 5 to 10

acres, neither the .33 acres envisioned by the development plan, nor even the 1 acre per lot limitation in the current zoning of the parcel.

The latter fact hints at a deeper problem. In assessing the feasibility of the project, Mr. Lignelli did not determine whether needed approvals – among them, not only the zoning changes allowing for much smaller lots, but also design, sewage, environmental, utility and road permits and approvals – could be obtained from the half dozen or more Federal, state and local authorities with sometimes interlocking jurisdiction over various aspects of the property. Rather, he simply assumed that those permissions would be forthcoming based solely on oral representations he received from Mr. Hofius. Because Mr. Hofius did not testify, the court is ill-positioned to analyze the weight that should be afforded his opinions, assumptions or factual premises. Substantially undercutting that weight, Mr. Lignelli admitted that Mr. Hofius made only the most general of statements to him – merely indicating that the approvals were "more likely than not" – leaving Mr. Lignelli unsure whether Mr. Hofius even had included all the approvals required.[21] Mr. Lignelli also assumed, based only upon representations made by Mr. Brace, that well water would be available for the entire subdivision at a nominal cost. Because the court finds Mr. Lignelli's various assumptions unproven and suspect, it concludes that that the use of Murphy Farm as a large-scale housing development was a fictional litigation construct that was neither legally permissible nor financially feasible. *See Moore v. United States*, 61 Fed. Cl. 73, 78 (2004) (rejecting appraisal value that did not adequately account for zoning restrictions).

Second, assuming *arguendo* that the "highest and best" use of the Murphy Farm was as a subdivision, there are serious deficiencies in Mr. Lignelli's use of the discounted cash flow

---

[21] Asked how he was able to "conclude that it was reasonably probable that a 125-lot subdivision could be constructed on the Murphy farm tract?," Mr. Lignelli tellingly explained –

> Well, again, it goes back to the hypothetical condition that if it can be built, it is feasible. Again, that's one of the tests of highest and best use. It's assumed that it's legally permissible. Since we're in 2004 appraising site as of 1996 it was unknown at that time whether it could or could not because again, it's a conceptual subdivision as opposed to a proposed subdivision. If it were proposed, all the regulatory requirements would have been met by the time the appraisal would be ordered or engaged. Again, typically an appraiser is involved after the requisite approvals have been granted and the appraiser is often engaged by a lender or bank who is putting forth a development loan. So there's no need to hire an appraiser until and unless all of the compliance issues have been arranged.

Mr. Lignelli indicated that he wanted to obtain more information from Waterford Township, but was barred from doing so by Mr. Brace.

method to value the land.[22] On the one hand, Mr. Lignelli overstated the revenue likely to be produced from such a hypothetical subdivision. For example, he assumed, with no factual support and contrary to evidence produced by defendant, that permissions could be obtained to develop the almost 13 acres of the 58-acre Murphy Farm tract that were within the 100-year flood plain adjacent to the Elk Creek. Indeed some of the lots on the plan that Mr. Lignelli used appear to be located directly on the creek itself and at least one of the parcels includes within its contours a preexisting gas well. Nor did the plans Mr. Lignelli obtained from others make any allowance for the lots that would be lost in installing water and sewer treatment plants for the subdivision – Mr. Lignelli instead assumed that these facilities could be located, without cost, on adjoining property. This was not the only instance in which Mr. Lignelli donned rose-colored glasses in assessing the costs associated with developing the subdivision. Perhaps most significantly, he assumed that the hydric soils underlying the entire Murphy Farm were suitable for building and did not include any specific charge for what the records suggests would be the significant costs associated with preparing the wetlands for use as housing lots.[23] Testimony by defendant's expert showed that this assumption was erroneous. And, Mr. Lignelli assumed that Waterford Township would pay the cost of paving South Hill Road, again without any support in the record. Of course, the impact of Mr. Lignelli's overstating the income from the property and understating the expenses of development was to overstate the value of the property.

Third, as alluded to above, Mr. Lignelli relied heavily on representations made by parties that did not testify at the trial. Certainly, under the Rule 703 of the Federal Rules of Evidence, a testifying expert may rely upon "facts or data" made known to the expert before the hearing and even may rely upon opinions, if reasonably relied upon by experts in the particular field. *See* Advisory Committee Note to Rule 703. However, the *ipse dixit* of that reliance does not make those facts, data or opinions true, particularly where, as here, they are derived largely from hearsay. *See* Fed. R. Evid. 802. Rule 703 "was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion."

---

[22] A recent decision of this court described well the methodology that Mr. Lignelli essentially employed: "Under the subdivision development method: All direct and indirect costs [of development] and entrepreneurial profit are deducted from an estimate of the anticipated gross sales price of the finished lots; the resultant net sales proceeds are then discounted to present value at a market-derived rate over the development absorption period to indicate the raw value of land." *Norman*, 63 Fed. Cl. at 271 (internal citations omitted).

[23] During trial, whenever Mr. Lignelli was confronted with a cost that he had not considered, he asserted that it was covered by the $60,000 estimate that Mr. Hofius had provided for miscellaneous development costs. While there was no indication as to what was included in this figure, with each salvific reference thereto, it became more and more obvious that Mr. Lignelli had ignored expenses that might have individually, let alone collectively, exceeded this catchall figure.

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005).[24] In short, Mr. Lignelli's report did not "automatically become proof of the facts underlying [his] expert[] opinion," *Logan v. City of Pullman*, 392 F. Supp. 2d 1246, 1254 (E.D. Wash. 2005), requiring plaintiff to otherwise demonstrate that the critical factual assertions upon which he proceeded were preponderantly true, particularly as they related to the feasibility of developing the Murphy Farm into a subdivision. *See Ambrosini v. Labarraque*, 101 F.3d 129, 135-36 (D.C. Cir. 1996); *Mis-State Fertilizer Co. v. Exchange Nat. Bank of Chicago*, 877 F.2d 1333, 1338 (7th Cir. 1989); *Fox v. Taylor Diving & Salvage Co.*, 694 F.2d 1349, 1356 (5th Cir. 1983). While this is not to suggest that plaintiff was obliged to corroborate every single fact upon which his expert relied, it remains that, in presenting an abbreviated case, plaintiff largely skipped over this vital verification step.

In short, the record reveals that plaintiff provided little, if any, corroboration of the key assertions upon which Mr. Lignelli proceeded. Many of those assumptions involved the planning and costs of the subdivision and came either from Mr. Hofius or from letters from other nontestifying individuals that provided only the most conclusory of information. The situation thus confronted by the court was very similar to one faced by the Seventh Circuit in *Matter of James Wilson Assocs.*, 965 F.2d 160 (7th Cir. 1992). There, the Seventh Circuit observed –

> The issue was the state of the building, and the expert who had evaluated that state – the consulting engineer – was the one who should have testified. The architect could use what the engineer told him to offer an opinion within the architect's domain of expertise, but he could not testify for the purpose of vouching for the truth of what the engineer had told him – of becoming in short the engineer's spokesman . . . . [I]t is improper to use an expert witness as a screen against cross-examination.

*Id*. at 173. In the case *sub judice*, Mr. Hofius played the role of the consulting engineer, *i.e.*, "the one who should have testified." *Id.; see also TK-7 Corp.*, 993 F.2d at 732 ("[t]he fact that [the expert] relied upon the report in performing his calculation of lost profits does not relieve the plaintiffs from their burden of proving the underlying assumptions contained in the report"). As in these cases, Mr. Lignelli did not really determine the feasibility of using the property as a subdivision, but merely valued the property based on the assumption that such a use was feasible. In terms of weight, then, Mr. Lignelli's ultimate opinion of value is virtually devoid of factual moorings, depriving it of virtually any evidentiary value. *See Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) ("Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all."). Indeed, Mr. Lignelli boldy testified that

---

[24] *See also Dura Automotive Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002); *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728-29 (6th Cir. 1994); *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 731-34 (10th Cir. 1993); *Paddack v. Dave Christenson, Inc.*, 745 F.2d 1254, 1262 (9th Cir. 1984).

if any of his critical assumptions were not borne out, his conclusions would be "null and void," a statement that proved prophetic.

Hence, even if plaintiff were correct about the contours of the parcel as a whole here, his proof on this factor would still be grossly deficient. So where does this leave us? Based upon the record, the court believes that the calculations of defendant's appraiser, Mr. Silver, were more rigorous, supported, transparent and, ultimately, more accurate. In particular, Mr. Silver provided significantly greater detail regarding the sources of his information, as well as two volumes of background materials in support his findings – the wide majority of which material plaintiff did not bother to challenge, and all of which he did not rebut. Mr. Silver found that the highest and best use of the property was as farmland and that the value of the property unrestricted by the Consent Decree or application of the CWA was $355,000. In reaching this conclusion, he employed a comparable sales approach that relied on various sales of farm property, some of which incorporated "mucklands" comparable to the wetlands at issue here. Again, plaintiff showed flaws neither in Mr. Silver's selection of comparables nor in the adjustments he made to derive the "before" value of the property.

Using a similar methodology, Mr. Silver concluded that the "after" value of the parcel as a whole was $300,000. In this regard, he based his value, in part, on the view that the upland portions of the Murphy Farm could continue to be farmed. Claims to the contrary, in fact, were rebutted by evidence that, following the Consent Decree, Mr. Brace himself had conducted farming on the upland portions. To be sure, Mr. Lignelli initially testified that the value of the Murphy Farm with the Consent Decree in place was "scant," asserting that the presence of that decree somehow tainted the entire property.[25] But, he later admitted that the upland portions of the property could be used a single homesite that would overlook the wetlands, giving it a value of $140,000. Given that Mr. Lignelli did not value the larger Homestead Farm at all, the figure of $140,000 for the "after" value of the Murphy Farm compares favorably with Mr. Silver's estimate of the "after" value of the entire property. Accordingly, the court finds that the "after" value of the property was $300,000.

As such, the court finds that the numerator of the takings equation is equal to $300,000 and the denominator thereof is $355,000. Consequently, the court finds that the application of the Consent Decree and the corresponding regulation of the property under the CWA resulted in a diminution in value of approximately 14 percent.

---

[25] Mr. Lignelli's notion that the uplands portion of the property had scant value was based upon his view that the Consent Decree made it unlikely that anyone could put the uplands to profitable use. In this regard, while Mr. Lignelli was more than willing to assume that every approval would be obtained necessary to allow for the development of the subdivision, he was unwilling to assume that inquiries to the EPA regarding the Consent Decree would clarify the types of activities that would be allowed on the uplands.

**ii. The extent to which the regulation has interfered with reasonable investment-backed expectations.**

The second factor in *Penn Central* – the interference with reasonable investment-backed expectations – is a "way of limiting takings recoveries to owners who [can] demonstrate . . . reliance on a state of affairs that did not include the challenged regulatory regime." *Loveladies Harbor*, 28 F.3d at 1177; *see also Creppel*, 41 F.3d at 632. Although this factor is often couched in terms of the owner's expectations at the time the property is purchased, *see Loveladies Harbor*, 28 F.3d at 1177, various cases hold that the inquiry focuses on various investment decisions, including those made after the property was initially purchased. *See, e.g., Good*, 189 F.3d at 1361-62; *Deltona Corp.*, 657 F.2d at 1193; *Seldovia Native Ass'n, Inc. v. United States*, 35 Fed. Cl. 761, 773-74 (1996).[26] So framed, this factor encompasses two related elements: first, the extent of the plaintiff's investment in reliance on the regulatory scheme in place at the time of his investment decisions; and second, the extent to which the further regulation of its property was foreseeable. *See, e.g., Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1006 (1984); *see also Appolo Fuels*, 381 F.3d at 1349; *Walcek*, 49 Fed. Cl. at 268. These expectations must be reasonable – "[a] 'reasonable investment backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus*, 467 U.S. at 1005-06 (quoting *Webb's Fabulous Pharmacies v. Beckwith*, 449 U.S. 155, 161 (1980)); *see also Norman*, 429 F.3d at 1092; *Cienega Gardens v. United States*, 331 F.3d 1319, 1345-46 (Fed. Cir. 2003); *Good*, 189 F.3d at 1360.

Plaintiff's evidence on this point is somewhat more compelling. To be sure, the relevant provisions of the CWA were enacted in 1972, several years before plaintiff acquired the property. And, at trial, Mr. Brace admitted that, at the time of his purchase, he was aware of the CWA and that there were some form of wetlands on the property. Nonetheless, as this court explained in *Walcek* –

---

[26] As noted by Professor Eagle, in his treatise on regulatory takings-

> The phrase "investment-backed expectations" had been used first in Professor Frank Michelman's seminal article and borrowed for Justice Brennan's *Penn Central* opinion with no reference other than to the intent, or expectation, of the landowner at the time he made his "investment." *Good* suggests that subsequent events, including the alacrity with which the owner pursues his plans, the extent the owner has to battle administrative delay in a multitude of agencies, and the enactment of subsequent statutes and the promulgation of regulations, all play a role in "reasonable investment-backed expectations" analysis.

Steven J. Eagle, Regulatory Takings 931 (2001) (citing, *inter alia*, Frank I. Michelman, "Property, Utility, and Fairness: Comments on the Ethical Foundations of 'Just Compensation' Law," 80 Harv. L. Rev. 1165 (1967)).

> even after the passage of the Clean Water Act, the Corps, at first, adopted a narrow definition of the "navigable waters" subject to the Act, essentially defining them as coextensive with the "navigable waters" subject to regulation under Section 10 of the Rivers and Harbors Act. *See* 39 Fed. Reg. 12,115, 12,119 (April 3, 1974). It was not until 1975, following a district court decision invalidating the earlier regulation and ordering the issuance of broader regulations, that the Corps finally issued an interim final regulation redefining "the waters of the United States" to include all freshwater wetlands that were located near navigable waters. *See* 40 Fed. Reg. 31,324 (July 25, 1975); 33 C.F.R. § 209.120(d)(2)(h) (1976). And it was not until almost ten years later, in 1985, that the Supreme Court finally resolved that these more expansive regulations represented a valid and reasonable construction of the statute. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 130-39 (1985).

*Walcek*, 49 Fed. Cl. at 268-69 (footnote and citations omitted).[27] Accordingly, it was not until a few months before Mr. Brace purchased the property that the Corps itself reversed its initial interpretation of the CWA and not until nearly a decade after that purchase that the Supreme Court confirmed that the expanded view of the regulations was correct.

In the court's view, it does not seem reasonable to impute to plaintiff an interpretation of the CWA that clearly was in flux at the time the land in question was purchased. *See Walcek*, 49 Fed. Cl. at 269 (reaching the same conclusion as to an individual who had purchased property in 1971, stating that "[w]hile the *Penn Central* analysis anticipates reasonably foreseeable developments, it does not require a property owner to be clairvoyant"); *see also Deltona*, 657 F.2d at 1191 (suggesting that the events described above had "radically transformed" the regulatory regime, working an "unforeseen change in the law").[28] Application of the wetlands regulatory regime to plaintiff's property particularly was not foreseeable given the ambiguities

---

[27] This court described these developments in its earlier opinion in this case. *See Brace*, 48 Fed. Cl. at 277-78; *see also* Flint B. Ogle, "The Ongoing Struggle Between Private Property Rights and Wetlands Regulation: Recent Developments and Proposed Solutions," 64 U. Colo. L. Rev. 573, 575-76 (1993).

[28] Defendant essentially operates on the notion that "the law is what the law is" and that the history of the regulations is thus irrelevant. But, that argument seemingly ignores not only the foreseeability prong of this factor, but also the realities of the regulatory process and the marketplace. As to the latter, while one might reasonably assume that, after the passage of the CWA, a person could have acquired the property at somewhat of a discount, there is no indication that discount would have fully recognized the potential application of the CWA at the time Mr. Brace acquired the property, given the flux in the law. This is not to say that a person can harbor reasonable investment-backed expectations regarding the use of his property until it is actually identified as being subject to the CWA, but only to say that such expectations may, to a certain extent, be retained until the law itself is settled.

concerning whether the CWA barred certain types of farming activities. The record, of course, demonstrates that, for decades, the USDA encouraged plaintiff and his father to increase the agricultural capacity of their land and, in so doing, applied both definitions of wetlands, as well as the scope of the CWA, that were far narrower than what was ultimately determined to be the case. To be sure, the agencies involved here never specifically provided either guidance or financing targeted at draining the 30 acres of wetlands at issue here. But, even after the passage of the CWA and the issuance of the 1975 regulations, those same agencies continued to provide guidance and financing to drain other portions of plaintiff's property, undoubtedly leaving the impression that the requirements of the CWA were more relaxed and flexible when it came to farming. And that impression actually reflected what the local agency believed. Thus, Mr. Burawa, the former County Executive for the ACSC, testified that, at least into the 1980s, the local branch of his agency was of the view that the CWA did not prevent farmers from draining their lands to promote agriculture.

Of course, the actions of the USDA only reinforced plaintiff's reasonable investment-backed expectation to the extent that he sought to farm the property. They could not – and did not – impact any expectation of using the property as a housing subdivision. Nonetheless, while Mr. Brace's knowledge of the passage of the CWA diminishes somewhat the strength of his argument regarding his investment-backed expectations, the court finds in his favor on this second of the *Penn Central* factors.[29]

**iii. The character of the governmental action.**

The last criterion – the character of the government action – requires the court to consider "the purpose and importance of the public interest underlying [the] regulatory imposition, . . . obligating the court to 'inquire into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented.'" *Maritrans, Inc. v. United States* , 342 F.3d 1344, 1356 (Fed. Cir. 2003) (quoting *Creppel*, 41 F.3d at 631); *see also Lucas*, 505 U.S. at 1029 (no taking if the limitation "inhere[s] in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership"); *Forest Props.*, 177 F.3d at 1366; *Loveladies Harbor*, 28 F.3d at 1179. "[W]hile most burdens consequent upon government action undertaken in the public interest must be borne by individual landowners as concomitants of the advantage of living and doing business in a civilized community," the Supreme Court has stated, "some are so substantial and unforeseeable, and can so easily be identified and redistributed, that justice and fairness require that they be borne by the public as a whole." *Kirby Forest Indus.,*

---

[29] The court is aware that in his earlier opinion in this case, Judge Tidwell found that this factor weighed in favor of defendant. *Brace I*, 48 Fed. Cl. at 283-84. While the court agrees with many of the points that Judge Tidwell believed weighed against plaintiff, it believes that, based upon the evidence received at trial, particularly that regarding the USDA's practices, law of the case considerations do not prevent it from finding that this factor, on balance, now weighs toward plaintiff. *See Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 733-34 (2004).

*Inc. v. United States*, 467 U.S. 1, 14 (1984) (citation omitted).[30] Burnishing this concept, the Supreme Court, in *Eastern Enterprises*, suggested that in considering whether, under this factor, a regulation "implicates [the] fundamental principles of fairness underlying the Takings Clause," two other indicia are relevant: (i) the extent to which the action is retroactive; and (ii) whether the action targets a particular individual. *Eastern Enterprises*, 524 U.S. at 537; *see also Am. Pelagic I*, 49 Fed. Cl. at 50.

In the case *sub judice*, there is obviously nothing to suggest that farming constitutes a nuisance, so that application of the CWA could be viewed as effectuating a limitation inherent in the use of the land. *Cf. Appolo Fuels*, 381 F.3d at 1347 (indicating that defendant "may defend against liability by claiming that the regulated activity constituted a state law nuisance without regard to the other *Penn Central* factors"). At the same time, the existence of the wetland regulations in question, as well as their application to the farms, indisputably serve an important public purpose – one which benefits plaintiff as members of the public at large. *See, e.g., Riverside Bayview Homes, Inc.*, 474 U.S. at 131-35; *see also Rapanos v. United States*, 126 S.Ct. 2208, 2240 (2006) (Kennedy, J., concurring). Thus, as was said in an earlier Federal Circuit case, "[t]he importance of preserving the environment, the authority of state and federal governments to protect and preserve ecologically significant areas . . . through appropriate regulatory mechanisms is not here being questioned." *Loveladies Harbor*, 28 F.3d at 1175. In sum, this court reaffirms its finding in *Brace I*, 48 Fed. Cl. at 278-79, that "the United States has a legitimate public welfare obligation to preserve our nation's wetlands" and "the government's actions in this case were well directed to that end."

Considering the factors more recently identified in *Eastern Enterprises,* the degree of retroactivity here is not extraordinary – even assuming *arguendo* that plaintiffs could not have reasonably anticipated the final resolution of the disputes concerning the scope of the CWA, it remains that the CWA and the initial regulations extending that statute to wetlands such as those at issue were extant at the time that Mr. Brace purchased the property. Further, the CWA and the wetlands regulations issued thereunder are generally applicable to all similarly situated property owners and can in no way be viewed as being directed at plaintiffs. *Cf. American Pelagic*, 49 Fed. Cl. at 50-51. Accordingly, while the absence of a nuisance certainly cuts in favor of a finding of a taking, other circumstances in this case ameliorate somewhat the impact of the third *Penn Central* factor in this regard.

---

[30] *See also United States v. Locke*, 471 U.S. 84, 106 n.15 (1985); *Maritrans*, 342 F.3d at 1357; *Cienega Gardens*, 331 F.3d at 1338; *Am. Pelagic Fishing Co. v. United States*, 49 Fed. Cl. 36, 51 (2001), *rev'd on other grounds*, 379 F.3d 1363 (Fed. Cir. 2004), *cert. denied*, 125 S. Ct. 2963 (2005). In *Maritrans*, the Federal Circuit determined that the nature of the government's action in passing legislation that would require oil tankers to have double hulls, in the wake of the Exxon Valdez oil spill and as an attempt to limit such spills in the future, was not such that it imposed disproportionately a burden on the plaintiff. The legislation applied uniformly across the oil transport industry, "thereby spreading the burden imposed by the statute over the entire industry" and, therefore, did not rise to a taking of plaintiff's property. 342 F.3d at 1357.

**iv. Redux.**

The Supreme Court has observed that "*Penn Central* does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination whether just compensation is required." *Tahoe-Sierra*, 535 U.S. at 327 n.23 (quoting *Palazzolo*, 533 U.S at 633-34 (O'Connor, J., concurring)); *see also Bass Enter. Prods. Co. v. United States*, 381 F.3d 1360, 1370 (Fed. Cir. 2004); *Cane Tennessee, Inc. v. United States*, 57 Fed. Cl. 115, 122-23 (2003). Here, those guideposts provide mixed results, making this a closer case than some. In this regard, summarizing the results of its analysis, the court finds as follows:

**Economic Impact**. In *Lucas*, 505 U.S. at 1027-31, the Supreme Court held that a diminution of 93.7 percent did not constitute a categorical takings. While the Court in *Lucas* suggested that such a diminution might also not be indicative of a regulatory taking under the economic analysis factor under *Penn Central*, it refrained from drawing a bright line. Indeed, while courts have struggled with the dichotomy between compensable "partial takings" and noncompensable "mere diminutions," searching for a threshold beyond which diminution would be indicative of a taking, several Supreme Court decisions suggest that diminutions in value approaching 85 to 90 percent do not necessarily dictate the existence of a taking.[31] This court likewise has generally relied on diminutions well in excess of 85 percent before finding a regulatory taking.[32] Conversely, the Supreme Court, the Federal Circuit and this court all have held that percentages of value losses considerably higher than that found here are not indicative of a taking.[33]

---

[31] *See Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365 (1926) (no taking despite 75 percent diminution); *Hadacheck v. Sebastian*, 239 U.S. 394 (1915) (no taking despite 87.5 percent diminution).

[32] *See Loveladies Harbor v. United States*, 21 Cl. Ct. 153, 160 (1990) (taking – 99 percent dimunition), *aff'd*, 28 F.3d 1171 (Fed. Cir. 1994); *Bowles v. United States*, 31 Fed. Cl. 37, 48-49 (1994) (taking – 92-100 percent dimunition); *Formanek v. United States*, 26 Cl. Ct. 332, 340 (1992) (taking – 88 percent dimunition); *see also 1902 Atl. Ltd. v. United States*, 26 Cl. Ct. 575, 579 (1992) (88 percent loss satisfies "economic impact" factor, although no taking found); *cf. Florida Rock Indus. Inc. v. United States*, 45 Fed. Cl. 21, 40-41 (1999).

[33] *See Concrete Pipe*, 508 U.S. at 645 (no taking – 46 percent diminution); *Walcek*, 303 F.3d at 1355-56 (no taking – 60 percent diminution); *Jentgen v. United States*, 657 F.2d at 1213 (no taking – 50 percent diminution); *Arctic King,* 59 Fed. Cl. at 384-85 (no taking – 50 percent dimunition); *Cane Tennessee*, 57 Fed. Cl. at 129 (no taking – 49.6 percent diminution); *Ciampitti*, 22 Cl. Ct. at 320 (no taking – 25 percent diminution); *see also Maritrans*, 342 F.3d at 1344 (no taking – 13.1 percent dimunition); *see generally* David F. Coursen, "The Takings Jurisprudence of the Court of Federal Claims and the Federal Circuit," 29 Envtl. L. 821, 848-51 (1999) (discussing some of these cases).

"While this court is no better postured than others to snap a line dividing compensable from noncompensable exercises of government regulatory power," *Arctic King Fisheries*, 59 Fed. Cl. at 385, in the court's view, one cannot remotely say that a diminution on the order of 14 percent has the effect of a taking. As was recognized by the Supreme Court, "[o]nly when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the [property] in question can it be said that a taking has occurred." *Riverside Bayview Homes, Inc.*, 474 U.S. at 127. Such is certainly not the case here. Indeed, based on the case law, this court would have concluded that the diminution of the value of the parcel as a whole was not indicative of a taking even if plaintiff had been successful in demonstrating that the Murphy Farm had scant value. And, again, in many ways, the foregoing observations considerably overstate plaintiff's case as it remains that plaintiff valued the wrong parcel, that is, only the Murphy Farm. Accordingly, this factor weighs heavily in defendant's favor.[34]

**Reasonable Investment-Backed Expectations**. Second, the court finds that, at the time he purchased the property, plaintiff had a reasonable investment-backed expectation that he could use the wetlands portion of his property for purposes other than pasturing. Those expectations were consistent with the flux that was occurring in the state of the law, as well as indications that plaintiff received from the local officials of the ACSC. However, the impact of this finding is diminished somewhat by the fact that the CWA was passed prior to plaintiff's acquisition of the property. Plaintiff was aware of this development and of the presence of wetlands on the Murphy Farm. Had this been a sale between unrelated parties, rather than an intrafamily transaction, the value of the property undoubtedly would have been discounted somewhat to take into account the possibility that the CWA could limit the uses of those wetlands.

**Nature of the Governmental Action**. Third, and finally, the court finds that the farming of the property would not constitute a nuisance under state law, tending to support the conclusion that a taking occurred here. The impact of this factor, however, is significantly ameliorated by the fact that the imposition of the wetlands regulations here served important public purposes, was not severely retroactively, and was not targeted on plaintiff.

* * * * *

---

[34] Also supporting this conclusion is the fact that the evidence suggests that, even with the Consent Decree, Mr. Brace could recoup his investment in the twin farms (at least plaintiff did not show otherwise). The Federal Circuit in *Maritrans* observed that "the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored." 342 F.3d at 1354 (citing *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1363 (Fed. Cir. 2001), *cert. denied*, 536 U.S. 958 (2002)); *see also Florida Rock*, 45 Fed. Cl. at 38 ("In determining the severity of the economic impact of the permit denial, the court must also take into account whether [the plaintiff] was able to recoup its investment subject to the regulation.") (citing *Florida Rock*, 18 F.3d at 1567). As this court noted in *Cane Tennessee*, "if a party were able to recoup its investment after the government action, it is less likely that a taking has occurred." 57 Fed. Cl. at 124 (citing *Walcek*, 303 F.3d at 1357).

On this record, the court concludes that the application of the wetlands regulations through the Consent Decree and otherwise has not effectuated a regulatory taking of plaintiff's property. Rather, guided by the three-tiered *Penn Central* analysis, the court finds that the limitations associated with the Consent Decree and the underlying requirements of the CWA resulted only in a noncompensable dimunition in the value of the parcel as a whole and allow plaintiff to realize to significant degree his true reasonable investment-backed expectations. In short, the situation presented by the record simply is not "functionally comparable to government appropriation or invasion of private property." *Lingle*, 544 U.S. at 543.

### B. Physical Taking

Plaintiff also alleges that a physical taking of his property has occurred. In this regard, he asserts the Consent Decree effectuated a physical occupation of his property by requiring: (i) restoration of the wetlands; (ii) the installation of a check dam that has caused his property to flood; (iii) him to provide access to federal officials in order to inspect the restoration work; and (iv) recordation of the Consent Decree, creating, in plaintiff's view, a "conservation easement" over 30 acres of plaintiff's land.

A physical taking occurs "when the government itself occupies the property or 'requires the landowner to submit to physical occupation of its land.'" *Forest Props.,* 177 F.3d at 1364 (quoting *Yee*, 503 U.S. at 527); *see also Stearns Co. v. United States*, 396 F.3d 1354, 1358 (Fed. Cir. 2005), *cert. denied*, 126 S.Ct. 385 (2005); *Tuthill Ranch, Inc. v. United States*, 381 F.3d 1132, 1135 (Fed. Cir. 2004). Concepts such as "parcel of the whole" are meaningless in this context. Rather, it is well established that "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner . . . , regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." *Brown v. Legal Found. of Washington*, 538 U.S. 216, 233 (2003) (citing *United States v. Pewee Coal Co.*, 341 U.S. 114, 115 (1951)); *see also Loretto*, 458 U.S. at 441; *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1352 (Fed. Cir. 2003). Indeed, as plaintiff notes, a taking results "even if the Government physically invades only an easement in property." *Kaiser Aetna v. United States*, 444 U.S. 164, 179-80 (1979); *see also Ridge Line*, 346 F.3d at 1352.

#### 1. Did the Consent Decree effectuate a physical takings?

Of course, a threshold question here is whether a "consent" decree can give rise to a taking. Generally speaking, court orders have never been viewed themselves as independently giving rise to a taking. As Justice Brandeis said famously in *Brinkeroff-Faris Trust & Sav. Co. v. Hill*, 281 U.S. 673, 680 (1930), "the mere fact that a state court has rendered an erroneous decision on a question of state law, or has overruled principles or doctrines established by previous decision on which a party relied, does not give rise to a [takings] claim under the Fourteenth Amendment . . . ." This rule has been applied to both state and federal judgments and orders. *See, e.g.*, *Elks Nat. Found. v. Weber*, 942 F.2d 1480, 1485 (9th Cir. 1991), *cert. denied*,

505 U.S. 1206 (1992); *Reynolds v. Georgia*, 640 F.2d 702, 703 (5th Cir. 1981).[35] At least at one level of abstraction, these decisions proceed from the theory that courts do not create or change the law, but merely interpret and administer the Constitution, the law as declared by the legislature, and the common law. *See Great Northern Railway Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 365 (1932) (Cardozo, J.) (indicating that even a decision overruling a prior precedent does not effectuate a change in the law); *Brinkerhoff-Faris*, 281 U.S. at 680, 681 n.8; *Tidal Oil Co. v. Flanagan*, 263 U.S. 444, 450-55 (1924); *see also Patterson v. Colorado*, 205 U.S. 454, 461 (1907) (there is "no constitutional right to have all general propositions of law once adopted remain unchanged."). As such, "the constitutional obligation not to 'take' property does not fall equally on all branches." Roderick E. Watson, "The Constitution and Property: Due Process, Regulatory Takings, and Judicial Takings," 2001 Utah L. Rev. 379, 438 (2001). Indeed, were the court to accept plaintiff's syllogism, it would constantly be called upon by disappointed litigants to act as a super appellate tribunal reviewing the decisions of other courts to determine whether they represented substantial departures from prior decisional law. *See Vereda Ltd. v. United States*, 271 F.3d 1367, 1375 (Fed. Cir. 2001); *Reynolds*, 640 F.2d at 703 (rejecting claim that a decision of the Georgia Supreme Court effectuated a taking, noting that federal courts are not "designed to serve as additional appellate reviewers of state court judgments"); *see also Allustiarte v. United States*, 256 F.3d 1349, 1352 (Fed. Cir.), *cert. denied*, 534 U.S. 1042 (2001). Such an approach, fortunately, is untenable.

---

[35] Research reveals only one case holding that a judicial decision that overturned prior case law could be considered a taking, *Robinson v. Ariyoshi*, 753 F.2d 1468, 1474 (9th Cir. 1985). That case, however, was subsequently vacated by the Supreme Court on other grounds, 477 U.S. 902, 902 (1986), and eventually dismissed as unripe, 887 F.2d 215, 219 (9th Cir. 1989). A decision of this court has suggested, albeit in *dicta*, that a judicial action may give rise to a taking, *see Ultimate Sportsbar v. United States*, 48 Fed. Cl. 540, 550 (2001( Smith, C.J.), relying in that regard on Justice Stewart's concurring opinion in *Hughes v. Washington*, 389 U.S. 290, 296-97 (1967) and a few law review articles. But, this opinion did not discuss any of the considerable precedent to the contrary. *Cf.* W. David Sarratt, "Judicial Takings and the Course Pursued," 90 Va. L. Rev. 1487, 1510 (2004) (noting that Justice Stewart's concurrence "has never been followed by a majority of the Court, and the Court has since declined offers to take up the issue again"); J. Nicholas Bunch, "Takings, Judicial Takings, and Patent Law," 83 Tex. L. Rev. 1747, 1754 (2005) ("Although the argument [in favor of judicial takings] has been raised in the courts, it has been rejected time and time again."). While *Muhlker v. N.Y. and Harlem Railroad Co.*, 197 U.S. 544 (1905), is sometimes cited as judicial takings case, in fact, the Supreme Court there set aside a state court judgment under the Contracts Clause of the Constitution. *See* Sarratt, *supra*, at 1504 ("While Justice McKenna's plurality opinion reversing the Court of Appeals suggested that states could not skirt the compensation requirement through their courts, he ultimately grounded his decision in the Contracts Clause rather than the Takings Clause.").

Even were judicial takings cognizable, it is hard to fathom how a consent decree could meet the requirements for a taking, among which is the presence of a compelled acquiescence.[36] Such decrees are hybrids – part order, part contract – and obviously reflect the agreement of the parties, often to provisions that would be beyond the power of the court to impose without the parties' consent. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992) (noting that consent decrees are "in some respects contractual in nature"); *Local No. 93 v. City of Cleveland*, 478 U.S. 501, 519, 522 (1986) ("[I]t is the agreement of the parties, rather than the force of the law upon which the complaint was originally based that creates the obligations embodied in a consent decree."). In other situations involving agreements, this court has held that the compulsion or exaction element that characterizes a physical taking is missing,[37] and it would appear that the absence of the same element vitiates any notion that a *per se* or physical taking occurred here. *See Johnson v. United States*, 49 Fed. Cl. 648, 654 (2001), *aff'd*, 317 F.3d 1331 (Fed. Cir. 2003) ("Johnson's corporation 'consented' to the subject judgment and agreed to come into compliance with the law. In such circumstances, he cannot claim that the underlying action was a taking."); *see also SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 91 (2d Cir. 2002) (no takings claim where voluntary action led to court order).

Despite the Supreme Court's pronouncement that "the voluntary nature of a consent decree is its most fundamental characteristic," *Local No. 93*, 478 U.S. at 521-22, plaintiff intimates that the Consent Decree was not voluntary – that it was signed under the pressure created by the Third Circuit's reversal of the favorable (to plaintiff) decision rendered by the district court. But, this view is belied by the relative narrowness of the Third Circuit's ruling, which only dealt with the applicability of the CWA and did not dictate many of the provisions found in the Consent Decree, including those dealing with the appropriateness of assessing civil penalties. *See Brace*, 41 F.3d at 129. Apart from Mr. Brace's self-serving statements, there is neither evidence of a lack of consent generally nor, particularly, as to the decree provisions of which he most vociferiously complains, *i.e.,* the restoration plan, the creation of the check dam, and allowing the government to monitor the remediation efforts. Rather, it would appear that plaintiff agreed to these various provisions at least in part to avoid the imposition of more significant civil penalties under 33 U.S.C. § 1319(d), which during the period in question could range as high $25,000 per day for each violation. While the EPA initially sought a fine of

---

[36] *See F.C.C. v. Florida Power Corp.*, 480 U.S. 245, 253 (1987) ("the element of required acquiescence is at the heart of the concept of occupation"); *Ruckelshaus*, 467 U.S. at 1007-08 ("a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking"); *Norman*, 429 F.3d at 1089 ("voluntary transfer" not "a proper basis on which to premise a takings claim").

[37] *See BMR Gold Corp. v. United States*, 41 Fed. Cl. 277, 283 (1998) (no taking where plaintiff granted military consent to cross its land); *Turntable Fishery & Moorage Corp. v. United States*, 52 Fed. Cl. 256, 263 (2002) (no taking where plaintiff voluntary transferred common facilities to government in exchange for continued use of marina); *Scogin v. United States*, 33 Fed. Cl. 285, 291 (1995) (although the right to exclude others from one's property is a compensable Fifth Amendment interest, "a property owner relinquishes the right to exclude when the owner consents to the entry, use, and occupation of the subject property").

$125,000, the Consent Decree provided for a total civil penalty of only $10,000. Absent some evidence of compulsion, the court, therefore, must find that, like any other consent decree, the decree at issue led to a voluntary acquiescence and thus did not give rise to a physical taking. A contrary ruling, indeed, would threaten not only the validity of the Consent Decree here, but the entire concept of consent decrees, as it would hold open the possibility that a private party, after negotiating a settlement, could retain its rights under such agreement while challenging, as takings, the less desirable provisions thereof. *See John R. Sand & Gravel Co. v. United States*, 59 Fed. Cl. 645, 656 (2004).

Even if the Consent Decree could be viewed as potentially effectuating a taking, either as itself compelling acquiescence or simply as manifesting the binding requirements of the CWA, there is still no basis for concluding that it effectuated a physical takings. Rather, as the Federal Circuit explained in *Forest Properties* actions depriving plaintiff from using the wetlands as farmlands must be analyzed as a regulatory taking –

> A physical taking of land occurs when the government itself occupies the property or '*requires* the landowner to submit to physical occupation of its land,' *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992), whether by the government or a third party . . . . In a regulatory taking, the government prevents the landowner from making a particular use of the property that would be permissible.

177 F.3d at 1364 (emphasis in original) (internal citations omitted); *see also Tahoe-Sierra*, 535 U.S. at 324 (land use regulations do not fall under the ambit of a "classic" taking where the government directly appropriates private property for its own use, but rather involves a regulatory interference with property rights); *Tuthill Ranch*, 381 F.3d at 1137 ("Principal invasions short of an occupation and regulations that merely restrict the use of property may qualify as regulatory takings but not as a physical takings."). This rule has been applied to use limitations similar to those effectuated by the Consent Decree here.[38] In such cases, courts have made short shrift of attempts to recharacterize regulatory takings as physical takings, rejecting fanciful efforts to invoke the more strict regime associated with the latter doctrine. *See generally, Penn Central*, 438 U.S. at 124 ("A 'taking' may be more readily found when the interference with property can only be characterized as a physical invasion by the government.").

That most of the cases involved the denial of permits, rather than the restoration of property to its prior state, does not render them inapposite – simply put, if the denial of a permit causing property to be unsuitable for a particular purpose does not effectuate a physical taking, but rather must be analyzed as a regulatory taking, then the same should be true where property is

---

[38] *See, e.g., Stearns Co.,* 396 F.3d at 1357 (failure to allow mining under the Surface Mining Control and Reclamation Act did not effectuate a physical taking of mineral rights); *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1352-53 (Fed. Cir. 2002) (no physical taking where property owner prohibited from logging); *Forest Prop.*, 177 F.3d at 1364 (no physical taking where denial of permit prevented excavation and filling of lake bottom); *Canal Elec. Co. v. United States*, 65 Fed. Cl. 650, 653-54 (2005).

restored to the state it would have been in had a permit been denied. *See Broadwater Farms Joint Venture v. United States*, 35 Fed. Cl. 232, 242 (1996) (applying regulatory takings analysis in case where Corps "ordered plaintiff to stop work, then directed it to perform extensive restorative work that was inconsistent with the possibility of future development"), *vacated on other grounds*, 121 F.3d 727 (Fed. Cir. 1991). If the restoration efforts are properly calibrated, the end result is the same in both instances. A contrary conclusion, of course, would suggest that property owners who violate the CWA should be treated better than those who comply with the law – a *non sequitur* if there ever was one. Accordingly, plaintiff should not be heard to argue that the reverse engineering of his property effectuated a physical taking.[39] Rather, the appropriate analysis here is that of a regulatory taking and, as previously concluded, under that analysis plaintiff does not prevail.

---

[39] Plaintiff attempts to analogize this case to *Hendler v. United States*, 952 F.2d 1364, 1374 (Fed. Cir. 1991), in which the Federal Circuit suggested that an EPA order providing for permanent access to testing well sites created an easement. Of course, here, the EPA officials were only allowed to monitor the completion of the restoration plan – access so limited that, if it were a taking, virtually any incursion by Federal officials to determine compliance with Federal law would require compensation. Such a construction of *Hendler* was squarely rejected by the Federal Circuit in *Boise Cascade*, 296 F.3d at 1355-56, a case that plaintiff does not cite. In that case, the court rejected the notion that allowing the government brief intrusions onto the plaintiff's land to conduct surveys constituted a *per se* taking, stating –

> The government intrusion complained of in this case was of far lesser duration than that in *Hendler*, and it did not involve the placement of a permanent or even a quasi-permanent installation on Boise's property. In *Hendler*, the government entered the land and placed upon it what were essentially permanent wells – wells that it intended to actively monitor over the years. Here, in contrast, the Service briefly entered the land over a period of five months in order to conduct owl surveys needed for the resolution of a lawsuit initiated by Boise. The Service was not authorized to make, and did not make, any permanent incursion on Boise's land. Boise does not argue that the surveyors added any kind of permanent (or even temporary) addition to the landscape of the Walker Creek Unit. Boise nevertheless contends that the Service's intrusion satisfies the definition of "permanent" given in *Hendler*, and that the *Loretto* per se rule therefore applies.

*Id*. The Federal Circuit further indicated that, if read in the broad fashion plaintiff contends here, various *dicta* in *Hendler* was inconsistent with the Supreme Court's decision in *Loretto*. *Id.* at 1356; *see also Juliano v. Montgomery-Otsego-Schoharie Solid Waste Mgmt. Auth.*, 983 F.Supp. 319, 327 (N.D.N.Y.1997). Ultimately, the Federal Circuit concluded that it "is incorrect to suppose that *Hendler* compels us to turn a transient invasion by owl surveyors into a *per se* taking under *Loretto*." *Boise Cascade*, 296 F.3d at 1357.

### 2. Did the flooding of plaintiff's property effectuate a taking?

Plaintiff, however, asserts that the restoration efforts here went too far – that the Consent Decree overreached and its enforcement has led to the outright flooding of land that was usable. As plaintiff points out, various cases have concluded that a government can effectuate a taking by causing property to be flooded. *See, e.g.,United States v. Dickinson*, 331 U.S. 745, 751 (1946) (dam project resulted in taking of an "easement for intermittent flooding"); *United States v. Cress*, 243 U.S. 316, 318 (1917) (navigation improvements caused permanent condition in which plaintiff's land was overflowed by river); *United States v. Lynah*, 188 U.S. 445, 450 (1903) (flooding occasioned by dam left rice plantation an "irreclaimable bog"); *Pumpelly v, Green Bay Co.*, 80 U.S. 166, 167-68 (1871) ("where real estate is actually invaded by superinduced additions of water, earth, sand, or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking within the meaning of the Constitution"); *see also Tuthill Ranch*, 381 F.3d at 1136 (discussing these and other flooding cases). But, these cases involve situations in which public works created artificial structures which caused flooding where no such conditions naturally existed. Such is not the case here – the alleged taking is instead predicated upon flooding that occurred as the consequence of reversionary engineering designed to place the property back to its natural state. *See* Sharon S. Tisher, "Everglades Restoration: Constitutional Takings Analysis," 10 J. Land Use & Envtl. L. 1, 8, 12 (1994) (recognizing a distinction between actions that divert versus restore natural forces).

Rather than assisting plaintiff, the aforementioned flooding cases actually undercut his theory. First, they emphasize that to prove a physical takings, there must be evidence that the flooding of the Murphy Farm was proximately caused by the defendant. This requirement has been emphasized in cases where the property at issue had been flooded before the government undertook any action. Thus, for example, in *Sanguinetti v. United States*, 264 U.S. 146, 149-50 (1924), the Supreme Court held that no taking occurred where the plaintiff was unable to show that the overflow of his property was the "direct or necessary" of a levee constructed by the government. *See also Southern Pacific Co. v. United States*, 266 U.S. 586, (1924); *Bedford v. United States*, 192 U.S. 217, 225 (1904). Taking their lead from these cases, this court and the Court of Claims have denied recoveries in cases where the subject property was previously prone to natural flooding.[40] More recently, in *Ridge Line*, the Federal Circuit illuminated the causation requirement underlying these cases, stating there that a "loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." 346 F.3d at 1355-56; *see also Loretto*, 458 U.S. at

---

[40] *See, e.g., Leeth v. United States*, 22 Cl. Ct. 467, 473, 485 (1991); *Laughlin v. United States*, 22 Cl. Ct. 85, 102 (1990); *see also Bartz v. United States*, 633 F.2d 571, 577 (Ct. Cl. 1980), *cert. denied*, 450 U.S. 967 (1981); *Ark-Mo Farms, Inc. v. United States*, 530 F.2d 1384, 1386 (Ct. Cl. 1979); *Hartwig v. United States,* 485 F.2d 615, 620-21 (Ct. Cl. 1973); *Columbia Basin Orchard v. United States*, 132 F. Supp. 707, 709 (Ct. Cl. 1955); *Creech v. United States*, 60 F. Supp. 885, 896 (Ct. Cl. 1944), *cert. denied*, 325 U.S. 870 (1945).

427; *Moden v. United States*, 404 F.3d 1335, 1342-43 (Fed. Cir. 2005) (citing additional cases); *Banks v. United States*, 69 Fed. Cl. 206, 212 (2006). As described by this court in *Banks*, the Federal Circuit, in *Moden*, further explained that "the 'direct, natural, or probable result standard' articulated in *Ridge Line* requires not only proof of causation – that the government act was the likely cause of the injury – but also proof 'that the government should have predicted or foreseen the resulting injury' – that the injury was the likely result of the government act." *Banks*, 69 Fed. Cl. at 212 (quoting *Moden*, 404 F.3d at 1343); *see also Vaizburd v. United States*, 384 F.3d 1278, 1282-83 (Fed. Cir. 2004). This court further noted that "[t]he Federal Circuit advised in *Moden* that 'injury may not be foreseeable if an intervening cause breaks the chain of causation." *Banks*, 69 Fed. Cl. at 212 (quoting *Moden*, 404 F.2d at 1344); *see also Avery v. United States*, 330 F.2d 640, 644-45 (Ct. Cl. 1964).

In the case *sub judice*, the record plainly reveals that the purpose of the remediation plan was to restore the wetlands portion of the Murphy Farm to its state in 1985, prior to Mr. Brace's filling activities. Nothing in the record suggests that it was instead foreseen or foreseeable that implementation of the plan would flood that property, so as to preclude it from being used as pastureland, as it had been used before. Indeed, in terms of causation, it has not been shown that the flooding is the result solely of the restoration, as there is evidence, including testimony and earlier deposition statements by Mr. Brace, that flooding of this property has occurred in the past, at times attributable to presence of beaver dams. At all events, it is uncontroverted that Mr. Brace never contacted the EPA, the Corps, any other Federal agency, or even the district court that entered the Consent Decree to complain that the effectuation of the restoration plan was causing his property to flood. While Mr. Brace testified that he did not make those contacts because he felt that they would prove unfruitful, the law suggests that he could not stand back, allow his property to be flooded, and then complain, after the fact, that government action that was intended to simply restore the wetlands had instead caused a taking. In the court's view, plaintiff's failure to prevent damage from accruing on his property represents an "intervening cause" that broke the chain of causation, thereby preventing this court from attributing the flooding on his property to the actions of government. Accordingly, no physical takings claim lies, at least as of this time, as the result of the flooding of plaintiff's property.[41]

Lastly, it bears noting that, as a factual matter, there is no proof that the area flooded exceeds that which previously was wetlands. While certain maps in the record indicate that there is now a pond where there was once vegetation, no proof was adduced as how the contours of the existing pond corresponds to the prior limits of the wetlands. Indeed, in his brief, plaintiff suggests only that the pond now exists on the land that previously was wetlands. Proof in this regard is so attenuated that, even if the court were to find that the creation of the pond effectuated a taking, there would be no basis, except conjecture, upon which to calculate damages. *See Applegate v. United States*, 35 Fed. Cl. 406, 417 (1996) ("Without an appropriate showing of the

---

[41] At trial, various government officials indicated that they were prepared to work with Mr. Brace to remedy any unintended consequences of the restoration plan. The court will not speculate as to what legal action would be appropriate if these officials did not respond positively to an actual request.

amount of beachfront allegedly lost, the court cannot rule as a matter of fact and law that any loss occurred – assuming that such allegations of loss are uncontroverted – and that any plaintiff in this case therefore is entitled to compensation for a taking of property.").

### 3. Did the Consent Decree create a conservation easement that effectuated a takings?

Finally, the court rejects plaintiff's assertion that defendant took from plaintiff's property a "conservation easement." In making this assertion, seemingly as an afterthought, plaintiff glosses over a number of issues, principal among them whether the Consent Decree could be viewed as creating such an easement in favor of the United States. While plaintiff cites definitions of "conservation easement" from sources such as the Internal Revenue Code, it is beyond peradventure that, under takings law principles, the question whether the decree created such an interest in the United States is initially a question of Pennsylvania state law.[42] Under that law, "conservation easements" are easements in gross – a personal right in the real estate of another that is not appurtenant to other land, but rather benefits a particular entity. *See* Ladner on Conveyancing in Pennsylvania, § 11.01 at p. 1 (Bisel, 4th ed. 2006) (hereinafter "Ladner"). Such easements also are characterized as negative easements, also known as servitudes, because they authorize "the holder to object to a use of the servient tract by its owner inconsistent with the terms of the easement." *Ephrata Area School District v. County of Lancaster*, 886 A.2d 1169, 1174 (Pa. 2005) (citing Restatement (Third) of Property, Servitudes§ 1.2 (2000)(hereinafter "Restatement")).

Notably, conservation easements were not recognized under Pennsylvania common law because the equitable enforcement of a gross easements was prohibited. *See Ephrata*, 886 A.2d at 1175; *see also* Restatement, *supra*, at § 1.6, comment a. To remedy this, Pennsylvania, like 46 other states, *see id.* (statutory note), enacted a statute modeled on the Uniform Conservation Easement Act, 32 P.S. §§ 5051-59.[43] That statute defines a "conservation easement" as –

---

[42] *See MSF Corp. v. Exxon Corp.*, 295 F.3d 485, 491-92 (5th Cir.), *cert. denied*, 537 U.S. 1046 (2002) (question whether "consent decree" could constitute a servitude was initially a question of Louisiana law); *see also Preseault v. United States*, 100 F.3d 1525, 1537 (Fed. Cir. 1996).

[43] While this statute was not enacted until June 22, 2001, it applies to "any interest created before the effective date of this act when the interest would have been enforceable had it been created after the effective date of this act and has been recorded or, if not previously recorded, is recorded or otherwise placed of record within 180 days of the effective date of this act unless retroactive application contravenes the Constitution of the United States or laws of the Untied States or of this Commonwealth." 32 P.S. § 5057(b). Given the result reached below, the court need not address whether the retroactive application of the statute to the United States contravenes the Constitution.

> A nonpossessory interest of a holder in real property, whether appurtenant or in gross, imposing limitations or affirmative obligations, the purposes of which include, but are not limited to . . . protecting, conserving or managing the use of natural resources; protecting wildlife, [and] maintaining or enhancing land, air or water quality . . . .

*Id*. at § 5053. Such an easement, the statute further provides, "may be created, conveyed, recorded, assigned, released, modified, terminated or otherwise altered or affected in the same manner as other easements." *Id*. at § 5054(a).

Pennsylvania law consistently focuses on the intention of the parties as the main factor in determining whether an agreement created an express easement or servitude. *See Zettlemoyer v. Transcontinental Gas Pipeline Corp.*, 657 A.2d 920, 926 (Pa. 1995); *Lease v. Doll*, 403 A.2d 558, 561 (Pa. 1979); *see also Restatement*, *supra*, at §§ 2.1, 2.17. Rules of contract interpretation are applied in discerning this intent, under which rules "[e]asements will be recognized only when the owner clearly intended to limit the rights of his or her estate." *Kapp v. Norfolk Southern Ry. Co.*, 350 F. Supp. 2d 597, 607 (M.D. Pa. 2004); *see also Haines v. Minnock Constr. Co.*, 433 A.2d 30, 33 (Pa. 1981) (citing *Yeakle v. Jacob*, 33 Pa. 376 (1859)); *Thomas v. Deliere*, 359 A.2d 398, 399 (Pa. 1976); Ladner, *supra*, § 11.02(a). And while no case in Pennsylvania has dealt with the issue, it is notable that cases applying these same rules of contract interpretation have repeatedly held that agreements do not create a servitude or an easement where they merely recognizes the preexisting rights of the parties. *See Crigger v. Florida Power Corp.*, 436 So. 2d 937, 945 n.16 (Fla. App. 1983) ("An easement subtracts from the preexisting rights of the rightful owner of the servient estate."); *Plaquemines Parish Government v. Getty Oil Co.*, 662 So. 2d 773, 777 (La. App. 1 Cir. 1995) (no servitude created where "compromise of litigation . . . merely recognized those rights the parties claim to have"); 3 Richard R. Powell, Powell on Real Property § 34.10, at 34-111 (1994) ("an easement subtracts from the preexisting rights of the servient owner").[44] It would seem to follow, *a fortiori*, that a servitude or negative easement does not arise where an instrument merely recognizes the application of statutes that already apply of their own force to the property in question.

In arguing the existence of a conservation easement, plaintiff did not address any of these points. Certainly, nothing in the Consent Decree purports to create an easement or servitude and

---

[44] Applying a corollary to this rule, a variety of cases have held that the where an easement of necessity was created at the time property was transferred, compensation is not owed where that easement is later enforced by judicial decree. Summarizing these cases, one commentator has observed – "Since an easement of necessity is a right derived from the transaction – and exchange of consideration – by which the dominant and servient estates were originally severed, the judicial declaration of such an easement therefore amounts to a determination of preexisting rights, and does not constitute a new 'taking' of property or property rights for which payment of compensation would be constitutionally mandated." James Lockhart, 20 Causes of Action to Establish Easement of Necessity 395, § 25 (2005).

there is no basis to imply, via the other *res gestae* of the decree or otherwise, that either party believed that plaintiff was transferring such an interest to defendant. Rather, by its terms, the Consent Decree was designed to accomplish three main purposes: (i) to restore the property to its wetland state, *circa* 1985; (ii) to ensure that Mr. Brace would not commit further violations of the CWA; and (iii) to require plaintiff's payment of a civil penalty in the amount of $10,000. While the Consent Decree required plaintiff to record the decree in the applicable records office, it generally did not bind any of plaintiff's successors, stating only that –

> Until [the restoration of the property, the payment of the civil penalty and the recordation of the decree] have been performed and at least thirty days prior to any proposed transfer of any interest in any part of the property affected by this Consent Decree, Defendants will provide a true copy of this Consent Decree to any proposed transferee and simultaneously will notify the United States of any proposed transfer. A transfer of interest in the said property will not relieve Defendants of any responsibility in this Consent Decree, unless the United States, Defendants, and the transferee agree to allow the transferee to assume such responsibility.

Thus, Mr. Brace would remain obligated under the Consent Decree whether he owned the property or not, absent the assumption of the decree's obligations by a subsequent purchaser. Indeed, the only portion of the decree that applied to successors or assigns was that permanently enjoining the discharge of any pollutants into the wetlands "unless such discharge is in compliance with the CWA." The latter provision, of course, did not make the CWA applicable to the property, as the statute applied of its own force – as Justinian once said, *non jus ex regula, sed regula ex jure*. Consequently, the court has little trouble concluding that neither this provision – nor any other aspect of the Consent Decree – created an easement or a servitude, at least in the sense of those types of interests that might support a takings.[45]

---

[45] *See United States v. Colson*, 2005 WL 2086174 at *4 (S.D. Tex. 2005) (judicial decree did not effectuate a taking where it merely declared a preexisting right); *MacCaskill v. Ebbert*, 739 P.2d 414, 418 (Idaho Ct. App. 1987) (where a judicial declaration amounts to a determination of preexisting rights, it does not constitute a new 'taking' of property or property rights for which payment of compensation is constitutionally mandated); *see also Opinion of the Justices*, 649 A.2d 604, 609 (N.H. 1994) ("Where private title to tidelands is already burdened by preexisting public rights, a regulation designed to protect those same rights will not constitute a taking of property without just compensation."); *see also Scott v. State of Oregon*, 541 P.2d 516, 519 (Or. App. 1975) (use regulations imposed by state Scenic waterways Act was not easement for which compensation must be paid); *see generally*, Restatement, *supra*, at §2.15, comment c. (regarding an implied servitude – "[t]his means that, prior to the conveyance, the property did enjoy such rights and that, absent the implied servitude, the conveyance would deprive it of such rights").

Indeed, plaintiff has not cited a single case suggesting, let alone holding, otherwise. If the mere recognition of a property owners' obligations under the CWA gave rise to a servitude and, in turn, a physical taking, then virtually every regulation of a piece of property – certainly those effectuated through consent decrees and enforcement orders – would result in a takings. Such is not the law. None other than *Penn Central* itself dismissed, as "fallacy," the contention that "a 'taking' must be found to have occurred whenever the land-use restriction may be characterized as imposing a "servitude" on the claimant's parcel." *Penn Central*, 438 U.S. at 130 n.27. Numerous other cases have similarly refused to treat the application of statutes or regulations as giving rise to easements and physical takings, as well. *See Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 295-96 (1981) (rejecting the notion that the "mere enactment" of the Surface Mining and Control Reclamation Act effectuated a physical taking); *Stearns Co.,* 396 F.3d at 1357 (same); *Jentgen*, 657 F.2d at 1213 ("The [Supreme] Court has branded as fallacious the 'contention that a "taking" must be found to have occurred whenever the land-use restriction may be characterized as imposing a 'servitude' on the claimant's parcel.'"); *Seiber v. United States*, 53 Fed. Cl. 570, 576-77 (2002), *aff'd*, 364 F.3d 1356 (Fed. Cir. 2004), *cert. denied*, 543 U.S. 873 (2004) (imposition of logging restrictions on property did not, as a servitude, effectuate a physical taking); *Smith v. Town of Mendan*, 789 N.Y.S. 2d 696, 702-03 (N.Y. App. 2004) (refusing to treat town conservation condition as a physical taking).[46]

Plaintiff has offered nothing to distinguish these many authorities. Accordingly, his conservation easement argument suffers not only from a lack of factual development, but also from legal infirmities that seemingly are insurmountable. They are, at least, insurmountable here and, as such, warrant rejection of plaintiff's last ditch effort to demonstrate a physical taking in the case *sub judice*.

## III. CONCLUSION

This court need go no further. Based on the foregoing, the court finds none of plaintiff's takings claims well-taken. As such, the Clerk is hereby ordered to enter judgment dismissing the complaint. No costs.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[46] Buttressing these rulings, the Supreme Court has at least twice emphasized the narrowness of its holdings in *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 830-31 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994), both of which, of course, involved situations in which the landowner effectively was deprived of the right to exclude others. *See City of Monterey*, 526 U.S. at 702 ("we have not extended the rough proportionality test of *Dolan* beyond the special context of exactions – land use decisions conditioning approval of the development on the dedication of a public right"); *Lingle,* 544 U.S. at 546-47 (citing *City of Monterey* approvingly on this point).