# In the United States Court of Federal Claims

No. 98-720 C

Filed September 19, 2006

| | |
|---|---|
| PRECISION PINE & TIMBER, INC., ) <br> ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> THE UNITED STATES, ) <br> ) <br> Defendant. ) <br> ) | Timber sale contracts, suspensions, lost profits, independent and collateral undertakings, subject matter of the contract, foreseeability at time of contracting, availability of cover, partial breach, delayed delivery, election, waiver, expectancy damages, lost volume seller, burden of proof, offset of profits on previously suspended sales, lost production opportunity, "hole in the profit pipeline", additional timber sale contracts, full operating capacity, ability to sell additional lumber, profitability of additional sales |

Alan I. Saltman, Saltman & Stevens, P.C., Washington, D.C., for plaintiff. Richard W. Goeken and Bryan T. Bunting, Saltman & Stevens, P.C., Washington, D.C., of counsel.

David A. Harrington, Trial Attorney, Kathryn A. Bleecker, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. Lori Polin Jones and Patricia L. Disert, U.S. Department of Agriculture, Washington, D.C., of counsel.

## OPINION AND ORDER

<u>GEORGE W. MILLER</u>, Judge.

This matter is before the Court following a 24-day trial on damages held in Washington, D.C., between May 12, 2005 and June 20, 2005. The parties filed Post-Trial Proposed Findings of Fact and Conclusions of Law on September 2, 2005, and responses thereto on November 14, 2005.[1]

---

[1] By leave of the Court, plaintiff filed Plaintiff's Corrected Post-Trial Brief and Plaintiff's Corrected Proposed Findings of Fact on September 16, 2005. For the sake of simplicity, throughout this Opinion and Order the Court will refer to Plaintiff's Corrected Post-Trial Brief and Plaintiff's Corrected Proposed Findings of Fact filed on September 16, 2005 as "Plaintiff's Post-Trial Brief" and "Plaintiff's Proposed Findings of Fact." By leave of the Court,

The Court heard closing argument on February 17, 2006 and on March 1, 2006. Prior to closing argument, the Court issued Orders on January 23, 2006, February 1, 2006, February 15, 2006, and February 16, 2006 setting forth hypothetical cases and questions that the Court requested that the parties be prepared to address at closing argument.[2] The purpose of these questions and hypothetical cases was to provide the parties with an opportunity to clarify issues that had not been fully explained in the parties' Post-Trial Briefs and Post-Trial Response Briefs.

### BACKGROUND[3]

This case concerns 14 timber sale contracts that were either awarded or transferred to Precision Pine & Timber, Inc. ("Precision Pine") prior to August 1995: 1) the Hay contract; 2) the St. Joe contract; 3) the O.D. Ridge contract; 4) the U-Bar contract; 5) the Jersey Horse contract; 6) the Salt contract; 7) the Hutch-Boondock contract; 8) the Mud contract; 9) the Monument contract; 10) the Saginaw-Kennedy contract; 11) the Brann contract; 12) the Manaco contract; 13) the Brookbank contract; and 14) the Kettle contract.[4] On August 25, 1995, pursuant

---

defendant filed Defendant's Corrected Proposed Findings of Fact on January 10, 2006. For the sake of simplicity, throughout this Opinion and Order the Court will refer to Defendant's Corrected Proposed Findings of Fact filed on January 10, 2006 as "Defendant's Proposed Findings of Fact."

[2] The January 23, 2006 Order was modified by the Court's Order of February 14, 2006 to correct an error in one of the questions set forth in the January 23, 2006 Order.

[3] This recitation of facts sets forth certain of the Court's findings of fact in accordance with Rule 52(a) of the Rules of the United States Court of Federal Claims ("RCFC"). Additional findings of fact and rulings on mixed questions of fact and law are set forth in the Discussion section of this Opinion and Order. The Court states herein background facts necessary to an understanding of the issues in this case and facts relevant to defendant's collateral undertakings, foreseeability, and partial breach arguments and plaintiff's lost volume seller arguments, which are the subjects of this Opinion and Order. For a more complete account of the background facts and procedural history in this case, see Chief Judge Damich's Opinion on liability, *Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35 (2001), this Court's decision granting in part and denying in part Defendant's Motion for Partial Summary Judgment, *Precision Pine & Timber, Inc. v. United States*, 63 Fed. Cl. 122 (2004), and this Court's decision denying Defendant's Motion for Partial Reconsideration and Clarification of the Court's decision granting in part and denying in part Defendant's Motion for Partial Summary Judgment, *Precision Pine & Timber, Inc. v. United States*, 64 Fed. Cl. 165 (2005).

[4] Several of the contracts at issue provided for the harvesting of both sawlogs and roundwood, whereas other contracts only provided for the harvesting of sawlogs. *See* Plaintiff's

to an order of the United States District Court for the District of Arizona in *Silver v. Babbitt*, 924 F. Supp. 976, 989 (D. Ariz. 1995) the United States Forest Service (the "Forest Service") suspended harvesting on all Forest Service timber sale contracts in Forest Service Region Three, including Precision Pine's 14 contracts.  March 11, 2005 Joint Stipulation of Facts ¶¶ 28-29.

      The Arizona District Court ordered that harvesting be enjoined until the Forest Service complied with its obligation to consult with the United States Fish and Wildlife Service ("FWS") regarding the impacts of the Forest Service's Land and Resource Management Plans ("LRMPs") upon the Mexican Spotted Owl.  *Silver v. Babbitt*, 924 F. Supp. at 981-89.  The District Court ordered the suspensions because the Forest Service had failed to submit its LRMPs for consultation with the FWS as it was required to do under the Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et. seq.*, when the Mexican Spotted Owl was listed as a threatened species.  *Precision Pine*, 50 Fed. Cl. at 38-39.

      LRMPs were completed for National Forests in Forest Service Region Three between 1985 and 1988, before the Mexican Spotted Owl was listed as a threatened species in 1993.  *Id.* at 41.  On July 7, 1994, the United States Court of Appeals for the Ninth Circuit held that LRMPs represent ongoing "agency actions" for which the Forest Service is required to engage in consultations under Section 7 of the ESA whenever a new species is listed as threatened or endangered.  *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1057 (9th Cir. 1994).  However, the Forest Service did not submit any LRMPs from Region Three for consultation with the FWS after the Ninth Circuit's decision in *Pacific Rivers*.  *Precision Pine*, 50 Fed. Cl. at 44.  In fact, the Forest Service did not commence the required consultations on existing LRMPs in Region Three until well after it was ordered to do so by the Arizona District Court in *Silver v. Babbitt* on August 24, 1995, more than one year after the date of the *Pacific Rivers* decision.  *See Silver v. Babbitt*, 924 F. Supp. at 989.

      On October 18, 1995, less than eight weeks after the suspensions required by *Silver v. Babbitt* were imposed, the Forest Service released the Brann, Hutch-Boondock, and St. Joe timber sale contracts from the suspension pursuant to a stipulation with the plaintiffs in *Silver v. Babbitt*.[5]  *Precision Pine*, 50 Fed. Cl. at 47 n.18.  Pursuant to a settlement in a second lawsuit,

_____

Exhibit ("PX") 320.  "Sawlogs" refer to trees that are 9.0 inches in diameter or greater at breast height, whereas "roundwood" or "pulpwood" refers to trees that are between 5.0 and 9.0 inches in diameter at breast height.  *See* Trial Transcript ("Trial Tr.") at 111-12.  Technically, contracts that only require sawlogs to be harvested are referred to as "timber sale" contracts. *See Precision Pine*, 63 Fed. Cl. at 126 n.3.  Contracts that require both sawlogs and roundwood to be harvested are referred to as "multi-product sale" contracts.  *Id.*  For the purposes of this Opinion and Order, the distinction is not relevant, and the Court will refer to all of the contracts as "timber sale contracts."

    [5]  In his decision on liability, Chief Judge Damich found that the St. Joe and Hutch-Boondock timber sale contracts had not been breached.  *Precision Pine*, 50 Fed. Cl. at 71; *see*

*Southwest Center For Biological Diversity v. United States Forest Service*, No. 95 Civ. 1927 (D. Ariz. filed Sept. 13, 1995), the Mud contract was partially cancelled and was released for harvesting on March 11, 1996. *See* PX 106, PX 109. However, because the formal consultations initiated by the Forest Service became unreasonably protracted in length due to the Forest Service's failure to initiate the consultations in a timely manner and to provide a legally sufficient Biological Opinion, it was not until December 4, 1996 that the Arizona District Court dissolved the injunction against harvesting in Forest Service Region Three. *Precision Pine*, 50 Fed. Cl. at 47-51; *see also* March 11, 2005 Joint Stipulation of Facts ¶ 31. The Forest Service subsequently lifted the suspension of the Brookbank, Hay, Jersey Horse, Kettle, Manaco, Monument, O.D. Ridge, Saginaw-Kennedy, Salt and U-Bar contracts. *Id.*

Throughout the suspensions, Precision Pine informed the Forest Service that it considered the Forest Service to have breached the timber sale contracts. *See* PX 116, PX 299, *Precision Pine*, 62 Fed. Cl. at 637. However, rather than treating the breaches as total and terminating the contracts, Precision Pine elected to treat the breaches as partial and continue its performance. *Precision Pine*, 62 Fed. Cl. at 648-51. Precision Pine continued harvesting the previously suspended contracts once the suspensions were lifted. Trial Tr. at 1479. In addition, Precision Pine requested contract term adjustments for each contract affected by the suspensions. March 11, 2005 Joint Stipulation of Facts ¶ 34. The Forest Service granted each of Precision Pine's requests for contract term adjustments and provided adjustments equivalent to the number of days lost during each contract's normal operating season. *Id.*

In 1997, Precision Pine submitted claims to the appropriate Forest Service contracting officer requesting a total of $13,097,209.62 in damages resulting from the suspension of the 14 contracts. *See Precision Pine*, 50 Fed. Cl. at 51. The contracting officer issued a final decision that Precision Pine was entitled to only $18,242.78 in damages. *See id.*

## 1.     The Court's Decision on Liability

On September 11, 1998, plaintiff filed this action in the Court of Federal Claims, arguing that the suspensions breached the Forest Service's implied duties to cooperate and not to hinder performance of Precision Pine's timber sale contracts. *Precision Pine*, 50 Fed. Cl. at 39. Chief Judge Damich held that if a contract contains a specific warranty, a breach of that warranty breaches the implied duty to cooperate. *Id.* at 59 (citing *Cedar Lumber, Inc. v. United States*, 5 Cl. Ct. 539, 549 (1984)). On July 30, 2001, Chief Judge Damich issued a decision holding that the Forest Service had breached its implied duty to cooperate with respect to the Mud, Monument, Saginaw-Kennedy, Brann, Manaco, Brookbank, and Kettle contracts. *Precision Pine*, 50 Fed. Cl. at 73. Each of the contracts at issue contained Special Contract Clause CT

---

*also Precision Pine*, 63 Fed. Cl. at 126. As discussed in Section 1., *infra*, Chief Judge Damich found that the Forest Service had breached its implied duty to cooperate with respect to the Brann contract.

6.25, "Protection of Endangered Species," which provided:

> Location of areas needing special measures for protection of plants or animals
> listed as threatened or endangered under the Endangered Species Act of 1973
> and R-3 Sensitive Plant and Animal Species List are shown on Sale Area Map and
> identified on the ground.  Measures needed to protect such areas have been
> included elsewhere in the contract  . . . .

*Precision Pine*, 50 Fed. Cl. at 40.  Chief Judge Damich found that Special Contract Clause CT
6.25 warranted that, at the time the contracts were entered into, the Forest Service had identified
special measures necessary to protect endangered species under the ESA based upon an analysis
of reasonably available information, and that based upon the information reasonably available,
the measures identified were adequate for the protection of threatened or endangered species.  *Id.*
at 66-67.  Chief Judge Damich found that the Forest Service breached this warranty with respect
to those contracts entered into after July 7, 1994 (the date of the Ninth Circuit's decision in
*Pacific Rivers*), because the Forest Service had no reasonable basis to know whether the warranty
contained in CT 6.25 was true, due to its unreasonable failure to suspend logging activities and
submit its LRMPs for consultation with the FWS after *Pacific Rivers* made it clear that it was
required to do so.  *Id.* at 69-70.

Chief Judge Damich also found that the Forest Service had breached its implied duty not
to hinder with respect to the Hay, O.D. Ridge, U-Bar, Jersey Horse, Salt, Mud, Monument,
Saginaw-Kennedy, Manaco, Brookbank, and Kettle contracts.  *Id.* at 73-74.  Chief Judge Damich
found that even if a contract does not contain a specific warranty, an unreasonable delay in
performance that is caused by the Government can breach the implied duty not to hinder.  *Id.* at
59.  Chief Judge Damich held that the length of the suspensions was unreasonable for these
contracts, and that the Forest Service was at fault for the delay.  *Id.* at 70-72.  Although the
Arizona District Court order required the Forest Service to commence consultation with the FWS
on the LRMPs in Region Three on August 24, 1995, the Forest Service did not request formal
consultations until September 6, 1995 and did not formally reinitiate consultations until
November 9, 1995.  *Id.*  The Forest Service also unreasonably delayed completion of the
consultation process by failing to provide the Arizona District Court with a legally sufficient
Biological Opinion in conformity with the joint stipulation of *Silver v. Babbitt* until November
26, 1996.  *Id.* at 71.  As a result, Chief Judge Damich found that the suspensions became
unreasonably protracted and plaintiff's operations were significantly hindered.  *Id.*

## 2.     Plaintiff's Claim for Lost Profits Damages

Chief Judge Damich's decision on liability did not address the appropriate measure of
damages in this case.  Among other items, Precision Pine seeks to recover lost profits that it
claims it would have earned on the sale of lumber and lumber by-products if it had been able to
harvest the timber on the suspended sales between August 25, 1995 and the time that the

suspensions were lifted.[6]  Pl.'s Post-Trial Brief at 15-16.  Precision Pine's damages expert, Mr. Robert Ness, attempted to calculate these lost profits by determining "what would have changed" between what Precision Pine actually did during the period of the suspension and ensuing winter, and what Precision Pine would have done absent the Forest Service's breach.  *See* Pl.'s Proposed Findings of Fact ¶ 63, Trial Tr. at 2218-19.

In broad terms, Mr. Ness determined what he believed Precision Pine's gross profits before manufacturing and overhead would have been if there had been no suspension and Precision Pine had been able to produce and sell lumber and lumber by-products[7] from timber on the suspended sales in 1995, 1996, and early 1997.[8]  Pl.'s Post-Trial Brief at 17. To do this, he calculated what he believed Precision Pine's total revenues would have been with respect to lumber that would have been produced from timber that would have been harvested from the breached sales during the suspension period, and then deducted what he asserted were the direct manufacturing costs that Precision Pine would have incurred in harvesting this timber and manufacturing it into lumber and lumber by-products.  *Id.* at 17-18.  In total, Mr. Ness estimated that Precision Pine incurred $6,865,541.21 in lost profits damages (or what Mr. Ness termed a "lost market opportunity") from being unable to harvest the Monument, Mud, Saginaw-Kennedy, U-Bar, Brookbank, Jersey Horse, Manaco, Salt, Hay, Kettle, and O.D. Ridge sales during the suspension period.[9]  *See* PX 131 Ex. 1, 4.

---

[6]  As a result of manufacturing logs into lumber, Precision Pine produced bark, chips, shavings and grindings as by-products.  March 11, 2005 Joint Stipulation of Facts ¶ 33.

[7]  Throughout this Opinion and Order, the Court will use the term "lost lumber profits" to refer to lost profits from lumber and lumber by-products.  In addition, when addressing plaintiff's lost volume seller arguments, summarized at Section 3.D., *infra*, and analyzed at Section IV.A. and B. of the Discussion section, *infra*, the Court will refer to a lost "opportunity to produce and sell lumber" to denote a lost opportunity to produce and sell both lumber and lumber by-products.

[8]  Defendant argues that the model used by Mr. Ness to determine lost profits damages is inaccurate and does not attempt to describe what Precision Pine would have done "but for" the suspensions.  Def.'s Post-Trial Memorandum of Law ("Def.'s Post-Trial Brief") at 30-48.  As discussed *infra* at page 7, for the purpose of this Opinion and Order, the Court does not intend to discuss or rule upon the reasonableness of Mr. Ness's damage calculations, except to discuss Mr. Ness's contention that Precision Pine should be compensated as a lost volume seller.

[9]  Mr. Ness's $6,865,541.21 damages calculation includes lost profits damages for lumber, roundwood, and lumber by-products that he claims would have been earned from the suspended sales but for the suspensions.  *Id.*  Precision Pine is not seeking to recover lost profits damages with respect to the Brann contract, which is the only other contract that Chief Judge Damich found had been breached.  *See* February 17, 2006 Closing Argument Tr. at 9.  Plaintiff concedes that the suspension did not cause lost profits on the Brann contract because the

**3.      Arguments That the Court Will Address in This Opinion and Order**

In this Opinion and Order, the Court will address plaintiff's argument that it should not be required to offset profits that it earned by partially harvesting the suspended sales in the post-suspension period.  After reviewing the parties' Post-Trial Briefs and Post-Trial Response Briefs and considering the parties' responses at closing argument to the questions and hypothetical cases set forth in the Orders identified at page 2, *supra,* the Court concludes that it is not possible for the Court to determine at this time whether Precision Pine should be required to offset such profits, because neither party has addressed the proper standard for determining whether Precision Pine is entitled to be compensated as a lost volume seller.  Accordingly, the Court believes that limited additional briefing consistent with the standard set forth in this Opinion and Order would be beneficial to both the parties and the Court.

In this Opinion and Order, the Court will also address defendant's arguments that plaintiff cannot recover lost lumber profits because the manufacture and sale of lumber constituted independent and collateral undertakings and that plaintiff is precluded from recovering lost profits damages because plaintiff elected to assert a claim for partial breach and continue the timber sale contracts.  These issues can be resolved without first determining whether plaintiff is entitled to be compensated as a lost volume seller.  Furthermore, the additional briefs required by this Opinion and Order would be unlikely to further clarify the parties' arguments on these issues.

The Court will also address defendant's argument that lost lumber profits were not a foreseeable result of the suspensions of plaintiff's timber sale contracts.  As discussed in Section II., *infra,*  plaintiff argues that defendant's foreseeability arguments are only relevant to the extent that the Court determines that plaintiff is not entitled to be compensated as a lost volume seller. The parties have not yet sufficiently addressed whether plaintiff is entitled to be compensated as a lost volume seller.  However, all of the information and arguments necessary for the Court to determine whether lost lumber profits were foreseeable as a result of the suspensions are before the Court at this time, and therefore, the Court intends to address defendant's foreseeability arguments in this Opinion and Order.

After the parties have submitted the additional briefing required by this Opinion and Order addressing whether plaintiff is entitled to be compensated as a lost volume seller, the Court will issue a further Opinion and Order addressing the remaining factual and legal issues in this case, including but not limited to whether plaintiff has established that its lost profits damages were caused by defendant's breach and whether plaintiff has proved its damages with reasonable certainty.

The Court now turns to a description of the parties' arguments regarding independent and

---

suspension of that contract was lifted in October, 1995, long before Precision Pine would have harvested the contract if there had been no suspension.  *Id.*

collateral undertakings, the foreseeability of lost lumber profits, plaintiff's entitlement to recover lost profits damages for a partial breach, and whether plaintiff is entitled to be compensated as a lost volume seller.  After having described the parties' arguments, the Court will proceed to analyze, and to the extent possible at this time, resolve the parties' contentions.

### A.    Defendant's Independent and Collateral Undertaking Arguments

Defendant argues that plaintiff cannot recover damages attributable to lost lumber profits because the contracts at issue in this case are timber contracts that do not require the manufacture of lumber after the timber is removed from Forest Service land.  Def.'s Post-Trial Brief at 12. Defendant claims that Forest Service timber sales are frequently awarded to purchasers who do not own or do not have access to a sawmill, and that purchasers are free to and often choose to put Forest Service timber to a variety of uses other than the manufacture of lumber.  *Id.* Therefore, defendant argues that Precision Pine cannot recover lost lumber profits because such profits arise from activities that are independent of and collateral to the breached contracts, and are therefore unrecoverable as a matter of law.  *See* Def.'s Post-Trial Brief at 12-15.  Rather than putative profits from the sale of lumber products, defendant argues that Precision Pine's damages should be based upon the difference between the contract price/market value differential for the timber at issue at the time of breach and the contract price/market value differential on the day that the suspensions were lifted.  *See* Def.'s Post-Trial Brief at 10-11.

Plaintiff argues that where a contract to supply raw materials to a party in the business of manufacturing is breached, lost profits on the manufactured goods that would have been produced are not collateral to the contract. Pl.'s Post-Trial Brief at 6.  Plaintiff also argues that Precision Pine's bidding documents, the timber sale contracts themselves, and the Forest Service Timber sale program all refer to the production of lumber from timber, demonstrating that the manufacture and sale of lumber do not constitute independent and collateral undertakings.  *Id.* at 8.  Plaintiff notes that the Forest Service's manual states that an objective of the Forest Service's commercial timber sale program is "to provide a continuous flow of raw material to local forest industries." Pl.'s Post-Trial Brief at 9.  Furthermore, plaintiff notes that in bidding on Forest Service timber sale contracts, prospective purchasers are required to identify whether they are manufacturers of lumber, and that as part of their standard bid packages, potential purchasers are required to identify the plant at which the timber is to be manufactured into lumber.  *Id.* Plaintiff also notes that clauses in Precision Pine's timber sale contracts provided additional time to harvest the timber in the event of a downturn in the lumber market, and required Precision Pine to certify that the timber would be processed domestically.  *Id.* at 9-10.  Plaintiff argues that these provisions demonstrate that Precision Pine's timber sale contracts were drafted and awarded with the production and sale of lumber in mind, and as such, lumber production and sale cannot be collateral to the contracts.  *Id.* at 11.

### B.    Defendant's Foreseeability Arguments

Defendant also argues that Precision Pine's lost lumber profits claims should be rejected

because plaintiff has failed to establish that lost lumber profits were a legally foreseeable result of the Mexican Spotted Owl suspensions. Def.'s Post-Trial Brief at 28-30. Defendant argues that the suspensions merely delayed the harvesting of plaintiff's timber sale contracts, and that when the suspensions ended, Precision Pine elected to continue the contracts, and the very same trees on the very same contracts were available for harvesting. *Id.* at 29. According to defendant, the time for performance was also not affected, because the contract terms were adjusted to provide Precision Pine with additional time to harvest the sales. *Id.* Therefore, defendant argues, at the time of contracting there was no reason for defendant to foresee that the delays caused by the suspensions would result in a loss of profits, as opposed to a mere deferral of profits. *Id.* at 30.

Plaintiff argues that many of the facts discussed in Section 3.A., *supra*, demonstrating that the manufacture and sale of lumber were not independent of or collateral to Precision Pine's timber sale contracts also demonstrate that lost profits were a foreseeable result of the suspensions. Pl.'s Post-Trial Brief at 16. Furthermore, plaintiff argues that in documents prepared just days after the suspensions were imposed, the Forest Service indicated that it was aware of the impact of the suspensions on the profitability of timber companies. *Id.* On August 28, 1995, just three days after Precision Pine's contracts were suspended, the Forest Service prepared a document entitled "Effects of Injunction on Timber Harvest Activities on Region Three's Existing and Planned Timber Sales Program." *See* PX 138. This document stated that:

> if this injunction continues for 2-3 months, it is essentially a 12 month delay
> for a very high percentage of our sales. It also means that many mills will
> have to shut down for extended periods. Since they have been operating "on the
> edge" for some time due to low availability of logs to process, this injunction could
> cause mills to close permanently.

*Id.*

On September 14, 1995, less than one month after Precision Pine's contracts were suspended, the Forest Service prepared a document entitled "Summary Effects of Mexican Spotted Owl Injunction Southwest Region," which stated:

> The effect on the timber industry is very serious . . . . The logging season is
> restricted in most places to the fall months due to protective requirements for
> the owl and goshawks. Thus we expect to lose the 1995 year of production
> which will put several mills out of business permanently . . . . T[his] represents
> about 1300 job[s] or families that will lose some or all of their annual income
> with another 700 secondary jobs affected. Twelve communities in Arizona and
> 28 in New Mexico will feel the effects. We expect about three sawmills to go
> out of business permanently if the injunction lasts through this logging season.

PX 103.

Finally, plaintiff argues that foreseeability, to a large degree, has already been addressed by the Court and is now the law of the case. Pl.'s Post-Trial Brief at 16. Plaintiff argues that in his decision on liability, Chief Judge Damich already addressed the issue of foreseeability in stating that "[t]he Court finds that the Defendant was aware that the Plaintiff's operations would be significantly hindered by the delay" and "[t]he Forest Service was aware of the effects of the suspension of the timber sales contracts on the timber industry as a whole within Region 3." *See Precision Pine*, 50 Fed. Cl. at 71; *see also* Pl.'s Post-Trial Brief at 16.

Defendant argues that the Forest Service documents identified by plaintiff are not relevant in determining foreseeability because foreseeability should be assessed at the time of contracting, and the Forest Service documents discussed above were created at or after the time that the Mexican Spotted Owl suspensions were imposed. Def.'s Response to Pl.'s Post-Trial Memorandum of Law ("Def.'s Post-Trial Response Brief") at 26. Defendant claims that the statements made by the Forest Service after the timber sale contracts were entered into do not demonstrate what the Forest Service had reason to foresee at the time of contracting, which was as much as five and a half years before the suspensions occurred. *Id.* Furthermore, defendant argues that when stating that the Forest Service was "aware" of the effects of the suspensions, Chief Judge Damich was discussing what the Forest Service was aware of after the suspensions were imposed, not at the time of contracting. *Id.*

In response, relying on *Gardner Displays Co. v. United States*, 171 Ct. Cl. 497, 505, 346 F.2d 585, 589 (1965), plaintiff argues that there may be reasons to assess foreseeability at the time of breach, at which point plaintiff claims there can be no dispute that the impact of the suspension on Precision Pine was actually foreseen by the Forest Service. Pl.'s Post-Trial Response Brief at 24. Plaintiff also argues that *Myerle v. United States*, 33 Ct. Cl. 1, 27 (1867), *Specialty Assembly & Packing Co., Inc. v. United States*, 174 Ct. Cl. 153, 567-68, 355 F.2d 544 (1966), and *Lewis v. United States*, 1982 WL 36718 *17 (Ct. Cl. July 16, 1982) support plaintiff's argument that foreseeability should be assessed at the time of breach. *Id.*

On June 9, 2006, defendant filed a Notice of Supplemental Authority asserting that the Federal Circuit's May 25, 2006 decision in *Old Stone Corp. v. United States*, 450 F.3d 1360, 1375 (Fed. Cir. 2006) supports defendant's argument that plaintiff's loss must have been foreseeable at the time of contracting. Def.'s Notice of Supp. Auth. at 1. Defendant also argues that *Old Stone* established that plaintiff's alleged inability to make "substitute arrangements" (*i.e.*, to obtain cover) must itself have been foreseeable at the time of contracting. *Id.* at 4; *see also Old Stone*, 450 F.3d at 1376-77. Defendant claims that because plaintiff failed to establish that Precision Pine's asserted inability to obtain substitute timber was foreseeable at the time of contracting, plaintiff is not entitled to recover lost profits damages.[10] Def.'s Notice of Supp. Auth. at 4.

---

[10] Defendant does not concede that cover was unavailable during the suspensions. *See* Section III. of the Discussion section, *infra*.

### C.   Defendant's Partial Breach Arguments

Defendant also argues that because plaintiff elected to continue the Forest Service timber sale contracts and bring a claim for partial breach, plaintiff is not entitled to recover damages in the form of lost profits.  Def.'s Post-Trial Brief at 9-11; Def.'s Post-Trial Response Brief at 12-15.  Defendant notes that in the face of a material breach, an injured party can elect to either continue a contract or to cancel it.  Def.'s Post-Trial Brief at 9; *see also Cities Service Helix, Inc. v. United States*, 211 Ct. Cl. 222, 234-35, 543 F.2d 1306, 1313 (1976).  Plaintiff elected to continue the Forest Service timber sale contracts that had been affected by the Mexican Spotted Owl suspensions.  *Precision Pine*, 62 Fed. Cl. at 651; March 11, 2005 Joint Stipulation of Facts ¶ 34; Trial Tr. at 1479.  Defendant asserts that because plaintiff chose to continue the contracts, plaintiff has already received the benefit of its bargain with the Forest Service through performance of the contracts, and cannot also recover through damages for lost profits.  Def.'s Post-Trial Brief at 10.  As defendant also argued in support of its collateral undertakings argument, defendant contends that plaintiff's damages should be measured by the difference between the contract price/market value differential at the time of breach and the contract price/market value differential when the suspensions were lifted.  *Id.* at 10-11; February 17, 2006 Closing Argument Tr. at 110.

Counsel for defendant explained defendant's position with regard to partial breach at closing argument:

> what the election really is, in a broader context, is an allocation of the risk regarding the future performance of the contract.  When you choose to cancel the contract, what you're saying is I want to take a bird in the hand.  It's been materially breached, I know I'm within my rights to cancel it, I'm going to take the profits that I anticipate getting from this contract.  When you elect to continue the contract, on the other hand, what you're saying is, I want to see how this turns out.  I think there is a real upside with this contract, and I recognize that there's a possibility that I might not do as well as I would by cancelling and taking damages.  I recognize that there is a possibility I might do much, much better.  And why this is important, particularly in the context of a case like this . . . if they choose to continue the contract and then come back and say well, it didn't work out, I want my profits that I would have gotten if I had simply cancelled, it changes the entire dynamic.  It makes the Defendant a guarantor of those profits.

February 17, 2006 Closing Argument Tr. at 128-29.

Plaintiff, of course, vigorously contests defendant's assertions that it is not entitled to recover lost profits damages.  *See* Pl.'s Post-Trial Brief at 13-15.  Plaintiff argues that it is entitled to recover expectancy damages for defendant's partial breach, which it claims include lost profits in this case.  *Id.*  Furthermore, Precision Pine argues that it essentially had no choice

other than to treat the suspensions as a partial breach and continue the contracts, because if it had cancelled the contracts, Precision Pine would have lost its primary timber supply.  March 1, 2006 Closing Argument Tr. at 258-60.  Precision Pine also argues that it if had treated the suspensions as a total breach and had failed to meet its obligations to harvest timber under the contracts, the Forest Service would have declared Precision Pine in default, and as a result, Precision Pine would have had difficulty being considered as a bidder for future contract awards.  *Id.* at 259.  Accordingly, plaintiff argues that contrary to defendant's assertions, by electing to pursue damages for partial breach, Precision Pine was not engaging in speculation to see whether the contracts would be profitable in the post-suspension period or whether it wished to pursue lost profits through litigation.  *Id.* at 260.  Rather, Precision Pine was simply trying to survive as a business.  *Id.*

### D.      Plaintiff's Lost Volume Seller Arguments

Plaintiff argues that its claim for lost lumber profits should not be reduced by any profits that it actually earned from the sale of lumber produced from the suspended sales after the suspensions were lifted.  *See* Pl.'s Post-Trial Brief at 44-47. As discussed at page 4, *supra*, after the suspensions were lifted, the Forest Service granted Precision Pine's request for contract term adjustments and provided adjustments equivalent to the number of days that had been lost during each contract's normal operating season.  *See* March 11, 2005 Joint Stipulation ¶ 34.  After the suspensions had been lifted and contract term adjustments had been granted, Precision Pine harvested timber on the Hay sale, the Mud sale, the U-Bar sale, the Brookbank sale, the Jersey Horse sale, the Manaco sale, the Kettle sale, and the O.D. Ridge sale.  *See* Def.'s Exhibit ("DX") 832.  During the post-suspension period, Precision Pine cut and removed approximately 45% of the total timber available from these sales.[11]  *Id.*

Plaintiff contends that its lost profit damages should not be offset by any profits that it earned from harvesting these sales after the suspensions were lifted because, as a result of the Mexican Spotted Owl suspensions, Precision Pine lost an opportunity to produce and sell lumber that can never be replaced.  Pl.'s Post-Trial Brief at 44.  Plaintiff asserts that but for defendant's breach, Precision Pine would have processed all of the timber on the breached contracts during the period of the suspension and the ensuing winter, and thereafter, would have purchased additional timber from sales offered by the Forest Service in the post-suspension period and would have also earned profits on lumber produced from that subsequently-purchased timber.  Pl.'s Post-Trial Response Brief at 8-9.  Therefore, plaintiff argues that deducting post-suspension profits would put Precision Pine in a worse position than it would have been in but for defendant's breach.  *Id.* at 9.  Absent the breach, according to plaintiff, Precision Pine would have earned profits on lumber produced from the suspended timber sales during the suspension period *in addition* to profits on lumber produced from subsequently purchased timber sales in the

---

[11]  Specifically, Precision Pine harvested 100% of the Hay sale, 98% of the Mud sale, 11% of the U-Bar sale, 52% of the Brookbank sale, 55% of the Jersey Horse sale, 31% of the Manaco sale, 27% of the Kettle sale, and 40% of the O.D. Ridge sale.  *Id.*

post-suspension period.  *Id.*

Mr. Ness, plaintiff's economic and accounting expert, testified that he believed that it would be inappropriate to deduct profits that Precision Pine earned in the post-suspension period for the following reason:

> the critical factor is that you had lost production capability in the time periods that we were examining during the suspension period where this timber would have been cut and processed.  Those are lost opportunities.  There is no way to go back and put logs into that period and manufacture those.  Anything that happened post-suspension would have been opportunities that existed with or without the suspension.  Precision Pine would have still had those mills.  They would still have been able to buy timber, and they would have been able to earn additional profits during that period whether they were from breach[ed] timber sales, or new timber sales . . . or whatever timber they wanted to get.  They had that opportunity to do that, and you can't go back and fill in those holes that existed during that 20-month suspension period.  There is no way to go back.

Trial Tr. at 2362-2363.  Similarly, Precision Pine's president, Mr. Lorin Porter, testified that "[Precision Pine] had a period of time there that was taken from us that we could not produce, we could not sell, we could not do anything with that timber that was taken from us and therefore it's something that you never get back."  Trial Tr. at 629.

Defendant argues that plaintiff should not be compensated as a lost volume seller because the Mexican Spotted Owl suspensions merely delayed harvesting the timber on the suspended contracts, and Precision Pine did eventually earn profits from these contracts after the suspension was lifted.  Def.'s Post-Trial Brief at 15-16.  Furthermore, defendant notes that, unlike the typical lost volume seller scenario, in this case, defendant is not seeking to offset profits earned on **other** timber sale contracts that Precision Pine was awarded after the suspension was lifted.  *Id.* at 17.  Instead, the Government is asking to offset post-suspension profits earned on the suspended contracts themselves.  *Id.*  For these reasons, defendant asserts that if Precision Pine's damage claims are not reduced by its post-suspension profits, Precision Pine would be compensated twice for lost profits on the same timber contracts – once when it earned profits from harvesting and processing the timber, and once again through damages in this action.  *Id.*

Alternately, defendant argues that Precision Pine has failed to demonstrate that it is entitled to be compensated as a lost volume seller as a factual matter because Mr. Porter was unable to identify specific contracts that Precision Pine would have bid on or been awarded absent the Mexican Spotted Owl suspension.  *Id.* at 18.  Finally, defendant argues that Precision Pine should not be compensated as a lost volume seller because Precision Pine did not actually lose volume as a result of the suspensions.  *See* Def.'s Post-Trial Response Brief at 18-19; February 17, 2006 Closing Argument Tr. at 144-45.  Specifically, defendant argues that had plaintiff wished to do so, it had the sawmill capacity to process both the suspended sales and the additional sales that plaintiff argues it would have acquired in the post-suspension period had

-13-

there been no suspensions.  Def.'s Post-Trial Response Brief at 19.

The Court now turns to an analysis and, where possible at this time, resolution of the parties' arguments described above.

### DISCUSSION

**I.     The Manufacture and Sale of Lumber Products Do Not Constitute Independent and Collateral Undertaking**s

For lost profits to be recoverable in this Circuit, they must flow from the contract that is the subject of the lawsuit and not from "independent and collateral undertakings."  *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1328 (Fed. Cir. 2002); *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1023 (Fed. Cir. 1996); *see also Consolidated Edison Co. of N.Y., Inc. v. United States*, 67 Fed. Cl. 285, 290 (2005) ("Only if the damages naturally flow from the breach and are not realized from 'independent and collateral undertakings,' are they recoverable.").  As discussed at Section 3.A. of the Background section, *supra*, defendant argues that Precision Pine's timber sale contracts did not require or concern the manufacture of lumber, and that accordingly, any lost lumber profits arose from undertakings that are independent of and collateral to the contracts and are therefore unrecoverable.

In *Wells Fargo Bank, N.A. v. United States*, the Federal Circuit set forth the following test for determining whether lost profits arose from an activity collateral to a contract:

> If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement . . . . But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

88 F.3d at 1022-23 (quoting *Ramsey v. United States*, 121 Ct. Cl. 426, 435, 101 F. Supp. 353, 357-58 (1951)).

The relevant issue is whether the lost profits claimed "are too remote to be classified as a natural result" of the breach of a particular contract.  *Ramsey v. United States*, 121 Ct. Cl. at 434, 101 F. Supp. at 353, 357.  Collateral undertakings that are too remote to form the basis for expectancy damages are those that are not based directly on the subject of the contract, but instead, involve either the fruits of the contract or opportunities crowded out by breach of the contract.  *Mann v. United States*, 68 Fed. Cl. 666, 669 (2005); *see also Smokey Bear, Inc. v. United States*, 31 Fed. Cl. 805, 808 (1994) ("[T]he court and its predecessor ha[ve] previously held that damages for the loss of future profits and lost profitable business opportunities arising

-14-

from potential contracts with others are *per se* unrecoverable."). Such independent and collateral undertakings involve a second step that is not inherent in the contract itself. *Mann*, 68 Fed. Cl. at 669.

For example, in *Olin Jones Sand Co. v. United States*, the Court of Claims refused to award the plaintiff damages as a result of delayed payments on a contract with the Government that plaintiff alleged caused it to be unable to obtain bonding to enter into other, unrelated contracts. 225 Ct. Cl. 741, 742 (1980). The Court held that plaintiff could not recover such damages because they were "speculative" in nature and the receipt of prospective future contracts was "dependant on many factors not related to bonding." *Id.* at 744. Similarly, in *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1333 (Fed. Cir. 2003), the plaintiff sought to recover lost profits associated with future contracts that plaintiff alleged it would have been awarded absent harm to its business as a result of the Government's breach of an unrelated contract. The Court of Appeals for the Federal Circuit held that such lost profits were the result of independent and collateral undertakings, and were too "remote and uncertain" to be recoverable. *Id.*

In *Wells Fargo Bank, N.A. v. United States*, the Court of Appeals for the Federal Circuit held that a plaintiff could not recover lost profits from prospective loans that it allegedly would have made to unspecified third parties but for the unavailability of capital occasioned by the defendant's breach of a loan guarantee. 88 F.3d at 1022-24. The Court of Appeals found that the lost profits on these prospective additional loans were "too uncertain and remote to be taken into consideration as part of the damages occasioned by the breach of the contract in suit" because the purpose of the breached contract was for plaintiff to make profits from the interest on the loan guaranteed by the Government, not on other unrelated loans. *Id.* at 1023 (quoting *Ramsey*, 121 Ct. Cl. at 435, 101 F. Supp. at 358).

However, where lost profits directly relate to the subject of the contract, they are recoverable, even if they would have required a transaction with a third party. *Mann*, 68 Fed. Cl. at 670; *see also Cal. Fed. Bank, F.S.B. v. United States*, 245 F.3d 1342, 1349 (Fed. Cir. 2001) ("Profits on the use of the subject of the contract itself . . . are recoverable as damages."); *Commercial Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 338, 345-46 (2004) ("Although that profit was to be made on 'collateral undertakings,' such as mortgage loan activity, these profits were the result of the 'use of the subject of the contract itself.'"). Lost profits directly relate to the subject matter of the contract where "the only purpose of the contract . . . was for the plaintiff to make profits on the subject of the contract  . . . ." *Wells Fargo*, 88 F.3d 1023.

For example, in *Energy Capital Corp. v. United States*, the plaintiff sought to recover lost profits based on loans that plaintiff would have made to third parties pursuant to an agreement with the Government to secure such loans. 302 F.3d at 1317. The Government breached the agreement before plaintiff originated a single loan. *Id.* at 1319. However, the Court of Appeals for the Federal Circuit held that the express purpose of plaintiff's agreement with the Government was to enable plaintiff to make loans to third parties, and that the resulting loss of profits from such loans flowed directly from the Government's breach. *Id.* at 1329.

-15-

In *Neely v. United States*, the Court of Claims awarded plaintiff lost mining profits when the Government breached a contract to lease land for coal mining. 152 Ct. Cl. 137, 285 F.2d 438 (1961). In *Wells Fargo*, the court explained the holding in *Neely* as a result of the fact that "[t]he profits lost in *Neely* were profits on the use of the subject of the contract itself." 88 F.3d at 1023. Similarly, in *Mann v. United States*, the plaintiff sought to recover lost profits from the sale of energy to third parties as a result of the Government's breach of a geothermal lease agreement with the plaintiff. 68 Fed. Cl. at 666. The Government moved for summary judgment on plaintiff's claim for lost profits on the ground that profits from sales to third parties constituted activities that are independent of and collateral to the geothermal lease agreement that was breached. *Id.* The Court found that the evidence indicated that profits from the sale of energy from the leased property were contemplated by both parties. *Id.* at 670. The Court further held that the subject of the contract between plaintiff and the Government was geothermal energy, and that "[p]rofits on the use of the subject of the contract itself . . . are recoverable as damages." *Id.* at 670 (quoting *California Federal Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed. Cir. 2001)).

Determining whether lost profits relate to the subject matter of a contract is often a difficult, fact-specific inquiry. *See e.g., Smokey Bear, Inc. v. United States*, 31 Fed. Cl. at 809. The relevant inquiry is whether the lost profits claimed directly related to the breached contract and were within the contemplation of the parties at the time of contracting. *Mann*, 68 Fed. Cl. at 669; *see also Smokey Bear, Inc.*, 31 Fed. Cl. at 809 ("The issue for this court is whether the damages plaintiff seeks are the 'natural and probable consequences' of the alleged breach of the license agreement, *i.e.*, whether the damages were within the contemplation of the parties at the time the contract was made.").

For example, in *Smokey Bear, Inc. v. United States,* the Court of Federal Claims held that the plaintiff's lost profits based on the potential sales of licensed products to third parties were not unrecoverable as a matter of law because there was an issue of fact as to whether the lost profits claimed were within the contemplation of the parties at the time that the licensing contract was entered into. 31 Fed. Cl. 805, 809 (1994). Similarly, in *Mann v. United States*, the Court of Federal Claims held that the plaintiff's claim for lost profits on the sale of geothermal energy to third parties were not unrecoverable as a matter of law, because the parties not only contemplated that the plaintiff would sell the energy to third parties, but actively intended that result. 68 Fed. Cl. at 670.

In the present case, the timber contracts themselves and the nature of the Forest Service timber sale program indicate that the manufacture and sale of lumber were within the contemplation of the parties at the time that the contracts were entered into. At all times relevant to this case, an objective of the Forest Service's commercial timber sale program as recognized by the Forest Service manual was to "provide a continuous flow of raw material to local forest industries." PX 132; PX 134. Mr. Ronald Lewis, who had worked for the Forest Service for 30 years, testified that he believed that the Forest Service was "absolutely" aware that sawmill owners were the primary customers for Forest Service timber sales. Trial Tr. at 3080. He testified that he believed that this was the case "[b]ecause we were in the business of selling

-16-

commercial timber to sawmills or to loggers who in turn sold them to sawmills." *Id.*

In addition, the timber sale contracts and bid documents demonstrate that the purpose of the contracts was for Precision Pine to purchase timber to manufacture into lumber. Pursuant to contract clause CT8.212, the Forest Service provided purchasers with additional time to harvest the timber on a contract (known as a "Market-Related Contract Term Addition") if there was a significant downturn in the market for lumber products. *See* PX 170 at JRH-112; PX 171 at ODR-90; PX 172 at BRB-88. The stated purpose of the inclusion of such a contract provision was to avoid purchaser defaults in the event of a severe economic downturn because:

> [s]uch economic distress broadly affects community stability and
> threatens the ability of industry to supply construction lumber and other
> products for public use and threatens the maintenance of plant capacity
> necessary to meet future needs of the Nation for wood products from domestic
> sources. Accordingly, in order to insure the retention of a viable established
> industry capable of supplying the wood fiber needs of the public for housing
> and other products, the Chief of the Forest Service has determined that if there
> is a drastic reduction in wood product prices sufficient to trigger the
> market-related contract term addition being adopted by this rule, it would be in the
> substantial overriding public interest to extend the contract term . . . .

PX 222; 55 Fed. Reg. 50643 (Dec. 7, 1990). The inclusion of CT8.212 demonstrates that the Forest Service clearly recognized that the timber harvested from Forest Service sales would ultimately be used to manufacture lumber, which would ultimately be sold.

Furthermore, in bidding on Forest Service timber contracts, prospective purchasers were required to identify whether they were manufacturers of lumber products. *See* PX 44 at 2. As part of the standard Forest Service bid package, purchasers had to complete a "Certificate of Non-Substitution of Timber Purchased and Disposition of Timber Domestically Processed and Exported Timber," which required the purchaser to identify where it had processed other Forest Service timber during the previous calendar year as well as identify the mill at which the timber being bid on was to be processed. *See e.g.* PX 21; PX 24; PX 135, Trial Tr. at 201. Purchasers were subsequently required to notify the Forest Service if there was to be a change in the location to which the logs from the sale were to be delivered. Trial Tr. at 201. Contract clause CT8.641, which, like clause CT8.212, was incorporated in the contracts at issue, also required a purchaser to certify that timber removed under the contract would be processed domestically. *See e.g.* PX 170 at JRH-116. These provisions and obligations indicate that the production and sale of lumber were quite clearly contemplated by both the Forest Service and timber sale purchasers as the time the contracts were entered into.

Despite this evidence, defendant argues that the manufacture and sale of lumber are independent and collateral undertakings because Forest Service timber and multi-product sales are "frequently" awarded to purchasers who do not own a sawmill or planer, or who do not have access to such manufacturing facilities. *See* Def.'s Post-Trial Brief at 12. The evidence in the

record does indicate that it was possible for a purchaser who did not own a sawmill or a planer to be awarded a Forest Service timber sale contract, and that occasionally such purchasers did enter into timber contracts with the Forest Service.  For example, Mr. Stephen Reidhead, the president of Tri-Star Logging, testified that Tri-Star had never owned a planer or a sawmill, but had bid on, was awarded, and had performed several Forest Service timber sale contracts.  Trial Tr. at 1762-63, 1765.  Mr. Lewis testified that the Forest Service entered timber sale contracts with purchasers who did not own sawmills or planers, and that those purchasers were able to satisfy their obligations to harvest and remove timber.  *Id.* at 3116-17.  Mr. David Harris, who worked as a contracting officer in the Kaibab National Forest, testified that bidders on Forest Service timber and multi-product sale contracts did not need to own or have access to a sawmill or a planer.  *Id.* at 3770.

At the outset, the Court does not believe that the evidence cited by defendant supports the contention that purchasers who did not intend to manufacture lumber were "frequently" awarded Forest Service timber sale contracts.  In light of the evidence regarding Forest Service timber contracts themselves and the nature of the timber sale program, such purchases would have been the exception rather than the rule.

More importantly, the Government's evidence relates to isolated and hypothetical contracts between the Forest Service and purchasers other than Precision Pine.  Precision Pine identified itself as a manufacturer of lumber in the bids that it submitted on Forest Service timber sales.  Trial Tr. at 187-89; *see also* PX 44 at 2.  As part of its bid packages, Precision Pine submitted documentation to the Forest Service identifying where it had processed other Forest Service timber during the previous calendar year as well as the mill where the timber from each sale was to be processed into lumber.  Trial Tr. at 184-86, 201.  Precision Pine submitted certificates to the Forest Service on an annual basis certifying where timber from each of its Forest Service timber sale contracts was processed.  *See* PX 21-23, Trial Tr. at 185-86.  Furthermore, eight of the contracts at issue in this case (Brookbank, Hay, Jersey Horse, Manaco, Mud, O.D. Ridge, Salt and U-Bar) were variably priced contracts pursuant to which the stumpage price escalated and de-escalated by reference to the Western Wood Products Association's ("WWPA's"), Inland Rocky Mountain Ponderosa Pine index.[12]  See PX169-72, PX174-75; PX177-78; March 11, 2005 Joint Stipulation ¶ 32.  The Western Wood Products Association's Inland Rocky Mountain Ponderosa Pine index is a ***lumber*** market index.  Trial Tr. at 262-63.  It was impossible to determine the stumpage price to be paid to the Forest Service under these eight contracts without making a reference to prices in the ***lumber*** market.  This evidence indicates that regardless of what may have happened in contracts between the Forest Service and other purchasers, the Forest Service was fully aware that Precision Pine was purchasing timber to process into lumber and sell.

In fact, during trial, counsel for defendant stated:

---

[12]  The "stumpage price" refers to the price that a timber contract purchaser pays to the Forest Service for standing timber.  Trial Tr. at 113.

> Your Honor, it is a fair point that Precision Pine is in the lumber business, and we do not make any pretense that the Forest Service did not know that Precision Pine[] had sawmills.  We'd certainly concede that fact.  The Forest Service knew that Precision Pine had sawmills.

Trial Tr. at 5416-17.  However, counsel for defendant argued that despite this knowledge, "[t]he Forest Service did not know for sure one way or the other how Precision Pine was going to treat logs from the sale."  Tr. at 5417.  The sole examples that defendant provided in which Precision Pine used timber for any purpose other than the production and sale of lumber are the transfer of the Kettle sale to Stone Container and the sale of pulpwood to third parties.  *See* Def.'s Post-Trial Brief at 12 n.7.  The transfer of an entire sale to a third party is not analogous to a situation in which  Precision Pine put sawlogs from a Forest Service sale to an alternate use.  Similarly, Precision Pine's treatment of pulpwood is not relevant to its plans regarding lumber production because, as Mr. Porter testified, pulpwood is "not anything that can be sawed in the saw mill and made lumber out of."  Trial Tr. at 112.  Although a hypothetical purchaser might put timber to other uses, the evidence demonstrates that the Forest Service knew that Precision Pine was purchasing the timber at issue for the specific purpose of manufacturing lumber for sale to third parties.

Relying on *Mann v. United States*, 68 Fed. Cl. 666, defendant argues the manufacture and sale of lumber involves a "second step" that is not inherent in timber sale contracts themselves, even if the Forest Service knew that Precision Pine intended to manufacture and sell lumber, such activity constituted independent and collateral undertakings.  *See* February 17, 2006 Closing Argument Tr. at 134-35.  It appears that defendant contends that simply because the timber that was the subject of the contract between Precision Pine and the Forest Service was manufactured prior to being sold, the lost profits from such sales necessarily arise from independent and collateral undertakings.  *Id.*, Def.'s Post-Trial Response Brief at 9-10.  Defendant has cited no authority in support of this argument, and the Court is aware of none.  Furthermore, as previously discussed, *Mann* also holds that "when the lost profits directly relate to the subject of the contract, they are recoverable, even if they would have required a transaction with a third party." 68 Fed. Cl. at 670.  In *Mann*, the court held that the plaintiff was obviously not going to enter a geothermal lease to provide energy for his personal use – clearly, he intended to sell it to third parties.  *Id.*  Similarly, in this case, it was obvious to the Forest Service that Precision Pine did not intend to cut the sawlogs on the timber contracts at issue and use them as firewood or stack them and leave them unused – Precision Pine intended to manufacture the sawlogs into lumber and sell the lumber.

Defendant further argues that the Federal Circuit's decision in *First Heights Bank*, *F.S.B. v. United States*, 422 F.3d 1311 (Fed. Cir. 2005), demonstrates that the fact that the Forest Service was aware that Precision Pine intended to manufacture lumber from the breached timber contracts standing alone is insufficient to demonstrate that the manufacture and sale of lumber did not constitute independent and collateral undertakings.  Def.'s Post-Trial Response Brief at 7-8.  *First Heights Bank* was a *Winstar* case in which the plaintiff sought lost profits from reinvestment in its homebuilding business of money that it would have realized in tax benefits if

-19-

the Government had not breached an assistance agreement.  *Id.* at 1317-18.  The plaintiff argued that the Government was aware that plaintiff was involved in homebuilding and that plaintiff intended to reinvest the money that it would have realized from the tax benefits.  *Id.* at 1318.

In upholding the decision of the Court of Federal Claims denying lost profits, the Federal Circuit stated:

> Although the government was aware of background information about [plaintiff] being a profitable homebuilder, no specific reference was made during negotiations to homebuilding projects for which the tax benefits were to be used.  Nor did the Assistance Agreement inherently refer to the alleged additional homebuilding projects.  The subject of the contract in this case was simply money.

*Id.* at 1318.

The present case differs from *First Heights Bank* in that the manufacture of lumber was specifically referenced in the contracts themselves.  As previously discussed, contract clause CT8.212 provided a Market Related Contract Term Addition in the event of a downturn in the market for manufactured wood products.  Eight of the contracts at issue specified that the contract stumpage price would vary with changes in a lumber market index.  The contracts required Precision Pine to submit certificates to the Forest Service on an annual basis certifying where timber from each of its Forest Service timber sale contracts was processed.  In this case, the contracts themselves demonstrate that the parties anticipated that lumber would be produced and that lost lumber profits are profits on "the use of the subject of the contract[s]".  *Mann*, 68 Fed. Cl. at 671 (quoting *Cal. Fed. Bank*, 245 F.3d at 1349).  For these reasons, plaintiff is not precluded from recovering lost lumber profits on the ground that they arose from independent and collateral undertakings.

## II.   It Was Legally Foreseeable That Protracted Suspensions of Nearly All of Plaintiff's Timber Sale Contracts Would Result in Lost Lumber Profits to Plaintiff

As discussed in Section 3.B. of the Background section, *supra*, defendant argues that plaintiff cannot recover lost lumber profits because at the time of contracting, it was not foreseeable to defendant that lost lumber profits would occur as a probable result of the suspensions.[13]  To establish foreseeability, plaintiff must show that the resulting loss was

---

[13]  Plaintiff argues that defendant's foreseeability arguments are only relevant to the extent that plaintiff is determined not to be a lost volume seller.  Pl.'s Post-Trial Response Brief at 21.  As discussed in Section IV.A., the crux of Precision Pine's lost volume seller argument is that the Mexican Spotted Owl suspensions caused a "hole in the profit pipeline" for Precision Pine that could not be filled simply by releasing the suspended sales.  Therefore, to the extent that the Court accepts Precision Pine's lost volume seller arguments, defendant's argument that it

foreseeable because it followed from the breach either a) in the ordinary course of events; or b) as a result of special circumstances beyond the ordinary course of events that the party in breach had reason to know.  RESTATEMENT (SECOND) OF CONTRACTS, § 351(2); *Landmark Land Co., Inc. v. F.D.I.C.*, 256 F.3d 1365, 1378 (Fed. Cir. 2001).  Professor Corbin explains:

> The existing rule requires only reason to foresee, not actual foresight.  It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefor in case of breach.  It is erroneous, therefore, to refuse damages for an injury merely because its possibility was not in fact in the contemplation of the parties at the time they made the contract.

ARTHUR L. CORBIN, 11 CORBIN ON CONTRACTS, § 1009 (1964); *see also Fifth Third Bank v. United States*, 71 Fed. Cl. 56, 86 (2006); *Precision Pine*, 63 Fed. Cl. at 130; *Anchor Sav. Bank, F.S.B. v. United States*, 59 Fed. Cl. 126, 143-44 (2003).  In that regard, Precision Pine need not show that a particular type of breach was foreseeable, but must prove that the general type and magnitude of damages were foreseeable.  *Precision Pine*, 63 Fed. Cl. at 130.

### A.      Foreseeability Should Be Assessed at the Time of Contracting

A preliminary matter that the Court must address is the relevant time for assessing foreseeability in the present case.  Defendant argues that foreseeability must be assessed at the time of contracting.  Def.'s Post-Trial Response Brief at 26.  Plaintiff argues that, in the present case, foreseeability should be assessed at the time of breach.  Pl.'s Post-Trial Response Brief at 24.  If foreseeability is assessed at the time of breach, the Court can consider the August 28, 1995 and September 14, 1995 Forest Service documents discussed at Section 3.B. of the Background section, *supra*, which tend to support plaintiff's argument that lost profits damages were foreseeable to defendant as a result of the suspensions.  In addition, as discussed at Section 3.B. of the Background section, *supra*, these Forest Service documents relate to plaintiff's argument that Chief Judge Damich's statements that defendant was "aware" that the delay would hinder plaintiff's business demonstrate that foreseeability has already been established as the law of the case.  *See Precision Pine*, 50 Fed. Cl. at 71; Pl.'s Post-Trial Brief at 16.

The general rule is that foreseeability should be assessed at the time of contracting.  *See Old Stone Corp. v. United States*, 450 F.3d at 1375 ("plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation."); *Cal. Fed. Bank v. United States* 395 F.3d 1263, 1267 (Fed. Cir. 2005); *Hughes Communications Galaxy, Inc. v. United States*, 271

---

was not foreseeable that the suspensions would result in a loss of profits as opposed to a deferral of profits would not be on point.  However, as discussed in Section 3. of the Background section, *supra*, because the parties have not yet sufficiently addressed whether plaintiff is entitled to be compensated as a lost volume seller, the Court will address the foreseeability arguments that defendant has presented in its Post-Trial Brief and Post-Trial Response Brief.

F.3d 1060, 1066 (Fed. Cir. 2001) ("[T]he damages must have been foreseeable at the time the parties entered the contract. . . ."); *Bohac v. Dep't of Agric.*, 239 F.3d 1334, 1340 (Fed. Cir. 2001) ("The concept of 'consequential damages' in contract law relates to the concept of foreseeability at the time the contract is executed, not, as the petitioner would have it, foreseeability at the time of breach.")[14]; *Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 360 (2006) ("The plaintiff . . . must establish that . . . any losses incurred as a result of a partial breach of contract reasonably were foreseeable by the defendant when the contract was executed."); *see also* E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 12.14 at 260 (3d ed. 2004) ("The question is not what was foreseeable at the time of the breach, but what was foreseeable at the time of contracting."). The RESTATEMENT (SECOND) OF CONTRACTS provides that "[d]amages are not recoverable for losses that the party in breach did not have reason to foresee as a probable result of the breach *when the contract was made.*" RESTATEMENT (SECOND) OF CONTRACTS § 351 (emphasis added).

However, in the Court's November 23, 2004 decision on Defendant's Motion for Partial Summary Judgment, citing *Gardner Displays Co. v. United States*, 171 Ct. Cl. 497, 505, 346 F.2d 585, 589 (1965)), the Court stated "There may be, however, valid reason to assess foreseeability at the time of the breach rather than at the time of the agreement, for it is at the time of the breach that the consequences of the wrongdoing are more apparent and assessable, and the deterrent accordingly greater." *Precision Pine*, 63 Fed. Cl. at 130. The Court noted that, to the extent that foreseeability can be measured from the time of breach, the September 14, 1995 Forest Service document demonstrated that the Forest Service may have actually foreseen the types of lost profits sustained by Precision Pine as a result of the suspensions. *Id.* at 131.

In *Gardner Displays*, upon which plaintiff also relies in support of its argument that foreseeability should be assessed at the time of breach, the plaintiff, a manufacturer of rubber terrain maps pursuant to a contract with the Government, sought to recover damages for the increased price of latex, the principal raw material ingredient required to manufacture the maps.[15] 171 Ct. Cl. at 499, 346 F.2d at 586. The plaintiff bid on the contract prior to the Korean War, and entered into the contract shortly after the war broke out. *Id.* at 500, 587. The Government unreasonably delayed inspection and approval of the plaintiff's pre-production model and, in the interim, the cost of latex increased as an economic by-product of the war. *Id.* at 501-02, 587-88. The Government argued that it should not be liable for the increased latex costs because they resulted from the Korean War and not directly from the Government's delay. *Id.* at 504, 589.

---

[14] Plaintiff argues that *Bohac v. Dep't. of Agric.* is not persuasive as it involves an issue of statutory interpretation and the recovery of non-economic damages. *See* Pl.'s Post-Trial Resp. Br. at 24. While these contentions are accurate, this Court nevertheless finds the Federal Circuit's reasoning to be applicable, persuasive, and consistent with the weight of authority.

[15] The plaintiff, who was the prime contractor with the Government, brought the claim on behalf of its subcontractor, who actually suffered the loss as a result of the increased price of latex. *Id.* at 500, 586.

In determining that the Government was liable for the increased cost of latex, the Court of Claims noted that "[t]he true concept of consequential damages involves consideration of the type of loss foreseeable by the parties at the time of their agreement." *Id.* at 504-05, 589.  The court found that the Government was liable because when it contracted with the plaintiff, it implied an obligation to respond in damages for any unreasonable delays it might commit, including increased material costs. *Id.* at 505, 589.  The court held that "the cause or cost of such increases is not in every case material to and does not determine their foreseeability." *Id.* However, the Court of Claims also noted that "[t]here may even be valid reason to fix the foreseeability at the time of the breach rather than at the time of agreement . . ." *Id.*  The Court of Claims provided the following illustration to demonstrate a situation where it might be appropriate to fix foreseeability at the time of breach:

> [I]f the concrete results of delay in the form of war-inflated prices were not apparent to the Army when it awarded plaintiff the contract in suit just prior to the outbreak of the Korean War, most certainly the consequences became obvious in September 1950 when the breach occurred, for by then latex prices were on a rapid rise and the Army's risk more palpable.

*Id.*

In *Gardner Displays*, the Court of Claims actually assessed forseeability at the time of contracting, not at the time of breach. *Id.* at 504-05, 589.  More importantly, even if the Court of Claims had assessed foreseeability at the time of breach, plaintiff has failed to explain how this case is similar to *Gardner Displays* in a way that supports plaintiff's argument that the Court should deviate from the general rule that foreseeability is assessed at the time of contracting. Unlike the illustration set forth in *Gardner Displays*, defendant is not arguing that an unexpected event beyond its control occurring after the time of contracting was the actual cause of plaintiff's damages.  Defendant simply argues that the nature of defendant's breach made it unforeseeable that the suspensions would result in lost lumber profits as opposed to the deferral of lumber profits.  *See* Def.'s Post-Trial Brief at 30.

Plaintiff also claims that *Specialty Assembly & Packing Co.*, 174 Ct. Cl. 153, 355 F.2d 554 (1966) supports plaintiff's contention that forseeability should be assessed at the time of breach.  Pl.'s Post-Trial Response Brief at 24.  In *Specialty Assembly*, the plaintiff claimed that the Government had breached a series of contracts pursuant to which the plaintiff had agreed to manufacture radio direction finders for the Signal Corps of the Army. *Id.* at 154-56, 555-58. The foreseeability inquiry in *Specialty Assembly* revolved around whether the breach of one contract, number 45928, had "an adverse effect upon the performance by the plaintiff" of a second contract, number 873. *Id.* at 175, 567.  The Court of Claims ruled that "the proof in the record does not establish the supposed relationship between defendant's breaches of contract 45928 and the adverse effect upon plaintiff's performance of 873." *Id.* at 175, 355 F.2d at 567-68.  However, the court also stated that even if the record had established a relationship between the two contracts, "the defendant's liability under contract 45928 would not extend to the incidental effect of the breaches of that contract upon the performance of another contract, which

-23-

the defendant did not breach, since those consequences would not have been reasonably foreseeable by the defendant at the time when the breaches of contract 45928 were committed." *Id.* at 175, 567-68.

At the outset, the court's decision not to award damages for the breach of contract 873 in *Specialty Assembly* was based upon plaintiff's failure to establish a relationship between defendant's breach of contract 45928 and any adverse effect upon contract 873, not upon the issue of foreseeability. *Id.* at 175, 567. The foreseeability inquiry in *Specialty Assembly* involved the effect of the breach of a primary contract upon a subsequently-entered second contract involving the same subject matter. *Id.* at 175-76, 567-68. The primary contract, contract 45928, was entered into almost a year before the second contract, contract 873. *Id.* at 175, 567. At the time contract 45928 was entered into, it would have been difficult for defendant to foresee the potential effect of a breach of that contract on contract 873, which did not yet exist. In the present case, Precision Pine does not contend that the breach of any one of its timber sale contracts caused the breach of any other contract. In addition, although Precision Pine's contracts were entered into at various times, the same conduct by the Government breached the contracts during the same time period, regardless of when the contracts were entered into. Therefore, plaintiff has not convinced the Court that *Specialty Assembly* is pertinent to the foreseeability inquiry in this case.

Plaintiff also argues that *Lewis v. United States*, 1982 WL 36718 (Cl. Ct. July 16, 1982), supports the proposition that foreseeability may properly be addressed at the time of breach. Pl.'s Post-Trial Response Brief at 24. In *Lewis*, the Government sought to recover damages from the plaintiff as a result of the plaintiff's breach of a land lease agreement by planting wheat in a prohibited area near an Air Force landing strip. *Id.* at *16-17. After receiving several notices from the Government, the plaintiff finally mowed some of the wheat, but scattered wheat kernels on the ground and attracted birds to the runway area, causing a severe safety hazard for landing aircraft. *Id.* at *3. The Government asserted a counterclaim against the plaintiff to recover the cost of a bird elimination program that it was forced to implement to ensure the safety of its aircraft. *Id.* at *17.

In assessing whether the Government could recover the cost of the bird elimination program as damages, the Court of Claims stated, "The concept of consequential damages involves consideration of the type of loss foreseeable by the contracting parties at the time of their agreement or at the time of the breach." *Id.* In support of this statement, the Court of Claims cited *Gardner Displays* and *Specialty Assembly*. The Court of Claims then concluded that "[w]hile the cost of removing the unauthorized wheat crop is a reasonably foreseeable consequence of [plaintiff's] breach of the lease, the cost of the bird hazard elimination program is less so." *Id.* However, the court did not specify whether it made this determination by assessing foreseeability at the time of contracting or at the time of breach. Accordingly, *Lewis* provides no guidance as to the circumstances that would justify assessing foreseeability at the time of breach rather than at the time of contracting. In view of the foregoing, the Court is not persuaded that *Lewis* supports plaintiff's argument that foreseeability should be assessed at the time of breach in this case.

Finally, plaintiff claims that *Myerle v. United States*, 33 Ct. Cl. 1, 27 (1897), supports assessing foreseeability at the time of breach.  Pl.'s Post-Trial Response Brief at 24.  In fact, *Myerle* does not specifically speak to the issue whether foreseeability should be assessed at the time of contracting or at the time of breach.  The Court of Claims simply stated :

> The damages must be such as was to have been foreseen by the parties, who are assumed to have considered the situation, the contract, and the usual course of events; but eliminated from this consideration must be any condition of affairs peculiar to the contractor individually in the particular case and not of general application under similar conditions.

33 Ct. Cl. at 27.  This statement provides no clear authority to fix the foreseeability inquiry at the time of breach.  In *Specialty Assembly*, the Court of Claims cited *Myerle* in support of the proposition that the effects of a breach of one contract upon a second contract "would not have been reasonably foreseeable by the defendant at the time when the breaches of contract 45928 were committed."  174 Ct. Cl. at 175, 355 F.2d at 567-68.  However, the Court concludes that *Myerle* was cited for the proposition that the result of the breach must have generally been foreseeable, not that the result must have been foreseeable at the time of breach.  Accordingly, there was no discussion in *Myerle* of the proper point at which to assess foreseeability.

The Court is not aware of, nor does plaintiff cite, any other cases that might indicate the circumstances under which foreseeability may be measured at the time of breach.  Plaintiff has not explained why *Gardner Displays*, *Specialty Assembly*, *Lewis*, or *Myerle* should guide the Court's foreseeability inquiry in this case.  Nor has plaintiff identified criteria pursuant to which the Court can determine whether it should deviate from the general rule that foreseeability should be assessed at the time of contracting.  In addition, plaintiff has not established the existence of any circumstances that demonstrate a compelling need for a deviation from the general rule.  Accordingly, the Court believes that the foreseeability inquiry in this case should be guided by the principle that foreseeability should be assessed at the time of contracting.  Therefore, the Court will not consider the August 28, 1995 and September 14, 1995 Forest Service documents in assessing foreseeability, nor do Chief Judge Damich's statements that these documents evidence that defendant was "aware" that its breach would hinder Precision Pine's business establish foreseeability as the law of the case.[16]

---

[16]  Regardless of whether foreseeability is assessed at the time of contracting or at the time of breach, the Court does not find persuasive plaintiff's argument that Chief Judge Damich's statements established foreseeability as the law of the case.  Chief Judge Damich's statements that the Forest Service was "aware" of the effects of the suspension on the timber industry do not constitute a definitive finding that lost profits damages were foreseeable.  *See Precision Pine*, 50 Fed. Cl. at 71.  In addition, Chief Judge Damich's statements were based on a more limited record, as he did not have before him the evidence that the parties presented during the 24-day trial on damages.  Furthermore, under the law of the case doctrine, a court has the power to reconsider its decisions until the entry of judgment.  *Exxon Corp. v. United States*, 931

**B.     Lost Profits Damages Were a Foreseeable Consequence of Defendant's Breach**

The Court must now determine whether lost profits damages were foreseeable at the time of contracting.  Lost profits are legally foreseeable only if, at the time that the contract was entered into, (1) the loss was natural and inevitable upon the breach so that the defaulting party may be presumed from all the circumstances to have foreseen it; or (2) if the breach resulted in lost profits because of some special circumstances, those circumstances must have been known to the defaulting party at the time the contract was entered into.  *Chain Belt Co. v. United States*, 127 Ct. Cl. 38, 58, 115 F. Supp. 701, 714 (1953).  It is enough, however, that the loss was foreseeable as a probable, as distinguished from a necessary, result of defendant's breach. RESTATEMENT (SECOND) OF CONTRACTS § 351 cmt. a; *see also* 11 CORBIN ON CONTRACTS § 56.7 ("The rule does not require that anything should have been foreseeable to a dead certainty; seldom can anything be predicted with such assurance as that. The rule merely requires that the injury must be one of such a kind and amount as a prudent person would have realized to be a probable result of the breach.").  Although the Court finds that foreseeability should be assessed at the time of contracting in the present case, and accordingly, may not consider the Forest Service documents discussed at Section 3.B., *supra*, the Court finds that the circumstances known to defendant at the time of contracting were nevertheless sufficient to establish that defendant should have reasonably foreseen that it was probable that plaintiff would suffer lost profits as a result of the simultaneous, prolonged suspensions of nearly all of plaintiff's timber sale contracts.

Many of the same facts that establish that the manufacture and sale of lumber were not independent and collateral undertaking also establish that defendant was aware that Precision Pine intended to manufacture the timber into lumber and sell it.  As discussed at Section I., *supra*, the purpose of the Forest Service's timber sale contracts was to provide a continuous flow of raw materials to the local forest industries.  In addition, as discussed at Section I., *supra*, Precision Pine identified itself as a manufacturer of lumber on the bids that it submitted to the Forest Service and submitted documentation identifying the mill where the timber was to be processed into lumber as part of its bid packages for each sale.  Counsel for defendant conceded that the Forest Service was aware that Precision Pine owned sawmills.  Trial Tr. at 5416-17.  These facts demonstrate that the Forest Service was aware that Precision Pine intended to use timber from the suspended contracts to manufacture lumber.

---

F.2d 874, 877 (Fed. Cir. 1991); *Fla. Power & Light Co. v. United States*, 66 Fed. Cl. 93, 95 (2005).  Therefore, even if Chief Judge Damich had indicated that it was foreseeable that plaintiff would suffer lost profits damages, the Court could revisit that issue and arrive at a contrary conclusion if new or additional evidence were discovered, if there were a change in controlling law, or if the Court found that the prior determination was clearly incorrect and would work a manifest injustice.  *Wolfchild v. United States*, ___ Fed. Cl. ___, 2006 WL 2424741 at * 10 (August 22, 2006) (citing *Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 698 (Fed. Cir. 2001).

Defendant was also aware that plaintiff intended to offer the lumber that it manufactured for sale.  As discussed at Section I., *supra*, contract clause CT8.212 provided purchasers with additional time to harvest the timber on a contract in the event of a downturn in the lumber market.  *See* PX 170 at JRH-112; PX 171 at ODR-90; PX 172 at BRB-88.  Commercial contracts, especially those for resale, create the inference of lost profits as a probable result of breach by the nature of the contracts themselves.  *See* Section III., *infra*; *see also Lewis v. Mobil Oil Corp.*, 438 F.2d 500, 510 (8th Cir. 1971) ("Where a seller provides goods . . . with knowledge that they are to be used in the manufacturing process . . . loss of profits is a natural consequence . . . ."); ROBERT L. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS § 1.16, at 45-46 (6th ed. 2005)  ("The seller's knowledge that the sale is for resale has been sufficient, in most cases, to demonstrate foreseeability of loss.").  Comment 6 to U.C.C. § 2-715 states, "In the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know . . . ."[17]  Accordingly, lost lumber profits were a foreseeable result of plaintiff's breach.

As discussed at Section 3.B. of the Background section, *supra*, defendant asserts that no loss of profits was expected because it anticipated that the "very same contracts" would be available to Precision Pine after the suspensions were lifted.  *See* Def.'s Post-Trial Brief at 29.  Specifically, because the suspensions only delayed operations, as opposed to cancelling the contracts entirely, defendant argues that "there was no reason to think that delay caused by a suspension would have resulted in a loss of profits, as opposed to the mere deferral of profits." *Id.* at 30.  By the very nature of a breach due to a delay in delivery, defendant knew the timber would be delivered at a later time than the plaintiff had expected. The resulting loss would therefore be foreseeable if defendant was aware that lumber prices would likely fluctuate over the period of the suspensions and that there was a substantial risk that plaintiff's performance would be forced into a time period where it was more expensive or less profitable.

The record reflects that there was reason for defendant to foresee that the price of lumber would change over time.  For instance, as discussed in Section I., *supra*, several of the contracts at issue contained stumpage prices that were linked to the lumber market.  For the these contracts, it is impossible to determine the price to be paid for the Forest Service timber under contract without reference to an index of lumber product prices.  *See* PX 170 at JRH-29.  In addition, as discussed in Section I., *supra*, contract clause CT8.212 provided purchasers with additional time to harvest timber sales if there was a significant downturn in the lumber market. The escalated and de-escalated pricing clauses and contract clause CT8.212 demonstrate that it was foreseeable to defendant that the price of lumber would change over time, and that this

---

[17]  The Federal Circuit has found that in the context of a government contract, the U.C.C. and the concepts discussed therein, although not governing, provide "useful guidance in applying general contract principles."  *See Hughes Comm. Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2001); *see also Citizens Fed. Bank, FSB v. United States,* 59 Fed. Cl. 507, 514 n.6 (2004).

change would have a financial impact on timber sale purchasers.[18]

Defendant argues that lost lumber profits resulted from several circumstances that it was unaware of at the time of contracting, including the unavailability of substitute timber from other Forest Service sales and the unavailability of replacement timber from other sources, and accordingly, that lost profits were unforeseeable. *See* Def.'s Post-Trial Brief at 29-30; *see also id.* at 53.  On June 9, 2006, defendant filed Defendant's Notice of Supplemental Authority, in which defendant argued that *Old Stone Corp.*, 450 F.3d 1360, supported defendant's argument that the inability to make substitute arrangements must itself be foreseeable at the time of contracting. Def's Notice of Supp. Auth. at 4.  *Old Stone* is a *Winstar* damages case in which the plaintiff alleged that the enactment of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") breached two agreements with government regulators for goodwill accounting treatment in exchange for acquiring several troubled thrifts.  450 F.3d at 1363-67.  As a result of the enactment of FIRREA, the plaintiff's thrift did not meet the Government's regulatory capital requirements, and was accordingly subject to seizure.  *Id.* at 1365.  In an attempt to meet regulatory capital requirements, plaintiff sold two other subsidiaries that plaintiff referred to as its "crown jewels," and contributed the revenue from these sales to the thrift.  *Id.* at 1365-66.  The plaintiff claimed that the Government's breach caused the sale of the "crown jewels," which in turn caused long-term adverse consequences for plaintiff, including the eventual seizure of the thrift by the Government on the ground that it was severely undercapitalized.  *Id.* at 1375-76.  However, plaintiff also conceded that factors other than the Government's breach affected its operations in the period of the breach, but claimed that the breach eliminated its ability to weather these unrelated problems.  *Id.* at 1366.

The Court of Federal Claims had held that the need for additional replacement capital infusions to the thrift as a result of the breach was foreseeable.  *Old Stone Corp. v. United States*, 63 Fed. Cl. 65, 89-90 (2004).  However, on appeal, the Federal Circuit noted that "even if the need for replacement capital was foreseeable, that hardly establishes that the adverse consequences alleged to flow from the need to make infusions were foreseeable." *Old Stone Corp.*, 450 F.3d at 1376.  The Federal Circuit held that for damages from the sale of plaintiff's "crown jewels" to have been foreseeable at the time of contract formation, defendant would have had to foresee (1) that the thrift would have other problems that would require additional infusions of capital; (2) that the "crown jewels" would be the only source of additional capital because plaintiff would not have access to alternative capital; (3) that the thrift's other problems would be so severe that the thrift would be seized; and (4) that the availability of the "crown jewels" would have been sufficient to avoid the seizure.  *Id.* at 1376.  The Federal Circuit held that the plaintiff had not "called [the court's] attention to any testimony in the record that will

---

[18]  Defendant has also presented arguments that Precision Pine's lost profits were due to Precision Pine's decision to defer harvesting once the suspensions were lifted, rather than price fluctuations in the lumber market.  *See* Def.'s Post-Trial Brief at 27-28.  These arguments will be addressed in the further Opinion and Order referred to in Section 3. of the Background section, *supra*.

support the foreseeability of any of the[] assumptions" that were necessary to support plaintiff's lost profits claim. *Id*. at 1376. Accordingly, the Federal Circuit found that the plaintiff had failed to establish that "this extended chain of causation" was foreseeable at the time of contract formation. *Id*.

Defendant is correct that plaintiff can only recover lost profits damages if plaintiff can establish that defendant should have reasonably foreseen that Precision Pine would not be able to obtain cover for the suspended timber sales. However, this principle was established long before the Federal Circuit's decision in *Old Stone*. *See Happy Dack Trading Co. Ltd. v. Agro-Industries, Inc.*, 602 F. Supp. 986, 994 (S.D.N.Y. 1984) ("Where, as here, the buyer seeks to recover profits lost when the seller failed to deliver goods that the buyer had intended to resell at a profit, the buyer must show that 'the seller at the time of contracting had reason to know' that buyer would lose profits, and that the lost profits 'could not be reasonably prevented by cover or otherwise . . . .'"); U.C.C. § 2-715 ("Consequential damages resulting from the seller's breach include . . . any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise . . . ."); *see also* DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS § 2.2 at 86 ("The buyer's failure to cover when cover is available will bar recovery of lost profits damages that could have been prevented by cover.") As the RESTATEMENT (SECOND) OF CONTRACTS explains:

> If several circumstances have contributed to cause a loss, the party in breach is not liable for it unless he had reason to foresee all of them. Sometimes a loss would not have occurred if the injured party had been able to make substitute arrangements as, for example, by "cover" through purchase of substitute goods in the case of a buyer of goods . . . . If the inability of the injured party to make such [substitute] arrangements was foreseeable by the party in breach at the time he made the contract, the resulting loss was foreseeable.

RESTATEMENT (SECOND) OF CONTRACTS, § 351, cmt. d (1981).

In the present case, it was foreseeable to defendant at the time of contracting that no replacement timber (i.e., "cover") would be available to Precision Pine in the event that the Forest Service suspended harvesting on all Forest Service timber sale contracts in Region Three. Mr. Porter testified that almost all of the timber processed in mills in Arizona comes from Forest Service land. Trial Tr. at 83. Mr. Porter testified that Precision Pine was substantially dependent on Forest Service timber sale offerings to run its sawmills, and procured at least 75 percent of its raw materials from the Forest Service. *Id*. at 214. He testified that 83 percent of the land in Arizona is owned by either the federal government, Indian tribes, or the state. *Id*. at 83. Mr. Porter stated that Indian tribes did not offer timber for sale to the public very often, because they generally had their own mills and processed their own timber. *Id*. Defendant, long in the business of selling timber to Arizona mills, had reason to foresee that in the event of a protracted suspension of the Forest Service timber program in Region Three, Precision Pine would not be able to obtain substitute timber within the Region.

Furthermore, the Forest Service had reason to foresee that timber in other locations would not provide an economically viable source of cover.  The relevant market for a timber sale contract is determined in part by a sale's proximity to the buyer's sawmills.  *See* February 17, 2006 Closing Argument Tr. at 63.  If the distance between a timber sale and a prospective purchaser's mills is too great, the resulting hauling costs can be prohibitive.  *Id.*  The Forest Service was aware that hauling costs were an important cost component in the lumber business, and took into account the costs of hauling sawlogs to nearby mills in establishing the minimum bid price.  PX 1-17.  Moreover, the Forest Service made allowances for increased hauling cost to cover additional distance in some situations.  For example, if the sawmill to which the Forest Service had appraised the timber did not also have a planer, the Forest Service would make an additional allowance in the minimum bid price to account for the increased cost of hauling the green lumber produced at the sawmill to the planer for finishing.  *See* PX 38.  For these reasons, at the time of contracting, the Forest Service should have reasonably foreseen that in the event all timber sales in Region Three were suspended, it would be unlikely that timber sales in more distant locations could serve as economically viable sources of cover.

As plaintiff notes, the foreseeability inquiry in this case is drastically different from the inquiry in *Old Stone* in that, in the present case, plaintiff does not need to establish the foreseeability of an "attenuated claim of causation" to recover damages.  Pl.'s Notice Regarding Supp. Auth. at 5-7; *see also Old Stone*, 450 F.3d at 1378.  In *Old Stone*, the Federal Circuit explained:

> [plaintiff's] theory does not merely assume that the loss of profits was foreseeable; it also assumes it was foreseeable that those profits (or the revenues from asset sales) would have resolved problems not caused by [the breach] and that [plaintiff] would not be able to resolve those problems by raising funds from other sources.  There was no proof that the attenuated claim of causation on which [plaintiff] relies was foreseeable.

450 F.3d at 1378.  By contrast, in the present case, the breach at issue is the prolonged suspension of nearly all of Precision Pine's timber sale contracts, and the lost profits damages resulted from the fact that the timber (which was the subject matter of the contracts themselves) was unavailable, and no substitute timber could be obtained.  Therefore, because the lost profits damages that Precision Pine seeks are alleged to result directly from defendant's breach, it is not necessary for Precision Pine to establish the foreseeability of an "attenuated claim of causation."

For the reasons discussed above, Court finds it was foreseeable to defendant at the time of contracting that defendant's simultaneous and prolonged suspensions of nearly all of plaintiff's timber sale contracts would likely result in lost lumber profits to Precision Pine.

## III.   Plaintiff is Not Precluded From Recovering Lost Profits Because Plaintiff Has Alleged a Partial Breach

In support of its argument that plaintiff cannot recover lost profits for a partial breach,

defendant relies on *Cities Service Helix, Inc. v. United States*, 211 Ct. Cl. 222, 543 F.2d 1306 (1976). In *Cities Service Helix*, the Court of Claims stated:

> A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

*Id.* at 234-35, 1313. It is generally understood that when one party commits a material breach of contract, the other party has a choice between two inconsistent rights — he or she can either elect to allege a total breach, terminate the contract and bring an action, or, instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach. RICHARD A. LORD, 13 WILLISTON ON CONTRACTS § 39:32 at 645 (4th ed. 2000); *Arp Films, Inc. v. Marvel Entm't Group, Inc.*, 952 F.2d 643, 649 (2d Cir. 1991). Although *Cities Service Helix* confirms that a plaintiff who elects to continue a contract may only recover damages for partial breach, the case does not address the appropriate measure of damages for such a partial breach.

As discussed in Section 3.C. of the Background section, *supra*, defendant's position is that damages for partial breach in the case of the suspension of a timber sale for an unreasonable duration should be measured by the difference between the contract price/market value differential for timber at the time of breach and the contract price/market value differential when the suspension was lifted. Def.'s Post-Trial Brief at 10-11. Defendant asserts that because plaintiff failed to present evidence that would enable the Court to quantify plaintiff's damages pursuant to defendant's proposed method, the Court should enter judgment in favor of defendant on Precision Pine's breach claims. *Id.* at 11. Interestingly, however, defendant does not appear to dispute that plaintiff would be entitled to pursue its claim for lost profits if plaintiff had elected to treat the suspension as a total breach and to seek damages through the end of the contract term. Def.'s Post-Trial Brief at 9-11; Def.'s Post-Trial Response Brief at 12-15; February 17, 2006 Closing Argument Tr. at 128-30.

Defendant relies on *White v. United States*, 187 Ct. Cl. 564, 410 F.2d 773 (1969), in support of its proposed method of calculating damages for partial breach. Def.'s Post-Trial Brief at 10-11; February 17, 2006 Closing Argument Tr. at 113-14. *White* involved the partial breach of a contract to convey real property. 187 Ct. Cl. at 565, 410 F.2d at 773. The Government had promised to convey a parcel of land to the plaintiff subject to a railroad easement for two tracks, but instead conveyed the land subject to an easement for four tracks. *Id.* at 566-71, 774-76. In awarding damages to the plaintiff, the Court of Claims held that "[t]he normal measure of damages for partial breach of a contract to convey real estate is the difference between the value of what was conveyed and what should have been." *Id.* at 576, 779. The present case does not

involve a contract to convey real estate – it involves a contract for the sale of timber to a manufacturer of lumber products. Therefore, the Court must determine if the method of calculating damages set forth in *White* is applicable to the facts of this case.

Defendant notes that the Court of Claims applied the "difference in value" method of calculating damages set forth in *White* in *Everett Plywood Corp. v. United States*, 206 Ct. Cl. 244, 512 F.2d 1082 (1975), a case involving a breached timber sale contract. Def.'s Post-Trial Response Brief at 14. In *Everett Plywood,* the plaintiff, who was a manufacturer of plywood, sought lost profits for the Forest Service's breach of a timber sale contract. 206 Ct. Cl. at 254-58, 512 F.2d at 1088-91. Plaintiff sought to recover lost profits damages based upon the difference between the contract price of the timber and the price that plaintiff would have received if it had resold the timber in the export market. *Id.* at 258, 1091. The court found that reliance on the export market for logs was inappropriate, because plaintiff was a manufacturer of plywood, not a reseller of logs. *Id.* at 259, 1091. Instead, the court determined that plaintiff's damages should be the difference between the contract price and the price that plaintiff would have had to pay if it had sought to procure comparable timber in the market. *Id.* at 260-61, 1092.

Defendant is correct that in *Everett Plywood*, the Court of Claims held that "the usual measure of damages for the failure to deliver goods is the difference between the contract price the buyer was to pay and the fair market value of those goods. *Id.* at 258, 1091; *see also* U.C.C. § 2-713 ("[T]he measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price. . . ."). However, in the present case, the Court is not dealing with a failure to deliver goods; it is dealing with the delayed delivery of goods that the parties treated as a partial breach. Therefore, it is unclear to the Court why defendant believes that *Everett Plywood* supports its argument that the "difference in value" method should be applied ***because*** the present case involves a partial breach, when *Everett Plywood* involved a total breach.

Furthermore, even in cases of total breach, there are situations where the "difference in value" method is not applied. For example, when goods are unique, too scarce, or there are no available substitutes so that cover is impossible, lost profits damages are available against a breaching seller. Dunn, Recovery of Damages for Lost Profits § 2.3 at 88. In addition, U.C.C. § 2-713 provides that in the case of non-delivery by a seller, in addition to the market/contract difference in value, a buyer may also recover consequential damages.[19] U.C.C. § 2-715 provides that such consequential damages include any loss resulting from special requirements and needs of the buyer that the seller had reason to know of at the time of contracting and that could not reasonably be prevented by cover. Where a breaching seller has reason to know that the buyer is a reseller, the buyer can recover lost profits as consequential damages pursuant to U.C.C. § 2-715. U.C.C. § 2-715 cmt. 6 ("In the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know . . . ."); *Simeone v. First Bank Nat'l Ass'n*, 73 F.3d 184, 188-89 (8th Cir. 1996); *see also*

---

[19] *See supra* note 17.

CHARLES T. MCCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 175 at 699-70 (1935) ("[I]f the seller's failure to deliver makes it impracticable to carry out the resale, the buyer can recover directly the lost profits.").

In *Everett Plywood*, the plaintiff did not seek to recover lost profits on the plywood that it would have manufactured from the timber sale contract that had been breached, and therefore, the plaintiff's claims in that case are not analogous to Precision Pine's claims in this matter. *See* 206 Ct. Cl 244, 512 F.2d 1082. However, in *Everett Plywood*, the Court of Claims noted that "[h]ad this been a purchase of timber for resale, the price plaintiff could have obtained in the export market would have been pertinent." *Id.* at 259, 1091. This indicates that if the plaintiff had actually been a seller of logs in the export market, it could have recovered lost profits from such sales. Unlike the plaintiff in *Everett Plywood*, Precision Pine is seeking lost profits from delay in delivering a raw material, timber, that Precision Pine was in the business of manufacturing into and reselling as lumber. Therefore, *Everett* suggests that lost profits damages may be appropriate in this case.

Another significant difference between this case and *Everett Plywood* is that in *Everett Plywood*, when discussing the possibility of cover, the court noted that "it appears that plaintiff had a number of contracts with the Forest Service and had no difficulty in obtaining as much timber as its operations could handle." *Id.* at 260, 1092. In the present case, as discussed in Section II.B., *supra*, the Court finds that it was not possible for Precision Pine to effect cover in any meaningful sense. Defendant asserts that plaintiff did in fact effect partial cover by acquiring timber through state timber sales, private timber sales, and salvage sales. February 17, 2006 Closing Argument Tr. at 117. However, the record contains substantial evidence that any cover obtained through the means described by defendant would have been insubstantial. Mr. Porter testified that virtually all of the timber processed by sawmills in Arizona is acquired from the Forest Service, and that as of the date of the suspensions, Precision Pine depended upon Forest Service timber to supply its mills. Trial Tr. at 83, 214-15; *see also* PX 299 (letter from Mr. Lewis Tenney, Mr. Porter's former partner in Precision Pine, to the same effect). Mr. Ness, plaintiff's expert on damages, testified that during the suspension, there was no place that Precision Pine could go to purchase the timber that it needed to supply its mills in any significant quantity. Trial Tr. at 2194. Even counsel for defendant stated "I don't pretend that the amount [of timber] offered during the suspension was the same or comparable to what it would have been had there been no suspension . . . ." February 17, 2006 Closing Argument Tr. at 117.

In the absence of meaningful opportunities to effect cover, it is not possible for the Court to apply the methodology for calculating damages set forth in *Everett Plywood*. The Court cannot calculate Precision Pine's damages by taking the difference between the contract price and the price that Precision Pine would have had to pay to procure comparable timber in the market, because during the suspensions, comparable timber could not be procured in the market in the relevant geographic region at any price.

Defendant argues that even where there is no ability to cover, damages should be calculated based upon the difference between the contract price and the market price. February

17, 2006 Closing Argument Tr. at 119.  Defendant suggests that the WWPA index indicates that there was a market for lumber products during the suspension.  *Id.* at 119-23.  However, as discussed in Section I., *supra*, and as defendant acknowledges, the WWPA index is an index of prices for lumber products, not an index of prices for timber.  *See id.* at 121-22; *see also* Trial Tr. at 3322, 4450.  Defendant failed to explain how defendant believed that the WWPA index could be used to calculate a market price for timber.  Nor does defendant identify any other evidence that a market price for timber existed in Forest Service Region Three during the suspensions. Instead, defendant suggests that Precision Pine should have presented evidence of the market price for timber in a geographic region other than Forest Service Region Three.  February 17, 2006 Closing Argument Tr. at 121-22.  However, as discussed at Section II.B., *supra*, if a timber sale is not located near the purchaser's sawmills, the resulting hauling costs can preclude the sale from being profitable.  *See also* February 17, 2006 Closing Argument Tr. at 63.  Accordingly, the Court does not believe that the market price for timber outside of Forest Service Region Three is relevant.

Given that the Court does not accept defendant's "difference in value" argument, the Court must determine the appropriate method for calculating plaintiff's damages for defendant's partial breach.  Professor Farnsworth explains that, in the event of a partial breach:

> Damages are calculated on the assumption that both parties will continue to perform in spite of the breach.  They therefore compensate the injured party only for the loss it suffered as the result of the delay or other defect in performance that constituted the breach, not for the loss of the balance of the return performance.

FARNSWORTH ON CONTRACTS § 8.15 at 512-13; *see also id.* at § 12.9 at 204 ("If the injured party has not terminated the contract, damages need only compensate that party for the loss caused by the shortfall in the other party's performance.").  The remedy for a partial breach of contract is recovery of damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed.  *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005); *Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. at 360. Expectancy damages give the non-breaching party the benefit it expected to receive had the breach not occurred.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 344 (a); *Carabetta Enters., Inc. v. United States*, 68 Fed. Cl. 410, 413 (2005).  The appropriate measure of damages for a partial breach of contract is therefore the plaintiff's expectancy interest.  *Entergy Nuclear Indian Point 2, LLC v. United States*, 64 Fed. Cl. 515, 522 (2005); *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 179-80 (2005); *see also Cuyahoga Metro. Housing Auth. v. United States*, 65 Fed. Cl. 534, 542-544 (2005).

Expectancy damages are often equated with lost profits, although expectancy damages can include other damage elements as well.  *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324 (Fed. Cir. 2002); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 347.  Such damages are generally measured by the "loss in the value to [the injured party] of the other party's performance caused by its failure or deficiency, plus . . . any other loss, including incidental or

consequential loss, caused by the breach . . . ." *Home Sav. of Am., F.S.B. v. United States*, 57 Fed. Cl. 694, 723 (2003) *aff'd*, 399 F.3d 1341 (Fed. Cir. 2005); *Bank of Tex. F.S.B. v. United States*, 50 Fed. Cl. 645, 654 (2001) (citing RESTATEMENT (SECOND) OF CONTRACTS § 347).

The value of defendant's performance to plaintiff was that plaintiff would receive timber from defendant, which plaintiff would manufacture into lumber and sell at a profit. The "difference in value" approach advocated by defendant does not take into account the fact that plaintiff's lumber manufacturing operations were significantly hindered from August 25, 1995 through December 4, 1996 as a result of the Mexican Spotted Owl suspensions. Plaintiff lacked timber to run through its sawmills, and accordingly, could not realize its expected lumber profits during the suspension. *See* PX 115; PX 262. Defendant knew at the time that it entered the timber sale contracts that Precision Pine intended to use the timber to manufacture lumber that it would resell in the market. *See Lewis v. Mobil Oil Corp.*, 438 F.2d 500, 510 (8th Cir. 1971) ("Where a seller provides goods to a manufacturing enterprise with knowledge that they are to be used in the manufacturing process, it is reasonable to assume that he should know that defective goods will cause a disruption of production, and loss of profits is a natural consequence of such disruption.").

If the Court were to determine that Precision Pine is a lost volume seller based upon the further briefing required by this Opinion and Order, the damages resulting from defendant's partial breach would be equivalent to the profits that Precision Pine would have earned during the suspension period. However, if the Court were to determine that Precision Pine is not a lost volume seller, the Court would need to take into account the fact that the price of lumber products varies over time. *See e.g.,* PX 232; PX 294. Therefore, the profits that plaintiff would have earned during the post-suspension period would likely differ from the profits that plaintiff would have earned during the suspensions. To the extent that plaintiff's post-suspension profits were less than what plaintiff's profits would have been during the suspension period and to the extent that the Court concludes that plaintiff is otherwise entitled to lost profits, plaintiff should be able to recover as damages the difference between the profits that plaintiff would have earned but for the suspensions and the profits that plaintiff earned in the post-suspension period.[20]

Defendant notes that plaintiff has not identified a case in which lost profits were awarded to a party that elected to continue a contract. Def.'s Post-Trial Response Brief at 14. Nor has defendant identified any case supporting its contention that such damages are *per se* unrecoverable. The Court believes that *Dunkin' Donuts of America, Inc. v. Minerva, Inc.*, 956 F.2d 1566 (11th Cir. 1992), supports the proposition that, given appropriate proof of lost profits damages, such damages are recoverable in the event of a partial breach.

In *Dunkin' Donuts*, the defendant franchisee asserted a counterclaim against the plaintiff

---

[20] This calculation may need to be adjusted to take into account the fact that plaintiff did not harvest all of the timber from the suspended sales in the post-suspension period. *See* Def.'s Post-Trial Brief at 16 n.9; February 17, 2006 Closing Argument Tr. at 173-74.

franchisor for breach of the obligation of good faith and fair dealing implied in the franchise agreements. 956 F.2d at 1568. The franchisor had offered all franchisees the option to renew their franchise agreements for an additional ten years at a fixed cost in exchange for participating in a specified advertising program. *Id.* The franchisee elected not to accept the offer, and was subsequently audited by the franchisor on several occasions using a methodology not authorized by the franchise agreements. *Id.* The Eleventh Circuit held that a reasonable jury could have found that the audits were motivated by the franchisee's refusal to participate in the advertising program, and consequently, that they violated the obligation of good faith and fair dealing inherent in the franchise agreements. *Id.* at 1570.

The franchisee argued that the court should treat the franchise agreements as terminated and award damages equal to the fair market value of her franchises. *Id.* at 1571. Relying in part on *Cities Service Helix*, the court found that the franchisee had elected to continue the contract after the franchisor's breach, and could therefore only recover damages for partial breach. *Id.* Accordingly, the court held that the franchisee was entitled to recover "only for those lost profits or lost future profits related to her ongoing operation caused by [the franchisor's] breach." *Id.* at 1573. However, because the record contained no evidence demonstrating lost profits relating to the franchisee's ongoing operations, the Eleventh Circuit affirmed the trial court's grant of judgment for the franchisor not withstanding the verdict and awarding the franchisee only nominal damages. *Id.*

Although the franchisee in *Dunkin' Donuts* did not actually recover lost profits damages for partial breach, her inability to recover was based on a failure of proof rather than any legal prohibition on recovery. The Eleventh Circuit's holding makes clear that if a party is able to prove that lost profits resulted from a partial breach, a court may award such lost profits as damages.

Defendant's Notice of Supplemental Authority filed on June 9, 2006 directed the Court's attention to a discussion of the election doctrine in *Old Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir. 2006), discussed in Section II.B., *supra*. Although the Government's breach in *Old Stone* occurred in 1989, the plaintiff continued performance of the contract and did not bring an action for breach against the Government until three years later, in 1992. *Id.* at 1366. In the interim, the plaintiff agreed to a new plan with the Office of Thrift Supervision pursuant to which the plaintiff agreed to make payments to the thrift to bring it back into compliance with FIRREA. *Id.* at 1373. Plaintiff contributed $74.5 million to the thrift in order to replace the regulatory capital eliminated by FIRREA. *Id.* at 1367-68. The Court of Appeals held that the plaintiff was entitled to recover this $74.5 million as mitigation costs. *Id.* at 1370. Plaintiff also sought to recover the initial cash and stock that it contributed to the thrift transactions under restitution and reliance theories. *Id.*

Defendant notes that in denying the plaintiff recovery under a restitution theory, the Federal Circuit stated:

The election doctrine is designed to avoid the very kind of moral hazard that

would result here if the thrift could postpone repudiation of the contract. for several years, bet that it could make the thrift profitable, but secure restitution if the thrift failed.  Our predecessor court, the Court of Claims, has recognized (in the waiver context) that "[a]s a general proposition, one side cannot continue after a material breach by the other . . . act as if the contract remains fully in force . . ., run up damages, and then go suddenly to court."  *Northern Helix Co. v. United States*, 197 Ct. Cl. 118, 455 F.2d 546, 551 (1972).

*Old Stone*, 450 F.3d at 1373-74.  Defendant argues that the "very kind of moral hazard" discussed in the *Old Stone* case exists in the present case as well.  Def.'s Notice of Supp. Authority at 2.  As discussed in Section 3.C. of the Background section, *supra*, defendant claims that by choosing to continue the suspended timber contracts and subsequently seeking lost profits damages from defendant, plaintiff is endeavoring to make the Government a guarantor of Precision Pine's profits.  February 17, 2006 Closing Argument Tr. at 128-30.

However, the present case differs from *Old Stone* in several significant ways.  In *Old Stone*, the plaintiff sought to recover restitution.  450 F.3d at 1370.  Restitution is available as a remedy for breach of contract only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach.  RESTATEMENT (SECOND) OF CONTRACTS § 373 cmt. a; *Pac. Gas & Elec. Co. v. United States*, 70 Fed. Cl. 766, 771 (2006); *Cuyahoga Metro. Hous. Auth.*, 65 Fed. Cl. at 561.  Because the plaintiff in *Old Stone* elected to continue the contracts and treat the Government's breach as partial, it could not recover under a restitution theory.  450 F.3d at 1373-74.  In the present case, plaintiff seeks to recover expectancy damages, not restitution.  Pl.'s Post-Trial Brief at 1, 14, 15.  As discussed *supra* at pages 34-35, expectancy damages are the appropriate measure of damages for a partial breach of contract.

In addition, in *Old Stone*, the Federal Circuit's "moral hazard" discussion arose in the context of a situation where the plaintiff had elected to continue the contract for three years after the breach prior to bringing an action for restitution.  *Id.* at 1366.  The Federal Circuit found that the Government detrimentally relied on the plaintiff's representation that it wished to continue the contracts in *Old Stone*.  *Id.* at 1373.  In addition, the plaintiff's decision to continue the contracts resulted in the Government's liability for $74.5 million to plaintiff in mitigation costs. *Id.*  The Federal Circuit found that, given the plaintiff's conduct of failing to promptly bring a claim for breach, plaintiff was precluded from recovering under a restitution theory.  *Id.* at 1373-74.  In the present case, Precision Pine notified the Forest Service just weeks after the suspensions were first imposed and throughout the course of the suspensions that it considered the suspensions to be a breach of the timber sale contracts and intended to hold the Forest Service liable for any damages that Precision Pine sustained as a result of the suspensions. *See* PX 116, PX 299, *Precision Pine*, 62 Fed. Cl. at 637.  Moreover, in 1997, relatively soon after the suspensions were lifted, Precision Pine filed a claim for damages with the appropriate Forest Service contracting officer.  *Precision Pine*, 50 Fed. Cl. at 51.  The "moral hazard" discussed in *Old Stone* is simply not present in this case, because Precision Pine informed the Government from the outset that it considered the contracts to be breached, and is not currently seeking to repudiate the contracts and recover restitution.

Furthermore, the Court simply does not agree that awarding lost profits for a partial breach renders defendant a "guarantor" of plaintiff's profits. A plaintiff has the burden of proving its damages, including lost profits, with reasonable certainty. *Standard Fed. Bank v. United States*, 62 Fed. Cl. 265, 273 (2004). Plaintiff cannot recover lost profits for a partial breach unless plaintiff establishes with reasonable certainty that there would have been a profit in the absence of defendant's breach, and that there is an adequate basis upon which a reasonable estimate of such lost profits can be made. *Hi-Shear Tech. Corp. v. United States,* 356 F.3d 1372, 1379 n.2 (Fed. Cir. 2004); *Cal. Fed. Bank v. United States*, 245 F.3d 1342, 1349 (Fed. Cir. 2001). In other words, the burden is on plaintiff to demonstrate "what might have been" if there had been no suspension. *Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001); *Bluebonnet Sav. Bank F.S.B. v. United States*, 67 Fed. Cl. 231, 238 (2005). If plaintiff cannot prove that it lost profits as a result of defendant's partial breach, plaintiff is not entitled to lost profits damages.

**IV.     Additional Briefing is Necessary for the Court to Determine Whether Precision Pine is Entitled to Be Compensated as a Lost Volume Seller**

Having determined that at the time of contracting, it was foreseeable to defendant that the simultaneous and prolonged suspension of nearly all of Precision Pine's timber sale contracts would cause Precision Pine to suffer lost lumber profits, that the manufacture and sale of lumber were not independent and collateral undertakings, and that plaintiff is not precluded from recovering lost profits because it elected to assert a claim for partial breach and continue to perform the contracts, the Court now turns to the question whether plaintiff should be required to offset against the lost lumber profits it seeks profits that plaintiff actually earned from harvesting the suspended contracts during the post-suspension period.

**A.     Plaintiff's Argument That the Lost Volume Seller Theory is Applicable to the Facts of This Case**

In support of its position that Precision Pine should not be required to offset its post-suspension profits, plaintiff relies on the "lost volume seller" concept. *See* Pl.'s Post-Trial Brief at 44-47; *see also* Pl.'s Post-Trial Response Brief at 8-10. A lost volume seller is one who has the capacity to perform the contract that was breached in addition to other potential contracts due to unlimited resources or production capacity. *Bill's Coal Co. v. Board of Pub. Utils.*, 887 F.2d 242, 245 (10th Cir. 1989). If an injured party could and would have entered into a subsequent contract even if the original contract had not been breached, and could have had the benefit of both, he can be said to have "lost volume." RESTATEMENT (SECOND) OF CONTRACTS § 347 Comment f; *see also* JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 7.9 at 386 (4th Ed. 1995) ("A seller is not a 'lost volume seller' unless the seller would have made the sale to the breaching buyer *and* the sale to the party who purchased the buyer's goods.") (emphasis in original). The RESTATEMENT (SECOND) OF CONTRACTS § 347, illustration sixteen, is instructive in understanding the lost volume seller concept:

> A contracts to pave B's parking lot for $10,000. B repudiates the contract and A
> subsequently makes a contract to pave a similar parking lot for $10,000. A's
> business could have been expanded to do both jobs. Unless it is proved that he
> would not have undertaken both, A's damages are based on the net profit he would
> have made on the contract with B, without regard to the subsequent transaction.

RESTATEMENT (SECOND) OF CONTRACTS § 347, illus. 16; *see also Anchor Sav. Bank, F.S.B. v.
United States*, 59 Fed. Cl. 126, 155 (2003).

Lost volume damages are premised on the notion that had the defendant fully performed,
the plaintiff would have had the benefit of the original sale, and as a trader of the particular good,
the profits from the subsequent sale as well. *Precision Pine*, 63 Fed. Cl. at 132. If a lost volume
seller sells goods to a second buyer after the first buyer's breach, it nevertheless loses the profits
from the first potential sale to the breaching buyer. DUNN, RECOVERY OF DAMAGES FOR LOST
PROFITS § 2.16 at 133. The lost volume seller could have made the second sale and earned
profits on it regardless of the breach. *Id.* Accordingly, no remedy other than an award of lost
profits on the breached sale is adequate to make the lost volume seller whole. *Id.*; *see also R.E.
Davis Chemical Corp. v. Diasonics, Inc.*, 924 F.2d 709, 711 (7th Cir. 1991) ("To be made whole,
a lost volume seller must thus recover damages equal to the profit it lost on the sale.").

Professors White and Summers illustrate the appropriate method of calculating damages
for a lost volume seller:

> [A]ssume a contract for the sale of a washing machine with a list price of $500.
> Assume further that the seller has or can obtain more machines than it can sell.
> The buyer breaches, and seller resells the washing machine destined for the
> breacher at the same list price to another. However, the resale buyer is one of
> seller's regular customers who had intended to purchase a washing machine from
> seller anyway. If the seller's total cost per machine was $300, seller stood to gain an
> aggregate profit of $400, that is, $200 profit from each of two sales . . . . In such
> a case the damage award should be the lost profit, that is, $200, for this will place
> the seller "in as good a position as performance would have done."

WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 7-9 at 385.

Plaintiff's reliance on the lost volume seller concept differs from the concepts and
examples discussed above in several ways. At the outset, the Government is not a breaching
**buyer**, but rather, is a breaching **seller** of timber to Precision Pine. Precision Pine planned to
manufacture the timber that it purchased from the Government into lumber and subsequently sell
the lumber to third parties at a profit. Therefore, although Precision Pine is a buyer of timber *vis-
à-vis* the Government, it is a seller of lumber products in the market, and the lost-volume seller
concept is potentially applicable. *Precision Pine*, 63 Fed. Cl. at 132. Where a plaintiff is a buyer
of goods for resale whose volume is limited by supply because it is exceeded by demand, the
plaintiff may claim to have lost volume if the supplier does not deliver what the contract

requires. FARNSWORTH ON CONTRACTS § 12.11 at 228. If a buyer of goods purchases another lot of goods that the buyer would have purchased and have been able to dispose of at a profit if there had been no breach, damages should be measured by lost profits on resale, without deducting the profits from the sale of the second lot of goods. *Id.* at 228-29.

As discussed in Section 3.D. of the Background section, *supra*, defendant argues that plaintiff should not be compensated as a lost volume seller because the suspended sales were eventually released, and plaintiff eventually earned profits from those sales. Defendant fails to recognize that the crux of plaintiff's argument is that the Mexican Spotted Owl suspensions caused a "hole in the profit pipeline" for Precision Pine for 1995 and 1996 that could not be filled simply by releasing the suspended sales. March 1, 2006 Closing Argument Tr. at 270. According to plaintiff, absent the breach, Precision Pine would have earned profits on the suspended sales during the suspension, and would have purchased additional timber sales in the post-suspension period and earned additional profits. *Id.* at 270-71*; see also* Pl.'s Post-Trial Response Brief at 8-9. Plaintiff claims that as a result of the suspensions, plaintiff did not purchase these additional timber sales for two reasons. First, plaintiff claims that its cash position was extremely poor as a result of the suspension, reducing its ability to bid on other sales. February 17, 2006 Closing Argument Tr. at 67-68. Second, plaintiff contends that its need for additional timber was not as great as it would have been if there had been no suspension and all of the timber on the suspended sales had already been manufactured into lumber. *Id.* Because the suspension prevented plaintiff from making these additional profits, plaintiff argues that it caused plaintiff to lose an opportunity to produce and sell lumber that can never be replaced. Pl.'s Post-Trial Brief at 44. Plaintiff's counsel draws the following analogy to illustrate why, although the suspensions were eventually released, plaintiff should not be required to offset profits earned in the post-suspension period:

> If a lawyer with a substantial practice is suspended from practicing law for 16 months, during which time he receives no compensation, and then is allowed to pick up his practice exactly where he was on the date of the suspension, he is not whole by that fact. Rather he has lost 16 months of profit, and that fact is not made up by his being able to do the work that was on his desk when the suspension started. That's where Precision Pine was in this situation.

March 1, 2006 Closing Argument Tr. at 270.

As discussed in Section 3.D. of the Background section, *supra*, at closing argument on February 17, 2006, and in Defendant's Post-Trial Response Brief, defendant argued that Precision Pine's "hole in the profit pipeline" theory is invalid because Precision Pine could have made up any production volume that it lost during the suspension in the post-suspension period. February 17, 2006 Closing Argument Tr. at 144-45; Def.'s Post-Trial Response Brief at 18-19. Defendant claims that the evidence in the record demonstrates that Precision Pine historically always operated its mills at a level substantially less than its estimated full operating capacity. Closing Argument Tr. at 144-45; Def.'s Post-Trial Response Brief at 18-19. Therefore, defendant claims that if plaintiff had increased its sawmill production rate to achieve its maximum estimated

operating capacity after the suspensions were lifted, it could have simultaneously produced lumber from **both** the previously suspended contracts and the additional contracts that plaintiff alleges that it would have purchased but for the suspensions.

Precision Pine appears to agree that its lost volume seller theory depends upon demonstrating that it would have run its mills at its estimated annual full capacity in the post-suspension period.  As discussed above, counsel for Precision Pine analogized its situation to that of a lawyer who was suspended from practicing law for 16 months, and could not be made whole by picking up his practice where he left off on the date of the suspension.  *See* March 1, 2006 Closing Argument at 270.  In response to an inquiry from the Court as to whether this analysis depended upon the proposition that, had the lawyer not been suspended, he would have been operating at full capacity in the post-suspension period, counsel for plaintiff replied:

> Yes.  Well, at full capacity, he would have been operating – he had an ongoing
> practice, so that yes, in the hypothesis, he would have had new cases and done –
> he would have been fully employed, yes.

*Id.* at 271.  It seems logical that, to the extent that plaintiff's lost volume seller theory is based on the argument that Precision Pine lost an opportunity to produce and sell lumber that can never be replaced, plaintiff would not be entitled to be compensated as a lost volume seller if the alleged lost production opportunity could have simply been made up in the post-suspension period by increasing the rate at which Precision Pine operated its mills.

Defendant also argues that plaintiff should not be compensated as a lost volume seller because, unlike the usual scenario in which plaintiff is seeking to be compensated as a lost volume seller, defendant in this case is not seeking to offset profits from other timber sales that plaintiff purchased in the post-suspension period. Def.'s Post-Trial Brief at 17.  In the present case, it is clear that plaintiff is not a lost volume seller as the concept is traditionally understood.[21]  The relevant inquiry in this case is not whether a subsequent transaction that was actually entered into could have been entered into and produced profits had there been no breach.  *See e.g.*, FARNSWORTH ON CONTRACTS § 12.11 at 228-29; 6 CORBIN ON CONTRACTS § 57.13 (2000).  Rather, the question is whether defendant's breach prevented or discouraged plaintiff from entering into additional contracts to purchase timber after the suspensions were lifted.  Counsel for plaintiff argued that if there had been no suspension, after plaintiff had processed all of the timber on the suspended sales:

---

[21]  The pertinent issue is not whether Precision Pine is a lost volume seller, as the term is traditionally understood, but rather, whether Precision Pine should be required to offset profits that it earned from partially harvesting the suspended sales in the post-suspension period.  During closing argument on February 17, 2006, counsel for plaintiff agreed that it was not essential to plaintiff's offset arguments for plaintiff to demonstrate that it is a lost volume seller in the traditional sense.  *See* February 17, 2006 Closing Argument Tr. at 58.

> Precision Pine would be out of wood. They wouldn't have a stick of
> timber left, because all 24.9 million feet would have been harvested and processed,
> gone. So there they sit. They have three mills and a lot of money. What would
> they do? It's a timber company.

February 17, 2006 Closing Argument Tr. at 56. Essentially, Precision Pine argues that it should not be required to offset post-suspension profits because the suspension foreclosed the opportunity for Precision Pine to purchase and earn profits on additional timber in the post-suspension period.

However, the mere fact that Precision Pine does not fit the traditional concept of a lost volume seller does not mean that it is required to offset profits earned in the post-suspension period. Professors White and Summers note that the lost volume seller method of calculating damages can apply to a multitude of plaintiffs who are not traditional lost volume sellers. WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 7-11 at 389.[22] The relevant inquiry is whether requiring plaintiff to offset damages earned in the post-suspension period would give plaintiff the benefit of its bargain by awarding plaintiff damages that will put Precision Pine in as good a position as it would have been had the contract been performed. *See* RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. a.

### B.        Criteria That Plaintiff Must Prove in Order to Establish That it Should Be Compensated as a Lost Volume Seller

A preliminary matter that the Court must determine is the burden of proof on whether Precision Pine is entitled to be compensated as a lost volume seller. Plaintiff argues that once plaintiff has established that it is a regular dealer in lumber, the burden shifts to defendant to

---

[22] Specifically, Professors White and Summers note that the damages principles set forth in U.C.C. § 2-708(2) cover a multitude of plaintiffs who are not lost volume sellers. *Id.* U.C.C. 2-708(2) provides:

> If the measure of damages provided in subsection (1) is inadequate to put the
> seller in as good a position as performance would have done then the measure of
> damages is the profit (including reasonable overhead) which the seller would have
> made from full performance by the buyer, together with any incidental damages
> provided in this Article (Section 2-710), due allowance for costs reasonably incurred
> and due credit for payments or proceeds of resale.

U.C.C. § 2-708(2). U.C.C. § 2-708(2) is the provision pursuant to which lost volume sellers recover lost profits resulting from a breach without offsetting subsequently earned profits that would have been earned regardless of the breach. *See* WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 7-9 at 384-85; 67A AM. JUR. 2D SALES § 1004. As discussed at note 17, *supra*, the U.C.C. and the concepts discussed therein, although not governing, provide useful guidance in applying contract principles in a government contracts case.

prove that absent the breach, plaintiff would *not* have made profits from lumber sales manufactured from timber purchased in addition to the breached sales. *See* Pl.'s Post-Trial Brief at 45; *see also* March 1, 2006 Closing Argument Tr. at 272. Specifically, plaintiff argues that defendant bears the burden of proving that, absent the suspensions, (1) Precision Pine would not have harvested and milled the timber on the breached sales between August 1995 and April 1997 and sold the resulting lumber and by-products or that (2) Precision Pine would not, absent the suspensions, have purchased a substantial quantity of additional timber in late 1996 and 1997 from which it would have manufactured and sold lumber and by-products in 1997 and 1998. *See* Pl.'s Post-Trial Brief of 46. In support of its contentions regarding the proper burden of proof, plaintiff relies upon the following excerpt from Professors White and Summers' treatise:

> In these circumstances, we believe it should be the responsibility of the defendant (who seeks to reduce the plaintiff's damages) to show that it is more probable than not that the plaintiff would *not* have had both sales, would not have enjoyed the second resale profit, and thus that the second resale profit (as a child of the breach) should be used to reduce the plaintiff's recovery.

WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 6-3 at 298 (emphasis in original).

Plaintiff fails to recognize that this excerpt relates to a discussion of a buyer's right to cover damages pursuant to U.C.C. § 2-712.[23] Specifically, Professors White and Summers are discussing *Fertico Belgium, S.A. v. Phosphate Chemicals Export Ass'n, Inc.*, 70 N.Y.2d 76, 510 N.E.2d 334 (N.Y. 1987), a case that plaintiff also relies on in support of its arguments regarding the burden of proof. *See* March 1, 2006 Closing Argument Tr. at 276-77. In *Fertico Belgium*, the plaintiff had contracted to purchase fertilizer from defendant, to be delivered in two separate shipments on two specified dates. 70 N.Y.2d at 80, 510 N.E.2d at 335. The plaintiff had a contract to resell the fertilizer to a third party, also to be delivered in two separate shipments on two specified dates. *Id.* at 79-80, 335-36. The first shipment of fertilizer from defendant to plaintiff was delivered well after the agreed-upon date. *Id.* at 80, 336. As a result, the buyer was obligated to seek cover in the market at a price above the original contract price to timely fulfill its

---

[23] U.C.C. 2-712 provides:

(1) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.
(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2-715), but less expenses saved in consequence of the seller's breach.
(3) Failure of the buyer to effect cover within this section does not bar him from any other remedy.

contract with the third party.  *Id*. at 80-81, 336.  However, although the buyer cancelled the second shipment of fertilizer, the buyer accepted the first late-delivered shipment from the breaching seller, and subsequently sold the first shipment to a fourth party at a profit.  *Id*. at 81, 336.

The Court of Appeals of New York held that the buyer should not be required to deduct the profits from the second sale from the cover damages and other damages that it sought to recover from defendant as a result of the breach.  *Id*. at 83-84, 337-38.  The court held that the Appellate Division had erred in offsetting this profit against the damages that the buyer otherwise suffered because the Appellate Division mistakenly concluded that the second sale stemmed from and was dependent upon the seller's breach.  *Id*.  The court found that as a trader in fertilizer, plaintiff would have undertaken the transaction with the fourth party regardless of defendant's breach.  *Id*. at 83, 338.  The court noted that "[i]t would be anomalous to conclude that had it not been for [defendant's] breach, [plaintiff] would not have continued its trade . . . ."  *Id*.  For this reason, the court concluded that "[plaintiff's] profit made on the sale of a non-specific article such as fertilizer, of which the supply in the market is not limited, should not therefore be deducted from the damages recoverable from [defendant]."  *Id*.

In analyzing *Fertico*, Professors White and Summers assert that in a case where a buyer seeks to recover cover damages from a breaching seller, the buyer should not be required to deduct the profit from the sale of the delayed goods from the cover damages unless the defendant can demonstrate that plaintiff would not have made both sales absent the breach.  *See* WHITE & SUMMERS, UNIFORM COMMERCIAL CODE §6-3 at 298.  The present case differs from *Fertico* in that plaintiff is not seeking to recover cover damages.  As discussed at Section II.B. and Section III., *supra*, in the present case, the Court found that it was not possible for Precision Pine to obtain cover in any economically viable manner, and Precision Pine did not in fact effect cover.

More significantly, unlike in *Fertico*, defendant is not arguing that the profits that were ultimately earned on the suspended contracts were dependent upon or a result of defendant's breach.  Instead, defendant is simply arguing that once the suspensions were lifted, Precision Pine received the very same timber sales that it had originally bargained for.  Def.'s Post-Trial Brief at 29-30.  For this reason, defendant is not endeavoring to prove that plaintiff received an unexpected benefit or windfall as a result of the breach.  A different burden of proof applies where plaintiff is attempting to prove its damages than where defendant is attempting to establish an offset against damages that a plaintiff has proved.  *See Caroline Hunt Trust Estate v. United States*, 65 Fed. Cl. 271, 315 (2005) ("While plaintiff has the burden of proving its damages, the government has the burden of proving any setoffs . . . .").

Another relevant distinction is that in *Fertico*, the court held that "[plaintiff's] profit made on the sale of a non-specific article such as fertilizer, *of which the supply in the market is not limited*, should not therefore be deducted from the damages recoverable from [defendant]."  70 N.Y.2d at 84, 510 N.E.2d at 338. (emphasis added).  In the present case, however, the evidence suggests that the supply of timber was limited.  During the suspensions, the Forest Service timber sale program in the region that Precision Pine operated in came to a virtual halt.  Trial Tr. at 1289, PX 304.  Mr. Porter testified that, even when suspensions were not in place, the market for timber

in Arizona has always been competitive. *Id.* at 1278. Defendant presented evidence that the amount of timber offered for sale or harvest on national forest land declined significantly during the late 1980s and throughout the 1990s. DX 776 at 7. These declines represented significant restrictions on the supply of available timber in Arizona. *Id.* at 8. This factual distinction makes it doubtful that the burden of proof applied in *Fertico* should be applied in the present case as well. *See* Alan I. Saltman, *Must Profits Made in Transactions Involving Late-Delivered Goods Be Deducted From the Injured Party's Breach Damages? If Not, What Impact Should Late-Delivered Goods Have?*, 78 ST. JOHN'S L. REV. 131, 154 (2004) ("Unless raw materials at commercially reasonable prices are nearly impossible to obtain from any source or sources at any time during the period between the supplier's breach and its belated performance, the task of the breaching supplier is to demonstrate that it is more reasonable than not that the manufacturer *could not* have produced as much without the supplier's late delivery.") (emphasis in original).

Plaintiff argues that *Aluminum Distributors, Inc. v. Gulf Aluminum Rolling Mill Co.*, 1989 WL 157515 (N.D. Ill. Dec. 12, 1989) represents a case where a court placed the burden of proof as to whether the plaintiff was a lost volume seller on the defendant, even where the plaintiff was not able to obtain complete cover. *See* March 1, 2006 Closing Argument Tr. at 279. In *Aluminum Distributors*, the plaintiff, a reseller of aluminum, asserted a breach of contract claim against the defendant, an aluminum manufacturer and plaintiff's supplier, who had made late deliveries of aluminum to plaintiff. 1988 WL 132098 at *1-*4. As a result of the delay, the plaintiff lost some of its resale contracts, and sought cover for others. *Id.* at *5. The defendant sought to offset profits that the plaintiff made from reselling the late-delivered goods from plaintiff's cover damages. *Id.* The court held that "[defendant] may not offset against these damages [plaintiff's] profits on the resale of the late-delivered aluminum as costs saved due to the breach, unless [plaintiff] fails to prove that it could otherwise have purchased similar aluminum for resale and hence would nevertheless have made these additional sales." *Id.*

Contrary to plaintiff's assertion, the Court does not believe that *Aluminum Distributors* stands for the proposition that once plaintiff proves that it is a regular dealer, the burden shifts to defendant to demonstrate that plaintiff would not have made the second sale. Instead, the Northern District of Illinois held that the initial burden of proof was on plaintiff to demonstrate that it could have obtained additional goods for resale absent defendant's breach and that it would have made additional sales absent defendant's breach. *Id.*

The case law demonstrates that in the present case, plaintiff bears the burden of demonstrating that it should be compensated as a lost volume seller. *See Bill's Coal Co. v. Board of Pub. Utils.*, 887 F.2d at 245 ("Sellers have the burden of proving that they are lost volume sellers . . . .") (applying Missouri law); *R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 826 F.2d 678, 684 (7th Cir. 1987) ("Diasonics must establish, not only that it had the capacity to produce the breached unit in addition to the unit resold, but also that it would have been profitable for it to have produced and sold both. Diasonics carries the burden of establishing these facts because the burden of proof is generally on the party claiming injury to establish the amount of its damages . . . . "), *appeal after remand at* 924 F.2d 709 (7th Cir. 1991) (applying Illinois law); *Snyder v. Herbert Greenbaum & Associates, Inc.*, 38 Md. App. 144, 154 (1977) ("First and foremost is the

possibility that appellee is a 'lost volume seller'. That is, appellee carried his burden of proving that due to the nature of his business he was damaged by appellants' breach to the extent that he lost the entire profit."); WHITE & SUMMERS, UNIFORM COMMERCIAL CODE §7-11 at 390 ("[W]e believe that any plaintiff who is hardy enough to prove that the 2-708(1) measure of damages will not put it in the same position performance would have, should be permitted to prove what performance would have done and should recover that amount under 2-708(2).").

Comment f to section 347 of the RESTATEMENT (SECOND) OF CONTRACTS clearly states that whether a party is a "lost volume seller" is a question of fact:

> Whether a subsequent transaction is a substitute for the broken contract sometimes raises difficult questions of fact. If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have "lost volume" and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then based on the net profit that he has lost as a result of the broken contract.

*See also Anchor Sav. Bank, F.S.B. v. United States*, 59 Fed. Cl. at 156. The relevant inquiry therefore becomes precisely what plaintiff needs to establish to demonstrate that it is a lost volume seller. In *Diasonics*, the Seventh Circuit held that in order to qualify as a lost volume seller, a plaintiff must establish the following three factors: (1) that it possessed the capacity to make an additional sale; (2) that it would have been profitable for it to make an additional sale; and (3) that it probably would have made an additional sale absent the buyer's breach. 826 F.2d at 685; *see also* 924 F.2d at 711. Similarly, in *Bill's Coal Co., Inc. v. Board of Public Utilities*, in holding that the plaintiff had not demonstrated that it was a lost volume seller, the Court of Appeals for the Tenth Circuit relied on the fact that evidence presented at trial indicated that the plaintiff did not have the production capacity to perform defendant's contact as well as contracts with other potential purchasers. 887 F.2d at 245. Professors White and Summers propose a modification of the test set forth in *Diasonics*: the seller should bear the burden of demonstrating that it had the capacity to produce an additional unit. WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 7-9 at 386. If the seller presents evidence that it had the capacity to produce an additional unit, it should be presumed that it would have been profitable for the seller to produce the additional unit. *Id.* However, if the breaching party puts forth evidence to question the profitability of the additional sale, the seller should then have to prove that the second sale would have been economically beneficial. *Id.*

Other courts have examined factors similar to the ones that the Seventh Circuit applied in *Diasonics.* For example, in *P.F.I., Inc. v. Kulis*, 363 N.J. Super 292, 832 A.2d 931 (N.J. Super. Ct. App. Div. 2003), the Superior Court of New Jersey held that the plaintiff had failed to sustain its burden of demonstrating that it was a lost volume seller because the record was devoid of any evidence that the plaintiff had an unlimited supply of goods, an unlimited market, and that absent the defendant's breach, plaintiff would have made two sales instead of one. *Id.* at 300, 935. In *Ullman-Briggs, Inc. v. Salton, Inc.*, 754 F. Supp. 1003 (S.D.N.Y. 1991), a case involving the breach of a distributorship agreement, the United States District Court for the Southern District of

New York held that test for determining whether a plaintiff is a lost volume seller has both objective and subjective components. *Id.* at 1008. First, the plaintiff was required to demonstrate that it had the subjective intent to distribute additional lines of merchandise had the defendant not breached its agreement. *Id.* at 1008-09. Next, the plaintiff was required to demonstrate that it had the capacity to distribute additional lines without incurring additional overhead expenditures had defendant not breached its agreement. *Id.* at 1009. In *Gianetti v. Norwalk Hosptial*, 266 Conn. 544, 833 A.2d 891 (Conn. 2003), the Supreme Court of Connecticut applied the same three-part test set forth in *Diasonics. Id.* at 898, 554.

As discussed at page 41, *supra*, Precision Pine does not precisely fit within the traditional concept of a lost volume seller. Thus, the criteria that Precision Pine must establish to demonstrate that it should be compensated as a lost volume seller differ somewhat from the criteria set forth in more traditional lost volume seller cases. After reviewing plaintiff's lost volume seller arguments, the Court is of the opinion that, in the present case, in order to demonstrate that Precision Pine should be compensated as a lost volume seller, *i.e.*, that it should not be required to offset profits earned from harvesting the suspended sales in the post-suspension period, plaintiff must show that:

> (1) but for the suspensions, Precision Pine would have successfully bid on and been awarded additional timber sale contracts that it would have harvested and manufactured into lumber in the post-suspension period;

> (2) but for the suspensions, Precision Pine would have been operating its mills at full capacity in the post-suspension period.

In addition, after reviewing the more traditional lost volume seller cases discussed above, the Court is of the opinion that plaintiff must also show that:

> (3) but for the suspensions, Precision Pine would have sold at a profit the lumber that it would have manufactured from the additional timber sales that it would have bid on and been awarded in the post-suspension period.

This criterion is analogous to the requirements set forth by the Seventh Circuit in *Diasonics* that the plaintiff demonstrate that it would have probably made an additional sale absent the buyer's breach and that it would have been profitable for it to make such a sale. *See* 826 F.2d at 685; 924 F.2d at 711.

Finally, in order to demonstrate that plaintiff is not required to offset any portion of the profits that it earned from harvesting the suspended sales in the post-suspension period from its lost profits damages, plaintiff must demonstrate that the profits that it would have earned on the additional lumber sales that it would have made but for the suspensions would have been at least equivalent to the profits that it actually earned by harvesting the suspended sales in the post-suspension period. Otherwise, the Court is of the opinion that plaintiff would be required to offset the profits that it earned by harvesting the suspended sales in the post-suspension period to the

-47-

extent that those profits exceeded the profits that plaintiff lost by being unable to earn profits on lumber that it would have manufactured from additional timber that it would have purchased but for the suspension.  Therefore, plaintiff must also establish that:

> (4) the profits that Precision Pine would have earned but for the suspensions by selling lumber from the additional timber sales that it would have bid on and been awarded in the post-suspension period would have equaled or exceeded the profits that Precision Pine actually earned by partially harvesting the suspended sales in the post-suspension period.


## C.      Additional Briefing Requested By the Court

To date, Precision Pine has not presented briefing or arguments addressing whether it has met the criteria set forth above.  Instead, plaintiff has focused all of its efforts on arguing that once plaintiff has demonstrated that it was a regular dealer in lumber, the burden shifts to defendant to show that plaintiff would not have made a second set of sales absent the breach.  *See* Pl.'s Post-Trial Brief at 45-46; February 17, 2006 Closing Argument Tr. at 52-53, 62-63.

Similarly, the majority of defendant's briefing has focused on arguing that plaintiff should not be compensated as a lost volume seller because defendant does not seek to offset profits from other post-suspension contracts awarded to Precision Pine.  *See* Def.'s Post-Trial Brief at 16-17; Def.'s Post-Trial Response Brief at 16-17.  Also, as discussed in Section 3.D. of the Background section, *supra*, defendant repeatedly argued that Precision Pine failed to demonstrate that it is a lost volume seller because Mr. Porter was unable to identify specific contracts that Precision Pine would have bid on or been awarded absent the Mexican Spotted Owl suspensions.  Def.'s Post-Trial Brief at 18.  The Court does not find this argument convincing.  While Mr. Porter's inability to identify such additional timber sales may be relevant to determining whether Precision Pine would have made additional lumber sales absent the Government's breach, standing alone, it is not determinative of whether Precision Pine is a lost volume seller.  *See e.g.*, *Diasonics*, 924 F.2d at 711-12.  Accordingly, the Court believes that further briefing from both parties would be helpful to the Court in addressing whether plaintiff has proved that it satisfies the four criteria described by the Court in Section IV.B., *supra*, for determining whether plaintiff is entitled to be compensated as a lost volume seller and therefore is not required to offset profits earned from harvesting the suspended sales in the post-suspension period.

In addition, the Court would find it helpful if plaintiff would explain how PX 28, 29, and 30 relate to whether, but for the suspensions, plaintiff would have operated its mills at full capacity in the post-suspension period.  In that regard, the Court is already familiar with Mr. Porter's general testimony regarding the historical operating capacity of Precision Pine's mills and the improvements that had been made to Precision Pine's mills, and it is not necessary for plaintiff to discuss that evidence again.  Similarly, the Court is familiar with DX 559 and Mr. Porter's testimony at trial regarding the same, and it is not necessary for defendant to reiterate any previous discussion of this evidence in its response to plaintiff's brief.

***CONCLUSION***

At the time of contracting, lost lumber profits were a foreseeable result of defendant's simultaneous and prolonged suspensions of all timber sale contracts in Region Three. The manufacture and sale of lumber from the timber harvested on the contracts at issue did not constitute independent and collateral undertakings, and plaintiff is not precluded from recovering lost profits damages on that basis. Furthermore, plaintiff is not precluded from recovering lost profits damages because it elected to assert a claim for partial breach and continue the timber sale contracts at issue, rather than treating the contracts as ended and asserting a claim for total breach. It is not possible for the Court to determine at this time whether Precision Pine should be required to offset the profits that it earned by partially harvesting the suspended sales after the suspensions were lifted, because neither party has fully addressed the proper standard for determining whether plaintiff is entitled to be compensated as a lost volume seller.

As set forth in Section IV.B., *supra*, in this case in order to demonstrate that it is entitled to be compensated as a lost volume seller and therefore is not required to offset profits earned from harvesting the suspended sales in the post-suspension period against the profits plaintiff would have earned from harvesting the suspended sales had there been no suspensions, Precision Pine bears the burden of proving that:

> (1) but for the suspensions, Precision Pine would have successfully bid on and been awarded additional timber sale contracts that it would have harvested and manufactured into lumber in the post-suspension period;

> (2) but for the suspensions, Precision Pine would have been operating its mills at full capacity in the post-suspension period;

> (3) but for the suspensions, Precision Pine would have sold at a profit the lumber that it would have manufactured from the additional timber sales that it would have bid on and been awarded in the post-suspension period; and

> (4) the profits that Precision Pine would have earned but for the suspensions by selling lumber from the additional timber sales that it would have bid on and been awarded in the post-suspension period would have equaled or exceeded the profits that Precision Pine actually earned by partially harvesting the suspended sales in the post-suspension period.

Accordingly, the Court ORDERS that on or before October 10, 2006, the parties shall simultaneously file and serve initial briefs, not to exceed 20 pages in length, discussing whether plaintiff has presented sufficient evidence to establish that it satisfies the four criteria that the Court has identified as necessary to prove that it is entitled to be compensated as a lost volume seller.

In addition, plaintiff's brief shall also address how PX 28, 29, and 30 relate to whether, but for the suspensions, plaintiff would have operated its mills at full capacity in the post-suspension

-49-

period.

The Court FURTHER ORDERS that on or before October 24, 2006 each party shall file a response to the opposing party's initial brief, not to exceed 15 pages in length.  The Court FURTHER ORDERS that on or before November 1, 2006, each party shall file a reply to the opposing party's response brief, not to exceed seven pages in length.  All briefs shall conform to the requirements of RCFC 5.3.


IT IS SO ORDERED.

 s/ George W. Miller

GEORGE W. MILLER
Judge