**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SUPPLEMENTAL POST-TRIAL BRIEF**
**PURSUANT TO THE COURT'S SEPTEMBER 19, 2006 ORDER**

## INTRODUCTION

On September 19, 2006, the Court ordered the parties to submit supplemental post-trial briefs. Precision Pine & Timber, Inc. v. United States, slip op. at 49-50 (Fed. Cl. Sept. 19, 2006). The Court directed the parties to address whether plaintiff, Precision Pine & Timber, Inc. ("Precision Pine"), "has presented sufficient evidence to establish that it satisfies the four criteria that the Court has identified as necessary to prove that [Precision Pine] is entitled to be compensated as a lost volume seller."[1] Id. at 49. Accordingly, pursuant to the Court's September 19, 2006 order, the United States submits this supplemental post-trial brief.

## ARGUMENT

### I. Precision Pine Has Failed To Establish That It Is A "Lost Volume Seller"

The Court has established a four part test that must be satisfied by a plaintiff to qualify as a lost volume seller. Id. at 47-48. Precision Pine failed to satisfy any prong of the prescribed test at trial.

---

[1] The United States respectfully disagrees with the Court's conclusion Precision Pine's "lost volume seller" claim is legally viable.

### A. Precision Pine Did Not Prove That, But For The MSO Suspensions, It Would Have Bid On And Been Awarded Additional Timber Sale Contracts In The Post-Suspension Period

The trial record establishes that Precision Pine continued to bid for timber sales after the MSO suspensions were lifted. See Tr. 671-77, 1089 (Porter). These included sales being offered by the Forest Service, the State of Arizona, and Indian tribes. See id. Indeed, in 1997 alone, Precision Pine was the high bidder and was awarded six new timber sale contracts. Id.; see also PX248 (identifying sales under contract). Thus, Precision Pine's post-suspension actions belie the suggestion that it was financially crippled and unable to compete for timber sale contracts in the post-suspension period. Furthermore, Precision Pine failed to identify any timber sale that it did not bid on in the post-suspension period as a result of the MSO suspensions. See Tr. 1288 (Porter). As a result, the record contains no evidence that Precision Pine would have bid on additional Forest Service, state, Indian or private timber sales but for the MSO suspensions.

The record is equally devoid of evidence demonstrating that Precision Pine would have been awarded any additional timber sale contracts in the post-suspension period. Timber sale contracts are awarded to the high bidder. First Joint Stip. ¶ 10; Tr. 1286 (Porter). Bidding for timber was competitive at all times in Arizona and New Mexico. E.g., Tr. 1278 (Porter). And Precision Pine's president, Lorin Porter, did not know of any additional contracts that Precision Pine would have been awarded but for the MSO suspensions. Tr. 1289 (Porter). Consequently, there exists no basis to conclude that, but for the MSO suspensions, Precision Pine (as opposed to some other bidder) would have been awarded any additional timber contracts in the post-suspension period.

Having failed to prove that it would have bid on and been awarded additional timber sale contracts in the post-suspension period but for the MSO suspensions, Precision Pine does not qualify as a "lost volume seller." Precision Pine, slip op. at 47.

**B. Precision Pine Did Not Prove That, But For The MSO Suspensions, It Would Have Been Operating Its Mills At Full Capacity In The Post-Suspension Period**

In addition to its failure to prove that it would have bid on and been awarded additional timber sale contracts, Precision Pine did not establish that it would have been operating its sawmills at their full capacity in the post-suspension period but for the MSO suspensions. Neither before nor after the MSO suspensions did Precision Pine run its three sawmill operation at its putative single-shift capacity of 35 million board feet per year. See Tr. 1410, 2144 (Porter); DX802; see also Tr. 1079-81, 1263 (Porter) (Precision Pine's mills were not operating at their single shift capacity in 1997 or 1998). Moreover, the single-shift capacity of Precision Pine's sawmills does not represent their "full capacity" for purposes of the lost volume seller claim. See Tr. 93-94 (Porter) (indicating that a single eight-hour shift was not full capacity); Tr. 344 (asserting that Precision Pine would have "tried to keep the mills running at their capacity at least on a one-shift basis") (emphasis added). The company, when warranted, made use of a two shift operation at its sawmills. Tr. 104 (Porter) (testifying that we "ran two shifts at our Heber mill for a while"); DX559 (showing double shift operations at Heber); see also Tr. 109 (Porter) (describing the Winslow mill's capacity "on a one-shift basis"). Consequently, Precision Pine's "full capacity" was greater than the single shift capacity of its three sawmills.

Even if the company's ability to use two shift (or extended hour) operations were disregarded, Precision Pine did not show that the failure to operate at its putative single-shift

capacity during 1997 and 1998 was attributable to the MSO suspensions. Lumber prices were higher in 1997, than they had been during the suspension period. See PX305; DX776 (exhibit 3). Each of Precision Pine's sawmills operated during 1997. Def.'s PFOF ¶¶ 87-88; DX798. And by virtue of both old and new contracts, Precision Pine had timber available for its sawmill operations. E.g., PX248 (identifying sales under contract).

Despite having timber under contract, and mills in which to process it, Precision Pine's mills did not operate at their supposed single-shift capacity of 35 million board feet in either 1997 or 1998. E.g., Tr. 1074, 1080-82, 1263 (Porter). In fact, Precision Pine produced only 8.3 million board feet of lumber from April 1997 to March 1998 (FYE1998), and only 6.5 million board feet from April 1998 to March 1999 (FYE1999). PX182 (exhibit 8). Thus, in the first year after the MSO suspensions, Precision Pine's mills produced only 24 percent of their alleged single-shift capacity, and in the second year after the MSO suspensions, only 19 percent of their alleged single-shift capacity. Id. Rather than increase production to capacity during 1997, Precision Pine chose to sell timber that it had under contract and to close its Eagar sawmill. See Tr. 1255, 1258 (Porter); PX117 (Kettle). Simply put, Precision Pine had the opportunity to harvest timber and to operate its mills at capacity in 1997 and 1998, but chose not do so for "business reasons." See DX800 (discussing why Precision Pine elected not to harvest available timber in 1997 and 1998). Precision Pine's failure to mill available timber in 1997 and 1998, thus, belies the claim that the company would have operated its sawmills at full capacity if the MSO suspensions had not occurred.

**C. Precision Pine Did Not Prove That, But For The MSO Suspensions, It Would Have Sold At A Profit Lumber Manufactured From Any Additional Timber Sales That It Would Have Bid On And Been Awarded**

In addition to failing to establish the first two requirements for qualifying as a lost volume seller, Precision Pine offered no evidence regarding the profitability of any additional timber sale contracts that it would have bid on and been awarded in the post-suspension period but for the MSO suspensions. Indeed, the record contains no evidence about the identity of any additional contracts, the size, quality and quantity of timber available from such contracts, the amount Precision Pine would have been willing to bid to obtain additional timber, or the price at which any additional timber sale contract would have been awarded. Such evidence would be necessary as the starting point for any analysis of profitability. Nor did Precision Pine proffer any analysis of the profitability of additional timber sale contracts that the company might (or might not) have been awarded.

Having failed to prove that it would have manufactured lumber at a profit from any additional timber sale contracts that the company would have bid on and been awarded in the post-suspension period, Precision Pine does not qualify as a "lost volume seller." Precision Pine, slip op. at 47.

**D. Precision Pine Did Not Prove That It Would Have Earned Greater Profits From Additional Timber Sales That It Would Have Been Awarded In The Post-Suspension Period But For The MSO Suspensions Than Were Actually Earned By Harvesting The Suspended Sales In The Post-Suspension Period**

As explained above, Precision Pine offered no evidence regarding the profitability of any additional timber sale contracts that the company allegedly would have been awarded in the post-suspension period but for the MSO suspensions. Consequently, there is no way to compare any profits earned as a result of such contracts with the profits actually earned by Precision Pine

by manufacturing and selling lumber derived from timber from contracts that were subject to the MSO suspensions. Consequently, Precision Pine failed to establish that it would have earned greater profits though any "additional contracts" than through the suspended timber sale contracts and, accordingly, Precision Pine does not qualify as a lost volume seller. Precision Pine, slip op. at 47-48.

## CONCLUSION

For these reasons, as well as the reasons given in our post-trial briefs, the Court should rule that Precision Pine does not qualify as a "lost volume seller."

Respectfully submitted,

PAUL D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

/s David A. Harrington

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Attorneys for Defendant

OF COUNSEL:

Patricia L. Disert
Lori Polin Jones
Office of the General Counsel
U.S. Department of Agriculture

October 17, 2006

**CERTIFICATE OF FILING**

I hereby certify that on this 17th day of October, 2006, a copy of the "DEFENDANT'S SUPPLEMENTAL POST-TRIAL BRIEF PURSUANT TO THE COURT'S SEPTEMBER 19, 2006 ORDER" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David A. Harrington