**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-720C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S INITIAL BRIEF AS TO WHETHER IT IS ENTITLED TO BE COMPENSATED WITHOUT AN OFFSET OF POST-SUSPENSION PROFIT**

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Washington, D.C. 20006
(202) 452-2140

Dated: October 17, 2006

# TABLE OF CONTENTS

**PAGE**

Table of Authorities .......... ii

INTRODUCTION.. .......... 1

I. An Offset Would Put Precision Pine In A Worse Position Than Had The Contracts Been Performed .......... 1

II. But For The Suspension, During The Post-Suspension Period Precision Pine Could And Would Have Processed Timber At The Maximum Capacity Of Its Mills. However, By Doing So, It Could Not Have Made Up Any Production Volume That It Lost During The Suspension In The Post-Suspension Period .......... 8

III. The Implications Of PX 28, 29 And 30 With Regard To Whether Precision Pine Would Have Operated Its Mills At Full Capacity In The Post-Suspension Period .......... 13

IV. Precision Pine's Responses To The Court's Four Criteria .......... 14

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

**CASES** **PAGE**

LaSalle Talman Bank F.S.B. v. United States,
317 F.3d 1363 (Fed. Cir. 2003)....................1

Precision Pine & Timber, Inc. v. United States,
63 Fed. Cl. 122 (2004)....................2

**MISCELLANEOUS**

John Hackley, UCC Section 2-714(1) and The Lost Volume Theory: A New Remedy for Middlemen?, 77 Ky. L. J. 189 (1989)....................8

RESTATEMENT (SECOND) OF CONTRACTS § 344(a) (1981)....................2

WILLISTON ON CONTRACTS § 64:2 (4th ed. 2002)....................2

## INTRODUCTION

On September 19, 2006, the Court ruled that it was foreseeable to defendant that the simultaneous and prolonged suspension of nearly all of Precision Pine & Timber, Inc.'s ("Precision Pine") timber sale contracts would cause Precision Pine to suffer lost lumber profits, that the manufacture and sale of lumber were not independent and collateral undertakings, and that plaintiff is not precluded from recovering lost profits because it asserted a claim for partial breach and continued to perform the contracts. Slip op. at 38. However, the Court also found that neither party had fully addressed the issue of whether an offset of profits earned from harvesting the suspended sales in the post-suspension period should be made against the profits that Precision Pine lost by not being able to harvest, process and sell the resulting lumber and by-products as it intended between August 25, 1995 and April 15, 1997. Id. 38-49. Accordingly, the Court engaged in its own inquiry into the law dealing with recovery by lost volume sellers and asked the parties for additional briefing related to four criteria that the Court distilled from its inquiry. This brief contains Precision Pine's responses to those criteria.[1]

## I. An Offset Would Put Precision Pine In A Worse Position Than Had The Contracts Been Performed

As an initial matter, Precision Pine notes that expectancy damages, i.e., the amount that represents the benefit to which the non-breaching party was entitled had performance been rendered, generally provide the basis for an award of damages for breach of contract. LaSalle

[1]This brief is also being submitted without prejudice to plaintiff's position, as expressed in the memorandum in support of its Motion For Relief From Certain Limited Aspects Of The Court's Order And Opinion Of September 19, 2006 filed this day, that some of the premises on which the Court's order is based are mistaken, and that plaintiff is entitled to relief from the effect of those erroneous premises in the further Opinion and Order that the Court has indicated will be issued in response to this supplemental briefing.

Talman Bank F.S.B. v. United States, 317 F.3d 1363, 1371 (Fed. Cir. 2003); RESTATEMENT (SECOND) OF CONTRACTS § 344(a) (1981); WILLISTON ON CONTRACTS § 64:2 at 30 (4th ed. 2002).[2] Precision Pine maintains that any offset of post-suspension profits will place it in a substantially worse position than it would have been had defendant performed as expected and therefore that no offset is appropriate.

Here, but for the suspension during the nearly 20-month period from August 25, 2006 to April 15, 1997, Precision Pine would have harvested and processed 25,000 mbf (LS) more timber than it did, sold the resulting lumber and by-products and made a profit thereon of $6,551,856. ("Plaintiff lacked timber to run through its sawmills, and accordingly, could not realize its expected lumber profits during the suspension. See PX 115; PX 262." Slip. Op. at 35.)[3] With those profits Precision Pine would have purchased additional timber at market prices and processed it profitably after April 15, 1997, just as it had done in every year for nearly a decade prior to the suspension. Plaintiff's Corrected Proposed Findings of Fact dated September 12, 2005 ("PPFF") 8.

---

[2] As this Court held: "[t]he relevant inquiry is whether requiring plaintiff to offset damages earned in the post-suspension period would give plaintiff the benefit of its bargain by awarding plaintiff damages that will put Precision Pine in as good a position as it would have been in had the contract been performed. See RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. a." Slip op. at 42.

[3] As the Court noted, "In total, Mr. Ness estimated that Precision Pine incurred $6,865,541.21 in lost profits damages . . . from being unable to harvest the [breached contracts]." Slip op. at 6. Mr. Ness' $6,865,541.21 damages calculation includes lost profits damages for lumber, roundwood, and lumber by-products that he claims would have been earned from the suspended sales but for the suspensions. The claim for the loss of roundwood profits in the amount of $313,685 brought by Precision Pine on behalf of its subcontractor was, however, dismissed by the Court. Precision Pine & Timber, Inc. v. United States, 63 Fed. Cl. 122, 138 (2004). Accordingly, Precision Pine's total lost profit claim at trial was $6,551,856. PPFF 137.

The following chart compares Precision Pine's profitability in the "but for" world and actual world and indicates the difference:

| | | | | | TOTAL |
|---|---|---|---|---|---|
| | **August 25,1996-April 15, 1997** Profit (loss) | | **April 1, 1997-March 31, 1999**[4] Profit (loss) | | **August 25, 1996-March 31, 1999** Profit (loss) |
| **But for the suspension** | $4,502,156 | PPFF 138, 140 | more than $616,833 | | more than $5,118,899 |
| | | | | | |
| **Actual** | ($2,050,000) | PPFF 138 | $616,833 | Ex. 3 attached hereto | ($1,388,167) |
| **Difference** | **$6,552,156** | PPFF 138, 140 | **more than $0** | | **more than $6,552,156** |

As the chart demonstrates, in the "but for" world (<u>i.e.</u>, if the government had performed as expected), from the start of the suspension on August 24, 1995 through the entire post-suspension period ending on March 31, 1999, Precision Pine would have earned a total gross profit of at least $5,118,899. However, in the actual world not only did Precision Pine not earn the profits it expected during that period but it incurred losses that it would not have incurred if

[4]This period is the best evidence of Precision Pine's profitability in 1997 and 1998 when defendant asserts that Precision Pine had the requisite capacity to produce lumber (assumedly at approximately historical levels) from newly-purchased contracts and simultaneously from the once suspended-contracts. D's Post-Trial Response Brief at 19. It also roughly approximates the 20-month period of the suspension and ensuing winter. Moreover, because Precision Pine's records are maintained on a fiscal year basis from April 1 to March 31 each year, this approach allows for a ready comparison of overall profitability in the years immediately following the suspension.

the government had not breached the contracts. Therefore, by comparing Precision Pine's total profitability during the suspension and post-suspension periods in the actual world with corresponding profitability had no breach actually occurred, it is clear that Precision Pine sustained lost gross profits in the amount of at least $6,552,126 due to the breach and likely much more.

With the possible exception of the post-suspension time period in the "but for" world, Precision Pine's profitability in each of the four time periods at issue (i.e., actual world: pre and post suspension; "but for" world: pre and post-suspension) was the subject of exacting calculations by Precision Pine and considerable evidence at trial. However, determining Precision Pine's profitability during the post-suspension period in the hypothetical "but for" world is not complicated and the evidence to do so exists in the trial record. That is, all that Precision Pine need show is that if there had been no suspension (i.e., in the "but for" world) it would have made an amount in the post-suspension period equal to or greater than what it actually made in the post-suspension period. This is the relevant inquiry because if Precision Pine would have made just one dollar more in the "but for" world during the post-suspension period than it did make during the actual post-suspension world of the breach, then no offset is required as doing so would place Precision Pine in a worse position than it would have been in if the breach had not occurred. This point can be seen on the chart above but may be made more simply as follows:

| | | | | |
|---|---|---|---|---|
| **<u>Profit in "But For" (No Breach) World</u>** | | | | |
| **$100** | **+** | **more than $100** | | **= more than $200** |
| **(during suspension)** | | **(post-suspension)** | | |
| **<u>Profit in Actual (Breach) World</u>** | | | | |
| **$-50** | **+** | **$100** | | **= $50** |
| **(during suspension)** | | **(post-suspension)** | | |

Plaintiff's lost profit is at least $150.

As in this example, where the profits in the post-suspension actual world are equal to or less than what would have been the case in the absence of the breach, to be made whole the non-breaching party must receive at least all of the lost profits (and increased losses) it sustained during the suspension. In the foregoing example, that amount is no less than $150, <u>i.e.</u>, the entire loss sustained in suspension period without offset of profits made in the post suspension period. For the same simple reason, Precision Pine is entitled to all of the damages that it suffered during the period of the suspension, <u>i.e.</u>, $6,552.126.[5]

The evidence admitted at trial which demonstrates that but for the breach Precision Pine would have made at least (if not considerably more than) the $616,833 that it actually did make in the post-suspension period includes the facts that:

1. In each and every year of its existence prior to the suspension, both in years where the lumber market was good and years in which the market was not very good, Precision Pine had been profitable. PPFF 8.

[5]In keeping with the conservative nature of its damage calculations, Precision Pine has not quantified the costs imposed on it by the breach due to the inefficiencies it incurred in trying to resume its operations and customer relationships in the post-suspension period. PX 131 at 3, Trial Tr. at 2191-94 (Ness). Needless to say, these costs were considerable and were absorbed entirely by Precision Pine.

2. In order to produce a total gross profit of $616,833 in the post-suspension period had there been no breach, Precision Pine would only have had to have gross profits averaging $308,417 per year.

3. In the three full fiscal years preceding the suspension, Precision Pine had net profits ranging from $576,995 to $2,719,919. PX 247. Gross profits (i.e., profits without regard to overhead, PPFF 64) would have been well in excess of these profit figures.

4. In the post-suspension period, the Forest Service resumed selling timber. PX 304. From December 6, 1996 through December 31, 1998, on the four forests where Precision Pine had historically (but not exclusively) operated, the Forest Service offered a total of 93,312 mbf (LS) of sawlogs.[6] Id.

5. At the beginning of the post-suspension period, Precision Pine's finances were devastated (Trial Tr. 2194-94 (Ness)) and it still had a substantial inventory of "suspended" timber that had been returned to it. PPFF 366. But for these conditions, which were the result of the suspension, Precision Pine could and would have continued to buy a substantial portion of the timber offered on the four forests in the post-suspension period just as it had always done. PPFF 369-371. In fact, despite its weakened condition in the post-suspension period and the availability of some of the suspended timber, Precision Pine purchased six new timber sales in 1997. PPFF 373.

6. Precision Pine would have been able to acquire Forest Service timber at very reasonable prices because of the greatly diminished total sawmill capacity of Precision Pine's competitors for Forest Service timber sales. Tr. 103-09 (Porter). Indeed, from the late-1980's until the suspension occurred, some 47 million feet (mmbf (LS)) of annual sawmill capacity that had competed with Precision Pine for Forest Service timber in Northern Arizona had been shut down. Plaintiff's Additional Proposed Findings of Fact ("PAPFF") filed November 14, 2005 at 1406. Indeed, at the time of the suspension, there were only two other sawmills that remained in competition with Precision Pine, the Reidhead sawmill in Nutrioso (near Eager) and the Stone sawmill in Eagar (id.), both of which were proximate to the Apache-Sitgreaves National Forest. Id. As a result, there was effectively no competition for Forest Service timber sales for Precision Pine's sawmills in Heber or Winslow, which drew their source of supply primarily from the Tonto, the Coconino and the Kaibab National Forests. PPFF 10-12; PAPFF 1406; PX 104. As Dr. Neuberger, defendant's expert, correctly conceded: (1) there had been a "dramatic" reduction in sawmill capacity competing with Precision Pine for Forest Service timber sales; and (2) given

[6] This was enough to supply Precision Pine's three mills at full capacity, i.e., a log usage of 27.7 mmbf (LS) per year (see discussion, infra, at page 12) for nearly 3.5 years. With the Eagar sawmill closed this represents enough wood to have run Precision Pine's sawmills at Heber and Winslow (and their combined capacity to use 19.6 mmbf (LS) of timber per year (see discussion, infra, at page 12) for approximately 4.7 years.

the location of the remaining competitors, Precision Pine may have been well-situated to obtain Forest Service timber sales offered on the Coconino, Tonto, Kaibab and the western half of the Apache-Sitgreaves National Forests. PAPFF 1406; see PPFF 10-13.

7. In the post-suspension period, the Forest Service substantially reduced the price it set administratively for roundwood (which was not subject to change by bid) from $9.40/ccf to $.73 per ccf. Trial Tr. at 2907 (Matson); Trial Tr. at 4503-04 (Harris).

8. Precision Pine's profitability in the "but for" world would also have been greatly enhanced by the fact that had there been no suspension, Precision Pine would not have experienced the shutdowns of its sawmills during the suspension period and the concomitant inefficiencies of trying to restart those sawmills once the suspension was lifted.

9. Precision Pine, like any rational lumber manufacturer sought to run its mills as close to capacity as it could to maximize efficiencies and profit. Trial Tr. at 633 (Porter); Trial Tr. at 2195, 2283 (Ness).[7]

10. Precision Pine certainly would have run more timber through its sawmills during the post-suspension time period in the "but for" world than it did in the actual world because Precision Pine would have been in a strong financial position and would not have been saddled with trying to reassemble its employees and restart its sawmills in winter. Trial Tr. at 663, 981, 1078, 1080, 1596, 1861-62, 2105 (Porter). Additionally, as more and more timber is processed and the resulting lumber is sold, revenue increases but direct manufacturing costs increase more slowly. See Trial Tr. at 2755 (Ness). Therefore, in the "but for" world, where Precision Pine would have purchased, harvested and milled a substantial volume of timber above what it was able to do in the actual world and sold the resulting lumber and by-products, its gross profits (profits without regard to overhead (PPFF 64)) also would have increased substantially.[8]

---

[7]Specifically, running additional timber through the sawmills would also have allowed Precision Pine to more fully absorb its manufacturing overhead and its general and administrative expenses, thereby increasing net profit. See Trial Tr. 2756-8 (Ness); PX 182 at 2 of 2. As Mr. Ness testified, in the post-suspension period, Precision Pine's overhead was no where near being absorbed. Trial Tr. 2443 (Ness).

[8]In FYs 3/31/98 and 3/31/99, which essentially encompassed calendar years 1997 and 1998, Precision Pine's sawmill production was 8.3 mmbf (LT) and 6.4 mmbf (LT), respectively. PX 183, Ex. 8. This was due in no small part to ongoing financial repercussions from defendant's breach combined with ongoing inefficiencies due to mill shutdowns caused by defendant's breach, the Forest Guardians suspension (which again suspended Precision Pine's operations) on quite a number of the breached sales during the 1997 operating season, the resulting cession of operations at the Eagar mill, and the fire which destroyed the Winslow mill

11. Implicit in defendant's argument that in the post-suspension Precision Pine had the requisite capacity to produce lumber (assumedly at approximately historical levels) from timber on newly-purchased contracts and in addition thereto from the timber on once suspended-contracts (D's Post-Trial Response Brief at 19) is an admission that all other things being equal Precision Pine would have been able to bid on and been awarded sufficient newly-purchased contracts after December 6, 1996 (when the Forest Service recommenced selling timber) to produce lumber at its normal rate of production.

In short, although the lost volume seller theory remains a useful conceptual tool for addressing why no offset is required, one need not even resort to a lost volume theory to determine the damages of a buyer of raw materials for manufacture and resale such as Precision Pine. See Slip op. at 27 ("Commercial contracts, especially those for resale, create the inference of lost profits as a probable result of the breach by the nature of the contracts themselves" (citations omitted)). Here, the Court can simply look to cases involving lost profits of a non-breaching buyer. See John Hackley, UCC Section 2-714(1) and The Lost Volume Theory: A New Remedy for Middlemen?, 77 Ky. L. J. 189, 201 (1989). Stated another way, "if a middleman buyer [such as Precision Pine] makes a profit that it would have made absent the seller's breach, surely it should be allowed to retain the profit. Id. at 216.

## II. But For The Suspension, During The Post-Suspension Period Precision Pine Could And Would Have Processed Timber At The Maximum Capacity Of Its Mills. However By Doing So, In 1997 And 1998 It Could Not Have Made Up Any Production Volume That It Lost During The Suspension[9]

---

in 1998. In contrast, in the two FYs preceding the MSO suspension, Precision Pine's lumber production was 30.1 and 30.2 mmbf (LT), respectively. PPFF 70.

[9]This section of the brief responds to the inquiries raised by the Court regarding Precision Pine's total mill capacity in the post-suspension period. For the reasons set forth in the accompanying Motion For Relief From Certain Limited Aspects Of The Court's Order And Opinion Of September 19, 2006, the question asked by the Court (at defendant's urging) as to whether or not Precision Pine's actual operations in 1997 and 1998 were at or near maximum capacity focuses on a very different and wholly irrelevant question: Whether, long after the

As the Court found, “the breach at issue is the prolonged suspension of nearly all of Precision Pine’s timber sale contracts, and the lost profits damages resulted from the fact that the timber (which was the subject matter of the contracts themselves) was unavailable, and no substitute timber could be obtained.” Slip op. at 30. As the Court also determined: (a) “the crux of plaintiff’s argument is that the Mexican Spotted Owl suspensions caused a ‘hole in the profit

---

breach occurred, Precision Pine had the capacity in the actual world to produce additional lumber in the volume represented by Transaction 1 and by doing so could have recouped the profit it lost on Transaction 1 at the same time that it earned profits on Transaction 2. With all due respect, however, this is an inquiry entirely detached from any basis in reality. Precision Pine, like any profit maximizing enterprise, did the best it could in the post-suspension period to resume profitable operations given the fact that quite a number of the timber contracts it had with the Forest Service were suspended again by the Forest Guardians suspension in 1997, Trial Tr. at 1078 (Porter), its severely wounded financial status, market conditions, other practical considerations and the limitations on any company’s ability to predict the future. As Mr. Ness explained, in the post- suspension period Precision Pine probably had the equivalent of less than one and a half sawmills feeding a planer operation geared to handling three mills. On this basis alone the inefficiencies were significant. Trial Tr. 2834 (Ness).

The premise underlying the inquiry urged on the Court by defendant is that Precision Pine had additional sawmill capacity in the post-suspension period that it might have used to produce additional lumber AND that if it had done so it would have been able to sell all of the resulting lumber at a profit (at least equal to that would have been earned on Transaction 1) but that it willfully failed to do so. Of course, this proposition is facially absurd and defendant has not posited (let alone proven) any argument as to why Precision Pine, a company that had always been profitable, would suddenly and irrationally have forgone profitable operations following the suspension. To the contrary, the evidence at trial shows that, despite Precision Pine’s wounded condition, it struggled mightily to reopen its sawmills and return to “normal” operations as best it could in the winter of 1996-1997. Absent the breach, Precision Pine would have acted no differently and would have produced lumber at the rate that market conditions, other practical considerations and the limitations on the ability to predict the future suggested was prudent. However, in the “but for” world (absent the breach), and by virtue of the fact that it would have been flush with profits from Transaction 1 and all of its mills would have been operating uninterrupted by virtue of not having suffered the dislocations caused by the breach, Precision Pine certainly would have been even more profitable in the post-suspension period in the “but for” world than it was in the actual world of the breach. As such, the hole in its “profit pipeline” in the full amount of Transaction 1 remains unfilled. Precision Pine is entitled to this amount with no offset, regardless of whether or not it operated “at capacity” in the post-suspension period.

pipeline' for Precision Pine for 1995 and 1996 that could not be filled simply by releasing the suspended sales" (slip. op. at 40) and (b) that defendant's counter-argument is that "Precision Pine's 'hole in the profit pipeline' theory is invalid because [in the actual world] Precision Pine could have made up any production volume that it lost during the suspension in the post-suspension period." Id.

Essentially defendant asserts that, notwithstanding the fact that due to the breach Precision Pine harvested and processed only half of the timber that it intended to during the suspension and as a result lost $6.5 million in lumber and by-product sales, in the post-suspension period Precision Pine could have processed twice as much timber as normal, i.e., "Precision Pine had ample sawmill capacity in 1997 and 1998 to produce lumber from both newly purchased contracts and the once suspended contracts." D's Post-Trial Response Brief at 19. This assertion insinuates that Precision Pine's total profit during the suspension period and the post-suspension period in the actual and "but for" worlds would have been the same. However, this unsupported assertion was specifically refuted at trial by Mr. Ness who testified that if the suspension had been a short one Precision Pine might have been able to operate a few more hours per week, maybe run some weekends and made up small amounts of production lost, but that there simply was no way that Precision Pine could make up the 50 percent of its production that it lost over a 20-month period. See Trial Tr. 2363 (Ness).

The facts proven at trial also belie the government's unsupported argument that Precision Pine could have processed anywhere near a "normal" level of timber[10] and the suspended volume too in 1997 and 1998, i.e., by Precision Pine's processing timber at "its maximum estimated capacity after the suspensions were lifted." Slip op. at 40-41.[11]

As proven at trial, in the two fiscal years prior to the suspension, Precision Pine processed approximately 24,000 mbf (LS) of timber at it three mills.[12] PPFF 365. Clearly,

---

[10]The processing of timber at the level accomplished in the two FYs preceding the suspension.

[11]The same inability to make up a significant backlog applies to the analogy regarding the lawyer with a substantial practice that is suspended for 16 months. See slip op. at 40. That is, when the lawyer returns to work after the suspension and resumes his practice where he left it on the date of suspension, it would almost be impossible for him to handle both a normal level of new work and reduce the 16 months of work that accumulated on his desk during the suspension.

Stated mathematically, if the lawyer had a practice that consistently generated 2,000 billable hours of work per year, during the 16-month (i.e., 1.33 year) long suspension some 2,666 billable hours (2000 x 1.33) would have gone unperformed. Even if the lawyer were to work 2,200 billable hours a year upon his return to practice, it would take him over 13 years to handle his normal amount of work and eliminate this backlog.

Even if the lawyer increased his annual workload by 50% to 3,000 billable hours per year, it would still take him over 2½ years to handle his normal amount of work and catch up on this backlog. (3,000-2,000 = 1,000 hours = lawyer's excess annual capacity above normal; back logged volume = 2,666 hours; 2,666÷1,000 = 2.6 years).

[12]From that volume, Precision Pine produced in excess of 30,000 mbf (LT) of lumber each year. PPFF 365. At that time, the mills had the following capacities:

| | Lumber production capacity | PPFF | Annual log usage |
|---|---|---|---|
| Heber | 9-10 mmbf (LT) | 11 | 7.2-8 mmbf (LS) |
| Winslow | 14-15 mmbf (LT) | 12 | 11.2-12 mmbf (LS) |
| Eagar | 9-10 mmbf (LT) | 15 | 7.2-8 mmbf (LS) |
| Total | 32-35 mmbf (LT) | | 25.6-28 mmbf (LS) |

Precision Pine had been able to purchase enough timber to sustain this level of production. The evidence at trial also demonstrated that but for the suspension, during the period August 25, 1996 to April 15, 1997, Precision Pine would have processed timber at the rate of 27.7 mmbf (LS) per year which represented its capacity at that time at all three mills on a one shift basis.[13]

The evidence at trial also demonstrated that in the wake of the so-called MSO suspension and the subsequent Forest Guardians suspension, Precision Pine reached the conclusion by late July of 1997 to permanently close the Eagar sawmill. Trial Tr. 1255-58 (Porter). This reduced Precision Pine's capacity in the post-suspension period by 30%, i.e., from a capacity to use 27.7 mmbf of logs per year to a capacity to use only 19.6 mmbf of logs. Assuming that Precision Pine had, in turn, only been able to purchase a proportionate share of the 24,000 mbf of logs that it had secured and run through its mills annually prior to the suspension, i.e., 16,457 mbf (see Ex. 1), its "excess" processing capacity at its Heber and Winslow sawmills would be only have been some 3.2 mmbf of logs per year (i.e., 19.6 mmbf – 16.4 mmbf).

---

At the time of the suspension, Precision Pine was in the process of expanding its capacity at Eagar to approximately 11 mmbf (LT) per year. PPFF 15. Thus, during the suspension, Precision Pine's mills would have had the following capacities:

| | Lumber production capacity | PPFF | Annual log usage |
|---|---|---|---|
| Heber | 9-10 mmbf (LT) | 11 | 7.2-8 mmbf (LS) |
| Winslow | 14-15 mmbf (LT) | 12 | 11.2-12 mmbf (LS) |
| Eagar | 11 mmbf (LT) | 15 | 8.8 mmbf (LS) |
| Total | 34-37 mmbf (LT) | | 27.2-28.8 mmbf (LS) |

[13]Total anticipated lumber production for all three mills for the 19¾ months of the suspension plus the ensuring winter, i.e., from August 25, 1995 to April 15, 1997, was 57.134 mmbf (LT) (57,134 mbf (LT)) (PPFF 69) which is a rate of lumber production of 34.7 mmbf (LT) or 34,714 mbf (LT) per year. Id. At an average overrun factor of 1.25, this amounts to a log usage of 27.7 mmbf (LS) of timber per year (34,714 ÷ 1.25 = 27,771).

Utilizing this "excess" capacity to process the 25 mmbf of timber that remained on the suspended sales and ignoring the fire that actually destroyed Precision Pine's Winslow sawmill in September of 1998, it would have taken Precision Pine some 7.8 years to process both its "normal" volume of timber and the 25 mmbf (LS) of suspended volume.[14] Certainly, therefore, Precision Pine did not have the capacity in 1997 and 1998 to process anywhere near a normal amount of timber from newly purchased contracts plus the timber from the suspended contracts.

## III. The Implications Of PX 28, 29 And 30 With Regard To Whether Precision Pine Would Have Operated Its Mills At Full Capacity In The Post-Suspension Period

The Court also requested plaintiff to explain how PX 28, 29, and 30 relate to whether, but for the suspensions, plaintiff would have operated its mills at full capacity in the post-suspension period. Slip op. at 98. As discussed supra and in the accompanying motion, plaintiff does not believe that such an inquiry into capacity is relevant. In any event, as discussed in the preceding section of this brief, in the post-suspension period plaintiff simply could not have processed a normal level of timber and the volume of timber remaining on the breached timber sale contracts as well. Without prejudice to these positions, plaintiff responds to the Court as follows:

[14] Even if Precision Pine had not closed its Eagar mill in 1997 when the Forest Guardians suspension hit and thus had maintained a capacity to use 27.7 mmbf (LS) of logs per year, its "excess" capacity would be still only have been some 3.7 mmbf of logs per year, i.e., 27.7 mmbf – 24 mmbf (the amount run through the mills in the "normal" years prior to the suspension). Accordingly, even in a three mill scenario, it would have taken Precision Pine some 6.75 years to process both its "normal" volume of timber and the 25 mmbf of suspended volume.

Taking the loss of the Winslow mill's annual capacity to use 11 mmbf+ (LS) into account, it would have taken Precision Pine many more than 7.8 years to process both its "normal" volume of timber and the 25 mmbf of suspended volume.

PX 28, 29, and 30 indicate the amount of lumber that Precision Pine produced by mill on a monthly basis during a six-month period prior to the suspension, i.e., from September 1994 through February 1995. As set forth on PX 28, the total production of lumber for these six months was 16.7 mmbf (16,716,916 board feet). This is totally congruent with the fact that prior to the suspension Precision Pine had an annual production capacity of approximately 33 mmbf of lumber. PPFF 11, 12 and 15. It is also consistent with the position that whenever possible Precision Pine, like all timber companies, wanted to run its mills at or at least near capacity and constitutes evidence that during this particular six-month period of relative normalcy before defendant's breach and seriatim suspensions of Precision Pine's timber sale contracts that Precision Pine did, in fact, operate at capacity. From this fact it is not difficult to conclude that in the assumedly relatively normal "but for" world in 1997 and 1998 Precision Pine would again have endeavored to operate whatever mills it had available at or near their capacity.

## IV. Precision Pine's Responses To The Court's Four Criteria

In light of the foregoing (and to the extent that they still obtain in whole or in part), plaintiff responds to the Court's four criteria as follows:

### 1. Precision Pine would have successfully bid on and been awarded additional timber sale contracts.

As plaintiff proved at trial, but for the government's breach, during the suspension period Precision Pine would have harvested all of the timber that it had under contract on August 25, 1995 and all of the timber that it was actually able to acquire thereafter during the suspension period. PPFF 365, 368. Accordingly, in this "but-for" world, as of December 1996, Precision

Pine, a long-time purchaser/processor of timber, would have had no more timber to harvest, but would still have had three mills that were quickly running out of timber to harvest plus it would also have had substantial financial resources (i.e., the profits from Transaction 1). The undisputed facts demonstrate that, starting in December of 1996, a substantial volume of timber came on the market as the Forest Service resumed its timber sale program, that Precision Pine had relatively little competition for that timber and that, due to the location of its mills near the forests, also had a substantial competitive advantage over those few competitors that did exist. PPFF 370; PAPFF 1406. As Mr. Porter testified, without contradiction, on this point, in the "but for" world, Precision Pine would have bid on timber sales on the forests to which its mills were adjacent. Trial Tr. at 660-66 (Porter).[15] There is absolutely no basis in the record (or in logic) to conclude that in the "but for" world, Precision Pine, with its strong cash position and competitive advantage, would not have been awarded most if not all of the sales on which it chose to bid.

**2. But for the suspension, Precision Pine would have operated its mills at full capacity in the post suspension period.**

As discussed above and again subject to Precision Pine's questioning the relevance of this inquiry to the determination of Precision Pine's damages, in the "but for" world (taking into account independent events that reduced Precision Pine's maximum capacity during the post-suspension period, i.e., the permanent shutdown of the Eagar mill in mid-1997 once the Forest

[15]In fact, Precision Pine, despite the severe impacts of the suspension on its operations and finances and the return of the breached sales, did purchase six new sales in 1997 in the "actual" breach world. PPFF 373.

Guardians suspension occurred, and the fire in 1998 that destroyed the Winslow sawmill),[16] Precision Pine would not have had difficulty operating at "full capacity."

**3. But for the suspension, Precision Pine would have sold at a profit the lumber that it would have manufactured from the additional timber sales that it would have bid on and been awarded in the post-suspension period.**

A. As proven at trial in the "but for " world during the post-suspension period, Precision Pine should have been the successful bidder on most if not all of the timber sale contracts on which it bid. Moreover, it would have obtained these contracts at or near the minimum acceptable bid price because: (i) the Forest Service establishes the minimum bid price for saw timber in significant part based on the quality of the timber being sold and by taking current lumber product prices into account (i.e., the WWPA lumber price index), see Trial Tr. 4450 (Harris); DX 840 at 22-23; and (ii) as noted above, there was an absence of substantial competition for the sales in the post-suspension period and Precision Pine had a competitive advantage due to the location of its mills near the forests.

B. Even if the market for lumber had declined after Precision Pine purchased some of its new timber sale contracts in the post-suspension period: (i) the price that Precision Pine would have paid the Forest Service for timber would have decreased by 100% of the corresponding decrease in the WWPA index under standard clause B(T)3.2, see PPFF 19, 191, and (ii) if the decline in market prices for timber were sufficiently substantial, Precision Pine would have been

[16] As noted, the shutdown of Eagar reduced Precision Pine's capacity by 30%; Winslow represented an additional 40% reduction in Precision Pine's capacity.

entitled to a market term addition, i.e., more time to harvest the timber on the contract (in the hope that with the passage of time lumber markets would have improved). See PPFF 189.

C. In some of the contracts, the price paid for roundwood would not have been the administratively established $9.40 per ccf which was the price on several breached contracts but rather would only have been $.73 per ccf. Trial Tr. at 2907 (Matson); Trial Tr. at 4503-04 (Harris).

D. Moreover, each such contract would also have contained standard contract clause B(T)6.4 which would have permitted Precision Pine not to remove roundwood if there was no market for it (PPFF 276-77; Trial Tr. at 705-07 (Porter)), and/or specifically allowed Precision Pine Precision Pine only to cut and deck any roundwood on the sale. PPFF 278. As such, roundwood removal would have continued not to pose any impediment to profitable operation of timber sale contracts.

E. In the "but for" world, Precision Pine would not have experienced the inefficiencies of having to re-commence full scale operations at its mills after shutdowns caused by defendant's breach as it did in the actual world, and

F. As discussed above, in the "but for" world without the mill inefficiencies resulting from defendant's breach which Precision Pine had to overcome, Precision Pine would have processed more timber than it actually did in the post-suspension period and as a result of that fact alone would have had greater gross profit. See discussion supra at ¶ 10 on page 7.

Accordingly, at an absolute minimum, it is more probable than not that Precision Pine would have sold at a profit the lumber that it would have manufactured from the additional timber sales that it would have bid on and been awarded in the post-suspension period.

**4. The profits that Precision Pine would have earned but for the suspensions by selling lumber from the additional timber sales that it would have bid on and been awarded in the post-suspension period would have equaled or exceeded the profits that Precision Pine actually earned by partially harvesting the suspended sales in the post-suspension period.**

As criterion 4 suggests, the Court appreciates that if Precision Pine simply would have been equally or more profitable in the "but for" world in 1997 and 1998 than it was in the actual (breach) world that no offset is required to place Precision Pine in the position it would have occupied had the government performed as expected. As discussed in detail above at pages 5-8 (points 1-11), the facts proven at trial certainly demonstrate that it is more than a reasonable inference that, absent the breach, Precision Pine's operations in FY 3/31/98 to FY 3/31/99 would have been at least as profitable than those that actually occurred following the breach in the actual world.

Moreover, as set forth in Ex. 4 attached hereto, in the post-suspension period, i.e., Precision Pine's FYEs 3/31/98 and 3/31/99, Precision Pine earned a gross profit by selling the lumber and by-products from timber on the breached sales of $833,362. It would not have been difficult for Precision Pine to have sold lumber from timber sale contracts that it would have bid on and been awarded in the post-suspension period and made a total gross profit greater than this. That is, in the "but for" world during the two-year post-suspension period, even taking into account the shutdown of Eagar in mid-1997 and the destruction of the Winslow sawmill in

September of 1998, Precision Pine would have produced a total of somewhere in the neighborhood of 38,750 mbf (LT) of lumber. See Ex. 5 attached hereto. A substantial part of this production would of necessity have come from timber that, unlike the timber remaining on many of the suspended sales, would not have been subject to the Forest Guardians suspension which played havoc with Precision Pine's production in 1997.

Moreover, even if the gross profit per mbf of lumber that Precision Pine would have made by selling lumber and by-products from these timber sales that it would have bid on and been awarded in the post-suspension period had only been 1/6th of what Precision Pine made by selling lumber and by-products in the post-suspension period from the timber on the breached sales, its gross profits still would have been higher than the $853,362 that it did make in 1997 and 1998 on the sale of lumber from the suspended contracts. See Ex. 6 attached hereto. In other words, in order to have made $853,362 in gross profits on sale of 38,750 mbf (LT) of lumber, Precision Pine would only have had to have averaged gross profits of $22.02 per mbf (LT) not the $130.55 per mbf (LT) that it did generate from the suspended sales.

Accordingly, at a minimum, it is more probable than not that Precision Pine's level of gross profits generated in the "but for" world in 1997 and 1998 would have exceeded the total gross profits it was actually able to achieve in the wake of the Forest Service breach on processing timber from the breached contracts.

**CONCLUSION**

For all of the reasons set forth herein, and in the accompanying motion, plaintiff submits that no offset of profits made on the sale of lumber during the post-suspension period made from timber on the breached contracts is required or appropriate.

Respectfully submitted,

s/Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: October 17, 2006

**Exhibit 1**

Lumber Production/Log usage capacity including Eagar

| | Lumber production capacity | PPFF | Annual log usage capacity |
|---|---|---|---|
| Heber | 9-10 mmbf (LT) | 11 | 7.2-8 mmbf (LS) |
| Winslow | 14-15 mmbf (LT) | 12 | 11.2-12 mmbf (LS) |
| Eagar | 11 mmbf (LT) | 15 | 8.8 mmbf (LS |
| Total | 34-36 mmbf (LT) | | 27.2-28.8 mmbf(LS) |
| | | | **28 mmbf (LS)** |

Lumber Production/Log usage capacity without Eagar

| | Lumber production capacity | PPFF | Annual log usage capacity |
|---|---|---|---|
| Heber | 9-10 mmbf (LT) | 11 | 7.2-8 mmbf (LS) |
| Winslow | 14-15 mmbf (LT) | 12 | 11.2-12 mmbf (LS) |
| Eagar | 0 | | 0 |
| Total | 23-25 mmbf (LT) | | 18.4-20.8 mmbf(LS) |
| | | | **19.6 mmbf (LS)** |

Drop in annual capacity = 28 mmbf (LS) -19.6 mmbf (LS) = 8.4 mmbf (LS). This is a 30% decrease.

24 ÷ 35 = 68.6%

68.6% of 24,000 mbf = 16,457 mbf

| | | | | |
|---|---|---|---|---|
| **Exhibit 3** | | Precision Pine's gross profit before Overhead | | |
| | | | | |
| | FYE | | PX 182 | |
| | 3/31/1998 | $974,972 | Ex. | 14a |
| | 3/31/1999 | -$358,139 | | 14b |
| | | $616,833 | | |

EX. 3

**Exhibit 4**

| FYE | total gross profit from breached sales | volume of lumber in mbf (LT) produced | | | |
|---|---|---|---|---|---|
| 3/31/1998 | $382,573 | 2,784.12 | PX 182, EX. 2 at pg. 20 of 22 | | |
| 3/31/1999 | $470,789 | 3,752.37 | PX 182, EX. 2 at pg. 20 of 22 | | |
| | $853,362 | 6,536.49 | | $ 130.55 | of gross profit per mbf of lumber produced |

EX. 4

| **Exhibit 5** | | | | |
|---|---|---|---|---|
| Mill | Annual Production capacity in mbf of lumber | PPFF | number of years that the mill was in operation in FYE 3/31/98 and 3/31/99 | Total production capacity available in mbf (LT) |
| | | | | |
| Heber | 9500 | 11 | 2 | 19000 |
| Eagar | 14500 | 12 | 0.3 | 4350 |
| Winslow | 11000 | 15 | 1.4 | 15400 |
| | | | | 38750 |

EX. 5

| **Exhibit 6** | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Total gross profits actually achieved in FYE 3/31/98 and 3/31/99 from lumber and by-products made out of timber on breached sales | $853,362 | see Ex. 4 | | | |
| 2 | Volume of lumber in mbf (LT) produced in FYE 3/31/98 and 3/31/99 from timber on breached sales | 6,536.49 | see Ex. 4 | | | |
| 3 | Gross profit per mbf (LT) produced | **$130.55** | | | | |
| 4 | Total production capacity available in mbf (LT). Total gross profits actually achieved | | | 38750 | see Ex. 5 | |
| 5 | Gross profit actually achieved divided by total available capacity (i.e., 1 divided by 4) | | | **$22.02** | | |
| 6 | 3 divided by 5 | | | | | 5.928258 |

EX. 6