**IN THE UNITED STATES COURT OF FEDRAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MOTION FOR RELIEF FROM LIMITED ASPECTS OF**
**<u>THE COURT'S ORDER AND OPINION OF SEPTEMBER 19, 2006</u>**

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Washington, D.C. 20006
(202) 452-2140

Dated: October 17, 2006

# TABLE OF CONTENTS


Table of Authorities ........ ii

I. At Times, The Court Misconstrued Aspects Of Precision Pine's Arguments ........ 1

II. Even Though Plaintiff Can Make The Showings Deemed Necessary By The Court, The Court Is In Error When It States That The Burden Of Proof Relevant To An Offset Falls On The Plaintiff ........ 3

A. Precision Pine's Argument ........ 3

B. The Burden Is Properly On The Breaching Party To Show That An Offset Is Required And The Amount Of That Offset ........ 7

Conclusion ........ 18

# TABLE OF AUTHORITIES

**CASES** **PAGE**

Aluminum Distributors, Inc. v. Gulf Aluminum Rolling Mill Co.,
1989 WL 157515 (D. Ill. 1989) ....................8, 10, 16

American Federal Bank, FSB v. United States,
__ Fed. Cl. __, 2006 WL 2524044 (Sept. 1, 2006)....................14

Caroline Hunt Estate v. United States,
65 Fed. Cl. 271 (2005)....................8

Fertico Belgium, S.A. v. Phosphate Chemicals Export Ass'n, Inc.,
70 N.Y.2d 76, 510 N.E.2d 334 (N.Y. 1987)....................12, 13, 14

Fifth Third Bank of Western Ohio v. United States,
402 F.3d 1221 (Fed. Cir. 2005).................... 13-14

Miller v. Robertson,
266 U.S. 245 (1924)....................16

R.E. Davis Chemical Corp. v. Diasonics,
924 F.2d 709 (7th Cir. 1991) ....................10

Trans Ocean Van Serv. v. United States,
426 F.2d 329 (Ct. Cl. 1970)....................8

**MISCELLANEOUS**

Alan I. Saltman, Must Profits Made in Transactions Involving Late-Delivered Goods Be Deduced From the Injured Party's Breach Damages? If Not, What Impact Should Late-Delivered Goods Have?, 78 St. John's L. Rev. 131 (2004)....................11, 18

John Hackley, UCC Section 2-714(1) and The Lost Volume Theory: A New Remedy for Middlemen?, 77 Ky. L. J. 189 (1989)....................15

Roy R. Anderson, Damages for Sellers Under the Code's Profit Formula,
40 S.W. L. J. 1021 (1986)....................11

RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. c (1981)....................14

RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. f (1981) ....................6, 11

White & Summers, UNIFORM COMMERCIAL CODE § 6-3 (4th ed. 1995)....................................9, 11

White & Summers, UNIFORM COMMERCIAL CODE § 7-9 (4th ed. 1995).......................................10

White & Summers, UNIFORM COMMERCIAL CODE § 7-14 (4th ed. 1995).....................................10

WILLISTON ON CONTRACTS § 66:55-56 (4th ed. 2002).................................................................14

In an order issued on September 19, 2006, the Court found that additional briefing from the parties was necessary for it to determine if profits that Precision Pine & Timber, Inc. ("Precision Pine") earned from harvesting the suspended contracts in the post-suspension period should be offset against the lost lumber profits that Precision Pine proved at trial. Based on its inquiry into the law dealing with recovery by lost volume seller, the Court also set forth certain criteria that the Court believed plaintiff needs to establish in order to be compensated as a lost volume seller. The Court further ordered that the parties were to brief whether plaintiff has presented evidence sufficient to show that it satisfies the four criteria.

By separate brief filed this day, without prejudice to the arguments set forth in this motion, Precision Pine has complied with the Court's order. However, for the reasons set forth herein, plaintiff believes that some of the premises on which the Court's order was based are mistaken either in law or in fact or are otherwise not probative. Specifically, plaintiff contends that the order misallocates the burden of proof and elevates the issue of Precision Pine's post-suspension mill capacity to a position it does not deserve in the circumstances of this case. Accordingly, plaintiff seeks relief from the effect of those erroneous premises in the further rulings that the Court has indicated will be issued in response to the parties' supplemental briefing. <u>See</u> Slip op. at 7.

## I. At Times, The Court Misconstrued Aspects Of Precision Pine's Arguments

Although it is not clear what impact, if any, may have resulted, it seems that in several instances the Court misconstrued Precision Pine's arguments. That is, contrary to statements in the Court's opinion:

a. Precision Pine did not argue that:

"Because the suspension prevented plaintiff from making these additional profits, [i.e., profits on lost lumber sales in the post-suspension period] plaintiff argues that it caused plaintiff to lose an opportunity to produce and sell lumber that can never be replaced. Pl.'s Post-Trial Brief at 44" (emphasis added). Slip op. at 40, and

b. The question is not therefore:

"Whether defendant's breach prevented or discouraged plaintiff from entering into additional contracts to purchase timber after the suspensions were lifted." Slip op. at 41.

c. Likewise, Precision Pine never argued that:

"It should not be required to offset post-suspension profits because the suspension foreclosed the opportunity for Precision Pine to purchase and earn profits on additional timber in the post-suspension period." Slip op. at 42.

Rather, Precision Pine's argument remains simply that but for the Forest Service's suspension, during the nearly 20-month period from August 25, 2006 to April 15, 1997, Precision Pine would have harvested and processed 25,000 mbf (LS) more than it did, sold the resulting lumber and by-products and made a profit thereon of $6,551,856.

As demonstrated below, in assessing this argument the burden of proof to establish the necessity and amount of any offset falls on defendant and Precision Pine's post-suspension mill capacity is not relevant to the issue of offset.

## II. Even Though Plaintiff Can Make The Showings Deemed Necessary By The Court, The Court Is In Error When It States That The Burden Of Proof Relevant To An Offset Falls On The Plaintiff

The Court found that plaintiff bears the burden of proof as to whether profits made by it on transactions involving late-delivered goods need to be deducted from damages suffered by it as a result of defendant's breach. Slip op. at 43-45. However, in so concluding, the Court is in error both as to the relevant facts and the applicable law.

### A. Precision Pine's Argument

As noted, plaintiff's position remains that "but for" defendant's breach, during the nearly 20-month period from August 25, 2006 to April 15, 1997, Precision Pine would have harvested and processed 25,000 mbf (LS) more timber than it did, sold the resulting lumber and by-products and made a profit thereon of $6,551,856.[1] (These sales of lumber and by-products are designated herein as "Transaction 1.") Moreover, plaintiff's position is that: because the Forest Service historically was Precision Pine's primary supplier of timber (PPFF 7) and the Forest Service timber sale program came to a halt between August 24, 1995 and December 1996 (PPFF 367), by December 1996 Precision Pine would have virtually exhausted its timber supply during the suspension. PPFF 368. Furthermore, while in this "but-for" world, as of that time Precision Pine would have had little to no timber to harvest, it still would have had three sawmills and substantial financial resources (i.e., the profits from Transaction 1) with which to purchase the timber to supply those mills from the Forest Service which had just resumed selling timber on the four national forests where Precision Pine historically operated. Therefore, but for the

[1] 25,000 mbf (LS) is the volume of timber in the suspended contracts. Plaintiff's Corrected Proposed Finding of Fact filed September 12, 2005 ("PPFF") 21-23.

suspension Precision Pine would have bought a substantial volume of that timber, processed it into lumber and by-products and sold that lumber and by-products. PPFF 369-72. (The sales of lumber and by-products from 25,000 mbf (LS) of such timber that would have taken place in 1997 and 1998 are designated herein as "Transaction 2.") Accordingly, "but for" the breach Precision Pine would have had the profits from both Transaction 1 and Transaction 2.[2]

However, defendant's breach prevented Transaction 1 from happening, i.e., during the suspension Precision Pine was not able to sell lumber from the 25,000 mbf (LS) of timber on the suspended contracts as it had intended and as a result Precision Pine seeks to recover the profits it would have made had Transaction 1 been accomplished. Thus, in the real world, Precision Pine did not, in fact, accomplish Transactions 1 and 2. Rather, Precision Pine not only was prevented from achieving Transaction 1 but it was, in fact, only able to achieve a portion of Transaction 2.

---

[2]The Court correctly restated Precision Pine's argument as follows:

> Plaintiff asserts that but for defendant's breach, Precision Pine would have processed all of the timber on the breached contracts during the period of the suspension and the ensuing winter, and thereafter, would have purchased additional timber from sales offered by the Forest Service in the post-suspension period and would have also earned profits on lumber produced from that subsequently-purchased timber. Pl.'s Post-Trial Response Brief at 8-9. Therefore, plaintiff argues that deducting post-suspension profits would put Precision Pine in a worse position than it would have been in but for defendant's breach. Id. at 9. Absent the breach, according to plaintiff, Precision Pine would have earned profits on lumber produced from the suspended timber sales during the suspension period [i.e., profits from Transaction 1] **in addition** to profits on lumber produced from subsequently purchased timber sales in the post-suspension period [i.e., profits from Transaction 2].

Slip op. at 12-13 (citations omitted, emphasis in original).

Put differently, Precision Pine was able to sell some lumber in the post-suspension period as planned (although that lumber was not produced exclusively from timber purchased in the post-suspension period as Precision Pine would have anticipated; rather, it was manufactured in part from timber from the suspended contracts).[3]

As the RESTATEMENT recognizes:

> "[i]f the injured party could and would have entered into the subsequent contract, even if the [first] contract had not been broken, and could have had the benefit of both, he can be said to have 'lost volume' and the subsequent transaction is not a substitute for the broken contract." RESTATEMENT (SECOND) OF CONTRACTS § 347 comm. f (1981).

Here, even though there was a breach, Precision Pine not only would have, but in fact did, accomplish a portion of Transaction 2. Precision Pine believes that it is therefore improper to deduct any portion of the profit that it actually made on Transaction 2 from the damages that it suffered as a result of not being allowed, due to defendant's breach, to accomplish Transaction 1 because, " but for" the suspension, it would have fully accomplished both transactions.[4]

The Court, citing a series of inapposite authorities, appears to question whether in the actual world, Precision Pine had sufficient mill capacity to process sufficient timber to accomplish both Transaction 1 and Transaction 2 in the post-suspension period. Slip op. at 38-37. However, what the Court may have lost sight of is that, unlike the situation in the cited cases

[3]This fact does not matter because, but for the suspension, timber from the suspended contracts would have been the corpus of Transaction 1 and other timber, i.e., timber from sales purchased in the post-suspension period, would have constituted the corpus of Transaction 2.

[4]Precision Pine could have, but did not, seek the difference between the full profits that it would have made on Transaction 2 in the post-suspension period and the much smaller actual profit that it made by accomplishing only a portion of Transaction 2.

and RESTATEMENT illustration, Precision Pine never intended to perform Transactions 1 and 2 concurrently. Rather, these transactions and the harvesting and processing of the timber leading up to them would have been done consecutively, i.e., Transaction 1 (and the underlying harvesting and processing relating to it) would have taken place in 1995, 1996 and early 1997 whereas Transaction 2 (and the underlying harvesting and processing for it) would have taken place in 1997 and 1998.

By contrast, comment f to § 347 of the RESTATEMENT (SECOND) OF CONTRACTS, each of the cases and the illustration cited by the Court involve situations where defendant permanently ceased performance of the contract and plaintiffs asserted that "but for" defendant's breach, during the original term of the breached contract, they would not only have performed the contract with defendants (from which profit would have resulted either directly or in a subsequent transaction such as a resale) but also simultaneously performed an additional contract from which an additional profit would have resulted either directly or indirectly. As logic would dictate, the courts and commentators have suggested that in such circumstances plaintiffs need to show that they had the capacity to perform both contracts at the same time.

However, here Precision Pine's profitable transactions would have been accomplished in two different time periods and, therefore, capacity to accomplish both Transaction 1 and Transaction 2 at the same time is not an issue. Rather, Precision Pine need only establish that it was deprived of the opportunity to accomplish Transaction 1 by defendant's breach and that in the actual world Transaction 2 was either equally or less profitable than it would have been in the "but for" world. By doing so, Precision Pine will have established that it was damaged by the

breach in an amount at least equal to the profits anticipated from Transaction 1. Such being the case, the lost volume seller model may be of less utility here than simply applying the traditional goal of breach of contract damages, i.e., to restore plaintiff to the position it would have been in if defendant had performed as expected.

**B. The Burden Is Properly On The Breaching Party To Show That An Offset Is Required And The Amount Of That Offset**

The Court found that the burden is on Precision Pine to show that the profits on Transaction 2 in the post-suspension period should not be offset against the profits that Precision Pine lost by not being able to make Transaction 1 during the suspension period because:

1. "[D]efendant is not endeavoring to prove that plaintiff received an unexpected benefit or windfall as result of the breach." Slip op. at 44.

2. The conclusion reached by Professors White and Summers that the burden of proof is properly on the breaching party was made in the context of a case relating to cover damages not lost profits. Id.

3. During the suspension, there was a significant restriction on the supply of timber available in Arizona. Id.

The Court is, however, factually in error on point 1 and legally incorrect with regard to its conclusion on point 2. Moreover, because of the availability of substantial qualities of timber in the immediate post-suspension period, point 3 is not probative in this case.

As to point 1, contrary to the Court's statement, defendant is asserting that absent an offset of post-suspension profits Precision Pine will receive a windfall. For example, during closing argument, counsel for defendant specifically stated that "awarding lost profits, without taking into account the fact that profits were actually earned on a contract, confers just the sort of windfall that is not available under Bluebonnet and many other cases." Tr. (Feb. 17, 2006) at 139 (emphasis added). Moreover, as the Court observed, "defendant asserts that if Precision Pine's damage claims are not reduced by its post-suspension profits, Precision Pine would be compensated twice for lost profits on the same timber contracts – once when it earned profits from harvesting and processing the timber, and once again through damages in this action. [D's Post-Trial Brief at 15-16]." Slip op. at 13 (emphasis added). Since defendant does, in fact, seek to offset post-suspension profits from the damages proven by plaintiff, under the rationale of a case cited by the Court: "The burden [is] on the government to prove the amount of the claimed offset." Caroline Hunt Estate v. United States, 65 Fed. Cl. 271, 315 (2005), quoting Trans Ocean Van Serv. v. United States, 426 F.2d 329 (Ct. Cl. 1970).[5]

This point is further supported by Aluminum Distributors, Inc. v. Gulf Aluminum Rolling Mill Co., 1989 WL 157515 (D. Ill. 1989), where the argument that profits made on transactions involving late-delivered goods should be offset from breach damages was made in the form of a counterclaim filed by the breaching party upon which, of course, it had the burden of proof.

[5]This is certainly true with regard to any benefit that may have been conferred on Precision Pine because of the suspension and Precision Pine's concomitant delayed receipt of the timber on the contracts. To the extent that such a special benefit may have existed and could be offset, defendant was obliged to present evidence of it at trial. It did not and, therefore, no offset on this basis is appropriate. In any event, Precision Pine does not believe that any such special benefit was conferred on it.

As to point 2, there is no ground for the Court to reject the statement of Professors White and Summers on the matter of the burden of proof based on a non-existent distinction between "cover" cases and those cases in which cover could not be accomplished. As the Court noted, Professors White and Summers state that in the case of subsequent profits made on late-delivered goods:

> [W]e believe it should be the responsibility of the defendant (who seeks to reduce the plaintiff's damages) to show that it is more probable than not that the plaintiff would *not* have had both sales, would not have enjoyed the second resale profit, and thus that the second resale profit (as a child of the breach) should be used to reduce the plaintiff's recovery.

Slip op. at 43, quoting White & Summers, UNIFORM COMMERCIAL CODE § 6-3 at 298 (4th ed. 1995) (emphasis in original).

In rejecting the Professors' judgment as to where the burden of proof lies, the Court stated that:

> Plaintiff failed to recognize that this excerpt relates to a discussion of a buyer's right to cover damages pursuant to U.C.C. § 2-712. Specifically, Professors White and Summers are discussing Fertico Belgium, S.A. v. Phosphate Chemicals Export Ass'n, Inc., 510 N.E.2d 334 (N.Y. 1987). . . .

Id. The Court, however, apparently failed to recognize that: (1) the same formulation of the burden of proof set out in § 6-3 is reiterated in sections of the White & Summers treatise that do not deal with cover; and (2) there is no relevant legal distinction between the situation where the non-breaching party was able to cover (and thus is entitled to the increased cost of cover), and the situation here, where the non-breaching party is unable to cover and thus is entitled to damages measured by the profits lost because of the breach.

As to the first point, Professors White and Summers explain that the burden of proof essentially lies with the breaching party:

> "Because we are persuaded that lost profits under 2-708(2) is the proper and best measure of damages in the large majority of cases, we would demand only that the plaintiff prove its basic case under 2-708(2). If the defendant is then able to prove that the lost profits are overstated . . . because a sale was made that would not have been made because of the breach then the damages should be reduced accordingly.

White & Summers, UNIFORM COMMERCIAL CODE § 7-14 at 406 (4th ed. 1995) (emphasis added).[6]

As the Court noted, in the traditional lost volume seller situation White & Summers (with some modification) agree with the tests laid out by the Seventh Circuit in R.E. Davis Chemical Corp. v. Diasonics, 924 F.2d 709 (7th Cir. 1991). See slip op. at 46. This is, however, not true in situations which simply involve a plaintiff's seeking damages for the late delivery of goods where he also made a profit on subsequent transactions involving those late-delivered goods. In such circumstances, if the plaintiff demonstrates that he is a regular dealer in such goods then he need only make a showing that he had the means and intention to perform both the initial transaction and the subsequent one (which by happenstance involved the late-delivered goods), i.e., the "could have and would" have showing suggested by White & Summers in § 7-9 at 386

---

[6]As Section 2-714(1) demonstrates, the remedy outlined in Section 2-708(2) is not exclusive to non-breaching sellers because where, as here, a non-breaching buyer has accepted non-conforming (i.e., late-delivered) goods, the buyer may recover damages for the non-conformity as determined in a reasonable manner. See Aluminum Distributors, Inc. v. Gulf Aluminum Rolling Mill Co., 1989 WL 157515 at *5.

and the RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. f.[7] Once this "could have and would" showing is made by a regular dealer, the burden shifts to the defendant to prove that but for the late delivery the plaintiff would not have had the profits from the second transaction and thus that the profits from the late-delivered goods should be setoff from the damages that the plaintiff seeks.[8] This view is shared by other commentators. See, e.g., Roy R. Anderson, Damages for Sellers Under the Code's Profit Formula, 40 SW. L. J. 1021, 1060 (1986).[9] See also RESTATEMENT § 347 cmt. f.

In this light, even if plaintiff had the initial obligation to make a showing that but for the suspension it could have and would have harvested and milled the timber on the breached sales between August 1995 and April 1997 and sold the resulting lumber and by-products (i.e.,

---

[7]See also Alan I. Saltman, Must Profits Made in Transactions Involving Late-Delivered Goods Be Deducted From the Injured Party's Breach Damages? If Not, What Impact Should Late-Delivered Goods Have?, 78 St. John's L. Rev. 131, 147-48 (2004) [hereinafter "Article"]. Here, Precision Pine has made such a showing. See discussion infra.

[8]Article, citing White & Summers § 6-3 at 298.

[9]Professor Anderson states:

> Although the ultimate burden must rest on the [non-breaching party], once the [non-breaching party] has made a basic showing of lost volume status, the burden of going forward with the evidence should fall upon the [] defendant. Indeed, the Restatement (Second) of Contracts supports this reasoning by placing the burden on the [defendant] of showing that the [non-breaching party] was not left at lost volume by the breach once the [non-breaching party] has made an initial showing of lost volume status. (Restatement (Second) of Contracts § 347, comment f, illustration 16, § 350 comment d (1982)). . . . The [defendant] may, of course, effectively counter evidence of the [non-breaching party's] lost volume status if the [defendant] can show either that the breach enabled the [non-breaching party] to make a resale that otherwise could not have been made, or that the [non-breaching party] unreasonably failed to mitigate damages by making such a sale.

Id.

engaged in Transaction 1) (PX 131) and that, thereafter, it could and would have purchased a substantial quantity of additional timber in late 1996 and 1997 from which it would have manufactured and sold lumber and by-products in 1997 and 1998 (i.e., engaged in Transaction 2) (PPFF 369-72), Precision Pine has done so. With these showings, plaintiff has, in the parlance of the Professors, established its "basic case" and the burden thus shifts to defendant to show that it is more probable than not that, in the "but for" world, Precision Pine would not have accomplished both Transaction 1 and Transaction 2. Aside from its assertion that Precision Pine could not have harvested the breached contracts between August 25, 1995 and December 6, 1996 due to the existence of roundwood on them, or the existence of fire closures at various times,[10] defendant makes no argument (other than that Mr. Porter cannot identify exactly which sales in the "but for" world Precision Pine would have purchased of the more than 93 mmbf of sawtimber offered by the Forest Service) as to why Precision Pine could not have done as it demonstrated that it would have.

Moreover, the Court's rejection of Fertico Belgium, S.A. v. Phosphate Chemicals Export Ass'n, Inc., 70 N.Y.2d 76, 510 N.E.2d 334 (N.Y. 1987), in assessing who bears the burden of proof in late-delivered goods cases is also incorrect. That is, the fact that Fertico involved a non-breaching party who was able to obtain cover after the defendant suspended performance does not mean that the case is inapplicable here. In fact, since Precision Pine could not obtain cover, in the instant case it is much easier to see the hole in plaintiff's raw material supply/lumber

[10]As documented in detail in plaintiff's post-trial briefing, none of these asserted impediments would, however, have prevented Precision Pine from harvesting and milling the timber on the breached contracts as planned and selling the resulting lumber, i.e., accomplishing Transaction 1.

production pipeline created by defendant's breach and that plaintiff therefore actually lost volume as a result of that hole which was not made up by harvesting the timber at a later time (i.e., it would have harvested that volume if not more at the time in the normal course of things). Unlike the situation in Fertico, during the period of the suspension and ensuing winter Precision Pine was unable to engage in Transaction 1 because of the breach and the lack of cover. Therefore, Precision Pine did not receive any of the profit that it anticipated with respect to Transaction 1. In comparison, Fertico, because it acquired replacement goods on the open market, albeit at a price higher than that set forth in the breached contract with Phoschem, was able to complete its Transaction 1, i.e. the sale of the fertilizer to Altaweed. Of course, due to the increased cost of cover, it made less profit on its Transaction 1 than it anticipated.

Not surprisingly, upon Fertico's receipt of damages equal to the increased cost of acquiring the raw materials to complete Transaction 1, the actual amount that Fertico made on Transaction 1 was exactly equal to the profit that it had anticipated. Indeed, reimbursement of any increased cost of cover experienced by a non-breaching business is simply another way of compensating it for the reduced profits that it suffered as a result of the breach and is legally indistinguishable (except in amount) from damages for the full amount of profits that a non-covering business would lose by being denied the opportunity to complete Transaction 1. As the Federal Circuit has held: "Cover damages are thus a form of expectancy damages, restoring the plaintiff to the position it would have been in but for the breach by replacing, or covering, the value of an asset taken away by the breach." Fifth Third Bank of Western Ohio v. United States,

402 F.3d 1221, 1237 (Fed. Cir. 2005) (emphasis added).[11] Likewise, in American Federal Bank, FSB v. United States, __ Fed. Cl. __, 2006 WL 2524044 (Sept. 1, 2006), the Court of Federal Claims ruled that expectancy damages generally are equated with lost profits, but may also include other losses incurred by the breach of contract, including costs (such as cover) incurred in a reasonable effort, whether successful or not, to avoid loss. Citing RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. c (1981); and WILLISTON ON CONTRACTS § 66:55-56 at 664-77 (4th ed. 2002). Thus, the only distinction between the situation in Fertico and Precision Pine's situation is the degree to which the non-breaching party failed to achieve the profit that it anticipated from Transaction 1 (profits on the resale of the goods it contracted for with defendant as anticipated and without any breach). This mere difference in degree certainly does not warrant a transfer of the burden of proof to Precision Pine and, in fact, further supports Precision Pine's view that the burden now rests with defendant.[12]

The Court cites several cases to support its conclusion that a plaintiff bears the burden of demonstrating that it should be compensated as a lost volume seller. Slip op. at 45-47. However, each of those cases involved: (1) a defendant that was a breaching buyer who sought to offset profits that the plaintiff had made on another contract that was separate from the breached contract, and (2) an assertion by the plaintiff that even if there had been no breach he

[11] As can be seen graphically in Ex. 1 hereto, by having to pay a higher cost for raw materials, a covering plaintiff suffered a loss of some anticipated profit, i.e., an amount equal to the increased cost of securing cover.

[12] The instant situation is just like that in Fertico in another important respect, i.e., in both instances, the breaching party has sought to offset profits made on transactions directly involving the late-delivered goods (rather sought to offset profits made on transactions involving unrelated goods) from the damages suffered by the non-breaching party as was the case in each of the cases cited by the Court.

would have been able to simultaneously perform both contracts. As the Court recognized, however, neither condition applies here as the instant case does not involve a traditional lost volume seller situation, but rather merely involves the application of a lost volume-type analysis combined with buyer's traditional remedies as an applied to a dealer engaged in the ongoing business of manufacture and resale.[13]

As the Court notes, traditional lost volume cases involve a seller who loses volume when the buyer breaches and the seller resells the item in question to another buyer who would have bought the item from the seller even if there had been no breach of the original contract. Slip op. at 46. As has been recognized:

> "There are implicit conditions within [the traditional lost volume seller situation]: (1) the seller would have sought an additional sale absent the breach, (2) the seller would have made an additional sale absent the breach, and (3) the seller had the capacity to make the additional sale.

John Hackley, UCC Section 2-714(1) And The Lost Volume Theory: A New Remedy For Middlemen?, 77 Ky. L. J. 189, 192-3 (1989).

There are, however, situations, such as the present one that involve a seller's breach and resulting damages to a regular dealer involved in resale where there is no express need to apply a lost volume theory to determine the plaintiff's damages; rather, a court can simply look to cases involving lost profits of a non-breaching buyer. Id. at 192. On the other hand, some courts have allowed middleman-buyers (i.e., re-sellers) to recover lost profits in cases that are "roughly analogous to the lost-volume seller cases." Id. at 201. These cases include situations where the

[13] As such, the instant situation falls into a very unique and limited set of cases, where, in contrast to cases such as those cited by the Court, a seller is the aggrieved party.

plaintiff seeking damages for the late delivery of goods also made a profit on a subsequent transaction involving those late-delivered goods. In those cases, all that plaintiff has been required to show is that, notwithstanding the breach, it could have obtained comparable raw materials with which to make the subsequent transaction that it did make with the late-delivered goods. Aluminum Distributors, 1989 WL 157515 at *5; see Miller v. Robertson, 266 U.S. 245 (1924). In the parlance of Professors White and Summers, where the plaintiff is a regular dealer in the goods and had the means and intention to perform both the initial transaction and the subsequent one, no setoff is appropriate unless that defendant can show that "but for the suspension the plaintiff would not have been able to enter the second transaction." See discussion supra.

Lastly, as to point 3, the Court is also in error in placing the burden of proof on plaintiff due to alleged lack of timber in the area during the suspension. Although the Court is correct that the volume of timber being put up for sale by the Forest Service had declined in the 1980's and 1990's (slip op. at 45), the Court failed to take into account that during this period the number of potential purchasers (and the total industry mill capacity) had also greatly diminished.[14]

---

[14]As Mr. Porter testified, at the same time that the volume of Forest Service timber being offered was putatively declining, so too was the total sawmill capacity of Precision Pine's competitors for Forest Service timber sales. Tr. 103-09 (Porter). Indeed, from the late-1980's until the suspension occurred, some 47 million feet (mmbf) of sawmill capacity that had competed with Precision Pine for Forest Service timber in Northern Arizona had been shut down. Id. at 109. In fact, at the time of the suspension, there were only two other sawmills that remained in competition with Precision Pine, the Reidhead sawmill in Nutrioso (near Eager) and the Stone sawmill in Eagar (Tr. 102-03 (Porter)), both of which were proximate to the Apache-Sitgreaves National Forest (see PX 104, Map of Arizona showing relative positions of Eager, Nutrioso and the Apache-Sitgreaves National Forest). As a result, there was effectively no

More importantly, although the Court appears to suggest that timber was in short supply continuously and therefore that Precision Pine never would have accomplished Transaction 2 (slip op. at 44-45), the facts are otherwise. Although Precision Pine agrees that during the suspension the Forest Service's sale program was halted and thus that cover was not available, from December 6, 1996 through December 31, 1997 alone, the four forests on which Precision Pine historically operated offered a total of 56,872 mbf (LS) of sawlogs, PX 370, and sold an additional 36,440 mbf (LS) of sawlogs in 1998. Id.[15] Moreover, as was proven at trial: (a) if the distance between a timber sale and a prospective purchaser's mills is too great, the resulting hauling costs can be prohibitive (see slip op. at 30); (b) if a timber sale is not located near the purchaser's sawmills, the resulting hauling costs can preclude the sale from being profitable (slip op. at 34); and (c) Precision Pine had mills located nearer the four forests on which it historically operated than any other company. See note 14 supra. These facts demonstrate that in the post-suspension period not only that a substantial volume of timber was, in fact, available but that

---

competition for Forest Service timber sales for Precision Pine's sawmills in Heber or Winslow, which drew their source of supply primarily from the Tonto, the Coconino and the Kaibab National Forests. PPFF 10-12; Tr. 88-89, 103 (Porter); PX 104. As Dr. Neuberger, defendant's expert, correctly conceded: (1) there had been a "dramatic" reduction in sawmill capacity competing with Precision Pine for Forest Service timber sales; (2) given the location of the remaining competitors, Precision Pine may have been well-situated to obtain Forest Service timber sales offered on the Coconino, Tonto, Kaibab and the western half of the Apache-Sitgreaves National Forests; and, most importantly, (3) Precision Pine was well-positioned to cut the timber it had under contract at the time of the suspension. Tr. 3448-49 (Neuberger); see PPFF 10-13. Simply put, the alleged decline in the volume of Forest Service timber sale offerings and lumber production as whole in Arizona would not have changed the fact that, absent the suspension, Precision Pine would have harvested all of the timber on the breached sales that it had under contract to supply its three sawmills and sold the resulting lumber at profit, just as it always had done prior to the suspension.

[15]In toto in just over two years, between December 6, 1996 and December 31, 1998, these forests sold 93,312 mbf (LS) of sawlogs – enough timber in and of itself to supply three mills at full capacity for nearly 3.5 years.

Precision Pine had relatively little competition for that timber and a substantial competitive advantage over those few competitors that did exist.[16]

The Court cites approvingly the proposition that "Unless raw materials at commercially reasonable prices are nearly impossible to obtain from any source or sources at any time during the period between the supplier's breach and its belated performance, the task of the breaching supplier is to demonstrate that it is more reasonable than not that the manufacturer could not have produced as much without the supplier's late delivery." Slip op. at 45 (emphasis in original).[17] Here, evidence at trial showed that substantial quantities of raw material did become available prior to the belated performance of the suspended sales. On that basis alone, the "extremely difficult task" of showing "by a preponderance of the evidence that had [defendant] not breached, the non-breaching party would not have produced as much finished product as it did in the subsequent period when late delivery was made" should fall on defendant.[18]

**Conclusion**

For the reasons set forth herein, plaintiff has demonstrated that the Court has elevated the issue of Precision Pine's post-suspension mill capacity to a position it does not merit in the

[16]Indeed, given the availability of Forest Service timber again after December 1996, plus the availability of some timber from the State of Arizona and the Hualapai tribe (Tr. 664 (Porter)), in the absence of the suspension, it would not have been difficult for Precision Pine to have purchased 25,000 mbf (LS) of sawlogs (a volume equal to that which remained on the 11 breached sales) between December of 1996 and the spring of 1998. PPFF 371

[17]See Article at 154.

[18]Id.

circumstances and that the burden of proof in this case properly falls on defendant to show that an offset is required and the amount of that offset.

Respectfully submitted,

s/Alan I. Saltman

SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: October 17, 2006

# Effect of Cover on Non-Breaching Party's Profits




EX. 1