# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S SUPPLEMENTAL POST-TRIAL BRIEF

On September 19, 2006, the Court ordered supplemental briefing limited to whether plaintiff, Precision Pine & Timber, Inc. ("Precision Pine"), "has presented sufficient evidence to establish that it satisfies the four criteria that the Court has identified as necessary to prove that [Precision Pine] is entitled to be compensated as a lost volume seller." Precision Pine & Timber, Inc. v. United States, 72 Fed. Cl. 460, 498-99 (2006). Pursuant to the Court's order, the United States submits this response to Precision Pine's supplemental post-trial brief.[1]

## ARGUMENT

### I. Precision Pine's First Argument Regarding An Alleged "Offset" Is Untimely, Unauthorized, And Has Already Been Rejected By The Court

Precision Pine opens its supplemental brief with an section arguing that the Court should disregard profits derived from timber harvested pursuant to its once-suspended Forest Service contracts. See Pl.'s Supp. Post-Trial Br. at 1-8 (docket no. 430). The Court's September 19, 2006, order does not request or authorize such briefing. Precision Pine, 72 Fed. Cl. at 497-99.

[1] Precision Pine captioned its supplemental post-trial brief "Plaintiff's Initial Brief As To Whether It Is Entitled To Be Compensated Without An Offset Of Post-Suspension Profits." In this response, the United States cites Precision Pine's supplemental brief as "Pl.'s Supp. Post-Trial Br. at __."

Indeed, at Precision Pine's request, the Court held a status conference to clarify its order. The parties were directed to identify factual evidence "admitted at trial that addressed the four points that the Court has identified in its opinion." See Tr. at 17-18 (Oct. 3, 2006). By raising new a legal argument in its supplemental brief,[2] Precision Pine has ignored both plain language of the Court's order and the Court's subsequent instructions. This is yet another instance of Precision Pine's disregard of Court orders. See, e.g., Order at 1 (Nov. 18, 2005) (docket no. 400) (striking docket entry 398 because it was not authorized by the Court's order on post-trial briefing); id. (allowing the United States to file a reply brief because, contrary to Court rules, Precision Pine used an 11 point font to evade the Court-ordered page limit); Order at 12-13 (Jan. 30, 2004) (docket no. 215) (granting monetary sanctions because of Precision Pine's failure to provide Court-ordered discovery). Because Precision Pine has failed to comply with the Court's order, as clarified, the Court should strike the first section of Precision Pine's supplemental post-trial brief.

Precision Pine's argument is in any event without merit and has already been rejected by the Court. The proper focus in an action for breach of contract is the loss resulting directly from non-performance of the contract itself. E.g., Southern California Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1334 (Fed. Cir. 2005) ("Expectation damages give the non-breaching party the benefit of his bargain by putting him in as good a position as he would have been in had the contract been performed.") (emphasis added); see also Myerle v. United States, 33 Ct. Cl. 1, 27 (1897) ("there must appear no intervening incident . . . to complicate or

---

[2] Precision Pine chose not to raise this argument, which is different than its "lost volume seller" claim, in its September 2005 post-trial brief. Coming over a year after post-trial briefs were due, Precision Pine's new argument is untimely. See Order at 1 (June 21, 2005).

confuse the certainty of the result between the cause and the damage"); Precision Pine & Timber, Inc. v. United States, 64 Fed. Cl. 165, 166 (2005) (damages must result "directly and primarily" from "the breach"). In this action, the contracts at issue were merely suspended. This allegedly delayed Precision Pine's harvesting of trees and, as a result, the manufacture of lumber from those trees. Precision Pine was free to log the sales once the suspensions were lifted and did in fact cut trees on many contracts. Accordingly, the Court ruled that unless Precision Pine prevails upon its "lost volume seller" claim, any profits from the once-suspended contracts must be taken into account in assessing damages. Precision Pine, 72 Fed. Cl. at 487-88 (describing damages as "the difference between the profits that plaintiff would have earned but for the suspensions and the profits that plaintiff earned in the post-suspension period").

Precision Pine has, of course, alleged that but for the MSO suspensions it would have entered into additional timber sale contracts from which it would have earned additional lumber profits.[3] Precision Pine's supposed inability to profit from additional contracts that it allegedly would have entered into but for the MSO suspensions might conceivably be claimed as consequential damages. It is well-established, however, that such consequential losses are unrecoverable as a matter of law. E.g., Olin Jones Sand Co. v. United States, 225 Ct. Cl. 741, 743-44 (1980) (damages based upon future contracts are "too remote and speculative to be recoverable" even when Government's breach allegedly caused contractor to be unable to obtain such contracts).

---

[3] As explained in our supplemental brief and below, the evidence admitted at trial does not support this claim. See Def.'s Supp. Post-Trial Br. at 1-6 (docket no. 429).

## II. Precision Pine Has Failed To Establish That It Is A "Lost Volume Seller"

In August 2003, Precision Pine admitted that it "did not forego bidding on Government timber sale contracts or forego other opportunities to acquire additional timber for its mills as a result of" the MSO suspensions. PX780. Two weeks before trial, over the United States' objection, the Court allowed Precision Pine to withdraw this admission. Order at 1 (Apr. 29, 2005) (docket no. 339). As a result, Precision Pine was free to present evidence that it would have entered into additional timber sale contracts in 1997 and 1998 but for the MSO suspensions, and that it would have earned profits through those additional contracts. At trial, however, Precision Pine offered no direct evidence that it would have bid on and been awarded any additional timber sale contracts but for the MSO suspensions, much less that it would have profitably manufactured and sold lumber derived from these phantom contracts. As a result, under the four-part test enunciated by the Court, Precision Pine does not qualify as a lost volume seller. See Precision Pine, 72 Fed. Cl. at 497.

### A. Precision Pine Did Not Prove That, But For The MSO Suspensions, It Would Have Bid On And Been Awarded Additional Timber Sale Contracts In The Post-Suspension Period

In its supplemental brief, Precision Pine identifies no testimony establishing that the company would have bid on and been awarded additional timber sale contracts but for the MSO suspensions. Pl.'s Supp. Post-Trial Br. at 14-15. Precision Pine's two principal officers – company president Lorin Porter and company vice president Lewis Tenney – testified at trial. Mr. Porter was unable to identify any instance where Precision Pine chose to forego bidding for a timber sale as a result of the MSO suspensions. Tr. 1289 (Porter). Furthermore, neither Mr. Porter nor Mr. Tenney testified that the company changed its bidding practices or lacked the

financial wherewithal to compete for additional timber sales in the post-suspension period. To the contrary, Precision Pine bid upon contracts offered by the Forest Service, Indian tribes and the State of Arizona in 1997 and 1998. See Tr. 671-77, 1089 (Porter). Precision Pine was the high bidder for some of these timber sales; it was outbid by competitors for other sales. Id.; see also Tr. 1278 (Porter) (testifying that timber sales were always competitive). Nor did the company lack the incentive to bid as the volume of timber the company had under contract had declined by 50 percent during the 1990's and remained low in December 1996. Def.'s PFUF ¶¶ 28-36; DX559 (showing timber under contract declining from 51,571 mbf (l.s.) in 1992 to 34,288 mbf (l.s.) in December 1995). There simply is no evidentiary basis to conclude that Precision Pine chose to forego opportunities to compete for any timber sale contract that it expected to be profitable.

Despite this lack of evidence, Precision Pine asks the Court to assume that it would have bid on additional timber sale contracts. Precision Pine simply argues that the company would have had an incentive to bid on timber sale contracts after December 1996 in the hypothetical "but for" (i.e., no suspension) world.[4] See Pl.'s Supp. Post-Trial Br. at 15. Precision Pine fails to offer evidence that it did not have the very same incentive in the actual, post-suspension

---

[4] Precision Pine's argument starts from a false premise, namely, that but for the MSO suspensions, the company would have cut and used all timber that it had under contract, and all timber that it would have been able to acquire between August 1995 and December 1996. Pl.'s Supp. Post-Trial Br. at 14. As we have previously explained, Precision Pine left uncut literally millions of board feet of timber that were available during the suspension period. Def.'s Post-Trial Response Br. at 51-52 (citing DX552); see also Def.'s PFUF ¶¶ 41-42, 137, 206, 303. Furthermore, Precision Pine let most of the timber upon its Forest Service contracts go uncut after the suspensions were lifted. Def.'s PFUF ¶ 82; DX832. Indeed, Precision Pine never cut any timber upon the Monument, Saginaw-Kennedy and Salt contracts – contracts that were ultimately terminated for default by the Forest Service. Tr. 1063-64 (Porter).

environment – an environment when the company was in fact bidding on timber sale contracts that were expected to generate a profit. Precision Pine's argument provides no basis to conclude that the company would have bid on any additional timber sales, i.e., sales above and beyond those it actually bid on in 1997 and 1998.

Precision Pine has also failed to establish that it would have been awarded additional timber sale contracts but for the MSO suspensions. Timber sale contracts are awarded to the high bidder. First Joint Stip. ¶ 10; Tr. 1286 (Porter). While Precision Pine was the high bidder for some timber sales, it was outbid for others. And while Precision Pine might have been in a better financial position if the MSO suspensions had not occurred, so too would Precision Pine's competitors, who were likewise affected by the region-wide suspensions. Given that bidding for timber was competitive at all times, e.g., Tr. 1278 (Porter), it would be sheer speculation to conclude that Precision Pine – as opposed to some other bidder – would have been the high bidder for unidentified timber contracts but for the MSO suspensions.

**B. Precision Pine Did Not Prove That, But For The MSO Suspensions, It Would Have Been Operating Its Mills At Full Capacity After December 1996**

In its supplemental brief, Precision Pine makes two related arguments regarding its sawmill capacity in the post-suspension period, i.e., after December 1996. First, Precision Pine asserts that in the "but for" (i.e., no suspension) world, it would have operated its sawmills at their putative capacity. Pl.'s Supp. Post-Trial Br. at 15-16. Second, Precision Pine asserts that in the actual post-suspension environment, it had insufficient capacity to mill its timber under contract and additional volumes of timber being sold by the Forest Service. Id. at 12-13 (discussing its "hole in the profits pipeline" theory). Neither assertion is supported by the trial

record. Consequently, Precision Pine is not a "lost volume seller." See Precision Pine, 72 Fed. Cl. at 497.

As explained above, Precision Pine has not established that it would have bid on and been awarded additional timber sale contracts but for the MSO suspensions. Consequently, Precision Pine has not established that it would have had a sufficient volume of timber under contract to operate its sawmills at capacity after December 1996. In its supplemental brief, Precision Pine states that but for the MSO suspensions, it "would have harvested all of the timber that it had under contract on August 25, 1995 and all of the timber it was actually able to acquire" through December 1996. Pl.'s Supp. Post-Trial Br. at 14-15. If so, Precision Pine would have had no timber under contract, and would have needed to purchase enough timber to produce 35 million board feet of lumber in 1997, another 35 million board feet in 1998, and another 35 million board feet in 1999. Precision Pine had been unable to purchase enough timber to maintain a steady inventory of timber even when it was operating its sawmills at less than capacity in the early 1990's. Def.'s PFUF ¶¶ 28-36; DX559. Indeed, tacitly acknowledging that it was unable to obtain the necessary timber, Precision Pine attempts to lower the bar.[5] See id. at 12 (factoring in its business decision to close the Eagar sawmill in July 1997 and stating that it would, therefore, need only 16.4 million mbf per year); see also id at 15 ("taking into account" the shutdown of Eagar in July 1997 and the Winslow mill fire in September 1998 to reduce needed timber volumes). The evidence presented at trial does not establish that Precision Pine would have bid on and been awarded any particular volume of

---

[5] The Eagar sawmill was opened in February 1997 after the MSO suspensions had ended. Def.'s PFUF ¶¶ 88-89.

timber, much less the unprecedented volumes needed to operate its mills at their supposed 35 million board feet capacity.

Precision Pine also failed to present factual support for its "hole in the profit pipeline" theory. Despite having timber under contract, and mills in which to process it, Precision Pine's mills did not operate at their supposed 35 million board feet capacity in either 1997 or 1998. E.g., Tr. 1074, 1080-82, 1263 (Porter). In fact, Precision Pine produced only 8.3 million board feet of lumber from April 1997 to March 1998 (FYE1998), and only 6.5 million board feet from April 1998 to March 1999 (FYE1999). PX182 (exhibit 8). Thus, in the first year after the MSO suspensions, Precision Pine's mills produced only 24 percent of their alleged single-shift capacity, and in the second year after the MSO suspensions, only 19 percent of their alleged single-shift capacity. Id. Precision Pine chose not to harvest and mill timber that it had under contract in 1997 and 1998 for "business reasons." DX800. While Precision Pine was free to defer harvesting of its existing timber supplies, this business decision freed up capacity at the company's sawmills to manufacture lumber from "additional" timber sale contracts. In other words, in the post-suspension period, Precision Pine had ample mill capacity to process timber from any additional contracts that it bid on and was awarded. It is not, therefore, a "lost volume seller."

### C. Precision Pine Did Not Prove That, But For The MSO Suspensions, It Would Have Sold At A Profit Lumber Manufactured From Any Additional Timber Sales That It Would Have Bid On And Been Awarded

In addition to failing to establish the first two requirements for qualifying as a lost volume seller, Precision Pine cites no evidence establishing the profitability of any additional timber sale contract that it would have bid on and been awarded in the post-suspension period

but for the MSO suspensions. As explained in our supplemental post-trial brief, the record contains no evidence about the identity of any additional contracts, the size, quality and quantity of timber available from such contracts, the amount Precision Pine would have been willing to bid to obtain additional timber, or the price at which any additional timber sale contract would have been awarded. Def.'s Supp. Post-Trial Br. at 5. Without such evidence, no meaningful analysis of profitability can be performed.

Precision Pine nevertheless claims that it could have obtained unidentified, additional timber sale contracts "at or near the minimum acceptable bid price." Pl.'s Supp. Post-Trial Br. at 16. Precision Pine bases its argument upon the supposed "absence of substantial competition" – an assertion directly contradicted at trial by Precision Pine's own president. Tr. 1278 (Porter) ("it has always been a competitive market for timber in Arizona").

Having failed to prove that it would have manufactured lumber at a profit from any additional timber sale contracts that the company would have bid on and been awarded in the post-suspension period, Precision Pine does not qualify as a "lost volume seller." Precision Pine, 72 Fed. Cl. at 497.

### D. Precision Pine Did Not Prove That It Would Have Earned Greater Profits From Additional Timber Sales That It Would Have Been Awarded In The Post-Suspension Period But For The MSO Suspensions Than Were Actually Earned By Harvesting The Suspended Sales In The Post-Suspension Period

Precision Pine offered no evidence regarding the profitability of any additional timber sale contracts that the company allegedly would have been awarded in the post-suspension period but for the MSO suspensions. Consequently, there is no way to compare any profits earned as a result of such contracts with the profits actually earned by Precision Pine by

manufacturing and selling lumber derived from timber from contracts that were subject to the MSO suspensions.

This is confirmed by the discussion in Precision Pine's supplemental brief, which contains not a single cite to evidence admitted at trial. Pl.'s Supp. Post-Trial Br. at 18-19. Lacking evidence, Precision Pine asks the Court to simply "infer" that it is more likely than not that Precision Pine would have earned greater profits though "additional contracts" than through the suspended timber sale contracts. Id. at 18. The Court is not free to make findings that are unsupported by evidence at trial. Because Precision Pine bears the burden of proof, the Court should rule that Precision Pine has failed to establish that it qualifies as a lost volume seller. See Precision Pine, 72 Fed. Cl. at 496.

## III. Plaintiff's Exhibits 28-30 Are Unclear And Uninformative

The Court directed Precision Pine to "explain how PX 28, 29, and 30 relate to whether, but for the suspensions, plaintiff would have operated its mills at full capacity in the post-suspension period." Precision Pine, 72 Fed. Cl. at 498. Precision Pine, however, failed to elicit any testimony explaining these exhibits at trial. See Tr. 950-52 (Porter). Consequently, Precision Pine can offer no additional evidence about the meaning or import of these trial exhibits. See Estee Lauder, Inc. v. L'oreal S.A., 129 F.3d 588, 595 (Fed. Cir. 1997) ("arguments of counsel cannot take the place of evidence lacking in the record").

Plaintiff's exhibits 28, 29 and 30 contain several tables, provide seemingly contradictory numbers, and are far from self-explanatory. The "sawmill production" table on these exhibits may refer, for instance, to rough cut lumber that had not yet been planed and graded and, therefore, would not be indicative of actual lumber volumes produced for sale. Other tables on

these exhibits provide two different percent "overrun" numbers – some positive and others negative – for sawmill production at very same mills. See PX28; PX29; PX30. This apparent inconsistency is not explained. Id. Additionally, one document has the word "corrected" in handwriting across the top, indicating that needed corrections to the other two exhibits might well have been necessary. See PX29.

The admitted documents were prepared by Mel Bowers, an accountant who worked for Precision Pine. Tr. 950 (Porter). However, without testimony from Mr. Bowers explaining what the numbers signify, and whether needed corrections were made, exhibits 28, 29 and 30 provide no support for Precision Pine's claim. Additionally, even if the stated "production volumes" reflect planed lumber that is ready for sale, and this is far from clear, the respective exhibits provide data only for part year periods. Consequently, unlike business records that cover the entire year, see, e.g., DX559, these exhibits do not indicate whether Precision Pine sustained operations at the company's putative 35 million board feet (l.t.) per year capacity. Indeed, given that Precision Pine chose not introduce the full set of its monthly business records into evidence, and chose not to elicit explanatory testimony from company personnel, the Court should conclude that such evidence would not support Precision Pine's claim. See, e.g., Knorr Bremse Systeme Fuer Nutzfahrzuege GmbH v. Dana Corp., 383 F.3d 1337, 1345 n.3 (Fed. Cir. 2004) ("permitting adverse inference from failure to call witnesses peculiarly within the party's power to produce") (citing MacNaughton v. United States, 888 F.2d 418, 423 (6th Cir.1989)).

## CONCLUSION

For these reasons, as well as the reasons given in our previous post-trial filings, the Court should rule that Precision Pine does not qualify as a "lost volume seller."

Respectfully submitted,

PAUL D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

/s David A. Harrington

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Attorneys for Defendant

OF COUNSEL:

Patricia L. Disert
Lori Polin Jones
Office of the General Counsel
U.S. Department of Agriculture

November 14, 2006

**CERTIFICATE OF FILING**

I hereby certify that on this 14th day of November, 2006, a copy of the "DEFENDANT'S RESPONSE TO PLAINTIFF'S SUPPLEMENTAL POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David A. Harrington