**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-720C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S INTIAL BRIEF**
**PURSUANT TO THE COURT'S ORDER OF SEPTEMBER 19, 2006**

In its Initial Brief defendant argues that Precision Pine & Timber, Inc. (Precision Pine) has failed to meet any of the four criteria set forth in the Court's Order of September 19, 2006 regarding Precision Pine's status as a lost volume seller. Defendant's cursory arguments, which do not even fill six pages, betray a fundamental misunderstanding of the law governing lost volume sellers as applied to this case, as well as the facts proven at trial. As set forth below, in "Plaintiff's Initial Brief As To Whether It Is Entitled To Be Compensated Without An Offset Of Post-Suspension Profit" (P's Initial Brief), Precision Pine has established its entitlement to the lost profits it suffered due to the Forest Service's breach without any offset of post-suspension profits.

A. The Evidence Shows That But For The Forest Service's Breach, Precision Pine Would Have Bid On And Been Awarded Additional Timber Sale Contracts

In its Initial Brief, Precision Pine pointed out the considerable amount of evidence from trial showing that "but for" the Forest Service's breach, it would have bid on and been awarded additional timber sales contracts that it then would have harvested and manufactured into lumber

in the post-suspension period. See P's Initial Brief at 5-8 (¶¶ 1-11); 14-15; see also Plaintiff's Corrected Proposed Findings of Fact dated September 12, 2005 (PPFF) 364-373.

Moreover, as a practical matter, Precision Pine actually did continue to search for and obtain additional timber in the post-suspension period -- just not to the same extent that it would have done so had the breached sales been harvested to completion, as would have been the case had the Forest Service not suspended them. PPFF 366-369. That is, despite its substantially weakened financial condition caused by the Forest Service's breach, Precision Pine purchased six new timber sales in 1997 alone. PPFF 373.[1] Additionally, at trial Precision Pine presented evidence that because it still had the breached sales under contract after the suspension was lifted it did not need to purchase as much timber in the post-suspension period, as would have been the case had there been no breach. See e.g. PPFF 366, 369.

Defendant's primary support for its contention that had Precision Pine harvested the breached contracts as it expected to do in 1995 and 1996 it would not have bid on and been awarded additional contracts is an oft-repeated mischaracterization of Mr. Porter's testimony. That is, defendant claims that Mr. Porter "did not know of any additional contracts that Precision Pine would have been awarded but for the [] suspensions." D's Initial Brief at 2. This argument distorts Mr. Porter's testimony and shows nothing except that eight years after the fact Mr. Porter

[1]Defendant also argues (rather inconsistently with its primary contention that Precision Pine would not have obtained additional timber sales) that Precision Pine's ability to purchase six new sales in 1997 shows that the suspension did not financially cripple Precision Pine. D's Initial Brief at 2. However, in the two fiscal years following the suspension Precision Pine did, for the first time in its history, operate at loss. Compare PPFF 8 with PX 182 at p. 2; Id. at ex. 14 A & B. As Mr. Ness testified, this was due in large measure to the fact that in the post-suspension period Precision Pine experienced inefficiencies in trying to resume normal operations after the suspension was lifted, and its overhead costs were no where near being absorbed. Trial Tr. 2443 (Ness).

could not recall from memory the names of sales offered by the Forest Service on which he might have bid, had he the means and need to do so. His testimony was:

> Q: Can you identify any additional timber sale that, in your view, you would have been awarded, if the Mexican spotted owl suspensions had not occurred?
>
> A: The Forest Service had a list of sales that they were to bring up and a program. They told us which ones were to be brought up. **If you could show me a list, you know, I might be able to show you which sales were coming up and which ones I would have bid on for which mill.**

Tr. 1288 (Porter).[2] Mr. Porter also testified that historically Precision Pine tried to keep a sizable backlog of timber under contact and would have continued to buy timber at a relatively constant rate, but for the suspension. Tr. 631-33 (Porter). The simple fact remains that Precision Pine did not, however, need to purchase as much timber in the immediate post-suspension period as it would have had the Forest Service not breached its contracts, because the breached contracts remained available to it. PPFF 366.

Defendant further suggests that the record is "devoid of evidence demonstrating that Precision Pine would have been awarded any additional timber sale contracts in the post-suspension period" because "bidding for timber was competitive at all time in Arizona and New Mexico." D's Initial Brief at 2. That bidding may have been competitive in and of itself proves nothing because Precision Pine had been consistently able to purchase timber and operate

---

[2] Mr. Porter's testimony was consistent on the point:

> Q: Can you identify any specific timber sale contracts that you would have bid on, but you did not bid on, as a result of the Mexican spotted owl suspensions?
>
> A: **Not without some Forest Service documents in front of me.**

Tr. 1288 (Porter). A list of sales offered by the Forest Service in 1996-1997 was put in evidence at trial. Plaintiff's Exhibit 304. For obvious reasons, defendant chose not to provide Mr. Porter with the list of sales offered by the Forest Service in the post-suspension period.

profitably, primarily on Forest Service timber sales, for a decade prior to the suspension when competition was admittedly keen. PPFF 8. However, between the late-1980's and August 1995, some 47 million feet (mmbf (LS)) of annual sawmill capacity that had competed with Precision Pine for Forest Service timber in Northern Arizona had been permanently shut down. Plaintiff's Additional Proposed Findings of Fact ("PAPFF") dated November 14, 2005 at 1406. In fact, the undisputed facts indicate that at the time of the suspension, there was little competition left, i.e., there were only two other sawmills that remained in competition with Precision Pine, the Reidhead sawmill in Nutrioso (near Eagar) and the Stone sawmill in Eagar (id.), both of which were proximate to the Apache-Sitgreaves National Forest. Id. That is, there was effectively no competition for Forest Service timber sales for Precision Pine's sawmills in Heber or Winslow, which drew their source of supply primarily from the Tonto, the Coconino and the Kaibab National Forests. PPFF 10-12; PAPFF 1406; PX 104. Thus, Precision Pine would have been able to acquire Forest Service timber at very reasonable prices due to the greatly diminished total sawmill capacity of Precision Pine's competitors for Forest Service timber sales. Tr. 103-09 (Porter). As Dr. Neuberger, defendant's expert, correctly conceded: (1) there had been a "dramatic" reduction in sawmill capacity competing with Precision Pine for Forest Service timber sales; and (2) given the location of the remaining competitors, Precision Pine may have been well-situated to obtain Forest Service timber sales offered on the Coconino, Tonto, Kaibab and the western half of the Apache-Sitgreaves National Forests. PAPFF 1406; see PPFF 10-13. In these circumstances, it is entirely reasonable to conclude that, but for the Forest Service's breach and the devastating financial consequences it caused, Precision Pine would have bid on and been awarded additional timber sale contracts had the suspension not occurred and the breached sales been harvested during the suspension as Precision Pine expected to do.

B. Assuming That It Is Relevant, Precision Pine Has Demonstrated That It Would Have Operated Its Sawmills At Capacity In The Post-Suspension Period Of The "But For" World

In the order of September 19, 2006, the Court indicated that Precision Pine would need to show that it would have been operating its mills at capacity in the post-suspension period. In its initial brief Precision Pine demonstrated why, but for the breach, it would have operated at capacity during the post-suspension period. P's Initial Brief at 8-13.[3] Defendant argues, that Precision Pine would not have conducted its "three sawmill operation" at capacity in the post-suspension period because it had not done so either before or after the suspension. D's Initial Brief at 3.

The available data, however, fully supports Precision Pine's claim that it would have operated at or about capacity in the post-suspension period because it had done so in each of the two fiscal years prior to the suspension. That is, in the two fiscal years prior to the suspension, Precision Pine annually processed approximately 24,000 mbf (LS) of timber at its three mills and annually produced in excess of 30,000 mbf (LT) of lumber therefrom. PPFF 365. Mr. Porter estimated that at the time Precision Pine's production capacity, on a one-shift basis, was 32-35 mmbf of lumber per year. Id.

---

[3]Although Precision Pine can appreciate the potential significance of this inquiry for the traditional lost volume seller situation, i.e., where the seller is claiming that it could have made a profit on breached Transaction 1 and also **expanded** its capacity to make a second profit on Transaction 2 **in the same time period,** (see e.g. RESTATEMENT (SECOND) OF CONTRACTS § 347 comm. f (1981)) that is not the situation presented here.

Precision Pine's claim is that but for the suspension it would have made all of the profits it claims during the suspension period (Transaction 1) and at least as much profit as it actually made in the post-suspension period (Transaction 2). P's Initial Brief at 1-8. In these circumstances, Precision Pine's expectancy damages are measured, at a minimum, by the full amount of Transaction 1 as it represents the hole in the company's profit pipeline resulting from the breach. Id. Whether or not Precision Pine operated at capacity in the post-suspension period is not strictly relevant to its ability to recover all of the profits lost on Transaction 1. Id. at 8-9 n.9. Precision Pine's discussion of it operations at capacity in the "but for" world is without prejudice to this position.

Nevertheless, defendant asserts that Precision Pine's capacity in the post-suspension period should be premised on a two shift operation at all three of its mills. In doing so, however, defendant cites no evidence that Precision Pine ever operated even one of its mills on more than a single shift basis during the time that its three mill operation was in place, let alone that Precision Pine operated **all three** mills on a two shift basis simultaneously for an extended period of time, as defendant asserts should now be the basis for determining Precision Pine's production capacity.[4] As Mr. Ness testified there was no way for Precision Pine to go back and make up for the lost opportunity it had suffered due to the suspension by running the mills for two shifts over an extended period of time. PPFF 145. Moreover, operating on a two shift basis would have resulted in twice as much rough green lumber being produced and defendant cites no evidence which suggests that Precision Pine's planer and kiln drying units at Winslow could have handled this additional volume. In sum, defendant has identified no basis in the record for finding that Precision Pine's actual operating capacity in the post-suspension period should be based on anything other than a one shift operation.[5]

---

[4]The evidence that defendant does cite relates to a two shift operation at the Heber mill "for a while" **in 1990**. See Tr. at 104 (Porter). Similarly, defendant's reliance on DX 559 is wholly misplaced as that document indicates that Precision Pine operated a double shift at a time in the early 1990's when it only had one sawmill in operation. DX 559 does not show that Precision Pine ever ran a double shift at any of its mills when it had three mills operating. Thus, defendant has presented no reasonable basis to conclude that Precision Pine's capacity for its three sawmill operations should be based on anything other than one shift that it actually used for its three mill operation.

[5]Moreover, to the extent the government is arguing that Precision Pine somehow failed to adequately mitigate its damages by not running on a two shift basis in the post-suspension period, the law is clear that the non-breaching party must only make those efforts that are fair and reasonable under the circumstances, Home Savings of America v. United States, 399 F.3d 1341, 1353 (Fed. Cir. 2005). A non-breaching party need not take any action regarding which, for example, it would incur unreasonable expense or inconvenience or disrupt its business. Restatement (Second) Contracts §350, cmt. b; Commercial Federal Bank v. United States, 59 Fed. Cl. 338, 355 (2004) ("Plaintiff was not required to change the entire financial structure of its

In apparent recognition of the weakness of its argument that Precision Pine's capacity should be assessed on the basis of two shifts, defendant devotes the majority of its argument to the contention that in the "but for" world Precision Pine would not have operated at full capacity even on a single shift basis in the post-suspension period. D's Initial Brief at 3-4. Defendant attempts to base this contention on the "facts" that once the Forest Service lifted the suspension Precision Pine had timber under contract and mills in which to process it, yet operated at less than full capacity. The relevance of this inquiry aside,[6] defendant's contentions wholly ignore the fact that at the time the 16-month suspension was finally lifted in the first week of December, 1996, Precision Pine only had one mill operating (PX 163) and that December was also well outside of the normal operating season for most of the Forest Service contracts in its portfolio. See PX 169-179. For Precision Pine to resume anything approaching normal operations in such conditions when many of its skilled mill employees had long-since been laid-off (Trial Tr. at 1839, 1861 (Porter); 2192-93 (Ness)) and Precision Pine's financial condition had been severely eroded by the loss of profits during the suspension (PX 182 at 2) was very difficult. Of course, none of these hurdles would have existed had there been no breach and Precision Pine's operations had proceeded unabated during the rising lumber market that existed in the first half of 1997.

---

institution, taking on what it deemed to be new risks of financial loss in order to mitigate the potential losses caused by FIRREA.") Defendant's desires aside, in the post-suspension period Precision Pine was simply under no compulsion to change its standard mode of operation.

[6]The relevant inquiry for determining the amount of Precision Pine's expectancy damages is whether Precision Pine would have made more profits but for the breach in the post-suspension period than it did in the actual post-suspension period. If Precision Pine would have done so, then no offset of post-suspension profits is appropriate. See P's Initial Brief at 1-8, 16-17. That inquiry is the subject of the Court's third criterion and is addressed in the next section of this brief.

Moreover, despite the significant difficulties imposed on Precision Pine by the breach, Precision Pine did resume operations at all three sawmills in the first half of 1997 (PX 163), which, in and of itself, is considerable evidence that, absent the breach, Precision Pine would certainly have continued operating all three sawmills at capacity in the post-suspension period. However, just as Precision Pine was hoping to return to something approaching normal level of operations it was faced with yet another suspension of its Forest Service timber sales, this time due to the Forest Guardians injunction. PPFF 47. Because the Forest Guardians lawsuit targeted older timber sales, (see PX 120, 121) it only impacted seven of Precision Pine's sales, all of which were sales that had also been subject to the so-called MSO suspension. PX 119-124. The evidence at trial demonstrated that had there been no MSO suspension the sales affected by Forest Guardians would have been harvested long-before the Forest Guardians injunction was entered. See e.g. PX 131. Accordingly, but for the so-called MSO injunction the Forest Guardians suspension would not have impacted Precision Pine's operations.

As it was, however, the Forest Guardians suspension halted both the Hay and O.D. Ridge sales again (PX 120) which, in 1997 along with Kettle were the three sales that were to have supplied Precision Pine's Eagar sawmill. Trial Tr. at 1257-58 (Porter). In light of the Forest Guardians suspension (the end to which no one could have predicted), which came on the heels of the harm caused to Precision Pine by the so-called MSO suspension, Precision Pine decided to permanently close its Eagar sawmill in late-July of 1997 (PPFF 47) and sell its Kettle sale to Stone Container, which Precision Pine agreed to do on August 15, 1997 and which the Forest Service approved on November 3, 1997. PX 117-118.[7] The closure of Eagar alone reduced

---

[7]Defendant's argument that Precision Pine had the opportunity to process the Kettle sale in 1997, but voluntarily gave it up (D's Initial Brief at 4) ignores the fact that Precision Pine did harvest approximately 3,000 mbf of sawlogs from Kettle and mill it at Eagar in 1997 (PX 290

Precision Pine's capacity by about 30%. Accordingly, it is not surprising that Precision Pine did not actually operate at the capacity of its three sawmills in 1997 or 1998. Thus, Precision Pine's actual operations in the post-breach world are simply not an accurate barometer for what would have happened in the "but for" world, i.e., in absence of the breach.

C. But For The Suspension, Precision Pine Would Have Sold At A Profit The Lumber That It Would Have Manufactured From The Additional Timber Sales That It Would Have Bid On And Been Awarded In The Post-Suspension Period

Precision Pine has presented the Court with ample evidence from the trial record which demonstrates that it is more than reasonable to conclude that Precision Pine would have sold at a profit the lumber that it would have manufactured from the additional timber sales that it would have bid on and been awarded in the post-suspension period. P's Initial Brief at 16-18. The government's five sentence argument on this point, which is unsupported by any citation to the trial record and which does not discuss the evidence relied on by Precision Pine, is unpersuasive.

D. The Profits That Precision Pine Would Have Earned But For The Suspensions By Selling Lumber From The Additional Timber Sales That It Would Have Bid On And Been Awarded In The Post-Suspension Period Would Have Equaled Or Exceeded The Profits That Precision Pine Actually Earned By Partially Harvesting The Suspended Sales In The Post-Suspension Period

---

Kettle TSSA (April TSSA at p.1, May TSSA at p.2, June TSSA at p.2)), and the fact that both Hay and O.D. Ridge, the other two sales that were to have gone to Eagar were suspended again by June of 1997. PX 119. In light of Stone's offer to buy the remaining portion of the Kettle sale (including the sizable volume of roundwood that remained) and the uncertainty of when, if ever, the Hay and O.D. Ridge sales would be available for harvest, Precision Pine's decision to sell the Kettle sale made practical sense, and is certainly not subject to being second-guessed by the breaching party.

The evidence at trial demonstrates that it is more than reasonable to conclude that the profits Precision Pine would have earned "but for" the suspensions by selling lumber from the additional timber sales that it would have bid on and been awarded in the post-suspension period would have equaled or exceeded the profits that Precision Pine actually earned by partially harvesting the suspended sales in the post-suspension period. P's Initial Brief at 18-19. The government's three sentence argument on this point, which is unsupported by any citation to the trial record and which does not discuss the evidence relied on by Precision Pine, is unpersuasive.

Respectfully submitted,

s/ Alan I. Saltman___________

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Washington, D.C. 20006
(202) 452-2140

Dated: November 14, 2006