**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR RECONSIDERATION**

## INTRODUCTION

Pursuant to the Court's November 15, 2006 order, the United States submits this opposition to the motion for reconsideration filed by Precision Pine & Timber, Inc. ("Precision Pine").[1] As explained below, Precision Pine's motion fails to identify any intervening change in controlling law, allege the discovery of previously unavailable evidence, or establish that the Court's ruling is manifestly unjust. The Court should, therefore, deny Precision Pine's motion for reconsideration.

## ARGUMENT

### I. Standard of Review

Rule 59(a)(1) of the Rules of the Court of Federal Claims ("RCFC") states: "A new trial or rehearing or reconsideration may be granted . . . for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States." However, it is well-settled that the Court "has a right to know before it decides [the

---

[1] Precision Pine's motion for reconsideration is captioned "Plaintiff's Motion for Relief from Limited Aspects of the Court's Order and Opinion of September 19, 2006." It is cited in this brief as "Pl.'s Mot. at __."

controversy at hand] whether the parties have anything further to present." General Electric Co. v. United States, 416 F.2d 1320, 1322 (Ct. Cl. 1969). Indeed, the litigation process rests upon the assumption that the parties will present their case once, to their best advantage. Bishop v. Unites States, 26 Cl. Ct. 281, 286 (1992); see also Bluebonnet Savings Bank, FSB v. United States, 466 F.3d 1349, 1361 (Fed. Cir. 2006) ("an argument made for the first time in a motion for reconsideration comes too late, and is ordinarily deemed waived"). Because motions for reconsideration are not intended to give a disappointed party a second bite at the litigation apple, Circle K Corp. v. United States, 23 Cl. Ct. 659, 664-65 (1991), motions for reconsideration are disfavored, General Electric, 416 F.2d at 1321.

"For a movant [seeking reconsideration] to prevail, he must point to a 'manifest error of law, or mistake of fact' and demonstrate that the motion 'is not intended to give an unhappy litigant an additional chance to sway the court.'" Strickland v. United States, 36 Fed. Cl. 651, 657 (1996) (citing Circle K Corp., 23 Cl. Ct. at 664-65); accord Precision Pine & Timber, Inc. v. United States, No. 98-720C, slip op. at 3 (Jan. 27, 2004) (citing Bishop, 26 Cl. Ct. at 286, Circle K Corp., 23 Cl. Ct. at 664-65, and Franconia Assocs. v. United States, 44 Fed. Cl. 315, 316 (1999)). To meet this heavy burden, the movant must show (1) an intervening change in controlling law, (2) that previously unavailable evidence has been discovered, or (3) that the motion is necessary to prevent manifest injustice. Strickland, 36 Fed. Cl. at 657 (citing Bishop, 26 Cl. Ct. at 286). Additionally, because "[a] motion for reconsideration 'is not intended to give an unhappy litigant an additional chance to sway the court,'" the movant is not "permitted to present new legal theories or facts that could have been raised earlier." Precision Pine, slip op. at 5 (Jan. 27, 2004); see also Bluebonnet, 466 F.3d at 1361; Bishop, 26 Cl. Ct. at 286; Circle K Corp., 23 Cl. Ct. 664-65; Gelco Builders & Burjay Constr. Corp. v. United States, 369 F.2d 992,

1000 n.7 (Ct. Cl. 1966) ("Litigants should not, on a motion for reconsideration, be permitted to attempt an extensive re-trial based upon evidence which was manifestly available at the time of the hearing.").

Precision Pine fails to identify any change in controlling law and makes no claim that previously unavailable evidence has been discovered. By simply rehashing arguments that the Court has already rejected, Precision Pine's motion is nothing but an attempt "to give an unhappy litigant an additional chance to sway the court." Strickland, 36 Fed. Cl. at 657. Precision Pine's motion for reconsideration should, therefore, be denied.

## II. Precision Pine Has Shown No Manifest Injustice

### A. Precision Pine's Claim That The Court "May Have Misconstrued Aspects Of Precision Pine's Arguments" Provides No Basis For Reconsideration

In the first section of its motion, Precision Pine states that "it seems that in several instances the Court misconstrued Precision Pine's arguments." Pl.'s Mot. at 1. At the same time, however, Precision Pine acknowledges that "it is not clear what impact, if any, may have resulted." Id. Because Precision Pine does not contend that any error resulted, much less a manifest injustice, Precision Pine's suggestion that the Court's misconstrued its arguments provides no basis for granting a motion for reconsideration.

Moreover, Precision Pine admits that it does not claim that the MSO suspensions prevented "additional profits" on lost lumber sales in the post suspension period and that it, therefore, lost an opportunity to produce and sell lumber that can never be replaced. Id. at 2. Based upon this concession, the Court should reject Precision Pine's putative lost volume seller claim. Precision Pine's concession is consistent with the position long advocated by the United

States, namely, that potential profits from additional timber sale contracts that Precision Pine might (or might not) have been awarded in the post-suspension are immaterial.

**B. The United States Does Seek An Offset Of Profits From Precision Pine's Post-Suspension Timber Sale Contracts**

Precision Pine describes this action as involving two distinct sets of transactions. The first set concerns the 14 Forest Service contracts at issue – contracts supplying timber that supposedly would have been harvested and milled during the period of the MSO suspensions in 1995 and 1996. Precision Pine labels this set of transactions "Transaction 1." Pl.'s Mot. at 3. The second set concerns contracts that Precision Pine supposedly would have executed (but did not execute) in 1997 and 1998 for additional timber during the post-suspension period. Precision Pine labels this set of transactions "Transaction 2." Pl.'s Mot. at 4.

After laying this foundation, Precision Pine argues that it would be "improper to deduct any portion of the profit that it actually made on Transaction 2 from the damages" related to Transaction 1. Pl.'s Mot. at 5. Precision Pine's argument is a strawman. The United States has never argued that profits from additional contracts executed by Precision Pine during the post-suspension period (i.e., Transaction 2) should offset any damages assessed in this action. See Def.'s Post-Trial Br. at 29-30. The Court correctly recognized this fact in its September 19, 2006 decision. Precision Pine, 72 Fed. Cl. at 492 ("defendant in this case is not seeking to offset profits from other timber sales that plaintiff purchased in the post-suspension period"); see also id. at 494 ("defendant is simply arguing that once the suspensions were lifted, Precision Pine received the very same timber sales that it had originally bargained for").

### C. The Court Correctly Concluded That Post-Suspension Sawmill Capacity Is An Essential Element Of A Modified Lost Volume Seller Claim

Precision Pine next argues that the Court mistakenly focuses upon its sawmill capacity in the post-suspension period. Pl.'s Mot. at 5-7. According to Precision Pine, because it never intended to perform "Transaction 1" and "Transaction 2" at the same time, the Court need not consider whether it would have been operating at capacity during the post-suspension period. Pl.'s Mot. at 5-6.

Precision Pine's argument misses the point. The question whether Precision Pine's sawmills would have been operating at full capacity is essential to the modified "lost volume seller" claim recognized by the Court. If Precision Pine's mills were operating at less than full capacity, the company would have had sufficient capacity to process timber from both the once-suspended contracts (i.e., Transaction 1) and new timber sale contracts executed in the post-suspension period (i.e., Transaction 2). In such an situation, there would have been no "lost volume" or, put differently, Precision Pine would have been able to profit from both the Transaction 1 and Transaction 2 contracts. As the Court explained, "to the extent that plaintiff's lost volume seller theory is based on the argument that Precision Pine lost an opportunity to produce and sell lumber that can never be replaced, plaintiff would not be entitled to be compensated as a lost volume seller if the alleged lost production opportunity could have simply been made up in the post-suspension period by increasing the rate at which Precision Pine operated its mills."[2] Precision Pine, 72 Fed. Cl. at 492. The Court, thus, correctly ruled that

[2] Given that Forest Service contracts allowed performance over several years, see, e.g., PX170 (AT16), Precision Pine would have to show that it would have operated at full capacity for at least the first three years of the post-suspension period. Precision Pine failed to make such a showing. See, e.g., Def.'s Supp. Post-Trial Br. at 3-4.

Precision Pine must establish that its sawmills would have been operating at capacity in the post-suspension period in order to prevail on the modified "lost volume seller" claim recognized by the Court in this action.[3]

**D. Precision Pine Bears The Burden Of Proof With Respect To Damages**

It is black letter law that the plaintiff in a breach of contract action bears the burden of proof with respect to both liability and damages. E.g., Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc) (the plaintiff "has the burden of proving the fundamental facts of liability and damages"); California Fed. Bank, FSB v. United States, 395 F.3d 1263, 1267-68 (Fed. Cir. 2005) (plaintiff must prove that claimed losses flowed "inevitably and naturally, not possibly nor even probably," from the breach). The burden is no different when a plaintiff claims to be a lost volume seller. E.g., Bill's Coal Co. v. Board of Pub. Utils., 887 F.2d 242, 245 (10th Cir 1989) ("Sellers have the burden of proving that they are lost volume sellers."); R.E. Davis Chem. Corp. v. Diasonics, Inc., 826 F.2d 678, 684 (7th Cir. 1987) (plaintiff seeking to recover as a lost volume seller bears the burden of proof). Accordingly, the Court correctly ruled Precision Pine bears the burden of proof in this action. See Precision Pine, 72 Fed. Cl. at 493-97.

In seeking reconsideration of the Court's burden of proof ruling, Precision Pine starts from a false premise that infects every part of its argument. Precision Pine asserts that the Court

---

[3] The authority cited by Precision Pine is inapt. See Pl.'s Mot. at 5-6 (discussing Restatement (Second) of Contracts § 347). The modified lost volume seller claim recognized by the Court in this action is unique and unprecedented. Authority discussing the lost volume seller concept recognized by the UCC, see UCC 2-708(2), a kind of claim that is not at issue in this action, provides no meaningful guidance on this point. See Precision Pine, 72 Fed. Cl. at 492 ("In the present case, it is clear that plaintiff is not a lost volume seller as the concept is traditionally understood.").

erred in requiring it "to show that the profits on Transaction 2 in the post suspension period should not be offset against the profits" it allegedly lost on the "Transaction 1" contracts. Pl.'s Mot. at 7. The Court made no such ruling. Indeed, the United States does not seek to offset profits from Precision Pine's post-suspension (i.e., "Transaction 2") contracts. See Precision Pine, 72 Fed. Cl. at 494. The Court simply ruled that the law places upon Precision Pine the burden of proving any profits lost from the delayed performance of the "Transaction 1" contracts.[4] Id. at 489-90. As such, it is Precision Pine's burden to establish that it is in fact a "lost volume seller" as described in the Court's decision. Id. at 495 (citing Bill's Coal, 887 F.2d at 245, R.E. Davis Chemical, 826 F.2d at 684, and Snyder v. Herbert Greenbaum & Assocs., Inc., 380 A.2d 618 (Md. App. 1977)).

Precision Pine argues that Professors White and Summers would require the defendant to bear the burden of proof. Pl.'s Mot. at 9. The discussion in White & Summers addresses the situation where a seller's delayed delivery results in a breach and the buyer covers, later accepts the delayed goods, and resells them at a profit. James J. White & Robert S. Summers, Uniform Commercial Code § 6-3 at 298 (4th ed. 1995). In such a situation, Professors White and Summers conclude that "the buyer must deduct this profit from its cover damages," but that the defendant, who seeks to reduce damages based upon the profitable second transaction, should have to show that the plaintiff would not have enjoyed the resale but for the breach. Id. (discussing Fertico Belguim, S.A. v. Phosphate Chemicals Export Ass'n, Inc., 501 N.E. 334 (N.Y. 1987)).

---

[4] To make such a showing, Precision Pine must show the profits anticipated from the "Transaction 1" contracts during the period of the MSO suspensions, and it must also account for the profits that it earned (or was able to earn) from these contracts in the post-suspension period. Def.'s Post-Trial Br. at 16.

Precision Pine raised this argument in its post-trial briefs and it was properly rejected by the Court. Precision Pine has identified no new judicial authority, much less a change in controlling law, that supports its position regarding the burden of proof. For this reason alone, Precision Pine's motion should be denied. See Strickland, 36 Fed. Cl. at 657 (reconsideration is not a vehicle "to give an unhappy litigant an additional chance to sway the court"). Moreover, Precision Pine has offered no basis for reconsidering the Court's well-reasoned conclusion. An academic discussion based upon a 20-year old state court ruling is not binding. Moreover, as the Court concluded, that case, Fertico Belguim, S.A. v. Phosphate Chemicals Export Ass'n, Inc., 501 N.E. 334 (N.Y. 1987), is distinguishable. Fertico addresses the effect of a profitable sale of late-delivered goods after the purchaser has effected cover. Unlike the plaintiff in Fertico, Precision Pine did not effect cover and does not seek to recover cover damages.[5] Precision Pine, 72 Fed. Cl. at 494. Precision Pine seeks instead alleged lost lumber profits on the contracts subject to the MSO suspensions as its measure of damages.

Moreover, the Court correctly recognized that, unlike in Fertico, the United States does not contend that Precision Pine's ability to produce lumber from the previously-suspended contracts in the post-suspension period conferred "an unexpected benefit or windfall as a result

---

[5] Where cover is not available, under the Uniform Commercial Code, the plaintiff's remedy should be the contract price and market price differential for the goods being purchased. U.C.C. § 2-713; see also White & Summers, Uniform Commercial Code § 6-4 at 313 ("2-713 will come into play only in the aberrational case in which the buyer decides not to cover or finds that it is unable to do so"). As we have previously explained, because Precision Pine presented no evidence concerning the contract price/market price differential for timber, Precision Pine's damages claim should be rejected on this basis. Def.'s Post-Trial Br. at 10-11; Def.'s Post-Trial Response Br. at 8; see also White & Summers, Uniform Commercial Code § 6-4 at 316 (discussing section 2-713 and noting that "in a remarkable number of cases parties appear to have lost their cases by failing to offer adequate evidence of market price").

of the breach." Id. (emphasis added). When the suspensions ended, Precision Pine had available the very timber from the very contracts that it had originally purchased.

Seizing upon the term "windfall," Precision Pine points out that the United States has argued that Precision Pine would obtain a windfall if its post-suspension profits on the "Transaction 1" contracts are disregarded. Pl.'s Mot. at 8 (citing Tr. 139 (Fed. 17, 2006)). Precision Pine misses the point. The fact that Precision Pine was able to harvest its "Transaction 1" contracts after the MSO suspensions ended is itself neither unexpected nor a windfall. A windfall would result only if post-suspension profits were disregarded, that is, if Precision Pine were able to profit twice from the very same timber sale contracts. Where, as here, contract performance was suspended, the plaintiff elected to continue performance after the suspension was lifted and, indeed, the plaintiff had a contractual obligation to complete performance as a result of its election, profits that plaintiff actually (or could have) obtained from the once-suspended must be taken into consideration in assessing damages. See, e.g., Bluebonnet Savings Bank, FSB v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003) ("the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach").

Lastly, the Court correctly concluded that, unlike in Fertico, this case does concern "a non-specific article such as fertilizer, of which the supply in the market is not limited." Precision Pine, 72 Fed. Cl. at 494-95. Precision Pine does not directly dispute the Court's finding and, indeed, acknowledges that the volume of timber being offered for sale by the Forest Service in Region 3 declined significantly during the 1980's and 1990's. Pl.'s Mot. at 16. In fact, Precision

Pine urged the Court to find that the limited supply of timber available in Arizona explained its failure to fully cover during the MSO suspensions. Precision Pine cannot have it both ways.

## **CONCLUSION**

Precision Pine has identified no new controlling law, does not allege the discovery of previously unavailable evidence, and has established no manifest injustice in the Court's decision. Accordingly, Precision Pine's motion for reconsideration should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

s/ David A. Harrington

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
(202) 307-0277
(202) 307-0972 (fax)

December 15, 2006

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on the 15th day of December, 2006, a copy of "DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David A. Harrington