**IN THE UNITED STATES COURT OF FEDRAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., Plaintiff, | ) | |
| v. | ) | No. 98-720C (Judge George W. Miller) |
| THE UNITED STATES, Defendant. | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR RELIEF FROM LIMITED ASPECTS OF THE COURT'S ORDER AND OPINION OF SEPTEMBER 19, 2006**

**Introduction**

In Plaintiff's Motion for Relief From Limited Aspects of the Court's Order and Opinion of September 19, 2006 ("Plaintiff's Motion for Relief") Precision Pine raised two basic points:

> [T]he order misallocates the burden of proof and elevates the issue of Precision Pine's post-suspension mill capacity to a position it does not deserve in the circumstances of this case.

Motion for Relief at 2. Although the Court's order of November 15, 2006 invited defendant to respond to Plaintiff's Motion for Relief, defendant has used the opportunity to rehash several arguments that have already been raised and addressed several times in other briefing. Accordingly, in an effort to avoid belaboring the record any further, Precision Pine will fuly respond to the government's arguments that actually go to the points made in Plaintiff's Motion for Relief and respond more briefly to defendant's other, less germane arguments but also provide citations to points in the briefs where a more developed discussion may be located.

**Argument**

In section A of its argument, the government contends that:

> Precision Pine admits that it does not claim that the [] suspension prevented "additional profits" on lost lumber sales in the post suspension period and that it, therefore, lost an opportunity to produce and sell lumber that can never be replaced.

D's Response at 3 (emphasis in original). This argument misstates Precision Pine's position and is emblematic of defendant's attempt to thwart the obvious application of the key aspects of the lost volume seller theory to this case. As Precision Pine actually argues (and has repeatedly demonstrated), had the government not breached the contracts, Precision Pine would have had the profit it was prevented from making on lumber sales during the suspension (Transaction 1) as well as profit in an amount at least equal to what it actually made on lumber sales in the post-suspension period (Transaction 2). Thus, off-setting profits in the post-suspension period (which Precision Pine would have made absent the breach) from damages in the amount of lost profits caused by defendant's breach in the suspension period, places Precision Pine in a demonstrably worse position that it would have been in had defendant not violated the contracts. See Precision Pine's Initial Brief as to Whether It Should Be Compensated Without An Offset of Post-Suspension Profits ("Plaintiff's Initial Brief") at 1-7. This is congruent with the classic lost volume seller situation, i.e., where a plaintiff shows that in the absence of the breach it would have had the transaction that was disrupted by the breach plus a second transaction that it actually made. Id. For obvious reasons, defendant's argument never squarely confronts this basic point and instead misstates Precision Pine's position in an effort to avoid it.

In section B of its brief defendant asserts that it "has never argued that profits from additional contracts executed by Precision Pine during the post-suspension period (i.e., Transaction 2) should offset any damages assessed in this action." D's Response at 4.

(Emphasis supplied). This argument, apart from being tangential to the points made in Precision Pine's Motion for Relief, is irrelevant. The fact remains that defendant does seek to offset profits made in the post-suspension period from profits that would have been earned during the suspension period if there had been no breach. The salient point is, as was proven at trial, had there been no suspension all of the breached contracts would have been harvested, processed into lumber and sold during the 16-month suspension an ensuing winter. That those contracts remained available for harvest in the post-suspension was a direct result of the government's breach. However, all of the post-suspension lumber sales that were made (and likely considerably more) would have been made even if the breach had not occurred.

As Precision Pine also proved at trial, the Forest Service offered sufficient additional timber for sale in areas where Precision Pine was active and well-positioned to bid, such that, had there been no breach, Precision Pine would have been able to secure an ample supply of timber for its operations in the winter of 1996-97 and beyond. See Plaintiff's Initial Brief at 6. Thus, by trying to reduce Precision Pine's damages by subtracting profits earned on lumber sales in the post-suspension period, the government does seek to offset profits earned in the post-suspension period, even though, absent the breach, those umber sale profits would have been made in at least the same amount. That some of Precision Pine's post-suspension profits were earned on the sale of lumber made from timber on the breached contracts is wholly irrelevant to the issue actually before this Court: the determination of the amount of the damages sustained by Precision Pine as a result of the breach, i.e., returning Precision Pine to the position it would have occupied absent the breach. At the risk of being repetitious: Had there been no suspension, Precision Pine would have earned all of the profits it proved at trial on the breached contracts,

and also would have been able to purchase an additional supply of timber from the ongoing Forest Service timber sale program from which it would have manufactured additional lumber and sold it in what has been designated as Transaction 2. Indeed, constantly buying timber, making it into lumber and then selling it is precisely what it had done for more than a decade of profitable operation prior to the breaches. Plaintiff's Initial Brief at 5-8. In light of these facts, it would be contrary to the law of this circuit (and manifestly unjust) to reduce the lost profits that Precision Pine suffered because it was prevented from making lumber sales during the period of the suspension by the profits earned in the post-suspension period, regardless of whether those profits were earned on the sale of lumber from timber on the breached sales (that were only available due to the breach) or from additional sales that were being offered and would have been purchased by Precision Pine absent the breach.

In Section C of its Response, the government maintains that "the question [sic] whether Precision Pine's sawmills would have been operating at full capacity is essential to the modified 'lost volume seller' claim recognized by the Court," because if Precision Pine had sufficient capacity it could have accomplished both Transactions 1 and 2 in the post-suspension period. D's Response at 5.[1] Defendant's argument presents nothing new and Precision Pine has already addressed this point. See Plaintiff's Initial Brief at 10-12 (explaining why the precise level of operations in the post-suspension period is irrelevant once Precision Pine shows that it would have made at least as much profit absent the suspension as it did in the post suspension period);

---

[1]In a footnote, defendant pushes its argument into absurdity by contending that because the Forest Service contracts allowed performance over "several years," therefore, (for some unexplained reason) "Precision Pine would have to show that it would have operated at full capacity for at least the first three years of the post-suspension period." Motion at 5 n. 2. Defendant provides no support for this contention in either law or logic.

See also Precision Pine's Motion For Relief From Limited Aspects Of the Court's Order And Opinion Of September 19, 2006. Indeed, defendant made this same argument in its initial brief responding to the Court's four questions. See Defendant's Response to Plaintiff's Supplement Post Trial Brief at 8. "([I]n the post-suspension period, Precision Pine had ample capacity at the company's sawmills to manufacture lumber from additional timber contracts.)" Precision Pine has responded directly to defendant's argument. See Precision Pine's Response To Defendant's Initial Brief Pursuant To The Court's Order of September 19, 2006 at 5-9.

Without significantly belaboring the record further on the issue of capacity, in brief summation, Precision Pine's response is three fold:

1. Even if operations at capacity in the post suspension period are relevant, given its weakened condition (both financial and operationally) due to the prolonged suspension which resulted in all of its sawmill being closed, Precision Pine simply could not "flip a switch" on the day that the suspension was finally lifted and resume operations at full capacity. Thus, to the extent that operations at capacity in the post-suspension period are even relevant, the government should not be permitted to benefit from Precision Pine's weakened condition (which the government caused) by arguing that some how Precision Pine should have achieved operations at capacity immediately in the post-suspension period;[2]

2. Even if operations at capacity in the post-suspension period are relevant, Precision Pine did not have the capacity to process all of the breached timber and all of the new timber sale contracts that it would have had absent the breach. Rather processing the breached timber would have taken a considerable period of time. See Plaintiff's Initial Brief at 8-13. Accordingly, Precision Pine could not have simply recouped Transaction 1 in the immediate post-suspension period;

[2]As Precision Pine has previously noted, its damages resulting from the suspension continued into the post-suspension period due to, among other things, reduced operations, strained customer relationships, a less efficient work force, etc. Although these costs are very real and could have been quantified, Precision Pine has not sought to recover them in this action. This further underscores that Precision Pine's damages are, if anything, understated.

3. Operations at capacity in the post-suspension period are not relevant to restoring Precision Pine to the position it expected to have achieved absent the breach because Precision Pine would have had all of the profits that it was deprived of during the suspension period, and profits in at least the amount that it actually earned in the post-suspension period. Thus, because absent the suspension Precision Pine would have operated at least at the level that it actually did operate in the actual post-suspension period, and would have earned profit at least at the level that it did in the actual post-suspension period, no offset is required.[3]

Defendant devotes the remainder of its Response (Section D) to the issue of which party bears the burden of proof with respect to demonstrating the need for, and the amount of, any offset. In support of its contention that Precision Pine should be made to bear this burden, defendant argues that plaintiff bears the burden of proof with respect to both liability and damages as well as the burden of proof that it is a lost volume seller. D's Response at 6. Although these blandishments are true, they also shed no light on the issue of who bears the burden of proof with respect to whether an offset from the breach of contract damages is required and if so proving the amount of that offset. Of course, for the reasons set forth above, Precision Pine continues to maintain that no such offset is required at all.[4] Moreover, because defendant

---

[3]As the Court is aware, it is Precision Pine's belief that the issue over operations at capacity in the post-suspension period arises from a mistaken effort to "shoehorn" the instant case into a common lost-volume seller fact pattern such as that presented in one of the many illustrations to Restatement (Second) of Contracts, § 347, where the non-breaching party must be able to show that it had the capacity to have had two transactions <u>simultaneously</u> if it is to retain its breach damages without an offset. In that case, if the injured party lacks the capacity to make both transactions at the same time, allowing it to retain profits on both transactions would provide it with something it would not have had absent the breach. By contrast here, the transactions at issue are seriatim, not simultaneous. Thus, under the same the inquiry, <u>i.e.</u>, what amount of damages will place Precision Pine in the financial condition that it would have occupied absent the breach, Precision Pine cannot be made whole if its breach damages are subject to an offset of post-suspension profits. This is due to the fact that as demonstrated at trial, absent the breach Precision Pine would have made the profits claimed in the suspension period and <u>at least</u> those profits that it actually made in the post-suspension.

[4]As the Court will recall, Precision Pine was ordered, over its objection, to prepare a calculation of the amount of post-suspension profits it earned on the breached contracts. That calculation is contained in PX 182. Precision Pine respectfully maintains that no such

does, in fact, seek to offset post-suspension profits from the damages proven by plaintiff, under the rationale of a case cited by the Court: "The burden [is] on the government to prove the amount of the claimed offset." Caroline Hunt Estate v. United States, 65 Fed. Cl. 271, 315 (2005), quoting Trans Ocean Van Serv. v. United States, 426 F.2d 329 (Ct. Cl. 1970).

Next, defendant repeats its argument that it only seeks to offset profits earned on the suspended contracts, not on any contracts entered into in the post-suspension period. D's Response at 7.[5] The only reason that the suspended contracts remained available for harvest in the post-suspension period is due to the government's breach. However, in trying to restore Precision Pine, a regular dealer in lumber, to the position it would have been had the breach not occurred, the offset of any post-suspension profits on lumber sales in the post-suspension period, whether the lumber came from timber on the breached contracts or other contracts, is improper. See Plaintiff's Initial Brief at 1-7.

Recognizing that both Fertico and Professors White and Summers fully support Precision Pine's view that the burden of proof on the issue of an offset, if any, rests with the breaching party, the government attempts to distinguish these authorities by arguing that a "[a]n academic discussion based upon a 20-year old state court ruling is not binding." D's Response at 8. Be

---

calculation is necessary in this case and that any such offset will place it in a substantially worse position than it would have been in absent the breach. To the extent that the Court determines that an offset is required and that Precision Pine is obliged to establish its amount, PX 182 contains the means of making that calculation. The precise amount of post-suspension profits currently set forth in PX 182 would now have to be adjusted in light of the final judgment entered by the Court in Precision Pine & Timber, Inc. v. United States, 02-131c.

[5]Defendant does not explain what bearing this argument has on which party has the burden of proof on the issue of an offset.

that as it may, the reasoning of Fertico and the professors is directly on point and the government has provided no authority to the contrary. Moreover, the government wholly ignores Precision Pine's citation to Aluminum Distributors, 1989 WL 157515 (D. Ill. 1989), where the argument that profits made on transactions involving late-delivered goods should be offset from breach damages was made in the form of a counterclaim filed by the breaching party upon which, of course, it had the burden of proof.

Finally, defendant presents a series of arguments in which it attempts to distinguish Fertico from the instant case. However, defendant merely points out distinctions without a difference regarding the issue of who bears the burden of proof as to the need for, and the amount of, an offset of post-suspension profits. First, defendant contends that Fertico was a case involving cover damages, whereas cover was not available to Precision Pine in the instant case. D's Response at 8. Defendant does not, however, explain why this "fact" has any impact on who should bear the burden of proof on the amount of offset, if any, in this case.[6] The truth is that this distinction wholly supports Precision Pine's position that the burden of proof rests with defendant. See Plaintiff's Motion For Relief at 12-15. That is, had cover been available, at least ostensibly, Precision Pine's status as a lost-volume seller would be more difficult to establish because it would have had to substitute timber from which to produce the lumber whose sale would have constituted Transaction 1. Id. Here, Transaction 1 never occurred because of the suspension of Precision Pine's raw material supply and that, as a result, Precision Pine's lose of lumber sales during that period is undeniable.

[6]Defendant ignores the fact that Professors White and Summers reach the conclusion that the breaching party bears the burden of proof in cases involving an offset regardless of whether or not cover damages are involved. See Plaintiff's Motion For Relief at p. 8.

Next, defendant merely reiterates in slightly different language its position that unless post-suspension profits are deducted Precision Pine will receive a windfall. However, in so doing, it fails to respond to the fact that, such being the case, pursuant to cases cited by the Court "The burden [is] on the government to prove the amount of the claimed offset." Caroline Hunt Estate v. United States, 65 Fed. Cl. 271, 315 (2005), quoting Trans Ocean Van Serv. v. United States, 426 F.2d 329 (Ct. Cl. 1970). Defendant's mere citation to Bluebonnet Savings Bank FSB v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003), for the general proposition that the non-breaching party should not be placed in a better position through the award of damages than if there here had been no breach, does not meet that burden.

In sum, defendant's attempts to distinguish Fertico are unavailing, and certainly do nothing to alter the applicability of the reasoning of that case (and the other authorities cited by Precision Pine) in support of Precision Pine's position that it is the breaching party that bears the burden of proof on the issue of whether an offset is required, and, if so, the amount of that offset.

**Conclusion**

In light of the foregoing, Precision Pine respectfully requests that the Court grant plaintiff's Motion For Relief From Limited Aspects Of The Court's Order And Opinion Of September 19, 2006 and grant such further relief as the Court deems just.

Respectfully submitted,

s/Alan I. Saltman

SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: January 5, 2007