# In the United States Court of Federal Claims

No. 98-720 C
Filed September 14, 2007

<table>
<tr><td>

————————————————————

PRECISION PINE & TIMBER, INC.,

          Plaintiff,

v.

THE UNITED STATES,

          Defendant.

————————————————————
</td><td>

Timber sale contracts, expectancy damages, consequential damages, lost volume seller, cover damages, "hole in the profit pipeline", burden of proof, offset, collateral undertakings; overrun factor; conversion factor; product mix; economic impracticability; gross profit; net profit; manufacturing overhead; administrative overhead
</td></tr>
</table>

Alan I. Saltman, Saltman & Stevens, P.C., Washington, D.C., for plaintiff.  Richard W. Goeken and Bryan T. Bunting, Saltman & Stevens, P.C., Washington, D.C., of counsel.

David A. Harrington, Trial Attorney, Kathryn A. Bleecker, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.  Lori Polin Jones and Patricia L. Disert, U.S. Department of Agriculture, Washington, D.C., of counsel.

OPINION AND ORDER

GEORGE W. MILLER, Judge.

This matter is before the Court following the Court's previous Opinion and Order, 72 Fed. Cl. 460 (2006), requiring the parties to submit to the Court supplemental post-trial briefing with respect to plaintiff's modified lost volume seller theory of damage recovery, and on plaintiff's motion of October 17, 2006, styled as a "Motion for Relief from Limited Aspects of the Court's Order and Opinion of September 19" (docket entry 431, Oct. 17, 2006) and treated by the Court as a motion for reconsideration of the September 2006 Opinion pursuant to Rule 59(a)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  This Opinion and Order assumes familiarity with the Court's September 2006 Opinion and Order.

The September 2006 Opinion and Order followed a 24-day trial on damages held in Washington, D.C., between May 12, 2005, and June 20, 2005.  The parties filed Post-Trial Proposed Findings of Fact and Conclusions of Law on September 2, 2005, and responses thereto

on November 14, 2005.[1]  The Court heard closing argument on February 17, 2006 and on March 1, 2006.

For the reasons set forth below, after reconsideration, the Court holds that the lost volume seller theory, as formulated by plaintiff, depends upon the demonstration of unrecoverable damages for independent and collateral undertakings in the form of profits from future additional timber contracts that are not related to the subject matter of the breached contracts.  The Court further holds that permitting plaintiff to use these unrecoverable damages to reduce the amount of the deduction required to be made in the lost profits calculus to account for the profits earned on the breached contracts, would be the functional equivalent of affirmatively awarding damages for the lost profits on the future additional contracts.  Moreover, the Court holds that even if plaintiff's theory of recovery did not require a demonstration of unrecoverable damages, plaintiff has failed to establish on the evidence of record that it meets the criteria set forth in the Court's September 2006 Opinion and Order for application of plaintiff's modified lost volume theory.

As set forth below, the Court plaintiff is entitled to recover lost profits on the breached contracts as measured by the expected profits it would have earned on the breached contracts during the suspension period less profits it actually earned on the breached contracts in the post-suspension period.  However, also as set forth below, the Court has determined that certain of the input values used by plaintiff in its calculation of lost profits require modification, and as a result, plaintiff's damages must be recalculated in light of the Court's findings.  Finally, the Court finds that certain other categories of relief that plaintiff requests are either unavailable, or available only in part.

---

[1]  By leave of the Court, plaintiff filed Plaintiff's Corrected Post-Trial Brief (docket entry 386) and Plaintiff's Corrected Proposed Findings of Fact on September 16, 2005 (docket entry 386).  For the sake of simplicity, throughout this Opinion and Order the Court will refer to Plaintiff's Corrected Post-Trial Brief and Plaintiff's Corrected Proposed Findings of Fact filed on September 16, 2005 as "Plaintiff's Post-Trial Brief" ("Pl.'s Br.") and "Plaintiff's Proposed Findings of Fact" ("PPFF").  Similarly, by leave of the Court, defendant filed Defendant's Corrected Proposed Findings of Fact on January 10, 2006 (docket entry 408).  For the sake of simplicity, throughout this Opinion and Order the Court will refer to Defendant's Corrected Proposed Findings of Fact filed on January 10, 2006 as "Defendant's Proposed Findings of Fact" ("DPFF").

# BACKGROUND[2]

This case concerns 14 timber sale contracts that were either awarded or transferred to Precision Pine & Timber, Inc. ("Precision Pine") prior to August 1995.[3]  On August 25, 1995, pursuant to an order of the United States District Court for the District of Arizona in *Silver v. Babbitt*, 924 F. Supp. 976, 989 (D. Ariz. 1995), the United States Forest Service (the "Forest Service") suspended harvesting on all Forest Service timber sale contracts in Forest Service Region Three, including Precision Pine's 14 contracts.  Joint Stipulation of Facts ("Joint Stip.") ¶¶ 28–29 (docket entry 292, Mar. 11, 2005 ).

The *Silver* court held that Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et. seq.*, required the Forest Service to submit its Land and Resource Management Plans ("LRMPs") for consultation with the Fish and Wildlife Service ("FWS") in light of the listing of the Mexican Spotted Owl as a threatened species.  *Silver*, 924 F. Supp. at 988–89.  The Forest

---

[2]  This recitation of facts sets forth certain of the Court's findings of fact in accordance with RCFC 52(a).  Additional findings of fact and rulings on mixed questions of fact and law are set forth in the Discussion and Conclusion sections of this Opinion and Order.  In this section, the Court summarizes necessary background facts relevant to the subject of this opinion.  For a more complete account of the background facts and procedural history of this case, see Chief Judge Damich's opinion on liability, *Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35 (2001), this Court's decision granting in part and denying in part Defendant's Motion for Partial Summary Judgment, *Precision Pine & Timber, Inc. v. United States*, 63 Fed. Cl. 122 (2004), this Court's decision denying Defendant's Motion for Partial Reconsideration and Clarification of the Court's decision granting in part and denying in part Defendant's Motion for Partial Summary Judgment, *Precision Pine & Timber, Inc. v. United States*, 64 Fed. Cl. 165 (2005), and the September 2006 Opinion, *Precision Pine*, 72 Fed. Cl. 460 (2006).

[3]  The contracts at issue in this case are : 1) the Hay contract; 2) the St. Joe contract; 3) the O.D. Ridge contract; 4) the U-Bar contract; 5) the Jersey Horse contract; 6) the Salt contract; 7) the Hutch-Boondock contract; 8) the Mud contract; 9) the Monument contract; 10) the Saginaw-Kennedy contract; 11) the Brann contract; 12) the Manaco contract; 13) the Brookbank contract; and 14) the Kettle contract.  Several of the contracts at issue provided for the harvesting of both sawlogs and roundwood, whereas other contracts only provided for the harvesting of sawlogs.  *See* Plaintiff's Exhibit ("PX") 320.  "Sawlogs" refer to trees that are 9.0 inches in diameter or greater at breast height, whereas "roundwood" or "pulpwood" refers to trees that are between 5.0 and 9.0 inches in diameter at breast height.  *See* Trial Transcript ("Trial Tr.") at 111–12 (Porter).  Technically, contracts that only require sawlogs to be harvested are referred to as "timber sale" contracts.  *See Precision Pine*, 63 Fed. Cl. at 125 n.3.  Contracts that require both sawlogs and roundwood to be harvested are referred to as "multi-product sale" contracts.  *Id.*  For the purposes of this Opinion and Order, the distinction is not relevant, and the Court will refer to all of the contracts as "timber sale contracts."

Service had originally completed LRMPs for National Forests in Forest Service Region Three between 1985 and 1988, before the Mexican Spotted Owl was listed as a threatened species in 1993. *Id.* at 980–91. In 1994, however, the United States Court of Appeals for the Ninth Circuit held that the LRMPs represented ongoing "agency actions" for which the Forest Service was required to engage in consultations with the FWS whenever a new species is listed as threatened or endangered to the extent that the existing LRMPs "may affect" the newly listed species. *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1055–56 (9th Cir. 1994). Following *Pacific Rivers*, the Arizona District Court enjoined the Forest Service from permitting timber harvesting in the affected areas until the Forest Service consulted the FWS regarding the impacts of the Forest Service's LRMPs upon the Mexican Spotted Owl. *Silver*, 924 F. Supp. at 988–89.

Although the Arizona District Court order required the Forest Service to commence consultation with the FWS on the LRMPs in Region Three on August 24, 1995, the Forest Service did not request formal consultations until September 6, 1995, and did not formally initiate consultations until November 9, 1995. *Precision Pine*, 50 Fed. Cl. at 70. On October 18, 1995, less than eight weeks after the Mexican Spotted Owl suspensions ("MSO suspensions") required by *Silver* were imposed, the Forest Service released the Brann, Hutch-Boondock, and St. Joe timber sale contracts from the suspension pursuant to a stipulation with the plaintiffs in *Silver*.[4] *Precision Pine*, 50 Fed. Cl. at 47 n.18. Pursuant to a settlement in a second lawsuit, *Southwest Center For Biological Diversity v. United States Forest Service*, No. 95 Civ. 1927 (D. Ariz. filed Sept. 13, 1995), the Mud contract was partially cancelled and was released for harvesting on March 11, 1996. *See* PX 106, ¶ 5; PX 109. However, the Arizona District Court did not dissolve the injunction against harvesting in Forest Service Region Three until December 4, 1996, because the formal consultations initiated by the Forest Service became protracted in length due in part to the Forest Service's delay in initiating the consultations and in part to the Forest Service's failure to provide a legally sufficient Biological Opinion in conformity with the parties' joint stipulation of facts in *Silver*. *Precision Pine*, 50 Fed. Cl. at 47–51; *see also* Joint Stip. ¶ 31 (docket entry 292, March 11, 2005). The Forest Service lifted the suspensions of the remaining contracts after the Arizona District Court dissolved the injunction. *Precision Pine*, 50 Fed. Cl. at 47–51.

Each of the suspended contracts at issue except the Hay contract contained Special Contract Provision CT6.01, "Interruption or Delay of Operations," which provided:

> Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of the contracting officer:

---

[4] In his decision on liability, Chief Judge Damich found that the St. Joe and Hutch-Boondock timber sale contracts had not been breached. *See Precision Pine*, 50 Fed. Cl. at 73–74. Chief Judge Damich found that the Forest Service had breached its implied duty to cooperate with respect to the Brann contract. *Id.* at 73.

(a) To prevent serious environmental degradation or resource damage that may require contract modification under C8.3 or termination pursuant to C8.2;

(b) To comply with a court order, issued by a court of competent jurisdiction; or

(c) Upon determination of the appropriate Regional Forester, Forest Service, that conditions on this sale are the same as or nearly the same as conditions existing on sale(s) named in such an order as described in (b).

Purchaser agrees that in the event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be: (1) Contract Term Adjustment pursuant to BT8.21, or (2) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to BT8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, replacement cost of timber, or any other anticipatory losses suffered by Purchaser. Purchaser agrees to provide receipts or other documentation to the Contracting Officer which clearly identify and verify actual expenditures.

*Precision Pine*, 50 Fed. Cl. at 40.

Throughout the suspensions, plaintiff informed the Forest Service that it considered the Forest Service to have breached the timber sale contracts. *See* PX 116; PX 299; *Precision Pine*, 62 Fed. Cl. at 637. Rather than treating the breaches as total and terminating the contracts, plaintiff instead elected to treat the breaches as partial and resumed harvesting timber from the sales after the suspensions were lifted. *Precision Pine*, 62 Fed. Cl. at 648–51. In addition, plaintiff requested contract term adjustments for each contract affected by the suspensions. Joint Stip. ¶ 34 (docket entry 292, March 11, 2005). The Forest Service granted each of plaintiff's requests for contract term adjustments and provided adjustments equivalent to the number of days lost during each contract's normal operating season. *Id.*

In 1997, plaintiff submitted claims to the appropriate Forest Service contracting officer requesting a total of $13,097,209.62 in damages resulting from the suspension of the 14 contracts. *See Precision Pine*, 50 Fed. Cl. at 51. The contracting officer issued a final decision that plaintiff was entitled to only $18,242.78 in damages. *See id.* at 52.

On September 11, 1998, plaintiff filed this action in the Court of Federal Claims, arguing that the Forest Service breached its implied duties to cooperate and not to hinder performance of

5

plaintiff's timber sale contracts. *Precision Pine*, 50 Fed. Cl. at 39.  On July 30, 2001, Chief Judge Damich issued a decision holding that the Forest Service had breached its implied duty to cooperate with respect to the Mud, Monument, Saginaw-Kennedy, Brann, Manaco, Brookbank, and Kettle contracts. *Precision Pine*, 50 Fed. Cl. at 73.  Each of the contracts at issue (except Hay) contained Special Contract Clause CT 6.25, "Protection of Endangered Species."  Chief Judge Damich found that CT 6.25 warranted that, at the time the contracts were entered into, the Forest Service had identified special measures necessary to protect endangered species under the ESA that were adequate for the protection of threatened or endangered species. *Id.* at 65–67. Chief Judge Damich reasoned that if a contract contains a specific warranty, a breach of that warranty breaches the implied duty to cooperate. *Id.* at 59 (citing *Cedar Lumber, Inc. v. United States*, 5 Cl. Ct. 539, 549–50 (1984)).  Chief Judge Damich held that the Forest Service breached this warranty with respect to those contracts entered into after the Ninth Circuit issued its decision in *Pacific Rivers* on July 7, 1994. *Id.* at 69.  After this date, the Chief Judge reasoned, the Forest Service knew that it was required to submit its LRMPs for consultation with the FWS. *Id.*  Having failed to do so, the Forest Service had no reasonable basis to know whether the warranty language contained in CT 6.25 was true. *Id.* at 69–70.

Chief Judge Damich also found that the Forest Service had breached its implied duty not to hinder with respect to the Hay, O.D. Ridge, U-Bar, Jersey Horse, Salt, Mud, Monument, Saginaw-Kennedy, Manaco, Brookbank, and Kettle contracts. *Id.* at 73–74.  Chief Judge Damich found that even if a contract does not contain a specific warranty, an unreasonable delay in performance that is caused by the Government can breach the implied duty not to hinder. *Id.* at 59.  Chief Judge Damich held that the length of the suspensions was unreasonable for these contracts, and that the Forest Service was at fault for the delay. *Id.* at 70–72.  The Forest Service also unreasonably delayed completion of the consultation process by failing to provide the Arizona District Court with a legally sufficient Biological Opinion in conformity with the joint stipulation of *Silver v. Babbitt* until November 26, 1996. *Id.* at 71.  As a result, Chief Judge Damich found that the suspensions became unreasonably protracted and plaintiff's operations were significantly hindered. *Id.*

At the trial on damages before this Court and in its post-trial briefs, defendant argued that: (1) plaintiff cannot recover lost profits because "the manufacture and sale of lumber constituted independent and collateral undertakings"; (2) plaintiff is precluded from recovering lost profits damages because it elected to treat the breach as partial and continued to perform under the contracts after the suspensions had been lifted; and (3) lost lumber profits were not a foreseeable result of the suspensions of plaintiff's timber sale contracts. *Precision Pine*, 72 Fed. Cl. at 465–66.  The Court ruled against defendant on all these arguments.  With respect to defendant's independent and collateral undertakings argument, the Court held that the "relevant issue is whether the lost profits claimed 'are too remote to be classified as a natural result' of the breach of a particular contract." *Id.* at 471 (quoting *Ramsey v. United States*, 121 Ct. Cl. 426, 434, 101 F. Supp. 353, 357 (1951)).  The Court held that "the timber contracts themselves and the nature of the Forest Service timber sale program indicate that the manufacture and sale of lumber were within the contemplation of the parties at the time that the contracts were entered

into." *Id.* at 473. Accordingly, the Court held that plaintiff was not "precluded from recovering lost lumber profits on the ground that they arose from independent and collateral undertakings." *Id.* at 476. With respect to defendant's arguments that plaintiff's decision to treat defendant's breach as partial rather than total precluded the recovery of lost profits, the Court held that the "remedy for a partial breach of contract is recovery of damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Id.* at 487 (citing *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005)). The Court further held expectancy damages can include lost profits. *Id.* (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324 (Fed. Cir. 2002); RESTATEMENT (SECOND) OF CONTRACTS § 347.) With respect to defendant's argument that plaintiff's lost profits were not a foreseeable result of defendant's breaches, the Court held that although "plaintiff can only recover lost profits damages if plaintiff can establish that defendant should have reasonably foreseen that Precision Pine would not be able to obtain cover for the suspended timber sales," *id.* at 482, "it was foreseeable to defendant at the time of contracting that no replacement timber (*i.e.*, 'cover') would be available to Precision Pine in the event that the Forest Service suspended harvesting on all Forest Service timber sale contracts in Region Three." *Id.* at 483.

At trial and in its post-trial briefs, plaintiff argued that its case was similar to that of a lost volume seller and that it "should not be required to offset profits that it earned by partially harvesting the suspended sales in the post-suspension period." *Precision Pine*, 72 Fed. Cl. at 465. The Court held that in order for plaintiff to demonstrate that it was entitled to recover lost profits without subtracting the profits it actually earned on the breached contracts during the post-suspension period,[5] plaintiff was required to demonstrate that:

> (1) but for the suspensions, Precision Pine would have successfully bid on and been awarded additional timber sale contracts that it would have harvested and manufactured into lumber in the post-suspension period;
>
> (2) but for the suspensions, Precision Pine would have been operating its mills at full capacity in the post-suspension period;
>
> (3) but for the suspensions, Precision Pine would have sold at a profit the lumber that it would have manufactured from the additional timber sales that it would have bid on and been awarded in the post-suspension period; and
>
> (4) the profits that Precision Pine would have earned but for the suspensions by selling lumber from the additional timber sales that it

---

[5] Plaintiff contended there should be no subtraction of the profits it actually earned on the breached contracts because plaintiff was entitled to be compensated as if it were a lost volume seller. *See Precision Pine*, 72 Fed. Cl. at 469–71.

> would have bid on and been awarded in the post-suspension period
> would have equaled or exceeded the profits that Precision Pine
> actually earned by partially harvesting the suspended sales in the
> post-suspension period.

*Id.* at 498. The Court ordered the parties to file supplemental briefs "discussing whether plaintiff
has presented sufficient evidence to establish that it satisfies the four criteria that the Court has
identified as necessary to prove that it is entitled to be compensated as a lost volume seller." *Id.*
at 498–99.

In response to the Court's September 2006 Opinion, the parties filed initial supplemental
briefs on the issue of plaintiff's lost volume seller theory of damage recovery on October 17,
2006. On this same day, plaintiff filed its motion styled as a "Motion for Relief from Limited
Aspects of the Court's Opinion and Order of September 17" ("Pl.'s Mot."). The Court ordered
that plaintiff's motion be treated as an RCFC 59(a)(1) motion for reconsideration and that
pursuant to RCFC 59(b), defendant was not to file a response unless ordered to do so by the
Court. *See* Order of October 27, 2006 (docket entry 433).

In its motion, plaintiff takes issue with the criteria set forth in the September 2006
Opinion. Although plaintiff acknowledges that it carries the initial burden of proof of
establishing what it describes as its "basic case," Pl.'s Mot. at 11–12 (docket entry 431, Oct. 17,
2006), plaintiff argues that based on legal scholarship and existing case law with respect to
traditional lost volume seller cases and cover damage cases, its basic case consists only of a
demonstration that it is an ordinary dealer in goods—here, lumber—who, in the absence of
defendant's breach, would have and could have entered into additional timber sale contracts
during the post-suspension-period. *Id.* Plaintiff argues that once it makes such a demonstration
the burden then shifts to defendant to show that, in the absence of the breach, plaintiff could not
have performed both the breached contracts and the additional contracts that plaintiff contends it
would have been awarded. *Id.* Accordingly, plaintiff requests that the Court grant it "relief from
the effect of [the Court's] erroneous premises."[6] *Id.* at 1.

Each party filed a response to the opposing party's initial supplemental brief on
November 14, 2006. On November 15, 2006, the Court ordered defendant to respond to
plaintiff's motion for reconsideration. Defendant filed its response to plaintiff's motion on

---

[6] Plaintiff focuses most of its attention on the second criterion concerning plaintiff's
operational capacity. A fair reading of plaintiff's briefs suggests that plaintiff acknowledges that
it must show that it "could have and would" have entered into the additional contracts (roughly
corresponding to the first criterion), *see* Pl.'s Mot. at 10 (docket entry 431, Oct. 17, 2006), and
that it must show that it would have earned as much or more on the additional timber contracts
that it would have bid on and been awarded in the post-suspension period than it actually earned
by partially harvesting the suspended sales in the post-suspension period (corresponding with the
third and fourth criteria), *see* Pl.'s Mot. at 6 (docket entry 431, Oct. 17, 2006).

December 15, 2006 ("Def.'s Resp. to Pl.'s Mot."). Plaintiff filed a reply on January 5, 2007 ("Pl.'s Reply").

## DISCUSSION

### I.    Reconsideration

#### A.    Standard of Review

"A motion for reconsideration 'enables a trial court to address oversights, and the court appreciates the opportunity to do so.'" *Cane Tenn., Inc. v. United States*, 62 Fed. Cl. 703, 705 (2004) (quoting *Fru-Con Constr. Corp. v. United States*, 44 Fed. Cl. 298, 315 (1999)). The decision whether to grant a motion for reconsideration is largely within the trial court's discretion. *Yuba Natural Res., Inc. v. United States*, 904 F.2d 1577, 1583 (Fed. Cir. 1990); *see also Triax Co. v. United States*, 20 Cl. Ct. 507, 509 (1990) ("A motion for reconsideration is addressed to the discretion of the trial court."). However, "[a] motion for reconsideration is not intended to give an unhappy litigant an additional chance to sway the court." *Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States*, 73 Fed. Cl. 154, 157 (2006) (quoting *Bishop v. United States*, 26 Cl. Ct. 281, 286 (1992)).[7]

#### B.    Plaintiff's Modified Lost Volume Seller Theory Depends Upon Proof of Lost Profits on Contracts That It Allegedly Would Have Entered Into in the Post-Suspension Period, But Such Lost Profits Are Not Based Directly on the Subject of the Breached Contracts and Are Therefore, As a Matter of Law, Too Remote and Indirect to Be Recovered

Plaintiff objects to the criteria set forth in the September 2006 Opinion. Plaintiff argues that based on existing case law with respect to traditional lost volume seller cases and cover damage cases, the Court should not require it to carry any burden beyond demonstrating that it is an ordinary dealer in goods who would have and could have entered into subsequent, profitable

---

[7] Defendant states that "the movant must show: (1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice." Def.'s Resp. to Pl.'s Mot at 2 (docket entry 438, Dec. 15, 2006) (citing *Strickland v. United States*, 36 Fed. Cl. 651, 657 (1996)). Defendant refers to the factors applicable to the reconsideration of final judgments. Because plaintiff seeks reconsideration of an interlocutory order, and not a final judgment, "the law of the case doctrine governs. . . , not the rules that apply to reconsideration of final judgments." *Wolfchild v. United States*, 72 Fed. Cl. 511, 524 (2006). Under the law of the case doctrine, the Court has wider latitude to reconsider and modify an interlocutory order at any time before the entry of a final judgment, subject to the principle that questions once decided ought not to be subject to continued re-argument. *First Fed. S&L Ass'n v. United States*, 76 Fed. Cl. 765, 767 n.2 (2007) (citing *Holland v. United States*, 75 Fed. Cl. 492, 494 n.2 (2007)).

timber sale contracts during the post-suspension period.[8]  Pl.'s Mot. at 10–11 (docket entry 431, Oct. 17, 2006).  Defendant argues that

> Precision Pine has . . . alleged that but for the MSO suspensions it would have entered into *additional* timber sale contracts from which it would have earned *additional* lumber profits.  Precision Pine's supposed inability to profit from additional contracts that it allegedly would have entered into but for the MSO suspensions might conceivably be claimed as consequential damages.  It is well-established, however, that such consequential losses are unrecoverable as a matter of law.

Defendant's Supplemental Response Brief ("Def.'s Supp. Response") at 3 (docket entry 435, Nov. 14, 2006) (citing *Olin Jones Sand Co. v. United States*, 225 Ct. Cl. 741, 743–44 (1980) (not published in FEDERAL REPORTER)) (footnote omitted).  The Court has not yet addressed this precise issue.[9]  Because the Court has not yet entered a final judgment, it has the discretion under the law of the case doctrine to revisit any of its interlocutory orders and make any modifications that it deems necessary.

Defendant urges the Court to deny plaintiff recovery under plaintiff's modified lost volume theory as a matter of law.  Def.'s Supp. Resp. Br. at 3 (docket entry 435, Nov. 14, 2006).  Defendant cites to *Olin Jones,* in which the United States Court of Claims, the predecessor court to the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), held that as a

---

[8] In the true "but for" world there would either have been no suspension or an abbreviated suspension.  For the sake of simplicity, the Court, like the parties, uses the term "post-suspension period" to refer to the time period after December 4, 1996, the date upon which the suspensions were lifted.  In addition the Court uses the term "suspension period" to refer to the time period between August 25, 1995, and December 3, 1996, whether discussing the "but for" world or when describing actual events.

[9] In its previous opinion the Court rejected defendant's arguments that under *Olin Jones* and its progeny, plaintiff's manufacture and sale of lumber products constituted "independent and collateral undertakings" and that, as a consequence, plaintiff could not recover lost profits damages.  *Precision Pine*, 72 Fed. Cl. at 471–76.  The Court remains of the view that the manufacture and sale of lumber were not independent of and collateral to plaintiff's purchase of timber from defendant.  Here, the Court addresses the issue whether plaintiff's modified lost volume seller theory is dependent on plaintiff's establishing lost profits on contracts entered into after December 1996, and whether lost profits on such contracts are too remote and indirect to qualify as recoverable damages under *Olin Jones* and its progeny.  Among such progeny is *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012 (Fed. Cir. 1996)*,* which describes lost profits not related to the subject matter of the breached contracts as "independent and collateral undertakings."

matter of law, damages "relating to potential future work or contracts"—"even assuming such damages could be proven"—"are too remote and indirect to be recoverable." *Olin Jones*, 225 Ct. Cl. at 744.  Plaintiff in *Olin Jones* argued that defendant's delay in making required payments under the contracts in dispute, "damage[d] plaintiff's standing in the business community and impair[ed] its ability to obtain other work which required bonding." *Id.* at 742.  The court held that plaintiff's injuries suffered due to its weakened business standing caused by the breach of contract could be "roughly divided into two categories; those which relate to completion of [the] particular contract [at issue], and those which involve plaintiff's ability to obtain other contracts or work." *Id.* at 743.  While plaintiff could recover provable damages in the first category, "as a matter of law" it could not recover damages in the second category, and the trial judge was "foreclosed" from considering such damages. *Id.*  In sum, even if plaintiff's damages in *Olin Jones* were certain, easily quantified by the court, and entirely foreseeable by the contracting parties at the time they entered into the contract, the court was barred from considering lost profits from the additional future contracts that plaintiff alleged it would have entered into absent defendant's breach.

This rule has faced some criticism by practitioners. *See, e.g.*, Daniel Patrick Graham, *Departing From* Hadley*: Recovering Lost Profits on Collateral Undertakings in Suits Against the Government*, 35 PUB. CONT. L.J. 43, 81 (2005) (arguing that the existing rule "represents a stark departure from the common law, which inquires whether such damages are, in fact, foreseeable and certain"); Marcia G. Madsen & Gregory A. Smith, *Proceedings of the 15th Judicial Conference Celebrating the 20th Anniversary of the United States Court of Federal Claims: The Court of Federal Claims in the 21st Century: Specific Proposals for Legislative Changes*, 71 GEO. WASH. L. REV. 824, 849–53 (2003) (arguing in favor of legislative initiative that would confer upon the United States Court of Federal Claims the "power to grant those damages that would be appropriate in commercial litigation between two private parties").  However, when the Federal Circuit has had occasion to revisit the holding in *Olin Jones*, it has consistently reaffirmed that case's central holding that lost profits that are unrelated to the subject matter of the breached contracts are not recoverable. *See Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012 (Fed. Cir. 1996); *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320 (Fed. Cir. 2003).

In *Wells Fargo*, the Federal Circuit acknowledged that its predecessor court had "repeatedly refused to award damages for profits lost on transactions not directly related to the contract that was breached." *Wells Fargo*, 88 F.3d at 1022; *see also id.* at 1223 (discussing *Olin Jones*).  Plaintiff in *Wells Fargo* argued that defendant's breach cost it the opportunity to earn profits from additional loans that it would have made in the absence of the breach. *Id.* at 1018.  The trial court accepted plaintiff's theory, and awarded it lost profits on the loans that it proved at trial it would have made but for defendant's breach. *Id.*  The Federal Circuit reversed, holding that plaintiff's "loss of interest on additional loans it allegedly could have made had there been no breach is 'too uncertain and remote to be taken into consideration as part of the damages occasioned by the breach of the contract in suit'" *Id.* at 1023 (quoting *Ramsey v. United States*, 121 Ct. Cl. 426, 435, 101 F. Supp. 353, 358 (1951)).  In so holding, the Federal Circuit classified

the additional loans as "independent and collateral undertakings." *Id.* (quoting *Myerle v. United States*, 33 Ct. Cl. 1, 26 (1897), as quoted in *Ramsey*, 121 Ct. Cl. at 435, 101 F. Supp. at 358). The Federal Circuit also emphasized that "not every injury resulting from a breach of contract is remediable in damages." *Id.* at 1022 (citing *Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540 (1903)). The Federal Circuit drew a distinction between the "anticipated profits of the contracts in question [and] the anticipated profits of its entire business enterprise." *Id.* at 1022 (quoting *Myerle*, 33 Ct. Cl. 26 , as quoted in *Ramsey*, 121 Ct. Cl. at 434). The Federal Circuit held that the former category was remediable in damages but the latter was not.

The Federal Circuit once again restated this principle in *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320 (Fed. Cir. 2003). In that case, plaintiff argued that the Armed Services Board of Contract Appeals ("Board") "should have awarded [it] anticipated profits and fixed overhead associated with future contracts which, it contend[ed], it would have been awarded . . . absent the government's breach of contract." *Id.* at 1333. Citing both *Olin Jones* and *Wells Fargo*, the Federal Circuit held that the "Board . . . correctly held that such profits are too 'remote and uncertain' to be recoverable." *Id.* Following these precedents the Court of Federal Claims has stated that "[c]ollateral undertakings that are too remote to be the basis for expectancy damages are those that are not based directly on the subject of the contract, but instead either involve the fruits of the contract or the opportunities crowded out by the breach of the contract." *Mann v. United States*, 68 Fed. Cl. 666, 669 (2005); *see also, e.g.*, *United Med. Supply Co. v. United States*, 63 Fed. Cl. 430, 440 (2005) (plaintiff not entitled to "consequential damages to its overall business or lost profits on future contracts that were not obtained."); *Mega Constr. Co. v. United States*, 29 Fed. Cl. 396, 474 (1993).

Plaintiff suggests that it hypothetically "could have, but did not, seek the difference between the full profits that it would have made on [the future contracts that it alleges it would have obtained but for defendant's breach] in the post-suspension period and the much smaller actual profit that it made [on the suspended contracts in the post-suspension period]." Pl.'s Mot. at 5 n.4 (docket entry 431, Oct. 17, 2006). Based on *Olin Jones* and its progeny, plaintiff's conclusion with respect to its hypothetical is mistaken. The profits from the additional contracts that plaintiff alleges it would have performed in the absence of the breach do not "relate" to the breached contracts as that term was used in *Wells Fargo*. Generally, lost profits based upon a later transaction relate to the subject matter of the breached contract when the breached contract is an agreement to supply inputs or resources that plaintiff uses to produce and sell end goods in a second transaction. *Wells Fargo*, 88 F.3d at 1023 (plaintiff was entitled to profits from a later transaction only when "the only purpose of the contract . . . was for the plaintiff to make profits on the subject of the contract—[for example] through mining, dairy cow operations, or property resale."). However, as the cases cited above consistently hold, it is never enough for a plaintiff to merely allege that the lost profits on the breached contract made entering into the second contract economically infeasible or that defendant's breach "crowded out" another opportunity that would have existed in the absence of the breach. Such contracts are considered independent and collateral to the breached contacts and profits from those contracts do not relate

to the breached contract.  The law in this Circuit is well-established that lost profits caused by the lost opportunity to enter into collateral contracts are not recoverable.

Plaintiff also argues that "*any* offset post-suspension profits will place it in a substantially worse position than it would have been had defendant performed as expected and therefore . . . no offset is appropriate," Pl.'s Supp. Br. at 2 (docket entry 430, Oct. 17, 2006).  However, as the Federal Circuit enunciated in *Wells Fargo*, "not every injury resulting from a breach of contract is remediable in damages."  *Wells Fargo*, 88 F.3d at 1022 (citing *Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540 (1903)).  Thus, plaintiff's contention that it will be placed in a substantially worse position than it would have been in the absence of the breach does not establish the viability of its modified lost volume seller theory.

The Court's September 2006 Opinion, describes a hypothetical involving the sale of a washing machine.  *Precision Pine*, 72 Fed. Cl. at 491.  The seller "has or can obtain more machines than it can sell.  The buyer breaches and the seller resells the washing machine destined for the breacher at same list price to another."  1 WHITE & SUMMERS, UNIFORM COMMERCIAL CODE ("WHITE & SUMMERS"), § 7-9, 484 (5th ed. 2006).  Because the "resale buyer is one of seller's regular customers who had intended to purchase a washing machine from seller anyway," deducting the profits that seller made on the sale of that specific machine from the profits that seller would have made absent the breach would under-compensate the seller.  In the absence of the buyer's breach, the seller would have made two sales, but instead, the seller only made one sale.  In such cases, the seller is entitled to the entire lost profit that it would have earned on the breached contract, without reducing that amount by the profits ultimately earned on the sale of that specific washing machine.

Compare the foregoing typical example of a lost volume sale to the following hypothetical.  Assume that the seller and the buyer have contracted for the sale *and delivery* of the washing machine.  As part of their agreement the buyer has promised to make himself available to accept the delivery.  However, when the seller arrives at the point of delivery, the buyer cannot be found, and the seller's delivery truck returns to the seller's shop having failed to deliver the washing machine.  After further communication, the seller re-schedules the delivery and buyer accepts the washing machine.  Assume further that the seller can prove that but for the buyer's breach, the seller would have been able to accomplish one additional sale, because the seller would have been able to make a different delivery during the time it was occupied completing the rescheduled delivery.  Note that in this hypothetical, the seller suffers the exact same injury as the seller in the typical example of a lost volume sale: the loss of one sale.  However, to the extent that lost volume damages in the first hypothetical may be available in the Court of Federal Claims, it is well-settled that lost volume damages are not available in the second case.  That is because the lost sale in the second hypothetical concerns a collateral contract opportunity "crowded out by the breach of the contract," *see Mann*, 68 Fed. Cl. at 669,

and thus the loss of that opportunity falls into the category of injuries not "remediable in damages." *Wells Fargo*, 88 F.3d at 1022.[10]

With respect to the second hypothetical above, plaintiff here does not directly request the lost profits from the second sale. Rather, plaintiff's theory is analogous to the seller of the washing machine requesting the full profits that it would have earned on the failed delivery without respect to the consideration that the buyer actually paid the seller. For the sake of simplicity, assume that the cost of the washing machine to the seller was $250, its delivery costs were $50, and the contract price is $500. The seller, thus, expected to earn $400 ($200 on each sale and delivery), but due to defendant's breach, it earned only $200. The critical question as the hypothetical pertains to the case before the Court is whether the seller may seek the full $200 "lost profits" that it would have earned on the failed delivery without accounting for the $150 ($200 less the additional $50 in costs for the second delivery trip) it actually earned on the re-scheduled delivery. Based on *Olin Jones* and its progeny, the Court holds that plaintiff cannot.

Plaintiff cannot escape the fact that it requests an amount in excess of its actual lost profits on the contracts in dispute. By definition, the "lost" profits on the contracts in dispute cannot include the profits earned on those contracts. A lost profit is only the amount that was not—but would have been—earned due to defendant's breach. The cases discussed above stand for the principle that only damages that flow from the "subject matter" of the contracts may be recovered, and plaintiff is not entitled to damages affecting its "entire business enterprise." *Wells Fargo Bank,* 88 F.3d at 1022; *Ramsey*, 121 Ct. Cl. at 434. In this case, the subject matter of the contracts is the specific timber that defendant sold to plaintiff. Thus, following the precedent discussed above, plaintiff may recover the losses it suffered due to its inability to sell lumber products manufactured from the specific timber that plaintiff was unable to harvest because of defendant's breach. Plaintiff cannot, however, recover the profits it would have earned on the collateral contracts that it alleges it would have profited from in the absence of defendant's breach.

According to plaintiff's model, the profits that plaintiff would have earned in the absence of defendant's breach can be broken down into two transactions. Pl. Mot. at 3–4 (docket entry 431, Oct. 17, 2006). Transaction 1 consists of the profits that plaintiff would have earned during the suspension period. *Id.* Transaction 2, according to plaintiff, consists of the profits from lumber sales that plaintiff would have made in the absence of the breach in 1997 and 1998. *Id.*

---

[10] Like plaintiff, the seller in this hypothetical probably would not qualify as a traditional lost volume seller. This is because in this hypothetical (1) delivery is part of the sales package and (2) the seller has a limited truck capacity. The lost volume seller theory generally operates under the assumption that seller has the capacity to sell an unlimited number of goods. *See, e.g.*, 3 FARNSWORTH ON CONTRACTS § 12.10 (3d ed. 2004); 1 WHITE & SUMMERS, § 7-9, 484 ; *see also, e.g*, 3 WILLISTON ON SALES, § 24:26, 658 (5th ed. 2006) (discussing *Lake Erie Boat Sales, Inc. v. Johnson*, 11 Ohio App. 3d. 55, 463 N.E.2d 70 (8th Dist. Cuyahoga County 1983)); 4A LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE, § 2-708:5, 220 (3d. ed. 2006).

Thus, under plaintiff's view, Transaction 1 never occurred. *Id.* Plaintiff argues it partially completed Transaction 2, which as a matter of "happenstance," *id.* at 10, involved the timber from the breached contracts. *Id.* The Court reads the above-cited precedent to require a more rigorous tracking of which profits flow from which contracts. Put another way, plaintiff is not entitled to the profits it would have earned *during the suspension period*; rather, plaintiff is entitled to the profits it would have earned *from the breached contracts*.

Under plaintiff's approach, the Court would simply ignore the profits that plaintiff actually earned on the breached contracts during the post-suspension period. Plaintiff argues that its approach is appropriate because even though it did make up some of its lost production on the specific breached contracts, it could never have made up lost production with respect to its overall business operations. Pl.'s Supp. Br. at 9 (arguing that the "hole in the 'profit pipeline' in the full amount of [the lost volume during the suspension period attributable to the breached contracts] remains unfilled.") (docket entry 430, Oct. 17, 2006). However, this approach is impermissible because plaintiff is not entitled to "anticipated profits of its entire business enterprise" but only the "anticipated profits [on] the contracts in question." *Wells Fargo,* 88 F.3d at 1022; *Ramsey*, 121 Ct. Cl. at 434. Although plaintiff appears to treat the breached contracts and the collateral contracts as fungible profit-making opportunities the sources of which are a matter of "happenstance," within this circuit plaintiff must show that its lost profits actually flow from the breached contracts.

In addition to its inconsistency with the general rule that injuries to a plaintiff's overall business enterprise that do not flow directly from the subject matter of the breached contract are nonremediable, plaintiff's approach, if accepted, would circumvent the more specific rule that a plaintiff may not recover for its losses related to collateral contract opportunities "crowded out by the breach of the contract." *Mann*, 68 Fed. Cl. at 669. It would make little practical difference if the Court affirmatively permitted plaintiff to recover lost profits on collateral contracts or if it permitted plaintiff to use its lost profits on such contracts as a quasi-credit to negate the profits plaintiff actually earned on the breached contracts in the post-suspension period. Arithmetically, adding a positive figure is identical to subtracting a negative figure. The only practical difference between awarding damages for lost profits on unrelated contracts and adopting plaintiff's lost volume seller theory is that plaintiff's approach would place a cap on the amount recoverable from lost profits on unrelated contracts equal to the profits earned on the breached contracts.[11]

--------

[11] To calculate "lost profits" one subtracts the earned profits ("Y") from the expected profits ("X"). Lost profits can thus be expressed as X - Y. From an arithmetic standpoint, it makes no difference if the Court directly permits plaintiff to affirmatively recover its lost profits on collateral contracts in amounts up to Y (this can be expressed as "(X - Y) + Y", or whether it permits plaintiff to negate the value of Y based on the existence unrelated contracts (this can be expressed as "X - (Y-Y)"). In both scenarios, plaintiff is left with the full amount X. The only difference between adopting plaintiff's approach and permitting it to affirmatively recover the lost profits on the unrelated contracts—something that is clearly impermissible under *Olin Jones*

(continued...)

However, for the reasons stated above, lost profits on collateral contracts are nonremediable as a matter of law.  There is simply no basis to conclude that injuries that are *per se* nonremediable may nonetheless be awarded in smaller fractions.

In view of the foregoing, the Court now holds that plaintiff's modified lost volume seller theory is not viable because plaintiff's theory relies upon proof of lost profits on contracts that were independent and collateral undertakings not related to the subject matter of the breached contracts.  Lost profits on contracts plaintiff allegedly would have entered into in the post-suspension period are, as a matter of law, too remote and indirect to be recovered.  In sum, plaintiff may only recover for its losses that flow from the specific contracts in dispute and not from losses to its overall business enterprise.  Because plaintiff has no legal entitlement to recover in this action its losses stemming from collateral contracts, it may not recover damages for such losses either affirmatively or by using the existence of such losses as a means to reduce the profits actually earned on the suspended contracts in the post-suspension period.  Plaintiff's modified lost volume theory of recovery fails because the losses on collateral contracts are, as a matter of law, too remote and indirect.  Thus, for all contracts, except Manaco,[12] plaintiff must reduce the profits it would have earned on the suspended contracts by the profits it actually earned on such contracts in the post-suspension period.

C.   **Even If Plaintiff's Modified Lost Volume Seller Theory Did Not Depend On Proving Damages That Are Not Recoverable as a Matter of Law, Plaintiff Has Not Established on the Evidence of Record That It Meets the Criteria Set Forth in the Court's September 2006 Opinion and Order**

1.   **Plaintiff Bears the Burden of Proof**

Plaintiff objects to the formulation of burden of proof set forth in the September 2006 Opinion and Order.  Plaintiff characterizes the Court's opinion as placing the burden on plaintiff "to show that profits [in the post-suspension period] should not be offset against the profits that

--------

[11](...continued)
and its progeny—is that plaintiff could not recover amounts above Y to the extent that the value of the expected profits on the unrelated contracts exceeded Y.

[12] Manaco presents a unique situation because even absent defendant's breach, plaintiff likely would not have harvested the entire amount of timber on that contract until the post-suspension period.  *Infra,* Section II.A.1.e.  Thus, plaintiff need not deduct the entire amount of profit that it earned on the Manaco contract from the profit it would have earned during the suspension period in the absence of the breach.  Specifically, plaintiff need not deduct the portion of its post-suspension profit that it earned on the Manaco contract equivalent to the amount that the Court determines plaintiff likely would have earned on the Manaco contract in the post-suspension period even absent defendant's breach.  *Infra,* Section II.A.1.e.

Precision Pine lost . . . during the suspension period."  Plaintiff argues that once it proves its "basic case,"[13] the burden then shifts to defendant to prove that its post-suspension profits should be "offset"[14] from the profits that plaintiff would have earned in the absence of defendant's breach.  Pl.'s Mot. at 12 (docket entry 431, Oct. 17, 2006).

Plaintiff argues that other commentators agree with this formulation:

> Although the ultimate burden must rest on the [non-breaching party], once the [non-breaching party] has made a basic showing of lost volume status, the burden of going forward with the evidence should fall upon the . . . defendant.

---

[13] Plaintiff adopted the phrase "basic case" from WHITE & SUMMERS, § 7–14.  Pl.'s Mot. at 10 (docket entry 431, October 17, 2006).  Plaintiff argues that its basic case consists of showing that it is a "regular dealer in goods" that "could have and would have" completed both the breached transaction and the lost transaction.  Pl.'s Mot. at 10–12 (docket entry 431, October 17, 2006).  The Court has adopted the phrase used by plaintiff and the text writers, understanding it to mean "prima facie case."

[14] Much of the confusion appears to derive from the imprecise use of the word "offset."  Both the parties and the Court use the word "offset" as a shorthand to refer to the "reduction of the profits plaintiff would have earned in the absence of the breach by the profits actually earned on the breached contract during the suspension period."  However, defendant is not actually requesting an "offset" as that term is traditionally understood.  *See, e.g.*, BLACK'S LAW DICTIONARY (8th ed., 2004) (quoting  4 Ann Taylor Schwing, CALIFORNIA AFFIRMATIVE DEFENSES 2d § 44:1, at 4–5 (1996) ("The . . . equitable concept of 'offset' recognizes that the debtor may satisfy a creditor's claim by acquiring a claim that serves to counterbalance or to compensate for the creditor's claim . . . .")); *see also Caroline Hunt Trust Estate v. United States*, 65 Fed. Cl. 271, 315 (2005) (noting that the set-off, or offset, equaled the value of benefits conferred on plaintiff).  Here, defendant is neither asserting any claims against plaintiff nor arguing that plaintiff's profits actually earned on the breached contracts represent a benefit conferred upon plaintiff.  For this reason, case law which plaintiff cites to stand for the proposition that defendant carries the burden of establishing the amount of an "offset" is not on point.  *See Precision Pine*, 72 Fed. Cl. at 495 ("A different burden of proof applies where plaintiff is attempting to prove its damages than where defendant is attempting to establish an offset against damages that a plaintiff has proved.") (citing *Caroline Hunt Trust Estate,* 65 Fed. Cl. at 315).  Here, the parties dispute the outcome of the application of the ordinary lost profits calculus in the first instance.  The burden is on plaintiff to show that it is entitled to be compensated as if it were a lost volume seller, *i.e.*, that it is entitled to recover lost profits on the breached sales without reducing those profits by the profits actually earned on the breached sales in the post-suspension period.  *See Precision Pine*, 72 Fed. Cl. at 492 n.21.

> . . . The [defendant] may, of course, effectively counter
> evidence of the seller's lost volume status if the buyer can show either
> that the breach enabled the [non-breaching party] to make a resale
> that otherwise could not have been made, or that the [non-breaching
> party] unreasonably failed to mitigate damages by making such a sale.

*Id.* at 11 n.9 (quoting Roy Ryden Anderson, *Damages for Sellers under the Code's Profit
Formula*, 40 Sw. L.J. 1021, 1060 (1986)).

This second passage clarifies that the burden of proof shifts to defendant only when
defendant intends to show that its breach benefitted plaintiff by enabling plaintiff to "make a
resale that otherwise could not have been made" or that plaintiff "unreasonably failed to mitigate
damages by making such a sale." Here, defendant makes neither argument, and the Court's
criteria do not force plaintiff to carry the burden of proof with respect to those issues. Although
plaintiff suggests that the Court has mistakenly tried to "shoe horn" its case to fit within the
traditional lost volume fact pattern, Plaintiff's Reply Brief ("Pl.'s Reply. Br."), at 6 n.3 (docket
entry 439, Jan. 5, 2007), it is actually plaintiff that urges the Court to apply case law that is not on
point. As the Court explained in its September 2006 Opinion, "Precision Pine does not precisely
fit within the traditional concept of a lost volume seller. Thus, the criteria that Precision Pine
must establish to demonstrate that it should be compensated as a lost volume seller differ
somewhat from the criteria set forth in more traditional lost volume seller cases." *Precision
Pine*, 72 Fed. Cl. at 497. Put another way, and using the terminology that plaintiff has adopted
from the White & Summers treatise, plaintiff here must prove a different set of facts to establish
its "basic case" than a plaintiff in a traditional lost volume seller case.

Plaintiff explains its case as follows:

> "[B]ut for" defendant's breach, during the nearly 20-month period
> from August 25, 2006 [*sic*] to April 15, 1997, Precision Pine would
> have harvested and processed 25,000 mbf (LS) *more* timber than it
> did, sold the resulting lumber and by-products and made a profit
> thereon of $6,551,856 (These sales of lumber and by-products are
> designated herein as "Transaction 1.") . . . Furthermore, while in this
> "but-for" world, as of [December 1996] Precision Pine would have
> had little to no timber to harvest, it still would have had three
> sawmills and substantial resources (*i.e.*, the profits from Transaction
> 1) with which to purchase the timber to supply those mills from the
> Forest Service which had just resumed selling timber on the four
> national forests where Precision Pine historically operated.
> Therefore, but for the suspension Precision Pine would have bought
> a substantial volume of that timber, processed it into lumber and by-
> products and sold that lumber and by products. (The sales of lumber
> and by-products from 25,000 mbf (LS) of such timber that would
> have taken place in 1997 and 1998 are designated herein as

"Transaction 2.") Accordingly, Precision Pine would have had the
profits from both Transaction 1 *and* Transaction 2.

Pl. Mot. at 3–4 (docket. entry 431, Oct. 17, 2006) (citations and footnotes omitted).

Plaintiff's model needs to be more precise.  Each "transaction"[15] consists of at least two
sub-transactions: (1) a purchase of timber and (2) the manufacture and sale of lumber products
and by-products.  To modify plaintiff's model from above, the Court labels the purchase of goods
or input materials relating to the breached contract—here, the breached timber sale contracts—as
Transaction 1A, and the manufacture and/or sale of the corresponding goods—here, lumber and
by-products—as Transaction 1B.  Similarly, the Court labels the purchase of goods or input
materials for the nonbreached contracts—here, the unrelated contracts that plaintiff alleges it
would have entered into but for defendant's breach—as Transaction 2A, and the manufacture
and/or sale of the corresponding goods as Transaction 2B.

As mentioned above, plaintiff argues that to prove its basic case it must demonstrate only
that it is a "regular dealer in goods" that "could have and would have" completed both the
breached transaction and the lost transaction.  *See* Pl. Mot. at 10–12 (docket entry 431, October
17, 2006).  These are important elements of what the Court holds is plaintiff's basic case, and
indeed the Court's criteria require plaintiff to demonstrate these facts.  The Court's first and third
criteria, *see supra*, p. 7, require plaintiff to establish these facts.  However, where plaintiff and
the Court's views on plaintiff's basic case appear to diverge is with respect to whether plaintiff
must also show that defendant's breach deprived it of the opportunity to accomplish the second
transaction.[16]  *See infra*, Section II.C.3.  The Court is of the view that this is an essential
component of plaintiff's basic case, and the second criterion requires plaintiff to establish that
defendant permanently deprived plaintiff of the lost opportunity to earn profits from the
additional contracts that plaintiff alleges it would have completed in the absence of defendant's
breach.

---

[15]  As discussed previously, *supra*, pp. 14–15, the Court rejects plaintiff's approach the
extent that it attempts to define the "transactions" as the I) profits it would have earned during the
suspension period and ii) the profits plaintiff would have earned in 1997–1998.  Rather, the
Court uses the term transaction in the traditional sense—*i.e.*, a contract to buy or sell something.

[16]  Or as the Court held in the September 2006 Opinion, "to the extent that plaintiff's lost
volume seller theory is based on the argument that Precision Pine lost an opportunity to produce
and sell lumber that can never be replaced, plaintiff would not be entitled to be compensated as a
lost volume seller if the alleged lost production opportunity could have simply been made up in
the post-suspension period by increasing the rate at which Precision Pine operated its mills."
*Precision Pine*, 72 Fed. Cl. at 492.  In such a case, plaintiff's lost profits would be the result of
its own business decisions.

As formulated by the Court in its September 2006 Opinion and using the model outlined above, plaintiff must demonstrate that defendant's breach deprived it of the opportunity to manufacture additional lumber in the post-suspension period and that but for defendant's breach it would have purchased additional timber in Transaction 2A, manufactured such timber into lumber and by-products, and sold its products at a profit in Transaction 2B.  As always, plaintiff would carry the burden of proving its basic case.  Under the Court's view, in order to prove its basic case, plaintiff would have to prove that it satisfied the first three of the Court's four criteria.

The fourth criterion is only relevant after plaintiff establishes that it is entitled to be compensated as a lost volume seller.  Put another way, if plaintiff fails to demonstrate any of the first three criteria, it cannot show that it is entitled to recover as if it were a lost volume seller.[17] However, if plaintiff fails to demonstrate the fourth criterion, it can still recover as if it were a lost volume seller.  The consequence of failing to demonstrate the fourth criterion would be a reduction of the lost volume damages in order to prevent placing plaintiff in a better position than it would have been in but for the breach.

The purpose of the fourth criterion is perhaps best understood through use of another hypothetical.  Assume that in the absence of defendant's breach, plaintiff would have earned $10 on the breached contracts in the suspension period and $5 on the collateral contracts that it would have entered into during the post-suspension period.  Plaintiff would thus have earned a total of $15 profit in the absence of the breach.  If plaintiff actually earned $7 in the post-suspension period, it would be improper for the Court to award it the full $10 that it would have earned during the suspension period in the absence of the breach because that would leave plaintiff with $17 ($10 in damages plus the $7 that it actually earned) whereas in the absence of defendant's breach it would have only earned $15.  Thus, in such a case, it would be appropriate to reduce the lost profits on the breached sales by $2, or the amount that the profits actually earned on such sales in the post suspension period ($7) exceeded the lost profits plaintiff would have earned on the collateral contracts ($5).

The Court concludes that in this case, it is fair to place the burden on plaintiff to show that "the profits that Precision Pine would have earned but for the suspensions by selling lumber from the additional timber sales that it would have bid on and been awarded in the post-suspension period would have equaled or exceeded the profits that Precision Pine actually earned by partially harvesting the suspended sales in the post-suspension period."  Only plaintiff knows its intent and plaintiff can best present evidence with respect to its strategy for harvesting

---

[17] Even a traditional lost volume plaintiff is not necessarily entitled to its full profits on the lost sale.  Rather, once plaintiff has established its basic case, the presumptive starting point for the calculation of damages is the full profits of the lost sale.  However, these damages are reduced to the extent that such an award would place plaintiff in a better position than had their been no breach.  It is within this context that White and Summers argue that the burden should be on defendant to show that plaintiff would be overcompensated.  WHITE & SUMMERS, § 7-14, 507.

timber and manufacturing lumber and by-products.  Moreover, in the course of proving the first
and third criteria, plaintiff must prove that it would have manufactured and sold additional
lumber products at a profit.  By assigning the burden of proof to plaintiff with respect to the
fourth criterion, plaintiff need only show that the profits proven in the third criterion exceed the
profits plaintiff actually earned on the suspended contracts during the post-suspension period.  In
any event, plaintiff acknowledges that it would need to establish that, in the post-suspension
period, the production of lumber from the breached contracts was "either equally or less
profitable" than production of lumber from the contracts plaintiff alleges it would have been
awarded in the absence of the breach.  Pl.'s Mot. at 6 (docket entry 431, Oct. 17, 2006).

Plaintiff also continues to rely on *Fertico Belgium, S.A. v. Phosphate Chemicals Export
Ass'n, Inc.,* 510 N.E.2d 334 (N.Y. 1987), for the proposition that defendant bears the burden of
showing that the profits actually earned from the breached contracts should be deducted from the
profits plaintiff expected to earn but for defendant's breach.  In the September 2006 Opinion, the
Court distinguished the *Fertico* on grounds that it concerned cover damages.  Plaintiff now
argues that the Court has latched on to a "non-existent distinction between 'cover' cases and
those cases in which cover could not be accomplished." Pl.'s Mot. at 9 (docket entry 431, Oct.
17, 2006).  Plaintiff supports its argument by noting that both cover damages and lost profits are
forms of "expectancy damages."  That alone, however, does not answer the question what types
of proof are required to establish each category of damages.

The nature of plaintiff's arguments—that is, denying that any relevant distinction exists
between its case and cover damage cases—requires another brief diversion into first principles,
and an illustration is helpful.  Assume that Buyer contracts with Seller to purchase a ton of bricks
for $1000, with the intention of reselling the bricks to Customer One at the price of $1200.
Buyer, thus, has an expected profit of $200 on the sale to Customer One.  Now, assume that
Seller cannot meet Buyer's delivery schedule and Buyer has to purchase bricks on the open
market at a price of $1050 per ton.  Buyer's cover damages would be the difference between
market price and the contract price, or $50.  Buyer's actual profits are the difference between its
purchase price of the replacement goods and its sale price to Customer One, or $150.  Thus,
Buyer's lost profits are the difference between its expected profits, $200, and its actual profits,
$150, for a total of $50.  Although the *amount* of Buyer's cover damages equals its lost profits, it
is a mistake to conclude that therefore the same *proof* is required to establish each category of
damages.  For cover damages, Buyer needs to show its contract price and the price of
replacement goods.  For lost profits, Buyer needs to show its expected profits on the contract
with Customer One and the profits it actually earned on that contract.  In the real world, there
would generally be little incentive for Buyer to attempt to pursue a claim for lost profits if it
could establish a case for cover damages.  However, if Buyer could not obtain cover, as plaintiff
could not obtain cover in the instant case, Buyer would have no choice but to pursue the more
complicated path of proving lost profits.

Plaintiff specifically relies on what are known as the "child of the breach" cases to argue
that defendant bears the burden of showing that plaintiff would not have completed both the
breached contracts and the collateral contracts that it would have been awarded in the absence of

21

defendant's breach.  In the child of the breach cases, after Buyer delivers its replacement goods to Customer One, Seller completes a late delivery of its original order.  Using the example from above, assume that Buyer accepts the late shipment and sells the bricks to Customer Two for $1025, earning an additional $25 in profit.  Assume further that in the absence of Seller's late delivery, Buyer would have not completed the second sale; in other words, assume that the second sale is a "child of the breach."  In such a case, Buyer would have earned profits of $175 ($150 from the first sale and $25 from the second sale), whereas in the absence of the breach Buyer would have earned $200.[18]  If Seller can prove that the Buyer's sale to Customer Two is a child of the breach, Seller is entitled to reduce Buyer's damages in the amount of the second sale. Thus, rather than owing the original $50 in cover damages, Seller would only owe $25.  In such a case, it would be defendant's burden to show that the second sale was a child of the breach.  This has little—if any—relevance in the instant case because plaintiff did not actually complete the equivalent of the "second sale" and thus, plaintiff must prove that but for defendant's breach, it would have.  In the child of the breach cases, the buyer has completed two re-sales, and the seller argues that but for its own breach, the buyer would have only completed one re-sale.  In the instant case, plaintiff has completed one set of timber sale contracts, and it argues that but for defendant's breach it would have completed two sets of timber contracts.  Given that plaintiff itself appears to acknowledge that it bears the burden of proving that but for defendant's breach it "could have and would have" completed the second set of sales, the child of the breach cases are of no help to plaintiff.

Plaintiff also argues that "the same formulation of the burden of proof set out in § 6-3 is reiterated in sections of the White & Summers treatise that do not deal with cover."  Pl.'s Mot at 9 (docket entry 431, Oct. 17, 2006).  The Court understands the sections of the treatise "that do not deal with cover" to be those dealing with the lost volume seller theory.  Even assuming *arguendo* that the typical formulations of the burden of proof are similar in cover damage cases and in cases involving lost volume damages with respect to whether a reduction of damages is required, plaintiff is *not* seeking cover damages and is *not* a typical lost volume seller.  Plaintiff's analogy to cover damage cases is therefore simply not persuasive in this case.

---

[18] In *Fertico*, defendant failed to timely deliver a shipment of fertilizer which plaintiff intended to resell.  Plaintiff obtained cover and completed its first sale.  Plaintiff later accepted defendant's late delivery and completed a second sale.  Defendant argued that but for its breach, plaintiff would have only had one sale.  The court in *Fertico* ruled in favor of plaintiff.  Although the initial reaction in the literature was positive, scholars, including White and Summers (upon whose treatise plaintiff relies) are now more skeptical of the ultimate outcome in *Fertico*: "Contrary to our conclusion in the last edition, we are now more doubtful of the majority's opinion. . . . [I]n our view, there should be an offset from Fertico's recovery . . . ."  White and Summers cite to rising market prices for fertilizer as necessitating an offset.  "It may be true that [plaintiff] could have made two sales, but if it did not have the first shipment from defendant . . . [plaintiff] would have had to buy additional phosphate on the market at a price that probably would have been higher than its contract price."  1 WHITE & SUMMERS, UNIFORM COMMERCIAL CODE, § 6-3, 390.

2.    **The First Criterion**

Under the Court's first criterion, in order to recover as if it were a lost volume seller, plaintiff must establish that "but for the suspensions, Precision Pine would have successfully bid on and been awarded additional timber sale contracts that it would have harvested and manufactured into lumber in the post-suspension period."

Under the first criterion, plaintiff must establish that but for the suspensions it would have completed Transaction 2A, *see supra*, p. 19, during the post-suspension period. Plaintiff's case differs significantly from the traditional lost volume seller cases. In the typical lost-volume sale case, the contract corresponding with Transaction 2A is *never* in issue because it is customarily "assumed that the supplier's own supply exceeds demand." 3 FARNSWORTH ON CONTRACTS § 12.10 (3d ed. 2004); 1 WHITE & SUMMERS, UNIFORM COMMERCIAL CODE, § 7-9, 484 (5th ed. 2006) ("Assume further that the seller has or can obtain more machines than it can sell."); *see also, e.g*, 3 WILLISTON ON SALES, § 24:26, 658 (5th ed. 2006); 4A LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE , § 2-708:5, 220 (3d. ed. 2006). Indeed, a plaintiff's failure to establish that it has an unlimited supply of goods can be fatal to a claim for lost volume damages. *See, e.g.*, *Lake Erie Boat Sales*, 11 Ohio App. 3d. at 57, 463 N.E.2d at 73. In stark contrast to traditional lost volume sellers, here the Court has already found in favor of plaintiff that "it was not possible for Precision Pine to effect cover in any meaningful sense." *Precision Pine*, 72 Fed. at 486.[19] Accordingly, plaintiff must demonstrate that in the absence of defendant's breach it would have completed Transaction 2A. For its part, plaintiff appears to acknowledge that it must at a minimum demonstrate that it "could have and would have" purchased timber in Transaction 2A and sold the corresponding lumber and byproducts in Transaction 2B.

Plaintiff argues that from "December 6, 1996 through December 31, 1998, on the four forests where Precision had historically . . . operated, the Forest Service offered a total of 93,312 mbf (LS) of sawlogs." Pl.'s Supp. Br. at 6 (citing PX 304) (docket entry 430, Oct. 17, 2006). Plaintiff further argues that due to the "greatly diminished total sawmill capacity of Precision Pine's competitors," *id.* (citing Trial Tr. 103–09 (Porter)), there was "effectively no competition for Forest Service timber sales for Precision Pine's sawmills in Heber or Winslow, which drew their source of supply primarily from Tonto, the Coconino and Kaibab National Forests." *Id.* (citing PPFF ¶¶ 10–12; Plaintiff's Additional Proposed Findings of Fact ("PAPFF") ¶¶ 1406; PX 104). Plaintiff argues that there is no basis to conclude that plaintiff, "with its strong cash position and competitive advantage, would not have been awarded most if not all of the sales on which it chose to bid." *Id.* at 15.

---

[19] As a general rule, "[t]he buyer's failure to cover when cover is available will bar recovery of lost profits damages that could have been prevented by cover." ROBERT L. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS,§ 2.2, 86 (6th ed. 2005) (cited by *Precision Pine*, 72 Fed. Cl. at 482–83).

Defendant argues that plaintiff continued to bid on timber sale contracts and was awarded six new contracts in 1997 alone. Def.'s Supp. Br. at 2 (docket entry 329, Oct. 17, 2006). Further, defendant argues that plaintiff failed to identify any timber sale that it did not bid on in the post-suspension period. *Id.* Moreover, defendant argues that plaintiff has not identified any additional contracts that it would have been awarded in the post-suspension period. Defendant identifies testimony that "bidding for timber was competitive at all times in Arizona and New Mexico." *Id.* (citing Trial Tr. at 1278 (Porter)). In defendant's view, this casts doubt on plaintiff's ability to show that it would have been awarded additional contracts in the post-suspension period in the absence of the breach.

Plaintiff has failed to prove that it would have, but for the suspensions, successfully bid on additional timber contracts and processed the resulting timber into lumber and by-products. As a preliminary matter, the Court is not persuaded by defendant's arguments suggesting that plaintiff is required—and has failed—to identify specific contracts that it would have bid on and been awarded. As illustration, it is conceivable that plaintiff would have had a 40 percent chance of being awarded any particular contract upon which it bid. If that were the case, plaintiff would never be able to demonstrate that it more likely than not would have been awarded any specific contract; nonetheless, the logical conclusion would be that plaintiff would have been awarded around four out of every ten contracts upon which it elected to bid. Thus, inquiring whether plaintiff would have been awarded any particular contract is not a useful exercise. Rather, the Court examines (1) number of additional contracts upon which plaintiff would have bid but for the MSO suspension, and (2) the likely success rate of plaintiff's being awarded those contracts. In order to establish the first criterion, plaintiff must be able to demonstrate what these two factors were as events actually transpired and what these two factors would have been in the absence of defendant's breach. In short, plaintiff must show that either it would have bid on additional contracts or that it would have bid on the same number of contracts but would have enjoyed a higher success rate in winning contracts. Here, plaintiff has failed at both steps. Plaintiff has failed to show what additional volume of timber it would have (but did not) bid on as a consequence of the breach. Also, plaintiff failed to demonstrate what its likely success rate was in the real world, and what its success rate would have been in the absence of the breach.

In arguing that it has satisfied the first criterion, plaintiff relies on two facts: (1) that in the first two years of the post-suspension period the Forest Service sold 93,312 Mbf (LS) of saw logs in the vicinity of plaintiff's mills; and (2) that plaintiff would have had the intent and capability of purchasing some of that timber. Pl. Supp. Br. at 6, 14–15. (docket entry 430, Oct. 17, 2006). Merely reciting the total amount of timber that the Forest Service offered is not probative, because plaintiff actually bid on some volume of that timber. Indeed, the Forest Service awarded plaintiff contracts to harvest a portion of overall 93,312 Mbf (LS) of timber offered for sale within two years of the suspension. The question before the Court is how much *additional* timber plaintiff would have bid on, but for defendant's breach. Without identifying what percentage of the total volume (*i.e.,* 93,312 Mbf (LS)) plaintiff did not bid on, the Court is left to speculate how much additional volume actually would have existed. To illustrate, if, in the real world, plaintiff actually bid on all of the offered for sale by the Forest Service in the post-suspension period, there would exist no additional contracts on which plaintiff could have bid in

the absence of the breach.  In such a case, plaintiff would be required to demonstrate that it would have enjoyed a higher rate of success at winning timber sale contracts in the absence of the breach than it actually enjoyed in the real world.  On the other hand, if plaintiff actually bid on a small fraction of the total 93,312 Mbf (LS), then plaintiff could argue that in the absence of the breach it would have bid on a larger percentage of that volume.  Here, however, plaintiff has not cited any evidence tending to show or to permit the Court to draw a reasonable inference as to what percentage of the entire 93,312 Mbf (LS) plaintiff actually bid on in the real world.

Moreover, the mere existence of additional available timber does not mean that plaintiff would bid on it.  As stated above, plaintiff continued to bid on Forest Service contracts.  It is not clear from the record whether plaintiff bid on all of the contracts that the Forest Service or others sold or solicited for bids, or whether plaintiff, after deliberation, elected to bid on some contracts but restrained itself from bidding on others.  If the former, the only way that plaintiff could establish the first criterion would be to demonstrate that it would have enjoyed a higher rate of success at being awarded such timber contracts, which plaintiff has failed to do.  *See infra*, p. 27. If it is the latter, plaintiff must prove the factors that it considered when deciding whether or not to bid on a particular contract, and what would have changed absent the breach.  Plaintiff argues that the primary factor that would have changed was its need for more logs, after exhausting the supply from the sales at issue in this case.  Pl.'s Supp. Br. 14–15 (docket entry 430, Oct. 17, 2006).  However, the possibility also exists that some available timber offered for contract was less desirable to plaintiff for various reason such as quality or location and would have remained less desirable to plaintiff in the absence of defendant's breach.  Plaintiff has not proven how it selected which contracts to bid on, and which contracts to forgo.  Plaintiff having failed to clearly explain its decision-making process, the Court has no basis to make findings as to what would have changed in the absence of the breach.  In sum, plaintiff has not identified any evidence in the record tending to show that it restrained itself from bidding on contracts that it otherwise would have bid on.

During cross-examination, Mr. Porter implied that many of the contracts on which plaintiff anticipated bidding were never actually offered by the Forest Service:

> Q: Putting aside those contracts that you bid on and were awarded, do you believe you would have gotten additional contracts from the Forest Service in 1997, if the Mexican spotted owl suspensions had not occurred.
>
> . . .
>
> THE WITNESS: . . . We were looking for timber to be offered by the Forest Service, to keep our mills operating. . . . . They had told us that they were going to bring those sales up, and they had a program to bring sales up that we felt was sufficient for our mills.  So we would have been bidding on those sales, *had they been offered*.

25

> Q:     And sales were offered, weren't they?
>
> A:     *And we bid on them.*
>
> . . .
>
> Q:     Can you identify any additional timber sale that, in your view, you would have been awarded, if the Mexican spotted owl suspensions had not occurred?
>
> A:     The Forest Service had a list of sales that they were to bring up and a program.  They told us which ones were to be brought up.  If you could show me a list . . . I might be able to show you which sales were coming up and which ones I would have [bid on].

Trial Tr. at 1286–88 (Porter) (emphasis added).  The testimony continues:

> Q: Can you say what additional volume of timber Precision Pine would have obtained through Forest Service contracts, had it not been for the Mexican spotted owl suspension?
>
> A: I can tell you that they did not sell any timber during the suspension, and there was timber on their program that they were supposed to sell, if that answers the questions.  *There were many timber sales in their program that should have been sold during the suspension and post-suspension, that were not available.*

*Id.* at 1289 (emphasis added).

There is no indication from this testimony that plaintiff restrained itself from bidding on contracts that were offered in the post-suspension period.  Mr. Porter's testimony suggests that plaintiff did bid on the desirable contracts that the Forest Service actually offered.  Trial Tr. at 1287 (Porter) ("Q: And sales were offered, weren't they? . . . A: And we bid on them.").  However, Mr. Porter also appears to assert that *before the suspensions occurred* plaintiff had an understanding that the Forest Service would sell certain timber based on a predetermined schedule (*i.e.*, the "program"), and that the Forest Service did not sell timber "in their program" as a result of the suspensions.  In other words, Mr. Porter is basing his testimony on the idea that but for the suspensions the Forest Service would have offered timber for sale *in addition* to that which it actually offered for sale in the real world.

The record does not permit the Court to assume that but for defendant's breach, the Forest Service would have conducted "business as usual" without any regard for the safety of the Mexican Spotted Owl or other concerns and considerations that arose after the Forest Service shared its scheduled "program" with plaintiff.  Efforts to protect threatened species caused the

breach; the breach did not cause the efforts to protect threatened species.  Hence, in the absence of the breach, no reason exists to assume that the Forest Service would have sold any more timber than it actually did sell.  Plaintiff cannot credibly rely on a pre-suspension understanding of what the Forest Service intended its timber sale schedule to be.

In addition to demonstrating a volume of timber that plaintiff would have bid on in the absence of the breach but that it did not bid on as a result of the breach, plaintiff has also failed to demonstrate a likely success rate that it would have enjoyed on the contracts that it would have bid on but for defendant's breach.  Plaintiff argues that there is "no basis" to conclude that plaintiff, "with its strong cash position and competitive advantage, would not have been awarded most if not all of the sales on which it chose to bid."  Pl.'s Supp. Br. at 15 (docket entry 430, Oct. 17, 2006).  The difficulty for the Court is that there is no basis in the record to draw any conclusions with respect to the volume of timber plaintiff would have been awarded in the absence of the breach.  Mr. Porter testified that "bidding for timber was competitive *at all times* in Arizona and New Mexico."[20]  Trial Tr. at 1278 (Porter) (emphasis added).

In the face of this testimony it is difficult for the Court to conceive, as plaintiff now asserts, that it would have been awarded "most if not all" of the contracts upon which it elected to bid.  Plaintiff has not identified any evidence tending to show what its traditional success rate was on the contracts upon which it bid, or how its success rate for winning timber sale contracts would have changed in the absence of the breach.  Plaintiff's proof is simply insufficient to permit the Court to find in its favor with respect to the first criterion.  Here again, plaintiff acknowledges that it carries the burden of proving at a minimum, that in the absence of defendant's breach, it "would have and could have" acquired additional timber post December 1996.  Thus, even setting aside the holding in Part I.B of this opinion, and even if the Court were to adopt plaintiff's formulation of the elements required to establish its basic case, the Court would still be required to conclude that plaintiff failed to prove the elements of its basic case and thus failed to establish that it is entitled to recover as if it were a lost volume seller.

### 3.    The Second Criterion

Under the Court's second criterion, plaintiff must establish that "but for the suspensions, Precision Pine would have been operating its mills at full capacity in the post-suspension

---

[20] Counsel for defendant attempted to ask Mr. Porter whether "[a]lthough there may have been fewer people at the bid table, it was still a competitive . . . market?"  Trial Tr. at 1278 (Harrington).  Counsel for plaintiff objected, asserting that the question had been "asked and answered"—presumably when Mr. Porter testified that bidding was competitive *at all times*—and the Court sustained the objection.  In so doing, the Court took Mr. Porter's testimony that bidding for timber was competitive "at all times" at face value, as counsel for plaintiff apparently did, and the Court understood Mr. Porter's testimony to mean that bidding was competitive in the post-suspension period notwithstanding the declining number of bidders for timber sale contracts in Arizona and New Mexico.

period." Of the Court's four criteria, plaintiff appears to object most strongly to this one. However, it is necessary for plaintiff to establish the second criterion in order to demonstrate that plaintiff actually lost volume as a result of defendant's breach.[21] By showing that in the absence of the breach, plaintiff would have been operating its mills at full capacity, plaintiff demonstrates it could not have simply "made up" the lost volume in the post-suspension period. If on the other hand, plaintiff would have had unused capacity and could therefore could have made up all or some of the volume, then defendant did not cause it to "lose" such volume.[22]

As the Court held in its previous opinion, "to the extent that plaintiff's lost volume seller theory is based on the argument that [because of the suspensions] Precision Pine lost an opportunity to produce and sell lumber that can never be replaced, plaintiff would not be entitled to be compensated as a lost volume seller if the alleged lost production opportunity could have simply been made up in the post-suspension period by increasing the rate at which Precision Pine operated its mills." *Precision Pine*, 72 Fed. Cl. at 492. Here, plaintiff objects to the Court's characterization of its central argument. Plaintiff argues that contrary to the Court's opinion, it never "argue[d] that [defendant's breach] caused plaintiff to lose an opportunity to produce and sell lumber." Pl.'s Mot. at 2 (docket entry 431, Oct. 17, 2006) (quoting *Precision Pine*, 72 Fed. Cl. at 491 (alterations added)). According to plaintiff, it has never argued that defendant's breach "prevented or discouraged plaintiff from entering into additional contracts to purchase timber after the suspensions were lifted." *Id.* (docket entry 431, Oct. 17, 2006) (quoting *Precision Pine*, 72 Fed. Cl. at 492). *But see* PPFF ¶ 143 (quoting Trial Tr. at 629 (Porter)) ("We had a period of time there that was taken from us that we could not produce, we could not sell, we could not do anything with that timber that was taken from us and therefore it's something that you never get back."); Trial Tr. at 2362 (Ness) ("[T]he critical factor is that you had lost production capability in the time periods that we were examining during the suspension period where this timber would have been cut and processed. Those are lost opportunities. There is no way to go back and put logs into that period and manufacture those."); Pl.'s Supp. Br. at 9 (docket entry 430, Oct. 17, 2006) ("[T]he hole in [plaintiff's] 'profit pipeline' . . . remains unfilled.").

Plaintiff distinguishes its case from the traditional lost volume seller cases by noting that in a traditional case defendant argues that plaintiff could not have performed both the breached contract and the subsequent contract simultaneously. Plaintiff argues that because it never

---

[21] Note that in a traditional lost volume case, once plaintiff demonstrates that it is a regular dealer in goods who could have and would have performed the second transaction, plaintiff can easily show the loss of volume. It is tautological to say that but for a breached sales contract, plaintiff would have completed the sale at issue. Here, plaintiff completed the breached contract, thus its lost volume is less obvious and requires the additional showing that defendant's breach prevented plaintiff from entering into and completing some other contracts.

[22] To use the washing machine sale and delivery hypothetical, *supra*, pp. 13–14, the seller would have to show that it could not have fit an extra washing machine on its delivery truck and completed both sales.

intended to perform both contracts simultaneously, capacity is a nonissue in this case.  Instead, plaintiff argues that it must merely show that it would have "engaged in Transaction 1" and also "engaged in Transaction 2."  Pl.'s Mot. at 11–12 (docket 431, Oct. 17, 2006).  Plaintiff argues that after this showing, the "burden, thus shifts to defendant to show that it is more probable than not, that, in the 'but for' world, Precision Pine *would not have accomplished both Transaction 1 and Transaction 2*."  *Id.* (emphasis added).  Plaintiff has it backwards.[23]  The Court did not task plaintiff with showing that it could have affirmatively performed both transactions simultaneously.  On the contrary, plaintiff's claim to recover as if it were a lost-volume seller depends upon showing that it *could not have* performed both transactions simultaneously in the post-suspension period.  As the Court held in its previous opinion, "plaintiff would not be entitled to be compensated as a lost volume seller if the alleged lost production opportunity could have simply been made up in the post-suspension period by increasing the rate at which Precision Pine operated its mills."  *Precision Pine*, 72 Fed. Cl. at 492.  Plaintiff also misses the mark when it argues that it "never intended to perform" both the breached contracts and the other contracts that it alleges it would have been awarded simultaneously.  The question is whether plaintiff *could have* performed both contracts simultaneously, not whether it *intended* to perform them both simultaneously.  Irrespective of plaintiff's intent, if plaintiff could have performed the breached contracts and the additional contracts that it alleges it would have been awarded in the absence of defendant's breach, then defendant's breach did not cause plaintiff to lose out on such additional contracts.

Although plaintiff argues that "capacity to accomplish both transactions at the same time is not an issue," this statement is inconsistent with the legal scholarship cited by plaintiff to support its "hole in the profit pipeline" damages theory, which assumes that the manufacturer is operating at full capacity.

> [I]f a manufacturer with no inventory needs delivery of twenty tons of aluminum each week to make cars in its factory, *which is operating at full capacity*, assuming that cover were not possible on short notice, a supplier's failure to make delivery one week would result in the loss of a week's worth of auto production that can never be made up without expanding the capacity of the factory.

Alan I. Saltman, *Must Profits Made In Transactions Involving Late-Delivered Goods Be Deducted From the Injured Party's Breach Damages?  If Not, What Impact Should Late-Delivered Goods Have?*, 78 ST. JOHN'S L. REV. 131, 133–34 (2004) (emphasis added).

---

[23] In its supplemental brief, however, plaintiff demonstrates that it understands the Court's inquiry.  Pl.'s Supp. Br. at 9 n.9 (docket entry 430, Oct. 17, 2006) ("The premise underlying the inquiry . . . is that Precision Pine had additional sawmill capacity in the post-suspension period that it might have used to produce additional lumber.").

Plaintiff argues that capacity is irrelevant because "[a]bsent the breach, Precision Pine would have acted no differently and would have produced lumber at the rate that market conditions, other practical considerations, and the limitations on the ability to predict the future would suggest was prudent." Pl.'s Br. at 9 n.9 (docket entry 430, Oct. 17, 2006). The Court recognizes that capacity has two components. The first component concerns the physical ability to manufacture lumber products at plaintiff's mills. The second component concerns the market conditions that can support plaintiff's additional production. Clearly, if market conditions make it economically infeasible for plaintiff to operate it mills at their full physical capacity, plaintiff need not need not operate at such a level. The entire purpose of the second criterion is to establish that plaintiff could not simply "make up" its lost profit upon release of the timber for harvesting. It would be nonsensical, then, to require plaintiff to lose even more money in a futile effort to make up its lost profit. The unspoken assumption in the September 2006 Opinion was that plaintiff need only show either that it would have in the absence of the breach produced timber at its maximum physical capacity or at a rate consistent with profitability.

Here, however, plaintiff failed to demonstrate under the first criterion that it "would have successfully bid on and been awarded additional timber sale contracts that it would have harvested and manufactured into lumber in the post-suspension period." Thus, plaintiff has necessarily failed to demonstrate that it could have bid on and been awarded enough timber to keep its mills operating at their physical or economic capacities. Given that the Court rejects the modified lost-volume seller theory as formulated by plaintiff to the extent that it depends upon proof of lost profits that are as a matter of law too remote and indirect to be recovered, whether plaintiff could have satisfied the second criterion is more an academic question than one of substantive import. However, having failed to establish the first criterion it is logically impossible for plaintiff to establish the second.

### 4. The Third Criterion

The Court's third criterion requires that plaintiff demonstrate that "but for the suspensions, Precision Pine would have sold at a profit the lumber that it would have manufactured from the additional timber sales that it would have bid on and been awarded in the post-suspension period." This criterion is closely related to the first. Whereas the first criterion inquires whether plaintiff would have acquired additional timber and manufactured it into lumber, the third criterion inquires whether plaintiff would have been able to sell such lumber at a profit. For its part, plaintiff appears to acknowledge that it must show that it is a dealer in goods and that it "could have and would have" completed Transaction 2. Pl.'s Mot. at 11 (docket entry 431, Oct. 17, 2006). Here again, given that plaintiff failed to prove that it met the first criterion, namely, that in the absence of the breach it would have purchased additional timber in the post-suspension period, *see supra,* Section I.C.2, plaintiff has necessarily failed to prove that it would have sold such timber at a profit.

5.    **The Fourth Criterion**

The Court's fourth criterion requires plaintiff to show "the profits that Precision Pine would have earned but for the suspensions [in Transaction 2B] would have equaled or exceeded the profits that Precision Pine actually earned by partially harvesting the suspended sales in [Transaction 1B]." The purpose of the fourth criterion is to ensure that plaintiff is not overcompensated by the Court. *See supra*, pp. 20–21. In other words, the fourth criterion ensures that plaintiff is not placed in a better position than it would have been in the absence of defendant's breach. The fourth criterion is only relevant after plaintiff has demonstrated its basic case. In this case, plaintiff has failed to do so. Moreover, as a factual matter, having failed to show that it would have (1) purchased additional timber as required by the first criterion, and (2) sold such timber at a profit as required by the third criterion, it would be impossible for the plaintiff to satisfy the fourth criterion. Thus, plaintiff has failed to prove that it is not "required to offset profits that it earned from partially harvesting the suspended sales in the post-suspension period."[24] *Precision Pine*, 72 Fed. Cl. at 492 n.21. Thus, the Court now turns to determining the amount of plaintiff's lost profits on the suspended sales during the suspension period and the amount of profits actually earned by plaintiff on the suspended sales during the post-suspension period.

## II.    **Damages**

### A.    **Lost Profits**

To prove its damages plaintiff presented testimony from its expert, Mr. Robert Ness, who sought to determine "what would have changed" had defendant not breached the suspended contracts. Trial Tr. at 2218–19 (Ness). The first step for Mr. Ness was to determine when the plaintiff would have harvested the timber from the suspended sales had defendant not breached. Here, Mr. Ness examined a reconstructed timber harvesting schedule developed by Mr. Porter that plaintiff asserts it would have followed in the absence of the breach. PPFF ¶ 72. Next, Mr. Ness needed to determine the volume of the resulting lumber products that could have been produced from the harvested logs. To accomplish this task, in some cases,[25] Mr. Ness needed to first convert the volume of unharvested timber remaining on each contract measured in one hundred cubic feet (ccf), to the resulting volume measured in one thousand board feet in log scale (Mbf (LS)). For this step, Mr. Ness used a conversion factor 0.5 Mbf (LS) per each ccf timber. *Id. ¶ 71.* Next Mr. Ness needed to convert the volume of harvested logs (expressed in Mbf (LS))

---

[24] As discussed, *supra,* note 12, and *infra*, Section II.A.1.e, plaintiff may retain a portion of its post-suspension profits earned on the Manaco contract equivalent to the amount that the Court determines it likely would have harvested in the post-suspension even absent defendant's breach.

[25] Not all of the contracts were stated in ccf. The Hay, O.D. Ridge, and U-Bar contracts were stated in terms of Mbf (LS). Third Joint Stip., ¶¶ 7, 18, 22 (docket entry 361, June 3, 2005).

to the volume of lumber (expressed in one thousand board feet in lumber tally (Mbf (LT))).  The ratio of the amount of lumber products in Mbf (LT) that a mill can produce from a volume of logs measured in Mbf (LS) is referred to as the "overrun factor."  Trial Tr. at 139–40 (Porter); *see* discussion, *infra*, Section II.A.2.  Here, Mr. Ness used an overrun factor of 1.25 Mbf (LT) of lumber products for every Mbf (LS) of logs.  PPFF ¶ 77(b).  Mr. Ness then needed to apportion the overall expected volume of lumber products that plaintiff would have produced on the suspended contracts in the absence of the breach into assorted product categories.  *Id.* ¶ 85.  Mr. Ness accomplished this by relying on a projected "product mix" developed by Mr. Porter.  *Id.* The product mix is the percentage of the overall volume of lumber that plaintiff could have expected to produce in each category of products.  Trial Tr. at 4278 (Munn).  After determining the volume of lumber in each product category, Mr. Ness then relied on price information developed by Mr. Porter for each product category and, based on the timing of the production and sale of the products, determined the amount that plaintiff would have earned in the absence of the breach on the sale of lumber products from the breached contracts.  PPFF ¶ 91.  Mr. Ness then deducted the variable manufacturing overhead expenses that plaintiff would have incurred in the course of production from the gross profit figures he calculated.  *Id.* ¶ 65.  These amounts included the "stumpage price"[26] paid by plaintiff to the Forest Service for the timber as provided by the contracts.  *Id.*  Although plaintiff argues that this amount should not be reduced by the profits it actually earned on the suspended contracts in the post-suspension period, Mr. Ness also calculated the profits it actually earned on the suspended contracts should the Court reject its principal theory.  PX 182.  In arriving at its actual profit figures, plaintiff reduced its actual profits by an estimated amount of damages owed in *Precision Pine v. United States* (No. 02-131) ("*Precision Pine II*").[27]  *Id.* at Exhibit 1.  Plaintiff also calculated its profits using increased overhead costs.  *See* discussion *infra*, Section II.A.10.

Defendant objects to plaintiff's methodology on numerous bases.  Defendant also asserts that the harvesting and milling schedules developed by plaintiff were not realistic because: (1) the harvesting schedule overstates the amount of decked logs that plaintiff would have maintained in inventory in the absence of the breach, Def.'s Br. at 34–35 (docket entry 382, Sept. 2, 2005) ; (2) the harvesting schedules would require the harvesting of timber outside the

---

[26] Stumpage prices are the purchase prices that plaintiff pays to the Forest Service upon harvesting.  The stumpage prices charged plaintiff were generally variable and would rise and fall in concert with the lumber market.  *See* PX 169–79 (AT5, AT6, AT7).  As a consequence, the timing of harvesting would establish the stumpage price that plaintiff would have paid the Forest Service.

[27] The Court issued an Opinion and Order in *Precision Pine II* on December 22, 2006. *Precision Pine & Timber, Inc. v. United States*, 75 Fed. Cl. 80 (2006).  In that Opinion and Order, the Court awarded defendant in excess of $427,000 in default damages plus interest. Defendant filed a notice of appeal in *Precision Pine II* on February 21, 2007, and the case is currently in its briefing phase before the Federal Circuit.  The Federal Circuit has docketed the appeal in *Precision Pine II* as case number 07–5085.

contractual harvesting seasons, *id.* at 54; (3) the harvesting schedules do not take into account forest-wide fire closures that would have prevented timber harvesting in May through early July of 1996, *id.*; and (4) the schedules assume that start date for defendant's liability coincided with start of the suspension whereas defendant interprets Chief Judge Damich's Opinion to hold that liability only arose after the suspensions became unreasonably protracted in duration, *id.* at 6–8. Defendant further argues that plaintiff erroneously used an overrun factor of 1.25 Mbf (LT) per Mbf (LS) instead of 1.08, which defendant asserts is a more reliable measure of the overrun that plaintiff would have realized in the absence of the breach. *Id.* at 38–39. In addition defendant argues that in converting ccf timber into Mbf (LS), plaintiff erroneously relied on a general "rule of thumb" figure of 0.5 rather than the specific conversion factors that the Forest Service computed for each timber sale. *Id.* at 36. Defendant also asserts that plaintiff's methods of calculating product mixes were inaccurate and skewed towards higher priced products. *Id.* at 39–42. Moreover, defendant objects to plaintiff's methods of computing the sale prices of lumber products within each product category, asserting that plaintiff improperly excluded certain invoices when it calculated the average price and arguing that plaintiff should have calculated a weighted average of the invoice prices as opposed to a straight average. *Id.* at 37–38.

With respect to arriving at a final amount of lost profits, defendant argues that plaintiff should have calculated its lost profits in terms of net profit rather than what defendant characterizes as gross profit. *Id.* at 18. Defendant further argues that plaintiff inadequately accounts for losses that plaintiff would have absorbed in harvesting and removing roundwood as it asserts was required by the contracts. *Id.* at 43. Finally, defendant argues that plaintiff has understated its profits on the breached contracts in the post-suspension period, and because plaintiff's expected profits in the absence of the breach must be reduced by its actual profits on the breached contracts in the post-suspension period, plaintiff has thus inflated its damages. In particular, defendant argues that: (1) plaintiff may not reduce its profits on the breached contracts in the post suspension period for amounts owed as default damages in *Precision Pine II*, *id.* at 46–47; and (2) may not reduce those profits by increased logging and hauling expenses, *id.* at 47; and (3) may not reduce those profits for "increased overhead," *id* at 47–48. Defendant argues that plaintiff is not entitled to recover what plaintiff described as its "mill inefficiency" costs incurred during the MSO suspension. Defendant asserts that plaintiff may not recover its increased hauling expense incurred on the Hay contract in the post-suspension period. *Id.* Defendant also asserts that plaintiff has overstated the profits it would have earned from the sale of lumber by-products—namely bark, chips, shavings, and grindings. *Id.* at 44–45.

### 1.      The Harvest Schedule Used By Mr. Ness

#### a.      Inventory Size

Defendant also challenges the inventory size that Mr. Ness projected that plaintiff would have maintained absent the suspensions. Mr. Ness used a harvesting schedule created by Mr. Porter. Trial Tr. at 2245 (Ness). Mr. Ness's method assumed that plaintiff would have adopted what defendant refers to as a "harvest and hold" approach by which plaintiff would harvest

excess timber and maintain such timber in inventory.  Def.'s Br.at 34–35(docket entry 382, Sept. 2, 2005).  Defendant argues that this methodology permits plaintiff to artificially inflate its projected profits by presuming it could harvest large amounts of timber during periods when stumpage prices were low, and then selling the resulting lumber when the prices were higher.  *Id.* at 37.  Defendant argues that the assumption that plaintiff would have maintained a large inventory of decked logs is improper because in practice, plaintiff never maintained such large inventories.  *Id.*

Defendant relies principally on the deposition of Mr. John Smith, a former purchaser representative of plaintiff during the MSO suspensions, to support this contention.[28]  Smith Dep. Tr. at 14.  Mr. Smith's primary responsibility during his employment with plaintiff was to act as a liaison between plaintiff "and a logging contractor, and the Forest Service."  *Id.*  Mr. Smith also demonstrated a intimate familiarity with the timber industry of the southwest.  He graduated with a degree in Forestry from Northern Arizona University in 1966 sometime thereafter began a career in the forest industry.  *Id.* at 10.  Over the course of his career Mr. Smith had been employed in the both the public and private sector.  *Id.* at 10–14.  Mr. Smith testified that in the southwest, the customary timber industry practice was that a mill would typically try to exhaust its inventory of decked logs "down to about zero" over the course of the winter, which coincided with the harvesting off-season.  *Id.* at 24.  Sometime around April a mill would begin "building a deck depending on the size of [the] sawmill to run two weeks, three weeks, whatever."  *Id.*  In Mr. Smith's experience, a sawmill would hold "maybe three weeks [of decked logs] at the most" until September.  *Id.* at 27.  Beginning in September, a typical mill would then increase inventory of decked logs until it was large enough to keep its mills running through the winter months.  *Id.* at 25.  Typically, a mill would not maintain an inventory of decked logs larger than two or three weeks during the summer and early fall because that time is known as the "blueing season."  *Id.* at 26–27.  The term blueing season refers to the period when logs are vulnerable to host a type of fungus that causes a blue stain that degrades the value of certain lumber products.  *Id.*  Mr. Smith testified that in his experience, plaintiff's customary decking practice was consistent with the described harvesting strategy and that plaintiff did not deviate from this strategy during his tenure.  *Id.* at 29.

---

[28] Mr. Smith did not testify in person during the trial.  Defendant served him with a subpoena.  However, Mr. Smith moved to quash the subpoena, through counsel recommended to Mr. Smith by plaintiff's counsel, Trial Tr. at 5313 (Smith), as unduly burdensome for health reasons.  *See* Motion to Quash Subpoena of John Smith (docket entry 364, June 13, 2005).  As an alternative to in-person testimony, each party consented to designate portions of Mr. Smith's deposition conducted on January 30, 2004, for introduction into evidence.  Trial Tr. at 3964–72.  In addition, Mr. Smith testified telephonically on June 17, 2005.  Trial. Tr. at 5312–5354 (Smith).

Mr. Porter testified that plaintiff "had the ability" to employ methods to deter blue stain but that it "didn't routinely do so" because "there were times when it wasn't necessary." Trial Tr. at 1677 (Porter). Mr. Ness testified that he confirmed with Mr. Porter that bluestain would not "be a problem." *Id.* at 5700 (Ness). Moreover, plaintiff argues that it had maintained large inventories of decked logs in the past, and had room for decks of the size required by its projected harvesting schedule. *Id.* at 5611 (Ness).

Plaintiff did not introduce any testimony with respect to what methods it would have used to maintain large log inventories throughout the summer without grade degradation due to staining. Moreover, plaintiff failed to adequately explain why it would have decided in 1996 to alter its practice of maintaining smaller log decks during blueing season. Although plaintiff argues that it has historically maintained large log inventories, plaintiff failed to argue, let alone prove, that it ever purposefully maintained sizable log decks during blueing season. Plaintiff's other argument that plaintiff "had room at its mills" for log decks of that size and that plaintiff had in the past maintained log decks of that size or larger similarly miss the mark. The question is not the size of the decks, rather it is the timing of the decking. In other words, it is unsurprising, given the testimony of Mr. Smith that plaintiff maintained large log decks in the fall and winter months. The question is whether plaintiff would have maintained large log decks in the spring and summer months.

Mr. Ness testified that plaintiff's projected harvesting schedule would have resulted in log decks during blueing season sufficient to supply plaintiff's mills with logs for 60 to 90 days. *Id.* at 5610–11 (Ness). In other words, the harvesting schedule developed by Mr. Porter and used by Mr. Ness assumed that plaintiff would have maintained log inventories of two to three months during blueing season as opposed to two to three weeks as Mr. Smith testified was plaintiff's custom. After reviewing the evidence, the Court finds Mr. Smith's testimony credible and is persuaded that plaintiff's standard practice over the course of the spring, summer, and early fall was to maintain an inventory of decked logs sufficient to operate its mills for three weeks. The Court is also persuaded from the evidence that plaintiff's customary practice was to begin to amass larger inventories of decked logs beginning in September and that by the conclusion of a typical harvesting season, plaintiff would have built up large enough inventories of decked logs to supply its mills with logs through the winter months coinciding with the harvesting off-season. The evidence does not support the proposition that plaintiff would have deviated from the customary harvesting and decking practices described by Mr. Smith.[29]

---

[29] Defendant also argues that such a "harvest and hold" strategy would result in a "cash crunch" for plaintiffs. Mr. Ness testified, however, that in the absence of defendant's breach plaintiff would have had a steady cash flow. Trial Tr. at 5616 (Ness).

b.     **Operating Season**

Defendant argues that Mr. Ness's projections rely on a harvesting schedule that was inconsistent with normal operating seasons. Def.'s Br. at 32–35(docket entry 382, Sept. 2, 2005); DPFF ¶¶ 78–79, 145, 161–62, 212–13, 230, 249–250, 255–56, 285, 311, 329–30, 345, 374–75. Plaintiff responds by arguing that the Forest Service routinely permitted it to harvest outside the normal operating season in the winter provided that the ground was either frozen or dry. PPFF ¶ 255. Plaintiff further argues that in the winter of 1995–96, plaintiff requested, and was granted permission to harvest in the off-season for certain of the contracts that were released from or not subject to the suspensions. *See* PPFF ¶ 255; Trial Tr. at 339 (Porter). This, plaintiff argues, is sufficient evidence to conclude that the ground conditions during the winter of 1995–1996 were favorable for harvesting out of season. *See* PPFF ¶ 255; Trial Tr. at 339 (Porter).

Setting aside the issue whether the Forest Service would have granted plaintiff permission to harvest out of season, plaintiff has not demonstrated that it would have requested permission to harvest out of season in the absence of the breach. As discussed in above in Section II.A.2.a, the Court is persuaded by Mr. Smith's testimony that plaintiff's custom was to amass a sizable inventory of decked logs in the fall, sufficient to supply its mills with logs throughout the winter months. As events actually transpired, plaintiff requested and was granted permission to harvest some timber out of season in the winter of 1995–1996, when much of plaintiff's timber was unavailable because of the MSO suspensions. However, in the absence of defendant's breach, plaintiff would have had ample timber available for it to harvest and would have been able to build up an inventory sufficient to last throughout the winter. *See infra*, Section II.A.1.f, ¶¶ 3–4 (plaintiff would have had 10661 Mbf (LS) of timber available for harvesting in the fall of 1995 and would have only needed to harvest and deck an additional 3664 Mbf (LS) in order to keep its mills running at full physical capacity[30] throughout the winter). Again, plaintiff has failed to show that it would have deviated from its standard practice as described by Mr. Smith.

---

[30] Although the Court found, *supra,* Section I.C.3, that plaintiff failed to prove that during the *post-suspension* period plaintiff would have been operating its mills at their full capacity, the Court finds here, during the *suspension* period, that given the amount of timber plaintiff had under contract plaintiff would have, absent the breach, operated its mills at their full physical capacity. *See infra*, Section II.A.1.f, ¶ 2. In Section I.C.3, the Court found that plaintiff failed to show that it would have been operating at full capacity in the post-suspension period in the absence of the breach because it did not demonstrate that it had access to enough timber to operate at full capacity. During the suspension period, however, in the absence of the breach, plaintiff would have had an ample supply of timber with which to supply its mills.

c.      **Fire Closures**

Defendant also challenges Mr. Ness's harvesting schedule on the basis that it "projects timber harvests during times when logging was barred by . . . fire closures."  Def.'s Br. at 32 (docket entry 382, Sept. 2, 2005).  In particular, defendant argues that between the period of May 6, 1996, and July 9, 1996, the Forest Service was forced to suspend all timber harvesting in Arizona in accordance with Industrial Fire Plan D in the forests in which plaintiff operated.  DPFF ¶¶ 78–79.  When Fire Plan D is in place, all harvesting must cease.  *See, e.g.*, PX 113.  Defendant presented testimony from Mr. David Harris, contracting officer for the Forest Service in the Kaibab and Coconino National Forests during the MSO suspensions.  Trial Tr. at 3745–46 (Harris).  Mr. Harris's testimony indicates that Fire Plan D was in place in the Kaibab and Coconino National Forests and that the severity of the weather conditions were consistent with the implementation of Fire Plan D across all of the National Forests within the entire state of Arizona, although he could not recall from the stand the exact dates involved.  Trial Tr. at 3900–01, 4165–66, 4533 (Harris).  This testimony is corroborated by various letters and contemporaneous documents exchanged by the parties alluding to the fire closures in the Kaibab, Coconino, and Apache-Sitgreaves National Forests.  PX 113; Defendant's Exhibit ("DX") 118; DX 275; DX 308; DX 378; DX 380.

Plaintiff argues that "although the Kaibab and Coconino National Forests may have been shut down due to fire [closures]" there is insufficient evidence to conclude that the fire closures would have affected plaintiff's contracts in the Apache-Sitgrave and Tonto National Forests.  PPFF ¶¶ 257, 259, 262.  With respect to the Apache-Sitgreaves National Forest, plaintiff argues that although defendant introduced in evidence a letter from Mr. Smith to the Forest Service in which Mr. Smith referenced a fire closure that affected the Brookbank and Jersey Horse sales, both situated within the Appache-Sitgreaves National Forest, it is possible that the fire closures were not forest-wide and thus would not have affected other contracts located in the Appache-Sitgreaves National Forest.  *Id.* ¶ 259.  Moreover, plaintiff argues that it was theoretically possible that the known fire closures within the Apache-Sitgreaves National Forest were subject to only Fire Plan C.  *Id.* ¶ 260.  Under Fire Plan C, harvesting was permitted in the morning hours.  Trial Tr. at 1505–06 (Porter).  Plaintiff also notes that defendant did not present evidence that the Forest Service would have imposed any fire closures within the Tonto National Forest.  PPFF ¶ 262.

The Court finds Mr. Harris's testimony that all timber sale contracts within Arizona were subject to Fire Plan D, requiring a halt of all timber harvesting, to be credible.  Further, the documentary evidence shows that numerous and distant contracts were subject to Fire Plan D, which tends to confirm the accuracy of Mr. Harris's testimony.[31]  Hence, the Court finds that

---

[31] Moreover, the language used in the contemporaneous communications between the Forest Service and plaintiff tends to support Mr. Harris's testimony regarding the severity of the weather conditions.  *See, e.g.*, PX 113 (letter dated May 24, 1996, from the Forest Service to Mr.

(continued...)

plaintiff would not have harvested any of the breached contracts between May 6, 1995, and July 9, 1995.

### d.    Date of the Breach

Defendant argues that in its decision on liability "the Court held that the Forest Service's suspension was unreasonable (and, therefore, a breach) only insofar as the suspensions substantially exceeded 135 days. . . .  Thus, damages that flow from contracts being suspended prior to January 6, 1996 should not be compensable."  Def.'s Br. at 33 (docket entry 382, Sept. 2, 2005).  In his opinion on liability, Chief Judge Damich held that "clause CT 6.01 of the 13 non-Hay contracts gives the Forest Service the right to suspend the contracts to comply with a court order that is issued by a court of competent jurisdiction  Likewise, clause CT 6.25, contained in all 14 contracts at issue, gives the Forest Service implicit authority to suspend the contracts.  This right to suspend, however, is not only qualified by its own terms, but also by implied duties."  *Precision Pine*, 50 Fed. Cl. at 59 (citations omitted).  In particular, Chief Judge Damich held that CT 6.01 was qualified by the implied duties to cooperate and not to hinder.  "If the contract contains a specific warranty, a breach of that warranty breaches the implied duty to cooperate . . . and, even if there is no specific warranty, an unreasonable delay that is caused in some way by the Government can breach the implied duty not to hinder."  *Id.* at 59 (citing *Cedar Lumber, Inc. v. United States*, 5 Cl. Ct. 539, 549–50 (1984)).  On this point defendant does not appear to distinguish between those contracts as to which the Court found the defendant breached an implied duty to cooperate and those contracts as to which the Court found defendant breached an implied duty not to hinder.

With respect to the implied duty to cooperate, Chief Judge Damich held that "the Forest Service breached an express warranty contained in those contracts [and] the Forest Service also breached its implied duty to cooperate with respect to those contracts entered into after July 7, 1994, the date of the Ninth Circuit's decision in *Pacific Rivers*."  *Precision Pine*, 50 Fed. Cl. at 70.  In particular, Chief Judge Damich held that CT 6.25 contains an express warranty that defendant breached.  CT 6.25 provides that:

> [l]ocation of areas needing special measures for protection of plants or animals listed as threatened or endangered under the Endangered Species Act of 1973 and R-3 Sensitive Plant and Animal Species List are shown on Sale Area Map and identified on the ground.  Measures needed to protect such areas have been included elsewhere in this contract or are as follows. . . .

---

[31](...continued)
Smith advising of the fire closures on the Mud Timber Sale and cautioning "[a]s I am sure you are aware, it will take a fair amount of precipitation to change the Plan to a lower rating.")

*See, e.g.*, PX 170 (CT 6.25). Chief Judge Damich held that this clause warranted that the Forest Service had identified and taken the required protections necessary for all known threats to endangered species. *Precision Pine*, 50 Fed. Cl. at 69–70. The Court further held that after the *Pacific Rivers* decision, the Forest Service knew that it was legally required to consult the FWS with respect to the Mexican Spotted Owl. *Id.* Thus, the Forest Service breached the express warranty for those contracts entered into after the *Pacific Rivers* decision, but did not breach the express warranty with respect to those contracts entered into before the *Pacific Rivers* decision. *Id.* These contracts entered into after the *Pacific Rivers* decision are: Mud, Monument, Saginaw-Kennedy, Brann, Manaco, Brookbank, and Kettle. The Court now holds that for these contracts, defendant breached the express warranty contained in CT6.25 at the time that those contracts were executed. Thus, defendant was in continuous breach of its implied duty to cooperate; however, damages from these breaches did not arise until the onset of the MSO suspensions on August 25, 1995.

With respect to the implied duty not to hinder, the Court held that "in order to hold that the Forest Service breached the implied duty not to hinder, the Court must determine whether, in the surrounding circumstances of the contract, the length of the suspension was unreasonable." *Id.* at 70. Ultimately, the Court held that the "two-month suspension of [the Brann, Hutch-Boondock, and St. Joe timber sale] contracts, in light of the regulations which normally would prescribe consultations to be completed within 135 days, is reasonable." *Precision Pine*, 50 Fed. Cl. at 71. "Notwithstanding the protracted length of the suspensions, the mere fact that the [11 other] suspensions remained in effect far longer than provided for in the regulations does not in itself suggest that the length of the delay was unreasonable and was the fault of the Forest Service." *Id.* at 70. However, after examining the particular facts, Chief Judge Damich held that the delays were unreasonable because: (1) the Forest Service waited 60 days before initiating formal consultations with the FWS and "reasonably could have gathered the necessary information for consultation at any time between the Ninth Circuit's decision in *Pacific Rivers* and the district court's order in *Silver v. Thomas*, *id.* at 70; (2) the Forest Service failed "to provide the environmental plaintiffs and the district court with a legally sufficient Biological Opinion in conformity with the joint stipulation of dismissal of the case on several occasions," *id.* at 71; and (3) "the Arizona district court, which was in the position to weigh the Forest Service's compliance with the stipulation of dismissal, opined that the Forest Service was not diligent in doing all that it could to lift the suspensions." *Id.*

Taken as a whole these passages provide that the so long as the Forest Service limits the suspensions to the authorized statutory time frame, CT 6.01 gives the Forest Service the contractual right to suspend the contracts. It is only after the statutory time frame expires that the Forest Service can be found to have breached its implied duty not to hinder, and even then only after additional findings with respect to unreasonableness are made. Thus, defendant was not in breach of the implied duty not to hinder until, at the earliest, the time at which the 135-day statutory consultation period had elapsed on January 7, 1996. The contracts as to which defendant breached the duty not to hinder (but did not breach the duty to cooperate) are: Hay, O.D. Ridge, U-Bar, Jersey Horse, Salt.

### e.      Manaco Sale

The Manaco contract provided that no harvesting was to occur between July 15 and August 15. PX 178 (AT 17). In addition, Manaco was subjected to an additional suspension because a Mexican Spotted Owl was identified in nearby forest land in the summer of 1996, requiring the Forest Service to undertake additional consultations with the FWS. Trial Tr. at 4625–27 (Dils). The Forest Service did not lift that suspension until March of 1997. *Id.* at 4625 (Dils). In June of 1997, the Manaco contract was subjected to a further partial suspension which lasted until December of 1997. DX 800 at 19. Defendant argues that the MSO suspension did not prevent plaintiff from harvesting the Manaco contract because plaintiff would not have been able to harvest it even absent its breach. Def.'s Br. at 26 (docket entry 382, Sept. 2, 2005). Plaintiff argues that notwithstanding the further suspensions, plaintiff would have "conducted substantial harvesting." Pl.'s Resp. Br. at 19–20 (docket entry 396, Nov. 14, 2005). The Court finds that plaintiff would have had an opportunity to harvest a substantial amount of the Manaco contract.[32] Nonetheless, based on the Court's revised harvesting schedule described below and set forth in the appendices to this Opinion and Order, plaintiff would not have completely harvested the Manaco sale during the suspension period. Under the Court's harvesting contract apportionment table, on July 15, 1995, the date on which the Manaco sale would have entered its break in the harvesting season, Manaco would have had 623 Mbf (LS) of timber remaining on the sale. *See* Appendix B, at B-2; *see also infra,* Section II.A.2.f (explanation of Appendix B). In the actual world, plaintiff harvested 769 Mbf (LS) in the post-suspension period. Although plaintiff may not recover lost profits on the 623 Mbf (LS) that the Court finds it likely would not have harvested during the suspension period in the absence of the breach, this amount is excluded from the computation of its profits in the post-suspension period which the Court, *supra*, Section I.B, requires plaintiff to deduct from its lost profits in the suspension period. The Court finds that plaintiff likely would have harvested at least 623 Mbf (LS) from the Manaco sale in the post-suspension period irrespective of the breach. Put another way, only 19% of the total 769 Mbf (LS) that plaintiff actually harvested from the Manaco sale in the post-suspension period consists of timber that plaintiff would not have harvested in the post-suspension period absent the breach. Thus, for the Manaco sale, plaintiff need only reduce its lost profits during the suspension period by 19% of its actual profits in the post-suspension period.

---

[32] Defendant's argument is partially based on the assertion that the breach of the Manaco sale did not occur for the first 135 days of the suspension. *Id.* Def.'s Br. at 26 (docket entry 382, Sept. 2, 2005). The Court has already held that for those contracts upon which defendant breached it implied duty to cooperate, including Manaco, the breach arose at the time that those contracts were executed. *Supra,* Section II.A.1.d. Thus, the Court finds that but for the breach, plaintiff would have had the timber from the Manaco sale available to it for those periods up until July 15, 1996, during the normal Manaco operating season with the exception of the period corresponding the fire closure.

### f.      Summary of Court's Alternative Harvesting Schedule

In sum, plaintiff has presented the Court with a methodology to calculate damages which relies on a specific harvesting schedule that the Court finds plaintiff would likely not have followed. Indeed, in certain time periods, such as during the fire closures, it would have been impossible for plaintiff to have followed its projected schedule. Although plaintiff has failed to carry its burden of proof with respect to the precise harvesting schedule upon which Mr. Ness relied, the Court will not bar plaintiff from recovering reasonable damages solely by reason of this failure. "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Locke v. United States*, 151 Ct. Cl. 262, 267, 283 F.2d 521, 524 (1960). Having listened to 24 days of trial testimony and having reviewed hundreds of trial exhibits—many exhibits individually consisting of hundreds of pages—the Court concludes that plaintiff has established that it sustained damages as a direct and foreseeable result of defendant's breach. Binding authority does not permit this Court to bar plaintiff from recovering damages on the basis that they are difficult to ascertain. "Certainty is sufficient if the evidence adduced enables the court to make a fair and reasonable approximation of the damages." *Id.* Here, the Court has fashioned from the evidence of record an alternative harvesting schedule that it has determined to be fair and reasonable. Rather than try to postulate a specific harvesting schedule that plaintiff would have followed had there been no breach, the Court's alternative schedule treats the total available timber as one large inventory, which plaintiff would have been able to efficiently harvest in order to keep its mills operating at full capacity. The Court's alternative avoids the limitations presented by plaintiff's method of attempting to impose a precise harvesting schedule on the "but for" world. The Court has created a schedule that is neutral as between the parties and, when used as a component of plaintiff's overall method of projecting lost profits, will result in profit projections that fairly and reasonably approximate the profits that plaintiff would have earned in the absence of defendant's breach.

The first step in the Court's alternative approach, was to determine the overall volume of timber that plaintiff would have harvested from the breached contract in each relevant time period. Mr. Smith testified in his deposition that harvesting was "based on mill need." Tr. Smith Dep. at 29. Thus, in each month of the Court's schedule, the starting point for the amount harvested equals the difference between plaintiff's total mill capacity for all three mills and plaintiff's actual total production each month as set forth in PX 131, Exhibit 7. To that figure, the Court added additional amounts of timber that plaintiff would have harvested and maintained in log decks, consistent with Mr. Smith's testimony regarding plaintiff's customary practices. *See supra*, Section II.A.1.a. The Court's harvesting (and milling) schedule is found in Appendix A, *infra*. In creating its harvesting schedule, the Court finds that but for defendant's breach:

1)      During all months, except June and July of 1996 (after defendant had exhausted its supply of decked logs during the fire suspensions), plaintiff would have operated its mills at their full physical capacity.

2)      Plaintiff was historically able to manage its inventory of standing timber under contract efficiently and in the absence of defendant's breach, plaintiff would have

managed its inventory of standing timber such that its mills would have been operating at their full physical capacity throughout the suspension with the exception of the months of June and July 1996, during the fire closures.

3)   Plaintiff would have at all times had available to it the Mud,[33] Monument, Saginaw-Kennedy, Brann, Manaco, Brookbank, and Kettle timber sale contracts —i.e. the contracts upon which defendant breached its implied duty to cooperate— totaling 10,661 Mbf (LS).

4)   In September 1995, plaintiff would have entered "decking season." Between September 1, 1995, and December 31, 1995,[34] plaintiff would have ratably by

---

[33] Plaintiff asserts that the volume of available timber remaining on the Mud contract was 6199 ccf (3099.5 Mbf (LS)). PPFF ¶ 23; PX 1013. This figure represents the amount of timber remaining on the Mud sale prior to the partial cancellation of the Mud contract. By terms of the stipulation in *Silver v. Babbit, see supra,* p. 4, the Forest Service agreed to cancel cutting units 1, 4, and 16 of the Mud sale. PX 106, ¶ 5. In a letter dated August 15, 1996, the Forest Service advised plaintiff that "the court approved stipulation required limiting all trees larger than 12 inches from harvest. It was determined that removal of the 12 inch plus sawtimber from these units would make the remaining timber in the canceled units uneconomical to harvest." DX 311. The Forest Service further advised plaintiff that it was exercising its authority under the contract term, CT 8.2, which provided that the Forest Service "may terminate this contract, in whole or in part, . . . to comply with a court order, regardless of whether this sale is named in such an order." DX 311; DX 284 (CT 8.2). The partial cancellation reduced the volume of included timber to 4,173 ccf (2086.5 Mbf (LS)), and plaintiff was paid $65,796.66. PX 175; PX 131, Exhibit 1. The Court finds that plaintiff has failed to demonstrate that, in the absence of the breach, plaintiff would have had access to cutting units 1,4, and 16 of the Mud contract. It is at least equally plausible that had the Forest Service complied with its obligations under the ESA, it would never have offered cutting units 1,4, and 16 for sale in the first place. Therefore, the Court finds that 4,173 ccf (2086.5 Mbf (LS)) is the correct amount of remaining timber on the Mud contract at the time of suspension.

[34] The end of the harvesting season for the Kettle contract was October 31. PX 173 (AT 17)  The end of the harvesting season for the Brookbank contract was November 15. PX 172 (AT 17);  The end of the harvesting season for the Manaco and Monument contracts was November 30. PX 178 (AT 17); PX 176 (AT 17). The operating seasons of both the Mudd and Saginaw-Kennedy contracts ended in December 31. PX 175 (AT 17); PX 179 (AT 17). Those two contracts had 6441 Mbf (LS) of unharvested timber, more than enough logs to supply plaintiff's mills for two months. The Court finds that plaintiff would have managed its supply of standing timber such as to maximize its harvesting season, and thus adopts December 31, as the end of "decking season."

month increased its inventory of decked logs to the size of 3,664 Mbf (LS)[35] (enough logs to keep its mills running at full capacity until April 15, 1996).

5) On December 4, 1995, the Forest Service would have lifted the suspensions on the remaining contracts (Hay, O.D. Ridge, U-Bar, Jersey Horse, Salt) constituting an additional 13,389 Mbf (LS) of timber. However, the end of the harvesting season would have expired on all of these contracts by the time that the Forest Service released them.

6) Between January 1 and April 14, 1996, plaintiff would have milled its decked logs, depleting its inventory down to zero.

7) On April 15, 1996, the beginning of the 1996 harvesting season for some contracts, plaintiff would have resumed harvesting as permitted under the contracts;[36] between April 15 and May 5 plaintiff would have built up an inventory of decked logs equivalent to three weeks production, or approximately 1,770 Mbf (LS);

8) Between May 6 and July 9, 1996, the Forest Service would have suspended all harvesting in the national forests located in the State of Arizona because of the institution of Industrial Fire Plan D. During this time, plaintiff would have drawn down its inventory of decked logs.

9) On July 9, 1996, the Forest Service would have lifted the harvesting restrictions due to the fire closure and plaintiff would have resumed harvesting. In addition to harvesting enough timber to resume mill operation at full capacity, plaintiff would have additionally harvested enough timber to establish a three week inventory of decked logs, approximately 1,700 Mbf (LS), in accordance with its customary practice.

10) In September 1996, plaintiff would have entered "decking season" which would have lasted until November 30, 1996. However, plaintiff would have fully harvested the remaining timber from the breached contracts in early November.

---

[35] In other words, in addition to harvesting enough timber to keep its mills running at their full capacity in the months of September through December of 1995, plaintiff would have harvested an additional 916 Mbf (LS) in each month. That figure, 916 Mbf (LS) for each of the four months, represents one quarter of the total 3,664 Mbf (LS) needed for decking purposes.

[36] The start of the harvesting season for the Brookbank, Hay, Jersey Horse, Monument, Saginaw-Kennedy, and U-Bar contracts was April 15. The start of the harvesting season for the Manaco and Salt contracts was May 1. The start of the harvesting season for the Kettle and O.D. Ridge contracts was May 15. The start of the harvesting season for the Mud contract was June 1.

After computing the total amount of timber harvested from the breached contracts in each month, the second step in the Court's alternative approach was to apportion the overall volume of harvested timber in each quarter to the individual contracts.  This step is necessary because the different contracts would have been subject to different stumpage prices.  In practice, plaintiff probably would have harvested the contracts sequentially: plaintiff would have harvested a handful of sales in one month or quarter and then moved on to harvest different sales in the next month or quarter.  However, based on the evidence of record, it is not possible for the Court to discern the precise sequence that plaintiff would have followed.  Nonetheless, the Court's objective is to create a fair and reasonable approximation of plaintiff's damages, *Locke*, 151 Ct. Cl. at 267, 283 F.2d at 524, and not necessarily to reconstruct plaintiff's day-to-day operations many years after the fact.  To accomplish the task of creating a fair and reasonable approximation of plaintiff's damages, the Court assumes that plaintiff would have harvested its available contracts[37] simultaneously, with the volume of timber harvested from each contract apportioned as described below.

The Court has determined that this approach will yield the best approximation of plaintiff's damages.  The precise harvesting schedule that plaintiff would have followed is at this point in time unknowable.  Although the Court could attempt to create a precise harvesting schedule, any resulting schedule would be to a large extent arbitrary.  Moreover, to the extent that the different contracts would have been subject to different stumpage prices and would have resulted in different product mixes, any precise schedule that the Court could create would have the possibility of unfairly favoring one party over the other.  The Court's approach is neutral as between the parties' contentions.  To the extent that the Court's approach might slightly benefit one party or the other from month to month, it is reasonable to anticipate that over the course of the suspensions any such benefits will largely cancel each other out, given the Court's reliance on what is in effect an average or composite of the possible harvesting schedules.[38]

The Court apportioned the volume of harvested timber according to the overall volume of available timber on each contract.  Because the harvesting seasons of the different contracts vary in length, the Court's methodology also takes into account the number of days available for harvesting on each contract within each quarter.  In determining each contract's apportioned volume of harvested timber in each quarter, the Court computed the product of the volume of timber in Mbf (LS) remaining on each contract and the number harvesting days for that contract

---

[37] An "available contract" is one that was within its harvesting season, and was not subject to any suspensions or closures other than the MSO suspensions that constituted a breach of contract.

[38] The Court also adopts a similar approach for determining the product mixes that plaintiff would have realized.  *See supra*, Section II.A.4.c.

in the given quarter.[39]  The Court then divided that product by the sum of such products for all the contracts to determine each contract's fractional portion of the harvested volume in each quarter.  To determine the apportioned volume for each contract in a given quarter, the Court computed the product of the overall volume of timber harvested from the breached contracts in each quarter and the fractional portion of each individual contract.[40]  The parties shall refer to the apportioned volume for each contract in each quarter in order to calculate stumpage payments.

## 2.    An Overrun Factor of 1.25 Is Reasonable

Defendant also challenges the so called "overrun factor" that plaintiff used in its calculations.  Def.'s Br. at 37–38 (docket entry 382, Sept. 2, 2005).  The overrun factor is the ratio of lumber that a particular mill can produce from logs.  Trial Tr. at 1142–43 (Devere).  As explained to the Court, modern timber mills can produce a larger volume of lumber than the volume of input logs.  *Id.*  The overrun is a product of various factors.  Significant among them is the fact that the conventional two-by-four board is in fact only one-by-three inches.  Trial Tr. at 1171 (Devere).  Each mill can have a different overrun factor depending on the efficiency of its

---

[39] Generally, the number of harvesting days equals the number of days in the harvesting season for each contract.  By contract, the Mud and Saginaw-Kennedy sales would have provided for 92 harvesting days in the 4th Quarter of 1995.  However, neither sale would have contained enough timber to last for a full 92 days, using the Court's methodology.  Thus, for each of those contracts, the number of harvesting days was adjusted downward, so that at the end of the 4th Quarter of 1995, each contract would have exactly 0 Mbf (LS) remaining timber.

[40] For those contracts that contain  Douglas Fir and/or Englemann Spruce, the Court assumes for the sake of computing damages that plaintiff would have harvested Douglas Fir and Englemann Spruce in proportion by volume to the rate at which it harvested timber on such contract.  The Hay sale contained 258 Mbf (LS) of Douglas Fir.  PX 131, Exhibit 9.  For each time period, the parties shall assume that 6.8 % of the apportioned volume of timber harvested and milled from the Hay contract consists of Douglas Fir.  The remainder on the Hay contract consists of Ponderosa Pine.  The O.D. Ridge contract contained 441 Mbf (LS) of Douglas Fir and 264 Mbf (LS) of Englemann Spruce.  PX 131, Exhibit 9.  For each time period, the parties shall assume that 16.8 % of the apportioned volume of timber harvested and milled from the O.D. Ridge contract consists of Douglas Fir and 10.1 % consists of Englemann Spruce.  The remainder on the O.D. Ridge contract consists of Ponderosa Pine.  The U-Bar sale contained 1,361 Mbf (LS) of Douglas Fir.  PX 131, Exhibit 9.  For each time period, the parties shall assume that 42.6 % of the apportioned volume of timber harvested and milled from the Hay contract consists of Douglas Fir.  The remainder on the U-Bar contract consists of Ponderosa Pine.

equipment, the width of the saw blades used, the skill of its sawyers, the product mix[41] produced, the diameter and taper of the logs milled.  Trial Tr.at 1144–46, 1179–80, 1211–14 (Devere).

Plaintiff presented expert testimony through its witness, Mr. Martin Devere.  Mr. Devere earned a degree in forestry from Purdue University and had 40 years experience in the lumber industry at the time of his testimony.  Trial Tr. 1130–42 (Devere).  Mr. Devere testified that because of his experience he could estimate a saw mill's overrun factor by witnessing its operations.  Trial. Tr. at 1207–08 (Devere).  Mr. Devere did not independently determine that plaintiff's likely overrun factor was 1.25; rather, plaintiff enlisted Mr. Devere to verify whether plaintiff would have likely realized an overrun factor of 1.25.  Trial Tr. at 1129 (Devere).  Mr. Devere testified that based on his experience a 1.25 overrun factor was a reasonable—and possibly conservative—estimate for the overrun factor that plaintiff would typically realize.  Trial Tr. at 1164 (Devere).  He also testified that the best way to calculate an overrun factor is by conducting a "mill study."  Trial Tr. at 1143 (Devere).  A mill study involves measuring the scale[42] of logs that goes into a mill and the volume of lumber products that come out.  *Id.*  Mr. Devere did not, however, conduct a mill study in this case.

Plaintiff notes that in the appraisal summaries the Forest Services furnished to potential bidders it consistently used an overrun factor of 1.245 to 1.3935.[43]  Pl.'s Br. at 24–25 (docket entry 386-2, Sept. 12, 2005); PPFF ¶ 215.  By the Court's own arithmetic, the weighted average[44] of the overrun factors for the eleven contracts at issue is 1.3309.  Defendant attempts to discredit the overrun factors that it supplies as part of the appraisal summary as "a relic from an old

---

[41] In particular, higher grade "shop products" and molding products will result in a lower overrun factor and dimensional lumber (*e.g.*, 2" by 4", etc.) results in a higher overrun factor.  Trial Tr. at 1212–13 (Devere).

[42] The term "scale" refers to the measurement of the volume of felled timber.  Trial Tr. at 2915–16 (Matson).

[43] Mr. Porter testified that the Forest Service adopted these number by conducting a mill study of one of plaintiff's competitors in the mid-1980's.  Trial Tr. 152–56 (Porter).  Plaintiff further argues that because all of plaintiff's mills are at least as efficient as the mill on which the Forest Service based its mill study, the Forest Service's appraisal summary estimates provide a fair approximation of the overrun factor that plaintiff would have expected.  PPFF ¶¶ 216–220; Trial Tr. 157–58 (Porter), 1186 (Devere).

[44] To calculate the weighted average overrun factor the Court multiplied the estimated overrun factor calculated by the Forest Service and supplied to the bidders on the appraisal summaries by the total volume of lumber remaining on the sale at the time of the suspension for each contract.  The Court then added the products of the above computation together and divided the sum by the total remaining unharvested timber on all of the sales at issue to arrive at the weighted average overrun factor.

appraisal system that was phased out . . . twenty years ago." Def.'s Resp. Br. at 36 (docket entry 394, Nov. 14, 2005).

In arguing for a lower overrun factor, defendant relies principally on an estimate created Mr. Smith in 1995 and 1996. Def.'s Br. at 39 (docket entry 382, Sept. 2, 2005). Plaintiff argues that Mr. Smith's estimate did not scale the logs going into the calculations and that Mr. Smith considered his figures to be mere "estimates." Pl.'s Br. at 27–28 (docket entry 386-2, Sept. 12, 2005); Trial Tr. at 5334 (Smith). Moreover, plaintiff argues that calculating overrun was not within the scope of Mr. Smith's duties as plaintiff's employee. PPFF ¶ 231(e); Trial Tr. at 5339 (Smith). Most importantly, however, plaintiff notes that Mr. Smith's calculations contained two different columns of figures, and Mr. Smith testified that he could not recall why. Smith Dep. Tr. at 251.

Defendant also relies on an estimate created by plaintiff which purportedly shows that it expected to realize a 1.10 overrun. Def.'s Br. at 39 (docket entry 382, Sept. 2, 2005) (citing DX521–27). In July of 1995, shortly before the beginning of the MSO suspensions, Stone Container Corporation, a competitor of plaintiff, made inquiries regarding the purchase of plaintiff's business. Trial Tr. 919 (Porter). In the course of negotiations, Mr. Porter prepared a set of profit projections for each of the timber sales under contract, upon which Mr. Porter stated an expected overrun of 1.10. *Id.* Plaintiff asserts, however, that this document was created to be a "worst case scenario." PPFF ¶ 227(b); Trial Tr. 918–19 (Porter). Mr. Porter testified that, for example, when he performed an internal pre-bid analysis for the Barber sale (which is not in issue in this litigation) he assumed an overrun factor of 1.2–1.25, notwithstanding the fact that he later prepared the profit projections for the Stone Container negotiations assuming a 1.10 overrun factor for the Barber sale. Trial Tr. 924–28 (Porter). Thus plaintiff attempts to show that notwithstanding the profit projections that it shared with a potential buyer, internally, it expected to realize a 1.25 overrun factor.

In sum, each party created contemporaneous documents purporting to show a particular overrun factor. Now, both parties attempt to discredit the very documents that each created before the suspensions occurred. Although the Court appreciates that the estimated overrun factors that the Forest Service supplied potential bidders were not intended to be a representation of the precise overrun factor that all bidders would realize, the Court nonetheless finds that such estimates are the best starting point from which to calculate the overrun factor that plaintiff would have realized on the suspended contracts in the absence of the breach. The Court is not persuaded by estimates created by Mr. Smith. Mr. Smith by his own testimony did not appear to afford much weight to the accuracy of his estimates. However, even to the extent that Mr. Smith's document may represent an estimate which could serve as a starting point for determining the likely overrun factor that plaintiff would have realized in the absence of the breach, the Court finds Mr. Smith's computations less reliable that the estimates provided by the Forest Service in its appraisal summaries. Mr. Smith could not fully recall nor describe precisely how he performed the calculations, nor could he explain what various columns of figures represented. Smith Dep. Tr. at 251. On the other hand, the Forest Service does not deny that its estimates are based upon an actual mill study performed at the Stone Container Mill in the mid-

1980s, about a decade before the MSO suspensions.  Moreover, defendant does not present a convincing argument why the overrun factor that plaintiff would have enjoyed would have been nearly 19% lower than its own projected estimates.  Plaintiff introduced testimony that its mills were at least as efficient as the Stone Container Mill was a decade earlier and defendant has not attempted to show that plaintiff's mills were less efficient than the mill upon which the Forest Service estimates are based.  Trial Tr. 157–60 (Porter), 1186 (Devere).  After reviewing and weighing all the evidence, the Court concludes plaintiff would have likely realized an overrun of 1.25.

### 3.     A Conversion Factor of 0.5 Mbf(LS) per CCF is Reasonable

Mr. Ness used a 0.5 conversion factor in converting ccf to Mbf (LS).  Mr. Porter testified that this conversion factor is commonly accepted in the industry.  Trial Tr. 245 (Porter). Defendant argues that plaintiff should have used a set of "more accurate" numbers that the Forest Service included in its appraisal summaries.  Def.'s Br. at 36 (docket entry 382, Sept. 2, 2005). However, defendant does not cite any supporting evidence proving the accuracy of the Forest Service numbers.  Defendant itself characterizes other information that the Forest Service supplied on its appraisal summaries as "a relic from an old appraisal system that was phased out . . . twenty years ago."  Def.'s Resp. Br. at 36 (docket entry 394, Nov. 14, 2005).  Thus, the mere inclusion of a contract-specific number the appraisal summaries does not necessarily mean that those figures are more accurate than the number generally accepted in the industry.[45]  The Court finds plaintiff's testimony that 0.5 is the standard conversion factor used in the industry to be credible, and that the Court finds that plaintiff's use of that number is reasonable.  The Court declines to assume the Forest Service estimates are more accurate than the conversion factor generally accepted in the industry.

### 4.     Plaintiff Has Demonstrated That Its Projected Product Mix Figures Are Reasonable

#### a.     Ponderosa Pine

Plaintiff generally produced 13 distinct lumber products from the harvested logs.  Trial Tr. at 357–58, 363 (Porter).  The percentage of each product that can be manufactured from a given set of logs is known as the product mix.  Trial Tr. at 4278 (Munn).  Because the various lumber products have different sales values, the product mix can have a significant effect on the profits that a mill earns on lumber sales.  For the purposes of computing its damages, plaintiff referred to its "Winslow Sales Journal," which purports to show the volumes of the various lumber products sold by plaintiff.  Trial Tr. 394 (Porter).  Mr. Porter attempted to isolate a two-month period from which all of plaintiff's lumber production would have come from the same timber sale.  Trial Tr. at 401–04 (Porter).  Mr. Porter then calculated the total production

---

[45]  The mere fact that the conversion figures listed in the solicitation materials are more *precise* than the general 0.5 figure does not mean that they are more *accurate*.

for that two-month period and divided each product total by the total lumber production to arrive at a final product mix.  Trial Tr. at 403–04 (Porter).

Defendant presented expert testimony from Dr. Ian Munn, Professor of Forestry Economics and Management at Mississippi State University, disputing plaintiff's methodology. Dr. Munn testified that plaintiff's methodology would only be accurate to the extent that:

> (1) timber harvesting was occurring on a single timber sale, (2) the appropriate lag time from timber harvest to sale was used, (3) Precision Pine accounted for any inventory of lumber products, and (4) the mix of lumber products sold to Precision Pines's customers was identical to the mix of products manufactured from the contract under consideration.

Def.'s Br. at 40–41 (docket entry 382, Sept. 2, 2005) (citing Trial Tr. 4287–88 (Munn); DX 775). Dr. Munn testified that, in his opinion, the methodology employed by Mr. Porter resulted in a product mix that was skewed toward higher priced products when compared with the product mix figures published by the Western Wood Products Association (WWPA).[46]  Trial Tr. at 4316–17 (Munn); *see also* DX 775 (ex. 1).  Dr. Munn grouped plaintiff's product categories into three groups: low, medium, and high grade products.  DX 775 at 4.  Dr. Munn found that while the grade distribution for Ponderosa Pine in the Rocky Mountain region in the month of January 1996 was 8.71% high-grade products, 18.64% medium-grade products, and 72.65% low-grade products, plaintiff projected that it would have produced 13.4% high-grade products, 60.5% medium-grade products, and 26.1% low-grade products.  *Id.*

Plaintiff responds by first noting that the WWPA figures cover a wide geographic area and the WWPA publication contains a disclaimer that "[g]rade recovery by individual mills may vary considerably."  Pl.'s Br. at 30 (docket entry 386-2, Sept. 12, 2005) (quoting PX 62).  With respect to Dr. Munn's four criticisms of Mr. Porter's methods, plaintiff argues "that keeping the kind of log-by-log, sale-specific lumber production data that the government is . . . asserting that Precision Pine should have maintained is a very difficult task," *id.* at 30 n.18 (citing Trial Tr. 5476–77 (Miller, Judge)), and "the risk of limited available evidence to prove damages falls on the breaching party, not the aggrieved party."  *Id.* (citing *LaSalle Talman Bank v. United States,* 317 F.3d 1363, 1374 (Fed. Cir. 2003)).  Plaintiff also demonstrated that the average of the product mixes computed by Mr. Porter closely tracked the overall product mix observed by plaintiff between the months of July 1994 and July 1995.  PPFF ¶ 329.

---

[46] The WWPA publishes monthly product mix for all of the Rocky Mountain region, which in addition to Arizona, includes Colorado, Montana, New Mexico, Utah, Wyoming, and portions of South Dakota and Idaho.  Trial Tr. at 4316 (Munn); PX 62.  Dr. Munn compared plaintiff's projected product mixes with the January 1996 product mix published by the WWPA. Trial Tr. at 4316 (Munn).

Based on the available evidence, plaintiff has as accurately as possible estimated the product mix that it would have realized. Plaintiff cannot completely dispel Dr. Munn's criticism without evidence that no longer exists (if it ever did). Nonetheless, plaintiff has shown that its estimates are roughly inline with the product percentages that it has historically experienced. "[W]hen damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *LaSalle Talman Bank,* 317 F.3d at1374. The Court finds that the product mix utilized by plaintiff is reasonable.

### b.    Douglas Fir and Engelmann Spruce

Mr. Porter testified that he estimated the product mix for Douglas Fir and Englemann Spruce because plaintiff did not have any records of lumber production from these species during any relevant time period. Trial Tr. at 430–33 (Porter). Defendant characterizes these estimates as "unmoored" and argues that the Court should not rely on them. Def.'s Br. at 42 n.25 (docket entry 382, Sept. 2, 2005). As discussed above, however, "when damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *LaSalle Talman Bank,* 317 F.3d at1374. Here, plaintiff has proven, as best it can, the product mix it would have realized for Douglas Fir and Englemann Spruce in the absence of defendant's breach. The Court finds plaintiff's estimates are reasonable.

### c.    Calculating Average Product Mix

Because Mr. Porter estimated different product mixes for different contracts, plaintiff must compute a weighted average product mix for each relevant time period. Plaintiff must then use the computed weighted averages in calculating its lost profits during each time period. For the time period of September 1995 through April 14, plaintiff must use the weighted average product mix of the apportioned volumes on the breached sales harvested between September and December of 1995 (as set forth in Appendix B). For time period between April 15, 1996, through June 30, 1996, plaintiff must use the weighted average product mix apportioned volumes on the breached sales harvested during the second quarter of 1996. For the time period between July 1996 and February 1997, plaintiff must use the weighted average product mix of apportioned volumes on the breached sales harvested in the third and fourth quarters of 1996. The Court adopts these time periods because, in each case, plaintiff would have milled all of its harvested timber from the breached sales by the end of each time period. As a consequence, the Court need not determine the lag time between harvesting and milling.

### 5.    Sales Prices for Lumber Products

### a.    Ponderosa Pine

To determine the sales prices for lumber products produced from Ponderosa Pine, Mr. Porter "averaged the prices, by quarter, as reflected on Precision Pine's actual lumber sales invoices from the suspension period." Pl.'s Br. at 32 (docket entry 386-2, Sept. 12, 2005). When price information for certain products was not available or insufficient for a particular quarter,

Mr. Porter employed two gap-filling measures.  One such mechanism was to rely on the price of a similarly priced product for that quarter.  Trial Tr. 446–48 (Porter).  If a particular product was produced only in one or two months out of the quarter, Mr. Porter would consult an industry publication, RANDOM LENGTHS, to supply the information for the months in which he did not have sales data.  *Id.* at 449–54 (Porter).  Mr. Porter then averaged the information from RANDOM LENGTHS, with the available monthly data he had for the given quarter.  *Id.* (Porter).  Occasionally, Mr. Porter excluded certain invoices from his calculations because: (1) the invoice was for products that plaintiff did not typically produce, (2) the invoice price was either "too high" or "too low" when compared with other contemporaneous sales prices so that Mr. Porter was concerned that inclusion would unreasonably skew the resulting price averages.  *Id.* at 455–58 (Porter).

Defendant objects to Mr. Porter's methods, arguing that Mr. Porter improperly excluded invoices from his average, and should have relied on the Winslow Sales Journal.  Def.'s Br. at 38 (docket entry 382, Sept 2, 2005).  Moreover, defendant argues that Mr. Porter erred by taking the straight averages of the invoices rather than calculating the weighted averages which would take the volume of each sale into account.  *Id.*  Plaintiff responds by asserting that the invoices were the source records from which the Winslow Sales Journal was compiled.  Pl.'s Resp. Br. at 37 (docket entry 396, Nov. 14, 2005).  However, plaintiff cautions that the Winslow Sales Journal is less reliable than the underlying invoices due to the occasional miscategorization of certain products by Mr. Porter's secretary.  Pl.'s Resp. Br. at 37  (docket entry 396, Nov. 14, 2005) (citing  Trial Tr. at 1669–70 (Porter)).  Thus, plaintiff responds, an average of the sales invoices is likely to be more accurate than reliance on the Winslow Sales Journal.  Plaintiff does not dispute that it used a straight average rather than a weighted average, but appears to argue that the differing methodology would have had a *de miminis* effect on prices.  *Id.* at 39 n.53 (citing Trial Tr. at 2642 (Ness)).  Plaintiff also notes that of over 1,100 invoices it excluded "less than 35."  Pl.'s Br. at 33 (docket entry 386-2, Sept. 12, 2005).

The Court finds that to the extent that the Winslow Sales Journal is based upon the invoices that plaintiff used to calculate average prices, if done properly, calculating average price information from the invoices is at least as accurate as calculating average prices from the Winslow Sale Journal.  Further, it was permissible for plaintiff to omit price information for specific products that plaintiff did not typically produce and would not have produced additional volumes of in the absence of defendant's breach.  With respect to the omission of the invoices that Mr. Porter determined to be "too high" or "too low" the Court is not necessarily opposed to methods that exclude statistical outliers.  However, in order for this practice to be permissible, plaintiff must employ articulable methods and concrete criteria for determining which records constitute statistical outliers.  In this case, Mr. Porter only stated a generalized, vague belief that a given invoice was either "too high" or "too low."[47]  These statements amount to little more than

---

[47]   The Court is not persuaded that the number of invoices excluded—*i.e.* "less than 35"—is insignificant in comparison with the number of invoices overall.  Depending on the

(continued...)

Mr. Porter's intuition and do not meet the Court's stated standards.  The Court also finds that a weighted average of the invoices will more closely approximate the likely sales prices plaintiff would have realized in the absence of defendant's breach.

In its revised damages calculations ordered, *infra*, p. 76, plaintiff shall recalculate its average prices using all available invoices except those for the odd products that plaintiff does not customarily produce.  Plaintiff shall not exclude any invoices on the basis of price alone.  Plaintiff shall also use a weighted average rather than a straight average of these invoices.

### b. Douglas Fir and Englemann Spruce

To determine the sales prices of lumber products manufactured from Englemann Spruce, Mr. Porter took the price listed in RANDOM LENGTHS and added $50.  Trial Tr. at 462–63 (Porter).  To determine the sales prices of lumber products manufactured from Douglas Fir, Mr. Porter took the price listed in RANDOM LENGTHS and added $60.  *Id*. at 459–60.  Mr. Porter reasoned that this adjustment was necessary because the prices listed in RANDOM LENGTHS were F.O.B. Portland, Oregon, and thus, plaintiff would have had a "freight advantage" over the sellers in RANDOM LENGTHS equal to the difference in freight costs.  *Id.*  Plaintiff asserts that Englemann Spruce is lighter and thus costs less to ship.  PPFF ¶ 120.  Consequently, plaintiff argues that its freight advantage was proportionately smaller for Englemann Spruce.  *Id*.  Defendant does not address plaintiff's argument that it would have had a freight advantage on Englemann Spruce and Douglas Fir.  Rather, defendant argues only that the adjustments are not supported by "logic, nor sales invoices."  Def.'s Br. at 38 n.20  (docket entry 382, Sept. 2, 2005).  The Court finds plaintiff's rationale persuasive, and finds that plaintiff reasonably calculated its sales prices for Englemann Spruce and Douglas Fir.

### 6. Plaintiff's Obligation to Harvest Roundwood Would Have Been Excused by BT 6.4 as Constituting Gross Economic Impracticability

Defendant argues that plaintiff did not have an outlet for roundwood during the suspensions.  Def.'s Br. at 43 (docket entry 382, Sept. 2, 2005).  The primary buyer of roundwood in plaintiff's region was Stone Container.  DX 570.  Defendant identifies numerous letters from plaintiff during the suspension period in which plaintiff advised the Forest Service

---

[47](...continued)
timing and grouping of the excluded invoices (for example if multiple invoices concerned the same product in the same quarter), their absence could have an effect on the overall averages.  Moreover, given that the entire rationale for excluding certain invoices was the concern that including them might "skew" the resulting averages, Trial. Tr. at 457 (Porter), it is inconsistent for plaintiff to also argue that the inclusion or exclusion of those invoices will not make a difference.

that Stone Container refused to buy roundwood from plaintiff.[48]  DX 263 (Oct. 31, 1995) ("PP&T does not have an outlet for pulpwood at this time."); DX 306 (Apr. 9, 1996) ("[W]e have no outlet for pulpwood."); DX 555 (June 6, 1996) ("Stone Container has in the recent past declined to purchase pulpwood from PP&T").  Defendant further argues that as a consequence plaintiff would have lost at least $75 per ccf of included roundwood which defendant asserts plaintiff was contractually obligated to harvest and remove.  Def.'s Br. at 43 (docket entry 382, Sept. 2, 2005).  Therefore, argues defendant, plaintiff's damages calculation must account for significant losses associated with harvesting and disposal of roundwood.

Plaintiff first argues that it had an arrangement with a subcontractor, Tri-Star Logging, for the removal of roundwood, and even if Stone Container would not have purchased roundwood from plaintiff, Stone Container may have nonetheless purchased roundwood from Tri-Star. PPFF ¶ 270(e) (citing Trial Tr. 682–83 (Porter)).  Plaintiff also argues that in any event if no market existed for roundwood, plaintiff's performance on the contract as it relates to the harvesting of roundwood would have been excused under contract term BT 6.4, which provides:

> Unless otherwise specifically provided herein, Purchaser shall fell trees designated for cutting and shall remove the portions which meet Utilizations Standards . . . .  Exceptions for occasional trees inadvertently not cut or trees or pieces not removed may be made for good reason, including possible damages to forest resources or gross economic impracticability at the time of removal of other timber.

*E.g.*, PX 170 (BT 6.4)).  Mr. Harris testified for defendant that in his opinion this contract provision was intended to cover situations where plaintiff failed to remove certain trees and "where it would be grossly uneconomic . . . for a purchaser to move a piece of equipment a significant distance through the sale back to get to those small logs."  Trial. Tr. at 4156 (Harris). In Mr. Harris's opinion, contract term BT 6.4 would not excuse plaintiff from harvesting all included roundwood within a region.  *Id.* 4156–58 (Harris).

Plaintiff argues that Mr. Harris's understanding of BT 6.4 is too narrow and is inconsistent with the relevant Forest Service directive:

> [G]ross economic impracticability applies to the trees or logs "at the time of removal of other timber."  Thus, if it was economically practicable to cut and remove included timber in an area, then the purchaser is required to cut and remove missed trees and pieces even

---

[48] Moreover, after August of 1995, Stone Container only purchased roundwood from plaintiff once, in late 1997.  Trial Tr. at 2121–22 (Porter); PX 223.  On February 12, 1998, Stone Container advised plaintiff that it intended to satisfy all of its needs through recycled materials and therefore would no longer purchase any roundwood from plaintiff.  Trial Tr. at 991–92 (Porter); PX 126.

though they may be uneconomical to remove individually at a later
time.  The determination of gross economic impracticability should
always be made prior to beginning operations in a given area.

FSH 2409.15 (Aug. 3, 1993) ("the Handbook").[49]

Based on the evidence, the Court finds that plaintiff did not have a suitable outlet for
roundwood during the suspension period.  Given the pattern of communications plaintiff sent to
the Forest Service during the suspension period advising the Forest Service that it did not have an
outlet for  roundwood, *see* defendant's exhibits quoted *supra*, p. 53, the Court finds that it is
unlikely that in the absence of the breach plaintiff would have located an outlet for an even
greater volume roundwood, either directly or through its subcontractor.  Thus, whether plaintiff
must deduct losses for the harvesting and disposal of roundwood turns of the question whether
BT 6.4 would have excused plaintiff's performance as constituting gross economic
impracticability.

The interpretation of government contracts is a matter of law.  *Textron Defense Sys. v.
Widnall,* 143 F.3d 1465, 1468 (Fed. Cir. 1998)*; Fortec Constructors v. United States*, 760 F.2d
1288, 1291 (Fed. Cir. 1985).  Contract interpretation "begins with the language of the written
agreement."  *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003).  A
contract interpretation should give words their plain and ordinary meaning, as understood by a
reasonably intelligent person familiar with the contemporaneous circumstances.  *Olympia Props.,
L.L.C. v. United States*, 54 Fed. Cl. 147, 152 (2002) (quoting *Hol-Gar Mfg. Corp. v. United
States*, 169 Ct. Cl. 384, 388 (1965)).  "An interpretation which gives a reasonable meaning to all
parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void,
insignificant, meaningless, superfluous, or achieves a weird and whimsical result."  *Northrop
Grumman Corp. v. United States*, 50 Fed. Cl. 443, 459 (2001) (quoting *Arizona v. United States*,
216 Ct. Cl. 221, 235–36, 575 F.2d 855, 863 (1978)).

---

[49] By its terms, the Handbook contains "direction and guidance for timber sale
administrators concerning contract provisions for operations, fire precaution and control, other
conditions, and performance and settlement."  Defendant argues that the Court may not consider
the Handbook because, strictly speaking, it is not a regulation of the Forest Service and therefore
was not binding on the parties.  Moreover, defendant argues that plaintiff failed to introduce the
Handbook into evidence at trial.  The Court elects to take judicial notice of the Handbook.  "A
court may take judicial notice, whether requested or not" and may take judicial notice "at any
stage of the proceeding."  Fed. R. Evid. 201(c), (f).  Judicial notice is appropriate when evidence
is: "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of
accurate and ready determination by resort to sources whose accuracy cannot reasonably be
questioned."  Fed. R. Evid. 201(b).  Here, given that the Forest Service publishes its Handbooks
on its internet web page, the Court finds that the Handbook falls into the second category.  The
existence and contents of the Handbook cannot reasonably be questioned.

As with any matter of contract interpretation, the Court begins with the plain language of the contract. Here, the Court finds that the meaning of the term "gross economic impracticability" is not apparent on the face of the contract. The contract does not define the term gross economic impracticability nor does it delineate which situations constitute gross economic impracticability. Thus, the Court may rely on extrinsic evidence to determine what the parties intended the phrase to mean. Here, defendant offered testimony from Mr. Harris in which he asserted that the intent of the gross economic impracticability term was to excuse the harvesting of a small number of trees that were not harvested on plaintiff's initial pass. Trial. Tr. at 4156 (Harris).[50] Mr. Harris's interpretation is inconsistent with the directives set forth in the Handbook. According to the Handbook, the situation which Mr. Harris describes—*i.e.,* excuse from harvesting trees that plaintiff initially failed to harvest—expressly does not constitute gross economic impracticability because such a determination must be made before harvesting has begun.

Moreover, if the Court were to adopt Mr. Harris's interpretation, it would render a portion of the clause "useless, inexplicable, inoperative, void, insignificant, meaningless, [or] superfluous." *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. at 459. Here the relevant clause contains two provisions. The first excuses plaintiff from removing "occasional trees inadvertently not cut." The second excuses plaintiff from, among other things, removing "trees or pieces . . . for good reason including . . . gross economic impracticability at the time of removal of other timber." Hence, if the Court were to adopt Mr. Harris's interpretation, the phrase "gross economic impracticability" would mean the same thing in substance as "occasional trees inadvertently not cut." Such a reading would render the phrase "gross economic impracticability" superfluous, and the Court declines to adopt this reading. Rather, the Court concludes that whatever its definition, "gross economic impracticability" is broader than merely excusing the removal of trees inadvertently not cut.

Having determined what the phrase "gross economic impracticability" does not mean, the Court must now turn to the question of what it does mean. The parties have not cited and the Court is unaware of any case law squarely on point. The case law that does exist is helpful but not dispositive. *See Greer Properties, Inc. v. LaSalle Nat'l Bank*, 874 F.2d 457 (7th Cir. 1989) (holding that "economic impracticability" is distinct from "commercial impracticability" and may arise even in the absence of an unforeseeable event).

Here, the Court finds two factors compelling and weighing heavily in favor of finding that removal of the roundwood would constitute gross economic impracticability. The first factor is that, as defendant notes, there was effectively no market for roundwood and plaintiff "would have had no outlet for roundwood during the period of the MSO suspensions." Def.'s

---

[50] The Court considers Mr. Harris's testimony insofar as it assists the Court in performing its task of construing the contractual term. The Court assumes that Mr. Harris would have acted in conformity with the contract. Defendant may not shield itself from liability by asserting that Mr. Harris would have acted inconsistently with the relevant contractual provisions.

Br. at 43 (docket entry 382, Sept. 2, 2005).  Standing alone, this fact would not necessarily constitute gross economic impracticability.  It is conceivable that even if no market existed for roundwood, the volume of included roundwood would be small enough that removal would not constitute gross economic impracticability.  Alternatively, it is conceivable that the cost of removal of roundwood, would be inexpensive enough that it would not be unduly harsh to require plaintiff to remove the included roundwood.  Here, however, if the Court accepts defendant's estimation that it would cost plaintiff at least $75 to remove each ccf of roundwood, the overall loss that plaintiff would incur would exceed $ 1.4 million.  Over the three prior years, plaintiff averaged approximately $1.3 million in net profit[51] per year.  PX 247.  Requiring plaintiff to absorb costs greater than its typical profits for an entire year would be unreasonably harsh, and the Court finds that the imposition of a requirement that would have that effect would constitute gross economic impracticability.  The Court finds that (1) the lack of a market for roundwood, and (2) the magnitude of the expenses that plaintiff would have incurred if forced to harvest roundwood under those circumstances, constitute gross economic impracticability under BT 6.4.

Although the language of BT 6.4 might arguably be interpreted to rest a certain amount of discretion with the Forest Service in determining what constitutes gross economic impracticability (*i.e.*, exceptions "may be made for good reason"), here, the Court need not determine the precise bounds of that discretion.  Whatever the bounds of the Forest Service's discretion, it cannot extend so far as to negate the purpose of the contractual term.  The purpose of the language in CT 6.4 is to protect plaintiff from incurring harsh economic losses that could be avoided by excusing performance.  Here, defendant itself argues that plaintiff would have incurred losses exceeding an average year's net profit by harvesting the included roundwood.  Put simply, if such losses of that magnitude do not constitute gross economic impracticability, it is hard to imagine what would.  Thus, even if the language of BT 6.4 does rest some discretion with the Forest Service in close cases, the Court holds that the Forest Service would be well outside the bounds of that discretion to force plaintiff to harvest the included roundwood under the circumstances of this case.

### 7.    With the Exception of Grindings, Plaintiff Has Proved Its Damages for Lost By-Product Sales With Reasonable Certainty

Mr. Ness calculated the amount of profit plaintiff would have earned from the production of lumber by-products (chips, bark, grindings, and shavings).  PPFF ¶¶ 125–35.  To accomplish this, Mr. Ness first calculated the rate of production of each category of by-products.  PX 131, App. A, at 10.  Then, applying this figure to the milling schedule, Mr. Ness calculated the volume of each product that plaintiff would have produced in each quarter.  Trial. Tr. 2276

---

[51] The Court's use of plaintiff's net profit figure is illustrative of the financial impact to plaintiff.  The use of plaintiff's net profit figure for this purpose is not inconsistent with the Court's findings, *infra*, Section II.A.8, that, as plaintiff's expert testified, the proper measure of lost profits is the change in gross profits less manufacturing overhead.

(Ness).  From there, Mr. Ness multiplied the volume produced by plaintiff's expected sales prices[52] to arrive at a final lost-profit figure for the production of each category of by-product. Trial. Tr. 2277 (Ness).  Defendant does not object to plaintiff's methodology; rather, defendant argues for each category of by-products, that plaintiff has either failed to prove that it would have sold such by-product, or that plaintiff failed to prove its sales prices.  Def.'s Br. at 44–46 (docket entry 382, Sept. 2, 2005).  Defendant's arguments with respect to each particular category of lumber by-product are addressed separately.

### a.     Chips

Between October 1, 1992, and September 30, 1995, plaintiff was under contract with Stone Container which obligated Stone Container to purchase all of the chips produced by plaintiff.  PX 311.  After the expiration of that contract, Stone Container continued to buy plaintiff's chips at the same price as they were offered at the time that the contract expired ($18.25 per ton).  PPFF ¶ 1126 (citing Trial Tr. at 596 (Porter)); DX 476.  However, by letter dated December 27, 1995, Stone Container advised plaintiff that it intended to suspend purchasing chips from plaintiff between January 15, 1996, and April 15, 1996.  DX 476.  The letter indicates that Stone Container intended to purchase plaintiff's chips in the future and further indicated a willingness to discuss options "regarding chip storage and reclamation." *Id.* Mr. Porter testified that this meant that plaintiff could store the chips and sell them in bulk when Stone Container resumed purchasing chips. Trial Tr. at 599 (Porter). Mr. Porter also testified that plaintiff did, in fact, elect to store its chips for future sale to Stone Container. *Id.*  On April 22, 2006, plaintiff and Stone Container entered a new contract for the sale of chips at an initial price of $17.00 per ton.  PX 313.  Mr. Porter testified that at that point, Stone Container also purchased all of the chips that plaintiff had stored.  Trial Tr. at 600 (Porter).

Defendant argues that plaintiff's calculations are not accurate because they do not take into account the three months in which Stone Container refused to purchase plaintiff's chips. Def.'s Br. at 44 (docket entry 382, Sept. 2, 2005).  The Court finds that through testimony and documentary evidence, plaintiff has proven with reasonable certainty that although Stone Container suspended its chip purchasing for three months, when it resumed purchasing chips it purchased the chips that plaintiff had stored.  The Court is satisfied that plaintiff would have had an outlet for the chips that it would have produced in the absence of defendant's breach.

### b.     Bark

Mr. Ness calculated bark prices by reference to plaintiff's Bark Ledger.  PPFF ¶ 132(b); PX 316.  The Bark Ledger contains columns for among other things, date, ticket number, carrier, gross, tare, and net.  PX 316.  The Bark Ledger contains the notation "TRRI" in the column

---

[52] Depending on the particular by-product, Mr. Ness calculated sale price either by reference to sales invoices during the suspension period, by reference to one of plaintiff's sales ledgers, or by reliance on Mr. Porter's expertise.

labeled "carrier." *Id.*  TRRI refers to Transporting Renewable Resources, Inc., a wholly-owned subsidiary of plaintiff.  Trial Tr. at 1930, 2042 (Porter).  Defendant argues that the Bark Ledger thus does not actually evidence any invoices between plaintiff and any bark purchasers but only shows that TRRI "was providing Precision Pine with hauling services."  Def.'s Br. at 44 (docket entry 382, Sept. 2, 2005).  Moreover, defendant argues that plaintiff's financial statements between April 1, 1994, and March 31, 1996, indicated that plaintiff earned only $5.87 per Mbf (LT), rather than the $8.23 per Mbf (LT) rate used by Mr. Ness.  *Id.*

Plaintiff argues that defendant's conclusion is erroneous and identifies testimony from Mr. Tenney, Vice President of Precision Pine during the MSO suspensions, that "Western Organics was the major purchaser [of bark] and always have been."  Trial Tr. at 2985 (Tenney). Plaintiff asserts that the Bark Ledger "in fact records actual invoice numbers, amounts billed and billing dates." Pl.'s Resp. Br. at 46 (docket entry 396, Nov. 14, 2005).  Moreover, plaintiff asserts that, by including the years 1994 and 1995 within its calculation of bark prices, defendant has skewed the actual prices that plaintiff would have earned during the MSO suspensions.  Plaintiff notes that its financial statements show that in 1996 plaintiff earned on average $8.03/Mbf (LT) and in 1997 plaintiff earned on average $8.05/Mbf (LT) for bark.  Pl.'s Resp. Br. at 47 (docket entry 396, Nov. 11, 2005) (citing PX 246; PX 248).

After reviewing the evidence, the Court finds that plaintiff has proven that the Bark Ledger evidences invoices for the sale of bark.  The Court also finds that Mr. Ness's use of a sales price of $ 8.23/Mbf (LT) was reasonable.

### c.  Shavings

Mr. Ness calculated the sales prices of shavings from plaintiff's Shavings Record.  PX 317.  Defendant argues that plaintiff did not have a contract to sell shavings and that its financial records did not show any revenue for shavings during fiscal years 1995 and 1996.  Def.'s Br. at 45 (docket entry 382, Sept. 2, 2005).  However, plaintiff introduced testimony from Mr. Porter that plaintiff sold its shavings to Arabian horse farms in Scottsdale, Arizona, and that plaintiff also manufactured shavings into wood pellets that plaintiff sold for home heating.  Trial Tr. at 617, 1937 (Porter).  Moreover, plaintiff argues that its profits from the sales of shavings were recorded in its financial statements as "miscellaneous."  Pl.'s Resp. Br. at 48 n.66 (docket entry 396, Nov. 14, 2005).  The Court is satisfied that plaintiff's Shavings Record represents actual sales of shavings to third parties and that plaintiff had an adequate outlet for its shavings.

### d.  Grindings

Plaintiff did not introduce any records into evidence with respect to its sale of grindings. Rather, based on his experience, Mr. Porter estimated that plaintiff would have realized profits of $5.00/ton of grindings, and Mr. Ness relied on this estimate.  PPFF ¶ 132(d).  Here, the Court finds that plaintiff—having produced no records, ledgers, or invoices—has introduced too little evidence that plaintiff would have sold grindings at a profit.  Plaintiff may not recover for lost grindings sales.

**8.     The Change in Gross Profits Before Manufacturing Overhead is the Appropriate Measure of Lost Profits**

Plaintiff's expert witness on damages, Mr. Ness, calculated lost profits resulting from the defendant's breach of contract as the change in "gross profits before manufacturing overhead that plaintiff would have earned in 1995, 1996, and early 1997 from producing and selling lumber and by-products from the timber on the breached sales, that, but for the breach, plaintiff would have harvested between August 25, 1995 and December 4, 1996." Pl.'s Br. at 17 (docket entry 385, Sept. 12, 2005) (citing PPFF ¶ 64). To arrive at this figure, Mr. Ness subtracted from the total revenue plaintiff would have earned from harvesting the breached sales the "various direct manufacturing costs Precision Pine would have . . . incurred had it harvested th[e] timber and produced lumber and by-products from the sales as planned." *Id.* at 17–18. According to Mr. Ness's expert accounting opinion, the change in gross profits before manufacturing overhead is the appropriate measure of lost profits damages "because manufacturing overhead as well as general [and] administrative expenses remained static irrespective of the suspension." *Id.* at 18 (citing PPFF ¶ 66). In other words, plaintiff continued to incur manufacturing overhead and general and administrative expenses without regard to the defendant's breach.

Defendant challenges Mr. Ness's assertion that gross profits before manufacturing overhead is the appropriate measure of lost profits and argues that plaintiff "has presented no viable calculation of damages under its lost volume seller theory." Def.'s Br. at 18 (docket entry 382, Sept. 2, 2005). According to the Government, the Court has previously "ruled that a lost volume seller is entitled to recover only 'net profit.'" *Id.* (citing *Precision Pine & Timber, Inc. v. United States*, 63 Fed. Cl. 122, 133 (2004)). Defendant argues that Mr. Ness's report "does not provide a 'net profits' figure or even provide sufficient information to derive net profits." Def.'s Resp. Br. at 27 (docket entry 395, Nov. 14, 2005) (citing Trial Tr. at 2428, 2666–67 (Ness)). Finally, defendant asserts that, because Mr. Ness "did not make any deduction for manufacturing overhead, general and administrative expenses, other income and expenses, or taxes"—deductions defendant maintains "would be required to provide a figure for net profits"—plaintiff has failed to provide an appropriate figure for damages. Def.'s Br.at 18–19 (docket entry 382, Sept. 2, 2005) (citing Trial Tr. at 2592–94, 2717 (Ness); PX 1012).

As a preliminary matter, defendant misconstrues the language in this Court's earlier opinion when it asserts that Precision Pine is "entitled to recover only 'net profit.'" *Id.* at 18. In *Precision Pine & Timber, Inc.*, 63 Fed. Cl. at 133, the Court denied defendant's motion for summary judgment because genuine issues of material fact remained with regard to whether plaintiff was entitled to be compensated as a "lost volume seller." The Court relied upon an illustration from the Restatement (Second) of Contracts to explain the concept of lost volume damages:

A contracts to pave B's parking lot for $10,000. B repudiates the contract and A subsequently makes a contract to pave a similar parking lot for $10,000. A's business could have been expanded to do both jobs. Unless it is proved that he would not have undertaken

> both, A's damages are based on the *net profit* he would have made on
> the contract with B, without regard to the subsequent transaction.

*Precision Pine & Timber, Inc.*, 63 Fed. Cl. at 133 (emphasis added) (quoting
RESTATEMENT (SECOND) OF CONTRACTS § 347, illus. 16 (1981)).  The Court further
explained that

> [i]f the injured party could and would have entered into the
> subsequent contract, even if the contract had not been broken, and
> could have had the benefit of both, he can be said to have "lost
> volume" and the subsequent transaction is not a substitute for the
> broken contract.  The injured party's damages are then based on the
> *net profit* that he has lost as a result of the broken contract.

*Id.* (emphasis added) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 347, cmt. f).  The
Court quoted these passages for the purpose of describing lost volume damages.  As set forth
above, the Court has concluded that plaintiff is not entitled to be treated as a lost volume seller
for purposes of calculating damages.  The passages quoted do not constitute a ruling by the Court
that plaintiff is entitled to recover only net profits.  Therefore, the Court's earlier opinion does
not provide a basis for defendant's argument that plaintiff is entitled only to net profits as
damages.

"Contract remedies are designed to make the nonbreaching party whole."  *Holland v.
United States*, 75 Fed. Cl. 483, 489 (2007) (quoting *Cal. Fed. Bank v. United States*, 395 F.3d
1263, 1267 (Fed. Cir. 2005)).  When a breach of contract occurs, the "benefits that were expected
from the contract, 'expectancy damages,' are often equated with lost profits, although they can
include other damage elements as well."  *Glendale Fed. Bank, FSB v. United States*, 239 F.3d
1374, 1380 (Fed. Cir. 2001).  Damages based on the non-breaching party's expectation interest
are measured by "(a) the loss in the value to him of the other party's performance caused by its
failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by
the breach, less (c) any cost or other loss that he has avoided by not having to perform."
RESTATEMENT (SECOND) OF CONTRACTS § 347; *see also Kutner Buick, Inc. v. Am. Motors Corp.*,
868 F.2d 614, 618 (3d Cir. 1989) ("The effect on net income must be measured by revenue lost
less costs avoided. . . .  Fixed or unavoidable costs are by definition unrelated to the individual
income producing activity and thus are not relevant to the change in net profit calculation.");
*Hallmark Ins. Adm'rs, Inc. v. Colonial Penn Life Ins. Co.*, 990 F.2d 984, 989 (7th Cir. 1993)
("[A] party harmed by another's breach of contract is entitled to collect those lost net revenues
that would have helped defray fixed costs and contributed to profit.").

Mr. Ness maintains that plaintiff's lost profits are properly determined from gross profits before manufacturing overhead, which is equivalent to total revenue less direct manufacturing costs. If the Government had not breached the timber sale contracts, plaintiff would have derived revenue from the sale of lumber and lumber by-products. Trial Tr. at 2219 (Ness); PX 1012. Mr. Ness testified that "direct manufacturing costs are the ones that relate most directly to manufacturing. In other words, you could call them variable costs. As manufacturing goes up, these costs go up. As manufacturing goes down, these costs go down. They vary directly." Trial Tr. at 2264 (Ness). If defendant had not breached the contracts, plaintiff's direct manufacturing costs would have included stumpage, logging and hauling costs, severance tax, sawmill costs, green lumber hauling costs, and dry kiln and planer costs. Trial Tr. at 2219–20 (Ness); PX 1012. It follows that Mr. Ness's calculation of gross profits before manufacturing overhead represents the loss in value of the defendant's performance under the contracts less the costs plaintiff avoided by not harvesting timber and producing lumber. *See* RESTATEMENT (SECOND) CONTRACTS § 347.

Once gross profits before manufacturing overhead have been calculated,

> [d]educting manufacturing overhead (*e.g.*, property taxes, general insurance, supervisor wages, repairs and maintenance, etc.) then determines what Precision Pine's gross profit would have been. Subtracting general [and] administrative overhead ([*e.g.*,] officer salaries, sales expenses, accounting department payroll taxes, workman's comp, group medical insurance, etc.) from gross profit then yields operating income. Finally, deducting from operating income other items such as interest income, interest expenses, gains [and] losses, and gains [and] losses from subsidiaries, yields net income before taxes, otherwise termed 'net income.'

PPFF ¶ 66 n.5 (internal citations omitted). Mr. Ness testified that it would be inappropriate to calculate net profits based on the "net income line," because such a calculation would require "a lot of allocations, and you would be allocating things that are inappropriate to allocate." Trial Tr. at 2587 (Ness). He described manufacturing overhead and general and administrative expenses as costs that "would tend to stay static over a range" of timber-harvesting and lumber-producing activity. Trial Tr. at 2755–56 (Ness). As fixed costs, these expenses are not avoided by a breach of contract and, accordingly, they cannot properly be taken into account when calculating a non-breaching party's expectation damages. "In other words, to calculate 'what would have changed' between the scenario Precision Pine would have faced because of the breach and the scenario that Precision Pine would have faced absent the breach, Mr. Ness did not need to factor in these static costs." PPFF ¶ 66 (citing Trial Tr. at 2756–57(Ness)). Therefore, the change in gross profit before manufacturing overhead is the appropriate measure of Precision Pine's expectation damages.

### 9.      Plaintiff Must Recalculate its Expenses

#### a.      Logging and Hauling Expenses

Mr. Porter testified that he based the logging and hauling expenses used by Mr. Ness on plaintiff's "logger pay records," which show the actual rate plaintiff paid for logging and hauling. Trial Tr. at 516, 560, 577–80 (Porter); PX 307. Defendant argues that Mr. Ness should have independently derived these costs rather than relying on the representations of Mr. Porter. Def.'s Br. at 42 (docket entry 382, Sept. 2, 2005); *see also* Trial Tr. at 2697 (Ness) ("[Mr. Porter and plaintiff's counsel] gave me the numbers off invoices."). Defendant argues that Mr. Ness should have used plaintiff's comprehensive financial data to derive logging and hauling costs. Def.'s Br. at 42 (docket entry 382, Sept. 2, 2005). In its Proposed Findings of Fact, defendant purports to show the actual costs that it alleges that plaintiff would have incurred for each contract. DPFF ¶¶ 548–55. Plaintiff objects to this methodology because plaintiff alleges that defendant's methodology is based on defendant's estimates of the volume of timber that plaintiff harvested, rather than the actual volumes that plaintiff harvested. Pl.'s Resp. Br. at 42 (docket entry 396, Nov. 14, 2005). In reality, plaintiff argues, it often harvested more timber than the Forest Service estimated. *Id.* (citing Trial Tr. at 5325–26 (Smith)).

The Court is not satisfied that plaintiff has calculated its logging and hauling costs with reasonable certainty. Based on the testimony and plaintiff's exhibits, it is unclear to the Court exactly how plaintiff derived its logging and hauling costs. Mr. Ness indicated that he used the rates given to him off "invoices." Plaintiff introduced only three memoranda (*i.e.*, "logger pay records") from Mr. Smith to plaintiff's accountant which directed the account to pay for logging and hauling. The Court is not persuaded, nor has plaintiff argued, that these three records embody all of plaintiff's logging and hauling expenses during the MSO suspensions. It is unclear if the figures used by Mr. Ness were based on these three logger pay records or whether plaintiff used a larger sample. It is also unclear how plaintiff derived the sample ultimately relied upon by Mr. Ness. Plaintiff must recalculate its logging and hauling costs using the total cost of logging and hauling from its annual financial statement for the fiscal year ending in 1995, PX 248,

divided by plaintiff's total harvested timber for the fiscal year ending in 1995[53] as set forth in PX 131, Exhibit 10.

### b. Manufacturing Expenses

Mr. Ness testified that he based his manufacturing cost calculations on historical cost data from plaintiff's financial statements.  Trial Tr. at 2176–77 (Ness).  Defendant argues that Mr. Ness "ignores various categories in Precision Pine's contemporaneous 'cost comparison reports.'" Def.'s Br. at 42 (docket entry 382, Sept. 2, 2005).  As a consequence, defendant asserts that plaintiff's actual costs were over 50 percent higher than the costs used by Mr. Ness.  *Id.*  Plaintiff argues that Mr. Ness determined that the cost comparison reports were unreliable because they could not be reconciled with plaintiff's financial statements.  Pl.'s Resp. Br. at 44 (docket entry 396, Nov. 14, 2005).  Plaintiff further argues that contrary to defendant's assertions, Mr. Ness's calculations were actually divided into more cost categories than the cost comparison reports.  *Id.* Moreover, plaintiff asserts that defendant's experts could not explain who created the cost comparison reports or for what purposes they were used.  *Id.*  In short, plaintiff argues that the cost comparison reports are unreliable.

---

[53] Plaintiff uses a 17-month time period—the fiscal year immediately preceding the MSO suspensions plus the subsequent five months up to the beginning of the suspensions—to calculate its manufacturing expenses.  *Infra*, Section II.A.9.b.  For calculating estimated logging and hauling expenses the Court adopts a 12-month time period.  A 12-month period is preferable to a 17-month period because, as described below, with a 12-month period ending near the end of the harvesting off-season, the Court determines that it does not need to factor in the lag time between harvesting and hauling of timber, and the ultimate production into lumber from those logs. Based on Mr. Smith's testimony, *see supra,* Section II.A.1.a, toward the end of the typical harvesting season in late fall, plaintiff generally had amassed enough logs to supply its mills until the following spring when a new harvesting season would begin.  As logic would dictate, during the non-harvesting season plaintiff would have little in the way of logging or hauling expenses because in a typical season plaintiff will have all of the timber it needs decked in its lumber yards by the end of harvesting season.  Plaintiff's fiscal year ends on March 31.  PX 248.  That date corresponds with the final few weeks of the harvesting off-season.  Based on Mr. Smith's testimony, the Court determines that in a typical fiscal year, practically all of the timber that is harvested and hauled to plaintiff's mills will be manufactured into lumber by the end of its fiscal year.  Thus, plaintiff may divide its annual lumber output by its annual logging and hauling costs to arrive at a cost per Mbf.  In contrast, the 17-month time period that plaintiff uses for calculating manufacturing expenses ends in the middle of the harvesting season.  Because logs are not immediately manufactured into lumber after harvesting and hauling, using a 17-month period would require knowledge of the lag time between hauling and manufacturing.  The Court finds that relying on plaintiff's last full fiscal year prior to the suspension will provide a reasonable approximation of plaintiff's logging and hauling costs, and thus, determination of the lag time is not necessary.

The Court admitted the September 1995 cost comparison report as a business record.  Trial Tr. at 3013–14 (Miller, Judge).  Before admission as a business record, defendant attempted to lay the foundation for the cost comparison report through the testimony of Mr. Tenney.  *Id.* at 3012–13 (Harrington).  Mr. Tenney testified that he could not recall having ever seen the September 1995 cost comparison report (or any cost comparison report) before.  *Id.* (Tenney).  Mr. Tenney speculated that Mr. Porter may have created the cost comparison reports.  *Id.*  Mr. Porter, however, did not testify to the methods used to create the cost comparison reports.  There are no representations in the record as the general reliability of the cost comparison reports.  Defendant argues that Mr. Ness "ignores various categories" contained in plaintiff's cost comparison reports.  The Court cannot discern to which categories defendant is referring.[54]  Mr. Ness testified that he culled the information used to calculate plaintiff's manufacturing costs from plaintiff's financial statements.  Defendant does not dispute the accuracy of the information contained in plaintiff's financial statements, and in fact relies on the information contained in the financial statements in arguing that plaintiff overstated its logging and hauling expenses.  *Supra*, Section II.A.9.a; Def.'s Br. at 42 (docket entry 382, Sept. 2, 2005).  The Court finds that there is no basis to conclude that the cost comparison reports more accurately projected plaintiff's manufacturing costs than the figures that plaintiff obtained from plaintiff's financial statements.  The Court finds that plaintiff has proven its manufacturing costs with reasonable certainty.

> ### 10.     Profits Actually Earned on the Breached Sales in the Post-Suspension Period Must Be Taken Into Account in Computing Lost Profits Caused by the Government's Breach

Mr. Ness calculated that plaintiff's post-suspension profits on the breached sales totaled $803,353.12.  PX 182, Ex. 1.  Defendant argues that, in his calculation of post-suspension profits, Mr. Ness improperly reduced the profits earned on the breached sales in the post-suspension period by subtracting the default damages assessed against plaintiff by this Court in *Precision Pine & Timber, Inc. v. United States*, 75 Fed. Cl. 80 (2006) (*Precision Pine II*), the increased logging and hauling costs plaintiff incurred during the post-suspension period, and the increased overhead costs plaintiff incurred during the post-suspension period.  Def.'s Br. 46–48 (docket entry 382, Sept. 2, 2005).  Plaintiff replies that defendant has failed in each instance to demonstrate that plaintiff's calculation lacked reasonable certainty, and so Mr. Ness's damages calculation, including his calculation of plaintiff's post-suspension profits, should stand.  Pl.'s Resp. Br. at 51 (docket entry 396, Nov. 14, 2005) .

---

[54] The cost comparison report contains only three broad categories: "wages," "fuel, rep, supl," and "utilities."  DX 802.  Plaintiff's cost calculations contain eight categories "wages-operating," "payroll taxes," "workers' comp," "group insurance," "fuel & oil," "saw & knives," "supplies," and "utilities."  PX 131, tab 10.  Of these categories, the only cost that plaintiff has omitted is the portion of the second category ("fuel, rep, supl") relating to what the Court interprets to indicate "repairs" (*i.e.,* "rep").  However, *supra,* Section II.A.8, the Court determined that plaintiff may exclude the cost of maintenance and repair from its profit calculations.

      a.        **Plaintiff May Not Reduce Its Post-Suspension Profits by the**
                      **Amount of Damages Awarded Defendant in *Precision Pine II***

In calculating the financial impact to plaintiff in the post-suspension period, Mr. Ness subtracted damages claimed by the Forest Service in *Precision Pine II* from plaintiff's gross post-suspension profits. Trial Tr. at 2402 (Ness). Defendant argues that Mr. Ness failed to explain why he deducted this amount from plaintiff's post-suspension profits and, furthermore, that "there exists no basis [for plaintiff] to recoup in this action default damages that are owed to the Forest Service pursuant to the Court's decision in [*Precision Pine II*]." Def.'s Br. at 46–47 (docket entry 382, Sept. 2, 2005).

Plaintiff responds that defendant's argument is conclusory and that it cites no "law, expert opinion or other evidence in support of its argument." Pl.'s Resp. Br. at 52. According to plaintiff, but for the suspensions, plaintiff would have timely harvested all of the contracts and would not have been subject to default proceedings. It follows, plaintiff argues, that the breach was the proximate cause of the damages claimed by the Forest Service. Furthermore, plaintiff contends, if it is not permitted to reduce its post-suspension profits by the amount of damages due defendant pursuant to *Precision Pine II*, defendant will receive a double benefit and plaintiff will be in a worse position than it would have been absent a breach. *Id.*

Plaintiff is correct that defendant did not cite any authority to support its contention that there was no basis for reducing plaintiff's post-suspension profits by the amount of damages assessed in *Precision Pine II*. However, where, as here, plaintiff seeks expectancy damages, it is incumbent on plaintiff to establish, in the but-for world, "what might have been." *Bluebonnet Sav. Bank FSB v. United States*, 67 Fed. Cl. 231, 238 (2005) (quoting *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001)). It is, therefore, not defendant's burden to explain why plaintiff's post-suspension profits should not be reduced by the damage award in *Precision Pine II*, but plaintiff's burden to establish that plaintiff's post-suspension profits should be reduced and by what amount.

Plaintiff has failed to meet its burden in this regard. When asked by the Court why he included the contract damages from *Precision Pine II* as an element of damages in the present case, Mr. Ness testified that his assignment was to determine the "financial impact to Precision Pine in the post-suspension period," and that the damages had a financial impact. Trial Tr. at 2402 (Ness); *see also id.* at 2463–64 (Ness). Plaintiff did not, however, demonstrate that the damages it paid in *Precision Pine II* could appropriately be used to reduce the amount of its post-suspension profits in the present case.

Furthermore, plaintiff's assertion that not reducing the amount of post-suspension profits would constitute a double recovery for defendant is incorrect. To the contrary, were the amount

of post-suspension profits reduced, it would negate defendant's recovery in *Precision Pine II*.[55]  In asserting that it expected defendant to "continue to pursue a separate recovery of these same default damages" in *Precision Pine II*, plaintiff mischaracterizes the nature of defendant's claim; defendant is not looking to receive again the same damages it received in *Precision Pine II*. Rather, it seeks to prevent plaintiff from recovering the damages which plaintiff was previously required to pay to defendant.

Perhaps most important, however, is that if the Court were to permit plaintiff to reduce its post-suspension profits by the amount awarded defendant in *Precision Pine II*, it would have the effect of undoing the Court's summary judgment decision that case.  In its decision on summary judgment, the Court held that plaintiff had the option to: "1) entirely discontinue performance under the contract, 2) explicitly reserve its right to discontinue performance for the material breach, or 3) waive the right and continue performance under the contract."  *Precision Pine & Timber, Inc. v. United States*, 62 Fed. Cl. 635, 648 (2004).  The Court determined that:

> In light of Precision's continued manifestation of its intention to perform under the contracts and the lack of timely notice to the Forest Service regarding Precision's assertion of material breach, this Court concludes that it would be unjust under the circumstances to allow Precision to avoid liability for its breaches based on the assertion of prior material breach.

*Id*. at 650–51.  If plaintiff were permitted to reduce its post-suspension profits by the amount of damages due defendant pursuant to *Precision Pine II*, it would have the effect of negating the Court's previous holding and plaintiff would evade liability for its own breach of contract.  The

---

[55] In order to simplify plaintiff's argument, assume that defendant received $50 as a damage award in *Precision Pine II*.  Further assume that the Court found that plaintiff was entitled to $600 in damages in the present case, but that any such award had to be reduced by profits earned by plaintiff in the post-suspension period, which profits amounted to $300. Plaintiff argues that its $300 in post-suspension profits should be reduced by the $50 awarded defendant in *Precision Pine II* because, according to plaintiff, if the award is not reduced, defendant would receive a double recovery.

Calculating the difference in the two situations belies plaintiff's contention.  If the calculation of plaintiff's post-suspension profits were not reduced by the damage award from *Precision Pine II*, plaintiff would receive net damages of $250 ($600 − $300 (post-suspension profits) − $50 (damages paid by plaintiff to defendant in *Precision Pine II*)).  If plaintiff's post-suspension profits were reduced by the damage award from *Precision Pine II*, plaintiff would receive net damages of $300 ($600 − $250 (post-suspension profits less the *Precision Pine II* damage award) − $50 (damages paid by plaintiff to defendant in *Precision Pine II*)).  The difference between plaintiff's net recovery—$50—represents a single, not a double, recovery by defendant of the $50x damages awarded it in *Precision Pine II*.

Court views plaintiff's argument as a collateral attack on its previous decision in *Precision Pine II*, and declines permit plaintiff to avoid breach of contract liability in this manner. Therefore, the amount of post-suspension profits plaintiff must take into account in calculating its damages will not be reduced by the amount awarded defendant in *Precision Pine II*.

> **b.      Plaintiff May Not Deduct Increased Manufacturing and Administrative Overhead Costs From Its Post-Suspension Profits Because These Expenses Represent Fixed Costs That Plaintiff Would have Incurred Irrespective of the Breach**

In addition to reducing plaintiff's post-suspension profits by the *Precision Pine II* damages, Mr. Ness also subtracted $216,914.00 in increased manufacturing overhead from his calculation of post-suspension profits. PX 182, Ex. 1. Defendant objects to Mr. Ness's reduction of post-suspension profits by the costs incurred in the post-suspension period. Plaintiff responds that it calculated its post-suspension profits with reasonable certainty, using the actual costs it incurred in the post-suspension period.

Mr. Ness further subtracted $321,849.00 in increased administrative overhead from his calculation of plaintiff's post-suspension profits. PX 182, Ex. 1. Defendant raises similar objections to Mr. Ness's use of increased administrative overhead to reduce plaintiff's post-suspension profits, arguing that Mr. Ness lowered the baseline for his calculation of overhead using phantom values, that he erroneously based the increased overhead costs on per unit charges, and that plaintiff actually benefitted from the suspensions, earning more from post-suspension harvesting than it would have earned had there been no suspension. Def.'s Br. at 47–48 (docket entry 382, Sept. 2, 2005).

Plaintiff responds that, in fact, its post-suspension per-unit administrative overhead costs were higher than its per-unit costs during the suspension period, and that the increased overhead costs must be taken into account in determining plaintiff's post-suspension profits. Pl.'s Resp. Br. at 53 (docket entry 396, Nov. 14, 2005) (citing PX 182, Ex. 9). Plaintiff concedes that its lumber production was scaled back in the post-suspension period as compared with the pre-breach period. *Id*. at 54. Nonetheless, plaintiff contends, as with the increased manufacturing costs, the increased administrative overhead represents real costs incurred by plaintiff and "must be taken into account" in calculating plaintiff's post-suspension profits. *Id*. Finally, plaintiff contests defendant's assertion that it benefitted from the suspensions, contending that defendant's use of plaintiff's net sales figures does not show that plaintiff's *profit* was higher and, in fact, its profit was lower in the post-suspension period than it would have been during the suspension period in the absence of defendant's breach. *Id.* at 55.

While plaintiff has established that its per-unit manufacturing and administrative overhead costs were higher in the post-suspension period than they were during the suspension period, it has not established that its post-suspension profits should be reduced by those expenses. In fact, in discussing the appropriate measure of lost profits, plaintiff argued, and the Court agreed, that its lost profits damages should not be reduced by the amount of manufacturing and administrative

overhead it incurred, because plaintiff continued to incur those costs irrespective of the breach. *Supra,* Section II.A.8; *see also* Pl.'s Br. at 18 (docket entry 386-2, Sept. 12, 2005). That argument, compelling in the context of lost profits damages, is equally compelling in determining plaintiff's post-suspension profits. While it is true, as plaintiff argues, that it actually incurred such overhead costs in the post-suspension period, it is equally true that plaintiff would have incurred these costs irrespective of defendant's breach. Therefore, the amount of post-suspension profits plaintiff must take into account as it calculates its damages will not be reduced by the increased manufacturing and administrative overhead costs plaintiff alleges it incurred in the post-suspension period.

**c.**     **In Calculating the Profits It Made in the Post-Suspension Period, Plaintiff May Deduct the Actual Logging and Hauling Costs That It Incurred**

In calculating its post-suspension profits, plaintiff reduces its gross profits by the logging and hauling costs that it actually incurred in the post-suspension period. *See* Trial Tr. at 2705–07 (Ness). Both parties agree, that in contrast with manufacturing and administrative overhead, logging and hauling costs represent direct manufacturing expenses that should be deducted from gross revenue in calculating lost profits. Trial Tr. at 2219–20 (Ness); Def.'s Br. at 42 (docket entry 382, Sept. 2, 2005). Defendant, however, characterizes the logging and hauling costs used by plaintiff as "increased logging and hauling costs." *Id.* at 47. It is initially unclear what defendant means when it alleges that these costs are "increased" in light of plaintiff's uncontroverted assertion that it has calculated its post-suspension profits with reference to its actual costs. The Court infers that defendant is arguing plaintiff should have calculated its profits in the post-suspension profits with reference to the logging and hauling expenses that plaintiff would have incurred during the suspension period rather the higher costs that plaintiff actually incurred in the post-suspension period. However, as the Court has stated "plaintiff must reduce the profits it would have earned on the suspended contracts by the profits it *actually* earned on such contracts in the post-suspension period." *Supra,* p. 16 (emphasized added). To calculate the profits it actually earned on the breached contracts in the post-suspension period plaintiff must first calculate its actual revenue earned on the breached contracts in the post-suspension period and deduct from that figure its actual direct manufacturing costs.

Defendant also argues that plaintiff's use of its actual logging and hauling costs is impermissible because plaintiff had not previously asserted any claim for increased logging and hauling costs in this case, and such a claim had been rejected with respect to the O.D. Ridge and the Hay contracts. Def.'s Br. at 47 (docket entry 382, Sept. 2, 2005). Defendant thus argues that plaintiff's "attempt to resurrect (or assert for the first time) claims for increased logging and hauling costs is improper." *Id.* Here, defendant's argument is closely analogous to the Court's discussion, *supra,* note 14, regarding the distinction between a "claim" for offset and the ordinary deductions applied in the lost profits calculus. Plaintiff is not "asserting a claim" for increased logging and hauling costs—as defendant suggests—but rather attempting to calculate its actual profits in the post-suspension period for the purpose determining its lost profits on the breached contracts. The Court holds that plaintiff may utilize its actual logging and hauling to determine its actual profits earned on the breached contracts in the post-suspension period.

68

B.     Contract Claims Under CT 6.01

In addition to its claim for compensation under a breach of contract theory, plaintiff also seeks compensation under contract clause CT 6.01, *see, e.g.* PX 170 (CT 6.01), which provides in pertinent part that the contracting officer may require the contractor to suspend operations for, among other things, compliance with a court order.  CT 6.01 further provides that in the event of an interruption or delay of a contractor's operations arising out of the contracting officer's exercise of the government's right to impose a suspension, the contractor is entitled to "out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, replacement cost of timber, or any other anticipatory losses suffered by Purchaser."  In addition, CT 6.01 provides that recovery of the expenses described in that provision is to be the contractor's "sole and exclusive remedy" for the imposition of a suspension of operations.

Defendant argues that CT 6.01 and common law breach of contract claims are "alternative avenue[s] of recovery."  Def.'s Br. at 61 (docket entry 382, Sept. 2, 2005).  As support, defendant cites *Admiral Financial Corporation v. United States*, 378 F.3d 1336 (Fed. Cir. 2004) which held that a plaintiff may not recover both expectancy damages and restitution.  Def.'s Br. at 8 (docket entry 382, Sept. 2, 2005).  Plaintiff responds that *Admiral Financial* is not on point because plaintiff is not seeking restitution.  Pl.'s Resp. Br. at 11 (docket entry 395, Nov. 14, 2005). Moreover, plaintiff cites *Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223, 232 (1998), *aff'd sub nom. Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000), for the proposition that claims brought pursuant to contractual terms and breach of contract remedies are not mutually exclusive.  Although this general principle is sound, *Yankee Atomic* contains an important qualification to this general rule which is applicable in this case, namely, "the presence of a limited contractual remedy for a breach does not automatically bar a court action for additional relief *unless the parties clearly agreed that the contractual remedy would be exclusive*."  *Id.*  Here, the applicable contractual language provided that in the event of a suspension, the contractor's "sole and exclusive remedy" was the recovery of out-of-pocket expenses.  In addition, the contract clause specifically excluded "lost profits, replacement cost of timber, or any other anticipatory losses."  Consequently, to the extent that plaintiff seeks to exercise its rights under the terms of the contract, it must also subject itself to the limitations of that contractual right, which in this case prohibits the recovery of lost profits.  The Court holds that plaintiff may not recover under both CT 6.01 and under its common law breach of contract claim. Plaintiff may only recover under CT 6.01 with respect to those contracts upon which it does not seek breach of contract remedies—*i.e.* the St. Joe and Hutch-Boondock contracts, which Chief Judge Damich held defendant did not breach.[56]

---

[56]   Because plaintiff is entitled to compensation pursuant to CT 6.01 only for the St. Joe and Hutch-Boondock sales, plaintiff is precluded from recovering on certain categories of expenses which are only applicable to sales with respect to which plaintiff seeks expectancy damages.  Plaintiff seeks interest on cash balances for the Brookbank, Hay, and U-Bar contracts

(continued...)

The categories of expenses for which plaintiff requests compensation pursuant to CT 6.01 for the St. Joe and Hutch-Boondock contracts are: (1) claim preparation expenses; (2) bond costs along with a 7.6% mark-up attributable to overhead and a 10% mark-up attributable to profit; (2) interest on its down payment on the Hutch-Boondock sale along with a 7.6% mark-up attributable to overhead and a 10% mark-up attributable to profit.[57]  PX 131, Exhibit 2.  Defendant asserts that "[c]laim preparation costs—like attorney fees—are not ordinarily recoverable by a plaintiff."  Def.'s Br. at 63 (docket entry 382, Sept. 2, 2005) (citing *Singer Co. v. United States*, 215 Ct. Cl. 281, 568 F.2d 695, 721 (1977)).  Defendant argues that plaintiff may not recover for any bond costs that the Forest Service has not already paid plaintiff because plaintiff has not furnished the necessary proof of such expenses.[58]  Defendant argues that profits are not recoverable because profits are anticipatory losses and are excluded from recovery by terms of the contract.  Similarly, defendant argues that the express language of CT 6.01 precludes plaintiff from recovering for overhead because overhead is an indirect expense rather than a direct expense.  *Id.* at 69.  Defendant argues that as a matter of law, plaintiff is not entitled to interest absent an express and unambiguous waiver of sovereign immunity.  *Id.* at 66.  Last, defendant argues that plaintiff has not demonstrated an entitlement to snow removal costs and log transfer costs.  *Id.* at 67–68.

---

[56](...continued)
only.  Because plaintiff is pursuing breach of contract claims with respect to the Brookbank, Hay, and U-Bar contracts, plaintiff is not entitled to recover "interest on cash balances."  Plaintiff seeks "move-out costs" for the Brookbank contract only.  Because plaintiff is pursuing breach of contract claims with respect to the Brookbank sale, plaintiff is not entitled to recover "move-out costs" pursuant to CT 6.01.

[57] Mr.Ness also lists snow removal costs in January of 1996 and the "cost of transferring logs (due to closure of Eagar)" as out-of-pocket expenses recoverable under CT 6.01, *see* PX 131, Exhibit 2.  However, plaintiff argues that log transfer costs are actually consequential damages cause by defendant's breach, rather than out-of-pocket expenses.  Pl.'s Resp. Br. at 69 n.92 (docket entry 395, Nov. 14, 2005).  Plaintiff also argues that it could recover snow removal costs either as an out-of-pocket expense under CT 6.01 or as consequential damages caused by defendant's breach.  *Id.* 68 n.90.  Because plaintiff argues that these losses were incurred as a result of a lack of logs during the suspensions of the breached contracts rather than the suspensions of the St. Joe and Hutch-Boondock contracts, the Court finds that these expenses—to the extent that they are recoverable—constitute consequential damages caused by the breaches rather than out-of-pocket expenses incurred as a result of the St. Joe and Hutch-Boondock suspensions.  Thus, the Court analyzes these categories of expenses *infra*, Sections II.C.3, II.C.4.

[58] Plaintiff sought and the Forest Service paid $128.80 in bond costs on the Hutch-Boondock contract.  PX 221.  At trial, plaintiff requested an additional $1.39—for a total of $130.29.  PX 131, Exhibit 2.  Plaintiff also requests $614.04 on the St. Joe contract.  *Id.*  Defendant challenges plaintiff's request for the additional $1.29 on the Hutch-Boondock and the entire $614.04 on the St. Joe contract.  Def.'s Br. at 65 (docket entry 382, Sept. 2, 2005).

As discussed previously, *supra,* p. 54, the interpretation of government contracts is a matter of law, *Textron Defense,* 143 F.3d at 1468 (Fed. Cir. 1998), which "begins with the language of the written agreement." *Coast Fed. Bank,* 323 F.3d at 1038. Contract language is construed to give words their plain and ordinary meaning, as understood by a reasonably intelligent person familiar with the contemporaneous circumstances. *Olympia Props.,* 54 Fed. Cl. at 152. Here, the relevant contractual provision provides that plaintiff is entitled to "out-of-pocket expenses." The plain meaning of "out-of-pocket expense" is "[a]n expense paid from one's own funds." BLACK'S LAW DICTIONARY 618 (8th ed. 2004) (expense). This definition excludes those losses that are not paid out of one's funds. Moreover, the language in CT 6.01 provides that "[p]urchaser agrees to provide receipts or other documentation [of out-of-pocket expenses] to the Contracting Officer which clearly identify and verify *actual expenditures*." Taken together, the Court holds that to recover an out-of-pocket expense under CT 6.01, plaintiff must demonstrate that it made an actual expenditure paid out of its own funds.

Certain of the categories of compensation that plaintiff seeks to recover are incompatible with this definition of out-of-pocket expense. Neither interest nor "profit" constitute actual payments made out of plaintiff's own funds. Rather, these losses are anticipatory in nature. Plaintiff argues that interest compensates plaintiff for its "inability to use cash . . . or its equivalent." Pl.'s Resp. Br. at 68 (docket entry 395, Nov. 14, 2005). However, inability to use cash is not a loss resulting from an actual expenditure from plaintiff's funds. Similarly, plaintiff argues that it should be entitled to recover profits or else plaintiff would "simply break even on its operations." *Id.* at 70. However, the loss described by plaintiff is also not a loss resulting from an actual expenditure from plaintiff's funds.

Plaintiff requests a 7.6 % overhead charge on certain "miscellaneous expenses" including bond costs, snow removal costs, and log transferring costs. The Court is not persuaded by defendant's argument that overhead is never recoverable as an out-of-pocket expense because it is an indirect cost that is not "incurred as a direct result of interruption or delay of operations under [CT 6.01]." The Court can conceive of situations in which overhead expenses actually paid out the claimant's funds could be recoverable. However, here, plaintiff has not proven that a flat 7.6 % charge on top of plaintiff's other expenses represents the amount actually paid as required by CT 6.01. Thus, under CT 6.01, plaintiff is not entitled to its requested overhead costs.

The Court finds that to the extent that plaintiff may recover its claim preparation costs as out-of-pocket expenses,[59] plaintiff has failed to prove those costs with reasonable certainty. Plaintiff requests a total of $23,219.04 in claim preparation costs. PPFF ¶ 153. That amount is not

---

[59] Defendant argues that claim preparation costs are not recoverable as a matter of law. The Court is not persuaded that the cases cited by defendant are on point because those cases do not involve a contractual term that allegedly permits the recovery of claim preparation costs. Nonetheless, the Court declines to rule on the issue whether recovery of claim preparation costs is precluded as a matter of law because the Court finds that plaintiff has not proven those costs with reasonable certainty.

apportioned among the several contracts at issue.  Plaintiff argues that "given the sheer volume of data and complexity of plaintiff's claim letters . . . , the expenses that plaintiff seeks to recover . . . are quite modest."  Pl.'s Resp. Br. at 66 (docket entry 395, Nov. 14, 2005).  However, the reason that plaintiff's claim letters are complex was because the claim letters sought lost profits—a category of damages that are explicitly excluded as an out-of-pocket expense.  The portions of the St. Joe and Hutch-Boondock claims that are recoverable as legitimate out-of-pocket expenses (*i.e.* the portions relating to increased bond costs) are not very complex and likely consumed a minute fraction of the overall effort needed to prepare plaintiff's claim letters.  Plaintiff has not provided the Court any basis to determine the expenses associated with claim preparation for its legitimate out-of-pocket expenses.

Plaintiff also requests an additional $615.33 in bond costs.  These costs would meet the Court's interpretation of the term out-of-pocket expenses, and defendant does not challenge the recovery of bond costs generally.  Defendant argues, however, that in this case plaintiff has failed to provide the necessary proof of these costs as required by CT 6.01 (requiring "receipts or other documentation.").  Here, plaintiff argues that Mr. Ness relied on figures "reported by Precision Pine."  PPFF ¶ 157.  However, plaintiff has not furnished any documentary evidence that tends to show the costs that it alleges it incurred.  Plaintiff is therefore not entitled to recover these expenses by the express terms of the contract.

## C.     Other Consequential Damages

### 1.     Plaintiff May Recover Mill Inefficiency Costs On the Brann Contract

Plaintiff requests damages to compensate it for manufacturing inefficiencies that it alleges arose due to "the lower volume of logs feeding [its] mills as well as the lower quality of the mix of logs feeding [its] mill[s], both of which resulted from Precision Pine being denied access to timber on the breached contracts."  PPFF ¶ 144; Trial Tr. at 2375 (Ness).  Plaintiff's expert, Mr. Ness, calculated the mill inefficiencies suffered by plaintiff by comparing the "direct manufacturing costs per Mbf (LT) that Precision Pine incurred in the 17 months prior to the suspension with the direct manufacturing costs per Mbf (LT) that it incurred during the suspension period."  PPFF ¶ 145.

Defendant argues that plaintiff failed to establish that it is entitled to recover these expenses because plaintiff's method is based on the assumption that the entire loss of efficiency was attributable to the MSO suspensions and did not apportion its inefficiencies across other potential causes for its log shortage.  Def.'s Br. at 49 (docket entry 382, Sept. 2, 2005).  By analogy, defendant argues that "Mr. Ness's calculations resemble the disfavored 'total cost' approach in the construction context."  *Id.* (citing *Cavelier Clothes, Inc. v. United States*, 51 Fed. Cl. 399, 417 (2001)).

As a preliminary matter, plaintiff's claim for damages relating to its loss of efficiency during the suspension period again raises the issue of independent and collateral undertakings.  As discussed *supra*, Section I.B, plaintiff in this circuit is entitled only to damages that flow from the subject matter of the breached contracts.  Plaintiff, as a matter of law, is not entitled to "recovery

for general loss of business, the claimed loss of the entire [company's] net worth, and losses and the non-federal [contracts]—such damages are all deemed too remote and consequential." *Olin Jones*, 225 Ct. Cl. at 744 (alterations in original) (quoting *William Green Construction Co. v. United States*, 201 Ct. Cl. 616, 477 F.2d 930 (1973)); *see also Wells Fargo*, 88 F.3d at 1022 (plaintiff may not recover "anticipated profits of its entire business enterprise") (quoting *Ramsey*, 121 Ct. Cl. at 434). To the extent that plaintiff's business is wounded by defendant's breach, plaintiff can only recover losses associated with its weakened condition that relate to its performance of the breached contract. *See, e.g., Olin Jones*, 225 Ct. Cl. at 743 n.4 ("For example, by making it impossible for plaintiff to borrow money to finance *this* contract, to obtain further necessary bonds for *this* contract, or to obtain materials or personnel with which to perform *this* contract.") Put another way, to the extent that plaintiff's mills were operating at less than normal efficiency, plaintiff may recover for the effects of the inefficiency associated with the milling of logs from the breached contracts, but may not recover mill inefficiency costs experienced on other collateral contracts.

Here, the only breached contract that plaintiff harvested and milled during the suspension period was the Brann contract. Therefore, to the extent that defendant's breach caused plaintiff's mill inefficiencies, as a matter of law, plaintiff is only eligible to recover such losses incurred in performance of the Brann contract. The Court finds that plaintiff has demonstrated that its mills operated with less efficiency during the MSO suspensions because of a lack of supply of logs. To the extent that defendant argues that plaintiff's calculations are not accurate because plaintiff attributes the entire loss of efficiency to defendant's breaches, the Court again holds that to the extent that plaintiff's damage calculations suffer from imprecision, "the burden of imprecision does not fall on the innocent party." *LaSalle Talman Bank*, 317 F.3d at 1374. "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Id.* (quoting *Locke v. United States*, 151 Ct. Cl. 262, 283 F.2d 521, 524 (1960)). Here, the Court finds that plaintiff has established with reasonable certainty that its mill inefficiencies resulted from an insufficient supply of logs caused by defendant's breaches.

### 2.   Plaintiff Is Not Entitled to Recover Increased Hauling Costs Incurred on the Hay Contract in the Post-Suspension Period

Plaintiff also requests expenses related to increased costs of hauling logs harvested from the Hay sale to its Winslow Mill. PPFF ¶ 45. Plaintiff argues that but for defendant's breach it would not have been forced to close its Eagar Mill, which is closer in proximity to the Hay sale than the Winslow Mill. Pl.'s Resp. Br. at 58 (docket entry 395, Nov. 14, 2005); PPFF ¶ 42. Defendant argues, among other things, that awarding increased hauling costs on the Hay sale would constitute double-recovery.

The Court finds that plaintiff's methodology already takes hauling costs into account in calculating profits in the post-suspension period. *See* PX 182, Exhibit 2, p. 15 (showing a "Logging & Hauling" cost of $584,852.99). As plaintiff's hauling costs increase in the post-suspension period, its calculated post-suspension profits decrease. Because the calculated post-suspension profits are subtracted from the profits that plaintiff would have earned in the absence of

defendant's breach, as post-suspension profits decrease, plaintiff's final lost profit award increases. Put simply, under plaintiff's existing methodology the measure of its lost profits damages increases dollar for dollar along with the increased cost of hauling logs in the post-suspension period. Thus, awarding plaintiff increased log hauling costs would constitute double recovery. Accordingly, plaintiff is not entitled to recover increased hauling expenses on the Hay sale.

### 3.      Snow Removal Costs

Plaintiff requests $1,020.00 that it incurred as snow removal costs in harvesting the Hutch-Boondock, St. Joe, and South Black Aspen[60] contracts in January of 1996. Plaintiff alleges that these expenses were incurred because plaintiff had insufficient supply of logs during the winter of 1996. Pl.'s Resp. Br. at 68 (docket entry 396, Nov. 14, 2005). Plaintiff could not have harvested in the off-season without the Forest Service's permission. Trial Tr. 1498–99, 1503–04 (Porter). Defendant argues that these costs are not recoverable because they were incurred because plaintiff "made the decision *to continue* operations after the normal operating season ended—not because harvesting operations were interrupted or delayed." Def.'s Br. at 68 (docket entry 382, Sept. 2, 2005). The Court finds, consistent with Mr. Smith's testimony, discussed *supra*, Section II.A.1.a, that but for defendant's breach, plaintiff would have amassed a log inventory in the fall of 1995 sufficient to supply its mills throughout the harvesting off-season. However, without access to the timber on the breached contracts, plaintiff was forced to harvest out-of-season to make up at least some of its lost volume. Had plaintiff not undertaken to conduct out-of-season harvesting in January of 1996, plaintiff might have incurred additional losses and defendant might now be liable for additional damages. This expense is somewhat analogous to the cost of obtaining cover. The Court finds that the cost of obtaining replacement timber was a foreseeable consequence of defendant's breach, and thus plaintiff may recover $1,020.00 for snow removal costs.[61]

### 4.      Log Transfer Costs

In December of 1995, plaintiff closed its mill in Eagar, Arizona. At the time of the closure, plaintiff had a small amount of logs at the facility which plaintiff transferred to its Winslow mill at a cost of $1,375.00. PPFF ¶ 166; PX 131, Exhibit 2. Defendant argues that these costs are not recoverable because they are the product of plaintiff's decision to close the Eagar mill rather than "continue to operate the Eagar mill for another half day." Def.'s Br. at 68 (docket entry 382, Sept. 2, 2005). Moreover, defendant argues that plaintiff has not identified from which contracts the transferred logs were harvested. *Id.* In contrast to the cost of obtaining replacement timber for the breached contracts (which the Court finds to be recoverable), the costs of reorganizing its milling operations in the wake of the suspensions constitute consequential damages to plaintiff's overall business enterprise and are nonrecoverable. Plaintiff has not proven or argued that the logs

---

[60] South Black Aspen was not affected by the MSO suspensions.

[61] In its damage calculations, plaintiff included a 7.6% mark-up attributable to "overhead" and a 10% mark-up attributable to "profit." PX 131. The Court finds that plaintiff has failed to show that it is entitled to these amounts.

transferred were harvested from the breached contracts. *Olin Jones*, 225 Ct. Cl. 741, 744 (1980). Again, plaintiff can only recover losses associated with its weakened condition that relate to its performance of the breached contracts. *See, e.g., id.* at 743 n.4.

## *CONCLUSION*

The Court holds that plaintiff's modified lost volume seller theory depends upon proving lost profits from collateral contracts that are as a matter of law not remediable in damages. Permitting plaintiff to use these unrecoverable damages to reduce the amount of the deduction required to be made in the lost profits calculus to account for the profits earned on the breached contracts would be the functional equivalent of affirmatively awarding damages for the lost profits on the future additional contracts.  In any event, plaintiff has also failed to meet the criteria set forth in the Court's September 2006 Opinion and Order for recovery as if it were a lost volume seller.

With respect to plaintiff's damage calculations, the Court finds in favor of defendant that plaintiff's harvesting and milling schedule did not adequately account for: 1) the inventory of decked logs that plaintiff would have likely  maintained, 2) the harvesting season of the sales at issue, 3) the fire closures that affected all of the national forests in Arizona in the spring and summer of 1996; 4) the fact that the Manaco sale was subjected to additional suspensions. Consistent with these findings the Court has set forth a revised harvesting and milling schedule, attached as Appendix A to this Opinion and Order.  In the damage recalculations required below, plaintiff shall derive its lumber sales in each time period with reference to the column labeled "Volume Of Lumber Produced from Breached Contracts (Mbf (LT))" in Appendix A.  To derive stumpage payments, plaintiff shall rely on the volume of timber harvested in each quarter as set forth in Appendix B.

The Court finds in favor of plaintiff that a 0.5 conversion factor is reasonable for converting one ccf of timber into one Mbf (LS) of lumber.  The Court finds in favor of plaintiff that a 1.25 overrun factor is reasonable for converting one Mbf (LS) into one Mbf (LT).  The Court finds in favor of defendant that plaintiff improperly excluded certain invoices in determining sales prices for its lumber products and that plaintiff improperly used a straight average of the prices on the invoices as opposed to a weighted average.  The Court finds in favor of plaintiff that its estimated product mix is reasonable.  The Court finds in favor of plaintiff that BT 6.4 would have excused plaintiff from harvesting roundwood, because no market existed for roundwood and requiring plaintiff to harvest roundwood under such circumstances would have constituted gross economic impracticability.  The Court finds that plaintiff may recover its calculated lost profits for all lumber by-products except for grindings.  The Court finds that plaintiff did not prove that it incurred any losses with respect to the sale of grindings  The Court finds further that plaintiff must recalculate the logging and hauling costs it would have incurred during the suspension period by reference to its financial statement for the fiscal year ending March 31, 1995.  The Court finds that plaintiff has reasonably calculated the manufacturing expenses it would have incurred during the suspension period.

The Court finds in favor of plaintiff that its profits may be measured in terms of plaintiff's gross profits less manufacturing overhead. However, with respect to plaintiff's post-suspension profits, the Court rules in favor of defendant that plaintiff may not deduct the amount of the judgment against it in *Precision Pine v. United States*, 02–131, from the profits that it earned on the suspended contracts. Consistent with Mr. Ness's testimony that profits should be measured with reference to plaintiff's gross profits before manufacturing overhead, plaintiff also may not recover fixed costs such as manufacturing and administrative overhead. The Court finds in favor of plaintiff that, in calculating its actual profits in the post-suspension period on the breached contracts, plaintiff may refer to its actual logging and hauling costs. The Court finds in favor of defendant that plaintiff may not recover both breach of contract damages and recover under CT 6.01. The Court further rules that the language of CT 6.01 precludes recovery of items such as interest and profit. The Court finds that plaintiff has failed to prove that it is entitled to recover claim preparation costs, overhead costs, and additional bonding costs pursuant to CT 6.01.

The Court finds in favor of defendant to the extent that, with the exception of the Brann contract, plaintiff may not recover for mill inefficiencies during the MSO suspension. The Court finds in favor of defendant that plaintiff is not entitled to additional hauling expenses incurred by plaintiff on the Hay contract because plaintiff's lost profit calculations already take into such expenses account and thus award of increased hauling costs would constitute double recovery. The Court finds in favor of plaintiff that snow removal costs constitute expenses in acquiring replacement timber and are recoverable. The Court finds in favor of defendant that plaintiff has failed to show that the log transfer costs incurred when plaintiff closed its Eagar mill were incurred in performing the breached contracts and thus these costs are not recoverable.

The Court believes that the parties are in the best position to recalculate plaintiff's damages consistent with the Court's findings as set forth above. Thus, the Court ORDERS that plaintiff shall, on or before **Tuesday, November 13, 2007**, file with and serve a revised damages calculation consistent with the Court's findings. Defendant shall file and serve a response to plaintiff's recalculation, on or before **Thursday, December 13, 2007**, should it desire to do so. Upon receipt of the parties' further filings with respect to the recalculation of plaintiff's damages in light of the Court's findings, the Court intends to make a final determination of plaintiff's damages and to direct the entry of a final judgment.

**IT IS SO ORDERED.**

 s/ George W. Miller
GEORGE W. MILLER
Judge

**Appendix A: The Court's Alternative Harvesting and Milling Schedule**

| | Timber Harvested From Breached Contracts (MM (LS)) | Vol. Milled from Breached Contracts (MM (LT)) | Vol. Milled from Other Contracts (MM (LT)) | Total Mill Production (MM (LT)) |
|---|---|---|---|---|
| Sept. 1995 | 1598 | 853 | 1827 | 2680 |
| Oct. 1995 | 2061 | 1431 | 1249 | 2680 |
| Nov. 1995 | 1856 | 1175 | 1505 | 2680 |
| Dec. 1995 | 2070 | 1442 | 1408 | 2850 |
| Jan. 1996 | 0 | 1114 | 1836 | 2950 |
| Feb. 1996 | 0 | 826 | 2124 | 2950 |
| Mar. 1996 | 0 | 1827 | 1123 | 2950 |
| Apr. 1996 | 2317 | 1744 | 1206 | 2950 |
| May. 1996 | 629 | 1064 | 1886 | 2950 |
| Jun. 1996 | 0 | 1689 | 1258 | 2947 |
| Jul. 1996 | 3359 | 2019 | 446 | 2465 |
| Aug. 1996 | 1555 | 1944 | 1006 | 2950 |
| Sept. 1996 | 4138 | 2139 | 811 | 2950 |
| Oct. 1996 | 3843 | 1993 | 957 | 2950 |
| Nov. 1996 | 0 | 2122 | 828 | 2950 |
| Dec. 1996 | 0 | 2286 | 664 | 2950 |
| Jan. 1997 | 0 | 1916 | 1034 | 2950 |
| Feb. 1997 | 0 | 1701 | 952 | 2653 |
| *TOTAL:* | 23427 | 29283 | | |

**Appendix B: The Volume of Timber That, Pursuant to the Court's Alternative Approach, the Court Treats As the Volume That Plaintiff Would Have Harvested From Each of the Breached Contracts During the Suspension Period**

| 1995 3rd Quarter (September) | Total Volume Remaining in Mbf (LS) | Harvesting Days | Vol. x No. Days | Fractional Portion | Apportioned Volume |
|---|---|---|---|---|---|
| Brookbank | 1355.5 | 30 | 40665 | 0.127 | 203 |
| Hay | 3819 | 0 | 0 | 0.000 | 0 |
| Jersey Horse | 1520 | 0 | 0 | 0.000 | 0 |
| Kettle | 2851 | 30 | 85530 | 0.267 | 427 |
| Manaco | 2503 | 30 | 75090 | 0.235 | 375 |
| Monument | 730.5 | 30 | 21915 | 0.069 | 110 |
| Mud | 2086.5 | 30 | 62595 | 0.196 | 313 |
| O.D. Ridge | 2626 | 0 | 0 | 0.000 | 0 |
| Saginaw-Kennedy | 1134 | 30 | 34020 | 0.106 | 170 |
| Salt | 2230 | 0 | 0 | 0.000 | 0 |
| U-Bar | 3194 | 0 | 0 | 0.000 | 0 |
| *TOTAL:* | 24050 | | 319815 | | 1598 |

| 1995 4th Quarter | Total Volume Remaining in Mbf (LS) | Harvesting Days | Vol. x No. Days | Fractional Portion | Apportioned Volume |
|---|---|---|---|---|---|
| Brookbank | 1152 | 46 | 53006 | 0.097 | 582 |
| Hay | 3819 | 0 | 0 | 0.000 | 0 |
| Jersey Horse | 1520 | 0 | 0 | 0.000 | 0 |
| Kettle | 2424 | 31 | 75133 | 0.138 | 825 |
| Manaco | 2128 | 61 | 129796 | 0.238 | 1426 |
| Monument | 621 | 61 | 37881 | 0.070 | 416 |
| Mud † | 1774 | 91.05 | 161499 | 0.296 | 1774 |
| O.D. Ridge | 2626 | 0 | 0 | 0.000 | 0 |
| Saginaw-Kennedy † | 964 | 91 | 87725 | 0.161 | 964 |
| Salt | 2230 | 0 | 0 | 0.000 | 0 |
| U-Bar | 3194 | 0 | 0 | 0.000 | 0 |
| *TOTAL:* | 22452 | | 545040 | | 5987 |

† By contract, the Mud and Saginaw-Kennedy sales would have provided for 92 harvesting days in the 4th Quarter of 1995.  However, neither sale would have contained enough timber to last for a full 92 days, using the Court's methodology.  Thus, for each of those contracts, the number of harvesting days was adjusted downward, so that at the end of the 4th Quarter of 1995, each contract would have exactly 0 Mbf (LS) remaining timber.  As the Court found, *supra,* Section II.A.1.a, ¶ 2, plaintiff would have managed its inventory of standing timber so as to maximize its harvesting season.

B-1

| 1996 2nd Quarter | Total Volume Remaining in Mbf(LS) | Harvesting Days | Vol. x No. Days | Fractional Portion | Apportioned Volume |
|---|---|---|---|---|---|
| Brookbank | 570 | 5 | 2850 | 0.014 | 37 |
| Hay | 3819 | 21 | 80199 | 0.399 | 1032 |
| Jersey Horse | 1520 | 21 | 31920 | 0.159 | 411 |
| Kettle | 1598 | 0 | 0 | 0.000 | 0 |
| Manaco | 702 | 5 | 3510 | 0.017 | 45 |
| Monument | 205 | 21 | 4303 | 0.021 | 55 |
| Mud | 0 | 0 | 0 | 0.000 | 0 |
| O.D. Ridge | 2626 | 0 | 0 | 0.000 | 0 |
| Saginaw-Kennedy | 0 | 0 | 0 | 0.000 | 0 |
| Salt | 2230 | 5 | 11150 | 0.055 | 143 |
| U-Bar | 3194 | 21 | 67074 | 0.334 | 863 |
| TOTAL: | 16465 | | 201006 | | 2586 |

| 1996 3rd Quarter | Total Volume Remaining in Mbf(LS) | Harvesting Days | Vol. x No. Days | Fractional Portion | Apportioned Volume |
|---|---|---|---|---|---|
| Brookbank | 533 | 83 | 44272 | 0.043 | 387 |
| Hay | 2787 | 83 | 231339 | 0.223 | 2020 |
| Jersey Horse | 1109 | 83 | 92075 | 0.089 | 804 |
| Kettle | 1598 | 83 | 132662 | 0.128 | 1158 |
| Manaco †† | 657 | 6 | 3941 | 0.004 | 34 |
| Monument | 150 | 83 | 12412 | 0.012 | 108 |
| Mud | 0 | 0 | 0 | 0.000 | 0 |
| O.D. Ridge | 2626 | 83 | 217958 | 0.210 | 1903 |
| Saginaw-Kennedy | 0 | 0 | 0 | 0.000 | 0 |
| Salt †† | 2087 | 52 | 108501 | 0.105 | 947 |
| U-Bar | 2331 | 83 | 193479 | 0.187 | 1689 |
| TOTAL: | 13879 | | 1036639 | | 9052 |

| 1996 4th Quarter | Apportioned Volume |
|---|---|
| Brookbank | 158 |
| Hay | 824 |
| Jersey Horse | 328 |
| Kettle | 473 |
| Manaco | 0 |
| Monument | 44 |
| Mud | 0 |
| O.D. Ridge | 777 |
| Saginaw-Kennedy | 0 |
| Salt | 1166 |
| U-Bar | 689 |
| TOTAL: | 4459 |

†† The Manaco and Salt contracts provided that no harvesting occur between July 15 and August 15.

B-2