# In the United States Court of Federal Claims

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., Plaintiff, | ) | No. 98-720 C |
| v. | ) | Filed September 18, 2007 |
| THE UNITED STATES, Defendant. | ) | |

## ERRATA

Pursuant to Rule 60(a) of the Rules of the United States Court of Federal Claims, the Court, *sua sponte*, corrects the Opinion and Order filed September 14, 2007 in this case (docket entry 440) in the following respects:

On page 41, in the fifth line up from the bottom, substitute "plaintiff" for "defendant" so that the parenthetical in that line reads: "(after plaintiff had exhausted . . .)".

On page 43, in the third line, substitute "1996" for "1995"so that the third line reads: "5) On December 4, 1996 . . . ."

On page 46, in the third line of footnote 44, substitute "timber" for "lumber" so that the third line of the footnote reads: "summaries by the total volume of timber . . . ."

Attached are substitute pages 41, 43 and 46, which incorporate the foregoing corrections.

**IT IS SO ORDERED**.

s/ George W. Miller
GEORGE W. MILLER
Judge

**f. Summary of Court's Alternative Harvesting Schedule**

In sum, plaintiff has presented the Court with a methodology to calculate damages which relies on a specific harvesting schedule that the Court finds plaintiff would likely not have followed. Indeed, in certain time periods, such as during the fire closures, it would have been impossible for plaintiff to have followed its projected schedule. Although plaintiff has failed to carry its burden of proof with respect to the precise harvesting schedule upon which Mr. Ness relied, the Court will not bar plaintiff from recovering reasonable damages solely by reason of this failure. "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Locke v. United States*, 151 Ct. Cl. 262, 267, 283 F.2d 521, 524 (1960). Having listened to 24 days of trial testimony and having reviewed hundreds of trial exhibits—many exhibits individually consisting of hundreds of pages—the Court concludes that plaintiff has established that it sustained damages as a direct and foreseeable result of defendant's breach. Binding authority does not permit this Court to bar plaintiff from recovering damages on the basis that they are difficult to ascertain. "Certainty is sufficient if the evidence adduced enables the court to make a fair and reasonable approximation of the damages." *Id.* Here, the Court has fashioned from the evidence of record an alternative harvesting schedule that it has determined to be fair and reasonable. Rather than try to postulate a specific harvesting schedule that plaintiff would have followed had there been no breach, the Court's alternative schedule treats the total available timber as one large inventory, which plaintiff would have been able to efficiently harvest in order to keep its mills operating at full capacity. The Court's alternative avoids the limitations presented by plaintiff's method of attempting to impose a precise harvesting schedule on the "but for" world. The Court has created a schedule that is neutral as between the parties and, when used as a component of plaintiff's overall method of projecting lost profits, will result in profit projections that fairly and reasonably approximate the profits that plaintiff would have earned in the absence of defendant's breach.

The first step in the Court's alternative approach, was to determine the overall volume of timber that plaintiff would have harvested from the breached contract in each relevant time period. Mr. Smith testified in his deposition that harvesting was "based on mill need." Tr. Smith Dep. at 29. Thus, in each month of the Court's schedule, the starting point for the amount harvested equals the difference between plaintiff's total mill capacity for all three mills and plaintiff's actual total production each month as set forth in PX 131, Exhibit 7. To that figure, the Court added additional amounts of timber that plaintiff would have harvested and maintained in log decks, consistent with Mr. Smith's testimony regarding plaintiff's customary practices. *See supra*, Section II.A.1.a. The Court's harvesting (and milling) schedule is found in Appendix A, *infra*. In creating its harvesting schedule, the Court finds that but for defendant's breach:

1) During all months, except June and July of 1996 (after plaintiff had exhausted its supply of decked logs during the fire suspensions), plaintiff would have operated its mills at their full physical capacity.

2) Plaintiff was historically able to manage its inventory of standing timber under contract efficiently and in the absence of defendant's breach, plaintiff would have

month increased its inventory of decked logs to the size of 3,664 Mbf (LS)[35] (enough logs to keep its mills running at full capacity until April 15, 1996).

5) On December 4, 1996, the Forest Service would have lifted the suspensions on the remaining contracts (Hay, O.D. Ridge, U-Bar, Jersey Horse, Salt) constituting an additional 13,389 Mbf (LS) of timber. However, the end of the harvesting season would have expired on all of these contracts by the time that the Forest Service released them.

6) Between January 1 and April 14, 1996, plaintiff would have milled its decked logs, depleting its inventory down to zero.

7) On April 15, 1996, the beginning of the 1996 harvesting season for some contracts, plaintiff would have resumed harvesting as permitted under the contracts;[36] between April 15 and May 5 plaintiff would have built up an inventory of decked logs equivalent to three weeks production, or approximately 1,770 Mbf (LS);

8) Between May 6 and July 9, 1996, the Forest Service would have suspended all harvesting in the national forests located in the State of Arizona because of the institution of Industrial Fire Plan D. During this time, plaintiff would have drawn down its inventory of decked logs.

9) On July 9, 1996, the Forest Service would have lifted the harvesting restrictions due to the fire closure and plaintiff would have resumed harvesting. In addition to harvesting enough timber to resume mill operation at full capacity, plaintiff would have additionally harvested enough timber to establish a three week inventory of decked logs, approximately 1,700 Mbf (LS), in accordance with its customary practice.

10) In September 1996, plaintiff would have entered "decking season" which would have lasted until November 30, 1996. However, plaintiff would have fully harvested the remaining timber from the breached contracts in early November.

---

[35] In other words, in addition to harvesting enough timber to keep its mills running at their full capacity in the months of September through December of 1995, plaintiff would have harvested an additional 916 Mbf (LS) in each month. That figure, 916 Mbf (LS) for each of the four months, represents one quarter of the total 3,664 Mbf (LS) needed for decking purposes.

[36] The start of the harvesting season for the Brookbank, Hay, Jersey Horse, Monument, Saginaw-Kennedy, and U-Bar contracts was April 15. The start of the harvesting season for the Manaco and Salt contracts was May 1. The start of the harvesting season for the Kettle and O.D. Ridge contracts was May 15. The start of the harvesting season for the Mud contract was June 1.

equipment, the width of the saw blades used, the skill of its sawyers, the product mix [41] produced, the diameter and taper of the logs milled. Trial Tr.at 1144–46, 1179–80, 1211–14 (Devere).

Plaintiff presented expert testimony through its witness, Mr. Martin Devere. Mr. Devere earned a degree in forestry from Purdue University and had 40 years experience in the lumber industry at the time of his testimony. Trial Tr. 1130–42 (Devere). Mr. Devere testified that because of his experience he could estimate a saw mill's overrun factor by witnessing its operations. Trial. Tr. at 1207–08 (Devere). Mr. Devere did not independently determine that plaintiff's likely overrun factor was 1.25; rather, plaintiff enlisted Mr. Devere to verify whether plaintiff would have likely realized an overrun factor of 1.25. Trial Tr. at 1129 (Devere). Mr. Devere testified that based on his experience a 1.25 overrun factor was a reasonable—and possibly conservative—estimate for the overrun factor that plaintiff would typically realize. Trial Tr. at 1164 (Devere). He also testified that the best way to calculate an overrun factor is by conducting a "mill study." Trial Tr. at 1143 (Devere). A mill study involves measuring the scale[42] of logs that goes into a mill and the volume of lumber products that come out. *Id.* Mr. Devere did not, however, conduct a mill study in this case.

Plaintiff notes that in the appraisal summaries the Forest Services furnished to potential bidders it consistently used an overrun factor of 1.245 to 1.3935.[43] Pl.'s Br. at 24–25 (docket entry 386-2, Sept. 12, 2005); PPFF ¶ 215. By the Court's own arithmetic, the weighted average[44] of the overrun factors for the eleven contracts at issue is 1.3309. Defendant attempts to discredit the overrun factors that it supplies as part of the appraisal summary as "a relic from an old

---

[41]In particular, higher grade "shop products" and molding products will result in a lower overrun factor and dimensional lumber (*e.g.*, 2" by 4", etc.) results in a higher overrun factor. Trial Tr. at 1212–13 (Devere).

[42]The term "scale" refers to the measurement of the volume of felled timber. Trial Tr. at 2915–16 (Matson).

[43] Mr. Porter testified that the Forest Service adopted these number by conducting a mill study of one of plaintiff's competitors in the mid-1980's. Trial Tr. 152–56 (Porter). Plaintiff further argues that because all of plaintiff's mills are at least as efficient as the mill on which the Forest Service based its mill study, the Forest Service's appraisal summary estimates provide a fair approximation of the overrun factor that plaintiff would have expected. PPFF ¶¶ 216–220; Trial Tr. 157–58 (Porter), 1186 (Devere).

[44] To calculate the weighted average overrun factor the Court multiplied the estimated overrun factor calculated by the Forest Service and supplied to the bidders on the appraisal summaries by the total volume of timber remaining on the sale at the time of the suspension for each contract. The Court then added the products of the above computation together and divided the sum by the total remaining unharvested timber on all of the sales at issue to arrive at the weighted average overrun factor.