# In the United States Court of Federal Claims

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., Plaintiff, | ) | No. 98-720 C |
| v. | ) | Filed September 18, 2007 |
| THE UNITED STATES, Defendant. | ) | |

## FURTHER ERRATA

Pursuant to Rule 60(a) of the Rules of the United States Court of Federal Claims, the Court, *sua sponte*, corrects the Opinion and Order filed September 14, 2007 in this case (docket entry 440) in the following respects:

On page 43, in the third line, substitute "Soon after" for "On" so that the third line reads: "5) Soon after December 4, 1996 . . . ."

On page 62, in the seventh line up from the bottom, substitute "accountant" for "account" so that the seventh line reads: ". . . from Mr. Smith to plaintiff's accountant which directed the accountant to pay . . . ."

Attached are substitute pages 43 and 62, which incorporate the foregoing corrections.

**IT IS SO ORDERED**.

s/ George W. Miller
GEORGE W. MILLER
Judge

month increased its inventory of decked logs to the size of 3,664 Mbf (LS)[35] (enough logs to keep its mills running at full capacity until April 15, 1996).

5) Soon after December 4, 1996, the Forest Service would have lifted the suspensions on the remaining contracts (Hay, O.D. Ridge, U-Bar, Jersey Horse, Salt) constituting an additional 13,389 Mbf (LS) of timber. However, the end of the harvesting season would have expired on all of these contracts by the time that the Forest Service released them.

6) Between January 1 and April 14, 1996, plaintiff would have milled its decked logs, depleting its inventory down to zero.

7) On April 15, 1996, the beginning of the 1996 harvesting season for some contracts, plaintiff would have resumed harvesting as permitted under the contracts;[36] between April 15 and May 5 plaintiff would have built up an inventory of decked logs equivalent to three weeks production, or approximately 1,770 Mbf (LS);

8) Between May 6 and July 9, 1996, the Forest Service would have suspended all harvesting in the national forests located in the State of Arizona because of the institution of Industrial Fire Plan D. During this time, plaintiff would have drawn down its inventory of decked logs.

9) On July 9, 1996, the Forest Service would have lifted the harvesting restrictions due to the fire closure and plaintiff would have resumed harvesting. In addition to harvesting enough timber to resume mill operation at full capacity, plaintiff would have additionally harvested enough timber to establish a three week inventory of decked logs, approximately 1,700 Mbf (LS), in accordance with its customary practice.

10) In September 1996, plaintiff would have entered “decking season” which would have lasted until November 30, 1996. However, plaintiff would have fully harvested the remaining timber from the breached contracts in early November.

---

[35] In other words, in addition to harvesting enough timber to keep its mills running at their full capacity in the months of September through December of 1995, plaintiff would have harvested an additional 916 Mbf (LS) in each month. That figure, 916 Mbf (LS) for each of the four months, represents one quarter of the total 3,664 Mbf (LS) needed for decking purposes.

[36] The start of the harvesting season for the Brookbank, Hay, Jersey Horse, Monument, Saginaw-Kennedy, and U-Bar contracts was April 15. The start of the harvesting season for the Manaco and Salt contracts was May 1. The start of the harvesting season for the Kettle and O.D. Ridge contracts was May 15. The start of the harvesting season for the Mud contract was June 1.

### 9. Plaintiff Must Recalculate its Expenses

#### a. Logging and Hauling Expenses

Mr. Porter testified that he based the logging and hauling expenses used by Mr. Ness on plaintiff's "logger pay records," which show the actual rate plaintiff paid for logging and hauling. Trial Tr. at 516, 560, 577–80 (Porter); PX 307. Defendant argues that Mr. Ness should have independently derived these costs rather than relying on the representations of Mr. Porter. Def.'s Br. at 42 (docket entry 382, Sept. 2, 2005); *see also* Trial Tr. at 2697 (Ness) ("[Mr. Porter and plaintiff's counsel] gave me the numbers off invoices."). Defendant argues that Mr. Ness should have used plaintiff's comprehensive financial data to derive logging and hauling costs. Def.'s Br. at 42 (docket entry 382, Sept. 2, 2005). In its Proposed Findings of Fact, defendant purports to show the actual costs that it alleges that plaintiff would have incurred for each contract. DPFF ¶¶ 548–55. Plaintiff objects to this methodology because plaintiff alleges that defendant's methodology is based on defendant's estimates of the volume of timber that plaintiff harvested, rather than the actual volumes that plaintiff harvested. Pl.'s Resp. Br. at 42 (docket entry 396, Nov. 14, 2005). In reality, plaintiff argues, it often harvested more timber than the Forest Service estimated. *Id.* (citing Trial Tr. at 5325–26 (Smith)).

The Court is not satisfied that plaintiff has calculated its logging and hauling costs with reasonable certainty. Based on the testimony and plaintiff's exhibits, it is unclear to the Court exactly how plaintiff derived its logging and hauling costs. Mr. Ness indicated that he used the rates given to him off "invoices." Plaintiff introduced only three memoranda (*i.e.*, "logger pay records") from Mr. Smith to plaintiff's accountant which directed the accountant to pay for logging and hauling. The Court is not persuaded, nor has plaintiff argued, that these three records embody all of plaintiff's logging and hauling expenses during the MSO suspensions. It is unclear if the figures used by Mr. Ness were based on these three logger pay records or whether plaintiff used a larger sample. It is also unclear how plaintiff derived the sample ultimately relied upon by Mr. Ness. Plaintiff must recalculate its logging and hauling costs using the total cost of logging and hauling from its annual financial statement for the fiscal year ending in 1995, PX