**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-720C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF ROBERT A. NESS IN SUPPORT OF PLAINTIFF'S RECALCULATION OF ITS DAMAGES PURSUANT TO THE COURT'S OPINION OF SEPTEMBER 14, 2007, AS AMENDED**

I, Robert A. Ness, hereby declare under the penalties of perjury that:

1. I was engaged by Precision Pine to recalculate the damages in this case in accordance with the Court's decision of September 14, 2007, as amended.

2. In the course of performing the recalculation, I discovered that Appendix A and Appendix B, even as corrected by the errata pages of October 3, 2007, contained errors.

3. Accordingly, I prepared both a Corrected Appendix A and a Corrected Appendix B, which are set forth in the attached materials in Exhibits C2a and C2b of Tab C. (They are also set forth in identical Exhibits D2a and D2b of Tab D.) However, should the Court not agree with the errors I have indicated in my Corrected Appendices A and B, I have also recalculated Precision Pine's damages using Appendices A and B exactly as they appear in the Court's errata sheet of October 2, 2007. See Tabs A and B of the attached material.

**Lumber product prices**

4. As the Court ordered in its September 14, 2007 opinion (see Slip op. at pp. 50-52), I recalculated Precision Pine's average sales prices by specific lumber product. In doing so, I emulated the methodology I used in determining average lumber prices in the post-suspension period as set forth in my report on post-suspension profits. See PX 182 at Ex. 5. This approach was not contested by defendant and was, in fact, lauded by defendant's expert as the correct way to calculate average lumber prices. Trial Tr. at 3556. (Neuberger).

5. As directed by the Court, and consistent with my approach to lumber product pricing in the post-suspension period, my recalculation of prices in the suspension period uses a weighted, rather than a straight, average. Slip op. at 52.

6. Additionally, as directed by the Court, in performing the recalculation I used all available sales transactions reflected on Precision Pine's invoices and Sales Journal excluding only those transactions for odd products that Precision Pine did not customarily produce. Slip op. at 52. The differences between the approach to pricing during the suspension period set forth in my original report PX 131 and that set forth in the attached recalculation of damages are as follows:

   Sales Prices Excluded:

   a. In the recalculation, I excluded all transactions for 6/4 shop and moulding lumber products through December 31, 1996 and also I excluded all transactions for 4/4 shop and moulding lumber products. I did this pursuant to the Court's order because these are products that Precision Pine did not customarily produce. See Slip op. at 52.

b. I excluded all transactions for stained lumber as this is also a product that Precision Pine did not customarily produce. See Slip op. at 52.

Sales Prices Included:

c. As directed by the Court, I included all prices on all invoices from October to December of 1996 found in the binder of invoices located at PX 227. Also, consistent with the Court's orders and as required by the revised harvest and milling schedule, I also utilized all of the prices from all of the invoices located in PX 244 for the period January 1997 through March 1997 in exactly the same manner as I had done in my report on post-suspension profits. See PX 182. In some cases, an invoice contained prices for sales of multiple lumber products but only one price had been picked up in the original calculation; in other instances, entire invoices had been overlooked. To reiterate, however, all sales transactions are included in my calculation, save those excluded for the reasons listed above.

d. Also, where invoices were missing from PX 227 or PX 224, but the missing invoice number was located on the Winslow Sales Journal (PX 294), I also used the sales price for that transaction. This was done in the interest of having as complete a record as possible of all sales transactions that took place during the suspension period as directed by the Court.

Other Changes:

e. Consistent with the court's direction to use invoice pricing, as I had done in calculating lumber pricing in the post-suspension period and in the interest of greater accuracy, I deducted actual delivered freight charges as they appeared on each and every invoice and not by deriving average freight charges from the Sales

Journal as I had to do in my original report in order to "approximate the result if Delivered Freight had been eliminated from each invoice in the calculation of sales prices. . . ." See PX 131 at p. 9 of 16.

f. I moved eight invoices for 4 x 4 lumber from #2, #3, #4 & Better and #4 Common Economy to Timbers to be consistent with the approach taken in PX 181.

g. Because no invoices existed at various times for #5 Common and Timbers:

i. I developed pricing for #5 Common in the period July 1996 through March 1997 by using the ratio of weighted average lumber prices between #5 Common and #4 Common Economy in the period April 15, 1996 through June 1996; and

ii. For Timbers I used the September 1995 through April 1996 weighted average lumber price for the period April 15, 1996 through June 1996.

7. For each of Tabs A-D, I followed the methodology which the Court ordered to determine appropriate weighted average product prices for each applicable period. The results are set out in Exhibits A5 d, e, & f; B5 d, e, & f; C5 d, e, & f; and D5 d, e, & f of the respective Tabs.

**Logging and hauling costs**

8. Prior to trial, pursuant to an order of the Court, I prepared a calculation of Precision Pine's post-suspension profits. That calculation is PX 182. In preparing PX 182, I utilized logger pay records to calculate logging and hauling costs for the breached sales that were harvested. Because I believe that this is the correct manner in which to calculate post-suspension profits on the breached sales, I made no changes to this

approach in Tab E where I recalculated Precision Pine's post-suspension profits in accordance with the Court's opinion.

9. Despite the use of logger pay records to calculate post-suspension profits in PX 182, the Court concluded that the profits Precision Pine would have earned during the suspension should be based on the average logging and hauling cost per mbf (LS) derived from Precision Pine's financial statement for the fiscal year ended 3/31/95.

10. For all of the reasons set forth in plaintiff's Motion for Reconsideration, I do not believe that the use of such financial statement data is appropriate in this instance.

In particular:

a. Of the 24 line items showing "contract logging" on the FYE 1995 financial statement, just three of those line items involved contracts at issue in this case. PX 248. For 20 line items, there is no indication as to whether the timber type, terrain or haul distances for the sales to which they related bore any relationship whatsoever to the breached sales. Similarly, of the nine entries on the FYE 1995 financial statement pertaining only to log hauling costs, just two entries were for contracts at issue in this case. Id.[1] It is highly unlikely that an average rate derived from the financial statements provides as accurate a determination of the

[1]Notably, although there are eight line items on the FYE 1995 financial statement for "Log Hauling," there is also a line item for "Contract Log Hauling," a distinction which could signify some difference in treatment between hauling performed by Precision Pine's subsidiary, PFMI, and others logging subcontractors in the 1994-1995 time period. PX 248. Moreover, two of the log hauling line items on the FYE 1995 financial statement, including the largest single line item that year, were not identified as having been incurred for any given sale, but the logging costs are labeled "misc." What costs comprise the two "miscellaneous" line items and whether they may have been unique to FYE 1995 is also unknown.

logging and hauling rate on each of the breached sales as a sale-specific analysis such as the one performed by Mr. Porter.

b. The FYE 1995 financial statement shows pulpwood sales of $397,976.99 and topwood sales of $77,106.56, reflecting the fact that a considerable, albeit unspecified and undeterminable, volume of this material was harvested in that fiscal year. The financial statement for FYE 1995, however, contains no separate line item for logging and hauling costs associated with that pulpwood and topwood. The only logical conclusion is that the costs of logging and hauling pulpwood and topwood were included within the logging and hauling cost line items. As such, dividing total logging and hauling costs on the FYE 1995 financial statement by the total volume of sawlogs harvested in FYE 1995 (24,880.602 MBF (LS), Ex. A3b) produces a logging and hauling rate for sawlogs that is substantially overstated.

11. Nevertheless, if the Court remains of the view that the financial statement for FYE 3/31/95 is the proper basis upon which to calculate logging and hauling costs during the suspension period, I have done so in Tabs A and C of the attached material.

**Post-suspension profits on Manaco**

12. As directed by the Court at page 40 of the slip opinion, in recalculating Precision Pine's post-suspension profits, I reduced those profits by the amount that Precision Pine earned on 618 mbf (LS) which the Court found that Precision Pine would not have harvested on Manaco in the suspension period irrespective of the breach. See Ex. E1 of Tab E. The 618 mbf (LS) was premised on the Court's Alternative Harvest and Milling Schedule, Appendix A. However, using the corrected Appendix A set forth in Ex. C2a of the

attached material, the relevant number that needs to be subtracted becomes the profit on 652 mbf (LS) that would not have been harvested on Manaco in the suspension period irrespective of the breach. See Ex. C2b of Tab C. This profit figure is calculated in Tab E Ex. E2 of the attached material and reflected in the Summary.

**Post-Suspension Profits**

Grindings

13. Given: (1) the Court's ruling that the basis on which Precision Pine calculated its anticipated profits on grindings during the suspension was insufficient to prove the existence of any profits on grindings; and (2) that in calculating Precision Pine's post-suspension profits in PX 182 I relied on the same information to determine Precision Pine's profits on grindings from the breached sales in the post-suspension, those post-suspension grindings profits are equally suspect. Accordingly, consistent with the Court's decision, in recalculating Precision Pine's post-suspension profits, I excluded post-suspension profits on grindings. See Exs. E1 and E2 of Tab E.

Need to discount post-suspension profits

14. Whenever dollar values from two distinct time periods are to be added or subtracted, one has to be adjusted. That is, future dollars must be discounted to convert them to an equivalent amount during the earlier period or vice versa.

15. As such, in order to deduct post-suspension profits from Precision Pine's lost market opportunity during the suspension, as the Court has ordered, I was required to convert post-suspension profits to an equivalent amount during the suspension period.

16. I did so using the average yield of 10-year Treasury notes, which in my view reflects a very conservative rate of return and thus is appropriate for this purpose. Both my methodology and the dollar impact of this discounting is specifically set forth in Tab E.

**The need to correct Appendix A to the Court's Opinion**

17. As noted above, in the course of recalculating Precision Pine's damages, I discovered that the Alternative Harvest and Milling Schedule, Appendix A (as well as Appendix B) to the Court's opinion, even as corrected by errata of October 2, 2007, still contained errors. The nature of these errors is described below:

18. As the Court indicated, plaintiff would only have been able to harvest timber from the breached sales for five days in May of 1996 prior to being shut down for a fire closure. Slip op. at 43. Based on processing the volume harvested from the breached sales in those five days (118 mbf (LS)) (see Tab C, Ex. C 2c at pg. 1) plus the three weeks of timber that, pursuant to the Court's opinion, Precision Pine would have had in inventory at the end of April of 1996 (596 mbf (LS)) (id.), Precision Pine would have produced 892 mbf (LT) from the breached sales in May 1996. Adding that figure to the actual production from non-breached sales during May 1996, i.e., 1886 mbf (LT) (Appendix A of the Court's opinion), total production for the month of May 1996 could only have been 2778 mbf (LT), not 2950 mbf (LT) as shown by the Court in its Appendix A. This correction is reflected on the Corrected Appendix A, Ex. C2a of Tab C. (The Corrected Appendix A is also set out as Ex. D2a of Tab D.)

19. Likewise, under the Court's ruling, in June 1996, Precision Pine would not have been able to harvest any of the timber on the breached contracts due to fire closure. Slip. op at 43. Accordingly, since the company would have already exhausted its supply of timber

in inventory in May from any breached sale, no timber from any breached sales could or would have been processed in June 1996. The only lumber that would have been produced at Precision Pine's mills would have been the 1258 mbf (LT) of actual production that came from non-breached timber sources. See Appendix A of the Court's opinion. Thus, total production for the month of June could only have been 1258 mbf (LT) and not 2947 shown by the Court in Appendix A. This correction is also reflected on Corrected Appendix A. See Tab C, Ex. C2a and Tab D, Ex. D2a.

20. Lastly, under the Court's ruling, during the month of July 1996, Precision Pine would have been suspended from harvesting on the breached contracts through July 8, 1996. Accordingly, lumber production for July could only have equaled the production from non-breached sources, i.e., actual production (446 mbf (LT)) from Appendix A of the Court's opinion, plus 23/31 of the difference between capacity and actual production for the month. In other words, production from the breached contracts would have constituted only 23/31 of what would have been produced had there been no fire closure, i.e., 1858 mbf (LT). See Tab C Ex. C2c. As such, total lumber production for July 1996 would have only been 2304 mbf (LT) rather than the 2465 mbf (LT) set out in Appendix A of the Court's opinion. This correction is also reflected on Corrected Appendix A.

21. Needless to say, the above corrections in harvesting and production in May, June and July have a ripple effect under the Court's scenario. This is set forth in Tab C, Exs. C2a and C2b (and Tab D, Exs. D2a and b) where I have endeavored to scrupulously follow the Court's ruling as to harvesting, deck inventory and milling. The results of doing so are that:

a. the volumes that would have been harvested from the breach sales in and after August 1996 are also different than corresponding volumes set out in Appendix A of the Court's opinion;

b. the harvesting of the breached sales would not have been completed in October of 1996 as the Court indicated in Appendix A, but rather would have continued into November; and

c. correspondingly, the manufacturing of the timber from the breached sales would not have been completed in February of 1997 as the Court had indicated, but rather would have continued into March of 1997.

22. All of these changes which flow from the correction made to May-July 1996 lumber production are reflected in Corrected Appendix A.

23. These changes would also have a corresponding impact on such things as the stumpage component of delivered log cost and the weighted average product mix by period. All such impacts of the Corrected Appendix A have been taken into account in the calculations set out in Tabs C and D.

Dated: 12/07/07

Robert A. Ness

Robert A. Ness