**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-720C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S MOTION FOR RECONSIDERATION OF THE RULING THAT PLAINTIFF MUST RECALCULATE ITS LOGGING AND HAULING EXPENSES**

Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: December 7, 2007

# TABLE OF CONTENTS

**PAGE**

Table of Authorities .......... ii

Introduction .......... 1

I. Record Evidence Establishes What Precision Pine's Logging And Hauling Costs Would Have Been On The Breached Sales During The Suspension Period .......... 2

A. Standard for Reconsideration .......... 2

B. Argument .......... 3

II. The Use Of Average Costs From The FYE 1995 Financial Statement To Estimate Logging And Hauling Costs Is Less Reliable Than The Sale-By-Sale Evidence And Methodology Presented At Trial .......... 11

Conclusion .......... 16

# TABLE OF AUTHORITIES

**CASES** **PAGE**

Exxon Corp. v. United States,
931 F.2d 874 (Fed. Cir. 1991)....2

Fla. Power & Light Co. v. United States,
66 Fed. Cl. 93 (2005)....2

Fru-Con Constr. corp. v. United States,
44 Fed. Cl. 298 (1999)....2

Intergraph Corp. v. Intel Corp.,
253 F.3d 695 (Fed. Cir. 2001)....2

LaSalle Talman Bank v. United States,
317 F.3d 1347 (Fed. Cir. 2003)....4

Precision Pine & Timber, Inc. v. United States,
72 Fed. Cl. 460 (2006)....2

Wolfchild v. United States,
72 Fed. Cl. 511 (2006)....2

**STATUTES AND REGULATIONS**

Rule of the Court of Federal Claims 59....2

**INTRODUCTION**[1]

In the Opinion of September 14, 2007, the Court stated that it was “not satisfied that plaintiff has calculated its logging and hauling costs with reasonable certainty” because “[p]laintiff introduced only three memoranda (i.e., ‘logger pay records’) from Mr. Smith to plaintiff’s accountant which directed the accountant to pay for logging and hauling.” Slip op. at 62. This is not correct. Plaintiff actually introduced and the Court admitted more than 70 relevant logger pay sheets contained within nine exhibits setting forth rates at which it paid for logging and hauling on sales here in issue (PX 234, 236, 237, 238, 252, 307, 308, 309, 310). Additionally, plaintiff elicited more than 70 pages of testimony from its President, Mr. Porter, over two days explaining why those logger pay records were reliable and how Mr. Porter had used them, in conjunction with his knowledge about and experience with the sales at issue, to determine the logging and hauling costs Precision Pine would have incurred on the breached contracts during the suspension period absent the government’s breach. Trial Tr. at 517-89 (Porter). For the reasons set forth below, plaintiff respectfully suggests that the evidence of record provides more than a reasonable basis for determining plaintiff’s logging and hauling costs because it represents the most probative evidence available: actual rates paid on the sales at issue augmented by Mr. Porter’s experience with regard to sales that were never harvested, all

[1]Notwithstanding the filing of this motion, plaintiff will, as ordered, submit a recalculation of damages based on logging and hauling costs derived from the financial statement for the fiscal year ending 3/31/95. Plaintiff will, however, also submit a recalculation of damages based on information in the record as to the logging and hauling costs Precision Pine & Timber, Inc. (“Precision Pine”) did and would have experienced on the breached sales during the suspension period.

of which was subject to pretrial discovery and cross-examination at trial.[2] On the other hand, as is also discussed below, the alternative method identified in the Opinion of September 14, 2007 of calculating logging and hauling costs based primarily on sales that are not at issue in this case from a time period as much as 18 months prior to the start of the suspension and without any testimony establishing how the numbers in the financial statement for FYE 1995 were compiled and what they include is inherently less reliable than plaintiff's methodology.

## I. Record Evidence Establishes What Precision Pine's Logging And Hauling Costs Would Have Been On The Breached Sales During The Suspension Period

### A. Standard for Reconsideration

Although the Court's decision of September 14, 2007 was issued post-trial, that decision did not constitute a final judgment in the case. Of course, "a court has the power to reconsider its decisions until the entry of judgment." Precision Pine & Timber, Inc. v. United States, 72 Fed. Cl. 460, 480 n.16 (2006), citing Exxon Corp. v. United States, 931 F.2d 874, 877 (Fed. Cir. 1991); Fla. Power & Light Co. v. United States, 66 Fed. Cl. 93, 95 (2005). Therefore, a court can revisit an issue and arrive at a contrary conclusion if new or additional evidence were discovered, if there were a change in controlling law, or if the Court found that the prior determination was clearly incorrect and would work a manifest injustice. Id., citing Wolfchild v. United States, 72 Fed. Cl. 511, 525-26, 2006 WL 2424741 at *10 (2006), citing Intergraph Corp. v. Intel Corp., 253 F.3d 695, 698 (Fed. Cir. 2001). See also Rule of the Court of Federal Claims 59; Fru-Con Constr. Corp. v. United States, 44 Fed. Cl. 298, 301-302 (1999) (After ruling that

[2]Rates based on this evidence were used in the pretrial report on damages prepared by Precision Pine's expert. PX 131.

plaintiff had failed to prove its case at trial, court granted plaintiff's post-trial motion for reconsideration and awarded plaintiff $60,000 based on record evidence that the court had simply overlooked).

**B. Argument**

Despite the difficulties of proof imposed by the Forest Service's breach, plaintiff presented at trial:

- Actual logger pay records from eight of the sales at issue in this case that were harvested before, during and/or after the suspension period demonstrating the actual costs paid by Precision Pine for logging and hauling (PX 234, 236, 237, 238, 252, 307);

- Extensive testimony of Precision Pine's President based on his years of experience and knowledge of the sales at issue as to what the logging and hauling costs would have been on unharvested breached sales by comparing them to costs incurred on other sales at issue in this case that had been harvested. Trial Tr. at 517-89 (Porter).

Specifically, plaintiff introduced contemporaneous documentary evidence of the applicable logging and hauling rates paid on some of the breached sales. For other of the breached sales, plaintiff introduced documentary evidence from which the rate that would have applied during the suspension can easily be inferred. In addition, plaintiff provided uncontroverted testimony as to how the rates that it actually paid for logging and hauling on certain sales would have compared to rates yet to be negotiated for unharvested sales.

As Mr. Porter explained at trial, in preparing Precision Pine's claim letters back in 1997, he had originally determined the logging and hauling costs for a number of sales at issue based

on a review of available, actual logger pay records for sales that had been harvested and by estimating the costs for other sales that had not been harvested:

> Q. How did you determine what the logging and hauling costs for saw logs on those sales would have been during the suspension period?
>
> A. Well, for the sales that we had negotiated the price, we used that price. For the sales that we had not negotiated a price, again, I considered the distance from the mill, the type of timber, the terrain, and all those kinds of things, and came up with a price for those sales that were comparable to the ones that we had a price established for.

Trial Tr. at 517 (Porter).[3]

Specifically, in preparing the original claims in 1997, Mr. Porter first referred to logger pay sheets for three sales, Mud, Brann and Hutch-Boondock, on which some timber harvesting had been done during the period when all of the other breached sales remained suspended.[4]

---

[3]The evidence at trial indicated that the rate for logging and hauling timber on any given sale was arrived at through negotiation by Mr. Porter and Mr. Reidhead, president of Precision Pine's logging subcontractor, just prior to (and occasionally after) harvesting commenced on the sale. E.g., Trial Tr. 516-17 (Porter). However, because of the Forest Service's suspension, for a number of sales such negotiations simply never occurred during the suspension period and no rate for logging and hauling during the suspension was ever agreed to. It is well-established, as this Court has repeatedly recognized, that plaintiff should not be penalized for the absence of records resulting from the defendant's breach of contract. Slip op. at 49-50 ("The risk of limited available evidence to prove damages falls on the breaching party, not the aggrieved party," citing LaSalle Talman Bank v. United States, 317 F.3d 1347 (Fed. Cir. 2003)).

[4]The logger pay sheets are business records that were routinely created by Precision Pine employees familiar with the actual logging and hauling performed on the sales and maintained by Precision Pine's accounting department that document "the amount that we should be paying our contractor for logging and hauling these timber sales to our mills." Trial Tr. at 251, 258-59 (Porter). The Mud contract was released from the suspension in the summer of 1996 while Brann and Hutch-Boondock had been released in October of 1995.

These logger pay records were admitted as Ex. 307 and counsel for the government conceded that they were relevant to the issue of logging and hauling costs during the suspension.[5]

Mr. Porter went on to identify additional records of actual logging and hauling that took place on the Brann sale during the suspension period and these records were admitted as PX 234, as well as additional logger pay records that established the price for logging and hauling on the Hutch-Boondock sale which were admitted without objection as PX 237. Trial Tr. at 529-31 (Porter). All of these records established that Precision Pine was paying a rate of $135/MBF for logging and hauling on each of these sales <u>during the period of the suspension</u>. <u>Id.</u>

Mr. Porter further testified that other of the breached sales that had yet to be harvested were comparable in timber type, sale area terrain and haul distance such that the logging and hauling rate of $135/MBF on Brann, Hutch-Boondock and Mud could thus be used as a reasonable basis to determine what logging and hauling costs on those other sales would have

---

[5]MR. HARRINGTON: Your Honor, I would -- I concede that these are -- while other contracts were suspended, these contracts were not suspended. What we heard from Mr. Porter was that prices were negotiated on a contract-by-contract basis with Tristar. <u>If they're being admitted to show what the price was that was being paid to Tristar for the logging during the period of suspensions, they would be relevant for that</u>. But, I don't believe that's what they've been proffered for.

MR. SALTMAN: That's exactly what they're proffered for.

* * * *

MR. HARRINGTON: Your Honor, we will -- we do not object to them as business records and if they're being admitted to show what the price was for hauling on the contracts up at the top. We don't have any objection to that.

Trial Tr. at 324-325 (emphasis supplied).

been. Trial Tr. at 536 (Porter).[6] Specifically using these factors, Mr. Porter determined that the Monument and Saginaw-Kennedy timber were being comparable in terms of logging and hauling costs to Brann, Hutch-Boondock and Mud and, therefore, that the use of $135/MBF as an estimate of the logging and hauling rate that would have been experienced on these two sales during the suspension was appropriate.[7] Trial Tr. at 536 (Porter).

In exactly the same way that he had used records of logging and hauling rates experienced during the suspension period on Brann, Hutch-Boondock and Mud, Mr. Porter also used the large number of logger pay records from the harvest of the St. Joe timber sale to estimate the logging and hauling rate that would have been experienced on Jersey Horse. St. Joe had been released early in the suspension period and was harvested while the breached sales,

---

[6]In response to questioning from the Court, Mr. Porter explained that when the original claims were assembled he used a variety of information in assessing which sales were comparable with respect to Brann, Mud, and Hutch-Boondock in terms of logging and hauling cost:

> I reviewed the Forest Service information on the appraisal summaries. I, also, reviewed the locations and also the type of timber that it is, the size of timber, and also the terrain. Those kinds of things is what I evaluated as I put this together to find comparable sales.

Trial Tr. at 537 (Porter). See also id. at 539. The Forest Service appraisals for the sales are in evidence (PX 1 to PX 14) and Mr. Porter's detailed knowledge of the sale areas and timber on each of the sales has been accepted by the Court in resolving other issues in this case. See, e.g., Slip op. at 48-49 (product mix). Mr. Reidhead, President of Tri-Star Logging, Precision Pine's logging subcontractor, who was to have harvested all of the breached sales also identified the sale-specific factors that went into determining a logging and hauling price, including terrain, size and density of the timber and haul distance. Trial Tr. at 1725-27 (Reidhead).

[7]Although the Court correctly found that both Monument and Saginaw-Kennedy would have been harvested to completion "but for" the suspension, neither was able to be harvested in the post-suspension period. Accordingly, it is simply not possible to use any actual logging and hauling costs experienced on these sales as a basis for assessing what the costs would have been during the suspension period and some sort of estimate must be used.

including Jersey Horse, remained suspended. PX 252. The logger pay records from St. Joe establish that the logging and hauling rate on that sale had been $85/MBF at all times, including during the suspension period. Trial Tr. at 549-52 (Porter), PX 252. Mr. Porter used this $85/MBF rate as the likely logging and hauling rate that Precision Pine would have experienced during the suspension period on the Jersey Horse sale because Jersey Horse was located directly across the highway from St. Joe and the timber, terrain and haul distance for the two sales were quite comparable. Trial Tr. at 552-53 (Porter).

Mr. Porter also testified regarding logger pay sheets that showed the actual logging and hauling rate paid by Precision Pine on the U-Bar sale both in the months preceding the suspension, and immediately after the suspension was lifted. Trial Tr. at 540-44 (Porter). PX 308, 238. These logger pay records showed that Precision Pine had paid $108/MBF for logging and hauling on U-Bar both shortly before and after the suspension. Id. This fact leads to the reasonable inference that $108/MBF also would have been the rate for logging and hauling on the U-Bar sale during the suspension period. Id.

In the same way, Mr. Porter also testified that the logger pay records for the Brookbank sale showed that the price that Precision Pine was paying for logging and hauling on Brookbank, both at the time of the suspension and after the suspension was lifted, was $115/MBF (Trial Tr. at 545-46 (Porter)); PX 309. As Mr. Porter concluded: "The rate [on Brookbank] was the same from prior to or right at the beginning of the suspension until after the suspension." Trial Tr. at 546 (Porter). Again, the virtually irrefutable inference is that $115/MBF would also have been the rate for logging and hauling on Brookbank during the suspension period.

As Mr. Porter had been able to do with other sales for which he knew the actual logging and hauling rates paid by Precision Pine, he also applied the logging and hauling rate from the Brookbank sale to other sales that he determined were similar in terms of timber type, terrain, and haul distance. Trial Tr. at 547 (Porter). Specifically, Mr. Porter determined that Kettle was comparable to Brookbank such that a logging cost of $115/MBF should also be used for that sale. Id. Additionally, Mr. Porter concluded that the logging and hauling rate for Salt would have been comparable to that experienced on Brookbank but, because Salt was located further from the sawmill than was Brookbank, the additional hauling distance on the Salt sale warranted an increase of $10/MBF over what actually had been experienced on Brookbank. Trial Tr. at 548-49 (Porter). Thus, Mr. Porter determined that the logging and hauling rate during the suspension would have been $125/MBF for Salt. Id.

With respect to the Manaco timber sale, Mr. Porter used an actual logger pay record for that sale from the post-suspension period showing a logging and hauling rate of $128.65/MBF to confirm his belief that $128.65 was a reasonable estimate of the logging and hauling rate that Precision Pine would have experienced on Manaco during the suspension. As Mr. Porter testified, he determined that $128.65/MBF was reasonable because it also compared quite closely to the logging and hauling cost of $125/MBF that Mr. Porter had used on the Salt sale, which was similar to Manaco in terms of timber type, terrain and haul distance. Trial Tr. at 558-59 (Porter); PX 310.

For the Hay sale, Mr. Porter used a number of logger pay sheets for harvesting performed on that sale in 1994 and 1995, including records from months shortly before the suspension

began. These records demonstrated that the cost of logging and hauling paid by Precision Pine on Hay had consistently been $90/MBF. Trial Tr. at 582-84 (Porter); PX 236. Thus, Mr. Porter concluded that it was reasonable to assume that $90/MBF would have been the logging and hauling rate for Hay during the suspension.[8]

Mr. Porter also testified that the logging and hauling rate of $90/MBF for the Hay sale was used in determining the likely logging and hauling rate for the O.D. Ridge sale during the suspension because the two sales were comparable in terrain and distance from the mill. Trial Tr. at 582-84 (Porter). However, because the timber on the O.D. Ridge sale was slightly larger than that on Hay, Mr. Porter determined that the likely rate for logging and hauling on O.D. Ridge would be slightly less than that on Hay and projected the rate for logging and hauling on the O.D. Ridge sale downward to $85/MBF. Id.

In short, Mr. Porter's testimony and supporting exhibits regarding logging and hauling costs may be summarized as follows:

[8]As the Court will recall, in the immediate post-suspension period timber from the Hay sale was used to restart Precision Pine's operations at the Winslow mill. See Slip op. at 73. Thereafter, the Eagar mill, to which the Hay sale was to have been hauled for milling, was permanently closed. Accordingly, the increased post-suspension costs for hauling the Hay sale the greater distance to the Winslow sawmill were not used in determining what those costs would have been during the suspension period when the Eagar sawmill would have been available.

| **1. Sales at issue for which actual logging and hauling costs were available during the suspension period** | **Exhibit** | **Log & Haul Cost/MBF** | **Breached sales with comparable logging and hauling costs** |
|---|---|---|---|
| **Mud**, Brann, Hutch-Boondock | PX 237 | $125 | **Monument, Saginaw-Kennedy** |
| St. Joe | PX 257 | $85 | **Jersey Horse** |

| **2. Breached sales for which actual logging and hauling cost were available from both the immediate pre- and post-suspension period logging** | **Exhibit** | **Log & Haul Cost/MBF** | **Breached sales with comparable logging and hauling costs** |
|---|---|---|---|
| **U-Bar** | PX 308, 238 | $108 | N/A |
| **Brookbank** | PX 309 | $115 | **Kettle, Salt** (adjusted up to $125) |

| **3. Breached sale for which actual logging and hauling cost were available from the immediate pre-suspension period logging** | **Exhibit** | **Log & Haul Cost/MBF** | **Breached sales with comparable logging and hauling costs** |
|---|---|---|---|
| **Hay** | PX 236 | $90 | **O.D. Ridge** (adjusted down to $85) |

| **4. Breached sale for which actual logging and hauling cost were available from the post-suspension period** | **Exhibit** | **Log & Haul Cost/MBF** | **Breached sales with comparable logging and hauling costs** |
|---|---|---|---|
| **Manaco** | PX 310 | $128.65 | Reasonableness of rate on **Manaco** also confirmed by comparison to **Salt** at $125 |

Breached sales on which Precision Pine is seeking lost profits are shown in bold.

## II. The Use Of Average Costs From The FYE 1995 Financial Statement To Estimate Logging And Hauling Costs Is Less Reliable Than The Sale-By-Sale Evidence And Methodology Presented At Trial

As demonstrated above, the method by which Precision Pine calculated the logging and hauling costs that it would have experienced during the suspension used actual costs incurred exclusively on the sales at issue, from periods of time before, during, and after the suspension as augmented by the testimony of Mr. Porter based on his experience with these sales and years spent harvesting timber in northeastern Arizona. This methodology has several advantages over relying exclusively on the FYE 3/31/95 financial statement as a basis for deriving logging and hauling costs. See Declaration of Robert A. Ness, attached to Plaintiff's Recalculation of Damages filed this date.

First, although there is a substantial difference between the logging and hauling rates that Precision Pine calculated by using sale-specific data and a single average logging and hauling rate based on the financial statement for FYE 1995,[9] there is no testimony from anyone at

[9]The rate derived from the FYE 1995 financial statement by dividing the total cost of $3,488,488.18 shown therein for logging and hauling by the total 24,880,602 MBF (LS) actually harvested is $140.21 per MBF (LS). See Plaintiff's Recalculation of Damages Tab C, Ex. C3b. In comparison, the logging and hauling rates based on sale-specific evidence for the breached sales on which Precision Pine sought lost profits were:

| Sale | Rate |
|---|---|
| Jersey Horse | $85/MBF |
| O.D. Ridge | $85/MBF |
| Hay | $90/MBF |
| U-Bar | $108/MBF |
| Brookbank | $115/MBF |
| Kettle | $115/MBF |
| Salt | $125/MBF |
| Manaco | $128.65/MBF |
| Mud | $135/MBF |
| Monument | $135/MBF |
| Saginaw-Kennedy | $135/MBF |

Precision Pine who was involved in preparing the FYE 1995 financial statement or the accountants who reviewed it as to exactly what costs were included within the contract logging and hauling line items on the statement. There was, however, testimony at trial that Precision Pine sold its logging and hauling subsidiary, Precision Forest Management, Inc. ("PFMI"), to Tri-Star Logging ("Tri-Star") shortly before the suspension began, i.e., during the period covered by the FYE 1995 financial statement. Trial Tr. at 232 (Porter); Trial Tr. at 1720-22 (Reidhead). Thus, during the period covered by the FYE 3/31/95 financial statements, Precision Pine's logging and hauling was being performed by PFMI, Tri-Star and perhaps other contractors. In this regard, there is, however, no evidence as to how the logging and hauling costs on sales harvested by PFMI were charged back to Precision Pine or how they were dealt with in the financial statement.

It may have been that prior to its purchase of PFMI that Tri-Star was the company that did the logging and hauling on sales with difficult terrain and/or longer hauls and that only those costs (but not PFMI's costs) are reflected on the financial statement. In any event, the logging and hauling costs on the FYE 1995 financial statement have little or no relevance to the logging and hauling costs that would have been experienced during the suspension because they reflect a time before Tri-Star, which would have harvested all of the breached contracts during the suspension, took over substantially all of Precision Pine's logging and hauling, contrary to what would have been the case during the suspension period. Trial Tr. at 290 (Porter); Trial Tr. at 1721-23, 1744 (Reidhead).

Additionally, of the 24 line items showing “contract logging” on the FYE 1995 financial statement, just four involved contracts at issue in this case. PX 248. For the other 20 line items there is no testimony as to whether the timber type, terrain or haul distances for the sales to which they related bore any relationship whatsoever to the breached sales. Similarly, of the nine entries on the FYE 1995 financial statement pertaining only to log hauling, just two entries were for contracts at issue in this case. Id.[10] Because Mr. Porter considered the variables of timber type, terrain and haul distance to be critical to the determination of logging and hauling costs on the breached sales during the suspension period, it is highly unlikely that an average rate derived from the financial statements provides as accurate a determination of the logging and hauling rate on each of the breached sales as the sale-specific analysis performed by Mr. Porter.

Thirdly, the costs for FYE 1995 are from a period beginning 18 months prior to and ending six months before the start of the suspension at issue in this case, i.e., these costs were incurred between two and three years prior to the end of the suspension. In this regard, there is no evidence as to the relationship between a general weighted average of logging and hauling costs experienced in this earlier period and costs that Precision Pine would have been

[10]Notably, although there are eight line items on the FYE 1995 financial statement for “Log Hauling” there is also a line item for “Contract Log Hauling,” a distinction which was not explored at trial and which could signify some difference in treatment between hauling performed Precision Pine’s subsidiary, PFMI, and others logging subcontractors in the 1994-1995 time period. PX 248. Moreover, two of the log hauling line items on the FYE 1995 financial statement, including the largest single line item that year, were not identified as having been incurred for any given sale, but the logging costs are labeled “misc.” What costs comprise the two “miscellaneous” line items and whether they may have been unique to FYE 1995 is also unknown.

experienced during the suspension period.[11] In fact, an average of the logging and hauling costs on the FYE 1995 financial statement may bear little, if any, relationship to what Precision Pine would have experienced on the individual breached sales during the suspension period. As noted above, the testimony at trial indicated that logging and hauling prices were negotiated by Mr. Porter and Mr. Reidhead on a sale-by-sale basis just prior to (and occasionally after) harvesting commenced on the sale, and addressed such things as the characteristics of the timber, terrain of the sale area and haul distance. Trial Tr. at 516-17 (Porter). Mr. Porter imitated this same process in determining the logging and hauling costs on the breached sales during the suspension period.

Fourthly, the largest single line item for logging and hauling shown on the FYE 1995 financial statement is $345,241.72 in costs incurred on the Hualapai sale. PX 248. As the name suggests, the Hualapai sale was located on the Hualapai Indian reservation which was marked by Mr. Porter with a red dot and the designation "HT" for "Hualapai Timber" on PX 104. (Map of Arizona); Trial Tr. 1653-1655 (Porter). As the map also reflects, the closest of Precision Pine's sawmills to the Hualapai sale was the one at Winslow, which was located some 120 miles, as the crow flies, from the reservation. PX 104. In contrast, all of the sales at issue were located on National Forest land that was considerably closer to a Precision Pine mill than 120 miles. That is, the most distant part of any National Forest on which any of the sales at issue were located was the Kaibab National Forest which, at most, was only about 80 miles from the nearest Precision Pine sawmill. Id. Moreover, only Brann and Saginaw-Kennedy of the 12 breached

[11]It was for this reason that Precision Pine used logging and hauling prices from the suspension period as a baseline and augmented them where possible with actual prices shortly before and shortly after the suspension. See Trial Tr. at 517 (Porter)

sales were located on the Kaibab National Forest. Trial Tr. at 3745 (Harris).[12] The National Forests on which each of the 10 other breached sales are located were even closer to a Precision Pine sawmill. Accordingly, the haul distance for the Hualapai timber sale was at least 1.5 times longer (and in most cases even more) than the haul distance for the sales at issue. As such, the costs incurred in logging and hauling the timber from the Hualapai sale was likely considerably higher than those that would have been incurred on any of the sales at issue. The inclusion of the Hualapai sale logging and hauling costs thus likely inflated average logging and hauling costs during FYE 1995 when compared with the costs Precision Pine would have experienced for logging and hauling the breached sales.

Finally, and perhaps most significantly, the Court correctly held that Precision Pine would not have harvested any pulpwood from the breached sales during the suspension period. Slip op. at 52-55. Of course, it necessarily follows that Precision Pine also would not have incurred the costs of logging and hauling that pulpwood. However, the FYE 1995 financial statement shows pulpwood sales of $397,976.99 and topwood sales of $77,106.56, reflecting the fact that a considerable, albeit unspecified, volume of such material was harvested in that fiscal year. The financial statement for FYE 1995 does not, however, contain a separate line item for logging and hauling costs associated with that pulpwood and topwood. The only logical conclusion is that those costs were included within the logging and hauling cost line items. If that were the case, dividing total logging and hauling costs on the FYE 1995 financial statement by the total volume of sawlogs harvested would produce a rate per MBF that is substantially

---

[12]Although the Brann sale was released shortly after the suspension began, Chief Judge Damich found that it had been breached. Notably, under Precision Pine's methodology no sale has higher logging and hauling costs than Brann and Saginaw-Kennedy.

overstated with respect to the logging and hauling costs for the sawlogs – the rate that the Court found that Precision Pine would likely have incurred during the suspension period. The Court's decision that Precision Pine's logging and hauling costs for the sawlogs that Precision Pine would have harvested during the suspension should be computed by using the average logging and hauling costs set out on the financial statement for FYE 1995, thus would effectively re-impose much of the burden of the uneconomic pulpwood which the Court properly concluded Precision Pine would not have incurred during the suspension. Slip op. at 52-55.[13]

**CONCLUSION**

In light of the foregoing, Precision Pine respectfully requests that the Court reconsider that portion of the Opinion of September 14, 2007 requiring plaintiff to recalculate its logging and hauling costs and instead utilize the logging and hauling costs as set forth in PX 131 and restated in Tabs B and D of Plaintiff's Recalculation of Damages.

Should the Court deny this motion, in Tabs A and C of the material attached to Plaintiff's Recalculation of Damages plaintiff has set forth its damages using the logging and hauling costs from the FYE 1995 financial statement.

[13]Due to the government's suspension and breach of the contracts at issue, no records exist of what the actual logging and hauling costs on the breached sales were during the times those sales were improperly suspended by Forest Service.

Respectfully submitted,

s/Alan I. Saltman
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Counsel for Plaintiff

OF COUNSEL:

Richard W. Goeken
SALTMAN & STEVENS, P.C.
1801 K Street, N.W.
Suite M-110
Washington, D.C. 20006
(202) 452-2140

Dated: December 7, 2007