**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., Plaintiff, | ) | |
| v. | ) | No. 98-720C (Judge George W. Miller) |
| THE UNITED STATES, Defendant. | ) | |

**DECLARATION OF ROBERT A. NESS IN SUPPORT OF PLAINTIFF'S ADDITIONAL EXPLANATION OF ITS DAMAGES PURSUANT TO THE COURT'S ORDER OF DECEMBER 17, 2007**

I, Robert A. Ness, hereby declare under the penalties of perjury that:

1. Pursuant to the Court's Order of December 17, 2007, I was asked by Precision Pine & Timber, Inc. ("Precision Pine") to provide additional explanation for the mathematical errors that I discovered in the Court's Harvest and Milling Schedule, Appendix A, as revised on October 3, 2007.

2. During a status conference held on December 17, 2007, the Court specifically sought additional explanation regarding my correction of the Court's Harvest and Milling Schedule – Appendix A (10/03/07) that would explain the 596 MBF of logs in inventory as of April 30, 1996 that I believe would have supplied 21 days of lumber production in May of 1996. See Plaintiff's Recalculation of Damages (12/07/07), Exhibit C2c.

3. As an initial point, plaintiff continues to fully agree with the Court's Harvest and Milling Schedule (10/03/07) for the period September 1, 1995 to April 14, 1996. See "Plaintiff's Additional Explanation Of Its Calculations For Corrected Appendix A" ("Explanation") attached as Exhibit 1 to this Declaration. Please note that small differences on the Explanation between plaintiff's calculation and the Court's calculation appear to be the result of rounding differences.

4. As shown on the Explanation, plaintiff agrees with the Court's determination that the log inventory at the sawmills that would have been built-up during the 1995 decking season would have been totally exhausted by available sawmill capacity as of April 14, 1996. September 14, 2007 Slip op. at 43, ¶ 6.

5. It is a fundamental assumption of the Court's Harvest and Milling Schedule that Precision Pine would have had three weeks of logs in inventory for months outside of the decking season, including April through August of 1996. Slip. op. at 35-36.

6. In determining how the log decks would have been built back up to include three weeks of inventory upon the resumption of harvesting on April 15, 1996, the Court found that in April 1996 Precision Pine would have harvested "approximately 1770 MBF (LS)" of logs over and above those logs used for lumber production. See Slip op. at 43, ¶ 7. The 1770 MBF (LS) appears to have been derived by the Court as follows:

| | |
|---|---|
| 2,950 | Total sawmill capacity in May 1996 (MBF (LT)) |
| x .75 | (¾ of a month) |
| 2,212.5 | MBF (LT) |
| ÷ 1.25 | Overrun factor |
| 1,770 | ¾ of a month supply of logs decked in April (MBF (LS)) |

7. However, the Court's calculation of the 1770 MBF (LS) as the size of the log deck at the end of April 1996 appears to be based on the total monthly capacity of the sawmills in May. This approach is, however, contrary to methodology described by the Court and used elsewhere in its Harvest and Milling Schedule. It also appears that the Court erroneously used a 28-day month in its calculations.

8. The Court described its methodology for calculating deck size during other than the decking season as follows:

> Thus, in each month of the Court's schedule, the starting point for the amount harvested equals the difference between plaintiff's total mill capacity for all three mills and plaintiff's actual total production each month as set forth in PX 131, Exhibit 7. To that figure the Court added additional amounts of timber that plaintiff would have harvested and maintained in log decks, consistent with Mr. Smith's testimony regarding plaintiff's customary practices. [Citation omitted].

Slip op. at 41.

9. Put differently, the Court indicated that it had developed the log volumes that would have been harvested from the breached contracts by first determining the remaining sawmill capacity in the subsequent month. See e.g., Slip op. at 42-43, ¶ 4, ¶ 9. This was done by reducing the total sawmill capacity by lumber production from other, non-breached contracts. Id. Only then did the Court determine the level of harvest on the breached

contracts that would have been necessary to fill the remaining sawmill capacity and to build decks of a size consistent with it. Id.

10. Plaintiff applied the Court's stated methodology (as set forth in the preceding ¶¶ 8-9) to determine the size of the log decks available at the end of April 1996 as follows:

| | |
|---|---|
| 2,950 | Total sawmill capacity in May 1996 (MBF (LT)) |
| - 1,886 | Volume of lumber milled from other contracts (MBF (LT)) |
| 1,064 | Remaining sawmill capacity to be filled from breached contracts (MBF (LT)) |
| ÷ 1.25 | Overrun factor |
| 851.2 | Remaining monthly sawmill capacity to be filled from breached contracts (MBF (LS)) during May 1996 |
| x 21/30 | Fraction of month which three weeks represent |
| 596 | Size of log deck available for milling during May 1996 (MBF (LS)). See Exhibit 1 hereto. |

11. Based on the calculation in the preceding paragraph, as of the date of the Forest Service's imposition of the fire suspension on May 6, 1996, Precision Pine would only have had the requisite volume of logs in inventory to operate for three weeks (i.e., 21 days) (596 MBF (LS)). Thereafter, Precision Pine would have relied solely on any remaining timber from non-breached contracts. As a result, both total production and the volume milled from breached contracts for the month of May 1996 would have been substantially less than was indicated in the Court's Harvest and Milling Schedule, Appendix A (10/03/07).

12. The Court appears to have also erroneously determined the size of the log deck at the end of July 1996 by again using total mill capacity rather than remaining capacity after actual production is taken into account when it stated that Precision Pine would have built a log

deck of "approximately 1700 Mbf (LS)" once the fire closure was lifted by the Forest Service on July 9, 1996 and harvesting resumed. See Slip. op. at 43, ¶ 9.

13. In both the Explanation and in the recalculation filed on December 7, 2007, plaintiff used the approach described by the court (and set out in ¶¶ 8-10 above) to determine the size of the log inventory for both July and August 1996, i.e., the log decks are of sufficient size to provide three weeks of production based on available sawmill capacity after actual production is taken into account.

14. The result of correcting these errors in the Court's application of its stated methodology is that less decked timber would have been available to be milled into lumber during May, June and July than is shown in the Court's Harvest and Milling Schedule, Appendix A (10/03/07). See attached Explanation. However, this reduced lumber production is made up in plaintiff's calculation of its damages as sawmill capacity becomes available in later months. Plaintiff's Recalculation of Damages, filed December 7, 2007. This is the "ripple effect" that is identified and explained in paragraphs 21-23 of my declaration of December 7, 2007.

15. My declaration does not rely on any new facts, but is simply an application of the Court's stated logic and arithmetic for achieving its Harvest and Milling Schedule.

Dated: 12/21/07

Robert A. Ness

Robert A. Ness