No. 98-720C
(Judge George W. Miller)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PRECISION PINE & TIMBER, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUESTS FOR RECONSIDERATION REGARDING THE COURT'S HARVESTING AND MILLING SCHEDULES AND THE COURT'S DETERMINATION OF LOGGING AND HAULING COSTS

---

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

BRYANT G. SNEE
Deputy Director

DAVID A. HARRINGTON
MARLA T. CONNEELY
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277

Attorneys for Defendant

OF COUNSEL:

LORI POLIN JONES
PATRICIA L. DISERT
Office of General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

Dated: January 30, 2008

## TABLE OF CONTENTS


INTRODUCTION . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . 2

I. Standard Of Review . . . . . . . . . . 2

II. Precision Pine's Requests For Reconsideration Should Be Denied . . . . . . . . . . 4

A. Precision Pine' Has Neither Established "Mathematical Errors" In The Court's Harvesting And Milling Schedules, Nor Shown That It Would Suffer A Manifest Injustice . . . . . . . . . . 4

B. Precision Pine Has Failed To Establish That Basing Logging And Hauling Costs Upon The Company's Own Financial Statement Would Be Manifestly Unjust . . . . . . . . . . 7

1. Neither Isolated Logger Pay Sheets, Nor Unsupported Testimony, Provide An Adequate Basis For Establishing Logging And Hauling Costs . . . . . . . . . . 8

2. Precision Pine's Annual Financial Statement Provides A Far Superior Basis For Evaluating The Company's Logging And Hauling Costs . . . . . . . . . . 10

CONCLUSION . . . . . . . . . . 14

# TABLE OF AUTHORITIES

**Cases:**

Bath Iron Works v. United States,
34 Fed. Cl. 218 (1995) . . . . . . . . . . 9

Bishop v. Unites States,
26 Cl. Ct. 281, 286 (1992) . . . . . . . . . . 2, 3

Bluebonnet Savings Bank, FSB v. United States,
466 F.3d 1349 (Fed. Cir. 2006) . . . . . . . . . . 2, 3

Circle K Corp. v. United States,
23 Cl. Ct. 659, 664-65 (1991) . . . . . . . . . . 3

Franconia Assocs. v. United States,
44 Fed. Cl. 315 (1999) . . . . . . . . . . 3

Gelco Builders & Burjay Constr. Corp. v. United States,
369 F.2d 992 (Ct. Cl. 1966) . . . . . . . . . . 3

General Electric Co. v. United States,
416 F.2d 1320 (Ct. Cl. 1969) . . . . . . . . . . 2, 3

Goldberger Foods, Inc. v. United States,
23 Cl. Ct. 295, 308 (1991) . . . . . . . . . . 9

Interstate Circuit, Inc. v. United States Dept. of Treasury,
306 U.S. 208 (1939) . . . . . . . . . . 9

Lepkowski v. United States,
804 F.2d 1310 (D.C. Cir.1986) . . . . . . . . . . 9

Morowitz v. United States,
15 Cl. Ct. 621, 631 (1988) . . . . . . . . . . 9, 11

Precision Pine & Timber, Inc. v. United States,
Case No. 98-720 (Fed. Cl. Sept. 14, 2007) . . . . . . . . . . passim

Strickland v. United States,
36 Fed. Cl. 651 (1996) . . . . . . . . . . 3, 13

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUESTS FOR RECONSIDERATION REGARDING THE COURT'S HARVESTING AND MILLING SCHEDULES AND THE COURT'S DETERMINATION OF LOGGING AND HAULING COSTS**

Pursuant to the Court's December 17, 2007, and January 15, 2008 orders, the United States respectfully submits this response to plaintiff's requests for reconsideration with respect to the Court's harvesting and milling schedules, and the Court's determination of logging and hauling costs.

## INTRODUCTION

This Court conducted a six-week trial focused solely upon the issue of damages. On September 14, 2007, the Court issued an Opinion and Order in which it addressed numerous subsidiary issues, concluded that Precision Pine had failed to meet its burden of proof, developed a new methodology for calculating lost profit damages, and ordered Precision Pine to file and serve "a revised damages calculation consistent with the Court's findings." Order and Opinion at 41-45, 76 (Sept. 14, 2007).[1]

[1] The United States disagrees with the Court's decision to develop its own damages methodology and to allow Precision Pine to present new damages calculations based upon this methodology. Precision Pine failed to meet its burden of proof at trial and, therefore, judgment should have been entered in favor of the United States. By complying with this Court's subsequent orders, the United States does not waive (and expressly reserves) the argument that (continued...)

Precision Pine filed a motion for reconsideration with respect to the Court's determination of the logging and hauling costs to be used in the new damages calculations. Pl.'s Mot. for Reconsideration (filed Dec. 7, 2007). Precision Pine also requested that the Court alter the harvesting and milling schedule contained in the September 2007 decision. Declaration of Robert Ness (filed Dec. 21, 2007). This latter request, though framed as addressing purported mathematical errors made by the Court, also seeks reconsideration of the Court's September 2007 decision. As explained below, both of Precision Pine's requests for reconsideration should be denied.

## ARGUMENT

### I. Standard of Review

Rule 59(a)(1) of the Rules of the Court of Federal Claims ("RCFC") states: "A new trial or rehearing or reconsideration may be granted . . . for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States." However, it is well-settled that the Court "has a right to know before it decides [the controversy at hand] whether the parties have anything further to present." General Electric Co. v. United States, 416 F.2d 1320, 1322 (Ct. Cl. 1969). Indeed, the litigation process rests upon the assumption that the parties will present their case once, to their best advantage. Bishop v. Unites States, 26 Cl. Ct. 281, 286 (1992); see also Bluebonnet Savings Bank, FSB v. United States, 466 F.3d 1349, 1361 (Fed. Cir. 2006) ("an argument made for the first time in a motion for reconsideration comes too late, and is ordinarily deemed waived"). Because motions for

---

[1](...continued)
the post-trial proceedings ordered by the Court in this matter are unwarranted and improper.

reconsideration are not intended to give a disappointed party a second bite at the litigation apple, Circle K Corp. v. United States, 23 Cl. Ct. 659, 664-65 (1991), motions for reconsideration are disfavored, General Electric, 416 F.2d at 1321.

"For a movant [seeking reconsideration] to prevail, he must point to a 'manifest error of law, or mistake of fact' and demonstrate that the motion 'is not intended to give an unhappy litigant an additional chance to sway the court.'" Strickland v. United States, 36 Fed. Cl. 651, 657 (1996) (citing Circle K Corp., 23 Cl. Ct. at 664-65); accord Precision Pine & Timber, Inc. v. United States, No. 98-720C, slip op. at 3 (Jan. 27, 2004) (citing Bishop, 26 Cl. Ct. at 286, Circle K Corp., 23 Cl. Ct. at 664-65, and Franconia Assocs. v. United States, 44 Fed. Cl. 315, 316 (1999)). To meet this burden, the movant must show that granting the motion is necessary to prevent manifest injustice. Strickland, 36 Fed. Cl. at 657 (citing Bishop, 26 Cl. Ct. at 286). In addition, because "[a] motion for reconsideration 'is not intended to give an unhappy litigant an additional chance to sway the court,'" the movant is not "permitted to present new legal theories or facts that could have been raised earlier." Precision Pine, slip op. at 5 (Jan. 27, 2004); see also Bluebonnet, 466 F.3d at 1361; Bishop, 26 Cl. Ct. at 286; Circle K Corp., 23 Cl. Ct. 664-65; Gelco Builders & Burjay Constr. Corp. v. United States, 369 F.2d 992, 1000 n.7 (Ct. Cl. 1966) ("Litigants should not, on a motion for reconsideration, be permitted to attempt an extensive re-trial based upon evidence which was manifestly available at the time of the hearing.").

By simply rehashing arguments that the Court has already rejected, Precision Pine's requests for reconsideration are nothing but an attempt "to give an unhappy litigant an additional chance to sway the court." Strickland, 36 Fed. Cl. at 657. Precision Pine's motions for reconsideration should, therefore, be denied.

## II. Precision Pine's Requests For Reconsideration Should Be Denied

### A. Precision Pine' Has Neither Established "Mathematical Errors" In The Court's Harvesting And Milling Schedules, Nor Shown That It Would Suffer A Manifest Injustice

The Court held that the harvesting and milling schedules upon which Precision Pine based its damages calculations at trial were not viable. Precision Pine & Timber, Inc. v. United States, Case No. 98-720, slip op. at 41 (Fed. Cl. Sept. 14, 2007) (noting that "it would have been impossible for plaintiff to have followed its projected schedule"). Nevertheless, stating that it would not deny damages by reason of Precision Pine's failure to carry its burden of proof, the Court fashioned its own alternative harvesting and milling schedules upon which new damages calculations were to be based. Id. The Court used the following assumptions to develop alternative harvesting and milling schedules:

- Precision Pine would have operated its sawmills at their full physical capacity.
- Between January 1, 1996 and April 14, 1996, Precision Pine would have completely depleted its decked inventory of logs.
- On April 15, 1996, the beginning of the 1996 harvesting season, Precision Pine would have resumed harvesting.
- Between April 15, 1996 and May 5, 1996, Precision Pine would have built an inventory of decked logs equivalent to three weeks of production, or approximately 1770 mbf (LS).
- Between May 6, 1996 and July 9, 1996, the Forest Service would have suspended harvesting in National Forests in Arizona pursuant to Industrial Fire Plan D. Precision Pine would have used its inventory of decked logs (as well as timber unaffected by the Forest Service's fire suspension) to operate its mills during this period.
- On July 9, 1996, the Forest Service would have lifted the suspension of harvesting at which time Precision Pine would have resumed harvesting timber to supply its sawmills and to reestablish a three week inventory of decked logs (approximately 1770 mbf (LS)) in accordance with its customary practice.

Id. at 41-43. Harvesting and milling schedules based upon these assumptions were included as Appendix A and B to the Court's September 2007 decision. Id. at 77-79 (as corrected by the Court's third errata). The Court did not describe, however, the calculations used to arrive at the schedules appended to its opinion. See id.

Precision Pine has filed a declaration arguing that the Court erred in its determination of harvesting and milling schedules.[2] Precision Pine does not establish, however, that the Court's schedules either deviate from the parameters in the Court's opinion or work a manifest injustice. Precision Pine offers instead a "corrected" approach – an approach that would be impossible to implement in practice, that is contrary to Precision Pine's customary practices, and that disregards factual findings in the Court's decision. See Ness Decl. (filed Dec. 21, 2007) (docket no. 454-2).

At trial, the Court received testimony that Precision Pine's practice was to develop a three week supply of logs when timber harvesting began in the spring. See Precision Pine, slip op. at 34 (citing testimony of John Smith). Relying upon this testimony, the Court found that Precision Pine would have harvested enough timber to establish a log deck of approximately 1770 mbf (LS) by May 5, 1996. Id. at 43. By contrast, the "corrected" approach prepared by Mr. Ness uses "actual production" from "the subsequent month" to reduce the size of Precision Pine's log deck below a three week supply. See Ness Decl. ¶¶ 9, 12. As a result, Mr. Ness

---

[2] We have been unable to replicate the Court's harvesting and milling schedules and lack sufficient information to determine whether the Court's numbers are accurate. Consequently, while the changes to the Court's approach proposed by Precision Pine are untenable and inappropriate, our objection to Precision Pine's proposed changes to the harvesting and milling schedules should not be construed as an endorsement of the Court's general approach or its specific calculations.

provides only for a 596 mbf (LS) log deck as of April 30, 1996 – over one million board feet short of the 1770 mbf (LS) log deck under the Court-established parameters. Ness Decl., Ex. 1.[3]

Mr. Ness disregards – or treats as erroneous – the Court's statement that Precision Pine would in fact have built and maintained a three week inventory of logs (i.e., a log deck of 1770 mbf (LS)) upon commencing harvesting in April 1996. See Ness Decl. ¶¶ 7, 10, 12 (the Court "erroneously" assumed that Precision Pine's log deck would be based upon its "total mill capacity"). Instead, Mr. Ness uses May 1996 sawmill capacity and production data to derive the size of log deck that Precision Pine purportedly would have built during April 1996. See Ness Decl. ¶ 10. Mr. Ness's proposed approach makes no sense. Precision Pine could not know in April 1996 what its actual sawmill production would be during May 1996, much less base a decision about the volume of logs to harvest on such information. Nor did Precision Pine vary the size of its log deck from month to month, as is the case under Mr. Ness's "corrected" approach. Precision Pine, slip op. at 43 (from April to September, Precision Pine's customary practice was to build and maintain "an inventory of decked logs equivalent to three weeks production, or approximately 1770 mbf (LS)").

The Court should reject Precision Pine's request to use Mr. Ness's "corrected" harvesting and milling schedules as the basis for new damages calculations. First, this approach differs from the approach used by the Court and does not constitute a mere correction of "mathematical errors." Precision Pine presented its damages model at trial and that model was rejected by the

---

[3] Under Mr. Ness's "corrected" approach, even if all harvesting that Mr. Ness shows during the month of May were accomplished by May 5, 1996, Precision Pine still would not develop a 1770 mbf (LS) log deck. See Ness Decl., Ex 1 (indicating that 118 mbf(LS) of contract timber and 714 mbf(LS) of "other timber" would be harvested in May 1996).

Court. Precision Pine is not entitled to proffer a new model through its expert at this stage of proceedings. Second, it was Precision Pine's practice to develop a log deck sufficient to supply its mill for three weeks. Mr. Ness's approach does not have Precision Pine build and maintain a three week supply of logs, nor does he offer any basis for disregarding the company's acknowledged practice. Third, Mr. Ness's "corrected" approach would be impossible to implement. Mr. Ness uses actual milling data from a "subsequent month" to calculate the volume of timber that should be harvested and decked in a preceding month. See Ness Decl. ¶ 10. Because the data used by Mr. Ness (e.g., for May 1996) would not be available when the company's harvesting decisions would have to be made (e.g., in April 1996), Mr. Ness's approach does not and cannot provide a valid methodology for arriving at harvesting and milling schedules.

**B. Precision Pine Has Failed To Establish That Basing Logging And Hauling Costs Upon The Company's Own Financial Statement Would Be Manifestly Unjust**

In its September 2007 decision, the Court ruled that Precision Pine must recalculate logging and hauling costs using the company's fiscal year end ("FYE") 1995 financial statement. Precision Pine, slip op. at 62. The Court explained that the financial statement for the last full fiscal year prior to the MSO suspensions would "provide a reasonable approximation of [Precision Pine's] logging and hauling costs." Id. at 63 n.53.

Precision Pine has failed to demonstrate that using its own FYE 1995 financial statement – the very financial statement that Precision Pine used for other aspects of its damages claim – would work a manifest injustice. Accordingly, Precision Pine's motion for reconsideration should be denied.

**1. Neither Isolated Logger Pay Sheets, Nor Unsupported Testimony, Provide An Adequate Basis For Establishing Logging And Hauling Costs**

Precision Pine argues that the Court should rely upon isolated logger pay sheets and, for contracts where no logger pay sheets were offered in evidence, unsupported testimony, to establish the logging and hauling costs on the contracts at issue. Pl.'s Mot. at 3. Precision Pine's arguments are not new – they are the very arguments that the Court previously entertained and properly rejected. See Pl.'s Post-Trial Reply Br. at 41-43; Precision Pine, slip op. at 62-63.

Precision Pine begins by overstating the quantity and quality of evidence that it presented at trial. See Pl.'s Mot. at 3 (asserting that 70 pay sheets were offered with respect to eight contracts). Precision Pine seeks lost profits with respect to 11 contracts. No logger pay sheets were introduced with respect to six of these contracts.[4] Only a single logger paysheet was presented in connection with three other contracts. PX307 (Mud) (one sheet from 1996); PX309 (Brookbank) (one sheet from 1999); PX310 (Manaco) (one sheet from 1998). Indeed, the vast majority of logger pay sheets introduced in evidence concern contracts where no lost profits were claimed. See PX252 (33 sheets on St. Joe); PX237 (15 sheets on Hutch-Boondock); PX234 (four sheets on Brann); PX307 (two additional sheets on Brann and Hutch-Boondock).

The selective use of logger pay sheets is particularly troubling. Precision Pine offered logger pay sheets into evidence as business records, meaning that these records were kept in the ordinary course of business. See Pl.'s Mot. at 4 n.4. Yet Precision Pine presented no logger pay sheets showing actual costs for several contracts where harvesting occurred and actual cost information was available. See PX182 (showing harvesting on Kettle, Jersey Horse, and O.D.

[4] Contracts for which no logger pay sheets were presented at trial are Jersey Horse, Kettle, O.D. Ridge, Monument, Saginaw-Kennedy, and Salt.

Ridge). Precision Pine picked a single logger pay sheet – from the many available – to use in connection with another three contracts. PX307 (Mud); PX309 (Brookbank); PX310 (Manaco). Almost as troubling is Precision Pine's failure to elicit specific information about logging and hauling costs from Stephen Reidhead – the company's timber harvesting subcontractor who testified upon behalf of Precision Pine at trial. It is well settled that "a party's failure to bring forth evidence within [its] control, or to explain such omission, warrants an inference that the evidence, if proffered, would be unfavorable to [its] cause." Morowitz v. United States, 15 Cl. Ct. 621, 631 (1988) (citing Interstate Circuit, Inc. v. United States Dept. of Treasury, 306 U.S. 208, 226 (1939); and Lepkowski v. United States, 804 F.2d 1310, 1323 (D.C. Cir.1986))); Bath Iron Works v. United States, 34 Fed. Cl. 218, 239 (1995); Goldberger Foods, Inc. v. United States, 23 Cl. Ct. 295, 308 (1991). Here, Precision Pine's decision to present relevant logger pay records, to decline to elicit testimony about harvesting costs from Mr. Reidhead, and its concomitant failure to explain these omissions, warrants the conclusion that neither the missing pay records, nor Mr. Reidhead, would support Precision Pine's claimed logging and hauling costs. See Precision Pine, slip op. at 62 ("the Court is not persuaded, nor has plaintiff argued, that [the records presented at trial] embody all of plaintiff's logging and hauling expenses").

Having chosen not to present contemporaneous documents in its control, or testimony from its logging subcontractor, Precision Pine urges the Court to rely upon speculation by the company's own president. Pl.'s Mot. at 4-9. Precision Pine's president clearly does not qualify as a neutral arbiter. Nor did Mr. Porter present a detailed, objective analysis based upon harvesting area, haul distance, or any other neutral parameter. Mr. Porter merely offered subjective impressions about purported harvesting costs on the very contracts about which

Precision Pine withheld logger pay sheets. See Pl.'s Mot. at 4-9. Consequently, as the Court correctly noted, "it is unclear . . . exactly how plaintiff derived its logging and hauling costs." Precision Pine, slip op. at 62.

The Court has directed the parties to use Precision Pine's FYE 1995 financial statement to calculate logging and hauling costs. Id. at 62, 75. Plainly, this approach is preferable to reliance upon cherry-picked logger pay sheets and subjective opinions offered by the plaintiff's own president.

### 2. Precision Pine's Annual Financial Statement Provides A Far Superior Basis For Evaluating The Company's Logging And Hauling Costs

The Court's directive to use Precision Pine's 1995 financial statement to determine logging and hauling costs is consistent with the Court's overall methodology. This financial statement provides a comprehensive compilation of logging and hauling costs during the year immediately preceding the MSO suspensions and, thus, provides a basis to determine a company-wide average harvesting cost. Given that the Court has elected to "treat the total available timber as one large inventory," the use of an average harvesting cost for this "large inventory" is in keeping with the Court's general approach. See Precision Pine, slip op. at 41.

Using Precision Pine's financial statements as the basis for damages calculations is likewise consistent with the Court's treatment of manufacturing costs. Precision Pine based its manufacturing cost calculations on data taken from the FYE 1995 financial statement. Precision Pine, slip op. at 63; PX131. The United States asserted that the company's monthly cost comparison reports, which Precision Pine had disregarded, constituted a preferable data source. Id. Rather than use sawmill-specific data from monthly cost comparison reports, the Court accepted Precision Pine's annual financial statements as the preferable basis for determining

manufacturing costs. Id. at 64. Having embraced Precision Pine's financial statements for determining manufacturing costs, it is appropriate to use the same datasource to establish harvesting costs.

Precision Pine's recent attempt to undercut the reliability of its own financial statements is surprising. See Pl.'s Mot. at 11-16. Not only did Precision Pine use its financial statements to develop manufacturing costs, the company's financial statements also provided data on overhead and other costs that were incorporated into Precision Pine's damages calculations. See, e.g., PX131; PX182. It can hardly be the case that the company's financial statements are reliable only when invoked by Precision Pine itself.

Precision Pine nevertheless provides a litany of dubious suggestions about why its financial statements should not be used with respect to harvesting costs. Pl.'s Mot. at 11-16. First, Precision Pine points out that during FYE 1995 its wholly-owned subsidiary, Precision Forest Management, Inc. ("PFMI"), performed a substantial part of Precision Pine's timber harvesting. Id. at 11-12. This is a distinction without a difference. Precision Pine offers no evidence that PFMI charged higher prices than its new logging contractor, Tri-Star Logging, such that the FYE 1995 financial statement would be inaccurate. See Pl.'s Mot. at 12 (offering only speculation about what "may have been" the case). Indeed, such evidence is uniquely within Precision Pine's control. Pl.'s Mot. at 11-12 (acknowledging that the company chose to present "no testimony from anyone at Precision Pine who was involved in preparing the FYE 1995 financial statement or accountants who reviewed it"). Precision Pine should not be heard to complain about a lack of evidence when the purported lack of evidence was of its own creation. E.g., Morowitz, 15 Cl. Ct. at 631 (the "failure to bring forth evidence within [a party's] control . . . warrants an inference that the evidence, if proffered, would be unfavorable"). In any

event, available documents show that timber harvesting costs increased when Tri-Star took over from PFMI. See PX236 (showing that harvesting costs for the Hay contract increased from $60 per mbf(LS) to $85 per mbf(LS) when harvesting operations were taken over by Tri-Star). As a result, the FYE 1995 financial statement would appear to understate – not overstate – the harvesting costs that Precision Pine would have incurred during 1996 using Tri-Star. See Def.'s Proposed Findings of Fact ¶¶ 548-55 (showing that Precision Pine's actual logging costs were generally greater than the average cost derived from the FYE 1995 financial statement).

Precision Pine points out that the FYE 1995 financial statement has line items for only four of the contracts at issue in this action. Pl.'s Mot. at 13. This is immaterial because the very purpose of using the financial statement is to derive an average harvesting cost. In addition, project-specific data from the FYE 1995 financial statement (four contracts) compares favorably to the data available from logger pay records because Precision Pine chose to present more than one logger pay sheet for only two contracts upon which lost profits are sought. See section II.B.1., supra.

Precision Pine also argues that using the FYE 1995 financial statement is inappropriate because costs are for "a period beginning 18 months prior to and ending six months before the start of the [MSO] suspensions." Pl.'s Mot. at 13. Given the fact of inflation, costs tend to rise over time. For this additional reason, the FYE 1995 financial statement likely understates harvesting costs that would have been incurred by Precision Pine. Moreover, Precision Pine does not demonstrate that the timeframe of its financial statement constitutes a drawback vis-a-vis the company's logger pay sheets. In fact, many of Precision Pine's logger pay sheets are much further removed in time from the MSO suspensions than is the FYE 1995 financial statement. PX236 (Hay) (providing pay sheets from 1994 and 1999); PX238 (U-Bar) (providing

pay sheets from 1994); PX309 (Brookbank) (providing only a pay sheet from 1999); PX310 (Manaco) (providing only a pay sheet from 1998). This argument, therefore, provides no basis for granting Precision Pine's motion for reconsideration.

Precision Pine next notes that one sale on the FYE 1995 financial statement was the Hualapai sale. Pl.'s Mot. at 15. Precision Pine states that the haul distance for this sale was 50 percent longer than the sales at issue and that the logging and hauling costs for this sale were "likely considerably higher than" costs incurred on "the sales at issue." Id. However, Precision Pine offers no evidence about actual harvesting costs on the Hualapai sale, much less an analysis showing what amount (if any) the Hualapai sale increased average hauling costs during 1995. Precision Pine's argument is, thus, without an evidentiary basis and provides no basis for granting a motion for reconsideration. See, e.g., Strickland, 36 Fed. Cl. at 657 (requiring proof of a "manifest mistake of fact" to merit reconsideration).

Lastly, Precision Pine speculates that pulpwood might have been included in the harvesting costs in its financial statement. Pl.'s Mot. at 15. "If that were the case," Precision Pine suggests that the FYE 1995 financial statement could be inaccurate. Id. Once again, Precision Pine offers no evidence to support its position – evidence that would be uniquely within Precision Pine's control and that could have been presented at trial if it had supported Precision Pine's case. A movant seeking reconsideration "must point to a manifest error of law, or mistake of fact and demonstrate that the motion is not intended to give an unhappy litigant an additional chance to sway the court." Strickland, 36 Fed. Cl. at 657 (internal quotes omitted); see also Precision Pine, slip op. at 5 (Jan. 27, 2004) ("A motion for reconsideration is not intended to give an unhappy litigant an additional chance to sway the court."). This is a high burden that Precision Pine's various arguments do not satisfy.

## CONCLUSION

Precision Pine has established no manifest injustice in the Court's decision. Accordingly, Precision Pine's requests for reconsideration should be denied.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Bryant G. Snee

BRYANT G. SNEE
Deputy Director

s/ David A. Harrington

DAVID A. HARRINGTON
MARLA T. CONNEELY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
(202) 616-0465
(202) 305-7644 (fax)

January 30, 2008

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on the 30th day of January, 2008, a copy of "DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUESTS FOR RECONSIDERATION REGARDING THE COURT'S HARVESTING AND MILLING SCHEDULES AND THE COURT'S DETERMINATION OF LOGGING AND HAULING COSTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David A. Harrington