No. 98-720C
(Judge George W. Miller)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PRECISION PINE & TIMBER, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S MOTION FOR RECONSIDERATION AND RESPONSE TO PLAINTIFF'S FURTHER RECALCULATION OF DAMAGES

---

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

BRYANT G. SNEE
Deputy Director

DAVID A. HARRINGTON
MARLA T. CONNEELY
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-0465

Attorneys for Defendant

OF COUNSEL:

LORI POLIN JONES
PATRICIA L. DISERT
Office of General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

Dated: April 18, 2008

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DEFENDANT'S MOTION FOR RECONSIDERATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. This Court's Decision Undercuts The Adversarial Process And Fails To Afford A Full And Fair Opportunity To Contest The New Damages Methodology And Precision Pine's Post-Trial Damages Calculations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. The Court Should Also Reconsider Its Ruling In Three Other Areas . . . . . . . . . . 5

A. Precision Pine's Contractual Obligation To Harvest Roundwood Should Not Be Excused By "Gross Economic Impracticability" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

1. A Market For Roundwood Existed During The MSO Suspensions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

2. Precision Pine's Recently-Filed Damages Claim Establishes That Harvesting Roundwood Was Not Economically Impracticable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

B. The Court Should Use A *Pro Rata* Allocation Of Post-Suspension Profits On The Manaco Contract . . . . . . . . . . . . . . . . . . 9

C. The Court-Approved Prices For Douglas Fir and Engelman Spruce Sales Lack Evidentiary Support . . . . . . . . . . . . . . . . . . . . . . . . . 11

DEFENDANT'S RESPONSE TO PRECISION PINE'S FURTHER REVISED DAMAGES CALCULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I. Precision Pine's Use Of A Discounted Cash Flow Methodology To Reduce Offsetting Post-Suspension Profits Is Unauthorized And Unsupported . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II. Precision Pine's "Further Revised Damages Calculation" Does Not Support An Award Of Lost Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A. An Analysis Of Precision Pine's Claim Shows That The Company Suffered No Lost Profits As A Result Of The MSO Suspensions . . . . . . . . . . 15

1. Mr. Menenberg Is Well Qualified To Analyze Precision Pine's Recently-Submitted Damages Calculations . . . . . . . . . . 16

2. Most Of Precision Pine's Claimed Damages Were Caused By Precision Pine's Failure To Harvest In The Post Suspension Period – Not The MSO Suspensions . . . . . . . . . . 16

B. Precision Pine Failed To Mitigate Damages . . . . . . . . . . 18

C. Precision Pine's Claimed Mill Costs Are Unrecoverable . . . . . . . . . . 21

D. Precision Pine Owes The Forest Service $4,362.48 . . . . . . . . . . 22

III. The Court Cannot Award The Damages Claimed By Precision Pine Without Reopening The Record And Holding A New Trial . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . 23

# TABLE OF AUTHORITIES

**Cases:**

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) . . . . . . . . . . 17

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 22

Astoria Fed. Sav. & Loan Ass'n v. Solimino,
501 U.S. 104 (1991) . . . . . . . . . . 3

Barmag Barmer Maschinenfabrik AG v. Murata Mach. Ltd.,
731 F.2d 831 (Fed. Cir. 1984) . . . . . . . . . . 23

Bishop v. Unites States,
26 Cl. Ct. 281 (1992) . . . . . . . . . . 3

California Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005) . . . . . . . . . . 17, 21

Cargill, Inc. v. Canbra Foods, Ltd.,
476 F.3d 1359 (Fed. Cir. 2007) . . . . . . . . . . 11

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 3

Fawick Corp v. United States,
149 Ct. Cl. 623 (1960) . . . . . . . . . . 20

Frontier Pipeline Co. v. F.E.R.C.,
452 F.3d 774 (D.C. Cir. 2006) . . . . . . . . . . 12, 13

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001) . . . . . . . . . . 21

In re Seagate Technology,
497 F.3d 1360, 1376 (Fed. Cir. 2007) . . . . . . . . . . 4

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . 4

Locke v. United States,
283 F.2d 521 (Ct. Cl. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Midwest Indus. Painting of Fla. v. United States,
4 Cl. Ct. 124, 133 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21

Precision Pine & Timber, Inc. v. United States,
62 Fed. Cl. 635 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Precision Pine & Timber, Inc. v. United States,
64 Fed. Cl. 165 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21

Precision Pine & Timber, Inc. v. United States,
72 Fed. Cl. 460 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Precision Pine & Timber, Inc. v. United States,
___ Fed. Cl. ___, 2007 WL 5030766 (Sept. 14, 2007) . . . . . . . . . . . . . . . . . . . . . . . passim

Pruitt v. Mote,
503 F.3d 647 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Scott Timber Co. v. United States,
333 F.3d 1358 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 21

Strickland v. Washington,
466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Sun Cal, Inc. v. United States,
25 Cl. Ct. 426 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Toledo P. & W. Ry. v. Metro  Waste Sys., Inc.,
59 F.3d 637 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Other Authorities:**

22 Am. Jur. 2d Damages § 514 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Restatement (Second) of Contracts § 350 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PRECISION PINE & TIMBER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 98-720C |
| v. | ) | (Judge George W. Miller) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR RECONSIDERATION AND**
**<u>RESPONSE TO PLAINTIFF'S FURTHER RECALCULATION OF DAMAGES</u>**

**<u>INTRODUCTION</u>**

This action concerns the claimed breach of certain timber sale contracts awarded to Precision Pine & Timber, Inc. ("Precision Pine"). In May and June 2005, the Court held a six-week trial focused solely on the issue of damages. On September 14, 2007, the Court ruled that Precision Pine had failed to meet its burden of proof at trial. Disregarding this failure of proof, the Court devised a new methodology for determining damages and established a quasi-summary judgment process for submitting and responding to new damages calculations. Specifically, the Court ordered Precision Pine to submit new calculations based upon the judicially-created damages model and directed the United States to file a written response to Precision Pine's calculations.

Pursuant to Rule 59(a) of the Rules of the Court of Federal Claims ("RCFC"), the United States respectfully seeks reconsideration of several aspects of the Court's September 2007 decision. Additionally, in accordance with the Court's order, the United States submits its response to Precision Pine's recalculation of damages.

## DEFENDANT'S MOTION FOR RECONSIDERATION

### I. Standard Of Review

"[A] court has the power to reconsider its decisions until the entry of judgment." Precision Pine & Timber, Inc. v. United States, 72 Fed. Cl. 460, 480 n.16 (2006). "Because the Court's September 14, 2007 order was interlocutory in nature, 'the Court, applying law of the case doctrine, has the power to reconsider and modify its order at any time before the entry of final judgment, subject to the principle that questions once decided ought not be subject to continued re-argument.'" Order Denying Pl.'s Mot. For Reconsideration And Directing Pl. To Submit Further Revised Damages Calculation at 2 (Mar. 13, 2008) (docket no. 458) (quoting Holland v. United States, 75 Fed. Cl. 492, 494 n.2 (2007), and citing Fla. Power & Light Co. v. United States, 66 Fed. Cl. 93, 95-96 (2005); Wolfchild v. United States, 68 Fed. Cl. 779, 784-85 (2005), and Intergraph Corp. v. Intel. Corp., 253 F.3d 695, 698 (Fed. Cir. 2001)).

### II. This Court's Decision Undercuts The Adversarial Process And Fails To Afford A Full And Fair Opportunity To Contest The New Damages Methodology And Precision Pine's Post-Trial Damages Calculations

In both civil and criminal cases, courts in the United States rely on an adversarial process to reach just results. See, e.g., Strickland v. Washington, 466 U.S. 668, 685 (1984) ("The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to reach just results"). As the Seventh Circuit recently explained in a different context:

> We rely on the adversarial process to aid courts in producing evidence and ascertaining the relevant facts, to articulate the arguments for and against particular holdings, and to anticipate the ramifications of the rules they adopt. . . . The process is far from perfect, but to function as it is intended it must in fact be an adversarial process.

Pruitt v. Mote, 503 F.3d 647, 665 (7th Cir. 2007) (Rovner, J., concurring) (citations omitted).

The adversarial process is based upon the bedrock principle that "both parties present their case once, to their best advantage." Bishop v. Unites States, 26 Cl. Ct. 281, 286 (1992); see also Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 107 (1991) ("a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings"). Thus, where a party fails to meet its burden of proof, judgment for the opposing party is warranted. E.g., Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Here, the Court not only excused Precision Pine's failure to meet its burden of proof, it created its own damages model – a model that was neither presented at trial, nor vetted by the adversarial process. In justifying this approach, the Court notes that the "burden of imprecision" should "not fall on the innocent party." Precision Pine & Timber, Inc. v. United States, ___ Fed. Cl. ___, 2007 WL 5030766, slip op. at 41 (Sept. 14, 2007) (citing Locke v. United States, 283 F.2d 521, 524 (Ct. Cl. 1960)) ("where a reasonable probability of damages is shown, uncertainty as to the amount will not preclude recovery"); see also Order Denying Pl.'s Mot. For Reconsideration And Directing Pl. To Submit Further Revised Damages Calculation at 2 n.2 (damages may be awarded even where plaintiff is "unable to prove the precise amount of damages with absolute certainty"). Precision Pine's failure of proof did not occur because Precision Pine lacked evidence as a result of a Government breach and was therefore unable to prove damages with "absolute certainty;" it was caused by Precision Pine's own failure to present a valid "but for" damages model. Precision Pine slip op. at 41 ("in certain time periods, such as fire closures, it would have been impossible for plaintiff to have followed its projected schedule"). Describing what the company would have done if the suspensions had not occurred

was uniquely within Precision Pine's control. Yet, at trial, Precision Pine's own expert acknowledged that Precision Pine was using a "but for" (no suspension) scenario that the company would not have followed if the Mexican Spotted Owl ("MSO") suspensions had not occurred Tr. 2622, 2626, 2848 (Ness). The Court does not – and cannot – suggest that Precision Pine was unable to present the damages model described in Court's post-trial opinion (or some other valid approach) at trial.

Nor does the authority cited by the Court support its conclusion. The Court relies on cases discussing when "speculative damages" should be barred. Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005); Locke, 283 F.2d at 524. Precision Pine's claim did not fail because damages were speculative; it failed because the "but for" scenario on which Precision Pine based its damages claim was "impossible" to perform. Precision Pine, slip op. at 41. The burden of proof is rendered meaningless if it may be disregarded simply to relieve a party from the consequence of presenting a fatally flawed damages approach.

Of course, the Court has not only provided a second chance to prove damages, it has developed its own methodology for Precision Pine to use. The United States had no prior notice of the judicially-created damages approach, no opportunity to present witnesses or evidence regarding the appropriateness of the Court's model at trial, and would in any event have been placed in the awkward position of litigating against the Court. For the adversarial process "to function as it is intended, it must in fact be an adversarial process." Pruitt, 503 F.3d at 665; see also In re Seagate Technology, 497 F.3d 1360, 1376 (Fed. Cir. 2007) (protecting work product because this promotes an "adversarial system" that will "ultimately and ideally further the search for the truth").

The United States respectfully requests that the Court grant this motion for reconsideration, and enter judgment in favor of the United States based upon the record made at the damages trial in this action.

## III. The Court Should Also Reconsider Its Ruling In Three Other Areas

### A. Precision Pine's Contractual Obligation To Harvest Roundwood Should Not Be Excused By "Gross Economic Impracticability"

The Court ruled that contract clause BT 6.4 required the Forest Service to excuse the harvesting of roundwood on Precision Pine's contracts because of "gross economic impracticability." Precision Pine, slip op. at 54-56. The Court stated that "two factors" support its conclusion: first, that "there was effectively no market for roundwood;" and second, that the magnitude of Precision Pine's loss would be "unreasonably harsh." Id. at 55-56. Because neither factor supports the Court's conclusion, reconsideration is warranted.[1]

#### 1. A Market For Roundwood Existed During The MSO Suspensions

The Court's statement that there existed "no market for roundwood" during the MSO suspensions is clearly erroneous. Neither Precision Pine, nor the United States, presented any such evidence. Rather, the trial record establishes that Stone Container Corporation ("Stone") – the largest local purchaser of roundwood – continued to buy substantial quantities of roundwood for its paper mill until converting to recycled material in February 1998. Tr. 991-92 (Porter); PX126.

---

[1] The United States respectfully disagrees with other aspects of the Court's ruling. By limiting the argument in this motion for reconsideration to the issue of gross economic impracticability, the United States does not waive arguments that the Court's construction and application of BT 6.4 are erroneous for other reasons.

The evidence at trial only established that Stone was unwilling to purchase roundwood from Precision Pine between August 1995 and December 1997. See, e.g., DX555 ("Stone Container has in the recent past declined to purchase pulpwood from PP&T") (emphasis added); DX47 (noting "Stone's unwillingness to buy . . . roundwood from us") (emphasis added); DX454 (discussing Stone's refusal to purchase roundwood, directly or indirectly, from Precision Pine); Tr. 3857-61, 3864 (Harris) (testifying that in 1996 Stone refused to buy roundwood from Art Daley upon learning that Mr. Daley was cutting roundwood for Precision Pine). Precision Pine's inability to sell roundwood thus resulted from Stone's antagonism toward Precision Pine – not from general market conditions.[2]

BT 6.4 was not intended to extricate Precision Pine from difficulties caused by its own failure to maintain a good business relationship with the area's largest purchaser of roundwood. Lower profits resulting from Precision Pine's strained relationship with Stone are properly borne by Precision Pine – not the Forest Service.[3]

---

[2] Stone's refusal to take roundwood from Precision Pine may have been based upon the rejection of Stone's offer to purchase Precision Pine in July 1995, Precision Pine's aggressive bidding for timber sale contracts, or the fact that Stone had a more cordial relationship with other suppliers. Tr. 1741 (Reidhead) (Stone would refuse to buy roundwood because Precision Pine would often compete "very strongly" with Stone and "Stone would get upset"); DX776 (writing, during bidding, "don't give Stone anything over here"); see also Tr. 1566 (Porter), Tr. 2948-49, 3034, 3043 (Tenney), Tr. 3463 (Neuberger), Tr. 4139 (Harris), Tr. 4630-32 (Dils), Tr. 4563-65 (Lee). Of course, the reason for Stone's antipathy is immaterial.

[3] Clause BT 6.4 is not self executing. Because Precision Pine never requested that the Forest Service waive the contractual obligation to cut and remove roundwood pursuant to BT 6.4, the Court addressed a hypothetical question, i.e., whether the Forest Service would have approved a request to waive the harvesting of roundwood pursuant to BT 6.4 if such a request had been made by Precision Pine. The Court mistakenly disregarded specific testimony that the Forest Service would have rejected a request pursuant to BT 6.4. Precision Pine, slip op. at 53.

**2. Precision Pine's Recently-Filed Damages Claim Establishes That Harvesting Roundwood Was Not Economically Impracticable**

The second basis for the Court's ruling was the magnitude of loss that Precision Pine would supposedly incur. Precision Pine, slip op. at 56. The Court took judicial notice and relied upon the following language in the Forest Service Handbook:

> [G]ross economic impracticability applies to the trees or logs "at the time of removal of other timber." Thus, if it was economically practicable to cut and remove included timber in an area, then the purchaser is required to cut and remove missed trees and pieces even though they may be uneconomical to remove individually at a later time.

Precision Pine, slip op. at 53-54 & n.49 (emphasis added). The Court should reconsider its ruling because Precision Pine's recently-filed damages calculations show that each contract would have been profitable even if roundwood harvesting were not excused.

According to Precision Pine, the company would have earned a profit of $5.56 million from its timber sale contracts but for the MSO suspensions. Pl.'s Further Revised Damages Calculation, Ex. 1. After roundwood losses are deducted, this leaves Precision Pine a $4.12 million net profit over 16 months. Menenberg Decl., Sch. 1.E; see also Precision Pine, slip op. at 56 (finding roundwood costs to be $1.4 million).[4] Thus, after taking into account roundwood losses, Precision Pine's claimed annual profit on the suspended contracts is $3.09 million[5] – more than double the company's average profit during the three years before the MSO

[4] Todd Menenberg is an accounting expert who has reviewed Precision Pine's damages calculations. See p. 16, infra (discussing Mr. Menenberg's qualifications).

[5] Even this figure is artificially low because it disregards the profit earned by Precision Pine on contracts that were unaffected by the MSO suspensions during 1995 and 1996.

suspensions. See Precision Pine, slip op. at 56 ("Over the three prior years, plaintiff averaged approximately $1.3 million in net profit per year.").

A contract-by-contract analysis buttresses the conclusion that roundwood harvesting does not constitute gross economic impracticability. According to Precision Pine's own figures, not a single contract would have operated at a loss if roundwood harvesting occurred:

| Contract | Claimed Profit | Roundwood Loss (if harvested) | Profit After Roundwood Harvesting |
|---|---|---|---|
| O.D. Ridge | $678,124 | - | $678,124 |
| U-Bar | $534.245 | - | $534,245 |
| Salt | $430,159 | (137,625) | $292,534 |
| Manaco | $422,461 | ($101,100) | $321,361 |
| Brookbank | $447,153 | ($401,010) | $46,143 |
| Jersey Horse | $351,669 | - | $352,336 |
| Hay | $1,531,435 | - | $1,531,435 |
| Saginaw-Kennedy | $244,817 | (124,350) | $120,467 |
| Kettle | $424,112 | (296,850) | $127,262 |
| Monument | $153,785 | ($82,500) | $71,285 |
| Mud | $343,077 | ($304,500) | $38,577 |
| TOTALS | $5,561,037 | $1,447,935 | $4,113,102 |

Menenberg Decl., Sch. 1.E (providing a contract by contract breakdown of Precision Pine's claimed damages).

In sum, Precision Pine's own damages figures rebut the conclusion that roundwood harvesting would constitute a gross economic impracticability. If roundwood harvesting were required to proceed, no contract would be rendered unprofitable and company profits would

more than double. The Court's conclusion that the Forest Service would have abused its discretion by declining to excuse roundwood harvesting is therefore untenable. Accordingly, the Court should grant the United States' request for reconsideration and find that contract clause BT 6.4 would not excuse Precision Pine's contractual obligation to harvest roundwood.

### B. The Court Should Use A *Pro Rata* Allocation Of Post-Suspension Profits On The Manaco Contract

The Manaco contract prohibited harvesting between July 15 and August 15, was effected by a fire closure from May 6 to July 9, 1996, and was subject to an additional suspension when a Mexican Spotted Owl was identified in nearby forest land in the summer of 1996. Precision Pine, slip op. at 37-38, 40. As a result of these limitations, the Court found that in the "but for" (i.e., no suspension) world Precision Pine would have cut only 75 percent of available timber (1849 mbf (LS)) during the period of the MSO suspensions. Precision Pine, slip op. at 40 & app. B. The Court further assumed that Precision Pine would have cut the remaining 25 percent (624 mbf (LS)) in the post-suspension period. Id. at 40.

Precision Pine did not actually complete harvesting timber on the Manaco sale. When the MSO suspensions were lifted, 2503 mbf (LS) was available to be harvested. See Third Joint Stip. Of Fact ¶ 14. During the next five years, Precision Pine obtained repeated time extensions to complete harvesting, but cut only 769 mbf (LS) of the available timber. Precision Pine, slip op. at 40. The remaining 1734 mbf (LS) was never harvested by Precision Pine. See Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635 (2004) (discussing Precision Pine's breach of the Manaco contract). The partial harvest of the Manaco sale yielded approximately $75,000. PX182; see also Pl.'s Further Revised Damages Calculation, Ex 8.

Because Precision Pine would not have fully harvested the Manaco sale in the "but for" world, the profits actually earned must be allocated between the MSO suspension period (which reduces the damages claimed by Precision Pine) and the post-suspension period (which has no effect on claimed damages). According to the but-for schedule adopted by the Court, Precision Pine would have cut 75 percent of the Manaco timber during period of the MSO suspensions and the remaining 25 percent in the post-suspension period.[6]

As shown on the table below, the Court allocated the entire uncut volume to the MSO suspension period and none of the uncut volume to the post-suspension period. See Precision Pine, slip op. at 40.

| | **Suspension Period** | **Post-Suspension** | **Total** |
|---|---|---|---|
| **"But For" Harvesting** | 1879 mbf (LS)<br>75% | 624 mbf (LS)<br>25% | 2503 mbf (LS) |
| **Court's Allocation** | Cut Volume<br>145 mbf (LS)<br>19%<br><br>Uncut Volume<br>1734 mbf (LS)<br>100% | Cut Volume<br>624 mbf (LS)<br>81%<br><br>Uncut Volume<br>0 mbf (LS)<br>0% | Cut Volume<br>769 mbf (LS)<br><br>Uncut Volume<br>1734 mbf (LS) |
| **Pro Rata Allocation** | Cut Volume<br>578 mbf (LS)<br>75%<br><br>Uncut Volume<br>1301 mbf (LS)<br>75% | Cut Volume<br>191 mbf (LS)<br>25%<br><br>Uncut Volume<br>433 mbf (LS)<br>25% | Cut Volume<br>769 mbf (LS)<br><br>Uncut Volume<br>1734 mbf (LS) |

[6] This "but for" schedule was not presented at trial and, consequently, neither party had occasion to address the appropriate method for allocating profits from the Manaco sale in their post-trial briefs.

There exists no evidentiary basis for this allocation, which has the effect of minimizing the offset resulting from post-suspension profits. Indeed, common sense suggests that those trees that Precision Pine cut immediately after the MSO suspension was lifted also would have been the first trees cut in the "but for" world – either because those trees were the most valuable or because they were more accessible.[7]

Because the parties never had the opportunity to address the method for allocating post-suspension profits on the Manaco contract, and because no evidentiary basis for a particular allocation was presented at trial, the Court should grant the United States' request for reconsideration and adopt a pro rata allocation of post-suspension profits on the Manaco contract. A pro rata approach would allocate 75 percent of profits to the MSO suspension period (which would be offset against Precision Pine's damages) and 25 percent of profits to the post-suspension period (which would have no effect on the damages claimed in this action).

### C. The Court-Approved Prices For Douglas Fir and Engelman Spruce Sales Lack Evidentiary Support

This Court endorsed the use of market data from an industry publication – Random Lengths – to establish the sale price for lumber made from Douglas Fir and Engleman Spruce. Precision Pine, slip op. at 52. Random Lengths provides the price paid for lumber products "F.O.B. Portland, Oregon." PX232. The term "F.O.B." is "a delivery term which requires a seller to ship goods and bear the expense and risk of loss to the F.O.B. location." Black's Law Dictionary at 444 (6th ed. 1991); see also Cargill, Inc. v. Canbra Foods, Ltd., 476 F.3d 1359, 1369 (Fed. Cir. 2007) (citing Black's Law Dictionary). To obtain the Random Lengths price, the

[7] If this were the case, the entire volume cut in the post-suspension period would be properly credited against Precision Pine's damages claim.

seller of lumber products would have to bear the risk and expense of hauling the lumber to Portland, Oregon. By definition, therefore, the producer's net revenue for a product sold "F.O.B. Portland" would be the sale price less the cost of shipping to Portland, Oregon. See Frontier Pipeline Co. v. F.E.R.C., 452 F.3d 774, 790 (D.C. Cir. 2006) ("On goods sold f.o.b. destination i.e., where the seller is liable to the carrier for the price of transportation, and the buyer doesn't take title to the goods until they arrive, the published freight charge from the point of origin becomes, in essence, a part of the seller's cost of production. [The] freight charge for delivery of the finished article affects him as directly as does a like charge upon his raw materials.").

The Court erred in applying the Random Lengths data in this action. Random Lengths establishes only that a buyer for lumber products that the seller delivers to Portland, Oregon would pay the specified price. Therefore, the net revenue recoverable by Precision Pine for Douglas Fir and Engleman Spruce products is the Random Lengths price minus the cost of delivery to Portland, Oregon. See id. The Court, however, allows Precision Pine to use the Random Lengths price plus the cost of delivery to Portland, Oregon as the sale price for Douglas Fir and Engleman Spruce lumber. See Precision Pine, slip op. at 52. This overstates the revenue that Precision Pine could derive for Douglas Fir and Engelman Spruce products according to Random Lengths.

At trial, Precision Pine argued it could sell Douglas Fir and Engleman Spruce products in Phoenix, Arizona for $50 to $60 per mbf (l.t.) more than the F.O.B. Portland price in Random

Lengths.[8] The mere fact that lumber could be purchased in Portland and shipped to Phoenix does not establish a market price for lumber "F.O.B. Phoenix, Arizona." Precision Pine offered no industry data, sale invoices, or other evidence that establishes the market price for Douglas Fir and Engleman Spruce products "F.O.B. Phoenix, Arizona" during the period of the MSO suspensions. The only market data establishing what buyers were willing to pay for Douglas Fir and Engleman Spruce lumber during the period of the MSO suspensions is the "F.O.B. Portland" price from Random Lengths – a price that requires the seller to incur the cost and risk of shipping to the F.O.B. location.

Precision Pine failed to correctly use the Random Lengths price as the basis for its lost profits claim. The Court should grant the United States' motion for reconsideration and order that this error be corrected.

**DEFENDANT'S RESPONSE TO**
**PRECISION PINE'S FURTHER REVISED DAMAGES CALCULATIONS**

On March 18, 2008, Precision Pine submitted "Further Revised Damages Calculations" in this action. See Notice of Filing (Mar. 18, 2008) (docket no. 459). Precision Pine's revised damages claim seeks $3,509,921.35. Id.

Precision Pine's claim for $3.5 million in breach damages is unsound. First, Precision Pine uses an unsupported and unapproved discounting methodology to reduce post-suspension profits and inflate claimed damages. Second, most of the damages claimed by Precision Pine

---

[8] Precision Pine argued that it had a "freight advantage" because it costs less to ship to Phoenix from Precision Pine's sawmills in Arizona than from Portland, Oregon. See Precision Pine, slip op. at 52. Precision Pine's supposed freight advantage is of no moment because Precision Pine tendered no evidence that it was the practice of buyers in the Phoenix area to purchase Douglas Fir and Engleman Spruce lumber from Oregon.

were caused by its own failure to harvest in the post-suspension period – not the MSO suspensions. Third, Precision Pine's damages calculations establish that Precision Pine failed to take reasonable steps to mitigate damages. And fourth, Precision Pine's increased sawmill costs are remote and unrecoverable. Scott Timber Co. v. United States, 333 F.3d 1358 (Fed. Cir. 2003).

Precision Pine's lost profit damages calculations show that lower lumber sale prices in the post-suspension period caused $193,481 in losses. Menenberg Decl. at 3-4 & Sch. 1.C. Yet this sum is more than offset by lower post-suspension delivered log costs. See Menenberg Decl., Sch. 1.C. (showing a $425,954 reduction in log costs). The remainder of Precision Pine's damages claim is either attributable to its own failure to harvest or to damages that are unrecoverable as a matter of law. Consequently, based upon its own numbers, Precision Pine is entitled to no lost profit damages in this action.

## I. Precision Pine's Use Of A Discounted Cash Flow Methodology To Reduce Offsetting Post-Suspension Profits Is Unauthorized And Unsupported

In its September 2007 decision, the Court ruled that Precision Pine "must reduce the profits it would have earned on the suspended contracts by the profits it actually earned on such contracts in the post-suspension period." Precision Pine, slip op. at 16 (rejecting Precision Pine's "modified lost volume seller theory"). Precision Pine earned $2,232,276 in profits by partially harvesting the timber sales in the post-suspension period. See PX182; Pl.'s Further Revised Damages Calculation, Ex 8. Deducting this amount from Precision Pine's claimed profits ($5,561,037) results in a net claim of $3,328,761.

In its calculation of damages, Precision Pine uses discounting to reduce post-suspension profits – and increase claimed damages – by nearly $200,000. Pl.'s Further Revised Damages

Calculation, Ex. 8. At trial, Precision Pine presented no evidence demonstrating that discounting in this context is appropriate, discussing how discounting should be performed, or establishing an appropriate discount rate. The Court's decision did not direct or authorize Precision Pine to discount post-suspension profits. Nor did Precision Pine seek judicial authorization in its December 2007 motion for reconsideration. Thus, there exists no legal or evidentiary basis for Precision Pine's approach.[9]

Precision Pine's discounting of post-suspension profits is properly disregarded. Therefore, the net claim asserted in Precision Pine's "Further Revised Damages Calculation" is $3,328,761.

## II. Precision Pine's "Further Revised Damages Calculation" Does Not Support An Award Of Lost Profits

### A. An Analysis Of Precision Pine's Claim Shows That The Company Suffered No Lost Profits As A Result Of The MSO Suspensions

Precision Pine's "Further Revised Damages Calculation" does not provide a contract-by-contract breakdown of damages and lumps together various time periods. Consequently, the United States retained an accounting expert to review and analyze the damages being claimed by Precision Pine.

[9] Precision Pine's apparent use of the "average yield on ten year Treasury notes" is clearly improper for discounting over a one-year period. See Pl.'s Further Revised Damages Calculation, Ex. 8.

### 1. Mr. Menenberg Is Well Qualified To Analyze Precision Pine's Recently-Submitted Damages Calculations

The United States' accounting expert – Todd Menenberg – is accomplished and well-qualified. Mr. Menenberg is certified public accountant, has years of experience performing accounting services for the timber industry, and has been qualified as an expert in accounting by numerous Federal and state courts. Menenberg Decl. at 1 & Att. 1 & 2.

The analysis performed by Mr. Menenberg in this matter has three basic parts: first, he determines the damages claimed by Precision Pine on each of the 11 contracts at issue; second, he determines the key economic factors driving Precision Pine's claimed damages and their relative effect on each contract; and third, he determines how the Court's decision on roundwood harvesting affected the profit claimed on each contract. Id. at 1.

Mr. Menenberg's work is based upon the information contained in Exhibits 1 through 8 of Precision Pine's Further Revised Damages Calculation and Exhibits 1 through 4 of Precision Pine's report on post-suspension harvesting (PX182). Menenberg Decl. at 2. Thus, for purposes of his analysis, Mr. Menenberg accepted Precision Pine's claimed lumber sale prices, by-product revenues, log costs, milling costs and other expenses. Id. (explaining that he used the "economic information used by the plaintiff and its expert, Robert A. Ness).

### 2. Most Of Precision Pine's Claimed Damages Were Caused By Precision Pine's Failure To Harvest In The Post Suspension Period – Not The MSO Suspensions

The data used by Precision Pine as the basis for its "Further Revised Damages Calculation" reveals the following:

- Of the $3,328,761 in claimed lost profits, $2,909,587 (over 87 percent) was caused by reduced production volumes between claimed would-have-been ("but for") operations and the reported operations during the post-suspension period.

- Over 99 percent of Precision Pine's claimed lost lumber revenues was caused by reduced production volumes between claimed would-have-been operations and the reported operations during the post-suspension period.

- Only $193,481 of the claimed lost profits relate to changes in sale prices between the MSO suspension period and the post suspension period.

- Delivered log costs in the post-suspension period were approximately $425,000 lower than during the MSO suspension period.

- Precision Pine's damages calculations do not support the conclusion that it was not economical to harvest in the post-suspension period.

Id. at 3-5. Thus, Precision Pine is not entitled to the sum sought in the revised damages calculations filed on March 18, 2008.

To recover lost profits, or indeed any damages, it is insufficient for the plaintiff simply to establish a contractual breach. See Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400 (2004). The plaintiff must also establish, among other things, that the breach caused the loss of profits "'directly and primarily,' and 'inevitably and naturally, not possibly or probably.'" Precision Pine & Timber, Inc. v. United States, 64 Fed. Cl. 165, 166 (2005) (discussing California Fed. Bank v. United States, 395 F.3d 1263, 1268-70 (Fed. Cir. 2005)); Myerle v. United States, 33 Ct. Cl. 1, 27 (1897).

Precision Pine's revised damages calculation establishes that Precision Pine could have made an additional $2,909,587 by harvesting all timber on the 11 Forest Service contracts at issue. Menenberg Decl. at 3-4 & Sch. 1.C. This sum was not earned because Precision Pine chose not to harvest after the MSO suspensions ended – not because of a breach by the Forest Service. Because this sum was not caused "directly and primarily" by the MSO suspensions, it must be deducted from Precision Pine's claimed lost profit damages.

**B. Precision Pine Failed To Mitigate Damages**

Precision Pine failed to mitigate damages by completing profitable, contractually-required timber harvesting after the MSO suspensions were lifted. Its damages claim should be reduced accordingly.

It is black letter law that the nonbreaching party has an obligation to attempt to mitigate damages following another party's breach of contract:

> Avoidability as a Limitation on Damages
>
> (1) Except as stated in Subsection (2), damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation.
>
> (2) The injured party is not precluded from recovery by the rule stated in Subsection (1) to the extent that he has made reasonable but unsuccessful efforts to avoid loss.

Restatement (Second) of Contracts § 350, at 126 (1981), quoted in Sun Cal, Inc. v. United States, 25 Cl. Ct. 426, 432 n.10 (1992); see also Midwest Indus. Painting of Fla. v. United States, 4 Cl. Ct. 124, 133 (1983) ("a nonbreaching or injured party must take reasonable steps to avoid incurring damage as a result of the other party's action"). If the nonbreaching party fails to make any attempt to mitigate his damages, but instead merely attempts to impose all loss, even if it could have been avoided, upon the breaching party, the nonbreaching party will be precluded from recovering the amount of loss that could have been avoided. See, e.g., Midwest Indus., 4 Cl. Ct. at 133 ("nonbreaching or injured party may not recover those damages which could have been avoided by reasonable precautionary action on its part"); Toledo P. & W. Ry. v. Metro Waste Sys., Inc., 59 F.3d 637, 640 (7th Cir. 1995) ("[i]n the event [the injured party] fails to take reasonable steps to avoid additional harm, [the injured party] bears the risk of any increased

damages which could have been avoided"); Restatement (Second) of Contracts § 350(1), at 126 (1981). The rationale of this rule is to provide an incentive to the nonbreaching party to reduce any damages resulting from the breach:

> Rationale. The rules stated in this Section reflect the policy of encouraging the injured party to attempt to avoid loss. The rule stated in Subsection (1) encourages him to make such efforts as he can to avoid loss by barring him from recovery for loss that he could have avoided if he had done so. The exception stated in Subsection (2) protects him if he has made actual efforts by allowing him to recover, regardless of the rule stated in Subsection (1), if his efforts prove unsuccessful.

Restatement (Second) of Contracts § 350 cmt. a, at 127 (1981) (citation omitted).

With regard to the nonbreaching party's obligation to incur additional expenses in attempting to mitigate his damages, he need not do so if they involve an "undue risk, burden, or humiliation." Although a nonbreaching party is not generally required to spend substantial sums of additional money to avoid further damage,

> a party may be required to make expenditures to mitigate damages caused by a breach of contract if (1) the expenditures are small in comparison to the possible losses, and (2) it is virtually certain that the expenses incurred will avoid at least a part of the loss.

22 Am. Jur. 2d Damages § 514, at 596 (1988) (emphasis added). In fact, this Court's predecessor, the Court of Claims, has held that, if a contractor's damage is a direct result of the Government's breach of contract, and the contractor could have reduced its loss by expending money and subsequently seeking recovery of that money (in lieu of the entire claimed amount of the loss absent mitigation) from the Government, the contractor's failure to do so precludes recovery:

> Plaintiff's only explanation is that it preferred to accept the larger loss rather than to pay any sum whatsoever to GSA when it was

> convinced GSA was in error. This explanation is hardly consistent with traditional legal principles pertaining to proximate cause or the duty to minimize damages. If there was in fact such a direct causal connection between the release and plaintiff's suit against Winslow, and plaintiff could have won its suit simply by paying the Government $20,000, it should have paid it under protest, thereby not suffering any losses from Winslow, and then sued in this court to recover the $20,000.

Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960).

Here, Precision Pine could have substantially (or completely) reduced its loss by fully harvesting the previously-suspended timber contracts. The contracts had been awarded to Precision Pine and, indeed, Precision Pine was contractually obligated to complete harvesting. See PX169-79. According to Precision Pine's own calculations, the company's failure to harvest timber and manufacture lumber in the post suspension period resulted in a loss of $2.9 million. Menenberg Decl. at 3 & Sch. 1.C.

Precision Pine implied at trial that it did not complete harvesting in the post-suspension period – a period of five years – because such harvesting would have been unprofitable. Precision Pine's newly-produced damages claim rebuts that assertion. It is undisputed that the partial harvesting that Precision Pine actually performed in the post-suspension period earned – and, thus, reduced damages – more than $2 million. PX182; Menenberg Decl., Sch. 1 & 7. According to Precision Pine's newly-revised damages claim, the completion of post-suspension harvesting would have reduced Precision Pine's damages by an additional $2.9 million. Menenberg Decl. at 3 & Sch. 1.C.

If Precision Pine's claim is accepted by the Court, the implications of that claim with respect to mitigation cannot be disregarded. Precision Pine's own claim establishes that the company failed to mitigate when it did not cut contract timber after the MSO suspensions were

lifted. Accordingly, as a result of this failure to mitigate, Precision Pine's damages should be reduced by $2,909,587. See Menenberg Decl. at 3 & Sch. 1.C.

**C. Precision Pine's Claimed Mill Costs Are Unrecoverable**

In an action for breach of contract, the plaintiff must establish that damages resulted from the contract's breach "'directly and primarily,' and 'inevitably and naturally, not possibly or probably.'" Precision Pine, 64 Fed. Cl. at 166 (citing California Federal, 395 F.3d 1263); see also Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1071 (Fed. Cir. 2001); Myerle, 33 Ct. Cl. at 27. Embedded within Precision Pine's lost profits calculations is a component for higher post-suspension mill costs. Precision Pine has offered no evidence that higher (per mbf) sawmill costs resulted from the MSO suspensions – as opposed to other causes such as its own failure to harvest available timber. As a result, Precision Pine has failed to demonstrate that increase in sawmill costs were caused by the breach of its timber sale contracts.

Moreover, even if an increase in sawmill costs could be traced indirectly to the suspension of one of Precision Pine's timber sale contracts, damages would not be recoverable under the common law. In Scott Timber, the Federal Circuit ruled that increases in sawmill costs are not the direct result of the suspension of a timber cutting contract. 333 F.3d at 1372. The Federal Circuit's conclusion is equally applicable here, as Precision Pine's claim for cost increases is even more tenuous than the failed claim asserted by Scott Timber. See id. (holding a claimed increase in sawmill costs due to the inability to perform a timber cutting contract is consequential and remote).

**D. Precision Pine Owes The Forest Service $4,362.48**

As explained above, Precision Pine is entitled to no recovery on its lost profits claim. Precision Pine also seeks $13,930.94 for sawmill inefficiency costs in connection with the Brann contract and $1020.00 in snow removal costs. Pl.'s Further Revised Damages Calculation, Summary & Ex. 9. The United States submits no response to Precision Pine's calculation of these sums.

Precision Pine has elected to pursue claims for common law breach. Common law breach damages and reimbursement pursuant to contract clause CT 6.01 are alternative remedies. Precision Pine, slip op. at 69. Because Forest Service contracting officers paid Precision Pine $19,313.42 pursuant to CT 6.01,[10] see PX131, table 2, this sum must be deducted from Precision Pine's damages. Accordingly, Precision Pine owes the United States $4,362.48.

**III. The Court Cannot Award The Damages Claimed By Precision Pine Without Reopening The Record And Holding A New Trial**

The Court has directed the parties to employ a damages model that was not presented or addressed at trial. The procedures employed are akin to summary judgment and the limits on granting motions for summary apply here with equal force. The United States has presented a declaration from an expert establishing, among other things, that Precision Pine's claimed damages are primarily attributable to the failure to harvest after the MSO suspensions were lifted. The record contains no contrary declaration or evidence and, therefore, a ruling in favor of the United States is appropriate. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49

[10] This sum does not include payments made in connection with the St. Joe and Hutch-Boondock contracts – the contracts where this Court found no breach and Precision Pine has not pursued claims for common law damages. See Precision Pine, slip op. at 69.

(1986); Barmag Barmer Maschinenfabrik AG v. Murata Mach. Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984) ("The party opposing [relief] must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant."). Of course, even if a disputed issue of material fact were to exist, a judgment in favor of Precision Pine could not be entered without reopening the record and holding a new trial.

## CONCLUSION

For these reasons, we respectfully request that the Court rule that Precision Pine is entitled to no lost profit damages and enter judgment in favor of the United States in the amount of $4,362.48.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Bryant G. Snee

BRYANT G. SNEE
Deputy Director

/s David A. Harrington

OF COUNSEL:

Lori Polin Jones
Patricia L. Disert
Office of the General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

DAVID A. HARRINGTON
MARLA T. CONNEELY
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-0465

April 18, 2008

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on this 18th day of April, 2008, a copy of the "DEFENDANT'S MOTION FOR RECONSIDERATION AND RESPONSE TO PLAINTIFF'S FURTHER RECALCULATION OF DAMAGES" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David A. Harrington