# Precision Pine, Inc.

# v.

# U.S.

## Declaration

**Signed:** ______________________

**Todd D. Menenberg**
**Navigant Consulting, Inc.**

**April 14, 2008**

**Precision Pine, Inc. v. U.S.**
**Declaration of Todd D. Menenberg**
**April 14, 2008**

# TABLE OF CONTENTS

I. Introduction

II. Summary Of Findings

III. Overview Of Schematics And Schedules Included In Attachments 3 And 4

IV. Description Of Methodology For Determining Claimed Lost Profits By Contract

Attachment 1: Resume of Todd D. Menenberg

Attachment 2: Testimony Experience of Todd D. Menenberg

Attachment 3: Analysis Of Lost Profits Claimed By Plaintiff, By Contract

Attachment 4: Schematic Of Schedule Flow

## I. Introduction

This declaration was prepared by Todd D. Menenberg of Navigant Consulting, Inc. ("Navigant"). Navigant is an international consulting firm providing litigation, financial and other services to clients. I am a Managing Director of Navigant. I am a certified public accountant. I have provided consulting services on a wide variety of financial and economic matters. My experience is summarized in my resume, included as Attachment 1. Attachment 2 is a summary of the last four years of my testimony experience. Navigant's work on this matter was performed by me or under my supervision.

Navigant has been asked by the Department of Justice, who represents the U.S. Forest Service in this matter, to: (1) determine damages claimed by Precision Pine, Inc. ("Precision Pine") in its "Further Revised Damages Calculations"[1] for each of the eleven contracts that Precision Pine alleges resulted in a "lost market opportunity;" (2) determine some of the key economic factors driving the plaintiff's damages claim and their relative impact on each contract; and, (3) determine the impact of the Court's decision regarding the harvesting of roundwood on the damages claimed by Precision Pine for each contract.

The portion of Precision Pine's damages claim that I have analyzed for the purposes of this Declaration, totaling $3,328,761, is generally comprised of the difference between: 1) the claimed "lost market opportunity" of $5,561,037 (the profits Precision Pine claims it would have earned during the suspension period had the contracts not been suspended); and 2) the alleged post-suspension period profits before discounting, $2,232,276.[2]

Precision Pine's Damages Calculations are prepared and expressed in total for all contracts by period (i.e., September 1995 through April 14, 1996 (hereinafter referred to

---

[1] Precision Pine submitted its "Further Revised Damages Calculations" to the Court on March 18, 2008. Hereinafter this document shall be referred to as "Precision Pine's Damages Calculations."

[2] Although Precision Pine's Damages Calculations expressed alleged post-suspension period profits in present value terms and Precision Pine's Damages Calculations includes damages related to "mill inefficiency costs on Brann" and "snow removal costs," I was asked by counsel not to include these components of alleged damages in my analysis.

as "Period 1); April 15, 1996 through June 1996 (hereinafter referred to as "Period 2"); and July 1996 through March 1997 (hereinafter referred to as "Period 3")) as opposed to by contract. Accordingly, it was necessary to perform a significant amount of reformatting of the information in Precision Pine's Damages Calculations to delineate the claimed damages by individual contract. The work that I performed to allocate Precision Pine's claimed damages to each contract is based solely on the information contained in Exhibits 1 through 8 in Precision Pine's Damages Claim and Exhibits 1 through 4 of plaintiff's exhibit PX 182 (pertaining to alleged post-suspension period profits). For the purposes of this analysis, I have not analyzed or opined on the validity of the inputs or assumptions relied upon by the plaintiff in creating these Exhibits, the methodologies employed by the plaintiff in creating these Exhibits, the extent to which this methodology complies with the Court's most current Order and Opinion, or the accuracy of the calculations included in these Exhibits. Rather, my work was limited to reformatting the information contained in Precision Pine's damages claim and analyzing the results of the reformatted damages claim on a contract-by-contract basis and in total.

In summary, the scope of my work was to delineate the lost profits claim submitted by the plaintiff on March 18, 2008 on a contract-by-contract basis using the same economic information used by the plaintiff and its expert, Mr. Robert A. Ness. My work also included comparing lumber production volumes, average sales prices, and costs Precision Pine claims it would have experienced during the suspension period to lumber production volumes, average sales prices, and costs Precision Pine alleges it did experience during the post-suspension period, on a contract-by-contract basis and in total. After reformatting Precision Pine's Damages Calculations on a contract-by-contract basis, some of the underlying reasons for the decline in performance as a result of the suspended harvesting become more apparent.

## II. Summary Of Findings

*1. Under Traditional Damages Theory, Precision Pine Has An Obligation To Mitigate Its Damages. In Fact, Precision Pine's Claimed Lost Revenues Were Primarily The Result Of Precision Pine's Decision To Harvest And Produce Far Less Lumber Than Originally Expected*

As indicated in Schedule 1.B., of the approximate $8,474,000 in claimed lost lumber revenues,[3] approximately $8,437,000, or over 99%, was caused by reduced production volumes between the claimed would-have-been ("WHB") operations during the suspension period and the reported operations during the post-suspension period. While average lumber sales prices increased on some contracts and decreased on others, the overall impact on lumber revenues of changing sales prices was minimal (less than 1%).[4] In total, the average sales price for lumber products declined by only $2.93 per MBF (LT) during the post suspension period; with the overall average sales price for Ponderosa Pine lumber actually increasing by $9.76 per MBF (LT) during the post-suspension period.

Regarding by-products, over 76% of the difference in claimed lost revenues (i.e., the difference between claimed WHB by-product sales before discounts and reported post-suspension by-product sales before discounts) was caused by reduced production volumes between the claimed WHB suspension period and post-suspension period.

*2. Precision Pine's Claimed Lost Profits Were Predominantly Caused By Precision Pine's Decision To Harvest And Produce Far Less Lumber In The Post-Suspension Period*

As indicated in Schedule 1.C., of the approximate $3,329,000 in claimed lost profits, approximately $2,910,000 or over 87% was caused by reduced production

[3] Claimed lost lumber revenues are defined as the difference between claimed WHB lumber sales before discounts and reported post-suspension lumber sales before discounts.
[4] Only .4% of the claimed lost lumber sales before discounts related to sales price differences between the claimed WHB suspension period and post-suspension period.

volumes between the claimed WHB suspension period and post-suspension period. In contrast, only approximately $193,000 (less than 6%) of the claimed lost profits relates to changes in sales prices between the claimed WHB suspension period and post-suspension period. Finally, only approximately $196,000 (less than 6%) of the claimed lost profits relates to changes in delivered log costs and manufacturing costs between the claimed WHB suspension period and post-suspension period.

As indicated on Schedule 1.D., although the average manufacturing cost per MBF (LT) produced increased by approximately $45, these increases were largely offset by decreases in delivered log costs (including log costs (i.e., stumpage cost), miscellaneous costs, and logging and hauling costs).

These findings do not support claims by Precision Pine that it was not economical to harvest during the post-suspension period.

*3. Precision Pine Did Not Harvest Any Timber For Three Of The Eleven Contracts In The Post-Suspension Period*

As indicated in Schedule 1, Precision Pine did not produce any lumber from three of the eleven contracts in which it claims lost market opportunity. These were the Salt, Saginaw Kennedy and Monument contracts.

*4. For Three Of The Remaining Eight Contracts, Precision Pine Harvested and Produced Less Than Half Of The Volume In The Post-Suspension Period Than Was Expected In The Suspension Period*

As indicated in Schedule 1.G., in the post-suspension period, Precision Pine allegedly harvested and produced less than 50% of the claimed WHB suspension period volume of lumber on the U-Bar, Manaco and Kettle contracts.[5] Total alleged post-suspension period lumber production of 13,865 MBF (LT) was only 47% of the amount of lumber Precision Pine claimed it would have produced during the suspension period

[5] I understand that the Kettle contract was sold to Stone Forest during the post-suspension period.

(29,288 MBF (LT)). Furthermore, Precision Pine harvested and produced only 46% of the total expected Ponderosa Pine lumber.

*5. If Precision Pine Had Harvested Roundwood During The Suspension Period, It Still Would Have Made Money On Each Contract, But-For The Suspension*

Although the Court concluded that roundwood would not have been harvested during the suspension period because of "gross economic impracticability,"[6] each contract would still have been profitable for Precision Pine in the claimed WHB suspension period even if Precision Pine had harvested the remaining Roundwood on each contract. This is shown at Schedule 1.F.

*6. Precision Pine Actually Earned More Profits In The Post-Suspension Period Than It Is Claiming It Lost In The Suspension Period On The Mud Contract*

As shown in Schedule 1, Precision Pine claims it would have earned $343,077 in the suspension period but-for the suspension on the Mud contract. Precision Pine actually earned $430,962 on that contract during the post-suspension period, resulting in an $87,886 gain.

## III. Overview Of Schedules And Schematics Included In Attachments 3 And 4

The results and underlying support schedules of my analysis are included as Attachment 3 to this Declaration. The flow of my Attachment 3 schedules is depicted in the schematic included as Attachment 4. The following table summarizes the various schedules included in Attachment 3:

---

[6] See the Court's Opinion and Order, dated September 14, 2007, pages 52-56.

| Schedule(s) | Purpose |
|---|---|
| 1 | Summary of claimed lost profits, by contract |
| 1.A. through 1.G. | Summary level schedules that provide additional insights regarding the results of my overall analysis. Include comparisons of the claimed WHB suspension period profits to the alleged post-suspension period profits, as well as allocations of lost revenues and lost profits to the key factors driving lost revenues and lost profits. |
| 2 | Summary of claimed lost market opportunity, by contract |
| 3, 3.A. through 3.C. | Summary of claimed lost lumber sales, by contract, with summaries by period (for Periods 1, 2, and 3) |
| 4, 4.A. through 4.D. | Summary of claimed WHB delivered log costs, by contract, with summaries by period (for Periods 1, 2, and 3), and claimed WHB severance tax |
| 5 | Summary of claimed WHB manufacturing costs, by contract |
| 6, 6.A. through 6.C. | Summary of claimed lost by-product revenue, by contract, with summaries for each type of by-product (e.g., chips, bark and shavings) |
| 7, 7.A., and 7.B. | Summary of alleged post-suspension period profits, by contract, with summaries of alleged post-suspension period lumber sales, harvest volumes, and production volumes over time on plaintiff's exhibit PX 182 |
| 8, and 8.A., | Summary of claimed WHB harvest and production volumes, by contract; and summary of stipulated volumes remaining on contracts as of August 25, 1995, by contract. |

## IV. Description Of Methodology For Determining Claimed Lost Profits By Contract

Below is a brief description of the methodology I employed for determining each component of claimed lost profits by contract. Detailed source references and formulas used in my calculations are indicated directly on the schedules in Attachment 3.

*Claimed Lost Profits, By Contract (Schedule 1)*

As indicated in Schedule 1 and as described above, claimed lost profits (also referred to as "claimed damages") were determined as the difference between claimed lost market opportunity and the alleged post-suspension period profits for each contract. The amounts for each contract for each of these two components were calculated on Schedules 2 and 7, respectively.

*Claimed Lost Market Opportunity, By Contract (Schedule 2)*

As indicated in Schedule 2, the claimed lost market opportunity for each contract was determined as the claimed WHB suspension period (e.g., lost) net lumber sales for each contract (from Schedule 3), less the claimed WHB suspension period delivered log cost for each contract (from Schedule 4), less the claimed WHB suspension period manufacturing cost for each contract (from Schedule 5), plus the claimed WHB suspension period (e.g., lost) by-product revenue for each contract (from Schedule 6).

*Claimed WHB Suspension Period (e.g., Lost) Lumber Sales, By Contract (Schedules 3, 3.A., 3.B., and 3.C.)*

As indicated in Schedule 3, the claimed WHB suspension period (e.g., lost) net lumber sales for each contract was determined as the sum of Period 1, Period 2, and Period 3 claimed WHB suspension period (e.g., lost) net lumber sales for each contract, less sales discounts (calculated at 1% of sales) for each contract. Period 1, Period 2, and Period 3 claimed WHB suspension period (e.g., lost) net lumber sales for each contract are summarized on Schedules 3.A., 3.B., and 3.C., respectively. Schedules 3.A., 3.B., and 3.C. multiply the weighted average sales price per MBF (LT) for each lumber product in each respective period (based on Precision Pine's Damages Calculations, Exhibits 5a, 5b, and 5c, respectively) by the amount of estimated footage of each lumber product produced for each contract in that period (based on Precision Pine's Damages Calculations, Exhibits 5a, 5b, and 5c, respectively).

*Claimed WHB Suspension Period Delivered Log Cost, By Contract (Schedules 4, 4.A., 4.B., 4.C., and 4.D.)*

As indicated in Schedule 4, the claimed WHB suspension period delivered log costs for each contract were determined as the sum of Period 1, Period 2, and Period 3 claimed WHB suspension period delivered log costs before severance tax for each contract, plus severance tax for each contract. Period 1, Period 2, and Period 3 claimed WHB suspension period delivered log costs before severance tax for each contract are

summarized on Schedules 4.A., 4.B., and 4.C., respectively. Schedules 4.A., 4.B., and 4.C. simply reformat the information contained in Exhibit 3 of Precision Pine's Damages Calculations to indicate total claimed WHB suspension period log costs (e.g., stumpage costs), miscellaneous costs, and logging and hauling costs on a contract-by-contract basis for each period. Severance tax for each contract was determined in Schedule 4.D. as the total claimed WHB suspension period timber harvested of each tree species under each contract (based on Exhibit 4 of Precision Pine's Damages Calculations) multiplied by the severance tax rate for each timber species (based on Exhibit 7 of Precision Pine's Damages Calculations).

*Claimed WHB Suspension Period Manufacturing Cost, By Contract (Schedule 5)*

Schedule 5 simply reformats the information contained in Exhibit 6 of Precision Pine's Damages Calculations to indicate total claimed WHB suspension period sawmill costs, planing costs, and freight costs on a contract-by-contract basis.

*Claimed WHB Suspension Period (e.g., Lost) By-Product Revenue, By Contract (Schedules 6, 6.A., 6.B., and 6.C.)*

As indicated in Schedule 6, the claimed WHB suspension period (e.g., lost) by-product revenue for each contract was determined as the sum of claimed WHB suspension period (e.g., lost) chip revenue, bark revenue, and shavings revenue for each contract. Claimed WHB suspension period (e.g., lost) chip revenue, bark revenue, and shavings revenue for each contract are calculated on Schedules 6.A., 6.B., and 6.C., respectively.

Schedule 6.A. calculates the amount of chips Precision Pine claims would have been produced under each contract in each period (in MBF (LT)) by multiplying the amount of lumber Precision Pine claims would have been produced under each contract in each period (in MBF (LT)) (based on Exhibits 5a, 5b, and 5c of Precision Pine's Damages Calculations) by the chip volume conversion factor indicated in Exhibit 7 to Precision Pine's Damages Calculations. Schedule 6.A. then calculates the claimed WHB

suspension period (e.g., lost) chip revenue for each contract by multiplying the amount of chips Precision Pine claims would have been produced under each contract in each period (in MBF (LT)) by the sales price Precision Pine claims it would have earned for each ton of chips produced in each period, as indicated in Exhibit 7 to Precision Pine's Damages Calculations. Schedule 6.A. then calculates the sum of claimed WHB suspension period (e.g., lost) chip revenue for each contract in Periods 1, 2 and 3 to determine the total claimed WHB suspension period (e.g., lost) chip revenue for each contract.

Schedules 6.B. and 6.C. perform similar calculations as those performed in Schedule 6.A. to determine total claimed WHB suspension period (e.g., lost) bark and shavings revenue for each contract, respectively.

*Alleged Post-Suspension Period Profits, By Contract (Schedule 7)*

As indicated in Schedule 7, alleged post-suspension period profits for each contract were determined as the sum of alleged post-suspension period "gross profits" for each contract (based on plaintiff's exhibit PX 182, Exhibits 1 and 2), plus adjustments for the Manaco contract[7] and the Kettle contract,[8] minus the alleged amount of post-suspension period grindings by-product revenue fore each contract (based on plaintiff's exhibit PX 182, Exhibit 2).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of April, 2008.

Todd D. Menenberg

[7] In Exhibit 8 of Precision Pine's Damages Calculations, Precision Pine deducted "profits related to harvest of 624 mbf (LS) on Manaco per court's direction" in its calculation of post-suspension profits. The $60,249.32 deduction equals 81% of the $74,381.88 total post-suspension profits calculated by Precision Pine for Manaco. (See the Court's Order Denying Plaintiff's Motion For Reconsideration And Directing Plaintiff To Submit Further Revised Damages Calculation, filed March 13, 2008, Exhibit 1).
[8] Exhibit 8 of Precision Pine's Damages Calculations, Precision Pine added $60,495 profit on the sale of Kettle to Stone Forest (per letter, dated December 29, 1997) to the $142,016.08 post-suspension profits calculated by Precision Pine for Kettle.